IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEAN H. DUSSIAS<br><br>Plaintiff,<br><br>v.<br><br>MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:21-cv-05709<br><br>JURY DEMANDED |

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

Defendants, Merri Gleckler ("Gleckler") and TMG Kreations, LLC ("TMG"), by their undersigned counsel, and for their Answer to the Complaint filed by Plaintiff, Dean H. Dussias ("Dussias"), state as follows:

**NATURE OF THE ACTION**

1. Dussias files this action to recover the fair and reasonable value of his ownership interest in TMG, which has been wrongfully withheld by Gleckler. The action arises from Gleckler's wrongful conduct in attempting to eliminate Dussias' ownership interest in TMG, in breach of the parties' agreement, and Gleckler's failure to compensate Dussias for such interest. Dussias seeks a declaration related to his rights and interest in TMG, an accounting and constructive trust on the amounts due and owing him currently and in the future, and damages for the breaches of contract, promissory estoppel, and fiduciary obligations. As an alternative to the breaches, Dussias seeks damages for the unjust enrichment Gleckler and TMG have received by virtue of their wrongful refusal to provide Dussias with the value of his ownership interest in TMG.

**ANSWER:** Defendants admit that Plaintiff has asserted the claims made in the Complaint, but deny Plaintiff's factual allegations and legal conclusions, and deny that Plaintiff is entitled to any relief in this action.

2. For more than 30 years, Dussias has led diverse businesses throughout the business cycle, at both private and public companies. His background includes working with high growth start-ups and mature businesses, strategy development, and turnaround situations. In or about May 2019, Dussias met with Gleckler, the CEO of TMG, better known as "Kashwere," a retailer of luxury clothing, bedding, and bath accessories. Dussias and Gleckler had known each other for approximately 10 years, since Dussias previously served as a consultant for TMG. During their meeting, Gleckler informed Dussias she was ending a business relationship with her then partner, Cedric Reingold ("Reingold") and Gleckler proposed to Dussias for him to join her as a co-owner and partner in TMG, and to take over Reingold's role. Dussias accepted Gleckler's offer and, in August 2019, Dussias began working with Gleckler at TMG.

**ANSWER:** Defendants lack knowledge sufficient to either admit or deny the first two sentences of paragraph 2. Defendants admit that in or about 2019, Dussias met with Gleckler who is the CEO of Kashwere, that Dussias and Gleckler had known each other for approximately 10 years at that time, and that Dussias had served as a consultant for TMG. Defendants admit that Dussias was informed of litigation involving Defendants and Reingold that ultimately ended Reingold's business relationship with Defendants and that Dussias began working with Gleckler as an employee in October 2019. Defendants deny the remaining allegations in paragraph 2.

3. Thereafter, Dussias stabilized and strengthened TMG's business in a variety of ways, including but not limited to its operations, accounting, marketing, and technology platforms. Gleckler consistently referred to Dussias as her co-owner and partner at TMG when communicating internally and to third parties. Gleckler never referred to Dussias as an employee

and he was not subject to an employment agreement. Dussias served as TMG's President. Dussias paid a capital contribution to TMG affirming his ownership interest in TMG. TMG paid Dussias and Gleckler as co-owners, where each received payments in the form of draws, consisting of distributions against future profits.

**ANSWER:** Defendants admit that Dussias for a certain time was employed as President of TMG. Defendants deny the remaining allegations in paragraph 3.

4. Between February and April 2021, counsel for Gleckler and Dussias exchanged communications to attempt to formalize, in writing, certain additional terms to TMG's Operating Agreement to address corporate governance, distributions, and leadership, in furtherance of Gleckler's desire to secure Women's Business Enterprise ("WBE") certification for TMG. Also, during this same period and under Dussias' leadership, TMG launched nearly all of its new infrastructure and technology rebuild. Subsequently, Gleckler purported to "terminate" Dussias' employment with TMG on April 22, 2021. Despite the numerous indices of Dussias' ownership interest in TMG, and Gleckler's repeated admissions that Dussias is a TMG owner (not an employee), Gleckler has refused to acknowledge her breach of their agreement. Accordingly, Dussias brings this action to recover his ownership interest in TMG.

**ANSWER:** Defendants admit that counsel for Defendants drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias to agree to in writing if he desired to pursue an opportunity to acquire a membership interest in TMG. Defendants admit that counsel for Defendants and for Dussias also communicated in 2021. Defendants admit that Dussias' employment with TMG was terminated on or about April 22, 2021. Defendants deny the remaining allegations in paragraph 4.

## PARTIES

5. Dussias is an individual residing in Winnetka, Cook County, Illinois.

**ANSWER:** Admitted.

6. Gleckler is an individual residing in Scottsdale, Maricopa County, Arizona.

**ANSWER:** Admitted.

7. TMG is a Delaware limited liability company with its principal place of business located in Northbrook, Cook County, Illinois.

**ANSWER:** Defendants admit that TMG is a Delaware limited liability company with its principal place of business in Arizona. Defendants deny the remaining allegations in paragraph 7.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 735 ILCS 5/2-209 since the Defendants, individually and collectively, conduct business in Illinois, and TMG, the business that is the subject of this dispute, at all times maintained its principal place of business in Illinois.

**ANSWER:** Defendants admit that this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Defendants admit that TMG conducts business in Illinois. Defendants deny the remaining allegations in paragraph 8.

9. Venue is proper in Cook County, Illinois, pursuant to 735 ILCS 5/2-101 because TMG's principal place of business is located in Cook County, Illinois, and Dussias' work on behalf of TMG was, at all relevant times, in Cook County, Illinois.

**ANSWER:** Defendants admit that venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1441. Defendants deny the remaining allegations in paragraph 9.

## FACTS

### I. Background On The Parties' Relationship

10. Dussias and Gleckler first became acquainted in or about 2009, when Dussias performed due diligence work regarding a transaction involving TMG. Thereafter, in or about 2013, Gleckler, on behalf of TMG, engaged Dussias to perform consulting work for TMG.

**ANSWER:** Defendants admit that Gleckler first met Dussias before she had ownership of TMG. Defendants admit that Dussias performed some consulting work for TMG. Defendants deny the remaining allegations in paragraph 10.

11. In his prior role as a consultant, Dussias became familiar with Kashwere's business model and developed a business relationship with TMG's owners, Gleckler and Reingold.

**ANSWER:** Defendants admit that Dussias previously acted as a consultant for TMG and necessarily had business-related interactions with TMG's then-owners, Gleckler and Cedric Reingold. Defendants deny the remaining allegations in paragraph 11.

12. In or about May 2019, Dussias met with Gleckler in Arizona.

**ANSWER:** Defendants admit that Dussias visited Arizona while vacationing with his family in or about May 2019 and during that visit he briefly met with Gleckler. Defendants deny the remaining allegations in paragraph 12.

13. During their meeting, Gleckler advised Dussias she was involved in litigation with Reingold. Gleckler informed Dussias she expected a resolution of the dispute with Reingold would result in his exit from TMG.

**ANSWER:** Defendants admit that Dussias, while on vacation with his family in Arizona in or about May 2019 briefly met with Gleckler. Defendants deny the remaining allegations in paragraph 13.

14. Gleckler and Dussias discussed that, upon Reingold's departure, Dussias would be her business partner and co-owner in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 14.

15. Gleckler and Dussias further engaged in multiple communications relative to Dussias' joining TMG and the scope of his equity in the company.

**ANSWER:** Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020, which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing. Defendants further admit that counsel for Defendants and for Dussias communicated about the opportunity. Defendants deny that any agreement was ever reached. Defendants deny the remaining allegations in paragraph 15.

16. On or about July 4, 2019, Gleckler confirmed in writing to Dussias that upon joining TMG, the scope of his ownership in TMG would include the following:

> "1. 20% Equity up until 5 million in sales then it increases to 30% Equity"
>
> "2. Should the company [TMG] be sold for under 5 million [,] Equity reverts back to 20%, 5 million and above . . . 30% Equity"
>
> "3. Should Merri [Gleckler] want to get out earlier than Dean [Dussias], Merri [Gleckler] will let Dean [Dussias] know and give him the ability to buy Merri [Gleckler] for the same offer"
>
> "4. Dean [Dussias] will receive pay of $8,000 a month: Timing TBD."
>
> "5. Shares will be transferred after March 15 final payment to Cedric [Reingold] but we can create a side agreement until then to confirm all."
>
> "6. Dean [Dussias] can *openly* work with Merri [Gleckler] once agreement is signed. (Believe by end of July)."

**ANSWER:** The July 4, 2019 communication referenced is a written document that speaks for itself, and Defendants deny the allegations in paragraph 16 to the extent they are

inconsistent with or are an improper characterization of that document. Defendants deny the remaining allegations in paragraph 16.

17. Gleckler confirmed Dussias would be a TMG co-owner. Initially, Dussias would own a 20% equity interest and then it would grow to a 30% equity interest after TMG's sales exceeded $5 million per annum. Subsequently, as further detailed below, in June 2020, Gleckler and Dussias finalized Dussias' ownership interest in TMG at 30%, with such equity interest to commence on July 1, 2020. Thereafter, neither Gleckler nor Dussias would receive base salaries, but only distributions from their respective 70% and 30% ownership interests in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 17.

18. Gleckler's confirmation of Dussias' interest in TMG was never for Dussias to merely serve as a TMG employee, but to be a TMG owner.

**ANSWER:** Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants deny any confirmation of Dussias actually acquiring any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 18.

19. Dussias was never subject to an employment agreement with TMG.

**ANSWER:** Defendants admit that the terms of Dussias' employment by TMG were not in a written employment agreement, but were governed by a valid and enforceable oral agreement

for Dussias to act as President of TMG. Defendants deny the remaining allegations in paragraph 19.

20. Gleckler never referred to Dussias as a TMG employee.

**ANSWER:** Defendants deny the allegations in paragraph 20.

**II. Dussias' Role At TMG**

21. Dussias, relying upon his discussions with Gleckler and Gleckler's written confirmation of their business relationship should he join TMG, commenced working with Gleckler at TMG in August 2019, and, initially, was not compensated.

**ANSWER:** Defendants admit that Dussias began working for TMG in 2019. Defendants deny the remaining allegations in paragraph 21.

22. Dussias focused his early work on TMG's accounting, enterprise resource planning ("ERP"), and general ledger ("GL") systems.

**ANSWER:** Defendants admit that Dussias performed certain work for TMG when he first started his employment at TMG, including working on accounts receivable. Defendants deny the remaining allegations in paragraph 22.

23. Dussias worked closely with TMG personnel at the TMG warehouse located in Northbrook, Cook County, Illinois.

**ANSWER:** Defendants admit that Dussias performed certain work at the TMG warehouse in Northbrook while he was employed at TMG. Defendants deny the remaining allegations in paragraph 23.

24. Within a short period at TMG, by the end of September 2019, Dussias led TMG warehouse operations since Reingold stopped his work at TMG. Thereafter, Reingold assisted Dussias on a transition basis only.

**ANSWER:** Defendants deny the allegations in paragraph 24.

25. In addition to running warehouse operations, Dussias began to assume Reingold's other responsibilities, including but not limited to all of TMG's accounting and finance activities, accounts payable, accounts receivable, TMG payroll, and technology management.

**ANSWER:** Defendants deny the allegations in paragraph 25.

26. In this capacity, Dussias created a strategy and framework to create enterprise value for TMG, all of which was discussed extensively with Gleckler, and included but was not limited to the following: (1) focusing on TMG's stability and a successful transition following Reingold's exit from the company; (2) rebuilding TMG's systems, processes, and infrastructure across marketing, distribution, operations, accounting, and, eventually, sales; and (3) delivering profitable growth from a rebuilt business foundation.

**ANSWER:** Defendants deny the allegations in paragraph 26.

27. At the time Dussias joined TMG in August 2019, Gleckler and Reingold each shared a 50% equity interest in TMG, and were working toward execution of a Membership Interest Purchase Agreement (the "MIPA"), for Gleckler to acquire Reingold's equity interest in TMG.

**ANSWER:** Defendants admit that in August 2019, Gleckler and Reingold were each 50% owners in TMG and were working toward a membership interest purchase agreement for TMG to redeem Reingold's interest. Defendants deny the remaining allegations in paragraph 27.

28. Gleckler expressed to Dussias that she did not want her intentions for Dussias' role with TMG to be disclosed to Reingold.

**ANSWER:** Defendants deny the allegations in paragraph 28.

29. As of October 2019, Dussias pointed out to Gleckler that TMG's balance sheet was weak and he coordinated TMG's obtaining of a $500,000 loan in order to purchase additional inventory to fund sales.

**ANSWER:** Defendants admit that a loan was obtained in or about October 2019 but not for inventory or sales, and that Dussias was responsible for finding the proposed loan. Defendants deny the remaining allegations in paragraph 29.

30. Dussias continued to lead TMG's growth strategy, whereby Dussias, among other activities, handled the following: (1) led the engagement of a marketing/branding specialist, and (2) strategized regarding the approach for terminating and replacing a TMG licensee based in Japan. At all relevant times, throughout these discussions and meetings with third parties, Gleckler referred to Dussias as her partner, never as an employee.

**ANSWER:** Defendants deny the allegations in paragraph 30.

31. Beginning in or about November 2019, Dussias led TMG's work to select (1) a new web platform, whereby TMG switched from Magento to Shopify; (2) a new ERP/GL system, with a transition to NetSuite; (3) a new WMS/shipping service, known as ShipStation; (3) new ancillary services to enable Kashwere's digital marketing platform and a scalable store; and (4) outsource TMG's warehouse operations to a new third party logistics (3PL) provider, known as Bergen Logistics.

**ANSWER:** Defendants admit that Dussias, in his role as President of TMG, was responsible for various tasks, including but not limited to implementing a new website with Anatta Design, transitioning TMG to NetSuite, and transitioning TMG to a new third party logistics warehouse, Bergen Logistics. Defendants deny the remaining allegations in paragraph 31.

32. Dussias' activities were designed to rebuild Kashwere, the TMG brand, from the inside, including all of its processes, personnel, distribution, and the brand, all of which would support revenue growth, increase profitability, and create value for TMG.

**ANSWER:** Defendants deny the allegations in paragraph 32.

33. At all relevant times, Dussias kept Gleckler apprised of his activities, all geared toward the long–term, profitable growth of TMG. In addition to the growth strategy and infrastructure rebuild described above, Dussias began to focus his work and attention to (1) strengthen TMG's balance sheet; (2) change the relationship with TMG's licensee based in Japan; (3) improve TMG's relationships with suppliers; and (4) eventually develop an improved TMG presence in Europe.

**ANSWER:** Defendants deny the allegations in paragraph 33.

34. Due in substantial part to Dussias' efforts, TMG's sales increased substantially in fiscal year 2020, rising approximately 30% over 2019, despite the COVID-19 pandemic.

**ANSWER:** Defendants admit that TMG's sales increased in fiscal year 2020. Defendants deny the remaining allegations in paragraph 34.

## III. The TMG Operating Agreement

35. On information and belief, TMG was formed on or about December 15, 2009.

**ANSWER:** Admitted.

36. On information and belief, TMG's only Operating Agreement was executed on December 30, 2009. A true and accurate copy of the Operating Agreement is attached hereto as Exhibit 1.

**ANSWER:** Defendants admit that Exhibit 1 is a copy of TMG's operating agreement, and state that the operating agreement is a written document that speaks for itself, and Defendants

deny the allegations in paragraph 36 to the extent they are inconsistent with or are an improper characterization of that document.

37. Pursuant to the terms of the Operating Agreement, Gleckler and Reingold were each identified as the sole Members and shared an equal 50% ownership interest in TMG.

**ANSWER:** Defendants state that the operating agreement is a written document that speaks for itself, and Defendants deny the allegations in paragraph 37 to the extent they are inconsistent with or are an improper characterization of that document.

38. On information and belief, following Gleckler's and Reingold's execution of the MIPA, Reingold's ownership interest in TMG was terminated in or about late 2019 or early 2020.

**ANSWER:** Defendants admit that Reingold's membership interest was acquired in 2019 following execution of a membership interest purchase agreement by Reingold. Defendants deny the remaining allegations in paragraph 38.

39. After the MIPA was finalized, Gleckler never presented the Operating Agreement to Dussias or required him to execute any documents relating thereto.

**ANSWER:** Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants deny that Dussias ever acquired any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 39.

40. Instead, at all relevant times, following Gleckler's acquisition of Reingold's interest, Gleckler referred to Dussias as her co-owner and partner in TMG, orally, by conduct, and in written communications to third parties.

**ANSWER:** Defendants admit that Gleckler may have referred to Dussias as a business partner in anticipation that the negotiations and acquisition documents with Dussias would be completed in the near future, but denies that referring to him as such was any admission that he had already acquired any membership interest in TMG since the intent was for Dussias to acquire membership through written documents including an amended operating agreement to protect against the type of litigation Gleckler had previously experienced. Defendants further admit that there were communications between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants deny that Dussias ever acquired any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 40.

41. Gleckler never presented any document to Dussias to sign to confirm the terms of the Operating Agreement, or for Dussias to consent that his ownership interest was subject to and bound by the Operating Agreement or pursuant to any other document.

**ANSWER:** Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating

Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants deny that Dussias ever acquired any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 41.

**IV. Dussias As A Member Of TMG**

42. At the end of January 2020 and early February 2020, Dussias met with Gleckler, and Gleckler's husband, Rob Gleckler, in Arizona, and discussed TMG completing its obligations related to the MIPA with Reingold, with Dussias thereafter to formalize his ownership interest in TMG.

**ANSWER:** Defendants admit that Dussias met with Gleckler and her husband in or about January 2020 in Arizona. Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants deny that Dussias ever acquired any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 42.

43. As of March 2020, the MIPA was finalized. TMG made its final payment to Reingold and, thereafter, TMG had no further obligations to Reingold.

**ANSWER:** Admitted.

44. During the Spring of 2020, Dussias continued to work to strengthen TMG's performance and operations, which included his selection of Shopify as TMG's web platform, Anatta Design as TMG's lead web development group, and NetSuite as its enterprise resource planning system and general ledger.

**ANSWER:** Defendants admit that Dussias, in his role as President of TMG, was responsible for various tasks, including but not limited to implementing a new website with Anatta Design, transitioning TMG to NetSuite, and transitioning TMG to a new third party logistics warehouse, Bergen Logistics. Defendants deny the remaining allegations in paragraph 44.

45. In addition, throughout this period, Dussias led TMG's finalizing of contracts with multiple vendors, including but not limited to NetSuite, Anatta Design, and Shopify. Dussias executed each of these vendor contracts, with Gleckler's knowledge and approval, on behalf of TMG. Further, Dussias maintained a continuous, daily leadership presence over all employee activity and operations at TMG's warehouse in Northbrook, Illinois. Dussias was also responsible for the hiring and firing of warehouse staff, all of which coincided with the early stages of the COVID-19 pandemic when many businesses were shuttered.

**ANSWER:** Defendants admit that Dussias, in his role as President of TMG, was responsible for various tasks, including but not limited to implementing a new website with Anatta Design, transitioning TMG to NetSuite, and transitioning TMG to a new third party logistics warehouse, Bergen Logistics. Defendants admit that Gleckler was aware of contracts entered into with Anatta Design, NetSuite, and Bergen Logistics. Defendants deny the remaining allegations in paragraph 45.

46. On March 28, 2020, TMG sent an email blast to approximately 16,000 Kashwere customers, with a subject line entitled "Kashwere for you, family and friends" (the "March 2020 Email"). In the March 2020 Email, TMG notified its customers regarding its founding principles;

a 20% discount offer for the purchase of its products; and a charitable donation Kashwere was making to an organization supporting healthcare workers. At the conclusion of the email, TMG specifically identifies its two "Owners" as Gleckler and Dussias.

**ANSWER:** The March 28, 2020 e-mail referred to is a written document that speaks for itself, and Defendants deny the allegations in paragraph 46 to the extent they are inconsistent with or are an improper characterization of that document. Further answering, Defendants state that the original version of the e-mail drafted by Gleckler was only signed by Gleckler as CEO, but that Dussias insisted that his name be added to the e-mail and that he be referred to as an "owner." Gleckler accepted Dussias' change to the e-mail to add his name and the word "owners" because she expected that the negotiations with Dussias would soon be completed, that he would operate in good faith to complete the negotiations, and the definitive acquisition documents and an amended operating agreement would be executed in the near future which would have added Dussias as a member in TMG. Those things did not occur. Defendants deny the remaining allegations in paragraph 46.

47. Thereafter, beginning in June 2020, Gleckler and Dussias engaged in discussions with David Lazar ("Lazar") to join TMG and to continue to accelerate the building of Kashwere's digital retail presence. In that capacity, Lazar's role was to enable TMG's digital presence and ensure its success in marketing directly to consumers. Moreover, the eventual goal was to bring Kashwere products to prominent retailers, such as Nordstrom and other similar retailers. Gleckler and Dussias also discussed with Lazar his potential to obtain an equity interest in TMG. During those discussions, Gleckler and Dussias specifically advised Lazar that Gleckler owns a 70% interest in TMG, and Dussias owns a 30% interest in TMG.

**ANSWER:** Defendants admit that Dussias unilaterally suggested and discussed a potential business relationship with David Lazar where he would buy-in to become a member in

TMG and assist in marketing TMG to consumers. Defendants deny the remaining allegations in paragraph 47.

48. Ultimately, Lazar joined TMG solely as a consultant, without any equity interest.

**ANSWER:** Admitted.

49. Prior to Lazar's joining TMG, Gleckler and Dussias further discussed and finalized the economics of their relationship at TMG, including Dussias' ownership interest. They agreed that, after July 1, 2020, Gleckler and Dussias would each receive distributions against their respective share of profits.

**ANSWER:** Defendants deny the allegations in paragraph 49.

50. In mid-June 2020, Gleckler and Dussias agreed that each would receive one-time distributions of 70% ($17,916.50 to Gleckler) and 30% ($7,678.50 to Dussias), with such distributions paid by TMG to Gleckler and Dussias on June 15, 2020.

**ANSWER:** Defendants admit that Gleckler received a one-time payment of $17,916.50 and Dussias received a one-time payment of $7,678.50 on or about June 15, 2020. Defendants deny the remaining allegations in paragraph 50.

51. Gleckler and Dussias further agreed Gleckler would receive a $25,000 monthly draw as TMG's co-owner, and Dussias would receive a $15,000 monthly draw as TMG's co-owner, and that these payments would serve as distributions against their share of profits.

**ANSWER:** Defendants admit that Gleckler and Dussias discussed that once written documents were agreed upon and after Dussias would sign written acquisition documents and an amended operating agreement to acquire a membership interest in TMG, Dussias would receive $15,000 per month. Defendants deny the remaining allegations in paragraph 51.

52. On June 30, 2020, pursuant to Dussias' agreement with Gleckler regarding his ownership in TMG, Dussias made a capital contribution of $20,000 to TMG.



LEGAL\59786642\1

**ANSWER:** Defendants admit that Dussias unilaterally made an unauthorized payment of $20,000 to TMG which was never requested, never contemplated, and Gleckler was not notified that he was going to, or that he made that payment. Defendants deny that any capital contribution for TMG, even if requested or authorized, should have been made to TMG instead of to the entity that owned TMG's membership interests, and deny that this payment was a capital contribution at all. Defendants deny the remaining allegations in paragraph 52.

53. In addition to their respective monthly draws, TMG paid Gleckler's and Dussias' monthly health care premiums and vehicle/expense allowances. Such payments were only made to TMG's owners, and not paid to any TMG employees.

**ANSWER:** Defendants admit that TMG paid Gleckler's, Dussias', and other employees' various benefits including health care premiums and vehicle/expense allowances. Defendants deny the remaining allegations in paragraph 53.

54. On a going forward basis, after July 1, 2020, Gleckler continued as TMG's CEO and Dussias continued as TMG President. Both Gleckler and Dussias each were paid their respective monthly draws ($25,000 to Gleckler and $15,000 to Dussias), health care premiums, and vehicle/expense allowances, consistent with their agreed upon respective ownership interests of 70% and 30% in TMG.

**ANSWER:** Defendants admit that Gleckler served and serves as TMG's CEO. Defendants admit that Dussias served for a certain period as TMG's President. Defendants admit that Gleckler during a certain period received compensation from TMG in the amount of $25,000 per month and received health care premiums and vehicle/expense allowances. Defendants admit that Dussias for a certain time received compensation from TMG in the form of a salary for his employment as President of TMG in the amount of $15,000 per month and received health care

premiums and vehicle/expense allowances. Defendants deny the remaining allegations in paragraph 54.

55. In or about November 2020, TMG's Annual Report was filed with the Illinois Secretary of State, with Dussias identified as both TMG's President and as an Owner.

**ANSWER:** Defendants admit that Dussias unilaterally and without authority to do so filed a false annual report in or about November 2020. The annual report filed by Dussias is a written document that speaks for itself, and Defendants deny the allegations in paragraph 55 to the extent they are inconsistent with or are an improper characterization of that document.

**IV. Negotiation Of An Amended Operating Agreement**

56. By the end of 2020, Gleckler and Dussias discussed the need to assemble an Amended Operating Agreement, since Gleckler sought to obtain WBE certification for TMG.

**ANSWER:** Defendants admit that Gleckler sought WBE certification for TMG. Defendants deny the remaining allegations in paragraph 56.

57. Between approximately February and April 2021, Gleckler and Dussias, through their respective counsel, exchanged multiple drafts of proposed Amended Operating Agreements to discuss additional terms regarding corporate governance, distributions, and leadership, in furtherance of Gleckler's desire to secure WBE certification for TMG.

**ANSWER:** Defendants admit that communications occurred between Gleckler and Dussias including through counsel for Defendants who drafted a term sheet that was delivered to Dussias in or about May 2020 which outlined proposed amendments to TMG's Operating Agreement under certain required conditions and terms for Dussias' to agree to in writing if he desired to pursue an opportunity to acquire a certain percentage membership interest in TMG over time and under certain conditions which were to be in writing but that the term sheet was never executed. Defendants admit that counsel for Defendants and for Dussias also communicated in

2021 and that drafts of proposed amended operating agreements were exchanged. Defendants deny that Dussias ever acquired any membership interest in TMG since Defendants always intended that any such acquisition would be through written and executed documents. Defendants deny the remaining allegations in paragraph 57. Defendants further state that those drafts are written documents that speak for themselves, and Defendants deny the allegations in paragraph 57 to the extent they are inconsistent with or are an improper characterization of those documents.

58. Through the process of reviewing the additional terms exchanged by the parties, Gleckler and Dussias also included TMG's accountant, Ray Conway ("Conway").

**ANSWER:** Defendants admit that Ray Conway had some involvement relating to the proposed draft amendments to the operating agreement. Defendants deny the remaining allegations in paragraph 58.

59. During those discussions with Conway, including email communications on February 18, 2021, Gleckler advised Conway regarding Dussias' ownership in TMG whereby Gleckler specifically stated: "Dean is a Member not a Manager."

**ANSWER:** Defendants admit that Gleckler gave Dussias the opportunity to acquire membership through a written agreement and further admit that Gleckler never intended Dussias to become a manager of TMG. Defendants admit that Gleckler stated "Dean is a Member not a Manager" in an e-mail because Dussias submitted a draft document to Conway that Dussias prepared that stated he was to be a manager of TMG, which was false and never contemplated. Defendants further state that the February 18, 2021 e-mail referred to is a written document that speaks for itself, and Defendants deny the allegations in paragraph 59 to the extent they are inconsistent with or are an improper characterization of that document. Defendants deny the remaining allegations in paragraph 59.

## V. Gleckler's Improper Attempt To "Terminate" Dussias

60. On April 22, 2021, counsel representing Gleckler and TMG sent a letter to Dussias' counsel informing Dussias that Gleckler and TMG "will not be pursuing the completion of the offer of membership into the Company by your client, Dean Dussias" (the "April 22 Letter").

**ANSWER:** Defendants state that the April 22, 2021 letter referred to is a written document that speaks for itself, and Defendants deny the allegations in paragraph 60 to the extent they are inconsistent with or are an improper characterization of that document.

61. The April 22 Letter ignored the fact that, in July 2019, as a condition to Dussias' joining TMG, Gleckler confirmed to him in writing an ownership interest in TMG. In return, Dussias accepted Gleckler's proposal and thereafter commenced working on behalf of TMG. Indeed, after Reingold exited TMG, Gleckler notified approximately 16,000 customers that she and Dussias were "Owners."

**ANSWER:** Defendants deny the allegations in paragraph 61.

62. Further, the April 22 Letter ignored the fact that, in June 2020, Gleckler requested and Dussias agree to formalize his ownership whereby Dussias would not receive any base compensation, but only distributions. Beginning July 1, 2020, Dussias was only to be entitled and paid distributions by TMG, with no other compensation paid to him other than (i) the equity value of his 30% ownership of TMG; and (ii) health care benefits and vehicle/expense allowance, which were only paid to TMG's owners, Gleckler and Dussias.

**ANSWER:** Defendants deny the allegations in paragraph 62.

63. The April 22 Letter further stated that the offer of membership was "predicated on your client performed [sic] certain roles and responsibilities for the Company," and states that since the offer was made, Dussias "has a [sic] made a series of mismanagement decisions, entered

into deceptive behaviors, breached his fiduciary duties, and failed to perform critical tasks that has placed the Company in a serious financial and logistics issue."

**ANSWER:** Defendants state that the April 22, 2021 letter referred to is a written document that speaks for itself, and Defendants deny the allegations in paragraph 63 to the extent they are inconsistent with or are an improper characterization of that document.

64. Collectively, each of the foregoing allegations in the April 22 Letter are false and without any factual support.

**ANSWER:** Defendants deny the allegations in paragraph 64.

65. Moreover, the allegations contained in the April 22 Letter constitute a misleading pretext for Gleckler to attempt to withhold and revoke Dussias' ownership interest which she promised to Dussias upon joining TMG with Reingold's departure, and which Dussias accepted.

**ANSWER:** Defendants deny the allegations in paragraph 65.

66. Dussias, through counsel, replied in detail to the April 22 Letter, outlining the myriad of ways the allegations in the April 22 Letter are completely and utterly false. To date, the parties have been unable to resolve this matter and thus, Dussias has initiated this action to recover the fair and reasonable value of his ownership interest in TMG.

**ANSWER:** Defendants state that Dussias' reply correspondence referred to is a written document that speaks for itself, and Defendants deny the allegations in paragraph 66 to the extent they are inconsistent with or are an improper characterization of that document. Defendants deny the remaining allegations in paragraph 66.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT

67. Dussias realleges and incorporates paragraphs 1 through 66 as through fully stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 66 as though fully stated herein.

68. TMG remains in operation and continues to conduct business as Kashwere.

**ANSWER:** Admitted.

69. Gleckler, on behalf of TMG, has impermissibly withheld Dussias' ownership interest in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 69.

70. Dussias is entitled to an allocation of thirty percent (30%) of TMG's profits from July 1, 2020, and continuing to date, consistent with his ownership interest in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 70.

71. Dussias is entitled to payment of the fair and reasonable amount representing thirty percent (30%) of TMG's equity value.

**ANSWER:** Defendants deny the allegations in paragraph 71.

72. Dussias has an inadequate remedy at law.

**ANSWER:** Paragraph 72 is a legal conclusion to which no answer is required. To the extent an answer is deemed required, Defendants deny the allegations in paragraph 72.

73. As a result of the above and foregoing, there is an actual case in controversy between Dussias and the Defendants.

**ANSWER:** Paragraph 73 is a legal conclusion to which no answer is required. To the extent an answer is deemed required, Defendants deny the allegations in paragraph 73.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

## COUNT II
## ACCOUNTING AND CONSTRUCTIVE TRUST

74. Dussias re-alleges and incorporates by reference paragraphs 1 through 73 as though they were fully set forth and stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 73 as though fully stated herein.

75. Gleckler and TMG owe fiduciary duties to Dussias with respect to the payment to Dussias of thirty percent (30%) of TMG's profits from July 1, 2020, and continuing to date, consistent with his ownership interest in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 75.

76. Gleckler was at all relevant times in a position of trust and confidence with respect to Dussias in the performance of her duties as CEO of TMG.

**ANSWER:** Defendants deny the allegations in paragraph 76.

77. Dussias cannot account for the allocation of profits earned by TMG, because Dussias does not control the books and records of TMG, as such financially information is solely controlled by Gleckler.

**ANSWER:** Defendants admit that Dussias does not control the books and records of TMG. Defendants deny the remaining allegations in paragraph 77.

78. Gleckler and TMG have not accounted to Dussias with respect to the payments owed to Dussias for his interest in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 78.

79. Dussias has an inadequate remedy at law.

**ANSWER:** Paragraph 79 is a legal conclusion to which no answer is required. To the extent an answer is deemed required, Defendants deny the allegations in paragraph 79.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

## COUNT III
## BREACH OF CONTRACT

80. Dussias re-alleges and incorporates by reference paragraphs 1 through 79 as though they were fully set forth and stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 79 as though fully stated herein.

81. TMG, Gleckler, and Dussias, by their collective conduct, including oral and written communications, created a valid and enforceable agreement, whereby Gleckler and Dussias each served as co-owners of TMG.

**ANSWER:** Defendants deny the allegations in paragraph 81.

82. In exchange for Gleckler's promise of ownership, Dussias commenced working on behalf of TMG. Dussias stabilized and strengthened TMG's business in a variety of ways, including but not limited to its operations, accounting, and technology platforms, beginning in August 2019, and continuing to April 2021.

**ANSWER:** Defendants deny the allegations in paragraph 82.

83. Dussias' leadership of TMG included, but not was not limited to, the selection of (1) a new web platform, whereby TMG switched from Magento to Shopify; (2) a new ERP/GL system, with a transition to NetSuite; (3) a new WMS/shipping service, known as ShipStation; (3) a new ancillary services to enable Kashwere's digital marketing platform and scalable store; and (4) a new third party logistics (3PL) provider, known as Bergen Logistics.

**ANSWER:** Defendants admit that Dussias, in his role as President of TMG, was responsible for various tasks, including but not limited to implementing a new website with Anatta

Design, transitioning TMG to NetSuite, and transitioning TMG to a new third party logistics warehouse, Bergen Logistics. Defendants deny the remaining allegations in paragraph 83.

84. TMG's sales increased substantially in fiscal year 2020, rising approximately 30% over 2019, despite the COVID-19 pandemic, due in large part to Dussias' foregoing activities on behalf of TMG.

**ANSWER:** Defendants admit that TMG's sales increased in fiscal year 2020. Defendants deny the remaining allegations in paragraph 84.

85. Dussias fully performed and satisfied the terms of the parties' agreement.

**ANSWER:** Defendants deny the allegations in paragraph 85.

86. Gleckler and TMG materially breached the agreement by:

a. wrongfully and impermissibly attempting to terminate Dussias' interest in TMG;

b. failing and refusing to adequately account to Dussias concerning the expenses incurred, and the profits earned, by TMG;

c. failing to allocate thirty percent (30%) of TMG's profits to Dussias from July 1, 2020, and continuing to date, consistent with his ownership interest in TMG;

d. failing to pay Dussias the fair and reasonable amount representing thirty percent (30%) of TMG's equity value.

**ANSWER:** Defendants deny the allegations in paragraph 86, including subparts a. through d.

87. Dussias has sustained damages in an amount to be proven at trial, proximately caused by TMG and Gleckler's breach of the agreement.

**ANSWER:** Defendants deny the allegations in paragraph 87.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**

88. Dussias re-alleges and incorporates by reference paragraphs 1 through 87 as though they were fully set forth and stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 87 as though fully stated herein.

89. Gleckler has an obligation of loyalty and good faith in their dealings with Dussias with respect to TMG.

**ANSWER:** Defendants deny the allegations in paragraph 89.

90. Gleckler has a fiduciary duty to Dussias with respect to Dussias' ownership interest in TMG and such amounts distributable to Dussias consistent with said interest.

**ANSWER:** Defendants deny the allegations in paragraph 90.

91. Gleckler breached her fiduciary duties to Dussias by:

a. failing and refusing to adequately account to Dussias concerning the expenses incurred, and the profits earned, by TMG;

b. failing to allocate thirty percent (30%) of TMG's profits to Dussias from July 1, 2020, and continuing to date, consistent with his ownership interest in TMG; and

c. failing to pay Dussias the fair and reasonable amount representing thirty percent (30%) of TMG's equity value.

**ANSWER:** Defendants deny the allegations in paragraph 91, including subparts a. through c.

92. Dussias has sustained damages as a direct and proximate result of Gleckler's breaches of her fiduciary duties.

**ANSWER:** Defendants deny the allegations in paragraph 92.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

**COUNT V**
**PROMISSORY ESTOPPEL**

93. Dussias re-alleges and incorporates by reference paragraphs 1 through 92 as though they were fully set forth and stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 92 as though fully stated herein.

94. Gleckler made an unambiguous promise to Dussias that, should he join her at TMG, Dussias would serve as a co-owner of TMG.

**ANSWER:** Defendants deny the allegations in paragraph 94.

95. At all relevant times, through and including April 2021, Dussias worked on behalf of TMG, as its co-owner, in reliance upon such promise by Gleckler.

**ANSWER:** Defendants deny the allegations in paragraph 95.

96. Dussias' reliance upon Gleckler's promise was expected and foreseeable by Gleckler.

**ANSWER:** Defendants deny the allegations in paragraph 96.

97. Dussias relied upon Gleckler's promise to his detriment, and has been wrongfully denied his ownership interest in TMG.

**ANSWER:** Defendants deny the allegations in paragraph 97.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Pled In the Alternative to Count III)**

98. Dussias re-alleges and incorporates by reference paragraphs 1 through 79, and 88 through 97, as though they were fully set forth and stated herein.

**ANSWER:** Defendants reallege and incorporate their Answers to paragraphs 1 through 79 and 88 through 97 as though fully stated herein.

99. Throughout the period August 2019, to and including April 2021, TMG and Gleckler received the benefit of Dussias' services.

**ANSWER:** Defendants admit that Dussias was employed by TMG from October 1, 2019 to April 2021, and failed to adequately perform services for TMG during that time. Defendants deny the remaining allegations in paragraph 99.

100. Dussias performed his duties for TMG and Gleckler in reliance upon Gleckler's promise to Dussias that such work was performed in his capacity as a co-owner of TMG.

**ANSWER:** Defendants deny the allegations in paragraph 100.

101. Notwithstanding TMG's and Gleckler's receipt of the benefit of Dussias' services in reliance upon Gleckler's promises, TMG and Gleckler have failed to remit to Dussias such amounts to which he is entitled as a co-owner of TMG.

**ANSWER:** Defendants deny the allegations in paragraph 101.

102. TMG and Gleckler's retention of the ownership interest earned by Dussias was to the detriment of Dussias, and violates the principles of justice, equity, and good conscience.

**ANSWER:** Defendants deny the allegations in paragraph 102.

**WHEREFORE**, Defendants request that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

DEFENDANTS DEMAND A JURY ON ALL COUNTS SO TRIABLE.

## AFFIRMATIVE DEFENSES

Defendants, without waiving any of their denials contained in the foregoing Answer, assert the following Affirmative Defenses to the Complaint, without assuming the burden of proof for matters for which the burden is not normally upon the responding party:

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted against Defendants for the reasons including, but not limited to, those stated in Defendants' Motion to Dismiss.

### Second Affirmative Defense

Plaintiff's claim for damages is barred by the doctrines of waiver, ratification, estoppel, and/or equitable estoppel, on the grounds that Plaintiff voluntarily chose not to sign an amended operating agreement, term sheet, or other formal acquisition documents, and was aware of the requirements to become a member of TMG, through multiple communications including a term sheet drafted by Defendants' counsel and presented to Dussias for signature, and Dussias did not satisfy those requirements..

### Third Affirmative Defense

Plaintiff's claim for damages is barred on the grounds that Plaintiff's employment relationship was terminable at will.

### Fourth Affirmative Defense

Plaintiff's claim for damages is barred by the doctrines of waiver, release, laches, estoppel, forfeiture and/or unclean hands. Dussias understood that a writing was required by Defendants, the Operating Agreement, and under applicable law for him to acquire the proposed membership interest and that Defendants would require a written and executed amended operating agreement to protect Defendants from the type of litigation it had previously endured. Dussias, despite

multiple opportunities, refused to sign proposed writings drafted by Defendants' counsel and instead engaged in misleading, false and manipulative actions, including but not limited to making an unauthorized payment purported to be a "capital contribution" and changing payroll and corporate filings without the knowledge or authority of Gleckler to falsely reflect Dussias as a member or manager.

**Fifth Affirmative Defense**

Plaintiff's claim for damages is barred as a result of its material breach of the alleged contract by taking actions that were not in the best interests of TMG for the sole purpose of benefitting Plaintiff to manipulate Defendants and to orchestrate falsities for Plaintiff's own benefit and to the detriment of Defendants as further alleged in Defendants' Counterclaim, and by failing and refusing to execute written acquisition documents, including an amended operating agreement.

**Sixth Affirmative Defense**

Plaintiff's claim for damages is barred by his fraud and breach of fiduciary duty by making representations and taking actions that were not in the best interests of TMG, including unilateral conduct performed with the purpose of making it appear falsely as though Plaintiff was a member and manager of TMG, including but not limited to making an unrequested and unprompted $20,000 payment and filing an annual report naming Dussias as a manager and member, acting in an intentional or grossly negligent manner in the performance of his duties as TMG's president, and otherwise acting in bad faith as outlined in Defendants' Counterclaim.

**Seventh Affirmative Defense**

The TMG operating agreement contained an express condition for membership that a signed consent form be executed by the prospective member, and Plaintiff failed to meet this condition precedent.

**Eighth Affirmative Defense**

Plaintiff's claim for damages is barred by the doctrine of equitable estoppel because Dussias made representations and promises to Defendants that he had expertise and qualifications to perform the tasks required as President of TMG, that he would act in the best interests of TMG, and that he would sign written documents reflecting any proposed acquisition of a membership interest in TMG, Defendants relied on these representations and promises, but Dussias purposely did not live up to his word, instead engaging in self-dealing to benefit himself at the expense of TMG as further alleged in Defendants' Counterclaim.

**Ninth Affirmative Defense**

Plaintiff's claim for damages is barred because any alleged agreement between the parties was merely an "agreement to agree" in the future which is too indefinite and uncertain to be enforced, as demonstrated by the numerous communications, drafts, and proposals exchanged between the Defendants and Plaintiff and their respective counsels.

**Tenth Affirmative Defense**

Defendant's claims are barred, in whole or in part, by the Statute of Frauds.

**Eleventh Affirmative Defense**

Defendant reserves the right to raise additional affirmative defenses as discovery progresses and as the interests of justice require.

**WHEREFORE**, Defendants requests that this Court dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants, and award Defendants their costs, expenses, attorneys' fees, interest, and all other relief as the Court may deem just and proper.

## COUNTERCLAIM

Defendants/Counter-Plaintiffs, Merri Gleckler ("Gleckler") and TMG Kreations, LLC ("TMG"), by their undersigned attorneys, Cozen O'Connor, and for their Counterclaim against Plaintiff/Counter-Defendant, Dean H. Dussias ("Dussias"), allege as follows:

## NATURE OF THE ACTION

1. Gleckler joined TMG more than decade ago, and painstakingly built it into the successful business that it is today. TMG manufactures and sells boutique clothing, décor, and spa products. TMG is governed by an operating agreement (the "Operating Agreement"), which provides that Gleckler and her former partner, Cedric Reingold ("Reingold"), were the sole members and owners of TMG. The Operating Agreement (and controlling Delaware law) also clearly and unambiguously provides that a signed consent form must be executed to admit any new member. In 2018, a dispute arose between Gleckler and Reingold that resulted in a lawsuit by Gleckler. Ultimately, that case was resolved and TMG redeemed Reingold's interest in the company.

2. Gleckler was introduced to Dussias years before becoming involved with TMG in 2009. Dussias had consulted for TMG several times and had first-hand knowledge of TMG's business and the issues that Gleckler was experiencing with Reingold, even consulting privately with Gleckler at times regarding these issues. During an informal, friendly meeting, Gleckler informed Dussias generally about the litigation, prompting Dussias to frequently make comments



LEGAL\59786642\1

such as Gleckler had "selected the wrong partner" and that it "should have and could have been" Dussias as her partner.

3. It was upon hearing that Gleckler's dispute with Reingold had reached a head and gone to litigation that that Dussias saw an opportunity. Dussias, knowing the success of TMG and apparently seeing Gleckler as vulnerable, betrayed Gleckler's trust by concocting a scheme to lie about his qualifications, offer his services to TMG, and ultimately propose himself as Gleckler's new business partner. Once hired, Dussias intended to (and did) take unilateral and unauthorized actions, and engaged in self-dealing, all in an effort to create an outward appearance that he was a partner and owner of TMG and to obtain control of TMG to steal the business from Gleckler.

4. Playing up his purported expertise and qualifications, Dussias was hired by Gleckler who allowed him to serve as President of TMG while Gleckler served as CEO. As Gleckler and many others affiliated with or who worked with TMG later learned, all of Dussias' representations turned out to be lies and a scheme to manipulate Gleckler. Dussias lacked the business knowledge to perform adequately as an officer of the company, lacked the appropriate and necessary knowledge of TMG, and lacked any basic knowledge or understanding of business technology and finance, two of the primary assignments he convinced Gleckler he should handle based on his purported past experience. Dussias' willful misconduct or, at the very least, gross negligence in his performance, as detailed herein, cost TMG over $1 million in damages to date. TMG is still suffering from several of the negative impacts caused by Dussias' actions.

5. Based on Dussias' lies and overstated credentials, Dussias and Gleckler engaged in discussions for Dussias to potentially become an eventual 30% owner of TMG. Dussias, aware at all times of the requirements of the Operating Agreement that any new member must sign a written consent form to acquire an interest in and to become admitted as a member, exchanged numerous

drafts and communications which included term sheets and even proposed amended operating agreements with Gleckler to reflect his proposed ownership interest. All of those documents and discussions made abundantly clear that nothing was final until a definitive agreement was signed. Gleckler and counsel made it known to Dussias that Gleckler would require written and executed documents so she could maintain control of TMG and to avoid disputes with any new member of TMG, as she experienced with Reingold.

6. After recognizing in the discussions that Gleckler was not simply going to hand over 30% of the business to him without specific written and executed documents which make clear that Gleckler maintained control of the business, and that any membership interest would be subject to a vesting period and other terms to protect Gleckler from a repeat of the situation in the past that resulted in litigation, Dussias put his scheme into motion. He refused to sign the term sheet prepared by Defendant's lawyers, delayed in retaining his own lawyer, otherwise drew out the negotiations and discussions, rejected all of the drafts and submitted self-serving counterproposals which if executed would have effectively given Dussias equal control over TMG. At the same time, he began engaging in unilateral, unauthorized self-dealing without notice to Gleckler, to give the outward appearance that he was already a member in TMG, all in an effort to strong-arm Gleckler into either recognizing him as an owner in TMG or buying out his purported "share" of the business.

7. For example, as discussed below, Dussias made a unilateral and unauthorized payment of $20,000 to a TMG account which was never requested by TMG or Gleckler, and that Gleckler was never told of when made. Dussias now claims this was a "capital contribution" reflecting his ownership interest in TMG. However, not only was there never any agreement or writing reflecting any "capital contribution" by Dussias, but also the proposal (as expressed in a

term sheet prepared by Defendants' counsel in 2020) was for Dussias to acquire a membership interest in return for services rendered over a 3-year vesting period, not by any capital contribution. Further, $20,000 does not come close to reflecting the value of a 30% interest in TMG and that money was not even paid to the entity that owns TMG. Dussias' payment was merely an effort, as part of his scheme, to support his fraudulent and false argument made in his lawsuit that he is a member "by implication," and that Gleckler somehow "waived" the requirement that membership acquisitions be in writing. To that end, Dussias also unilaterally submitted a TMG annual report to the Illinois Secretary of State, without advising Gleckler, which changed the company information on file to falsely reflect that Dussias was member and manager of TMG – even though he never agreed to the written proposal for acquiring a membership interest and even though Gleckler never intended him to be a manager since she wanted to maintain full control of her company even if she admitted any new members. Once again, Dussias merely intended to bolster his fraudulent claim that he is a member by implication in TMG.

8. Dussias' scheme did not end there. At the same time, he engaged in conduct intended to hurt the business so that he could devalue TMG and either attempt to convince Gleckler to sell her interest to him at an artificially low price, or try to convince Gleckler that she needed to place Dussias in control of the business to keep TMG afloat. Dussias often failed to pay and lied to vendors, willfully failed to implement critical systems, and lied to Gleckler and intentionally kept her out of the loop and encouraged others to keep her out of the loop on business activities, all resulting in substantial and continuing financial and operational damage to TMG.

9. By this Counterclaim, TMG and Gleckler seek redress for Dussias' egregious and malicious conduct, which, to date, has caused TMG more than $1 million in damages as well as damaged TMG's reputation in the marketplace.

## THE PARTIES

10. Gleckler is an individual residing in Scottsdale, Arizona. Gleckler joined TMG in 2009 and holds her ownership in TMG through MerriG, LLC.

11. TMG is a Delaware limited liability company with its principal place of business located in Scottsdale, Arizona. TMG was formed in 2009 and is in the business of manufacturing and selling boutique clothing, décor, and spa products direct to consumers online.

12. Dussias is an individual residing in Winnetka, Illinois.

## FACTUAL BACKGROUND

### A. The Operating Agreement and TMG's Redemption of Reingold's Interest

13. TMG is governed by the Operating Agreement, which was executed on December 30, 2009. (A true and correct copy of the Operating Agreement is attached hereto as Exhibit A).

14. The Operating Agreement is governed by Delaware law. (Operating Agreement, § 10.2).

15. The Operating Agreement specifically provides that the acquisition of a membership interest ***must be in writing*** and under the condition of being bound by the terms of the Operating Agreement. (*Id.*, § 7.2).

16. Section 7.2 of the TMG Operating Agreement expressly provides that:

> A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless Members holding a majority of the Membership Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

(*Id.*).

17. The referenced Exhibit C to the Operating Agreement provides: "The undersigned agrees to be bound as a Member by the terms of the Operating Agreement of TMG as if the undersigned was a signatory thereof." (*Id.*, p. 11).

18. Moreover, Article 10.1 of the Operating Agreement states that it "constitutes the whole and entire agreement . . . and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members." (*Id.*, § 10.1).

19. Exhibit B of the Operating Agreement lists its members as Gleckler and Reingold. (*Id.*, p. 10). Gleckler holds her membership interest in TMG through MerriG, LLC.

20. In or about 2018, a dispute arose between Gleckler and Reingold, resulting in a Delaware lawsuit entitled *MerriG, LLC and Merri Gleckler v. Cedric Reingold and TMG Kreations, LLC*, C.A. No. 2018-0772-MTZ. Reingold ultimately entered into a Membership Interest Purchase Agreement dated September 18, 2019, in which Reingold's membership interest was redeemed by TMG's ownership.

**B. Dussias is Hired as President of TMG**

21. Gleckler was introduced to Dussias prior to Gleckler's involvement in TMG in 2009. Dussias had previously performed certain limited consultant services for TMG.

22. During a friendly, informal meeting, Gleckler informed Dussias generally of the litigation involving Reingold. Gleckler had periodic conversations with Dussias where she discussed the issues with Reingold that had been raised in the litigation, believing she could trust Dussias. Dussias would at times privately consult Gleckler on some of these issues.

23. Shortly after learning that Reingold would be departing TMG, Dussias pitched himself to Gleckler to become her new business partner and an officer of TMG. He represented to Gleckler that he was an experienced businessman with an understanding of TMG's business, and

he purported to have vast experience in particular with leveraging technology and finance to assist in the growth and operation of the business.

24. Based on Dussias' representations and in reliance on Dussias' statements about his prior experience and his alleged abilities and know-how, Gleckler hired Dussias to act as President of TMG.

**C. Dussias and Gleckler Discuss Dussias Obtaining an Interest in TMG**

25. In or about the spring of 2020, after he learned that Reingold would be departing TMG, Dussias proposed himself to become Gleckler's new business partner and to become a part-owner in TMG. Gleckler was open to the idea as she, at that time, believed Dussias' statements that his prior experience could help her grow the business. With the idea of Dussias eventually acquiring a partial membership interest in TMG, Gleckler and Dussias thereafter engaged in discussions and negotiations, including eventually through attorneys, for Dussias to acquire a 30% membership interest in TMG.

26. Gleckler, not wanting to risk being placed in a situation where she would again have to get involved in litigation over control of her business, worked with her counsel to prepare documents to present to Dussias for signature. Gleckler and her counsel repeatedly during this period of time advised Dussias, both in writing and orally, that any agreement needed to be in writing and that nothing was final until a written agreement acceptable to TMG and Gleckler was signed. Gleckler and her counsel were adamant about this point because, as expressed to Dussias repeatedly (and which he was indisputably clear on and well aware of), Gleckler wanted to be protected from litigation over ownership of her business similar to what she had dealt with in the past.

27. At all relevant times, Dussias was aware of the terms of the existing Operating Agreement, including the requirement in § 7.2 that that any new member must sign a written consent form before being admitted as a new member. In fact, in his role as a consultant nearly a decade earlier, Dussias reviewed and discussed with Gleckler and Reingold this same provision.

28. In a May 7, 2020 e-mail to Dussias, Gleckler copied and pasted a note from her counsel to Gleckler and Dussias, which attached a term sheet and confirmed, consistent with many other communications to Dussias both in writing and orally, that a signed writing was absolutely necessary before Dussias could acquire any membership interest in TMG:

> Outlined is the Term Sheet that will outline your proposed ownership in TMG as well as the duties and policies/procedures for the operation of TMG on a go-forward basis . . . I know that you have known Merri for a number of years and were with her as she was dealing with the litigation regarding the buyout of her former co-owner. Some of the provisions included in the Term Sheet as well as the eventual Operating Agreement, once we come to agreement on the Term Sheet, are designed to prevent a similar situation from happening with you or with any other additional member, if any, in the future. I use these terms and provisions on a regular basis, especially when a new member is coming into an existing and operating business. . . .

29. The Term Sheet attached to the e-mail, which was titled as a term sheet for a "Revised and Restated Operating Agreement," provided:

> *The Term Sheet is non-binding except as expressly set forth below. It is not a complete description of the terms of any proposed transaction, is for discussion purposes only and does not create, and is not intended to create, a binding or enforceable contract between the parties or any duty on any person to negotiate toward a binding contract. Each party reserves the right to terminate discussion with respect to the acquisition of membership in TMG and the revised Operating Agreement at any time and for any reason. This summary may not be relied upon by any person as the basis for a contract by estoppel or otherwise.*
>
> ***
>
> Either party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG and the ancillary and associated agreements by notice in writing at any time prior to the execution of definitive agreements between them.

(A true and correct copy of the Term Sheet is attached as Exhibit B).

30. The Term Sheet provided that Gleckler would remain the sole manager of TMG, and that Dussias would acquire up to a 30% interest, subject to the following vesting schedule:

> Dean will be entitled to acquire a twenty-percent (20%) Membership Interest in TMG in return for services rendered as well as completion of a 3 year vesting period. He may be given an additional ten percent (10%) Membership Interest in the Company in the event that TMG has greater than $5M in sales by December 31, 2020. In the event that the sales metric is not met, Dean shall not be entitled to the additional ten percent (10%). The vesting period may be accelerated in the event of a sale or change of control.
>
> ***
>
> Dean will contribute services for his Membership Interests in the Company. The Membership Interests will vest over a 3-year period. Until Dean's Membership Interests are fully vested, he shall be entitled to participate in votes. He will still be involved in providing Merri all necessary information that she needs to make decisions for TMG as the sole Managing Member.

(*Id.*).

31. Dussias confirmed that he received the Term Sheet, and stated that he would "send you back a redline after I have reviewed it, etc."

32. On June 7, 2020, Dussias e-mailed Gleckler a rewritten Term Sheet which still contained identical disclaimer language:

> *The Term Sheet is non-binding except as expressly set forth below. It is not a complete description of the terms of any proposed transaction, is for discussion purposes only and does not create, and is not intended to create, a binding or enforceable contract between the parties or any duty on any person to negotiate toward a binding contract. Each party reserves the right to terminate discussion with respect to the acquisition of membership in TMG and the revised Operating Agreement at any time and for any reason. This summary may not be relied upon by any person as the basis for a contract by estoppel or otherwise.*

(A true and correct copy of Dussias' Revised Term Sheet is attached as Exhibit C).

33. Dussias' rewritten term sheet did not contain any vesting period and provided that Dussias would immediately become a 30% owner and a manager of TMG. It provided that "Merri

will not remain as the sole Managing Member," and that Dussias "will become a Member and be a Manager of the Company." (*Id.*). Defendants did not agree to Dussias' rewritten version of the term sheet and did not agree to any of Dussias' other proposals which contradicted the terms proposed by Defendants.

34. Dussias' rewritten term sheet provided that:

> The restructure and admission of Dean as a Member in the Company shall be conditioned on both parties being satisfied with a revised Amended and Restated Operating Agreement and the terms and conditions contained therein.
>
> ***
>
> Either party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG and the ancillary and associated agreements by notice in writing at any time prior to the execution of definitive agreements between them.

(*Id.*).

35. No version of the Term Sheet was ever signed.

36. Thereafter, Gleckler and Dussias exchanged drafts of an amended operating agreement to reflect Dussias' potential acquisition of a membership interest in TMG.

37. Dussias attempted to change the language of the draft amended operating agreement multiple times, and each time Gleckler rejected Dussias' version because he repeatedly added language that purported to make him a manager of TMG and eliminated any vesting period. Gleckler was clear on many occasions that while she was open to the idea of Dussias eventually becoming a member through acquisition of a portion of the membership interest in TMG, she never intended anyone other than her to be the manager of TMG.

38. Despite having no agreement on terms, on January 1, 2021, Dussias e-mailed Gleckler just the signature page of one of the drafts of the amended operating agreement, signed by Dussias and which stated that he was a "manager" of TMG, and requested that she sign the

form in an attempt to trick her into agreeing to Dussias' self-serving terms. Gleckler refused to and never did sign what Dussias presented to her.

39. Other additional drafts were exchanged in February 2021. However, no agreement on the terms was ever reached and no amended operating agreement was ever signed.

40. In or about April 2021, as outlined in detail below, Gleckler learned from conversations with vendors, clients, consultants, and others associated with TMG, that all of Dussias' purported credentials and "accomplishments" for TMG were untrue, that Dussias had actually been lying to Gleckler and others, hiding information and communications from Gleckler, and effectively sabotaging the business.

41. On April 22, 2021, one of the counsel for Defendants sent a letter to Dussias' counsel informing Dussias that Gleckler and TMG "will not be pursuing the completion of the offer of membership into the Company by your client, Dean Dussias."

42. The April 22, 2021 letter was consistent with the unsigned Term Sheets, which provided that either party may terminate the discussions by written notice at any time prior to the execution of definitive written agreements between the parties.

43. TMG suffered substantial costs in attorneys' fees relating to the negotiations with Dussias that ultimately turned out to be, as discussed below, in bad faith and based on a false pretense that Dussias was trustworthy, competent, and qualified to be involved in TMG's business.

**D. Dussias Engages in Unauthorized, Unilateral Conduct and Self-Dealing In Order to Give the False Outward Appearance That He Was Already a Member of TMG**

44. Shortly after receiving the initial Term Sheet that contained a three-year vesting period that was contingent on Dussias competently performing his job, which he knew he could not do, Dussias began, without notice to Gleckler, taking unilateral and unauthorized actions for the sole purpose of giving the outward appearance that he was already a member in TMG.

45. For example, on or about June 30, 2020, Dussias made an unauthorized and unilateral payment of $20,000 into a TMG account, which he now characterizes as a "capital contribution." Dussias did not inform Gleckler, either in writing or orally, that he would be making any deposit for the purported purpose of a capital contribution. In fact, the proposal for Dussias to acquire a membership interest was for Dussias to provide services instead of paying in capital. Dussias made this payment despite there being no agreement on the then-existing value of the company to determine any capital contribution, no agreement on any terms for him becoming a member, and no signed writing.

46. At no time did Gleckler or TMG request this payment. There are no documents or receipts or communications memorializing or reflecting that Gleckler agreed to such a payment or that this payment was a "capital contribution." The payment was made to a TMG account and not even made to the entity that owns the membership interests of TMG. The payment amount, $20,000, is also an arbitrary number and does not reflect the value at that time of a 30% ownership interest in TMG.

47. Dussias never disclosed this payment to Gleckler, nor did she immediately discover it on her own, as in her misplaced trust of Dussias, Gleckler allowed him full access and control over TMG's bank account. Dussias casually mentioned the deposit during a phone call much later, and claimed that he did it for his personal taxes, not because it was any sort of "capital contribution." When she learned of the deposit, Gleckler communicated to Dussias that she was very unhappy that he made this type of deposit without her knowledge and without any agreement or authorization.

48. Gleckler learned through a Chase fraud alert in or about January 2022 that Dussias, without Gleckler's knowledge or authorization, had requested and received from the bank a TMG

company debit card, something that Gleckler did not even have. When questioned about this, Dussias falsely told her that he did not request it and the bank "just sent it to him."

49. Gleckler also later learned that in November 2020, Dussias filed a TMG annual report with the Illinois Secretary of State, which falsely identified Dussias as a member and manager of TMG.

50. Once again, Dussias did not disclose this filing to Gleckler at any time, nor was he authorized to name himself as a member or manager of TMG.

51. Gleckler has also learned from one of TMG's technology consultants that Dussias had told him as soon as he was hired by TMG in 2019 that he was an owner and partner of TMG, and that his wife also owned shares in the company. These statements were part of Dussias' scheme, were false, and were known by Dussias to be false.

52. As part of his scheme to eventually take control of the business, Dussias also instructed this consultant not to copy Gleckler on e-mails, and when she was copied, Dussias would angrily call the consultant and question why Gleckler was copied, and ask that he "trust the chain of command."

53. In another instance in March 28, 2020, Gleckler prepared an e-mail on behalf of TMG that was signed "Merri Gleckler, CEO." Dussias convinced Gleckler to have the e-mail state that Dussias was also an owner, and changed the document to be signed by "Merri Gleckler and Dean Dussias, Owners." Trusting Dussias would operate in good faith and expecting the negotiations to be completed and final documents to soon be executed, Gleckler agreed to Dussias' desired change. It is now clear that Dussias had an ulterior motive and wanted his name listed as an "owner" solely so that he could argue in his lawsuit that he was a member "by implication."

54. When Dussias was acting as President of TMG, he was a W-2 employee. In 2021, Dussias unilaterally changed his TMG payroll status, without adequate discussion or explanation to Gleckler, to 1099-NEC (nonemployee compensation). This designation was improper and misleading, as Dussias had not yet executed any agreements to become a member, and was at all relevant times a W-2 employee of TMG acting as its President.

55. Upon Dussias' hiring as President of TMG, he was instructed by Gleckler to obtain all of TMG's account information for various services, websites, and bank accounts, as well as all of TMG's passwords, and put those accounts in Gleckler's name only. Instead, he changed or established most, if not nearly all, of the account access logins and passwords solely to his name. This included TMG's Amazon seller account, which only Dussias had access to, and which he did not revert back to TMG, forcing Gleckler to have to reopen and prove her ownership of TMG to Amazon, which caused delays in processing Amazon sales, and caused TMG to incur costs, expenses and damage to reputation.

56. Gleckler has also learned that Dussias signed numerous forms and agreements on behalf of TMG without Gleckler's authority, and often communicated falsely that he was a manager, member, or owner of TMG. Gleckler at no time gave Dussias authority to sign on behalf of the company as a member or manager, or to refer to himself as a member or manager of the company. Dussias was given the title of President but was not authorized to represent himself as a member or manager of TMG.

57. All of the foregoing actions were taken by Dussias with the purpose of creating an outward appearance that Dussias was a member and manager of TMG, when he was not, as part of Dussias' scheme to take control of the business and now claim membership "by implication,"

or that Gleckler somehow "waived" any requirement that a new member must sign definite, written documents prior to being admitted as a new member.

58. Understanding that Defendants would not agree in writing to terms that would give Dussias the ability to take control of the business but only to eventually allow him to acquire, after fulfilling certain requirements, up to a 30% interest in TMG, Dussias intended, as he is doing in this lawsuit, to rely on fraudulent and unauthorized actions to argue that he was a member "by implication" or "waiver," and to force Gleckler into giving him a 30% membership without any vesting schedule and without Dussias providing certain required services, and/or forcing Gleckler to buy out his manufactured membership interest.

**E. <u>Dussias Attempts to Sabotage TMG, Grossly Mismanaging the Business</u>**

59. Gleckler has also since learned that Dussias, once he realized that Defendants would not agree in writing to terms that would give Dussias the ability to take control of the business, not only lied about everything that he "achieved" for TMG, but mismanaged the business in such a way that the only reasonable conclusion is that it was intentional. Dussias' purpose in doing so was to artificially devalue the business so that he could either convince Gleckler to allow him to buyout her interest at an artificially low price, or so that he could play "hero" and argue to Gleckler that the business was struggling and that Dussias is the only person who could save it and should be made a member and manager and given control of the business.

60. Dussias was tasked with overseeing three crucial TMG items: the implementation of a new website; the conversion to a new operating system, NetSuite; and the company's move to a new third party logistics warehouse (moving away from the self-managed warehouse TMG had used for over a decade). Dussias' efforts failed miserably at all three of these tasks and TMG

has had to incur significant time, expense, and damage to reputation to correct the impacts of Dussias' actions.

61. With regards to the website, Anatta was selected as the web developer to design and implement TMG's new website. The agreed-upon cost of the rebuild was to be $120,000, and was to be completed within 6 months.

62. Dussias failed to inform Gleckler that there were substantial delays with the project, most if not all caused purposefully by Dussias. Gleckler was informed by Anatta that Dussias had, without Gleckler's knowledge, unilaterally extended the work order via a "gentleman's agreement" with no set terms, no scope of work, no timeline, no date or deadlines for deliverables, and no signed written amendment to the original work order. Gleckler did not learn of this "gentleman's agreement" until after Dussias' employment was terminated. Given the egregious terms of this "gentleman's agreement" which did not in any way benefit TMG, and in fact harmed TMG, it is clear Dussias intentionally sabotaged the website project.

63. Dussias also inexplicably failed to submit Anatta's invoices for payment for multiple months.

64. At one point, Gleckler questioned Dussias why the website was taking so long, and instead of answering, Dussias got angry and told Gleckler that he was "on top of it" and doing everything he could to complete the website. These were lies.

65. The website was completed very late, well after Dussias' employment was terminated, and ultimately was removed and had to be scrapped because it was not performing adequately. The project failed miserably and ended up costing $60,000 over budget, for a total of $180,000, and TMG had to incur more time and expense to create an entirely new website built from scratch, which is still not complete.

66. Dussias also executed an agreement with Loop Returns in August 2020, which was to be part of the integration for the new website. Dussias entered into this agreement with an immediate effective date – despite the website being nowhere near complete. This agreement should have been effective when it could be installed and implemented. As a result, TMG made 9 months of payments for a service that had no benefit to TMG.

67. Gleckler learned in June 2021 from one of TMG's technology consultants that Dussias instructed him not to include Gleckler on any e-mails relating to the website. The consultant also informed Gleckler that Dussias failed to pay invoices on time, and failed to respond to important requests and concerns relating to the website. These actions resulted in damages to Defendants.

68. Dussias was informed by this consultant that business sales were declining because of the slow speed of the website and other content requirements. Instead of addressing this issue, Dussias brushed it under the rug and blamed the slow sales on the "market." Dussias never informed Gleckler of the concerns raised about the website performance, and never took any action to remedy the website performance. Gleckler had to discover these concerns on her own, much later.

69. Dussias was also responsible for the installation and integration of NetSuite, a new operating system. NetSuite was to replace the prior operating system, and was essential to the operation of the company, including warehouse management, inventory, ordering, order fulfillment, financials, accounts payable, and accounts receivable.

70. Upon the conversion, Dussias failed to secure access to financial and proprietary information, such that this critical information was not available to employees of TMG. Dussias also completely mismanaged the mapping of NetSuite and the input of information into the system,

causing substantial delays and extra work to fix these issues and to accurately complete TMG's books and records going forward.

71. Dussias was also informed that the inventory may have been duplicated upon the transfer from the prior system to NetSuite, however, Dussias did not inform Gleckler of this, and made no effort to correct it in the system, resulting in inventory not being properly accounted for and accounts payable and accounts receivable not being properly applied.

72. In August 2021, Gleckler was informed by the bookkeeping vendor hired by Dussias that the way the sales transactions were mapped into NetSuite by Dussias "doesn't make sense and makes it difficult to try to reconcile the bank accounts as we have to make manual journal entries to move transactions over into the Chase Bank Account." The bookkeeper has since informed Gleckler of innumerable other serious problems with Dussias' implementation of NetSuite.

73. Dussias was also responsible for locating a new third party logistics warehouse after the Illinois warehouse lease expired on April 30, 2021. Once a warehouse was located, the integration between NetSuite and Bergen Logistics (TMG's then-new e-commerce fulfillment vendor) was essential to a smooth transition. The integration needed to be completed prior to the end of April 30, 2021, to ensure TMG would be able to ship orders from its warehouse through Bergen, and the integration required a *minimum* of approximately 8-10 weeks to complete.

74. Gleckler learned on April 19, 2021 (11 days prior to the expiration of the existing warehouse lease) that not only was the integration not complete, but it had not yet even begun. In fact, no preparation had even begun. Dussias failed to complete even the elementary task of cleaning and organizing the warehouse for the move. As a result, TMG was forced to extend the prior warehouse lease 2 months past the original April 30 deadline at substantial additional cost

and expense. Dussias' delay and failure was willful and malicious, and intended to cause harm to TMG.

75. Gleckler later learned from NovaModule (the integration service between NetSuite and Bergen) that the agreement which was executed by Dussias had never been implemented. The project was never even kicked off. Shipping from Bergen could not be completed until the minimum 7-8 week integration process with NovaModule was completed, resulting in even more delays and costs.

76. In addition, all of the products and inventory needed to be moved from the Illinois warehouse to Bergen. All inventory and products required inventory control barcodes for Bergen to receive in the product and to perform inventory management and order fulfillment. This physical integration of inventory management was to be spearheaded by Dussias so that Bergen could receive all of the inventory with the inventory control barcode labels already on the products. TMG was to order, print, and apply the inventory control barcode labels prior to the move to Bergen. The only thing completed was that stickers were ordered. As a result, TMG incurred substantial additional expense, shipping time, and damage to reputation, when Bergen had to print and apply the stickers when the products were received, instead of having the factory and TMG employees perform the task prior to the transition to Bergen. Despite touting his competency in such tasks, Dussias could not even handle the basis task of moving inventory properly. His failures could only have been willful, and caused great harm to TMG.

77. Dussias' sabotage regarding Bergen continues to drastically harm TMG both operationally (including shipping costs) and in terms of reputation. Dussias failed to provide Bergen with any scope of work, guidelines, or direction of any kind, including instructions on picking and packing products. Bergen has improperly cut off 100% of factory carton tops,

damaged product in transit, mixed products in cartons, consistently shipped products late, and had and continue to have many other problems in fulfilling TMG's orders. TMG now has to transition, yet again, to another third-party logistics warehouse, and in doing so has incurred substantial expense and damage to reputation in removing product from Bergen's warehouse, and temporarily storing/shipping product from Gleckler's home and 3 storage units until the new warehouse is in place. Had Dussias provided Bergen with a scope of work and proper guidelines, these damages would not have been incurred. And again, Dussias had falsely ensured Gleckler that he was competent, qualified, and experienced to spearhead this project due to his years of expertise.

78. Dussias also hired Supporting Strategies as the bookkeeper for TMG in October 2020 without Gleckler's knowledge. It was only when Gleckler told Dussias that TMG should hire a bookkeeper that she learned, months after Dussias signed the engagement letter, that he had already hired a bookkeeper. However, Dussias repeatedly failed to provide any of the bookkeepers' contact information or the terms of their agreement even after repeated requests in writing from Gleckler. Despite executing an agreement in October 2020, Dussias did not onboard Supporting Strategies, so that they were not able to provide any services for TMG until Gleckler completed the onboarding process herself much later.

79. After Dussias' employment was terminated, the bookkeeper notified Gleckler in May 2021 what had transpired with Dussias prior to Gleckler's involvement. The bookkeeper highlighted that Dussias had been completely unresponsive, uninterested, and failed to provide key information regarding the NetSuite transition, thereby hindering the process. According to the bookkeeper, Dussias did not know where items had gone after the NetSuite conversion, causing balances not to be applied to anything in NetSuite. Dussias also repeatedly refused and failed to provide the bookkeeper with requested third-party account information.

80. Dussias' failure to provide even basic information needed to complete vital tasks was a complete abdication of his duties as President and a bad faith effort to hurt TMG for the sole purpose of gaining leverage in his negotiations with Gleckler.

81. Dussias was also responsible for setting up TMG's accounts with Zonos, a vendor that provides services relating to international commerce, and Avalara, a vendor that provided tax collection services. Dussias, however, failed to properly set up the accounts, resulting in negative feedback from international customers, further damage to TMG's business reputation, and additional time and expense to fix Dussias' errors and properly implement these systems. Incredibly, Dussias did not even activate the Zonos account for Canada and Hawaii.

82. Dussias also failed to follow any semblance of corporate governance. He signed multiple agreements on behalf of TMG without authority and without informing Gleckler, even though Gleckler was the sole manager of TMG. He failed to have corporate resolutions properly prepared and executed to authorize his various unilateral actions. Indeed, no corporate resolutions were ever prepared for any of the contracts described above.

83. Dussias also hired a "director of technology" and then failed to use him or allow him to assist in implementing any of the vital technology, including NetSuite.

84. Dussias consistently failed to pay vendor invoices on time, sometimes falling behind by six months or more, and sometimes never paying at all.

**COUNT I**
**(Breach of Fiduciary Duty)**

85. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 84 as though fully set forth herein.

86. TMG is a Delaware LLC and the TMG Operating Agreement is governed by Delaware law.

87. As President of TMG and an officer of the company who had managerial responsibilities and exercised substantial control over the business, Dussias owed a fiduciary duty to TMG and its owner, Gleckler, including a duty of care and a duty of undivided and unqualified loyalty, honesty, and trust towards TMG and Gleckler.

88. Gleckler and TMG placed a special trust in Dussias to perform the critical duties necessary as President and an officer of TMG.

89. As President and an officer of TMG, and being granted substantial control and managerial responsibilities over the business, Dussias had a special duty to protect the interests of TMG and its owner, Gleckler.

90. From the inception of his employment with TMG until his termination, Dussias did not comply with his fiduciary duties, engaging in activities and self-dealing for his own benefit and to the detriment of TMG and Gleckler.

91. Dussias breached his fiduciary duties to TMG and Gleckler by:

a) Taking unilateral and unauthorized actions without Gleckler's consent;

b) Taking unilateral and unauthorized actions to create the outward appearance that he was a member or manager of TMG;

c) Undertaking actions for his own benefit without obtaining authorization and without disclosing those undertakings to Gleckler;

d) Representing to third parties falsely that he was a member or manager of TMG;

e) Failing to carry out his duties as President of TMG with due care;

f) Intentionally and/or grossly negligently failing to carry out his duties as President of TMG;

g) Acting in bad faith in carrying out his duties as President of TMG;

h) Failing to act in the best interests of TMG and Gleckler at all times;

i) Otherwise breaching his fiduciary duties to TMG and Gleckler.

92. Because a claim for breach of fiduciary duty permits the remedy of disgorgement and complete forfeiture of compensation and benefits paid by a business entity to its fiduciary during a time when the fiduciary was breaching his duty to the business, Dussias has no right to recovery of any amounts he has alleged in his Complaint and is also required to disgorge and forfeit all compensation and benefits he was paid by TMG during the years when he was breaching his duty to TMG and Gleckler.

93. Dussias' breach of fiduciary duty has proximately caused TMG and Gleckler to incur damages, in an amount to be proven at trial, in the form of compensation and other benefits paid to Dussias under the belief that Dussias was acting at all times with due care and engaging in activities for the benefit of TMG rather than activities which solely benefitted Dussias.

94. TMG and Gleckler have also incurred substantial additional expense as a result of Dussias' breaches of fiduciary duty, including but not limited to, attorneys' fees in connection with the negotiations with Dussias, costs and expenses associated Dussias' intentional and/or grossly negligent failure to perform his duties as President of TMG with due care, and damage to TMG's reputation.

**WHEREFORE**, Counter-Plaintiffs, TMG and Gleckler, respectfully request that this Court enter judgment in their favor and against Counter-Defendant, Dussias, and enter an Order:

a) Requiring Dussias to disgorge all compensation and other benefits paid to him during the years when he was in breach of his fiduciary duties in an amount in excess of $100,000;

b) Awarding TMG and Gleckler compensatory damages in an amount to be proven at trial, but in excess of $1 million;

c) Awarding TMG and Gleckler punitive/exemplary damages for Dussias' intentional, deliberate, and willful misconduct;

d) Granting such other and further relief as the Court deems equitable and just.

## COUNT II
## (Breach of Employment Agreement)

95. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 as though fully set forth herein.

96. Dussias was hired by TMG as its President, and his employment was governed by a valid, enforceable, oral employment agreement.

97. Under the oral agreement, Dussias was required to act in the best interests of TMG at all times, and to competently and adequately perform his duties as President. The duties assigned to Dussias included, but were not limited to, leveraging technology to help grow the business, such as implementing a new website and a new operating system (NetSuite), transitioning TMG to a new third party logistics warehouse, as well as handling TMG's finances, accounts receivable, and budgeting.

98. In his role as President, Dussias was initially compensated at a salary of $12,000 per month in 2019, which was then reduced to $8,000 a month going forward. Dussias also received insurance benefits, reimbursed expenses, and a vehicle allowance.

99. Dussias breached his employment agreement with TMG by:

a) Taking unilateral and unauthorized actions without Gleckler's consent;

b) Failing to adequately carry out his duties as President of TMG, as described herein, including but not limited to, failing to implement a new website, failing

to transition TMG to NetSuite, and failing to transition TMG to a new third-party logistics warehouse, among other failures;

c) Failing to act in the best interests of TMG at all times;

d) Otherwise breaching his employment agreement.

100. Dussias' conduct also constitutes a violation of the implied covenant of good faith and fair dealing.

101. Dussias' breach of his employment agreement has proximately caused TMG to incur damages, in an amount to be proven at trial, including but not limited to the compensation and benefits paid to Dussias during his tenure as President of TMG, the costs associated Dussias' failure to adequately perform his duties as President of TMG, and damage to TMG's reputation.

**WHEREFORE**, Counter-Plaintiff, TMG, respectfully requests that this Court enter judgment in its favor and against Counter-Defendant, Dussias, and enter an Order:

a) Awarding TMG compensatory damages in an amount to be proven at trial, but in excess of $1 million;

b) Granting such other and further relief as the Court deems equitable and just.

**COUNT III**
**(Breach of Contract)**

102. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 101 as though fully set forth herein.

103. Dussias' lawsuit alleges that Defendants and Dussias had an oral agreement to enter into a written agreement in the future under which Dussias would become up to a 30% owner in TMG. Defendants strenuously deny the existence of any such oral agreement.

104. However, in the event the Court finds that the oral agreement exists and is enforceable, then Dussias materially breached any such agreement.

105. The oral agreement alleged by Dussias also contemplates Dussias acting as TMG's President, performing his job duties adequately, and acting in the best interests of the company.

106. Dussias materially breached any oral agreement with Defendants by:

a) Refusing and failing to sign a written agreement to reflect Dussias' proposed membership interest acquisition;

b) Taking unilateral and unauthorized actions without Gleckler's consent or knowledge;

c) Taking unilateral and unauthorized actions to create the outward appearance that he was a member or manager of TMG;

d) Undertaking actions for his own benefit without obtaining authorization and without disclosing those undertakings to Gleckler;

e) Representing to third parties falsely that he was a member or manager of TMG;

f) Failing to carry out his duties as President of TMG, as described herein;

g) Failing to act in the best interests of TMG at all times, and;

h) Otherwise breached the alleged oral agreement.

107. Dussias' conduct also constitutes a violation of the implied covenant of good faith and fair dealing.

108. Dussias' breach of the alleged oral agreement has proximately caused TMG and Gleckler to incur damages, in an amount to be proven at trial, including but not limited to the compensation and benefits paid to Dussias during his tenure as President of TMG, attorneys' fees related to the negotiations with Dussias, the costs and expenses associated with Dussias' failure to adequately perform his duties as President of TMG, and damage to TMG's reputation.

**WHEREFORE**, Counter-Plaintiffs, TMG and Gleckler, respectfully request that this Court enter judgment in their favor and against Counter-Defendant, Dussias, and enter an Order:

a) Awarding TMG and Gleckler compensatory damages in an amount to be proven at trial, but in excess of $1 million;

b) Granting such other and further relief as the Court deems equitable and just.

**COUNT IV**
**(Unjust Enrichment)**

109. This Count is pled in the alternative to Count II.

110. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 as though fully set forth herein.

111. Dussias was enriched in that he received compensation and benefits from TMG during the time that he served as its President and an officer of the company.

112. TMG suffered a detriment because Dussias was paid substantial compensation and benefits, but abdicated and failed to carry out his duties as President of TMG, and caused harm to TMG.

113. It would be unjust for Dussias to retain the compensation and benefits received from TMG, and would violate fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Counter-Plaintiff, TMG, respectfully requests that this Court enter judgment in its favor and against Counter-Defendant, Dussias, and enter an Order:

a) Awarding TMG compensatory damages in an amount to be proven at trial, but in excess of $1 million;

b) Granting such other and further relief as the Court deems equitable and just.

**COUNT V**
**(Fraudulent Concealment)**

114. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 108 as though fully set forth herein.

115. As President of TMG, Dussias at all times had a duty to speak and disclose facts to Gleckler, the CEO and sole owner of TMG.

116. Dussias concealed material facts from Defendants when he failed to disclose that he was:

a) Taking unilateral and unauthorized actions to create the outward appearance that he was a member and manager of TMG, including but not limited to making a $20,000 payment into a TMG account and filing a false annual report with the Illinois Secretary of State's Office;

b) Representing to TMG employees and third parties, including vendors and clients, that he was a member and manager of TMG;

c) Requesting that TMG employees and third parties, including vendors, not copy Gleckler on communications; and,

d) Intentionally and/or grossly negligently causing harm to TMG by failing to carry out his duties as President of TMG by, among other acts, failing to implement a new website, failing to implement NetSuite, and failing to transition to Bergen.

117. Defendants could not have discovered the truth through reasonable inquiry because Dussias took actions, including instructing employees and vendors not to copy Gleckler on communications, and putting accounts into Dussias' name only, to hide information from Gleckler.

118. Defendants justifiably relied on Dussias to provide truthful and complete information as the President of TMG and an officer of TMG.

119. Defendants would have acted differently had they known that Dussias was concealing material information by terminating his employment immediately and not engaging in discussions with Dussias regarding the potential acquisition of a membership interest in TMG.

120. Dussias' fraud has proximately caused TMG and Gleckler to incur damages, in an amount to be proven at trial, including but not limited to, the compensation and benefits paid to Dussias during his tenure as President of TMG, the attorneys' fees incurred in the negotiations with Dussias, the costs and expenses associated with Dussias' intentional and/or grossly negligent failure to adequately perform his duties as President of TMG, and damage to TMG's reputation.

**WHEREFORE**, Counter-Plaintiffs, TMG and Gleckler, respectfully request that this Court enter judgment in their favor and against Counter-Defendant, Dussias, and enter an Order:

a) Awarding TMG and Gleckler compensatory damages in an amount to be proven at trial, but in excess of $1 million;

b) Awarding TMG and Gleckler punitive/exemplary damages for Dussias' intentional, deliberate, and willful misconduct;

c) Granting such other and further relief as the Court deems equitable and just.

**<u>COUNT VI</u>**
**(Fraudulent Inducement)**

121. Counter-Plaintiffs incorporate by reference the allegations in paragraphs 1 through 108 and 114 through 120, as though fully set forth herein.

122. Dussias made false statements of material fact to Gleckler, including but not limited to:

a) Falsely representing his credentials and expertise to Gleckler, particularly that he was knowledgeable regarding the implementation of business technology and finance;

b) Falsely representing that he would perform an agreement to act as President of TMG and in the best interests of TMG, when in fact he had no intention of doing so and instead intended to sabotage the business as part of a scheme to defraud to position himself to steal the business from Gleckler; and,

c) Falsely promised that he would agree to execute definitive, written documents to reflect any agreed-upon acquisition of a membership interest.

123. Dussias knew these representations and promises were false at the time he made them, as they were all part of Dussias' scheme to defraud Gleckler and TMG and gain control of the business.

124. Dussias intended to induce Defendants to hire him as President of TMG and to allow him to acquire a membership interest in TMG.

125. In reliance on the truth of Dussias' representations and promises, Defendants hired Dussias as President of TMG, and discussed with him the opportunity to acquire a membership interest (which Dussias now claims in his lawsuit was an "oral agreement" to agree in the future).

126. Had Defendants known the truth, they would not have hired Dussias and would not have considered the possibility of Dussias acquiring a membership interest in TMG.

127. Dussias' fraud has proximately caused TMG to incur damages, in an amount to be proven at trial, including but not limited to, the attorneys' fees incurred in the negotiations with Dussias, the compensation and benefits paid to Dussias during his tenure as President of TMG, the

costs associated with Dussias' intentional and/or grossly negligent failure to adequately perform his duties as President of TMG, and damage to TMG's reputation.

**WHEREFORE**, Counter-Plaintiffs, TMG and Gleckler, respectfully request that this Court enter judgment in their favor and against Counter-Defendant, Dussias, and enter an Order:

a) Awarding TMG and Gleckler compensatory damages in an amount to be proven at trial, but in excess of $1 million;

b) Awarding TMG and Gleckler punitive/exemplary damages for Dussias' intentional, deliberate, and willful misconduct;

c) Granting such other and further relief as the Court deems equitable and just.

Dated: September 30, 2022

Respectfully submitted,

COZEN O'CONNOR

*/s/ James G. Argionis*
Attorney for Defendants

James G. Argionis (jargionis@cozen.com)
Corey T. Hickman (chickman@cozen.com)
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898

## CERTIFICATE OF SERVICE

I, James G. Argionis, an attorney, hereby certify that on September 30, 2022, I filed the foregoing **Answer, Affirmative Defenses, and Counterclaim** electronically, via Electronic Case Filing (ECF), which shall send notice to all counsel of record.

/s/ *James G. Argionis*