**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEAN H. DUSSIAS<br><br>Plaintiff,<br><br>v.<br><br>MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:21-cv-05709<br><br>Honorable April M. Perry |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT**

James G. Argionis
Corey T. Hickman
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898
jargionis@cozen.com
chickman@cozen.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

A. The TMG Operating Agreement ........ 2

B. The Negotiations Relating to Dussias Potentially Becoming a Member of TMG ........ 2

C. The Draft Amended Operating Agreements ........ 4

ARGUMENT ........ 5

I. Dussias' Claims All Fail Because He Failed to Comply With the Requirements of the Operating Agreement and Delaware Law to Acquire a Membership Interest ........ 5

II. Basic Contract Law Also Defeats Dussias' Claims ........ 10

a. The Parties' Intent Was to Memorialize Any Agreement in Writing ........ 10

b. There Was No Meeting of the Minds on Material Terms ........ 11

c. The Back-and-Forth Exchange of Documents Constitutes Counter-Offers ........ 13

III. Dussias' Supplemental Claims Fail as a Matter of Law ........ 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Achaian, Inc. v. Leemon Family LLC*,
25 A.3d 800 (Del. Ch. 2011)........6

*Alaska Fin. Co. III, LLC v. Glob. Mortgage Group, LLC*,
1:17-CV-01723, 2018 WL 574940 (D. Del. Jan. 26, 2018)........7

*Altaire Pharm., Inc. v. Rose Stone Enter.*,
13-CV-4373 JFB WDW, 2013 WL 6235862 (E.D.N.Y. Dec. 3, 2013)........9

*AMPMS Chicago, LLC v. BEDT, LLC*,
Case No. 2022 CH 09167 (Cook County, Ill., Chancery Div.)........8

*Ankerstjerne v. Schlumberger, Ltd.*,
155 Fed. Appx. 48 (3d Cir. 2005)........14, 15

*Cumulus Radio Corp. v. Olson*,
15-CV-1067, 2015 WL 1110592 (C.D. Ill. Mar. 10, 2015)........9

*Franklin Pharm., LLC v. Aaron*,
3:15-CV-1314-AKK, 2016 WL 11627522, at *3 (N.D. Ala. Aug. 18, 2016)........9

*Friel v. Jones*,
42 Del. Ch. 148, 206 A.2d 232 (1964)........13

*Greetham v. Sogima L-A Manager, LLC*,
CIV.A. 2084-VCL, 2008 WL 4767722 (Del. Ch. Nov. 3, 2008)........10

*Grunstein v. Silva*,
CIV.A. 3932-VCN, 2014 WL 4473641 (Del. Ch. Sept. 5, 2014)........11, 12

*In re Carlisle Etcetera LLC*,
CV 10280-VCL, 2015 WL 1947027 (Del. Ch. Apr. 30, 2015)........9

*Intellisource Group, Inc. v. Williams*,
C.A. 98-57-SLR, 1999 WL 615114 (D. Del. Aug. 11, 1999)........10, 11

*Johnson v. Rooney*,
CIV.A. 05C-04-087CLS, 2011 WL 2178693 (Del. Super. Ct. May 25, 2011)........13

*Kirsch v. MNJ Techs. Direct, Inc.*,
2021 IL App (1st) 200953-U........*passim*

*Lord v. Souder*,
748 A.2d 393 (Del. 2000) ....................................................................................14

*PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*,
857 A.2d 998 (Del. Ch. 2004)..............................................................................13

*Steele v. Rosenfeld, LLC*,
936 So. 2d 488 (Ala. 2005) ..................................................................................8, 9

*Transamerican S.S. Corp. v. Murphy*,
CIV.A. 10511, 1989 WL 12181 (Del. Ch. Feb. 14, 1989) ...................................10

**Statutes**

Del. Code tit. 6, § 18-101(9) ...........................................................................6, 7, 8

Del. Code tit. 6, § 18-301 .......................................................................................6

**INTRODUCTION**

This is a frivolous lawsuit that should never have been filed. Plaintiff Dean Dussias ("Dussias") is a former employee of Defendant TMG Kreations, LLC ("TMG"). Dussias asserts claims all based on the allegation that he and Defendant Merri Gleckler ("Gleckler"), TMG's sole member, allegedly made an oral agreement that Dussias would acquire a 30% membership interest in TMG. Discovery has more than debunked this assertion.

Beginning in 2019, the parties discussed the terms of Dussias potentially acquiring a membership interest in TMG, and over the next two years, exchanged two non-binding term sheets, neither of which was signed, and five draft amended operating agreements, none of which were finalized or signed. Dussias' absurd position is that – despite the parties exchanging seven written documents that were never signed and that contained materially different and evolving terms – an oral contract was formed during those negotiations.

Dussias' claims lack any good faith basis in law or fact. TMG's operating agreement expressly provides that the admission of a new member must be consented to in writing by all of the members, and that the new member must sign the operating agreement. Controlling Delaware law further provides that the conditions of the operating agreement must be met for the admission of a new member, and that there must be some form of "writing" setting forth the terms of the new member's admission. None of this occurred, as all of the documents exchanged between the parties were unsigned, and Dussias testified that he bases his claim on a purported oral agreement.

Dussias' claims are also defeated by basic contract law. There can be no oral agreement where, as is the case here, there is a clear intent by a party that any agreement is conditioned on memorializing the terms in a writing. The drafts exchanged between the parties and the contemporaneous communications also establish that the parties never agreed on the material terms. Finally, the back-and-forth exchange of materially different draft documents plainly

constitutes counter-offers, none of which was ever accepted by either party. Dussias is indisputably not a member of TMG, and his frivolous claims all fail as a matter of law.

## FACTUAL BACKGROUND

### A. The TMG Operating Agreement

TMG's operating agreement (the "Operating Agreement") was executed on December 30, 2009, by the then-members of TMG: Gleckler for and on behalf of MerriG, LLC, and Cedric Reingold ("Reingold"). (Rule 56 Statement of Material Facts ("SOF"), ¶¶ 2-3).

Section 7.2 of the TMG Operating Agreement provides that:

> A person may acquire Membership Interests directly from [TMG] upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of [TMG] after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

(SOF ¶ 6). The Operating Agreement is governed by Delaware law. (SOF ¶ 9).

### B. The Negotiations Relating to Dussias Potentially Becoming a Member of TMG

Following the settlement of a contentious dispute between Gleckler and Reingold that resulted in TMG redeeming Reingold's membership interest, Dussias was hired as TMG's President and, in late 2019, Gleckler and Dussias began discussing proposed terms regarding Dussias potentially acquiring a membership interest in TMG. (SOF ¶¶ 10-11, 14-15).

On May 4, 2020, Gleckler's attorney, Cheryl Borland from the Griesing Law Firm, drafted an email to Dussias and Gleckler attaching a term sheet and stating that it outlines "[Dussias'] proposed ownership in TMG," and describing the intent to have a written agreement in place to "prevent a similar situation from happening with [Dussias]" as occurred with Reingold. (SOF ¶ 19). The term sheet attached to the e-mail (the "Gleckler Term Sheet") provided:

> *The Term Sheet is non-binding except as expressly set forth below . . . and does not create, and is not intended to create, a binding or enforceable contract between the parties or any duty on any person to negotiate toward a binding contract. Each party reserves the right*

> *to terminate discussion with respect to the acquisition of membership in TMG and the revised Operating Agreement at any time and for any reason . . .*
>
> ***
>
> The restructure and admission of Dean as a Member in the Company shall be conditioned on both parties being satisfied with the negotiation of the Amended and Restated Operating Agreement and the terms and conditions contained therein.
>
> ***
>
> Either party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG and the ancillary and associated agreements by notice in writing at any time prior to the execution of definitive agreements between them.

(SOF ¶ 21). The Gleckler Term Sheet reiterated that the necessary written agreements would be drafted with the aim of "protecting Merri – especially after the protracted litigation she went through with Cedric [Reingold]." (SOF ¶ 23). The Gleckler Term Sheet provided that Gleckler would remain the sole managing member of TMG, and that Dussias would acquire up to a 30% interest in "return for services rendered," subject to a three-year vesting period. (SOF ¶ 24). The Glecker Term Sheet was never signed by either party. (SOF ¶¶ 26-27).

On June 7, 2020, Dussias e-mailed Gleckler a rewritten term sheet (the "Dussias Term Sheet"), which contained the identical disclaimer language that it was non-binding, discussions could be terminated at any time, and that Dussias' admission was conditioned on "definitive agreements" being executed. (SOF ¶¶ 28-29). Unlike the Gleckler Term Sheet, the Dussias Term Sheet did not contain any vesting period, instead providing that Dussias would immediately become a 30% owner of TMG. (SOF ¶ 32). It also provided that "Merri will not remain as the sole Managing Member," and that Dussias "will become a Member and be a Manager of the Company." (SOF ¶ 32). The Dussias Term Sheet was never signed by either party. (SOF ¶ 35).

Despite no documents having been agreed to or signed, on July 1, 2020, Dussias paid $20,000 into TMG's bank account without Gleckler's knowledge (SOF ¶¶ 36, 52), on July 5, 2020, Dussias accessed TMG's payroll system and changed his status to a "30% owner," an "officer," and changed his compensation to receive a "draw" in addition to his salary (SOF ¶ 37), and in

November 2020, Dussias prepared and filed a TMG annual report with the Illinois Secretary of State in which he identified himself as a "member" and "manager" of TMG. (SOF ¶ 38).

### C. The Draft Amended Operating Agreements

Beginning in February 2021, Gleckler, Dussias, and their respective counsel exchanged multiple drafts of amended operating agreements regarding the potential admission of Dussias as a member in TMG. (SOF ¶ 39). However, before any draft amended operating agreement was ever shared with Gleckler, in an attempt to defraud her, on January 1, 2021, Dussias e-mailed Gleckler an attachment containing only the signature page of a purported operating agreement, which stated that he was a "manager" of TMG. In the email, Dussias stated: "Please see attached; counter-sign; PDF and send back." (SOF ¶ 40). Gleckler did not sign it. (*Id.*).

On February 6, 2021, Gleckler sent Dussias a draft amended operating agreement prepared by her counsel (the "First Draft"). (SOF ¶ 41). The First Draft contained a section entitled "Vesting Schedule," that provided for Dussias' membership to vest over three years, and also provided: "In the event that Dean resigns or is terminated prior to the Membership Interests being fully vested, Dean shall surrender his Membership Interests in the Company without payment of any compensation or consideration." (SOF ¶ 42). The First Draft stated that Gleckler was the sole manager of TMG. (SOF ¶ 43). The First Draft was never signed by either party. (SOF ¶ 44).

On February 16, 2021, Dussias emailed another draft amended operating agreement (the "Second Draft"), that he prepared, to Gleckler and TMG's accountant, Ray Conway, not copying Gleckler's counsel. (SOF ¶ 45). The Second Draft was not a redline, but a completely different document than the First Draft. (*Id.*). It had a retroactive effective date of July 1, 2020, removed any vesting schedule for Dussias' membership interest and instead proposed to make him an immediate 30% owner pursuant to a $20,000 capital contribution, and proposed Dussias as a co-manager of TMG. (SOF ¶ 47). The Second Draft was never signed by either party. (SOF ¶ 48). On

February 22, 2021, Dussias emailed Gleckler a revised version of the same draft operating agreement that he prepared (the "Third Draft"). (SOF ¶ 49). The Third Draft changed the effective date to be retroactive to March 13, 2020, and also was revised to state that MerriG, LLC would be the sole initial manager. (SOF ¶ 50). The Third Draft was never signed by either party. (SOF ¶ 51).

On April 8, 2021, Dussias' counsel, Kelly E. Hall of Golan Christie Taglia, emailed Gleckler's counsel another draft (the "Fourth Draft") of an amended operating agreement. (SOF ¶ 54). The Fourth Draft abandoned Dussias' prior two drafts and instead was a redline of the First Draft. (*Id.*). The Fourth Draft made significant changes, including adding a retroactive date of July 1, 2020, and again deleting the "Vesting Schedule" section. (SOF ¶ 55). The Fourth Draft was never signed by either party. (SOF ¶ 56). On April 12, 2021, Gleckler's counsel emailed Dussias' counsel another draft (the "Fifth Draft"). (SOF ¶ 57). The Fifth Draft was revised by Gleckler's counsel from the Fourth Draft. (*Id.*). The Fifth Draft added back in the "Vesting Schedule" section. (SOF ¶ 58). The Fifth Draft was never signed by either party. (SOF ¶ 59).

On April 22, 2021, Gleckler's counsel sent a letter to Dussias' counsel terminating his employment and ending the discussions regarding his potential membership in TMG. (SOF ¶ 64).

## ARGUMENT

### I. Dussias' Claims All Fail Because He Failed to Comply With the Requirements of the Operating Agreement and Delaware Law to Acquire a Membership Interest

Dussias' claims are all predicated on the notion that, through some form of agreement with Gleckler, he acquired a membership interest in TMG. However, discovery has revealed that there was never an agreement between the parties and that Dussias failed to meet *any* of the express requirements of the Operating Agreement or Delaware law to be admitted as a member of TMG.

Section 18-301 of the Delaware Limited Liability Company Act (the "Act"), entitled "Admission of members," provides that a person may become a member of an LLC after formation

"at the time provided and upon compliance with the limited liability company agreement." Del. Code tit. 6, § 18-301; *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 811, n. 57 (Del. Ch. 2011) (a person can become a member only per the "specific terms of the LLC agreement"). The TMG Operating Agreement lays out the express conditions for admission of a new member: "upon the written consent of all Members," *i.e.* Gleckler, and "after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C." (SOF ¶ 6). It is undisputed that neither of those acts occurred. (SOF ¶¶ 60-61).

In denying TMG's motion to dismiss, Judge Lee held that Dussias' allegations were "sufficient to survive a motion to dismiss" because Section 18-101(9) of the Act provides that:

> [A] writing… [m]ay provide that a person shall be admitted as a member of a limited liability company… if such person… complies with the conditions for becoming a member … as set forth in… any other writing… and… [s]hall not be unenforceable by reason of its not having been signed by a person being admitted as a member[.] 6 Del. C. § 18-101(9). Dussias alleges that, through a series of writings and agreements (which may reasonably be inferred were in writing), Gleckler, as the majority interest holder in TMG set forth conditions of Dussias' becoming a member and he complied with each of those conditions.

(Dkt. 16). With the aid of discovery, it is now clear that Dussias' claims are not saved by the Act.

First, there is no "writing" that provided for the admittance of Dussias as a member of TMG. Rather, the undisputed evidence shows that the parties were negotiating and never agreed in any "writing" to the terms of Dussias' potential membership. Dussias and Gleckler exchanged no less than seven draft documents back-and-forth, including two term sheets and five different draft amended operating agreements, with each version containing substantially different terms. (SOF ¶¶ 41-59). None were ever signed. (SOF ¶¶ 60-61). To be sure, Dussias testified that his claim is based on an <u>*oral*</u> agreement and that no writing contains what he contends were the agreed terms. (SOF ¶¶ 77-78). No "writing" exists here to implicate Section 18-101(9) of the Act.

Further, as Judge Lee noted, while a "writing" is not rendered unenforceable by the lack of the new member's signature, "the conditions for becoming a member" must still be met. (Dkt. 16). The Operating Agreement provided that a new member must obtain the "*written* consent of all Members." (SOF ¶ 6). It is undisputed that Gleckler never signed any document consenting to Dussias being admitted as a member of TMG. (SOF ¶¶ 60-61). Similarly, while Section 18-101(9) contemplates that an otherwise valid writing is not rendered unenforceable "by reason of its not having been signed by a person being admitted as a member," it *does not* state that such a writing can be enforced when it is not signed by the LLC or its members. It is undisputed that Gleckler never signed *any* document regarding Dussias' potential admittance as a member. (SOF ¶¶ 60-61).

Plaintiff will also assert that the conduct of the parties somehow made him a member "by implication." Not so – no such claim is recognized under the law. For example, in *Alaska Fin. Co. III, LLC v. Glob. Mortgage Group, LLC*, 1:17-CV-01723, 2018 WL 574940, at *1 (D. Del. Jan. 26, 2018), the plaintiff argued that it contributed $1 million to a new LLC and therefore, even though it failed to satisfy the express conditions for membership, "it should be entitled to *some* equity interest in [the defendant LLC] – even if not the promised 12.5% – by virtue of its cash transfer." *Id.* at *3. The Court rejected this argument, noting that "[u]nder Delaware law, however, additional members are admitted to an existing LLC only as the LLC agreement provides," or if the agreement is silent, then "upon consent of all members." *Id.* The Court held that the plaintiff "has produced no evidence that those criteria have been met; consequently, this Court may conclude that [the plaintiff] never acquired an equity interest in [the defendant LLC]." *Id.* at *3.

Similarly, a recent case in Cook County containing nearly identical facts as here, found that there is no such thing as membership by implication. In *AMPMS Chicago, LLC v. BEDT, LLC*,

Case No. 2022 CH 09167 (Cook County, Ill., Chancery Div.),[1] the plaintiff alleged he had a 4% membership interest in an LLC because the operating agreement was amended to add it as an additional member after it made a substantial capital contribution. The operating agreement, like TMG's, provided that a new member must sign "an instrument accepting and adopting" the agreement, and "shall have received the unanimous consent of the other members." (Ex. 1, pp. 2-3). Judge Neil Cohen dismissed the complaint with prejudice because the amendment to the operating agreement was not executed by the plaintiff nor any of the LLC's members. As the Court held: "The Act does not allow a person to become a member of a limited liability company by implication. Nor does BEDT's Operating Agreement. The Operating Agreement, as well as the Amendment, unequivocally required Plaintiff and every other member to execute the Amendment in order for Plaintiff to become a member of BEDT . . . Because Plaintiff did not comply with the requirements of the Operating Agreement, it is not a member of BEDT." (Ex. 1, p. 3). Judge Cohen also denied the plaintiff's motion to reconsider,[2] holding that the "court will not rewrite the terms of the Operating Agreement or the Amendment to allow Plaintiff membership by implication," and finding that extrinsic evidence "cannot change the fact that membership in BEDT cannot be implied under the terms of the Operating Agreement and Amendment." (Ex. 2, p. 3).

Also persuasive is *Steele v. Rosenfeld, LLC*, 936 So. 2d 488, 489 (Ala. 2005). There, the plaintiff argued that he became a member in an LLC by virtue of an oral agreement with the defendant and through various payments and other acts consistent with membership. The Court – recognizing that "the clear and unambiguous provisions of the Act, the articles, and the operating agreement require the *written consent*" of the members – held that the plaintiff could not have become a member because the court cannot "ignore noncompliance with those requirements." *Id.*

---

[1] A copy of the *AMPMS* Opinion granting the motion to dismiss is attached as Exhibit 1.
[2] A copy of the *AMPMS* Opinion denying the motion to reconsider is attached as Exhibit 2.

at 493. The Court reasoned that it "will not disregard the plain meaning of these provisions [of the statute and the operating agreement] in order to afford [the plaintiff] membership in [the LLC] on the basis of implied representations and the purported acquiescence of [the members] in certain actions by [the plaintiff]." *Id.* at 495; *see Alexander as trustee of Franklin Pharm., LLC v. Aaron*, 3:15-CV-1314-AKK, 2016 WL 11627522, at *3 (N.D. Ala. Aug. 18, 2016) (receipt of distributions does not establish membership where there was not compliance with the operating agreement); *Cumulus Radio Corp. v. Olson*, 15-CV-1067, 2015 WL 1110592, at *4 (C.D. Ill. Mar. 10, 2015) (finding no membership "where the LLC Operating Agreement is clear that individuals must sign a counterpart of the Operating Agreement in order to become a member" and "South has not signed a counterpart."); *Altaire Pharm., Inc. v. Rose Stone Enter.*, 13-CV-4373 JFB WDW, 2013 WL 6235862, at *5 (E.D.N.Y. Dec. 3, 2013) ("Defendants cite no authority—from California or elsewhere—holding that the membership of a California LLC should be determined by looking to the conduct of the parties rather than the operating agreement."); *In re Carlisle Etcetera LLC*, CV 10280-VCL, 2015 WL 1947027, at *7 (Del. Ch. Apr. 30, 2015) (finding the lack of formal written consent by the members fatal to a party's claim of membership, and reasoning: "It makes sense that the LLC Act would require formal member action to accept a new business partner, rather than contemplating de facto membership or the constructive admission of assignees.").

The same logic applies here. It is undisputed that Dussias did not receive written consent of TMG's sole member, Gleckler, nor did he sign Exhibit C to the Operating Agreement (or any other writing relating to membership in TMG). Dussias cannot rely on extrinsic conduct of the parties to establish "membership by implication." Summary judgment should be granted.

## II. Basic Contract Law Also Defeats Dussias' Claims

### a. The Parties' Intent Was to Memorialize Any Agreement in Writing

It is "a well established principle of contract law that if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to ***or until the whole has been reduced to another written form***, the preliminary negotiations and agreements do not constitute a binding contract." *Greetham v. Sogima L-A Manager, LLC*, CIV.A. 2084-VCL, 2008 WL 4767722, at *15 (Del. Ch. Nov. 3, 2008) (emphasis added). In *Intellisource Group, Inc. v. Williams*, C.A. 98-57-SLR, 1999 WL 615114, at *5 (D. Del. Aug. 11, 1999), for example, the plaintiff sent an acceptance letter to which the defendant responded "we do not have a deal until we agree on the language of the [agreement,]" and later reiterated "there is no 'deal' until final documentation." *Id.* at *3, 5. The Court held that that there was no contract because the "parties' correspondence further demonstrates that neither party regarded the agreement to settle as complete until a formal settlement and stock repurchase agreements had been signed." *Id.*; *see Transamerican S.S. Corp. v. Murphy*, CIV.A. 10511, 1989 WL 12181, at *1 (Del. Ch. Feb. 14, 1989) ("Where one of the contracting parties states that he will not be bound until an event-such as the signing of a memorandum that might not otherwise be required-occurs, he will not be bound before that condition is satisfied, even though an agreement on all of the material terms of the contract have been reached.").

This case is even clearer. On May 4, 2020, Gleckler's counsel drafted an email to Gleckler and Dussias attaching the Gleckler Term Sheet and describing the importance of a written agreement to avoid future disputes and litigation. (SOF ¶ 19). The Gleckler Term Sheet provided that Dussias' admission as a member "shall be conditioned" on the creation of a final "Amended and Restated Operating Agreement" and that "[e]ither party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG . . . at any time prior to the

execution of definitive agreements between them." (SOF ¶ 21). Dussias responded by sending the Dussias Term Sheet, a substantially rewritten document, but that contained the same disclaimer language providing that no contract existed until definitive agreements were executed. (SOF ¶ 29). The parties then exchanged no less than five draft amended operating agreements that were never signed. (SOF ¶¶ 41-61). Dussias testified that the intent of the parties was to "document [Dussias'] ownership interest terms." (SOF ¶ 22).

In light of these written statements – including in Dussias' own term sheet that he prepared – Dussias undoubtedly "kn[ew] or ha[d] reason to know that [Gleckler] regard[ed] the agreement as incomplete . . . until the whole has been reduced to another written form." *Intellisource Group*, 1999 WL 615115 at *5. As such, no enforceable contract could have been formed.

**b. There Was No Meeting of the Minds on Material Terms**

Dussias' claims are based on his frivolous assertion that – despite counsel being involved and seven unsigned draft documents being exchanged, all of which provide that final, signed, definitive documents are a condition to a contract – somehow there was an oral agreement reached between Gleckler and Dussias during those negotiations. The test for whether an oral contract exists is "[w]hether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that the agreement concluded the negotiations." *Grunstein v. Silva*, CIV.A. 3932-VCN, 2014 WL 4473641, at *17 (Del. Ch. Sept. 5, 2014). Dussias absurdly claims that the parties reached an oral agreement that "concluded the negotiations," despite subsequently negotiating for another year and exchanging five unsigned, draft amended operating agreements. (SOF ¶¶ 74-75, 77).

In *Kirsch v. MNJ Techs. Direct, Inc.*, 2021 IL App (1st) 200953-U, ¶ 1, the plaintiff claimed there was an oral agreement to purchase a 30% stake in the defendant company where he was

employed, alleging that the parties agreed on essential terms and that he paid $100,000 toward the purchase price. The appellate Court affirmed the granting of summary judgment, holding that the parties had not "reached an agreement as to the material terms of the sale" because after the alleged oral contract was reached, there were "multiple draft agreements," including drafts "written by or on behalf of [the plaintiff]" that contained changes to the essential purchase terms. *Id.* at ¶ 20. One of those essential terms that was not agreed upon was "whether [the plaintiff] could maintain an ownership interest if he ever left the company." *Id.* at ¶ 8. The Court reasoned that the evidence "showed that the parties continued to negotiate, even as to essential terms, after the alleged formation of the contract." *Id.* at ¶ 22. The Court further held that it was irrelevant that the plaintiff allegedly paid a portion of the purchase price, as this goes to performance but "there was never a binding oral contract." *Id.* at ¶ 24; *see also Grunstein*, 2014 WL 4473641, at *19 (finding no enforceable oral contract because any "assertion that the material terms were agreed to during this period is undermined by the evidence demonstrating active negotiation . . . this exchange of documents and proposals is indicative of a negotiation involving offers and counteroffers.").

Here, the undisputed evidence establishes that no agreement was ever reached on material terms, including terms relating to Dussias' equity interest and whether he would remain a member if his employment was terminated. Dussias testified that initially the parties discussed different equity percentages and when his proposed equity would vest or "flex" down. (SOF ¶ 71). The Gleckler Term Sheet provided that Dussias' membership interest would vest as sweat equity over a three-year period, and that Gleckler would remain the sole manager of TMG. (SOF ¶ 24). Dussias did not agree and prepared the Dussias Term Sheet, which provided that he would immediately be a 30% owner and that he would also be a co-manager of the company. (SOF ¶¶ 27, 32).

Dussias testified that after the competing term sheets were exchanged (both of which expressly state that final, definitive documents are a condition precedent to any agreement), the parties suddenly agreed to stop negotiating and "be done," reaching an oral agreement on all terms. (SOF ¶ 77). Contrary to Dussias' fabricated and self-serving tale, counsel for the parties subsequently exchanged at least five different drafts of amended operating agreements. (SOF ¶¶ 41-61). Once again, the drafts provided by Gleckler differed substantially from the drafts provided by Dussias, including on terms relating to the vesting of Dussias' equity, whether he would remain a member or be compensated if he resigned or was terminated, and the management of TMG. (*Id.*). None of the term sheets or draft operating agreements were ever signed. (SOF ¶¶ 60-61).

Just as in *Kirsch*, summary judgment is appropriate on an oral contract claim where the evidence shows "that the parties continued to negotiate, even as to essential terms, after the alleged formation of the contract." 2021 IL App (1st) 200953-U, ¶ 22. Dussias cannot simply ignore the active back-and-forth written negotiations. Dussias' claim is frivolous, and if allowed, would open the floodgates to any party to a failed contract negotiation claiming there was an "oral agreement."

**c. The Back-and-Forth Exchange of Documents Constitutes Counter-Offers**

"Delaware follows the mirror image rule, requiring the acceptance to be identical to the offer." *Johnson v. Rooney*, CIV.A. 05C-04-087CLS, 2011 WL 2178693, at *2 (Del. Super. Ct. May 25, 2011). To be an acceptance, the response to the offer must be on "identical terms" and be "unconditional." *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004). Thus, a "response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer." *Id.*; *see Friel v. Jones*, 42 Del. Ch. 148, 151, 206 A.2d 232, 234 (1964) (granting summary judgment because there "was not an unconditional acceptance of the offer made, but rather a counter-offer, [and so] there was no meeting of the minds.").

Here, there can be no contract because there was never an acceptance of any offer or counteroffer. The two term sheets were expressly non-binding and therefore not offers, and in any event contained materially different terms. (SOF ¶¶ 21-35). The parties then exchanged at least five draft amended operating agreements, each having substantially different material terms than the prior versions. (SOF ¶¶ 41-59). None of those documents was ever signed, and the discussions were terminated shortly thereafter. (SOF ¶¶ 60-61, 64). Each back-and-forth draft document was a counteroffer, and no counteroffer was ever accepted. (*Id.*).

## III. <u>Dussias' Supplemental Claims Fail as a Matter of Law</u>

Dussias' supplemental claims all fail for the same reasons as above. His accounting and constructive trust claim (Count II) is predicated on "fiduciary duties to Dussias … consistent with his ownership interest in TMG." (Dkt. 1-3, ¶ 75). Because he has no ownership interest in TMG, there is no fiduciary duty owed and no basis to seek an accounting. His breach of fiduciary duty claim (Count IV) likewise is predicated on "Dussias' ownership interest in TMG." (*Id.*, ¶¶ 90-91). Dussias has no ownership interest in TMG and is therefore owed no fiduciary duties.

Dussias' promissory estoppel claim (Count V) also fails. A plaintiff asserting promissory estoppel must show "by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000). In *Kirsch*, the Court granted summary judgment on a promissory estoppel claim because "[y]ears of negotiations—including negotiations as to the proposed sale price—and multiple draft agreements with varying terms show that there was no unambiguous promise." 2021 IL App (1st) 200953-U, ¶ 26; *see also Ankerstjerne v. Schlumberger, Ltd.*, 155 Fed. Appx. 48, 51 (3d Cir. 2005) (granting summary judgment on promissory estoppel

claim because the plaintiff could not show detrimental reliance where there was no evidence the negotiations caused him to "forego working on some other project.").

Dussias' promissory estoppel claim lacks any merit. First, just as in *Kirsch*, Dussias cannot point to an unambiguous promise made by Gleckler, as the parties negotiated for two years and exchanged seven unsigned, draft documents. (SOF ¶¶ 41-61). Second, any reliance by Dussias was not reasonable. Dussias knew as early as 2013 that the Operating Agreement and the Act required any agreement to be in writing and signed. (SOF ¶ 13). Dussias – a sophisticated businessman with an MBA from Northwestern and substantial experience in contracts – certainly understood the need to document the transaction and engaged in extensive written negotiations and exchange of drafts. (SOF ¶ 79). Third, Dussias suffered no detriment. He was employed by TMG as its President, was paid a large salary, and has put forth no evidence of any other opportunity he was forced to forego because of Defendants. (SOF ¶¶ 15-16). Finally, justice would not be served because it would lead to absurd results to permit a party to a failed contract negotiation to assert a claim for promissory estoppel merely because the negotiations failed and no contract was finalized.

Finally, Dussias' claim for unjust enrichment (Count VI), in which he seeks "such amounts to which he is entitled as a co-owner of TMG," also fails. (Dkt. 1-3, ¶ 101). Because he is not a co-owner, he is not "entitled" to any compensation. In addition, far from being unjustly enriched, TMG paid Dussias a salary and also incurred substantial costs retaining attorneys to handle the failed negotiations with Dussias. (SOF ¶¶ 16, 65). A party is not entitled to compensation merely because a contract negotiation did not result in an agreement. *See Ankerstjerne*, 155 Fed. Appx. at 52 (granting summary judgment on implied contract claim for additional bonus compensation and unjust enrichment claim because the plaintiff was paid his full salary for the work performed). Summary judgment should be granted on all counts.

Dated: January 31, 2025

Respectfully submitted,

COZEN O'CONNOR

*/s/ James G. Argionis*
Attorney for Defendants

James G. Argionis
Corey T. Hickman
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898
jargionis@cozen.com
chickman@cozen.com

**CERTIFICATE OF SERVICE**

I, James G. Argionis, an attorney, hereby certify that on January 31, 2025, I filed the foregoing **Memorandum of Law in Support of Motion for Summary Judgment** electronically, via Electronic Case Filing (ECF), which shall send notice to all counsel of record.

/s/ *James G. Argionis*