# EXHIBIT A

# TMG Kreations, LLC

## Operating Agreement

THIS OPERATING AGREEMENT of TMG Kreations, LLC (the "Company") is entered into as of the date set forth on the signature page hereto by each of the persons named in Exhibit A hereto (referred to individually as a Member and collectively as the Members).

A. The Company has been formed as a limited liability company under Chapter 18 of Title 6, et seq., of the Delaware Code (the "Delaware Limited Liability Company Act"), by the filing of the certificate of formation with the office of the Secretary of State of Delaware. The Company may carry on any lawful business, purpose or activity permitted under the Act.

B. The location of the principal place of business of the Company shall be determined by the Members. In addition, the Company may maintain such other offices as the Manager may deem advisable at any other place or places within or without the United States.

C. The registered agent for the Company is set forth in the Company's certificate of formation, provided that the Members may from time to time designate another registered agent by appropriate filings with the Secretary of State.

D. The term of the Company commenced on the date of filing of the certificate of formation and shall be perpetual, unless an earlier term is specified in Section 8.1 or the Company is dissolved and terminated in accordance with the provisions of this Agreement

E. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the Delaware Limited Liability Company Act.

"Capital Contribution" means the amount of cash, property or services contributed to the Company.

"Company" means TMG Kreations, LLC, a Delaware limited liability company.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

EXHIBIT
Dusses 37
8-22-24
PENGAD 800-631-6989

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest" means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 **Initial Capital Contributions and Membership Interests.** The Capital Contributions of the initial Members, as well as the Membership Interests of each Member, are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 **Subsequent Contributions.** No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 **Capital Accounts.** Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 **Interest.** No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 **Limited Liability.** A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocations.** The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 **Distributions.** The Company shall have the right to make distributions of cash and property to the Members pro rata based on the relative Membership Interests. The timing and

amount of distributions shall be determined by the Members in accordance with Delaware law.

ARTICLE 4: MANAGEMENT

4.1 **Management.** The business of the Company shall be managed by the Members. In the event of a dispute between Members, final determination shall be made by a vote of the majority of the Members (unless a greater percentage is required in this Agreement or under Delaware law). Any Member may bind the Company in all matters in the ordinary course of business.

4.2 **Banking.** The Members are authorized to set up one or more bank accounts and are authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company.

4.3 **Officers.** The Members are authorized to appoint one or more officers from time to time. The officers shall hold office until their successors are chosen and qualified. Subject to any employment agreement entered into between the officer and the Company, an officer shall serve at the pleasure of the Members. The current officers of the Company are listed on Exhibit B.

ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 **Accounts.** Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member. The costs of such inspection and copying shall be borne by the Member.

5.2 **Records.** At all times during the term of existence of the Company, and beyond that term if the Members deems it necessary, the Members shall keep or cause to be kept the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member;

(b) A copy of the certificate of formation, as amended;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; and

(d) An original executed copy or counterparts of this agreement and any amendments.

5.3 **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

5.4 **Tax Matters Member.** Cedric Reingold shall act as tax matters member of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 6: MEMBERSHIP--MEETINGS, VOTING

6.1 **Members and Voting Rights.** Members shall have the right and power to vote on all matters with respect to which this agreement or Delaware law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under Delaware law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

6.2 **Meetings.** Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

A written notice shall be given not less than 10 days nor more than 60 days before the date of the meeting to each member entitled to vote at the meeting. In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by Delaware law, including by conference telephone or similar communications equipment. In addition, any action which could be taken at a meeting can be approved without a meeting and without notice if a consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this paragraph.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1 **Withdrawal.** A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this Section 7.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account.

7.2 **Restrictions on Transfer.** A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless Members holding a majority of the Membership Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

## ARTICLE 8: DISSOLUTION AND WINDING UP

8.1 **Dissolution.** The Company shall be dissolved upon the first to occur of the following events:

(a) The vote of Members holding a majority of the outstanding Membership Interests to dissolve the Company.

(b) Entry of a decree of judicial dissolution under the Delaware Limited Liability Company Act.

(c) At any time there are no Members, provided that the Company is not dissolved and is not required to be wound up if, within 180 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the legal representative of such Member or its assignee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

8.2 **No automatic dissolution upon certain events.** Neither the death, incapacity, disassociation, bankruptcy or withdrawal of a Member shall automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1 **Indemnification.** The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person had no

reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 **Expenses.** Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

## ARTICLE 10: GENERAL PROVISIONS

10.1 **Entire Agreement; Amendment.** This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

10.2 **Governing Law; Severability**. This agreement shall be construed and enforced in accordance with the internal laws of the State of Delaware. If any provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this agreement shall remain in effect.

10.3 **Benefit**. This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.4 **Number and Gender**. Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this agreement may require.

10.5 **No Third Party Beneficiary**. This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

**IN WITNESS WHEREOF,** the parties have executed or caused to be executed this Operating Agreement as of the date below.

Dated: 12/30/09

Merri Gleckler
For and Behalf of Merrig, LLC

Cedric Reingold

EXHIBIT A

**MEMBERS**

The following persons are the initial Members of the Company, and their initial capital contributions and ownership is set forth below.

| Name | Capital Contribution ($) | Percentage Interest |
|---|---|---|
| Merri Gleckler | $1.00 | 50% |
| Cedric Reingold | $1.00 | 50% |

EXHIBIT B

## OFFICERS

The following person(s) are elected as officers of the Company:

| Name of Officer | Title |
| --- | --- |
| Merri Gleckler | Manager |
| Cedric Reingold | CFO & Manager |

EXHIBIT C

## NEW MEMBER'S CONSENT

The undersigned agrees to be bound as a Member by the terms of the Operating Agreement of TMG Kreations, LLC as if the undersigned was a signatory thereof.

______________________________
(Signature)

Name: ______________________________

Date: ______________________________

# EXHIBIT B

Fully Redacted Pursuant to Protective Order

# EXHIBIT C

**Merri Glecker**

**From:** Merri Gleckler <merri.gleckler@gmail.com> on behalf of Merri Gleckler
**Sent:** Sunday, September 4, 2022 7:48 PM
**To:** Merri Gleckler
**Subject:** Fwd: LLC questions, responding to your request

---------- Forwarded message ---------
From: **Dean H Dussias** <dean@dussias.org>
Date: Tue, Nov 26, 2013 at 2:41 PM
Subject: LLC questions, responding to your request
To: Merri Gleckler <merri.gleckler@gmail.com>

1. Have lawyer review LLC Operating Agreement - its 6 1/4 pages. Must know Delaware LLC law.

2. Focus all questions on governance, distribution of funds, disputes and potential financing or splitting of interests:

- if deadlock, what happens? how to best work out most easily, without litigation? Appoint board? Mediator?
- if one partner sends restriction to another in writing what happens?
- what are fiduciary obligations of one Member to the LLC and to the other Member and to the other interested party?
- what are information obligations? audit rights? maintenance of books and records? tax provider exposure?
- what if LLC needs funds and Members don't agree?
- can one Member restrict distributions, payments in ordinary course, payments to other Member (salary, bonus, etc)
- how might LLC be "split"
- how does one Member buy the other out; how does one Member obtain majority control? If majority, what can be done?
- what don't we know that we don't know?

3. Not worth focusing on Russ - he is not a Member (see his one page agreement, his deposition, pattern of actions, Section 7.2 of Kashwere Operating Agreement and section 18-702, (b) (1) of the Delaware Code. No copy of LLC Agreement signed by him, no meetings of the Members including him, no voting ever, no agreement from you, he has different terms than Merri G and CR.

I will phone you.

--

**Dean H Dussias**
**Arete General Management**
dean@dussias.org
**(847) 612-1010**

EXHIBIT
Dussias 27
8-22-24
PENGAD 800-631-6989

# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEAN H. DUSSIAS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 1:21-CV-05709 |
| | ) | |
| MERRI GLECKLER and TMG | ) | |
| KREATIONS, LLC, a | ) | |
| Delaware Limited | ) | |
| Liability Company, d/b/a | ) | |
| KASHWERE, | ) | |
| | ) | |
| Defendants. | ) | |

The videotaped deposition of DEAN H. DUSSIAS, called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions before MAUREEN A. WOODMAN, a notary public within and for the County of Cook and State of Illinois, at Suite 1800, 123 North Wacker Drive, Chicago, Illinois, on the 22nd day of August, 2024, at the hour of 9:00 o'clock a.m.

PRESENT:
GOLAN CHRISTIE TAGLIA LLP
BY: MR. MATTHEW M. SHOWEL
70 West Madison Street
Suite 500
Chicago, Illinois 60602
Phone: 312.465.2848
Email: Mmshowel@gct.law.com,
on behalf of the Plaintiff;
COZEN O'CONNOR
BY: MR. JAMES ARGIONIS
MR. COREY T. HICKMAN
123 North Wacker Drive
Suite 1800
Chicago, Illinois 60606
Phone: 312.474.7900
Email: Jargionis@Cozen.com,

on behalf of the Defendants.

ALSO PRESENT:
Ms. Merri Gleckler (Via Zoom);
Mr. Peter Van Winkle,
Videographer, Thompson Court
Reporters.



I N D E X


| WITNESS | PAGE |
|---|---|
| DEAN H. DUSSIAS | |
| Examination by Mr. Argionis | 4-358 |
| Examination by Mr. Showel | 352-358 |
| Reexamination by Mr. Argionis | 358-359 |

\- - - - - - - - - - - - - - - - - -

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | LinkedIn Page | 32 |
| Exhibit 2 | Virtas Announcement | 33 |
| Exhibit 3 | BluTip Announcement | 36 |
| Exhibit 4 | Complaint | 44 |
| Exhibit 5 | Email 7/4/2019 | 112 |
| Exhibit 6 | Test Messages | 126 |
| Exhibit 7 | Email 5/7/2020 | 128 |
| Exhibit 8 | Email 2/23/20 | 160 |
| Exhibit 9 | Email 5/7/2020 | 180 |
| Exhibit 10 | Email 6/7/2020 | 224 |
| Exhibit 11 | Email 1/1/2021 | 245 |
| Exhibit 12 | Email 2/6/2021 | 248 |
| Exhibit 13 | Email 2/7/2021 | 259 |
| Exhibit 14 | Email 2/16/2021 | 262 |
| Exhibit 15 | Email 2/22/2021 | 286 |
| Exhibit 16 | Text Messages | 293 |
| Exhibit 17 | Email 4/8/2021 | 310 |
| Exhibit 18 | Email 4/12/2021 | 314 |
| Exhibit 19 | Email 5/21/2021 | 317 |
| Exhibit 20 | Employee ID Number | 320 |
| Exhibit 25 | Spreadsheet | 325 |
| Exhibit 26 | Email 5/29/2019 | 327 |
| Exhibit 27 | Email 11/26/2013 | 329 |
| Exhibit 28 | Email 8/28/2019 | 334 |
| Exhibit 37 | Operating Agreement | 332 |
| Exhibit 43 | Email Blast | 349 |
| Exhibit 44 | Email Blasts | 347 |
| Exhibit 45 | Paycheck Protection Program | 342 |


(ATTACHED)



THE VIDEOGRAPHER: We're now on the record. Here begins the video deposition of Dean Dussias in the matter of Dussias versus Gleckler and TMG Kreations, LLC. Today's date is August 22nd, 2024, and the time is 9:01 a.m.

My name is Peter Van Winkle. I am the videographer. The court reporter is Maureen Woodman.

Today's deposition is being taken place at Cozen O'Connor in Chicago, Illinois.

Will counsel please introduce themselves and state whom they represent?

MR. ARGIONIS: Jim Argionis on behalf of the defendants.

MR. HICKMAN: Corey Hickman, also on behalf of defendants.

MR. SHOWEL: Matthew Showel, S-H-O-W-E-L, here for the plaintiff.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

(Witness was duly sworn.)

DEAN DUSSIAS,

called as a witness herein, after having been first duly sworn, was examined and testified as



follows:

EXAMINATION

BY MR. ARGIONIS:

Q. Good morning, and could you please state your full name for the record?

A. Dean Dussias.

Q. Do you have a middle name?

A. I do.

Q. What's that?

A. Hippocrates.

Q. And I take it that you have given a deposition before?

A. Yes.

Q. In what capacity?

A. As an officer of a company.

Q. Were you a defendant, a party to the lawsuit?

A. I was not a party, and I was asked to participate by Rand McNally.

Q. And what was the lawsuit again? What was your understanding of it?

A. Intellectual property violation by one of the business units at Rand McNally.

Q. What year approximately was it?

Page 6

A. Early '90s.
Q. Do you recall what jurisdiction the lawsuit was filed in?
A. Yes, San Francisco. That's where it took place. It was in northern California. I don't know the name of the exact jurisdiction.
Q. Do you remember any of the other parties other than Rand McNally?
A. The two gentlemen who had a company that had produced a different type of map.
Q. Do you recall any of their names?
A. I do not.
Q. So I'm sure your lawyer has gone over some ground rules here today, but I will ask you a series of questions, you will be giving answers. If at any time you don't understand one of my questions, just tell me, and I will rephrase it. If you do give an answer, I will just assume you understood it and then we will move on.
You need some audible responses, more than just noises, so a yes or no, as opposed to an uh-huh or uh-uh, because it will be difficult for our court reporter to translate.

Page 7

If you want to take a break, just make sure you answer whatever question is asked of you, and then we will take a break.
We will try to accommodate you as much as possible, as we will try to accommodate the court reporter and videographer, anyone else in the room.
Anything today that would impair your ability to give honest and true answers, any medications you've taken or any conditions that you have?
A. No, I don't think so.
Q. Where do you currently live?
A. In Illinois.
Q. Your address?
A. 462 Chestnut Street.
Q. In what city?
A. Winnetka.
Q. How long have you lived there?
A. Since 2009.
Q. Did you do anything to prepare for this deposition here today?
A. Yes.
Q. What did you do?

Page 8

A. I looked over some documents. I spoke with Matt.
Q. I don't want to hear the substance of what you discussed with Matt. When did you talk to him?
A. Over the last week.
Q. Approximately how many times would you say?
A. Twice.
Q. Do you remember how long it took?
A. No, not exactly.
Q. Estimate?
A. A couple of hours.
Q. Do you recall the documents that you reviewed?
A. Not specifically.
Q. Other than talking to your attorney Matt, have you spoken to anyone else about this lawsuit -- about this deposition I should say?
A. My wife.
Q. Did you talk to her about any substance, or was it just about scheduling?
A. The latter.
Q. About the lawsuit in general, other than

Page 9

discussions with your attorneys, have you had any discussions with anybody else?
A. No.
Q. And I think you already covered this. Other than this lawsuit, have you been a party to any lawsuit?
A. I don't think so.
Q. And you say you don't think so. Why would you not know definitely?
A. I was divorced. I don't know if that's considered a lawsuit.
Q. If it got filed, sure. Do you know if it was filed?
A. I had a judgment with respect to my divorce, so okay.
Q. So you were a party?
A. Okay.
Q. What jurisdiction was that?
A. Cook County.
Q. What year do you recall the judgment was entered?
A. 2012.
Q. Was there any deposition given in that case?

A. I believe so.
Q. So you've had at least two depositions then, right, Rand McNally and your divorce?
A. Yes.
Q. Any other depositions that you recall now?
A. Not that I recall.
Q. And the person from whom you were divorced that was a party in that case?
A. Jan Karzen.
Q. Could you spell that for the court reporter?
A. J-A-N, K-A-R-Z-E-N.
Q. Did you have any employment-related potential lawsuits?
MR. SHOWEL: Objection to form of the question. It's vague.
BY MR. ARGIONIS:
Q. I'll ask a different question.
Other than your divorce and other than being a witness in that Rand McNally lawsuit, have you been involved in any other lawsuits?
A. Not that I recall, no.



Q. Do you recall communicating with Merri about some lawsuit that was pending?
A. Yes.
Q. And what was that about?
A. That was about Merri and Kashwere having a lawsuit with Kashwere's previous owner and third-party in Japan.
Q. Were you involved in that lawsuit?
A. I don't know what you mean by involved.
Q. Did you have any involvement in it in any capacity?
A. I don't know what you mean by involved.
Q. Did you have any connection to that lawsuit?
A. Same answer. I don't know what you mean by connected.
Q. What did you do regarding that lawsuit?
A. I discussed it with Merri and Cedric.
Q. And that's all you did regarding that lawsuit?
A. To the extent that they -- I was involved with other parties that interacted with Kashwere, I may have interacted with them.
Q. Who are those other parties?



A. Attorneys representing Kashwere, other employees at Kashwere.
Q. What was your interaction with them?
A. To understand and provide perspective.
Q. Do you recall who those individuals were?
A. Sara Pochin.
Q. Anyone else?
A. The folks at Patzik, Frank & Samotny.
Q. And that law firm, had they ever represented you?
A. They have.
Q. For what?
A. Some business dealings I've had from time to time.
Q. Do you recall with whom those business dealings were?
A. A group of investors in a preschool.
Q. Anyone else?
A. Not that I recall.
Q. Did they review any materials in connection with your involvement with Kashwere or TMG?
A. No.



Q. There was a -- we will get to it later. There was a text message where Merri had asked you about your lawsuit. Do you recall what that was about?
MR. SHOWEL: Objection to the form of the question. If you know, you can answer.
THE WITNESS: No.
BY MR. ARGIONIS:
Q. When you were leaving any employment, were you ever involved in potential litigation with any employers?
MR. SHOWEL: Objection to the form of the question as vague. You can answer if you know.
THE WITNESS: I guess it depends what you mean by "potential."
BY MR. ARGIONIS:
Q. Tell me if you've had any disputes with any employers when you were leaving them?
[redacted]

[redacted]

MR. SHOWEL: Hold on one second. Dean, just so you know, I'm going to -- you're going to hear me object to a lot of questions. Typically, you still have to answer them, but I would just ask that you give me an opportunity to get my objection out.

To that question, I will object to form and foundation. To the extent you remember the question, and you know the answer, you can answer.

THE WITNESS: I don't remember the question.

MR. ARGIONIS: Okay.

BY MR. ARGIONIS:

Q. Tell us about your employment at Virtas. When did you start?



A. Summer of 2018, I believe.

Q. And when did you leave?

A. April of 2019.

Q. When you left, there was some kind of issue regarding you leaving?

A. I don't know what you mean by issue.

Q. What were the conditions under which you left? Did you leave? Were you fired? Was it somewhere in between?

[redacted]

Q. So what did you do between the summer of 2018 and April 2019 for Virtas?

A. Principally worked on three projects.

Q. Were you an employee?

A. I don't recall.

Q. And then what do you recall about them making an offer of employment? When did that happen?



A. Approximately February or March of 2019.

Q. And did you discuss that with Merri?

A. I may have mentioned it to Merri.

Q. So what was the offer of employment? What do you recall about it?

A. It was to continue doing the types of work I had been doing over the past year.

Q. And you say that you declined. Why did you decline?

A. I didn't like the offer.

Q. What didn't you like about it?

A. The terms.

Q. Okay. Anything more specific? Was it the money being offered or non-competes or anything of that nature?

A. No.

Q. What no you don't recall?

A. No, it wasn't those, per se.

Q. What was it?

A. The package in its entirety.

Q. What do you mean by that?

A. The combination of pay and employment terms and conditions that were embodied in the agreement.



Q. And they presented that to you in writing?

[redacted]

[redacted]

Q. They paid you everything that you wanted?
A. 90 plus percent.
Q. And did you sign anything in connection with getting that money?
A. Yes.
Q. And was there any type of proceeding filed in connection with that?
A. Not to my knowledge, no.
Q. Are you currently employed?
A. I'm currently working.
Q. Working for what -- for who or for what?
A. I have my own company.
Q. And what's the name of your company?
A. Inyan Partners.
Q. Is that an LLC, Inc.?
A. It's an LLC.
Q. And in what state is it formed?
A. Delaware.
Q. When did you form -- are you the only



member of Inyan Partners?
A. No.
Q. Who else is?
A. Jack Bennett and Giora Salita.
Q. Can you spell that for the court reporter?
A. Which?
Q. The second one. I wouldn't ask you about the first one if I already asked you a question about that and moved on, you can assume it was that. But go ahead.
A. Okay. G-I-O-R-A. And Salita is S-A-L-I-T-A, I believe.
Q. What percentage of membership -- is that just the three of you are members?
A. Yes.
Q. And what percentage does each have?
A. 33.
Q. Any of those individuals managers?
A. I don't know.
Q. How about you?
A. I don't know.
Q. Would you know where to get that information?



A. I'm not sure.
Q. And when you say you're not -- well, you distinguished. You said you're working when I asked if you're currently employed. Are you employed by Inyan Partners in any way?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: I don't know what you mean.
BY MR. ARGIONIS:
Q. You made a distinction. You said you were working when I asked you if you are currently employed. Why did you make that distinction? Just asking what you mean. It is not a trick question.
A. Okay. Because I didn't know what you meant.
Q. Let me ask you again. Are you currently working?
A. Yes.
Q. Are you currently employed?
A. That's like a legal --
Q. You don't know if you're employed by anybody? I am not asking in the legal sense. What's your understanding --



A. My understanding --
Q. Wait. We need to not talk over each other. Let me get my question out because we are going to drive her nuts, then you can answer.
Do you have an understanding -- I'm not asking for a legal conclusion. Just asking for your understanding. It is not a trick question -- whether you're currently employed?
A. I have a company, and I'm currently working. That's my answer. Those are the words that I'm using.
Q. Do you have a title at that company?
A. Founder and managing director. But -- sure.
Q. And how do you declare yourself on any of your tax returns, do you know?
A. No.
Q. Do you know how you receive payment?
A. Yes.
Q. How?
A. Transfers from a bank account.
Q. How often?
A. Monthly.
Q. Do you get a 1099? Do you get a W-2?

Page 22

If you know.
A. I believe I get a K-1 from Inyan.
Q. And what does Inyan Partners do?
A. It does work in the field of clean tech. Clean energy.
Q. And just generally describe what you guys do. Do you consult with office buildings? Do you consult with companies about clean energy? Tell us what you do generally.
A. We consult with companies on their operating and capital raising activity.
Q. And when did you start working with Inyan Partners?
A. I think early '22.
MR. SHOWEL: I'm sorry. I want to make sure we're talking about the same company. Can you spell the name of the company you are discussing right now?
THE WITNESS: I-N-Y-A-N.
MR. SHOWEL: Okay.
BY MR. ARGIONIS:
Q. So Inyan?
A. Inyan or Inyan.
Q. Inyan Partners, LLC?

Page 23

A. Yes.
Q. Out of Delaware, right?
A. Yes.
Q. Any other employment or work that you currently have?
A. No.
Q. And since early 2022, since you've been working with Inyan, any other work that you've done, other than for Inyan?
A. Not that I recall.
Q. Prior to working for Inyan, what did you do for employment or work?
A. Nothing to recall.
Q. What other LLC have you been a part of?
MR. SHOWEL: Objection; form of the question in terms of a part. But you can answer to the extent you know.
BY MR. ARGIONIS:
Q. All my questions are if you know. If you don't know, just tell me, and we can move on.
MR. SHOWEL: I guess I'll add the additional objection that I assume you're talking about aside from this lawsuit?
MR. ARGIONIS: Not really. But for now,

Page 24

yeah. Go ahead.
BY MR. ARGIONIS:
Q. Aside from this lawsuit, what other LLC have you been part of? Something called Arete, A-R-E-T-E?
A. Sure. I have an LLC called Arete General Management. It is a Greek word.
Q. Is it Arete General Management or Arete Management?
A. Arete General Management.
Q. Are you still active with anything with that entity?
A. Not at this time.
Q. What does it do generally?
A. It's been the LLC I've used to do consulting work.
Q. And for how long approximately?
A. Since 2008 approximately.
Q. Who are the members of that LLC? And it was A-R-E-T-E.
A. Myself.
Q. A hundred percent?
A. Yes.
Q. And that's an Illinois entity?

Page 25

A. I believe so, yes.
Q. Who helped you form that? Was it the Patzik firm?
A. Yes.
Q. So they did do some work for you, right?
A. Yes.
Q. Are you the manager, too, of that entity?
A. I don't know.
Q. Do you have any understanding of what the difference is between being a member of a LLC and a manager of an LLC?
MR. SHOWEL: Objection; vague and calls for a legal conclusion. You can answer.
THE WITNESS: I believe some, yes.
BY MR. ARGIONIS:
Q. What's your understanding?
A. A manager is active in taking decisions in the company, and a member has ownership in the company.
Q. Regarding the LLC we've been talking about, A-R-E-T-E, have you been involved in filing the annual reports for that entity?
A. No.

Q. You have your Alan Patzik firm do that for you?
A. Yes.
Q. Do you still -- does he still do that work for you annually?
A. Yes.
Q. Does he deal with anything regarding your Inyan Partners, LLC?
A. No.
Q. When is the last time you did any consulting work through Arete General Management, LLC?
A. I don't recall.
Q. Can you give us an estimate?
A. No.
Q. Did you do any consulting work through that entity while you were involved with TMG/Kashwere?
A. I think so.
Q. And for whom then?
A. For TMG/Kashwere.
Q. Anyone else?
A. I'm sorry?
Q. During that time period, did you do any



consulting work through that LLC?
A. Yes.
Q. You already mentioned Kashwere, TMG, anyone else?
A. Yes.
Q. Who?
A. You mean whom has Arete done work for?
Q. During the time period you were working at Kashwere TMG.
MR. SHOWEL: I'm going to object to the form of the question as vague in terms of the time frame. Can you be more specific with regard to the time frame you're talking about?
BY MR. ARGIONIS:
Q. While he was involved with TMG Kashwere.
A. I don't recall dates of overlap. There may have been some.
Q. To your best recollection.
A. Yes, but I can't say which parties directly overlapped.
Q. Okay. Can you tell us which parties you did any work for through that LLC at any time? Whom do you recall?



[redacted]
MR. SHOWEL: Jim, are we going to do the same thing that we did with regard to confidentiality in Merri's dep, i.e., we're going to treat the whole transcript as confidential for two weeks after receipt of the transcript, and then I'll give you the specific designations within that time period?
MR. ARGIONIS: That's fine, yeah. I don't have a problem with that. I haven't looked at the protective order. If that's consistent with that, that's fine.
MR. SHOWEL: Yeah, I think that's what we agreed to with Merri. And at any rate, I'm going to designate the companies that he just named the counterparties as confidential.
MR. ARGIONIS: Okay. Again, to the extent it falls within what our protective order allows and the law allows, that shouldn't be a problem. Understand you are reserving your rights, that's fine. We can handle it that way.
MR. SHOWEL: Yes.
BY MR. ARGIONIS:



Q. Any of those entities that you talked about, did the work you did with them occur post April 2022?
A. No.
Q. Have we exhausted all the employment or work, whatever you want to call it, that you have done post April of 2022?
MR. SHOWEL: Objection to the form of the question as vague. You can answer -- you can answer.
THE WITNESS: I don't know what you mean by exhausted.
BY MR. ARGIONIS:
Q. Have we talked about it?
A. I'm considering forming another company.
Q. Okay. But you haven't formed it yet?
A. Correct.
Q. We'll get to that.
How about any work that you've done since April of 2022, have we already discussed that?
A. I think so, yes.
Q. Prior to April of 2022, where were you employed?

Page 30

MR. SHOWEL: Objection; form of the question. Calls for a legal conclusion. You can answer.
THE WITNESS: Prior to April of 2022?
BY MR. ARGIONIS:
Q. Walk me back. April of 2022 -- March of 2022, where were you employed and prior to that? Just give me your employment history.
A. I obviously worked with TMG. I ran my -- ran our -- did work with -- under the auspices of Arete. Prior to that, Magnatar Capital. Prior to that, Exxceed. Prior to that, NumeriX. Prior to that, Rand McNally. Prior to that, Arthur Andersen. Prior to that, tennis. Prior to that, caddying. And that takes us back to 11 years old.
Q. Great. That's what I wanted. Thank you.
A. You're welcome.
Q. Had you ever been asked to leave any of those positions -- or employment that you just mentioned?
A. Yes.
[redacted]

Page 31

[redacted].
Q. What year was that?
A. Approximately 2004.
Q. And why were you asked to leave? What's your understanding.
A. The largest investor was becoming active

Page 32

in the business, and the business's leadership was consolidating in Manhattan.
Q. And what year did you say that was?
A. Approximately 2004.
Q. Any other companies where you were asked to leave?
A. Not that I recall.
MR. ARGIONIS: Let's mark this as Dussias Exhibit 1, please.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 1 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we marked as Dussias Exhibit No. 1. It's a printout of the experience portion of your LinkedIn page. Is that your picture on there?
A. It is.
Q. And it looks like it's got it for most current to older. I don't see the Inyan on there. Is there a reason you didn't put that on there?
A. No.

Page 33

Q. And Virtas, it says you were managing director from June 2018 to April of 2019; is that true?
A. I believe so.
Q. Were you actually managing director during that whole time?
A. I believe so.
Q. And remind me again the reason why you left Virtas?
MR. SHOWEL: Objection; asked and answered. But go ahead.
THE WITNESS: I didn't want to work there any longer.
BY MR. ARGIONIS:
Q. You don't have a TMG or Kashwere on here, correct?
A. Correct.
Q. Is there any reason for that?
A. No.
MR. ARGIONIS: Let's mark this as Exhibit 2, please.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 2

for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we marked as Dussias Exhibit No. 2, and it is an announcement that Dean -- it's entitled "Dean Dussias joins Virtas Partners as managing director," and it is dated January 11, 2019. If you had been working with them since 2018, why was this announcement done in 2019?
A. I don't know.
Q. Had you ever seen this before?
A. Probably.
Q. Do you know in what capacity you were working for Virtas prior to this announcement?
A. As managing director.
Q. But they didn't announce it until January 11 of 2019?
MR. SHOWEL: Just going to --
BY MR. ARGIONIS:
Q. If you know.
MR. SHOWEL: -- object to the form of the question, that it lacks foundation. But you can go ahead and answer.
THE WITNESS: Apparently.



BY MR. ARGIONIS:
Q. Have are served on any boards, board of directors?
A. Yes.
Q. What entities?
A. DeAgostini Rand McNally. Northern Lights. I'm not sure if there are any others.
Q. And the two that you mentioned, what was your title?
A. Director, to my knowledge.
Q. Everything is to the best of your recollection as you sit here today. Okay?
A. Fantastic.
Q. Do you recall an entity called blutip Power?
A. Yes.
Q. Did you serve on that board?
A. I may have.
Q. What do you remember about blutip Power and your involvement with them?
A. Small company in Canada. Was invested in by a hedge fund, and I helped restructure and improve that company.
Q. Under what circumstances did you leave



your involvement with blutip?
A. I was asked to stop participating by one of its investors.
Q. What was the reason given to you?
A. I think he wanted to participate.
Q. Do you recall that investor's name?
A. Clint Coghill.
Q. You didn't include that in your LinkedIn profile, correct?
A. I don't see blutip mentioned specifically.
Q. Do you remember what years you were on the board of blutip?
A. I do not.
MR. ARGIONIS: Let's mark this as Dussias Exhibit 3, please.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 3 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we've marked as Dussias Exhibit No. 3, and it's entitled, "blutip Power announces changes to the board of directors," and



mentions that, "Today announce the appointment of Mr. Dean Dussias to the company's board of directors," mentions your Arete General Management based in Chicago.
Does this refresh your memory as to what year you were involved with blutip?
A. It does.
Q. So July 18 of 2011, do you recall how long your involvement lasted with blutip?
A. I believe into -- somewhere in 2012.
Q. And other than the three boards that we mentioned so far, Rand McNally, Northern Lights, and blutip, any other boards that you served on?
A. Not that I recall.
Q. Were there any actions filed in connection with your departure from blutip?
A. Not that I'm aware of. But I actually don't know what you mean by actions.
Q. Any kind of legal proceeding.
A. No, not that I know of.
Q. Were there any threatened?
A. No.
Q. Other than the LLCs we've talked about so far, Inyan, Arete General Management, and your

Page 38

involvement that concerns this lawsuit, any other LLCs in which you've been involved as a member or manager?
A. Not that I recall.
Q. Other than the dispute connected to this lawsuit, have you ever been involved in admitting any member to those two LLCs that you mentioned?
MR. SHOWEL: Objection; form of the question, calls for a legal conclusion and vague. You can answer.
THE WITNESS: The two LLCs being Arete and Inyan?
BY MR. ARGIONIS:
Q. Yes.
A. Not Arete. Inyan, there are two other members, so I guess I was involved.
Q. Okay. Were all three of the members of Inyan admitted when it was first formed?
A. Yes.
Q. And Arete, when you say no, you've always been the sole member?
A. Yes.
Q. So with Inyan, three original members?
A. Yes.

Page 39

Q. Have you with Inyan, you and the other members, discussed admitting or -- admitting anybody?
A. Not that I recall.
Q. Have you discussed whether anyone's going to be leaving as a member?
A. No, not that I recall.
Q. Regarding Arete Management, do you have an operating agreement?
A. I don't know.
Q. Who helped you form that entity, if anyone?
A. I think the Patzik firm.
Q. As you sit here today, you don't know if it has a written operating agreement?
A. Correct.
Q. How about for the other entity, Inyan, do you know if it has an operating agreement?
A. I'm not sure.
Q. Do you know who was involved in forming Inyan?
A. Yes.
Q. Who was that?
A. Me.

Page 40

Q. Anyone else?
A. My partners were informed.
Q. What do you mean they were informed?
A. I did the actual filing.
Q. With or without the assistance of any attorney?
A. I believe without.
Q. And you informed the members that you'd be handling that?
A. Yes.
Q. And you filed it in Delaware?
A. Yes.
Q. Did you mention to them whether you were putting together an operating agreement or not?
A. I don't recall.
Q. What else did you tell them about the forming of that entity?
A. That we did it.
Q. And what did you do to form that entity?
A. I believe I used Stripe, and we filed appropriate documents and opened a bank account and we've done work.
Q. When you say "we," though, you said you were telling your members. Was it truly "we"?

Page 41

Was it you and the others that did those tasks that you just mentioned, or was it you and you informed them like you told me about the filing?
A. They -- to my knowledge, they signed documents as did I.
Q. Okay. But who actually opened up, communicated with the bank?
A. Myself.
Q. So my question to you was, just want to make sure we've explored it all, what tasks did you do to get that LLC up and running? You already mentioned you filed paperwork with Delaware. You used Stripe to do that, right?
A. Yes.
Q. And you opened up a bank account while informing your members about it?
A. Yes.
Q. Any other tasks you did for opening up that entity?
A. Not that I recall.
Q. Okay. Do you have meetings regarding that entity with your members?
A. Occasionally.
Q. Now, I want to talk about the lawsuit

that's the basis of -- the lawsuit that you filed that we're here for today.
Did you have any involvement in this drafting the complaint that was filed?
MR. SHOWEL: Objection to the form of the question to the extent it calls for attorney-client communications. Don't talk about anything you spoke about with your attorneys.
MR. ARGIONIS: Yeah, my question didn't go that far. It didn't ask for any substance.
BY MR. ARGIONIS:
Q. Were you involved in the drafting of the complaint?
MR. SHOWEL: Yeah, it sounds like a yes-or-no question to me, so you can answer without disclosing any attorney-client communications.
THE WITNESS: Yes.
BY MR. ARGIONIS:
Q. Did you draft any of the language and provide it to your attorneys?
MR. SHOWEL: Calls for privileged information. I'm going to instruct him not to answer that question.
MR. ARGIONIS: It's privileged whether he did



any drafting?
MR. SHOWEL: If he drafted and -- if he drafted part of the complaint and transmitted it to his attorneys.
MR. ARGIONIS: I am not asking what he transmitted.
MR. SHOWEL: Can you read back the question, please?
(Said question was read back.)
MR. SHOWEL: Yes, same response.
BY MR. ARGIONIS:
Q. Without disclosing any of the substance, did you draft any of the complaint which is now public information and transmit it to your attorneys?
MR. SHOWEL: Same objection. I'm going to instruct him not to answer.
MR. ARGIONIS: Okay. Certify that question.
BY MR. ARGIONIS:
Q. Are you refusing to answer that question?
MR. SHOWEL: On advice of your counsel, yes, you are refusing. I'm instructing you not to



answer.
BY MR. ARGIONIS:
Q. Are you going to take that advice and not answer?
A. Yes.
MR. ARGIONIS: Okay. We will bring that up with the judge and bring him back if we need to.
BY MR. ARGIONIS:
Q. Have you -- well, let's mark it. Let's mark the complaint that was filed in this lawsuit as Exhibit 4.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 4 for Identification.)
BY MR. ARGIONIS:
Q. You've seen this before, correct?
MR. SHOWEL: Just going to object to the form of the question. This is a weird format.
MR. ARGIONIS: It was originally filed in Cook County, so it's a Cook County filing. It was removed to federal court.
MR. SHOWEL: Got it.
MR. ARGIONIS: So I will represent to you it



is the filing -- that's the stamp from the Cook County Clerk, and it's the version that we've pulled off of the Odyssey system.
MR. SHOWEL: And just for my own edification, what's the markings -- the markings at the bottom don't normally come from Odyssey, as far as I'm aware, nor do the ones at the top. It couldn't normally come out of Odyssey in this condensed format.
MR. HICKMAN: When you pull stuff directly off the Cook County portal, I don't know if you have experience doing that, it gives you image files. That's what the stamps are at the bottom. Just explaining the file format. Just the way it is on that system.
MR. SHOWEL: Got it. Thanks.
MR. HICKMAN: Mm-hmm.
BY MR. ARGIONIS:
Q. So you've seen this document before, correct?
A. Not in this format, but I believe so.
Q. And if you turn to page 18, the lawyers that filed it on behalf were David J. Ben-Dov and Brittany Bermudez.

Page 46

A. That's how page 18 reads.
Q. I'm not asking you how it reads. I'm asking if those were the lawyers that filed this on your behalf?
A. Yes, I believe so.
Q. And the first Golan Christie Taglia that is mentioned there, you dealt with other attorneys at that firm other than David, Brittany, and Matt, correct?
A. Yes.
Q. And they represented you regarding drafts of term sheets and operating agreements relative to your involvement with TMG/Kashwere?
MR. SHOWEL: I'm going to object to the form of the question as compound. That's -- you can answer to the extent you know.
THE WITNESS: Yes.
BY MR. ARGIONIS:
Q. Who were those attorneys?
A. Laura Balson.
Q. Have they done any -- anyone else other than Laura?
A. Darrin.
Q. And they're at the same law firm as your

Page 47

litigation counsel, correct?
MR. SHOWEL: If you know whether they're still employed, you can answer.
THE WITNESS: No.
BY MR. ARGIONIS:
Q. They're not part of the same firm?
A. No.
Q. Okay. Have they left Golan Christie, is that what you're saying?
A. Yes.
Q. Laura and Darrin have left?
A. Laura.
Q. Darrin is still there?
A. Yes.
Q. And he is still part of the same firm that's representing you for litigation here?
A. Yes.
Q. Do you still -- does Laura still represent you in anything currently?
A. No.
Q. Let's turn to paragraph 2 of the complaint, which is on page 2. I'll let you read that paragraph in total if you want to, but I'm going to ask you about the last phrase of it

Page 48

after where Cedric Reingold is listed, "And Gleckler proposed to Dussias for him to join her as a co-owner and partner in TMG and to take over Reingold's role. Dussias accepted Gleckler's offer, and in August of 2019, Dussias began working with Gleckler at TMG."
What is the offer that you are referencing in that paragraph that you say Dussias accepted?
MR. SHOWEL: Second to the last line, use of the word "offer" in the second to the last line of that paragraph?
MR. ARGIONIS: I think it's the last line. "Dussias accepted Gleckler's offer," but he can certainly read the paragraph if he wants some context.
BY MR. ARGIONIS:
Q. "And in August of 2019, Dussias began working with Gleckler." What's the offer that you accepted that's referenced here?
A. To join her as co-owner and partner.
Q. And that was all -- and when was that offer made? Are you saying that was made in August of 2019? Not trying to put words in your

Page 49

mouth. Just trying to get to what you are alleging in this paragraph. Was that offer made in August of 2019 is the first question?
A. We started discussing --
Q. I'm not asking what you started discussing. I'm asking about the offer that you referenced here, that you accepted.
MR. SHOWEL: I'm just going to object to the form of the question in terms of its foundation, because this paragraph plainly says about May 2019.
MR. ARGIONIS: That's fine. He can look at the whole paragraph if he wants. I gave him that ability. I just want him -- it is really not a trick question. I just want him to identify the time frame -- the specific time frame when you say -- let's start with when you allege you accepted Gleckler's offer. What is the specific time that that happened? Date, time, whatever you recall. Or maybe you don't recall. Just let us know.
THE WITNESS: In the summer of 2019.

BY MR. ARGIONIS:

Page 50

Q. Summer of 2019, you accepted an offer from Gleckler; is that true?
A. Yes.
Q. Where was that offer made to you?
A. It was made over the course of discussions starting in May.
Q. Do you recall how many discussions were in that course of discussions?
A. No.
Q. Okay. Now, that was the offer you say through the course of discussions, right, starting in May of 2019, correct?
A. Correct.
Q. Now, when did you -- we'll get to what your understanding is of what the offer was, but when are you alleging that you accepted that offer?
A. During the summer of 2019.
Q. Now, obviously you can't accept an offer until it's been made. You'd agree with me on that, right?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: It sounds like it.

Page 51

BY MR. ARGIONIS:
Q. So an offer you said was made during a course of discussions. Can you tell me -- and you can't tell me how many there were, right?
A. I had numerous conversations with Merri over the course of the summer -- starting in the spring and over the -- into the summer, meaning past June 20th, and during the course of that, we agreed that we would be partners, and in August I began -- I was -- started to be active at TMG.
Q. But my question to you is, when did you accept whatever offer -- we'll get to what you believe the offer was. When did you accept it, what date?
A. Prior to when I started being active.
Q. And when did you become active?
A. I believe in early -- late July, early August of 2019.
Q. So you accepted the offer from Merri before late July of 2019?
A. Yes.
Q. Now, tell me what you believe the offer was that you accepted.
A. To join her as co-owner and partner in

Page 52

TMG.
Q. That was all that the offer was?
MR. SHOWEL: Objection; vague. You can answer.
BY MR. ARGIONIS:
Q. I'm asking you for the entirety of the offer that Merri made to you that you accepted in late July of 2019?
MR. SHOWEL: Objection. It is not a memory test. Is there a document you want to show him?
MR. ARGIONIS: Of course it is not a memory test, but he is to testify to his best recollection here. He's made an allegation in the complaint, and I'm just asking about it.
THE WITNESS: I think that assertion is quite encompassing, and so captures the way in which we started working together.
Frankly, the question is so vague, I don't really know what to answer.
BY MR. ARGIONIS:
Q. You don't know what the offer was that Merri made to you?
A. That's not what you asked.
Q. What was the offer? Remind me.

Page 53

A. To join her as her co-owner and partner in TMG.
Q. Any other specifics you remember of the offer that Merri made to you?
A. That captures it.
Q. So before you accepted it in late July of 2019, nothing was offered to you regarding a particular split of ownership? That was discussed later, correct?
A. No. That was discussed during the summer, to my recollection.
Q. What summer?
A. Of 2019.
Q. Before or after you say you accepted?
A. Before. During.
Q. What do you mean during?
A. During the summer.
Q. Asking you, was it before or after you accepted her offer. You told me accepted --
A. I believe --
Q. Let me finish my question. You told me you accepted her offer in late July of 2019, did you not?
MR. SHOWEL: Objection. I think it misstates

his prior testimony. You can answer.
BY MR. ARGIONIS:
Q. I will give you another opportunity. When did you accept Merri's offer that you allege in your complaint in paragraph 2? What date?
A. Sometime before I started, and I don't recall a specific date.
Q. You don't recall a specific date when you accepted the offer for which you're alleging -- you've got a basis for the claims in this lawsuit; is that a true statement?
A. Correct.
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: Correct.
MR. ARGIONIS: I'm asking for the foundational facts for which he is leveraging his claim.
BY MR. ARGIONIS:
Q. And you don't recall the specific date when you accepted the offer that you allege in this complaint?
MR. SHOWEL: Objection to form of the question. You're asking about the offer in



paragraph two. He's already answered you that he doesn't recall the date of that particular offer.
MR. ARGIONIS: That's all I'm establishing.
MR. SHOWEL: Okay. Established.
BY MR. ARGIONIS:
Q. Prior to you accepting that offer, what do you remember about the terms that were offered to you?
A. We discussed how we would build and grow the business, and that's when we first discussed ownership split in the business, the 70/30.
Q. So it's your allegation that prior to you accepting an offer sometime in the late summer of 2019, you specifically were offered a 70/30 split in TMG?
A. That's what we discussed.
Q. If you discussed it or not, was it part of the offer that Merri made to you?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: Yes.
BY MR. ARGIONIS:
Q. Is it your contention -- at what point in time do you believe that you became a 70/30



owner in TMG?
A. I believe -- I think my ownership was never in question, and I became an owner officially in June of 2020.
Q. So it's your allegation June -- is there a particular date in June of 2020 that you became an owner?
MR. SHOWEL: Objection; calls for a legal conclusion, but you can answer.
THE WITNESS: I would say officially July -- guess the end of June 2020 or July 1st of 2020.
BY MR. ARGIONIS:
Q. So either June of 2020 -- end of June of 2020 or July 1st is your contention when you became an owner of TMG?
A. Are we splitting hairs over June 30th at midnight or July 1st?
Q. What's your understanding of when you became an owner?
A. Then.
Q. What do you mean then? Both dates, one date?
A. July 1st, 2020.
Q. What's your basis for saying July 1st,



2020, was the date you became an owner?
A. Merri and I agreed.
Q. When did you make that agreement?
A. We finalized that agreement in June of 2020.
Q. So prior to June of 2020, you didn't have any finalized agreement with Merri regarding your ownership in TMG?
A. No. Meaning there was never a point at which my -- my -- as I said to you before, my ownership was never in question from when I started with Kashwere.
Q. And you started at Kashwere in 2019?
A. I did.
Q. Were you an owner in 2019?
A. Yes.
Q. On what basis do you believe that you were an owner in 2019 of TMG?
A. My agreement with Merri.
Q. And your agreement with Merri was based on an offer she made to you, correct?
A. My agreement with Merri was based on the conversations Merri and I had.
Q. In 2019?

Page 58

MR. SHOWEL: And 2020 he just testified.
MR. ARGIONIS: Okay. I could swear you in later if you want to testify. Right now I'm taking his deposition. If you have an objection, state the objection. I don't think he needs to be reminded things by you.
BY MR. ARGIONIS:
Q. It is really not a trick question. I'm just trying to get to what you're alleging you and Merri specifically discussed in 2019 about ownership, about you becoming a member. What do you recall? If you don't recall stuff, you don't recall stuff, I guess. It's your claim.
A. Yes. It's my claim, and Merri and I agreed that the only way I was going to start at Kashwere was as an owner.
Q. Okay. In 2019, you considered yourself an owner?
A. Yes.
Q. And you considered yourself an owner on a 70/30 split in 2019?
A. Yes.
Q. Because you are saying you accepted an offer to become a 70/30 owner in 2019?

Page 59

A. As I said to you before, my ownership was never in question from when I started with Kashwere and became official in June of 2020.
Q. What do you mean by became official?
A. We finalized all the relative terms of my ownership.
Q. So prior to that time, the relative terms of your ownership -- and we will get to what you mean by that -- were not finalized?
A. I think they were always clearly understood.
Q. At what point in time did they become clearly understood?
MR. SHOWEL: Well, objection to form of the question; calls for speculation. You can answer.
THE WITNESS: I don't think at any time were they not clearly understood.
BY MR. ARGIONIS:
Q. So in July of 2019, the terms of your ownership were clearly understood?
A. I think so, yes.
Q. What were those terms that were clearly understood in July of 2019?
A. Exactly what's in my claim.

Page 60

Q. Only what's been specified in your -- you pointed to Deposition Exhibit 4. You're saying just what's in this Deposition Exhibit 4?
A. No.
Q. Then tell us what you mean by it. It is your claim. You're going to have to testify to it.
A. I'm simply repeating myself, which is, as I said, there was no disagreement between me and Merri that I was an owner of an -- already an owner of Kashwere, and that we would build the business together.
Q. And as you sit here today, you can't give us any other terms that you agreed to in July of 2019, other than you were going to be an owner and that that was clearly understood?
A. Not that I recall.
Q. Did you put anything in writing in 2019 to capture what was clearly understood?
A. I believe we had some documents exchanged between us.
Q. And did you two in 2019 come to an agreement as to what those -- what that final document would look like?

Page 61

A. There wasn't a, quote unquote, "final document."
Q. Was there ever a final document?
MR. SHOWEL: I'm going to object to the form of the question. Vague in terms of final document. But you can answer.
MR. ARGIONIS: Just using terms he used. Again, if he doesn't understand that, fine.
THE WITNESS: You said final document.
BY MR. ARGIONIS:
Q. Let's go back. You testified your agreement was finalized in July 1, 2020, correct?
A. I said it became official.
Q. I asked you what do you mean it became official. You said it was finalized.
MR. SHOWEL: I'm not so sure that was his testimony.
BY MR. ARGIONIS:
Q. I will ask him again. What do you mean it becoming official July 1 of 2020?
A. It -- was -- there weren't any other -- there weren't any terms to be discussed in the future. It became part of all of the operating activities of the company, got recorded in the

Page 62

company's books and records, and we continued building the business as we had previously.
Q. Okay. Let's break that down now.
No future terms to be discussed as of July 1 of 2020, that's your testimony?
A. I think we had resolved all the substantive terms.
Q. Okay. But July 1 of 2020?
A. That's correct.
Q. So prior to that time, you didn't have a finalized on all the substantive terms, correct?
MR. SHOWEL: Objection to the form of the question as vague. You can answer.
THE WITNESS: We had had numerous discussions prior to that point.
BY MR. ARGIONIS:
Q. But had any of the future -- any of the substantive terms still remained open prior to July 1 of 2020?
A. Not that -- remained open?
Q. Yes.
A. We had discussions about them. I don't know what you mean by remained open.
Q. You both had not agreed to them.

Page 63

A. I actually don't recall significant disagreement about any terms in specific.
Q. Significant or not, was there any disagreement or -- were any of the terms finalized before July 1 of 2020? You gave me that date as a date there were no future terms, right? So prior to that, there was some open items then? Even if they were agreed to or disagreed to, there were open items prior to that time, right?
MR. SHOWEL: Objection; misstates prior testimony. You can answer.
THE WITNESS: I'm sorry. What's the question?
BY MR. ARGIONIS:
Q. Prior to July 1 of 2020 -- well, why do you say July 1 of 2020 there were no longer any future terms that needed to be discussed? What in your mind -- why do you attribute that to that particular date?
A. Because in early June, Merri and I said we were done. We were agreed and finalized.
Q. I like this. Early June now. Not late June and not July 1, right?

Page 64

A. Correct.
Q. Tell me about that. When did you and Merri in early June -- under what circumstances did you and Merri say you guys are done and agreed?
A. We had discussions about some of the documents that had gone back and forth, and we had calls, because COVID was preventing travel, and we agreed.
Q. What was said in early June? First off, let me ask you this. Can you attribute it to any particular day? Sometimes things occur, birthday of a loved one, anniversary of something, and I can attribute what occurred to me on a specific date. Can you attribute to the date you said you and Merri agreed in early June? Can you give me a day?
A. I think the first weekend of June.
Q. Why do you say first weekend? What triggers that?
A. Because I believe that's when we spoke to each other.
Q. Would that have been on a phone call?
A. Phone call or Zoom.

Page 65

Q. Okay. And what phone would you have used if it was a phone call? What phone number would you have used?
A. (847) 612-1010.
Q. You believe it occurred the first weekend of June?
A. I do.
Q. Could have been by Zoom also?
A. It was a phone call.
Q. So what was said in that first weekend of June? A bunch of documents going back and forth, okay, we're done?
MR. SHOWEL: Objection. The question's vague and compound. You can answer to the extent you understand it.
THE WITNESS: Yeah, we finalized the economics of our ownership relationship and moved forward.
BY MR. ARGIONIS:
Q. When you say the economics of the relationship, as opposed to just the relationship, what do you mean? Why did you include that adjective?
A. I mean the 70/30 split of ownership and

the fact that the owners would have no other compensation other than from the profits of TMG.
Q. And that was all the terms that were finalized that first weekend of June of 2020?
A. Other terms included there would be no contingency with respect to the ownership.
Q. Any other terms?
A. There wouldn't be bonuses or base pay.
Q. Give me all the terms that were agreed to.
MR. SHOWEL: Objection to the form of the question. It's not a memory test.
BY MR. ARGIONIS:
Q. Let me get at it this way. There were a lot of drafts -- and we will look at them soon. There were a lot of drafts, and you were proposing some, your lawyers were proposing some, red lines, et cetera. A lot of terms in there. Are you telling me in early June of 2020, despite all those drafts, you guys orally just said we're done and all these terms are finalized in my mind, in both of our minds that first weekend of June of 2020?
A. We finalized our ownership then.



Q. Orally?
A. Orally and then in writing.
Q. Did you and Merri ever sign the same document that included all these terms?
A. Not that I recall.
MR. SHOWEL: Hey, Jim, is now a good time to take a break?
THE WITNESS: I'd like to use the men's room.
MR. ARGIONIS: If you'd like to. How long do you want?
MR. SHOWEL: Two minute for me.
THE VIDEOGRAPHER: Off the record at 10:18.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 10:25.
BY MR. ARGIONIS:
Q. Before the break that we took, we were talking about first weekend in June of 2020 when you say you and Merri agreed to the terms of your ownership. Do you recall that?
A. Yes.
Q. And I'm just trying to get at there were a bunch of drafts going -- let me ask you this, as you know, there were drafts, and we will get



to them, and we will show you what was in there to refresh your memory. There were drafts occurring before that time period, and there were after drafts occurring after that time period, you recall that right, generally?
A. I'm sorry. Drafts of?
Q. Of a term sheet, of an operating agreement, things discussing the terms you talked about, ownership, restrictive covenants, there was an employment agreement we saw. I mean you were involved in this, right?
MR. SHOWEL: Objection. What's the question that's being asked?
BY MR. ARGIONIS:
Q. There were documents involved both before various drafts relative to your ownership interest in the TMG, LLC? There were draft documents out there, correct?
MR. SHOWEL: I'm sorry. Are you asking if there were draft documents before June of 2020?
MR. ARGIONIS: No. Right now. Because of the way he is answering, I'm asking if there were any documents, any drafts relative to your proposed ownership in TMG?



THE WITNESS: At any time, yes.
BY MR. ARGIONIS:
Q. Okay. Now let's break it down to before and after this weekend in June of 2020. Were there some drafts -- same type of drafts we're talking about now. Were there any prior to that weekend that you believe you finalized and agreed in June of 2020, were there some drafts before that time period?
MR. SHOWEL: I'm sorry. Object to the form of the question. I think you just asked in the span of one question both before and after.
MR. ARGIONIS: No. I'm asking him before.
MR. SHOWEL: So you're asking if there were draft agreements that were exchanged between he and Merri before June of 2020?
MR. ARGIONIS: No. I'm asking him were there drafts before June of 2020 relative to your ownership interest in TMG?
THE WITNESS: There were documents before June of 2020 relative to my ownership.
BY MR. ARGIONIS:
Q. When you say "documents," you changed my word. I asked for drafts. What's your

Page 70

distinction?
A. My distinction is there were documents that Merri and I exchanged, and there were documents that Merri's lawyers did.
Q. Okay. Let's talk about that. You're in the right time frame, right, prior to June, the weekend, you can't tell us -- you are saying it's the first weekend -- first weekend of June of 2020. Right now I'm asking you prior to that date, you said there were documents, right?
A. Yes.
Q. Okay. And you made a distinction now between the documents you and Merri exchanged and the documents that you said Merri's lawyers and your lawyers exchanged, correct?
A. My -- I'm --
MR. SHOWEL: I think that misstates the testimony. Go ahead and answer.
THE WITNESS: I'm sorry. The last part of the question? This is all pre -- this is in 2020 you're talking about?
BY MR. ARGIONIS:
Q. We're talking pre -- the first weekend of June 2020. Okay?

Page 71

A. Yep.
Q. Documents that -- drafts, I wanted to know were there drafts relative to the terms that you agreed upon on that first weekend of June of 2020 relative to TMG?
MR. SHOWEL: I'll be honest. I don't have a clue what you're asking him. Do you want to show him a document?
MR. ARGIONIS: No, I don't. I want him to answer.
THE WITNESS: There were discussions.
BY MR. ARGIONIS:
Q. I'm not talking about discussions. I'm talking were there drafts? There were no documents, drafts?
MR. SHOWEL: Again, objection to form of the question in terms of it's vague. Documents might be emails, it might be term sheets, it might be draft agreements.
MR. ARGIONIS: Thank you. Thank you, Matt, yes.
MR. SHOWEL: So you're asking him if they exchanged emails before June of 2020?
MR. ARGIONIS: Again, if you want to testify,

Page 72

you can.
BY MR. ARGIONIS:
Q. Are there documents that existed? We're going to narrow it down because -- this will go faster if you just answer the question, but if you want to make these distinctions, we will make these distinctions. So prior to June --
A. Jim, I'd like to understand your questions and be responsive to your questions.
Q. Absolutely.
A. Thank you.
Q. When you understand my question, you answer it. You answer it, but then you change it a bit in there, and I asked you why you changed it, and that's how we get into this. That's fine. You can handle this however you want. We will deal with it at the appropriate time.
You say that there was a finalized agreement orally the first weekend of June of 2020?
MR. SHOWEL: Objection; misstates the testimony. You can answer.
BY MR. ARGIONIS:
Q. Let me ask him again then.

Page 73

Do you have a particular date when you believe that you finalized your agreement with Merri relative to your ownership in TMG?
MR. SHOWEL: Objection; asked and answered.
MR. ARGIONIS: Okay. He is going to answer it again.
THE WITNESS: We finalized our ownership, and it became official when -- in June, and then July 1st of 2020 everything was followed through on.
BY MR. ARGIONIS:
Q. Okay. It became official both June and July?
MR. SHOWEL: Objection; misstates the testimony.
THE WITNESS: We finalized in June, and I made an investment, and my status was changed in the payroll system. And so if you want to call it -- it became official.
BY MR. ARGIONIS:
Q. You're using the term "it became official." I'm just asking you what mean by that. Who changed the status in the system?
A. Either myself or Rachel Melgar.
Q. Okay. Prior to that point in time, are

you telling me nothing was official?
A. No. What I said to you before is Merri and I never had any disagreement about my ownership.
Q. That's great. That's lovely. I'm not asking whether you had a disagreement or not. We will get to that. Obviously, there is a disagreement because there is a lawsuit here. So we will get to when that disagreement arose, et cetera.
I'm just asking you when do you believe that the terms of your ownership -- well, let's back up.
There was an offer made by Merri that you said in 2019, correct? To become an owner.
A. Yes.
Q. Now, you accepted that offer when?
A. I accepted that offer in 2019 and became active at TMG.
Q. And yet even though you accepted the offer in 2019 -- well, what happened relative to your ownership after you accepted in 2019? Did you become an owner? What's your understanding?



A. My understanding is from the moment I started work at -- being active at Kashwere, I was an owner.
Q. What percentage were you an owner when you became active in --
A. 30 percent.
Q. And you became active in this TMG/Kashwere in 2019?
A. That's right.
Q. And so as far as you're concerned, you were 30 percent owner once you became active in 2019, true?
A. I was an owner when -- yes.
Q. The ownership terms once you became active, were they all agreed upon at that point in time?
A. In 2019 when I started?
Q. When you became active, using your words. At that exact moment when you became active.
A. We didn't vary from my 30 percent ownership.
Q. Not my question.
A. Okay.



Q. The terms of your ownership were more than just the 70/30, right? Or is that all that you agreed upon? It's fine. It's not a trick question.
A. Well, there were -- okay, so there were additional terms that were agreed between the start of 2019 and July 1 of 2020.
Q. When you say the start of 2019, you mean the date you became active?
A. I'm sorry. I might have just misspoke. There were -- there was additional specificity between the summer of 2019 and July 1 of 2020. For example, around my participation in the healthcare plan and other perquisites, like, for example, a car.
Q. Those were not agreed to prior to you accepting the offer is what you're saying?
MR. SHOWEL: I'm sorry. Objection to form of the question. You're talking about the offer in July of 2019?
MR. ARGIONIS: No.

BY MR. ARGIONIS:
Q. I'm asking from the date when you say



you accepted and you became an owner, you told me that was the date -- you can give me the specific date, but you are saying the first time you became active in TMG/Kashwere, right? We established that several times now, that was in 2019?
A. Yeah.
Q. And then you said there were additional terms after that point in time that had not yet been finalized, correct?
A. Correct.
Q. So let's break it down. What were the terms that were finalized prior to that date when you became active and became an owner?
MR. SHOWEL: Objection to form of the question. It is not a memory test, but you can answer.
THE WITNESS: At this time, I don't recall other specific terms.
BY MR. ARGIONIS:
Q. And how about after you became active -- after you became active, which is the date you allege you became an owner in 2019, were there terms after that point in time that were agreed

upon between you and Merri relative to you becoming an owner?
MR. SHOWEL: Madam court reporter, can you read that last question back?
(Said question was read back.)
MR. SHOWEL: If you understand the question.
THE WITNESS: Excuse me. Please read back the last part of the phrase.
(Said question was read back.)
THE WITNESS: And that's after 2019? That's after 2019?
BY MR. ARGIONIS:
Q. I'm saying it's after the date when you allege you became an owner. You're telling me that's some date in 2019. You won't give me a date. If you give me a date, I will use that specific date. You won't give me a date. Probably because you don't remember. You didn't write it down, and you didn't sign anything relative to it which would have been better for you to remember, but since you don't remember, you said when you became active in 2019 in TMG,



you believe that's the date when you became an owner. So from that point forward, were there terms that -- additional terms that you and Merri agreed to relative to your ownership?
A. Yes. We --
Q. That's all I need, yes, right there.
Can you give me specific dates when -- regarding those terms? And we will get to them. When you agreed to those additional terms.
MR. SHOWEL: Objection to form of the question. Again, it is not a memory test. You can answer.
THE WITNESS: I believe that occurred in the first weekend of June.
BY MR. ARGIONIS:
Q. Okay. So now the first weekend of June is when additional terms were agreed upon, correct?
A. I don't think there was disagreement prior to that point.
Q. Great. So in 2019, all the terms of your ownership were agreed upon already?
A. My ownership was agreed upon.
Q. That's one term. Were there other



terms?
A. I don't know what to say other than repeat the sentence I just said.
Q. Okay. That's fine.
Let's look at paragraph 4 of your complaint, which is Exhibit 4. Between February and April of 2021 now, "Counsel for Gleckler and Dussias exchanged communications to attempt to formalize in writing certain additional terms to TMG's operating agreement to address corporate governance, distributions and leadership, in furtherance of Gleckler's desire to secure Women's Business Enterprise certification for TMG. Also during this time period under Dussias' leadership, TMG launched nearly all of its infrastructure."
Those additional terms that are referenced in paragraph 4 of this complaint, what's your understanding of them? What were they? If you remember. If you don't remember, you don't remember. We will get to documents.
A. So the terms in the operating agreement referenced here were around ensuring that Kashwere would qualify as a WBE, just what it



says here in the complaint.
Q. And you don't recall what those terms were?
A. I think generally they were terms around Merri's continued leadership of TMG so that it would meet the WBE certification requirements.
Q. Okay. So prior to that point in time, all of the terms relative to your ownership had been agreed upon between you and Merri?
MR. SHOWEL: Objection; asked and answered.
BY MR. ARGIONIS:
Q. You can answer.
A. Thank you. My ownership had been decided, yes.
Q. If you look at paragraph 12 through 16 of the complaint, talks about May of 2019. "Dussias met with Gleckler in Arizona." Paragraph 13, "During their meeting, Gleckler advised Dussias that she was involved in litigation with Reingold. Gleckler informed Dussias she expected resolution of the dispute with Reingold would result in his exit from TMG."
And then if we keep going, "Gleckler and Dussias discussed that upon Reingold's

departure, Dussias would be her business partner and co-owner in TMG. Gleckler and Dussias further engaged multiple communications relative to Dussias joining TMG and the scope of his equity in the company."
MR. SHOWEL: Hey, Jim, I'm sorry to interrupt you. One thing that we didn't do at the beginning that I should have like we did in Dean's deposition, does Merri have anybody in the room with her in Arizona?
MR. ARGIONIS: Merri, can you hear us?
MS. GLECKLER: Yeah. No, I don't.
MR. SHOWEL: What camera is she -- what camera is zooming --
MR. ARGIONIS: The court reporter's.
MR. SHOWEL: So the Zoom feed is coming through that camera. I wanted to make sure there wasn't one above me. You know what I mean? Sorry to interrupt.
BY MR. ARGIONIS:
Q. So what I wanted to focus on paragraph 16, "On or about July 4, 2019, Gleckler confirmed in writing to Dussias that upon joining TMG, the scope of his ownership would include the



following:" When you say confirmed in writing, what do you mean?
MR. SHOWEL: Objection. I think the allegation speaks for itself.
BY MR. ARGIONIS:
Q. What was the writing? Was it a handwritten note that you guys signed on a back of napkin? Was it email? Was it text?
A. It was probably an email.
Q. Does this refresh your memory then that -- then in paragraph 17, it mentions, "Gleckler confirmed Dussias would be a TMG co-owner. Initially Dussias would own 20 percent equity interest, and then it would grow to 30 percent equity after TMG sales exceeded 5 million per annum." Do you see that? Paragraph 17.
A. I see paragraph 17, yes.
Q. And that's what your discussions were with Merri in July of 2019, correct?
A. We had discussions around what's written there in 2019 and then in 2020.
Q. So what was mentioned in 2019 that it would initially be 20 percent, did you accept that?



MR. SHOWEL: Objection; misstates the document, but you can answer.
BY MR. ARGIONIS:
Q. I'm not asking whether the document says it or not. I'm asking what you did relative to her discussing 20 percent with you.
A. So we had discussions that in the event that -- this was in 2019, and I believe they carried into early 2020 -- that out of fairness, I would -- we considered that the 30 percent would only be 20 if there wasn't certain increase in Kashwere's value, the proxy of which was taken was a sales number as is described here.
Q. Was that agreed upon by you?
A. It was discussed.
Q. I'm not asking whether it was discussed. Obviously, it was discussed, it was put in there. Did you agree to that term?
A. We didn't finalize that term.
Q. Okay. Good. So July of 2019 --
A. I'm sorry. If the term you're asking me about is that we -- that the equity would flex, that is not what we ultimately agreed.
Q. Correct. That's what I'm asking you.



So you didn't agree to that term?
A. We didn't agree to my equity flexing from the 30 percent. We didn't finalize.
Q. And, again, how you would have finalized that? What do you mean by finalize?
A. That it was recognized by us that that's how we would go forward.
Q. And how do you contend that anything relative to your agreements with Merri was finalized? You both signed on something? You guys both shook hands? You guys both stood up and -- what? Tell me what you believed meant that something between you and Merri -- obviously now we're seeing terms, right? 20 percent. We saw 30, 70/30. There were different terms discussed. You said they were finalized at some point. What was the action that Merri and you took that meant in your mind that it was finalized?
MR. SHOWEL: Okay. I'm just going to object to the question as vague and compound. You can answer.
THE WITNESS: We agreed and said we were done. We put the -- we put our agreement in

Page 86

writing, and all of our actions and statements going forward as -- actually, as they had been previously were consistent with my ownership in the company.
BY MR. ARGIONIS:
Q. Great. So when you said, "We said we were done," both you and Merri used that specific term?
A. I believe so, yes.
Q. When did that occur?
A. First weekend of June.
MR. SHOWEL: I guess belatedly object to the form of the question as vague in terms of that term. Are you referring to the term done or the term --
MR. ARGIONIS: He said they said it. I said when did they say it. It's pretty simple.
BY MR. ARGIONIS:
Q. You say first weekend of June 2020?
A. Yes.
Q. So now is that a different point in time when you became owner relative to when you became active in 2019? Are you alleging both those are dates when you became owner?

Page 87

MR. SHOWEL: Objection to the form of the question, calls for a legal conclusion.
MR. ARGIONIS: No, I'm asking his understanding.
BY MR. ARGIONIS:
Q. I don't want you to give a legal conclusion, even though you did give legal advice in some documents we will look at.
I'm asking you when you became owner -- you told me when you became active in 2019, correct? But now you're telling me first weekend of June is when you and Merri said you were done with discussing the terms.
A. I don't think there was any disagreement about my ownership from when I started with Kashwere.
Q. So why would you need to say that we are done in June of 2020 if you were already an owner?
A. Because Merri wanted to have -- she wanted an economic change in -- in the terms of my ownership.
Q. What was that economic change she wanted?

Page 88

A. To start with the profits from going forward from July 1 of 2020 and to have all of our -- all of the cash that we received be distributions and not be base pay before a 70/30 split.
Q. Okay. And you are alleging that that occurred -- Merri brought that up when?
A. That occurred and was finalized in our discussion the first weekend of June.
Q. Pay attention. What I said is --
MR. SHOWEL: Objection. Wait a minute. Don't tell my client to pay attention. That's rude.
MR. ARGIONIS: He is not answering the question.
MR. SHOWEL: Ask a better question then.
MR. ARGIONIS: Repeat the -- if he is answering, then that means he understood it. He's got that ground rule. He can say I don't understand your question. He doesn't need for his counsel to say his counsel doesn't understand it. Let's go over --
THE WITNESS: Please don't interrupt me. I answered the question I thought you asked.

Page 89

MR. ARGIONIS: Okay. Let's try to again, can you read back my question, and with the understanding that any question I ask you, go ahead and tell me you don't understand it before you start answering. If you start answering, I am going to assume you understood it. Okay?
THE WITNESS: Okay.
(Said question was read back.)
BY MR. ARGIONIS:
Q. Let me ask it fresh. You said Merri wanted to change the economics of your ownership. Initially you said you became a 30 percent owner when you became active in 2019. And you say at some point Merri wanted to change the economics of it. When I asked you about this paragraph 17, it references initially at 20 percent equity. All I'm asking you, when did Merri first bring up that change in equity that you allege she wanted?
A. I think it was during that first weekend of June. And I thought it made sense for us and created alignment. And it was a significant economic benefit to Merri, but I was willing to do it.

Page 90

Q. I'm not trying to be cute here. What did you agree to do?
A. What we agreed was that we would move forward, and the only -- to the extent that we received any distributions, it would -- we would true up to a 70/30 split. There would be no base pay in front of the 30/70 sharing of the two owners.
Q. This 20 percent, you agreed to it?
A. No. Jim, that had gone by the wayside long before that.
Q. Let's back up. This 20 percent that you referenced in your paragraph 17, it's your allegation -- who brought that potential term up, you or Merri?
A. I think I did.
Q. When did you bring that term up?
A. I think recently from when we started having discussions that I was looking to be helpful to bound Merri's downside risk.
Q. Can you give me a date?
A. When our discussions started in 2019. I can't give you a specific date.
Q. Best roundabout, and you have some

Page 91

signposts here, you can say the date I became active, this weekend in June. That's all I'm trying to get at. If you can't give me a specific date -- you are saying you brought it up to Merri, this 20 percent, and then it would grow to 30 sometime in 2019, correct?
MR. SHOWEL: Objection; misstates the testimony.
BY MR. ARGIONIS:
Q. Then why don't you tell me when you first brought that up to Merri.
A. The spring/summer of 2019. Depends on whether it was after -- probably started to be discussed about of June 20th and then was discussed afterwards.
Q. Of 2019?
A. Of 2019. Yeah, I apologize if I misspoke.
Q. So you say you became an owner when you first became active in 2019, correct?
A. I said my ownership was never in question.
Q. You did say that, but I also asked when you did you first -- when is your understanding

Page 92

when you first became an owner, and you said when you first became active in 2019.
A. I said to you that I don't believe my ownership was ever in question at the time I became active in Kashwere and became official on July 1st, 2020.
Q. Okay. When you first became active in 2019, you were not an owner, is what you're saying now? Because you are saying you became official. You already testified prior -- we can read it back to you if you want -- that when you became active in 2019, you said you understood you were an owner.
A. I told you what I believe.
Q. Okay. And that dates back to 2019? The only reason I'm bringing that up is, did you present this 20 percent prior to or after the date when you believe you became an owner in 2019? Whatever date that might be.
A. The first time -- that was discussed prior to the beginning of August 2019.
Q. Okay. You gave me a date there, but what I'm asking, was it before or after the date when you say you became an owner in 2019?

Page 93

Because you didn't give me a date for that.
MR. SHOWEL: I object to the form of the question. It's not a memory test. You can answer.
THE WITNESS: Please repeat back the question.
(Said question was read back.)
THE WITNESS: I'm sorry. I've gotten lost. What's the this?
BY MR. ARGIONIS:
Q. When you brought up the 20 percent that would grow to 30, was it before or after the date you say you became an owner in 2019?
MR. SHOWEL: Objection; misstates the testimony.
THE WITNESS: The equity -- the 30 percent ownership, I think you're asking when I first brought it up --
BY MR. ARGIONIS:
Q. Paragraph 17, 20 percent would grow to 30. When did you first -- you told me you brought that up, and I'm just asking when did you bring it up relative to when you are saying you

Page 94

became an owner in 2019? Was it before or after?
A. Before.
Q. So when you became an owner, did you -- were those the terms of the ownership, that it was 20 percent that would grow to 30?
A. Prior to my starting, it took a different form, which was it would be 30 percent, and then there would be -- if certain conditions didn't occur, I guess that's the best way to think about it, then it may flex down to 20, and we had discussions about that, I think, through -- even into 2020, and that was not part of what we finalized.
Q. So your paragraph 17 said that there would be 20 percent equity that would grow to 30. Now you are saying there was a different discussion where it would be 30 percent and flex down to 20. Did I get that right?
A. An additional discussion, yes.
Q. And you didn't allege that in the complaint in this paragraph 17, correct?
A. In paragraph 17, no.
Q. Okay. Did you ever -- and so at the point in time when you became an owner, when you

Page 95

first became active in TMG in 2019, what was the agreement? Was it 30 flexing down to 20? Was it 20 flexing up to 30? Or was it just 70/30?
A. It was 30 and there may be conditions under which it could flex.
Q. But you hadn't discussed those conditions? You say there may be conditions.
A. We had had discussions, and we hadn't finalized them.
Q. So when you allege you became an owner in 2019, when you became active, you hadn't finalized yet your ownership percentage interest?
MR. SHOWEL: Objection; misstates the testimony.
MR. ARGIONIS: That's the question I'm asking you.
THE WITNESS: No. We had, it was 70/30.
BY MR. ARGIONIS:
Q. And then as you sit here today, you can't tell us what confirmed in writing you're talking about -- what writing you are talking about in paragraph 17. Paragraph 16. Sorry. It says, "July 4th, 2019, Gleckler confirmed in writing to Dussias that upon joining the scope of

Page 96

his ownership would include the following," and then there is 1 through 6.
A. I think that's an email that Merri sent.
Q. Okay. And is that your allegation that that email is what controls -- or that email is what the agreement was between you and Merri, that you guys agreed to relative to your ownership in TMG?
MR. SHOWEL: I guess I'll object to the form of the question based on the word "allegation." Are you asking if that's what the complaint alleges?
MR. ARGIONIS: No. You don't need to add words to my question.
BY MR. ARGIONIS:
Q. I'm asking was that the agreement you reached? That's what it says, "Merri confirmed in writing that upon joining the scope of his ownership." Is that a true statement?
A. Do I believe that Merri sent me those things in writing?
Q. No. Is it true? Assuming it was in an email, that's what your agreement was?
Let me ask it fresh. Does that

Page 97

paragraph 16 adequately -- or accurately set forth the agreement you reached with Gleckler, and that she confirmed in writing to you July 4th of 2019?
MR. SHOWEL: Objection; it is compound. But you can answer.
THE WITNESS: Sorry. Repeat back the question, again.
BY MR. ARGIONIS:
Q. I will ask if fresh. What did Merri confirm to you in writing on July 4th of 2019? Was that the terms of your ownership interest?
A. This is what she confirmed to me in writing, and I think that accurately reflected the discussions we had up until that point.
Q. And -- but I'm asking you at the time in time when you agreed with Merri, to use your terms, when you agreed that you were done, does that accurately reflect that point in time?
You said at some point in time you and Merri said we're done, terms are agreed to.
A. That was in 2020. This is in 2019.
Q. Okay. Does this accurately state what you agreed to when you guys said you were done?

Page 98

Just because it was presented in 2019 doesn't mean it didn't -- it wasn't agreed to at some point. That's all I'm asking. Did you agree to those terms that are alleged there in paragraph 1? Did you agree to those terms?
A. I agreed to move forward, becoming active at Kashwere with those terms, and we finalized different terms in 2020 but substantially the same terms.
Q. Okay. So you agreed to these terms, but then they were finalized different terms in 2020, right? And all I'm going to ask you to give you a preview is why did those terms change? Was it something you brought up, Merri brought up, the lawyers brought up?
A. I don't think it was the fact that the terms changed.
Q. You just said you agreed to different terms in 2020. You finalized different terms in 2020 was your exact wording. What I'm saying is, why were they different terms in 2020? Who initiated the different terms?
A. They simply came out of discussions between me and Merri.

Page 99

Q. You don't recall who suggested different terms, whether it was you or Merri?
A. I think there were some suggestions that Merri made and some suggestions that I made.
Q. So the agreement between you and Merri changed. There was one agreement -- there were certain terms in 2019, and then there were different terms that you say were finalized in 2020, correct?
A. Yes.
Q. And why were those terms -- why should those terms in 2020 control if you agreed to other terms in 2019?
MR. SHOWEL: Objection; calls for a legal conclusion.
BY MR. ARGIONIS:
Q. In your mind, why should you and Merri follow the terms that you finalized in 2020 if you had already agreed to terms that you alleged in paragraph 16 in 2019?
Let me ask it a different way since that's perplexing you and understandably so.
In 2019, you agreed to the terms you said in paragraph 16. Did you and Merri operate

Page 100

under those terms until you finalized different terms?
MR. SHOWEL: Objection; I think the question misstates his testimony.
MR. ARGIONIS: I'm asking him a fresh question.
BY MR. ARGIONIS:
Q. Did you operate under these terms that you agreed to in 2019 until you finalized new terms in 2020?
A. I think the best I can do for you, Jim, is to say that I moved forward, and those were the terms that we had discussed at that time.
Q. When you say those terms, you were looking at this document, you mean the ones 20 percent to flex up to 30?
A. Yes. You've been asking me about terms in 2019.
Q. You agreed to those, and you moved forward with those up until a point in time?
A. I agreed to move forward.
Q. With what terms? 20 percent growing to 30? I'm asking what percentage ownership. What terms did you agree to?

Page 101

A. Those had not been finalized at that point in time.
Q. So what had become finalized to make you an owner in June of 2019 when you first became active in TMG, as you testified to earlier?
A. Merri telling me straight out that that was the basis of our relationship.
Q. What was the basis of your relationship?
A. That I was a co-owner and her partner.
Q. But you had not yet agreed to what percentage of co-owner?
A. I don't think that's true.
Q. Then tell me what is true? In 2019 when you first became active, what was your percentage of ownership?
A. 30 percent with possible flex.
Q. 30 percent and flex down?
A. We had --
Q. Just answer my question. 30 percent and flex down is what you're saying?
A. Potentially.
Q. But the email that Merri said that you said you confirmed in writing -- let me finish -- the email that you alleged in your complaint,

paragraph 16, that Gleckler confirmed in writing July 4th, 2019, says that it's 20 percent equity up until 5 million in sales, then it increases to 30 percent. Are you saying that that email was wrong? It should have said decreased?

MR. SHOWEL: Objection to the form of the question as vague. You can answer.

THE WITNESS: So we had multiple discussions about how to structure, and so there was a point in time in which it was --

BY MR. ARGIONIS:

Q. Confirmed in writing, per paragraph 16?

MR. SHOWEL: Objection. Can you let him -- time out. Jim, Jim, can you let him answer the question instead of keep cutting him off?

MR. ARGIONIS: I want him to answer my question. He is going on to other topics.

MR. SHOWEL: Well, he is not. He is trying to answer the question as best he can.

BY MR. ARGIONIS:

Q. Let me ask you a fresh question then. Paragraph 16, do you agree that Gleckler confirmed in writing that Dussias upon joining TMG, the scope of his ownership would include the



following, and 1 through 6. Do you recall that that was what Merri confirmed with you? That those were the terms that she confirmed in writing to you?

A. She confirmed what we had discussed.

Q. Is this what you had discussed?

A. I think it is what we had discussed.

Q. Which is 20 percent increasing to 30?

A. Then I said to you that at a later time we discussed 30 decreasing to 20.

Q. Correct. And I asked you when in time, and you couldn't say that. So all I'm asking you now, regardless of what happened in the future, did you agree to this 20 percent equity increasing to 30 percent, and Merri -- did you agree to that in July 4th of 2019?

A. And I've said to you that I agreed to move forward becoming active with Kashwere.

Q. Great. That's not what I'm asking you, though. I'm asking you, did you agree as you allege in paragraph 16 -- as you allege in paragraph 16, to that statement, did you ever agree with Merri Gleckler that your ownership in TMG would include 20 percent equity up until 5



million in sales, then increases to 30 percent equity? Did you ever agree to that term?

A. We discussed that term and didn't finalize that term.

Q. So you never agreed to that term?

A. We agreed to my ownership.

Q. Okay. I'll get to that.

Did you ever agree to a 20 percent equity up until 5 million in sales that increased to 30 percent equity? Did you ever agree to that term. Regardless of what ownership you agreed to, did you ever agree to that specific term?

A. I don't -- we did not finalize that term.

Q. By you saying you didn't finalize that term, is that the same as you never having agreed to that term?

A. I don't think we disagreed about that term.

Q. So you agreed -- you didn't disagree that it should be 20 percent equity up to 30?

A. Jim, we talked about in principal my ownership having some fluctuation.

Q. Did you agree to that, to your ownership



having fluctuation, whether you talked about it or not? Obviously you talked about it. You got to talk about it before you can agree. My question to you is, you already told me several times that you talked about it.

A. It's not what we finalized.

Q. Let me finish.

A. Okay.

Q. Did you ever agree -- I don't know what you mean by finalized, so what I'm asking is -- because I asked you before, and you couldn't really give me a definition of what finalized means. So my question is pretty specific. Did you ever agree with Merri that your ownership in TMG would be 20 percent of equity up until 5 million in sales, then it increases to 30 percent equity? Did you ever agree to that?

A. We didn't disagree about that.

Q. What does that mean?

A. That means we discussed it, and when we finalized my ownership, it wasn't part of that.

Q. So you understand that you agree to something, you could change it later, right? You agree with me on that general term?

MR. SHOWEL: Yeah, I'm going to object as vague. You can answer.
BY MR. ARGIONIS:
Q. Let me ask it to you this way. If something happened to you in 2019, and you were separated from TMG, what would have been your percentage ownership interest?
MR. SHOWEL: Objection; calls for a legal conclusion and object in terms of an incomplete hypothetical and relevance as well. You can answer.
BY MR. ARGIONIS:
Q. Go ahead.
A. I guess I'd need to know more about the hypothetical.
Q. Yeah, the hypothetical is you decide to leave TMG. What's your ownership interest in 2019 -- December of 2019?
MR. SHOWEL: Objection again.
THE WITNESS: I don't have any speculation because it didn't occur.
BY MR. ARGIONIS:
Q. And you don't know. Okay.
December 2019, what was your



ownership interest in TMG? What's your understanding of that?
A. That it was 30 percent and possibly could flex.
Q. And why wouldn't it be 20 percent equity, up to 5 million in sales it increases to 30, as Gleckler confirmed in writing to you July 4th of 2019?
A. Because we've had further discussions.
Q. Okay. Great. So was there ever a writing and confirmation -- a confirmation in writing as to what percentage of ownership you had? Whether it was 30, 30 going down to 20 or 20 going up to 30, was there ever anything in writing? I thought that's what your complaint was referencing in paragraph 16. You are telling me it's not. So was there ever any confirmation in writing of what Gleckler agreed to?
A. Agreed to when?
Q. You had more than one agreement as to when you became owner? The ownership interest, when was that agreed upon?
A. In June of 2020.
Q. Great. Was there ever any confirmation



in writing from Merri as to that ownership interest that was confirmed in June of 2020?
A. Yes.
Q. What is that writing? It's not this email?
A. It's not that email.
Q. So which is it? Is it a different email? It's a handwritten note? It is a combination of emails? It's a draft that your attorneys presented? What's the writing that she confirmed to you of what your ownership interests would be, the 30 percent?
A. The -- I guess all the places that that ownership percentage existed in terms of the payroll system, the accounting system of the company, and I think there are other places. I don't recall at this time.
Q. Okay. And those were documents that you somehow had involvement in, you either directed or changed the payroll system, for instance, correct?
MR. SHOWEL: Objection. Question is compound and vague.



BY MR. ARGIONIS:
Q. Did you change the payroll system to reflect your 30 percent?
A. I already answered that. That either myself or Rachel Melgar did.
Q. Would Rachel do that without any direction from you?
A. I don't think so.
Q. Did you direct her to change it?
A. I believe so.
Q. So that change was something that you did or directed? That was my question.
A. That's correct.
Q. Any writing that Merri sent to you that said, Hey, Dean, we're done, here's the terms, similar to what you said was confirmed in July 4th of 2019 in paragraph 16 of your complaint that references your 30 percent coming from Merri?
A. I believe the documents that we exchanged in 2021 had that as well.
Q. And there were documents, plural, correct?
A. I think it may have been the same

document exchanged multiple times.
Q. And they were the exact same document?
MR. SHOWEL: Objection; form of the question and vague. I don't know what document you are talking about.
MR. ARGIONIS: He brought up a document that they exchanged, and I said documents plural, more than one document?
THE WITNESS: It may have been more than one document.
BY MR. ARGIONIS:
Q. So which document controls your -- which document are you alleging controls your ownership interest?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
BY MR. ARGIONIS:
Q. What's your understanding of what it controls?
A. I said there's no single document that controls. That it's multiple writings, and the agreement I made with Merri in June of 2020.
Q. And multiple writings, including one that says it's 20 percent ownership interest to



start going up to 30. Does that document also control?
How can we distinguish what document controls and what doesn't control?
MR. SHOWEL: Objection; compound, calls for a legal conclusion.
BY MR. ARGIONIS:
Q. Are one of the documents you exchanged in paragraph 16 a document where it was said your initial ownership interest would be 20 percent increasing to 30?
MR. SHOWEL: Objection; vague.
BY MR. ARGIONIS:
Q. You allege in your complaint. I'm assuming that would be true.
MR. SHOWEL: Alleges what? I don't understand what you're asking.
BY MR. ARGIONIS:
Q. Paragraph 16, is there a document -- you or your lawyers drafted paragraph 16. Do you rely on the accuracy of paragraph 16, your complaint?
MR. SHOWEL: Objection; vague, calls for a legal conclusion. I don't even know what that



means, rely on the accuracy of.
BY MR. ARGIONIS:
Q. Do you believe paragraph 16 is true?
A. Yes, I believe paragraph 16 is accurate.
Q. Okay. But you don't believe that at any point in time your ownership interest was 20 percent to start?
A. That's correct.
MR. ARGIONIS: Great. Let's mark this as Exhibit 5, I believe we're on.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 5 for Identification.)
BY MR. ARGIONIS:
Q. For the record, Dussias Exhibit 5 is a two-page document that was produced as TMG 00167071 through 72. It is an email with an attachment from Merri to you dated July 4th, 2019, at 8:44.
Do you recall this email?
A. I -- it's -- it looks like a valid email.
Q. Do you recall it?



A. Not specifically, no.
Q. If you look at paragraph 16 of the complaint, July 4th, 2019, is the confirmed in writing that's referenced in paragraph 16 of the complaint. Obviously, your lawyers couldn't have gotten that information without you providing it to them. So all I'm asking, do you recall this email?
MR. SHOWEL: You're asking if he recalls, and he said not specifically.
THE WITNESS: Okay.
BY MR. ARGIONIS:
Q. Great. "Hey, Dean, here are the notes of our conversations. Let me know if we missed anything. A lot to do in the meantime. Would you like to schedule a trip to Chicago. Let's discuss when I return." Look at the attachment it says, "Dean notes," do you know who prepared that document?
A. I believe Merri did.
Q. And in there it says, "20 percent equity up until 5 million in sales, and then it increases to 30 percent equity." Did you ever agree to that term with Merri in July of 2019?

Page 114

MR. SHOWEL: Objection; asked and answered.
BY MR. ARGIONIS:
Q. You can answer.
A. No, we didn't finalize that term.
Q. Let's look at the other ones. "Should the company be sold for under 5 million equity reverts back to 20, 5 million and above 30 percent equity." Did you ever agree to that term?
A. We didn't finalize that term.
Q. And by finalize, you're saying you didn't agree to it, right? Because that's my question. Did you ever agree to it? You keep changing it saying you didn't finalize it. If that means the same thing to you, that's fine. If it means something different, tell me what it means different.
A. We discussed these terms.
Q. Did you agree to them?
A. We agreed to my ownership.
Q. All right. I'm showing you a document.
A. I know.
Q. Right? We don't need to go into Court and show the judge a transcript that you're not

Page 115

answering the questions asked of you, do we?
This is a document that says -- it has specific terms on here. It was sent to you by Merri saying here are the notes of our conversation. Simple question. Number one, 20 percent equity up until 5 million in sales and then it increases to 30 percent equity. Did you ever agree to that term relative to your ownership in TMG? It is a simple yes or no.
A. You're asking about number one, correct?
Q. Number one, yeah.
A. That's not what we finalized.
Q. But did you agree to it, yes or no?
MR. SHOWEL: Was that ever part of your ownership interest, this specific term.
MR. ARGIONIS: I will ask the questions.
MR. SHOWEL: I'm trying to help.
MR. ARGIONIS: I don't think he needs your help. If he needs your help, that's a problem, because he will have to testify on the stand at some point if we get that far.
THE WITNESS: Great. I'm trying to accurately as possible tell you what happened.

Page 116

BY MR. ARGIONIS:
Q. Let me take a step back. Did you and Merri ever agree to you becoming an owner in TMG; yes or no?
A. Yes.
Q. Did you finalize becoming an owner in TMG?
A. Yes.
Q. Are those the same to you, finalize and agreeing to?
A. No, not necessarily.
Q. Explain the difference between you agreeing to something and you finalizing something, what's the distinction that you are making.
A. The distinction is between --
Q. Not relative to this. Just in general. You are using the term -- you simply refuse to answer my question whether you agreed to something yes or no, so you are saying you finalized. What distinction are you making between finalizing a term of an agreement and agreeing to it? Not relative to this, but just in general. Why is there a distinction between

Page 117

those two?
A. Because there's a gray in terms of agreeing or not disagreeing and what can change going forward.
Q. And would a writing signed by both parties clear up that gray area?
A. Possibly.
Q. Under what circumstances would it not clear up a gray area?
A. Depends on the writing.
Q. Whether it's clear or not, right?
A. Possibly.
Q. So -- and the fact that you're having difficulty answering yes or no, you need to say it's finalized, you need to say whether it was discussed. It would have been easier if you had a document signed by both of you and then we could see is that term in there, would you agree with that?
MR. SHOWEL: Objection; calls for an incomplete hypothetical.
THE WITNESS: It depends on the circumstances.

BY MR. ARGIONIS:
Q. So now going back to my question, do you see a distinction between having agreed to a term and having finalized a term?
A. Depends on the circumstances.
Q. Tell me how.
A. Depends on what the people do and what they say.
Q. So finalized does not equate to having agreed to it, is what you're saying?
A. I feel like I'm playing a semantic game, Jim.
Q. No. I'm asking you a question whether you agreed to something and you only want to respond that you finalized it.
Is that the same thing having agreed to it?
A. It may not be the same thing. Finalized implies that we agreed.
Q. Finalized implies that you agreed. Okay. Then I will ask you the question as to agree. You just said it implies you agreed. I'm asking you, did you ever agree to this term number one?



A. We had discussions about term number one.
Q. Not my question.
A. Well, that's my answer.
Q. How many discussions did you have?
A. More than three, less than ten.
Q. Did you ever agree to any terms that you discussed?
A. Yes.
Q. Did one of those terms that you agreed to include 20 percent equity up to 5 million in sales, then it increases to 30 percent equity?
A. It wasn't the term that we finalized.
Q. You did not agree to it; is that true?
A. We didn't disagree.
Q. What does that mean you didn't disagree? You agreed to 20 percent?
A. It means we discussed it, Jim, and that's what happened.
Q. Okay. So what was your initial ownership interest in TMG? The very first time you allege you became an owner, what percentage was yours?
A. 30 percent.



Q. So you never agreed that your initial interest would be 20 percent, true?
A. True.
Q. Thank you. Now look at number two, "Should the company be sold for under 50 million, equity reverts back to 20 percent" --
A. 5 million equity.
Q. Oh, "5 million equity, reverts back to 20 percent, 5 million and above 30 percent equity. Did you ever agree to that term?
A. We discussed that term.
Q. Did you agree to it?
A. We didn't finalize that term.
Q. And finalize to you is the same as not having -- well, finalize to you is the same as having agreed to it, right?
A. It's -- I don't think it's identical, but I've got to think about that.
Q. Because it is not identical, your answer is not responsive to my question.
A. And I'm being as responsive as I can be, Jim.
Q. I'm not asking if you finalized it or not, but did you agree to the second term of this



Exhibit No. 5?
A. I discussed this term with Merri.
Q. We've established that. Did you agree to it?
A. It's not what we finalized as my ownership.
Q. And finalize you distinguish different than having agreed to. My question to you is, did you agree to it? I'm not asking you if you finalized it. Simple question.
A. I considered it.
Q. But you didn't agree to it?
A. Didn't finalize it.
MR. ARGIONIS: Okay. We'll ask the judge to bring him back if he is not going to answer whether he agreed to it or not, since he wants to play games with that and use different terminology.
BY MR. ARGIONIS:
Q. number three is your same answer, "Should Merri want to get out earlier than Dean, Merri will let Dean know and give him the ability to buy Merri for the same offer." Did you ever agree to that term?

A. I think we had agreement about that term. I think Merri was fine with that term, and I was fine with that term.
Q. Okay. And so your agreement was as of July 4th of 2019?
A. I think that's what we both found acceptable at that time.
Q. How about number four, "Dean will receive a pay of 8,000 a month timing TBD," did you agree to that term?
A. We both found that term acceptable.
Q. As of July 4th of 2019?
A. Yes.
Q. How about number 5, did you agree to that term, "Shares will be transferred after March 15, final payment to Cedric, but we can create a side agreement until then to confirm all." Did you agree to that?
A. I think we both found that acceptable at that time.
Q. Did you ever create a side agreement?
A. I don't think so.
Q. What was your understanding that side agreement would look like?



A. I don't think I thought about it since then.
Q. Do you know who was going to create that side agreement?
A. Given that I haven't thought about it since then, no.
Q. How about term six, "Dean can openly work with Merri once the agreement is signed, believed by the end of July." Did you agree to that term?
A. I think we both found that term acceptable.
Q. As of July 4th, 2019, you found that acceptable?
A. Yeah.
Q. Did you ever sign anything to comply with that term?
A. Once agreement is signed, I believe refers to the MIPA.
Q. Why do you say that?
A. Because Merri initially had a concern that we not openly work together until the MIPA was signed which turned out not to be the case.
Q. What do you mean by that not being the



case?
A. The MIPA didn't get signed until September of 2019, and I started openly working end July, early August.
Q. You were already an owner when you began to openly work?
A. As I said to you before, there's never any disagreement about my ownership.
Q. I'm just asking whether there is disagreement or not, you believed you were an owner when you started working for Kashwere, right?
A. And I said on numerous occasions that my ownership became official July 1, 2020.
Q. But you can't define for us exactly what official means; is that true?
A. I don't know what you mean by define.
Q. What do you mean by it became official on a particular date? That's when it became effective?
MR. SHOWEL: Objection; asked and answered.
MR. ARGIONIS: No, he didn't answer. He didn't tell me what he means by that.
MR. SHOWEL: He did, because you went over



with this at least an hour ago. But you can answer to the extent you know.
MR. ARGIONIS: That was my question, whether he knows.
THE WITNESS: I'm sorry. Repeat the question.
BY MR. ARGIONIS:
Q. I will ask it fresh. What do you mean by something becoming official?
MR. SHOWEL: Objection; vague as to what something is.
THE WITNESS: That we were done. That we -- that I was an owner of TMG. I'd like to go to the men's actually.
MR. ARGIONIS: That's fine. We can take a break.
THE VIDEOGRAPHER: Off the record at 11:37.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 11:45.
MR. ARGIONIS: We're going to mark this as Exhibit 6.
(WHEREUPON, said document was marked as Dussias

Deposition Exhibit No. 6
for Identification.)
MR. ARGIONIS: For the record and for your edification, Mr. Dussias, there's documents at the bottom-right-hand corner. If they have the DHD, it's something that your counsel produced for DH Dussias, if it's TMG, it's something TMG produced. We may see something from J.P. Morgan. But this is a page from the text messages that your counsel turned over to us, and it's between and Merri Gleckler, and you see there the blue ones are yours as iPhone comes up with. I'm speaking to Fran" -- January 24th, kind of the middle of the page, third bubble down, January 24th, 2020, at 12:43 p.m. Central Standard Time, "I'm speaking to Fran at noon about Cedric's email." Do you know who Fran is?
A. Yes.
Q. Who is Fran?
A. Fran is an attorney.
Q. Was that attorney helping Merri at this particular point in time, if you know?
A. Yes.
Q. And that attorney was helping with



certain drafts of potential term sheets relative to your ownership interest in TMG, correct?
A. I think later, yes.
Q. You think later than this email?
A. Yes.
Q. Let's read. "Send me what you have regarding the operating agreement, as she keeps telling me I have to take care of all this. You said you have something prepared, so please send me, and we can discuss further when you're in town, otherwise Fran will start preparing something for you and I to discuss so we can get the ball rolling."
Do you recall that Fran was going to prepare some documents for you and Merri to get the ball rolling relative to your ownership interest in TMG?
A. Only when being reminded of this.
Q. Say that again.
A. I said seeing this, sure.
Q. So it refreshed your memory?
A. Yes.
Q. So as of January 2020, Merri's lawyer was going to start preparing something to get the



ball rolling relative to your ownership interest, right?
MR. SHOWEL: Objection; foundation. But you can answer.
THE WITNESS: It appears from Merri's text, yes.
BY MR. ARGIONIS:
Q. And she said that you said you have something prepared. Did you have something prepared? Do you recall?
A. I don't recall.
MR. ARGIONIS: Let's mark No. 7.
(WHEREUPON, said document
was marked as Dussias
Deposition Exhibit No. 7
for Identification.)
BY MR. ARGIONIS:
Q. What we've marked as Dussias Exhibit 7 is a document produced by your counsel as DHD3280 through 3281, and it is -- looks like one email from you to Merri May 7 of 2020, and the subject line is "Term Sheet for Dean Membership Acquisition." Do you see that?
A. I see that.



Q. Do you recall having received this email -- we will get to the attachments in another one -- but do you recall having received this email?
A. I think this is an email that was sent to me.
Q. Okay. And if we start with the bottom where it says Dean and Merri, the bottom of the first page, "Outlined is the term sheet that will outline your proposed ownership in TMG, as well as the duties and policies."
A. I'm sorry. Where are you reading from?
Q. Bottom of page two -- sorry. Bottom of page 1.
A. Thanks.
Q. It is an email if you want to flip to the other page from Cheryl. Do you recall who Cheryl was?
A. Yeah.
Q. She is a lawyer over at the Griesing Law --
A. Griesing, yeah.
Q. And those were the lawyers that were helping Merri draft documents relative to your

ownership interest in TMG? That's a law firm that Fran's affiliated with, right?
A. They drafted these documents.
Q. And then Merri forwarded to you, "Dean, I'm sorry. I'm not sure I sent this email in its entirety. Please see below and ensure that a copy sent to you is the same as it was updated prior to being sent to you," and then you say, May 7th, 2020, "Confirmed message received with attachment. Will send you back a red line after I have reviewed it." Do you see that?
A. I do, yep.
Q. Did you send that message?
A. I believe so.
Q. So you were going to -- so the intent between you and Merri was to document your ownership interest terms, correct? In writing.
A. Yes.
Q. And before that document would get drafted, the lawyer was sending a term sheet for you and Merri to look at, right?
A. The lawyer sent a term sheet.
Q. And if you look at the second page of this, the paragraph that begins, "Finally, please



note that Griesing Law represents Merri and TMG. You have a right to engage an attorney to work with you and explain the legal principles laid out in the term sheet, employment agreement, and operating agreement. If you choose not to engage a separate attorney, the documents will all be clear of my" -- "will all be clear of my representation, and in the event of a conflict with you, we will continue to represent only Merri and TMG." Do you recall receiving that message from Cheryl?
A. Upon reading it now, yes.
Q. And did you ever retain lawyers then to represent you relative to the term sheet, employment agreement, and operating agreement discussions?
A. I did not retain lawyers.
Q. But at some point -- what do you mean by you didn't retain lawyers?
A. I didn't retain lawyers at this time, which is what I thought you were asking me.
Q. I didn't say at this time. Did you retain lawyers relative to the discussions to document in writing the term sheet, employment



agreement, and operating agreement?
A. No.
Q. So in a bunch of the documents that we'll see and emails, and you said that previously Laura had represent you connected to your ownership interest in TMG, right?
A. No.
Q. Did any lawyers from the Golan Law Firm ever represent you relative to the TMG discussion of drafts?
A. I engaged with Matt's law firm in the spring of 2020, but not at this time.
Q. I'm saying at any time.
A. Okay. Well, didn't know what you meant.
Yes, so in the spring of 2020.
Q. Okay.
A. And it was not to discuss these documents.
Q. This email is May of 2020, so you had already retained a lawyer.
A. I apologize. 2021. My mistake. So -- I apologize.
Q. That's fine. Let's get clarity on that



since you do remember the time frame of that one.
A. Yeah.
Q. When was the first time -- I'm not asking what you -- the substance of what they conveyed to you, but when was the first time you retained any lawyers? Having seen -- the background is you saw this statement by Merri's lawyers about you should check with your own lawyer? Summarizing there.
A. Yeah.
Q. At what point did you retain any lawyer to look at the documents that Merri's lawyers were conveying over to you guys?
A. In 2021.
Q. And you say spring of 2021?
A. I don't know the exact date. So somewhere -- yes. I don't think it was January, but it could have been February, March. Could have been before March 21st.
Q. Prior to that time, you weren't dealing with Patzik firm or anyone else relative to any of these?
A. Correct.
Q. So then we'll get to that point in time.

Page 134

So at this point in time, May of 2020, you were not dealing with any attorney relative to the documents that Cheryl or Fran were preparing, correct?
A. That's correct.
Q. If you look at page 1 of this, Cheryl mentions -- we'll get to the term sheet. I will show you a copy of that, but it wasn't attached to this email because this was your response to Merri. The email was sent --
A. Understand. I got it. Yeah, yeah, that's fine.
Q. So, "Dean and Merri. "Outlined in the term sheet that will outline" -- "outlined is the term sheet that will outline your proposed ownership in TMG." Was that your understanding that as of May of 2020, you only had a proposed ownership in TMG?
A. No.
Q. So it's your assertion that prior to May of 2020, you already were an owner in TMG?
A. As I said to you before, I don't believe that my ownership was ever in question as -- from when I started with TMG and was finalized July

Page 135

1st.
Q. Great. What my question is, prior to May of 2021, you had an actual ownership in TMG is your assertion?
A. Yes. That was the only -- yes, that was the agreement between me and Merri.
Q. So did you ever respond back to Merri and Cheryl saying it's not a proposed ownership, it is an actual ownership?
A. I don't believe so.
Q. Why not?
A. I don't -- there wasn't a -- there's no reason. I mean --
Q. The lawyer's telling you you only have a proposed ownership, and you say there's no reason?
A. Okay. I wasn't going to -- never engaged with Cheryl in any direct conversations, so --
Q. Okay. Was the agreement between you and Merri that your ownership interest would be finalized once there was a writing signed by the parties?
A. No.

Page 136

Q. Was there ever an agreement between you and Merri that your agreement to become owner would be done and complete after the parties signed an agreement?
A. No.
Q. Did you ever agree that there would be a writing signed by you and Merri to document the terms of your ownership in TMG?
A. No.
Q. Then why were there so many -- and we'll get to them -- drafts back and forth if there was never an agreement by you that the terms would be documented in writing and signed?
A. I'm sorry. Repeat the question.
Q. Why were there so many drafts back and forth of term sheets, there was an employment agreement, which we will get to it, an operating agreement, various drafts if you never agreed that the parties, you and Merri, would put something in writing and both of you would sign it? If you never agreed to that, why so much fuss?
A. You're asking me I know why. I don't know why.

Page 137

Q. And Merri incurred -- she told you at one point she incurred attorney fees for the drafting of all these drafts, right? Do you recall that?
A. I do recall that.
Q. It was the tens of thousands of dollars, do you recall that?
A. I believe it was more than 10-K.
Q. Why -- do you have any understanding why Merri would incur all of that if you never agreed that there would be a writing to document the terms of your ownership?
MR. SHOWEL: Objection; calls for speculation. You can answer.
MR. ARGIONIS: No, it doesn't. I'm asking does he have an understanding of why Merri would do that.
THE WITNESS: No.
BY MR. ARGIONIS:
Q. Okay. At some point in time, you sent Merri some drafts that were different -- completely different than what the lawyers were sending back and for the, correct?
A. What time frame are you talking about?

Page 138

Q. 2021. Late 2020.
A. We had different drafts, yes.
Q. You sent some drafts, correct?
A. I believe I did send some drafts.
Q. Why were you sending drafts if you never agreed that you and Merri would document the terms of your ownership in writing and both of you would sign it?
A. Because what I sent was an operating agreement for TMG and our ownership had already been settled.
Q. And an employment agreement -- you had a draft employment agreement, too, right?
A. I did not. I don't believe I ever sent -- I -- I believe there was an employment agreement that's on the one that gets sent. Let's see. Yes, there apparently was.
Q. So the operating agreement, did you ever agree that there would be a written operating agreement that you and Merri would agree to and sign off on?
MR. SHOWEL: Objection; asked and answered. You can answer.
THE WITNESS: We talked about putting one in

Page 139

place, yes.
BY MR. ARGIONIS:
Q. So you agreed that there would be a writing that would be agreed to and signed and executed by you and Merri relative to an operating agreement, correct?
MR. SHOWEL: Objection; asked and answered. You can answer.
THE WITNESS: I think we both agreed that having an operating agreement at some point would be a good idea.
BY MR. ARGIONIS:
Q. What was your understanding of what this term sheet was leading up to?
Where did you go to school? Let's start -- where did you get your undergraduate degree? Brown, right?
A. Yes.
Q. And where did you get your MBA?
A. Kellogg.
Q. Northwestern. That's a good school.
A. Thanks.
Q. You are familiar with a term sheet?
A. Yes.

Page 140

Q. You've dealt with them in the past, right?
A. Yes.
Q. Term sheet, does that usually lead up to some other document?
A. It can.
Q. Okay. It certainly can. And so lawyers drafting a term sheet -- the lawyers -- let's get back to Exhibit 7. Cheryl is presenting you a term sheet. What was that term sheet supposed to lead up to?
MR. SHOWEL: Objection; calls for speculation.
THE WITNESS: Yeah.
BY MR. ARGIONIS:
Q. You don't know.
A. No.
Q. She says it right there, "Term sheet that will outline your proposed ownership in TMG," right?
A. That's what Cheryl said. That's what Cheryl wrote.
Q. Do you agree that that's what was going on at this point in time?

Page 141

A. No, not exactly.
Q. So what was she sending you a term sheet about a proposed ownership that on May 7th you said you will -- you will send back a red line after you review it? You don't know what you were reviewing and red lining?
MR. SHOWEL: Objection. You're asking two different questions. You can answer.
THE WITNESS: Which question would you like me to answer?
BY MR. ARGIONIS:
Q. Do you understand what you were red lining and reviewing?
A. Once I saw it, I had a better understanding of what was in there and --
Q. What was in there, generally?
MR. SHOWEL: Objection. Do you want to show him the term sheet?
THE WITNESS: Yeah. What was in there was whatever --
BY MR. ARGIONIS:
Q. Outlined your proposed ownership in TMG?
A. It was whatever Merri and Cheryl had agreed to send me.

Q. All my basic question is, at some point you understood that there was going to be a writing that you both would execute and agree to, right?
MR. SHOWEL: Objection; asked and answered.
THE WITNESS: A writing concern what?
BY MR. ARGIONIS:
Q. Your ownership interest in TMG.
You never agreed that there would be a document that both of you would sign relative to your ownership interest in TMG?
A. That was never a condition of my ownership.
Q. You've been involved in -- well, you never agreed to it is what you're saying?
A. No. It was never a condition of my ownership.
Q. Okay. But I'm asking you a different question.
A. Which is?
Q. Did you ever agree to put the terms of your ownership agreement in writing and to be signed off on by you and Merri?
MR. SHOWEL: Objection; asked and answered



like five times.
THE WITNESS: Yeah.
BY MR. ARGIONIS:
Q. Answer it again.
A. Read back the question, please.
Q. I'll ask it fresh.
A. Great.
Q. Did you ever agree that you and Merri would enter into a writing that would be signed and agreed to by both of you relative to the terms of your ownership interest?
A. No. That was never a condition of my ownership.
Q. Okay. It was never a condition of your ownership, but did you ever agree to do it? Whether it was a condition or not, you either agreed or didn't agree to it.
A. What's the it?
Q. Putting the terms of your ownership interest in writing and both of you signing off on it.
A. No, that was never a condition of my ownership.
Q. And by condition, what are you telling



me? That's not what I'm asking you. I'm asking whether you agreed to put it in writing. Maybe it was a condition. Maybe it wasn't a condition. I'm asking whether you agree that a writing would be had -- wait, let me finish.
A. Sure.
Q. Did you ever agree with Merri -- you brought a lawsuit here, sir. This isn't funny. This is costing people a lot of money. It really is. And we're here to understand your claim. We're asking -- we're looking at the complaint, and I'm asking you questions about it, and you are telling me different things are in the complaint, so I need to understand and the Court needs to understand what your claim is. So let's get to it.
Did you and Merri ever agree in writing -- did you ever agree that you would create a writing that would outline the terms of your ownership interest in TMG that you would both agree to and sign?
MR. SHOWEL: Objection; asked and answered. You can answer.
THE WITNESS: Having that agreement was never



a condition of my ownership.
BY MR. ARGIONIS:
Q. So you never agreed to put the terms of your ownership in writing?
A. No, the terms of our ownership were in writing.
Q. Where?
A. They were in the books and records of the company. They were in the payroll system. They were in drafts of the documents that went back and forth.
Q. So the drafts of the documents, that's what we're getting at, were -- did you ever agree that there would be drafts of documents prepared? Let's get to that, without even saying they'd be executed. Did you agree that there would be drafts of documents that would show -- that would outline the term of your ownership in TMG? Did you agree to that?
A. I participated in the exchange of drafts of documents.
Q. For what purpose? Why were you engaging in that?
A. To put in place an operating agreement

Page 146

for the company.
Q. And the -- you understand what an operating agreement does, right? You've got two LLCs at least you've been involved in; is that true?
A. That's true.
Q. We've already went over that.
A. That's true.
Q. Does an operating agreement outline somewhere in it what a member's ownership is?
MR. SHOWEL: Objection; calls for an incomplete hypothetical. You can answer.
THE WITNESS: It can, yes.
BY MR. ARGIONIS:
Q. The ones that -- you don't even know if you have you an operating agreement for your other LLCs in writing, correct?
A. Correct.
Q. So you said before that you were presenting draft operating agreements, right?
A. I had prepared some draft operating agreements, not at this time.
Q. Okay. The draft that you prepared of the operating agreement would outline the term of

Page 147

your ownership interest, true?
A. It could.
Q. All right. We'll get to the draft. You don't know if you put the ownership terms in the draft operating agreement you sent?
A. I don't recall any of the specifics of the red line.
Q. What was the purpose of sending a draft operating agreement? What was your intent of sending a draft operating agreement to Merri?
A. When I sent a draft operating agreement to Merri, which I believe the first time was somewhere around November, December of 2020, it was to -- have one for TMG and to accommodate the women business enterprise qualifications that Merri told me she would like to have met.
Q. Then let's -- we will certainly get to that. Let's back up. What was your understanding of why a term sheet was being sent to you?
A. I guess it was supposed to capture the previous discussions that Merri and I had had.
Q. About what?
A. About TMG.

Page 148

Q. What about TMG?
A. About our ownership and operating agreement for the company.
Q. So this term sheet was about ownership interest in TMG?
MR. SHOWEL: Objection. The term sheet can speak for itself. You can answer.
THE WITNESS: The term sheet may have been.
BY MR. ARGIONIS:
Q. You don't recall as you sit here today?
A. I don't recall specifics of that term sheet.
Q. Any other topic that that term sheet could be covering other than your ownership interest as Cheryl says here?
A. I don't recall.
Q. Do you recall whether you had any other discussions with Merri about term sheets that didn't involve your ownership interest?
A. No.
Q. And if you look at this same paragraph that we're looking at on Exhibit 7 --
A. Paragraph on the first page?
Q. Yeah, the first page.

Page 149

A. Okay.
Q. Outlined is a term sheet that will outline your proposed ownership in TMG, as well as duties and policies of the procedure, and then we go down a few more sentences, she says, "I specialize in starting, growing, and strategic planning with my clients. My experience covers the full life cycle of a business. I know that you have known Merri for a number of years and were with her as she was dealing with the litigation regarding the buyout of her former co-owner. Some of the provisions included in the term sheet, as well as the eventual operating agreement" -- do you know what she meant by event actual operating agreement?
A. I don't know what she meant, no.
Q. What did you understand it to mean when you read it?
A. That there may be an operating agreement finalized.
Q. "Once we come to agreement on the term sheet." So did you take that to mean that once you came to agreement on the term sheet, there would be an operating agreement drafted by this

lawyer?
A. That would be typical.
Q. And she says, "Are designed to prevent a similar situation from happening with you or with any additional member, if any, in the future." You understood that, right? That Merri was trying to avoid the litigation she had with Cedric with you or any other additional member, correct?
MR. SHOWEL: Objection. It's vague and calls for speculation. But you can answer.
MR. ARGIONIS: I'm not asking him to speculate. I'm asking what he understood about Merri's intent in getting -- hiring lawyers to draft up agreements when Merri had given you background about the Cedric lawsuit.
THE WITNESS: I don't think Merri wanted to be engaged in future litigation.
BY MR. ARGIONIS:
Q. Right. And the lawyer's telling you that we're going to put that in writing to avoid that, right?
MR. SHOWEL: Objection; email speaks for itself. You can answer.



BY MR. ARGIONIS:
Q. Did you understand that from this writing? You're a well-educated guy. You didn't understand what was being said here?
A. Yeah. Where is the writing that we're talking about? Yes, Cheryl's writing that is designed to prevent a similar situation. So, yes, it appears that Cheryl is writing that Merri would like to avoid future litigation.
Q. So Merri wanted something in writing signed by you and any other member that would get admitted, correct?
A. I don't know that to be the case.
Q. Did Merri express to you that she wanted a writing to avoid what was going on with a lawsuit that happened with her and Cedric?
A. Not with respect to my ownership, no.
Q. With respect to what then?
A. I don't know how Merri thought she might avoid future litigation.
Q. You just qualified that Merri didn't tell you that with respect to your ownership. So what did she -- you're implying she said it to you in some fashion relative to something else



that happened with Cedric. What is it?
A. No, I don't think that's the case.
Q. So I'll ask you again to get a clear answer. Did Merri ever tell you that she wanted a written agreement with you relative to your ownership so that she could avoid the litigation she endured with Cedric? Anything along those lines, not those exact words. She wanted something in writing because things happen between members, partners, whatever you want to call them, business associates, and it's best to have things in writing. Did she ever tell you that?
MR. SHOWEL: Objection; compound and vague. There's a lot in there, Jim.
BY MR. ARGIONIS:
Q. Sure. Did she ever tell you?
A. No.
Q. She never told you she wanted a writing relative to your ownership interest?
MR. SHOWEL: Objection. That's a different question than you just asked him.
THE WITNESS: Yeah, I don't know what relative means.



BY MR. ARGIONIS:
Q. Relating to, consisting of, connected to. Broadest sense possible.
A. No, not specifically.
Q. Merri never told you to get anything in writing -- that she wanted something in writing, yet she hired lawyers to send you drafts, and you sent drafts back to her, that's your testimony?
MR. SHOWEL: Asked and answered.
THE WITNESS: Asked and answered.
BY MR. ARGIONIS:
Q. What's the answer? You can answer.
A. Repeat the question, please.
Q. You don't get to object. Go ahead.
(Said question was read back.)
THE WITNESS: If Jim is asking me that Merri hired lawyers, Merri and her lawyers sent me draft documents, the answer is yes, that happened.
BY MR. ARGIONIS:
Q. That wasn't what I asked you.
A. So what did you ask me?
Q. Did Merri tell you that she was having

Page 154

lawyers draft this to avoid disputes that might arise?
A. Not specifically, no. I don't recall -- no.
Q. Whether -- you said not specifically. You qualified. Generally did she tell you that?
A. Generally, Merri expressed the fact she would not like to be involved in any future litigation.
Q. And one way she was going to try to avoid that was having Fran document things with you, correct?
A. No. Ask -- ask Merri.
Q. She never told you that? Okay. I'm telling you, did she tell you that? I know what Merri told you. I'm asking you, can you admit or deny whether she told you that in any fashion, generally, specifically, unspecifically?
MR. SHOWEL: Objection; vague, compound, and, frankly, I'm not sure what you're asking. But go ahead.
THE WITNESS: Jim, Merri initiated litigation with Cedric. Merri was in a prior litigation with Pete Seltzer and Heroshi. My recollection

Page 155

is that's what issue referred to that she wanted to avoid, the Heroshi/Seltzer episode. She chose to do what she chose to do with respect to Cedric.
BY MR. ARGIONIS:
Q. But now I'm talking relative to you. With that background, she wanted to avoid litigation, did she generally tell you that she wanted to get a writing signed by both of you agreed to to avoid potential litigation? Did she ever bring that concept up to you in any form or fashion?
A. Other than she generally wanted to avoid litigation in the future, no.
Q. Okay. So that general avoid litigation in the future, she wanted something in writing and signed by you; is that what you're telling me?
A. No, that's not what I'm telling you, Jim.
Q. Just tell me that. She never told you that she wanted something in writing with you relative to your TMG ownership interest, that's what you're telling me?

Page 156

A. I -- I've -- I've answered the question.
Q. And then what the lawyer says here, last sentence of her statement on page 1 of this, Exhibit 7, to avoid ex -- let's read before. If the scenario -- my goal is to -- I'm going back three sentences. "My goal is that everyone knows what to expect in nearly every situation a business would face, and to provide a process for handling it at the time. If the scenario never materializes, then that is usually best for everyone concerned. But if they to, to avoid expensive and protracted litigation, we would look to the operating agreement to see how the parties agreed to resolve them. Do you see that?
A. I see that.
Q. Do you recall having read that back in May of 2020?
A. No.
Q. Do you recall Merri ever expressing to you a concept similar to that, that to avoid protracted litigation, we should have a writing that we can all look to to resolve?
A. I don't recall Merri expressing any legal concept to me.

Page 157

Q. Great. Do you recall her lawyers ever expressing any legal concept to you?
A. No.
Q. But you do recall the lawyers telling you to get your own lawyer? You already said that.
A. No, I don't -- I don't think that's what that says. They did not give me any legal advice. They simply --
Q. "Finally, please note that the Griesing Law represents Merri and TMG. You have a right to engage an attorney to work with you and explain with the legal principle laid out in the term sheet, employment agreement, operating agreement. If you choose not to engage a separate attorney, the documents will all be clear of my representation. In the event of a conflict with you, we will continue to represent Merri and TMG."
So my question to you is, Merri's lawyers expressed to you that you -- it would be a good idea for you to look to get your own lawyer?
MR. SHOWEL: Objection. That's plainly not

what that document says.
THE WITNESS: That's not at all what that says.
BY MR. ARGIONIS:
Q. Do you recall her making that statement?
A. Who made what statement? No, because nobody spoke to me. Okay. So I don't recall reading that. I'm reading it right now. And it doesn't mean at all -- somebody giving me advice to go get my own lawyer.
Q. What do you understand it to mean?
A. It means that, I guess, this is America, and I can go get a lawyer if I want, and that it appears that she is telling me at the end of this that she is Merri's lawyer and TMG's lawyer.
Q. And you remember her expressing that to you?
A. She didn't express it to me, she wrote it.
Q. Do you remember her writing that to you?
A. No. Upon reading it now, then --
Q. That's my question.
A. Okay. I believe this is a valid email; that somebody didn't make it up.



Q. And the concept in there you recall that she mentioned that it would be a good idea for you to have a lawyer, summarizing again?
MR. SHOWEL: Objection.
THE WITNESS: No, no.
BY MR. ARGIONIS:
Q. That's all I'm asking, whether --
A. I don't recall it either.
Q. Mr. Dussias, it will go quicker if you don't try to restate my question. Just answer. All I asked you was whether you remember the concepts that -- however you interpret it -- that Ms. Cheryl sent to you on this particular date. If you don't, you don't.
MR. SHOWEL: Hey, Dean, let me get my objection out. I object that the question's been asked and answered. He's already said that he doesn't remember reading this, Dean. You can answer his question again to the extent you understand it.
THE WITNESS: I don't think there is a question. You just made a statement as to how things would go easier.
MR. ARGIONIS: He is paying attention.



THE WITNESS: And I have been.
MR. ARGIONIS: Okay. Let's mark this as Exhibit 8.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 8 for Identification.)
MR. ARGIONIS: Let's go through this exhibit, and then we will take a break for lunch.
THE WITNESS: That would be lovely.
BY MR. ARGIONIS:
Q. We marked as Deposition Exhibit 8 a two-page document, TMG 192436 through 37, an email from you Dean@Dussias.org. Is that your email address?
A. That is my email address. Dean@Dussias.org.
Q. Do you use that for particular business or personal?
A. Personal.
Q. And it's to Merri, right?
A. Yes, let's look. It's to Merri.
Q. The subject is "Kashwere for MG and DHD." What did you mean by that?



A. That MG would be Merri Gleckler and DHD would be Dean Hippocrates Dussias.
Q. And this is February of 2020, correct?
A. Yes.
Q. And so if we look at the attachment there -- did you create this attachment?
A. I believe I did.
Q. A Word document, if you recall?
A. Probably.
Q. What computer would you have used?
A. Don't recall.
Q. Do you have the same computer nowadays that you had back in 2020?
A. I don't think so.
Q. What computer do you have now, type and model, laptop, Apple?
A. I have a Mac Air book, I think.
Q. Back then do you recall what you had February-ish of 2020?
A. I might have had an earlier version.
Q. In the document you say, "Please see attached."
A. Yep.
Q. And the attachment says, "New operating

agreement to be created for Kashwere."
You understood that there was an operating agreement for -- well, what did you mean for Kashwere? Did you mean TMG?
A. Yes.
Q. So your understanding that as of this time, February 2020, TMG had an existing operating agreement, right?
A. At this time?
Q. Yeah.
A. It didn't.
Q. Why didn't it?
A. Because Merri didn't want the old one.
Q. What do you mean by Merri didn't want the old one? When did she tell this to you, what date?
A. She told it to me in the fall of 2019 and again when I was in Arizona.
Q. What did she say relative to that?
A. Didn't want anything that had to do with Cedric. So not the operating agreement, not the infrastructure that had been built, not the systems, et cetera.
Q. Okay. And why did she ex -- did she



explain to you why she didn't want the operating agreement?
A. It was an artifact of her previously awful partnership.
Q. Did she tell you how she was going to go about getting rid of that operating agreement?
A. I think she stated it had already been gotten rid of.
Q. How so? What did she tell you?
A. She didn't explain.
Q. Do you have an understanding -- you got -- let me ask you this, we turned over the documents that Cedric entered into when he was bought out of TMG. And I don't recall if we kept those attorney eyes only. I think you objected.
MR. HICKMAN: Judge ruled that they're not.
MR. ARGIONIS: The judge ruled they're not. I believe your client wanted to look at them.
BY MR. ARGIONIS:
Q. Did you look at that membership interest purchase agreement, what we've been calling MIPA, M-I-P-A?
A. I don't believe I looked at it since it was taken off the list whatever.



Q. So your testimony is your attorney never sent that to you to review?
MR. SHOWEL: I don't think I did, to be honest, because it was AEO, and he had already seen it when he was involved -- to be honest, I don't think I ever -- in fact, I think you asked me to send it to you last week and I didn't. Sorry.
THE WITNESS: No worries.
BY MR. ARGIONIS:
Q. So you've seen that agreement at some point?
A. I had seen that agreement, yes.
Q. In it, didn't it say that he was going to remove himself from TMG?
MR. SHOWEL: Objection; document speaks for itself.
MR. ARGIONIS: Sure.
BY MR. ARGIONIS:
Q. What's your understanding? That Cedric was still going to remain a part of TMG? That would be ridiculous, right?
A. Yeah.
Q. Absolutely.



A. So as of the signature of that agreement, Cedric cooperated fully in a transition, but no longer had any decision-making power at Kashwere and Merri did.
Q. Okay. So why would Merri need a new operating agreement if Cedric was already removed?
A. Because Merri didn't like that operating agreement.
Q. Okay. And does her existing operating agreement have -- express how she should go about getting a new one?
A. I don't know.
Q. You don't know one way or another, correct?
MR. SHOWEL: Objection; asked and answered. He said he didn't know.
BY MR. ARGIONIS:
Q. Did you ever take a look at it?
A. When?
Q. Any time.
A. Yes.
Q. When?
A. When I consulted for TMG for Kashwere.

Page 166

Q. Did that agreement contain provisions as to how Merri can go about changing it?
A. I don't recall.
Q. Great.
A. Come on.
Q. In your experience, do operating agreements -- how much experience have you had with operating agreements?
A. I don't know. I don't know how to answer that question.
Q. You don't know if -- have you had any experience with operating agreements?
A. Yes.
Q. Connected to what? Just TMG?
A. No. Connected to my work at Rand McNally.
Q. Tell us about that. Rand McNally first. What was your experience with the operating agreements?
A. So in considering various entities, to set up and/or looking at companies we wanted to acquire, came across a variety of operating agreements.
Q. You reviewed them?

Page 167

A. Yes.
Q. Did they ever have terms in them expressing how a new member can be admitted and/or expelled?
A. Some of them may have.
Q. Okay. Do you have an understanding when they don't have those terms in there what happens?
MR. SHOWEL: Objection; calls for a legal conclusion, incomplete hypothetical. What are we even talking about right now?
MR. ARGIONIS: His understanding of operating agreements.
MR. SHOWEL: I mean that's a broad -- broad spectrum.
MR. ARGIONIS: Yeah.
THE WITNESS: Yep.
BY MR. ARGIONIS:
Q. You have an understanding? That's what I'm exploring. If you don't, you don't, we move on.
A. Yeah, I guess I'd say I'm comfortable discussing operating agreements.
Q. Great. So operating agreements often

Page 168

have provisions in there that specifically say this is the way you would change this operating agreement, right?
A. They may, they may not.
Q. That's all I'm asking you.
A. Okay. I think I answered that a few minutes ago.
Q. TMG's operating agreement has specific provisions as to how to change it, correct?
MR. SHOWEL: Objection; foundation. The document -- the document speaks for itself, and he said a second ago unambiguously that he doesn't remember what's in the TMG operating agreement. If you want to show him the TMG operating agreement, go ahead and do it.
MR. ARGIONIS: We will get to that. We're exploring what he remembers and doesn't remember.
THE WITNESS: Fabulous.
BY MR. ARGIONIS:
Q. Do you remember whether it has --
A. Do I remember what? The old Cedric-Merri operating agreement? No, I do not.
Q. Why do you call it the old Cedric-Merri operating agreement?

Page 169

A. Because Merri didn't want it to have anything to go do with our TMG.
Q. And Merri not wanting something means it automatically happens? I don't understand what you mean by that. Do you know? Or maybe you don't know.
MR. SHOWEL: Objection; vague, compound, calls for an incomplete hypothetical.
BY MR. ARGIONIS:
Q. Let me ask a fresh question then. Do you know if Merri ever got rid of that operating agreement that TMG had that you had reviewed at one point you said, do you know?
A. I believe Merri did.
Q. How? What's your basis for knowing that she got rid of it?
A. From Merri saying she didn't want it to have anything to do with Kashwere and with us.
Q. That's all she told you, and from that you're implying she got rid of it?
A. In Merri's head, it was gone.
Q. That's what I'm getting at. Is that the basis -- you think that when Merri believes in her head that the operating agreement is gone,

Page 170

that it's gone? That's all I'm asking you.
A. And my answer is, Merri believed it was gone.
Q. Okay. Do you know if Merri ever spoke with a lawyer to make it gone, your word?
A. I don't know about Merri's discussions with lawyers or anybody else for that matter.
Q. Do you know if she followed the specific provisions in that TMG agreement to make it, quote unquote, "gone"?
A. No.
Q. Okay. Any other basis you have other than Merri purportedly telling you she wanted it gone? Any other basis for thinking that it was gone?
A. Sure, that it never ever came up between us. It's really easy, Jim. Really clear.
Q. Okay. It never came up between you -- you and Merri is what your testimony is as you sit here?
A. To my recollection, yes.
Q. We'll get to a bunch of drafts here that say amended and restated operating agreement. Do you recall that?

Page 171

A. You will have to show me the documents.
Q. I will. I'm asking if you recall it.
A. I believe that language may have been used.
Q. Correct. In that language, it mentions the TMG operating agreement, that we're amending it, right?
MR. SHOWEL: Objection.
THE WITNESS: I don't think so. Sorry, Matt. I apologize.
MR. SHOWEL: Objection. Those documents speak for themselves. You can answer.
BY MR. ARGIONIS:
Q. Yeah, you can answer.
A. I'm sorry. What's the question?
MR. ARGIONIS: We'll withdraw that one.
BY MR. ARGIONIS:
Q. So the amended and restated document, why would a lawyer send a draft that says amended and restated operating agreement? If you know. You might not know. They might not have covered that in MBA school.
A. Why might a lawyer send that?
Q. Well, you were sent them you said. Why

Page 172

do you believe those were sent to you that said amended and restated?
MR. SHOWEL: Objection to the form of the question as vague. Are you asking him why the documents use the language amended and restated?
MR. ARGIONIS: No, I'm not. I'm asking if he has an understanding of what an amended and restated operating agreement is.
MR. SHOWEL: Well, objection; vague, calls for an incomplete hypothetical. You can answer.
THE WITNESS: Generally speaking, yes.
BY MR. ARGIONIS:
Q. What's your general speaking understanding of what amended and restated operating agreement means?
A. It means that -- frankly, what I meant was it's part of a boilerplate, and I have -- it's part of boilerplate language that a lawyer may have put in a document.
Q. So in your -- now we're back on Exhibit 8. This is your document that you created. New operating agreement to be created for Kashwere, and that was -- was that your -- what did you mean by new operating agreement? Were you going

Page 173

to go amend the old one?
A. Just what it says, Jim.
Q. I don't know what it says.
A. It says new.
Q. What does new operating agreement mean? Amending the old one or starting from scratch? Take that question then.
A. It would mean putting a new one in place, likely starting from scratch.
Q. Likely but --
A. I hadn't started drafting.
Q. So it could mean that you guys were just going to amend the existing one?
A. I guess that's possible.
Q. Great. Thank you.
Next bullet point, "MG equity at 70, DHD equity at 30 with the following exceptions: If revenue cash were less than 5 million, then DHD profit distributions to reduce to 20 percent at the current time profit distributions, if any, to be made at the 20 level." Was that what you guys had agreed relative to your ownership interest?
A. It's what we discussed.

Q. Again, this is February of 2020. You had only discussed 70 to 30 and this 20 percent, you had not agreed to it at this point in time, February 22 of 2020?
A. It was a shared understanding.
Q. So there was no agreement to it? Just asking you a question. There was no agreement?
A. And my response it was a shared understanding.
Q. But no agreement? Only a shared understanding?
A. It was a shared understanding.
Q. Was that shared understanding going to be expressed in the new operating agreement you mention in bullet point one?
A. I hadn't -- don't know.
Q. Okay. Did you feel comfortable that you were going to draft that without getting any legal advice?
A. I would feel comfortable drafting an operating agreement, yes.
Q. Why?
A. Because I've done a lot of contracting.
Q. You understand how operating agreements



work, right?
A. I'm comfortable, and I think I understand.
Q. And so if you had a clearly -- what was your intention of how the operating agreement would expel a member? You don't remember?
A. Do you mean at this time?
Q. Yes.
A. Hadn't even considered the topic at that time that I can recall.
Q. So you and Merri hadn't agreed to that particular topic at that point in time? If you hadn't considered it, how would you have agreed to it? You don't remember?
A. What I recall is us discussing what would happen if one or the other of us wanted to leave the business.
Q. Was there an agreement as to how that would be handled by February 22 of 2020?
A. I don't recall any disagreement.
Q. Again, that's not my question.
A. So, generally speaking, I don't recall any disagreement.
Q. What do you not recall no disagreement



on?
A. Actually, I don't recall any disagreement.
Q. Do you recall that you would you only get your capital contribution back if you were expelled?
A. No.
Q. That you specifically don't recall, right?
A. Well, I don't -- I don't know what it means to have a specific non-recollection.
Q. Okay. February 22 of 2020, had you agreed that if you were expelled, you'd only get your capital contribution back? Was that a term you agreed to on February 22nd of 2020?
A. I don't believe we ever discussed the topic involving my expulsion.
Q. So February 22nd of 2020, you and Merri had never discussed how a member could get expelled from the LLC that you were joining; is that true?
MR. SHOWEL: Objection.
THE WITNESS: I don't recall.



BY MR. ARGIONIS:
Q. Okay. So it's possible since you don't recall that you may have agreed by February 22nd of 2020 that if you were expelled, you'd only get your capital contribution?
A. No, I don't think that's possible.
Q. Why not?
A. Because I don't remember ever discussing that.
Q. And if you don't remember, it's possible? Could be one or could be the other, right?
A. Is there some probability that that's the case? Perhaps.
Q. Okay. That's what possible means.
As this document that you attached here, did this document that we've marked as Exhibit 8, the attachment that you prepared in Word document, is it your allegation that these are the terms that control your agreement with Merri for you to be an owner in TMG?
A. No.
Q. Okay. Great.
A. I thought we were breaking for lunch.

Page 178

MR. ARGIONIS: Yeah, yeah, we did say that. Let me ask you one more on this Exhibit 8 before we break.
BY MR. ARGIONIS:
Q. At the bottom of this Word document that you prepared, right, TMG 192437, that's the Bates number on it, the last bullet point, you drafted that, right?
A. I believe so.
Q. "All other operating agreement content to be drafted by MG," you meant Merri Gleckler?
A. Yes.
Q. "And Griesing Law, that's Merri's attorneys, Fran and Cheryl?
A. I believe so.
Q. "For comment by DHD," that means you, right?
A. That means me.
Q. "Will trust terms to be reciprocal, protective of minority unit holder rights, enabling for MG to make business decisions and context of building value in Kashwere." So you agreed that there would be a writing drafted by IG and Griesing Law for comment by you, right?

Page 179

A. We both intended that that would be the case.
Q. And you drafted that to document that was your understanding?
A. I believe I wrote this.
Q. Right. And you specifically understood that all other operating content to be drafted by MG and Griesing Law for comment by DHD, right?
A. That's what it reads.
Q. So but the terms up above are not the final terms that you agreed to?
A. That's correct.
Q. And there's some blanks even in the --
A. Yeah. There are some blanks on the page.
MR. ARGIONIS: Let's take a break. What time you want to come back? It's 12:42 now. Off the record.
THE VIDEOGRAPHER: Off the record at 12:42.
(Recess.)
MR. ARGIONIS: Mark this as Exhibit 9.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 9

Page 180

for Identification.)
THE VIDEOGRAPHER: Back on the record at 1:37.
BY MR. ARGIONIS:
Q. Showing you what we have marked as Dussias Exhibit No. 9, and it's a multi-page document email and attachment TMG 168420 through 427. And this is again March -- sorry, May 7 of 2020. This was the email that we looked at before prior to your response with the actual term sheet. I wanted to show you the term sheet that was circulated with that email May 7, 2020. So the term sheet begins at 168421, and on that particular page, I wanted to show you -- well, first, do you recall having received a term sheet on or about May of 2020?
A. After looking at this message, yes.
Q. And it's a term sheet -- it is entitled "Term Sheet TMG Kreations LLC, Revised and Restated Operating Agreement," right?
A. That's what it reads at the top.
Q. Was that your understanding, this was a term sheet connected to a proposed revised and restated operating agreement?

Page 181

A. It was a term sheet.
Q. What was your understanding of this term sheet?
A. That it was the product of discussions between Merri and her lawyers, and that it -- it didn't represent the discussions between Merri and me.
Q. Okay. And so -- and you could say that without having really looked at this in detail, right?
A. I just did look at it. So I said that after having looked at it. And recalling my reaction to it.
Q. Okay. So the terms in this term sheet were not what you agreed to with Merri?
A. Neither the structure nor the specific terms.
Q. Great. The document I showed you before with that email, those, too, were not the terms you agreed to it, right?
MR. SHOWEL: Objection to form. Which document?
THE WITNESS: Are you talking the previous version of this one that had no attachment?

BY MR. ARGIONIS:
Q. No. The email that we looked at.
A. The email I said --
MR. SHOWEL: Wait. Are you talking about Exhibit 8?
THE WITNESS: Let's clarify what you're talking about.
MR. ARGIONIS: No -- yeah, yeah.
BY MR. ARGIONIS:
Q. Let's start with that. I didn't mean that. Let's start with Exhibit 8, Exhibit 8 is not the terms that you agreed to with Merri?
A. As I said before, these were the terms that we were discussing that we -- I don't remember any substantial disagreement on.
Q. When say you don't remember any substantial disagreement, is your claim that those terms should be enforced or not?
Let me ask you a simpler question. Of the documents you've seen so far, Exhibit 5, Exhibit 8, and you already mentioned the one you are looking at now, do any of those express the terms that you believe you agreed to with Merri?
A. In part.



Q. Okay. Is there any one document -- we'll go through things. Is there any one document that expresses all the terms that you and Merri agreed to relative to your TMG ownership, or do you have to look at more than one document?
MR. SHOWEL: Objection to form of the question. Are you talking about any one of the documents you just listed or any document ever in the -- in the history of the world?
MR. ARGIONIS: Yeah, it's any. That's why asked it that way.
MR. SHOWEL: Okay. I wasn't clear.
BY MR. ARGIONIS:
Q. The question wasn't really just any. It was can we look at one document, or do we have to look at multiple documents to get to what you believe you and Merri agreed to when the deal was done, finalized, whatever term you want to use in your parlance, can we look at one document to get those terms?
A. I don't think we can look at one document.
Q. Great. We have to look at more than one



document, right?
A. Possibly.
Q. As you sit here today, can you identify those documents?
A. Not off the top of my head.
Q. Do you know if they were attached to your complaint or not?
A. I don't know.
Q. Let's look back on Exhibit No. 9. The top of that page that we're looking at, 168421, is the second page of this exhibit. There's italicized words up there, do you see those?
A. I see the italicized words.
Q. "TMG Kreations, LLC, is a Delaware limited liability company." Do you agree with that? The statement itself, not that it is drafted in there.
A. That I believe that to be true.
Q. Principal place of business is blank on this sheet. "The sole member of TMG is Merri Gleckler. The term sheet will outline the proposed structure of TMG by the additional of Dean Dussias and the material terms of the agreements governing the relationship among TMG,



Merri, and Dean." Did you understand that that's what was being conveyed to you in this term sheet?
A. I understand that it was sent to me, yes.
Q. For what purpose did you think it was being sent to you?
A. To discuss putting in place an operating agreement.
Q. That would discuss the material terms of the agreements governing the relationship among TMG, Merri, and Dean?
A. Broadly, yes.
Q. Next sentence, "The term sheet is non-binding, except as expressly set forth herein." Did you understand this term sheet was going to be non-binding?
A. That's what it reads, and it reads below not herein. Are we looking at different versions? Mine says "below."
Q. "The term sheet is binding" -- "is non-binding except as expressly set forth below." I read that to you.
MR. HICKMAN: You said herein.

BY MR. ARGIONIS:
Q. Sorry.
Did you understand that at that time that you received this?
A. I don't recall it specifically. I believe I understand what it says.
Q. What I'm asking you, putting you back in time, when you received this, was it your understanding that it was non-binding?
A. This term sheet, yes.
Q. And then next sentence, "It is not a complete description of the terms of any proposed transactions." Did you understand that at that time?
A. I understand the sentence.
Q. Did you understand it when you received it back in May of 2020?
A. I don't recall.
Q. How about, "Is for discussion purposes only and does not create and is not intended to create a binding or enforceable contract between the parties."
Did you understand that back in time when you received it?



A. I don't recall, but I believe I understand it now.
Q. Okay. So would you agree with me that the terms of this term sheet that's expressed in Exhibit 9 were not binding or enforceable between you and Merri?
A. Yes, I believe that to be correct.
Q. And if you look at the second box, "Overall Structure," this one has, "Dean will be entitled to acquire a 20 percent membership interest in TMG in return for services rendered as well as completion of a three-year vesting period." It's expressed a little bit different than what we had seen in some prior documents -- exhibits that we looked at. Was that a term that you had agreed to?
A. Never even discussed, so no.
Q. After you received this term sheet, did you express back that that was something you had never discussed?
A. Yes.
Q. To whom?
A. Merri.
Q. How?



A. Direct conversation.
Q. In person?
A. This was at the height of COVID, so no.
Q. What do you mean by direct, phone, email?
A. Either phone or Zoom. Probably phone.
Q. So you have no writing to confirm what you said on the phone to Merri relative to that term; is that true?
A. I don't know if that's true.
Q. Why don't you know that?
A. Because I don't have an exhaustive memory sitting here of what was sent via email or not.
Q. Did you help your lawyers accumulate documents in response to the discovery requests that we issued in this case?
A. I did and didn't memorize them.
Q. That's what I'm asking you though.
A. Fair enough. And I'm answering you directly, Jim.
Q. Great. When you were assisting attorneys in drafting the complaint, do you recall if you provided any document that might



have documented what you said back to Merri relative to this term that we just looked at in this Exhibit 9?
A. That I might have sent back in writing?
Q. Yes.
A. I do not recall.
Q. If you look at -- box three.
A. Bottom of the same page?
Q. Yeah, it begins on there and it bleeds over into the next page. "Contributions, Due Diligence. Dean will contribute services for his membership interests in the company. Membership interests will vest over a three-year period until Dean's membership interests are vested, he shall be entitled to participate in votes." Was that a term you agreed to with Merri?
A. Never even discussed, so no.
Q. Was this a term where there was no disagreement then?
A. It was a term that was never raised between me and Merri. The term of vesting and so forth.
Q. It was raised in this term sheet to you, right?

A. It -- it's here on this piece of paper, yes, and it was sent to me and received by me.
Q. And how did you communicate back that that was nothing that you discussed, this term that we just talked about?
A. I told Merri directly.
Q. In the same conversation as to the term we just talked above?
A. Might have come up in multiple conversations, but yes.
Q. How much -- what period of time multiple conversations?
A. Basically through the end of the first week of June, so a month.
Q. Okay. And what do you recall about those multiple conversations that you had between May to the end of June?
A. That this didn't correspond to what we had discussed and agreed.
Q. And that's all you said? Did you then say, Let's put together what we did agree to?
A. As I said previously, this was discussed. We talked about what we needed to do to be done. We agreed. And this whole process



didn't come back until the end of 2020, in a very different form.
Q. I'm talking about May of 2020 now, through you said June of 2020, did you have multiple discussions with Merri about this term sheet? That's what I understood your last answer to be.
A. I believe I had more than one, yes.
Q. Do you recall how many?
A. Two to three.
Q. And how were those occurring, via email, text?
A. By phone.
Q. No emails or no texts pushing back on any of these terms?
A. There may be. I don't recall.
Q. Did you ever red line this?
A. I believe I did send a red line.
Q. And the red line that you sent, was it ever accepted by Merri?
A. I don't know what you mean by that.
Q. Did she agree to your red lines?
A. I don't know.
Q. So June -- that first weekend of June



that you say in 2020, what do you know about that? Did she agree to any terms at that point?
A. I'm sorry. I didn't understand the first part of that.
Q. You don't know if Merri agreed to your red lines, correct?
My follow-up question is going to be, how did you guys get to where you believe you guys were done relative to the term of your ownership by June of 2020?
A. By speaking to each other.
Q. So you had drafts of documents, and you red lined them back, and you just said forget all that, we will agree orally on a phone conversation, no one is going to write down what we agreed to; is that your testimony?
A. That's not my testimony.
Q. Explain to me what is your testimony then. What did you guys say relative to the red lines and this draft and how did you come to finalize the agreement orally?
A. I had a conversation about this, and there may have been some other documents with Merri, and we agreed that we would stop this. I



asked Merri what she needed for us to be done. We discussed that and agreed, and then everything got put in writing, going forward, and as I said before all morning, my ownership became official July 1st of 2020.
Q. Okay. And the agreement that Merri -- how long was that conversation where you guys agreed to what you just said?
A. I think it was two conversations, and at least more than 90 minutes between the two of them.
Q. Each?
A. Could be close to that, I think.
Q. 90 minutes each --
A. Approximately.
Q. Approximate is fine.
A. Thank you.
Q. 90 minutes each between May when you received this term sheet and that -- well, earlier you told me it was the first weekend of June. Are you still at the first weekend of June when you guys agreed to all the terms?
A. We discussed this prior to that, and then decided what to do the first weekend of

Page 194

June.
MR. SHOWEL: First week of June 2021, right?
THE WITNESS: 2020. We're in 2020, right?
BY MR. ARGIONIS:
Q. I'm asking you. When did you agree?
A. 2020. This is all 2020.
MR. SHOWEL: These documents are exchanged 2020. But the first weekend in June conversations have been --
THE WITNESS: In 2020.
MR. ARGIONIS: He said that multiple times already.
MR. SHOWEL: All right. I'm confused.
THE WITNESS: No worries.
BY MR. ARGIONIS:
Q. There were two conversations, though, before you and Merri agreed to all the terms?
A. Something like that.
Q. So is it the final of those two conversations that occurred that first weekend of June 2020?
A. Yes.
Q. And can you give us of those two conversations, can you list for us the terms that

Page 195

were agreed to, the specific terms agreed to in those two conversations?
A. 30 percent ownership without variance, so none of the flex. That any draw would not be salary before the 70/30 split, but we would be, quote unquote, exposed or fully -- only paid by the profits that we would create together. So we would be fully aligned in that sense. That I would make an investment in the company, which I did. And --
Q. Did you agree to an amount?
A. $20,000. And that my ownership becoming official would begin on the date I've said, which meant that for all the entire prior period from August since when I've been helping, I would receive no other benefit than what I'd already been paid. So, in other words, I wouldn't have a share of those profits.
Q. And the date that you said official ownership?
A. July 1, 2020. That we said.
Q. Sure. This is all what you understand you agreed to. That's what I'm getting at.
A. Okay.

Page 196

Q. And now -- and that took -- any other terms or is that it?
A. I don't recall.
Q. So two conversations, that's all you recall? - two 90-minute conversations about this agreement about you becoming an owner, and that's what you recall as to the terms you agreed upon?
A. I would call them two long conversations. They may have longer than 90 minutes, yeah.
Q. Any other terms that you agreed to during those two conversations?
A. Not that I recall at this time.
Q. During the first of those two conversations, how was -- had you reached an agreement on certain terms and you said, Hey, let's kick this over to that first weekend of June? How did that occur? Why two conversations? And what occurred in one and what occurred in the other?
MR. SHOWEL: Objection; compound. You can answer.
THE WITNESS: So both conversations occurred discussion of what was happening in the business

Page 197

above and beyond this. And --
BY MR. ARGIONIS:
Q. Okay. But I'm only asking you --
A. Jim, I'm answering your question. Just let me complete my answer, please. Okay?
Q. Go ahead, but I'm asking about what conversations did you agree about these terms, and why did it take two conversations relative to these terms that you agreed to?
A. And I'm explaining that to you. And that -- I think the early part of the conversations is why this was not at all consistent with what we had discussed, and that we talked about what to do about it, and what to do about it was to agree and move forward and continue building the business with that, and to stop this process in its entirety and revisit it at the appropriate time.
Q. What do you mean by revisit it at the appropriate time?
A. That if and when we wanted to put in place an operating agreement, we could do so, and that's what we agreed at that time.
Q. So the -- what you're telling me is that

Page 198

the two of you agreed you did not need an operating agreement until some point in time in the future?
A. Well, we agreed we would stop this process and revisit it later.
Q. Why did you guys agree to stop this process? What's your position on that?
A. Because this process didn't reflect what Merri and I had agreed.
Q. But you guys came to terms you said in that first weekend of June of 2020, right?
A. What do you know? Yes.
Q. Wouldn't that be easy to say, Hey, lawyers of mine, I pay your bills, please document this, this and this. You only rattled off -- it took you less than two minutes to rattle off the terms. The lawyer couldn't have drafted that up? You guys didn't discuss that?
A. They weren't lawyers of mine, and Merri decided not to do that. And we thought it would be expensive and unnecessary, and we had an incredible amount of other activity to get after.
Q. You decided not to write down those terms either, right?

Page 199

A. I don't think I ever -- no, I did not in my head go, I'm deciding not to write these down.
Q. You didn't?
A. You asked me if I decided. I don't ever remember deciding.
Q. You decided not to write them down?
A. I didn't say that.
Q. Okay. Did you decide to write them down?
A. Jim, what are we doing? I wrote them down. They were written down in numerous places, so it wasn't hard for me to remember that I had 30 percent ownership in Kashwere. It wasn't hard for Merri to remember that either.
Q. Correct, but you just rattled off other terms, too, correct?
A. Yes.
Q. You didn't write those other terms down?
A. May have.
Q. Did you turn that over to your lawyer if you wrote those down?
A. I don't recall whether I wrote them down or not.
Q. Okay. Did you -- you said you were

Page 200

comfortable drafting up operating agreements yourself, right?
A. I am, yeah.
Q. At this point in time, did you decide not to write them down in an operating agreement form?
A. We decided to do it at a later time.
Q. Okay. So at that point in time, you -- we'll get to what Merri decided and didn't decide, you were comfortable not writing down the terms that you agreed to on that first weekend of June of 2020?
A. I didn't prepare an operating agreement in June of 2020.
Q. You were comfortable with that decision?
A. I think so.
Q. Why do you say you think so? Why do you quality that?
A. Because I don't know if I have an exhaustive memory how I felt during June.
Q. It is an important issue, right? You filed a lawsuit over it.
A. I don't know what the "it" is.
Q. Your ownership.

Page 201

A. Well, it wasn't a question you asked me. Yes, my ownership is an important issue.
Q. Yet you don't remember whether you made a conscious decision to write down what you agreed upon on that date or not; is that true?
A. I don't recall.
Q. Let's look at box five on page -- Bates label 168422, the one employment arrangements -- well, no, we didn't finish with box --
A. Are we on page 422?
Q. Box four. 422. "Merri shall be the sole managing member and shall be responsible for the management, control, and decision-making of the company." Did you ever agree to that term?
A. No.
Q. But that's how Merri wanted it to be, right?
A. You'd have to ask Merri.
Q. You had no understanding that she wanted that, even though she had her lawyers send it over to you in a term sheet?
A. You would have to ask Merri.
Q. I'm asking your understanding. I can't ask Merri about your understanding. Did you have

Page 202

an understanding that Merri wanted to be the sole managing member?
A. I did not -- I did not have a perspective on what Merri may have or may have not reviewed in entirety with her lawyers, and I felt and said to Merri on numerous occasions that her management, control, and decision-making, if we were to speak at the member level, votes were pretty easy, they would be 10/0 or 7/3. In either case, Merri gets to decide.
Q. So is it your testimony as you sit here today that Merri never wanted to be the sole managing member?
A. I don't know what Merri wanted.
Q. Did Merri ever express to you that she wanted to be the sole managing member?
A. I don't recall.
Q. Next box, "Employment Arrangements." "Dean will enter into an employment agreement as part of his admission into the company and in exchange for his membership interest." Did you have an understanding -- did Merri express that term to you?
A. No.

Page 203

Q. But she put it in this email, right?
MR. SHOWEL: Objection. She didn't put it in the term sheet.
BY MR. ARGIONIS:
Q. Sure. But she sent to you via email? In addition to her lawyer sending it to you, she also sent it to you, right?
A. This email is from Merri. So Merri's email sent it to me.
Q. And what did you take that to mean when Merri sent you this term sheet with that statement that you will enter into an employment agreement as part of your admission into the company in exchange for your any interests, what did you take that to mean?
A. I'm sorry. Which sentence are you talking about?
Q. "Employment Arrangements," first one.
A. I took that to mean that the document contemplates that I'd have an employment agreement and so forth.
Q. So you understood that statement that there would be an employment agreement as part of your admission into the company and in exchange

Page 204

for your membership interest?
A. I understood that's what that sentence reads.
Q. And at that point in time, you understood that Merri wanted you to enter into an employment agreement in exchange for your any interest, right?
A. No, I did not.
Q. Yet, did you reject that term?
And the next question to prepare you, because you need to, obviously, think about them a long time is, how did you reject that term if you did?
A. I didn't reject any of the terms in specific.
Q. Perfect. So some of these terms might be still applicable to your agreement with Merri?
A. No.
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
MR. ARGIONIS: I'm just asking his understanding.
THE WITNESS: No.

Page 205

BY MR. ARGIONIS:
Q. You don't understand that?
A. No, no, no. You asked me a question, I said no.
Q. Okay. Well, was it your understanding that you ever agreed to enter into an employment agreement in exchange for your membership interests?
A. I did not agree to enter -- I didn't even -- didn't even contemplate nor discussed with Merri an employment agreement.
Q. Even after you received this term sheet?
A. Correct.
Q. Great. If you turn to the page that's Bates labeled 168425, there's a box on the left-hand side that says, "Conditions and Approval." Are you there? "Conditions and Approval. The restructuring and admission of Dean as a member in the company shall be conditioned on both parties being satisfied with the negotiation of the amended and restated operating agreement and the terms and conditions contained therein." Did you agree to that term?
A. No.

Page 206

Q. You can definitively say that you didn't agree to that term?
A. Yes.
Q. What was your response to Merri when you read that term?
A. I don't recall if there was any response at all, let alone what that response might be.
Q. So you don't recall whether you specifically rejected that term?
A. That's correct.
Q. Let's turn to the next page, that's 426, 168426, the box that says "Cost." You mentioned that it might be a cost and expensive to draft this thing. In this -- it was contemplated there, Merri sent -- her lawyer sent it and Merri sent it to you also, "The parties will pay their own costs and expenses relating to the preparation of proposed amended and restated operating agreement." Do you recall that -- well, did you ever agree to that term, that you'd pay your own costs regarding the proposed amended restated operating agreement?
A. No.
Q. Did you ever respond back when you read

Page 207

this term that Merri had sent to you and that her lawyer had sent to you, did you ever respond back to anybody?
A. I'm not sure what you mean by respond. But Merri and I discussed this had been sent.
Q. This specific term I'm talking about. You already told me about the whole thing this. That specific term, that you pay your own costs, did you talk about that?
A. I don't recall.
Q. So you don't know as you sit here today whether the parties were -- whether you agreed to the parties paying their own costs?
A. No, I know we didn't agree to it.
Q. That's what I'm asking. So you say for this term you did not agree to it?
A. Correct.
Q. At what conversation did you not agree to it, that first one of the two or the second one of the two?
A. I think I didn't agree to it because --
Q. No, no. When?
A. Probably somewhere in May. Somewhere in May after having received this.

Page 208

Q. Right, right. But what I asked you is, earlier, where do we find the terms -- all the terms that you agreed to that you believe and Merri agreed to? You said it's in two conversations, oral conversations you had on the phone, and that happen between May 7th of 2020, when this term sheet came out and the first weekend of June. Do you remember that? Those were the terms you agreed to, presumably some you didn't agree to. Was that specific term discussed in those two conversations? Because you just said you didn't agree to it, so you must have had a discussion.
A. So let me describe what happened. Right?
Q. This specific term. Was it discussed and did you agree or disagree to it? It's two questions, but...
A. I don't recall the specific term ever being discussed, and as part of the entire document being set aside, it was discarded and not agreed to.
Q. Okay. So was that an open term then, who would pay the costs of eventually documenting

Page 209

this?
A. I don't know what you mean by open term.
Q. Did you agree to it or not?
MR. SHOWEL: Objection to the form of the question. Calls for a legal conclusion as to what an open term is. As to your follow-up question of did at the agree to it or not, he's already told that he did not agree to it, so asked and answered.
BY MR. ARGIONIS:
Q. Okay. My question to you then was, when was the specific conversation when you said I'm not agreeing to that term?
MR. SHOWEL: Objection; asked and answered. He said the entire document was set aside.
MR. ARGIONIS: You can testify later. But that wasn't my question.
BY MR. ARGIONIS:
Q. My question was, when did that happen?
A. In May after this document was sent to me.
Q. You had two conversations, right? We can conversation one, conversation two for shorthand. Did it happen in conversation one or

conversation two?
A. My best guess would be conversation one.
Q. But you are guessing?
A. No, I --
Q. You just labeled it best guess.
A. Did I? I don't think I said best guess.
Q. I don't think this is funny, sir. We're trying to get at your specific recollection. You are suing my client, causing her to incur a lot of expenses here. I'd appreciate if you take this seriously and answer the questions.
Do you know if that specific term was discussed in conversation one or conversation two? And then we will get to what the discussion was.
A. Jim, I don't appreciate being badgered. I don't appreciate your ignoring my answers. I'm answering your questions to the best of my ability and trying you to tell you exactly what happened. And so to repeat again in conversation with Merri, when this entire document was set aside, that term went with it and was never agreed.
Q. Great. You've said that three times.



That's not my question. When did that happen, sir?
A. And I have answered it on a number of times. I said in May, after receiving this. So that means it wasn't on or before -- I can't find the first page. May 7th.
Q. Okay. So between May 7th and follow-up question -- between May 7th and the first weekend of June, you said you only had two conversations about the terms of this agreement?
MR. SHOWEL: Objection; misstates the testimony completely.
BY MR. ARGIONIS:
Q. Tell me what's wrong with it after your attorney coached you to that. What's wrong with what I just said?
A. You used the word "only." I said to you that we may have had more than two conversations. Okay?
Q. Great. So now it's more than two conversations.
A. I said -- let's just take what I said is what I said. We may have had more than two conversations.



Q. How many? Can you estimate for us? More than five?
MR. SHOWEL: Asked and answered.
BY MR. ARGIONIS:
Q. What's your answer? You can answer.
A. More than two and less than 11.
Q. Two to 11 conversations. How long were those conversations about the terms now of this alleged agreement you made with Merri?
A. Two longer conversations, and there were, perhaps, shorter conversations.
Q. Between another nine, right?
A. Another nine.
Q. You said two to 11.
A. Yes. So I don't understand.
Q. They were all on the phone?
A. As I said before, could have been Zoom, but I think phone.
Q. So between May 7th of 2020 to the first weekend of June 2020, we should be able to find up to 11 conversations on your call logs or Merri's call logs and/or Zoom logs?
A. Between me and Merri?
Q. Yeah.



A. Yeah, and we'll find long-ish ones, too.
Q. Between all of those, it was your testimony that you were discussing terms of your agreement that you allege you were made with Merri as to TMG. That's all I'm asking about. You could have been talking about the sky, weather, other things. My question is: During how many conversations were you discussing the terms that you allege you agreed to that you are suing her for?
A. So during some of those, not all of those, and I've given you an estimate, and I've told you that a couple of them may have been long -- there may have been others that would have been long, and that they would have included discussions about the business as well.
Q. And all I'm trying to get at here, not trying to be cute, but it is important to the case that we understand what you're saying was agreed to and when that happened. And so you're saying two to 11 now, but some of those conversations may or may not have any of the agreement that you believe actually occurred between you and Merri? You don't know?

Page 214

A. No, I do know that we reached agreement.
Q. Correct. You reached an agreement on various terms during those two to 11 conversations. I'm trying to narrow down how many conversations where you actually discussed terms, Yes, I'm agreeing to that term, no, I'm not agreeing to that term, et cetera?
A. At least two, and I'm going to amend what I said before, because I said less than 11, but we will include 11 now. Somewhere between that number.
Q. Great. And that's what you're suing Merri over, that she didn't adhere to the terms that you and her talked about over lengthy -- some lengthy conversations between two and 11 from May 7th of 2020 to the first weekend of June of 2020?
A. I'm suing Merri over my ownership in Kashwere.
Q. And that agreement for that ownership in Kashwere occurred during those phone conversations that I just mentioned?
A. It not only occurred in those phone conversations, but in the actions that we took

Page 215

and our working together.
Q. So it stretched beyond that time is what you're saying of June of 2020?
A. As I said before, from the moment I started, I don't believe my ownership in Kashwere was in question, and it was made official starting July 1st of 2020.
Q. Merri sent you term sheets from her lawyers saying that it was a proposed ownership, and you think that that means your ownership was not in question?
A. I don't believe my ownership was in question.
Q. Even though you received term sheets that called it a proposed ownership, that's your testimony?
A. That's my testimony.
Q. Okay. On that same page that we were on, under costs, the second bullet point, "Dean should consider hiring separate counsel. Griesing represents Merri and TMG. The operating agreement and the ancillary agreement shall be fair and equitable but will be drafted for the purpose of protecting Merri, especially after the

Page 216

protracted litigation she went through with Cedric."
Prior to you receiving this term sheet, had Merri expressed that concept to you?
A. I'm waiting for you. I don't know what concept you are speaking of.
Q. What I just read to you.
A. There's a lot of concepts there.
Q. All of them then if you think there's more than one.
MR. SHOWEL: Are you talking about the second bullet here in the cost box?
MR. ARGIONIS: That's what I just read, Matt.
THE WITNESS: So I think that -- my recollection would be yes, Merri had shared with me that Griesing represented her and TMG.
BY MR. ARGIONIS:
Q. And the rest of that statement she didn't represent to you in any way?
A. Let me read it.
Q. Please do.
A. Thank you.
I don't believe that Merri ever commented to me about my -- the should of the

Page 217

counsel.
Q. Did Merri express to you prior to receiving this term sheet that she wanted to avoid protracted litigation that she went through with Cedric, and that's why she was going to want to want writing?
A. I don't recall. I don't think so.
Q. Once you saw that in this document, did you have a response to Merri about it?
A. About this bullet point?
Q. Yes.
A. No.
Q. Did Merri understand though since you didn't have a response that you agreed to that point?
MR. SHOWEL: I'm sorry. Could you read back the last question back, Ms. Court Reporter?
MR. ARGIONIS: I'll withdraw it.
THE WITNESS: Thank you.
BY MR. ARGIONIS:
Q. Let's move on to Exhibit 10. Let's look at Exhibit No. 9. Back on Exhibit No. 9 --
A. Are we looking at 10 or 9?
Q. 9.

Page 218

A. Where are we?
Q. Second-to-the-last page of the document Bates labeled 168426.
A. Okay.
Q. The governing law in the middle of that paragraph, middle of that page. It mentions that it would be the state of Delaware. Was that what you had agreed to with -- is that your position, that you agreed to state of Delaware laws would govern the amended restated operating agreement?
A. As I said before, we set aside the entire thing.
Q. Separate from setting aside -- well, what law did you agree with Merri would govern the operating agreement?
A. We didn't have an operating agreement at this time.
Q. You said you entered into an agreement with Merri as to your ownership, right?
A. Yes.
Q. What was the agreement as to what law would govern?
A. I don't believe we discussed governing law.

Page 219

Q. So you hadn't agreed at any point in time -- up to today's date, you hadn't agreed with Merri as to what law would govern your alleged ownership in TMG?
A. I don't recall ever discussing governing law with Merri at this time.
Q. But Merri presented it to you in this term sheet?
A. It was in this term sheet.
Q. She presented it to you in this term sheet, right?
A. It was in this term sheet.
Q. She sent it to you via an email?
A. She did.
Q. Did you review it?
A. What do you mean by review?
Q. Your eyes took a look at it --
A. Did I look at it? Yes, I looked at it.
Q. Did you understand it?
A. I believe so.
Q. Did you understand she was presenting to you that the state of Delaware would govern the agreement between you and her relative to your ownership, did you understand that?

Page 220

A. No. I understood that that's what's written on the page.
Q. Did you understand that she was proposing that?
A. No.
Q. Why not?
A. I didn't know what was in her head.
Q. But you said you were going to red line it and send it back? Withdraw that.
She sent you a term sheet, and yet you didn't understand why she was sending you that term sheet, that's your testimony?
A. That's not my testimony.
Q. Why was she sending you this term sheet in May of 2020?
A. I don't know.
Q. Then --
A. One second. Jim, you think that's fucking funny?
Q. I do think it's funny. Go off the record for a second.
THE VIDEOGRAPHER: Off the record at 2:24 p.m.
(Recess.)

Page 221

THE VIDEOGRAPHER: Back on the record at 2:34.
BY MR. ARGIONIS:
Q. We're still using at Dussias Exhibit No. 9, please. And if you turn back to the page that's 168426, it's two from the back.
A. Yeah.
Q. We were talking about governing law, and I'm going to ask you a question about exclusivity.
My question to you before the break was, did you have understanding as to why Merri -- why Merri and her lawyers had sent you this term sheet?
A. I don't know what was in Merri or her lawyer's heads.
Q. That's not my question. Please listen to my question. I'm asking, do you have an understanding as to why this was sent to you? What was your understanding?
A. I don't recall a specific understanding.
Q. In all your business dealings, had anyone ever sent you a term sheet?
A. Yes.

Q. When you received those term sheets, what was your understanding as to what the intention was in sending you those term sheets?
A. To complete an agreement.
Q. Okay. Did you have that understanding with Merri that she was sending you this as her proposed terms for you to look at and to disagree or agree with going forward to come to an agreement like you just said?
A. I don't think that's how I thought of it.
Q. Ask you one other question. How did you think of it then?
A. That we would have a document for the company so that we both would be comfortable.
Q. And then at some point that document would be executed by both of you?
A. Potentially, yes.
Q. Let's look at that same page, Exclusivity. "Either party may terminate the discussions regarding the potential admission of Dean as a new member of TMG." Do you remember that Merri had sent that off to you in this email?



A. I'm sorry, which section did you --
Q. Exclusivity.
A. Okay.
Q. "Either party may terminate the discussions regarding the potential admission of Dean as a new member of TMG." Merri proposed that term to you in this term sheet. She sent it to you. Did you ever agree to that term?
A. As I said before in the general set-aside of this entire document, no, I did not agree to this term.
Q. So is it your position that Merri at some point -- well, was there an agreement that discussions could not be terminated; is that your understanding?
A. My recollection is we never discussed this term in specifics. And as a general set-aside of this document, it never came up again.
Q. Okay. So Merri proposed this document to you. You said you agreed to set it aside because you brought up to her that you didn't agree with this document, you wanted it set aside?



A. I raised with Merri setting aside this document, and she agreed.
Q. Did you ever respond back in writing to this document?
A. I don't recall.
MR. ARGIONIS: Let's mark this as 10.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 10 for Identification.)
BY MR. ARGIONIS:
Q. This is a document for the record Bates labeled TMG 187353 all the way through 187376. The cover page is an email from you at your Dean@Dussias.org email address to Merri Gleckler at her Gmail account, Sunday, June 7th, 2020, 7:29 p.m., subject: Agreements. Do you recall sending this email to Merri?
A. Not specifically.
Q. Is that the first weekend of June?
A. It is.
Q. Is this the date that you're alleging you and Merri were done and agreed to as to terms?



A. I believe it was in this conversation that we ended up agreeing to terms and move forward.
Q. Okay. You sent two documents that are attachments there. One is entitled, if you look at the first page, "Merri/Dean/TMG Kreations, LLC, term sheet June 2020" --
A. I'm sorry. Where are you reading from?
Q. Underneath subject line, page 1. Those look like that's how it comes up as the attachments, "Employment Agreement Dussias..." You say, "Please see attached. Call you in an hour" and a smiley face emoji.
A. Yes, ma'am.
Q. There's a term sheet, and then if you go to 187361, additional terms and exhibits, and then at 187362, employment agreement, and the rest of this exhibit is the employment agreement. Do you see those documents? Are those documents that you prepared and sent to Merri, or did you have the help in preparing those?
A. I don't recall having help in preparing any documents.

Q. Did you prepare them from some kind of form that you had, prior term sheet or anything, prior employment agreement? If you recall. If you don't recall, you don't recall.
A. Probably.
Q. Probably what?
A. Probably had some -- I had some form to start from.
Q. Do you recall what that basic form you used that you started from, one of your old employment agreements or --
A. I don't recall.
Q. How about the term sheet?
A. I'm sorry, the question is?
Q. That's all right. We will withdraw that question.
Look at the first page of the term sheet, TMG 187354. Is this a term sheet that you created on a computer and sent back to Merri? It looks like a Word doc, DOCX trailer to it, so --
A. I would have to -- sure. It looks like a Word doc.
Q. You created on one of your computers?
A. I believe so.



Q. So this term sheet, very first page, second paragraph, you sent this back to Merri, right? Second page.
A. Okay. 54 or 55?
Q. 54.
A. Okay.
Q. Second paragraph at the top, "The term sheet is non-binding, except as expressly set forth below." You sent that back to Merri, right?
A. It was sent back to Merri, yes.
Q. And were you expressing to her that this term sheet should be non-binding, except as expressly set forth below?
A. That's what the term sheet says.
Q. And that's what you conveyed to Merri, right?
A. That's what was conveyed in the term sheet.
Q. And that was your intention, that this would not be binding?
A. That's what the term sheet says.
Q. Okay. But what was your intention relative to what the term sheet says? That's my



question. That's why I'm saying you are not being responsive. You are just repeating what I tell you is not responsive. You either recall or you don't recall what your intention was in sending this to Merri.
Usually people when they send something they intend to convey that I'm okay with what I sent you in this term sheet. That's what I'm getting at. Were you okay if she would have agreed to this term sheet?
A. Let me look at it.
Q. Right now I'm just asking about that the term sheet is non-binding. Would you be okay if she agreed this term sheet would be non-binding?
A. Yes.
Q. So you were conveying to her it should be non-binding between us, right?
A. That's what the term sheet says, yes.
Q. Look at the last sentence of that paragraph, "This summary may not be relied upon by any person as the basis for a contract by estoppel or otherwise. Is that something you added into that?
A. I think it was part of a boilerplate.



Q. Where did you get that boilerplate from?
A. A document I had.
Q. What's your understanding of what you put in there?
A. That it's similar to the expression above that it's non-binding.
Q. So any of the terms below here, you intended not to be binding on Merri or you?
A. I intended those terms to be part of the discussion between Merri and me.
Q. That Merri could accept or reject, correct?
A. I intended them to be part of a discussion.
Q. With what intentio? Discussion just for discussion sake, or was it to reach an agreement on terms?
A. To reach an agreement.
Q. Did you ever reach an agreement on terms?
A. We did.
Q. And what were those terms? Are they exactly what's in this document?
A. They are not.

Page 230

Q. What you are saying is that this summary may not be relied upon by any person as a basis for a contract, right?
A. That's correct.
Q. Are you relying on anything in this Exhibit 10 as a basis for an alleged contract with Merri or TMG?
A. I don't know what you mean by relying, per se.
Q. Same definition as what you put in this document, the one you sent back, "This summary may not be relied upon by any person as a basis for a contract by estoppel or otherwise."
A. I'm sorry, the question is?
Q. Are you relying on any of the terms in this contract for your claim against Merri?
A. We agreed to some of the terms in this contract, so I -- if that's relying on them, then, sure, I'm relying on them.
Q. And in this overall structure, what you sent back to Merri, it says -- first bullet point on that page, 187354, are you there?
A. Okay.
Q. "Overall Structure." This is what you

Page 231

sent back to Merri. "Merri is the sole member of TMG and is the managing member," correct?
A. That's what was sent, yes.
Q. And that's what you understood?
A. At that time, I don't know.
Q. Next bullet point, "Merri will not remain as the sole managing member"; is that what you proposed?
A. Yes. That's what's here.
Q. I know that's on the document, but is that what you proposed back to Merri after seeing the term sheet we looked at in Exhibit 9?
A. Yes.
Q. Okay. The next sentence, "Dean upon completion of this transaction as a minority owner will become a member and be a manager of the company." That's in the future tense. Is that what you sent back to Merri, and you conveyed to her, that upon completion of this transaction as minority owner, you will become a member and be a manager of the company, true?
A. That's what this sentence reads.
Q. Okay. If you're alleging you were already an owner by this point in time, June 7th

Page 232

of 2020, why did you phrase it that upon this completion you will become a member and be a manager?
A. I don't recall.
Q. Did you agree that -- obviously, you sent it to Merri. But you proposed that term to Merri. Did Merri agree to that term?
A. Merri agreed to my ownership in Kashwere.
Q. This term I'm asking you. Did Merri agree to this term, the second bullet point, "Merri will not remain as sole a managing member; Dean upon completion of this transaction as a minority owner will become a member and be a manager of the company." Question is just related to that. Did Merri agree to that term?
A. And my response is Merri agreed to my ownership.
Q. So you're telling me you can't answer whether Merri agreed to this particular term I read to you?
A. I'm telling you Merri agreed to my ownership.
Q. How is that responsive to what I'm

Page 233

asking you?
A. Because that term -- that language refers to my ownership.
Q. In the future. She agreed to your ownership in the future is what you're saying?
A. Merri had agreed to my ownership when we started working together, and that didn't waver.
Q. Back in 2019?
A. Yeah.
Q. Okay. But you sent her a term sheet here intending to document your ownership interests, right? Can you agree on that?
A. Intending to document -- to have an operating agreement for the company, et cetera.
Q. Sure. And you proposed the term that I just read to you, that second bullet point, correct?
A. Correct.
Q. Did Merri accept that term that you proposed to her?
A. Okay. And my answer is Merri accepted my ownership in TMG.
Q. This is the weekend that you say you guys finalized your ownership interest in TMG,

Page 234

right?
A. We did.
Q. But you can't tell me as you sit here whether Merri agreed to that specific term that you would also be a manager?
A. We agreed that I would be an owner in Kashwere, and that -- and effectively this went away as well. So, in other words, this term sheet wasn't -- yeah, this process similar to the process with Cheryl was set aside as we reached our agreement and didn't get started up again until the end of 2020.
Q. Okay. So this -- is that your same answer relative to the employment agreement that's attached?
A. It is.
Q. So this is the end of the weekend -- near the end of the weekend, first weekend of June of 2020. It's a Sunday, the first weekend of June of 2020. June 7, 2020, right, Sunday, 7:29 p.m.?
A. Yeah. The 7:29 I don't -- I don't know what the UTC designation is.
Q. That's the time zone that that one came

Page 235

through.
A. So that would be -- in Central time what would that be, less six hours?
Q. Whatever it is.
A. Something like that, but 7:30 at night.
Q. Okay. It was 7:30 at night for someone. 5:00 o'clock somewhere.
A. Okay.
Q. Just trying to get it's Sunday, and Sunday is the last day of the weekend?
A. Yes.
Q. That's the weekend you say you remember you guys finalized your ownership interest in TMG, right?
A. Yes.
Q. But you're telling me this -- whenever it was sent by your time, this was set aside in total? The term sheet that's attached here as Exhibit 10 -- the employment agreement that's attached here as Exhibit 10, and your agreement was different than what's in here?
A. Not substantially so, no.
Q. What you're telling me is sometime before midnight of Sunday June 7th, you reached

Page 236

some oral agreement with Merri as to your ownership interest in TMG?
A. I believe so.
Q. But you can't tell me if we walked through this whether Merri agreed or didn't agree to the specific terms and whether those terms are in that agreement you allege was made that Sunday?
A. No, I -- I don't believe Merri and I went through this point by point. And I'd have to spend time with this to give you that kind of review.
Q. Correct. You knew you were coming here today to testify as to your claim against Merri that she agreed to your ownership interest, right? Did you know that?
A. I'm sorry?
Q. You were coming to give a deposition. You've given your deposition before. You knew you were coming here to testify as to your claim that you're an owner of TMG, correct?
A. Correct.
Q. So you wanted to come prepared so that you can accurately describe what you're alleging

Page 237

Merri breached as to that agreement, right?
MR. SHOWEL: Objection; form of the question. He's got no obligation to prepare for this deposition.
MR. ARGIONIS: I'm just asking if he wanted to be prepared.
THE WITNESS: Yes, I like to be prepared in general.
BY MR. ARGIONIS:
Q. Did you do anything to prepare to accurately be able to describe to me and articulate to me what the specific terms were between you and Merri that you are alleging she breached?
A. Yes.
Q. What did you do to prepare for that?
A. I looked through some documents. None of which I could enumerate sitting here right now.
Q. What was the purpose of looking at those documents, to figure out and get the best memory you can of what you and Merri agreed to?
A. I think it was generally to be prepared and comfortable in answering questions.

Q. Are you comfortable in answering the question whether a specific term in this sheet that you provided to Merri was agreed to or not to by Merri?
MR. SHOWEL: Objection; vague. Which term?
MR. ARGIONIS: The second one, "Overall Structure."
THE WITNESS: I don't recall Merri and I going through term by term or page by page of the documents I'm holding right now.
BY MR. ARGIONIS:
Q. You wouldn't be able to tell me even if we looked two down that, "Dean will acquire 30 percent membership interest in TMG," you don't recall whether you and Merri discussed that term and whether she agreed to it?
A. We discussed my having 30 percent ownership in TMG and agreed to it.
Q. So that term you do remember?
A. The term I just expressed, yes, I do remember.
Q. But you don't remember whether you guys agreed you would also be a manager?
A. I don't remember, which means we might



have, going through this document point by point with Merri.
Q. Do you know if Merri sent this to her lawyer?
A. I do not.
Q. And it's your understanding that -- well, so what did Merri tell you about this document itself, the term sheet and the employment agreement? Did she have a response to you? You were talking to her that day you said. So we should be able to find that, June 7th, some point after this point in time on the email, whatever time that is, UTC. I don't know that. So we should have a discussion that evening because that's when you agreed to the terms, right?
A. That's right.
Q. Okay. And what I'm trying to get at is what exactly were those terms and how many of these points in here did you agree to and how many did you guys not discuss or not agree to?
A. Okay. So we agreed to my 30 percent ownership. We agreed, and I contributed $20,000. We agreed that my profit -- my ownership and



claim to profits wouldn't start until July 1st of 2020. We agreed to the owner's perquisites, car allowance, healthcare benefits, et cetera. We agreed quite significantly that there wasn't employment, per se, and an employment agreement, and that my activity of -- as an owner and hers would not come with a salary; so, in other words, the monies we were paid were not prior to the 70/30 split.
Q. That's it?
A. I would have to think about if I recall other terms.
Q. Okay. So you guys reached that without looking at this particular term sheet, is that what you're telling me?
A. No. We may have discussed the term sheet.
Q. You just don't know one way or another?
A. I think it's likely that we did. I don't remember exactly this, per se, going through this document.
Q. So you may have gone through this document. Merri might have said, No, I don't agree to that term, this term, you just don't



recall?
A. I actually don't recall her objecting to any term.
Q. Of this term sheet?
A. Yeah.
Q. How about the employment agreement, did she reject any term in that employment agreement?
A. I don't think we discussed that in specific at all.
Q. What was the discussion relative to that employment agreement?
A. What I just said to you, which we set it aside.
Q. Okay. And did you ever put that in writing that you were setting aside the term sheets and employment agreement, and we were coming to term on something that you guys discussed orally?
A. We did better than that, we just set it aside.
Q. That wasn't my question whether it was better or not. Did you ever put it in writing what you agreed to that Sunday, June 7th of 2020?
A. Yes.

Q. Where?
A. In the payroll system, in the accounting system.
Q. Wait. I understand -- but that doesn't go through all the terms you just told me. Payroll system doesn't have all those terms you told me, right?
And there is a question whether Merri knew about that. She is contending, as you see, whether she did or didn't. Okay? You saw her pleadings.
What I'm saying is, did the two of you say, Here's what we agreed to. Dean, you wrote this up. Merri, you write it up, send it back to me, this is what we agreed to? Did you ever do that?
A. I don't recall us doing that.
Q. Okay. If you look at Exhibit 4, the complaint, paragraph 19, page 5 of Exhibit 4, paragraph 19, there is an allegation in there that you're asserting against Merri and TMG. "Dussias was never subject to an employment agreement with TMG." Is that your position, that you were never subject to an employment agreement?
A. Yes.



Q. Why do you say that? There wasn't any unwritten employment agreement between you and the company?
A. There was never an employment agreement between me and TMG.
Q. So the agreement -- the draft employment agreement that you sent was never agreed to, right? That's your position.
A. That's correct.
Q. And how were you operating as president of TMG?
A. When?
Q. At any time. Subject to what? How did you get authority to be president?
A. Capably.
Q. How did you get authority to be president?
A. Merri and I agreed I would be president.
Q. So you had some kind of agreement as to your employment as president of TMG?
A. No. We had an agreement as to my ownership as TMG, and I would have the title of president.



Q. Okay. So is it your position that you were never employed by TMG as president?
A. I received pay as a W-2 during the period of time in which the MIPA was in effect, and when Merri and I agreed my ownership, that stopped, and I received distributions as an owner does.
Q. And those distributions were made pursuant to a change that you put into the system?
A. Pursuant to a change that Merri and I agreed.
Q. Who put those into the system?
A. Either Rachel Melgar or me. There could have been a different person, but those are my two -- those are my best estimates.
Q. And Rachel wouldn't have done it unless you directed her to, right?
A. Rachel would have wanted direction from either Merri or me or would have wanted both.
Q. And do you know who gave that direction to Rachel?
A. I would have corroborated it and so would have Merri.



Q. Do you know when that occurred?
A. Sometime before the July 15th payroll run.
Q. So during the time that you say you received a W-2, what's your significance of saying you received a W-2?
A. It's how I was paid by TMG.
Q. Does that mean you were an employee of TMG?
A. It -- no. I think there's a different answer depending on from what perspective we're looking at that.
Q. Give me the answer from the perspectives.
A. Okay. With respect to accommodating the MIPA, that's what worked. As you know, Merri and I considered me an owner for the entirety I was at TMG.
Q. From the day you started working for TMG in 2019, correct? Is that true?
A. That's true.
MR. ARGIONIS: Let's mark this as Exhibit 11.
(WHEREUPON, said document

Page 246

was marked as Dussias
Deposition Exhibit No. 11
for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we've mark as Dussias Exhibit 11, Bates labeled TMG 4208035 through 806. This is now January 1 of 2021. An email you sent from your Kashwere.com email address, right?
A. Yeah, that's the Kashwere email.
Q. You send it to Merri's Kashwere email address, right?
A. Yep.
Q. Signature page LLC agreement is the subject you put in that email, right?
A. Yes.
Q. "Please see attached countersign PDF and send back." That's what you wrote to Merri January 1 of 2021, right?
A. Right.
Q. "As discussed, whatever we may need to add as Exhibit C, we can do during 2021 in time to support the stability increase in value and growth of the business." What did you mean as to

Page 247

Exhibit C?
A. That there may have been amendments or further terms we wanted in the agreement, and that we would have flexibility about that.
Q. Okay. So you already signed -- look at the next page. You already signed this and sent it to her, right?
A. That's right.
Q. You're asking her to countersign?
A. That's right.
Q. You didn't attach the actual agreement in this email, right?
A. I believe she already had it.
Q. Which one was it, do you know?
A. I think she already had it.
Q. You just wanted her to countersign and send back to you?
A. That was the request.
Q. Why? Why did you request that?
A. Because I thought that we were done.
Q. But this is now -- I thought you said you were done in June of 2020?
A. With this document.
Q. Okay. So tell me what led up between

Page 248

June of 2020 through January of 2021 that now there was supposed to be a document that you wanted her to sign off on?
A. Merri wanted a document in place for the WBE certification. And so to do that, we would have to create a document, so we worked to do that.
Q. And as of January 1, 2021, you were taking the position that you guys were done. You already signed. So you agreed to some terms?
A. I thought it appropriate that we sign the document that was referenced.
Q. And Merri never signed that document, right?
A. I don't believe so.
Q. Okay.
MR. ARGIONIS: Let's mark this as Exhibit 12.
(WHEREUPON, said document
was marked as Dussias
Deposition Exhibit No. 12
for Identification.)
BY MR. ARGIONIS:
Q. This is an email dated TMG -- sorry, Bates labeled TMG 00162880through 162927. The

Page 249

first page is an email from Merri at her Gmail account to Dean Dussias at DeanDussias.org email account, Saturday, February 6th, 2021, "Subject: Amended and restated TMG Kreations amended operating agreement, February 2021. Amended and restated TMG Kreations amended and operating agreement," it says it twice. Oh, that's the attachment. Subject line and the attachment have the same title. "Hi, Dean. Finally, attached is our operating agreement created by Fran's firm highlighting the details of our agreement. Of course Cheryl will be happy to review any part of this should you need or want that."
You already saw the prior exhibit. You can take a look at it. You sent Merri in January a signature page that you signed off on. Why was Merri sending you then an amended operating agreement if you believed you were done, and you state that she agreed in January?
A. Because Merri, I guess, wanted this agreement as the agreement to move forward.
Q. So at some point is it your testimony that from January to February 6th -- actually less than a month's time.

A. A little more than a month's time but okay.
Q. January 1st and a day -- two days.
A. Five days.
Q. Okay.
A. Whatever. Close enough.
Q. So between that time period, what happened? Merri said, No, let's not forget what we agreed to sign. I want you to look at a different document?
A. I don't recall the conversation between those two dates.
Q. If you look at the attachment. The one, two, three, four, five, fifth whereas clause on that first page, Bates labeled 162881, "Whereas the parties desire to amend and restate the operating agreement and enter into this agreement to set forth the rights." Was that your understanding, that the original operating agreement of TMG was going to be amended and restated?
A. No.
Q. Did you understand that that's what Merri was proposing with this draft?



A. No.
Q. What did you understand?
A. That Fran or Cheryl had drafted a recitals clause.
Q. In those recitals clause, Cedric is mentioned, too?
A. I'm sorry.
Q. Second whereas.
A. Second whereas. That's another recitals clause which describes the MIPA.
Q. And Merri told you Cheryl will be happy to review any part of this with you, right?
A. I'm sorry? Where's that?
Q. First page. Cover email.
A. That's what it reads, yes.
Q. So Merri wanted you to sign off on this document, right?
A. I'm not going to presuppose what was in Merri's head.
Q. Did Merri ever tell you -- aside from this email, did you have any discussions that Merri said, This is what Fran put together, you should sign it?
A. We had discussions that Cheryl and Fran



had got it wrong again, and we did a different operating agreement that reflected the actual agreement we had come to.
Q. When was that one drafted?
A. Subsequent to this one. Don't know the exact date.
Q. Who drafted it?
A. I probably drafted it.
Q. Was that different than the one you presented for Merri to sign in January of 2021?
A. It may have been. I'd have to see the two.
Q. Okay. Are those terms, the ones that you presented to Merri, whether it is the one in January of 2021 or the one you say subsequently you drafted, is that what you allege Merri breached?
A. I don't believe I've alleged that Merri breached a draft operating agreement.
Q. I'm saying the terms. You're saying there is an agreement to ownership.
Let me ask it this way. Either of those documents that you drafted, do you believe that those accurately conveyed the terms that you



and Merri agreed upon relative to your ownership interest?
MR. SHOWEL: Objection to form. I don't think he has to memorize what's in those documents, if you want to show them to him, but you can answer if you know.
THE WITNESS: The part of the document asserting my ownership and when it started is what Merri's breached.
BY MR. ARGIONIS:
Q. And those documents that you wanted her to sign, the one in January of 2021, how did those relate to the terms that she agreed to?
A. You mean the one on January 1st?
Q. Sure.
A. I believe they embodied those terms.
Q. And Merri never signed it though?
A. No, not to my knowledge.
Q. If you look at page 13 of this Exhibit 12 --
A. Page 13 of the document?
Q. Exhibit 12.
A. Yeah. Yep. Begins "Personally"?
Q. Actually, no. It's page 16 that is

Bates labeled -- you were right. 9.3.
A. 9.3.
Q. Page 13, there is a 5 .1 in this document management.
A. I'm sorry. I'm looking at -- I'm missing --
Q. Page 13.
A. Okay. On page 13, I have -- it starts with the continuation of section 4. --
MR. SHOWEL: Are you looking at Section 5.1, Jim?
MR. ARGIONIS: Yes.
THE WITNESS: Thank you.
BY MR. ARGIONIS:
Q. It's entitled "Management." And if you go to -- you can review the paragraph if you'd like. I'm going to ask you questions about the last sentence of that paragraph which bleeds over into page 14. "The initial manager shall be Merri Gleckler who shall serve as the manager until her death, resignation, retirement, or the sale of her membership interest."
When you've read that, let me know, and I'll ask you a question.



A. Okay.
Q. So as of February 6th, 2021, was it your understanding that Merri was proposing to you that she would be the initial manager, and she would serve until her death, resignation, retirement, or sale of her membership interest?
A. It's my understanding that Merri was the manager, and we were the members.
Q. Okay. So did you agree that Merri would be the manager and just you and her would be the members?
A. I agreed that we were the members. I don't recall explicitly agreeing that she was the manager.
Q. Does this refresh your recollection that she wanted to be the manager, the sole manager?
A. It refreshes my recollection that it was in a document prepared by Cheryl and Fran.
Q. Yes. Attorneys usually prepare documents for their clients. Are you trying to say that somehow Merri didn't approve of the document her attorneys prepared? Is that why you keep saying that?
A. I don't believe that Merri necessarily



read the term sheet or the documents in their entirety.
Q. Even if she hadn't, she was telling you that this is what she felt highlighted the details of your agreement, right?
A. No.
Q. She never told you that, whether in this email or not? You don't recall her telling you that?
A. No. She didn't -- I don't recall her ever saying that to me verbally. And now reading this sentence, it doesn't make much sense to me.
Q. So you believe that Merri sent you a document that she never read; is that what you're telling me?
A. I don't know to what extent Merri read it.
Q. So then why would you say that she didn't read it?
A. Well, my belief would be she may have looked at part of it and likely did not read it in its entirety.
Q. Based on what?
A. Conversations I've had with Merri about



contracts.
Q. About this specific contract?
A. Certainly about the previous term sheets and operating agreement, I would have no idea if Merri read this, and, frankly, I think it's odd that one would describe an operating agreement as highlighting the details. Operating agreements don't tend to highlight, so I wouldn't have -- I was sent an operating agreement. Fine. I read it.
Q. And it's your understanding that she didn't intend for you to sign off on this operating agreement?
A. I'm not going to presume to guess her intention.
Q. You were about to enter into -- or you say you were already an owner, and she sends you a document with an amended restated operating agreement that tells you it came from her lawyer, and you didn't inquire or you formed no opinion as to why she is sending that to you?
A. Merri wanted an operating agreement done so the business could have the WBE certification. So that's -- that's what I believe she intended.

Page 258

Q. Okay. And by intending that, she wanted you to sign off on it, right?
A. Probably, yes.
Q. She was okay with you not signing off on it?
A. Possibly.
Q. What's your basis for saying that?
A. Well, we were owners of a business. We hadn't had an operating agreement. Our business was going well, and she -- yes, she did want it for the WBE certification.
Q. And were you not agreeing to this blocking her ability to get the WBE?
A. Oh, absolutely not.
Q. Then why would she give it to you to sign on it if you're telling me -- it wasn't required for you to sign this to do the WBE requirements?
A. There's a number of documents one could execute to meet the qualifications.
Q. Yes. But why was she sending -- you told me she is sending you this to meet the WBE qualifications? Is that your testimony? Is that the only reason she sent this to you, is that

Page 259

your testimony?
A. I think that was the primary reasons.
Q. What were the secondary reasons?
A. She may have wanted an operating agreement in place.
Q. What was your response to this operating agreement?
A. I believe a different operating agreement.
Q. So you did not agree to these terms that are set forth in February -- in the February 6th, 2021, version sent to you?
A. I did not sign this agreement.
MR. ARGIONIS: Let's mark this as Exhibit 13.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 13 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we've marked as Dussias Exhibit 13, document Bates labeled DHD 000963. Again, these are text messages you turned over to your attorneys and produced to us with Merri Gleckler. You're the blue bubbles and Merri is

Page 260

the gray. If we look at timestamp -- date and timestamp February 7th, 2021, at 1:54:22, "Did you read OP agreement?" That's the same date -- if you want to look at the email that we showed you in Exhibit 12 -- well, it's the day after.
A. Mm-hmm. So this must be a Sunday that this is happening, yeah.
Q. Merri asked you if you read the operating agreement, right?
A. Correct.
Q. And you responded, "Yes, will red line and we can discuss." That was your response?
A. Yes.
Q. And your intention in red lining that document would be to correct anything that you thought Merri had inaccurate in the operating agreement?
A. I don't know if I ever went and red lined that document, per se.
Q. That was going to be my follow-up question.
A. Don't know from reading that.
Q. That was going to be my follow-up question. Thanks for answering in anticipation.

Page 261

My question to you was, you were intending to red line that document, right?
A. I expressed an intention to, yes.
Q. For what purpose were you going to red line that document?
A. Hopefully being able to complete it.
Q. By complete it, what? Are there any blanks in there? There's no blanks that I saw.
A. Okay. Completed --
Q. So what were you --
A. Complete meant to sign it.
Q. Oh, good. So Merri sent this to you, and it was your intention to potentially sign it? You weren't going to red line and sign it, you were going to just sign it?
A. No, I wasn't going to just sign it.
Q. Good. So what was your intention -- you were going to red line it with the hopes of correcting whatever Merri might not have gotten right and send it back to her so she could agree or disagree with your red line; isn't that what people normally do with red lines? Again, it's not a trick question.
A. My intention was to give her -- from

looking at the text, to give her feedback on the documents and hopefully we could --
Q. Come to an agreement?
A. Come to finalize the document.
Q. Right. And by finalize, you mean agree and sign?
A. Yes.
Q. And you believe you never red lined that, is that what you're saying?
A. I don't know.
Q. Okay. Do you know why you didn't red line it?
A. Not at this time.
MR. ARGIONIS: Let's mark this as Exhibit 14.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 14 for Identification.)
BY MR. ARGIONIS:
Q. This is a document Bates labeled TMG 00416384 through 416407. It was also for references later Merri Exhibit 46. Merri's Deposition Exhibit 46.
We've marked this as Exhibit 14.



There's an email dated February 16th, 2021. Subject line -- it's you -- from your Kashwere email address. Do you know why on some of these you were using your Kashwere address, some of them you're using Dussias.org?
A. I think pure convenience, yeah.
Q. And then some of them you would send to Merri's Kashwere.com and others to her Gmail again?
A. Pure convenience, yeah.
Q. And this was also to Ray Conway. You know who Ray Conway is?
A. I do.
Q. Who is he?
A. He is an accountant.
Q. Kashwere operating agreement is the subject line draft, right?
A. Yep.
Q. You asked Ray for input about tax treatment, right?
A. I asked him to review, read the document, and it would be a way to give his opinion. Yes, I'm reading what's at the bottom here.



Q. Take a look at the document.
A. Okay.
Q. It's entitled, "Limited liability company, operating agreement of TMG Kreations, LLC, doing business as Kashwere (the company)." Did you draft this document?
A. I believe I may have created this document.
Q. What did you create it from? What template or what did you use?
A. Something I would have had on my computer.
Q. Did you have any lawyer's input into the drafting of this document?
A. I don't think so.
Q. And you intended that this document -- you are not a lawyer, right?
MR. SHOWEL: Are you asking me? Sorry. No. Go ahead.
MR. ARGIONIS: I told you I'll depose you later. Going to swear you in. You're doing good at testifying.
THE WITNESS: Are you a lawyer?
BY MR. ARGIONIS:



Q. Are you a lawyer?
A. I'm not a lawyer.
Q. Do you have any legal training?
A. No.
Q. But you felt comfortable drafting an operating agreement and presenting it to Merri without having any feedback from any attorney?
A. Yes, I felt comfortable drafting this and sending it to Merri.
Q. You're familiar with Delaware law?
A. Not extensively, and I'm not a lawyer.
Q. Okay. You were not extensively familiar with Delaware law, yet you were still comfortable drafting a whole new draft, different titled document than what Merri's lawyer sent to you, you were comfortable doing that?
A. Yes, I was comfortable sending it to Merri and sharing it with Ray Conway.
Q. You felt you would have adequately drafted this to comply with Delaware law?
A. I was comfortable sending this to Merri in that it would be a valid fair contract for us.
Q. And actually would have been Arizona law? Wanted to convert it from Delaware to

Arizona?
A. I don't -- I don't know why you say it would have been Arizona law. If Merri had said she wanted this under Arizona law that --
Q. Take a look at the first page of what you sent to Merri in your email.
A. Yeah, okay.
Q. Limited liability company.
A. Where?
Q. Third whereas paragraph on the first page.
A. There we go. Yeah, so that was a desire.
Q. Are you familiar with Arizona limited liability law?
A. You know, I'm not familiar. I believe I may have Googled about Arizona law, but there we go.
Q. And why did you prepare this draft, as opposed to red lining the previous drafts that Merri had sent you?
A. This draft reflected my agreement with Merri.
Q. The agreement you reached when?



A. The agreement that was reached back in June of 2020, and that took place as of July 1st of 2020.
Q. So is this what you wanted Merri to sign off on in January -- actually, is this the one that you signed in January of 2021?
A. Likely, yes. Let's look.
Q. There's no signature page on this one, I can tell you that.
A. That looks a lot like a signature page.
Q. Is it signed by you like the one we saw in January of 2021?
A. It doesn't look like it, does it?
Q. It doesn't. Why? Again, I'm not trying to be cute. I'm just asking you. You prepared a document in January of 2021, lawyers sent you back, you said you're going to red line, you didn't red line, now you come up with this document, and it is a different document, right?
A. Hold on. Different from -- it is certainly.
Q. What you signed.
A. It's not this document, and I -- I don't recall if there were differences between this and



the December '20 document that would have reflected feedback from Merri.
Q. Why did you entitle this "Limited Liability Company Operating Agreement" and not amended and restated?
A. I -- um -- because those weren't the recitals that I thought most appropriate.
Q. Title, "Limited Liability Company Operating Agreement of TMG Kreations." We saw the other drafts. Let me finish my question.
A. Yeah, sorry.
Q. There's other drafts you could look at. Merri's lawyers who are lawyers and have legal training and do know the laws and how to draft these things legally, they sent you documents that were entitled Amended and Restated. You sent Merri one that doesn't have those terms in the title. Did you do that for a particular purpose?
MR. SHOWEL: Objection; assumes facts not in evidence. You can answer.
BY MR. ARGIONIS:
Q. You sent this document, right?
A. I sent this document.



Q. You created this document, right?
A. That's right.
Q. On a computer that you owned at that time?
A. That's right.
Q. Okay. Did you have a purpose for entitling it what you entitled it?
A. Yes, that it appropriately conveyed the subject matter of the document itself.
Q. How does that title appropriately convey the subject matter? I don't know what you're talking about. If it had amended and restated, it wouldn't appropriately convey it?
A. I thought this was appropriate.
Q. I'm asking you why.
A. Because it conveyed the substance of this document, and I thought you were asking me about why I didn't choose other language, amended and restated, and it never struck me to make that comparison. I wasn't trying to mimic the previous document sent by Fran, Cheryl, or anybody else.
Q. Do you have any understanding of what amended and restated means relative to an

Page 270

operating agreement?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
MR. ARGIONIS: He is drafting these things. I'm asking what he understands it to mean or not.
THE WITNESS: I have a lot of experience doing contracts and so --
BY MR. ARGIONIS:
Q. That's why I'm asking you the question.
A. Yeah, I think I understand those words.
Q. What do they mean relative to a contract when they are amended and restated?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: They would express that one document is taking the place of another.
BY MR. ARGIONIS:
Q. Okay. Did you understand that you were -- is that why you left this out, because you didn't want to give that impression?
A. No, not at all.
Q. So you had no particular purpose as to why you entitled this document the way you did?
A. The title, as well as everything else

Page 271

that that's in here, I thought appropriate for Merri, me, and Kashwere.
Q. Did you feel that this document -- well, relative to the prior operating agreement, how does this -- do you know what impact signing this agreement that you sent to Merri and asking her to sign, do you know how this would have impacted TMG's prior operating agreement, if at all?
A. My understanding was TMG's prior operating agreement was gone.
Q. Because?
A. Because Merri told me, and she wanted nothing -- didn't apply to us and had nothing to do with TMG.
Q. Could Merri make this agreement just be gone by wanting it to be gone? The one you drafted.
MR. SHOWEL: Objection; calls for a legal conclusion.
BY MR. ARGIONIS:
Q. What did you intend in sending this to her?
A. I intended that we would sign it and move forward with the terms that are here.

Page 272

Q. Right. But relative to whether Merri could say this agreement is gone, could she just think of it and be gone and want it to be gone without doing some kind of writing?
A. I don't think so.
Q. Okay. Why do you not think so relative to this one, as opposed to the one that you think the TMG operating agreement -- which I'll tell you my legal conclusion is still in effect today -- why do you think that one Merri could say is gone without a writing but this one you say needs a writing?
A. Because Merri had -- because she told me that's what she wanted. And that was an agreement between her and Cedric, and Cedric was no longer there.
Q. So if you and Merri wanted this one to be gone -- if you signed it and wanted this one to be gone, you guys would not have to do any writing for this to go gone, this Exhibit 14?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer if you understand or if you know.
THE WITNESS: I --

Page 273

BY MR. ARGIONIS:
Q. You sent this document to Merri, right?
A. I sent the document to Merri, that's correct.
Q. You wanted her to sign it?
A. Yes.
Q. You wanted it to control the terms between you and Merri and TMG, correct?
A. I wanted it to be the operating agreement for the company.
Q. Did you have any understanding as to how this operating agreement could be amended?
MR. SHOWEL: Objection; document speaks for itself. Is there an amendment provision in there?
MR. ARGIONIS: He drafted it.
MR. SHOWEL: He didn't memorize it.
MR. ARGIONIS: He's got it in front of him.
THE WITNESS: You don't happen to know where it is, do you?
BY MR. ARGIONIS:
Q. Admission of a member, withdrawal of a member, 10.1, 10.2.

Page 274

A. Hang on.
MR. SHOWEL: Just for the record, that is Article 12 called Amendments, begins on Bates stamp page 4163497, I think. Bates stamps are cut off in the lower right, so it's hard to tell.
THE WITNESS: Okay. Amendment. That's what I was looking for. So, yes, I believe this could be amended, as long as there's the written consent of not less than 75 percent of the equity -- interest of the members, and only if such amendments do not have an adverse impact on the equity interest of existing members.
BY MR. ARGIONIS:
Q. So was that your understanding, that there would be a writing required before this could be amended?
MR. SHOWEL: Objection; the document speaks for itself.
BY MR. ARGIONIS:
Q. You drafted the document. What did you intend by having that provision in there? Or did you not read it like what you said Merri didn't do?
A. I didn't memorize it. That's why I had

Page 275

to look it up now.
Q. You read it, you drafted it, and you understood it, right?
A. I believe so. Hang on. Repeat the question, please.
Q. Did you understand that this agreement needed to be amended through a writing?
A. Yes, it would require the written consent.
Q. So with that provision in there, could you and Merri just say we don't want this operating agreement anymore, we want to amend it, and it goes away without any writing?
MR. SHOWEL: Objection; calls for a legal conclusion.
THE WITNESS: I'm unclear as to your question.
BY MR. ARGIONIS:
Q. You said Merri wanted that prior -- the TMG operating agreement to be gone. That she expressed that to you in some way is your allegation that you testified to, right?
A. It was more clear than that.
Q. It was crystal clear, right, in your

Page 276

mind?
A. It was clear.
Q. Okay.
A. And so your question is?
Q. Could she have done that without a writing?
MR. SHOWEL: For the old agreement?
MR. ARGIONIS: Yeah.
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: I believe she did it. She may have written it down.
BY MR. ARGIONIS:
Q. Okay. My question to you is, could she have done it with a writing?
MR. SHOWEL: I thought your question was without a writing.
MR. ARGIONIS: Without a writing. You're right. I was testing to see if you are paying attention.
THE WITNESS: I believe she did it.
BY MR. ARGIONIS:
Q. You believe she has a writing that did away with the TMG operating agreement?

Page 277

A. No, you asked me if I believe she did it -- whether she wrote it down or not.
Q. Okay. Do you know whether she did it via writing?
A. I don't.
Q. Okay. You reviewed that agreement, right?
A. I saw that agreement well prior to when I was -- when Merri and I were partners. You're talking about the old Cedric agreement now? We're not talking about this agreement.
Q. I don't know why you are calling it the Cedric agreement. It was a TMG operating agreement, right?
A. Okay.
MR. SHOWEL: The 2009 agreement?
MR. ARGIONIS: Yes.
BY MR. ARGIONIS:
Q. At some point you understood Cedric was out at that point? His interest was assigned back to TMG?
A. My understanding would be his interests were purchased by TMG.
Q. So then it became TMG's operating

Page 278

agreement without Cedric as a member? At some point it became that, right?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
BY MR. ARGIONIS:
Q. You don't have an answer to that one?
A. The question is?
MR. ARGIONIS: Could you read it back to him, please?
(Said question was read back.)
Q. So then it became TMG's operating agreement without Cedric as a member? At some point it became that, right?
THE WITNESS: I guess at some point it became -- I don't know. It was disregarded by Merri.
BY MR. ARGIONIS:
Q. Do you know if that disregard by Merri was legally effective or not?
MR. SHOWEL: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: I didn't ask a lawyer about

Page 279

that.
BY MR. ARGIONIS:
Q. Okay. So you don't know?
A. I took Merri at her word.
Q. Did Merri tell you whether her lawyer approved of that or not?
A. No.
Q. Okay. So you don't know?
MR. SHOWEL: Objection.
THE WITNESS: Don't know what?
BY MR. ARGIONIS:
Q. Whether it was legally effective what she did relative to TMG?
MR. SHOWEL: Objection; calls for a legal conclusion.
THE WITNESS: I didn't have any reason to doubt that it was effective in the case.
BY MR. ARGIONIS:
Q. Did you ever inquire whether she ran by how she did that?
A. No. It's what Merri wanted. It was really clear.
Q. What Merri wanted, she should just get?
A. In this case, I thought it was

Page 280

completely appropriate.
Q. And why -- if you don't know how that operating agreement legally can be changed, why do you think that's totally appropriate?
A. Because Merri and I are the owners of Kashwere, and will have the agreement appropriate to us, and I was okay with Merri -- I was in agreement with that decision.
Q. Okay. But did you ever confirm whether that decision was carried out in a legal fashion?
MR. SHOWEL: Objection; asked and answered.
THE WITNESS: And I believe that with the unanimity of me and Merri, that that agreement was entirely effective and not to be objected by either one of us.
BY MR. ARGIONIS:
Q. You weren't part of TMG, the old operating agreement, right? Merri got that when Cedric's interest was bought back. And you said she wanted it gone, and you believe that she got rid of it, whatever that means -- you're making some kind of opinion that that was gotten rid of, and my question to you is, you didn't do anything to confirm whether she legally got rid of that

Page 281

operating agreement? You didn't look it up on Google? You didn't ask a lawyer? You didn't run it by a lawyer, et cetera, right?
A. Here. Another way of saying this is Merri wanted it, I agreed.
Q. Why would you get to agree or disagree when it's Merri's operating agreement?
A. Because I'm Merri's partner, and we own Kashwere. And by the way, I get to have opinions, agency, a perspective. You are talking about something that was completely non-debatable, objectionable, controversial, and never entered into our running the company.
Q. That TMG operating agreement was no longer in effect had no impact on your ownership interest?
MR. SHOWEL: Objection; misstates his prior testimony.
BY MR. ARGIONIS:
Q. But that's my question. I wasn't trying to misstate anything.
A. I don't believe that Cedric operating agreement had the -- the one that Merri and Cedric had had any impact on my ownership

Case: 1:21-cv-05709 Document #: 91-2 Filed: 01/31/25 Page 88 of 571 PageID #:858



Page 282

interest in Kashwere.
Q. I asked you why, and you said you felt Merri got rid of it, it was gone, whatever that means.
A. Neither one of us wanted it as the operating agreement of the company.
Q. Great. Did you ever confirm whether it being gone was appropriate? Was it done appropriately? Did it comply with the terms of how to make it gone?
MR. SHOWEL: So the question is compound.
MR. ARGIONIS: Sure. I'll withdraw it.
BY MR. ARGIONIS:
Q. Did you get any legal opinion as to whether that -- did you seek out any legal opinion as to whether that TMG operating agreement, that involved Merri and Cedric at one point and Cedric withdrew from, did you ever get any legal opinion as to whether that TMG operating agreement was no longer in effect at any point in time?
MR. SHOWEL: I guess -- does that call for a legal conclusion? You're asking him did he ever --

Page 283

MR. ARGIONIS: Did he seek out an opinion -- did he seek out a legal conclusion. I'm not asking for a legal conclusion. Did he seek one out. You.
MR. SHOWEL: Hold on a second. Give me a second.
MR. ARGIONIS: Then I will withdraw it.
BY MR. ARGIONIS:
Q. You wanted to become a member of TMG, right?
A. I am a member of TMG.
Q. At some point you weren't, correct? Let's take you back in time. When you weren't a member, you wanted to become a member, right?
A. Yeah.
Q. Okay. There was an operating agreement in effect at some point in time prior to you becoming a member, true?
A. I believe so.
Q. Okay. Do you know if that TMG operating agreement is still in effect today?
A. I don't believe it's in effect today.
Q. When do you believe it was no longer in effect?

Page 284

A. When Merri told me it had nothing to do with our partnership in building Kashwere.
Q. Did Merri ever tell you that she got a legal opinion to confirm that that TMG agreement was no longer in effect and would have no impact on you becoming a member?
A. No.
Q. Did you ever seek out an opinion to see if that TMG agreement was in effect and wouldn't have any impact on you becoming a member?
MR. SHOWEL: Okay. Objection to the form of the question. If you went and asked a lawyer for any legal advice with regard to the old Cedric operating agreement --
BY MR. ARGIONIS:
Q. Yeah, I'm not asking for the actual advice, but did you seek out legal advice to give you an opinion as to whether it would impact your membership interest?
MR. SHOWEL: His communications with lawyers soliciting legal advice are obviously privileged.
MR. ARGIONIS: Agreed. Whether he sought out a legal opinion is not.
BY MR. ARGIONIS:

Page 285

Q. Did you seek out a legal opinion on that?
MR. SHOWEL: If he asked an attorney for legal advice, it's privileged. The communication is privileged.
BY MR. ARGIONIS:
Q. Are you refusing to answer my question whether you sought out any legal opinion? Maybe you Googled it yourself.
A. I'm not answering your question.
Q. Okay.
MR. SHOWEL: Well, you can answer the Google question.
THE WITNESS: Didn't Google it.
BY MR. ARGIONIS:
Q. Did you do anything to attempt to determine whether the cancellation of the TMG agreement needed to be done before you become -- became a member?
A. I took Merri at her word.
Q. That's all you did, take her at her word?
A. I took Merri at her word.
Q. Is that all that you did?

Page 286

MR. SHOWEL: Let me put it this way, Dean, if you didn't seek out legal advice and didn't contact an attorney, that's not privileged. So you can tell him you didn't seek out legal advice, but you can't tell him if you contacted an attorney and got advice about it. That's what I'm instructing you.
THE WITNESS: I didn't seek out legal advice with respect to that issue.
MR. ARGIONIS: Let's mark this as deposition Exhibit 15.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 15 for Identification.)
THE WITNESS: I'm going to the bathroom guys.
MR. ARGIONIS: Sure. We'll take a break. Off the record.
THE VIDEOGRAPHER: Off the record at 3:56.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 4:00 o'clock.
BY MR. ARGIONIS:
Q. I'm showing you what we've marked as

Page 287

Dussias Exhibit 15, Bates labeled TMG 409744 through 766. It has a cover page and then a document. First question is, is that a document that you had emailed to Merri on February 22, 2021?
A. I believe it is.
Q. And it says, "Hi, Merri. Have incorporated feedback from Friday. Let's go over when you have a moment." What do you recall about what the feedback was from Friday?
MR. SHOWEL: Just --
THE WITNESS: Hang on.
MR. SHOWEL: Never mind.
THE WITNESS: What I recall is the feedback incorporated conversation between Merri and I and Ray Conway that resulted in the effective dates changing, such that TMG would have better tax consequences. So it affirmed my ownership interest from July 1st and cited percentage interest. I'm looking at page ending 9765 on Exhibit 15 and comparing it to exhibit -- there were some additional -- yeah. So you have two additional bullet points between page 9765 on -- in Exhibit 15 and page 6406, I think, the same

Page 288

Exhibit B of Exhibit 14.
BY MR. ARGIONIS:
Q. And those differences then, is your allegation that Merri agreed to those changes?
A. I believe Merri and I were agreed to those changes.
Q. But you never signed -- you and Merri never signed a document agreeing to those, correct?
A. I believe we did not sign this document.
Q. And you didn't sign any document agreeing to those changes, correct?
A. I don't believe there was a document signed agreeing to those changes.
Q. So do those changes control what the agreement is between you and Merri, or does it revert back to what you agreed to in 2019 or 2020?
A. I believe those changes were entirely amenable to both me and Merri.
Q. And you believe that they are actionable through a lawsuit, even though there wasn't any agreement signed by both of you agreeing to those changes, right?

Page 289

MR. SHOWEL: Objection; calls for a legal conclusion. I guess you can answer.
THE WITNESS: I believe that accurately reflects the agreement between me and Merri.
BY MR. ARGIONIS:
Q. And it changed to what you guys had agreed to prior? You just told me there were differences.
A. It added to what we agreed to prior.
Q. So it changed what you had agreed to prior?
A. It added to what we agreed to prior.
Q. How about the effective date? That's different now. You said before there was an effective date of July 1, 2020, right? This one says March 13, 2020.
A. That's correct.
Q. So is it your allegation that the effective date was changed between you and Merri by you and Merri orally agreeing to change it?
MR. SHOWEL: I guess objection; legal conclusion. You can answer.
THE WITNESS: I believe that both Merri and I were fine with that -- agreed to the effective

date change and the additional bullet points in the exhibit.
BY MR. ARGIONIS:
Q. So before you told me the effective date was July 1, 2020. Were you mistaken?
A. No.
Q. Is the effective date of the agreement you had with Merri July 1st, 2020, or is it March 13th, 2020? Just asking what you two agreed to.
A. Great. We made the agreement when I said, and then through discussion with --
Q. What date was that that you said?
A. July 1st, 2020. And I am fine with the -- at that time and with the purpose of the final two bullet points.
Q. I'm asking you about effective date. We can get through it quicker if you focus on my question. The effective date says March 13, 2020. You said you agreed to that with Merri, right?
A. In February of 2021, I was fine with the effective date being amended to March 13th, 2020.
Q. And you and Merri agreed to amend the effective date to March 13th, 2020, is what you



told me?
A. I believe Merri was just fine with that.
Q. That's not my question about Merri. You can't really -- you told me before, you can't testify as to what's in Merri's mind. I'm asking you about your mind. Is it your understanding that you and Merri agree that the effective date of your agreement relative to ownership was March 13th of 2020? And I'm just showing you this document to refresh your memory on this because earlier you told me July 1.
A. I think Merri had no disagreement with that.
Q. Does that mean you two had agreed to it? I'm just asking your understanding. It is not a trick question.
A. My understanding is -- the change is entirely to Merri's benefit. Yeah, I think it was fine.
Q. So you agreed to March 13th, 2020, as the effective date of you becoming a member of TMG?
A. I'm not sure that's the right way to say it, but there was -- but there was -- I was



agreeable to having my percentage interest start then, so as Merri would have lower taxes, and there was a negotiation over a tax basis and how it would be allocated that was favorable to Merri.
Q. Did you also agree to 7.1 of this document, same document, 409748, regarding management of the company -- that the initial manager of the company shall be Merri G, LLC, a Delaware limited liability company? Did you agree to that term?
A. I think that term was fine by me.
Q. So you agreed to it?
A. Yeah.
Q. Did Merri agree to it?
A. I think it was fine with Merri, too.
Q. Did Merri agree to it?
A. I believe so.
Q. So as you sit here today, whom do you believe is the initial manager of TMG?
MR. SHOWEL: As of what date? Objection.
MR. ARGIONIS: Withdraw that one.
BY MR. ARGIONIS:
Q. As you sit here today, whom do you



believe is the manager of TMG?
MR. SHOWEL: Objection. I believe there are documents on file with the state of Arizona.
MR. ARGIONIS: Plenty of documents out there. But I'm asking what he believes is the current manager of TMG.
THE WITNESS: Merri Gleckler.
BY MR. ARGIONIS:
Q. Did Merri G, LLC, ever become a manager of TMG while you were still there?
A. I believe that Merri is the manager, and whether effective to that entity or not, I don't have an opinion at this time.
Q. Do you know -- okay. That's fine.
Let's mark Exhibit 16.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 16 for Identification.)
MR. ARGIONIS: Again, these are text messages that you turned over to your attorney and were produced in this litigation. I got the Bates page DHD 994 through 995.
(WHEREUPON, said document

was marked as Dussias
Deposition Exhibit No. 16
for Identification.)
BY MR. ARGIONIS:
Q. You put money into an account without Merri's knowledge, right?
A. No.
Q. Okay. If you look at the second page of this document -- let me ask you about that. What are you saying that -- when did you -- when you deposited it, how did you let Merri know in advance of the deposit?
A. We talked about it maybe as early as May, but also in June.
Q. How, phone, Zoom, in person?
A. Phone.
Q. No email by you saying, Hey, Merri, I'm going to deposit 20 grand for my capital contribution, right?
A. There may be.
Q. You didn't find one when you produced documents to your lawyers, right?
A. I don't think so.
Q. Did you have any text message saying,



Hey, Merri, I'm going to deposit this money as my capital contribution?
A. No. I told Merri and when it was deposited into the account it was very clearly marked.
Q. By you?
A. Yes, by me.
Q. You put a description on there. That's a good point. You said "capital contribution," right?
A. I'd have to see the description.
Q. We'll show it to you in a bit.
A. That would be great.
Q. You put that for a reason, right? To be clear as to why you were depositing it?
A. Because it was accurate as to what it was.
Q. Right. You didn't feel that it was necessary to document that prior through some email or text?
A. I told Merri.
Q. You didn't feel that there might be a dispute as to whether --
A. No, I did not.



Q. You didn't? Even though you guys were trying to negotiate this agreement over the last couple of years, and you hadn't been able to come to terms?
A. That's not an accurate description at all.
Q. What is an accurate description about all the drafts that were going on?
A. I don't have any comment at this time.
Q. You can't answer that question?
A. Like I said, I don't have any comment at this time.
Q. Why don't you have any comment about an issue regarding --
A. Because I am still thinking about how to answer the question.
Q. What would be best to your advantage is what you're thinking of?
A. No.
Q. Then just tell us. What's your interpretation of why so many drafts were going back and forth as to an operating agreement, and why you didn't rely on, like you said, I never think that Merri would say anything different as



capital contribution, why were you guys doing all these drafts as to these other terms?
MR. SHOWEL: Compound; objection.
THE WITNESS: Yeah, I don't think there was any lack of clarity with respect to the capital contribution.
BY MR. ARGIONIS:
Q. How about the other terms, all those drafts, is there any lack of clarity as to the terms between you?
A. I think the lawyers that Merri used consistently sent drafts that were --
Q. Trying to protect her, as they said in their emails.
A. I'm sorry. Are you testifying or am I?
Q. I'm asking a question.
A. Oh, all right.
Q. That's what they were trying to do, right?
A. I don't believe so.
Q. What do you believe they were trying to do?
A. I don't know what they were trying to do.

Q. Okay.
A. What they did do wasn't reflective at all as to the conversations and the agreement.
Q. So why didn't you just tell Merri -- why didn't you just tell Merri let's get on the phone with your lawyers, and I'll walk them through what they should do?
A. Because each time I had a conversation with Merri, we had agreement, there was clarity, and I didn't feel any need to get on the phone with Merri's lawyers.
Q. Even though you kept seeing -- you told me you had clarity in 2019, you had clarity in 2020, and in between those we see drafts from her lawyers and Merri saying, Hey, Dean, here's a draft, you can talk to my lawyers, yet you still feel that Merri was disagreeing some way with her lawyers, is that what you're telling me?
MR. SHOWEL: Objection; misstates his prior testimony, it is compound, vague.
BY MR. ARGIONIS:
Q. I am not trying to restate anything. I'm just trying to ask him whether he thinks that's the case, Merri was disagreeing with her



lawyers?
A. I don't know what Merri said to her lawyers.
Q. Did you ever say, Let's get on the phone with your lawyers and straighten things out?
A. I don't believe so.
Q. Why not?
A. Because Merri and I agreed.
Q. And you were better off talking to Merri without a lawyer present?
MR. SHOWEL: Objection. Answer.
THE WITNESS: I guess I don't hear a question in that.
BY MR. ARGIONIS:
Q. Did you feel you were better off talking to Merri without her lawyers?
A. I felt that Merri and I had an agreement and would go on building our business.
Q. So why not involve her lawyers to document it?
A. That's up to Merri.
Q. Merri did. She had her lawyers send you drafts that you would reject. You wanted to have conversations without her lawyers?



A. The -- Merri and I were building a business together. And --
Q. Does this have to do with whether you wanted her lawyers involved in the discussion?
A. I didn't care if her lawyers were involved in the discussion.
Q. You actually would have preferred them not to be involved because they weren't doing things that you approved of?
MR. SHOWEL: Objection; misstates the answer that he just gave you literally one second ago.
BY MR. ARGIONIS:
Q. I'm asking him a fresh question.
A. Which is?
Q. You didn't agree with what the lawyers were presenting to you, did you?
A. I didn't agree with the documents that were sent.
Q. So why didn't you contact those lawyers to say, Hey, you got it wrong?
A. Because the lawyers aren't the decision-makers, Merri is.
Q. Why not have the discussion with Merri and the lawyers who were drafting it?



A. Because Merri and I had the kind of relationship where I just told Merri exactly what I thought and felt. I thought she was doing the same, and the actions that happened, happened.
Q. Regarding the $20,000 that you deposited, how did you deposit that? Did you go with a physical check, ATM, what?
A. I think it was ACH.
Q. From what account?
A. From a Chase Bank account.
Q. With you and your wife's name on it?
A. I believe so.
Q. And you initiated the ACH?
A. I believe so.
Q. Let's look back on Exhibit 16. The second page of that document, Bates labeled 995, and you could look and read the other ones if you want. I'm going to focus you on the second gray bubble. "I don't think texting is smart. You put money in an account without my knowledge claiming that you told me so you bought in?" Do you remember Merri sending you that text on March 25th, 2021?
A. Not in specific, but reading it, I

believe it's a genuine text.
Q. And is it true that you put it in there without her knowledge?
A. No, it's not true.
Q. Why do you think she sent this to you? What's your understanding why she sent this to you?
A. I don't know, other than I think she's lying.
Q. Why would she be lying in March of 2021 to you about a capital contribution?
A. I don't know. Maybe she generally forgot, but I don't believe she forgot that I put 20K in the account, and so I don't know why she sent me that text.
Q. And you were still working at TMG, right, during this time period?
A. I was still active at TMG, yes.
Q. So did you have a discussion with her to clear up or to tell her, Hey, Merri, remember we had this discussion or anything of that nature?
A. We may have discussed this text at a subsequent date. I don't recall.
Q. Why didn't you respond to her text?



A. Because I didn't think it was truthful.
Q. Why didn't you respond to tell her you didn't think it was truthful?
A. It's -- I don't think text arguments typically go anyplace. So not me. Not my style.
Q. At any point in time did you sit down to clarify why you put in that 20K and did Merri ever agree with you that, yeah, I forgot, yeah, it was appropriate, did that ever happen?
A. Like I said, I think I may have discussed it at a subsequent date.
Q. When?
A. Sometime between this date and mid April.
Q. How?
A. By phone.
Q. But you can't narrow it down any more than that?
A. At this time, I can't narrow it down any more than that.
Q. You did a lot -- there's been a lot of emails, like 500 pages of documents and emails and everything else, text messages, yet you didn't feel it was necessary for you to put in



writing somehow that you resolved the issue with Merri about the $20,000 being deposited?
A. I don't know what you mean by -- do you mean like in this time frame?
Q. To respond to it -- to respond to what she put in her text, you didn't feel it necessary to do that in writing in some fashion?
A. No, I didn't think that would be productive.
Q. Why? If you just thought she might have forgotten about it, wouldn't it be productive to clear up a misunderstanding?
A. I thought she may have been lying about it. She may have forgotten about it.
Q. Okay. I asked you your reason -- you have to have a reason for something. You can't just be guessing, right? Why do you think she was lying?
A. Well, actually, at that time, I didn't necessarily have a reason, and this occurred at the end of March, and Merri had been upset since the beginning of March.
Q. Do you have any reason -- you said you didn't have a reason at this time. Do you have



any reason subsequent to this time as to why you think Merri was lying?
A. I think the obvious that Merri is trying to deny my ownership in the business.
Q. Why would she be denying it in March of 2021?
A. I don't know.
Q. You have no basis for why you think she was lying in 2021. Okay.
A. No, I said I don't --
Q. Or why she wanted you out --
A. I have to think about that. Okay.
Q. You have no explanation for that as you sit here today why she would want to deny your ownership interest as of March of 2021?
A. I think that Merri wants to keep something that's very valuable.
Q. Okay. So she had regrets at some point that she made you an owner, is that what you're telling me? Just your understanding of why she would try to deny your ownership interest.
MR. SHOWEL: Objection; calls for speculation, but you can answer.
THE WITNESS: Yeah, I --

Page 306

BY MR. ARGIONIS:
Q. Well, yeah, are you just guessing or do you have a basis is what I'm saying? If you are just guessing, just tell me you're guessing.
MR. SHOWEL: Wait, time out. Guessing as to what?
MR. ARGIONIS: He said that he believed she lied, and then he said in follow-up, I believe she lied because she wanted to deny my ownership interest. I said why would she be denying your ownership interest? Are you just guessing or do you have a basis for that, something happened, something occurred, there was an opportunity, whatever it might be, or are you just guessing? You just don't know? Then I will a follow-up to that.
THE WITNESS: I'm sorry, what's the follow-up?
BY MR. ARGIONIS:
Q. Do you know?
A. I don't -- at this time I'm not going to speculate other than, as I said before, I think...

Page 307

Q. Okay. On the same exhibit, the next two, the next bubbles you say, "Hi, Merri." This is the next day, "please use your administrative role for now. If you would like another role to have the privilege, just let me know. I can give you the same sales and operations role Rachel has. You can give you any role you want by the way."
Do you recall what that conversation was about, Merri was asking for access --
A. I'm sorry. You mean what this bubble is about?
Q. Yeah.
A. This bubble has to do with NetSuite, and I think there was probably an email question, and so I was letting Merri know that she could use the -- what's called administrator role. She had the same number of roles that I did, which I think was upwards of a dozen. And then what I'm referring to is probably neither of us had the same identical role as another person in the company named Rachel. And so she could have -- I was letting her know she could have that role, and I was also letting her know she could

Page 308

actually give herself any role she wanted.
Q. And she contacted -- initiated that, and she contacted you to say she didn't have access -- admin access, right?
A. I don't know what she contacted me --
Q. That was my question, whether you know what that arose from. So you don't know what it arose from?
A. I answered you, it came from a question from her having a role in NetSuite.
Q. Did she ever contact you to say she couldn't get administrative access to NetSuite?
A. I don't know. But that wouldn't have been true.
Q. Did she ever contact you about who the bookkeeper is around this time period? And you can look at the next bubble from her, next two.
A. Yeah, I believe Merri contacted me about the bookkeeper.
Q. Two times it says, right; is that true?
A. Well, that's what it says here. If you want to show me some email, I'm happy to look at that.
Q. I'm asking if you recall.

Page 309

A. I recall.
Q. She emailed you a couple of times. You hadn't responded, so she texted you about the bookkeeper, right?
MR. SHOWEL: Objection. Objection; states facts not in evidence. Dean, you can answer.
THE WITNESS: I had responded.
BY MR. ARGIONIS:
Q. Respond again.
A. No, I had responded.
MR. SHOWEL: To Merri he is saying.
THE WITNESS: I had responded, so I don't believe that this text is true.
BY MR. ARGIONIS:
Q. Emailed you two times for bookkeeper -- so you are saying she is lying about that, too?
A. I am saying she is mistaken about that.
Q. Did you ever talk to her about that to confirm with her and clear up whether -- that she was mistaken?
A. No, but I recall actually looking at the emails to see that I did, in fact, respond.
So if you want to produce the emails, I'll walk you through them.

Q. Okay. And my question was a bit different. Did you ever then confirm with her that you had responded to clear up that she was mistaken?
A. I believe so.
Q. And how did you do that?
A. By email.
Q. So you clarified with Merri via email, Hey, I already sent you this, take a look at this, right?
A. Something like that.
MR. ARGIONIS: Okay. Let's mark this as deposition Exhibit 17.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 17 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we've marked as Deposition Exhibit 17. It's a document Bates labeled TMG 00162260, all the way through 317. And there is a cover email and then a document Amended and Restated Limited Liability Company Operating Agreement of TMG Kreations with an



effective date of July 1, 2020, red lined into it with exhibits to it, and there's a cover email, and two emails on there, from Merri Gleckler April 8th, 2021, so we're progressing from the prior drafts. Merri had sent it to herself and at the top -- sorry. Merri sent it to herself again. But my question was going to be as to this red line, is this the point in time -- well, at some point in time you had engaged lawyers in the spring of 2021, right?
A. That's right.
Q. Your lawyers red lined one of the drafts that Merri's lawyers had done as to an amended and restated limited liability company agreement, right?
A. I believe that may be true.
Q. And they were working off the amended and restated limited liability agreement that Merri's lawyers had sent off, right?
A. I'm looking at a red line of this agreement which I think that those lawyers did red line.
Q. Okay. You don't have any independent recollection other than looking at this that your



lawyers red lined a document for you that was amended and restated, as opposed to red lining your document which didn't have that amended and restated is what I'm saying?
A. They red lined a document started by --
Q. Right, and my question to you is, prior to that, you told me that you sent the document, didn't have amended restated in it, because you believed that was more accurate as to what you and Merri had agreed to orally, you know, and that you didn't disclose in some document, right? That's the preface of my question. That's not the question.
MR. SHOWEL: Objection; misstates prior testimony. You can answer.
THE WITNESS: I'm sorry. Repeat the question, please.
BY MR. ARGIONIS:
Q. Sure. You said you sent an operating agreement draft to Merri, because you didn't feel her lawyers were adequately capturing what you and she agreed to?
A. Generally, I think that's true.
Q. And you felt that the document that you



sent more accurately reflected what you and Merri agreed to, right?
A. Generally, yes.
Q. So why didn't your lawyers work off of your document if that one was more accurate?
MR. SHOWEL: Just going to object and say to the extent -- don't say anything that you and your lawyers talked about that. With that caveat, go ahead and answer.
THE WITNESS: Okay. Give me a second to look through this, will you?
MR. SHOWEL: I guess I'll also object to foundation because it is not clear to me Dean's attorneys created this red line.
THE WITNESS: I'm sorry. Repeat the question, please.
BY MR. ARGIONIS:
Q. Why didn't the lawyers red line your document, as opposed to red line Merri's lawyers document?
A. I believe we felt this was the easiest, least expensive path to getting done, and it would satisfy Merri's desire to have TMG be a WBE.

Q. Because your draft didn't adequately capture that?
A. No, that's not true.
Q. Okay. Do you feel your document more adequately captured?
A. I haven't done a comparison between the two documents.
Q. As you sit here today, you don't know?
A. I would have to take a look at them.
MR. SHOWEL: Can I clarify, Jim? Are you saying his document versus this redlined document?
MR. ARGIONIS: Yeah. Let's mark the next one as 18.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 18 for Identification.)
BY MR. ARGIONIS:
Q. Before we get to the actual document, did you save all of the drafts of whatever it was, term sheet, operating agreement, your version, lawyer's version, did you save all of those somewhere?



A. All of them should be either on Merri's computer or in Kashwere's email, whatever.
Q. I'm not asking about Merri. Did you save them?
A. Yes, when you say save, I haven't deleted anything. So if there's -- yes, whatever exists, exists.
Q. Were your lawyers communicating with you through Merri's email?
A. What do you mean?
Q. You said it would be saved in Merri's. I'm asking you whether you saved drafts that your lawyers dealt with -- sent you, other lawyers sent you, Merri's lawyers?
A. Probably I had everything, yeah.
Q. Did you turn those over to your lawyer?
A. I gave them everything I had.
Q. Presumably you should have the same drafts that Merri and her lawyers have, right?
A. Somewhere, yeah.
MR. SHOWEL: Hold on. Hold on. Hold on. Objection.
MR. ARGIONIS: Withdraw the question.
BY MR. ARGIONIS:



Q. You should have some subset of all those documents on your computer? If you know. If you know, you know, if you don't, you don't.
A. I haven't memorized what's on my computer, but I don't think -- what I've got is what I got and I've always had.
Q. And you did a diligent search to turn over to your attorney any and all drafts you had relative to the operating agreement, the term sheet, and any other documents that were being exchanged between you and Merri and/or your attorneys, right?
A. I believe they have -- I believe they have all the documents I had -- have.
MR. SHOWEL: Is this Exhibit 18?
MR. ARGIONIS: Yes.
BY MR. ARGIONIS:
Q. So let's look at Deposition Exhibit 18. It is a document Bates labeled TMG 176156 and it runs through 176205. Again, it's entitled, "Amended and Restated Limited Liability Company Operating Agreement" and on top CLB Griesing 4/12/2021. And do you recall -- whether you recall seeing this particular draft?



A. I don't recall seeing this particular draft.
Q. But your lawyers had sent you some kind of draft of this particular document, right? Strike that.
Is it your understanding that your lawyers and Merri's lawyers were communicating and red lining, black lining, this one's called an Amended and Restated Limited Liability Company Operating Agreement of TMG Kreations, LLC, do you have that understanding?
A. I have the understanding that the lawyers exchanged red line drafts of this document.
Q. Which is entitled, "Amended and Restated Operating Agreement," and we marked as Exhibit 18, right?
A. Yes.
MR. ARGIONIS: Let's mark the next one as Exhibit 19.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 19 for Identification.)

THE WITNESS: You want me to look at Exhibit 19?
BY MR. ARGIONIS:
Q. Yes. So we've marked as Dussias Exhibit 19 a document that's Bates labeled TMG 176105 through 6155. And, again, in the -- well, from looking at this, do you understand whether you've seen this document before? That it was your lawyer's version or Merri's lawyers?
A. I may have seen this document before. Are you telling me it's -- what's the date of when this was sent?
Q. Unclear from this document, but there's a header on it on the first page that it's, Dean counsel and then CLB revisions. And all my question is, is there any way that you --
A. What does CLB stand for? Are those Laura's initials?
MR. SHOWEL: I don't have any idea.
BY MR. ARGIONIS:
Q. Those are Cheryl's initials.
A. Thank you.
Q. So Dean counsel and Cheryl's lawyer revision. My only question to you is, was there



a way that you were able to identify from looking at the document that your lawyer made the revisions versus Merri's lawyer, et cetera, or would you have to look at some kind of email that would have been attached?
A. Yeah, I would want to look at some -- I guess I'd want to go look back at emails that were actually sent, as opposed to this May of 2021.
Q. Right. And that's my point, is that without looking at this, would there have been emails that you have that said, Hey, Dean, this is the draft that we responded, et cetera, and that's how you knew it was your lawyer's draft versus Merri's, et cetera? Or was there some other way that you understood that?
A. I'm sorry. I guess I'd have to look at originally to understand -- who is making what comments when.
Q. That's what I'm asking.
A. Yes, I don't know it from memory.
Q. Or from looking at this document?
A. I don't think so. No, I would not want to do that. I'm sorry.



Q. If you look at page 13 of that document, there's a footnote in there.
A. Yeah.
Q. "We would like to discuss the intended purpose of this Section 4.10. We are not agreeable to the language as drafted." It is regarding no dissenter's rights up above, if you want to look at that.
A. I saw that, too. I don't know who's making that comment.
Q. As you sit here today, do you know if you have a disagreement with that particular 4.10, or was it something your lawyers raised or Merri's lawyers raised?
A. I don't know who raised it, and I would like to think about it. Yeah, I don't have an opinion.
Q. You don't know. Okay.
Any of these versions that we just looked at, they were never signed by you and Merri, correct?
A. To my knowledge, that's correct.
MR. ARGIONIS: Let's mark this as Dussias Exhibit 20.



(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 20 for Identification.)
BY MR. ARGIONIS:
Q. This is a document Bates labeled TMG 590492. There are employee ID numbers on the left hand column. Kind of hard to see, but the next page they're a little bigger. Did you have two employee ID numbers?
A. I'm sorry. Is this from the assignment system?
Q. Yes.
A. I believe there are two ID numbers identifying me in the system.
Q. Why was that?
A. The change from W-2 to owner.
Q. Okay. And if you look at --
A. Where is it here?
Q. Employee ID numbers.
A. I see. Okay. I'm trying to -- you're right. It is quite small. Okay. Do you have any other questions about this one?
Q. Yeah. You can look at the July 5

Page 322

entries. The date is second to the right hand column. Second to the last right hand column.
A. July. 07/05. Okay.
Q. Those are all different activities going on there, and they all say Dussias next to them. Do you recall why you were doing things in this system on July 5th of 2020?
A. So not specifically without looking at the document, but I believe the document has the setup by Rachel on July --
Q. July 5th I'm asking you about, those entries. They all say Dussias. Do you recall why you were -- let me point you to specific ones. The first two, July 5th entries. You can put a piece of paper there if you want.
MR. SHOWEL: I'm sorry. First from the top or first from the bottom?
MR. ARGIONIS: First two from the top. There's two July 5 entries.
THE WITNESS: I'm sorry. The ones that are around officer and owner?
BY MR. ARGIONIS:
Q. Yes.
A. Okay.

Page 323

Q. Was that you as Dussias changing -- putting in officer -- or changing from officer to owner as of July 5th, 2020?
Do you see that officer false and then true, owner, false, true?
A. Okay.
Q. Did you make those changes on July 5th?
A. I don't directly recall that but possibly.
Q. Okay. Then you go down below that one, owner percent, and there's a 30 in there. Did you change that in the system on July 5th, 2020, around 6:32 p.m.?
A. I don't directly recall, but I see that entry.
Q. Does that refresh your memory as to your testimony later that it was you or Rachel, that it was actually you?
A. No.
Q. The last column is user.
A. Look, I don't know if Rachel is able to go in as me.
Q. You didn't know that? You were the one controlling the system, and you didn't know if

Page 324

Rachel had access to your user ID?
A. It's H. Simon's system, and I didn't then, don't know now, the answer to the question that someone at H. Simon could go in using my ID or not. Perhaps they could. I'm just -- I don't know.
Q. And you don't think you changed this?
A. I may have.
Q. You're basing some of your lawsuit on the payroll records, right?
MR. SHOWEL: Objection; form of the question. You can answer.
THE WITNESS: The payroll records subsequent to July 1st accurately showed my status as an owner.
BY MR. ARGIONIS:
Q. And you testified earlier that you went in and changed that, right?
MR. SHOWEL: Objection; misstates his prior testimony.
BY MR. ARGIONIS:
Q. Let me ask you fresh. Did you go to the system July 5th and change those?
MR. SHOWEL: Objection; asked and answered.

Page 325

THE WITNESS: I don't recall directly. It appears so from this document.
MR. ARGIONIS: Let me show you what -- let's mark this as Dussias Exhibit 25, please.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 25 for Identification.)
Matt, this is what you used as Merri Exhibit 56, and it doesn't have the Bates on it, but you said these were from the J.P. Morgan.
MR. SHOWEL: Yes, they were produced in native, so the -- this spreadsheet is not Bates stamped. The placement was Bates stamped.
THE WITNESS: What's this?
BY MR. ARGIONIS:
Q. We've marked this as Dussias Exhibit 25. It was previously used as Merri Gleckler Exhibit 56. Record that your counsel had subpoenaed from J.P. Morgan.
Where did you live at the time that you were doing work with TMG?
A. Winnetka. Same address I gave earlier.
Q. Did you have access to the J.P. Morgan

Page 326

accounts?
A. I did.
Q. Did you access them through their web access from your house in Winnetka?
A. Probably.
Q. Do you know if your internet service provider around that time was SteadFast?
A. I don't believe it was SteadFast.
Q. Whom do you think your ISP was?
A. Comcast.
Q. Do you utilize any type of technology that would --
A. No.
Q. -- that would show your -- that would show your ISP as something different than -- other than where you are?
A. No.
Q. You understand that technology, right?
A. Yeah, like I'm not trying to watch my Netflix from Sweden. So, no, I don't have one of those services for ISP.
MR. ARGIONIS: We're designating everything confidential, but I think bank records we can do that, so I don't think we need to discuss that

Page 327

now. Okay.
BY MR. ARGIONIS:
Q. Let -- who is Russ Shaffer?
A. Russ Shaffer is a person that Merri and Cedric dealt with.
Q. And did you interact at all relative to TMG?
A. Yes.
Q. Was he asserting in some way that he had some kind of ownership interest in TMG?
A. I believe he did.
Q. What was your discussions with Merri or anyone regarding whether Russ had a membership interest in TMG?
A. I did not think that Russ was an owner of Kashwere.
Q. And why did you think he did not have -- he was not an owner?
A. He didn't -- the number of parties involved and their -- the actions that they took, that he wasn't an owner.
MR. ARGIONIS: Let's mark this as exhibit Dussias Exhibit 26.
(WHEREUPON, said document

Page 328

was marked as Dussias Deposition Exhibit No. 26 for Identification.)
BY MR. ARGIONIS:
Q. Take a look at what we marked as Dussias Exhibit 26, Bates labeled TMG 167246 through 268 it should be. Unless the other document -- 247 and then there -- it looks like a photograph of a document on the third page. I'm not sure right now whether it has a Bates, but we can figure that out. But it is the same thing --
MR. HICKMAN: 167248.
MR. ARGIONIS: 248.
BY MR. ARGIONIS:
Q. This was the same thing as what was used as Exhibit 27 to Merri's dep. So there's a --
A. I'm sorry? This was --
Q. Used at Merri's deposition as Exhibit 27.
A. Thank you.
Q. But we are marking it here as Dussias Exhibit 26.
There is an attachment called "Business Agreement" attached to this. Had you

Page 329

ever seen that document at any time?
A. No.
Q. Do you know if Russ or Cedric were presenting that to Merri at any time? If you were involved in it.
A. Let me read it, please.
What I recall that I've been told about this that while they move forward with part of this with Russ, that the Nandina piece and Matthew and Laurel Thomas, that none of that happened is my understanding.
Q. Okay.
A. So I don't believe I've ever seen that. That being the business agreement photograph.
MR. ARGIONIS: So let's mark this as Dussias Exhibit 27.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 27 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we've marked as Dussias Exhibit 27, there's an email in the center of this page. It is a one-page document TMG 589599.

Page 330

Email from you to Merri and from the Dussias.org email address, dated November 26 of 2013. Subject: LLC questions, responding to your request. So you were responding to a request that Merri had made of you relative to Russ?
A. Apparently, yes. Subject of the email.
Q. And do you recall that you and Merri were discussing Russ and you made this response to her?
A. Not in specific. But, sure, this is 2013.
Q. You mentioned to Merri there, "Have lawyer review LLC operating agreement. It's six and a quarter pages. Must know Delaware LLC law." You felt that was important for Merri to do?
A. I thought it was something Merri should do. I don't know about important.
Q. Do you know why you told Merri that?
A. If she wanted to -- if she was asking LLC questions, she should go have somebody do that.
Q. Okay. Because the LLC operating agreement is what governs the relationship?

Page 331

A. Because she wanted to understand the agreement.
Q. Relative to Russ making some allegation that he was an owner, and she was denying that he was an owner, right?
A. To my recollection, she wanted to understand the agreement. Beyond that, okay, you can speculate that.
Q. You don't know that this response was relative to your discussion with her about Russ and his alleged ownership?
A. I think it was LLC questions.
Q. Take a look at the document, look at number three, "Not worth focusing on Russ, he is not a member. See his one-page agreement, his deposition, pattern of action, Section 7.2 of Kashwere operating agreement." What did you mean by saying he is not a member and referencing Section 7.2 of the Kashwere operating agreement?
A. I didn't think he was a member.
Q. Because 7.2 provided that there were certain things that needed to be complied with to be a member, right?
A. You'd have to show me 7.2, and I appear

Page 332

to cite a number of different reasons.
MR. ARGIONIS: Let's mark the operating agreement. We'll mark this as Dussias Exhibit 37.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 37 for Identification.)
BY MR. ARGIONIS:
Q. Showing you the TMG Kreations, LLC, operating agreement, and if you turn to Section 7.2, "Restrictions on Transfer. Requires consent to such transfer. Written consent of all members by executing a consent form of Exhibit C." Is that what you were referencing to Merri in this email that is Dussias Exhibit 27 as to one of the reasons why Russ is not a member?
A. Apparently.
Q. And that was your understanding of the TMG LLC agreement Section 7.2?
A. That's what I wrote to Merri.
Q. And you were trying to be accurate in what you wrote to Merri, right?
A. Is that a question?

Page 333

Q. Yes. Were you trying to be accurate in what you wrote to Merri?
A. I was.
Q. When you say focus -- your bullet point number two -- we're still on bullet point number three. You also reference Section 18-702(b)(1) of the Delaware code. Did you look that up yourself?
A. Don't recall.
Q. And 18-702 talks about assignment of limited liability company interest. Did you mean by sending that to Merri that Russ needs to have complied with that particular section of Delaware code to be a member?
A. I don't recall.
Q. Next. "No copy of LLC agreement signed by him." Was that one of the reasons you were telling Merri that Russ was not an owner in TMG?
A. That's why I told her it's not worth focusing on him.
Q. My question to you was, "No copy of LLC agreement signed by him," you're referencing Russ, right?
A. I'm referencing Russ.

Q. One of the reasons you told Merri that you didn't feel Russ was a member of the LLC was that he didn't sign the LLC agreement, right?
A. That's what I wrote.
Q. And that's what you believed when you sent this to Merri?
A. I believed I was accurate.
Q. Okay.
MR. ARGIONIS: Let's mark Exhibit 28.
(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 28 for Identification.)
BY MR. ARGIONIS:
Q. Showing you what we marked as Dussias Exhibit 28, it is a two-page email that was produced by your attorneys DHD 00327 through 3288, and an email from you to Merri dated August 28, 2019, "Thoughts on Russ Shaffer." And in that I will give you an opportunity to take a look at it, but I'm going to ask you first about bullet point, or whatever you want to call them, paragraph three. "Russ received all of his capital back with interest. He is not a member,



has no ownership, nor profit interest of any kind. As of this writing, he has no standing with TMG, Kashwere, for the purposes of this message, and is owed nothing, no money, no communication, nothing." That was your position relative to Russ's allegation that he was an owner of TMG?
A. That's what I wrote to Merri.
Q. Is that what you believed?
A. I believe so.
Q. And you talk about in bullet point number four, "Russ and Cedric made plans to diminish your ownership." You were talking about Merri, your ownership, right? "And governance of Kashwere."
A. That's what Merri had told to me.
Q. Bullet point number five, "Russ's actions over the years have been costly and detrimental to Kashwere and you/well beyond any characterization of being a distraction, and you/Kashwere may have a strong case for legal action." That was your opinion as to Russ's action relative to Kashwere TMG?
A. It was worth considering.



Q. What did you mean by saying strong case for legal action?
A. That Merri can consider suing Russ.
Q. What were you basing that on?
A. The actions that Merri had shared with me that Russ and Cedric had taken.
Q. You felt that Russ's actions were wrong?
A. I thought that something should be considered.
Q. Any other specifics that you remember of why you wrote that?
A. No.
Q. Bullet point number six, "All of Cedric's characterization of Russ having some type of interest-member/owner and/or profits interest-has been disputed by you."
So Merri was disputing that Russ had any type of ownership interest, right?
A. That's what Merri told me.
Q. But Cedric was trying to characterize Russ as having some kind of ownership interest, right? That was your understanding?
A. Understanding was that Cedric had a characterization of Russ having some type of



interest.
Q. Yeah, you understood that?
A. I had that perception.
Q. That's what I'm asking you. "As with many other actions taken by Cedric, you have not been able to stop the filing of taxes where Russ has been provided a K-1." Do you recall that Russ was getting a K-1 inappropriately, and Cedric was controlling the taxes to let Russ have a K-1?
A. I know that Cedric was doing the K-1s. I don't know what Merri did or didn't do to stop -- to change that.
Q. Okay. And it was your understanding that Russ should not have had a K-1, right?
A. It was my belief that a K-1 wasn't appropriate for Russ.
Q. But Cedric had arranged for him to have a K-1, that's your understanding?
A. That's what I understood.
Q. Without Merri's consent?
A. I don't know if that's true.
Q. Even though you say in there, "Has been disputed by you," you're talking about Merri?

Page 338

A. Merri told me she disputed it.
Q. So that was your understanding, she was saying that was wrong?
A. My understanding was Merri -- it's unclear to me whether Merri -- to what extent Merri disagreed. I don't know what she said and didn't say, do and didn't do.
Certainly Merri didn't -- to me express the notion that she didn't want that to have happened.
Q. You have not been able to stop the filing of taxes where Russ has been provided a K-1, and you're saying that --
A. Where are you reading from?
Q. The same sentence we're on.
A. Which -- I've lost --
Q. First sentence, last phrase of it. After the hyphen.
A. And that's Merri's version of that.
Q. Okay. So you sent this to Merri just saying, Hey, this is what he said. You are not giving your opinion back on this?
A. No. I'm telling you that I had an opinion largely colored by what Merri said to me.

Page 339

Q. Okay. And you were trying to be accurate in what you provided to her as to advice? Do you have any reason -- well, was that true?
A. I tried to be accurate in what I wrote.
Q. Do you have any reason to believe that Merri was not accurate in what she told you?
A. Merri may have not been accurate.
Q. Why?
A. I don't know. Given all of this, it's -- I don't know.
Q. So Russ might have been a member is what you're saying?
A. No. You just asked me about Merri's accuracy. I don't know. I didn't independently validate it.
Q. Okay. "You may consider" -- next sentence, "You may consider some written communication to Cedric concurrent with the filing of the taxes before or after September 15th informing him that you do not agree with Russ having been provided a K-1 and believe you both had received less profits and cash than you would otherwise." Why did you feel it was

Page 340

important for Merri to do some kind of written communication that she doesn't agree with Russ getting a K-1?
A. Then, perhaps, Russ wouldn't get a K-1.
Q. Because a writing is somehow better than her just telling him?
A. No.
Q. You didn't mean that?
A. No. I didn't -- she could have written, she could have said something.
Q. But you said, "You may consider some written communication." You didn't say you may consider, you may just do it orally?
A. I wrote what I wrote.
Q. Right.
MR. SHOWEL: Jim, we're right at six hours and 45 minutes on the record.
MR. ARGIONIS: Do you want to take a break, is that what you're saying?
MR. SHOWEL: No. I'm wondering if you are going to wrap it up in the next 15 minutes.
MR. ARGIONIS: No. We got seven hours, right?
MR. SHOWEL: We're right at 6:45 now.

Page 341

MR. ARGIONIS: Yeah, we will. You're not agreeing to more time?
MR. SHOWEL: I am not.
BY MR. ARGIONIS:
Q. Who is David Lazar?
A. Wow, that's a question.
Q. Let me ask it to you simpler. Have you had any communication with David Lazar since your separation from TMG?
A. No.
Q. Do you have a good or bad opinion of David Lazar?
A. I don't think I have a judgmental opinion of David Lazar.
Q. What does that mean not judgmental? Is that a positive thing or negative?
A. It's neither. That would be the point.
Q. Who is John -- well, have you spoken to John Bartlett since you were separated from TMG?
A. I have not.
Q. Do you have a negative or positive opinion of John Bartlett?
A. I have not -- I don't have a judgment.
Q. Okay. How about Colin Phillips, have

you spoken to him since you separated from TMG?
A. I believe I did speak to Colin.
Q. When?
A. Shortly thereafter.
Q. Just on one occasion or more?
A. Might have been two. Might have been three.
Q. Do you have a good or bad opinion of Colin?
A. Non-judgmental.
Q. Did you discuss any issues related to your ownership interest in TMG with Colin?
A. I did not.
Q. Okay. Do you know who Desiree Roth is?
A. I believe so.
Q. Did you speak to her at any time since you have separated from TMG?
A. I don't believe so.
Q. Do you have a positive or negative opinion of her?
A. I have no judgment of her.
Q. Let me show you what we will mark as Dussias Exhibit 45.
(WHEREUPON, said document



was marked as Dussias Deposition Exhibit No. 45 for Identification.)
MR. ARGIONIS: Hold on, that's not 45. Where did I get that from? This is 45.
BY MR. ARGIONIS:
Q. Showing you what we've marked as Dussias Exhibit 45, it is a document that was subpoenaed from J.P. Morgan, Bates labeled 2017 through 2020. Paycheck Protection Program Borrower Application Form. Looks like it's a few pages. Looks like you filled this out, right?
A. Okay.
Q. Dean Dussias. Did you fill this out?
A. Probably.
Q. April 8th of 2020?
A. That's the date.
Q. As president?
A. That's the title.
Q. Okay. On the first page, if you look at that, owner Merri Gleckler CEO ownership, you said a hundred percent you represented for this Paycheck Protection Program in April of 2020?
A. That would be an accommodation to the



MIPA, but yes.
Q. What do you mean by that?
Were you trying to be accurate in this document as to the ownership interest?
A. Yes.
Q. Was there any reason you didn't list yourself as an owner?
A. Not that I recall.
Q. Were there certain domain -- Kashwere domain names you secured for Kashwere, Kashwere.ME, Kashwere.INFO, Kashwere.store, do you recall?
A. I don't recall. I'm not sure what you mean by secure. I don't remember creating any.
Q. You reserve them or --
A. No, I don't remember creating any. I may have -- no, I don't.
MR. ARGIONIS: Give me a minute, Matt. Let's mark this one. I wanted to change it from -- and then I think we're going to wrap up.
MR. SHOWEL: You want to take five?
MR. ARGIONIS: Why don't we take a little break, and I'll try to find this one. Let's go off the record.



THE VIDEOGRAPHER: Off the record at 5:16.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 5:21.
BY MR. ARGIONIS:
Q. Could you please pull out your version of Exhibit 4?
A. Number 4.
Q. The complaint. And I want you to go paragraph 41, which is page 8 of the complaint that your lawyers filed on your behalf. Paragraph 41. Take a look at that. I'm going to read into the record while you are looking at it. Paragraph 41 says, "Gleckler never presented any document to Dussias to sign to confirm the terms of the operating agreement," and prior to that they're talking about the TMG operating agreement -- you can look back if you want to -- that was actually executed December 13th, 2019, attached as Exhibit 1 to the complaint. 2009. That's referenced back to paragraph 36. Paragraph 41 says, Gleckler" --
A. I'm reading 41.
Q. Correct. I'm just trying to say where

Page 346

it's operating agreement it's capitalized, and it's referenced back in paragraph 36, if you wanted to confirm that.

A. Got it.

MR. SHOWEL: Do you understand what he's asking?

THE WITNESS: I'm reading 41, yeah.

BY MR. ARGIONIS:

Q. "Gleckler never presented any document to Dussias to sign to confirm the terms of the operating agreement or for Dussias to consent that his ownership interest was subject to and bound by the operating agreement or pursuant to any other document."

If the -- if it's your position that that operating agreement was no longer in effect because Merri didn't want it in effect, why would Merri ever need to present to you something to sign to confirm that operating agreement?

A. I would think that Merri would need to present it to me. It simply says she never presented me any document to sign to confirm the terms of the operating agreement.

Q. And is it your position that if she

Page 347

presented it to you, you would have been a member?

A. Huh?

Q. Do you know why that allegation is made in your complaint? If you know. Maybe you don't.

A. I'd like to think about it.

MR. SHOWEL: You don't have to guess.

THE WITNESS: I don't want to guess, that's fine.

BY MR. ARGIONIS:

Q. I don't want you to guess. If you know. If you don't, just tell us you don't know.

A. I don't know at this time.

Q. Then let's look at our last exhibit, Dussias 44.

(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 44 for Identification.)

Dussias Exhibit 44 is a document Bates labeled TMG 529609 through 610. It's a -- well, do you know what this is?

A. It's got no date on it, and I -- could

Page 348

you tell me what it is?

Q. Okay. I know we presented it at Merri's dep. I don't remember, Matt, if we marked it. It's what Corey had pulled up and sent to you.

MR. SHOWEL: Yeah, I don't think we marked it, but don't quote me.

MR. ARGIONIS: I don't think we did.

THE WITNESS: Okay. Are you going to tell me what it is?

BY MR. ARGIONIS:

Q. I'm asking you first, do you know what -- that there was a front page -- draft of a front page of website and some email blasts that were going to go out that were being drafted around -- during the COVID time.

A. So this is spring of 2020?

Q. Around that time period.

A. And it looks to be a draft of what might go on the front page, what could go to accounts. And what a property could send to a guest.

Q. Yes. And there's --

A. Okay.

Q. The version here just has Merri Gleckler, CEO, do you see that for the front page

Page 349

of the website?

A. I do.

Q. There is another exhibit -- I don't know if marked that one either. There is another draft where it says Merri and Dean Dussias as owners. I think it's 43.

A. Okay.

MR. ARGIONIS: Let's mark Dussias Exhibit 43, if you want to reference that.

(WHEREUPON, said document was marked as Dussias Deposition Exhibit No. 43 for Identification.)

BY MR. ARGIONIS:

Q. And Dussias 43 is TMG 00361975. The front page of website draft was changed from Merri Gleckler, CEO, to Merri Gleckler and Dean Dussias owners. My question to you was, did you request that that change be made and that you be identified as an owner, and that it be changed from the version that's here, Dussias 44?

A. I don't think I requested it.

Q. Do you have any idea why it was changed?

A. By the way, is this the version that

went out? Which went out?
Q. I don't know, but the Merri Gleckler and Dean Dussias is a subsequent version or draft.
A. Yeah, so I think this went out, and it's what Merri and I agreed should go out.
Q. And that was my question. Do you know why it was changed from Merri Gleckler to Merri Gleckler and Dean Dussias?
A. We thought this was a better message than this.
Q. And it was something you and Merri both came to, as opposed to you just asking for it?
A. Both Merri and I sent this out. It wasn't a question of asking or not asking. It's the draft we thought best.
Q. Right. The change of the draft from this to this, whose idea -- that's all I'm asking, whose idea was it? Not to send it out.
A. Who wrote the change initially?
Q. No, whose idea was it to change it?
A. It was our idea.
Q. A joint decision, not just you asking for it; is that true?
A. Yeah. Saying me asking for it isn't the



-- we wrote what we thought was best to go out. I believe this is what went out, and so that's what happened.
MR. ARGIONIS: Okay. That's all we have. I think we're beyond our time anyways. But that's it. We're done. Sorry. I'm done with questions, except for what I reserved in the deposition relative to potentially bringing him back and presenting some stuff to the judge, and I'd have to go back and review those.
MR. SHOWEL: I may have some follow-ups here. Just bear with me, and I'll try to get them done as quickly as I can. I may not have any.
EXAMINATION
BY MR. SHOWEL:
Q. Can you take a look at Exhibit No. 9?
A. You're speaking to me, right?
Q. Yep.
A. Okay. Okay. I got 9.
Q. A couple of times you talked about that the term sheet was set aside. I think you used the term set aside with respect to both Exhibit 9 and Exhibit 10. Does that sound familiar?
A. That does.



Q. Okay. By set aside, you mean that the two of you guys just disregarded it?
MR. ARGIONIS: Objection; leading.
BY MR. SHOWEL:
Q. You can answer.
A. We decided that we would finalize our ownership and move forward with us as 70/30 without moving forward on this term sheet and the other documents associated with it.
Q. All right. Let's take a look at Exhibit No. -- well, here. First take a look at Exhibit No. 9. Take a look at the attachment.
A. Okay. This is the attachment?
Q. Yep. You see the italicized language there?
A. I do. At the top?
Q. Yep. At the very end of the italicized language, there is some language about the basis for contract by estoppel or otherwise. Do you see that?
A. Yep.
Q. Now let's take a look at Exhibit No. 10, and let's look at the exhibit that's attached to Exhibit No. 10 or the attachment to Exhibit No.



10. Let's look at the same italicized language in the front.
A. Okay.
Q. If you go to that italicized language, at the very end it's got that same contract by estoppel or otherwise language. Do you see that?
A. Yes.
Q. Okay. Is 10 a -- did you just revise the Word document that you had gotten from Merri?
A. It's boilerplate, so, yeah, I don't think I -- so I just left what was at the top, I think, untouched.
Q. Okay. You were asked some questions by Mr. Argionis regarding a -- well, let me ask it a different way.
You recall Jim Argionis showed you a document in which you sent an operating agreement to Ray Conway?
A. Yes.
Q. And subsequent to that, there's another version in which you say something to the effect of tried to incorporate the items we discussed last Friday or something along those lines. Do you remember is that?

MR. ARGIONIS: Objection to form, leading.
THE WITNESS: I'm sorry. You're talking about the documents that were exchanged, I believe, in February of 2021?
BY MR. SHOWEL:
Q. Yeah, that's correct.
A. That's correct, yeah.
Q. And you recall that you were asked some questions about the effective date of the contract moving from July 1, 2020, to March 13th, 2020?
A. March 16, something like that, yes.
Q. Do you recall as you sit here why Ray Conway suggested that change?
A. More favorable tax treatment.
Q. Okay. Do you recall -- were you going to have the same ownership percentage from March 13th through July 1 as you would after July 1, per Ray Conway's suggestion?
A. No.
Q. What do you recall about that?
A. It was di minimus between those two dates and what Merri and I agreed the 30 percent thereafter.



Q. Do you recall why Ray suggested to you guys the de minimis allotment, I'll call it, between March and July?
A. I believe there ends up being more favorable tax consequences for Merri without changing the substance of the agreement that Merri and I had.
Q. Let's take a look back at Exhibit No. 10. Specifically, I want to look at the page that's Bates stamped 187355. It's this third page of the document.
A. Got it.
Q. And if you look at the section called "Contribution/Due Diligence."
A. Okay.
Q. Do you see that?
A. Yeah.
Q. And do you see from there it says, "Dean will contribute and have as his initial tax basis $20,000"?
A. I do.
Q. Okay. Had you had discussions with Merri surrounding your contribution of $20,000 on or about this time?



MR. ARGIONIS: Objection; leading.
THE WITNESS: Yes.
BY MR. SHOWEL:
Q. Do you recall Mr. Argionis asked you a -- and you had a lot of discussion with Mr. Argionis, concerning the 2009 TMG operating agreement that had been executed by Cedric Reingold and Merri Gleckler?
A. Yes.
Q. And you had a lot of conversation about -- well, let me -- you testified, and you can correct me if I'm wrong, that Merri told you the agreement was gone; do you recall that?
A. I do.
Q. What do you recall about the conversations about the agreement being gone?
A. As we got started in the fall, Merri told me that the -- that agreement had nothing to do with us. Nothing to do with TMG. And she wanted everything that Cedric did gone.
Q. And do you recall specific conversations when that occurred?
A. That occurred going into the holidays of 2019 and then reoccurred when I was out in



Arizona. Similar conversation, similar set of emotions.
Q. So when you were out in Arizona, would that have been a face-to-face conversation?
A. That's correct.
MR. SHOWEL: I don't have anything else.

EXAMINATION

BY MR. ARGIONIS:
Q. Just a follow-up to that Exhibit 9 and 10. If you take a look at those again, the introductory paragraph.
A. Okay.
Q. 9 has some blanks in there. 9 was the one sent to you. 9 has a blank italicized language that your attorney just questioned you about. On Exhibit 9. Do you see the blank?
A. I see the blank, yeah.
Q. If we looked at your version on your computer, would you have been the one that filled that in to Exhibit 10?
A. Probably.
Q. So you did look at that paragraph, and you did make some additions to it?
A. Probably.

MR. ARGIONIS: That's all I have.
MR. SHOWEL: We'll reserve.
THE VIDEOGRAPHER: I've been asked to get the order on the record as well.
MR. SHOWEL: We'll take a copy for regular delivery.
MR. ARGIONIS: We'll take a copy, too. Regular delivery is fine. We can do mini and everything. We'll take a copy of the video, yeah.
THE VIDEOGRAPHER: Just like MP4?
MR. ARGIONIS: Let me know what our options are.
THE VIDEOGRAPHER: I don't think there is --
MR. ARGIONIS: If we need something --
THE VIDEOGRAPHER: You can get an immediate copy or hold off.
MR. ARGIONIS: Let's hold off. We'll let you know.
MR. SHOWEL: I do not want the video transcript. Thank you.
THE VIDEOGRAPHER: This concludes the deposition. Off the record at 5:38.
(WHEREUPON, the proceedings



were adjourned at 5:38 p.m.)



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEAN H. DUSSIAS, Plaintiff,

-vs-

MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware Limited Liability Company, d/b/a KASHWERE, Defendants.

No. 1:21-CV-05709

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition given as aforesaid, with corrections, if any, appearing on the attached correction sheet(s).

Please check one:
_________ I made no corrections
Number of Correction sheets attached

DEAN DUSSIAS

SUBSCRIBED AND SWORN TO before me this day of A.D., 2024

Notary Public



CORRECTION PAGE

CASE NAME: DUSSIAS vs. GLECKLER, et al.
DEPOSITION OF: DEAN DUSSIAS
DATE TAKEN: August 22, 2024

- - - - - - - - - - - -

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

DATE: ______________

SIGNATURE:____________________________

Page 362

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

I, MAUREEN A. WOODMAN, Certified Shorthand Reporter and Notary Public in and for the County of Cook and State of Illinois, do hereby certify that DEAN DUSSIAS was first duly sworn to testify the whole truth and that the above deposition was recorded stenographically by me, and was reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified.

I further certify that I am not a relative nor employee or attorney nor counsel of any of the parties, nor a relative or employee of such attorney nor counsel nor financially interested directly nor indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 16th day of September A.D., 2024.

MAUREEN A. WOODMAN, C.S.R.
Thompson Court Reporters
License No. 084-002740

**Exhibits**

**Exhibit 1** 3:9 32:9,12, 16 345:20
**Exhibit 2** 3:9 33:20,24 34:4
**Exhibit 3** 3:10 36:16, 19,23
**Exhibit 4** 3:10 44:11, 14 60:2,3 80:6 242:18,19 345:7
**Exhibit 5** 3:11 112:10, 13,16 121:1 182:20
**Exhibit 6** 3:11 125:22 126:1
**Exhibit 7** 3:12 128:15, 18 140:9 148:22 156:4
**Exhibit 8** 3:12 160:3, 6,12 172:20,21 177:18 178:2 182:5, 11,21
**Exhibit 9** 3:13 179:21, 24 180:6 184:9 187:5 189:3 217:22 221:4,5 231:12 351:16,22 352:11,12 357:9,16
**Exhibit 10** 3:13 217:21 224:9 230:6 235:19,20 351:23 352:22,24 353:1 355:8,9 357:20
**Exhibit 11** 3:14 245:23 246:2,6
**Exhibit 12** 3:14 248:17,20 253:19,20, 22 260:5
**Exhibit 13** 3:15 259:14,17,21
**Exhibit 14** 3:15 262:14,17,24 272:20 288:1
**Exhibit 15** 3:16 286:11,14 287:1,21, 24
**Exhibit 16** 3:16 293:15,18 294:2 301:15
**Exhibit 17** 3:17 310:13,16,20
**Exhibit 18** 3:17 314:17 316:15,18 317:16,17
**Exhibit 19** 3:18 317:20,23 318:1,2,4,5
**Exhibit 20** 3:18 320:24 321:3
**Exhibit 25** 3:19 325:4, 7,17
**Exhibit 26** 3:19 327:23 328:2,6,22
**Exhibit 27** 3:20 328:16,18,19 329:16, 19,23 332:16
**Exhibit 28** 3:20 334:9, 12,16
**Exhibit 37** 3:21 332:3, 4,7
**Exhibit 43** 3:21 349:8, 12
**Exhibit 44** 3:22 347:19,21
**Exhibit 45** 3:22 342:23 343:2,8

**$**

**$20,000** 195:12 239:23 301:5 304:2 355:20, 23

**0**

**000963** 259:21
**00162260** 310:21
**00162880through** 248:24
**00167071** 112:18
**00327** 334:17
**00361975** 349:15
**00416384** 262:21
**07/05** 322:3

**1**

**1** 32:9,12,16 61:12,20 62:5,8,19 63:5,16,17, 24 76:7,12 88:2 96:2 98:5 103:1 124:14 129:14 134:6 156:3 195:21 225:9 246:7, 19 248:8 254:3 289:15 290:5 291:11 311:1 345:20 354:10, 18
**10** 217:21,23 224:6,9 230:6 235:19,20 351:23 352:22,24 353:1,8 355:9 357:10, 20
**10-K** 137:8
**10.1** 273:24
**10.2** 273:24
**10/0** 202:9
**1099** 21:24
**10:18** 67:12
**10:25** 67:15
**11** 30:14 34:7,17 212:6,7,14,21 213:21 214:3,9,10,15 245:23 246:2,6
**11:37** 125:17
**11:45** 125:20
**12** 81:15 248:17,20 253:20,22 260:5 274:3
**12:42** 179:17,19
**12:43** 126:15
**13** 81:18 253:19,21 254:3,7,8 259:14,17, 21 289:16 290:18 320:1
**13th** 290:9,22,24 291:9,20 345:19 354:10,18
**14** 254:19 262:14,17, 24 272:20 288:1
**15** 122:16 286:11,14 287:1,21,24 340:21
**15th** 245:3 339:21
**16** 81:15 82:22 95:22 97:1 99:20,24 102:1, 12,22 103:21,22 107:16 109:17 111:9, 19,20,21 112:3,4 113:2,4 253:24 293:15,18 294:2 301:15 354:12
**162881** 250:15
**162927** 248:24
**167246** 328:6
**167248** 328:12
**168420** 180:7
**168421** 180:13 184:10
**168422** 201:8
**168425** 205:15
**168426** 206:12 218:3 221:6
**16th** 263:1
**17** 83:11,16,17 89:16 90:13 93:21 94:14,21, 22 95:22 310:13,16, 20
**176105** 318:5
**176156** 316:19
**176205** 316:20
**18** 37:8 45:22 46:1 314:14,17 316:15,18 317:17
**18-702** 333:10
**18-702(b)(1)** 333:6
**187353** 224:13
**187354** 226:18 230:22
**187355** 355:10
**187361** 225:16
**187362** 225:17
**187376** 224:13
**19** 242:19,20 317:20, 23 318:2,5
**192436** 160:13
**192437** 178:6
**1:37** 180:3
**1:54:22** 260:2
**1st** 56:11,14,17,23,24 73:9 92:6 135:1 193:5 215:7 240:1 250:3 253:14 267:2 287:19 290:8,13 324:14

**2**

**2** 33:20,24 34:4 47:21, 22 54:5
**20** 83:13,23 84:6,11 85:14 89:17 90:9,12 91:5 92:17 93:12,21 94:5,10,15,18 95:2,3 100:15,22 102:2 103:8,10,14,24 104:8, 21 105:15 107:5,13, 14 110:24 111:10 112:6 113:21 114:7 115:5 119:11,17 120:2,6,9 173:19,21 174:2 187:10 268:1 294:18 320:24 321:3
**2004** 31:21 32:4
**2008** 24:18 31:2
**2009** 7:20 277:16 345:20 356:6
**2011** 37:8
**2012** 9:22 37:10
**2013** 330:2,11
**2017** 343:9
**2018** 15:1,14,18 33:2 34:8
**2019** 15:3,14,18 16:1 33:2 34:7,9,17 48:5, 18,24 49:3,11,22 50:1,12,18 51:18,20 52:8 53:7,13,22 55:14 57:13,15,18,24 58:10, 17,21,24 59:19,23 60:15,18,22 74:15,19, 22,23 75:8,12,17 76:7,8,12,20 77:6,23 78:12,13,17,24 79:21 81:16 82:22 83:19,21, 22 84:8,20 86:23 87:11 89:14 90:22 91:6,12,16,17,20 92:2,8,12,15,19,21,24 93:14 94:1 95:1,11,23 97:4,11,22 98:1 99:7, 13,20,23 100:9,18 101:4,13 102:2 103:16 106:5,18,24 107:8 109:17 112:20 113:3,24 122:5,12 123:13 124:3 162:17 233:8 245:21 288:17 298:13 334:19 345:19 356:24
**2020** 56:4,6,11,13,14, 23 57:1,5,6 58:1 59:3 61:12,20 62:5,8,19 63:5,16,17 66:4,19,23 67:18 68:20 69:4,8, 16,18,21 70:9,20,24 71:5,23 72:20 73:9 76:7,12 83:21 84:9 86:19 87:18 88:2 92:6 94:12 97:22 98:8,11,

19,20,21 99:9,12,18 100:10 107:23 108:2 110:22 124:14 126:15 127:23 128:21 130:9 132:12,16,20 134:1, 17,21 138:1 147:13 156:17 161:3,13,19 162:7 174:1,4 175:19 176:12,15,18 177:4 180:9,12,16 186:17 191:1,3,4 192:1,10 193:5 194:3,6,8,10,21 195:21 198:11 200:12,14 208:6 212:19,20 214:16,17 215:3,7 220:15 224:16 225:7 232:1 234:12,19,20 240:2 241:23 247:22 248:1 267:2,3 288:18 289:15,16 290:5,8,9, 13,19,22,24 291:9,20 298:14 311:1 322:7 323:3,12 343:10,16, 23 348:16 354:10,11

**2021** 80:7 109:21 132:22 133:14,15 135:3 138:1 194:2 246:7,19,22 248:1,8 249:3,5 252:10,15 253:12 255:2 259:12 260:2 263:1 267:6,12, 16 287:5 290:21 301:23 302:10 305:6, 9,15 311:4,10 319:9 354:4

**2022** 23:7 29:3,7,20,23 30:3,5,6

**2024** 4:5

**20K** 302:14 303:7

**20th** 51:8 91:14

**21st** 133:19

**22** 22:14 174:4 175:19 176:12 287:4

**22nd** 4:5 176:15,18 177:3

**247** 328:7

**248** 328:13

**24th** 126:13,15

**25** 325:4,7,17

**25th** 301:23

**26** 327:23 328:2,6,22 330:2

**268** 328:6

**27** 328:16,19 329:16, 19,23 332:16

**28** 334:9,12,16,19

**2:24** 220:22

**2:34** 221:2

**3**

**3** 36:16,19,23

**30** 75:6,11,21 83:14 84:10 85:3,15 89:13 91:6 93:13,17,22 94:5,7,15,17 95:2,3,4 100:16,23 101:16,17, 19 102:4 103:8,10,15 104:1,10,21 105:16 107:3,7,13,14 108:12 109:3,18 111:1,11 113:23 114:7 115:7 119:12,24 120:9 173:17 174:2 195:3 199:13 238:13,17 239:22 323:11 354:23

**30/70** 90:7

**30th** 56:16

**317** 310:21

**3281** 128:20

**3288** 334:18

**33** 19:18

**36** 345:21 346:2

**37** 160:13 332:4,7

**3:56** 286:19

**4**

**4** 44:11,14 60:2,3 80:5, 6,18 82:22 242:18,19 254:9 345:7,8

**4.10** 320:5,13

**4/12/2021** 316:23

**409744** 287:1

**409748** 292:7

**41** 345:10,12,14,22,23 346:7

**4163497** 274:4

**416407** 262:21

**4208035** 246:6

**422** 201:10,11

**426** 206:11

**427** 180:8

**43** 349:6,8,12,15

**44** 347:16,19,21 349:21

**45** 340:17 342:23 343:2,4,5,8

**46** 262:22,23

**462** 7:16

**4:00** 286:21

**4th** 95:23 97:3,11 102:2 103:16 107:8 109:17 112:19 113:3 122:5,12 123:13

**5**

**5** 83:15 102:3 103:24 104:9 105:15 107:6 112:10,13,16 113:22 114:6,7 115:6 119:11 120:7,8,9 121:1 122:14 173:18 182:20 242:19 254:3 321:24 322:19

**5.1** 254:10

**50** 120:5

**500** 303:22

**529609** 347:22

**54** 227:4,5

**55** 227:4

**56** 325:10,19

**589599** 329:24

**590492** 321:7

**5:00** 235:7

**5:16** 345:1

**5:21** 345:4

**5:38** 358:23

**5th** 322:7,11,14 323:3, 7,12 324:23

**6**

**6** 96:2 103:1 125:22 126:1

**610** 347:22

**6155** 318:6

**6406** 287:24

**6:32** 323:13

**6:45** 340:24

**6th** 249:3,23 255:2 259:11

**7**

**7** 128:12,15,18,21 140:9 148:22 156:4 180:8,12 234:20

**7.1** 292:6

**7.2** 331:16,19,21,24 332:12,20

**7/3** 202:9

**70** 173:16 174:2

**70/30** 55:11,15,24 58:21,24 65:24 76:2 85:15 88:4 90:6 95:3, 17 195:5 240:9 352:7

**72** 112:18

**75** 274:9

**766** 287:2

**7:29** 224:17 234:21,22

**7:30** 235:5,6

**7th** 130:9 141:3 208:6 211:6,7,8 212:19 214:16 224:16 231:24 235:24 239:11 241:23 260:2

**8**

**8** 160:3,6,12 172:21 177:18 178:2 182:5, 11,21 345:10

**8,000** 122:9

**806** 246:7

**847 612-1010** 65:4

**8:44** 112:20

**8th** 311:4 343:16

**9**

**9** 179:21,24 180:6 184:9 187:5 189:3 217:22,23,24 221:5 231:12 351:16,19,22 352:12 357:9,13,14, 16

**9.3** 254:1,2

**90** 18:7 193:10,14,18 196:9

**90-minute** 196:5

**90s** 6:1

**9765** 287:20,23

**994** 293:23

**995** 293:23 301:16

**9:01** 4:5

**A**

**A-R-E-T-E** 24:5,20 25:22

**a.m.** 4:5

**ability** 7:9 49:14 121:22 210:19 258:13

**able** 212:20 237:11 238:12 239:11 261:6 296:3 319:1 323:21 337:6 338:11

**about** 8:18,19,21,22, 24 11:2,4,5 13:3,4,21 14:23 15:22 16:5,11 19:9,10,21 22:8,16 23:22 25:22 27:13 29:2,14,19 35:19 37:23 39:17 40:16 41:3,16,24 42:7,8 47:24 49:6,10 52:14 54:24 55:7 58:10,11 62:22 63:2 64:2,6 67:18 68:9 69:6 70:5, 21 71:13 74:3 76:19 77:21 81:16 82:22 84:22 87:15 89:16 91:14 94:10,11 95:21, 22 100:17 102:9 104:18,22 105:1,2,3, 5,18 106:14 110:5 115:10 119:1 120:18 122:1,8,14 123:1,5,7 124:8 126:17 133:8 137:24 138:24 141:3 144:12 147:23,24 148:1,2,4,18 150:13, 16 151:6 163:6 165:11 166:2,17 167:11 170:6 180:16 182:4,7 183:8 186:19 190:5,15,23 191:3,5 192:1,22 196:5,6

197:6,7,14,15 201:24 203:17 204:11 207:6, 7,9 211:10 212:8 213:5,6,16 214:14 216:11,24 217:9,10 221:8,9 226:13 228:12 239:7 240:11 241:6 242:9 247:4 254:17 256:24 257:2, 3,16 263:19 266:17 269:12,18 277:10,11 278:24 281:11 286:6 287:10 289:13 290:16 291:3,6 294:9,13 296:7,13,15 297:8 302:11 304:2,11,13, 14 305:12 307:10,12 308:15,18 309:3,16, 17,18 313:8 315:3 320:16 321:23 322:11 329:8 330:18 331:10 333:10 334:21 335:11,13 337:24 339:14 341:24 345:17 347:7 351:20 352:18 354:3,9,21 355:24 356:10,15,16 357:16

**above** 82:18 114:7 120:9 179:10 190:8 197:1 229:6 320:7

**absolutely** 72:10 164:24 258:14

**accept** 50:19 51:12,13 54:4 83:23 229:11 233:19

**acceptable** 122:7,11, 19 123:12,14

**accepted** 48:4,9,14,20 49:7,18 50:1,16 51:19,23 52:7 53:6, 14,19,22 54:9,21 58:23 74:18,19,21,23 77:1 191:20 233:21

**accepting** 55:6,13 76:17

**access** 307:10 308:4, 12 324:1 325:24 326:3,4

**accommodate** 7:4,5 147:14

**accommodating** 245:16

**accommodation** 343:24

**account** 21:21 40:21 41:15 224:16 249:2,3 294:5 295:4 301:9,10, 20 302:14

**accountant** 263:15

**accounting** 108:15 242:2

**accounts** 326:1 348:19

**accumulate** 188:15

**accuracy** 111:21 112:1 339:15

**accurate** 112:4 295:16 296:5,7 312:9 313:5 332:22 333:1 334:7 339:2,5,7,8 344:3

**accurately** 97:1,14,19, 23 115:23 236:24 237:11 252:24 289:3 313:1 324:14

**ACH** 301:8,13

**acquire** 166:22 187:10 238:13

**Acquisition** 128:23

**across** 166:22

**action** 85:17 331:16 335:22,23 336:2

**actionable** 288:21

**actions** 37:15,18 86:1 214:24 301:4 327:20 335:18 336:5,7 337:5

**active** 24:11 25:18 31:24 51:10,15,16 74:20 75:2,5,7,11,15, 18,20 76:9 77:4,14, 21,22 78:24 86:23 87:10 89:14 91:2,20 92:2,5,7,12 95:1,11 98:7 101:5,14 103:18 302:18

**activities** 61:24 322:4

**activity** 22:11 198:22 240:6

**actual** 40:4 135:3,9 149:15 180:10 247:11 252:2 284:16 314:20

**actually** 33:5 37:17 41:6 63:1 86:2 125:14 176:2 213:23 214:5 241:2 249:23 253:24 265:23 267:5 300:7 304:19 308:1 309:21 319:8 323:18 345:19

**add** 23:21 96:13 246:22

**added** 228:23 289:9, 12

**addition** 203:6

**additional** 23:21 76:6, 11 77:8 79:3,9,17 80:9,17 94:19 150:5,8 184:22 225:16 287:22,23 290:1

**additions** 357:23

**address** 7:15 80:10 160:15,16 224:15 246:8,12 263:3,4 325:23 330:2

**adequately** 97:1 265:19 312:21 314:1, 5

**adhere** 214:13

**adjective** 65:23

**admin** 308:4

**administrative** 307:3 308:12

**administrator** 307:17

**admission** 202:20 203:13,24 205:18 222:21 223:5 273:23

**admit** 154:16

**admitted** 38:18 151:12 167:3

**admitting** 38:6 39:2

**advance** 294:12

**advantage** 296:17

**adverse** 274:11

**advice** 43:23 44:3 87:7 157:9 158:9 174:19 284:13,17,21 285:4 286:2,5,6,8 339:3

**advised** 81:19

**AEO** 164:4

**affiliated** 130:2

**affirmed** 287:18

**after** 4:23 28:7 48:1 53:14,18 68:4 69:4,12 74:23 77:9,21,22,24 78:12,13,15 83:15 91:13 92:17,23 93:13 94:1 122:15 130:10 136:3 141:5 180:17 181:12 187:18 198:22 205:12 207:24 209:20 211:4,14 215:24 231:11 239:12 260:5 338:18 339:20 354:18

**afterwards** 91:15

**again** 5:20 20:17 28:18 33:8 61:8,19 71:16,24 72:24 73:6 79:11 85:4 89:1 97:8 106:19 127:19 143:4 152:3 159:3,19 162:18 174:1 175:21 180:8 210:20 223:19 234:11 252:1 259:22 261:22 263:9 267:14 293:20 309:9 311:7 316:20 318:6 357:10

**against** 230:16 236:14 242:21

**agency** 281:10

**ago** 125:1 168:7,12 300:11

**agree** 50:20 84:18 85:1,2 90:2 98:3,5 100:24 102:22 103:14,16,20,23 104:2,8,10,12,24 105:3,9,14,17,22,24 113:24 114:8,12,13, 19 115:8,13 116:3 117:18 118:22,23 119:7,14 120:10,12, 24 121:3,9,12,24 122:10,14,18 123:9 136:6 138:19,20 140:23 142:3,21 143:8,15,17 144:4,7, 17,18,21 145:13,16, 19 184:15 187:3 190:21 191:22 192:2, 14 194:5 195:11 197:7,15 198:6 201:14 205:9,23 206:2,20 207:14,16, 18,21 208:10,12,17 209:3,7,8 218:14 222:8 223:8,11,23 232:5,7,11,16 233:12 236:5 239:20,21 240:24 255:9 259:10 261:20 262:5 281:6 291:7 292:6,11,15,17 300:15,17 303:8 339:21 340:2

**agreeable** 292:1 320:6

**agreed** 28:15 51:9 57:2 58:15 60:14 62:24 63:8,22 64:5,9, 16 66:9 67:19 69:7 71:4 75:15 76:3,6,16 77:24 79:4,9,17,22,23 81:9 84:14,23 85:23 90:3,9 96:7 97:17,18, 21,24 98:2,6,10,18 99:12,19,23 100:9,19, 21 101:10 103:17 104:5,6,11,16,20 107:18,19,22 114:20 116:19 118:3,10,14, 16,19,20,22 119:10, 17 120:1,16 121:8,16 136:18,21 137:10 138:6 139:3,4,9 141:24 142:9,15 143:10,17 144:2 145:3 155:10 156:14 173:22 174:3 175:11, 13 176:13,15 177:3 178:23 179:11 181:15,20 182:12,23 183:4,18 187:16 189:16 190:19,24 192:5,16,24 193:2,8, 22 194:17 195:1,23 196:7,11 197:9,23 198:1,4,9 200:11 201:5 205:6 207:12 208:3,4,9,22 210:23 213:9,20 217:14 218:8,9 219:1,2 223:21 224:2,23 228:10,14 230:17 232:8,17,20,22 233:4, 6 234:4,6 236:5,15 237:22 238:3,16,18, 23 239:15,22,23,24 240:2,4 241:23 242:13,15 243:9,20 244:6,13 248:10 249:19 250:9 253:1, 13 255:12 281:5 284:22 288:4,5,17 289:7,9,10,12,24 290:9,19,23 291:14, 20 292:13 299:8 312:10,22 313:2

Case: 1:21-cv-05709 Document #: 91-2 Filed: 01/31/25 Page 112 of 571 PageID #:882



350:5 354:23
**agreeing** 116:10,13,23 117:3 209:13 214:6,7 225:2 255:13 258:12 288:8,12,14,23 289:20 341:2
**agreement** 16:24 17:4, 14,18,21 39:9,15,18 40:14 57:3,4,7,19,20, 22 60:23 61:12 68:8, 10 72:19 73:2 80:10, 22 85:24 95:2 96:6, 16,23 97:2 99:5,6 107:20 110:22 116:22 122:1,4,17,21,24 123:4,8,18 127:7 131:4,5,15 132:1 135:6,20 136:1,2,4, 12,17,18 138:10,12, 13,16,18,20 139:6,10 142:22 144:24 145:24 146:3,9,16,24 147:5, 9,10,11 148:3 149:14, 15,19,21,23,24 152:5 156:13 157:14,15 162:1,3,8,21 163:2,6, 21 164:11,13 165:2,6, 9,11 166:1 168:3,8, 14,15,22,24 169:12, 24 170:9,23 171:6,20 172:8,15,22,24 173:5 174:6,7,10,14,21 175:5,18 177:20 178:10 180:20,24 185:9 192:21 193:6 196:6,16 197:22 198:2 200:5,13 202:19 203:13,21,23 204:6,17 205:7,11,22 206:19,22 211:10 212:9 213:4,23 214:1, 2,20 215:22 218:10, 15,16,18,21 219:23 222:4,9 223:13 225:11,17,18 226:3 229:16,18,19 233:14 234:11,14 235:19,20 236:1,7 237:1 239:9 240:5 241:6,7,11,16 242:23 243:1,4,6,8,9, 21,23 246:14 247:3, 11 249:5,7,10,11,18, 21 250:17,20 252:2,3, 19,21 256:5 257:4,6, 9,13,19,22 258:9 259:5,7,9,13 260:3,9, 17 262:3 263:16 264:4 265:6 266:22, 24 267:1 268:4,9 270:1 271:4,6,8,10,15 272:2,8,15 273:11,13 275:6,12,20 276:7,24 277:6,8,10,11,13,14, 16 278:1,13 280:3,6, 8,13,18 281:1,7,14,23 282:6,17,20 283:16, 21 284:4,9,14 285:18 288:16,23 289:4 290:7,10 291:8 296:2, 22 298:3,9 299:17 310:24 311:14,18,21 312:20 314:22 316:9, 22 317:10,16 328:24 329:14 330:13,24 331:2,7,15,17,19 332:3,11,20 333:16, 22 334:3 345:16,18 346:1,11,13,16,19,23 353:17 355:6 356:7, 13,16,18
**agreements** 46:12 69:15 71:19 85:9 146:20,22 150:15 166:7,8,12,19,23 167:13,23,24 174:24 184:24 185:11 200:1 224:17 226:11 257:7
**ahead** 19:11 24:1 33:11 34:23 70:18 89:4 106:13 153:14 154:21 168:15 197:6 264:19 313:9
**Air** 161:17
**Alan** 26:1
**aligned** 195:8
**alignment** 89:22
**all** 11:19 23:19 29:5 38:17 41:10 48:22 52:2 55:3 59:5 61:23 62:6,11 66:3,9,20,21 67:4 70:20 75:15 76:2 79:6,21 80:15 81:8 86:1 88:2,3 89:18 91:2 98:3,12 103:12 108:13 113:7 114:21 122:18 127:8 131:6,7 137:3,10 142:1 147:3 156:22 157:16 158:2, 9 159:7,11 168:5 169:19 170:1 178:10 179:7 183:3 190:20 193:4,22 194:6,13,17 195:14,22 196:4 197:12 206:7 208:2 212:16 213:2,5,11,17 216:9 221:22 224:13 226:15 241:9 242:5,6 270:21 271:8 285:21, 24 296:6,8 297:1,8,17 298:3 310:21 314:21, 23 315:1 316:1,8,14 318:15 322:4,5,12 327:6 332:13 334:23 336:13 339:10 350:17 351:4 352:10 358:1
**allegation** 52:13 55:12 56:5 83:4 90:14 96:4, 10 177:19 242:20 275:22 288:4 289:18 331:3 335:6 347:4
**allege** 49:17 54:4,21 77:23 78:16 89:19 94:20 95:10 103:21 111:14 119:22 213:4, 9 236:7 252:16
**alleged** 98:4 99:19 101:24 212:9 219:4 230:6 252:18 331:11
**alleges** 96:12 111:16
**alleging** 49:2 50:16 54:9 58:9 86:23 88:6 110:13 224:22 231:23 236:24 237:13
**allocated** 292:4
**allotment** 355:2
**allowance** 240:3
**allows** 28:19,20
**along** 152:7 353:23
**already** 9:4 19:9 27:3 29:20 41:12 55:1 60:10 79:22 87:18 92:10 99:19 105:4 109:4 124:5 132:21 134:21 138:10 146:7 157:5 159:17 163:7 164:4 165:6 182:21 194:12 195:16 207:7 209:8 231:24 247:5,6, 13,15 248:10 249:14 257:17 310:9
**also** 4:15 65:8 80:14 91:23 111:1 203:7 206:16 234:5 238:23 262:21 263:11 292:6 294:14 307:24 313:12 333:6
**always** 38:21 59:10 316:6
**am** 4:6 20:23 43:5 89:6 200:3 283:11 290:13 296:15 297:15 298:22 309:17 341:3
**amenable** 288:20
**amend** 173:1,13 214:8 250:16 275:12 290:23
**amended** 170:23 171:18,19 172:2,5,7, 14 205:21 206:18,21 218:10 249:4,5,6,17 250:20 257:18 268:5, 16 269:12,18,24 270:12 273:13 274:8, 16 275:7 290:22 310:23 311:13,17 312:2,3,8 316:21 317:9,15
**amending** 171:6 173:6
**amendment** 273:15 274:6
**amendments** 247:2 274:3,11
**America** 158:12
**among** 184:24 185:11
**amount** 195:11 198:22
**an** 5:15 6:18,23 14:14 15:10,20,23 17:4 18:20,21 21:5 24:6,24 25:12 26:14 34:4 35:14 39:9,18 40:14 50:1,19 51:2 52:13 55:13 56:3,7,15,19 57:1,15,18,21 58:4, 16,18,20,23 60:10,15, 22 68:7,10 73:16 74:14,15,24 75:3,4,13 77:1,14,23 78:2,16 79:1 83:9 87:18,21 91:19 92:1,8,13,18,24 93:14 94:1,3,19,24 95:10 96:3,22 101:4 106:9 112:18 116:3,6, 22 117:20 119:22 124:5,10 125:1,13 126:20 129:5,16 131:2 134:21 135:3,9 136:1,4,12,16,17 137:16 138:9,12,15 139:5,10 145:24 146:2,9,11,16 149:19, 24 157:12 160:13 161:20 162:2,7 163:3, 11 167:6,19 169:8 172:7,10 174:20 175:18 177:21 185:8 188:12 195:9,11 196:6,15 197:22 198:1,21 200:5,13,19, 21 201:2 202:1,19,22 203:12,20,23 204:5 205:6,11 208:23 209:6 213:12 214:2 218:16,18 219:13 221:18 222:4,8 223:13 224:14 225:13 229:16,18,19 230:6 231:24 233:13 234:6 236:21 240:5,6 242:20,22,24 243:6, 23 244:7 245:9,18 246:7 248:23 249:1, 17 252:21 257:6,9,17, 18,22 258:9 259:4 261:3 262:3 263:1,15 265:5 269:24 272:14 273:15 274:11 278:6 283:1,16 284:8,18 285:3 286:3,6 289:14 293:13 294:5 296:5,7, 13,22 299:17 301:20 305:19 306:14 307:15 310:24 311:13 312:19 317:9 320:16 324:14 327:15,18,21 328:23 329:23 331:4,5 333:18 334:18,20 335:6 338:23 343:24 344:7 349:20 353:17 358:16
**ancillary** 215:22
**and** 4:4,5,12,24 5:4, 11,18,20 6:17,19 7:3, 6,9 9:4,8 10:3,8,20 11:4,5,6,18,19 12:4, 10 14:2,5,8,17,18 15:2,10,11,18,22 16:2,8,22,23 17:1,4, 23 18:2,8,11,18,22 19:4,10,12,17 20:2

21:9,13,15 22:3,6,11, 12 23:7,20 24:17,19, 24 25:12,13,19 26:20 28:7,15,19 30:6,14 31:6,8,13,14,17,22 32:1,3,20 33:1,8,10 34:4,6,23 35:8,20,22 36:23,24 37:11,13,24 38:9,11,20 39:1 40:8, 11,19,20,21,22 41:1, 2,11,15 42:19 43:2,3, 15 44:3,7 45:2,4,22, 23 46:6,9,11,12,24 47:11,15 48:1,3,5,18, 21,22 51:3,7,8,9,16, 24 52:14,16 53:1 54:6,20 55:9,10 56:3 57:2,13,20,23 58:1, 10,14,20 59:3,8 60:10,11,13,16,22 62:1 63:21,22,24 64:2,4,7,9,13,16 65:1, 11,14,17,24 66:3,15, 16,21 67:2,3,19,22,24 68:1,3 69:4,7,12,16 70:3,12,13,14,18 72:9,14,15 73:4,7,8, 11,15,16,17 74:3,19, 21 75:7,10 76:7,12,14 77:1,8,14,21 78:1,12, 21 79:3,8 80:7,11 81:2,9,10,23,24 82:2, 4 83:14,18,21 84:8 85:4,8,12,13,17,21,23 86:1,7 87:12 88:2,4,6, 8 89:2,4,14,21,22 90:4,24 91:5,14 92:1, 5,15 93:23 94:8,10, 12,17,20,23 95:4,8,19 96:1,4,6 97:3,14,16, 21 98:7,12,24 99:4,5, 7,11,17,22,24 100:12, 19 101:9,17,19 102:9 103:1,11,12,15,17 104:3 105:11,20 106:5,9,10,23 107:3, 5,11 108:16,18,23 109:22 110:2,4,7,21, 23 111:4 113:9,21,22 114:1,7,11,24 115:6 116:2,9,13,22 117:3, 5,13,17 118:4,7,14 119:18 120:9,14,21 121:7,17,22 122:2,4 124:3,13,21 126:3,10, 11,24 127:10,12,15 128:8,20,21 129:7,8, 11,23 130:4,6,8,16, 19,21,23 131:1,3,4,8, 10,13,15 132:1,4,18 133:15 134:13,24 135:6,8,15,20 136:2, 3,7,10,11,13,15,19,20 137:1,23 138:6,7,10, 12,20,22 139:4,5,7,19 140:7 141:6,13,15,23 142:3,5,22,23,24 143:8,10,20,24 144:10,12,14,17,21, 22 145:8,11 146:2 147:14,22 148:2,21 149:4,6,9 150:3,10,20 151:11,16 152:11,14 153:7,9,10,18 154:10, 19,24 155:17 156:2,8, 12 157:11,12,19 158:8,13,15,16 159:1, 17 160:1,9,21,23 161:1,3,5,15,24 162:18,24 163:14 164:4,7 165:4,10,16 168:11,15,17 169:3, 18,19 170:2,19,23 171:18,20 172:2,5,7, 14,17,23 174:2,8 175:2,4,11 176:18 177:10 178:13,14,21, 24 179:3,6,8,13 180:6,7,8,13,18,19,23 181:5,7,8,12 182:21 183:4,18 184:23 185:1,12,18 186:11, 20 187:6,8 188:18,20 189:9,21 190:2,3,15, 19,20,24 191:11,19 192:12,13,20,22,24 193:2,3,6,9,19,23 194:17,23 195:10,12, 19 196:1,6,16,19 197:1,8,10,13,14,15, 16,17,21,22 198:5,9, 15,19,20,21 200:9 201:12,13 202:5,6,7, 20 203:10,21,24 204:4,10 205:16,17, 18,21,22 206:13,15, 17,18 207:1,5 208:3, 6,7,17,20,21 209:9,14 210:11,14,19,20,22 211:3,7,8 212:3,6,10, 23 213:1,12,15,17,20, 24 214:8,12,14,15,20 215:1,6,10,21,22,23 216:16,18 217:5 219:23 220:9,10 221:5,8,13 222:7,16 223:17 224:2,23 225:2,13,15,16,17,21 226:19 227:12,16,20 229:10,22 230:20 231:2,4,16,18,21 232:2,14,17 233:7,15, 21 234:7,11 235:9,20 236:6,9,10 237:11,13, 21,22,24 238:8,15,16, 18 239:6,8,18,19,20, 23,24 240:5,6 241:14, 16 242:8,21 243:4,7, 12,20,24 244:6,7,9, 12,18,22,24 245:17 246:17,23 247:3,6,16 248:5,8,13 249:4,5,6, 8,19 250:3,16,17,20 251:11,24 252:1 253:1,8,11,17 254:15, 24 255:4,8,10,18 256:11,21 257:4,5,11, 17,20 258:1,10,12 259:23,24 260:1,11, 12,14,18 261:13,14, 20 262:2,5,6,8 263:7, 8,11,22 264:16 265:6, 9,11,18,23 266:19 267:2,19,23,24 268:4, 5,13,14,16 269:12,17, 19,24 270:7,12 271:2, 6,12,13,23 272:3,14, 15,17,18 273:9 274:10 275:2,11,13 276:4 277:9 280:2,5, 6,7,11,12,13,14,19, 20,23 281:8,9,12,23 282:2,17,18 284:5,9, 12 286:2,6 287:2,7, 15,19,21,24 288:3,5, 7,11,16,20,21 289:4, 6,19,20,23 290:1,11, 13,14,23 291:7,9 292:2,3 293:11,21 295:3 296:3,22 298:3, 6,10,14,15 299:5,8,9, 17,18 300:1,2,24 301:1,3,4,11,13,17 302:2,14,16 303:7,13, 22,23 304:20,21 306:9 307:6,14,15,19, 22,24 308:2,16 309:19 310:1,6,22,23 311:2,3,5,14,17,18 312:2,3,6,10,22,24 313:1,6,7,9,22 315:19 316:6,7,8,10,11,19, 21,22,23 317:7,8,9, 15,16 318:6,15,23 319:10,13 320:15,20 321:18 322:5,21 323:4,11,24 324:2,7, 17,18,23,24 325:10 327:4,6,17,20 328:8 329:9,10 330:1,7,8,14 331:4,11,18,24 332:11,19,22 333:10 334:5,18,19 335:4,11, 12,14,18,19,20 336:6 337:8,14 338:6,7,13, 19 339:1,22,23 340:17 344:19,23 345:9,16 346:1,12,24 347:24 348:4,13,18, 20,21 349:5,15,17,19, 20 350:2,4,5,6,8,11, 13 351:2,9,10,12,23 352:7,8,23 353:20 354:8,23 355:3,7,13, 18,19 356:5,8,10,11, 19,21,24 357:9,22 358:8

**and/or** 166:21 167:4 212:22 316:11 336:15

**Andersen** 30:13

**anniversary** 64:13

**announce** 34:16 37:1

**announcement** 34:4,8, 14

**announces** 36:24

**annual** 25:23

**annually** 26:5

**annum** 83:16

**another** 29:15 54:3 129:3 165:14 212:12, 13 240:18 251:9 270:16 281:4 307:4, 21 349:3,4 353:20

**answer** 6:18 7:2 11:15 13:6,13,23 14:13,18, 19 17:10,16 20:7 21:4,10 23:16 25:14 29:9,10 30:2 34:23 38:10 42:15,23 43:18, 21 44:1,4 46:16 47:3 50:23 52:4,19 54:1,14 55:20 56:9 59:15 61:6 62:13 63:12 65:14 70:18 71:10 72:5,13, 22 73:5 77:17 79:12 81:12 84:2 85:22 93:4 97:6 101:19 102:7,14, 16,19 106:2,11 110:16 114:3 116:19 119:4 120:19 121:15, 20 124:22 125:2 128:4 137:14 138:23 139:8 141:8,10 143:4 144:23 146:12 148:7 150:11,24 152:4 153:12,19 159:10,19 166:10 170:2 171:12, 14 172:10 191:6 196:22 197:5 204:20 210:11 212:5 232:19 233:21 234:14 245:12,14 253:6 268:21 270:3,14 272:22 276:10 278:4, 6,23 285:7,12 289:2, 22 296:10,16 299:11 300:10 305:23 309:6 312:15 313:9 324:3, 12 352:5

**answered** 33:10 55:1 73:4 81:10 88:24 109:4 114:1 124:21 138:22 139:7 142:5, 24 144:22 153:9,10 156:1 159:17 165:16 168:6 209:9,14 211:3 212:3 280:11 308:9 324:24

**answering** 68:22 88:14,18 89:5 115:1 117:14 188:20 197:4 210:18 237:24 238:1 260:24 285:10

**answers** 6:16 7:9 210:17

**anticipation** 260:24

**any** 6:7,11,16 7:9,10 8:21 9:1,6,23 10:5,14, 22 11:10,11,13 12:21 13:9,11,17,18 14:5 15:15 17:13,23 18:11 19:19 20:5 21:15

23:4,8 25:10 26:10, 16,24 27:23 28:15 29:1,19 30:19 31:14, 18 32:5 33:12,18 35:2,7 37:13,15,19,21 38:1,7 40:5 41:18 42:3,10,16,19 43:1, 13,14 46:21 53:3 57:7 59:16 60:14 61:21,22 62:17 63:2,3,4,17 64:11 66:7 68:23 69:1,6 74:3 87:14 89:3 90:5 106:20 107:17,24 109:6,14 112:5 119:7 124:8 132:8,13 133:6,11,21 134:2 135:18 137:9 147:6 148:13,17 150:5,8 151:11 154:8, 17 155:11 156:23 157:2,8 165:3,21 166:11 170:12,14 173:20 174:18 175:20,23 176:2 182:15,16,22 183:1,2, 8,9,11,15 186:12 188:24 191:15 192:2 195:4 196:1,11 203:14 204:6,14 206:6 213:22 216:19 219:1 225:24 228:21 229:7 230:2,12,15 241:3,7 243:3,15 249:12 251:12,21 261:7 264:13 265:3,7 269:23 272:19 273:12 275:13 279:16 281:24 282:14,15,19,21 284:10,13 285:8 288:11,22 294:24 296:9,11,13 297:5,9 298:10 303:6,17,19 304:23 305:1 307:7 308:1 311:23 316:8, 10 318:16,19 320:19 321:23 326:11 329:1, 4 335:1,19 336:10,18 339:3,6 341:8 342:11, 16 344:6,14,16 345:14 346:9,14,22 349:23 351:13

**anybody** 9:2 20:23 39:3 82:9 170:7 207:3 269:22

**anymore** 275:12

**anyone** 7:6 8:18 12:8, 19 26:22 27:4 39:12 40:1 46:21 133:21 221:23 327:13

**anyone's** 39:5

**anyplace** 303:5

**anything** 7:8,21 16:13, 15 17:8 18:8 24:11 26:7 42:8 47:19 60:18 78:21 85:8 107:14 113:15 123:16 152:7 153:5 162:20 169:2, 18 226:2 230:5 237:10 260:15 280:23 281:21 285:16 296:24 298:22 302:21 313:7 315:6 357:6

**anyways** 351:5

**apologize** 91:17 132:22,23 171:10

**apparently** 34:24 138:17 330:6 332:18

**appear** 331:24

**appears** 128:5 151:8 158:14 325:2

**Apple** 161:16

**applicable** 204:17

**Application** 343:11

**apply** 271:13

**appointment** 37:1

**appreciate** 210:10,16, 17

**appropriate** 40:21 72:17 197:18,20 248:11 268:7 269:14 271:1 280:1,4,6 282:8 303:9 337:17

**appropriately** 269:8, 10,13 282:9

**Approval** 205:17,18

**approve** 255:21

**approved** 279:6 300:9

**Approximate** 193:16

**approximately** 5:24 8:7 16:1 24:17,18 31:21 32:4 193:15

**April** 15:3,14,18 29:3, 7,20,23 30:3,5 33:2 80:7 303:14 311:4

343:16,23

**are** 11:24 18:14,24 19:15 20:4,11,17,20 21:3,10 22:17 23:19 24:11,19 25:7 28:3,21 35:2,7 38:15 43:21,24 44:3 45:13 48:7,23 49:1 50:16 56:16 58:23 64:4 66:19,21 68:19 70:7 72:3 73:24 77:3 80:17 86:14,23 87:17 88:6 91:4 92:9 93:24 94:16 95:21 96:11 97:21 98:4 102:4 107:16 108:16 110:4,13 111:8 113:13 115:4 116:9, 14,18,20,21 126:12 129:12 137:24 139:23 143:24 144:13 150:3 167:10 172:4 177:20 179:10,14 181:23 182:4,22 183:8 185:19 189:14 193:21 194:7 199:10 201:10 203:16 205:17 210:3, 9 213:9 216:6,11 217:23 218:1 225:4,8, 20 228:1,2 229:22,24 230:1,5,15,22 236:6 237:13 238:1 244:16, 17 252:13 254:10 255:20 259:11,22 261:7 264:17,18,23 265:1 266:14 268:13 270:12 271:24 274:4 276:19 277:12 280:5 281:10 284:21 285:7 288:21 293:2,20 294:10 297:15 306:3, 4,12,15 309:16 314:10 318:11,17,21 320:5 321:7,14 322:4, 20 326:16 328:21 338:14,21 340:20 345:13 348:8 358:13

**area** 117:6,9

**aren't** 300:21

**Arete** 24:4,6,8,10 26:11 27:7 30:10 37:3,24 38:11,15,20 39:8

**Argionis** 4:13 5:3 10:18 13:8,16 14:4, 21,22 17:12,19 20:9 22:21 23:18,24 24:2 25:16 27:14 28:10,18, 24 29:13 30:4 32:8,14 33:14,20 34:2,19 35:1 36:15,21 38:13 42:9, 11,18,24 43:5,12,19, 20 44:2,6,8,16,20,24 45:18 46:18 47:5 48:13,17 49:12,24 51:1 52:5,11,20 54:2, 16,19 55:3,5,22 56:12 58:2,7 59:18 61:7,10, 18 62:16 63:15 65:19 66:13 67:9,16 68:14, 21 69:2,13,17,22 70:22 71:9,12,20,24 72:2,23 73:5,10,19 76:21,23 77:20 78:14 79:15 81:11 82:11,15, 20 83:5 84:3 86:5,16, 18 87:3,5 88:14,17 89:1,10 91:9 93:11,20 95:15,18 96:13,15 97:9 99:16 100:5,7 102:11,16,20 106:3, 12,22 109:1 110:6,11, 17 111:7,13,18 112:2, 9,15 113:12 114:2 115:16,18 116:1 118:1 121:14,19 124:22 125:3,7,15,21 126:3 128:7,12,17 137:15,19 139:2,12 140:15 141:11,21 142:7 143:3 145:2 146:14 148:9 150:12, 19 151:1 152:16 153:1,11,21 155:5 158:4 159:6,24 160:2, 8,11 163:17,19 164:10,18,19 165:18 167:12,16,18 168:16, 19 169:9 171:13,16, 17 172:6,12 177:1 178:1,4 179:16,21 180:4 182:1,8,9 183:11,14 186:1 194:4,11,15 197:2 203:4 204:21 205:1 209:10,16,18 211:13 212:4 216:13,17 217:18,20 221:3 224:6,11 237:5,9 238:6,11 245:23 246:4 248:17,22 253:10 254:12,14 259:14,19 262:14,19 264:20,24 268:22 270:4,8,17 271:20 273:2,17,19,22 274:13,19 275:18 276:8,13,18,22 277:17,18 278:5,8,19 279:2,11,18 280:16 281:19 282:12,13 283:1,7,8 284:15,22, 24 285:6,15 286:10, 17,23 288:2 289:5 290:3 292:22,23 293:4,8,20 294:4 297:7 298:21 299:14 300:12 306:2,8,20 309:8,14 310:12,18 312:18 313:17 314:13,19 315:23,24 316:16,17 317:19 318:3,20 320:23 321:5 322:18,22 324:16,21 325:3,16 326:22 327:2,22 328:4,13,14 329:15, 21 332:2,9 334:9,14 340:18,22 341:1,4 343:4,6 344:18,22 345:5 346:8 347:11 348:7,10 349:8,14 351:4 352:3 353:14, 16 354:1 356:1,4,6 357:8 358:1,7,12,15, 18

**arguments** 303:4

**arise** 154:2

**Arizona** 81:17 82:10 162:18 265:23 266:1, 3,4,14,17 293:3 357:1,3

**arose** 74:9 308:7,8

**around** 76:13 80:23 81:4 83:20 147:13 308:16 322:21 323:13 326:7 348:15,17

**arranged** 337:18

**arrangements** 201:8 202:18 203:18

**Arthur** 30:13

**Article** 274:3

**articulate** 237:12
**artifact** 163:3
**as** 4:23,24 5:15 6:22 7:4,5 13:13 27:11 28:6,17 29:9 32:8,11, 15 33:20,23 34:3,6,15 35:12 36:15,18,22 37:5 38:2 39:6,14 41:5 44:11,13 45:6 46:15,24 48:3,21 51:24 53:1 57:10 58:16 59:1 60:9,13,23 62:2,4,13 63:6 65:21 67:24 75:10 80:24 84:13 85:21 86:2,13 95:19 101:5 102:7,19 103:20,21 104:16 106:1,10 107:7,12,20 108:1 109:21 112:9, 12,17 115:23 118:21 120:14,15,21 121:5 122:4,12 123:13 124:7 125:10,21,24 126:12 127:7,23 128:14,18,19 129:10, 11 130:7 134:17,22, 23 148:10,15 149:3,4, 10,13 159:22 160:2,5, 12 162:6 165:1 166:1 168:9 170:19 172:4 175:18 177:16,17 179:21,23 180:5 182:13 184:3 185:15, 22 187:12 190:7,22 193:3 196:7 202:11, 19 203:13,23 205:19 207:11 208:20 209:5, 6 212:17 213:5,16 215:4 218:11,19,21 219:3 221:12,19 222:2,6,22 223:6,9,17 224:6,8,23 225:10 227:8,13 228:21 230:2,6,10,12 231:7, 15,20 232:12,13 234:3,8,10 235:18,20 236:1,14,20 237:1 240:6 242:9 243:12, 21,22,23,24 244:3,4,7 245:17,23 246:1,5,21, 22,24 248:8,17,19 249:21 254:20 255:2 257:6,21 259:14,16, 20 262:14,16,24 264:5 266:19 267:2 270:22,24 272:7 273:12 274:8 275:16 278:1,14 282:5,14,16, 19 284:18 286:10,13, 24 291:5,20 292:2,19, 21,24 293:17 294:1, 13 295:1,15,16,23 296:22,24 297:2,9,13 298:3 305:1,13,15 306:6,23 307:21 310:12,15,19 311:7, 13 312:2,9 313:19 314:8,14,16 317:16, 19,22 318:4 319:8 320:6,11,23 321:2 323:1,3,16,22 324:14 325:4,6,9,17,18 326:15 327:22 328:1, 5,15,16,18,21 329:15, 18,22 332:3,6,16 334:11,15 335:2,22 336:21 337:4 339:2 342:22 343:1,7,18 344:4,7 345:20 347:18 349:5,11,20 350:12 351:13 352:7 354:13,18 355:19 356:17 358:4
**aside** 23:23 24:3 208:21 209:15 210:22 218:11,13 223:21,24 224:1 234:10 235:17 241:13,15,20 251:20 351:21,22 352:1
**ask** 6:14 10:19 14:13 19:8 20:17 42:10 47:24 61:19 64:11 67:23 72:24 88:16 89:3,11 96:24 97:10 98:12 99:21 102:21 106:4 115:16 118:21 121:14 125:8 143:6 152:3 153:23 154:13 163:12 169:10 178:2 182:19 201:18,22,24 221:9 222:12 252:22 254:17,24 278:24 281:2 294:9 298:23 324:22 334:21 341:7 353:14
**asked** 5:18 7:2 13:2 19:9 20:4,11 30:19 31:4,18,22 32:5 33:10 36:2 52:23 61:14 68:13 69:11,24 72:14 73:4 81:10 88:24 89:16 91:23 103:11 105:11 114:1 115:1 124:21 138:22 139:7 142:5,24 144:22 152:22 153:9,10,22 159:11,17 164:6 165:16 183:12 193:1 199:4 201:1 205:3 208:1 209:9,14 212:3 260:8 263:19,21 277:1 280:11 282:2 284:12 285:3 304:15 324:24 339:14 353:13 354:8 356:4 358:3
**asking** 20:13,23 21:6 43:5 46:2,3 49:5,6 52:6,14 53:18 54:16, 24 68:19,22 69:13,14, 17 70:9 71:7,22 73:21 74:6,11 76:24 84:4,5, 16,21,24 87:3,9 89:18 92:23 93:18,23 95:15 96:11,16 97:16 98:3 100:5,17,23 103:12, 19,20 105:10 111:17 113:7,9 115:10 118:13,23 120:23 121:9 124:9 131:21 133:4 136:23 137:15 141:7 142:18 144:1,4, 11,12 150:12,13 153:17 154:16,20 159:7 168:5 170:1 171:2 172:4,6 174:7 186:7 188:19 194:5 197:3,6 201:23 204:21 207:15 213:5 221:18 228:12 232:10 233:1 237:5 247:9 264:18 267:15 269:15,17 270:5,9 271:6 282:23 283:3 284:16 290:9,16 291:5,15 293:5 297:16 300:13 307:10 308:24 315:3,12 319:20 322:11 330:20 337:4 346:6 348:11 350:12,14,18,22,24
**asserting** 242:21 253:8 327:9
**assertion** 52:15 134:20 135:4
**assigned** 277:20
**assignment** 321:11 333:10
**assistance** 40:5
**assisting** 188:22
**associated** 352:9
**associates** 152:11
**assume** 6:19 19:10 23:22 89:6
**assumes** 268:20
**assuming** 96:22 111:15
**at** 4:10 5:23 6:16 10:2 12:2,9 14:23 21:12 24:13 27:9,23 28:11, 15 45:5,7,13 46:8,24 48:6 49:12 51:10 55:23 56:16 57:9,13 58:15 59:12,16 66:14, 15 67:12,14,22 69:1 72:17 74:20 75:2,15, 19 77:18 80:5 81:15 82:7 85:16 87:8 89:14,17 91:3 92:4 94:23 97:16,20 98:2,7 100:13,15 101:1 103:9 108:17 112:5, 20 113:2,17 114:5 115:20 120:4 122:7, 19 125:1,17,19 126:4, 15,16,21 129:20 130:21,23 131:18,20, 22 132:12,13 133:11, 12 134:1,6 137:1,20 139:10 140:24 142:1 144:11 145:13 146:4, 22 148:21,22 156:9 158:2,9,14 161:5 162:9 163:18,20,23 164:11 165:4,19 166:15,21 169:12,22 173:16,17,20,21 174:3 175:7,9,12 178:5 179:19 180:2,9, 13,17,21 181:9,11,12 182:2,22 183:5,16,17, 20,22,24 184:10 185:19 186:3,13 187:8,15 188:3 189:2, 7 192:2 193:9,21 195:23 196:13 197:12,18,19,23 200:4,7,8 201:7 202:8 204:4 206:7 207:18 209:7 210:8 213:17 214:8 217:22,23 218:16 219:1,6,17,18 220:22 221:1,4 222:7, 16,19 223:12 224:14, 16 225:6,17 226:17 227:7 228:9,11,19 231:5,12 235:5,6 237:20 239:18 240:14 241:9 242:18 243:15 245:13,19 247:5 249:1,2,15,22 250:9, 13 253:19 254:5,10 256:21 260:1,2,4 262:1,13 263:23 264:1,22 266:5 268:12 269:3 270:21 271:8 277:19,20 278:1,15,17 279:4 282:17,20 283:12,17 285:20,21,23 286:19, 21 287:20 290:14 293:13 294:8 296:5,9, 11 298:2 302:16,18, 22 303:6,11,19 304:19,20,24 305:18 306:22 308:17,22 309:21 310:9 311:6,9, 20,24 314:9 316:18 318:1,7 319:2,4,6,7, 11,17,22 320:1,8,20 321:18,24 322:8 324:4 325:21 327:6 328:5,18 329:1,4 331:13 334:21 340:16,24 342:16 343:20 345:1,3,12,13 347:14,15 348:2 351:16 352:10,11,12, 16,17,22,23 353:1,5, 11 355:8,9,13 357:10, 18,22 358:23
**ATM** 301:7
**attach** 247:11
**attached** 134:8 161:22 177:16 184:6 225:12 234:15 235:18,20 246:17 249:9 319:5 328:24 345:20 352:23
**attachment** 112:19 113:17 130:10 161:5, 6,24 177:18 180:7

181:24 249:8 250:13 328:23 352:12,13,24
**attachments** 129:2 225:5,11
**attempt** 80:8 285:16
**attention** 88:10,12 159:24 276:20
**attorney** 8:17 40:6 126:20,21,24 131:2,6 134:2 137:2 157:12, 16 163:15 164:1 211:15 265:7 285:3 286:3,6 293:21 316:8 357:15
**attorney-client** 42:7, 16
**attorneys** 9:1 12:1 42:8,20 43:4,16 46:8, 19 108:10 178:14 188:23 255:19,22 259:23 313:14 316:12 334:17
**attribute** 63:19 64:11, 14,15
**audible** 6:21
**August** 4:4 48:5,18,24 49:3 51:9,18 92:21 124:4 195:15 334:18
**auspices** 30:9
**authority** 243:16,18
**automatically** 169:4
**avoid** 150:7,21 151:9, 15,20 152:6 154:1,11 155:2,7,10,13,15 156:4,11,20 217:4
**aware** 37:17 45:7
**away** 31:7 234:8 275:13 276:24
**awful** 163:4

**B**

**back** 30:5,14 43:7,10 44:7 61:11 64:7 65:11 67:14 74:13 78:4,6,8, 11 83:7 89:2,9 90:12 92:11,15 93:5,8 97:7 114:7 116:2 118:2 120:6,8 121:15 125:19 130:10 135:7 136:11,15 137:23 140:9 141:4 143:5 145:11 147:18 153:8, 16 156:5,16 161:13, 18 172:20 176:5,14 179:17 180:2 184:9 186:7,17,23 187:19 189:1,4 190:3 191:1, 14 192:13 206:24 207:2 217:16,17,22 220:9 221:1,5,6 224:3 226:19 227:2,9,11 230:11,21 231:1,11, 18 233:8 242:15 246:18 247:17 261:20 267:1,17 277:21 278:8,11 280:19 283:13 286:21 288:17 296:22 301:15 319:7 334:24 338:22 345:3, 18,21 346:2 351:9,10 355:8
**background** 133:7 150:16 155:7
**bad** 341:11 342:8
**badgered** 210:16
**ball** 127:13,16 128:1
**Balson** 46:20
**bank** 21:21 40:21 41:7,15 301:10 326:23
**Bartlett** 341:19,22
**base** 66:8 88:4 90:6
**based** 37:4 57:20,22 96:10 256:23
**basic** 142:1 226:9
**Basically** 190:13
**basing** 324:9 336:4
**basis** 42:1 54:10 56:24 57:17 101:7,8 169:15, 23 170:12,14 228:21 230:2,6,12 258:7 292:3 305:8 306:4,13 352:18 355:19
**Bates** 178:6 201:7 205:15 218:3 224:12 246:6 248:24 250:15 254:1 259:21 262:20 274:3,4 287:1 293:22 301:16 310:20 316:19 318:5 321:6 325:10, 13,14 328:6,10 343:9 347:22 355:10
**bathroom** 286:16
**be** 6:15,23 27:12 28:20 39:6 40:9 51:9,10 58:6 60:15 61:22 62:4 63:18 66:5,8 71:6,18 72:9 82:1 83:12,23 84:11 88:3,4 90:1,6, 19 91:13 92:19 94:7, 8,15,17 95:4,7 104:21 105:15 107:5 108:12 111:10,15 114:6 118:18 120:2,5,21 122:15 123:23 131:6, 7 135:21 136:3,6,12 137:11 138:19 139:3, 4,11 142:2,9,22 143:9 144:5 145:14,15,16 148:14 149:19,24 150:2,18 151:13 154:8 157:16,21 159:2 160:10 161:1,2 162:1 164:3,5,22 167:3 172:22 173:21 174:14 175:19 177:11,21 178:11,19, 23 179:1,7 182:18 184:18 185:17 187:7, 9 189:15 190:24 191:7,16 192:8 193:1, 13 195:4,5,8 198:13, 21 201:11,12,16 202:1,9,12,16 203:23 204:17 205:19 206:7, 13 210:2 212:20 213:18 215:22,23 216:15 218:7 222:15, 17 223:14 227:13,21 228:13,14,17,20 229:8,9,13 230:2,12 231:16,21 232:2,14 234:5,6 235:2,3 237:6,7,11,23 238:12, 23 239:11 243:16,18, 20 248:2 249:12 250:20 251:11 254:19 255:4,10,16 256:20 260:6,15,20,23 263:22 265:22 267:15 271:15,16 272:3,18, 19 273:10,13 274:8, 15,16 275:7,20 277:22 280:3,14 285:18 292:4,9 294:20 295:13,14,22 296:17 300:8 302:10 304:8,11,17 305:5 306:11,15 311:7,16 313:23 315:1,11 328:7 331:22,23 332:22 333:1,14 336:8 339:1,5 341:17 343:24 344:3 348:18 349:19,20
**bear** 351:12
**became** 55:24 56:3,6, 15,19 57:1 59:3,4 61:13,14,23 73:8,11, 18,20 74:19 75:5,7, 11,14,18,19 76:9 77:1,4,14,21,22,23 78:16,24 79:1 86:22, 24 87:9,10 89:13,14 91:1,19,20 92:1,2,5,7, 9,12,18,24 93:14 94:1,3,24 95:1,10,11 101:4,14 107:21 119:22 124:14,18,19 193:4 277:24 278:2, 12,16,17 285:19
**because** 6:23 20:15 21:3 49:10 58:23 63:21 64:8,21 68:21 72:4 74:8 78:20 87:20 92:9 93:1 98:1 105:11 106:21 107:9 114:12 115:20 117:2 120:19 123:21 124:24 134:9 138:9 152:9 158:6 162:13 164:4 165:8 169:1 174:23 177:8 188:12 198:8 200:19 204:11 207:21 208:11 214:9 223:22 233:2 239:15 247:20 249:20 268:6 269:16 270:19 271:11,12 272:13 280:5 281:8 291:10 295:16 296:15 298:8 299:8 300:8,21 301:1 303:1 306:10 312:8, 20 313:13 314:1 330:23 331:1,21 340:5 346:17
**become** 51:16 58:24 59:12 74:15,24 101:3 136:2 231:16,20 232:2,14 283:9,14 285:18 293:9
**becoming** 31:24 58:11 61:20 78:2 98:6 103:18 116:3,6 125:9 195:12 196:6 283:18 284:6,10 291:21
**been** 4:23 9:5 10:22 16:7 23:7,14 24:4,15 25:21,22 27:18 30:19 34:7 38:2,6,21 50:20 60:1 64:23 65:8 77:10 78:22 81:9,13 86:2 100:17 101:1 106:6 109:24 110:9 117:16 133:18,19 138:11 142:14 146:4 148:8 159:16 160:1 162:22 163:7,21 171:3 192:23 194:9 195:15, 17 207:5 212:17 213:6,13,14,15 244:16 247:2 252:11 265:23 266:3 296:3 303:21 304:13,21 308:14 319:5,11 329:7 335:18 336:16 337:6,7,23 338:11,12 339:8,12,22 342:6 347:1 356:7 357:4,19 358:3
**before** 5:12 34:11 44:17 45:19 51:20 53:6,14,15,18 54:6 57:10 59:1 63:5 67:17 68:3,16,20 69:3,8,12, 13,16,18,20 71:23 74:2 88:4 89:4 90:11 92:23 93:13 94:1,2 105:3,11 124:7 130:19 133:19 134:22 146:19 156:4 178:2 180:10 181:18 182:13 193:4 194:17 195:5 211:5 212:17 214:9 215:4 218:11 221:11 223:9 235:24 236:19 245:3 274:15 285:18 289:14 290:4 291:4 306:23 314:20 318:8, 10 339:20
**began** 48:5,18 51:10 124:5
**begin** 195:13
**beginning** 82:8 92:21 304:22

**begins** 4:2 130:24 180:13 189:9 253:23 274:3
**behalf** 4:13,15 45:23 46:4 345:11
**being** 4:9 10:21 16:14 25:11 31:4 38:11 51:15 68:13 75:2 120:21 123:24 127:18 130:8 147:19 151:4 185:2,7 205:20 208:20,21 210:16 228:2 261:6 282:8 290:22 304:2 316:10 329:14 335:20 348:14 355:4 356:16
**belatedly** 86:12
**belief** 256:20 337:16
**believe** 10:1 15:1 17:13,20 19:13 22:2 25:1,15 33:4,7 37:10 40:7,20 45:21 46:5 51:13,17,22 53:20 55:24 56:2 57:17 60:20 64:21 65:5 69:7 73:2 74:12 79:1,13 84:8 86:9 92:3,14,18 96:20 109:10,20 112:3,4,5,10 113:20 123:18 130:14 134:22 135:10 137:8 138:4, 14,15 147:12 158:23 161:7 163:18,23 169:14 171:3 172:1 176:16 178:9,15 179:5 182:23 183:18 184:18 186:6 187:1,7 191:8,18 192:8 208:3 213:23 215:5,12 216:23 218:23 219:20 225:1 226:24 236:3,9 247:13 248:15 252:18,23 253:16 255:24 256:13 257:24 259:8 262:8 264:7 266:16 274:7 275:4 276:11,21,23 277:1 280:12,20 281:22 283:19,22,23 287:6 288:5,10,13,19,21 289:3,23 291:2 292:18,20 293:1,2,11 297:20,21 299:6 301:12,14 302:1,13 306:9 308:18 309:13 310:5 311:16 313:21 316:13 321:14 322:9 326:8 327:11 329:13 335:10 339:6,22 342:2,15,18 351:2 354:4 355:4
**believed** 85:12 123:9 124:10 170:2 249:18 306:8 312:9 334:5,7 335:9
**believes** 169:23 293:5
**below** 130:6 185:18, 20,22 227:9,14 229:7 323:10
**Ben-dov** 45:23
**benefit** 89:23 195:16 291:18
**benefits** 240:3
**Bennett** 19:4
**Bermudez** 45:24
**best** 27:19 35:11 52:12 90:24 94:9 100:11 102:19 152:11 156:10 210:2,5,6,18 237:21 244:17 296:17 350:15 351:1
**better** 78:22 88:16 141:14 241:19,22 287:17 299:9,15 340:5 350:9
**between** 15:9,17 25:11 60:9,21 69:15 70:13 76:6,12 78:1 80:6 81:9 85:13 96:6 98:24 99:5 116:12,16,22,24 118:3 126:10 130:16 135:6,20 136:1 152:10 170:16,18 181:5,6 186:21 187:5 189:21 190:16 193:10,18 208:6 211:7,8 212:12,19,23 213:2,24 214:10,15 219:23 228:17 229:10 237:13 243:4,7 247:24 250:7,11 267:24 272:15 273:9 287:15,23 288:16 289:4,19 297:10 298:14 303:13 314:6 316:11 354:22 355:3
**beyond** 197:1 215:2 331:7 335:19 351:5
**bigger** 321:9
**bills** 198:14
**binding** 185:21 186:21 187:5 227:21 229:8
**birthday** 64:12
**bit** 72:14 187:13 295:12 310:1
**black** 317:8
**blank** 184:19 357:14, 16,17
**blanks** 179:13,14 261:8 357:13
**blasts** 348:13
**bleeds** 189:9 254:18
**blocking** 258:13
**blue** 126:11 259:24
**blutip** 35:14,19 36:1, 10,13,23 37:6,9,13,16
**board** 35:2,17 36:13, 24 37:2
**boards** 35:2 37:11,13
**boilerplate** 172:17,18 228:24 229:1 353:10
**bonuses** 66:8
**book** 161:17
**bookkeeper** 308:16,19 309:4,15
**books** 62:1 145:8
**Borrower** 343:10
**both** 56:21 62:24 66:22 68:15 69:12 73:11 85:10,11 86:7, 23 117:5,17 122:6,11, 19 123:11 136:20 138:7 139:9 142:3,10 143:10,20 144:21 155:9 179:1 196:23 205:20 222:15,17 244:21 288:20,23 289:23 339:23 350:11,13 351:22
**bottom** 45:5,13 129:7, 8,13 178:5 189:8 263:23 322:17
**bottom-right-hand** 126:5
**bought** 163:14 280:19 301:21
**bound** 90:20 346:13
**box** 187:8 189:7 201:7,9,11 202:18 205:15 206:12 216:12
**breached** 237:1,14 252:17,19 253:9
**break** 7:1,3 62:3 67:7, 17 69:3 77:12 125:16 160:9 178:3 179:16 221:11 286:17 340:18 344:23
**breaking** 177:24
**bring** 44:6,7 89:18 90:17 93:24 121:15 155:11
**bringing** 92:16 351:8
**Brittany** 45:24 46:9
**broad** 167:14
**Broadest** 153:3
**Broadly** 185:13
**brought** 88:7 90:14 91:4,11 93:12,19,23 98:14,15 110:6 144:8 223:22
**Brown** 139:17
**bubble** 126:14 301:19 307:11,14 308:17
**bubbles** 259:24 307:2
**build** 55:9 60:11
**building** 62:2 178:22 197:16 284:2 299:18 300:1
**buildings** 22:7
**built** 162:22
**bullet** 173:16 174:15 178:7 215:19 216:12 217:10 230:21 231:6 232:11 233:16 287:23 290:1,15 333:4,5 334:22 335:11,17 336:13
**bunch** 65:11 67:23 132:3 170:22
**business** 5:23 12:14, 16 32:1 55:10,11 60:12 62:2 80:13 82:1 147:15 149:8 152:11 156:8 160:18 175:17 178:21 184:19 196:24 197:16 213:16 221:22 246:24 257:23 258:8, 9 264:5 299:18 300:2 305:4 328:24 329:14
**business's** 32:1
**but** 6:14 14:13 19:11 21:13 23:16,24 27:20 29:16 33:11 34:16,22 37:17 41:6 45:21 47:23 48:14 50:15 51:11 52:12 56:9 61:6 62:8,17 72:5,13 77:3, 16 78:23 84:2 87:11 89:23 91:23 92:22 95:6 97:5,16 98:8,10 101:10,22 112:5 115:13 116:23 120:18,24 121:12 122:16 124:15 125:1 126:9 128:3 129:3 131:18 132:12 133:5, 18 134:8 142:18 143:15 150:11 154:20 155:6 156:11 157:4 165:3 173:10 174:10 179:10 187:1 190:10 194:8 195:5 197:3,6 198:10 199:15 201:16 203:1,5 207:5 208:1, 18 209:16 210:3 212:18 213:18,21 214:10,24 215:23 219:7 220:8 227:23 231:10 232:6 233:10 234:3 235:5,16 236:4 238:22 242:4 244:16 247:21 250:1 253:5 258:21 265:5 266:17 272:1,11 280:9 281:20 284:17 286:5 288:7 291:24 293:5 294:14 301:24 302:13 303:17 305:23 308:13 309:21 311:7 316:5 317:3 318:13 321:8 322:9 323:8,14 325:11 326:23 328:10,11,21 330:10 334:21 336:20 337:18 340:11 344:1 348:6 350:2 351:5
**buy** 121:23
**buyout** 149:11
**by** 5:3,19,22 10:18 11:9,12,16 13:8,15,16 14:4,22 15:6 16:21

17:12,19 20:5,9,22 22:21 23:18 24:2 25:16 27:14 28:24 29:11,13 30:4 32:14 33:14 34:2,19 35:1,22 36:2,21 37:18 38:13 42:11,18 43:12,20 44:2,8,16 45:18 46:18 47:5 48:17 49:24 51:1 52:5,20 54:2,19 55:5, 22 56:12 58:6,7 59:4, 9,18 60:5 61:10,18 62:16,23 63:15 65:8, 19 66:13 67:16 68:14 69:2,22 70:22 71:12 72:2,23 73:10,19,21 74:14 76:23 77:20 78:14 79:15 81:11 82:20 83:5 84:3,14 85:5,6 86:5,18 87:5 89:10 90:10 91:9 93:11,20 95:18 96:15 97:9 99:16 100:7 102:11,20 104:15 105:10 106:3,12,22 109:1 110:11,17 111:7,13,18 112:2,15 113:12 114:2,11 115:4 116:1 117:5,17 118:1 121:19 123:9, 24 124:17,18,23 125:7,9 128:7,17,19 131:18 133:7 135:22 136:7,12 137:19 139:2,5,12 140:15 141:11,21 142:7,23 143:3,10,24 145:2 146:14 148:9 149:14, 24 150:19 151:1,11 152:16 153:1,11,21 155:5,9,17 158:4 159:6 160:11,24 162:14 163:19 164:10,19 165:18 167:18 168:19 169:5, 9 171:13,17 172:12, 24 175:19 177:1,3 178:4,11,16,23,24 179:7,8 180:4 182:1,9 183:14 184:22 186:1 188:4 190:2 191:13, 20,21 192:10,11 194:4,15 195:6 197:2, 19 203:4 205:1 207:4 209:2,10,18 211:13 212:4 216:17 217:20 219:16 221:3 222:17 224:11 228:21 230:2, 8,12,13 231:24 235:17 236:10 237:9 238:4,9,11 239:1 244:3 245:8 246:4 248:22 249:10 253:10 254:14 255:18 258:1 259:19 261:7 262:5, 19 264:24 267:11 268:22 269:21 270:8, 17 271:16,20 273:2, 22 274:13,19,21 275:18 276:13,22 277:18,23 278:5,18, 19,20 279:2,11,18,19 280:14,16 281:3,9,19 282:13 283:8 284:15, 24 285:6,15 286:23 288:2,23 289:5,20 290:3 292:12,23 293:8 294:4,17 295:6, 7 297:7 298:21 299:14 300:12 303:16 304:3 306:2,20 307:7 309:8,14 310:7,18 312:5,18 313:17 314:19 315:24 316:17 318:3,20 320:20 321:5 322:10,22 324:16,21 325:16 327:2 328:4,14 329:21 331:18 332:9, 14 333:12,17,22 334:14,17 336:1,16 337:5,24 338:24 341:4 343:6 344:2,14 345:5 346:8,13 347:11 348:10 349:14,24 351:15 352:1,4,19 353:5,13 354:5 356:3,7 357:8

## C

**caddying** 30:14

**California** 6:5 28:1

**call** 29:6 64:23,24 65:2,9 73:17 152:11 168:23 196:8 212:21, 22 225:12 282:22 334:22 355:2

**called** 4:23 24:4,6 35:14 215:15 274:3 307:17 317:8 328:23 355:13

**calling** 163:21 277:12

**calls** 17:15 20:6 25:13 30:2 38:9 42:6,21 50:22 54:13 55:19 56:8 59:15 64:8 87:2 99:14 106:8 110:15 111:5,23 117:20 137:13 140:12 146:11 150:10 167:9 169:8 172:9 204:19 209:5 270:2,13 271:18 272:21 275:14 276:9 278:3,22 279:14 289:1 305:22

**came** 98:23 149:23 166:22 170:16,18 198:10 208:7 223:18 234:24 257:19 308:9 350:12

**camera** 82:13,14,17

**can** 13:6,13,23 14:18 17:10,16 19:5,10 20:7 21:4 22:16 23:16,20 25:14 26:14 27:12,22 28:22 29:9 30:2 34:22 38:9 42:15 43:7 46:15 47:3 48:14 49:12 50:23 51:3 52:3 54:1, 14 55:20 56:9 59:15 61:6 62:13 63:12 64:11,14,15,16 65:14 72:1,16,22 77:2,16 78:3 79:7,12 81:12 82:11 84:2 85:21 88:19 89:1 90:21 91:1 92:10 93:3 97:6 100:11 102:7,13,14, 19 105:3 106:2,10 110:16 111:3 114:3 117:3 120:21 122:16 123:7 125:1,15 127:10,12 128:4 137:14 138:23 139:8 140:6,7 141:8 144:23 146:12,13 148:6,7 150:11,24 153:12 154:16 156:22 158:13 159:18 166:2 167:3 171:12,14 172:10 175:10 183:16,20,22 184:3 194:23,24 196:21 204:20 206:1 209:16,23 212:1,5 233:12 236:24 237:22 246:22 249:15 253:6 254:16 260:12 267:9 268:21 270:3,14 272:22 276:10 278:4, 23 280:3 285:12 286:4 289:2,22 290:17 298:16 305:23 307:5,7 308:17 309:6 312:15 314:10 321:24 322:14 324:12 326:23 328:10 331:8 336:3 345:18 351:13,16 352:5 356:11 358:8, 16

**can't** 27:20 50:19 51:4 60:13 70:7 90:23 91:3 95:20 124:15 201:23 211:5 232:19 234:3 236:4 286:5 291:4 296:10 303:17,19 304:16

**Canada** 35:21

**cancellation** 285:17

**cap** 31:11,12

**Capably** 243:17

**capacity** 5:14 11:11 34:13

**capital** 22:11 30:10 176:5,14 177:5 294:18 295:2,9 297:1, 5 302:11 334:24

**capitalized** 346:1

**capture** 60:19 147:21 314:2

**captured** 314:5

**captures** 52:16 53:5

**capturing** 312:21

**car** 76:15 240:2

**care** 127:8 300:5

**carried** 84:9 280:10

**case** 9:24 10:9 123:23 124:1 151:13 152:2 177:14 179:2 188:17 202:10 213:19 279:17,24 298:24 335:21 336:1

**cash** 88:3 173:18 339:23

**causing** 210:9

**caveat** 313:9

**Cedric** 11:18 48:1 122:16 150:8,16 151:16 152:1,7 154:23 155:4 162:21 163:13 164:20 165:2, 6 216:2 217:5 251:5 272:15 277:10,13,19 278:1,14 281:22,24 282:17,18 284:13 327:5 329:3 335:12 336:6,20,23 337:5,9, 11,18 339:19 356:7, 20

**Cedric's** 126:17 280:19 336:14

**Cedric-merri** 168:22, 23

**center** 329:23

**Central** 126:15 235:2

**CEO** 343:21 348:24 349:17

**certain** 80:9 84:11 94:8 99:7 127:1 196:16 331:22 344:9

**certainly** 48:15 140:7 147:17 257:3 267:21 338:8

**certification** 80:13 81:6 248:5 257:23 258:11

**Certify** 43:19

**cetera** 66:18 74:10 162:23 214:7 233:14 240:3 281:3 319:3,13, 15

**change** 72:13 87:21,23 89:12,15,19 98:13 105:23 109:2,9,11 117:3 168:2,9 244:10, 12 289:20 290:1 291:17 321:17 323:12 324:23 337:13 344:19 349:19 350:16,19,20 354:14

**changed** 69:23 72:14 73:16,22 98:17 99:6 108:20 280:3 289:6, 10,19 324:7,18 349:16,20,23 350:7

**changes** 36:24 288:4, 6,12,14,15,19,24 323:7
**changing** 114:14 166:2 287:17 323:1,2 355:6
**characterization** 335:20 336:14,24
**characterize** 336:20
**Chase** 301:10
**check** 133:8 301:7
**Cheryl** 129:17,18 131:11 134:3,6 135:8, 18 140:9,21,22 141:23 148:15 151:8 159:13 178:14 234:10 249:12 251:3,11,24 255:18 269:21
**Cheryl's** 151:6 318:21,23
**Chestnut** 7:16
**Chicago** 4:10 37:4 113:16
**choose** 131:5 157:15 269:18
**chose** 155:2,3
**Christie** 46:6 47:8
**circulated** 180:12
**circumstances** 35:24 64:3 117:8,23 118:5
**cite** 332:1
**cited** 287:19
**city** 7:17
**claim** 54:18 58:13,14 59:24 60:6 144:10,15 182:17 230:16 236:14,20 240:1
**claiming** 301:21
**claims** 54:10
**clarified** 310:8
**clarify** 182:6 303:7 314:10
**clarity** 132:24 297:5,9 298:9,13
**clause** 250:14 251:4,5, 10
**CLB** 316:22 318:15, 17
**clean** 22:4,5,8
**clear** 117:6,9,11 131:7 152:3 157:17 170:17 183:13 275:23,24 276:2 279:22 295:15 302:20 304:12 309:19 310:3 313:13
**clearly** 59:10,13,17, 20,22 60:16,19 175:4 295:4
**Clerk** 45:2
**client** 88:12 163:18 210:9
**clients** 149:7 255:20
**Clint** 36:7
**close** 193:13 250:6
**clue** 71:7
**Co-capital** 28:2
**co-owner** 48:3,21 51:24 53:1 82:2 83:12 101:9,11 149:12
**coached** 211:15
**code** 333:7,14
**Coghill** 36:7
**Colin** 341:24 342:2,9, 12
**colored** 338:24
**column** 321:8 322:2 323:20
**combination** 16:22 108:9
**Comcast** 326:10
**come** 45:6,8 60:22 149:21 166:5 179:17 190:9 191:1 192:20 222:8 236:23 240:7 252:3 262:3,4 267:18 296:3
**comes** 126:12 225:10
**comfortable** 167:22 174:17,20 175:2 200:1,10,15 222:15 237:24 238:1 265:5,8, 13,16,17,21
**coming** 82:16 109:18 236:13,18,20 241:17
**comment** 178:16,24 179:8 296:9,11,13 320:10
**commented** 216:24
**comments** 319:19
**communicate** 190:3
**communicated** 41:7
**communicating** 11:1 315:8 317:7
**communication** 285:4 335:5 339:19 340:2, 12 341:8
**communications** 42:7, 16 80:8 82:3 284:20
**companies** 22:8,10 28:16 31:12 32:5 166:21
**company** 5:15 6:9 18:17,18 21:9,12 22:16,17 25:19,20 29:15 35:21,23 61:24 82:5 86:4 108:16 114:6 120:5 145:9 146:1 148:3 184:15 189:12 195:9 201:14 202:20 203:14,24 205:19 222:15 231:17,21 232:15 233:14 243:5 264:4,5 266:8 268:4,8 273:11 281:13 282:6 292:8,9, 10 307:22 310:23 311:14 316:21 317:9 333:11
**company's** 37:2 62:1
**comparing** 287:21
**comparison** 269:20 314:6
**compensation** 31:15 66:2
**complaint** 42:4,13 43:3,14 44:10 47:22 52:14 54:5,22 80:6,18 81:1,16 94:21 96:11 101:24 107:15 109:17 111:14,22 113:3,5 144:11,14 184:7 188:23 242:19 345:9, 10,20 347:5
**complete** 136:3 186:12 197:5 222:4 261:6,7,11
**Completed** 261:9
**completely** 137:22 211:12 280:1 281:11
**completion** 187:12 231:15,19 232:2,13
**complied** 331:22 333:13
**comply** 123:16 265:20 282:9
**compound** 46:15 65:14 85:21 97:5 108:22 111:5 152:14 154:19 169:7 196:21 282:11 297:3 298:20
**computer** 161:10,12, 15 226:19 264:12 269:3 315:2 316:2,5 357:19
**computers** 226:23
**concept** 155:11 156:20,24 157:2 159:1 216:4,6
**concepts** 159:12 216:8
**concern** 123:21 142:6
**concerned** 75:10 156:11
**concerning** 356:6
**concerns** 38:1
**concludes** 358:22
**conclusion** 17:16 20:7 21:6 25:14 30:2 38:9 50:23 54:14 55:20 56:9 87:2,7 99:15 106:9 110:16 111:6, 24 167:10 204:20 209:5 270:3,14 271:19 272:9,22 275:15 276:10 278:4, 23 279:15 282:23 283:2,3 289:2,22
**concurrent** 339:19
**condensed** 45:8
**condition** 142:12,16 143:12,14,16,22,24 144:3 145:1
**conditioned** 205:20
**conditions** 7:10 15:7 16:23 94:8 95:4,7 205:16,17,22
**confidential** 28:6,17 326:23
**confidentiality** 28:4
**confirm** 97:11 122:17 188:7 280:9,24 282:7
284:4 309:19 310:2 345:15 346:3,10,19, 22
**confirmation** 107:11, 17,24
**confirmed** 82:22 83:1, 12 95:20,23 96:17 97:3,13 101:23 102:1, 12,23 103:2,3,5 107:7 108:2,11 109:16 113:3 130:9
**conflict** 131:8 157:18
**confused** 194:13
**connected** 11:16 38:5 132:5 153:2 166:14, 15 180:23
**connection** 11:13 12:22 18:8,12 37:16
**conscious** 201:4
**consent** 274:9 275:9 332:12,13,14 337:21 346:11
**consequences** 287:18 355:5
**consider** 215:20 336:3 339:17,18 340:11,13
**considered** 9:11 31:6 58:17,20 84:10 121:11 175:9,13 245:18 336:9
**considering** 29:15 166:20 335:24
**consistent** 28:12 86:3 197:13
**consistently** 297:12
**consisting** 153:2
**consolidating** 32:2
**consult** 22:7,8,10
**consulted** 165:24
**consulting** 24:16 26:11,16 27:1
**contact** 286:3 300:19 308:11,15
**contacted** 286:5 308:2,3,5,18
**contain** 166:1
**contained** 205:23
**contemplate** 205:10
**contemplated** 206:14

**contemplates** 203:20
**contend** 85:8
**contending** 242:9
**content** 178:10 179:7
**contention** 55:23 56:14
**context** 48:16 178:22
**contingency** 66:6
**continuation** 254:9
**continue** 14:1 16:6 131:9 157:18 197:16
**continued** 62:1 81:5
**contract** 15:16 186:21 228:21 230:3,6,13,16, 18 257:2 265:22 270:11 352:19 353:5 354:10
**contracting** 174:23
**contracts** 257:1 270:7
**contribute** 189:11 355:19
**contributed** 239:23
**contribution** 176:5,14 177:5 294:19 295:2,9 297:1,6 302:11 355:23
**Contribution/due** 355:14
**Contributions** 189:10
**control** 99:12 111:2,4 177:20 201:13 202:7 273:8 288:15
**controlling** 323:24 337:9
**controls** 96:5 110:12, 13,19,21 111:4
**controversial** 281:12
**convenience** 263:6,10
**conversation** 115:5 188:1 190:7 192:15, 22 193:7 207:18 209:12,23,24 210:1,2, 13,20 225:1 250:11 287:15 298:8 307:9 356:10 357:1,4
**conversations** 51:5 57:23 113:14 135:18 190:10,12,16 193:9 194:9,16,20,24 195:2 196:4,5,9,12,15,19,23 197:7,8,12 208:5,11 209:22 211:9,18,21, 24 212:7,8,10,11,21 213:8,22 214:4,5,15, 22,24 256:24 298:3 299:24 356:16,21
**convert** 265:24
**convey** 228:7 269:10, 13
**conveyed** 133:5 185:2 227:16,18 231:19 252:24 269:8,16
**conveying** 133:13 228:16
**Conway** 263:11,12 265:18 287:16 353:18 354:14
**Conway's** 354:19
**Cook** 9:19 44:21 45:1, 11
**cooperated** 165:2
**copy** 130:7 134:8 333:16,21 358:5,7,9, 17
**Corey** 4:15 348:4
**corner** 126:5
**corporate** 80:10
**correct** 29:17 33:16, 17 36:9 39:16 44:17 45:20 46:9 47:1 50:12,13 53:9 54:12, 15 57:21 61:12 62:9, 11 64:1 68:18 70:15 74:15 77:10,11 79:18 83:19 84:24 87:11 91:6,20 94:21 99:9 103:11 108:21 109:13,23 112:8 115:10 127:2 130:17 133:23 134:4,5 137:23 138:3 139:6 146:17,18 150:9 151:12 154:12 161:3 165:15 168:9 171:5 179:12 187:7 192:6 199:15,16 205:13 206:10 207:17 214:2 229:12 230:4 231:2 233:17,18 236:13,21, 22 243:11 245:21 260:10,15 273:5,9 283:12 288:9,12 289:17 320:21,22 345:24 354:6,7 356:12 357:5
**correcting** 261:19
**correspond** 190:18
**corroborated** 244:24
**cost** 206:12,13 216:12
**costing** 144:9
**costly** 335:18
**costs** 206:17,21 207:8, 13 208:24 215:19
**could** 5:4 10:11 58:2 65:8 95:5 105:23 107:4 117:18 133:18 147:2 148:14 152:6 173:12 176:19 177:11 181:8 193:13 197:22 212:17 213:6 217:16 223:14 229:11 237:18 244:15 257:23 258:19 261:20 262:2 268:12 271:15 272:2,10 273:13 274:7,16 275:10 276:5,14 278:8 301:17 307:16, 22,23,24 324:4,5 340:9,10 345:6 347:24 348:19,20
**couldn't** 45:7 103:12 105:11 113:5 198:17 308:12
**counsel** 4:11 43:23 47:1 80:7 88:21 126:6,10 128:19 215:20 217:1 318:15, 23 325:19
**counterparties** 28:17
**countersign** 246:17 247:9,16
**County** 9:19 44:21 45:2,11
**couple** 8:13 213:13 296:3 309:2 351:20
**course** 50:5,8,11 51:3, 6,8 52:11 249:12
**court** 4:7,19 6:24 7:6 10:11 19:5 44:22 78:3 82:15 114:23 144:14 217:17
**covenants** 68:9
**cover** 224:14 251:14 287:2 310:22 311:2
**covered** 9:4 171:21
**covering** 148:14
**covers** 149:7
**COVID** 64:8 188:3 348:15
**Cozen** 4:10
**create** 122:17,21 123:3 144:19 161:6 186:20,21 195:7 248:6 264:9
**created** 89:22 162:1 172:21,22 226:19,23 249:10 264:7 269:1 313:14
**creating** 344:14,16
**crystal** 275:24
**current** 32:21 173:20 293:5
**currently** 7:13 18:14, 15 20:4,12,17,20 21:8,9 23:5 47:19
**cut** 274:5
**cute** 90:1 213:18 267:15
**cutting** 102:15
**cycle** 149:8

### D

**Dairies** 28:1
**Darrin** 46:23 47:11,13
**date** 4:4 49:19 51:14 54:5,7,8,20 55:2 56:6, 22 57:1 63:6,20 64:15 70:10 73:1 76:9,24 77:2,3,13,22 78:15, 17,18,19 79:1 90:21, 23 91:1,4 92:18,19, 22,23 93:1,13 124:19 133:16 159:13 162:16 195:13,19 201:5 219:2 224:22 252:6 260:1,3 289:13,15,19 290:1,4,7,12,16,18, 22,24 291:7,21 292:21 302:23 303:11,13 311:1 318:11 322:1 343:17 347:24 354:9
**dated** 34:6 112:19 248:23 263:1 330:2 334:18
**dates** 27:17 56:21 79:7 86:24 92:15 250:12 287:16 354:23
**David** 45:23 46:8 341:5,8,12,14
**day** 64:12,17 235:10 239:10 245:20 250:3 260:5 307:3
**days** 250:3,4
**de** 355:2
**Deagostini** 35:6
**deal** 26:7 72:17 183:18
**dealing** 133:20 134:2 149:10
**dealings** 12:14,17 221:22
**dealt** 46:7 140:1 315:13 327:5
**Dean** 4:2,22 5:6 14:10 34:5 37:2 109:15 113:13,18 121:21,22 122:8 123:7 128:22 129:8 130:4 134:13 159:15,18 161:2 184:23 185:1,12 187:9 189:11 202:19 205:19 215:19 222:22 223:6 231:14 232:13 238:13 242:13 249:2, 9 286:1 298:15 309:6 318:14,23 319:12 343:14 349:5,17 350:3,8 355:18
**Dean's** 82:9 189:14 313:13
**Dean@dussias.org** 224:15
**Dean@dussias.org.** 160:14,17
**Deandussias.org** 249:2
**death** 254:21 255:5
**December** 106:18,24 147:13 268:1 345:19
**decide** 106:16 199:8 200:4,10 202:10

**decided** 14:1 15:11 81:14 193:24 198:20, 23 199:4,6 200:7,9 352:6
**deciding** 199:2,5
**decision** 200:15 201:4 280:8,10 350:22
**decision-makers** 300:22
**decision-making** 165:3 201:13 202:7
**decisions** 25:18 178:21
**declare** 21:15
**decline** 16:9
**declined** 15:11 16:8
**decreased** 102:5
**decreasing** 103:10
**defendant** 5:16
**defendants** 4:14,16
**define** 124:15,17
**definitely** 9:9
**definition** 105:12 230:10
**definitively** 206:1
**degree** 139:17
**Delaware** 18:23 23:2 40:11 41:13 184:14 218:7,9 219:22 265:10,13,20,24 292:10 330:14 333:7, 13
**deleted** 315:6
**delivery** 358:6,8
**deny** 154:17 305:4,14, 21 306:10
**denying** 305:5 306:11 331:4
**dep** 28:5 328:16 348:3
**departure** 37:16 82:1
**depending** 245:12
**depends** 13:14 91:12 117:10,22 118:5,7
**depose** 264:20
**deposit** 294:12,18 295:1 301:6
**deposited** 294:11 295:4 301:6 304:2
**depositing** 295:15
**deposition** 4:2,9 5:12 7:22 8:19 9:23 32:12 33:24 36:19 44:14 58:4 60:2,3 82:9 112:13 126:1 128:15 160:6,12 179:24 224:9 236:18,19 237:4 246:2 248:20 259:17 262:17,23 286:10,14 293:18 294:2 310:13,16,20 314:17 316:18 317:23 321:3 325:7 328:2,18 329:19 331:16 332:7 334:12 343:2 347:19 349:12 351:8 358:23
**depositions** 10:2,5
**describe** 22:6 31:9 208:14 236:24 237:11 257:6
**described** 84:13
**describes** 251:10
**description** 186:12 295:8,11 296:5,7
**designate** 28:16
**designating** 326:22
**designation** 234:23
**designations** 28:8
**designed** 150:3 151:7
**desire** 80:12 250:16 266:13 313:23
**Desiree** 342:14
**despite** 66:19
**detail** 181:9
**details** 249:11 256:5 257:7
**determine** 285:17
**detrimental** 335:19
**DH** 126:7
**DHD** 126:6 160:24 161:1 173:17,19 178:16 179:8 259:21 293:23 334:17
**DHD3280** 128:19
**di** 354:22
**did** 7:21,24 8:4,21 10:14 11:10,13,17,19 12:21 13:19,24 14:5, 24 15:2,8,17,23 16:2, 8 17:4,7 18:2,8,24 20:12 22:12 23:11 25:5 26:10,16,24 27:23 28:4 29:2 30:9 32:3 35:17,24 40:4, 13,16,18,19 41:1,5, 10,18 42:3,19,24 43:14 50:14 51:11,13, 16 53:22 54:4 57:3,14 59:12 60:18,22 64:2,4 65:22 67:3 70:4 74:23 82:8 83:23 84:5,18 86:10,17 87:7 89:18 90:2,16,17 91:23,24 92:16 93:22,23 94:3, 18,23 97:10 98:3,5,13 99:24 100:8,24 103:14,15,20,22 104:2,8,10,12,13,24 105:9,13,17 109:2,5, 9,12 113:20,23 114:8, 13,19 115:7,13 116:2, 6 118:23 119:5,7,10, 14 120:10,12,24 121:3,9,23 122:9,14, 18,21 123:9,16 124:24 128:9 130:13 131:13,17,22 132:8 133:11 135:7 136:6 138:4,14,18 139:15, 16,19 142:21 143:8, 15 144:7,17,18 145:13,16,18 149:17, 22 151:2,14,23 152:4, 12,17 153:23,24 154:6,15 155:8,10 157:8 160:24 161:6,7 162:3,4,15,19,24 163:5,9,20 164:3 165:4,19 166:1 167:2 169:14 172:23 174:17 177:17 178:1 181:11 185:1,6,16 186:3,13, 16,23 187:18 188:15, 18 190:3,20,21 191:4, 17,18,22 192:2,8,19, 20 194:5 195:10,11 196:18 197:7,8 198:1, 6 199:1,8,20,24 200:4 201:14,24 202:3,15, 21,22 203:10,15 204:8,9,12,13 205:9, 23 206:20,24 207:2,9, 16,18 208:17 209:3,7, 8,19,24 210:6 211:1 217:2,8,13 218:14 219:14,15,18,19,21, 24 220:3 221:12 222:5,12 223:1,8,10 224:3 225:21 226:1 229:1,19,21 232:1,5, 7,10,16 233:19 234:2 236:16 237:10,16 239:7,9,20,21 240:19 241:6,14,19,22 242:10,12,15 243:15, 18 246:24 247:19 250:23 251:2,20,21 252:1 253:12 255:9 256:21 258:10 259:10,13 260:2 264:6,9,10,13 266:19 268:3,18 269:6 270:18,23 271:3,21 273:12 274:20,21 275:6 276:11,21,23 277:1,3 279:5,13,19, 20 280:9 282:7,9,14, 15,18,23 283:1,2,3 284:3,8,17 285:1,16, 21,24 288:10 292:6, 10,15,17 293:9 294:10,11,24 295:24 298:2 299:4,15,22 300:16 301:6 302:19 303:6,7,9,21 307:18 308:11,15 309:18,22 310:2,6 311:21 314:21,23 315:3,16 316:7 321:9 323:7,11 324:22 325:21,24 326:2,3 327:6,11,15, 17 331:17 333:7,11 336:1 337:12 339:24 342:2,11,13,16 343:5, 14 348:7 349:18 353:8 356:20 357:22, 23
**didn't** 15:15 16:10,11 20:15 32:22 33:12 34:16 36:8 42:9,10 57:6 62:10 75:21 78:20,21 82:7 84:19 85:1,2,3 93:1 94:9,20 98:2 104:3,15,20 105:18 106:21 114:4, 10,12,14 119:15,16 120:13 121:12,13 124:2,22,23 131:19, 20,22 132:14 143:17 148:19 151:3,21 158:18,24 162:11,12, 13,14,20 163:1,10 164:7,14 165:8,17 169:1,17 181:6 182:10 188:18 190:18 191:1 192:3 198:8,18 199:3,7,18 200:9,13 201:9 203:2 204:14 205:9,10 206:1 207:14,21 208:10,12 214:13 216:19 217:14 218:16 220:7,11 223:22 233:7 234:11 236:5 242:10 247:11 255:21 256:10,19 257:12,20 262:11 267:18 269:18 270:20 271:13 273:18 274:22,24 278:24 279:16 280:23 281:1, 2 285:14 286:2,4,8 288:11 294:21 295:18,22 296:1,23 298:4,5,10 300:5,15, 17,19 302:24 303:1,2, 3,24 304:6,8,19,24 308:3 312:3,8,11,20 313:4,18 314:1 323:23,24 324:2 327:19 331:20 334:2, 3 337:12 338:7,8,9 339:15 340:8,9,12 344:6 346:17
**difference** 25:11 116:12
**differences** 267:24 288:3 289:8
**different** 6:10 10:19 85:15 86:21 94:7,16 98:8,11,18,19,21,22 99:1,8,21 100:1 108:7 114:16,17 121:7,17 137:21,22 138:2 141:8 142:18 144:13 152:21 185:19 187:13 191:2 235:21 244:16 245:11 250:10 252:1, 9 259:8 265:14 267:19,20 289:14 296:24 310:2 322:4 326:15 332:1 353:15
**difficult** 6:24

**difficulty** 117:14
**Diligence** 189:11 355:14
**diligent** 316:7
**diminish** 335:13
**direct** 28:1 109:9 135:18 188:1,4
**directed** 108:19 109:12 244:19
**direction** 109:7 244:20,22
**directly** 27:21 45:10 188:21 190:6 323:8, 14 325:1
**director** 21:13 33:2,5 34:6,15 35:10
**directors** 35:3 36:24 37:3
**disagree** 104:20 105:18 119:15,16 208:17 222:7 261:21 281:6
**disagreed** 63:9 104:18 338:6
**disagreeing** 117:3 298:17,24
**disagreement** 18:1,2 60:9 63:2,4 74:3,6,8,9 79:19 87:14 124:8,10 175:20,23,24 176:3 182:15,17 189:19 291:12 320:12
**discarded** 208:21
**disclose** 312:11
**disclosing** 42:16 43:13
**discovery** 188:16
**discuss** 16:2 113:17 127:10,12 132:18 185:8,10 198:18 239:21 260:12 320:4 326:24 342:11
**discussed** 8:4 11:18 29:20 39:2,5 53:9,10 55:9,10,16,17 58:10 61:22 62:4 63:18 81:24 84:15,16,17 85:16 91:14,15 92:20 95:6 100:13 103:5,6, 7,10 104:3 105:20 114:18 117:16 119:8, 18 120:11 121:2 173:24 174:2 176:16, 19 187:17,20 189:17 190:4,19,23 193:2,23 197:13 205:10 207:5 208:11,16,20 210:13 214:5 218:23 223:16 238:15,17 240:16 241:8,18 246:21 302:22 303:11 353:22
**discussing** 22:17 49:4, 6 68:8 84:6 87:13 167:23 175:15 177:8 182:14 213:3,8 219:5 330:8
**discussion** 88:9 94:17, 19 132:9 186:19 196:24 208:13 210:14 229:10,14,15,16 239:14 241:10 290:11 300:4,6,23 302:19,21 331:10 356:5
**discussions** 9:1,2 50:6, 7,8,11 51:3 62:14,22 64:6 71:11,13 83:18, 20 84:7 90:19,22 94:11 95:8 97:15 98:23 102:8 107:9 119:1,5 131:16,23 147:22 148:18 170:6 181:4,6 191:5 213:16 222:21 223:5,14 251:21,24 327:12 355:22
**dispute** 17:23 38:5 81:21 295:23
**disputed** 336:16 337:24 338:1
**disputes** 13:17 154:1
**disputing** 336:17
**disregard** 278:20
**disregarded** 278:18 352:2
**dissenter's** 320:7
**distinction** 20:10,13 70:1,2,12 116:14,16, 21,24 118:3
**distinctions** 72:6,7
**distinguish** 111:3 121:7
**distinguished** 20:3
**distraction** 335:20
**distributions** 80:11 88:4 90:5 173:19,20 244:7,9
**divorce** 9:15 10:3,20
**divorced** 9:10 10:9
**do** 5:7,8 6:2,7,11,12, 18 7:13,21,24 8:10,14 9:12,20 11:1,17 12:5, 16 13:3 15:13,17,22 16:5,21 17:13,20 21:5,12,15,16,18,24 22:3,7,8,9 23:12 24:14,15 25:5,10 26:1,4,16,24 27:24 28:3 34:13 35:14,19 36:6,12,14 37:8 39:8, 18,20 40:3,19 41:11, 13,21 45:7 47:18 50:7 53:16 55:7,24 56:21 57:17 58:11 59:4 61:14,19 63:16,19 64:19 65:7,22 67:9,20 71:7 73:1 74:11 82:7 83:2,16 85:5,8 89:24 90:2 96:20 100:11 102:22 103:1 109:6 111:20 112:3,21,24 113:7,15,18 115:1 118:2,7 123:3,20,24 124:18 125:8 126:17 127:14 128:10,23 129:1,3,17 130:11,12 131:10,18 133:1 137:3,5,7,9,17 140:23 141:12,17 143:15 148:17 149:14 155:3 156:14,16,19 157:1,4 158:5,11,20 160:18 161:12,15,18 162:14, 20 163:11 166:6 167:6 168:15,20,21, 22,23 169:2,5,10,13, 18 170:4,8,23 172:1 175:7,24 176:4 180:15 182:22 183:5, 16 184:6,12,15 188:4, 23 189:6 190:15,23 191:9 192:1 193:24 197:14,15,19,22 198:12,20 200:7,17 206:19 208:2,8 210:12 214:1 216:21 219:16 220:20 221:18 222:22 224:17 225:19 226:9 237:10,16 238:19,20 239:3,5 242:16 243:3 244:22 245:2 246:22 247:14 248:5,6 252:23 258:17 261:22 262:11 263:3,13 265:3 268:14,18 269:23 270:11 271:5,7,14 272:6,10,19 273:21 274:11,23 277:3 278:20 280:4,23 283:20,23 284:1 285:16 287:9 288:15 292:19,24 293:14 297:18,21,22,24 298:2,7 300:3 301:21 302:5 304:3,7,17,23, 24 306:3,12,21 307:9, 14 310:6 314:4 315:10 316:23 317:10 318:7 319:24 320:11 321:22 322:6,12 323:4 326:6,9,11,23 329:3 330:7,16,18,19, 21 337:7,12 338:7 339:3,6,21 340:1,13, 18 341:11,21 342:8, 14,19 344:2,11 346:5 347:4,23 348:11,24 349:2,23 350:6 352:16,19 353:6,23 354:13,16,21 355:1, 16,18,21 356:4,13,14, 15,19,21 357:16 358:8,20
**doc** 226:20,22
**document** 32:10 33:22 36:17 44:12 45:19 52:10 60:24 61:2,3,6, 9 67:4 71:8 84:2,4 100:15 110:1,2,4,6,8, 10,12,13,20 111:1,3, 9,19 112:11,17 113:19 114:21 115:2 117:17 125:23 128:13,19 130:16,19 131:24 136:7 137:11 138:6 140:5 142:10 154:11 158:1 160:4, 13 161:8,21 164:16 168:11 171:18 172:19,21 177:16,17, 19 178:5 179:3,22 180:7 181:18,22 183:1,3,6,9,16,20,23 184:1 188:24 198:15 203:19 208:21 209:15,20 210:21 217:8 218:2 222:14, 16 223:10,18,20,23 224:2,4,7,12 229:2,23 230:11 231:10 233:11,13 239:1,8 240:21,23 245:24 247:23 248:2,4,6,12, 13,18 250:10 251:17 253:7,21 254:4 255:18,22 256:14 257:18 259:15,21 260:15,19 261:2,5 262:4,15,20 263:22 264:1,6,8,14,16 265:15 267:16,19,23 268:1,23,24 269:1,9, 17,21 270:16,23 271:3 273:3,4,14 274:17,20 286:12 287:3 288:8,10,11,13 291:10 292:7 293:16, 24 294:9 295:19 299:20 301:16 310:14,20,22 312:1,3, 5,7,11,24 313:5,19,20 314:4,11,12,15,20 316:19 317:4,14,21 318:5,8,10,13 319:2, 22 320:1 321:1,6 322:9 325:2,5 327:24 328:7,9 329:1,17,24 331:13 332:5 334:10 342:24 343:8 344:4 345:15 346:9,14,22 347:17,21 349:10 353:9,17 355:11
**documented** 136:13 189:1
**documenting** 208:24
**documents** 8:1,14 40:21 41:5 60:20 64:7 65:11 68:15,18,20,23 69:20,23 70:2,4,10, 13,14 71:2,15,17 72:3 80:21 87:8 108:18 109:20,22 110:7 111:8 126:4 127:15 129:24 130:3 131:6 132:3,19 133:12 134:3 145:10,12,14,

17,21 153:19 157:16 163:13 171:1,11 172:5 182:20 183:9, 17 184:4 187:14 188:16 192:12,23 194:7 225:4,19,20,24 237:17,21 238:10 252:23 253:5,11 255:20 256:1 258:19 262:2 268:15 293:3,4 294:22 300:17 303:22 314:7 316:2,10,14 352:9 354:3

**DOCX** 226:20

**does** 19:17 22:3,4 24:14 26:4,7 37:5,7 47:18 82:9 83:10 96:24 97:18,23 105:19 111:1 118:9 119:16 137:16 140:4 146:3,9 165:10 173:5 186:20 244:8 245:9 255:15 267:13 269:10 271:5 282:22 288:16 291:14 300:3 318:17 323:16 341:15 351:23,24

**doesn't** 55:2 61:8 88:20,21 98:1 111:4 137:15 158:9 159:18 168:13,17 242:4,6 256:12 267:13,14 268:17 325:10 340:2

**doing** 16:6,7 45:12 199:10 242:17 264:5, 21 265:16 270:7 272:4 297:1 300:8 301:3 322:6 325:22 337:11

**dollars** 137:6

**domain** 344:9,10

**don't** 6:6,16 7:12 8:3 9:7,8,10 11:9,12,15 14:20 15:6,21 16:17 17:11 19:20,22 20:8, 22 23:20 25:9 26:13 27:17 28:10 29:11 32:21 33:15 34:10 36:10 37:18 39:10,14 40:15 42:7 45:6,11 49:20 52:19,21 54:6, 8,20 58:5,12 59:16 62:22 63:1 71:6,9 77:18 78:20,23 79:19 80:2,20,21 81:2 82:12 87:6,14 88:12,19,23 89:4 91:10 92:3 96:13 98:16 99:1 101:12 104:13,18 105:9 106:20,23 108:17 109:8 110:4 111:16, 24 112:5 114:23 115:18 120:17 122:22 123:1 124:17 128:11 133:16,17 134:22 135:10,12 136:23 138:14 140:16 141:5 146:15 147:4,6 148:10,11,16 149:16 150:17 151:13,19 152:2,23 153:14 154:3 156:23 157:7 158:7 159:8,10,14,21 161:11,14 163:14,23 164:3,6 165:13,14 166:3,9,11 167:7,20 169:4,6 170:6 171:9 173:3 174:16 175:6, 14,20,22 176:2,8,10, 16,23 177:2,6,8,10 182:14,16 183:22 184:8 186:5,18 187:1 188:10,11,12 191:16, 21,23 192:5 196:3 199:1,4,22 200:19,23 201:3,6 202:14,17 205:2 206:6,8 207:10, 11 208:19 209:2 210:6,7,16,17 212:15 213:24 215:5,12 216:5,23 217:7 218:23 219:5 220:16 221:15,21 222:10 224:5 225:23 226:4, 12 228:4 230:8 231:5 232:4 234:22 236:9 238:8,14,22,24 239:13 240:18,20,23, 24 241:2,8 242:17 248:15 250:11 252:5, 18 253:3 255:13,24 256:8,10,16 257:8 260:18,22 262:10 264:15 266:2 267:23 269:11 272:5 273:20 275:11 277:5,12 278:6,18 279:3,8,10 280:2 281:22 283:22 288:13 293:12 294:23 296:9,11,13 297:4,20, 23 299:2,6,12 301:19 302:8,12,13,14,23 303:4 304:3 305:7,10 306:16,22 308:5,7,13 309:12 311:23 313:7 314:8 316:3,5 317:1 318:19 319:21,23 320:9,15,16,18 323:8, 14,21 324:3,5,7 325:1 326:8,20,24 329:13 330:18 331:9 333:9, 15 337:12,22 338:6 339:10,11,15 341:13, 23 342:18 344:13,14, 16,17,22 347:6,8,9, 12,13,14 348:3,5,6,7 349:3,22 350:2 353:10 357:6 358:14

**done** 23:9 27:7 29:7, 19 34:8 40:22 46:21 63:22 64:4 65:12 66:21 85:24 86:7,14 87:13,18 97:18,21,24 109:15 125:12 136:3 174:23 183:19 190:24 192:9 193:1 224:23 244:18 247:20,22 248:9 249:19 257:22 276:5,15 282:8 285:18 311:13 313:22 314:6 351:6,12

**doubt** 279:17

**down** 62:3 69:3 72:4 77:12 78:21 94:10,18 95:2 101:17,20 107:13 126:14 149:5 192:15 198:23 199:2, 6,9,11,18,21,22 200:5,10 201:4 214:4 238:13 276:12 277:2 303:6,17,19 323:10

**downside** 90:20

**dozen** 307:19

**draft** 42:19 43:14 68:17,20 69:15 71:19 108:9 129:24 138:13 146:20,21,23 147:3,5, 8,10,11 150:15 153:19 154:1 171:19 174:18 192:20 206:13 243:8 250:24 252:19 263:17 264:6 265:14 266:19,22 268:14 298:16 312:20 314:1 316:24 317:2,4 319:13,14 348:12,18 349:5,16 350:3,15,16

**drafted** 43:2,3 111:20 130:3,20 149:24 178:7,11,23 179:3,7 184:17 198:18 215:23 251:3 252:4,7,8,16,23 265:20 271:17 273:17 274:20 275:2 320:6 348:14

**drafting** 42:4,12 43:1 137:3 140:8 173:11 174:20 188:23 200:1 264:14 265:5,8,14 270:4 300:24

**drafts** 46:12 66:15,16, 20 67:23,24 68:2,4,6, 16,23 69:5,8,18,24 71:2,3,14,15 127:1 132:10 136:11,15,18 137:3,21 138:2,3,4,5 145:10,12,14,17,20 153:7,8 170:22 192:12 266:20 268:10,12 296:8,21 297:2,9,12 298:14 299:23 311:5,12 314:21 315:12,19 316:8 317:13

**draw** 195:4

**drive** 21:4

**Due** 189:10

**duly** 4:21,24

**during** 26:24 27:8 33:6 50:18 51:2,8 53:10,15,16,17 80:14 81:18 89:20 196:12, 14 200:20 213:7,11 214:3,21 244:4 245:5 246:22 302:17 348:15

**Dussias** 4:3,22 5:6 32:8,11,15 33:23 34:3,5 36:15,18,22 37:2 44:13 48:2,4,5,9, 14,18 80:8 81:17,19, 21,24 82:1,2,4,23 83:12,13 95:24 102:23 112:12,16 125:24 126:4,7 128:14,18 159:9 160:5 161:2 179:23 180:6 184:23 221:4 224:8 225:11 242:22 246:1,5 248:19 249:2 259:16,20 262:16 286:13 287:1 293:17 294:1 310:15 314:16 317:22 318:4 320:23 321:2 322:5,12 323:1 325:4,6,17 327:23 328:1,5,21 329:15,18, 22 332:3,6,16 334:11, 15 342:23 343:1,7,14 345:15 346:10,11 347:16,18,21 349:5,8, 11,15,18,21 350:3,8

**Dussias'** 80:14

**Dussias.org** 263:5 330:1

**duties** 129:11 149:4

**E**

**each** 19:17 21:2 64:22 192:11 193:12,14,18 298:8

**earlier** 101:5 121:21 161:20 193:20 208:2 291:11 324:17 325:23

**early** 6:1 22:14 23:7 51:17 63:21,23 64:3, 10,16 66:19 84:9 124:4 197:11 294:13

**easier** 117:16 159:23

**easiest** 313:21

**easy** 170:17 198:13 202:9

**economic** 87:21,23 89:23

**economics** 65:17,20 89:12,15

**edification** 45:4 126:4

**effect** 244:5 272:9 281:15 282:20 283:17,21,22,24 284:5,9 346:16,17 353:21

**effective** 124:20 278:21 279:12,17 280:14 287:16 289:13,15,19,24 290:4,7,16,18,22,24 291:7,21 293:12

311:1 354:9
**effectively** 234:7
**either** 56:13 73:23 108:19 109:4 143:16 159:8 188:6 198:24 199:14 202:10 222:20 223:4 228:3 244:15, 21 252:22 280:15 315:1 349:4
**else** 7:6 8:18 9:2 12:8, 19 19:3 26:22 27:4 40:1,16 46:21 133:21 151:24 170:7 269:22 270:24 303:23 357:6
**email** 83:8,9 96:3,5,23 101:22,24 102:4 108:5,6,8 112:18,21, 23 113:8 126:17 127:4 128:20 129:2,4, 5,16 130:5 132:20 134:9,10 150:23 158:23 160:14,15,16 180:7,9,12 181:19 182:2,3 188:5,13 191:11 203:1,5,8,9 219:13 222:24 224:14,15,18 239:12 246:7,8,10,11,15 247:12 248:23 249:1, 2 251:14,21 256:8 260:4 263:1,3 266:6 294:17 295:20 307:15 308:22 310:7,8,22 311:2 315:2,9 319:4 329:23 330:1,2,6 332:16 334:16,18 348:13
**emailed** 287:4 309:2, 15
**emails** 71:18,23 108:9 132:4 191:14 297:14 303:22 309:22,24 311:3 319:7,12
**embodied** 16:23 253:16
**emoji** 225:13
**emotions** 357:2
**employed** 18:14 20:4, 5,12,20,22 21:8 29:24 30:6 47:3 244:3
**employee** 15:20 245:9 321:7,10,20
**employees** 12:2
**employers** 13:11,18
**employment** 13:9 14:2,23 15:10,13,15, 16,23 16:4,22 23:4,12 29:5 30:7,20 31:18 68:10 131:4,15,24 136:16 138:12,13,15 157:14 201:8 202:18, 19 203:12,18,20,23 204:6 205:6,11 225:11,17,18 226:3, 11 234:14 235:19 239:9 240:5 241:6,7, 11,16 242:22,24 243:4,6,8,22
**employment-related** 10:14
**enabling** 178:21
**encompassing** 52:16
**end** 56:11,13 123:9 124:4 158:14 190:13, 17 191:1 234:12,17, 18 304:21 352:17 353:5
**ended** 225:2
**ending** 287:20
**ends** 355:4
**endured** 152:7
**energy** 22:5,8
**enforceable** 186:21 187:5
**enforced** 182:18
**engage** 131:2,5 157:12,15
**engaged** 82:3 132:11 135:18 150:18 311:9
**engaging** 145:22
**enough** 188:20 250:6
**ensure** 130:6
**ensuring** 80:23
**enter** 143:9 202:19 203:12 204:5 205:6,9 250:17 257:16
**entered** 9:21 163:13 218:18 281:13
**enterprise** 80:13 147:15
**entire** 195:14 208:20 209:15 210:21 218:12 223:10
**entirely** 280:14 288:19 291:18
**entirety** 16:20 52:6 130:6 197:17 202:5 245:18 256:2,22
**entities** 29:1 35:5 166:20
**entitle** 268:3
**entitled** 34:5 36:23 180:18 187:10 189:15 225:5 254:15 264:3 268:16 269:7 270:23 316:20 317:15
**entitling** 269:7
**entity** 24:12,24 25:8, 23 26:17 35:14 39:11, 17 40:17,19 41:19,22 293:12
**entries** 322:1,12,14,19
**entry** 323:15
**enumerate** 237:18
**episode** 155:2
**equate** 118:9
**equitable** 215:23
**equity** 82:5 83:13,15 84:22 85:2 89:17,19 93:17 94:15 102:2 103:14,24 104:2,9,10, 21 105:15,17 107:6 113:21,23 114:6,8 115:6,7 119:11,12 120:6,7,8,10 173:16, 17 274:9,12
**especially** 215:24
**established** 55:4 77:5 121:3
**establishing** 55:3
**estimate** 8:12 26:14 212:1 213:12
**estimates** 244:17
**estoppel** 228:22 230:13 352:19 353:6
**et** 66:18 74:9 162:23 214:7 233:14 240:3 281:3 319:3,13,15
**even** 63:8 74:21 87:7 94:12 111:24 145:15 146:15 167:11 175:9 179:13 187:17 189:17 201:20 205:10,12 215:14 238:12 256:3 288:22 296:1 298:12 337:23
**evening** 239:14
**event** 84:7 131:8 149:14 157:17
**eventual** 149:13
**eventually** 208:24
**ever** 12:10 13:10 17:4 30:19 31:17 34:11 38:6 61:3 67:3 92:4 94:23 103:22 104:2,8, 10,12 105:9,14,17 107:10,14,17,24 113:23 114:8,13 115:8,14 116:3 118:23 119:7 120:10 121:23 122:21 123:16 131:13 132:9 134:23 135:7 136:1,6 138:14, 18 142:21 143:8,15 144:7,17,18 145:13 152:4,12,17 155:11 156:19 157:1 164:6 165:19 167:2 169:11 170:4,16 176:16 177:8 183:9 191:17, 20 199:1,4 201:14 202:15 205:6 206:20, 24 207:2 208:19 216:23 219:5 221:23 223:8 224:3 229:19 241:14,22 242:16 251:20 256:11 260:18 279:19 280:9 282:7, 18,24 284:3,8 293:9 299:4 303:8,9 308:11, 15 309:18 310:2 329:1,13 346:18
**every** 156:7
**everyone** 156:6,11
**everything** 18:5 35:11 73:9 193:2 270:24 303:23 315:15,17 326:22 356:20 358:9
**evidence** 268:21 309:6
**ex** 156:4 162:24
**exact** 6:6 75:19 98:20 110:2 133:16 152:8 252:6
**exactly** 8:11 59:24 124:15 141:1 210:19 229:23 239:19 240:20 301:2
**EXAMINATION** 5:2 351:14 357:7
**examined** 4:24
**example** 76:13,15
**exceeded** 83:15
**except** 185:15,22 227:8,13 351:7
**exceptions** 173:17
**exchange** 145:20 202:21 203:14,24 204:6 205:7
**exchanged** 60:21 69:15 70:3,13,15 71:23 80:8 109:21 110:1,7 111:8 194:7 316:11 317:13 354:3
**exclusivity** 221:10 222:20 223:2
**Excuse** 78:8
**execute** 142:3 258:20
**executed** 139:5 145:16 222:17 345:19 356:7
**executing** 332:14
**exhausted** 29:5,12
**exhaustive** 188:12 200:20
**exhibit** 32:9,12,16 33:20,24 34:4 36:16, 19,23 44:11,14 60:2,3 80:6 112:10,13,16 121:1 125:22 126:1 128:15,18 140:9 148:22 156:4 160:3,6, 8,12 172:20 177:18 178:2 179:21,24 180:6 182:5,11,20,21 184:9,11 187:5 189:3 217:21,22 221:4 224:9 225:18 230:6 231:12 235:19,20 242:18,19 245:23 246:2,6,22 247:1 248:17,20 249:14 253:19,22 259:14,17, 21 260:5 262:14,17, 22,23,24 272:20 286:11,14 287:1,21, 24 288:1 290:2 293:15,18 294:2

Case: 1:21-cv-05709 Document #: 91-2 Filed: 01/31/25 Page 125 of 571 PageID #:895



301:15 307:1 310:13, 16,20 314:17 316:15, 18 317:16,20,23 318:1,4 320:24 321:3 325:4,7,10,17,18 327:22,23 328:2,6,16, 18,22 329:16,19,23 332:3,7,14,16 334:9, 12,16 342:23 343:2,8 345:7,20 347:15,19, 21 349:3,8,12 351:16, 22,23 352:10,11,22, 23,24 355:8 357:9,16, 20

**exhibits** 187:15 225:16 311:2

**existed** 72:3 108:14

**existing** 162:7 165:10 173:13 274:12

**exists** 315:7

**exit** 81:22

**expect** 156:7

**expected** 81:21

**expel** 175:6

**expelled** 167:4 176:6, 13,20 177:4

**expenses** 206:17 210:10

**expensive** 156:12 198:21 206:13 313:22

**experience** 32:16 45:12 149:7 166:6,7, 12,18 270:6

**explain** 116:12 131:3 157:13 163:1,10 192:18

**explaining** 45:14 197:10

**explanation** 305:13

**explicitly** 255:13

**explored** 41:10

**exploring** 167:20 168:17

**exposed** 195:6

**express** 151:14 158:18 165:11 182:22 187:19 202:15,22 217:2 270:15 338:9

**expressed** 154:7 157:21 174:14 187:4, 13 216:4 238:20

261:3 275:21

**expresses** 183:3

**expressing** 156:19,23 157:2 158:16 167:3 227:12

**expression** 229:5

**expressly** 185:15,22 227:8,14

**expulsion** 176:17

**extensively** 265:11,12

**extent** 11:21 14:17 23:17 28:18 42:6 46:16 65:14 90:4 125:2 159:19 256:16 313:7 338:5

**Exxceed** 30:11

**eyes** 163:15 219:17

**F**

**Fabulous** 168:18

**face** 156:8 225:13

**face-to-face** 357:4

**fact** 66:1 98:16 117:13 154:7 164:6 309:22

**facts** 54:17 268:20 309:6

**fair** 188:20 215:23 265:22

**fairness** 84:9

**fall** 162:17 356:17

**falls** 28:19

**false** 323:4,5

**familiar** 139:23 265:10,12 266:14,16 351:23

**Fantastic** 35:13

**far** 37:12,24 42:10 45:6 75:10 115:21 182:20

**fashion** 151:24 154:17 155:12 280:10 304:7

**faster** 72:5

**favorable** 292:4 354:15 355:5

**February** 16:1 80:6 133:18 161:3 162:7 174:1,4 175:19 176:12,15,18 177:3 249:3,5,23 255:2

259:11 260:2 263:1 287:4 290:21 354:4

**February-ish** 161:19

**federal** 44:22

**feed** 82:16

**feedback** 262:1 265:7 268:2 287:8,10,14

**feel** 118:11 174:17,20 271:3 295:18,22 298:10,17 299:15 303:24 304:6 312:20 314:4 334:2 339:24

**fees** 137:2

**felt** 200:20 202:6 256:4 265:5,8,19 282:2 299:17 301:3 312:24 313:21 330:15 336:7

**few** 149:5 168:6 343:11

**field** 22:4

**fifth** 250:14

**figure** 237:21 328:10

**file** 45:14 293:3

**filed** 6:3 9:12,13 18:12 37:15 40:11,20 41:12 42:1,4 44:10,20 45:23 46:3 200:22 345:11

**files** 45:13

**filing** 25:23 40:4 41:3 44:21 45:1 337:6 338:12 339:20

**fill** 343:14

**filled** 343:12 357:19

**final** 60:23 61:1,3,5,9 122:16 179:11 194:19 290:14

**finalize** 84:19 85:3,5 104:4,13,15 114:4,10, 11,14 116:6,9 120:13, 14,15 121:7,13 192:21 262:4,5 352:6

**finalized** 57:4,7 59:5,9 61:12,15 62:11 63:5, 22 65:16 66:4,21,24 69:7 72:18 73:2,7,15 77:10,13 85:4,10,16, 19 88:8 94:13 95:9,12 98:8,11,19 99:8,18 100:1,9 101:1,3 105:6,10,12,21

115:12 116:21 117:15 118:4,9,15,18,20 119:13 120:23 121:5, 10 134:24 135:22 149:20 183:19 233:24 235:13

**finalizing** 116:13,22

**Finally** 130:24 157:10 249:9

**find** 208:2 211:5 212:20 213:1 239:11 294:21 344:23

**fine** 28:10,13,22 49:12 61:8 72:16 76:3 80:4 114:15 122:2,3 125:15 132:24 134:12 193:16 257:9 289:24 290:13,21 291:2,19 292:12,16 293:14 347:10 358:8

**finish** 53:21 101:23 105:7 144:5 201:9 268:10

**fired** 15:8

**firm** 12:10 25:3 26:1 39:13 46:8,24 47:6,15 130:1 132:8,11 133:21 249:10

**first** 4:24 19:9 38:18 46:6 49:3 55:10 64:10,18,19 65:5,10 66:4,22 67:18 70:8,23 71:4 72:19 77:3 79:14,16 86:11,19 87:11 88:9 89:18,20 91:11,20,24 92:1,2,7, 20 93:18,22 95:1 101:4,14 119:21 129:9 133:3,5 147:12 148:23,24 166:17 180:15 190:13 191:24 192:4 193:20,21,24 194:2,8,20 196:14,17 198:11 200:11 203:18 207:19 208:7 211:6,8 212:19 214:16 224:20 225:6 226:17 227:1 230:21 234:18,19 249:1 250:15 251:14 266:5,10 287:3 318:14 322:14,16,17, 18 334:21 338:17 343:20 348:11 352:11

**five** 143:1 201:7 212:2 250:4,14 335:17 344:21

**flex** 84:22 94:10,17 95:5 100:16 101:16, 17,20 107:4 195:4

**flexibility** 247:4

**flexing** 85:2 95:2,3

**flip** 129:16

**fluctuation** 104:23 105:1

**focus** 82:21 290:17 301:18 333:4

**focusing** 331:14 333:20

**folks** 12:9

**follow** 99:18

**follow-up** 192:7 209:6 211:7 260:20,23 306:9,16,19 357:9

**follow-ups** 351:11

**followed** 73:9 170:8

**following** 83:1 96:1 103:1 173:17

**follows** 5:1

**footnote** 320:2

**for** 4:18 5:5 6:24 7:21 10:11 12:13 15:18 17:15 18:16 19:5 20:6 21:6,7 23:9,11,12,24 24:17 25:5,13,23 26:2,5,20,21 27:7,23 28:6 30:2 31:3,15 32:13,20 33:18 34:1, 14 36:20 38:9 39:17 41:18 42:2,6,10,21 44:15 45:4 47:16 48:2 50:22 52:6 54:9,10, 13,16,17 55:19 56:8, 24 59:15 67:11 69:24 76:13,14 78:22 80:7, 13 83:4 87:2 88:20 89:21 93:1 99:14 100:11 106:8 108:20 110:15 111:5,23 112:14,16 114:6 117:20 120:5 121:23 124:11,15 126:2,3,7 127:12,15 128:16,22 130:20 137:2,13,23 138:10 140:12 145:22 146:1,11,16 147:14

148:3,7 149:9 150:11, 23 156:8,10 157:22 159:2 160:7,9,18,23 162:1,3,4 164:16 165:24 167:9 168:11 169:8,15 170:7,14 171:12 172:10,22 177:21,24 178:16,21, 24 179:8 180:1 185:6 186:19 187:11 189:11 193:1 194:24 195:14 199:12,14 201:12 202:21 203:14 204:1, 6,19 205:7 207:15 209:5,23 212:1 213:10 214:20 215:23 216:5 220:21 222:7, 14 224:10,12 228:21 229:15 230:3,6,13,16 233:14 235:6 237:3, 16 245:18,20 246:3 248:4,21 252:10 255:20 257:12 258:7, 11,17 259:18 260:24 261:4 262:18,21 263:19 265:22 268:18 269:6 270:2,13 271:1, 18 272:20,21 273:11, 14 274:2,7,18 275:14 276:7,9 278:3,22 279:14 282:22 283:3 284:12,16 285:3 286:15 289:1 293:19 294:3,18 295:14 303:24 304:16 305:8, 13,22 306:13 307:4, 10 309:15 310:17 312:1 314:18 317:24 318:17 321:4 325:8 326:21 328:3 329:20 330:15 332:8 334:13 335:3,21 336:2 337:17,18 340:1 343:3,22 344:10 346:11 347:20 348:24 349:13 350:12,23,24 351:7 352:19 355:5 358:5

**forget** 250:8

**forget all** 192:13

**forgot** 302:13 303:8

**forgotten** 304:11,14

**form** 10:16 13:5,12,22 14:17 17:9 18:24 23:15 25:2 27:10 29:8 30:1 34:21 38:8 39:11 40:19 42:5 44:18 46:14 49:9 54:23 59:14 61:4 62:12 66:11 69:10 71:16 76:18 77:15 79:10 86:13 87:1 93:2 94:7 96:9 102:6 110:3 155:11 172:3 181:21 183:7 191:2 200:6 209:4 226:2,7,9 237:2 253:3 284:11 324:11 332:14 343:11 354:1

**formalize** 80:9

**format** 44:19 45:9,14, 21

**formed** 18:22 29:16 38:18 257:20

**former** 149:11

**forming** 29:15 39:20 40:17

**forth** 64:7 65:12 97:2 136:11,16 145:11 185:15,22 189:22 203:21 227:9,14 250:18 259:11 296:22

**forward** 65:18 79:2 85:7 86:2 88:2 90:4 98:6 100:12,20,21 103:18 117:4 193:3 197:15 222:8 225:3 249:21 271:24 329:8 352:7,8

**forwarded** 130:4

**found** 122:6,11,19 123:11,13

**foundation** 14:17 34:22 49:9 128:3 168:10 313:13

**foundational** 54:17

**Founder** 21:13

**four** 122:8 201:11 250:14 335:12

**frame** 27:12,13 49:16 70:6 133:1 137:24 304:4

**Fran** 126:13,16,17,19, 20 127:11,14 134:3 154:11 178:14 251:3, 22,24 255:18 269:21

**Fran's** 130:2 249:10

**Francisco** 6:4

**Frank** 12:9

**frankly** 52:18 154:20 172:16 257:5

**fresh** 89:11 96:24 97:10 100:5 102:21 125:8 143:6 169:10 300:13 324:22

**Friday** 287:8,10 353:23

**from** 10:8 12:14 14:6 15:14 21:21 22:2 23:23 24:3 31:15 33:2 37:16 45:1,6 50:2 51:19 57:11 59:2 66:2 75:1,21 76:24 79:2 81:22 85:3 87:15 88:1,2 90:18 106:6 108:1 109:7,18 112:19 126:8,9 128:5, 21 129:12,17 131:11 132:8 134:23 150:4 151:2 160:14 164:15 169:17,19 173:6,9 176:20 195:14 203:8 214:16 215:4,8 218:13 221:6 224:14 225:8 226:1,8,10 229:1 244:20 245:12, 14,20 246:8 249:1,23 251:20 257:19 260:22 261:24 263:2 264:9 265:7,24 267:20 268:2 282:18 287:8, 10,19 298:14 301:9, 10 308:7,8,9,10,17 311:3,4 318:6,13 319:1,21,22 321:11, 17 322:16,17,18 323:2 325:2,11,19 326:4,20 330:1 334:18 338:14 341:9, 19 342:1,17 343:5,9 344:19 349:16,21 350:7,16 353:9 354:10,17 355:18

**front** 90:7 273:19 348:12,13,19,24 349:16 353:2

**fucking** 220:19

**full** 5:5 149:8

**fully** 165:2 195:6,8

**fund** 35:22

**funny** 144:8 210:7 220:19,20

**further** 82:3 107:9 127:10 247:3

**furtherance** 80:12

**fuss** 136:22

**future** 61:23 62:4,17 63:6,18 103:13 150:5, 18 151:9,20 154:8 155:14,16 198:3 231:17 233:4,5

**G**

**G-I-O-R-A** 19:12

**game** 118:11

**games** 121:17

**gave** 31:3 49:13 63:5 92:22 244:22 300:11 315:17 325:23

**general** 8:24 24:7,8,10 26:11 37:3,24 105:24 116:17,24 155:15 172:13 223:9,17 237:8

**generally** 22:6,9 24:14 68:5 81:4 141:16 154:6,7,18 155:8,13 172:11 175:22 237:23 302:12 312:23 313:3

**gentlemen** 6:9

**genuine** 302:1

**get** 13:1 14:5,14 19:23 21:3,24 22:2 29:18 41:11 49:1 50:14 51:12 58:9 59:8 66:14 67:22,24 72:15 74:7,9 79:8 80:21 91:3 94:18 104:7 115:21 121:21 124:2 127:12,15,24 129:2 130:19 132:24 133:24 134:7 136:11, 17 139:16,19 140:8 144:16 145:15 147:3, 17 151:11 152:3 153:5,14 155:9 157:5, 22 158:10,13 159:15 168:16 170:22 176:5, 13,19 177:4 183:17, 20 192:8 198:22 200:9 210:8,14 213:17 229:1 234:11 235:9 237:21 239:18 243:16,18 258:13 279:23 281:6,9 282:14,18 290:17 298:5,10 299:4 308:12 314:20 340:4 343:5 351:12 358:3, 16

**gets** 138:16 202:10

**getting** 18:9 145:13 150:14 163:6 165:12 169:22 174:18 195:23 228:9 313:22 337:8 340:3

**Giora** 19:4

**give** 6:18 7:9 14:14 26:14 28:8 30:7 54:3 60:14 64:16 66:9 77:2 78:17,18,19 79:7 87:6,7 90:21,23 91:3 93:1 98:12 105:12 121:22 157:8 194:23 236:11,18 245:14 258:15 261:24 262:1 263:22 270:20 283:5 284:17 307:5,7 308:1 313:10 334:20 344:18

**given** 5:11 9:23 31:14 36:4 123:5 150:15 213:12 236:19 339:10

**gives** 45:12

**giving** 6:15 158:9 338:22

**Gleckler** 4:3 48:2,6,19 50:2 80:7 81:17,18, 20,23 82:2,12,22 83:11 95:23 97:2 102:1,22 103:23 107:7,18 126:11 161:1 178:11 184:21 224:15 254:20 259:24 293:7 311:3 325:18 343:21 345:14,22 346:9 348:24 349:17 350:2,7,8 356:8

**Gleckler's** 48:4,14 49:18 80:12

**Gmail** 224:16 249:1 263:8

**go** 19:11 24:1 33:11 34:23 42:9 61:11

70:18 72:4 85:7 88:22 89:3 106:13 114:23 125:13 139:15 149:5 153:14 154:20 158:10,13 159:9,23 160:8 163:5 165:11 166:2 168:15 169:2 173:1 183:2 197:6 199:2 220:20 225:15 242:5 254:16 264:19 266:12,18 272:20 287:8 299:18 301:6 303:5 313:9 319:7 323:10,22 324:4,22 330:21 344:23 345:9 348:14,19 350:5 351:1,10 353:4

**goal** 156:5,6

**goes** 275:13

**going** 14:11 15:12 21:4 27:10 28:3,5,15 34:18 39:6 42:22 43:17 44:3,18 46:14 47:24 49:8 58:15 60:6,15 61:4 65:11 67:23 72:4 73:5 81:23 85:20 86:2 88:1 89:6 98:12 102:17 106:1 107:13,14 111:1 117:4 118:2 121:15 123:3 125:21 127:14, 24 130:15 135:17 140:23 142:2 150:21 151:15 154:10 156:5 163:5 164:14,21 172:24 173:13 174:13,18 185:17 192:7,15 193:3 214:8 217:5 220:8 221:9 222:8 238:9 239:1 240:20 250:20 251:18 254:17 257:14 258:10 260:20,23 261:4,14, 15,16,18 264:21 267:17 286:16 294:18 295:1 296:8,21 301:18 306:22 311:7 313:6 322:4 334:21 340:21 344:20 345:12 348:8,14 354:16 356:23

**Golan** 46:6 47:8 132:8

**gone** 6:13 64:7 90:10 169:21,24 170:1,3,5, 10,14,15 240:22 271:10,16 272:2,3,11, 18,19,20 275:20 280:20 282:3,8,10 356:13,16,20

**good** 5:4 67:6 84:20 139:11,21 157:22 159:2 261:12,17 264:21 295:9 341:11 342:8

**Google** 281:2 285:12, 14

**Googled** 266:17 285:9

**got** 9:12 32:20 44:23 45:16 54:10 61:24 88:19 105:2 120:18 134:11 146:3 163:11 169:11,16,20 193:3 237:3 252:1 273:19 280:18,20,24 282:3 284:3 286:6 293:22 300:20 316:5,6 340:22 346:4 347:24 351:19 353:5 355:12 356:17

**gotten** 93:9 113:6 163:8 261:19 280:22 353:9

**govern** 218:10,14,22 219:3,22

**governance** 80:11 335:14

**governing** 184:24 185:11 218:5,23 219:5 221:8

**governs** 330:24

**grand** 294:18

**gray** 117:2,6,9 260:1 301:18

**great** 30:16 74:5 79:21 86:6 103:19 107:10, 24 112:9 113:13 115:22 135:2 143:7 157:1 166:4 167:24 173:15 177:23 181:18 183:24 188:22 205:14 210:24 211:20 214:12 282:7 290:10 295:13

**Greek** 24:7

**Griesing** 129:20,22 131:1 157:10 178:13, 24 179:8 215:21 216:16 316:22

**ground** 6:14 88:19

**group** 12:18 31:5,6,8, 9,10

**grow** 55:9 83:14 91:5 93:13,21 94:5,15

**growing** 100:22 149:6

**growth** 31:12 246:24

**guess** 13:14 23:21 38:16 56:11 58:13 86:12 94:9 96:9 106:14 108:13 147:21 158:12 167:22 173:14 210:2,5,6 249:20 257:14 278:17 282:22 289:2,21 299:12 313:12 319:7,17 347:8,9,12

**guessing** 210:3 304:17 306:3,5,6,12,15

**guest** 348:20

**guy** 151:3

**guys** 22:7 64:4 66:20 83:7 85:11 96:7 97:24 133:13 173:12,22 192:8,9,19 193:7,22 198:6,10,18 233:24 235:13 238:22 239:21 240:13 241:17 248:9 272:19 286:16 289:6 296:1 297:1 352:2 355:2

**H**

**had** 6:9,10 9:1,14 10:2 12:10,14 13:2,17 14:7 15:16 16:7 17:13,17, 20 30:19 34:7,11 51:5 57:23 60:20 62:2,6, 14,17,22,24 64:6,7,8 74:3,6 77:9 81:8,13 83:20 84:7 86:2 90:10 94:11 95:8,17 97:15 99:19 100:13 101:1,3, 10,18 102:8 103:5,6,7 107:9,13,20 108:19 109:21 117:16 119:1 122:1 123:21 132:5, 20 134:17 135:3 138:2,10,12 141:14, 23 144:5 146:21 147:22 148:17 150:7, 15 161:13,18,20 162:7,20,22 163:7 164:4,13 165:3 166:7, 11 169:12 173:22 174:2,3 175:4 176:12, 19 181:24 187:14,16, 19 190:16,19 191:8 192:12,22 196:15 197:13 198:9,21 199:12 201:19,20 207:1,2,5 208:5,13 209:22 211:9,18,23 216:4,15 218:8 221:13,22 222:23 226:2,7 229:2 233:6 243:21,23 247:13,15 251:3,24 252:1,3 256:24 258:9 260:16 264:11 266:3,21 269:12 270:22 271:13 272:13 274:24 281:15,23,24 284:1 287:4 289:6,10 290:8 291:12,14 298:8,9,13 299:17,22 301:1 302:21 304:21 305:18 307:17,20 309:7,10, 12 310:3 311:5,9,13, 19 312:10 315:15,17 316:6,8,14 317:3 324:1 325:19 327:9, 13 328:24 330:5 335:16 336:5,6,17,23 337:3,15,18 338:23 339:23 341:8 348:4 353:9 355:7,22 356:5, 7,10,18

**hadn't** 95:6,8,11 173:11 174:16 175:9, 11,13 219:1,2 256:3 258:9 296:3 309:3

**hairs** 56:16

**hand** 321:8 322:1,2

**handle** 28:22 72:16

**handled** 175:19

**handling** 40:9 156:9

**hands** 85:11

**handwritten** 83:7 108:8

**Hang** 274:1 275:4 287:12

**happen** 15:24 152:9 175:16 208:6 209:19, 24 211:1 273:20 303:9

**happened** 49:19 74:22 103:13 106:5 115:23 119:19 151:16 152:1 153:20 208:14 210:20 213:20 250:8 301:4 306:13 329:11 338:10 351:3

**happening** 150:4 196:24 260:7

**happens** 167:8 169:4

**happy** 249:12 251:11 308:22

**hard** 199:12,13 274:5 321:8

**has** 6:13 25:19 27:7 39:15,18 115:3 168:8, 20 172:7 187:9 253:4 276:23 287:2 307:7, 14 322:9 328:10 335:1,2 337:7,23 338:12 348:23 357:13,14

**have** 5:7,11 7:11,19 8:18 9:1,5 10:14,22 11:10,13,23 12:12 14:13 15:15 16:3 17:8 18:17 19:17 21:5,9,12 23:5,14 24:4,6 25:10, 22 26:1 27:18 28:11 29:5,6,14,20 33:15 35:2,18 38:6 39:1,5,8 41:21 42:3 44:9 45:12 46:21 47:8,11 57:7 58:4 60:6 62:10 64:23 65:1,3,8 66:1 71:6 73:1 76:10 78:22 82:8,9 85:4 87:20 88:2 90:24 102:5 106:6,20 109:24 110:9 113:5 115:20 117:16 119:5 126:5 127:6,8,9 128:8,9 130:11 131:2 133:18, 19 135:14 137:9,16 146:16 147:14,16 148:8 149:9 152:12 156:21 157:11 159:3 160:1 161:10,12,15, 17,20 163:11 165:11 166:7,11 167:2,5,6,7, 19 168:1 169:1,18 170:12 171:1,3,21

172:17,19 175:13 176:11 177:3 180:5 183:5,16,24 188:7,12 189:1,4 190:9 191:4 192:23 194:9 195:17 196:9 198:17 199:19 200:19 201:18,22,24 202:3,4,22 203:20 208:13 211:3,18,23 212:17 213:6,13,14, 15,22 217:9,14 218:16 221:12,18 222:5,14 225:21 226:21 228:10 233:13 236:10 239:1,9,14 240:11,16,22,23 242:6 243:24 244:16, 18,20,21,24 245:1 247:2,4 248:6 249:8 251:21 252:11 254:8 256:20 257:4,8,23 259:4 261:19 264:7, 11,13 265:3,19,23 266:3,17 268:1,13,17 269:6,23 270:6 271:7 272:19 273:12 274:11 276:5,12,15 278:6 279:16 280:6 281:9 284:5,10 287:7,9,17, 22 292:2 293:13 294:24 295:11 296:9, 11,13 299:23 300:3,7, 23 302:19,22 303:10 304:10,13,14,16,20, 23,24 305:8,12,13 306:4,13 307:5,22,23 308:3,13 311:23 312:3,8 313:23 314:9 315:18,19 316:1,13, 14 317:11,12 318:10, 19 319:4,5,11,12,17 320:12,16 321:9,22 324:8 325:10,24 326:20 327:17 330:12,21 331:24 333:12 335:18,21 337:5,9,15,18 338:10, 11 339:3,6,8,12 340:9,10 341:7,11,13, 18,20,21,23,24 342:6, 8,17,19,21 344:17 347:1,8 349:23 351:4, 10,11,13 354:17 355:19 357:4,6,19 358:1

**haven't** 28:11 29:16 123:5 314:6 315:5 316:4

**having** 4:23 11:5 90:19 104:16,23 105:1 117:13 118:3,4, 9,16 120:15,16 121:8 129:1,3 133:6 139:10 144:24 153:24 154:11 156:16 180:15 181:9, 12 207:24 225:23 238:17 265:7 274:21 292:1 308:10 336:14, 21,24 339:22

**he** 26:4,7 27:15 28:16 36:5 42:24 43:2,5 47:15 48:14,15 49:12, 13 52:12 54:17 55:1 58:1,5 61:7,8 68:22 69:15 73:5 86:16 88:14,17,18,19,20 102:17,18,19 110:6 113:9,10 115:18,19, 20 121:15,16 124:22, 23,24 125:4 137:16 150:13 159:17,24 163:13 164:4,5,14 165:17 168:12,17 172:6 189:14 194:11 209:8,15 237:5 253:4 263:14,15 270:4,5 273:17,18 282:23 283:1,2,3 284:22 285:3 293:5 298:23 300:11 306:8,9 309:11 327:9,11,17, 18,19,21 331:4,14,18, 20 334:3,24 335:2,6 338:21

**he's** 52:13 55:1 88:19 159:17 209:7 237:3 273:19 346:5

**head** 169:21,24 184:5 199:2 220:7 251:19

**header** 318:14

**heads** 221:16

**healthcare** 76:14 240:3

**hear** 8:3 14:11 82:11 299:12

**hedge** 35:22

**height** 188:3

**help** 115:17,19 188:15 225:22,23

**helped** 25:2 35:22 39:11

**helpful** 90:20

**helping** 126:21,24 129:24 195:15

**her** 8:21 21:4 48:2,21 51:24 53:1,19,22 82:1,10 84:6 101:9 109:9 149:10,11 151:16 153:8,18 156:3 157:1 158:5,16, 20 163:3 165:10 169:24 181:5 201:20 202:5,7 203:6 206:15 207:1 210:9 213:10 214:14 215:8 216:16 219:23 220:7 221:13, 15 222:6 223:22 224:16 227:12 228:16 231:19 233:10,20 239:3,10 241:2 242:11 244:19 247:7, 9,16 248:3 249:1 253:11 254:21,22 255:5,6,10,22 256:8, 10 257:14,19 258:13 261:20,24 262:1 263:8 271:6,22 272:15 273:6 279:4,5 285:20,21,23 297:13 298:14,17,24 299:2, 16,19,22,24 300:4,5 302:3,19,20,24 303:2 304:6 307:23,24 308:10,17 309:18,19 310:2 312:21 315:19 330:9 331:10 333:19 339:2 340:6 342:16, 20,21

**here** 4:2,18 6:14 7:22 33:16 35:12 39:14 42:2 47:16 48:20 49:7 52:13 60:13 74:8 80:23 81:1 84:13 90:1 91:1 95:19 113:13 115:3,4 144:8,10 148:10,15 151:4 156:2 170:20,22 177:17 184:3 188:13 190:1 202:11 207:11 210:10 213:17 216:12 229:7 231:9 233:11 234:3 235:18,20,21 236:13,20 237:18 239:20 263:24 271:1, 24 281:4 292:19,24 305:14 308:21 314:8 320:11 321:19 328:21 348:23 349:21 351:11 352:11 354:13

**here's** 109:15 242:13 298:15

**herein** 4:23 185:16,19, 24

**Heroshi** 154:24

**Heroshi/seltzer** 155:2

**hers** 240:6

**herself** 308:1 311:5,6

**Hey** 67:6 82:6 109:15 113:13 159:15 196:16 198:13 294:17 295:1 298:15 300:20 302:20 310:9 319:12 338:21

**Hi** 249:9 287:7 307:2

**Hickman** 4:15 45:10, 17 163:16 185:24 328:12

**highlight** 257:8

**highlighted** 256:4

**highlighting** 249:11 257:7

**him** 8:5 42:22 43:18 44:7 48:2 49:13,14,15 52:10 61:19 69:13,17 71:7,8,9,22 72:24 100:5 102:13,14,15, 16 121:15,22 141:18 150:12 152:22 168:14 172:4 253:5 263:21 273:19 278:8 282:23 286:4,5 298:23 300:13 333:17,20,22 337:18 339:21 340:6 342:1 351:8

**himself** 164:15

**Hippocrates** 5:10 161:2

**hired** 153:7,18

**hiring** 150:14 215:20

**his** 43:4 52:12 54:1,17 58:4 61:16 81:22 82:4,24 87:3 88:21 96:1,18 100:4 102:24 159:19 167:12 189:11 202:20,21 204:21 263:22 277:20,22 281:17 284:20 298:19 314:11 324:19 331:11,15 334:23 346:12 355:19

**history** 30:7 183:10

**hold** 14:10 267:20 283:5 315:21 343:4 358:17,18

**holder** 178:20

**holding** 238:10

**holidays** 356:23

**honest** 7:9 71:6 164:4, 5

**hopefully** 261:6 262:2

**hopes** 261:18

**hour** 125:1 225:13

**hours** 8:13 235:3 340:16,22

**house** 326:4

**how** 7:19 8:7,10 18:2 19:21 21:15,18,20,22 24:17 29:19 37:8 39:17 46:1,2 50:7 51:4 55:9 67:9 72:15 77:21 85:4,7,8 102:9 111:3 118:6 119:5 122:8,14 123:7 151:19 156:13 159:22 163:5,9 165:11 166:2, 7,9 167:3 168:9 169:15 174:24 175:5, 13,18 176:19 186:19 187:24 190:3,11 191:9,11 192:8,20 193:7 196:15,18 200:20 201:16 204:12 212:1,7 213:8 214:4 222:10,12 225:10 226:13 232:24 239:19,20 241:6 243:12,15,18 245:8 253:12 268:14 269:10 271:4,7 273:12 279:20 280:2 282:10 289:13 292:3 294:11, 15 296:15 297:8 301:6 303:15 310:6 319:14 341:24

**however** 72:16 159:12

**Huh** 347:3
**hundred** 24:22 343:22
**hyphen** 338:18
**hypothetical** 106:10, 15,16 117:21 146:12 167:10 169:8 172:10

**I**

**I'D** 67:8 72:8 106:14 125:13 167:22 195:16 203:20 210:10 236:10 252:11 295:11 319:7, 17 347:7 351:10
**I'LL** 10:19 23:21 28:7 47:22 71:6 96:9 104:7 143:6 152:3 217:18 254:24 264:20 272:8 282:12 298:6 309:24 313:12 344:23 351:12 355:2
**I'M** 6:13 14:11 18:15 20:1 21:5,9,11 22:15 26:23 27:10 28:15 29:15 35:7 37:17 39:19 42:22 43:17,24 45:6 46:2,14 47:23 49:5,6,8 52:6,14 54:16 55:3 58:3,8 60:8 61:4,16 63:13 67:22 68:6,19,22 69:10,13,17 70:9,16, 19 71:13 73:21 74:5, 11 76:10,18,24 78:15 82:6 84:4,5,16,21,24 85:20 87:3,9 89:18 90:1 91:2 92:16,23 93:9,23 95:15 96:16 97:16 98:3,12,20 100:5,23 103:12,19, 20 105:10 106:1 111:14 113:7 114:21 115:17,22 118:11,13, 22 120:21,23 121:9 124:9 125:5 126:13, 16 129:12 130:5 132:13 133:3 136:14 137:15 142:18 144:1, 4,12 150:12,13 154:14,16,20 155:6, 19 156:5 158:8 159:7 167:20,22 168:5 169:22 170:1 171:2, 15 172:6 175:2 186:7 188:19,20 191:3 192:3 194:5,13 195:23 197:3,4,6,10 199:2 201:23 203:16 204:21 207:4,6,15 209:12 210:17 213:5, 17 214:4,6,8,18 216:5 217:16 221:9,18 223:1 225:8 226:14 228:1,7,9,12 230:14, 19 232:10,22,24 236:17 237:5 238:10 239:18 242:12 251:7, 13,18 252:20 254:5, 17 257:14 263:23 265:2,11 266:16 267:14,15 269:15 270:5,9 275:16 281:8 283:2 284:16 285:10 286:7,16,24 287:20 290:16 291:5,9,15,23 293:5 294:17 295:1 297:15,16 298:23 300:13 301:18 306:4, 18,22 307:11,19 308:22,24 311:20 312:4,16 313:15 315:3,12 319:17,20, 24 321:11,21 322:11, 16,20 324:5 326:19 328:9,17 333:24 334:21 337:4 338:23 340:20 344:13 345:12,23,24 346:7 348:11 350:17 351:6 354:2 356:12
**I'VE** 12:14 24:15 93:9 103:17 120:18 156:1 174:23 195:13,15 213:12 252:18 256:24 316:5,6 329:7,13 338:16 358:3
**I-N-Y-A-N** 22:19
**i.e.** 28:5
**ID** 321:7,10,14,20 324:1,4
**idea** 139:11 157:22 159:2 257:4 318:19 349:23 350:17,18,20, 21
**identical** 120:17,19 307:21
**Identification** 32:13 34:1 36:20 44:15 112:14 126:2 128:16 160:7 180:1 224:10 246:3 248:21 259:18 262:18 286:15 293:19 294:3 310:17 314:18 317:24 321:4 325:8 328:3 329:20 332:8 334:13 343:3 347:20 349:13
**identified** 349:20
**identify** 49:15 184:3 319:1
**identifying** 321:15
**if** 6:16,18 7:1 9:10,12 13:6,13,17 19:9 20:4, 11,22 22:1 23:19 28:12 34:7,20 35:7 39:11,14,18 43:2 44:7 45:11,22 46:3 47:2,23 48:15 49:13 55:17 58:3,4,12 61:8 63:8 65:2 67:9 68:19,22 69:14 71:22,24 72:5 73:17 78:7,18 80:20 81:15,23 84:11,21 87:18 88:17 89:5 91:3,17 92:11 94:8 96:11 97:10 99:12,18 106:4 113:2,9,14 114:14,16 115:19,21 117:16 120:23 121:9, 15 126:5,7,22 129:7, 16 130:23 131:5 134:6 136:11,18,21 137:10 138:5 146:15 147:4 148:21 150:5 153:17 156:4,9,11 157:15 158:13 159:9, 14 161:5,8 163:14 165:6 166:11 167:20 168:14 169:11 170:4, 8 171:2,20 172:6 173:18,20 175:4,12, 16 176:5,13 177:4,10 184:6 187:8 188:10, 24 189:7 192:5 197:21 199:4,20 200:19 202:7 204:13 205:14 206:6 210:10, 12 216:9 221:5 225:5, 15 226:3 228:9,13 230:18 231:23 236:4 237:5 238:12 239:3 240:11 242:18 249:18 250:13 253:5,6,19 254:15,16 256:3 257:4 258:16 260:1,4, 8,18 266:3 267:24 269:12 271:8 272:17, 18,22,23 274:10 276:19 277:1 278:20 280:2 283:20 284:9, 12 285:3 286:1,5 290:17 294:8 300:5 301:17 304:10 306:4 307:4 308:21,24 309:23 313:5 315:6 316:2,3 320:1,7,11 321:18 322:15 323:21,24 326:6 329:3,4 330:20 332:11 337:22 340:20 343:20 345:18 346:2, 15,24 347:5,12,13 348:3 349:4,9 353:4 355:13 356:12 357:10,18 358:15
**IG** 178:24
**ignoring** 210:17
**Illinois** 4:10 7:14 24:24
**image** 45:12
**immediate** 358:16
**impact** 271:5 274:11 281:15,24 284:5,10, 18
**impacted** 271:7
**impair** 7:8
**implies** 118:19,20,22
**implying** 151:23 169:20
**important** 200:21 201:2 213:18 330:15, 18 340:1
**impression** 270:20
**improve** 35:23
**in** 4:3,10,20 5:14 6:3,5 7:7,14,17 8:24 9:23 10:9,21,22 11:7,8,10 12:18,21 13:10 15:9 16:20,23 17:1,7,8 18:8,12,22 20:5,23 22:4 23:16 25:18,19, 22 27:11 28:5 31:11 32:1,2 34:9,13 35:21, 22 36:8 37:4,10,15 38:2,6 39:20 40:11 42:3,12 44:10,20 45:8,21 47:19,23 48:3,5,8,11,18,23,24 49:2,3,9,22 50:6,8,12 51:6,9,17,24 52:7,13, 16 53:2,6,22 54:5,10, 21,24 55:11,13,15,24 56:1,3,4,6 57:4,8,11, 13,15,18,24 58:2,10, 17,21,24 59:2,3,12, 19,23,24 60:1,3,14, 18,22 61:5,12,22,24 63:2,19,21 64:3,10,16 65:10 66:18,19,21,22 67:2,18 68:1,11,17,24 69:4,8,11,19 70:5,20 71:17 72:14 73:3,8, 15,16,22,24 74:15,19, 22,23 75:5,7,8,11,16, 17 76:13,19 77:4,5,9, 23,24 78:17,24 79:13, 21 80:9,11,18,22 81:1,7,17,19,22 82:2, 5,8,9,10,23 83:1,11, 19,21,22 84:7,8,12,17 85:18,24 86:3,13,21, 23 87:8,10,18,21 88:8 89:14,19 90:7,13,22 91:2,6,20,21 92:2,4,5, 7,12,18,24 93:14 94:1,20,21,22,24 95:1,11,20,22,23 96:8,18,21,22 97:3, 11,13,16,19,20,22 98:1,4,8,11,19,21 99:7,8,12,13,17,18, 20,23,24 100:9,10,18, 20 101:2,4,5,13,23,24 102:1,3,10,12,23 103:3,11,13,16,21,23 104:1,9,22 105:14,16 106:5,9,17 107:1,6,7, 11,14,16,18,23 108:1, 2,14,19 109:16,17,21 110:22 111:9,14 112:6 113:3,4,15,21, 22,24 115:6,9 116:3, 6,17,24 117:2,18 119:11,21 126:22 127:2,10,17 129:2,10 130:1,5,17 131:4,8,24 132:3,6,11,16 133:14, 24 134:1,13,16,18,21, 23 135:3,18 136:8,13,

20 137:20 138:7,24 140:1,19,24 141:15, 16,19,22 142:8,11,14, 22 143:20 144:2,13, 17,20 145:4,5,8,9,10, 18,20,23,24 146:4,10, 17 147:4 148:5 149:3, 6,12 150:5,14,18,21 151:10,24 152:9,12, 15 153:5,6 154:8,17, 23 155:11,14,16,22 156:7,16 157:13,17 159:1 161:13,21 162:17,18 164:6,14 165:2 166:6,20 167:2, 7 168:1,13 169:21,23 170:9 171:5,22 172:19,20 173:8 174:3,14,15 175:12 177:18,21 178:22 179:13 181:9,14 182:24 183:9,10,19 184:17 185:2,8 186:7, 17,23 187:4,11,14 188:2,16,17,23 189:2, 4,12,15,23 190:7,9 191:1 192:1 193:3 194:3,8,10 195:1,8,9, 17 196:19,20,24 197:17,21 198:2,10 199:1,11,13 200:4,5, 8,14 201:21 202:5,9, 20 203:1,2,6,14,24 204:4,6,14 205:7,19 206:14 207:23 208:4, 11 209:20,24 210:13, 20 211:4 214:18,20, 23,24 215:5,6,11,12 216:12,19 217:8 218:5 219:1,4,7,9,10, 12 220:7,15 221:15, 22 222:3,23 223:7,9, 17 224:3 225:1,13,22, 23 227:18 228:4,8 229:4,23 230:5,10,15, 17,20 231:12,17,24 232:8 233:4,5,8,22,24 234:6,8 235:2,13,17, 21 236:2,7 237:7,24 238:1,2,14,18 239:12, 20 240:7 241:7,8,14, 22 242:2,20 244:5 245:21 246:15,22,23 247:3,12,22 248:4 249:15,19 251:5,18 252:10,14 253:4,12 254:3 255:18 256:1,7, 22 259:5,11 260:5,14, 16,24 261:8 264:21 265:22 266:6 267:1,5, 6,12,16 268:17,20 271:1,21 272:9 273:15,19 274:5,21 275:10,21,24 279:17, 24 280:7,10 281:15 282:1,20,21 283:13, 17,21,22,23 284:2,5,9 287:16,24 288:17 290:1,21 291:5 293:22 294:11,14,15 295:12 297:13 298:13,14 299:13 300:4,6 301:20,21,24 302:2,10,14 303:6,7, 24 304:4,6,7 305:4,5, 9 306:9 307:21 308:10 309:6,22 311:8,9 312:8,11 315:2,11 318:6 320:2 321:15 322:6 323:2, 11,12,22 324:4,18 325:12 326:4 327:9, 10,14 329:5,23 330:10 332:15,22 333:1,18 334:19 335:11 337:23 339:2, 5,7 340:21 342:12 343:23 344:3 346:2, 16,17 347:5 351:7 353:2,17,21 354:4 356:17,24 357:3,13, 20

**inaccurate** 260:16

**inappropriately** 337:8

**Inc** 18:20

**include** 36:8 65:23 82:24 96:1 102:24 103:24 119:11 214:10

**included** 66:5 67:4 149:12 213:15

**including** 110:23

**incomplete** 106:9 117:21 146:12 167:10 169:8 172:10

**incorporate** 353:22

**incorporated** 287:8,15

**increase** 84:11 246:23

**increased** 104:9

**increases** 102:3 104:1 105:16 107:6 113:23 115:7 119:12

**increasing** 103:8,15 111:11

**incredible** 198:22

**incur** 137:10 210:9

**incurred** 137:1,2

**independent** 311:23

**independently** 339:15

**individuals** 12:5 19:19

**information** 19:24 42:22 43:15 113:6

**informed** 40:2,3,8 41:3 81:20

**informing** 41:16 339:21

**infrastructure** 80:16 162:22

**initial** 111:10 119:20 120:1 254:19 255:4 292:8,20 355:19

**initially** 83:13,23 89:13,17 123:21 350:19

**initials** 318:18,21

**initiated** 98:22 154:22 301:13 308:2

**input** 263:19 264:13

**inquire** 257:20 279:19

**instance** 108:20

**instead** 102:15

**instruct** 42:22 43:18

**instructing** 43:24 286:7

**Intellectual** 5:22

**intend** 228:7 257:12 271:21 274:21

**intended** 179:1 186:20 229:8,9,13 257:24 264:16 271:23 320:4

**intending** 233:11,13 258:1 261:2

**intent** 130:15 147:9 150:14

**intentio** 229:15

**intention** 175:5 222:3 227:20,23 228:4 257:15 260:14 261:3, 13,17,24

**interact** 327:6

**interacted** 11:22,23

**interaction** 12:3

**interest** 68:17 69:19 83:14 95:12 97:12 106:7,17 107:1,21 108:2 110:14,24 111:10 112:6 115:15 119:21 120:2 127:2, 17 128:1 130:1,17 132:6 135:21 142:8, 11 143:11,20 144:20 147:1 148:5,15,19 152:20 155:23 163:20 173:23 187:11 202:21 204:1,7 233:24 235:13 236:2,15 238:14 253:2 254:22 255:6 274:10,12 277:20 280:19 281:16 282:1 284:19 287:19, 20 292:1 305:15,21 306:11,12 327:10,14 333:11 334:24 335:1 336:18,21 337:1 342:12 344:4 346:12

**interest-has** 336:16

**interest-member/ owner** 336:15

**interests** 108:11 189:12,13,14 203:14 205:8 233:12 277:22

**internet** 326:6

**interpret** 159:12

**interpretation** 296:21

**interrupt** 82:6,19 88:23

**Interworkings** 28:2

**into** 37:10 51:7 72:15 84:9 94:12 114:23 143:9 163:13 189:10 202:19,20 203:12,13, 24 204:5 205:6 218:18 228:23 244:10,14 250:17 254:19 257:16 264:13 281:13 294:5 295:4 311:1 345:13 356:23

**introduce** 4:11

**introductory** 357:11

**invested** 31:11 35:21

**investment** 31:10 73:16 195:9

**investor** 31:24

**investor's** 36:6

**investors** 12:18 36:3

**involve** 148:19 299:19

**involved** 10:22 11:8,9, 12,22 13:10 25:22 26:17 27:15 37:6 38:2,6,16 39:20 42:12 68:11,15 81:19 142:14 146:4 154:8 164:5 282:17 300:4,6, 8 327:20 329:5

**involvement** 11:10 12:22 35:20 36:1 37:9 38:1 42:3 46:13 108:19

**involving** 176:17

**Inyan** 18:19 19:1 20:5 22:2,3,13,22,23,24 23:8,9,11 26:8 32:21 37:24 38:12,15,18,23 39:1,17,21

**iphone** 126:12

**is** 4:4,5,6,7,9 7:2 14:9 18:20,22 19:3,12,14 20:13 21:7 24:7,8 25:11,18 26:10 32:17, 19,22 33:2,18 34:4,6 35:11 43:14 44:19 45:1,15 46:7 47:8,13, 15,22 48:1,7 49:3,14, 18 50:2,15 51:11 52:9,10,11,12,15,18 54:11,17 55:23 56:5, 14 58:8 60:5,8 67:6 68:22 70:2,20 73:5 74:2,7,8 75:1 76:2,17 77:16,22 79:11,17 80:6 82:13,14,16 84:13,22,23 86:21 87:12 88:10,14,17 91:24 92:8,16 96:2,4, 5,19,22 97:5,13,22 98:13,20 100:12 101:13,20 102:17,18 103:6,7,8 104:16 105:4,10,13 106:16 108:4,7,8,22 111:19

112:3,4,16,18 113:3 115:2,9 116:16,24 117:18 118:10,16 119:14 120:14,15,19, 20 121:8,15,20 123:8, 18 124:9,16 125:11 126:9,17,19,20 128:19,20,22 129:5,9, 16,20 130:7 131:21 132:20 133:7 134:14 135:2,4,9 140:9 142:1,15,20 144:9,10, 15 146:4,10 149:2 151:5,6,8 152:1 153:17,19 155:1,17 156:5,6,10 157:20 158:12,14,15,23 159:21,24 160:14,16, 23 161:3 164:1 168:2 169:22,24 170:2,19 172:8,21 174:1 175:15 176:20 177:13,19 180:8,18 182:11,17 183:1,2 184:11,14,16,19,20 185:14,21 186:11,19, 20 188:9 192:7,15,16, 18 193:16 194:6,19 195:22 196:2 197:12, 24 200:21,23 201:2,5 202:11 203:8 204:12 208:1 209:6 210:7 211:22 213:7,18 215:2 218:8 223:12, 14,16 224:12,14,20, 21,22 225:5,18 226:14,18 227:8 228:3,13,22 230:1,14, 24 231:1,2,7,10,17 232:15,17,24 233:5, 21,23 234:13,16,17, 23 235:4,10,23 239:13,18 240:14 242:8,9,12,15,20,23 244:2 245:21 246:7, 14 247:21 248:23 249:1,9,22 251:5,22 252:14,16,21 253:8, 24 254:3 255:22 256:4,14 257:21 258:22,23,24 259:24 260:7 262:9,20 263:12,14,15,16 267:4,5,11,19,20 270:4,16,19 272:2,9, 11 273:15,21 274:2 275:21 276:4,14 278:7 280:23 281:4 282:11 283:21 284:23 285:5,24 287:3,6,14 288:3,16 289:18 290:7,8,24 291:6,15, 17 292:20 293:1,5,11 296:7,17 297:9 298:18,20 300:14,22 301:19 302:2 305:3, 19 306:4 307:3,11,20 308:16,20 309:11,13, 16,17 310:22 311:8 312:4,6 313:13 316:5, 15,19 317:6,15 318:16,24 319:10,13, 18 320:6 321:6,11,19, 22 322:1 323:20,21 325:9,13 327:3,4 328:11,23 329:11,24 330:10,24 331:14,18 332:14,16,17,24 334:16,24 335:4,9 338:21 339:12 340:5, 19 341:5,15,18 342:14 343:5,8 345:10 346:24 347:4, 21,23 348:1,9,16 349:3,4,15,24 350:3, 23 351:2 352:13,18 353:8,24 358:8,14

**isn't** 144:8 261:21 350:24

**ISP** 326:9,15,21

**issue** 15:5,6 155:1 200:21 201:2 286:9 296:14 304:1

**issued** 188:17

**issues** 342:11

**it** 5:11,21,24 6:4,5,18, 19,23 8:10,22 9:12,13 11:10,18 13:1,14 15:8 16:3,5,6,11,13,18,19 18:22 19:11 20:13 21:7 22:4 24:7,8,14, 19 25:2 28:18,22 29:6,14,16 31:10 32:19,20 33:1 34:4,6, 16,22 37:7 38:18 39:15,18 40:11,18,24 41:1,2,10,16 42:6,10, 14,20 43:3,15 44:9, 20,21,23,24 45:7,12, 14,16,23 46:2 47:24 49:14 50:5,24 51:13 52:9,11,14 53:5,6,18, 24 55:17,23 58:8 60:5,7 61:13,14,15, 20,21,23 64:11 65:2, 5,9,15 66:14 69:3 71:18 72:4,13,15,17 73:6,8,11,18,20 77:12,16 78:21,22 79:11 80:24 81:5 83:6,8,9,11,14,22 84:5,15,16,17 85:6,18 86:16,17 88:18,22 89:4,6,11,16,17,20, 21,22,24 90:5,9 91:4, 5,13 92:11,23 93:13, 19,24 94:1,4,6,7,10, 17 95:2,3,4,5,17,22 96:17,22,24 97:5 98:1,2,13,16 99:2,21 102:3,5,10 103:7 104:21 105:1,2,3,5, 16,20,21,23 106:4,21 107:3,5,6,13 108:7,8 109:9,24 110:9,18 111:9 112:18,22,24 113:6,18,21,22 114:12,13,14,16 115:2,3,7,9,13 116:23 117:8,15,16,22 118:10,15,17,18,22 119:12,13,14,18 120:12,16,19,23 121:4,9,10,11,12,13, 16 123:1,5 124:18,19 125:8 127:21 128:5, 20 129:8,16 130:7,11 131:12 132:18 133:17,18 134:8,11 135:9 136:17,21 137:6,8,15 138:8 140:6,7,18 141:5,14, 23 142:15,16 143:4,6, 14,15,16,17,18,21 144:2,3,9,12,16 146:10,13 147:2,13, 21 149:17,18 151:8, 23 152:1 156:9 157:21 158:8,11,12, 13,18,19,21,24 159:2, 8,9,12,20 162:11,12, 17 163:3,7,23 164:4, 5,7,14 165:19 166:2 168:9,15,20,23 169:1, 3,16,17,20,21 170:2, 5,9,13,14,16,18 171:2,5,7 172:16 173:2,3,4,8,12 174:3, 5,6,8,12 175:13,14 176:10 177:19 178:7 179:9 180:18,21 181:1,4,5,11,12,13,20 183:12,15 184:16 185:4,6,18 186:5,6,8, 9,11,16,17,24 187:2 189:9,20,23 190:1,2 191:19 193:9,20 194:19 196:2 197:8, 14,15,17,19 198:5,16, 20 199:12,13 200:7, 21,22,23 201:1,16,20 202:11 203:1,2,6,7,9 205:5 206:13,14,15, 16 207:14,16,19,21 208:12,16,17,21 209:3,7,8,24 210:5,22 211:3,5,14 213:2,18 214:23 215:2,6,9,15 216:20 217:9,18 218:6,7 219:7,9,10, 12,13,15,17,18,19 220:9 222:11,13 223:7,12,18,21,23 224:21 225:1,10 226:19,20,21 227:11 228:11,16,24 229:16 230:21 232:1,6 234:16 235:4,6,17 237:23 238:16,18 240:10 241:12,19,21, 22 242:14 244:2,18, 24 245:11 246:11 247:7,13,14,15 248:11 249:7,15,22 251:15,23 252:1,7,8, 11,14,22 253:8,17 254:8 255:2,17 256:12,17,19,21 257:10,19 258:2,5,10, 15,16 261:6,7,11,13, 14,15,16,18,20 262:12,21 263:22 264:9 265:6,9,17,18, 22,24 266:2 267:11, 13,14,19,20 269:7,8, 12,13,16,19 270:5 271:16,23 272:3,18 273:6,8,10,17,18,19, 21 274:22,24 275:1,2, 3,8,12,13,23,24 276:2,11,12,15,21 277:2,3,12,13,24 278:2,8,12,15,17,18 279:12,17,21,24 280:20,21 281:1,3,5 282:3,5,7,8,9,10,12 283:7,23 284:1,18 285:9,14 286:1,6 287:2,6,7,18,21 288:16 289:6,9,10,12, 18,20 290:8,17 291:6, 14,15,18,24 292:4,13, 15,16,17 294:11,13 295:3,4,12,15,16,18 298:20 299:20 300:20,24 301:8,11, 24 302:2 303:1,3,9, 11,17,19,24 304:5,6, 11,14 305:5 306:15 308:7,9,20,21 311:1, 2,5,6 312:8 313:13,22 314:21 315:11 316:19 317:6 318:8,14 319:14,21 320:6,13, 15,16 321:19,22 323:17,18 325:1,10, 18 326:8 328:7,8,10, 11,21 329:5,6,24 330:17 331:12 334:16,21 335:24 337:14,16 338:1,17 339:16,24 340:13,21 341:7 343:8 344:19 345:13 346:4,17,21, 24 347:1,7,24 348:1, 2,3,6,9,18 349:5,20, 22,23 350:7,11,12,13, 18,20,21,23,24 351:6 352:2,9 353:14 354:22 355:2,12,18 357:23

**it's** 10:17 17:10 18:21 24:15 32:16,20 34:5 36:23 42:24 44:21 45:2 48:13 50:20 55:12 56:5 58:13,14 66:12 70:7 71:17 76:3 78:15 86:17 90:13 93:3 102:2 105:6 107:17 108:4,6,8,9 110:21,24 112:22 117:11,15 120:17 121:5 126:6,7,10 134:20 135:8 150:10

152:11 160:21,22 170:1,17 172:17,18 173:24 177:2,10 179:17 180:6,18 183:11 187:13 190:1 208:4,17 211:20 220:20 221:6 229:5,6 234:19 235:9 239:6 240:19 245:8 253:24 254:15 255:7 257:5, 11 260:5 261:22 263:2 264:3 267:23 274:5 279:21 281:7 283:22 285:4 302:1,4 303:4 310:20 316:20 318:11,14 324:2 330:13 333:19 338:4 339:10 341:17 343:11 346:1,2,15 347:22,24 348:4 349:6 350:4,14 353:5,10 355:10

**italicized** 184:12,13 352:14,17 353:1,4 357:14

**items** 63:8,9 353:22

**its** 16:20 31:6 36:3 49:9 80:15 130:5 197:17 256:22

**itself** 18:3 83:4 148:7 150:24 164:17 168:11 184:16 239:8 269:9 273:15 274:18

**J**

**J-A-N** 10:13

**J.P.** 126:8 325:11,20, 24 343:9

**Jack** 19:4

**Jan** 10:10

**January** 34:7,17 126:13,15 127:23 133:17 246:7,19 248:1,8 249:16,19,23 250:3 252:10,15 253:12,14 267:5,6,12, 16

**Japan** 11:7

**Jim** 4:13 28:3 67:6 72:8 82:6 90:10 100:11 102:14 104:22 118:12 119:18 120:22 152:15 153:17 154:22 155:20 170:17 173:2 188:21 197:4 199:10 210:16 220:18 254:11 314:10 340:16 353:16

**John** 341:18,19,22

**join** 48:2,21 51:24 53:1

**joining** 82:4,23 95:24 96:18 102:23 176:20

**joins** 34:5

**joint** 350:22

**judge** 44:7 114:24 121:14 163:16,17 351:9

**judgment** 9:14,20 341:23 342:21

**judgmental** 341:13,15

**July** 37:8 51:17,20 52:8 53:6,22 56:10, 11,14,17,23,24 59:19, 23 60:15 61:12,20 62:5,8,19 63:5,16,17, 24 73:8,12 76:7,12,20 82:22 83:19 84:20 88:2 92:6 95:23 97:3, 11 102:2 103:16 107:7 109:16 112:19 113:3,24 122:5,12 123:9,13 124:4,14 134:24 193:5 195:21 215:7 240:1 245:3 267:2 287:19 289:15 290:5,8,13 291:11 311:1 321:24 322:3,7, 10,11,14,19 323:3,7, 12 324:14,23 354:10, 18 355:3

**June** 33:2 51:8 56:4,5, 6,11,13,16 57:4,6 59:3 63:21,23,24 64:3,10,16,18 65:6,11 66:4,19,23 67:18 68:20 69:4,8,16,18,21 70:6,8,24 71:4,23 72:7,19 73:8,11,15 79:14,16 86:11,19 87:12,18 88:9 89:21 91:2,14 101:4 107:23 108:2 110:22 190:14, 17 191:4,24 192:10 193:21 194:1,2,8,21 196:18 198:11 200:12,14,20 208:8 211:9 212:20 214:16 215:3 224:16,20 225:7 231:24 234:19, 20 235:24 239:11 241:23 247:22 248:1 267:2 294:14

**jurisdiction** 6:2,6 9:18

**just** 6:17,19,22 7:1 8:22 14:10,13 19:15 20:13 21:6 22:6 23:20 28:16 30:7,20 34:18 41:2,9 44:18 45:4,14 49:1,8,14,15,20 52:14 58:1,9 60:3 61:7 65:21 66:20 67:22 69:11 72:5 73:21 74:11 76:2,10 80:3,24 85:20 93:23 95:3 98:1,18 101:19 116:17,23 118:22 124:9 151:21 152:22 155:21 159:10,22 166:14 173:2,12 174:6 181:11 183:9, 15 189:2 190:5,8 192:13 193:8 197:4 199:15 204:21 208:12 210:5 211:16,22 214:22 216:7,13 222:9 228:2,12 229:15 232:15 233:16 235:9 237:5 238:20 240:18,24 241:12,19 242:5 247:16 255:10 261:15,16 267:15 271:15 272:2 274:2 275:11 279:23 287:11 289:7 290:9 291:2,9, 15 296:20 298:4,5,23 300:11 301:2 304:10, 17 305:20 306:3,5,12, 15,16 307:5 313:6 320:19 324:5 338:20 339:14 340:6,13 342:5 345:24 347:13 348:23 350:12,22 351:12 352:2 353:8, 11 357:9,15 358:11

**K**

**K-1** 22:2 337:7,8,10, 15,16,19 338:13 339:22 340:3,4

**K-1S** 337:11

**K-A-R-Z-E-N** 10:13

**Karzen** 10:10

**Kashwere** 11:5,23 12:1,2,22 27:3,9,16 33:15 57:12,13 58:16 59:3 60:11 75:2 80:24 87:16 92:5 98:7 103:18 124:11 160:23 162:1,4 165:4,24 169:18 172:22 178:22 199:13 214:19,21 215:5 232:9 234:7 246:10,11 263:2,4,16 264:5 271:2 280:6 281:9 282:1 284:2 327:16 331:17,19 335:3,15,19,23 344:9, 10

**Kashwere's** 11:6 84:12 315:2

**Kashwere.com** 246:8 263:8

**Kashwere.info** 344:11

**Kashwere.me** 344:11

**Kashwere.store** 344:11

**keep** 81:23 102:15 114:13 255:23 305:16

**keeps** 127:7

**Kellogg** 139:20

**kept** 163:14 298:12

**kick** 196:17

**kind** 14:8 15:4 17:13 37:19 126:13 226:1 236:11 243:21 272:4 280:22 301:1 317:3 319:4 321:8 327:10 335:2 336:21 340:1

**knew** 236:13,19 242:9 319:14

**know** 6:6 9:9,10,12 11:9,12,15 13:6,13 14:11,18 15:6 19:20, 22,23 20:8,15,22 21:16,18 22:1 23:17, 19,20 25:9 29:11 34:10,13,20 37:18,20 39:10,14,18,20 45:11 46:16 47:2 49:21 52:19,21 62:23 67:24 71:3 80:2 82:18 105:9 106:14,23 110:4 111:24 113:14,18 114:22 121:22 123:3 124:17 125:2 126:17, 22 132:14 133:16 136:23,24 140:16 141:5 146:15 147:4 149:8,14,16 151:13, 19 152:23 154:15 165:13,14,17 166:9, 11 169:5,6,11,13 170:4,6,8 171:20,21 173:3 174:16 176:10 184:6,8 188:10,11 191:21,23 192:1,5 198:12 200:19,23 202:14 207:11,14 209:2 210:12 213:24 214:1 216:5 220:7,16 221:15 230:8 231:5, 10 234:22 236:16 239:3,13 240:18 244:22 245:2,17 247:14 252:5 253:6 254:23 256:16 260:18,22 262:10,11 263:3,12 266:2,16 268:14 269:11 271:5, 7 272:23 273:20 277:3,12 278:18,20 279:3,8,10 280:2 283:20 293:14 294:11 297:23 299:2 302:8, 12,14 304:3 305:7 306:16,21 307:5,16, 23,24 308:5,6,7,13 312:10 314:8 316:2,3 319:21 320:9,11,15, 18 323:21,23,24 324:3,6 326:6 329:3 330:14,18,19 331:9 337:11,12,22 338:6 339:10,11,15 342:14 347:4,5,12,13,14,23 348:2,11 349:3 350:2, 6 358:12,19

**knowing** 169:15

**knowledge** 18:13 35:10 41:4 253:18 294:6 301:20 302:3 320:22

**known** 149:9

**knows** 125:4 156:6

**Kreations** 4:4 180:19 184:14 225:6 249:4,6 264:4 268:9 310:24 317:10 332:10

L

**label** 201:8
**labeled** 205:15 210:5 218:3 224:13 246:6 248:24 250:15 254:1 259:21 262:20 287:1 301:16 310:21 316:19 318:5 321:6 328:6 343:9 347:22
**lack** 297:5,9
**lacks** 34:22
**laid** 131:3 157:13
**language** 42:19 171:3, 5 172:5,18 233:2 269:18 320:6 352:14, 18 353:1,4,6 357:15
**laptop** 161:16
**largely** 338:24
**largest** 31:24
**last** 8:6 26:10 47:24 48:10,11,13 70:19 78:4,9 156:2 164:7 178:7 191:6 217:17 228:19 235:10 254:18 296:2 322:2 323:20 338:17 347:15 353:23
**lasted** 37:9
**late** 51:17,20 52:8 53:6,22 55:13 63:23 138:1
**later** 13:1 53:9 58:3 103:9 105:23 127:3,4 198:5 200:7 209:16 262:22 264:21 323:17
**latter** 8:23
**launched** 80:15
**Laura** 46:20,22 47:11, 12,18 132:5
**Laura's** 318:18
**Laurel** 329:10
**law** 12:10 28:20 46:24 129:21 130:1 131:1 132:8,11 157:11 178:13,24 179:8 218:5,14,21,24 219:3, 6 221:8 265:10,13,20, 24 266:3,4,15,17 330:15
**laws** 218:9 268:14
**lawsuit** 5:17,20 6:3 8:19,24 9:5,6,11 10:22 11:2,6,8,14,17, 20 13:3 23:23 24:3 38:1,6 41:24 42:1 44:10 54:11 74:8 144:8 150:16 151:16 200:22 288:22 324:9
**lawsuits** 10:15,23
**lawyer** 6:13 127:23 129:20 130:20,22 132:21 133:9,11 150:1 156:2 157:5,23 158:10,13,15 159:3 170:5 171:19,23 172:18 198:17 199:20 203:6 206:15 207:2 239:4 257:19 264:17, 23 265:1,2,11,15 278:24 279:5 281:2,3 284:12 299:10 315:16 318:23 319:2,3 330:13
**lawyer's** 135:14 150:20 221:16 264:13 314:23 318:9 319:14
**lawyers** 45:22 46:3 66:17 70:4,14,15 98:15 111:20 113:5 129:23 131:13,17,19, 20,23 132:8 133:6,8, 12 137:22 140:7,8 150:14 153:7,18 154:1 157:1,4,21 170:7 181:5 188:15 198:14,19 201:20 202:5 215:9 221:13 267:16 268:13 284:20 294:22 297:11 298:6, 11,15,16,18 299:1,3, 5,16,19,22,24 300:4, 5,15,19,21,24 311:9, 12,13,19,21 312:1,21 313:4,8,18,19 315:8, 13,14,19 317:3,7,13 318:9 320:13,14 345:11
**Lazar** 341:5,8,12,14
**lead** 140:4,11
**leadership** 32:1 80:11, 15 81:5
**leading** 139:14 352:3 354:1 356:1
**least** 10:2 125:1 146:4 193:10 214:8 313:22
**leave** 15:2,8 30:19 31:4,18,22 32:6 35:24 106:17 175:17
**leaving** 13:9,18 15:5 39:6
**led** 247:24
**left** 14:7 15:4,8 33:9 47:8,11 270:19 321:8 353:11
**left-hand** 205:16
**legal** 17:15 20:6,21,23 21:6 25:14 30:2 37:19 38:9 50:22 54:13 55:19 56:8 87:2,6,7 99:14 106:8 110:15 111:6,24 131:3 156:24 157:2,8,13 167:9 174:19 204:19 209:5 265:3 268:13 270:2,13 271:18 272:9,21 275:14 276:9 278:3,22 279:14 280:10 282:14,15,19,23 283:2,3 284:4,13,17, 21,23 285:1,4,8 286:2,4,8 289:1,21 335:21 336:2
**legally** 268:15 278:21 279:12 280:3,24
**lengthy** 214:14,15
**less** 119:6 173:18 198:16 212:6 214:9 235:3 249:24 274:9 339:23
**let** 20:17 21:3 47:22 49:20 53:21 64:11 66:14 67:23 72:24 89:11 96:24 99:21 101:23 102:13,14,21 105:7 106:4 113:14 116:2 121:22 144:5 159:15 163:12 169:10 178:2 182:19 197:5 208:14 216:20 228:11 252:22 254:23 268:10 286:1 294:9,11 307:5 322:13 324:22 325:3 327:3 329:6 337:9 341:7 342:22 353:14 356:11 358:12,18
**let alone** 206:7
**let's** 32:8 33:20 36:15 44:9 47:21 49:17 61:11 62:3 69:3 70:5 74:13 77:12 80:5 88:22 89:1 90:12 112:9 113:16 114:5 127:6 128:12 132:24 138:17 139:15 140:8 144:15 145:15 147:17,18 156:4 160:2,8,22 179:16 182:6,10,11 184:9 190:21 196:17 201:7 206:11 211:22 217:21 222:19 224:6 245:23 248:17 250:8 259:14 262:14 267:7 283:13 286:10 287:8 293:15 298:5 299:4 301:15 310:12 314:13 316:18 317:19 320:23 325:3 327:22 329:15 332:2 334:9 344:18,23 347:15 349:8 352:10, 22,23 353:1 355:8 358:18
**letting** 307:16,23,24
**level** 173:21 202:8
**leveraging** 54:17
**liability** 184:15 264:3 266:8,15 268:4,8 292:10 310:23 311:14,18 316:21 317:9 333:11
**lied** 306:9,10
**life** 149:8
**Lights** 35:7 37:12
**like** 16:10,11 20:21 32:20 41:3 42:14 50:24 60:24 63:23 67:8,9 72:8 76:14 82:8 112:22 113:16 118:11 122:24 125:13 128:20 141:9 143:1 147:16 151:9 154:8 165:8 194:18 222:9 225:10 226:20,21 235:5 237:7 254:17 267:10,11,13 274:22 296:11,23 303:10,22 304:4 307:4 310:11 320:4,16 326:19 328:8 343:11,12 347:7 354:12 358:11
**likely** 173:9,10 240:19 256:21 267:7
**limited** 184:15 264:3 266:8,14 268:3,8 292:10 310:23 311:14,18 316:21 317:9 333:11
**line** 48:10,11,13 128:22 130:10 141:4 147:7 191:17,18,19 220:8 225:9 249:8 260:11 261:2,5,14,18, 21 262:12 263:2,17 267:17,18 311:8,20, 22 313:14,18,19 317:13
**lined** 192:13 260:19 262:8 311:1,12 312:1, 5
**lines** 66:18 152:8 191:22 192:6,20 261:22 353:23
**lining** 141:6,13 260:14 266:20 312:2 317:8
**Linkedin** 32:17 36:8
**list** 163:24 194:24 344:6
**listed** 48:1 183:9
**listen** 221:17
**literally** 300:11
**litigation** 13:10 47:1, 16 81:20 149:11 150:7,18 151:9,20 152:6 154:9,22,23 155:8,10,14,15 156:12,21 216:1 217:4 293:22
**little** 187:13 250:1 321:9 344:22
**live** 7:13 325:21
**lived** 7:19
**LLC** 4:4 18:20,21 22:24 23:14 24:3,6, 15,19 25:11,12,21 26:8,12 27:1,23 41:11

68:17 176:20 180:19 184:14 225:7 246:14 264:5 292:9 293:9 317:10 330:3,13,14, 21,23 331:12 332:10, 20 333:16,21 334:2,3
**LLCS** 37:23 38:2,7,11 146:4,17
**logs** 212:21,22
**long** 7:19 8:10 24:17 31:12,13 37:9 67:9 90:11 193:7 196:8 204:12 212:7 213:14, 15 274:8
**long-ish** 213:1
**longer** 15:11,12 31:6 33:13 63:17 165:3 196:9 212:10 272:16 281:15 282:20 283:23 284:5 346:16
**look** 49:12 60:24 66:15 80:5 81:15 87:8 113:2,17 114:5 120:4 122:24 130:21,23 133:12 134:6 148:21 156:13,22 157:22 160:22 161:5 163:18, 20 165:19 181:11 183:5,16,17,20,22,24 184:9 187:8 189:7 201:7 217:21 219:17, 18 222:7,19 225:5,10 226:17 228:11,19 242:18 247:5 249:15 250:9,13 253:19 260:1,4 264:1 266:5 267:7,13 268:12 275:1 281:1 294:8 301:15,17 308:17,22 310:9 313:10 314:9 316:18 318:1 319:4,6, 7,17 320:1,8 321:18, 24 323:21 328:5 331:13 333:7 334:21 343:20 345:12,18 347:15 351:16 352:10,11,12,22,23 353:1 355:8,9,13 357:10,22
**looked** 8:1 28:11 163:23 180:9 181:9, 12 182:2 187:15 189:2 219:18 231:12 237:17 238:13 256:21 320:20 357:18
**looking** 90:19 100:15 144:11 148:22 166:21 180:17 182:22 184:10 185:19 217:23 237:20 240:14 245:13 254:5, 10 262:1 274:7 287:20 309:21 311:20,24 318:7 319:1,11,22 322:8 345:13
**looks** 32:20 112:22 128:20 226:20,21 267:10 328:8 343:11, 12 348:18
**lost** 93:9 338:16
**lot** 14:12 66:15,16,18 113:15 144:9 152:15 174:23 210:9 216:8 267:10 270:6 303:21 356:5,10
**loved** 64:13
**lovely** 74:5 160:10
**lower** 274:5 292:2
**lunch** 160:9 177:24
**lying** 302:9,10 304:13, 18 305:2,9 309:16

**M**

**M-I-P-A** 163:22
**ma'am** 225:14
**Mac** 161:17
**Madam** 78:3
**made** 15:10 20:10 48:23 49:2 50:4,5,20 51:2 52:7,13,22 53:4 55:18 57:21 70:12 73:16 74:14 89:21 99:4 110:22 158:6 159:22 173:21 201:3 212:9 213:4 215:6 236:7 244:9 290:10 305:19 319:2 330:5,8 335:12 347:4 349:19
**Magnatar** 30:10,24 31:15
**make** 7:2 20:12 22:15 41:10 57:3 72:6 82:17 101:3 158:24 170:5,9 178:21 195:9 256:12 269:19 271:15 282:10 323:7 357:23
**making** 15:23 116:15, 21 158:5 280:21 319:18 320:10 331:3
**management** 24:7,8,9, 10 26:11 37:4,24 39:8 201:13 202:7 254:4, 15 292:8
**manager** 25:7,12,18 38:3 231:16,21 232:3, 15 234:5 238:23 254:19,20 255:4,8,10, 14,16 292:9,20 293:1, 6,9,11
**managers** 19:19
**managing** 21:13 33:1, 5 34:6,15 201:12 202:2,13,16 231:2,7 232:12
**Manhattan** 32:2
**many** 8:7 50:7 51:4 119:5 136:10,15 191:9 212:1 213:8 214:5 239:19,21 296:21 337:5
**map** 6:10
**March** 16:1 30:5 122:16 133:18,19 180:8 289:16 290:8, 18,22,24 291:8,20 301:22 302:10 304:21,22 305:5,15 354:10,12,17 355:3
**mark** 32:8 33:20 36:15 44:9,10 112:9 125:21 128:12 160:2 179:21 224:6 245:23 246:5 248:17 259:14 262:14 286:10 293:15 310:12 314:13 317:19 320:23 325:4 327:22 329:15 332:2,3 334:9 342:22 344:19 349:8
**marked** 32:11,15 33:23 34:3 36:18,22 44:13 112:12 125:24 128:14,18 160:5,12 177:17 179:23 180:5 224:8 246:1 248:19 259:16,20 262:16,24 286:13,24 293:17 294:1 295:5 310:15, 19 314:16 317:16,22 318:4 321:2 325:6,17 328:1,5 329:18,22 332:6 334:11,15 343:1,7 347:18 348:3, 5 349:4,11
**marking** 328:21
**markings** 45:5
**material** 184:23 185:10
**materializes** 156:10
**materials** 12:21
**Matt** 8:2,4,18 46:9 71:20 171:9 216:13 325:9 344:18 348:3
**Matt's** 132:11
**matter** 4:3 170:7 269:9,11
**Matthew** 4:17 329:10
**Maureen** 4:7
**may** 11:23 16:3 27:18 35:18 49:10 50:6,12 81:16 94:10 95:4,7 109:24 110:9 118:18 126:8 128:21 130:9 132:20 134:1,17,20 135:3 141:3 148:8 149:19 156:17 167:5 168:4 171:3 172:19 177:3 180:8,12,16 186:17 190:17 191:3, 16 192:23 193:18 196:9 199:19 202:4 207:23,24 208:6 209:20 211:4,6,7,8, 18,23 212:19 213:13, 14,22 214:16 220:15 222:20 223:4 228:20 230:2,12 240:16,22 246:21 247:2 252:11 256:20 259:4 264:7 266:17 276:11 294:14,20 302:22 303:10 304:13,14 311:16 318:10 319:8 324:8 335:21 339:8, 17,18 340:11,12,13 344:17 351:11,13
**maybe** 49:20 144:2,3 169:5 285:8 294:13 302:12 347:5
**MBA** 139:19 171:22
**Mcnally** 5:19,23 6:8 10:3,21 30:12 35:6 37:12 166:16,17
**me** 6:17 13:17 14:12, 14 17:22 18:4 20:17 21:3 23:20 30:5,7 33:8 39:24 41:3 42:15 50:20 51:3,4,22 52:24 53:19,21 60:9 63:5 64:2,11,14,16 66:9, 14,19 67:11,23 72:24 74:1 77:1,2 78:8,16, 17,18,19 79:7 82:18 84:21 85:12 87:10,11 88:23 89:4,11 90:21 91:3,10 92:22 93:1,22 96:20,24 97:13 98:24 99:21 100:17 101:6, 13,23 102:21 105:4,7, 12,24 106:4 107:17 113:14 114:16 116:2 118:6 124:23 127:6,8, 10 129:6 131:21 135:6 136:23 141:10, 24 144:1,5,13 147:16 153:17,18,23 155:18, 21,24 156:24 157:8 158:7,9,14,18 159:15 162:17 163:12 164:7 169:10 171:1 178:2, 18 181:7 182:19 185:4 187:3 189:21 190:2 192:18 193:20 197:5,24 199:4,12 201:1 203:9 205:3 207:7 208:14 209:21 211:14 212:23 216:16,20,24 228:11 229:10 232:19 234:3 235:16,23 236:4 237:11,12 238:12 240:15 242:5,7,15 243:7 244:15,21 245:14,18 247:24 252:22 254:23 256:11,12,15 258:16, 22 264:18 268:10 269:17,19 271:2,12 272:13 277:1 280:13 283:5 284:1 286:1 288:20 289:4,7 290:4 291:1,4,11 292:12 294:9 295:7 298:13, 18 301:21 302:15 303:5 305:20 306:5

307:5 308:5,18,22 312:7 313:10,13 318:1,11 321:15 322:13 323:22 324:22 325:3 329:6 331:24 335:16 336:6,19 338:1,5,8,24 339:14 341:7 342:22 344:18 346:21,22 348:1,6,8 350:24 351:12,17 353:14 356:11,12,18 358:12

**mean** 11:9,12,15 13:15 15:6,13 16:21 20:8,13 27:7 29:11 37:18 40:3 53:16 56:21 59:4,9 60:5 61:14,19 62:23 65:22, 24 68:10 73:21 76:8 82:18 83:2 85:5 98:2 100:15 105:10,19 119:16 123:24 124:17,18 125:8 131:18 135:13 149:17,22 158:9,11 160:24 162:4,14 167:14 169:5 172:24 173:5,8,12 175:7 182:10 188:4 191:21 197:19 203:10,15,19 207:4 209:2 219:16 230:8 245:9 246:24 253:14 262:5 270:5, 11 291:14 304:3,4 307:11 315:10 331:17 333:11 336:1 340:8 341:15 344:2,14 352:1

**meaning** 51:7 57:9

**means** 88:18 105:13, 20 112:1 114:15,16, 17 119:18 124:16,23 152:24 158:12 169:3 172:15,16 176:11 177:15 178:16,18 211:5 215:10 238:24 269:24 280:21 282:4

**meant** 20:16 85:12,18 132:15 149:14,16 172:16 178:11 195:14 261:11

**meantime** 113:15

**medications** 7:10

**meet** 81:6 258:20,22

**meeting** 81:18

**meetings** 41:21

**Melgar** 73:23 109:5 244:15

**member** 19:1 25:11, 19 38:2,7,21 39:6 58:11 150:5,8 151:11 167:3 175:6 176:19 184:20 201:12 202:2, 8,13,16 205:19 222:22 223:6 231:1,2, 7,16,21 232:2,12,14 273:23,24 278:1,15 283:9,11,14,18 284:6, 10 285:19 291:21 331:15,18,20,23 332:17 333:14 334:2, 24 339:12 347:2

**member's** 146:10

**members** 19:15 24:19 38:16,17,23 39:2 40:8,24 41:16,22 152:10 255:8,11,12 274:10,12 332:13

**membership** 19:14 128:22 163:20 187:10 189:12,14 202:21 204:1 205:7 238:14 254:22 255:6 284:19 327:13

**memorize** 188:18 253:4 273:18 274:24

**memorized** 316:4

**memory** 37:5 52:9,11 66:12 68:2 77:16 79:11 83:10 93:3 127:21 188:13 200:20 237:21 291:10 319:21 323:16

**men's** 67:8 125:14

**mention** 40:13 174:15

**mentioned** 16:3 27:3 30:21 35:8 36:10 37:12 38:7 41:2,12 46:7 83:22 159:2 182:21 206:12 214:22 251:6 330:12

**mentions** 37:1,3 83:11 134:7 171:5 218:6

**Merri** 11:1,5,18 13:2 16:2,3 28:15 51:5,19 52:7,22 53:4 55:18 57:2,7,19,20,22,23 58:10,14 60:10 63:21 64:3,4,16 67:3,19 69:16 70:3,13 73:3 74:2,14 78:1 79:3 81:9 82:9,11 83:19 85:9,13,17 86:7 87:12,20 88:7 89:11, 15,18,23 90:15 91:5, 11 96:3,6,17,20 97:10,17,21 98:14,24 99:2,4,5,17,24 101:6, 22 103:2,15,23 105:14 108:1 109:14, 19 110:22 112:19 113:20,24 115:4 116:3 121:2,21,22,23 122:2 123:8,21 126:11,21 127:15 128:21 129:8,24 130:4,16,21 131:1,10 134:10,13 135:6,7,21 136:2,7,19 137:1,10, 16,21 138:6,20 139:5 141:23 142:23 143:8 144:7,17 147:10,12, 16,22 148:18 149:9 150:6,15,17 151:8,10, 14,19,21 152:4 153:5, 17,18,24 154:7,13,16, 22,23 156:19,23 157:11,19 160:21,22 161:1 162:13,14 165:4,5,8 166:2 169:1,3,11,14,17,23 170:2,4,13,19 175:11 176:18 177:21 178:11 181:5,6,15 182:12,23 183:4,18 184:20 185:1,12 187:6,23 188:8 189:1,16,21 190:6 191:5,20 192:5, 24 193:1,6 194:17 198:9,19 199:14 200:9 201:11,16,18, 22,24 202:1,4,6,10, 12,14,15,22 203:8,11 204:5,17 205:11 206:4,15 207:1,5 208:4 210:21 212:9, 23 213:5,24 214:13, 18 215:8,21,24 216:4, 15,23 217:2,9,13 218:14,19 219:3,6,7 221:12,13,15 222:6, 23 223:6,12,20 224:1, 15,18,23 225:21 226:19 227:2,9,11,16 228:5 229:8,10,11 230:7,16,21 231:1,6, 11,18 232:6,7,8,10, 12,16,17,20,22 233:6, 19,21 234:4 236:1,5, 9,14 237:1,13,22 238:3,4,8,15 239:2,3, 7 240:23 242:9,14,21 243:20 244:6,12,21 245:1,17 246:18 248:4,13 249:1,15,17, 20 250:8,24 251:11, 16,20,22 252:10,14, 16,18 253:1,17 254:20 255:3,7,9,21, 24 256:13,16,24 257:5,22 259:23,24 260:8,16 261:12,19 262:22 265:6,9,18,21 266:3,6,21,23 267:4 268:2,17 271:2,6,12, 15 272:1,10,13,17 273:3,4,9 274:22 275:11,19 277:9 278:18,20 279:4,5,21, 23 280:5,7,13,18 281:5,23 282:3,17 284:1,3 285:20,23 287:4,7,15 288:4,5,7, 16,20 289:4,19,20,23 290:8,19,23 291:2,3, 7,12 292:2,5,9,15,16, 17 293:7,9,11 294:11, 17 295:1,3,21 296:24 297:11 298:4,5,9,15, 17,24 299:2,8,9,16, 17,21,22 300:1,22,23 301:1,2,22 302:20 303:7 304:2,21 305:2, 3,16 307:2,10,16 308:18 309:11 310:8 311:3,5,6 312:10,20 313:1 315:3,19 316:11 320:21 325:9, 18 327:4,12 329:4 330:1,5,7,12,15,17,19 332:15,21,23 333:2, 12,18 334:1,6,18 335:8,14,16 336:3,5, 17,19 337:12,24 338:1,4,5,6,8,20,24 339:7,8 340:1 343:21 346:17,18,20 348:23 349:5,17 350:2,5,7, 11,13 353:9 354:23 355:5,7,23 356:8,12, 17

**Merri's** 28:5 54:4 70:4,14 81:5 90:20 127:23 128:5 133:7, 12 150:14 157:20 158:15 169:21 170:6 178:13 203:8 212:22 246:11 251:19 253:9 262:22 263:8 265:15 268:13 281:7,8 291:5, 18 294:6 298:11 311:13,19 313:19,23 315:1,9,11,14 317:7 318:9 319:3,15 320:14 328:16,18 337:21 338:19 339:14 348:2

**Merri/dean/tmg** 225:6

**message** 13:2 130:9,13 131:11 180:17 294:24 335:4 350:9

**messages** 126:9 259:22 293:20 303:23

**met** 81:17 147:16

**MG** 160:23 161:1 173:16 178:11,21 179:8

**mid** 31:12 303:13

**middle** 5:7 126:14 218:5,6

**midnight** 56:17 235:24

**might** 71:17,18 76:10 92:19 151:19 154:1 161:20 171:21,23 188:24 189:4 190:9 204:16 206:7,13 238:24 240:23 261:19 295:22 304:10 306:15 339:12 342:6 348:18

**million** 83:15 102:3 104:1,9 105:16 107:6 113:22 114:6,7 115:6 119:11 120:5,7,8,9 173:18

**mimic** 269:20

**mind** 63:19 66:22 85:18 99:17 276:1 287:13 291:5,6
**minds** 66:22
**mine** 185:20 198:14, 19
**mini** 358:8
**minimis** 355:2
**minimus** 354:22
**minority** 178:20 231:15,20 232:14
**minute** 67:11 88:11 344:18
**minutes** 168:7 193:10, 14,18 196:10 198:16 340:17,21
**MIPA** 123:19,22 124:2 163:21 244:5 245:17 251:10 344:1
**missed** 113:14
**missing** 254:6
**misspoke** 76:10 91:18
**misstate** 281:21
**misstates** 53:24 63:11 70:17 72:21 73:13 84:1 91:7 93:15 95:13 100:4 211:11 281:17 298:19 300:10 312:14 324:19
**mistake** 132:22
**mistaken** 290:5 309:17,20 310:4
**misunderstanding** 304:12
**Mm-hmm** 45:17 260:6
**model** 161:16
**moment** 75:1,19 215:4 287:9
**money** 16:14 18:9 144:9 294:5 295:1 301:20 335:4
**monies** 17:22,24 18:4 240:8
**month** 122:9 190:14
**month's** 249:24 250:1
**Monthly** 21:23
**more** 6:22 16:13 27:12 76:1 106:14 107:20 110:7,9 119:6 137:8 149:5 178:2 183:5,24 191:8 193:10 211:18, 20,23 212:2,6 216:10 250:1 275:23 303:17, 20 312:9 313:1,5 314:4 341:2 342:5 354:15 355:4
**Morgan** 126:8 325:11, 20,24 343:9
**morning** 5:4 193:4
**most** 32:20 268:7
**mouth** 49:1
**move** 6:20 23:20 90:3 98:6 100:21 103:18 167:20 197:15 217:21 225:2 249:21 271:24 329:8 352:7
**moved** 19:10 65:17 100:12,19
**moving** 352:8 354:10
**MP4** 358:11
**Mr** 4:13,15,17 5:3 10:16,18 13:5,8,12, 16,22 14:4,10,21,22 17:9,12,15,19 20:6,9 22:15,20,21 23:15,18, 21,24 24:2 25:13,16 27:10,14 28:3,10,14, 18,23,24 29:8,13 30:1,4 32:8,14 33:10, 14,20 34:2,18,19,21 35:1 36:15,21 37:2 38:8,13 42:5,9,11,14, 18,21,24 43:2,5,7,11, 12,17,19,20,23 44:2, 6,8,16,18,20,23,24 45:4,10,16,17,18 46:14,18 47:2,5 48:10,13,17 49:8,12, 24 50:22 51:1 52:3,5, 9,11,20 53:24 54:2, 13,16,19,23 55:3,4,5, 19,22 56:8,12 58:1,2, 7 59:14,18 61:4,7,10, 16,18 62:12,16 63:11, 15 65:13,19 66:11,13 67:6,9,11,16 68:12, 14,19,21 69:2,10,13, 14,17,22 70:17,22 71:6,9,12,16,20,22,24 72:2,21,23 73:4,5,10, 13,19 76:18,21,23 77:15,20 78:3,7,14 79:10,15 81:10,11 82:6,11,13,15,16,20 83:3,5 84:1,3 85:20 86:5,12,16,18 87:1,3, 5 88:11,14,16,17 89:1,10 91:7,9 93:2, 11,15,20 95:13,15,18 96:9,13,15 97:5,9 99:14,16 100:3,5,7 102:6,11,13,16,18,20 106:1,3,8,12,19,22 108:22 109:1 110:3,6, 11,15,17 111:5,7,12, 13,16,18,23 112:2,9, 15 113:9,12 114:1,2 115:14,16,17,18 116:1 117:20 118:1 121:14,19 124:21,22, 24 125:3,7,10,15,21 126:3,4 128:3,7,12,17 137:13,15,19 138:22 139:2,7,12 140:12,15 141:7,11,17,21 142:5, 7,24 143:3 144:22 145:2 146:11,14 148:6,9 150:10,12,19, 23 151:1 152:14,16, 21 153:1,9,11,21 154:19 155:5 157:24 158:4 159:4,6,9,15,24 160:2,8,11 163:16,17, 19 164:3,10,16,18,19 165:16,18 167:9,12, 14,16,18 168:10,16, 19 169:7,9 171:8,11, 13,16,17 172:3,6,9,12 176:22 177:1 178:1,4 179:16,21 180:4 181:21 182:1,4,8,9 183:7,11,13,14 185:24 186:1 194:2,4, 7,11,13,15 196:21 197:2 203:2,4 204:19, 21 205:1 209:4,10,14, 16,18 211:11,13 212:3,4 216:11,13,17 217:16,18,20 221:3 224:6,11 237:2,5,9 238:5,6,11 245:23 246:4 248:17,22 253:3,10 254:10,12, 14 259:14,19 262:14, 19 264:18,20,24 268:20,22 270:2,4,8, 13,17 271:18,20 272:21 273:2,14,17, 18,19,22 274:2,13,17, 19 275:14,18 276:7,8, 9,13,16,18,22 277:16, 17,18 278:3,5,8,19,22 279:2,9,11,14,18 280:11,16 281:17,19 282:11,12,13,22 283:1,5,7,8 284:11, 15,20,22,24 285:3,6, 12,15 286:1,10,17,23 287:11,13 288:2 289:1,5,21 290:3 292:21,22,23 293:2,4, 8,20 294:4 297:3,7 298:19,21 299:11,14 300:10,12 305:22 306:2,6,8,20 309:5,8, 11,14 310:12,18 312:14,18 313:6,12, 17 314:10,13,19 315:21,23,24 316:15, 16,17 317:19 318:3, 19,20 320:23 321:5 322:16,18,22 324:11, 16,19,21,24 325:3,12, 16 326:22 327:2,22 328:4,12,13,14 329:15,21 332:2,9 334:9,14 340:16,18, 20,22,24 341:1,3,4 343:4,6 344:18,21,22 345:5 346:5,8 347:8, 11 348:5,7,10 349:8, 14 351:4,11,15 352:3, 4 353:14 354:1,5 356:1,3,4,5 357:6,8 358:1,2,5,7,12,15,18, 20
**Ms** 82:12 159:13 217:17
**much** 7:5 136:21 166:7 190:11 256:12
**multi-page** 180:6
**multiple** 82:3 102:8 110:1,21,23 183:17 190:9,11,16 191:5 194:11
**must** 208:12 260:6 330:14
**my** 4:6 6:17 8:20 9:14 14:14 18:13,17 21:1, 3,10 23:19 30:8 35:10 40:2 41:4,9 42:9 45:4 51:11 53:11,21 56:2 57:10,19,22 58:14 59:1,6,24 66:21 69:21,23 70:2,16 72:12 73:16 74:3 75:1,21,23 76:13 79:23 81:13 85:2 86:3 87:15,22 88:12 89:2 91:21 92:3 94:6 96:14 101:19 102:16 104:6, 22 105:3,13,21 109:12 114:12,20 116:19 118:2 119:3,4 120:20 121:5,8 124:8, 13 125:3 131:7 132:22 134:23 135:2 142:1,12,16 143:12, 22 145:1 149:7 151:17 154:24 156:5, 6 157:17,20 158:10, 22 159:10,15 160:16 166:15 170:2,21 174:8 175:21 176:17 181:12 184:5 192:7, 17 193:4 195:12 197:5 199:2 201:2 209:11,17,19 210:2,9, 17,18 211:1 213:7 214:18 215:5,12,17 216:14,24 220:13 221:11,17,18 223:16 227:24 232:8,17,22 233:3,6,21,22 238:17 239:22,24 240:6 241:21 243:23 244:6, 16,17 253:8,18 255:7, 17 256:20 260:20,23 261:1,24 264:11 266:22 268:10 271:9 272:9 276:14 277:22 280:23 281:20,24 285:7 287:18 290:17 291:3,17 292:1 294:18 295:1 298:16 301:20 303:5 305:4 306:10 308:6 310:1 311:7 312:6,12 316:4 318:15,24 319:10 320:22 324:4,14 326:19 329:11 331:6 333:21 337:16 338:4 349:18 350:6
**myself** 24:21 41:8 60:8 73:23 109:5

N

**name** 4:6 5:5,7 6:6 18:18 22:17 36:6 301:11
**named** 28:16 307:22
**names** 6:11 344:10
**Nandina** 329:9
**napkin** 83:8
**narrow** 72:4 214:4 303:17,19
**native** 325:13
**nature** 16:15 302:21
**near** 234:18
**nearly** 80:15 156:7
**necessarily** 116:11 255:24 304:20
**necessary** 295:19 303:24 304:6
**need** 6:21 21:2 44:7 79:6 87:17 88:20 96:13 106:14 114:23 117:14,15 144:14 165:5 198:1 204:11 246:21 249:13 298:10 326:24 346:18,20 358:15
**needed** 63:18 190:23 193:1 275:7 285:18 331:22
**needs** 58:5 115:18,19 144:15 272:12 333:12
**negative** 341:16,21 342:19
**negotiate** 296:2
**negotiation** 205:21 292:3
**neither** 181:16 282:5 307:20 341:17
**Netflix** 326:20
**Netsuite** 307:14 308:10,12
**never** 56:3 57:9,11 59:2 74:3 91:21 104:5,16 120:1 124:7 135:17 136:12,18,21 137:10 138:5 142:9, 12,15,16 143:12,14, 22 144:24 145:3 152:19 153:5 154:14 155:21 156:9 164:1 170:16,18 176:19 187:17,20 189:17,20 202:12 210:22 223:16,18 242:22,24 243:6,9 244:3 248:13 253:17 256:7,14 262:8 269:19 281:13 287:13 288:7,8 296:23 320:20 345:14 346:9,21
**new** 100:9 161:24 165:5,12 167:3 172:21,24 173:4,5,8 174:14 222:22 223:6 265:14
**next** 173:16 185:14 186:11 189:10 202:18 204:10 206:11 231:6, 14 247:6 307:1,2,3 308:17 314:13 317:19 321:9 322:5 333:16 339:17 340:21
**night** 235:5,6
**nine** 212:12,13
**no** 6:22 7:12 8:11 9:3 10:24 12:24 13:7 15:11,12,16 16:16,17, 18 17:6 18:13 19:2 21:17 23:6 25:24 26:9,15 29:4 31:5 32:12,16,24 33:19,24 34:4 36:19,23 37:20, 22 38:20 39:7 44:14 47:4,7,20 50:9 53:10 57:9 60:4,9 62:4 63:6, 17 66:1,5 68:21 69:13,17 71:9,14 74:2 76:21 82:12 87:3 90:6,10 94:22 95:17 96:13,22 110:20 112:13 113:1 114:4 115:9,13 116:4,11,20 117:14 118:13 121:1 123:6 124:22 126:1 128:12,15 132:2,7 134:19 135:12,15,24 136:5,9 137:15,18 140:17 141:1 142:16 143:12,22 145:5 148:20 149:16 151:17 152:2,18 153:4 154:3, 4,13 155:14,19 156:18 157:3,7 158:6, 21 159:5 160:6 164:9 165:3 166:15 168:22 170:11 172:6 174:6,7, 10 175:24 176:7 177:6,22 179:24 180:6 181:24 182:2,8 184:9 187:17 188:3,7 189:17,18 191:14 192:15 194:14 195:16 199:1 201:9,15,19 202:24 204:8,18,23 205:3,4,24 206:23 207:14,22 210:4 214:1,6 217:12,22 220:1,5 221:4 223:10 224:9 235:22 236:9 237:3 240:16,23 243:23 245:11 246:2 248:20 250:8,22 251:1 253:18,24 256:6,10 257:4,20 259:17 261:8,16 262:17 264:18 265:4 267:8 270:21,22 272:16 277:1 279:7, 21 281:14,15 282:20 283:23 284:5,7 286:14 290:6 291:12 293:18 294:2,7,17 295:3,24 296:19 302:4 304:8 305:8,10, 13 309:10,21 310:16 314:3,17 317:23 319:23 320:7 321:3 323:19 325:7 326:13, 17,20 328:2 329:2,19 332:7 333:16,21 334:12 335:1,2,4 336:12 338:23 339:14 340:7,9,20,22 341:10 342:21 343:2 344:16, 17 346:16 347:19,24 349:12 350:20 351:16 352:11,12,22,24 354:20 355:8
**nobody** 158:7
**noises** 6:22
**non-binding** 185:15, 17,22 186:9 227:8,13 228:13,14,17 229:6
**non-competes** 16:14
**non-debatable** 281:12
**Non-judgmental** 342:10
**non-recollection** 176:11
**none** 195:4 237:17 329:10
**noon** 126:16
**nor** 45:7 181:16 205:10 335:1
**normally** 45:6,8 261:22
**northern** 6:5 35:6 37:12
**Northwestern** 139:21
**not** 5:18 6:12 8:11,16 9:9 10:7,24 12:20 14:1 18:13 20:1,2,14, 23 21:2,6,7 23:10,24 24:13 32:7 35:7 36:14 37:14,17,20 38:4,15 39:4,7,19 40:14 41:20 42:22 43:5,18,24 44:4 45:21 46:2 47:6 48:24 49:5,14 52:9,11,23 53:23 55:17 58:8 59:9,17 60:17 61:16 62:20,24 63:3,23,24 66:12 67:5 71:13 74:5,6 75:23 76:3,16 77:9,16 79:11 84:4,5, 16,23 88:4,14 90:1 92:8 93:3 94:12 101:1,10 102:18 103:19 104:13 105:2, 6 107:17 108:4,6 113:1,10 114:24 115:12 116:11,17,23 117:3,8,11 118:9,18 119:3,14 120:14,19, 20,23,24 121:5,9,15, 16 123:22,23,24 124:10 130:5 131:5, 17 132:12,18 133:3 134:2 135:8,11 138:14 141:1 143:16 144:1 146:22 150:12 151:17 152:8 153:4 154:3,5,8,20 155:19 157:8,15,24 158:2 162:21,22 163:16,17 168:4,22 169:3 171:21 172:6 174:3 175:21,24 177:7 179:10 181:15,19 182:12,18 184:5,7,16 185:19 186:11,20 187:5 188:14 189:6 192:17 195:4 196:13 197:12 198:1,20,23 199:1,2,6,23 200:5,10 201:5 202:3,5 204:8 205:9 207:4,16,18 208:22 209:3,7,8,13 211:1 213:11,17,22 214:7,23 215:11 220:6,13 221:17 223:10,14 224:19 227:21 228:1,3,20 229:8,24 230:2,12 231:6 232:12 235:22 238:3 239:5,21 240:7, 8 241:22 250:8 251:18 253:18 256:8, 21 257:14 258:4,12, 14 259:10,13 261:19, 23 262:13 264:17 265:2,11,12 266:16 267:14,23 268:4,20 270:5,21 272:6,19 274:9,11,22 277:2,11 278:21 279:6 280:14 283:2 284:16,23 285:10 286:3 288:10 291:3,15,23 293:12 295:24 296:5 298:22 299:7,19 300:8,23 301:24 302:4 303:5 306:22 309:6 312:12 313:13 314:3 315:3 319:23 320:5 322:8 324:5 325:13 326:19 327:15,17,18 328:9 330:10 331:14,15,18 332:17 333:18,19 334:24 337:5,15 338:11,21 339:7,8,21 341:1,3,15,20,23 342:13 343:4 344:8, 13 350:14,18,22 351:13 358:20
**note** 83:7 108:8 131:1 157:10
**notes** 113:13,18 115:4
**nothing** 23:13 53:7 74:1 190:4 271:13 284:1 335:4,5 356:18, 19
**notion** 338:9
**November** 147:13 330:2

**now** 4:1 10:6 22:18 23:24 41:24 43:14 50:10,14,19 51:22 58:3 62:3 63:23 67:6 68:21 69:3,6 70:9,12 74:18 77:5 79:16 80:7 85:14 86:21 87:11 92:9 94:16 103:13 118:2 120:4 131:12 155:6 158:8,21 161:15 167:11 172:20 179:17 182:22 187:2 191:3 196:1 211:20 212:8 213:21 214:10 228:12 237:19 238:10 246:7 247:21 248:1 256:11 267:18 275:1 277:10 289:14 307:4 324:3 327:1 328:10 340:24 352:22

**nowadays** 161:12

**number** 65:2 84:13 115:5,10,11 118:24 119:1 120:4 121:20 122:8,14 149:9 178:7 211:3 214:11 258:19 307:18 327:19 331:14 332:1 333:5 335:12, 17 336:13 345:8

**numbers** 321:7,10,14, 20

**Numerix** 30:11 31:19

**numerous** 51:5 62:14 124:13 199:11 202:6

**nuts** 21:4

**O**

**o'clock** 235:7 286:22

**O'CONNOR** 4:10

**object** 14:12,16 27:10 34:21 44:18 46:14 49:8 61:4 69:10 85:20 86:12 93:2 96:9 106:1,9 153:14 159:16 313:6,12

**objected** 163:15 280:14

**objecting** 241:2

**objection** 10:16 13:5, 12,22 14:15 17:9,15 20:6 23:15,22 25:13 29:8 30:1 33:10 38:8 42:5 43:17 50:22 52:3,9 53:24 54:13,23 55:19 56:8 58:4,5 59:14 62:12 63:11 65:13 66:11 68:12 71:16 72:21 73:4,13 76:18 77:15 79:10 81:10 83:3 84:1 87:1 88:11 91:7 93:15 95:13 97:5 99:14 100:3 102:6,13 106:8, 19 108:22 110:3,15 111:5,12,23 114:1 117:20 124:21 125:10 128:3 137:13 138:22 139:7 140:12 141:7, 17 142:5,24 144:22 146:11 148:6 150:10, 23 152:14,21 154:19 157:24 159:4,16 164:16 165:16 167:9 168:10 169:7 171:8, 11 172:3,9 176:22 181:21 183:7 196:21 203:2 204:19 209:4, 14 211:11 237:2 238:5 253:3 268:20 270:2,13 271:18 272:21 273:14 274:17 275:14 276:9 278:3, 22 279:9,14 280:11 281:17 284:11 289:1, 21 292:21 293:2 297:3 298:19 299:11 300:10 305:22 309:5 312:14 315:22 324:11,19,24 352:3 354:1 356:1

**objectionable** 281:12

**obligation** 237:3

**obvious** 305:3

**obviously** 30:8 50:19 74:7 84:17 85:13 105:2 113:5 204:11 232:5 284:21

**occasion** 342:5

**Occasionally** 41:23

**occasions** 124:13 202:6

**occur** 29:2 64:12 86:10 94:9 106:21 196:18

**occurred** 64:14 65:5 79:13 88:7,8 194:20 196:19,20,23 213:23 214:21,23 245:2 304:20 306:14 356:22,23

**occurring** 68:3,4 191:11

**odd** 257:5

**Odyssey** 45:3,6,8

**of** 4:2,3,13,16 5:15,21, 23 6:6,7,10,11,15,17 7:3 8:3,13 10:16 12:18 13:5,12,19,22 14:5,9,12 15:1,3,4,10, 14,15,17,23 16:1,4,6, 15,22 17:9,13 18:11, 18 19:1,14,15,19 21:16 22:4,17 23:2, 14,15,16 24:4,19 25:7,10,11,12 27:11, 17 28:7 29:1,7,8,20, 23 30:1,3,5,10,19 31:5,10 32:16,17 33:2 34:17,21 35:2,11 36:3,13,24 37:1,2,8, 17,19,20 38:8,17 40:5,17 42:1,5,12,19 43:3,13,14,23 44:19 45:3,8 46:12,15 47:6, 15,21,24 48:5,10,12, 18,24 49:3,9,22 50:1, 5,8,11,12,15,18 51:3, 6,8,18,20 52:6,8,11 53:3,7,8,13,22 54:23 55:2,14,18 56:4,6,11, 13,15,18 57:4,6,18 59:3,5,8,14,19,23 60:10,11,15 61:5,20, 23,24 62:5,8,12,17,19 63:4,5,16,17 64:6,13, 18 65:6,11,17,20,24 66:2,4,11,15,16,18, 19,22,23 67:18,19,23 68:6,7,20,21 69:4,5,8, 11,12,16,18,21 70:8, 19,24 71:4,16,17,23 72:19 73:9 74:12 76:1,7,8,12,18,20 77:15 78:9 79:10,14, 16,21 80:5,7,12,15, 18,19 81:5,8,16,21 82:4,24 83:8,19 84:9, 12,20 86:1,11,13,19 87:1,12,18,21 88:2,3, 9 89:12,16,21 90:7 91:12,14,16,17 92:21 93:2 94:4,12 95:24 96:10,18 97:4,11,12 98:23 101:4,7,8,11,15 102:6,15,24 103:13, 16 104:11 105:12,15, 21 106:9,18 107:2,8, 12,18,23 108:2,9,11, 14,15 109:17 110:3, 18,22 111:8,21 112:1 113:2,4,14,24 115:1, 4,14 116:22 117:2,17 119:10 120:24 122:4, 5,9,12 123:9,13 124:3 125:13 126:13,14 127:1,8,18,23 128:21 129:8,13 130:23 131:7,8 132:3,10,12, 16,20 133:1,4,15,22 134:1,6,8,17,21 135:3 136:8,16,20 137:3,6, 10,12,16 138:7 139:13 141:15 142:10,12,16,21 143:10,11,12,14,19, 20,22 144:9,19 145:1, 3,5,8,10,12,14,17,18, 20,21 146:23,24 147:6,8,9,13,19 148:11 149:4,8,9,11, 12 153:2 155:9 156:3, 17 157:17 158:14 161:3,19 162:6,17 163:3,6,8,14 164:21 165:1 166:22 167:5, 12 169:11,16,20 170:22 172:3,7,14,17, 18 174:1,4,23 175:5, 16,19 176:12,15,18 177:4 178:5,20,22 180:8,16 181:2,4,24 182:20,22 183:7,8,10 184:5,10,11,19,20,22, 23 185:10 186:12,17 187:4,12 188:3,13 189:8,21 190:1,11,13, 14,17 191:1,3,4,15,24 192:4,9,10,12 193:5, 10,20,21,24 194:2,19, 20,23 195:4,18 196:14,17,24 197:11 198:1,11,14,19,22 200:11,12,14 201:13 202:20 203:13,23 204:14,16 205:18,21 206:18 207:19,20 208:6,8,20,24 209:4,7 210:10,18 211:3,9,10 212:8,19,20 213:2,3, 11,13,21,22 214:16, 17 215:3,7,24 216:6, 8,9,18,24 218:2,5,6,7, 9 219:22 220:15 222:10,13,17,21,22 223:5,6,10,18 224:20 225:18 226:1,10,17, 23 228:19,24 229:3,7, 9,13 230:15,17 231:1, 15,16,19,21 232:1,13, 15 234:12,17,18,19, 20 235:10,24 236:11, 21 237:2,18,20,22 238:9 239:19 240:1,6 241:4,23 242:12,19 243:13,21,22,24 244:5 245:6,9 246:7, 19,24 247:22 248:1,8 249:11,12 250:20 251:12 252:10,15,22 253:7,12,19,21 254:9, 18,22 255:2,6,21 256:5,21 258:8,19 261:18 263:3,4,7 264:4,14 266:5 267:2, 3,6,12,16 268:9 269:9,16,23 270:6,16 272:3,4 273:19,23 274:9,10,12 279:6 280:5,13,15,17,21,22, 24 281:4 282:3,5,6,9 283:9,11 284:11 285:17 288:1,23 289:15 290:7,14,21 291:8,9,21 292:6,8,9, 20,21 293:1,3,4,6,10 294:8,12 296:3,18,21 297:5,9 300:9 301:1, 16 302:10,21 303:21, 22 304:21,22 305:5, 15,20 307:18,19,20 309:2 310:24 311:1, 10,12,20 312:12 313:4 314:21,23 315:1 316:1 317:4,10, 13 318:11 319:4,8 320:1,5,19 321:8 322:7,15 323:3 324:9, 11 326:11,20 327:10,

16,19 328:8 329:9,10, 23 330:2,5,6 331:16, 19 332:1,13,14,16,19 333:7,10,13,16,17,21 334:1,2,23 335:1,2,3, 7,14,20 336:10,13,14, 15,18,21,24 337:6 338:12,17,19 339:10, 20 340:1 341:11,14, 22 342:8,20,21 343:16,23 345:7,10, 16 346:10,23 348:12, 13,16,18 349:1,16 350:14,16 351:20 352:2,17 353:22 354:4,9 355:6,11,23 356:5,10,23 357:1 358:9

**off** 45:3,11 64:10 67:12 102:15 125:17 138:21 142:23 143:20 163:24 179:17,19 184:5 198:16,17 199:15 220:20,22 222:23 248:3 249:16 251:16 257:12 258:2, 4 267:5 274:5 286:18, 19 299:9,15 311:17, 19 313:4 344:24 345:1 358:17,18,23

**offer** 15:10,15,23 16:4,10 48:5,7,11,14, 19,23 49:2,6,18 50:1, 4,10,15,17,19 51:2, 12,13,19,22 52:2,7, 21,24 53:4,19,22 54:4,9,21,24 55:2,6, 13,18 57:21 58:24 74:14,18,19,22 76:17, 19 121:23

**offered** 14:2 15:13 16:14 53:7 55:7,14

**office** 22:7

**officer** 5:15 322:21 323:2,4

**official** 59:3,4 61:13, 15,20 73:8,11,18,21 74:1 92:5,10 124:14, 16,18 125:9 193:4 195:13,19 215:6

**officially** 56:4,10

**often** 21:22 167:24

**Oh** 120:8 249:7

258:14 261:12 297:17

**okay** 9:15,17 14:21 16:13 19:12 20:15 22:20 27:22 28:18 29:16 35:12 38:17 41:6,21 43:19 44:6 47:8 50:10 55:4 58:2, 17 62:3,8 65:1,12 69:3 70:5,12,24 73:5, 11,24 75:24 76:5 79:16 80:4 81:7 84:20 85:20 88:6 89:1,6,7 92:7,15,22 94:23 96:4 97:23 98:10 104:7 105:8 106:23 107:10 108:18 112:5 113:11 118:21 119:20 121:14 122:4 129:7 132:14, 17 135:17,20 137:20 140:7 142:18 143:14 146:23 149:1 154:14 155:15 158:7,23 160:2 162:24 165:5, 10 167:6 168:6 170:4, 12,18 174:17 176:12 177:2,15,23 181:8,14 183:1,13 187:3 190:15 193:6 195:24 197:3,5 199:8,24 200:8 205:5 208:23 209:11 211:7,19 215:18 218:4 222:5 223:3,20 225:4 227:4, 6,23 228:7,9,13 230:23 231:14,23 233:10,21 234:13 235:6,8 239:18,22 240:13 241:14 242:10,18 244:2 245:16 247:5,24 248:16 250:2,5 252:13 254:8 255:1,9 258:1,4 261:9 262:11 264:2 265:12 266:7 269:6 270:18 272:6 274:6 276:3,14 277:3, 6,15 279:3,8 280:7,9 283:16,20 284:11 285:11 293:14 294:8 298:1 304:15 305:9, 12,18 307:1 310:1,12 311:23 313:10 314:4 320:18 321:18,21,22 322:3,24 323:6,10 327:1 329:12 330:23

331:7 334:8 337:14 338:20 339:1,17 341:24 342:14 343:13,20 348:2,8,22 349:7 351:4,19 352:1, 13 353:3,8,13 354:16 355:15,22 357:12

**old** 30:15 162:13,15 168:21,23 173:1,6 226:10 276:7 277:10 280:17 284:13

**older** 32:21

**on** 4:1,13,15 6:20 14:10 15:19 17:17,18, 21 19:10 21:15 22:10 23:20 32:18,21,22 33:15 35:2,17 36:12 37:13 43:23 45:15,23 46:4 47:22 50:20 57:17,21,22 58:20 62:11 64:14,23 67:14 71:4 73:9 82:21,22 83:7 85:10 91:12 92:5 96:10 97:11 102:17 105:24 111:21 112:1, 10 115:3,20 117:10, 22 118:5,7 124:13,19 125:19 132:24 138:16,21 140:24 141:3 142:23 143:21 148:22,23 149:21,23 151:15 156:3 159:13 166:5 167:21 172:20 176:1,15 178:2,7 179:14 180:2,13,16 182:15 184:9,19 188:8 189:9 190:1 191:14 192:14 195:13 196:16 198:7 200:11 201:5,7,10 202:4,6 205:15,20 208:5 211:3,5 212:16,21 214:2 215:18,19 217:21,22 220:2 221:1 226:19,23 229:8,17,19 230:5,15, 18,19,22 231:10 233:12 239:12 241:17 245:12 248:3 249:16 250:14 251:16 253:14 254:8 256:23 257:12 258:2,4,16 262:1 263:3 264:11 266:10 267:5,8,20 269:3

274:1,3,11 275:4 281:1,15,24 283:5 284:6,10 285:1 286:21 287:4,12,20, 23 290:17 291:10 293:3 295:8 296:8,23 298:5,10 299:4,18 301:11,15,18,22 307:1 311:3 315:1,21 316:2,4,22 318:14 321:7 322:5,7,10 323:7,12 324:9 325:10 328:9 331:14 332:12 333:5,20 334:19 336:4 338:15, 22 340:17 342:5 343:4,20 345:3,11 347:24 348:19 352:8 355:23 357:16,18 358:4

**once** 75:11,14 123:8, 18 135:22 141:14 149:21,22 217:8

**one** 5:22 6:16 14:10 19:8,9 30:23 31:17 36:2 56:21 64:13 69:12 79:24 82:7,18 99:6 107:20 110:8,9, 23 111:8 115:5,10,11 118:24 119:2,10 128:20 129:3 133:1 137:2 138:16,24 147:14 154:10 162:13,15 165:12,14 169:13 171:16 173:1, 6,8,13 174:15 175:16 177:11 178:2 181:24 182:21 183:1,2,6,8, 16,20,22,24 187:9 191:8 192:15 196:19 201:8 203:18 207:19, 20 209:23,24 210:2, 13 216:10 220:18 222:12 225:5 226:10, 23 230:11 234:24 238:6 240:18 247:14 250:13 252:4,5,9,14, 15 253:12,14 257:6 258:19 267:5,8,11 268:17 270:15 271:16 272:7,10,11,17,18 278:6 280:15 281:23 282:5,17 283:3 289:15 292:22 294:21 300:11 311:12 313:5

314:13 317:19 321:23 323:10,23 326:20 332:16 333:17 334:1 342:5 344:19,23 349:4 357:14,19

**one's** 317:8

**one-page** 329:24 331:15

**ones** 45:7 100:15 114:5 126:12 146:15 213:1 252:13 301:17 322:14,20

**only** 18:24 31:13 58:15 60:1 84:11 90:4 92:16 118:14 127:18 131:9 134:17 135:5, 14 163:15 174:2,10 176:4,13 177:4 186:20 195:6 197:3 198:15 211:9,17 214:23 258:24 274:10 318:24

**OP** 260:3

**open** 62:18,20,23 63:7,9 208:23 209:2,6

**opened** 40:21 41:6,15

**opening** 41:18

**openly** 123:7,22 124:3,6

**operate** 99:24 100:8

**operating** 22:11 39:9, 15,18 40:14 46:12 61:23 68:7 80:10,22 127:7 131:5,15 132:1 136:17 138:9,18,19 139:6,10 145:24 146:3,9,16,20,21,24 147:5,9,10,11 148:2 149:13,15,19,24 156:13 157:14 161:24 162:3,8,21 163:1,6 165:6,8,10 166:6,8, 12,18,22 167:12,23, 24 168:2,8,13,15,22, 24 169:11,24 170:23 171:6,20 172:8,15,22, 24 173:5 174:14,21, 24 175:5 178:10 179:7 180:20,24 185:8 197:22 198:2 200:1,5,13 205:22 206:19,22 215:21 218:10,15,16 233:14

243:12 249:5,6,10,18 250:17,19 252:2,19 257:4,6,7,9,13,18,22 258:9 259:4,6,8 260:9,16 263:16 264:4 265:6 268:4,9 270:1 271:4,8,10 272:8 273:10,13 275:12,20 276:24 277:13,24 278:13 280:3,18 281:1,7,14, 22 282:6,16,20 283:16,20 284:14 296:22 310:24 312:19 314:22 316:9,22 317:10,16 330:13,23 331:17,19 332:2,11 345:16,17 346:1,11, 13,16,19,23 353:17 356:6

**operations** 307:6

**opinion** 257:20 263:23 280:22 282:14,16,19 283:1 284:4,8,18,23 285:1,8 293:13 320:17 335:22 338:22,24 341:11,14, 22 342:8,20

**opinions** 281:10

**opportunity** 14:14 54:3 306:14 334:20

**opposed** 6:22 65:21 266:20 272:7 312:2 313:19 319:8 350:12

**options** 358:12

**or** 6:22,23 7:10 8:22 12:22 16:1,14 18:16 22:23 23:4,12 24:8 29:5 30:20 33:15 38:2 39:2 40:5,14 41:2 49:20 53:14,18 55:17 56:11,14,17 63:3,4,8 64:24 66:8 73:23 74:6 76:2 82:22 84:5 86:14 90:15 92:17,23 93:13 94:1 95:3 96:5 97:1 99:2 105:2 107:13 108:20 109:5,12 111:20 115:9,13 116:4,20 117:3,11,14 120:23 121:16 124:10 133:21 134:3 143:16, 17 150:4,8 154:16 155:11 160:19 165:14 169:5 170:7 173:6 175:16 177:11 180:16 182:18 183:5,9,16 184:7 186:21 187:5 188:6,13 191:14 195:6 196:2 199:23 201:5 202:4,9 207:19 208:17 209:3,7,24 210:13 211:5 212:21 213:22 217:23 221:15 222:8 225:21 226:2, 11 227:4 228:3,22 229:8,11,16 230:7,13 236:5 238:3,9 239:21 240:18 241:22 242:10 244:15,21 247:2 249:13 251:3 252:15 254:21 255:6 256:1,8 257:16,20 261:21 264:10 269:21 270:5 272:22 274:21 277:2 278:21 279:6 281:6 288:16,17 290:8 293:12 295:20 297:15 302:20,21 305:11 306:3,12,15 315:2 318:9 319:3,15,22 320:13 322:17 323:2, 17 324:5 327:12 329:3 334:22 337:12 339:20 341:11,16,21 342:5,8,19 344:15 346:11,13 350:3,14 352:19,24 353:6,23 355:24 358:17

**oral** 17:13 208:5 236:1

**orally** 66:20 67:1,2 72:19 192:14,21 241:18 289:20 312:10 340:13

**order** 28:12,19 358:4

**original** 38:23 250:19

**originally** 44:20 319:18

**other** 6:7,8 8:17,24 9:5 10:5,20,22 11:22, 24 12:1 21:3 23:4,8,9, 14 24:3 31:17,18 32:5 37:11,13,23 38:1,5,15 39:1,17 41:18 46:7,8, 21 53:3 60:14,15 61:21 64:22 66:1,2,5, 7 76:14 77:19 79:24 80:2 99:13 102:17 108:16 114:5 129:17 140:5 146:17 148:13, 14,17 150:8 151:11 155:13 170:12,14 175:16 177:11 178:10 179:7 192:11,23 195:16,17 196:1,11, 20 198:22 199:15,18 213:7 222:12 234:8 240:7,12 268:10,12 269:18 297:2,8 301:17 302:8 306:23 311:24 315:13 316:10 319:16 321:23 326:16 328:7 336:10 337:5 346:14 352:9

**others** 28:2 35:7 41:1 213:14 263:8

**otherwise** 127:11 228:22 230:13 339:24 352:19 353:6

**our** 6:24 28:19 30:9 65:17 66:22,24 73:7 85:24 86:1 88:3,8 90:22 101:7 113:14 115:4 138:10 145:5 148:2 169:2 215:1 234:11 249:10,11 258:9 281:13 284:2 299:18 347:15 350:21 351:5 352:6 358:12

**out** 14:15 21:3 23:2 45:8 68:18 84:9 98:23 101:6 102:14 121:21 123:23 131:4 157:13 159:16 163:14 208:7 237:21 270:19 277:20 280:10 282:15 283:1, 2,4 284:8,17,22 285:1,8 286:2,4,8 293:4 299:5 305:11 306:6 328:11 343:12, 14 345:6 348:14 350:1,4,5,13,18 351:1,2 356:24 357:3

**outline** 129:10 134:14, 15 140:19 144:19 145:18 146:9,24 149:3 184:21

**outlined** 129:9 134:13, 14 141:22 149:2

**over** 6:13 8:1,6 16:7 17:23 21:2 48:3 50:5 51:6,7 56:16 88:22 124:24 126:10 129:20 133:13 146:7 163:12 189:10,13 196:17 199:20 200:22 201:21 214:13,14,18 254:18 259:22 287:8 292:3 293:21 296:2 315:16 316:8 335:18

**overall** 187:9 230:20, 24 238:6

**overlap** 27:17

**overlapped** 27:21

**owed** 17:22,24 335:4

**own** 18:17 45:4 83:13 133:8 157:5,22 158:10 206:17,21 207:8,13 281:8

**owned** 269:3

**owner** 11:6 56:1,3,7, 15,19 57:1,15,18 58:16,18,20,24 60:10, 11,16 74:16,24 75:3, 4,11,13 77:1,14,23 78:2,16 79:2 86:22,24 87:10,19 89:13 91:19 92:1,8,13,18,24 93:14 94:1,3,24 95:10 101:4 107:21 116:3,6 119:22 124:5,11 125:13 134:21 136:2 177:21 196:6 231:16, 20,24 232:14 234:6 236:21 240:6 244:7 245:18 257:17 305:19 321:17 322:21 323:3, 5,11 324:15 327:15, 18,21 331:4,5 333:18 335:7 343:21 344:7 349:20

**owner's** 240:2

**owners** 13:19 66:1 90:8 258:8 280:5 349:6,18

**ownership** 25:19 53:8 55:11 56:2 57:8,11 58:11 59:1,6,8,20 65:17,24 66:6,24 67:20 68:9,16,24 69:19,21 73:3,7 74:4, 12,23 75:14,22 76:1 79:4,22,23 81:8,13 82:24 86:3 87:15,22 89:12 91:21 92:4 93:18 94:4 95:12 96:1,8,19 97:12 100:23 101:15 102:24 103:23 104:6,11,23, 24 105:14,21 106:7, 17 107:1,12,21 108:1, 11,14 110:13,24 111:10 112:6 114:20 115:9,15 119:21 121:6 124:8,14 127:2, 16 128:1 129:10 130:1,17 132:6 134:16,18,23 135:3,8, 9,15,21 136:8 137:12 138:7,10 140:19 141:3,22 142:8,11,13, 17,22 143:11,13,15, 19,23 144:20 145:1,4, 5,18 146:10 147:1,4 148:2,4,14,19 149:3 151:17,22 152:6,20 155:23 173:22 183:5 192:10 193:4 195:3, 12,20 199:13 200:24 201:2 214:18,20 215:5,9,10,12,15 218:19 219:4,24 232:8,18,23 233:3,5, 6,11,22,24 235:13 236:2,15 238:18 239:23,24 243:24 244:6 252:21 253:1,8 281:15,24 287:18 291:8 305:4,15,21 306:10,12 327:10 331:11 335:1,13,14 336:18,21 342:12 343:21 344:4 346:12 352:7 354:17

**P**

**p.m.** 126:15 220:23 224:17 234:21 323:13

**package** 16:20

**page** 32:17 45:22 46:1 47:22 126:9,14 129:9, 13,14,17 130:23 134:6 148:23,24 156:3 179:15 180:14 184:10,11 189:8,10 201:7,10 205:14 206:11 211:6 215:18 218:2,6 220:2 221:5

222:19 224:14 225:6, 9 226:17 227:1,3 230:22 238:9 242:19 246:14 247:6 249:1, 16 250:15 251:14 253:19,21,24 254:3,7, 8,19 266:5,11 267:8, 10 274:4 287:2,20,23, 24 293:23 294:8 301:16 318:14 320:1 321:9 328:9 329:24 343:20 345:10 348:12,13,19,24 349:16 355:9,11

**pages** 303:22 330:14 343:11

**paid** 18:4,5 195:6,17 240:8 245:8

**paper** 190:1 322:15

**paperwork** 41:12

**paragraph** 47:21,23 48:8,12,15 49:2,10,13 54:5 55:1 80:5,18 81:15,18 82:21 83:11, 16,17 89:16 90:13 93:21 94:14,21,22 95:22 97:1 98:4 99:20,24 102:1,12,22 103:21,22 107:16 109:17 111:9,19,20, 21 112:3,4 113:2,4 130:24 148:21,23 218:6 227:2,7 228:20 242:19,20 254:16,18 266:10 334:23 345:10,12,14,21,22 346:2 357:11,22

**parlance** 183:20

**part** 23:14,16 24:4 31:5 43:3 47:6,15 55:17 61:23 70:19 78:9 94:12 105:21 115:14 164:21 172:17,18 182:24 192:4 197:11 202:20 203:13,23 208:20 228:24 229:9,13 249:12 251:12 253:7 256:21 280:17 329:8

**participants** 31:7

**participate** 5:19 36:5 189:15

**participated** 145:20

**participating** 36:2

**participation** 76:13

**particular** 53:8 55:2 56:6 63:20 64:12 73:1 124:19 126:22 159:13 160:18 175:12 180:14 232:20 240:14 268:18 270:22 316:24 317:1, 4 320:12 333:13

**parties** 6:7 11:22,24 27:20,22 117:6 135:23 136:3,19 156:14 186:22 205:20 206:16 207:12,13 250:16 327:19

**partner** 48:3,21 51:24 53:1 82:1 101:9 281:8

**partners** 13:20 14:1,3 18:19 19:1 20:5 22:3, 13,24 26:8 34:6 40:2 51:9 152:10 277:9

**partnership** 163:4 284:2

**party** 5:16,18 9:5,16 10:9 222:20 223:4

**past** 16:7 51:8 140:1

**path** 313:22

**pattern** 331:16

**Patzik** 12:9 25:3 26:1 39:13 133:21

**pay** 16:22 66:8 88:4, 10,12 90:7 122:9 198:14 206:16,21 207:8 208:24 244:4

**Paycheck** 343:10,23

**paying** 159:24 207:13 276:19

**payment** 14:7 21:18 122:16

**payroll** 73:17 108:15, 20 109:2 145:9 242:2, 6 245:3 324:10,13

**PDF** 246:17

**pending** 11:2

**people** 118:7 144:9 228:6 261:22

**per** 16:18 83:15 102:12 230:9 240:5, 20 260:19 354:19

**percent** 18:7 24:22 75:6,11,21 83:13,14, 23 84:6,10 85:3,14 89:13,17 90:9,12 91:5 92:17 93:12,17,21 94:5,7,15,17 100:16, 22 101:16,17,19 102:2,4 103:8,14,15, 24 104:1,8,10,21 105:15,16 107:3,5 108:12 109:3,18 110:24 111:10 112:7 113:21,23 114:8 115:6,7 119:11,12,17, 24 120:2,6,9 173:19 174:2 187:10 195:3 199:13 238:14,17 239:22 274:9 323:11 343:22 354:23

**percentage** 19:14,17 75:4 95:12 100:23 101:11,14 106:7 107:12 108:14 119:22 287:19 292:1 354:17

**perception** 337:3

**Perfect** 204:16

**perhaps** 177:14 212:11 324:5 340:4

**period** 26:24 27:8 28:9 68:3,4 69:9 80:14 187:13 189:13 190:11 195:14 244:5 250:7 302:17 308:16 348:17

**perplexing** 99:22

**perquisites** 76:14 240:2

**person** 10:8 188:2 228:21 230:2,12 244:16 294:15 307:21 327:4

**personal** 160:19,20

**Personally** 253:23

**perspective** 12:4 202:4 245:12 281:10

**perspectives** 245:15

**Pete** 154:24

**Peter** 4:6

**Phillips** 341:24

**phone** 64:23,24 65:1, 2,9 188:4,6,8 191:13 192:14 208:6 212:16, 18 214:21,23 294:15, 16 298:5,10 299:4 303:16

**photograph** 328:8 329:14

**phrase** 47:24 78:9 232:1 338:17

**physical** 301:7

**picture** 32:18

**piece** 190:1 322:15 329:9

**place** 4:10 6:5 139:1 145:24 173:9 184:19 185:8 197:22 248:4 259:5 267:2 270:16

**placement** 325:14

**places** 108:13,16 199:11

**plainly** 49:10 157:24

**plaintiff** 4:18

**plan** 76:14

**planning** 149:7

**plans** 335:12

**play** 121:17

**playing** 118:11

**pleadings** 242:11

**please** 4:11,20 5:4 32:9 33:21 36:16 43:8 78:8 88:23 93:5 127:9 130:6,24 143:5 153:13 157:10 161:21 197:5 198:14 216:21 221:5,17 225:12 246:17 275:5 278:9 307:3 312:17 313:16 325:4 329:6 345:6

**Plenty** 293:4

**plural** 109:22 110:7

**plus** 18:7

**Pochin** 12:7

**point** 17:7 55:23 57:9 59:12 62:15 73:24 75:15 77:9,24 79:2,20 81:7 85:17 86:21 89:15 94:24 97:15,19, 20 98:3 100:20 101:2 102:9 112:6 115:21 126:22 131:18 133:11,24 134:1 137:2,20 139:10 140:24 142:1 164:12 169:13 173:16 174:3, 15 175:12 178:7 192:2 198:2 200:4,8 204:4 215:19 217:10, 15 219:1 222:16 223:13 230:21 231:6, 24 232:11 233:16 236:10 239:1,12 249:22 277:19,20 278:2,15,17 282:18, 21 283:12,17 295:9 303:6 305:18 311:8,9 319:10 322:13 333:4, 5 334:22 335:11,17 336:13 341:17

**pointed** 60:2

**points** 239:20 287:23 290:1,15

**policies** 129:11 149:4

**portal** 45:11

**portion** 32:17

**position** 198:7 218:8 223:12 242:23 243:10 244:2 248:9 335:5 346:15,24

**positions** 30:20

**positive** 341:16,21 342:19

**possible** 7:5 101:16 115:23 153:3 173:14 177:2,6,11,15

**possibly** 107:3 117:7, 12 184:2 258:6 323:9

**post** 29:2,7

**potential** 10:15 13:10, 15 90:14 127:1 155:10 222:21 223:5

**potentially** 101:21 222:18 261:13 351:8

**power** 35:15,19 36:23 165:4

**pre** 70:20,23

**preface** 312:12

**preferred** 300:7

**preparation** 206:18

**prepare** 7:21 127:15 200:13 204:10 226:1 237:3,10,16 255:19 266:19

**prepared** 113:18 127:9 128:9,10 145:14 146:21,23 177:18 178:6 225:21 236:23 237:6,7,23 255:18,22 267:15
**preparing** 127:11,24 134:3 225:22,23
**preschool** 12:18
**present** 92:17 299:10 346:18,21
**presented** 17:1 98:1 108:10 219:7,10 252:10,14 345:14 346:9,22 347:1 348:2
**presenting** 140:9 146:20 219:21 265:6 300:16 329:4 351:9
**president** 243:12,16, 19,20,22 244:1,3 343:18
**presumably** 208:9 315:18
**presume** 257:14
**presuppose** 251:18
**pretty** 86:17 105:13 202:9
**prevent** 150:3 151:7
**preventing** 64:8
**preview** 98:13
**previous** 11:6 147:22 181:23 257:3 266:20 269:21
**previously** 62:2 86:3 132:5 163:3 190:22 325:18
**primary** 259:2
**principal** 104:22 184:19
**Principally** 15:19
**principle** 157:13
**principles** 131:3
**printout** 32:16
**prior** 17:7 23:11 29:23 30:3,6,10,11,12,13 34:14 51:15 54:1 55:6,12 57:6 59:7 62:10,15,18 63:7,9, 11,16 69:6 70:6,9 72:7 73:24 76:16 77:13 79:20 81:7 92:10,17,21 94:6 130:8 133:20 134:20 135:2 154:23 180:10 187:14 193:23 195:14 216:3 217:2 226:2,3 240:8 249:14 271:4,8, 9 275:19 277:8 281:17 283:17 289:7, 9,11,12 295:19 298:19 311:5 312:6, 14 324:19 345:16
**privilege** 307:5
**privileged** 42:21,24 284:21 285:4,5 286:3
**probability** 177:13
**probably** 34:12 78:20 83:9 91:13 161:9 188:6 207:23 226:5,6, 7 252:8 258:3 307:15, 20 315:15 326:5 343:15 357:21,24
**problem** 28:11,20 115:19
**procedure** 149:4
**proceeding** 18:11 37:19
**proceedings** 358:24
**process** 156:8 190:24 197:17 198:5,7,8 234:9,10
**produce** 309:23
**produced** 6:10 112:17 126:6,8 128:19 259:23 293:22 294:21 325:12 334:17
**product** 181:4
**productive** 304:9,11
**professionals** 31:11
**profile** 36:9
**profit** 173:19,20 239:24 335:1
**profits** 66:2 88:1 195:7,18 240:1 336:15 339:23
**Program** 343:10,23
**progressing** 311:4
**projects** 15:19
**property** 5:22 348:20
**proposed** 48:2 68:24 129:10 134:15,17 135:8,15 140:19 141:3,22 149:3 180:23 184:22 186:12 206:18,21 215:9,15 222:7 223:6,20 231:8, 11 232:6 233:15,20
**proposing** 66:17 220:4 250:24 255:3
**protect** 297:13
**protecting** 215:24
**Protection** 343:10,23
**protective** 28:12,19 178:20
**protracted** 156:12,21 216:1 217:4
**provide** 12:4 42:20 156:8
**provided** 188:24 238:3 331:21 337:7 338:12 339:2,22
**provider** 326:7
**providing** 113:6
**provision** 273:15 274:21 275:10
**provisions** 149:12 166:1 168:1,9 170:9
**proxy** 84:12
**public** 43:15
**pull** 45:10 345:6
**pulled** 45:3 348:4
**purchase** 163:21
**purchased** 277:23
**pure** 263:6,10
**purportedly** 170:13
**purpose** 145:22 147:8 185:6 215:24 237:20 261:4 268:19 269:6 270:22 290:14 320:5
**purposes** 186:19 335:3
**pursuant** 244:10,12 346:13
**pushing** 191:14
**put** 32:22 48:24 60:18 84:17 85:24 136:19 142:21 144:2 145:3, 24 147:4 150:21 172:19 190:21 193:3 197:21 203:1,2 229:4 230:10 241:14,22 244:10,14 246:15 251:22 286:1 294:5 295:8,14 301:20 302:2,13 303:7,24 304:6 322:15
**putting** 40:14 138:24 143:19 173:8 185:8 186:7 323:2

**Q**

**qualifications** 147:15 258:20,23
**qualified** 151:21 154:6
**qualify** 80:24
**quality** 200:18
**quarter** 330:14
**question** 7:2 10:17,19 13:6,13,23 14:16,18, 20 17:10 19:10 20:14 21:3,8 23:15 27:11 29:9 30:1 34:22 38:8 41:9 42:6,9,15,23 43:7,9,19,22 44:19 46:15 49:3,9,15 51:11 52:18 53:21 54:24 56:3 57:11 58:8 59:2, 15 61:5 62:13 63:14 66:12 68:12 69:11,12 70:20 71:17 72:5,12 75:23 76:4,19 77:16 78:4,5,7,10 79:11 85:21 86:13 87:2 88:15,16,20,24 89:2, 3,8 91:22 92:4 93:3,6, 7 95:15 96:10,14 97:8 100:3,6 101:19 102:7, 15,17,19,21 105:4,13 108:22 109:12 110:3 114:13 115:5 116:19 118:2,13,21 119:3 120:20 121:8,10 125:3,6 134:23 135:2 136:14 141:9 142:1, 19 143:5 152:22 153:13,15 156:1 157:20 158:22 159:10,19,22 166:10 169:10 171:15 172:4 173:7 174:7 175:21 182:19 183:8,15 192:7 197:4 201:1 204:10 205:3 209:5,7, 11,17,19 211:1,8 213:7 215:6,11,13 217:17 221:9,11,17, 18 222:12 226:14,16 228:1 230:14 232:15 237:2 238:2 241:21 242:8 254:24 260:21, 24 261:1,23 268:10 270:9 275:5,17 276:4, 14,16 278:7,10 280:23 281:20 282:11 284:12 285:7,10,13 287:3 290:18 291:3, 16 296:10,16 297:16 299:12 300:13 307:15 308:6,9 310:1 311:7 312:6,12,13,17 313:16 315:23 318:16,24 324:3,11 332:24 333:21 341:6 349:18 350:6,14
**question's** 65:13 159:16
**questioned** 357:15
**questions** 6:15,17 14:12 23:19 72:9 115:1,16 141:8 144:12 208:18 210:11,18 237:24 254:17 321:23 330:3, 21 331:12 351:7 353:13 354:9
**quicker** 159:9 290:17
**quickly** 351:13
**quite** 52:15 240:4 321:22
**quote** 61:1 170:10 195:6 348:6

**R**

**Rachel** 73:23 109:5,6 244:15,18,20,23 307:6,22 322:10 323:17,21 324:1
**raised** 189:20,23 224:1 320:13,14,15
**raising** 22:11
**ran** 30:8,9 279:19
**Rand** 5:19,23 6:8 10:3,21 30:12 35:6 37:12 166:15,17

**rate** 28:15
**rattle** 198:17
**rattled** 198:15 199:15
**Ray** 263:11,12,19 265:18 287:16 353:18 354:13,19 355:1
**reach** 229:16,18,19
**reached** 96:17 97:2 196:15 214:1,2 234:10 235:24 240:13 266:24 267:1
**reaction** 181:13
**read** 43:7,9 47:22 48:15 78:4,5,8,10 89:2,8 92:11 93:7 127:6 143:5 149:18 153:15 156:4,16 185:23 206:5,24 216:7,13,20 217:16 232:21 233:16 254:23 256:1,14,16,19,21 257:5,9 260:3,8 263:21 274:22 275:2 278:8,10 301:17 329:6 345:13
**reading** 129:12 131:12 158:8,21 159:18 225:8 256:11 260:22 263:23 301:24 338:14 345:23 346:7
**reads** 46:1,2 179:9 180:21 185:18 204:3 231:22 251:15
**really** 23:24 49:14 52:19 58:8 105:12 144:9 170:17 181:9 183:15 279:22 291:4
**reason** 31:3 32:22 33:8,18 36:4 92:16 135:13,16 258:24 279:16 295:14 304:15,16,20,23,24 305:1 339:3,6 344:6
**reasons** 259:2,3 332:1, 17 333:17 334:1
**recall** 6:2,11 8:14 9:20 10:5,7,24 11:1 12:5, 16,20 13:3 15:21,22 16:5,17 17:11,20 23:10,13 26:13 27:17, 24 32:7 35:14 36:6 37:8,14 38:4 39:4,7 40:15 41:20 49:20 50:7 54:7,8,20 55:2 58:12,13 60:17 63:1 67:5,20 68:5 77:18 81:2 99:1 103:1 108:17 112:21,24 113:7 127:14 128:10, 11 129:1,3,17 131:10 137:4,5,7 147:6 148:10,11,16,17 154:3 156:16,19,23 157:1,4 158:5,7 159:1,8 161:8,11,18 163:14 166:3 170:24 171:2 175:10,15,20, 22,24 176:2,4,8,23 177:3 180:15 186:5, 18 187:1 188:24 189:6 190:15 191:9, 16 196:3,5,7,13 199:22 201:6 202:17 206:6,8,19 207:10 208:19 217:7 219:5 221:21 224:5,17 225:23 226:3,4,9,12 228:3,4 232:4 238:8, 15 240:11 241:1,2 242:17 250:11 255:13 256:8,10 267:24 287:9,14 302:23 307:9 308:24 309:1, 21 316:23,24 317:1 322:6,12 323:8,14 325:1 329:7 330:7 333:9,15 337:7 344:8, 12,13 353:16 354:8, 13,16,21 355:1 356:4, 13,15,21
**recalling** 181:12
**recalls** 113:9
**receipt** 28:7
**receive** 21:18 122:9 195:16
**received** 88:3 90:5 129:1,3 130:9 180:15 186:4,8,16,24 187:18 190:2 193:19 205:12 207:24 215:14 222:1 244:4,7 245:6,7 334:23 339:23
**receiving** 131:10 211:4 216:3 217:3
**recently** 90:18
**Recess** 67:13 125:18 179:20 220:24 286:20 345:2
**reciprocal** 178:19
**recitals** 251:4,5,9 268:7
**recognized** 85:6
**recollection** 27:19 35:12 52:13 53:11 154:24 170:21 210:8 216:15 223:16 255:15,17 311:24 331:6
**record** 4:2 5:5 67:12, 14 112:16 125:17,19 126:3 179:18,19 180:2 220:21,22 221:1 224:12 274:2 286:18,19,21 325:19 340:17 344:24 345:1, 3,13 358:4,23
**recorded** 61:24
**records** 62:1 145:8 324:10,13 326:23
**red** 66:18 130:10 141:4,6,12 147:7 191:17,18,19,22 192:6,13,19 220:8 260:11,14,18 261:2,4, 14,18,21,22 262:8,11 266:20 267:17,18 311:1,8,12,20,22 312:1,2,5 313:14,18, 19 317:8,13
**redlined** 314:11
**reduce** 173:19
**reference** 333:6 349:9
**referenced** 48:20 49:7 80:18,23 90:13 113:4 248:12 345:21 346:2
**references** 89:17 109:18 262:22
**referencing** 48:8 107:16 331:18 332:15 333:22,24
**referred** 155:1
**referring** 86:14 307:20
**refers** 123:19 233:3
**reflect** 97:19 109:3 198:8
**reflected** 97:14 252:2 266:22 268:2 313:1
**reflective** 298:2
**reflects** 289:4
**refresh** 37:5 68:2 83:10 255:15 291:10 323:16
**refreshed** 127:21
**refreshes** 255:17
**refuse** 116:18
**refusing** 43:21,24 285:7
**regard** 27:12 28:4 284:13
**regarding** 11:17,19 15:5 25:21 26:7 39:8 41:21 46:11 53:7 57:7 79:8 127:7 149:11 206:21 222:21 223:5 292:7 296:14 301:5 320:7 327:13 353:14
**regardless** 103:13 104:11
**regrets** 305:18
**regular** 358:5,8
**Reingold** 48:1 81:20, 22 356:8
**Reingold's** 48:4 81:24
**reject** 204:9,12,14 229:11 241:7 299:23
**rejected** 206:9
**relate** 253:13
**related** 232:16 342:11
**relating** 153:2 206:17
**relationship** 65:17,21, 22 101:7,8 184:24 185:11 301:2 330:24
**relative** 46:13 59:5,7 68:16,23 69:18,21 71:3,5 73:3 74:22 78:1,22 79:4 81:8 82:3 84:5 85:9 86:22 93:24 96:7 115:8 116:17,23 127:1,16 128:1 129:24 131:14, 23 132:9 133:21 134:2 139:5 142:10 143:10 151:24 152:5, 20,24 155:6,23 162:19 173:22 183:4 188:8 189:2 192:9,19 197:8 219:23 227:24 234:14 241:10 253:1 269:24 270:11 271:4 272:1,6 279:13 291:8 316:9 327:6 330:5 331:3,10 335:6,23 351:8
**relevance** 106:10
**relied** 228:20 230:2,12
**rely** 111:21 112:1 296:23
**relying** 230:5,8,15,18, 19
**remain** 164:21 231:7 232:12
**remained** 62:18,20,23
**remember** 6:7 8:10 14:17,20 35:19 36:12 53:3 55:7 78:20,23 80:20,21 133:1 158:16,20 159:11,18 168:13,17,20,21 175:6,14 177:8,10 182:15,16 199:5,12, 14 201:3 208:8 222:22 235:12 238:19,21,22,24 240:20 301:22 302:20 336:10 344:14,16 348:3 353:24
**remembers** 168:17
**remind** 33:8 52:24
**reminded** 58:6 127:18
**remove** 164:15
**removed** 44:22 165:7
**rendered** 187:11
**reoccurred** 356:24
**repeat** 80:3 88:17 93:5 97:7 125:5 136:14 153:13 210:20 275:4 312:16 313:15
**repeating** 60:8 228:2
**rephrase** 6:18
**reporter** 4:7,20 6:24 7:6 10:12 19:6 78:3 217:17
**reporter's** 82:15
**reports** 25:23
**represent** 4:12 44:24 47:19 131:9,14 132:5, 9 157:18 181:6

216:19
**representation** 131:8 157:17
**represented** 12:11 46:11 216:16 343:22
**representing** 12:1 47:16
**represents** 131:1 157:11 215:21
**request** 247:18,19 330:4 349:19
**requested** 349:22
**requests** 188:16
**require** 275:8
**required** 258:17 274:15
**requirements** 81:6 258:18
**Requires** 332:12
**reserve** 344:15 358:2
**reserved** 351:7
**reserving** 28:21
**resignation** 254:21 255:5
**resolution** 81:21
**resolve** 18:2 156:14,22
**resolved** 62:6 304:1
**respect** 9:14 66:6 151:17,18,22 155:3 245:16 286:9 297:5 351:22
**respond** 118:15 135:7 206:24 207:2,4 224:3 302:24 303:2 304:5 309:9,22
**responded** 260:11 309:3,7,10,12 310:3 319:13
**responding** 330:3,4
**response** 43:11 134:9 174:8 180:10 188:16 206:4,6,7 217:9,14 232:17 239:9 259:6 260:12 330:8 331:9
**responses** 6:21
**responsible** 201:12
**responsive** 72:9 120:20,21 228:2,3 232:24
**rest** 216:18 225:18
**restate** 159:10 250:16 298:22
**restated** 170:23 171:18,20 172:2,5,8, 14 180:20,24 205:21 206:18,22 218:10 249:4,6 250:21 257:18 268:5,16 269:12,19,24 270:12 310:23 311:14,18 312:2,4,8 316:21 317:9,15
**Restrictions** 332:12
**restrictive** 68:9
**restructure** 35:22
**restructuring** 205:18
**result** 81:22
**resulted** 287:16
**retain** 131:13,17,19, 20,23 133:11
**retained** 132:21 133:6
**retirement** 254:21 255:6
**return** 113:17 187:11
**returns** 21:16
**revenue** 173:18
**revert** 288:17
**reverts** 114:7 120:6,8
**review** 12:21 141:5 164:2 219:15,16 236:12 249:12 251:12 254:16 263:21 330:13 351:10
**reviewed** 8:15 130:11 166:24 169:12 202:5 277:6
**reviewing** 141:6,13
**revise** 353:8
**revised** 180:19,23
**revision** 318:24
**revisions** 318:15 319:3
**revisit** 197:17,19 198:5
**rid** 163:6,8 169:11,16, 20 280:21,22,24 282:3
**ridiculous** 164:22
**right** 10:3 22:18 23:2 25:5 41:13 50:11,21 51:4 58:3 63:7,10,24 68:5,11,21 70:6,9,10 75:9 76:2 77:4 79:6 85:14 94:18 98:12 105:23 114:12,21,23 117:11 120:16 124:12 128:2 130:2,21 131:2 132:6 137:3 138:13 139:17 140:2,18,20 142:4 146:3,20 147:3 150:6,20,22 157:11 158:8 160:21 162:8 164:22 167:11 168:3 171:7 175:1 176:9 177:12 178:6,8,17,24 179:6,8 180:20 181:10,20 184:1 189:24 194:2,3,13 198:11,24 200:2,21 201:17 203:1,7 204:7 208:1,15 209:22 212:12 218:19 219:11 226:15 227:3,10,17 228:12,17 230:3 233:12 234:1,20 235:14 236:16 237:1, 18 238:10 239:16,17 242:7 243:10 244:19 246:9,12,15,19,20 247:7,8,10,12 248:14 251:12,17 254:1 256:5 258:2 260:9 261:2,20 262:5 263:17,20 264:17 267:19 268:23 269:1, 2,5 272:1 273:3 274:5 275:3,22,24 276:19 277:7,14 278:2,16 280:18 281:3 283:10, 14 288:24 289:15 290:20 291:23 294:6, 19,22 295:10,14,18 297:17,19 302:17 304:17 308:4,20 309:4 310:10 311:10, 11,15,19 312:6,11 313:2 315:19 316:12 317:4,17 319:10 321:22 322:1,2 324:10,18 326:18 328:9 331:5,23 332:23 333:23 334:3 335:14 336:18,22 337:15 340:15,16,23, 24 343:12 350:16 351:17 352:10
**rights** 28:21 178:20 250:18 320:7
**risk** 90:20
**role** 48:4 307:4,6,7,17, 21,23 308:1,10
**roles** 307:18
**rolling** 127:13,16 128:1
**room** 7:7 67:8 82:10
**Roth** 342:14
**roundabout** 90:24
**rude** 88:13
**rule** 88:19
**ruled** 163:16,17
**rules** 6:14
**run** 245:4 281:2
**running** 41:11 281:13
**runs** 316:20
**Russ** 327:3,4,13,15 329:3,9 330:5,8 331:3,10,14 332:17 333:12,18,23,24 334:2,19,23 335:12 336:3,6,14,17,21,24 337:6,8,9,15,17 338:12 339:12,22 340:2,4
**Russ's** 335:6,17,22 336:7

**S**

**S-A-L-I-T-A** 19:13
**S-H-O-W-E-L** 4:17
**said** 20:3,10 32:10 33:22 36:17 40:23 43:9 44:12 51:2 57:10 59:1 60:9 61:9,13,15 63:21 64:10,15 65:10 66:20 70:10,14 74:2, 15 77:8 78:5,10,24 80:3 85:16,23 86:6,16 87:12 88:10 89:8,11, 13 91:21 92:1,3,12 93:7 94:14 97:20,21, 24 98:18 99:24 101:22,23 102:5 103:9,17 109:15,16 110:7,20 111:9 112:11 113:10 118:22 124:7,13 125:23 127:9,20 128:8,13 132:4 134:22 140:21 141:4 146:19 151:4, 23 153:15 154:5 157:5 159:17 160:4 165:17 168:12 169:13 171:24 172:1 179:22 181:11 182:3,13 185:24 188:8 189:1 190:20,22 191:4 192:13 193:3,8 194:11 195:13,19,21 196:16 198:10 199:24 202:6 205:4 208:4,12 209:12,15 210:6,24 211:4,9,16,17,22,23 212:14,17 214:9 215:4 218:11,18 220:8 222:9 223:9,21 224:7 239:10 240:23 241:12 245:24 247:21 248:18 250:8 251:22 259:15 262:15 266:3 267:17 274:22 275:19 278:10 280:19 282:2 286:12 289:14 290:11,12,19 293:16, 24 295:9 296:11,23 297:13 299:2 303:10 304:23 305:10 306:8, 9,11,23 310:14 312:19 314:15 315:11 317:21 319:12 321:1 325:5,11 327:24 329:17 332:5 334:10 338:6,21,24 340:10, 11 342:24 343:22 347:17 349:10
**sake** 229:16
**salary** 195:5 240:7
**sale** 254:22 255:6
**sales** 83:15 84:13 102:3 104:1,9 105:16 107:6 113:22 115:6 119:12 307:6
**Salita** 19:4,12
**same** 11:15 22:16 28:3 43:11,17 46:24 47:6, 15 67:3 69:5 98:9 104:16 109:24 110:2 114:15 116:9 118:16, 18 120:14,15 121:20,

23 130:7 148:21 161:12 189:8 190:7 215:18 222:19 230:10 234:13 249:9 260:3 287:24 292:7 301:4 307:1,6,18,21 315:18 325:23 328:11,15 338:15 353:1,5 354:17

**Samotny** 12:9

**San** 6:4

**Sara** 12:7

**satisfied** 205:20

**satisfy** 313:23

**Saturday** 249:3

**save** 314:21,23 315:4, 5

**saved** 315:11,12

**saw** 68:10 85:15 133:7 141:14 217:8 242:10 249:14 261:8 267:11 268:9 277:8 320:9

**say** 8:8,19 9:8 16:8 20:2 27:20 32:3 38:20 40:23 48:8 49:17 50:10 53:14 56:10 63:17 64:4,19 65:20 67:19 69:23 72:18 76:8,24 80:2 83:1 86:17,19 87:17 88:19, 21 89:14 91:1,19,23 92:24 93:14 95:7 99:8 100:12,14 103:12 117:14,15 118:8 123:20 127:19 130:8 131:22 133:15 135:15 161:21 162:19 164:14 167:22 168:1 170:23 178:1 181:8 182:16 190:21 192:1,19 198:13 199:7 200:17 206:1 207:15 225:12 233:23 235:12 242:13 243:3 245:5 252:15 255:21 256:18 257:17 266:2 272:2,11,12 275:11 291:23 296:24 299:4 300:20 307:2 308:3,11 313:6,7 315:5 322:5,12 333:4 337:23 338:7 340:12 345:24 353:21

**saying** 14:9 47:9 48:23 56:24 58:23 60:3 70:7 76:17 77:3 78:15 91:4 92:9 93:24 94:16 98:20 101:20 102:4 104:15 114:11,14 115:4 116:20 118:10 132:13 135:8 142:15 145:15 169:17 213:19,21 215:3,9 228:1 230:1 233:5 242:12 245:7 252:20 255:23 256:11 258:7 262:9 281:4 294:10, 17,24 298:15 306:4 309:11,16,17 312:4 314:11 331:18 336:1 338:3,13,21 339:13 340:19 350:24

**says** 33:1 49:10 81:1 84:4 95:23 96:17 102:2 110:24 113:18, 21 115:2 129:8 140:18 148:15 149:5 150:3 156:2 157:8 158:1,3 161:24 171:19 173:2,3,4 185:20 186:6 205:16 206:12 227:15,22,24 228:18 230:21 249:7 287:7 289:16 290:18 308:20,21 345:14,22 346:21 349:5 355:18

**scenario** 156:5,9

**schedule** 113:16

**scheduling** 8:22

**school** 139:15,21 171:22

**scope** 82:4,24 95:24 96:18 102:24

**scratch** 173:6,9

**se** 16:18 230:9 240:5, 20 260:19

**search** 316:7

**second** 14:10 19:8 48:10,11 120:24 130:23 168:12 184:11 187:8 207:19 215:19 216:11 220:18,21 227:2,3,7 232:11 233:16 238:6 251:8,9 283:5,6 294:8 300:11 301:16,18 313:10 322:1,2

**Second-to-the-last** 218:2

**secondary** 259:3

**section** 223:1 254:9,10 320:5 331:16,19 332:11,20 333:6,13 355:13

**secure** 80:12 344:14

**secured** 344:10

**see** 32:21 36:10 83:16, 17 117:18 118:3 126:8,11 128:23,24 130:6,11 132:4 138:17 156:13,14,15 161:21 184:12,13 225:12,19 242:10 246:17 252:11 276:19 284:8 295:11 298:14 309:22 321:8,21 323:4,14 331:15 348:24 352:14,20 353:6 355:16,18 357:16,17

**seeing** 85:14 127:20 231:11 298:12 316:24 317:1

**seek** 282:15 283:1,2,3 284:8,17 285:1 286:2, 4,8

**seen** 34:11 44:17 45:19 133:6 164:5,11, 13 182:20 187:14 318:8,10 329:1,13

**Seltzer** 154:24

**semantic** 118:11

**send** 127:6,9 130:10, 13 138:4 141:4,24 153:7 164:7 171:19, 23 191:18 201:20 220:9 228:6 242:14 246:11,18 247:17 261:20 263:7 299:22 348:20 350:18

**sending** 130:20 137:23 138:5 141:2 147:8,10 203:6 220:11,14 222:3,6 224:18 228:5 249:17 257:21 258:21,22 265:9,17, 21 271:21 301:22 333:12

**sends** 257:17

**sense** 20:23 89:21 153:3 195:8 256:12

**sent** 96:3,20 109:14 115:3 129:5 130:5,7, 8,22 134:10 137:20 138:3,9,14,16 147:5, 11,19 153:8,18 159:13 164:2 171:24 172:1 185:4,7 188:13 189:4 190:2 191:19 203:5,7,9,11 206:15, 16 207:1,2,5 209:20 215:8 219:13 220:10 221:13,19,23 222:23 223:7 225:4,21 226:19 227:2,9,11 228:8 230:11,21 231:1,3,18 232:6 233:10 235:17 239:3 243:9 246:8 247:6 249:15 256:13 257:9 258:24 259:12 261:12 265:15 266:6,21 267:16 268:15,17,23, 24 269:21 271:6 273:3,4 297:12 300:18 302:5,6,15 310:9 311:5,6,19 312:7,19 313:1 315:13,14 317:3 318:12 319:8 334:6 338:20 348:4 350:13 353:17 357:14

**sentence** 80:3 156:3 185:14 186:11,15 203:16 204:2 228:19 231:14,22 254:18 256:12 338:15,17 339:18

**sentences** 149:5 156:6

**separate** 131:6 157:16 215:20 218:13

**separated** 106:6 341:19 342:1,17

**separation** 341:9

**September** 124:3 339:20

**series** 6:15

**seriously** 210:11

**serve** 35:17 254:20 255:5

**served** 35:2 37:13

**service** 326:6

**services** 187:11 189:11 326:21

**set** 97:1 166:21 185:15,22 208:21 209:15 210:21 218:11 223:21,23 227:8,14 234:10 235:17 241:12,19 250:18 259:11 351:21,22 352:1 357:1

**set-aside** 223:10,18

**setting** 218:13 224:1 241:15

**settled** 138:11

**settlement** 14:5,8

**setup** 322:10

**seven** 340:22

**several** 77:5 105:4

**severance** 14:9 31:14

**Shaffer** 327:3,4 334:19

**shall** 189:15 201:11,12 205:19 215:22 254:19,20 292:9

**share** 195:18

**shared** 174:5,8,10,12, 13 216:15 336:5

**Shares** 122:15

**sharing** 90:7 265:18

**she** 57:21 81:19,21 82:13 87:20,23 89:19 97:3,13 103:3,5 108:10 127:7 128:8 129:20 137:1,2 140:18 141:2 147:16 149:5,10,14,16 150:3, 7 151:14,19,23 152:4, 6,7,8,12,17,19 153:6, 7,24 154:6,7,10,14, 15,17 155:1,2,3,7,8, 10,13,16,21,22 158:14,15,18 159:2 162:15,17,19,24 163:1,5,7,9,10 165:11 169:16,17,19,20 170:8,13 191:22 192:2 193:1 201:19, 20 202:15 203:1,2,5,6 214:13 216:1,18

217:3,4,5 219:10,13, 14,21 220:3,10,11,14 222:6 223:7 224:2 228:9,14 233:4 236:15 237:13 238:16 239:9 241:7 242:9,10 247:13,15 249:19 253:13 255:4,13,16 256:3,4,7,10,14,18,20 257:11,17,21,24 258:1,4,10,15,21,22, 24 259:4 261:20 266:4 271:12 272:2, 13,14 275:20 276:5, 11,14,21,23 277:1,2,3 279:13,19,20,23 280:20,24 284:3 299:22 301:3 302:5,6, 10,12,13,14 304:6,10, 13,14,17 305:5,8,11, 14,18,19,20 306:8,10, 11 307:16,17,22,23, 24 308:1,2,3,5,11,15 309:2,3,16,17,19 310:3 312:22 330:20, 21 331:1,4,6 338:1,2, 6,9 339:7 340:2,9,10 346:21,24 356:19

**she's** 302:8

**sheet** 68:7 128:22 129:9 130:20,22 131:4,14,24 134:7,14, 15 139:14,23 140:4,8, 10,18 141:2,18 147:19 148:4,6,8,12, 13 149:2,13,22,23 157:14 180:11,13,15, 18,19,23 181:1,3,14 184:20,21 185:3,14, 16,21 186:10 187:4, 18 189:23 191:6 193:19 201:21 203:3, 11 205:12 208:7 216:4 217:3 219:8,9, 11,12 220:10,12,14 221:14,23 223:7 225:7,15 226:2,13,18 227:1,8,13,15,19,22, 24 228:8,10,13,14,18 231:12 233:10 234:9 235:18 238:2 239:8 240:14,17 241:4 256:1 314:22 316:10 351:21 352:8

**sheets** 46:12 71:18 127:1 136:16 148:18 215:8,14 222:1,3 241:16 257:3

**shook** 85:11

**short** 31:13

**shorter** 212:11

**shorthand** 209:24

**Shortly** 342:4

**should** 8:19 82:8 99:11,17 102:5 104:21 114:5 120:5 121:21 133:8 156:21 165:11 182:18 212:20 215:20 216:24 227:13 228:16 239:11,14 249:13 251:23 279:23 298:7 315:1,18 316:1 328:7 330:17,21 336:8 337:15 350:5

**shouldn't** 28:20

**show** 52:10 68:1 71:7 114:24 134:8 141:17 145:17 168:14 171:1 180:11,14 253:5 295:12 308:22 325:3 326:14,15 331:24 342:22

**showed** 181:18 260:4 324:14 353:16

**Showel** 4:17 10:16 13:5,12,22 14:10 17:9,15 20:6 22:15,20 23:15,21 25:13 27:10 28:3,14,23 29:8 30:1 33:10 34:18,21 38:8 42:5,14,21 43:2,7,11, 17,23 44:18,23 45:4, 16 46:14 47:2 48:10 49:8 50:22 52:3,9 53:24 54:13,23 55:4, 19 56:8 58:1 59:14 61:4,16 62:12 63:11 65:13 66:11 67:6,11 68:12,19 69:10,14 70:17 71:6,16,22 72:21 73:4,13 76:18 77:15 78:3,7 79:10 81:10 82:6,13,16 83:3 84:1 85:20 86:12 87:1 88:11,16 91:7 93:2,15 95:13 96:9 97:5 99:14 100:3 102:6,13,18 106:1,8,19 108:22 110:3,15 111:5,12,16, 23 113:9 114:1 115:14,17 117:20 124:21,24 125:10 128:3 137:13 138:22 139:7 140:12 141:7, 17 142:5,24 144:22 146:11 148:6 150:10, 23 152:14,21 153:9 154:19 157:24 159:4, 15 164:3,16 165:16 167:9,14 168:10 169:7 171:8,11 172:3, 9 176:22 181:21 182:4 183:7,13 194:2, 7,13 196:21 203:2 204:19 209:4,14 211:11 212:3 216:11 217:16 237:2 238:5 253:3 254:10 264:18 268:20 270:2,13 271:18 272:21 273:14,18 274:2,17 275:14 276:7,9,16 277:16 278:3,22 279:9,14 280:11 281:17 282:11,22 283:5 284:11,20 285:3,12 286:1 287:11,13 289:1,21 292:21 293:2 297:3 298:19 299:11 300:10 305:22 306:6 309:5, 11 312:14 313:6,12 314:10 315:21 316:15 318:19 322:16 324:11,19,24 325:12 340:16,20,24 341:3 344:21 346:5 347:8 348:5 351:11,15 352:4 354:5 356:3 357:6 358:2,5,20

**showing** 32:15 34:3 36:22 114:21 180:5 246:5 259:20 286:24 291:9 310:19 329:22 332:10 334:15 343:7

**side** 122:17,21,23 123:4 205:16

**sign** 17:4 18:8 67:3 78:21 123:16 136:20 138:8,21 142:10 144:21 248:3,11 250:9 251:16,23 252:10 253:12 257:12 258:2,16,17 259:13 261:11,13,14,15,16 262:6 267:4 271:7,23 273:6 288:10,11 334:3 345:15 346:10, 19,22

**signature** 165:1 246:14 249:16 267:8, 10

**signed** 41:4 83:7 85:10 117:5,17 123:8,18,23 124:2 135:22 136:4,7, 13 139:4 142:23 143:9 151:11 155:9, 17 247:5,6 248:10,13 249:16 253:17 267:6, 11,22 272:18 288:7,8, 14,23 320:20 333:16, 22

**significance** 245:6

**significant** 63:1,3 89:22

**significantly** 240:4

**signing** 143:20 258:4 271:5

**signposts** 91:1

**similar** 109:16 150:4 151:7 156:20 229:5 234:9 357:1

**Simon** 324:4

**Simon's** 324:2

**simple** 86:17 115:5,9 121:10

**simpler** 182:19 341:7

**simply** 60:8 98:23 116:18 157:9 346:21

**since** 7:20 23:7 24:18 29:20 34:8 78:23 99:21 121:16 123:1,6 133:1 163:23 177:2 195:15 217:13 304:21 341:8,19 342:1,16

**single** 110:20

**sir** 144:8 210:7 211:2

**sit** 35:12 39:14 60:13 95:19 148:10 170:20 184:3 202:11 207:11 234:3 292:19,24 303:6 305:14 314:8 320:11 354:13

**sitting** 188:13 237:18

**situation** 150:4 151:7 156:7

**six** 123:7 235:3 330:13 336:13 340:16

**sky** 213:6

**small** 31:11,12 35:21 321:22

**smart** 301:19

**smiley** 225:13

**so** 6:13,22 7:12 9:7,8, 15,16 10:1,2 14:11 15:17 16:4 22:22 25:1,5 26:19 29:22 31:6 33:4,7 37:8,12, 24 38:16,23 41:9 42:15 44:21,24 45:19, 21 46:5 51:2,19 52:16,18 53:6 55:12 56:5,13 57:6 59:7,19, 21 61:16 62:10 63:7 65:10 69:14 71:22 72:7 73:17 74:8 75:10 76:5 77:12 79:2,16,21 80:22 81:5,7 82:16,21 83:22 84:7,20 85:1 86:6,9,21 87:17 91:19 94:3,14,23 95:10 98:10 99:5,22 101:3 102:8,9 103:12 104:5, 20 105:10,13,22 107:10,17 108:7 109:8,10,11 110:12 113:7 116:20 117:13 118:2,9 119:20 120:1 122:4,22 127:9,12,21, 23 130:14,15 132:3, 16,20,22 133:16,24 134:1,13,20 135:7,10, 19 136:10,15,21 138:18 139:3 140:7 141:2 144:14,15 145:3,12 146:19 148:4 149:22 151:7, 10,22 152:3,6 153:23 155:15 157:20 158:7 161:5,14 162:6,21 163:9 164:1,11 165:1, 5 166:20 167:24 171:9,18 172:20 173:12 174:6 175:4, 11,22 176:18 177:2

178:9,15,22 179:10 180:13 181:8,11,14 182:20 187:3,17 188:3,7 189:17,21 190:14 191:24 192:12 194:19 195:4,7,17 196:4,23 197:22,24 199:12 200:8,16,17 202:11 203:8,21,22 204:16 206:8 207:11, 15 208:12,14,23 209:8 210:20 211:4,7, 20 212:15,19 213:11, 20 215:2 216:14 217:7 219:1,20 222:15 223:12,20 226:20,24 227:1 228:16 229:7 230:18 232:19 234:8,13,17 235:2,22 236:3,23 238:19 239:7,11,14, 22 240:7,13,22 243:8, 21 244:2,24 245:5 247:5,24 248:5,6,10, 15 249:22 250:7 251:16 255:2,9 256:13,18 257:8,23, 24 259:10 260:6 261:10,12,17,20 264:15 266:12 267:4 270:7,22 272:5,6,17 274:5,7,14 275:4,10 276:4 277:24 278:12 279:3,8 282:11 283:19 286:3 287:18, 22 288:15 289:10,18 290:4 291:20 292:2, 13,18,19 294:23 296:21 297:20 298:4 299:6,19 300:19 301:12,14,21 302:14, 19 303:5 305:18 307:16,22 308:7 309:3,12,16,23 310:5, 8 311:4 313:4 315:6 316:18 318:4,23 319:23 322:8 325:2, 13 326:20,24 328:16 329:13,15 330:4 335:10 336:17 338:2, 20 339:12 342:15,18 348:16 350:4 351:2 353:10,11 357:3,22

**sold** 114:6 120:5

**sole** 38:21 184:20 201:12 202:1,12,16 231:1,7 232:12 255:16

**soliciting** 284:21

**some** 6:14,21 8:1 11:2 12:14 14:8 15:4 25:5, 15 27:18 48:15 60:20 63:7 64:6 66:17 69:5, 8 78:17 85:16 87:8 89:15 90:24 97:20 98:2 99:3,4 104:23 115:21 127:15 131:18 137:20,21 138:3,4 139:10 140:5 142:1 146:21 149:12 151:24 164:11 167:5 177:13 179:13,14 187:14 192:23 198:2 204:16 208:9 213:11,21 214:15 222:16 223:13 226:1,7 230:17 236:1 237:17 239:11 243:21 248:10 249:22 263:3, 4,7 272:4 275:21 277:19 278:1,15,17 280:22 283:12,17 287:22 295:19 298:17 304:7 305:18 308:22 311:9 312:11 316:1 317:3 319:4,6,15 324:9 327:9,10 331:3 336:14,21,24 339:18 340:1,11 348:13 351:9,11 352:18 353:13 354:8 357:13, 23

**somebody** 158:9,24 330:21

**somehow** 108:19 255:21 304:1 340:5

**someone** 235:6 324:4

**something** 24:4 64:13 85:10,13 98:14 105:23 106:5 109:11 114:16 116:13,14,20 118:14 125:9,11 126:6,7,8 127:9,12,24 128:9 136:20 151:10, 24 152:9 153:6 155:16,22 169:3 187:19 194:18 228:7, 22 235:5 241:17 264:11 281:11 304:16 305:17 306:13,14 310:11 320:13 326:15 330:17 336:8 340:10 346:18 350:11 353:21,23 354:12 358:15

**sometime** 54:6 55:13 91:6 235:23 245:3 303:13

**Sometimes** 64:12

**somewhere** 15:9 37:10 133:17 146:10 147:13 207:23 214:10 235:7 314:24 315:20

**soon** 66:15

**sorry** 22:15 26:23 63:13 68:6,19 69:10 70:19 76:10,18 82:6, 19 84:21 93:9 95:22 97:7 125:5 129:12,13 130:5 136:14 164:8 171:9,15 180:8 186:2 192:3 203:16 217:16 223:1 225:8 226:14 230:14 236:17 248:23 251:7,13 254:5 264:18 268:11 297:15 306:18 307:11 311:6 312:16 313:15 319:17,24 321:11 322:16,20 328:17 351:6 354:2

**sought** 284:22 285:8

**sound** 351:23

**sounds** 42:14 50:24

**span** 69:12

**speak** 148:7 171:12 202:8 342:2,16

**speaking** 126:13,16 172:11,13 175:22 192:11 216:6 351:17

**speaks** 83:4 150:23 164:16 168:11 273:14 274:17

**specialize** 149:6

**specific** 16:13 27:12 28:8 49:16,18 54:7,8, 20 63:2 64:14 77:2,19 78:19 79:7 86:7 90:23 91:4 104:12 105:13 115:3,15 168:8 170:8 176:11 181:16 195:1 204:15 207:6,8 208:10,16,19 209:12 210:8,12 221:21 234:4 236:6 237:12 238:2 241:9 257:2 301:24 322:13 330:10 356:21

**specifically** 8:16 36:11 55:14 58:10 113:1,10 153:4 154:3,5,18 168:1 176:8 179:6 186:5 206:9 224:19 322:8 355:9

**specificity** 76:11

**specifics** 53:3 147:6 148:11 223:17 336:10

**specified** 60:1

**spectrum** 167:15

**speculate** 150:13 306:23 331:8

**speculation** 59:15 106:20 137:14 140:13 150:11 305:23

**spell** 10:11 19:5 22:17

**spend** 236:11

**split** 53:8 55:11,15 58:21 65:24 88:5 90:6 195:5 240:9

**splitting** 56:16

**spoke** 8:1 42:8 64:21 158:7 170:4

**spoken** 8:18 341:18 342:1

**spreadsheet** 325:13

**spring** 51:7 132:12,16 133:15 311:10 348:16

**spring/summer** 91:12

**stability** 246:23

**stamp** 45:1 274:4

**stamped** 325:14 355:10

**stamps** 45:13 274:4

**stand** 115:20 318:17

**Standard** 126:16

**standing** 335:2

**start** 14:24 22:12 49:17 58:15 76:7,8 88:1 89:5 111:1 112:7 127:11,24 129:7 139:16 182:10,11 226:8 240:1 292:1

**started** 49:4,5 51:10, 15 52:17 54:6 57:12, 13 59:2 75:2,17 87:15 90:18,22 91:13 124:3, 11 134:24 173:11 215:5 226:10 233:7 234:11 245:20 253:8 312:5 356:17

**starting** 50:6,12 51:6 94:6 149:6 173:6,9 215:7

**starts** 254:8

**state** 4:12 5:4 18:22 58:5 97:23 218:7,9 219:22 249:19 293:3

**stated** 163:7

**statement** 54:11 96:19 103:22 133:7 156:3 158:5,6 159:22 184:16 203:12,22 216:18

**statements** 86:1

**states** 309:5

**status** 73:16,22 324:14

**Steadfast** 326:7,8

**step** 116:2

**still** 14:13 24:11 26:4 47:3,13,15,18 62:18 164:21 193:21 204:17 221:4 265:13 272:9 283:21 293:10 296:15 298:16 302:16,18 333:5

**stood** 85:11

**stop** 36:2 192:24 197:17 198:4,6 337:6, 12 338:11

**stopped** 14:3 244:7

**straight** 101:6

**straighten** 299:5

**strategic** 31:6 149:6

**Street** 7:16

**stretched** 215:2

**Strike** 317:5

**Stripe** 40:20 41:13

**strong** 335:21 336:1

**struck** 269:19

**structure** 102:9 181:16 184:22 187:9

230:20,24 238:7
**stuff** 45:10 58:12,13 351:9
**style** 303:5
**subject** 128:21 160:23 224:17 225:9 242:22, 24 243:15 246:15 249:3,8 263:2,17 269:9,11 330:3,6 346:12
**subpoenaed** 325:19 343:8
**subsequent** 252:5 302:23 303:11 305:1 324:13 350:3 353:20
**subsequently** 252:15
**subset** 316:1
**substance** 8:3,21 42:10 43:13 133:4 269:16 355:6
**substantial** 182:15,17
**substantially** 98:9 235:22
**substantive** 62:7,11, 18
**such** 274:10 287:17 332:13
**suggested** 99:1 354:14 355:1
**suggestion** 354:19
**suggestions** 99:3,4
**suing** 210:9 213:10 214:12,18 336:3
**summarizing** 133:9 159:3
**summary** 228:20 230:1,11
**summer** 15:1,14,17 49:22 50:1,18 51:6,7 53:11,12,17 55:14 76:12
**Sunday** 224:16 234:19,20 235:9,10, 24 236:8 241:23 260:6
**support** 246:23
**supposed** 140:10 147:21 248:2
**sure** 6:13 7:2 9:12 20:1 21:14 22:15 24:6 35:7 39:19 41:10 61:16 82:17 127:20 130:5 144:6 152:17 154:20 164:18 170:16 195:22 203:5 207:4 226:21 230:19 233:15 253:15 282:12 286:17 291:23 312:19 328:9 330:10 344:13
**surrounding** 355:23
**swear** 4:20 58:2 264:21
**Sweden** 326:20
**sworn** 4:21,24
**system** 45:3,15 73:17, 22 108:15,20 109:2 145:9 242:2,3,6 244:11,14 321:12,15 322:7 323:12,24 324:2,23
**systems** 162:23

**T**

**Taglia** 46:6
**take** 5:11 7:1,3 44:3 48:3 67:7 116:2 125:15 127:8 149:22 160:9 165:19 173:7 179:16 197:8 203:10, 15 210:10 211:22 249:15 264:1 266:5 283:13 285:21 286:17 310:9 314:9 328:5 331:13 334:20 340:18 344:21,22 345:12 351:16 352:10,11,12, 22 355:8 357:10 358:5,7,9
**taken** 4:9 7:10 84:12 163:24 336:6 337:5
**takes** 30:14
**taking** 25:18 58:4 248:9 270:16
**talk** 8:4,21 21:2 41:24 42:7 70:5 105:3 207:9 298:16 309:18 335:11
**talked** 29:1,14 37:23 68:8 104:22 105:1,2,5 138:24 190:5,8,23 197:14 214:14 294:13 313:8 351:20
**talking** 8:17 22:16 23:22 25:21 27:13 67:18 69:6 70:21,23 71:13,14 76:19 95:21 110:5 137:24 151:6 155:6 167:11 181:23 182:4,7 183:8 191:3 203:17 207:6 213:6 216:11 221:8 239:10 269:12 277:10,11 281:10 299:9,15 335:13 337:24 345:17 354:2
**talks** 81:16 333:10
**tasks** 41:1,10,18
**tax** 21:16 263:19 287:17 292:3 354:15 355:5,19
**taxes** 292:2 337:6,9 338:12 339:20
**TBD** 122:9
**tech** 22:4
**technology** 326:11,18
**tell** 6:17 13:17,21 14:23 22:9 23:20 27:22 40:16 51:3,4,22 60:5 64:2 70:7 85:12 88:12 89:4 91:10 95:20 101:13 114:16 115:23 118:6 124:23 151:22 152:4,12,17 153:24 154:6,15 155:8,21 162:15 163:5,9 166:17 210:19 211:14 228:3 234:3 236:4 238:12 239:7 247:24 251:20 267:9 272:8 274:5 279:5 284:3 286:4,5 296:20 298:4,5 302:20 303:2 306:5 347:13 348:1,8
**telling** 40:24 66:19 74:1 78:16 87:11 101:6 107:16 127:8 135:14 143:24 144:13 150:20 154:15 155:17,19,24 157:4 158:14 170:13 197:24 232:19,22 235:16,23 240:15 256:3,8,15 258:16 298:18 305:20 318:11 333:18 338:23 340:6
**tells** 257:19
**template** 264:10
**ten** 119:6
**tend** 257:8
**tennis** 30:13
**tens** 137:6
**tense** 231:17
**term** 46:12 68:7 71:18 73:20 79:24 84:18,19, 21 85:1 86:8,14,15 90:14,17 104:2,3,4,5, 11,12,14,16,17,19 105:24 113:24 114:4, 9,10 115:8,15 116:18, 22 117:18 118:3,4,23 119:1,13 120:10,11, 13,24 121:2,24 122:2, 3,10,11,15 123:7,10, 11,17 127:1 128:22 129:9 130:20,22 131:4,14,24 134:7,14, 15 136:16 139:14,23 140:4,8,10,18 141:2, 18 145:18 146:24 147:19 148:4,6,8,11, 13,18 149:2,13,21,23 157:14 176:14 180:11,13,15,18,19, 23 181:1,2,14 183:19 184:21 185:2,14,16, 21 186:10 187:4,15, 18 188:9 189:2,16,18, 20,21,23 190:4,7 191:5 192:9 193:19 201:14,21 202:23 203:3,11 204:9,12 205:12,23 206:2,5,9, 20 207:1,6,8,16 208:7,10,16,19,23 209:2,6,13 210:12,22 214:6,7 215:8,14 216:3 217:3 219:8,9, 10,12 220:10,12,14 221:14,23 222:1,3 223:7,8,11,17 225:7, 15 226:2,13,17,18 227:1,7,13,15,18,22, 24 228:8,10,13,14,18 231:12 232:6,7,10,11, 16,20 233:2,10,15,19 234:4,8 235:18 238:2, 5,9,15,19,20 239:8 240:14,16,24 241:3,4, 7,15,17 256:1 257:3 292:11,12 314:22 316:9 351:21,22 352:8
**terminate** 222:20 223:4
**terminated** 223:14
**terminology** 121:18
**terms** 16:12,23 23:16 27:11 49:9 55:7 59:5, 8,19,22 60:14 61:5,7, 22 62:4,7,11,18 63:2, 4,6,18 66:3,5,7,9,18, 21 67:4,19 68:8 71:3, 17 74:12 75:14 76:1,6 77:9,13,19,24 79:3,8, 9,17,21 80:1,9,17,22 81:2,4,8 85:14,15 86:13 87:13,21 94:4 97:12,18,21 98:4,5,7, 8,9,10,11,13,17,19, 21,22 99:2,7,8,11,12, 13,18,19,23 100:1,2, 8,10,13,14,17,22,24 103:3 106:9 108:14 109:15 114:18 115:3 117:2 119:7,10 130:17 136:8,12 137:12 138:7 142:21 143:11,19 144:19 145:3,5 147:4 167:2,7 177:20 178:19 179:10,11 181:14,17, 19 182:12,13,18,23 183:3,21 184:23 185:10 186:12 187:4 191:15 192:2 193:22 194:17,24 195:1 196:2,7,11,16 197:7,9 198:10,17,24 199:16, 18 200:11 204:14,16 205:22 208:2,3,9 211:10 212:8 213:3,9 214:3,6,13 222:7 224:24 225:2,16 229:7,9,17,20,22 230:15,17 236:6 237:12 239:15,19 240:12 242:5,6 247:3 248:10 252:13,20,24 253:13,16 259:10 268:17 271:24 273:8 282:9 296:4 297:2,8,

10 345:15 346:10,23
**test** 52:10,12 66:12 77:16 79:11 93:3
**testified** 4:24 58:1 61:11 92:10 101:5 275:22 324:17 356:11
**testify** 52:12 58:3 60:6 71:24 115:20 209:16 236:14,20 291:5
**testifying** 264:22 297:15
**testimony** 54:1 61:17 62:5 63:12 70:18 72:22 73:14 91:8 93:16 95:14 100:4 153:8 164:1 170:19 192:16,17,18 202:11 211:12 213:3 215:16, 17 220:12,13 249:22 258:23 259:1 281:18 298:20 312:15 323:17 324:20
**testing** 276:19
**text** 13:2 83:8 126:9 128:5 191:12 259:22 262:1 293:20 294:24 295:20 301:22 302:1, 15,22,24 303:4,23 304:6 309:13
**texted** 309:3
**texting** 301:19
**texts** 191:14
**than** 6:8,22 8:17,24 9:5 10:20,21 23:9 31:17 37:11,23 38:5 46:8,22 60:15 66:2 76:2 80:2 107:20 110:8,9 119:6 121:8, 21 127:4 137:8,22 148:14 152:22 155:13 170:13 173:18 183:5, 24 187:14 191:8 193:10 195:16 196:9 198:16 211:18,20,23 212:2,6 214:9 216:10 235:21 241:19 249:24 250:1 252:9 265:15 274:9 275:23 302:8 303:18,20 306:23 311:24 326:15,16 339:23 340:5 350:10
**Thank** 4:19 30:16 71:20 72:11 81:13 120:4 173:15 193:17 216:22 217:19 254:13 318:22 328:20 358:21
**Thanks** 45:16 129:15 139:22 260:24
**that** 5:9,11 6:9 7:8,10 8:14 9:18,23 10:5,7,9, 11,21,24 11:2,4,5,8, 13,17,19,21,22 12:10, 20 13:3,21 14:8,9,14, 16 15:23 16:2,8,15, 21,23 17:1,7,22,24 18:2,5,9,12,20 19:5, 10,11,14,23 20:12 21:11,12 23:4,8,10,22 24:12,19 25:2,7,23 26:1,4,17,24 27:1,23 28:4,8,11,13,16,20,22 29:1,6,18,19,21 30:6, 10,11,12,13,14,20 31:1,5,11,15,17,20 32:3,7,17,22 33:2,6, 18 34:4,22 35:8,17,23 36:6,8 37:1,11,13,14, 17,20 38:1,4,7 39:4,7, 11,23 40:8,9,17,18,19 41:1,2,11,13,19,20,22 42:1,2,4,10,23 43:19, 21 44:3,6,10 45:2,12, 15,23 46:3,6,8 47:9, 23 48:7,8,12,19,22,23 49:2,6,7,13,19 50:2,4, 8,10,16,21 51:8,9,23 52:2,7,15,21 53:4,5,8, 10 54:4,11,21 55:1,2, 6,7,12,18,24 56:6 57:3,4,17 58:15 59:7, 9,22 60:10,11,14,16, 17,23 61:8,16 62:3, 10,15,20 63:6,7,9,18, 19 64:2,7,20,23 65:10,23 66:1,3,4,9, 22 67:4,5,17,20 68:3, 4,5 69:6,7,9,15 70:3, 4,5,9,14,17 71:2,3,4 72:3,18 73:2,22,24 74:7,9,12,15,18,19 75:15,19 76:2,6 77:2, 5,9,13,24 78:4,18 79:2,3,13,20 80:17,23 81:5,7,19,24 82:7,8, 17,23 83:7,10,16,22, 24 84:7,8,9,10,14,18, 19,22,23 85:1,5,6,8, 13,17,18 86:7,10,13, 21 87:17,23 88:3,6,7, 8,18,19 89:3,19,20 90:3,4,10,11,12,14, 17,19 91:11,23 92:3, 11,15,16,19,20 93:1, 12,23 94:4,5,11,12, 14,15,18,20 95:24 96:3,4,5,7,16,18,19, 20,24 97:3,12,14,15, 18,19,22 98:4,16 99:3,4,8,18,19 100:8, 12,13 101:1,6,9,22,24 102:1,2,4,22,23 103:1,2,3,9,12,16,17, 22,23 104:2,3,4,5,7,9, 10,12,13,15,16,17,18, 21,24 105:5,14,17,18, 19,20,21,22,24 107:2, 3,22 108:1,2,4,6,9,10, 13,18 109:4,6,11,12, 14,18,20,21 110:6,20, 21,24 111:1,15,24 112:5,17 113:6,19,24 114:4,8,10,15,24 115:2,8,14,21 116:14 117:6,13,18,19 118:15,16,19,20 119:7,10,13,14,16 120:1,10,11,13,18 121:3,17,24 122:1,2, 3,7,10,11,15,18,19, 20,23 123:3,5,10,11, 13,17,20,22,24 124:13,16,23 125:3, 12,13 126:6,9,21,24 127:14,19 128:8,23, 24 129:5,9,23 130:2, 6,11,13,19,24 131:1, 10 132:3,4,24 133:1, 12,20,24 134:3,8,14, 15,16,17,20,23 135:5, 21 136:2,6,12,19,21 137:4,5,7,10,11,17,21 138:6,16,19,20 139:3, 4,9 140:4,10,19,23 141:3 142:2,3,9,10,12 143:8,9,12,22 144:4, 18,19,20,24 145:10, 14,15,16,17,19,23 146:4,7,15,19,23 147:15,18,22 148:11, 13,18,22 149:2,8,19, 22 150:2,6,21,22 151:2,5,6,8,11,13,14, 16,21,22 152:1,4,6,13 153:6,17,19,22,24 154:1,6,11,14,15,17 155:1,7,8,11,15,17, 21,22 156:6,10,14,15, 16,20,22 157:6,8,10, 21 158:1,2,5,8,12,13, 14,15,16,20,24 159:1, 2,12,16,17 160:10,14, 16,18,24 161:1,13 162:2,6,19,20,22 163:6,13,16,20 164:2, 11,13,14,20,21 165:1, 8 166:1,10,17 168:1, 6,12,16 169:5,11,12, 15,19,22,23,24 170:1, 7,9,14,16,22,24 171:3,5,6,16,19,22,23 172:1,16,18,21,23 173:7,12,21 174:13, 17,18 175:9,10,11,12, 18 176:4,8,13,14,20, 21 177:3,4,9,13,16, 17,18,19,20 178:1,5, 8,16,18,23 179:1,3,7, 11 180:9,12,13,22 181:4,5,8,11,19,24 182:2,10,11,12,14,17, 23 183:3,12 184:10, 16,18 185:1,4,10,23 186:3,4,9,13,23 187:3,7,15,19 188:8, 9,11,17,24 189:2,4, 16,20 190:3,4,5,16,18 191:19,21,24 192:1,2, 4,14,16,24 193:2,6,7, 13,19,23 194:11,18, 20,24 195:4,7,8,12, 14,19,21 196:1,2,11, 13,17,18 197:9,10,11, 13,16,21,23,24 198:7, 11,13,18,20 199:7,12, 14,20 200:8,11,15,18 201:5,14,19,20 202:1, 6,12,15,22 203:10,11, 12,15,19,20,22 204:2, 4,5,9,12 205:2,6,16, 23 206:1,2,5,7,9,12, 13,19,20 207:1,8,9,19 208:3,6,8,10,23 209:8,13,17,19 210:12,22,24 211:1,5, 15,18 213:3,4,9,13, 14,15,19,20,23 214:1, 6,7,11,13,14,20,22,24 215:2,9,10,15,18 216:4,14,16,18,23 217:3,4,8,14 218:5,6, 7,8,9 219:22,24 220:1,3,4,9,12 222:5, 6,14,15,16,19,23 223:7,8,12,13,14,22 224:20,22 225:2,4,20 226:2,9,10,15,18 227:9,12,20 228:7,12, 19,22,23 229:1,5,6,11 230:1,22 231:5,7,11, 18,19 232:1,5,6,7,16, 24 233:2,7,12,15,16, 19,23 234:4,6,7,13,24 235:2,3,5 236:7,11, 15,16,21,23 237:1,13, 16 238:3,13,15,19 239:6,10,11,13,14,24 240:4,6,13,14,19,24 241:7,8,10,14,15,17, 19,21,23 242:4,9,16, 17,21,23 243:3,9 244:2,6,10,12,22 245:2,5,9,13,21 246:15 247:2,4,18,19, 20 248:1,2,5,7,9,11, 12,13 249:13,16,19, 23 250:7,15,18,19,23 251:3,13,21,24 252:2, 4,9,13,16,18,23,24 253:11,13,24 254:18, 23 255:3,4,7,9,12,13, 15,17,21,22,23,24 256:4,7,9,11,13,14,18 257:6,11,19,21 258:1, 7,23,24 259:2,10 260:4,6,12,14,15,19, 20,22,23 261:2,5,8,21 262:9 264:16 265:16, 22 266:4,12,20 267:1, 2,6,9,10 268:1,7,16, 17,18 269:3,8,10,19 270:15,18,19,20 271:1,3,6,23,24 272:7,10,14 274:2,14, 21 275:6,10,19,20,21, 22,23 276:5,23 277:6, 8,20 278:2,6,16,20 279:1,6,17,20 280:2, 8,10,12,13,18,20,21, 22,24 281:11,14,22, 23 282:3,15,16,17,19, 22 283:20 284:3,4,9 285:2,24 286:9 287:3,

4,16,17 288:4,21 289:3,18,23,24 290:12,14,19 291:2,7, 13,14 292:4,8,11,12, 22 293:11,12,21 294:9,10 295:13,14, 18,19,22 296:8,10,24 297:11,12 298:17,18 299:13,17,23 300:9, 11,17 301:4,5,6,16, 21,22 302:2,13,15,21 303:7,8,9,18,20 304:1,7,8,19 305:3, 12,13,16,19 306:8,13, 17 307:9,16,18,23 308:2,6,7,13,20,23 309:13,16,17,18,19, 22 310:3,6,11 311:13, 16,18,21,24 312:1,3, 7,9,11,24 313:5,7,8 314:2 315:12,19 316:10 317:5,6,11,12 318:8,14,16 319:1,2, 4,7,10,12,13,16,24 320:1,8,9,10,12,19 321:16 322:20 323:1, 4,8,10,12,14,16,17,23 324:4,17,18 325:19, 21 326:7,12,14,18,24 327:4,9,15,20,21 328:11 329:1,4,7,8,9, 10,13,14 330:5,7,15, 19,22 331:4,7,8,9,21, 22 332:15,16,19,24 333:7,12,13,17,18 334:1,3,16,20 335:5, 6,9,22 336:3,4,5,6,7, 8,10,11,17,22,23 337:2,3,7,11,13,15,16 338:2,3,9,13,19,23 339:3,6,21 340:2,8,19 341:15,16,17 343:5,8, 21,24 344:2,8 345:11, 12,16,19 346:3,12,15, 16,19,20,24 347:4 348:12,13,14,17,24 349:4,9,19,20,24 350:6,23 351:20,23, 24 352:1,6,20 353:4, 5,6,9,20,24 354:3,8, 12,14,21 355:6,16 356:7,12,13,18,20,22, 23 357:4,9,15,19,20, 22

**that's** 6:4 9:10 11:19 20:21 21:10 24:24 28:10,12,13,14,21 30:16 42:1 45:1,13 46:1,15 47:16 48:20 49:12 52:23 55:3,10, 16 62:5,9 64:21 68:13 72:15 74:5 75:9 78:12,17 79:1,6,24 80:4 83:18 84:24 85:6 88:12 91:2 94:9 95:15 96:3,11,17,23 98:3 99:22 101:12 103:19 107:15 109:13 112:8 113:4 114:12,15 115:12,19 119:4,19 122:6 124:19 125:15 130:1 132:24 134:5, 12 138:16 139:21 140:21,23 144:1 145:12 146:6,8 152:2, 21 153:8 155:1,19,23 157:7,24 158:2,22 159:7 167:14,19 168:5 169:19,22 170:1 173:14 175:21 177:6,13,15 178:6,13 179:9,12 180:21 183:11 185:1,18 187:4 188:10,19 190:20 191:6 192:17 195:23 196:4,6 197:23 201:16 204:2 205:14 206:10,11 207:15 211:1 213:5 214:12 215:15,17 216:13 217:5 220:1, 12,13,18 221:6,17 222:10 225:10 226:15 227:15,16,18,22,24 228:1,8,18 230:4,18 231:3,4,9,10,17,22 234:15,24 235:12,18, 19 239:15,17 240:10 243:10,11 245:17,22 246:10,18 247:8,10 249:7 250:23 251:9, 15 257:24 260:3 269:2,5 270:9 271:1 272:14 273:4 274:6, 24 280:4 281:20 285:21 286:3,6 289:13,17 291:3,23 293:14 295:8 296:5 297:18 298:24 299:21 305:17 308:21 311:11 312:12,23 314:3 318:5 319:10,14,20 320:22 332:21 333:19 334:4,5 335:8,16 336:19 337:4,19,20, 22 338:19 341:6 343:4,17,19 345:21 347:9 349:21 350:17 351:2,4,5 352:23 354:6,7 355:10 357:5 358:1

**the** 4:1,2,3,5,7,13,18, 19,20 5:5,16,20,23 6:2,6,7,9 7:6,7 8:3,6, 14,23,24 9:20 10:8, 11,16 11:21 12:9 13:5,7,12,14,19,22,24 14:17,18,20 15:7,17 16:4,6,7,10,12,14,20, 22,23 17:9,11,17,23 18:4,18,24 19:5,8,9, 15 20:8,23 21:10 22:4,16,17,19 23:15, 16,21 24:15,19 25:2, 7,11,15,19,21,23 26:10 27:8,10,11,13 28:3,5,7,8,12,16,18, 20 29:2,5,8,11 30:1,3, 9 31:3,5,6,8,9,24 32:1,16,21 33:8,12 34:21,24 35:8,11 36:4,13,24 37:1,2,11, 23 38:5,8,11,17,21 39:1,13,17 40:4,5,8, 16 41:1,3,7,24 42:1,4, 5,6,12,17,19 43:3,7, 13,14 44:7,10,18,19 45:1,2,3,5,7,11,13,14, 22 46:3,6,14,15,16, 17,24 47:4,6,15,21,24 48:7,10,11,13,15,19 49:3,6,8,9,13,15,16, 18,22 50:5,10,11,15, 18,24 51:6,7,8,13,19, 22 52:2,6,14,15,16, 18,21,24 53:3,10,17 54:9,10,15,16,20,21, 23,24 55:2,7,10,11, 13,18,21 56:10,11 57:1,22 58:5,15 59:5, 7,14,16,19 60:11 61:4,5,9,22,23,24 62:2,6,11,12,14,17 63:4,13 64:6,15,18 65:5,13,14,16,20,21, 24 66:1,2,3,6,9,11 67:3,8,12,14,17,19 68:8,12,17,22 69:1, 10,11,20 70:6,8,13, 14,17,19,20,23 71:3, 11,16 72:5,17,19,21 73:7,13,15,17,20,22 74:12,21 75:1,14 76:1,2,6,8,9,12,13,17, 19,24 77:2,3,12,15, 18,22 78:7,8,9,12,15 79:1,10,13,16,21 80:3,22 81:1,6,8,16, 21 82:4,5,7,9,15,16, 23,24 83:3,6 84:1,4,7, 10,12,21,22 85:3,17, 21,23,24 86:4,12,13, 14 87:1,13,21 88:1,3, 9,14,17,23,24 89:2,7, 12,15 90:4,7,10 91:1, 7,12 92:4,15,17,20, 21,23 93:2,5,9,10,12, 13,15,17 94:4,9,20,23 95:1,13,15,17,24 96:1,6,9,10,11,16,18 97:2,7,12,15,16 98:9, 14,16,22 99:5,18,23 100:3,11,13,15 101:7, 8,22,24 102:6,8,14, 19,24 103:3,13 104:16 106:14,16,20 107:21 108:10,12,13, 14,15,20 109:2,15,20, 24 110:2,3,9,21 111:8,21 112:1,16 113:2,3,4,11,13,15,17 114:5,6,15,24 115:1, 4,16,20,22 116:9,12, 14,16,18 117:10,13, 22 118:5,7,16,18,21 119:13,21 120:5,14, 15,24 121:14,22,23 123:8,9,19,22,23,24 124:2 125:2,5,12,14, 17,19 126:3,5,9,11,14 127:7,13,16,24 128:5, 21 129:2,7,8,9,11,17, 20,23 130:7,15,20,22, 23,24 131:3,4,6,8,14, 23,24 132:3,8,9,11,16 133:1,3,4,5,6,12,16 134:2,7,10,13,14 135:5,6,14,20,22 136:3,7,12,14,19 137:2,6,11,18,22,23 138:6,16,18,24 139:9 140:1,8,14 141:9,18, 19 142:6,21 143:2,5, 10,18,19 144:11,13, 14,19,24 145:3,5,8,9, 10,12,18,20 146:1,2, 13,15,23,24 147:3,4, 6,7,8,12,14,21 148:3, 6,8,23,24 149:4,8,10, 11,12,13,21,23 150:5, 7,16,17,20 151:5,13 152:2,6,23 153:10,12, 13,17,19 154:7,22 155:2,14,16 156:1,2, 5,9,13 157:4,10,13, 16,17 158:2,14 159:1, 5,11,16,19,21 160:1, 10,23 161:5,12,21,24 162:13,15,17,21,22 163:1,12,17,24 164:9 165:1 166:18 167:17 168:2,10,11,13,14,18, 21,23 169:22,24 170:8 171:1,6,9,15,18 172:3,4,5,11 173:1,6, 13,17,20,21 174:14 175:5,9,16,17 176:16, 20,23 177:11,14,18, 20 178:5,6,7 179:1, 10,13,14,17,19 180:2, 9,10,11,13,21 181:4, 6,14,16,18,19,23 182:2,3,6,12,13,20, 21,22 183:3,7,8,10, 15,18 184:5,9,11,13, 16,20,21,22,23,24 185:10,11,14,21 186:12,15,22 187:4,8 188:3,8,16,23 189:8, 10,12,21 190:7,13,17 191:1,19 192:3,9,19, 21 193:6,10,20,21,22, 24 194:3,8,10,14,17, 19,24 195:1,4,5,7,9, 13,14,19 196:7,14,20, 23,24 197:11,16,18, 19,24 198:1,3,17 200:10,23 201:8,11, 13,14 202:1,8,12,16, 20 203:3,13,19,24 204:10,14,23 205:14, 15,18,19,21,22 206:11,12,16,17,21 207:7,12,13,19,20

208:2,5,7,9,19,20,24 209:4,7,12,15 210:11, 14,18 211:6,8,10,11, 17 212:8,16,19 213:6, 8,16,18,22 214:13,16, 24 215:4,19,21,22,23, 24 216:11,12,14,18, 24 217:17,19 218:2,5, 7,10,11,15,21 219:22 220:2,20,22 221:1,5, 6,11 222:2,14,20,21 223:4,5,9 224:12,13, 14,20,22 225:6,10,17, 18,21 226:13,14,17 227:7,15,18,22,24 228:12,18,19,21 229:5,7,9 230:11,14, 15,17 231:1,2,7,10, 12,14,17,21 232:11, 15 233:4,5,14,15,23 234:9,12,14,17,18,19, 22,23,24 235:10,12, 18,19 236:6 237:2,7, 12,20,21 238:1,6,8,9, 20 239:8,12,15 240:2, 8,16 241:6,10,15 242:2,5,12,18 243:5, 8,24 244:4,5,10,14 245:3,5,14,16,18,20 246:10,14,23,24 247:3,6,11,18 248:4, 9,12,24 249:7,8,9,11, 14,21 250:11,13,16, 18,19 251:10 252:2,5, 9,11,13,14,15,20,24 253:7,12,13,14,21 254:9,13,16,17,19,20, 21 255:4,7,8,10,12, 13,16,21 256:1,4 257:3,7,23 258:11,13, 17,20,22,24 259:2,3, 11,24 260:1,3,4,5,8, 16 261:18 262:1,4 263:16,21,23 264:1,5, 13,23 266:5,10,20,24 267:1,5,11 268:1,6, 10,14,18 269:8,9,11, 16,20 270:6,9,15,16, 23,24 271:4,16,24 272:7,8,24 273:4,8, 10,11,20 274:2,5,6,8, 9,10,11,17,20 275:4, 8,16,19 276:7,11,21, 24 277:10,12,16 278:7,17,24 279:10, 16,17 280:5,6,12,17 281:9,13,23 282:5,6, 9,11 284:11,12,13,16 285:4,12,14,17 286:8, 16,18,19,21 287:10, 12,14,16,24 288:15 289:3,4,13,18,23,24 290:1,2,4,7,10,13,14, 18,21,23 291:7,17,21, 23 292:8,9,20 293:1, 3,5,7,11,22 294:8,12 295:4,11 296:2,8,16 297:4,5,8,9,11 298:3, 5,10,24 299:4,12 300:1,4,6,10,15,17, 21,23,24 301:1,3,4,5, 13,15,17,18 302:14 304:1,2,21,22 305:3, 4,24 306:18 307:1,2, 3,5,6,7,17,18,20,21 308:15,17,19 309:3,7, 12,21,23 310:21 311:4,6,8,10,12,17 312:7,12,13,16,24 313:7,10,15,18,21 314:6,13,20,21 315:18,23 316:9,14 317:12,19 318:1,6,11, 14 319:2,13 320:4,6 321:7,8,11,15,17,24 322:1,2,9,14,16,17, 18,20 323:12,20,23, 24 324:3,10,11,13,22 325:1,10,11,13,14,15, 21,24 327:19,20 328:7,9,11,15 329:9, 14,23 330:1,6,23,24 331:1,7,13,19 332:2, 10,16,19 333:7,17 334:1,2,3 335:3,18 336:5 337:6,9,11 338:9,11,15,18 339:19,20 340:17,21 341:17 343:17,19,20, 24 344:4,24 345:1,3, 9,10,13,15,16,17,20 346:7,10,13,15,22,23 347:9 348:8,15,19,23, 24 349:1,15,21,24 350:2,15,16,19,24 351:7,9,21,22 352:1, 8,12,13,14,16,17,18, 23,24 353:1,2,5,9,11, 21,22 354:2,3,9,17,23 355:2,6,9,11,13 356:2,6,12,15,16,17, 18,23 357:10,13,16, 17,19 358:3,4,9,11, 14,16,20,22,23,24

**their** 6:11 22:10 81:18 206:16 207:13 255:20 256:1 297:14 326:3 327:20

**them** 11:23 12:3 13:18 14:6,13 15:22 17:5 29:2 34:8 35:20 40:13,16 41:3 62:22, 24 66:15 68:1 79:9 80:19 95:9 113:7 114:19 136:11 140:1 152:11 156:14 163:18 166:24 167:2,5 171:24 188:18 192:13 193:11 196:8 199:6,8, 10,22 200:5 204:12 213:13 216:9 226:1 229:13 230:18,19 253:5 263:5,7 298:6 300:7 309:24 314:9 315:1,4,17 322:5 326:3 334:22 344:15 351:12

**themselves** 4:12 171:12

**then** 6:19 7:3 10:3 15:22 21:4 26:20 28:7 56:20,21 60:5 63:8 66:24 67:2 72:13,24 73:8 77:8 81:23 83:10,11,14,21 88:16, 18 91:5,10,14 94:8,10 95:19 96:2 98:11 99:7 101:13 102:3,21 103:9 104:1 105:16 113:22 115:7 117:17 118:21 119:12 122:17 123:2,6 130:4,8 131:13 133:24 136:10 147:17 149:4 151:18 156:2,10 158:21 160:9 161:18 169:10 173:7,18 186:11 189:19 190:20 192:19 193:2,24 208:23 209:11 210:14 216:9 220:17 222:13,16 225:15,17 230:19 249:17 256:18 258:15 263:7 277:24 278:12 283:7 287:2 288:3 290:11 292:2 296:20 306:9,16 307:19 310:2,22 318:15 323:5,10 324:3 328:8 340:4 344:20 347:15 356:24

**there** 7:19 9:23 13:1,2 14:2 15:4 17:23 18:1, 11 27:17 32:18,22,23 33:12,18 35:7 37:15, 21 38:15 46:7 47:13 51:4 52:10 56:5 57:9 60:9 61:1,3,21,22 63:3,6,7,9,17 66:5,8, 14,16,18 67:22,24 68:1,2,3,9,15,17,18, 20,22 69:5,6,8,14,17, 20 70:2,3,10 71:3,11, 14 72:3,14,18 74:7,8, 14 76:5,11 77:8,23 79:2,6,19,24 82:17 83:21 84:11,17 85:15 87:14 90:6 92:22 94:8,14,16 95:4,7 96:2 98:4 99:3,6,7 102:9 107:10,14,17, 24 108:16 109:22 111:19 113:21 116:24 117:18 124:9 126:11 133:9 135:12,22 136:1,6,10,11,15,16 137:11 138:15,17,19 139:3 140:18 141:15, 16,19 142:2,9 145:14, 16 149:19,23 152:15 159:1,21 161:6 162:2 167:7 168:1 174:6,7 175:18 177:13 178:23 179:14 183:1,2 184:12,17 189:9,18 191:16 192:23 194:16 203:23 205:17 206:6, 15 212:10 213:14 216:8 223:13 225:5 229:4 230:22 240:4 242:8,20 243:3,6 244:15 247:2 248:2 252:21 254:3 261:7,8 266:12,17 267:24 272:16 273:15,16 274:15,21 275:10 283:16 287:21 288:13,22 289:7,14 291:24 292:3 293:2,4, 10 294:20 295:8,22 297:4,9 298:9 302:2 306:14 307:15 310:22 311:3 318:16,24 319:11,15 320:2 321:7,14 322:5,15 323:11 328:8,23 330:12 331:21 337:23 344:6,9 348:12 349:3, 4 352:15,18 355:4,18 357:13 358:14

**there's** 110:20 117:2 124:7 126:4 135:12, 15 152:15 179:13 184:11 205:15 216:8, 9 225:15 245:11 258:19 261:8 263:1 267:8 268:12 274:8 303:21 311:2 315:6 318:13 320:2 322:19 323:11 328:16 329:23 348:21 353:20

**thereafter** 342:4 354:24

**therein** 205:23

**these** 66:21 67:4 72:6, 7 98:10 100:8 114:18 130:3 132:18 133:22 137:3 177:19 182:13 191:15 194:7 197:7,9 199:2 204:16 239:20 259:10,22 263:3 268:15 270:4 293:20 297:2 320:19 325:11

**they** 4:12 11:21 12:10, 12,21 17:1,22,24 18:4,5 25:5 31:3 34:16 40:3 41:4 46:11,21 47:8 59:10, 12,17 63:8 71:22 75:15 80:20 81:4 84:8 85:16 86:2,16,17 98:11,21,23 110:2,7 118:8 126:5 130:3 133:4 145:8,9,10 156:11 157:8,9 167:2, 7 168:4 171:21 184:6 196:9 198:19 199:11 202:9 212:16 213:15 228:6,7 229:22,24 253:16 268:15 270:11,12,15 288:21 297:13,18,21,23 298:2,7 300:8 311:17

312:5 316:13 320:20 322:5,12 324:5 325:12 327:20 329:8
**they'd** 145:15
**they're** 46:24 47:2,6 163:16,17 321:9 345:17
**thing** 28:4 82:7 114:15 118:16,18 206:14 207:7 218:12 328:11, 15 341:16
**things** 17:17 58:6 64:12 68:8 96:21 144:13 152:9,12 154:11 159:23 183:2 213:7 268:15 270:4 299:5 300:9 322:6 331:22
**think** 7:12 9:4,7,8 22:14 26:19 28:14 29:22 36:5 39:13 48:13 52:15 53:24 56:2 58:5 59:10,16,21 62:6 64:18 69:11 70:17 79:19 81:4 83:3 87:14 89:20 90:16,18 93:18 94:10,11 96:3 97:14 98:16 99:3 100:3,11 101:12 103:7 104:18 108:16 109:8,24 115:18 120:17,18 122:1,2,6, 19,22 123:1,11 127:3, 4 129:5 133:17 139:9 150:17 152:2 157:7 159:21 161:14,17 163:7,15 164:3,6 168:6 169:23 171:9 175:2 177:6 183:22 185:6 193:9,13 197:11 199:1 200:16, 17 204:11 207:21 210:6,7 212:18 215:10 216:9,14 217:7 220:18,20 222:10,13 228:24 237:23 240:11,19 241:8 245:11 247:15 253:4 257:5 259:2 263:6 264:15 270:10 272:3,5,6,7,10 274:4 280:4 287:24 291:12, 18 292:12,16 294:23 296:24 297:4,11 301:8,19 302:5,8 303:1,3,4,10 304:8,17 305:2,3,8,12,16 306:24 307:15,19 311:21 312:23 316:5 319:23 320:16 324:7 326:9,23,24 327:15, 17 331:12,20 341:13 344:20 346:20 347:7 348:5,7 349:6,22 350:4 351:5,21 353:11,12 358:14
**thinking** 170:14 296:15,18
**thinks** 298:23
**third** 126:14 266:10 328:9 355:10
**third-party** 11:7
**this** 7:21 8:18,19 9:4,5 23:23 24:3,13 32:8 33:20 34:8,11,14 36:15 37:5 38:1,5 42:3 44:10,17,19 45:8,19,21 46:3 49:2, 10 54:10,22 60:3 63:23 64:11 66:14 67:23 68:11 69:4 70:20 72:4,15,16 75:7 77:18 80:14,18 83:10 84:8 89:16 90:9,12 91:2,5 92:17 93:10 94:21 97:13,22,23 100:15 103:6,14 106:4 108:4,17 112:9, 21 113:7 115:2,15 116:17,23 118:23 120:24 121:2 125:1, 21 126:9,21 127:4,8, 18,20 129:1,4,5 130:5,24 131:20,22 132:12,20 133:7 134:1,6,9 139:13 140:24 144:8,9 146:22 148:4,21 149:24 151:2 154:1 156:3 158:12,14,23 159:13,18 160:2,8 161:3,6 162:6,9,15 163:12 168:2 172:21 174:1,2,3 175:7 177:16,17 178:2,5 179:5,21 180:8,9,17, 22 181:2,9,14,24 184:11,20 185:2,16 186:4,8,10 187:4,9,18 188:3,17 189:2,3,18, 23 190:1,4,18,22,24 191:5,17 192:20,22, 24 193:19,23 194:6 195:22 196:5,13,17 197:1,12,17 198:4,6, 8,15 200:4 203:1,8,11 205:12 206:14 207:1, 5,6,7,16,24 208:7,16 209:1,20 210:7,11,21 211:4,10 212:8 216:3 217:3,8,10 218:17 219:6,7,9,10,12 220:14 221:13,19 222:6,23 223:7,10,11, 17,18,20,23 224:1,4, 6,12,18,22 225:1,18 226:18 227:1,2,12,20 228:5,8,10,14,20 229:23 230:1,5,10,11, 16,17,20,24 231:15, 19,22,24 232:1,10,11, 13,20 233:23 234:7,8, 9,13,17 235:16,17 236:5,10,11 237:3 238:2 239:1,3,7,12 240:14,20,21,22,24 241:4 242:14,15 245:23 246:7 247:6, 12,21,23 248:17,23 249:13,20 250:17,24 251:12,16,21,22 252:5,22 253:19 254:3 255:15 256:4,7, 12 257:2,5,12 258:12, 17,22,24 259:6,13,14 260:6,7 261:12 262:13,14,20,24 263:11 264:6,7,14,16 265:8,20,21 266:4,19, 22 267:4,5,8,18,23,24 268:3,23,24 269:1,14, 17 270:19,23 271:3,5, 7,15,21 272:2,7,11, 17,18,20 273:3,13 274:7,15 275:6,11 277:11 279:24 281:4 286:1,10 288:10 289:15 291:9,10 292:6 293:13,22 294:9 295:1 296:2,9, 12 300:3 302:5,6,17, 21,22 303:13,19 304:4,20,24 305:1 306:22 307:2,11,14 308:16 309:13 310:9, 10,12 311:8,20,24 313:11,14,21 314:11 316:15,24 317:1,4,8, 13 318:7,8,10,12,13 319:8,11,12,22 320:5, 23 321:6,11,23 322:6 324:7 325:2,4,9,13, 15,17 327:22 328:15, 17,24 329:8,9,15,24 330:8,10 331:9 332:3, 15 334:6 335:2,3 338:20,21,22 339:10 343:5,12,14,22 344:4, 19,23 347:14,23 348:16 349:24 350:4, 9,10,13,17 351:2 352:8,13 355:10,24 358:22
**Thomas** 329:10
**those** 11:24 12:5,16 16:18 19:19 21:10 29:1 30:20 38:7 41:1 46:3,19 59:22 60:23 66:20 76:16 79:8,9 80:17 81:2 86:23 94:4 95:6 96:20 98:4,5,7, 13 99:11,12 100:1,12, 14,19,20 101:1 103:3 108:18 116:9 117:1 119:10 129:23 152:7, 8 163:15 167:7 171:11 172:1 181:19 182:18,22 183:21 184:4,12 190:16 191:11 194:19,23 195:2,18 196:12,14 198:23 199:18,21 208:8,11 212:8 213:2, 11,12,21 214:3,21,23 222:1,3 225:9,19,20, 22 229:9,22 236:6 237:20 239:19 242:6 244:9,14,16,17 250:12 251:5 252:13, 23,24 253:4,11,13,16 268:6,17 270:10 288:3,4,6,8,12,14,15, 19,23 297:8 298:14 300:19 311:21 314:24 315:16 316:1 318:17, 21 322:4,11 323:7 324:23 326:21 351:10 353:23 354:22 357:10
**though** 40:23 74:21 87:7 103:20 188:19 194:16 201:20 215:14 217:13 253:17 288:22 296:1 298:12 337:23
**thought** 88:24 89:21 107:15 123:1,5 131:21 151:19 177:24 198:20 222:10 247:20,21 248:11 260:16 268:7 269:14, 17 271:1 276:16 279:24 301:3 304:10, 13 330:17 336:8 350:9,15 351:1
**Thoughts** 334:19
**thousands** 137:6
**threatened** 37:21
**three** 15:19 19:15 37:11 38:17,23 119:6 121:20 156:6 189:7 191:10 210:24 250:14 331:14 333:6 334:23 342:7
**three-year** 187:12 189:13
**through** 15:14 26:11, 16 27:1,23 50:11 73:9 81:15 82:17 94:11 96:2 103:1 112:18 128:20 160:8,13 180:7 183:2 190:13 191:4 216:1 217:4 224:13 235:1 236:5, 10 237:17 238:9 239:1 240:21,22 242:5 246:6 248:1 262:21 275:7 287:2 288:22 290:11,17 293:23 295:19 298:6 309:24 310:21 313:11 315:9 316:20 318:6 326:3 328:6 334:17 343:9 347:22 354:18
**time** 4:5 6:16 12:15 17:7 24:13 26:10,24 27:8,11,13,23 28:9 33:6 49:16,19 55:24 59:7,12,16 62:10 63:10 67:6 68:3,4 69:1,9 70:6 72:17 73:24 75:16 77:3,9, 18,24 80:14 81:7

86:21 92:4,20 94:24 97:16,17,19,20 100:13,20 101:2 102:10,14 103:9,11 108:17 112:6 119:21 122:7,20 126:16,22 131:20,22 132:12,13 133:1,3,5,20,24 134:1 137:20,24 140:24 146:22 147:12 156:9 162:7,9 165:21 173:20 174:3 175:7, 10,12 179:16 186:3,8, 14,23 190:11 196:13 197:18,20,23 198:2 200:4,7,8 204:4,12 215:2 218:17 219:2,6 231:5,24 234:24 235:2,17 236:11 239:12,13 243:15 244:5 245:5 246:22 249:24 250:1,7 262:13 269:4 282:21 283:13,17 290:14 293:13 296:9,12 298:8 302:17 303:6, 19 304:4,19,24 305:1 306:6,22 308:16 311:8,9 325:21 326:7 329:1,4 341:2 342:16 347:14 348:15,17 351:5 355:24

**times** 8:7 77:5 105:5 110:1 143:1 194:11 210:24 211:4 308:20 309:2,15 351:20

**timestamp** 260:1,2

**timing** 122:9

**title** 21:12 35:9 243:24 249:9 268:8,18 269:10 270:24 343:19

**titled** 265:14

**TMG** 4:4 12:23 27:3, 9,15 30:8 33:15 48:3, 6 51:10 52:1 53:2 55:15 56:1,15 57:8,18 66:2 68:17,24 69:19 71:5 73:3 74:20 78:24 80:14,15 81:5,22 82:2,4,23 83:12,15 95:1 96:8 101:5 102:24 103:24 105:15 106:6,17 107:1 112:17 115:9 116:3,7 119:21 125:13 126:7 127:2,17 129:10 130:1 131:1,10 132:6, 9 134:16,18,21,24 135:3 136:8 138:10 140:20 141:22 142:8, 11 144:20 145:18 147:14,24 148:1,5 149:3 155:23 157:11, 19 160:13 162:4,7 163:14 164:15,21 165:24 166:14 168:13,14 169:2,12 170:9 171:6 177:21 178:6 180:7,19 183:4 184:14,20,22,24 185:12 187:11 213:5 215:21 216:16 219:4 222:22 223:6 224:13 226:18 230:7 231:2 233:22,24 235:14 236:2,21 238:14,18 242:21,23 243:7,13, 22,24 244:3 245:8,10, 19,20 246:6 248:23, 24 249:4,6 250:20 262:20 264:4 268:9 271:14 272:8 273:9 275:20 276:24 277:13,21,23 279:13 280:17 281:14 282:16,19 283:9,11, 20 284:4,9 285:17 287:1,17 291:22 292:20 293:1,6,10 302:16,18 310:21,24 313:23 316:19 317:10 318:5 321:6 325:22 327:7,10,14 328:6 329:24 332:10,20 333:18 335:3,7,23 341:9,19 342:1,12,17 345:17 347:22 349:15 356:6,19

**TMG's** 80:10 158:15 168:8 271:8,9 277:24 278:13

**TMG/KASHWERE** 26:18,21 46:13 75:8 77:4

**to** 5:16,18 6:23,24 7:1, 4,5,9,21 8:3,5,17,18, 21 9:5,14 10:16 11:13,21 12:4,15 13:1,5,12,22 14:1,2, 11,12,13,14,16,17 15:12 16:3,6 17:1,7,9 18:13 19:23 21:2,4 22:15 23:11,13,16 24:15 27:10,12,19 28:3,4,5,15,16,18 29:6,8,18,23 30:3,6, 10,11,12,13,14,19 31:4,18,22 32:6,21 33:2,12 34:14,18,21 35:10,11 36:2,4,5,24 37:2,5 38:5,7 39:6 40:13,19 41:4,9,11, 13,24 42:5,6,15,20,22 43:4,15,17,18,21,24 44:3,7,18,22,24 45:22 46:13,14,16 47:21,23, 24 48:2,3,10,11,21,24 49:1,8,15 50:4,14 51:10,11,12,15,24 52:7,10,12,19,22 53:1,4,7,11 54:23 55:6,8,12,18 57:6,10, 21 58:3,5,9,15,24 59:1,7,8,14 60:2,6,14, 15,19,22,23 61:4,22 62:4,10,12,15,18,24 63:7,8,9,16,18,19 64:11,14,15,22 65:14, 21 66:6,10,11 67:6,8, 9,19,22 68:1,2,16,23 69:3,6,10,18,21 70:6, 9 71:2,3,5,7,9,16,24 72:4,6,7,8,9 73:3,5, 17,24 74:2,7,9,15,22 76:16,18 77:13,15 78:1,22,23 79:4,8,9, 10,20 80:2,8,9,10,12, 21 81:7,8 82:4,6,17, 19,21,23 83:14 84:5, 18 85:1,2,9,20,21 86:12,14,22 87:1,6, 17,20 88:1,2,12,21 89:1,6,12,15,23 90:1, 2,4,6,9,19,20 91:3,5, 6,11,13 92:3,11,15, 17,21 93:2,13,21,24 94:5,6,9,10,15,18 95:2,3,24 96:7,9,13, 14 97:3,11,13,17,21, 24 98:2,3,5,6,10,12, 18 99:12,19,23 100:9, 12,16,19,21,22,24 101:3,5,10 102:3,6,9, 16,17,19 103:4,8,9, 10,14,15,16,17,22 104:1,2,5,6,7,8,10,12, 17,21,24 105:3,4,16, 17,22 106:1,4,5,14,16 107:6,7,12,13,14,18, 19,20 108:1,11 109:2, 9,14,16 110:24 111:1, 11 112:7,19 113:7,15, 16,23,24 114:7,8,12, 13,15,19,20,23 115:3, 7,8,13,17,20,22 116:3,9,10,13,17,18, 19,23 117:14,15 118:2,3,9,10,14,17, 21,23 119:7,11,12,14, 17 120:6,8,10,12,14, 15,16,18,20,24 121:4, 8,9,12,14,15,16,21, 23,24 122:10,14,16, 17,18 123:3,9,16,19, 23 124:6,7 125:2,10, 13,21 126:10,13,16 127:2,8,12,14,15,16, 24 128:1,21 129:2,6, 16,24 130:4,7,8,15, 16,21 131:2,5,9,13, 14,23 132:5,9,18 133:5,12,13,20,21,24 134:2,7,9,20,22 135:2,7,17 136:2,7, 11,17,21 137:11 138:20 139:4,5,14,15 140:4,9,10,11 141:10, 17,24 142:2,3,11,15, 21,22 143:10,15,17 144:2,10,14,15,16,21 145:3,15,19,24 147:3, 10,12,14,16,17,20,21 149:17,21,22,23 150:3,7,12,14,17,21 151:7,9,13,14,15,17, 18,22,23,24 152:3,5, 10,11,20 153:2,3,5,7, 8,14 154:1,8,10 155:1,2,3,6,7,9,10,11, 13,23 156:4,5,7,8,11, 13,14,19,20,22,24 157:2,5,12,15,18,20, 21,22 158:7,10,11,16, 18,20 159:3,10,13,19, 22 160:21,22 162:1, 15,17,19,20 163:1,5, 18 164:2,3,5,7,15,21 166:2,9,14,15,20,21 168:9,14,16 169:1,2, 17,18 170:5,9,21,22 171:1 172:1,3,22 173:1,13,19,21,22 174:2,3,6,13,18 175:11,14,16,18 176:11,15 177:21 178:11,19,21 179:3,7, 11,17 180:10,11,14, 23 181:13,15,20,21 182:12,23 183:4,5,7, 16,17,18,19,20,24 184:6,18 185:2,4,7,8, 17,23 186:20 187:7, 10,16,22 188:7,8,16 189:1,2,15,16,23 190:2,7,17,18,21,23, 24 191:7,10,22 192:2, 5,7,8,9,11,15,16,18, 19,20 193:1,8,13,22, 23,24 194:17 195:1, 11,23 196:7,11,17 197:8,9,10,14,15,16, 21 198:6,10,13,16,20, 22,23 199:2,6,8,12, 14,20 200:5,7,9,11 201:4,14,16,18,21,22 202:1,6,8,10,12,15, 16,23 203:5,6,7,9,10, 15,19 204:5,10,11,17 205:6,9,14,23 206:2, 4,11,13,16,17,20 207:1,2,3,12,14,16, 19,21 208:3,4,9,10, 12,17,22 209:3,4,5,6, 7,8,11,13,20 210:8,9, 14,18,19,20 211:15, 17 212:7,14,19,20,21 213:5,9,17,18,20,21 214:3,4,6,7,8,13,16 216:3,4,7,19,24 217:2,3,5,6,9,14,21 218:8,9,19,21 219:2, 3,7,10,13,21,23 220:8 221:5,9,11,12,18,19 222:2,4,7,8,23 223:7, 8,11,21,22 224:3,15, 18,23 225:2,16,21 226:7,19,20,21 227:2, 9,11,12,16,24 228:5, 7,10,16 229:5,8,9,13, 16,18 230:17,21 231:1,11,18,19 232:6, 7,8,11,16,17,20,21, 22,24 233:3,4,6,11,

13,16,20 234:4,9,14 235:9 236:1,6,11,14, 15,18,20,23 237:1,3, 6,7,10,11,12,16,21, 22,23 238:3,4,12,16, 18 239:3,9,10,11,15, 18,20,21,22 240:1,2, 8,11,24 241:2,10,12, 17,23 242:13,15,22, 24 243:9,15,16,18,21, 23 244:10,12,19,23 245:16 246:11,18,21, 23,24 247:7,9,16,17 248:2,3,5,6,10 249:2, 12,21,23 250:9,16,18, 20 251:12,16,18 252:3,5,10,11,14,21 253:1,3,4,5,12,13,18 254:16,17 255:3,16, 20 256:11,12,16 257:8,12,14,16,21 258:2,12,13,15,17,20, 22,24 259:6,10,12,22, 23 260:4,15,20,23 261:1,2,3,4,6,11,12, 13,14,15,16,18,20,24 262:1,3,4 263:7,8,11, 21,22 264:21 265:6,9, 15,17,20,21,24 266:6, 20 267:4,15,17 268:14 269:19,20,24 270:5,11,20,22 271:4, 6,7,13,16,21 272:1,3, 7,17,19,20 273:3,4,6, 8,10,12,20 274:5 275:1,7,12,16,20,21, 22 276:14,19 277:8, 21 278:6,8 279:13,16 280:7,14,23,24 281:6, 9,21 282:10,14,16,19 283:9,14,17 284:1,4, 8,11,13,17,18 285:7, 16,18 286:9,16 287:4, 21 288:4,5,8,12,14, 17,20,23 289:6,7,9, 10,12,20,24 290:9,19, 22,23,24 291:5,8,10, 14,18,20,23 292:1,4, 6,11,13,15,17 293:12, 21 294:18,22 295:1, 11,12,14,15,16,19,23 296:2,3,4,15,17,22 297:2,5,9,13,18,21,23 298:3,10,16,22,23 299:2,9,16,19,21,23 300:3,8,16,20 301:18 302:5,6,11,19,20,24 303:2,6,24 304:5,7, 11,16 305:1,4,12,14, 16,21 306:6,10,16,22 307:4,14,20 308:3,11, 12,22 309:11,18,22, 23 310:3 311:2,5,6,7, 13 312:2,6,7,9,10,20, 22 313:2,6,10,12,13, 19,22,23 314:9,20 315:16 316:7,8,9 318:1,24 319:1,4,6,7, 8,17,18,24 320:4,6,8, 16,22 321:8,17,21 322:1,2,5,13 323:2, 16,21 324:1,3,14,22 325:24 326:19,24 327:6 328:16,24 329:4 330:1,3,4,5,9, 12,15,20 331:1,3,6, 10,22,24 332:1,11,13, 15,16,21,22,23 333:1, 2,12,14,21 334:6,18, 20,21,22 335:6,8,12, 16,19,22,23 336:20 337:6,9,12,13,18 338:5,8,9,11,20,24 339:1,2,5,6,19 340:1, 18,21 341:2,7,18 342:1,2,11,16 343:24 344:3,4,19,20,21,23 345:9,12,15,16,18,20, 21,24 346:3,10,11,12, 13,18,19,20,21,22 347:1,7,8,9,12 348:4, 8,14,18,19,20 349:9, 17,18 350:7,12,17,18, 20 351:1,8,9,10,12, 17,22 352:23,24 353:4,18,20,21,22 354:1,10,17 355:1,9 356:18,19 357:9,14, 20,23 358:3

**today** 6:14 7:8,22 35:12 37:1 39:14 42:2 60:13 95:19 148:10 184:3 202:12 207:11 236:14 272:10 283:21,22 292:19,24 305:14 314:8 320:11

**today's** 4:4,9 219:2

**together** 15:12 40:14 52:17 60:12 123:22 190:21 195:7 215:1 233:7 251:22 300:2

**told** 41:3 53:19,21 77:1 87:10 92:14 93:22 105:4 137:1 147:16 152:19 153:5 154:14,16,17 155:21 162:17 169:19 190:6 193:20 207:7 209:8 213:13 242:5,7 251:11 256:7 258:22 264:20 271:12 272:13 284:1 289:7 290:4 291:1,4,11 295:3,21 298:12 301:2,21 312:7 329:7 330:19 333:19 334:1 335:16 336:19 338:1 339:7 356:12,18

**too** 25:7 138:13 181:19 199:16 213:1 251:6 292:16 309:16 320:9 358:7

**took** 6:5 8:10 67:17 85:18 94:6 196:1 198:16 203:19 214:24 219:17 267:2 279:4 285:20,23 327:20

**top** 45:7 180:21 184:5, 10 227:7 311:6 316:22 322:16,18 352:16 353:11

**topic** 148:13 175:9,12 176:17

**topics** 102:17

**total** 47:23 235:18

**totally** 280:4

**town** 127:11

**trailer** 226:20

**training** 265:3 268:14

**transaction** 231:15,20 232:13

**transactions** 186:13

**transcript** 28:6,7 114:24 358:21

**transfer** 332:12,13

**transferred** 122:15

**Transfers** 21:21

**transition** 165:3

**translate** 6:24

**transmit** 43:15

**transmitted** 43:3,6

**travel** 64:8

**treat** 28:5

**treatment** 263:20 354:15

**trick** 20:14 21:7 49:15 58:8 76:3 261:23 291:16

**tried** 339:5 353:22

**triggers** 64:20

**trip** 113:16

**true** 7:9 33:3 50:2 54:11 75:12 90:6 96:19,22 101:12,13 111:15 112:3 119:14 120:2,3 124:16 146:5, 6,8 147:1 176:21 184:18 188:9,10 201:5 231:21 245:21, 22 283:18 302:2,4 308:14,20 309:13 311:16 312:23 314:3 323:5 337:22 339:4 350:23

**truly** 40:24

**trust** 178:19

**truthful** 303:1,3

**try** 7:4,5 89:1 154:10 159:10 305:21 344:23 351:12

**trying** 48:24 49:1 58:9 67:22 90:1 91:3 102:18 115:17,22 150:7 210:8,19 213:17,18 214:4 235:9 239:18 255:20 267:14 269:20 281:20 296:2 297:13,18,21, 23 298:22,23 305:3 321:21 326:19 332:22 333:1 336:20 339:1 344:3 345:24

**turn** 45:22 47:21 199:20 205:14 206:11 221:5 315:16 316:7 332:11

**turned** 123:23 126:10 163:12 259:22 293:21

**twice** 8:9 249:7

**two** 6:9 10:2 28:6 35:8 38:7,11,15 55:1 60:22 67:11 90:7 117:1 120:4 129:13 141:7 146:3 191:10 193:9, 10 194:16,19,23 195:2 196:4,5,8,12, 14,18 197:8 198:1,16 207:19,20 208:4,11, 17 209:22,23 210:1, 14 211:9,18,20,23 212:6,7,10,14 213:21 214:3,8,15 221:6 225:4 238:13 242:12 244:17 250:3,12,14 252:12 287:22 290:9, 15 291:14 307:2 308:17,20 309:15 311:3 314:7 321:10, 14 322:14,18,19 333:5 342:6 352:2 354:22

**two-page** 112:17 160:13 334:16

**type** 6:10 14:5 18:11 69:5 161:15 326:11 336:15,18,24

**types** 16:6

**typical** 150:2

**typically** 14:12 303:5

**U**

**uh-huh** 6:23

**uh-uh** 6:23

**ultimately** 84:23

**um** 268:6

**unambiguously** 168:12

**unanimity** 280:13

**unclear** 275:16 318:13 338:5

**under** 15:7 30:9 35:24 64:3 80:14 95:5 100:1,8 114:6 117:8 120:5 215:19 266:4

**undergraduate** 139:16

**Underneath** 225:9

**understand** 6:16 12:4 28:21 61:8 65:15 72:8,12 78:7 88:20,21 89:4 105:22 111:17

134:11 141:12 144:10,14,15 146:2 149:17 151:2,4 158:11 159:20 169:4 174:24 175:3 185:1,4, 16 186:3,6,13,15,16, 23 187:2 192:3 195:22 205:2 212:15 213:19 217:13 219:19,21,24 220:3, 11 242:4 250:23 251:2 270:10,18 272:22 275:6 318:7 319:18 326:18 331:1, 7 346:5

**understandably** 99:22

**understanding** 5:21 20:24 21:1,5,7 25:10, 17 31:23 50:15 56:18 74:24 75:1 80:19 87:4 89:3 91:24 107:2 110:18 122:23 134:16 137:9,16 139:13 141:15 147:19 162:6 163:11 164:20 167:6, 12,19 172:7,14 174:5, 9,11,12,13 179:4 180:22 181:2 186:9 201:19,23,24 202:1, 22 204:22 205:5 221:12,19,20,21 222:2,5 223:15 229:3 239:6 250:19 255:3,7 257:11 269:23 271:9 273:12 274:14 277:22 291:6,15,17 302:6 305:20 317:6,11,12 329:11 332:19 336:22,23 337:14,19 338:2,4

**understands** 270:5

**understood** 6:19 59:11,13,17,20,23 60:16,19 88:18 89:6 92:12 142:2 150:6,13 162:2 179:6 191:6 203:22 204:2,5 220:1 231:4 275:3 277:19 319:16 337:2,20

**unit** 178:20

**units** 5:23

**unless** 244:18 328:7

**unnecessary** 198:21

**unquote** 61:1 170:10 195:6

**unspecifically** 154:18

**until** 34:16 50:20 97:15 100:1,9,20 102:3 103:24 104:9 105:15 113:22 115:6 122:17 123:22 124:2 189:14 191:1 198:2 234:12 240:1 254:21 255:5

**untouched** 353:12

**unwritten** 243:4

**up** 41:6,11,15,18 44:6 74:13 85:11 88:7 89:18 90:6,12,14,17 91:4,11 92:16 93:12, 19,23,24 95:3 97:15 98:14,15 100:16,20 102:3 103:24 104:9, 21 105:15 107:6,14 110:6 111:1 113:22 115:6 117:6,9 119:11 126:12 139:14 140:4, 11 147:18 150:15 155:11 158:24 166:21 170:16,18 179:10 184:12 190:9 198:18 200:1 212:21 219:2 223:18,22 225:2,10 234:11 242:14 247:24 267:18 275:1 281:1 299:21 302:20 304:12 309:19 310:3 320:7 333:7 340:21 344:20 348:4 355:4

**updated** 130:7

**upon** 71:4 75:15 76:3 78:1 79:17,22,23 81:9,24 82:23 84:14 95:24 96:18 102:23 107:22 131:12 158:21 196:7 201:5 228:20 230:2,12 231:14,19 232:1,13 253:1

**upset** 304:21

**upwards** 307:19

**us** 13:21 14:23 22:9 26:14 27:22 30:14 49:21 60:5,14,21 70:7 82:11 85:6 89:21 95:20 124:15 126:10 166:17 169:18 170:17 175:15,16 193:1 194:23,24 212:1 228:17 242:17 259:23 265:22 271:13 280:7, 15 282:5 296:20 307:20 347:13 352:7 356:19

**use** 48:10 67:8 78:18 97:17 121:17 160:18 172:5 183:19 264:10 307:3,16

**used** 24:15 40:20 41:13 61:7 65:2,3 86:7 161:10 171:4 211:17 226:10 297:11 325:9,18 328:15,18 351:21

**user** 323:20 324:1

**using** 21:11 61:7 73:20 75:18 116:18 221:4 263:4,5 324:4

**usually** 140:4 156:10 228:6 255:19

**UTC** 234:23 239:13

**utilize** 326:11

**V**

**vague** 10:17 13:13 17:10 25:13 27:11 29:9 38:9 52:3,18 61:5 62:13 65:13 71:17 85:21 86:13 102:7 106:2 108:23 110:4 111:12,23 125:10 150:10 152:14 154:19 169:7 172:4,9 238:5 298:20

**valid** 112:22 158:23 265:22

**validate** 339:16

**valuable** 305:17

**value** 84:12 178:22 246:23

**Van** 4:6

**variance** 195:3

**variety** 166:22

**various** 68:16 136:18 166:20 214:3

**vary** 75:21

**verbally** 256:11

**version** 45:2 161:20 181:24 259:12 314:23 318:9 338:19 345:6 348:23 349:21,24 350:3 353:21 357:18

**versions** 185:20 320:19

**versus** 4:3 314:11 319:3,15

**very** 119:21 191:1 227:1 295:4 305:17 352:17 353:5

**vest** 189:13

**vested** 189:14

**vesting** 187:12 189:21

**via** 188:13 191:11 203:5 219:13 277:4 310:8

**video** 4:2 358:9,20

**videographer** 4:1,7,19 7:6 67:12,14 125:17, 19 179:19 180:2 220:22 221:1 286:19, 21 345:1,3 358:3,11, 14,16,22

**violation** 5:22

**Virtas** 13:19,24 14:3, 23 15:18 17:8,14 33:1,9 34:5,14

**votes** 189:15 202:8

**W**

**W-2** 21:24 244:4 245:6,7 321:17

**wait** 21:2 88:11 144:5 182:4 242:4 306:6

**waiting** 216:5

**walk** 30:5 298:6 309:24

**walked** 236:4

**want** 7:1 8:3 22:15 29:6 33:12 41:9,24 47:23 49:14,15 52:10 58:3 67:10 71:7,9,24 72:6,16 73:17 87:6 92:11 102:16 118:14 121:21 129:16 141:17 152:10 158:13 162:13,14,20 163:1 168:14 169:1,17 179:17 183:19 217:5, 6 249:13 250:9 253:5 258:10 260:4 270:20 272:3 275:11,12 301:18 305:14 307:7 308:22 309:23 318:1 319:6,7,23 320:8 322:15 334:22 338:9 340:18 344:21 345:9, 18 346:17 347:9,12 349:9 355:9 358:20

**wanted** 18:6 30:16 36:5 71:2 82:17,21 87:20,21,24 89:12,15, 19 150:17 151:10,14 152:4,8,19 153:6 155:1,7,9,13,16,22 163:18 166:21 170:13 175:16 180:11,14 197:21 201:16,19 202:1,12,14,16 204:5 217:3 223:23 236:23 237:5 244:20,21 247:3,16 248:3,4 249:20 251:16 253:11 255:16 257:22 258:1 259:4 265:24 266:4 267:4 271:12 272:14, 17,18 273:6,8,10 275:19 279:21,23 280:20 281:5 282:5 283:9,14 299:23 300:4 305:11 306:10 308:1 330:20 331:1,6 344:19 346:3 356:20

**wanting** 169:3 271:16

**wants** 48:15 49:13 121:16 305:16

**was** 4:21,24 5:18,20, 21,24 6:3,5 8:22 9:10, 13,18,20,23 10:9 11:2,4,5,21 12:3 13:1, 2,4 14:2,8 15:4,8,10, 11 16:4,6,13,19 17:23 18:1,11 19:11 24:20 25:2 27:15 31:1,3,5, 10,20,24 32:2,3,11 33:23 34:8 35:8,21 36:2,4,18 38:16,18 39:20,23 40:24 41:1, 2,9 42:4 43:9 44:10, 13,20,22 48:22,23 49:2 50:4,5,10,15 51:2,10,13,23 52:2,

21,24 53:7,8,10,18 55:17 56:2 57:1,9,11, 20,22 58:15,16 59:2 60:9,10,16,19 61:3, 12,15,16,21 63:3,7 64:8,10 65:2,9,10 66:3 68:1,10 72:18 73:9,16 74:1,14 75:3, 13 76:11 77:2,5 78:5, 10 79:19,23 81:19 83:6,8,9,22 84:8,12, 13,14,15,16,17 85:6, 9,17,18 87:14,23 88:8 89:8,20,22,23 90:3,19 91:13,14,21 92:4,20, 23 93:7,13 94:1,5,7, 12,16 95:1,2,3,4,17 96:6,16,22,23 97:12, 22 98:1,13,16,20 99:2,6 101:7,8,9,14 102:4,9,10 103:2 106:24 107:3,10,13, 14,16,17,22,24 108:2 109:11,12,16 111:9 112:6,12,17 115:3,14 117:15 119:20,23 122:2,3,4,23 123:3,23 125:3,13,24 126:21, 24 127:14,24 128:14 129:5,18 130:7,16,20 132:18 133:3,5,17 134:9,10,16,23,24 135:5,20,22 136:1,11, 16 137:6,8 138:9,15, 17 139:13,14 140:10, 23 141:2,15,16,19,23 142:2,12,16 143:12, 14,16,22 144:3,24 147:8,9,12,14,18,19, 21 148:4 149:10 150:6 151:4,15 153:15,24 154:10,11, 23 159:11 160:5 162:2,18 163:3,5,13, 24 164:4,5,14,21 165:6 166:18 169:21 170:2,14 172:17,23 173:21 174:5,6,7,8, 12,13 175:4,18 176:14 179:4,23 180:9,12,22 181:1,2,4 183:16,18 185:2,4,6, 16 186:8,9 187:15,19 188:3,13 189:15,18, 20,23 190:2,4,22 191:19 193:7,9,20 196:15,24 197:12,15 205:5 206:4,6,14 208:10,16,21,23 209:11,12,15,19,20 210:13,15,21,22 213:2,19 215:6,9,10, 12 217:5 218:7,21 219:9,12,21 220:3,7, 11,14 221:12,15,19, 20 222:2,3,6 223:13 224:8 225:1 227:11, 18,20,23 228:4,24 229:16 231:3 234:10 235:6,17,21 236:7 237:20,23 238:3 241:10,21 242:22 243:6,9 244:5 245:8, 18 246:1 247:14,18 248:2,12,19 249:17 250:18,20,24 251:18 252:4,9 255:2,3,7,13, 17 256:3 257:9 258:4, 10,21 259:2,6,16 260:12,20,23 261:1, 13,17,24 262:16,21 263:11 265:17,21 266:12 267:1 269:14 271:9,10 272:14,15 274:7,14 275:23,24 276:2,16,19 277:9,13, 19,20 278:10,18,21 279:12,17,21,24 280:7,10,14,19,22 281:11,14 282:3,8,20 283:16,23 284:5,9 286:13 287:10 288:13 289:14,19 290:5,12, 21 291:2,8,19,24 292:3,4,12,16 293:17 294:1 295:3,4,16,17, 18 297:4 298:9,17,24 301:3,8 302:18 303:1, 3,9,24 304:18 305:2,9 306:14 307:10,15,16, 19,23,24 308:6 309:20 310:1,3,15 311:7 312:1,9 313:5, 21 314:16,22 317:22 318:8,12,24 319:14, 15 320:13 321:2,16 323:1,17,18 325:6,14, 18 326:7,8,9 327:9, 12,15,18 328:1,15,17 329:18 330:15,17,20 331:4,5,9,12,20 332:6,19 333:3,17,18, 21 334:2,7,11,16 335:5,6,22,24 336:17, 20,22,23 337:8,9,11, 14,16 338:2,3,4 339:3,7,24 343:1,8 344:6 345:19 346:12, 16 347:18 348:12 349:11,16,18,23 350:6,7,9,11,18,20,21 351:1,21 353:11 354:22 356:13,24 357:13

**wasn't** 16:18 61:1 82:18 84:11 98:2 105:21 119:13 134:8 135:12,17 144:3 153:22 183:13,15 199:12,13 201:1 209:17 211:5 234:9 240:4 241:21 243:3 258:16 261:16 269:20 281:20 288:22 298:2 327:21 337:16 350:14

**watch** 326:19

**waver** 233:7

**way** 20:5 28:22 45:14 52:16 58:15 66:14 68:22 94:9 99:21 106:4 154:10 165:14 168:2 183:12 216:19 224:13 240:18 252:22 263:22 270:23 275:21 281:4,9 286:1 291:23 298:17 307:8 310:21 318:16 319:1,16 327:9 349:24 353:15

**wayside** 90:10

**WBE** 80:24 81:6 248:5 257:23 258:11, 13,17,22 313:24

**we** 6:19 7:3,4,5 13:1 15:11 17:17 21:2,3 22:10 23:20 28:3,4, 14,22 29:5,14,20 32:15 34:3 37:11 40:18,20,23,24 44:6,7 49:4 51:8,9 52:16 55:9,10,16 56:16 57:4 59:5,8 60:11,20 62:1, 2,6,14,22 63:22 64:6, 7,9,21 65:16 66:15,24 67:17,24 68:1,10 72:6,15,16 73:7,15 74:6,9 75:21 77:4 79:5,8 80:21 81:23 82:7,8 83:20 84:7,10, 19,22,23 85:2,3,7,14, 23,24 86:6 87:8,17 88:3 90:3,4,5,18 92:10 94:11,13 95:8, 17 97:15 98:7 100:13 101:18 102:8 103:5,7, 10 104:3,6,13,18,22 105:6,18,20 109:20 111:3 113:14 114:4, 10,18,20,23 115:1,12, 21 117:17 118:19 119:1,13,15,18 120:11,13 121:5 122:1,6,11,16,19 123:11,22 125:12,15 126:8 127:10,12 129:2,7 131:9 136:17 138:2,24 139:9 147:17 149:5,21 156:12,21,22 157:18 160:9,12 161:5 163:12,14 166:21 167:10,20 168:16 173:24 176:16 177:24 178:1,3 179:1 180:5,9 182:2,14 183:16,20, 22,24 185:19 187:14, 15 188:17 189:2 190:5,8,18,21,23,24 192:14,16,24 193:2, 23 195:5,7,21 197:13, 14,21,22,23 198:4,20, 21 199:10 200:7 201:9,10 202:8 207:14 208:2 209:22 210:14 211:18,23 212:20 213:19 214:1, 10,24 215:18 217:23 218:1,11,16,23 221:8 222:14,15 223:16 225:2 226:15 229:21 230:17 231:12 233:6 234:2,6,10 236:4 238:13,17,24 239:11, 14,22,23,24 240:2,3, 8,16,19 241:8,12,16, 19 242:13,15 243:23 246:21,22 247:3,4,20 248:5,6,11 250:9 251:24 252:1,3 255:8, 12 258:8 260:1,4,12 262:2 266:12,17 267:11 268:9 271:23 275:11,12 281:8 288:10 289:9,12 290:10,16 294:13 298:9,14 302:20,22 313:21 314:20 317:16 319:13 320:4,5,19 326:23,24 328:5,10, 21 334:15 340:22 341:1 342:22 344:22 348:2,3,5,7 350:9,15 351:1,4 352:6 353:22 356:17 357:18 358:8, 15

**we'll** 29:18 50:14 51:12 121:14 132:4 133:24 134:7 136:10 147:3 170:22 171:16 183:2 200:9 213:1 286:17 295:12 332:3 358:2,5,7,9,18

**we're** 4:1 22:16 28:5 42:2 65:12 66:20 69:5 70:23 72:3 85:14 97:21 109:15 112:10 125:21 144:10,11 145:13 148:22 150:21 151:5 168:16 171:6 172:20 184:10 194:3 210:7 221:4 245:12 277:11 311:4 326:22 333:5 338:15 340:16, 24 344:20 351:5,6

**we've** 25:21 36:22 37:23 40:22 41:10 45:2 107:9 121:3 128:18 146:7 163:21 177:17 246:5 259:20 262:24 286:24 310:19 318:4 325:17 329:22 343:7

**weather** 213:7

**web** 326:3

**website** 348:13 349:1, 16

**week** 8:6 164:7 190:14 194:2

**weekend** 64:18,19 65:6,10 66:4,22 67:18 69:4,7 70:7,8,23 71:4 72:19 79:14,16 86:11, 19 87:12 88:9 89:20

91:2 191:24 193:20, 21,24 194:8,20 196:17 198:11 200:11 208:8 211:8 212:20 214:16 224:20 233:23 234:17,18,19 235:10, 12

**weeks** 28:6

**weird** 44:19

**welcome** 30:18

**well** 20:2 44:9 59:14 63:16 74:12,22 76:5 102:18 106:10 109:21 119:4 120:15 129:10 132:14 142:14 149:3, 13 162:3 171:24 172:9 176:10 180:14 187:12 193:19 198:4 201:1,9 205:5 206:20 213:16 218:13 223:13 234:8 239:7 256:20 258:8,10 260:5 270:24 271:3 277:8 285:12 304:19 306:3 308:21 311:8 318:6 339:3 341:18 347:23 352:11 353:14 356:11 358:4

**well-educated** 151:3

**went** 31:7 124:24 145:10 146:7 210:22 216:1 217:4 234:7 236:10 260:18 284:12 324:17 350:1,4 351:2

**were** 5:16 9:16 10:8 11:8 12:6,17 13:9,10, 18 15:7,8,12,20 16:23 20:11 26:17 27:8 29:23 30:6 31:14,17, 22 32:5 33:1,5 34:13 36:12 37:6,15,21 38:17 40:2,3,13,24 42:12 45:23 46:3,19 50:7 51:4 55:7,14 57:15,18 59:9,10,16, 20,22 60:15 63:4,6,8, 9,17,22 66:3,9,14,16, 17 67:17,22,24 68:2, 3,11,15,17,20,22 69:4,6,8,14,15,17,20 70:2,3,10 71:3,11,14 75:4,11,15 76:1,5,6, 11,16 77:8,12,13,23, 24 79:2,17,22,24 80:19,23 81:3,4 83:18 85:15,16,23 86:3,7 87:13,18 92:8,13 94:4 97:18,24 98:11,21 99:3,6,7,8,11 100:12, 14 103:3 106:5 108:18 109:22 110:2 124:5,10 125:12 129:23 130:15 131:21 133:13 134:1,3,21 136:10,15 137:21,22 138:5 141:6,12 145:5, 8,9,10,13,22 146:19 149:10 171:24 172:1, 24 173:12,18 174:18 176:5,13,20 177:4,24 181:15,19 182:13,14 184:6 187:5 188:22 191:11 192:9 194:16 195:1 199:11,24 200:10,15 202:8 207:12 208:9 212:7, 11,16 213:3,4,8 215:18 220:8 221:8 224:23 227:12 228:9, 16 229:22 231:23 236:13,18,20 237:12 239:10,19 240:8 241:15,16 242:24 243:12 244:3,9 245:9 247:20,22 248:8,9 249:18 254:1 255:8, 12 257:16,17 258:8, 12 259:3 261:1,4,10, 15,18 263:4 265:12, 13,16 267:24 268:16 269:17 270:18 277:9, 23 287:22 288:5,19 289:7,24 290:5 293:10,21 295:15 296:1,8,21 297:1,12, 18,21,23 299:9,15 300:1,5,16,18,24 302:16 311:17 312:21 315:8 316:10 317:7 319:1,8 320:20 322:6, 13 323:23 325:11,12, 22 329:3,5 330:4,8 331:21 332:15,22 333:1,17 335:13 336:4,7 339:1 341:19 344:3,9 348:14 353:13 354:3,8,16 357:3

**weren't** 61:21,22 133:20 198:19 261:14 268:6 280:17 283:12, 13 300:8

**what** 5:14,20,24 6:2 7:17,24 8:4 9:18,20 11:4,9,12,15,17 12:3, 13 13:3,14 14:8,9 15:6,7,13,17,22 16:4, 5,11,17,19,21 17:20 18:16,22 19:14,17 20:8,13,15 22:3,6,9 23:11,14 24:3,14 25:10 28:14,19 29:11 30:16 31:1,3,20 32:3, 15 34:3,13 35:5,8,19, 24 36:4,12,22 37:6,18 40:3,16,19 41:10 43:5 45:13 47:9 48:7 49:1, 5,18 50:14,15 51:12, 14,22 52:19,21,23,24 53:12,16 54:5 55:6, 16,23 56:21 57:17 58:9,11 59:4,9,12,22 60:5,19,23 61:14,19 62:23 63:18 64:3,10, 14,19 65:1,2,10,22 68:1 71:7 73:21 74:2, 22 75:4 76:17 77:12 80:2,19,24 81:2 82:13,18,21 83:2,6, 18,22 84:5,23,24 85:5,12,17 87:23 88:10 90:1,3 92:8,14, 23 94:12 95:1,20,21 96:5,6,11,17,23 97:10,13,23 98:20 100:22,23 101:3,8,10, 13,14,20 103:2,5,6,7, 13,19 104:11 105:6,9, 10,12,19 106:6,24 107:12,15,18 108:4, 11 109:16 110:4,18 111:3,4,16,17,24 114:16 115:12,23 116:21 117:3,8 118:7, 10 119:16,19,20,22 121:5 122:6,23 123:24 124:15,17,18, 23 125:8,10 127:6 128:18 131:18,21 132:14 133:4,11 135:2 137:22,24 138:9 139:13 140:10, 21,23 141:2,5,12,15, 16,19 142:6,15 143:24 144:1,15 145:13,22 146:2,10 147:8,9,18,23 148:1 149:14,16,17 150:13 151:4,15,18,23 152:1, 23 153:22,23 154:15, 20 155:1,3,17,19,24 156:2,7 157:7 158:1, 2,6,11 160:24 161:10, 15,18 162:3,14,15,19 163:9,21 166:14,18 167:7,10,19 168:17, 21 169:4,22 170:19 172:7,14,16,23 173:2, 3,5,21,24 175:4,15,24 176:10 177:15 179:9, 16 180:5,21 181:2,15 182:6 183:17 185:2,6, 18 186:6,7 187:14 188:4,7,13,19 189:1 190:11,15,18,21,23 191:6,21 192:1,15,18, 19 193:1,8,24 195:16, 22,23 196:7,19,24 197:6,13,14,19,23,24 198:8,12 199:10 200:9,23 201:4 202:4, 14 203:10,14 204:2 206:4,7 207:4,15,18 208:1,14 209:2,6 210:14,19 211:16,22, 23 213:19 214:9,12 215:2 216:5,7,13 218:7,14,21 219:3,16 220:7 221:15,20 222:2 226:6,9 227:15, 16,18,22,23,24 228:2, 4,8,9,18 229:3,15,22 230:1,8,10,20,24 231:3,4,7,11,18,22 232:24 233:5 234:23 235:2,23 236:24 237:12,16,20,22 239:7,18,19 240:15 241:10,12,23 242:12, 13,15 243:15 245:12, 17 246:5,18,24 247:24 250:7,8,23 251:2,15,18,22 252:16 253:9 256:4, 14,16,23 257:24 259:3,6,20 261:4,7, 10,17,21 262:9 264:9, 10 265:15 266:5 267:4,22 269:7,11,23 270:5,11 271:5,21 272:14 274:6,20,22 279:10,12,21,23 286:6,24 287:9,10,14 288:15,17 289:6,9,10, 12 290:9,12,24 292:21 293:5 294:9 295:16 296:7,17,18 297:18,21,23 298:2,7, 18 299:2 300:15 301:2,7,9 304:3,5 305:19 306:4,7 307:9, 11,19 308:5,7,21 310:19 312:4,9,21 313:1 315:10 316:5,6 318:17 319:18,20 325:3,9 327:12 328:5, 15 329:7,22 330:24 331:17 332:15,21,23 333:2 334:4,5,15 335:8,9,16 336:1,4,19 337:4,12,20 338:5,6, 21,24 339:2,5,7,12 340:14,19 341:15 342:22 343:7 344:2, 13 346:5 347:23 348:1,4,9,11,18,19,20 350:5 351:1,2,3,7 353:11 354:21,23 356:15 358:12

**what's** 5:9 18:18 20:24 25:17 31:8,22 45:5 48:19 56:18,24 59:24 60:1,3 63:13 68:12 69:24 74:24 80:19 83:20 93:10 106:17 107:1 108:10 110:18 116:14 143:18 153:12 164:20 168:13 169:15 171:15 172:13 198:7 211:14,15 212:5 220:1 229:3,23 231:9 235:21 245:6 253:4 258:7 263:23 291:5 296:20 302:6 306:18 307:17 316:4 318:11 325:15

**whatever** 7:2 29:6 49:19 51:12 92:19 141:20,23 152:10 163:24 183:19 235:4 239:13 246:21 250:6 261:19 280:21 282:3 306:15 314:21 315:2,

6 334:22
**when** 8:4 13:9,18 14:7,24 15:2,4,23 18:24 20:2,3,11 22:12 26:10 38:18,20 40:23 45:10 48:22 49:16,17 50:14,16 51:11,13,15, 16 54:4,8,21 55:10 56:14,18 57:3,11 59:2 64:2,21 65:20 67:18 69:23 72:12 73:1,8 74:9,11,18 75:4,13, 17,18,19 76:8,24 77:13 78:15,24 79:1, 7,9,17 83:1 86:6,10, 17,22,24 87:9,10,12, 15 88:7 89:14,16,18 90:17,18,22 91:10,19, 23,24 92:1,7,11,18,24 93:12,18,22,23,24 94:3,24 95:10,11 97:17,18,24 100:14 101:4,13 103:11 105:20 107:19,21,22 113:17 124:5,11,19 127:10,18 133:3,5 134:24 147:11 149:17 150:15 162:15,18 163:13 164:5 165:20, 23,24 167:6 169:23 182:16 183:18 186:8, 16,24 188:22 193:18, 22 194:5 195:15 197:21 203:10 206:4, 24 207:22 208:7 209:11,12,19 210:21 211:1 213:20 222:1 228:6 233:6 239:15 243:14 244:6 245:2 252:4 253:8 254:23 266:24 270:12 277:8, 9 280:18 281:7 283:13,23 284:1 287:9 290:10 294:10, 21 295:3 303:12 315:5 318:12 319:19 333:4 334:5 342:3 356:22,24 357:3
**whenever** 235:16
**where** 6:4 7:13 13:2 19:23 29:23 30:6 32:5 48:1 50:4 94:17 111:9 129:8,12 139:15,16, 19 145:7 151:5 189:18 192:8 193:7 208:2 214:5 218:1 225:8 229:1 242:1 266:9 273:20 301:2 321:19 325:21 326:16 337:6 338:12,14 343:4 345:24 349:5
**Where's** 251:13
**whereas** 250:14,15 251:8,9 266:10
**WHEREUPON** 32:10 33:22 36:17 44:12 112:11 125:23 128:13 160:4 179:22 224:7 245:24 248:18 259:15 262:15 286:12 293:16,24 310:14 314:15 317:21 321:1 325:5 327:24 329:17 332:5 334:10 342:24 347:17 349:10 358:24
**whether** 21:8 39:5 40:13 42:24 47:2 74:6 84:4,16 91:13 99:2 105:1 107:13 116:19 117:11,15 118:13 121:16 124:9 125:3 143:16 144:2,4 148:17 154:5,17 159:7,11 168:20 199:22 201:3 206:8 207:12 232:20 234:4 236:5,6 238:2,15,16, 22 241:21 242:8,10 252:14 256:7 272:1 277:2,3 279:5,12,19 280:9,24 282:7,15,16, 19 284:18,22 285:8, 17 293:12 295:23 298:23 300:3 308:6 309:19 315:12 316:23 318:7 327:13 328:10 338:5
**which** 15:7 17:17 19:7 27:20,22 30:23 38:2 43:14 47:22 52:16 54:9,17 57:10 60:8 77:22 78:22 80:6 84:12 94:7 95:5 102:10 103:8 108:7 110:12 123:23 131:21 136:17 141:9 142:20 147:12 181:21 195:9, 13 203:16 223:1 237:18 238:5,24 241:12 244:5 247:14 251:10 254:18 272:8 300:14 307:18 311:21 312:3 317:15 338:16 345:10 350:1 353:17, 21
**while** 26:17 27:15 41:15 293:10 329:8 345:13
**who** 6:9 11:24 12:5 18:16 19:3 24:19 25:2 27:6 39:11,20,23 41:6 46:19 73:22 90:14 98:21 99:1 113:18 123:3 126:17,19 129:17 158:6 208:24 244:14,22 252:7 254:20 263:12,14 268:13 300:24 308:15 319:18 320:15 327:3 341:5,18 342:14 350:19
**who's** 320:9
**whole** 28:6 33:6 49:13 190:24 207:7 265:14
**whom** 4:12 10:8 12:16 26:20 27:7,24 187:22 292:19,24 326:9
**whose** 350:17,18,20
**why** 9:8 16:8 20:12 31:22 33:8 34:8 63:16,19 64:19 65:22 72:14 87:17 91:10 98:13,21 99:11,17 107:5 116:24 123:20 135:11 136:10,15,21, 23,24 137:9,16 138:5 145:22 147:19 162:12,24 163:1 165:5 168:23 171:19, 23,24 172:4 174:22 177:7 183:11 188:11 196:18 197:8,12 198:6 200:17 217:5 220:6,11,14 221:12, 13,19 228:1 232:1 243:3 247:19 249:17 255:22 256:18 257:21 258:15,21 262:11 263:3 266:2,19 267:14 268:3 269:15, 18 270:9,19,23 272:6, 10 274:24 277:12 280:2,3 281:6 282:2 295:15 296:13,21,23 297:1 298:4 299:7,19 300:19,23 302:5,6,10, 14,24 303:2,7 304:10, 17 305:1,5,8,11,14,20 306:11 313:4,18 321:16 322:6,13 327:17 330:19 332:17 333:19 336:11 339:9, 24 344:22 346:17 347:4 349:23 350:7 354:13 355:1
**wife** 8:20
**wife's** 301:11
**will** 4:11,19 6:14,15, 17,18,19,23 7:3,4,5 13:1 14:16 44:6,24 54:3 59:8 61:19 66:15 67:24 68:1 72:4,6,17 74:7,9 78:18 79:8 80:21 87:8 97:10 115:16,20 118:21 121:22 122:8,15 125:8 127:11 129:2,9 130:10 131:6,7,9 134:7,14,15 136:17 140:19 141:4 147:17 149:2 157:16,18 159:9 160:9 168:16 171:1,2 178:19 184:21 187:9 189:11, 13 192:14 202:19 203:12 206:16 210:14 214:10 215:23 226:15 231:6,16,20 232:2,12, 14 238:13 249:12 251:11 260:11 280:6 283:7 306:16 313:11 334:20 341:1 342:22 355:19
**willing** 89:23
**Wines** 28:1
**Winkle** 4:6
**Winnetka** 7:18 325:23 326:4
**with** 8:2,4 9:1,2,14 11:1,6,18,22,23 12:3, 16,22 13:11,17,19,24 14:3 16:2 17:4,8,14 18:9,12 22:7,8,10,12 23:8 24:11 26:7,17 27:12,15 28:4,11,12, 15 29:2 30:8,9 34:7 35:20 36:1 37:6,9,16 38:23 39:1 40:5 41:7, 12,22 42:8 44:7 46:7, 13 48:6,19 49:17 50:20 51:5 57:7,12, 19,20,22 59:2 66:6 72:17 73:3 81:17,20, 22 82:10 83:19 84:6 85:9 86:3 87:13,15 88:1 89:2 97:2,17 98:7 100:20,22 101:16 103:2,18,23 105:14,24 110:22 112:18 113:24 117:19 121:2,17 122:2,3 123:8,17 125:1 126:12,24 129:7 130:2,9 131:3,9 132:11 133:8,21 134:2,24 135:18 139:23 140:1 144:7 148:18 149:7,10 150:4,7,8 151:15,16, 17,18,22 152:1,5,7 154:11,23,24 155:3,7, 22 157:12,13,18 162:20 166:8,12,18 169:2,18 170:5,7 173:17 177:20 180:10,12 181:15,19 182:10,11,12,23 184:15 187:3 189:16 191:5 192:23 197:13, 16 200:15 201:9 202:5 203:11 204:17 205:11,20 210:21,22 211:14,15 212:9 213:4 216:1,15 217:5 218:8,14,19 219:3,6 222:6,8 223:23 224:1 228:8 229:15 230:7 234:10 236:1,11 239:2 240:7 242:23 245:16 247:23 250:24 251:12 254:9 256:24 257:18 258:4 259:23 261:18,21,22 265:10, 13,18,20 266:14,22 267:18 271:14,24 275:10 276:15,24 280:7,8,12 282:9 284:2,13,20 286:9 289:24 290:8,11,13, 14,19,21 291:2,12

292:16 293:3 297:5 298:6,9,11,17,24 299:5 300:3,15,17,23 301:7,11 302:19 303:8 304:1 307:14 309:19 310:2,8,24 311:2 313:8 315:8,13 320:12 325:22 327:5, 12 329:8,9 331:10,22 333:13 334:24 335:3 336:5 337:4 339:19, 21 340:2 341:8 342:12 351:6,12,22 352:7,9 355:22 356:5, 19

**withdraw** 171:16 217:18 220:9 226:15 282:12 283:7 292:22 315:23

**withdrawal** 273:23

**withdrew** 282:18

**within** 28:8,19

**without** 40:5,7 42:15 43:13 109:6 113:6 145:15 174:18 181:9 195:3 240:13 265:7 272:4,11 275:13 276:5,17,18 278:1,14 294:5 299:10,16,24 301:20 302:3 319:11 322:8 337:21 352:8 355:5

**witness** 4:20,21,23 10:21 13:7,14,24 14:20 17:11,17 20:8 22:19 25:15 29:11 30:3 33:12 34:24 38:11 42:17 46:17 47:4 49:22 50:24 52:15 54:15 55:21 56:10 59:16 61:9 62:14 63:13 65:16 67:8 69:1,20 70:19 71:11 73:7,15 77:18 78:8,12 79:13 85:23 88:23 89:7 93:5,9,17 95:17 97:7 102:8 106:20 110:9 113:11 115:22 117:22 125:5, 12 128:5 137:18 138:24 139:9 140:14 141:9,19 142:6 143:2 144:24 146:13 148:8 150:17 152:23 153:10,17 154:22 158:2 159:5,21 160:1, 10 164:9 167:17 168:18 171:9 172:11 176:23 181:23 182:6 194:3,10,14 196:23 204:23 216:14 217:19 237:7 238:8 253:7 254:13 264:23 270:6, 15 272:24 273:20 274:6 275:16 276:11, 21 278:17,24 279:10, 16 280:12 285:14 286:8,16 287:12,14 289:3,23 293:7 297:4 299:12 305:24 306:18 309:7,12 312:16 313:10,15 318:1 322:20 324:13 325:1, 15 346:7 347:9 348:8 354:2 356:2

**women** 147:15

**Women's** 80:13

**won't** 78:17,19

**wondering** 340:20

**Woodman** 4:8

**word** 24:7 48:11 69:24 96:10 161:8 170:5 177:19 178:5 211:17 226:20,22 279:4 285:20,22,23 353:9

**wording** 98:20

**words** 21:10 48:24 75:19 96:14 152:8 184:12,13 195:17 234:8 240:7 270:10

**work** 13:24 14:1 15:12 16:7 22:4 23:4,8,12 24:16 25:5 26:5,11,16 27:1,7,23 29:2,6,19 30:9 33:12 40:22 75:2 123:8,22 124:6 131:2 157:12 166:15 175:1 313:4 325:22

**worked** 15:19 30:8 245:17 248:6

**working** 14:3 18:15, 16 20:3,11,18 21:10 22:12 23:8,11 27:8 34:7,14 48:6,19 52:17 124:3,11 215:1 233:7 245:20 302:16 311:17

**world** 183:10

**worries** 164:9 194:14

**worth** 331:14 333:19 335:24

**would** 7:8 8:7 9:9 14:13 19:23 51:9 55:9 56:10 60:11,24 64:23 65:1,3 66:1,5 78:22 80:24 81:6,22 82:1,24 83:12,13,14,23 84:10, 11,22 85:4,7 87:17 90:3,5,6 91:5 93:13, 21 94:5,7,8,15,17 96:1 102:24 103:24 105:15 106:6 108:12 109:6 111:10,15 113:15 117:5,8,16,18 120:2 122:24 130:19 135:21 136:3,6,12,19, 20 137:10,11,16 138:6,8,19,20 139:3, 4,10 141:9 142:3,9,10 143:9 144:4,18,19,20 145:14,16,17 146:24 147:16 149:24 150:2 151:9,11 154:8 156:8, 12 157:21 159:2,23 160:10 161:1,2,10 164:22 165:5 168:2 171:19 173:8 174:20 175:6,13,16,19 176:4 178:23 179:1 185:10 187:3 192:24 195:4,5, 7,8,9,13,15 196:8 198:4,20 201:22 202:9 203:23 208:24 210:2 213:14,15 216:15 218:7,9,14,22 219:3,22 222:14,15, 17 226:21 227:21 228:9,13,14 234:5,6 235:2,3 238:23 240:7, 11 243:20,24 244:20, 21,24 245:1 247:4 248:5 255:4,5,9,10 256:18,20 257:4,6 258:15 260:15 263:7, 22 264:11 265:19,22, 23 266:3 268:1 270:15 271:7,23 272:19 274:15 275:8 277:22 281:6 284:5, 18 287:17 292:2,4 295:13 296:17,24 299:18,23 300:7 302:10 304:8 305:5, 14,21 306:11 307:4 313:23 314:9 315:11 319:4,5,6,11,23 320:4,15 326:12,14 339:24 341:17 343:24 346:17,20 347:1 352:6 354:18 357:3, 19

**wouldn't** 19:8 66:8 107:5 195:17 198:13 238:12 240:1 244:18 257:8 269:13 284:9 304:11 308:13 340:4

**Wow** 341:6

**wrap** 340:21 344:20

**write** 78:21 192:15 198:23 199:2,6,8,18 200:5 201:4 242:14

**writing** 17:2,8 60:18 67:2 80:9 82:23 83:1, 6 86:1 95:20,21,24 96:18,21 97:3,11,14 101:23 102:1,12,23 103:4 107:7,11,12,15, 18 108:1,4,10 109:14 113:4 117:5,10 130:17 131:24 135:22 136:7,13,20 137:11 138:7 139:4 142:3,6, 22 143:9,20 144:2,4, 18,19 145:4,6 146:17 150:21 151:3,5,6,8, 10,15 152:9,12,19 153:6 155:9,16,22 156:21 158:20 178:23 188:7 189:4 193:3 200:10 217:6 224:3 241:15,22 272:4,11, 12,20 274:15 275:7, 13 276:6,15,17,18,23 277:4 304:1,7 335:2 340:5

**writings** 110:21,23

**written** 39:15 83:20 138:19 152:5 199:11 220:2 274:8 275:8 276:12 332:13 339:18 340:1,9,12

**wrong** 102:5 211:14, 15 252:1 300:20 336:7 338:3 356:12

**wrote** 140:22 158:18 179:5 199:10,21,22 242:14 246:18 277:2 332:21,23 333:2 334:4 335:8 336:11 339:5 340:14 350:19 351:1

### Y

**yeah** 24:1 28:10,14 42:9,14 65:16 77:7 82:12 91:17 106:1,16 115:11 123:15 129:19,22 133:2,10 134:11 140:14 141:19 143:2 148:24 151:5 152:23 162:10 164:23 167:16,22 171:14 178:1 179:14 182:8 183:11 189:9 196:10 200:3 212:24 213:1 221:7 233:9 234:9,22 241:5 246:10 253:23 260:7 263:6,10 266:7, 12 268:11 270:10 276:8 283:15 284:16 287:22 291:18 292:14 297:4 303:8 305:24 306:3 307:13 308:18 314:13 315:15,20 319:6 320:3,16 321:24 326:19 337:2 341:1 346:7 348:5 350:4,24 353:10 354:6,7 355:17 357:17 358:10

**year** 5:24 9:20 16:7 31:1,20 32:3 37:6

**years** 30:15 36:12 149:9 296:3 335:18

**yep** 71:1 130:12 161:23 167:17 246:13 253:23 263:18 351:18 352:14,17,21

**yes** 5:13 6:4,22 7:23 10:4 11:3 14:7 17:3 18:10 19:16 20:19 21:19 23:1,3 24:23 25:1,4,6,15 26:3,6 27:2,5,20 28:23 29:22 30:22 31:16 35:4,16 38:14,19,22,24 39:22 40:10,12 41:14,17

42:17 43:11,23 44:5 46:5,10,17 47:10,14, 17 50:3 51:21 55:21 57:16 58:14,19,22 59:21 62:21 67:21 69:1 70:11 71:21 74:17 75:13 79:5,6 81:14 83:17 86:9,20 94:19 99:10 100:17 108:3 112:4 115:9,13 116:4,5,8,20 117:14 119:9 122:13 126:18, 23 127:3,5,22 128:6 130:18 131:12 132:16 133:17 135:5 138:2, 17 139:1,18,24 140:3 146:13 151:6,8 153:19 160:22 161:4 162:5 164:13 165:22 166:13 167:1 170:21 172:11 174:21 175:8 178:12 180:17 185:5, 13 186:10 187:7,21 189:5 190:2,10 191:8 194:22 198:12 199:17 201:2 206:3 212:15 214:6 216:15 217:11 218:20 219:18 221:24 222:18 225:14 227:11 228:15,18 231:3,9,13 235:11,15 237:7,15 238:20 241:24 243:2 246:16 251:15 254:12 255:19 258:3,10,21 260:11,13 261:3 262:7 263:23 265:8, 17 267:7 269:8 273:7 274:7 275:8 277:17 295:7 302:18 313:3 315:5,6 316:16 317:18 318:4 319:21 321:13 322:23 325:12 327:8 330:6 333:1 344:1,5 348:21 353:7, 19 354:12 356:2,9

**yes-or-no** 42:14

**yet** 29:16 74:21 77:9 95:12 101:10 153:7 201:3 204:9 220:10 265:13 298:16 303:23

**you** 4:19 5:4,7,11,16 6:2,7,11,14,15,16,18, 19,21 7:1,2,3,4,11,13, 19,21,24 8:4,7,10,14, 18,21 9:1,4,5,8,9,12, 16,20 10:5,8,11,14,22 11:1,8,9,10,12,13,15, 17,19 12:5,11,16 13:3,6,9,10,13,14,18, 23 14:5,11,12,14,17, 18,24 15:2,4,5,6,7,8, 13,14,17,20,22 16:2, 5,8,9,11,17,21 17:1,4, 7,10,13,16,20,24 18:5,8,14,24 19:5,8,9, 10,15,21,23 20:2,3,4, 7,8,10,11,12,13,15, 17,20,22 21:4,5,12, 15,16,18,24 22:1,6,7, 8,9,12,16,17 23:4,11, 14,16,17,19,20 24:4, 11 25:2,5,7,10,14,22 26:1,2,4,5,10,14,16, 17,24 27:3,7,8,12,22, 24 28:8,21 29:1,2,6,9, 11,16,23 30:2,6,17, 19,20 31:3,14,17,22 32:3,5,15,22 33:1,5,8, 15 34:3,7,11,13,20,22 35:8,12,14,17,19,24 36:4,6,8,12,22 37:6,8, 13,18 38:6,7,9,20 39:1,5,8,11,14,18,20 40:3,8,11,13,16,19,23 41:1,2,3,9,11,12,13, 15,18,21 42:1,3,8,12, 15,19 43:7,14,21,24 44:3,9,24 45:10,11, 12,22 46:2,7,11,15,16 47:2,3,16,18,19,22, 23,24 48:7,8,20,23 49:1,5,6,7,16,17,20 50:1,4,7,10,14,16,19, 23 51:2,3,4,11,12,13, 16,19,22,23 52:3,6,7, 10,21,22,23 53:3,4,6, 7,14,16,18,19,21,22, 23 54:1,3,4,8,9,14,20, 21 55:1,6,7,8,13,14, 17,18,20,24 56:6,9, 14,18,21 57:1,3,6,10, 13,15,17,21 58:2,3,4, 6,9,11,12,17,20,23 59:1,4,9,15 60:2,5,13, 14,15,18,22 61:6,9, 11,14,15,19 62:10,13, 23,24 63:5,12,17,19 64:2,4,11,15,16,19 65:1,3,5,14,20,22 66:16,19,20 67:3,10, 19,20,23,24 68:1,5,8, 10,19 69:7,11,23 70:7,9,10,12,13,14 71:4,7,20,24 72:1,5,6, 11,12,13,14,16,18,22 73:1,2,17,21 74:1,2,6, 11,15,18,21,23,24 75:4,5,7,10,11,14,18, 19 76:3,8,9,16,24 77:1,2,3,8,14,16,21, 22,23 78:1,3,7,15,16, 17,18,19,20,21,23,24 79:1,3,7,9,11 80:20, 21 81:2,9,12,13,15 82:7,11,18 83:1,2,7, 16,23 84:2,5,6,14,18, 24 85:1,4,5,8,10,11, 12,13,16,17,21 86:6, 7,14,19,22,23,24 87:6,7,9,10,12,17,18 88:6,24 89:2,3,4,5,6, 11,13,14,16,18,19 90:2,9,12,15,17,21, 23,24 91:1,3,4,10,19, 23,24 92:1,2,3,7,8,9, 10,11,12,13,14,16,18, 22,24 93:1,3,12,14, 22,23,24 94:3,16,20, 23,24 95:6,7,10,11, 16,19,21 96:6,7,11, 13,16 97:2,3,6,11,16, 17,18,20,24 98:3,5, 10,12,14,18,19 99:1, 2,5,8,12,17,18,19,22, 23,24 100:1,8,9,11, 14,15,19,24 101:3,4, 5,10,14,22,23,24 102:4,7,13,14,21,22 103:1,2,4,6,9,11,12, 14,15,17,19,20,21,22 104:2,5,8,10,11,12, 15,16,20,24 105:1,2, 3,4,5,9,10,11,14,17, 22,23 106:2,4,5,10, 16,23 107:7,12,16,20, 21 108:11,18,19 109:2,7,9,11,14,16 110:4,13,16 111:8,14, 19,20 112:3,5,19,21, 24 113:2,6,7,16,18,23 114:3,8,11,13,14,15, 19,21 115:1,3,7,13,23 116:2,3,6,9,12,13,14, 18,19,20,21 117:14, 15,16,17,18 118:2,13, 14,15,20,21,22,23 119:5,7,10,14,16,17, 22 120:1,4,10,12,14, 15,23,24 121:3,7,8,9, 12,23 122:10,14,18, 21 123:3,9,13,16,20, 24 124:5,7,10,11,15, 17,18,24 125:1,2,8 126:11,17,22 127:4,6, 8,9,12,14,15 128:3,8, 9,10,21,23 129:1,3, 12,16,17 130:4,7,8, 10,11,13,15,16,21,23 131:2,3,5,9,10,13,14, 18,19,21,22 132:4,5, 9,14,20 133:1,4,5,7,8, 11,13,15,20 134:1,6, 8,17,21,22 135:3,7, 14,15,20 136:1,6,7, 12,18,19,20,21 137:1, 3,7,9,10,14,20,24 138:3,5,6,8,12,18,20, 23 139:3,5,8,15,16, 19,23 140:9,16,23 141:2,3,4,5,8,9,12,17 142:2,3,9,10,14,18, 21,23 143:8,10,15,16, 20,24 144:1,2,4,7,12, 17,18,20,23 145:3,13, 16,19,22 146:2,12,15, 16,19,23 147:3,4,5,20 148:7,10,17,21 149:9, 14,17,18,22,23 150:4, 6,8,11,15,20,24 151:2,3,11,14,21,22, 24 152:3,4,5,10,12, 17,19,22 153:5,7,12, 14,22,23,24 154:5,6, 12,14,15,16,17 155:6, 8,9,11,17,19,21,22 156:14,16,19,20 157:1,2,4,5,11,12,15, 18,20,21,22 158:5,11, 16,17,20 159:1,3,9, 11,12,13,14,18,19,22 160:14,18,24 161:6,8, 10,12,13,15,18,21 162:2,3,4,14,15 163:1,5,9,11,12,15,20 164:2,6,7 165:14,19 166:7,11,24 167:6,19, 20 168:2,5,14,20,23 169:5,11,12,13,19,23 170:1,4,8,12,13,18, 19,24 171:1,2,12,14, 20,21,24 172:1,4,10, 21,23,24 173:12,15, 21 174:1,3,7,14,17,24 175:4,6,7,11,12,13, 14,24 176:4,5,8,12, 13,15,18,20 177:2,3, 4,10,16,18,21 178:2, 6,7,11,16,22,24 179:3,6,11,17 180:5, 11,14,15 181:8,15,18, 20,23 182:4,12,16,19, 21,23 183:3,5,8,9,17, 18,19 184:3,6,12,15 185:1,2,6,7,16,23,24 186:3,4,7,8,13,16,23, 24 187:3,6,8,16,18,19 188:4,7,8,11,15,19, 20,22,23,24 189:1,7, 16,23 190:3,4,15,16, 20 191:4,9,17,19,21 192:1,5,8,12,13,19,20 193:7,8,17,18,20,21, 22 194:5,17,23,24 195:11,19,22,23 196:4,6,7,11,15,16,21 197:3,7,9,10,19 198:1,6,10,12,15,16, 18,23 199:3,4,6,8,15, 18,20,21,24 200:4,8, 10,11,15,17,21 201:1, 3,4,14,19,21,22,24 202:11,15,21,23 203:5,6,7,10,11,12, 15,16,22 204:4,5,9, 11,12,13,20 205:2,3, 6,12,14,17,23 206:1, 4,8,12,16,19,20,24 207:1,2,4,7,8,9,11,12, 15,16,18 208:1,3,4,5, 8,9,12,17 209:2,3,11, 12,16,22 210:3,5,8, 10,12,19 211:9,15,17 212:1,5,9,14 213:3,4, 6,8,9,12,13,23,24 214:2,5,14 215:8,10, 14 216:3,4,5,6,7,9,11, 19,22 217:2,8,9,13, 14,16,19 218:8,9,14, 18 219:1,2,7,10,13, 15,16,19,21,22,23,24 220:3,8,10,11,14,18 221:5,9,11,12,13,18, 19,23 222:1,3,5,6,7,9, 12,17,22,23 223:1,7,

8,21,22,23 224:3,14, 17,23 225:4,5,8,12, 13,15,19,20,21 226:1, 2,3,4,9,10,18,23 227:2,9,12,16 228:1, 2,3,4,8,9,13,16,22 229:1,3,7,8,19 230:1, 5,8,10,11,15,20,22,24 231:4,8,11,18,20,23 232:1,2,5,6,10,19,21, 22 233:1,10,12,15,16, 19,23 234:3,5 235:12, 13,24 236:4,7,11,13, 16,18,19,20,23,24 237:10,13,16,22 238:1,3,12,14,15,19, 22,23 239:3,7,10,15, 20,21 240:13,18,22, 24 241:12,14,15,17, 22,23 242:5,6,9,10, 13,14,15,18,24 243:3, 4,9,12,16,18,21 244:2,10,19,22 245:2, 5,7,9,17,20 246:5,8, 11,15,18,24 247:5,6, 11,14,16,17,19,21,22 248:2,8,9,10 249:13, 14,15,16,17,18,19 250:9,13,23 251:2,11, 12,16,20,21,22 252:9, 14,15,16,23,24 253:5, 6,11,14,19 254:1,10, 13,15,16,17,24 255:3, 9,10,20,22 256:3,7,8, 13,18 257:12,16,17, 19,20,21 258:2,4,12, 15,17,21,22,24 259:10,12,20,22 260:3,4,5,8,11,15 261:1,4,10,12,14,17 262:5,8,11 263:2,3,4, 7,11,19 264:6,9,10, 13,16,17,18,20,21,23 265:1,3,5,12,13,15, 16,19 266:2,6,14,16, 19,21,24 267:4,6,9, 11,15,16,17,18,22 268:3,12,15,16,18,21, 23 269:1,3,6,7,15,17, 23 270:3,9,14,18,19, 22,23 271:3,5,6,7,16, 21 272:6,7,9,10,11, 17,18,19,22,23 273:3, 6,8,9,12,20,21 274:20,22 275:2,6,11, 19,21,22 276:10,14, 19,23 277:1,3,6,12,19 278:4,6,8,20,23 279:3,5,8,19 280:2,4, 9,17,19,20,23 281:1, 2,6,10 282:2,7,14,15, 18 283:4,9,12,13,14, 17,20,23 284:3,6,8, 10,12,17,18 285:1,7, 8,9,12,16,18,21,24 286:2,4,5,7,24 287:4, 9,22 288:7,11,16,17, 21,23 289:2,6,7,10, 14,19,20,22 290:4,5, 8,9,12,16,17,19,23,24 291:3,4,6,7,9,11,14, 20,21 292:6,10,13,19, 24 293:10,14,21 294:5,8,9,10,11,17, 21,24 295:6,8,9,12, 14,15,18,22 296:1,3, 10,13,23 297:1,10,15, 21 298:4,5,12,13,16 299:4,9,15,22,23 300:3,7,9,11,15,16, 19,20 301:5,6,11,13, 17,18,19,21,22 302:2, 5,7,11,16,19,24 303:2,6,7,8,17,21,23, 24 304:1,3,6,10,15, 16,17,23,24 305:1,8, 11,13,19,23 306:3,4, 12,13,15,16,21 307:2, 4,6,7,9,11 308:3,6,7, 9,11,15,16,21,24 309:2,3,6,15,16,18, 23,24 310:2,3,6,8,9, 19 311:9,23 312:1,6, 7,8,9,10,11,15,19,20, 21,24 313:1,7,11 314:4,8,10,21,23 315:3,5,8,10,11,12, 13,14,16,18 316:1,2, 3,7,8,11,23 317:3,10 318:1,7,11,16,22,24 319:1,4,12,14,16 320:1,7,11,12,18,20 321:9,18,22,24 322:6, 11,12,13,14,15 323:1, 4,7,10,12,17,18,23,24 324:7,12,17,22 325:3, 9,11,21,22,24 326:3, 6,9,11,16,18 327:6,17 328:20,24 329:3,4,22 330:1,4,5,7,8,12,15, 19 331:7,9,17 332:10, 11,15,22,23 333:1,2, 4,6,7,11,17,21 334:1, 2,5,15,18,20,21,22 335:9,11,13 336:1,4, 7,10,11,16 337:2,4,5, 7,23,24 338:11,14,20, 21,23 339:1,2,3,6,7, 14,17,18,21,22,23,24 340:8,11,12,13,18,20 341:7,11,18,19,21 342:1,8,11,14,16,17, 19,22 343:7,12,14,20, 21,22 344:2,3,6,10, 12,13,15,21 345:6,9, 13,18 346:2,5,18 347:1,4,5,8,12,13,23 348:1,4,8,11,24 349:9,18,19,23 350:6, 11,12,22 351:16,20, 21 352:1,2,5,14,19 353:4,6,8,9,13,16,17, 21,24 354:8,13,16,18, 21 355:1,13,16,18,22 356:4,5,10,11,12,13, 15,21 357:3,10,14,15, 16,19,22,23 358:16, 18,21

**you'd** 40:8 50:20 67:9 176:13 177:4 201:18 206:20 254:16 331:24

**you're** 14:9,11 20:2,3, 4,22 21:8 23:22 27:13 30:18 47:9 54:9,24 58:9 60:2,6 69:14 70:5,21 71:7,22 73:20 75:10 76:17,19 78:16 84:21 87:11 92:8 93:18 95:20 101:20 111:17 113:9 114:11, 24 115:10 117:13 118:10 127:10 136:23 141:7 142:15 151:3, 23 154:20 155:17,24 169:20 182:6 197:24 213:19,20 214:12 215:3 224:22 231:23 232:19 233:5 235:16, 23 236:21,24 240:15 242:21 247:9 252:20 256:14 258:16 259:24 262:9 263:5 264:21 265:10 267:17 269:11 276:18 277:9 280:21 282:23 296:18 298:18 305:19 306:5 321:21 324:9 333:22 337:24 338:13 339:13 340:19 341:1 351:17 354:2

**you've** 7:10 10:2 13:17 23:7,8 29:19 38:2,20 44:17 45:19 54:10 100:17 140:1 142:14 146:3,4 164:11 182:20 210:24 236:19 254:23 318:7

**you/kashwere** 335:21

**you/well** 335:19

**your** 5:5,21 6:13 7:9, 15 8:17 9:1 10:3,20 12:3,22 13:3 14:23 18:18 20:24 21:7,16 25:17 26:1,8 27:19 28:21 30:7 31:23 32:17 35:9,11,20 36:1,8 37:3,5,9,16,24 40:24 41:16,22 42:8, 20 43:15,23 46:4,13, 24 48:24 50:15 54:5 55:12,23 56:5,14,18, 24 57:8,20 58:13 59:8,19 60:1,6 61:11 62:5 63:19 66:17 67:19 68:2,16,23 69:18,24 70:15 72:8,9 73:2,3 74:12,23,24 75:18 76:1 79:4,22 80:5,19 81:8 83:10,18 85:9,18 88:20 89:12 90:13 91:24 94:14 95:12 96:4,7,23 97:12,17 98:20 99:17 101:8,14,24 103:23 104:24 105:14 106:6, 17,24 107:1,15 108:9, 11 109:3,17,18 110:12,13,18 111:9, 14,20,21 112:6 113:5 115:8,14,18,19 119:20 120:1,19 121:20 122:4,23 126:3,6,10 127:2,16, 21 128:1,19 129:10, 24 130:16 132:6 133:8 134:9,15,16,20 135:4,21 136:2,8 137:12 138:7 139:13, 16,19 140:19 141:22 142:8,11,22 143:11, 14,19 144:10,15,20 145:4,18 146:16 147:1,9,18 148:14,19 149:3 151:22 152:5, 20 153:8 155:23 157:5,22 160:14 162:6 163:18 164:1, 20 166:6,18 169:15 170:5,19 172:13,20, 21,23 173:22 175:5 176:5,14 177:5,19,20 179:4 180:10,22 181:2 182:17 183:4, 20 184:7 186:8 188:15 191:6,22 192:5,9,16,18 197:4 198:7,14 199:20 200:24 201:23,24 202:11 203:13,14,24 204:1,6,17 205:5,7 206:4,21 207:8 209:6 210:8,17,18 211:14 212:5,21 213:2,3 215:10,15 218:8,19 219:3,17,23 220:12 221:20,22 222:2 223:12,14 224:14 226:10,23 227:20,23 228:4 229:3 230:16 233:4,11,24 234:13 235:13,17,20 236:1, 14,15,19,20 239:6 242:23 243:10,22 244:2 245:6 246:8 249:22 250:18 253:1 255:2,15 256:5 257:11 258:7,23 259:1,6,23 260:12,14 261:13,17,21 263:2,4 266:6 274:14 275:16, 21,24 276:4,16 281:15 284:18 285:10 288:3 289:18 291:6,8, 10,15 293:21 294:22 296:17,20 298:6 299:5 301:11 302:6 304:15 305:14,20,21 306:11 307:3 311:12, 24 312:3 313:4,5,8,18 314:1,4,22 315:8,12, 16 316:2,8,11 317:3,6 318:8 319:2,14 320:13 323:16 324:1, 9 325:19 326:4,6,9, 14,15 327:12 330:3

331:10 332:19 333:4 334:17 335:5,13,14, 22 336:22 337:14,19 338:2,22 341:8 342:12 345:6,11 346:15,24 347:5 355:23 357:15,18

**yours** 119:23 126:12

**yourself** 21:15 58:17, 20 200:2 285:9 333:8 344:7

**Z**

**zone** 234:24

**Zoom** 64:24 65:8 82:16 188:6 212:17, 22 294:15

**zooming** 82:14

# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS.
EASTERN DIVISION

| | | |
|---|---|---|
| DEAN H. DUSSIAS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No.: 1:21-cv-05709 |
| MERRI GLECKLER and TMG | ) | |
| KREATIONS, LLC, a Delaware | ) | HON. JUDGE MARTHA M. |
| limited liability company, | ) | PACOLD |
| d/b/a KASHWERE, | ) | MAGISTRATE JUDGE BETH |
| Defendants. | ) | W. JANTZ |

The deposition of Merri Gleckler, taken under oath on August 7, 2024, at 8:59 a.m. CST, via a Zoom videoconference, before Lindsay Welbers, CER #1487, in and for the County of Cook and State of Illinois.

APPEARANCES:

GOLAN CHRISTIE & TAGLIA, by
MATTHEW SHOWEL
70 W. Madison St. Suite 1500
Chicago, IL 60602
Appeared on behalf of the Plaintiff;

COZEN O'CONNOR, by
JAMES G. ARGIONIS and COREY T. HICKMAN
123 N. Wacker Dr., Suite 1800.
Chicago, IL 60606
Appeared on behalf of the Defendant.

ALSO PRESENT:
Lindsay Welbers, Court Reporter.
Dean Dussias, Observing



I N D E X


| | PAGE |
|---|---|
| Examination by Mr. Showel | 7 |


E X H I B I T S


| | PAGE |
|---|---|
| Exhibit 1 - Amended notice Rule 30(b)(6) | 11 |
| Exhibit 2 - Description | 47 |
| Exhibit 3 - Kashwere advertising expenses | 47 |
| Exhibit 4 - Sales by product type | 50 |
| Exhibit 5 - Payments to or for Merri Gleckler per TMG General Ledger | 52 |
| Exhibit 6 - Kashwere web sales year over year | 54 |
| Exhibit 7 - Purchase by vendor summary | 55 |
| Exhibit 8 - TMG 512682 | 78 |
| Exhibit 9 - 533753 | 80 |
| Exhibit 10 - TMG 556099 - 556100 | 83 |
| Exhibit 11 - TMG 489874 | 86 |
| Exhibit 12 - TMG 595598 - 595599 | 88 |
| Exhibit 13 - TMG 476590 - 476629 | 90 |
| Exhibit 14 - TMG 549377 - 549378 | 91 |





| | |
|---|---|
| Exhibit 15 - TMG 487956 - 487957 | 93 |
| Exhibit 16 - TMG 482923 | 96 |
| Exhibit 17 - TMG 436066 - 436068 | 99 |
| Exhibit 18 - TMG 418557 - 418558 | 104 |
| Exhibit 19 - TMG 415035 | 113 |
| Exhibit 20 - TMG 405153 - 405163 | 116 |
| Exhibit 21 - TMG 589613 - 589622 | 119 |
| Exhibit 22 - TMG 331717 - 331719 | 124 |
| Exhibit 23 - TMG 338992 | 128 |
| Exhibit 24 - TMG 244709-244710 | 132 |
| Exhibit 25 - TMG 213638 - 213643 | 134 |
| Exhibit 26 - TMG 167071 | 136 |
| Exhibit 27 - TMG 167246 - 167248 | 142 |
| Exhibit 28 - TMG 180586 - 180620 | 148 |
| Exhibit 29 - TMG 595035 - 595037 | 152 |
| Exhibit 30 - TMG 191553 | 157 |
| Exhibit 31 - TMG 564950 | 159 |
| Exhibit 32 - TMG 554725 | 159 |
| Exhibit 33 - TMG 590558 - 590568 | 163 |
| Exhibit 34 - TMG 0595290 - 595292 | 166 |
| Exhibit 35 - TMG 595362 - 595364 | 169 |
| Exhibit 36 - TMG 498516 - 498519 | 174 |
| Exhibit 37 - TMG 361974 - 361979 | 176 |
| Exhibit 38 - TMG 529412 - 529417 | 179 |





| | |
|---|---|
| Exhibit 39 - TMG 76419 - 76420 | 180 |
| Exhibit 40 - TMG 476958 | 181 |
| Exhibit 41 - TMG 473681 | 184 |
| Exhibit 42 - TMG 470606 - 470626 | 188 |
| Exhibit 43 - TMG 590668 | 193 |
| Exhibit 44 - TMG 162671 - 162675 | 194 |
| Exhibit 45 - HS 826 - 828 | 199 |
| Exhibit 46 - TMG 416384 - 416407 | 201 |
| Exhibit 47 - TMG 410243 - 410246 | 202 |
| Exhibit 48 - TMG 464589 - 464590 | 207 |
| Exhibit 49 - TMG 180792 - 180793 | 208 |
| Exhibit 50 - TMG 391187 - 391188 | 211 |
| Exhibit 51 - TMG 44374 | 214 |
| Exhibit 52 - TMG 590269 - 590470 | 217 |
| Exhibit 53 - Foreign Registration Statement | 220 |
| Exhibit 54 - JPM 2206 - 2271 | 222 |
| Exhibit 55 - JPM 2272 - 2280 | 225 |
| Exhibit 56 - JPM 2180 - 2181 | 226 |

Page 6

PROCEEDINGS

THE REPORTER: All right, so with that, we are on the record at 8:59 a.m. All right, but before we get started, remote proceedings are more challenging. We kindly ask all participants to speak clearly, and one at a time. The witness will be sworn in remotely. The parties agree not to challenge the validity of the oath, even if the court reporter is not physically present with the witness and not a notary republic in the state where the witness resides. So here begins the remote deposition of Ms. Merri Glec-- (Indiscernible.) in the matter of Doosias (phonetic) v. Gleckler and TMG Kreations. I apologize if I did a bad job of pronouncing that.

Today's date is August 7, 2024, and the time is 9:00 a.m. My name is Lindsay Welbers with Thompson Court Reporters. Beginning with noticing party, will counsel please introduce themselves, state whom they represent, and stipulate to the swearing in of the witness remotely?

MR. SHOWEL: Yes. On behalf of Dean Dussias, Matthew Showel, S-H-O-W-E-L, and so stipulated.

MR. ARGIONIS: Jim Argionis, on behalf of the defendants. And we also stipulate.

Page 7

MR. HICKMAN: Corey Hickman, also on behalf of defendants. And we also stipulate to the swearing-in of the witness remotely.

MR. SHOWEL: All right, everybody. Oh, sorry.

THE REPORTER: Okay, Ms. Gleckler, would you please raise your right hand for me? Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

MERRI GLECKLER

the deponent herein, called as a witness, after having been first duly sworn, was examined and testified as follows:

THE REPORTER: Parties have stated of their agreement on the record. Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. SHOWEL:

Q. Good morning, Ms. Gleckler, have you ever given your deposition before?
A. A deposition? Yes.
Q. Yes. Any deposition?
A. Yes.
Q. Approximately how many times?
A. Once.

Page 8

Q. Okay. And was that in the matter with Cedric Reingold?
A. Yes.
Q. Okay. And so how long ago was that?
A. Um, 2019.
Q. Okay. Did you guys do that deposition in person or via Zoom?
A. In-person.
Q. Okay, so just a few simple ground rules. There's a reporter that's going to be taking down your testimony today, and it's hard to do that if we talk over each other. So let's just make an effort not to talk over each other. It's going to happen, but let's just try to keep it in the back of our minds. If you want to take a break at any point, you can do that, just let me know. And you're probably going to hear your attorneys object quite a bit. Unless your attorney instructs you not to answer, I'm going to ask you to answer the question. Is there any reason today, medical or otherwise, that you're aware of why you can't give honest and accurate testimony?
A. No.
Q. Okay. Nothing impacting your memory? No-- Nothing like that?

Page 9

A. No, not that I'm aware of.
Q. Okay. And currently you are in a conference room in Phoenix or Scottsdale, Arizona, is that correct?
A. Yes.
Q. And your attorney, Jim Argionis is in the room with you, is that correct?
A. Yes.
Q. Okay. Is there anybody else in the room with you?
A. No.
Q. Okay, and you're doing this on your laptop computer?
A. Yes.
Q. Do you have any other communication devices at arm's length?
A. Yes.
Q. What do you have?
A. A phone.

MR. ARGIONIS: Okay, yeah, she's got her phone near.

MR. SHOWEL: I'm sorry?

MR. ARGIONIS: She's got her phone near her.

MR. SHOWEL: Okay. Do you have any notes?

MR. ARGIONIS: But it's turned over though. She's

not looking at it.
MR. SHOWEL: Okay. Do you have any notes or other documents in front of you?
THE WITNESS: No. Oh, the doc-- Yes, I'm sorry. Yes.
MR. ARGIONIS: Yes, we have some documents for the topics that you outlined that I have right now that she's going to be referencing because your topics are pretty specific and she had people gather information for her.
THE REPORTER: Okay, I hate to interrupt. It looks like Mr. Dussias has just entered the room. I just want to make that clear for the record. Is that fine with everyone?
MR. SHOWEL: Yes. With me is my client, Dean Dussias, D-U-S-S-I-A-S.
THE REPORTER: And you'll just be observing today, Mr. Dussias?
MR. SHOWEL: Yes, he's just observing today.
THE REPORTER: Thank you. I apologize for interrupting. Please proceed.
MR. ARGIONIS: No, thanks, Lindsay, for that. Matt, could you have Dean at least show his face and tell us that there's no one else in the room with him



listening to the deposition, things of that nature, where he is.
MR. SHOWEL: Why?
MR. ARGIONIS: Because other people can't sit through a court proceeding. This is actual trial testimony. It's a federal deposition.
MR. SHOWEL: I mean--
MR. ARGIONIS: Anyone that's a non-party shouldn't be listening to this deposition. Right?
MR. DUSSIAS: Just me. Thanks, guys. Good morning, everybody.
THE REPORTER: Good morning.
MR. ARGIONIS: Thank you.
THE WITNESS: I have to update, this was. I had two depositions prior to today. I forgot about another one.
BY MR. SHOWEL:
Q. Okay, what was the other one?
A. That was with the original owner of Kashwere.
Q. Got it.
A. Cedric and I were a part of that.
Q. All right, I'm sharing what's going to be marked as Exhibit 1.
(Whereupon Exhibit No. 1 was



marked for identification by the Court Reporter.)
Q. Do you see an Amended Notice of Rule 30(b)(6) deposition in front of you, Ms. Gleckler?
A. Yes.
Q. Okay, and is this a document that you've seen before?
A. Yes.
Q. And you understand that you're here today as a corporate representative of TMG Kreations, LLC?
A. Yes.
Q. And you see the heading topics in front of you?
A. Yes.
Q. All right, let's just start with the first topic. Is there anybody within the TMG organization more qualified to testify on this topic than you?
A. Yes.
Q. Okay. Who is that?
A. I have notes in front of me. So I conferred with him to have that information. So I'm qualified.
Q. Okay. Who's the person that's more qualified?
A. Ray Conway.
MR. ARGIONIS: Oh, but actually, let me interject



there. He asked you regarding, and you could ask follow up questions, Matt, within TMG.
THE WITNESS: Oh, okay. Yes. No, I'm, you're right.
BY MR. SHOWEL:
Q. All right. And you have, I believe you said you've prepared some notes.
A. Yes.
Q. Okay. I'd like Counsel to send those notes to me.
MR. ARGIONIS: Well, they're not, they're not notes. They're printouts that she accumulated from the various individuals that she needed to to get this stuff. Corey and I will consider whether we turn those over to you or not. But she's certainly using them now to refresh your recollection as to the specific topics that you identified in your 30(b)(6) notice. And they're not handwritten notes. They're all different types of printouts that she can certainly walk you through as to who printed them out and how they were pulled. But my understanding, and she could clarify as you go through them all, is that some of these are not necessarily kept in the ordinary course, but were given instructions to the individuals with the knowledge to

get to her so that she can prepare for the 30(b)(6) topics.

BY MR. SHOWEL:

Q. Okay. So any notes that she relies on or that she looks at during this deposition should be produced in this case. And frankly, they should have already been produced. But that's okay. We'll do it your way, and then we can meet and confer about the documents afterwards. So all payments of any kind made by TMG from March 31, 2021, and it goes on from there. Do you see that in topic one, Ms. Gleckler?

A. Yes.

Q. Okay. Are you prepared to identify those payments?

A. Yes.

[redacted]

Q. Ms. Gleckler, I apologize. Let me interrupt you. How many payments are on that sheet? Do you know? Or can you ballpark it for me?



MR. ARGIONIS: And one thing while she's doing that, Matt, since we're talking about financials and that for now, I'd like to have this information under the protective order as confidential and designate this testimony, this portion of deposition, as confidential. And like you said, we can meet and confer later if that designation needs to be removed. But anything regarding financials and salary and comp, I'd like to be confidential pursuant to the protective order that's in place.

MR. SHOWEL: So correct me if I'm wrong, Jim or Corey, but I thought that the procedure under the protective order is that everything is treated confidentially for two weeks until after you get the transcript. And then it's up to you to make written designations. So rather than take time on the record designating everything, I figured that's how we're going to do it, since that's what's in the protective order. So in other words, everything's going to be confidential unless you designate it attorney's eyes only today.

MR. ARGIONIS: Yeah, as long as we have that understanding, we can work through that then.

BY MR. SHOWEL:

Q. That's great. So, back to you, Ms. Gleckler.



Sorry about that interruption. So how many payments are on the sheet that you're looking at?

A. Approximately 100.

Q. Okay. So rather than reading off all 100 of those payments, I'm simply going to ask that that be sent to me. And frankly, it should be sent to me today. But at any rate, that was compiled for you by Ray Conway, is that correct?

A. Yes.

Q. All right, let's go down to topic number two, which is the $63,000 distribution from TMG requested by Gleckler on March 11, 2021. And it goes on from there. Do you see that?

A. Yes.

Q. Okay. Do you have notes in front of you or with you to testify on this topic?

A. I can testify. I don't have notes in front of me.

Q. Okay. Did you do anything to prepare on this topic?

A. Yes.

Q. What did you do?

A. I confirmed what the 63,000 was.

Q. Okay, and what was the 63,000?



[redacted]

[redacted]

Q. Okay, let's take a look at topic number three, the Internet traffic levels, dollar purchases amounts, and conversion rates at TMG's website, and it goes on from there. Do you see that?
A. Yes.
Q. Okay. Do you have notes in front of you to help you testify on this topic?
A. Yes.
Q. Okay. How did you compile those notes, or where did you get them from?
A. I conferred with the person who. Well, actually, it's from our Shopify and our Shopify information, and we have somebody that works with us to manage that. So it came right from the system.
Q. Okay. And who is the person that you work with to manage that?
A. His name is Collin.
Q. Collin Phillips?
A. Yes.
Q. Okay. So you asked Collin Phillips for this



information, and he prepared some notes for you from Shopify. Is that correct?
A. We reviewed it together. We put the information, it came out of Shopify. So we go through. Yes.
Q. Okay. And approximately how many pages of notes do you have for this topic?
A. Two.
Q. Okay. And, you know, I'm sort of at a loss here because I don't have your notes in front of me. So again, I'm going to ask that these be produced to me today. So what information do you have on the Internet traffic levels on a monthly basis from January 1, 2017 through March 2024?
A. I have sales by month. That's what we're able to track, and that's what we track.
Q. Okay. So in other words, you don't have actual Internet traffic levels.
A. No, we track it by sales.
Q. Okay. And so is all the information that you have in front of you is just sales?
A. Sales and comparisons year to from 2019 through 2024. Yes.
Q. Okay. And why not through January 1, 2017?



A. We don't have that information.
Q. So if I heard you correctly, it starts. The information you have starts in January 1, 2019?
A. Yes, but that. Yes, but our system. Collin had that from his records. That did not come from Shopify. We don't have access to that. The only reason Collin had it was because he had worked with us at that time. But we don't have that in our system.
Q. Okay. Shopify doesn't keep that information?
A. We don't have that information.
Q. Yes, but I'm asking a different question. Does Shopify maintain that information?
A. I don't know.
Q. Okay. Did you ask or did you do any investigation of that? To prepare for this proposition?
A. I asked Collin to give me the information within the date range requested, and this is what he was able to help me produce.
Q. Okay. Did you go back to Collin and say, well, I need Internet traffic levels?
A. We don't track that. We track sales.
Q. And I understand that you don't keep track of that, but did you ask Collin, nonetheless, to go get that information.



A. I asked Collin to get me whatever information was requested, and we discussed that. We only track sales.
Q. Okay, so in other words, you did not ask Collin to go get you Internet traffic levels? That's correct?
MR. ARGIONIS: I'll object. You're mischaracterizing her testimony as to what she talked about with Collin to prepare for this deposition as to what was available. But with that, if you understand his question, you can answer.
BY MR. SHOWEL:
Q. I'll withdraw the last question. It's pretty straightforward. What I'm trying to get at all I'm trying to say is you did nothing actually tell him to go get Internet traffic levels, correct?
A. No, that's not correct. I asked him to get me whatever was available, including the question. I read the question that was needed and the information requested, and this was the only thing we were able to track accurately was the sales. That's what we track.
Q. Okay. And so what information do you have on your notes in front of you regarding sales?
A. I have month-- monthly sales by year.

Page 22

Q. From the website.
A. From Shopify.
Q. From Shopify. Okay. And--
A. From the website, (Indiscernible - simultaneous speech.) website sales.
Q. Okay. And are those, on the notes that you have in front of you, are those expressed in a lump sum? So in other words, do you have one number per month?
A. Yes.
Q. Okay. So you don't have, for example, the number of sales per month from the website in front of you?
A. No.
Q. You only have a dollar amount per month. Is that correct?
A. We track sales, yes.
Q. Okay. And I don't quite know what you mean by we track sales, but I'm just asking you. You're relying on notes that I don't have. So I'm trying to figure out what it is that you have in front of you. And so, as I understand it, the information that you have in front of you is one dollar amount per month. That is a lump sum of sales from the website. Is that correct?
A. For that, for each month, yes.

Page 23

Q. And you have no data on conversion rates?
A. We don't track conversion.
Q. Okay.
A. We track sales. We look at conversion as sales. The sales. We track sales. We don't track conversions.
MR. ARGIONIS: And let me interject to an objection, too, that we did produce documents. That's Bates label already in the production. That was Google Analytics data that had a more fulsome report on this particular topic that's out there. So just so you're aware of that, too.
BY MR. SHOWEL:
Q. Mm-hmm. The reporter is going to get mad at me if I keep going mm-hmm. That's another guideline I should have given you, Ms. Gleckler, is that the reporter has a tough time taking down anything that isn't actual words like yes or no, and as you can tell, I'm guilty of it. Everybody does it during the normal course of speaking, does things like nods or says mm-hmm. But the reporter has a tough time taking that down. So if you could keep it in the back of your mind to try to respond verbally, that would be a big help for the reporter, getting your testimony down accurately.

Page 24

Is that okay?
A. Of course.
Q. All right. So you guys don't track Internet traffic levels. Correct.
A. We track sales.
Q. Okay. And I understand that I'm asking you something different, which is you don't track Internet traffic levels. Correct?
MR. ARGIONIS: I guess I'll object to the extent that the Internet traffic levels is vague and undefined, but if you have an answer, go ahead.
THE WITNESS: Being not an expert in this area, we track open rates. We track different things. I don't know if that's what you're referring to. We go into detail on sales. That's what we monitor.
BY MR. SHOWEL:
Q. And what sort of--
A. --Open rates.
Q. What sort of detail do you go into on sales?
A. We go, we review every week we go into sales. We review what drove sales, what sales happen, when they happen, why they may have happened.
Q. Okay. And you do that. You have individual data for each sale, correct?

Page 25

A. Each sale is. Each sale is tracked. Yes.
Q. Okay. And I think you testified a few minutes ago that convert, you view conversion rates as the same as sales. Is that correct?
A. Yes.
Q. All right, let's take a look at topic number four, which is the monthly sales to the following customer types. Do you see that?
A. Yes.
Q. Okay. And do you have any different notes than the notes that we just referred to in topic number three for topic number four. I realize that was, that was a little bit confusing. Do you understand what I'm asking you?
A. Can you repeat that, please?
Q. Yeah. I'm just wondering if you have a separate set of notes for topic number four.
A. Yes.
Q. Okay. And were those also provided to you by Collin Phillips?
A. No.
Q. Where did you get those notes?
A. NetSuite.
Q. And did you go and get those notes yourself?

Page 26

A. Yes.
Q. And so let's start with 4A, distributors, you have notes in front of you for your monthly sales from January 1, 2017 through April 2024 to distributors. Is that correct?
A. No.
Q. Okay. What do you have relative to the distributors?
A. I have sales by distribution starting with March 1, 2021.
Q. Okay. Starting with March 1, 2021. Why only starting in 2021?
A. Because that's when we moved into our new system, NetSuite. We don't have the information prior to that.
Q. Was the system prior to NetSuite was Everest. Is that correct?
A. Yes.
Q. Okay. And you don't have, you didn't retain any. Well, I guess. Let me start over. You guys don't have any subscription or license to use Everest anymore, is that correct?
A. Correct.
Q. When did that license terminate?

Page 27

A. At the end of its contract.
Q. And when was that?
A. 2023.
Q. At the end of the calendar year 2023?
A. I don't believe so. I don't believe so. I don't recall exactly when.
MR. ARGIONIS: And just so, and I'm sure Matt will agree, if you don't recall, tell him you don't recall as opposed to trying to guess, because if you're guessing and you're wrong, that's not really useful. So if you remember, give them an answer. If you don't remember, then just let us know that.
THE WITNESS: Okay.
BY MR. SHOWEL:
Q. Yeah, I second Jim's comment. And you'll probably hear one of your attorneys from time to time during this deposition say it's not a memory test and it is not. So if you don't remember, you don't have to struggle or guess or anything like that.
A. Okay.
Q. So long story short, you don't know the month in which the Everest contract terminated, is that correct?
A. Correct.

Page 28

Q. And TMG did not make any effort to retain data that was stored in Everest, is that correct?
A. Not completely.
Q. Okay, when you say not completely, can you explain?
A. Initially, the information was moved over under Dussias' direction and it was his decision not to identify prior years. It was clumped into one area. It wasn't detailed. We had to pay money from an outside service to hold this information that became unaffordable. So once the contract, which I learned about after the fact was over, that's when we stopped it. I looked into other options just to hold it, but it became unaffordable to continue to just hold or store information that we could never get into.
Q. Okay. Who was the outside party that was storing the data?
A. It was called Steadfast.
Q. And that was a contract that Dean entered into, is that correct?
A. It was an existing contract that apparently was renegotiated and Dean had allowed our outside IT to continue that contract in his own name. Wasn't even-- in on behalf of. It was on behalf of TMG, but it wasn't

Page 29

in TMG's name.
Q. So TMG wasn't the name on the contract, is that correct?
A. The contract was on behalf of TMG, but the name, the person who signed the contract, the updated contract, was not TMG or myself or Mr. Dussias.
Q. Who signed it?
A. John Bartlett.
Q. And John Bartlett is the person that you just described as the outside IT?
A. Yes. Dean had brought him into the company.
Q. And is John Bartlett still with the company?
A. No, he's not.
Q. And when was John Bartlett's involvement with the company terminated?
A. I don't recall.
Q. Was John Bartlett an employee of the company?
A. I don't recall if he was an employee or a 1099. Dean had hired him.
Q. And. All right, so let's get back to topic number four here, and I asked you something about distributors, and I didn't quite follow your answer, so can you explain to me again what you have for topic number 4A in your notes?

Page 30

A. What do I have as far as what? I'm sorry, what do you want to know?
Q. Do you have monthly sales to distributors?
A. I have monthly sales by distribution.
Q. Okay, and what do you mean by distribution? What's that mean?
A. Who we sell to, who they're classified as.
Q. Okay. Can you give me an example of that?
A. Distributors, hospitality, corporate gifts, hospitality, operations, or retail, resellers.
Q. Okay, so in other words, you don't list, individual distributors, you list what I'll call categories of distributors. Is that correct?
A. Repeat that, please.
Q. Yeah. So if we look at topic number four, you see it references Times Square? Do you see that?
A. Yes.
Q. Okay. What is Times Square?
A. A distributor.
Q. Okay. And do you guys keep track of information, keep track of your sales through each distributor, such as Times Square?
A. Yes.
Q. Okay. And you did not go and get that

Page 31

information in preparation for this deposition today?
MR. ARGIONIS: Well, let me. Let me object. Your topic called for the monthly sales to the following customer types, distributors, retailers, spas. And that's how we interpreted. We got the information for those particular customer types, and that's what she has in front of her in terms of a printout.
Again, this isn't information necessarily held in this format in the ordinary course, but we did the best we can interpreting your topics and gathering the information so that she's ready to testify on those particular topics, which is our understanding those customer types that you listed there, A through E. So she has those categories for all of those.
MR. SHOWEL: Got it. All right. So, again, I'm going to ask that the notes for topic number four be produced to me. Frankly, I think it's. Well, never mind.
MR. ARGIONIS: Yeah, and. Well, we're going to want to, Matt, Bates label them and mark them confidential and get them to you. Your list of topics didn't have a document production request to it, so we got this together. Obviously, it's not a memory game, like you said, and there's no way she'd be able to

Page 32

memorize this stuff. So she's using this information to refresh your recollection. Seems to me you're making a document request today that, like I said, I believe we're going to turn them over, but that's why they weren't turned over before because you didn't really ask for these.
There are stuff in the production that is held in the ordinary course that we turned over that likely cover some of this, but it's not in the exact format because obviously your topics were specific and we had to accumulate this, you know, through searches and printouts and talking to Ray and whoever else. So that's how we got here. Just so it's clear on the record.
MR. SHOWEL: Right. But any documents that the witness is relying on to support her testimony are presumptively discoverable and, you know.
MR. ARGIONIS: Yeah, and we'll turn them over after we get a chance to Bates label them and that, unless you want them. You want them. Unless we turn them over to you. We could email them to you, but they're not Bates labeled. And I guess we reserve our right to then Bates label them and get them to you later, marked confidential.

Page 33

MR. SHOWEL: Well, I'm going to mark them all as exhibits here. So, yes, I'd like electronic copies to be emailed to me today.
MR. ARGIONIS: Okay, Corey, let's figure out how to get them. And you want. Well, let's walk through, I guess, what she has, and she'll walk you through what she has, and then Corey can send those over to you, I suppose, and then we'll go from there, but with the understanding that we're going to Bates label them and they're all confidential.
MR. SHOWEL: Sure. I mean, for purposes of this deposition, they can all be confidential for the same two weeks as provided under the protective order.
MR. ARGIONIS: Yeah, that's what. I don't have a protective order in front of me, but we could handle it that way.
BY MR. SHOWEL:
Q. All right. Let's look at topic number six. Sales on a monthly basis from January 1, 2017 through March '24, for robes, throws, blankets, et cetera. And it goes on from there. Do you see that topic, Ms. Gleckler?
A. I'm sorry, one second. Yes.
Q. All right. Do you have a separate set of

Page 34

notes in front of you for this topic?
A. Yes.
Q. Okay. And where did the notes come from?
A. NetSuite.
Q. And were you able to go and get those yourself, or did you have somebody go and get them for you?
A. I got them myself.
Q. And do you have notes going all the way back to January 1, 2017?
A. No.
Q. How far back do they go?
A. March 1, 2021.
Q. Okay. And is that based on the same limitation that we talked about a few minutes ago, which is the conversion from Everest to NetSuite. And the fact that you don't believe that you have access to the data?
A. Yes.
Q. And does it go through March 2024? The data that you have?
A. It goes through year to date.
Q. And so do you have actual sales for, for example, robes from January 2024? Just to use a random

Page 35

example.
A. Yes.
Q. All right, let's go down to topic number seven, which is TMG's relationship with Collin Phillips, and it goes on from there. Do you see that?
A. Yes.
Q. All right. And I think you mentioned a couple of minutes ago that Collin Phillips still works with TMG. Is that correct?
A. Yes.
Q. And Collin's, an independent contractor?
A. I'm sorry.
Q. Is Collin an employee of TMG?
A. No.
Q. He's a third party service provider?
A. 1099.
Q. And he's, is he the SEO Mercenary?
A. Yes.
Q. And David Lazar, is he still affiliated with TMG?
A. No.
Q. Was David Lazar ever a TMG employee?
A. No.
Q. Is. When did TMG stop working with David

Page 36

Lazar?
A. I don't recall the date.
Q. Was it recently?
A. No.
Q. More than a year ago?
A. Yes.
Q. And how about Bergen Logistics? You know who Bergen Logistics is?
A. Yes.
Q. Does TMG still use Bergen Logistics?
A. No.
Q. Who is TMG's current logistics provider?
A. We have our own warehouse.
Q. And where is that warehouse located?
A. Scottsdale, Arizona.
Q. And you do not utilize any sort of third party logistics provider?
A. For what?
Q. Well, what did Bergen-- (Indiscernible - simultaneous speech.)
A. Well, we manage our own shipments for the most part.
Q. Do you involve any sort of third party or contractor in managing your logistics currently?

Page 37

A. I'm not understanding the question. Regard-- to do what?
Q. Well, what did Bergen Logistics do for you?
A. Pick and pack. We pick and pack our own products.
Q. When did you terminate the relationship with Bergen?
A. I don't recall the exact timeframe to date.
Q. Was it within the last year?
A. No.
Q. Was it in 2023?
A. I don't remember.
MR. ARGIONIS: I was just going to say, if you remember, let him know. That's fine.
BY MR. SHOWEL:
Q. How about Supporting Strategies? Who is Supporting Strategies?
A. Our accounting service.
Q. They're a bookkeeper. Is that correct?
A. Yes.
Q. And do you still use Supporting Strategies?
A. Yes.
Q. And Conway Tax is an accountant, correct?
A. Yes.

Page 38

Q. And you still use Conway Tax, correct?
A. Yes.
Q. Anatta Design was a website designer, is that correct?
A. Yes.
Q. And I believe I read in your counterclaim that you do not use the website that Anatta Designed anymore. Is that correct?
A. Yes.
Q. Who designed the current website?
A. Their name is Sweden.
Q. Sweden.
A. Sweden.
Q. Can you spell that for me? Is it like the country?
A. S-W-E-D-E-N.
Q. And who identified or retained Sweden?
A. I did.
Q. And how did you go about doing that?
A. I'm not sure exactly what you're asking me. How did I go about doing that. (Indiscernible - simultaneous speech.)
Q. Well, how did you learn about Sweden?
A. I'm sorry?

Page 39

Q. How did you learn about Sweden? How did you know?
A. They were recommended to me.
Q. By whom?
A. I don't even remember. I don't remember who had told me, but somebody had told me. I was inquiring about websites to various people.
Q. And when did you retain Sweden?
A. In 20... I'm just trying to think. Getting my years.
MR. ARGIONIS: And again, if you're. If you're guessing, I'd ask you to avoid guessing. If you.
THE WITNESS: I don't. I can't remember the exact timeframe.
MR. SHOWEL: How much have you paid Sweden?
MR. ARGIONIS: Objection. Vague. Is there a particular time period?
BY MR. SHOWEL:
Q. No. Ever?
A. The original contract we pay, we had a set amount and then we keep adding different phases to it, so it keeps changing. So there's no exact amount that I could give you right now, today, because it wasn't one set amount.

Page 40

Q. So do you pay them in the original contract? You pay them on a monthly basis?
A. We pay them on a monthly, but we agreed upon a certain scope of work and an amount.
Q. Okay, and what was the amount?
A. A hundred and... No, I can't remember. I'm not going to say the original amount because I don't remember exactly. We broke it up into phases.
Q. I'm sorry?
A. We broke the, what they were going to provide to us in phases. So I don't recall the exact amount initially.
Q. And you don't know what you've paid them to date?
A. Again, there are multiple payments based on the scope of work.
Q. Does the amount of the payments change?
A. The amounts are, depending on their scope of work. We get different quotes for that scope of work. So they change. They're in addition to any of the original quotes.
Q. Got it. So you don't pay them like a fixed monthly amount, for example?
A. Correct.

Page 41

Q. Okay. Was it ever the case that you paid them a fixed monthly amount?
A. Only off of the original contract.
Q. And what was their fixed monthly amount off the original contract?
A. I don't remember the exact amount.
Q. And what was their, Sweden's scope of work?
A. To create a custom website for us.
Q. And to what extent did they use or rely on the website that had been created by Anatta?
MR. ARGIONIS: And I'll object. Vague and ambiguous and calls for speculation. Merri's not an expert on Internet stuff, but if you have an answer, you could feel free to answer.
THE WITNESS: Rely on an Anatta? Not at all.
BY MR. SHOWEL:
Q. Okay. So in other words, it's your understanding that the current website that Sweden built for you guys doesn't utilize any components that were put in place by Anatta, is that correct?
A. Again, I don't know what they used at all, but I believe they didn't use anything.
Q. How did you decide that Sweden was the best designer for what TMG needed?

Page 42

A. We had many, many conversations with them. Scope of work, capability, can they execute what we had wanted them to execute just from. It wasn't a sole decision, it was a decision with my team, creative. There were many things that went into it.
Q. And who's the team that you're describing that participated in this decision?
A. The people that work for me with, at Kashwere.
Q. Yes. And what are the names of those people?
A. Anthony Saracino is our creative director.
Q. (Indiscernible - simultaneous speech.) I'm sorry.
A. Collin was a part of it based on his.
THE REPORTER: Collin Phillips.
THE WITNESS: I'm sorry?
THE REPORTER: Did you mean Collin Phillips?
THE WITNESS: Oh, I'm sorry, Lindsay. Yes. I was looking at Matthew. I didn't see his mouth move. Tracy Gibbs, I believe that's all.
BY MR. SHOWEL:
Q. Was David Lazar involved in that decision?
A. No.
Q. Did you prepare any notes for topic number seven or have any notes prepared for you?

Page 43

A. No.
Q. So in other words, you don't have any notes in the room with you regarding topic number seven. Is that correct?
A. Correct.
Q. All right, let's go down to topic number eight. Any vendors or service providers that TMG has paid more than $50,000 and it goes on from there. Do you see that?
A. I do.
Q. Okay. Do you have notes for this topic?
A. Yes.
Q. And did you prepare those notes yourself, or did you have somebody preparing for you?
A. I prepared that. Prepared them.
Q. And how did you do that?
A. NetSuite.
Q. So in other words, you just went to NetSuite and looked for any vendors that fit the bill of this, of topic number eight, correct?
A. Or you asked.
Q. I'm sorry?
A. I pulled the information based on what was asked.

Page 44

Q. Okay.
A. Over 50,000.
Q. And how many vendors are. Well, let me withdraw that question. Start over. The information that you pulled, I assume it only goes back to March of 2019?
A. The over 50 is starting with 2021.
Q. 2021, is that?
A. Right.
Q. So I might have misremembered. Is the NetSuite conversion happened in 2021, is that right?
A. Yes.
Q. And that's what creates the limitation, as far as you know, in terms of getting information out of NetSuite prior to that time?
A. Yes.
Q. Okay. Did you, for example, ask Ray Conway if he had this information?
A. No. No.
Q. And did you go back and look at any of your Chase Bank statements to see if it contained this information?
A. No.
Q. Did you ask Supporting Strategies if they had this information?

Page 45

MR. ARGIONIS: And when you say this information, you're talking about information that she wasn't able to obtain from NetSuite?
BY MR. SHOWEL:
Q. Correct.
A. No, no.
Q. And how many vendors, approximately are on the list that you have?
A. What year?
Q. Let's start. Let's go with full year 2022.
A. Ten.
Q. And how about 2023?
A. Nine.
Q. All right, can you read to me the names of the ten for 2022?
MR. ARGIONIS: And before you do that, Matt? Corey, did I saw the email come through. He sent these off to you, so you should have them in email now.
MR. SHOWEL: Madam Court Reporter, can you read the question back?
THE REPORTER: One moment. Can you read to me the names of the ten for '22? And before you do that, Corey, did I see the email came through? He sent those

Page 46

off to you?

(Whereupon the Court Reporter read back the previous answer.)

MR. SHOWEL: Yeah. So why don't we go off the record for five minutes, if that's okay with everybody else?

MR. ARGIONIS: Yep, that's fine.

THE REPORTER: We are off the record at 9:53 a.m.

(Whereupon a short recess was taken.)

THE REPORTER: So let's get back on the record at 10:04 a.m.

BY MR. SHOWEL:

Q. All right, so I'm going to bear with me one second. So, all right, do you see a document in front of you called Kashwere advertising expense by quarter per year?

A. Yes.

Q. All right. And this is a document that I just received via email from Corey, which item in the deposition notice do these notes relate to?

A. The marketing spend that you asked. Number five. Topic number five.

Q. All right, so. And this is going to be marked

Page 47

as deposition Exhibit Number 2. So...

(Whereupon Exhibit No. 2 was marked for identification by the Court Reporter.)

MR. ARGIONIS: And just to reiterate, Lindsay, we'll mark this one as confidential pursuant to the protective order.

BY MR. SHOWEL:

Q. Right. And so these are notes that you pulled, you yourself pulled off of NetSuite. Is that correct?

A. No.

Q. Okay. How did you get these notes?

A. Cathleen had given me, Supporting Strategies had given me that.

Q. Got it. So you got this from Supporting Strategies?

A. Yes.

Q. Now, looking at what will be marked as Exhibit Number 3.

(Whereupon Exhibit No. 3 was marked for identification by the Court Reporter.)

Q. And this is a document called Kashwere parent

Page 48

company. Do you see that?

A. Yes.

Q. Okay.

A. Yes.

Q. And which topic in the notice do these relate to?

A. I'm sorry, I don't understand your question.

Q. Sure. These are notes that you prepared for one of the topics in the deposition.

A. I'm sorry. I'm sorry. I thought you pulled something else up. I'm sorry. This is sales by product type, number six.

Q. Got it. And you...

MR. ARGIONIS: Wait, is that what. Hold on, hold on. Yeah.

THE WITNESS: Is it number six, sales by product?

MR. ARGIONIS: Yeah. He's just got this page. You've got the March 1 page open?

THE WITNESS: I thought he had this one open.

MR. ARGIONIS: No, right now....

THE WITNESS: Right now it's (Indiscernible - simultaneous speech.) Sales by product type.

MR. ARGIONIS: Okay.

THE WITNESS: Yep.

Page 49

MR. ARGIONIS: But he's got the March 1, 2021, so that's. Yeah.

THE WITNESS: Okay. Yeah.

MR. ARGIONIS: Trying to keep it in order. Yeah. All right.

BY MR. SHOWEL:

Q. So you see on your screen a document that says ACS sales by product type, right?

A. Yes.

Q. Okay. And these are your notes for topic number six, correct?

MR. ARGIONIS: And I'll object to calling them notes, but they're not handwritten notes. Just be clear for the record. They're print (Indiscernible.)

THE REPORTER: I'm sorry? They're printouts, you said?

MR. ARGIONIS: They're printouts, yeah.

THE REPORTER: Thank you.

BY MR. SHOWEL:

Q. With that understanding, these printouts are what you're relying on for your testimony for topic number six, correct?

A. Yes.

Q. And are these. Is this something that you

Page 50

created on your own from NetSuite?
A. Did I pull this information from NetSuite? Is that what you're asking?
Q. Yes.
A. Yes.
Q. Okay. Did you create this, this printout, or did you have somebody else do that for you?
MR. ARGIONIS: And I guess I'll object to the word create, but go ahead. To the best, if you understand this question. Otherwise, go ahead.
THE WITNESS: Are you asking me if I pulled this information from NetSuite or did I have somebody else do it for me?
BY MR. SHOWEL:
Q. I understand that you testified just a second ago that you pulled the information yourself, right?
A. Yes.
Q. Okay. Then did you put it into this format or did it come out of NetSuite like this?
A. It came out of NetSuite like that.
Q. Got it. Looking at what will be marked as Exhibit Number four.
(Whereupon Exhibit No. 4 was marked for identification by

Page 51

the Court Reporter.)
Q. Which is a document that says ACS sales by distribution line. Do you see that?
A. Yes.
Q. And this is a printout that you, yourself went and got from NetSuite, correct?
A. Yes.
Q. And for the benefit of the reporter, I'll just note that NetSuite is N-E-T-S-U-I-T-E. Okay. And this, these notes are your notes for topic number four. Is that correct?
A. Sales by distribution. Yes.
Q. Got it.
MR. ARGIONIS: Are you marking this, Matt, as four Exhibit 4?
MR. SHOWEL: Correct. Yes.
MR. ARGIONIS: And same thing, Lindsay. So I'm not repeating myself, we're marking everything, as you heard us say is confidential for now. Thanks.
BY MR. SHOWEL:
Q. Yeah, everything's going to be confidential for two weeks anyway. All right. Do you have on your screen a document called TMG Kreations, LLC? Payments to or from, to or for Merri Gleckler per TMG general

Page 52

ledger. Do you see that?
A. Yes.
Q. That's the document on your screen, Ms. Gleckler?
A. Yes.
Q. All right. Are these your notes for topic number one?
A. Yes.
Q. And this was created by Ray Conway, correct?
A. Yes.
MR. ARGIONIS: And again, I'm going to object to the word create and notes to the extent that these don't fall within what I determined to be notes and someone didn't create them, they printed them out from a computer system.
BY MR. SHOWEL:
Q. Noted. And so this document, payments to or for Merri Gleckler, per TMG. This is going to be marked as Exhibit Number 5.
(Whereupon Exhibit No. 5 was marked for identification by the Court Reporter.)
Q. And this only notes Merri Gleckler at the top. Do you see that? Ms. Gleckler, do you see that?

Page 53

A. I do, but the report I see highlights (Indiscernible.) other just Merri Gleckler.
THE REPORTER: I'm sorry, your audio cut out. Would you repeat that, please?
THE WITNESS: I'm sorry. It, it's the heading says payments for Merri Gleckler or per TMG. But in the document there are other, there are MerriG. It has other payments made to not just Merri Gleckler.
THE REPORTER: Thank you.
BY MR. SHOWEL:
Q. Okay. So--
A. --As you requested.
Q. Okay. Is it your understanding that this contains all payments to the individuals or entities listed in topic one?
A. Yes.
Q. Okay. Are you paying your legal bills? Well, let me. Is TMG paying your legal bills?
MR. ARGIONIS: You know, if there's legal fees, I believe we redacted, we didn't include those because those would be attorney-client privilege or we'll assert attorney-client privilege. But to the extent you know which entity is paying that, you could, you could. I suppose that question's okay, but you could go ahead and

Page 54

answer that.
A. Yes.
Q. Okay. So TMG is paying your legal bills and that is not included on this spreadsheet, right? Right.
MR. ARGIONIS: Correct. And that was a decision made by her counsel.
MR. SHOWEL: Okay. And her counsel is taking the position that the amount of her attorney's fees is attorney-client privileged information. Is that correct?
MR. ARGIONIS: Yes.
BY MR. SHOWEL:
Q. Okay, Ms. Gleckler, on your screen you should have a document that says Kashwere web sales year over year. Do you see that?
A. Yes.
Q. All right. We're going to mark this as Exhibit Number 6.
(Whereupon Exhibit No. 6 was marked for identification by the Court Reporter.)
Q. And which topic does this relate to?
A. Number three.
Q. And are these, is this information you went

Page 55

and gathered yourself or did you have somebody do it for you?
A. I had Collin put it together for me, which I reviewed.
Q. And I think I skipped one here. I think I skipped the vendor. So we'll mark this as Exhibit Number 7.
(Whereupon Exhibit No. 7 was marked for identification by the Court Reporter.)
Q. On your screen you should have a document that says purchase by vendor summary. Do you see that?
A. Yes.
Q. Okay. And which topic does this relate to?
A. Topic number eight.
Q. And. All right, so let's look at the second page of this document and it references Mallory International Logistics. Do you see that?
A. January '22? Yeah.
Q. Okay. What does Mallory do for TMG?
A. They're a logistics company.
Q. Okay. And what exactly do they do for TMG?
A. They take care of all our imports, some of our exports bring in the product to, you know, they take

Page 56

care of our imports.
Q. Okay. When you say they take care of your imports, are they actually shipping products for you or shipping--
A. --They manage the shipment.
Q. Okay. Do they ship stuff?
A. They manage the shipments.
Q. Okay. So do they--
A. They arrange for. They manage all our logistics.
Q. All your logistics?
A. Yes, pretty much. Yep.
Q. And what about 3PL Scottsdale?
A. What about it?
Q. Who are they? (Indiscernible - simultaneous speech.)
A. It was a 3PL that we had worked with.
Q. Okay. Did you stop working with them?
A. Yes.
Q. And what did they do for TMG?
A. They had shipped product for us.
Q. Okay. Did they staff your warehouse in Scottsdale at all?
A. They had nothing to do with my warehouse in

Page 57

Scottsdale.
Q. Okay. What products did they ship for you?
A. Can you be more specific? What types of products?
Q. Yeah, I really can't be more specific. This is the first I've ever seen of this note or of this company. So I'm just trying to figure out what they did for you. I'm not trying to ask you a trick question. I'm just trying to understand.
A. No, I know. I'm just trying to understand what type they. They did our pick and pack, so they picked many different products for us, if that's what you're asking.
Q. I see new web developer on here. Who's the new web developer?
A. Sweden.
Q. And what is the Amateur Group?
A. That was a person that sold for us and did some marketing for us. Not marketing, sales.
Q. Okay, and the first name of that person is Gary?
A. Yes.
Q. And what's Gary's last name?
A. Gary Adkins.

Q. A few seconds ago we talked about this 3PL Scottsdale. Do you see that?
A. I do.
Q. Okay. Is that the name of the company?
A. No.
Q. What's the name of the company?
A. Quetico.
Q. Quetico. And can you spell that?
A. Q-U-E-T-I-C-O.
Q. And now we're looking at the third page of this document and you guys are still relying on Mallory to handle all your logistics. Is that correct?
A. Correct.
Q. And I see 3PL AZ. Do you see that?
A. Yes.
Q. Okay. Is that the same company, Quetico?
A. Yes.
Q. So you guys still use that company, Quetico?
A. No.
Q. That relationship terminated in 2023?
A. Again, I don't recall exactly when it was terminated. Based on that.
Q. Do you recall why it terminated?
A. Do I call-- It was just a temporary location.


We had to get out of Bergen.
Q. Okay, so were you renting warehouse space from this company, Quetico?
A. No.
Q. All right, do you have the deposition notice in front of you that we've been talking about? Exhibit Number 1?
MR. ARGIONIS: She's got it on the screen?
BY MR. SHOWEL:
Q. Right. That's what I mean. Do you see it on your screen, Ms. Gleckler?
A. Yeah.
Q. All right, let's take a look at topic number nine, which states each harm or injury for which TMG seeks damages. And it goes on from there. Do you see that?
A. Yes.
Q. Okay. And you don't have any notes for this topic, correct?
A. Correct.
Q. Okay. So what did you do to prepare yourself for this topic?
A. I, I lived through the nightmare. I don't, I don't understand your question.


Q. Yeah, sure. Did you review any documents or data or information to prepare yourself to testify on topic number nine?
A. Yes.
Q. Okay. What did you review?
A. Past timelines and happenings and I reviewed a lot of different paperwork.
Q. Okay, so can you identify the harms or injuries for which TMG is seeking damages in this case?
A. There's financial damages, there's consumer damages. You know, we went through many different types of damages, so a multitude of different types of damages.
Q. Okay, what are the--
A. --Reputation.
Q. What are the financial damages?
A. I don't have them listed with all the financial damages. There are many different types of financial damages.
Q. Okay, what are the types?
A. What are the types?
Q. Yeah, I mean, in other words, I'm just trying to figure out how it is that you believe Dean Dussias harmed TMG, which is what we've been trying to get at


for a while now. So can you identify the different ways in which Dussias has harmed TMG or you believe Dussias harmed TMG?
A. By the many actions that Dean took or did do or didn't do, this company had to be resuscitated. Financial damages, shipping. We were in a logistics company that couldn't ship, that shipped incorrectly, that cut off all our box tops and we did. And ruined products, and delayed shipments during our busiest time of year, and shipped incorrectly, and lost consumer confidence by not shipping or missing holiday sales.
You know, the website, we, you know, the website didn't work. The website had to be scrapped. There are so many things on the financial side and on the backside.
We moved into a 3PL where they couldn't ship. We lost shipping time because nothing was, had a UPC. Nothing was, the systems weren't integrated. The list goes on and on and on. It was a disaster. The pipes were breaking and it continued to happen. Every time we turned around, there was something else.
There were Amazon. The Amazon account wasn't in my name. I had to prove I was the owner. We lost Amazon sales. We had to. It was, there were so many different

Page 62

things that happened. We didn't move out of a warehouse on time. We had to pay for, you know, two locations at the time. It was endless. It was just ridiculous what happened us.

I found out there were agreements that I didn't even know about. You know, I couldn't answer to anything. I didn't even. I couldn't, invoices were being sent to me. I didn't even know they existed. The list goes on.

Q. Right. You signed a complaint. Not signed. You filed a set of counterclaims. In this case, TMG did that said that Dean Dussias caused you guys, caused TMG over a million dollars in damages. Do you recall that?

A. Yes.

Q. Okay. How did you get to that million dollar number?

A. By isolating various expenditures that was a direct correlation with the things that Dean was directly spearheading and responsible for as president of the company.

Q. Okay, and what were those? Well, you know. one second, madam reporter, can you read that answer back for me.

THE REPORTER: Question. How did you get to that

Page 63

$1 million number? Answer. By isolating their expenditures that was a direct correlation with the things that Dean was directly spearheading and responsible for as president of the company.

(Whereupon the Court Reporter read back the previous answer.)

BY MR. SHOWEL:

Q. Okay, what were those expenditures that you just referred to?

A. I want to add to that expenditures as well as losses that we had. Expenditures I could speak to specifically, but not in any direct amount.

Q. Okay.

A. Warehouse again, paying for two different warehouses. The time to, you know, clean up the warehouse when we moved out, putting UPCs on product, scrapping a website that overextended what I had approved and that had to be scrapped. It wasn't a choice. Bringing in consultants to identify and do diagnostics on the website to know if we did have a choice prior to determining scrap it. We did. We hired outside people to look at the back end and tell us what was wrong. Can the website be fixed?

Q. Who are the outside people that you hired?

Page 64

A. One company was, I believe their name was Seed or Seeds. And another company was, the short name was CDA. CDA.

THE REPORTER: I'm sorry, would you spell the name of those two companies, please?

THE WITNESS: See, I don't recall if it was Seed or Seeds. S-E-E-D. And the second company was short. We kept calling them CDA. Was there...

THE REPORTER: Charlie, delta, alpha?

THE WITNESS: Cat, dog, apple. Yeah.

THE REPORTER: Thank you.

THE WITNESS: You're welcome.

BY MR. SHOWEL:

Q. All right, so we've got two different warehouses. We've got clean up the warehouse, we've got putting UPCs on product, we've got scrapping a website, we've got outside consultants including Seed and CDA. What other financial costs are there?

A. Oh boy. We had legal fee (Indiscernible.) me, you know, trying to create an updated operating agreement with Mr. Dussias. Let's say there were so many dumpsters that were taken away because we didn't pay the bills, or Mr. Dussias didn't pay the bills and they came and removed our dumpster. It was just a chain

Page 65

of events that every time we turned around we were paying. You know, we had to pay for a crane that because we didn't move out in time, so we had to pay for, the new owner couldn't deliver his product, so we had to pay for his crane. It just. The list went on and on, and it's all itemized. I can't (Indiscernible - simultaneous speech.) recall right now.

Q. I'm sorry?

A. I can't recall every single expenditure at this moment.

Q. Okay, you said it's all itemized, though?

A. The expenditures are itemized to the best of my ability to, you know. Yeah, but not completed.

Q. Okay, but you have an itemization somewhere that you've prepared, is that correct?

A. I have my notes and my own tracking, of course, all the expenditures that came from actual company payments.

Q. Okay, so you have notes?

A. My own (Indiscernible - simultaneous speech.)

Q. Okay, so you have notes somewhere of expenditures that you believe that you incurred because of Dean Dussias. Is that correct?

A. They're not notes. They're expenditures just

Page 66

pulled together by me. I don't know exactly what you're asking.
Q. But you used the word notes a few seconds ago, right? You recall that?
A. I do. It's my tracking of expenditures.
Q. Okay, and how do you track them?
A. I track them from what was paid out.
Q. Okay.
A. I know what was paid. I know for each situation what the cost would have been. It's not my calculations, it's what was paid.
Q. Okay. Do you have these costs compiled, for example, in a spreadsheet or a Word document somewhere?
A. Yes, but not in totality.
Q. And has that spreadsheet or that Word document? Well, first of all, what is it, a Word document or a spreadsheet? What is it?
A. A Word document or a spreadsheet? What is the difference how it's tracked? I'm not understanding the question. You're asking what platform I'm using? Excel or Word or something like that?
Q. I'm asking what is, yeah. What format do you have these notes in?
A. Many different formats.

Page 67

Q. Okay. Identify a few of them for me.
A. Some are in Word, some are notes in Word, some are in Excel. Yeah.
Q. Okay. Have they been produced in this case?
MR. ARGIONIS: And you. Well, you accumulated information. Whatever you accumulated for us, we produced on certain things.
THE WITNESS: Right. Right.
MR. ARGIONIS: If there's. If there's notes, and I don't know exactly what you're referring to, but if there's notes and things of that nature that you would have been sending to Corey and me, those are attorney-client privilege, so we probably wouldn't have produced something that from that. But, you know, you could testify more to that as to what exactly you're (Indiscernible - simultaneous speech.)
THE WITNESS: What I'm trying to say is I don't know if there is more. If there is additional costs, which I believe there was. There are, but I don't know because we keep identifying new costs as we learn more. So at the time, whatever was produced, there could be more to that.
BY MR. SHOWEL:
Q. Okay. But as we sit here today, you have a

Page 68

rough calculation somewhere of costs that you believe were incurred by TMG as a result of Dean Dussias' conduct, right?
A. Yes. Yes.
Q. And that rough calculation, as I understand your testimony a few minutes ago, is contained both in Word and Excel documents, is that correct?
A. Yes.
Q. Okay. What is the amount of that calculation that you've come to so far?
A. I don't have that in front of me. Can't answer that.
Q. Okay. And you didn't consult that or create any notes from that in preparation to testify on topic number nine, correct?
A. I did not.
Q. And to the best of your knowledge, those calculations that you've created have not been produced in this case?
MR. ARGIONIS: Well, I'll object to the. I'll object to that. I don't know exactly what was produced, too, but my understanding is we produced any underlying documents that would relate to that. But if you're talking about a specific sheet again, I'd have to go

Page 69

back and look at what she's talking about. And if that's a note to Corey and me, I'm not sure we're going to produce it. But with that background, we did produce documents that you turned over to us that you accumulated pursuant to your discussions with your attorneys, subject to what Mr. Showel had asked for. And those have been Bates labeled in the document production.
THE WITNESS: I believe they were produced.
BY MR. SHOWEL:
Q. I'm sorry, Ms. Gleckler?
A. I believe they were produced. But again, I'm not sure exactly what you're referring to exactly, so I don't.
Q. Well, I'm referring to the documents that you're referring to. I mean, you understand that we've been having a conversation the last few minutes about your personal calculations of the damages that you believe Dean Dussias has caused the TMG, right?
A. Yeah.
Q. Okay.
MR. ARGIONIS: Oh, sorry, Matt. Let me interject, too, that the magistrate recently issued an order that we are to supplement and identify. We didn't have time

Page 70

to do that yet. Bates label, bates ranges, I guess is my understanding of the order Corey's not back on yet--

MR. HICKMAN: No, I'm here now.

MR. ARGIONIS: In terms of what we produced over. Yeah, I was just going to summarize what the magistrate. Maybe you could do it better. What the magistrate ordered us to do that we haven't been able to do yet. Relative to damages.

MR. HICKMAN: Yeah. It included, included identifying the Bates ranges for the documents that we produced that support our damages claim. So we will do that at a later date. We just haven't done it yet. The order just came out two days ago.

MR. ARGIONIS: And so Merri's not ready to testify (Indiscernible.) specific requests in your topics anyways. But she wouldn't be able to identify the baseline.

THE REPORTER: I'm sorry? Your audio glitched, Mr. Argionis. Would you please repeat that?

MR. ARGIONIS: Sure. Merri wouldn't be able to, and I don't think it, it's within the topics, that specific requests, but she wouldn't be able to identify the specific Bates ranges or the specific documents that Corey and I produced that she turned over to us at some

Page 71

point. But like Corey said, the magistrate required us to do that and we're going to do that as expeditiously as we can. If that was your question.

BY MR. SHOWEL:

Q. Yeah. It wasn't. So you could, if you want to, Ms. Gleckler, right, consult your notes on what you believe the damages to be that Dean has caused TMG, right? I mean, in other words, you can go back and look at them, right?

A. Yes. Excuse me, let me just finish please. Not possibly all of them, only the damages that where there are specific payments.

Q. Right. And you have those accumulated somewhere as I understand your testimony. Right? You've got like a spreadsheet--

A. --They're in our financials. Yes, yes.

Q. They're in your financials?

A. Payments. I can pull the payments. I know exactly. I know where the damage is. I could look that up, yes.

Q. Okay. But do you have a document somewhere or a set of notes that's a list of all the specific payments that you believe are damages to TMG?

A. I don't have, the keyword is all. I don't

Page 72

have that to just say, here's the damages, done.

Q. Okay. But you've got all the ones that you're aware of so far somewhere in a document?

A. Yes.

Q. Okay. And so if you wanted to, you could have consulted that document in preparing to testify on topic number nine. Correct?

MR. ARGIONIS: And the only thing, I'll let you answer. Go ahead and answer. Then I'll interject something.

THE WITNESS: I did not think at this time it had to be an itemization of those damages and their costs had to be given based on the questioning or the preparation for the deposition.

MR. ARGIONIS: And I'd interject that if there's something you produced to us, and I think she did to her attorneys when we were responding to questions and discovery, that's going to be attorney-client privileged information. I'm not sure want her to go into that, but I'd have to go back and make sure that that's what she's talking about, too. But I'd interject attorney-client privilege there if it was something that you produced at our request when we were going through discovery and trying to answer the discovery that plaintiff has issued

Page 73

in this case.

And I'll allow you to question enough to gather that information was attorney-client privilege. But again, Matt, the magistrate has laid out that a specific quantification doesn't necessarily have to be done now, and we have experts that are going to be retained at some point to quantify that. But Merri's certainly ready to testify as to the category of type of damages and what she does recall as to the specifics of those categories and the companies and entities and out of pocket type of stuff involved.

Q. Okay. Can you read back my last question, Madam Court Reporter?

THE REPORTER: Excuse me. And so if you wanted to, you could have had that document in preparing to testify on topic number nine, correct?

(Whereupon the Court Reporter read back the previous answer.)

BY MR. SHOWEL:

Q. Okay. Can you please answer that question? It's pretty straightforward. You've got a document. You could have looked at it. Right?

A. I'm sorry. Can you say that again? You're asking me about number nine?

Page 74

Q. Sure. Madam Court Reporter. Can you read back the same question that you just read back?
THE REPORTER: And so if you wanted to, you could have that document in preparing to testify on topic number nine, correct?
(Whereupon the Court Reporter read back the previous answer.)
BY MR. SHOWEL:
Q. Right. It's not a trick question. I'm just asking.
A. No, I understand that, but yes, I could. Yes.
Q. You didn't?
A. I did not.
Q. Okay.
MR. ARGIONIS: And let me object again. To the extent she's referring to an attorney-client privilege document, I wouldn't want her to have it here with her looking at that because of the, what you just did before with the other documents, that you would ask for a copy of that. And we're not going to waive any attorney-client privilege relative to preparations that she had with us for responding to discovery or for this deposition.
MR. SHOWEL: So your objection is if she

Page 75

hypothetically bought (Sic.) a document to her deposition that she didn't actually bring to her document, you wouldn't want to produce that because it might be attorney-client privilege. Do I have that right?
MR. ARGIONIS: I think you, you asked if she could have brought that document with and without disclosing any attorney-client privilege for preparation, I would object to that. If the document she is talking about, which I'm not sure I'm clear yet on it, that was an attorney-client privilege document, I wouldn't want her to have it here looking at it for this deposition.
BY MR. SHOWEL:
Q. All right, let's jump down to topic number eleven. Do you see that on your screen? Ms. Gleckler? Any problem relating and it goes on from there. Do you see that, Ms. Gleckler?
A. I do. I do.
Q. Okay. What did you do to prepare to testify on that topic?
A. I understand. I know what the situation is.
Q. Okay, so you didn't do anything to prepare to testify on that topic?
MR. ARGIONIS: Well, I'll object. Mischaracterizes

Page 76

her testimony. And in addition to meeting with us, which you're not going to go into the specifics of that, you can tell him what you're relying upon to be prepared for that topic.
THE WITNESS: I'm not sure I understand what you just said, Jim.
MR. ARGIONIS: Okay, well, go ahead.
MR. SHOWEL: Why don't I take the deposition since it's mine? Anyway, so...
MR. ARGIONIS: So I'll just instruct you not to answer his question with anything that would infringe upon discussions you had with your attorneys, Corey and me, in preparation for this deposition.
BY MR. SHOWEL:
Q. Okay. Did you review any documents specifically related to topic number eleven in order to prepare yourself to testify on this topic today?
A. Yes.
Q. Okay. What documents did you look at?
A. I looked. I reviewed information of all the issues that we had with our website, previous website that Anatta had created.
Q. Okay, and what were the issues with the previous. Well, let me. Let me ask you a different

Page 77

question. What are the problems with the Anatta website that you believe were caused by Dean Dussias?
A. Everything.
Q. Okay, can you be more specific?
A. We had to scrap the entire website so we couldn't use that website.
Q. Why did you have to scrap the entire website?
A. There are multiple issues with the website.
Q. Okay.
A. We brought in third parties to help us try to fix it and it was unfixable.
Q. Okay, you said there was multiple problems. Can you identify some of them for me?
A. Site speed was awful. Errors kept coming up daily, inventory was off, wasn't communicating the inventory, we couldn't merchandise it the way we needed to. There's a lot of technical issues that are way above my understanding of a back-end of a computer. That was just the second company, CDA, that we relied on after the, we moved off of the first company. They told us that the entire theme needs to be redone and that's why we ended up scrapping it. And they did an entire diagnostic on the computer, on the website.
Q. And so you believe the site speed, the errors,

Page 78

the inventory problems that you experienced with the website were all caused by Mr. Dussias?

A. Mr. Dussias had three initiatives or three responsibilities as president of the company. The website, creating a website that was working, functional, and that can do what we needed it to do. Just work. But in addition to everything else, he failed.

Q. All right, let's take a look at what will be marked as Exhibit Number 8.

(Whereupon Exhibit No. 8 was marked for identification by the Court Reporter.)

MR. ARGIONIS: He'll pull it up.

MR. SHOWEL: Yeah, I'll pull it up for you. I'm not going to make you guess what it is.

MR. ARGIONIS: Oh, yeah. What did we mark as Exhibit 8?

MR. SHOWEL: I haven't marked it yet.

MR. ARGIONIS: Oh. Oh, you're going to get it.

MR. SHOWEL: All right. Do you have on your screen a document Bates stamp, TMG 512682 in the lower right hand corner?

MR. ARGIONIS: That's just the number.

Page 79

THE WITNESS: I don't see that, but okay.

MR. ARGIONIS: Well, she can't, she can't see it. It's cut off on hers. But I, I see it, 512682.

MR. SHOWEL: Okay.

MR. ARGIONIS: It's just the way her view screen is up and I don't want to try to fix it.

BY MR. SHOWEL:

Q. Okay. And do you see, Ms. Gleckler, it's an email from SEO Mercenary to you and Dean Dussias?

A. Yes.

Q. Okay. SEO Mercenary's again, Collin Phillips?

A. Yes.

Q. Okay. And he was involved in creating the new website, correct? Well, let me step back a second. I'll call it the Anatta website. Collin was involved in creating the Anatta website, correct?

A. I don't know if he was creating the website. He was helping with the website under Dean's guidance.

Q. And at this point in September 2019, how long have you been working with Collin?

A. I don't recall.

Q. I mean, more than a year at this point?

A. I don't know because he was hired by my previous partner.

Page 80

Q. And who's your previous partner?

A. Cedric Reingold.

Q. And in fact, you guys had not hired Anatta at this point, correct?

MR. ARGIONIS: On this particular September 6, 2019. Take a read through that, let him know when you need to scroll, and then see if you could answer his question, if you need to review it.

THE WITNESS: Can you just go up for a second? I want to see what website he's talking about. Okay, so the original Magento website. Okay, let me just see what...

MR. ARGIONIS: Wait, you scroll too fast for her.

BY MR. SHOWEL:

Q. Well, my question is pretty simple. If you don't know, you don't know. All I'm asking you is if you know whether or not he's talking about the old website now or the Anatta website.

A. He's talking about the old website.

Q. Got it.

A. The Magento website.

Q. All right, let's take a look at what will be marked as Exhibit Number 9.

(Whereupon Exhibit No. 9 was

Page 81

marked for identification by the Court Reporter.)

Q. And I'll just note for the record that this document's Bates stamped 533753 in the lower right. Ms. Gleckler, do you see an email in front of you from you to Nicole Williams?

MR. ARGIONIS: Can you give us the full, is it just the one Bates number or does it go through?

MR. SHOWEL: No, I'm not going to give you the full range. The first page is Bates stamped whatever I just said it was.

MR. ARGIONIS: Okay. Are you marking the whole chain as Exhibit 9?

MR. SHOWEL: I'm marking this document as it was produced to me as Exhibit 9.

MR. ARGIONIS: Okay. The one page is all I'm asking. If it's a one page or multiple pages, I can't see.

MR. SHOWEL: It's appears to be two pages.

MR. ARGIONIS: Okay, thank you.

BY MR. SHOWEL:

Q. Okay, Ms. Gleckler, do you see in front of you an email from you to Nicole Williams?

A. I do.

Page 82

Q. Dated September 19, 2020?
A. Yes.
Q. Okay. And this is an email that you sent to somebody named Nicole Williams, is that correct?
A. It looks like I was responding. One second, please. I don't recall this email. Okay.
Q. All I'm asking you is if you think this looks like an email that you sent to this woman named Nicole Williams.
A. Clearly, yes.
Q. Clearly, yes. Okay, great. And if you scroll down to the middle of the page, you see that Nicole Williams had emailed Cedric Reingold, correct?
A. Yes.
Q. Okay. And you responded to Nicole, correct?
A. Yes.
Q. Okay. You had access to Cedric's email at this time, is that correct?
A. Yes.
Q. And you refer to Cedric here as your partner, is that correct?
A. Yes.
Q. Okay. And Cedric was an owner of TMG, is that correct?

Page 83

A. Yes.
Q. Let's take a look at what we marked as Exhibit Number 10.
(Whereupon Exhibit No. 10 was marked for identification by the Court Reporter.)
Q. And for the record, I'll just note that this is document Bates stamped TMG 556099 on the front page. Ms. Gleckler, do you see in front of you an email from you to Leslie Levito and others?
MR. ARGIONIS: And before you answer, could you give us the full Bates range so we know you're working off of something? And if she needs to review the whole chain to answer a question, she can.
MR. SHOWEL: No, I'm not going to do that. I gave you the Bates number, the first page--
MR. ARGIONIS: --What are you talking about? What are you talking about? You're not going to do that. If you're marking something as an exhibit, I should have a copy of it. I don't have a copy of it in front of me. So at least identify exactly what it is. If you're just going to mark the one page that you said, TMG 0056099 and you're only going to ask your questions on that one page, fine, we'll extract that and we'll give the court

Page 84

reporter that one page. But if it's a whole strain, I don't know why you're fighting me on this. Just let us know what the chain is. And if she wants to look at the whole chain, she should be able.
MR. SHOWEL: To let's go off the record.
THE REPORTER: We are off to a record at 10:59 a.m.
(Whereupon a short recess was taken.)
THE REPORTER: We are back on the record at 11:02 a.m.
BY MR. SHOWEL:
Q. Okay, so we've previously identified Exhibit Number 10, which begins with Bates, number TMG 556099. And goes on consecutively from there, it's two pages. So the next page is 556100. And Ms. Gleckler, do you see on your screen an email from you to Leslie Levito?
A. I see Leslie. It says, from Merri Gleckler, but there's nothing there. And then it's Leslie. There's nothing. There's nothing in here.
MR. ARGIONIS: I think he's just talking the top. You're talking at the very top?
THE WITNESS: Just the heading. That's all I see.
MR. ARGIONIS: Yeah.
THE WITNESS: There's nothing in there.

Page 85

THE WITNESS: I see the header from Merri Gleckler to Leslie Levito, but there's no, there's nothing there.
MR. SHOWEL: All right. Do you want to open it up in your chat? I just sent it to you.
MR. ARGIONIS: Hold on. It's not downloading for some reason, now we can't download it. It's not letting us download it.
BY MR. SHOWEL:
Q. Okay, so on your screen right now, if you scroll down a little bit, do you see where it says thank you that I've highlighted?
A. Yes. Okay.
Q. Can you see Leslie Levito that I've highlighted?
A. Yes.
Q. Okay. Who's Leslie Levito?
A. She was a person we were working with, helping with marketing. TMG marketing. Branding.
Q. Okay. And if I scroll a little further down here, I see an email from SEO Mercenary to Dean Dussias on April 16. Do you see that?
A. Yes.
Q. And at this point, is he talking about the Anatta website or the old website?

Page 86

MR. ARGIONIS: And I'll object to the extent, if you need to look at the whole email for context. Have him scroll it for you since we don't have ability to. And if you remember, we don't want you to guess, speculating.
THE WITNESS: I don't know.
BY MR. SHOWEL:
Q. Okay, fair enough. Let's take a look at what will be marked as Exhibit Number 11.
(Whereupon Exhibit No. 11 was marked for identification by the Court Reporter.)
Q. And for the record, I'll note that this is a document Bates stamped 489874 in the lower right. It's one page. Ms. Gleckler, do you see an email on your screen from Dean to you dated April 24 of 2020?
A. Yes.
Q. Okay. And the subject line of this email is web digital agencies, is that correct?
A. Yes.
Q. And he goes on from there to say, take a look at over the weekend, correct?
A. Yes.
Q. Okay. And these are. Well, let's look at

Page 87

Anatta here. Are you familiar with that name?
A. Yes.
Q. All right. Who's Anatta?
A. The company that created a website for us.
Q. Okay. And this is prior to you guys hiring Anatta, correct?
A. Yes.
Q. Okay. And so Dean actually came up with a number of options for you guys to choose from for someone to build the website, correct?
A. Yes.
Q. Did you review all of these names?
A. I don't recall.
Q. Well, would it be, I mean, if Dean sent these to you and asked you to review them for your company, do you think it would have been normal for you just to not review them?
MR. ARGIONIS: Objection to the form of the question, you could answer.
THE WITNESS: All that was were their websites. So did I look at every one of them? I would think so, but I can't say I did.
MR. SHOWEL: Okay, so you don't know whether or not you reviewed any of these companies?

Page 88

MR. ARGIONIS: Objection. Asked and answered. She said she didn't recall. You can, sorry, you can answer.
THE WITNESS: Exactly. I don't recall. I would think I did, but again, I don't recall.
BY MR. SHOWEL:
Q. And why would you say you think, you would think you--
A. --Just looking at websites. I mean, that's all it was, is just looking at their websites.
Q. Take a look at what we marked as Exhibit Number 12.
(Whereupon Exhibit No. 12 was marked for identification by the Court Reporter.)
Q. Which is a document Bates stamped TMG 595598. In the lower right. It's two pages, goes on to 599. Do you recognize this document at all, Ms. Gleckler?
A. I don't see anything.
MR. ARGIONIS: I think that's all he's showing you. That's all that's on that page.
THE WITNESS: I don't.
BY MR. SHOWEL:
Q. Okay. Do you have on your screen, first page that says short message report?

Page 89

A. Yes.
Q. Got it. And a little further down, there's a line here that says interesting article and goes on from there. Do you see that?
A. Yes.
Q. Okay. And it references Anatta Design in PThreeMedia.
A. I see that.
Q. Okay. Who is PThreeMedia?
A. I don't recall. I don't know.
Q. Okay. Did you guys, first of all, this look like a text message exchange between you and Dean Dussias?
MR. ARGIONIS: And I'll object to. I'm not sure Merri has seen this, the way we collected this stuff. I'm not sure Merri saw the way it came out in the production, but it is something, Merri, that we produced. And I know that we downloaded text messages too. And as I sit here, unless Corey knows, I'm not sure what the format is, but with that background. Go ahead.
THE WITNESS: I see Dean's number above. So I'm assuming it's a text. Yes.
MR. SHOWEL: Okay. And so at this point, May 6,

2020, you are still involved in selecting a website company, is that correct?
MR. ARGIONIS: Objection to form of the question. Go ahead.
THE WITNESS: It appears so.
BY MR. SHOWEL:
Q. Take a look at exhibit what will be marked as Exhibit 13.
(Whereupon Exhibit No. 13 was marked for identification by the Court Reporter.)
Q. And this is a document Bates stamped TMG 476590 on the first page. It's 40 pages long. The final Bates number is 476629. I'll represent for the record that this is just the email with its attachments. And, Ms. Gleckler, do you have on your screen an email from Dean to you on June 6, 2020?
A. Yes.
Q. All right. And it appears from this email that--
A. --I'm sorry, I'm sorry. It says June 9, 2020.
Q. I'm sorry. Did I say June 6, 2020?
A. Yes.
Q. My bad. June 9, 2020. You are correct. And



it appears, does it not, that Dean is emailing you proposals from two different web designers?
A. Yes.
Q. Okay. And did you consider both of those proposals?
A. I would think, yes.
Q. Let's take a look at what we marked as Exhibit 14.
(Whereupon Exhibit No. 14 was marked for identification by the Court Reporter.)
Q. Which is a document Bates stamp TMG 549377 on the first page. And it goes on for another page to 378. Ms. Gleckler, do you see on your screen an email from you to Dean dated June 11, 2020?
A. Yes. All right.
Q. And if we scroll down a little bit, Dean says in a prior email to you, I sent a text to Dileepan, spelled D-I-L-E-E-P-A-N, at Anatta. Do you see that?
A. I do.
Q. He will be available for Jack and me tomorrow. Do you see that?
A. I do.
Q. Okay. You say. And he says, we'll send you



time when I know it. In the event that you would like to join the call. Correct?
A. I see it.
Q. All right. And you responded great, yes, I'd like to be on the call. Do you recall that?
A. I see that.
Q. Okay. And so you were participating in due diligence in selecting Anatta. Correct?
MR. ARGIONIS: Objection to the form of the question. Go ahead.
THE WITNESS: Incorrect.
MR. SHOWEL: So you were not participating in any way in the selection of Anatta?
MR. ARGIONIS: Objection. Form of the question. That's a different question.
THE WITNESS: Right.
BY MR. SHOWEL:
Q. Okay.
A. Yeah.
Q. So were you participating in any way in the selection of Anatta?
A. Yes.
Q. What was the extent of your participation?
A. Conversations with Dean.



Q. Okay. And you also had conversations with Anatta. Correct?
A. Based on this email, yes.
Q. Okay. And you are the person that selected the current, the designer of the current website, Sweden. Right?
A. Myself and my-- we did it as a team, but I made the final decision. Yes.
Q. Okay. And that final decision was based on some criteria that you determined were important to the website?
A. Yes.
Q. Take a look at what will be marked as Exhibit 15.
(Whereupon Exhibit No. 15 was marked for identification by the Court Reporter.)
Q. And this is an email that's Bates stamped 487956 on the first page. It's two pages long. Goes on to 957. Ms. Gleckler, do you have in front of you an email from Dean to Victoriya Scovel and others?
A. Yes.
Q. And just for the reporter, I'll note that Victoriya is V-I-C-T-O-R-I-Y-A and Scovel is S-C-O-V-E-

Page 94

L. And do you see this email is dated June 23, 2020, Ms. Gleckler?
A. Yes.
Q. And you see you're on this email as well, right?
A. Yes.
Q. Okay. And who is Jack Mueller?
A. (Indiscernible.)
Q. Ms. Gleckler, do you know who Jack Mueller is?
A. I said she's our art director.
Q. She's your art director? I'm sorry, your audio got cut off.
A. I'm sorry. I was, I thought I answered.
Q. Okay. Is she still your art director?
A. She is.
Q. Okay, and how long?
THE REPORTER: I just want to confirm that Jack Mueller uses she/her pronouns.
THE WITNESS: I'm sorry, Lindsay. It's a woman. Is that what you're asking, Jack? It's Jacqueline. She goes by Jack.
THE REPORTER: Thank you. I just wanted to be clear.
THE WITNESS: It's okay.

Page 95

BY MR. SHOWEL:
Q. And how long has Jack been with the company?
A. I don't recall off the top of my head. A long time.
Q. Who is John Bartlett?
A. He was IT support.
Q. Okay. He's no longer with the company, correct?
A. No longer.
Q. And Collin Phillips is, we've talked about him a few times now. He's still a contractor for TMG, correct?
A. Correct.
Q. And he does SEO work for Kashwere, is that correct?
A. Yes.
Q. And Tracy Gibb (Sic.) Gibbs. Sorry, who is Tracy Gibbs?
A. She's an employee of Kashwere.
Q. Okay, and so all of these folks were involved in the selection of Anatta, correct?
A. I don't believe so, no.
Q. Okay. So all of these folks were on a discovery and meet and greet leadership team call with

Page 96

Anatta, correct?
A. Correct.
Q. Okay. And presumably, all of them had the opportunity on that call to provide input to Anatta, correct?
A. Right. But you asked about the selection. They weren't involved in that.
Q. Okay, let's take a look at what we marked as Exhibit 16.
(Whereupon Exhibit No. 16 was marked for identification by the Court Reporter.)
Q. Exhibit 16 is a document Bates stamped 482923 in the lower right. It's a one page document. Ms. Gleckler, do you see an email from Victoriya Scovel to you and others dated June 26, 2020?
A. Yes.
Q. And the subject of that email is KA kickoff. Do you see that?
A. I do.
Q. In this email, Ms. Scovel says a little further down, she described some options, right? Do you see that, Ms. Gleckler?
A. I am. I'm just reading what she wrote. Okay.

Page 97

Q. And I'm merely asking that she presented you guys with some options in this email, correct?
A. Yes.
Q. Okay. One of those options is replatform as is, correct?
A. Yes.
Q. And then another option is replatform with a built Shopify theme, correct?
A. Yes.
Q. Okay. And these were options that you guys were going to discuss on this upcoming call that's discussed in this email, correct?
A. Yes.
Q. Okay. And so you had an opportunity to provide input on these options, correct?
A. Please repeat the question.
Q. Yeah. You had an opportunity to provide input on these two options, correct?
A. Yes.
Q. And to the best of your knowledge, Collin Phillips also had opportunity to provide input on these two options, correct?
A. I don't see Collin on this email.
Q. I will grant you he's not on this email. But

I'm asking a slightly different question. Despite the fact that Collin is not on this email, he would also have had an opportunity to weigh in on these options, correct?
A. I don't know.
Q. So you don't know if Dean or you would have consulted him in making this decision?
A. I don't. I don't recall.
Q. And it goes on from here to describe weekly client calls on Mondays at 9:30 a.m. do you see that?
A. I do.
Q. Okay. Did you participate in these weekly client calls with Anatta?
A. Sometimes.
Q. Sometimes, but not all the time?
A. Correct.
Q. Okay. There was no time when you were prohibited from participating in these calls, right?
MR. ARGIONIS: Objection to form. Go ahead.
THE WITNESS: I don't know if, I don't know 100 percent when. If the weekly calls occurred every week as highlighted. I'm not sure.
BY MR. SHOWEL:
Q. Okay. My question's a little different



though. I'm just saying that anytime there was a call, you could have been on it if you wanted to.
A. I don't know that from what. I don't know that--
Q. --Why don't you know that?
A. Because I was kept out of some of the calls or some of the information. So I don't know if there were other calls that I was not privy to. So I can't answer that.
Q. Let's take a look at what would be marked as Exhibit 17.
(Whereupon Exhibit No. 17 was marked for identification by the Court Reporter.)
Q. Exhibit 17 is a three page document that begins with TMG 436066, and goes on consecutively from there to 68. And Ms. Gleckler, do you see on your screen an email from SEO Mercenary to you, Dean Dussias and David Lazar?
A. Yes.
Q. Okay. And who again is David Lazar?
A. He was an outside, he was a 1099 person within Kashwere.
Q. Okay. And what's a 1099 person?



A. A non-employee.
Q. And what did he do for Kashwere?
A. He helped with the website as well as he was going to do some sales in major department stores but didn't.
Q. Okay, so he was helping out with the website? I think you testified just a second ago?
A. Yes.
Q. And Collin Phillips was helping out with the website as well, correct?
A. I don't know Collin's involvement in the website to what degree, but he was a part of it at some point.
Q. Well, have you ever asked Collin that? I mean, you still work with--
A. --I know, exactly. Collin tried to, Collin was a part of the website, he did not spearhead the efforts of the website.
Q. All right, you see down here where he discusses Kashwere 2.0?
A. I do.
Q. Okay. Kashwere 2.0 is how Collin referred to the Anatta website. Is that correct?
A. Yes.



Q. And Collin says, overall positive gain. That is way more in line with my expectations for how Kashwere and Kashwere 2.0 should perform. Do you see that?
A. I do.
Q. Okay. So in other words, as of this date, October 26, 2020, it's Collin's understanding that the website is performing in line with his expectations, correct?
MR. ARGIONIS: Objection to form. To the extent you're asking her to speculate as to what was in Collin's mind, but based on this exhibit. Go ahead, you can answer.
THE WITNESS: I again, I don't know exactly what Collin was, it clearly says it's positive gain. But if based on what I know about that website, initially, it was probably only the first 15 days that he's referring to.
BY MR. SHOWEL:
Q. Okay, how do you arrive at the 15 days that you just mentioned?
A. Because I remember initially, it started out it appeared to be okay, and then it took a deep dive and never came back.

Q. Okay.
A. So just my recollection.
Q. When you say it, you're referring to the website?
A. Yes. And the sales will highlight that as well.
Q. Okay. But you, 15 days seems pretty specific to me. Do you know how you recall the first 15 days or why you said 15 days?
A. Just based on, you know, launching a new website is a big deal. So. Yes, and just going over the sales, it's called a memory. I can't tell you why, but I remember the first couple of days, 15 days, two weeks. It was. It seemed to be okay. And then it just died.
Q. And when did it just die?
A. I can't answer that right now.
Q. How. How would you find that out? Well, let me. Let me withdraw that question. I'll ask you a different question. When you say it just died, when you say--
A. Sales started--
MR. ARGIONIS: --Let him finish his question. Don't talk over him.



BY MR. SHOWEL:
Q. And, yeah, I apologize. I'm mealy mouthed and not that bright, so it takes me a few turns to get my questions out. But at any rate. So when you say the website just died, how are you making the determination that the website died?
A. Sales.
Q. So it's just sales from the website went down to a point where you made the decision that the website's not working anymore.
A. No.
Q. Okay. Why am I wrong?
A. Because you're referencing that we made a decision to scrap the website solely based on sales. Sales were one part of it, a big part of it, but one part of it.
Q. And a little further down, Collin says we have a combo of both larger sales and consistently larger sales. Do you see that?
A. Yes.
Q. And he goes on to say, if we keep stacking these small positive modifiers, we'll see larger gains as time goes on. Do you see that?
A. I do.



Q. Okay. So this would indicate that the website was working pretty good at this point, correct?
MR. ARGIONIS: Objection to form. Go ahead.
THE WITNESS: That's what he wrote. I don't know what he was thinking. That's what I'm reading. That was. Yeah.
BY MR. SHOWEL:
Q. Let's take a look at what will be marked as Exhibit 18.
(Whereupon Exhibit No. 18 was marked for identification by the Court Reporter.)
Q. Exhibit 18 is a two page document Bates stamped 418557 and 558. And Ms. Gleckler, you see on your screen an email from David Lazar to you and Dean and, Collin Phillips.
A. I do.
Q. And it's dated December 17, 2020, correct?
A. Yeah.
Q. Okay. And so at this point, all of you guys are working on this website together, right?
MR. ARGIONIS: Objection to form. Go ahead.
THE WITNESS: I was, could have been a part of it. I was a listener in the day to day or back and forth of the website.



BY MR. SHOWEL:
Q. I'm sorry, you said you were a listener?
A. I was. I could be on an email, maybe, I was, you know, I was, took a backseat to the website construction because it's not in my wheelhouse. And I relied on other people to spearhead it based on what I was told their expertise are or knew.
Q. All right. You signed the contract with Anatta, right?
MR. ARGIONIS: If you recall. Without.
THE WITNESS: Yeah, I don't. I don't remember.
BY MR. SHOWEL:
Q. Okay. You don't recall whether or not you signed the Anatta contract?
A. I don't recall who signed the Anatta contract.
Q. If you had a strong feeling about Anatta, you could have vetoed them as the service provider. Correct?
A. I trusted. I didn't know enough to veto or I trusted the recommendation given to me.
Q. Okay. But my question is just slightly different. If for some reason you didn't want Anatta, you could have said, we're not going with them, right?

Page 106

A. Yes.
Q. I mean, when it comes to TMG, the buck stops with you, correct?
A. I can't answer that because evidently that's not what took place. So. No, it should be that way.
Q. Collin Phillips never came up to you or at any point said to you prior to hiring Anatta, you know, we shouldn't hire Anatta, they're not going to work out. Did he?
A. No.
Q. Okay. And David Lazar never approached you prior to hiring Anatta? Say, you know, they're not going to work out. Let's not hire them.
A. I wasn't the point of contact with the whole web, so, no, they never came. The answer to your question is, did they? They did not.
Q. And did you do any of your own diligence to evaluate Anatta?
A. Other than a phone call that I was on with Dean, I wouldn't know how to evaluate a good web company or a bad web company based on the backend and all the technical details of it needed.
Q. You evaluated Sweden, correct?
MR. ARGIONIS: Objection. Asked and answered. Go

Page 107

ahead.
THE WITNESS: I had other people on the call to help me make that decision.
BY MR. SHOWEL:
Q. And is it your testimony that your diligence in terms of hiring Anatta consisted of participating in one phone call with Dean and Anatta?
A. With regard to their capability? Would I say one phone call? I only recall one phone call with them. It was more on, it was never on the details or anything that was needed on the back end. I wouldn't know what that was, what was good and what was not.
Q. Right. When you say the back end, I mean, look, I will. I might be the one person on the Zoom that is, well, I shouldn't say that. I am a very non-tech savvy person myself. So I don't know what app goes into a website. I don't know how it gets built. I don't know any of that stuff. But when I hear you say back end, I'm understanding you to mean the technical aspects of creating the website. Is that what you're referring to when you say the back end?
A. Yes.
Q. Okay. So, understanding that. That neither you nor I have the wherewithal to evaluate the technical

Page 108

specifications of a website, you didn't do any other diligence to evaluate Anatta, that was non-technical in nature?
A. No. As I said, I was part of a phone call to meet them, and then we would have the discussions on what we wanted to, what type of website we were looking for. So, although I didn't know how to get there, it was discussed. What was the desire? What did we want the website to do or look like?
Q. And you were satisfied that they could deliver that based on your conversation with them?
A. No. I trusted that the people I reload-- the person that I relied on, would know whether or not they could get that done. Based on what was discussed.
Q. Did you do any diligence?
A. (Indiscernible - simultaneous speech.)
Q. I'm sorry, I didn't mean to cut you off. What was the last part that I spoke over?
MR. ARGIONIS: If you, Lindsay, did you happen to catch it?
THE REPORTER: The last part I confidently heard was... (Pause.) The person that I relied on would know whether or not they could get that done based on what was discussed and had discussed it with them, and that's

Page 109

where the process begins.
BY MR. SHOWEL:
Q. Okay.
A. Pretty good, Lindsay.
Q. So did you do any diligence in terms of other brands that Anatta had worked with?
A. I don't recall.
Q. Okay. And did you do any diligence in terms of other websites that Anatta had created?
A. I don't recall.
Q. Do you know whether David Lazar did any of that sort of diligence?
A. I don't know.
Q. Do you know whether Collin Phillips did any of that sort of diligence?
A. I don't know.
Q. And David Lazar says here, overall trend looks good, right?
A. That's what it says.
Q. Okay. Do you have any reason to think that he was lying when he said that?
A. No.
Q. He goes on to say, CTR is where we need to improve even further. Do you see that?

Page 110

A. Yes.
Q. What is CTR?
A. I don't know.
Q. And he goes on from there to say, any thoughts on what we should do to drive this? Do you see that?
A. I do.
Q. Okay. And he's directing this at Collin, right? Because this email is to Collin.
A. Yes.
Q. Okay. Why do you think David's directing this comment to Collin or this question to Collin?
A. I don't know.
Q. Is it because Collin's got technical expertise in dealing with websites?
MR. ARGIONIS: Objection. Asked and answered and asking for speculation as to what David Lazar thought. You can answer.
THE WITNESS: I don't know.
BY MR. SHOWEL:
Q. And a little further down, he says, going forward in January, I'm going to schedule a slash some recurring meetings that address the dot com goals. Do you see that?
A. I do.

Page 111

Q. Okay. Do you recall whether or not David scheduled any of these meetings?
A. I don't know.
Q. Did you attend any of these meetings?
A. I don't know what meetings.
Q. Okay. Do you recall whether or not you were invited to attend any meetings?
A. I don't know.
Q. And a little further down is an email from Collin dated Monday, December 14, 2020. Correct. Do you see that?
A. I do.
Q. And he states, you can see the click through impressions, clicks, and average position are all on an uphill climb. Do you see that?
A. I do.
Q. Okay. Do you have any reason to think that he was lying when he said that?
A. I would think not.
Q. And he says, I'm super excited to see how the new website is crawled. Do you see that?
A. I do.
Q. Again, any reason to think that he was lying about being super excited?

Page 112

A. No.
Q. And he goes on to say there are always shakeups when swapping over to a new website. Do you see that?
A. I do.
Q. Okay. And you, you still work with Collin, right?
A. I do.
Q. And you've been working with them for a fairly long time now, right?
A. Yes.
Q. I mean, this email is dated Monday, it's dated 2020. It's now 2024. So you've been working with them for at least four years, right?
A. Yes.
Q. Okay. And he's got a lot of experience with, quote unquote, swapping over to a new website, right?
A. He has a lot of experience with websites.
Q. Okay. And he says there are always shakeups when swapping over to a new website, right?
A. That's what it says.
Q. Okay. And again, he would know, right. Because he does this sort of thing for a living, right?
MR. ARGIONIS: Objection. Calls for speculation.

Page 113

You can answer.
THE WITNESS: He works with websites. This is regarding swapping over to a new website. I don't know how many times he has done that particularly.
BY MR. SHOWEL:
Q. Well, do you trust the information that you get from Collin?
A. Yes.
Q. Let's take a look at what we marked as Exhibit 19.
(Whereupon Exhibit No. 19 was marked for identification by the Court Reporter.)
THE REPORTER: Would this be an alright time to take a short break?
MR. SHOWEL: Yeah, sure, we can take a break. What do you want to do? Five minutes? Ten minutes?
THE REPORTER: Five minutes would be great.
MR. ARGIONIS: Okay. And then let us know, Lindsay and Merri, if you guys want to at some point break for lunch because, you know, we've been going, but you fine with ten minute break?
MR. SHOWEL: Well, do you guys want to do lunch? Do you guys want to do lunch right now? That's fine

Page 114

with me.
MR. ARGIONIS: You want to do that?
THE WITNESS: Yeah. Well.
MR. ARGIONIS: Or you want to go on a little bit longer and see. Lindsay? Are you okay taking a ten minute break and continuing for a bit? It's up to you, Merri.
THE REPORTER: I'm fine with that. Yeah.
MR. ARGIONIS: You want to continue?
THE WITNESS: We could continue a little bit.
MR. ARGIONIS: Okay, I'll do whatever. Yeah, let's take a lunch break sometime, reasonably, after maybe another, you know, 45 minutes of questioning after that, or hour at most. And then we'll take a lunch break.
MR. SHOWEL: Okay, so we're going off for ten minutes right now.
MR. ARGIONIS: Okay.
THE REPORTER: We are off the record at 11:47 a.m.
(Whereupon a short recess was taken.)
THE REPORTER: So with that, we are back on the record at 11:59 a.m. I believe we were about to begin to discussing Exhibit 19.
BY MR. SHOWEL:

Page 115

Q. Yes. All right, so in front of you is what will be marked as Exhibit 19. Ms. Gleckler, it's a one page document that is paid stamp 415035. It's an email from David Lazar to you and Dean. Do you see that?
A. Yes.
Q. Dated January 28, 2021, correct?
A. Yes.
Q. Okay. And a little further down, there's an email from Dean. And Dean says, here's the Bergen rate card. Do you see that?
A. I do.
Q. And he says, rates look at least 15 percent better than Kashwere's. Do you see that?
A. I do.
Q. Okay. Did you do anything to evaluate whether or not that was correct?
A. I did not.
Q. Okay. Do you know whether David Lazar did anything to evaluate whether or not that was correct?
A. I do not.
Q. Do you believe that Dean was lying when he told you that?
A. I don't know where Dean got his information. I don't know if that's accurate.

Page 116

Q. Okay. Let's take a look at what will be marked as Exhibit 20.
(Whereupon Exhibit No. 20 was marked for identification by the Court Reporter.)
Q. Bear with me just one second. I seem to have lost it. All right. Taking a look at what will be marked as Exhibit 20. It's an eleven page email thread, starts on 405153, goes to 405163. And you see it's an email from Collin Phillips to you and others, correct?
A. Yes.
Q. Including David Lazar and Dean, correct?
A. Yes.
Q. And who is Azizul, spelled A-Z-I-Z-U-L, and I'm not even, or Hoque, H-O-Q-U-E. Do you see that?
A. Yes. He's part of Anatta Design. He may even be the owner.
Q. And Collin states the site overall passes with flying colors for most areas of concern. Right?
A. That's what it says.
Q. Okay. You think he was trying to mislead you at all when you wrote that?
A. No, I believe at that time that's what it was.
Q. All right. And we're in a significantly

Page 117

better place than we were before for the technical site audits, correct?
A. That's what it says.
Q. Okay. So did you understand that as of 3/3/21, as of March 3, 2021, the Kashwere Anatta website was in a significantly better place than the old website?
MR. ARGIONIS: Objection to form. Go ahead.
THE WITNESS: Again, whenever that was written at the time, that's probably what it was.
BY MR. SHOWEL:
Q. Okay.
A. I don't know for what period of time at that time. That's why he wrote that.
Q. Okay, so in other words, he wrote that because at that time, the new website was performing well, correct?
A. I assume so, based on what he wrote.
Q. And he goes on to state, this is arguably the cleanest website I've seen on launch. Do you see that?
A. I do.
Q. Okay. Do you think that he was being anything other than truthful when he wrote that?
MR. ARGIONIS: Objection. Calls for speculation as

Page 118

to what he was thinking at that time. But go ahead.
THE WITNESS: Collin doesn't lie. So at that time it probably was accurate.
BY MR. SHOWEL:
Q. And a huge shout out to everyone, right? That's what Collin wrote?
A. Yes.
Q. Okay. So to the extent that you've said several times that Dean, quote, unquote, spearheaded the new website. Is that correct?
A. Yes.
Q. Okay. And so at this point, it seems to be going quite well, according to Collin, correct?
A. Yes.
Q. And when Collin says, huge shout out to everyone, who do you think he's referring to?
A. I don't know.
Q. Would it be all the folks on this email?
A. I don't know.
MR. ARGIONIS: Objection. Asked and answered.
BY MR. SHOWEL:
Q. Well, Dean wasn't the only person working on the website, right?
A. Dean was not the only person working on the

Page 119

website. He was spearheading the website.
Q. And he described this as a superb starting place. Right?
A. That's what it says. Starting place.
Q. And light years ahead of Magento. Do you see that?
A. I do.
Q. What's Magento?
A. The previous platform prior to Shopify, it was our original website.
Q. It's the platform for the old website, right?
A. Mm-hmm. I'm sorry. Yes.
Q. Take a look at what we marked as Exhibit 21.
(Whereupon Exhibit No. 21 was marked for identification by the Court Reporter.)
Q. And this is a ten page document that starts out with TMG 589613 and goes to 589622. And on the first page here, there's what looks to be an email that you sent to yourself. Do you see that?
A. Yes.
Q. And I guess my question is, this was produced to me, to us, as a single document, but it appears to be some sort of compilation with hand drawn highlights.

Page 120

Did you see this highlight here?
A. I do.
Q. So my question is to you, what is this document? And if you scroll further down, it's got what appears to be part of a contract with Chief Digital Advisors. Do you see that?
A. I do.
Q. All right. Who is Chief Digital Advisors?
A. They are the consultant that we used to do some diagnostics for us.
Q. Okay. You did that on the website?
A. I did.
Q. And you retained them November 1, 2021, it looks like.
A. Well, I guess that's when it was presented. I don't know.
Q. Yeah, you're right, my bad. Let's see. Looks like you retained them in November, yeah, of 2021, right. That's when this is signed?
A. That's when it was signed, yes.
Q. Okay. Was Dean made aware that you were entering this contract with these folks?
A. Dean wasn't with the company.
Q. At that time as of November 2021. Right?

Page 121

A. Right.
Q. So did you guys communicate with Chief via email?
A. As one of the ways we communicated? I'm not sure what you're asking me.
Q. Yeah. Did you exchange emails with this company called Chief?
A. We did.
Q. Okay. And were those emails produced in this case?
A. I don't know.
Q. And did Chief, Chief created some work product for you guys, right? It appears.
A. Yes.
Q. So in other words, they created some reports of some kind dealing with the old website?
A. They did.
Q. Okay. Were those produced in this case?
A. I don't know.
Q. Do you still have them?
A. I do.
MR. ARGIONIS: And they. And Matt, for the record, they. I think they should have been produced. I don't know, all the. The production was large, as you know,

Page 122

it's 500 and some pages, but we could certainly look into that to you. Merri wasn't involved in every detail. She didn't see the production as it went out either, even though she helped us gather things.
BY MR. SHOWEL:
Q. Okay, so, Ms. Gleckler, do you know what this document is? And I say that because it doesn't appear to be an email, because it's got, you know, two random emails and a contract and. And what appears to be a hand drawn highlight. So I guess I'm trying to figure out where this document comes from or what it is.
A. Which document are you referring to specifically?
Q. The whole thing. So this whole thing was produced to me as one document. This whole ten page document was produced as a single document.
MR. ARGIONIS: And. Let me. Let me. Let me interject. I don't think I'm step on any line here. That's something that we would have produced, and it looks like. And Corey would probably know better, but we'd probably have to go back and check. It looks like that's probably something that Merri had sent to us and we had in some format. We're the ones that probably had it in that format. I'd have to go back and check if it

Page 123

was an attachment or what, and also have to go back and check to see if you, if it's a duplicate based on, you know, we had a lot of meet and confers and we were filling in blanks, I think, after you took a look at our production. So I don't think Merri's going to be able to identify how it was produced to you, but if you can, you're certainly allowed to do that, if you know.
Q. Yeah, I guess. Do you recall putting this document together, Ms. Gleckler?
A. The document I wrote, the letter to Nirav. That's the document I'm looking at. I...
MR. ARGIONIS: I think he's saying this whole. There's hard to--
THE WITNESS: --Yeah, I don't.
MR. ARGIONIS: I think he's saying this whole document, which is Bates labeled. It's how many pages, Matt? 20?
MR. SHOWEL: Ten.
MR. ARGIONIS: Whatever it is. I think he's saying the way it's put together. Did you put that together?
THE WITNESS: I don't recall.
BY MR. SHOWEL:
Q. All right, fair enough. Let's, in front of you, you should have page three of the document, which

Page 124

is an email from you to Nirav. Do you see that?
A. I do.
Q. Okay. And you say, I believe Kashwere should be partially recompensed for this website failure. Do you see that?
A. I do.
Q. Did you guys get any. Did TMG get any money from, from Anatta?
A. We did not.
Q. Did TMG ever file a lawsuit with Anatta?
A. We did not.
Q. Let's take a look at what we marked as Exhibit Number 22.
(Whereupon Exhibit No. 22 was marked for identification by the Court Reporter.)
Q. Which is a document Bates stamped TMG 331717. In the lower right, it's three pages. It's Bates stamped consecutively ends on 719. On the first page, there's an email from David Lazar to you. Do you see that?
A. I do.
Q. Okay. It's dated October 8, 2021, right?
A. I do. I see.

Page 125

Q. Okay. And it appears to me, first of all, do you recall this email exchange with David Lazar?
MR. ARGIONIS: Give her a chance to take a look at it.
MR. SHOWEL: Sure. (Pause.)
THE WITNESS: Okay.
MR. ARGIONIS: Do you need to, yeah. Oh, wait, scroll. Scroll back to that. The beginning of this email.
THE WITNESS: Yeah.
MR. ARGIONIS: She reviewed the first email, so yeah. Let her see who it's from. And I think a couple more lines down. Okay. (Pause.)
THE WITNESS: Okay.
MR. ARGIONIS: Yeah. Give her the next email. Yeah. (Pause.)
BY MR. SHOWEL:
Q. Based on what you've read so far, do you recall having this sort of argument with Mr. Lazar?
A. It wasn't an argument. He was frustrated, so. Yeah.
Q. And when did Mr. Lazar leave the company? Do you recall? Does this refresh your memory at all?
A. I don't recall exactly when he left. No.

Page 126

Q. Was it shortly after this discussion?
A. No.
Q. And. October... Towards the bottom here. Mr. Lazar says, same with the Bergen discussion. We must stop the finger pointing and own our mess up. Do you see that?
A. I do.
Q. It takes more than one party to screw this up. Do you see that?
A. That's what David said.
Q. Right? So what was your. What was the mess up that he was referring to here?
A. I don't know. Specifically, don't know.
Q. And you wrote, if it was our error, so be it, but I won't just wing it. Do you see that?
A. I do.
Q. What error were you referring to?
A. I don't recall.
Q. And this is Dean was no longer with the company at this point, right?
MR. ARGIONIS: Did you scroll to the date of this email?
THE WITNESS: Right.
BY MR. SHOWEL:

Page 127

Q. Right. Dean was no longer with the company at this point, correct?
A. Correct.
Q. And a little further up, Mr. Lazar writes of, writes about Collin, that Collin asked a question about NetSuite and Shopify, not only was this inappropriate, his understanding was not even 50 percent accurate. Do you see that?
A. I do.
Q. All right. Do you, have you conducted any investigation into to what extent Collin may have been involved in screwing up the website?
A. I don't believe Collin screwed up the website.
Q. Well, I guess. Let me ask you a different way. Have you gone and picked apart the decisions that you believe led to the underperforming website?
A. We hired outside companies to do that for us.
Q. Okay. Then one of them is Chief. Right, that we just talked about?
A. Yes.
Q. Another is Seed?
A. Yes.
Q. Okay. Did Seed create any work product for you guys?

Page 128

A. I don't recall.
Q. You don't recall whether they had any reports or anything like that from their investigation?
A. I don't remember if there are any reports. Or was the conversation.
Q. Take a look at what would be marked as Exhibit 23.
(Whereupon Exhibit No. 23 was marked for identification by the Court Reporter.)
Q. It's a one page document. Bates stamped 338992. And you see there's an email from David Lazar to you. Do you see that?
A. I do.
Q. Dated October 15, 2021?
A. Yes.
Q. And Lazar writes, as much as Dean fucked up, not all of this is actually on him. Do you see that?
A. I do.
Q. Okay. And so do you agree with that statement that not all this is actually on him?
A. I don't know what he meant by that email. What, what all was or what he was. I don't know.
Q. And you state here we discussed selecting our

Page 129

preferred product with Anatta several times. Do you see that?
A. I do.
Q. Okay. Those were conversations that you had with Anatta.
A. I don't recall. But I don't recall exactly what was discussed with Anatta.
Q. Okay. But you had several conversations with Anatta about preferred product?
MR. ARGIONIS: Objection to form. It says, we discussed selecting. So if that refreshes your memory, go ahead. Otherwise, I think she's been asked and answered. Go ahead.
THE WITNESS: I don't recall.
BY MR. SHOWEL:
Q. Okay, well, you. You sent this email, correct?
A. I did.
Q. Okay. And when you wrote we, I assume you're referring to yourself in part, right?
MR. ARGIONIS: Objection. Asked and answered. Go ahead.
THE WITNESS: I don't recall.
BY MR. SHOWEL:

Q. So you don't recall whether you had several conversations with Anatta about preferred product?
A. I don't recall what was discussed.
Q. Do you have any reason to think that you didn't have several conversations with Anatta?
MR. ARGIONIS: Objection, asked and answered. Yeah, go ahead.
THE WITNESS: I don't recall.
BY MR. SHOWEL:
Q. Right, but my question is slightly different. Do you have any reason to suspect that what you wrote here was not accurate?
A. I don't recall the context of that sentence.
Q. And as you sit here today, you're not able to state with any specificity what it is you think Dean did wrong with respect to the website. Is that correct?
A. Dean was responsible in spearheading all efforts of the website, and it was brought to my attention multiple times afterwards, (Indiscernible.) wasn't working. Conversations that were--
Q. (Indiscernible - simultaneous speech.)-- I'm sorry to interrupt you. But I think you cut out there. I think there was a minute when you're. There was a few seconds when your audio was gone. I hate to interrupt



you, but would you mind starting over?
THE REPORTER: (Indiscernible - simultaneous speech.) Mr. Argionis, did you just issue an objection?
MR. ARGIONIS: No, I was just going to say let her finish. But if he didn't hear her, then she needs to start over.
THE REPORTER: Thank you. Please proceed.
THE WITNESS: Dean was responsible in spearheading all aspects of the website. And I learned afterwards that when things were brought to his attention, he was... They were either ignored or whatever he did, he didn't address them. So I relied on him to spearhead this in its entirety and he failed miserably.
BY MR. SHOWEL:
Q. Okay, can you cite me an example of something that was brought to his attention that he just ignored?
A. I, I forget what the technical term is, but he ruined the spiders of the website. He had them. He was told, don't do that. We had our Magento website for years. We were featured on Oprah in 2005. There was a lot of back end information that Google keeps in with regard to websites and he was, he, Collin actually had told Anatta and Dean not to change it and he was ignored and we lost all of our information and (Indiscernible.)



get it back. So...
THE REPORTER: (Indiscernible - simultaneous speech.) Your information and.
THE WITNESS: Nothing. I'm sorry. Lindsay, what did you just say?
THE REPORTER: Your audio glitched. So you lost all of your information and then. Please finish that sentence.
THE WITNESS: It was information or it should be called traffic. The spiders were lost. It was like disconnected. And Google was looking at our new website as if it was a brand new website that we were starting from scratch. So I learned that when that was brought up to Dean's attention and Anatta, he was, you know, ignored. Other specifics I don't have for you, but that one stands out in my mind. That was a big deal.
BY MR. SHOWEL:
Q. Take a look at what we marked as Exhibit 24.
(Whereupon Exhibit No. 24 was marked for identification by the Court Reporter.)
Q. It's a two page document, begins with 244709 and goes to 710. And Ms. Gleckler, do you see there's an email to you from Collin Phillips?



A. Yes.
Q. And a little further down, you sent an email to Collin that says Mr. Dussias was fraudulent in his behavior, confirming the scumbag he really is. Do you see that?
A. I do.
Q. Okay. And you a little further up, you discuss a Facebook ownership, right?
A. I don't know what I see. It says that's the ownership. Yes.
Q. Okay. You're discussing the Facebook page here, right?
MR. ARGIONIS: Well, give her an opportunity to read it. I don't think she's read the context of the emails, but. (Pause.)
THE WITNESS: Yes. Okay.
BY MR. SHOWEL:
Q. Okay. And at this point, you had full access to all of Dean's emails, right?
A. Yes.
Q. Yeah. And let me clarify. All of his Kashwere.com emails, right?
A. Yes.
Q. Okay. So if there was a, so in other words,

Page 134

if you wanted to change the pass, the password on the Facebook page, you easily could have done that through Dean's email, correct?

A. No.

Q. Why not?

A. Because it had a two step verification. And the second step, I didn't have access to that.

Q. What was the second step?

A. I believe it was his cell phone, but I shouldn't say. I don't know if it was his cell phone. I assumed I didn't have that second step because they kept sending it and it didn't come through to his email.

Q. Take a look at what we marked as Exhibit 25.

(Whereupon Exhibit No. 25 was marked for identification by the Court Reporter.)

Q. Which is a six page document beginning on 213638 and ending on 213643. And you see it's an email from somebody named Catherine Jungreis. Do you see that?

A. Yes.

Q. For the reporter, I'll just note that Jungreis is J-U-N-G-R-E-I-S. Who? And I'm sorry, it's Cathleen. Who's Cathleen?

Page 135

A. She's our bookkeeper slash accountant.

Q. Okay. And she says, I've attached the letter per your request. Do you see that?

A. I do.

Q. Okay, so you asked her to write a letter of problems that she believed Dean caused.

A. I don't know what this is referring to.

MR. ARGIONIS: I think you need to scroll down so she could see the context or the attachment at least.

BY MR. SHOWEL:

Q. Well, I mean, before I do that, do you recall requesting that Cathleen send you a letter of any kind?

A. I don't know what it could be any letter. I don't know what letter you're referring to.

Q. Okay. She writes, I would like to address some challenges I ran into from Dean setting up NetSuite, Shopify, Amazon and Avalara. Do you see that?

A. I do.

Q. Okay. Does that refresh your recollection about you asking her for a letter?

A. It does.

Q. About Dean?

A. Not about Dean. About her experiences. The experiences or the difficulties she's having.

Page 136

Q. And you solicited a similar letter from Collin Phillips, correct?

A. Instead of having people complain to me, I asked them to put their experiences and what they are find, their findings in writing.

Q. And you solicited a similar letter from Tracy Gibbs, correct?

A. I did.

Q. And you solicited a similar letter from David Lazar, correct?

A. Yes.

Q. Are you of the belief that you have an or that you had an oral employment agreement with Mr. Dussias?

A. An oral employ? Yes.

MR. ARGIONIS: And I'll object to the extent that calls for a legal conclusion, but go ahead.

BY MR. SHOWEL:

Q. Okay, well, we'll get into that a little bit later, I guess. Take a look at what will be marked as Exhibit 26.

(Whereupon Exhibit No. 26 was marked for identification by the Court Reporter.)

A. I don't know if anything changed.

Page 137

MR. ARGIONIS: No, it hasn't yet. He's pulling it up.

BY MR. SHOWEL:

Q. And this is a document that's Bates stamped 167071. It's two pages. I'll represent for the record that it's an email and it's attachment. Do you see on your screen an email from you to Dean dated July 4, 2019?

A. Yes.

Q. And you say, here are the notes of our conversations, right?

A. Yes.

Q. And do you recall when did this conversation take place?

A. I don't recall based on this.

Q. And did you review this document in preparation for this deposition?

A. I've seen this. I'm familiar with this document.

Q. Have you reviewed it in the last few days?

A. Yes.

Q. And you state 20 percent equity, up to 5 million sales, then it increases to 30 percent equity, right?

A. I didn't state anything. This was Dean's document.
Q. So you didn't make these notes?
A. No, those were Dean's documents.
Q. So when you say, here are the notes of our conversations, these are not notes that you compiled?
A. That was Dean's documents. That's what was discussed. But that was all based on what Dean had proposed.
Q. Okay, but all I--
A. --I don't even. Yeah.
Q. All right, so if you look at the extension on the attachment, it's a Word document, right?
A. Yes.
Q. Okay. All I'm asking is who typed up this Word document?
A. I, I don't remember doing it, so I don't recall. But it was based on conversations that were discussed or Dean had originally created. I don't recall.
Q. Okay, but you don't know whether. (Indiscernible - simultaneous speech.) I'm sorry?
A. It was one of the. I don't recall.
Q. Okay, so you don't recall whether you or Dean



typed up this document. Right?
A. Exactly.
Q. And you state shares will be transferred after March 15? Well, I say. I don't know who says it. Let me, so let me rephrase the question. Shares will be transferred after March 15. Do you see that?
A. I do.
Q. And that refers to shares in Kashwere?
A. I would think so.
MR. ARGIONIS: You were on number five, Matt?
THE WITNESS: Yeah.
MR. ARGIONIS: Shares will be transferred. Okay.
THE WITNESS: In reading this, I do not believe that I wrote this. This was not my proposal.
BY MR. SHOWEL:
Q. Okay. If we go back and look at the email, you say, let me know if we missed anything. Do you see that?
A. What I recall is a scratch piece of paper. It may have been, I could have typed it or I don't recall. So I (Indiscernible.).
Q. Okay.
THE REPORTER: I'm sorry. I think your audio glitched again--



THE WITNESS: --Prior to getting anything--
THE REPORTER: --You said, I could have typed it. I don't recall. And then I'm not sure I got the rest.
MR. ARGIONIS: Okay, I think your audio cut out.
THE WITNESS: Oh, oh.
MR. ARGIONIS: She's asking you to repeat yourself.
THE WITNESS: This is just one of the many conversations I don't, I recall a piece of paper, a scratch piece of paper. I don't recall if this is what it was and it was retyped, but this was a proposal given, discussed, but given to me by Dean.
BY MR. SHOWEL:
Q. Okay.
A. One of the many.
Q. So this statement here, Dean can openly work with Merri once agreement is signed. Do you see that?
A. Yes. Because everything had to do with an updated operating agreement. And in writing, according to my operating agreement, and nothing was signed.
Q. Well, this reference to this agreement here refers to the MIPA, right?
A. I don't know.
MR. ARGIONIS: If you, (Indiscernible - simultaneous speech.) Agreement.



THE WITNESS: Oh, okay.
MR. ARGIONIS: Scroll back down first so she sees the date, I think. Sorry. Up.
MR. SHOWEL: Up more?
MR. ARGIONIS: Yeah, we don't see the date yet of the email. There you go. July 4, 2019.
THE WITNESS: Yep. Yes.
THE REPORTER: Mr. Showel, you said it referred to the MIPA?
MR. SHOWEL: Yeah. M-I-P-A.
THE REPORTER: Thank you.
MR. SHOWEL: All caps. Does anybody remember what MIPA stands for?
THE WITNESS: Membership--
MR. ARGIONIS: Membership interest purchase agreement.
BY MR. SHOWEL:
[redacted]
Q. But we can create a side agreement until then to confirm all. Do you see that?
A. I do.

Q. Okay. Is it your position that there. Well, then it goes on to say Dean can openly work with Merri once agreement is signed. What if you understand openly to me.

A. I don't know what this agreement, where this agreement came from and who wrote it, so I can't answer anything specific to it.

MR. ARGIONIS: And don't guess. If you recall the context and you recall it, then give them an answer. If you don't, then you know, we don't want you speculating or guessing. (Pause.)

THE WITNESS: Oh, we're waiting for me?

BY MR. SHOWEL:

Q. No, I'm just making a note. Sorry. All right, let's take a look at Exhibit 27.

(Whereupon Exhibit No. 27 was marked for identification by the Court Reporter.)

Q. Which is a document that is Bates stamped 167246, it's a three page document. I'll represent that it's the email and the attachment it ends on. Well, the Bates stamp is very hard to read down there, but it's whatever the consecutive. Now it's cut off. Let's see. It ends on 167248. And if we go to the top.



A. Can you turn it around? Thank you.

Q. There's a email from you to Tim Foufas. Do you see that?

A. I do.

Q. With Foufas being F-O-U-F-A-S. Who is Tim Foufas?

A. He's a friend of a friend.

Q. And you write here ways to eliminate Russ' interests. Do you see that?

A. I do.

Q. And that refers to Russ Shafer?

A. Yes.

Q. Okay. And you understood at this point that Russel Shafer had an interest in TMG?

A. I don't know what you mean by interest in TMG.

Q. Well, you wrote interest, right?

A. There's a whole world of everything behind Russ, so I'm not sure what you're asking me with regard to his interest. He...

Q. Well, what did you mean by interest when you wrote this?

MR. ARGIONIS: Why don't you take a look at. Read through the document if you have to, for context. (Pause.)



THE WITNESS: Russ lent the company money, and Russ lent the company money that wasn't supposed to be returned. And it was reimbursed. It was reimbursed. [redacted]. The rules of Russ' game changed, that I don't believe we could go through that. It's a whole 'nother world that was proved that Russ does not own or is a member of Kashwere. That's it. So the, I don't even know where you're going with this.

BY MR. SHOWEL:

Q. Okay. What did you mean when you wrote Russ' interest here?

A. Russ was claiming to be a member of TMG. That's what I was referring to.

Q. Okay. And so you were proposing, for example, to do a merger agreement of TMG to eliminate an interest of Russ that Russ didn't have? Is that correct?

MR. ARGIONIS: Objection to form. Mischaracterize her testimony. You said that has claimed interest.

MR. SHOWEL: I mean, let's just cut to the chase. Plainly, when you wrote this at this time, you thought that Russ Schaefer had an interest in the company. Right?



MR. ARGIONIS: Objection to form. She said he was claiming he had an interest.

BY MR. SHOWEL:

Q. Yes. And I'm not asking what he's claiming, I'm asking what she understood. So I'll repeat the question. It is plain for I think anybody that reads this email to see that at this point, when you wrote this, you thought Russ had an interest in the company. Correct?

A. Russ never was a member of TMG.

Q. And is that what you thought when you wrote this email?

A. I can't tell you what I thought and how I said it. If I use the word interest, Russ was never a member of TMG, ever.

Q. Did you ever believe that Russ had an interest in TMG?

A. No.

Q. And so, even though you never thought he had an interest in TMG, you were proposing three different ways to terminate his interest. Is that correct?

MR. ARGIONIS: Object, sorry. Objection to form. Mischaracterize her testimony and calls for speculation.

THE WITNESS: And can you scroll up, please? I

don't recall this email at all, so I can't speak to it.
BY MR. SHOWEL:
Q. Okay. Do you have any. I'll just represent for the record. This was produced by your attorneys to me. Do you suspect that you didn't write this email?
A. I can't answer it. I can't answer that. I don't know.
MR. ARGIONIS: Take a read through the email.
THE WITNESS: Can we scroll down?
MR. ARGIONIS: Yes. Have you read the (Indiscernible - simultaneous speech.)? Okay, go ahead and read the email. To give yourself context, scroll to the beginning of it so she sees the date, too. Okay.
THE WITNESS: (Pause.) Can you scroll up, please?
MR. ARGIONIS: Or down. I think she means. Yeah. (Pause.)
MR. SHOWEL: Are you still reading this?
THE WITNESS: Yeah, somebody's right--
MR. ARGIONIS: --Wait, is there more? Is there more? Scroll down.
MR. SHOWEL: And there's a copy of the business agreement.
MR. ARGIONIS: Let her take a look at that, too. That's the thing. It's (Indiscernible.)



THE WITNESS: Yeah, this is a, this is an agree-- this is going so far back. This agreement was never signed. Somebody, you know, somebody else it references we. So I don't have, I don't recall the details of this to speak to it, but I just know that this agreement was never signed.
MR. ARGIONIS: The one you're looking at?
[redacted]



[redacted]



[redacted]

[redacted]

BY MR. SHOWEL:

Q. So, yeah, let me start over. You understand what the operating agreement that's being referred to here is, correct?

A. Yes.

Q. That's the 2009 operating agreement between you and Cedric, correct?

A. It's the TMG operating agreement.

Q. Yeah, and I'm not trying to argue. I'm just saying it's the 2009 operating agreement, right?

A. Yes.

[redacted]



Q. Okay. TMG never, in fact, did that, correct?

MR. ARGIONIS: If you. Again, if you know, because--

THE WITNESS: --I don't know. I don't know.

BY MR. SHOWEL:

Q. Well, who would know?

A. My lawyers.

Q. Is there a document somewhere? (Indiscernible - simultaneous speech.) I'm sorry?

A. My lawyers at that time.

[redacted]



[redacted]

Q. Taking a look at what we've marked as Exhibit 29, which is--

MR. ARGIONIS: --And just so we're at the time we said. We mentioned lunch, but if you want to go through this exhibit, that's fine.

MR. SHOWEL: Sure. Yeah. It'll be quick.

THE REPORTER: So it's Exhibit 29, you said?

(Whereupon Exhibit No. 29 was marked for identification by the Court Reporter.)

BY MR. SHOWEL:

Q. Yep. It's a three page document. Bates stamped 595035 and going on consecutively from there to 037. And do you recognize this phone number here?

A. I do.



Q. What phone number is that?

A. Dean Dussias'.

Q. Okay, and whose phone number is this?

A. My phone number.

MR. SHOWEL: (Clears throat.)

THE REPORTER: You said mm-mm? Is that a no?

MR. ARGIONIS: Oh, I think he was just clearing his throat.

BY MR. SHOWEL:

Q. I was just clearing my throat. I'm sorry. And you asked Dean, can I tell Wang you're my partner, correct?

A. Yes.

Q. Who's Wang?

A. He's our factory contact. One of them.

Q. Okay. And you consider Dean to be your business partner at this point?

A. He was. He was. With the assumption that paperwork would be drafted and everything would be in writing. I assume that we would be working together as partners and, you know. Yeah, but he wasn't.

Q. But he wasn't what?

A. He was not a member of TMG and my partner, per se.

Page 154

Q. Well, you told a lot of people he was your partner, right?

A. You wouldn't say to somebody, here's my partner, if he signs the operating agreement. And partner is also used as partner, you're doing things together. And it could have meant partner, but that never waived the, never waived the fact that the operating agreement had to be updated and it had to be in writing. And that's why I hired legal to help me protect myself from this, so I wouldn't be in the situation that we're in right now. So it doesn't matter what was. It was always with the anticipation of him being my partner. I'm not denying that.

Q. Okay. Did you ever ask Dean to sign. Well, let me. Let me withdraw that and rephrase it. You never once asked Dean to sign the 2009 operating agreement, correct?

A. Dean was given a term sheet. Yes, I did ask him to sign the operating agreement.

Q. The 2009 operating agreement between you and Cedric. You asked Dean to sign that document?

MR. ARGIONIS: I'll object to form. You're calling for some kind of legal conclusion that they could just sign on this old document. So I guess I don't

Page 155

understand your question. And I think it's calling for a legal conclusion that if you sign on that document, the 2009 operating agreement, that somehow be a legal and binding thing. She's not an attorney. And it calls for legal conclusion, but go ahead. If you understand this question, go ahead.

BY MR. SHOWEL:

Q. Well, let me withdraw the question and ask it a different way. And I'm not asking for any sort of legal conclusion. My question is purely factual. A few minutes ago, when we were talking about the MIPA, we were talking about the 2009 operating agreement. You refer to it as the TMG operating agreement. Do you recall that?

A. I do.

Q. Okay. Did you ever ask Dean to sign that document?

A. That's specific MIPA? No.

Q. No, not the MIPA, the 2009 operating agreement.

MR. ARGIONIS: I'll object to form of the question. You're asking him to sign something that was already signed by others?

MR. SHOWEL: Yes. The question couldn't be any

Page 156

more straightforward. Did you ever say to Dean Dussias, Mr. Dussias, you need to sign this 2009 operating agreement, please?

MR. ARGIONIS: I'll object to the form of the question if you understand it. You can answer.

THE WITNESS: The only. If you're asking me if I asked Dean to sign the operating agreement that Cedric signed that paperwork specifically, no.

MR. SHOWEL: All right, you guys want to take that break?

MR. ARGIONIS: Yeah. Ready for lunch?

THE WITNESS: That's fine, yeah.

MR. ARGIONIS: Okay, let's take about 45 minutes, we said, so 1:55 your guys' time, but let's just say 2:00 your time.

MR. SHOWEL: Okay.

MR. ARGIONIS: Does that give us too much time? Fifty minutes. Give us 51 minutes. I gotta log off and go back in so I'm not burning out my phone here.

THE REPORTER: All right. With that we are off the record at 1:09 p.m.

(Whereupon a short recess was taken.)

THE REPORTER: With that we are back on the record

Page 157

at 2:03 p.m.

BY MR. SHOWEL:

Q. All right, taking a look at what will be marked as Exhibit 30.

(Whereupon Exhibit No. 30 was marked for identification by the Court Reporter.)

Q. It's a one page document, bates stamped TMG 191553. Ms. Gleckler, do you see an email from you and to you on January 16?

A. Please wait one second, I'm just trying to move... Close that...

MR. ARGIONIS: --Pop it out.

THE WITNESS: --Yeah. How does that go away? Get it off the screen.

MR. ARGIONIS: It's not touchscreen, is it?

THE WITNESS: No.

MR. ARGIONIS: Hold on one second. Let's just move it.

THE WITNESS: It won't go. All right, I'll...

MR. ARGIONIS: No, hold on. Just tap on this. There we go. Okay.

THE WITNESS: Thank you.

MR. ARGIONIS: Yeah.

THE WITNESS: Okay.
BY MR. SHOWEL:
Q. Okay. Do you see on your screen an email from you to you dated 1/16/2020?
A. Yes.
Q. Okay. And a little further down, there's an email from you to Hiroshi Miyakawa. Do you see that?
A. Yeah.
Q. Dated September 23, 2019, correct?
A. Yes.
Q. Okay, and who is Hiroshi?
A. He's our Japanese licensee.
Q. All right. And this is a true and correct copy of an email that you sent to Hiroshi on September 3, 2019?
MR. ARGIONIS: To the best of her abilities, with the understanding that her attorneys put this together and produced it as it's Bates labeled with the TMG preface. Sorry. You could answer.
THE WITNESS: Oh, yes.
BY MR. SHOWEL:
Q. Okay. Showing you what will be marked as Exhibit 31, which is a one page email dated with the Bates stamp 564950.



(Whereupon Exhibit No. 31 was marked for identification by the Court Reporter.)
Q. It's an email from you to Michelle Euler. E-U-L-E-R. Do you see that?
A. Yes.
Q. All right. And once again, any reason to doubt that this is a correct copy of an email that you sent?
A. Not on face value, no.
Q. Okay. Take a look at what will be marked as Exhibit 31.
THE REPORTER: Sorry, was that most recent Exhibit 31?
MR. SHOWEL: Thirty two. My bad. This current exhibit will be marked as Exhibit 32. This is another exhibit.
THE REPORTER: The exhibit you're about to show us will be Exhibit 32.
MR. SHOWEL: Correct.
THE REPORTER: Thank you.
(Whereupon Exhibit No. 32 was marked for identification by the Court Reporter.)



BY MR. SHOWEL:
Q. Exhibit 32 is Bates stamped 554725. In the lower right. It's a one page document. At the top, there's an email from Merri Gleckler to Cathy Breit. Do you see that?
A. Yes.
Q. And who is Cathy Breit?
A. She's a person at St. Jude that helps with their fundraising.
Q. And Cathy Breit states on November 1, Merri, Dean is an owner. Do you see that?
A. I do.
Q. And she goes on to say, we are going to thank you from the podium. Should we thank the owners plural and mention Dean as well? Do you see that?
A. I do.
Q. And your response is, yes, Dean is a partial owner. Do you see that?
A. Yes.
Q. Okay. That was a true and correct statement when you made that statement, right?
MR. ARGIONIS: Objection to form. To the extent it's calling for a legal conclusion, but go ahead and you can answer.



THE WITNESS: Again, he was introduced as a partner, never wavering the need to have it in writing, according to the operating agreement and the input from my lawyers. I would not say this is my partner, if he signs the operating agreement or we update the operating agreement. So...
BY MR. SHOWEL:
Q. Okay, but you didn't call him a partner in this email, right. You said Dean is a partial owner, correct?
A. Partial owner, yes, partial owner, partner. To me, it's all. Still doesn't waive anything. The need for this to be done in writing. I knew the operating agreement. I knew my lawyers would protect me in this agreement. So this was, you know, everything was with the anticipation of Dean signing the agreement and becoming my partner.
Q. You had never told Dean prior, well, the date of this last email is January 1, 2019, or, I'm sorry, November 1, 2019. You see that?
A. I do.
Q. Okay. You had never told Dean at any time prior to this. You're not a member until you sign an operating agreement. Had you?

A. Absolutely. He was given a term sheet and absolutely, he knew he had to sign something.
Q. Okay. So in other words, prior to this date, November 1, 2019, it's your testimony that you said to Dean, Dean, you are not going to be an owner until you sign an operating agreement?
A. I don't recall what was said to Dean, but Dean was fully aware that we had an operating agreement and to admit somebody into TMG in our operating agreement needed to be in writing via an Exhibit C, and that did not happen. So I can't recall what was said, but Dean was absolutely aware of it.
Q. How do you know Dean was aware of it?
A. Because Dean had helped me with issues that I had with my previous partners. He was very well of our, very informed of the TMG operating agreement.
Q. Okay. But you never presented Exhibit C that you just mentioned. You never presented that to Dean and said, Dean, you need to sign this before you can become a member. Did you?
MR. ARGIONIS: Object to the form of the question, asked and answered as to what he was going to sign. But if you understand the question, you could go ahead, to the extent it calls a legal conclusion too, I'll object.



THE WITNESS: Yeah, I'm not going to answer that, based on the previous operating agreement with Cedric.
MR. SHOWEL: You're refusing to answer the question?
MR. ARGIONIS: No, you can answer.
THE WITNESS: I don't understand exactly what you're asking me in that question.
BY MR. SHOWEL:
Q. Okay, let's try this a different way. All right. Do you see in front of you what will be marked as Exhibit 33?
(Whereupon Exhibit No. 33 was marked for identification by the Court Reporter.)
Q. It's the TMG Kreations LLC operating agreement. Do you see that?
MR. ARGIONIS: Yeah. And could you scroll down for the record so that we see that it's something that we produced?
BY MR. SHOWEL:
Q. Sure. I'll note for the record that it begins with page number 590558. It's 11 pages and it ends on 590568. Do you see that 590568 on your screen, Ms. Gleckler?



A. I do.
Q. All right. And you mentioned a few seconds ago you mentioned Exhibit C. Is this what you were referring to?
A. Yes.
Q. Okay. You never once said, told Dean that he needed to sign this before becoming a member, did you?
A. What timeframe are you referring to? Whether or not Dean knew that he had to sign an updated operating agreement?
Q. I am asking you if you ever told Dean that he needed to sign this document before becoming a member?
A. That specific, the document-- First of all, I was relying on my legal team to update, to create a document for Dean and I to become partners. Okay. And update the operating agreement. So I did not ask the, I didn't do not recall giving him this particular document to sign, but he knew he had to sign, which is why I hired lawyers to protect me in this.
I just went through ten years of issues with a previous partner about an operating agreement. So that's why I hired lawyers to protect me and create an operating agreement that would reflect the company's operating agreement and up any updates to admit Dean as



my partner. So (Indiscernible.)
Q. I'm sorry?
A. I didn't say anything.
Q. It's your testimony that you instructed Dean that his membership in TMG was contingent on him signing a written operating agreement. Is that correct?
A. Dean was well aware that an updated operating agreement was needed in writing, which is why we went back and forth numerous times and created by my lawyers to protect me and the company when Dean would become-- If Dean was to be a member of this company.
Q. Yes. And I'm not asking you what you think Dean understood. I'm asking you about personal actions of yourself. You, it is your testimony that you personally told Dean that he, his membership in TMG was contingent on signing a written operating agreement. Is that correct?
A. At what point are you asking me?
Q. Ever.
A. I would say yes. Dean ever-- Yes.
Q. Okay.
A. You had to update-- He had to sign an updated operating agreement to become a member of TMG.
Q. How about prior to November 1, 2019? Did you

Page 166

tell him that?
A. I don't recall. I don't recall.
Q. All right, let's take a look at what will be marked as Exhibit 34.
(Whereupon Exhibit No. 34 was marked for identification by the Court Reporter.)
Q. Exhibit 34 is Bates stamped 595290. It's a three page document. Bates numbered consecutively, ending at 92. Do you see on your screen, Ms. Gleckler, a document that says short message report?
A. I do.
Q. And towards the bottom here, you see there's a message from Dean on December 17, 2019. Do you see that?
A. I do.
Q. He says insurance, done. Correct?
A. Correct.
Q. And a little further down, you state, I don't have to sign insurance. Question mark. We don't have you on any legal paperwork, so how can you sign a document without my signature? Do you see that?
A. I do.
Q. And a little further down, you state, does Tam

Page 167

know that we only have a handshake agreement to date? Do you see that?
A. I do.
Q. Okay. And that handshake agreement was that Dean was an owner. Correct?
MR. ARGIONIS: Object to form. Go ahead.
THE WITNESS: Incorrect.
BY MR. SHOWEL:
Q. Okay. What was your version of that hand--
A. --We did not have an agreement.
MR. ARGIONIS: Okay, wait. Just let them get in. I don't know if you finished your question, but you're jumping the gun. Go ahead, Matt.
BY MR. SHOWEL:
Q. Okay. So you said, does Tam know that we only have a handshake agreement to date right here, right? That's what it says?
A. If that's what it says, yeah.
Q. Okay. And it's your testimony now that, in fact, there was no handshake agreement?
MR. ARGIONIS: Objection. Mischaracterizes their testimony. Go ahead.
THE WITNESS: Dean and I were working together with the anticipation that he was going to be a member of

Page 168

TMG. When Dean-- When I learned that Dean signed our insurance, I questioned, how can he sign any paperwork? Because he is not a member of TMG. And he. So that's. That's why I asked that question.
BY MR. SHOWEL:
Q. Okay, but that's not the question you asked, right? You said we don't have you on any legal paperwork. Right. You didn't say you're not a member. Right?
A. He was not on any legal paperwork because he was not yet a member. And if he was signing TMG documents, insurance documents, I would have thought that I should be the one signing insurance documents on behalf of TMG.
Q. Is it yours--
A. --So that's why I question that.
Q. Is it your understanding, Ms. Gleckler, that you have no ability to enter into verbal contracts on behalf of TMG?
MR. ARGIONIS: Objection. To the extent you're calling for legal conclusion, and it's vague and ambiguous because you're saying any verbal agreements with that you can answer if you understand it.
THE WITNESS: I don't know how to answer that.

Page 169

MR. SHOWEL: Okay, so you have no. No understanding of whether or not you can enter into verbal agreements on behalf of TMG?
MR. ARGIONIS: Objection to form to the extent it calls for legal conclusion, and it's vague. Go ahead.
THE WITNESS: I would rely on my partners, my partners, my lawyers to guide me in any agreement.
BY MR. SHOWEL:
Q. Taking a look at what we mark as Exhibit 35.
(Whereupon Exhibit No. 35 was marked for identification by the Court Reporter.)
Q. Do you see on your screen, Ms. Gleckler, a document called short message report?
A. Yes.
Q. And it says dates range--
MR. ARGIONIS: I'm sorry, Matt. Sorry to do that to you. Could you give us the Bates label again?
MR. SHOWEL: Yeah. It's a three page document, TMG 595362 on the front, 364 at the end.
MR. ARGIONIS: Okay.
BY MR. SHOWEL:
Q. And you see Ms. Gleckler on your screen, the date is January 24, 2020, correct?

Page 170

A. Yes.
Q. All right. And on about January 24, 2020, at 11:43 a.m. you send a message to Dean saying, I'm speaking to Fran at noon about Cedric's email. Right?
A. Yeah.
Q. Okay. Who's Fran?
A. Fran was our previous counsel.
Q. Is that Fran Griesing?
A. Yes.
Q. And am I pronouncing that correctly?
A. Griesing.
Q. And it's. What is it? G for the reporter, is it G-R-E-I-S-I-N-G?
A. I'm sorry? The spelling of her name is, what is it?
Q. G-R-E-I-S-I-N-G?
A. I believe so, yes.
Q. Okay. And you say, send me what you have regarding the operating agreement. She keeps telling me I have to take care of all this. Correct?
A. Yes.
Q. Okay. But it's your testimony that the 2009 operating agreement is that we just looked at as Exhibit 33 is the TMG operating agreement, right?

Page 171

A. TMG operating agreement is, yes, it's a TMG operating agreement.
Q. Okay. So really there's nothing to take care of because TMG already has an operating agreement at this point. Right?
MR. ARGIONIS: Objection to form. Go ahead. If you, if you understand or if you need more context from the texts.
THE WITNESS: Tell me what information you are asking, Matt.
BY MR. SHOWEL:
Q. Okay. She says, send me what you have regarding the operating agreement as she keeps telling me I have to take care of all this. Do you see that?
A. I do.
Q. Okay. And what is she telling you that you need to take care of?
A. We were in many, many discussions with Dean, going back and forth with trying to create an updated operating agreement. And we were going back and forth. So I asked, I was asking Dean, Dean, you know, I was doing my best to try to put together an agreement that we can both agree to and have it documented and updated so that Dean can be, become a member of TMG. So I was

Page 172

giving him the, you know, we need, Fran's saying we have to take care of this, updating the operating agreement. And I was asking Dean if he has any, you know, we went back so many different, so many times. I was asking him what information, you know, what else does he want to add or where is he on it? Because he--
Q. And it's yours--
A. --That's where we left off.
Q. Okay. And it's your testimony that as of January 24, 2020, you had exchanged draft operating agreements at that time?
A. I am not saying we exchanged draft operating agreements. We had numerous conversations at that time.
Q. Okay. So help me understand--
MR. ARGIONIS: (Indiscernible - simultaneous speech.)
MR. SHOWEL: Go ahead.
MR. ARGIONIS: And let me interject. If you remember the date that, I think it's well documented when the drafts were produced and they're in the documents, if you remember the specific date, tell him. If you don't remember the specific date, whether it was before or after January 24, don't guess because that's not going to help any of us if you're, if you're

Page 173

inaccurate on it.
THE WITNESS: I don't remember the dates exactly. So, no.
BY MR. SHOWEL:
Q. Okay. So if Dean's not a member, then you've got an operating agreement. What is the urgency to take care of all this?
A. I don't know how you, oh--
MR. ARGIONIS: --And let me, let me object to the use of the word urgency. I don't think I see that in the text message, but that's your implication, so I'll object to that. But if you understand the context or if you want to try to get it from this, go ahead.
THE WITNESS: Yeah, I, exactly. I don't see anything that speaks to that.
MR. SHOWEL: You don't think. Okay, so when you wrote, she keeps telling me, I have to take care of all this, we have to take care of all this part. There was no urgency involved there?
MR. ARGIONIS: Objection to form. Asked and answered. Go ahead, you can answer.
THE WITNESS: She was aware that I was in conversation with Dean, so she wanted. Listen, I hired lawyers to protect me in the business. So if I'm having

Page 174

conversations with them, they wanted to update and protect me in their efforts. So that's why she wanted us to get it done for that reason.
BY MR. SHOWEL:
Q. Let's take a look at Exhibit 36.
(Whereupon Exhibit No. 36 was marked for identification by the Court Reporter.)
Q. This is a four page document that begins with Bates number 498516 and ends on 519. I'll represent for the record that it's an email with its attachment. Ms. Gleckler, do you see an email to you from Dean Dussias on March 19, 2020?
A. I do.
Q. And it attaches a document called Kashwere Cares from phone call. Do you see that?
A. I do.
Q. And it says at the top of the attachment, front page of website, do you see that?
A. I do.
Q. Okay. And at the bottom of this, it says, be well, Merri and Dean, owners. Do you see that?
A. I do.
Q. Okay. This is the first draft that exists of

Page 175

this document, is it not?
A. Can I see the draft?
Q. Sure.
MR. ARGIONIS: And again, if you need to look at the dates or if you remember the dates, that's fine. But if you're guessing, I don't want you guessing on stuff. Could you scroll up and show her what date that was? Or this is March 19 of '20, this email?
MR. SHOWEL: Correct.
MR. ARGIONIS: 2020.
THE WITNESS: What was the date?
MR. ARGIONIS: March 19, 2020.
THE WITNESS: I know this could not be the first draft.
BY MR. SHOWEL:
Q. And how do you know that?
A. Because I, this was my idea to create this, and I wrote this, and it did not have Dean's name on it.
Q. Okay. And do you know who you sent it to when you first wrote it?
A. I can't recall who exactly got a copy of it, but I know it was reviewed, maybe. I don't know if a copy was sent, but it was reviewed with Dean and the person that was helping us at that time with the website

Page 176

doing a little bit marketing for us. So it was definitely discussed.
Q. Taking a look at what will be marked as Exhibit 37.
(Whereupon Exhibit No. 37 was marked for identification by the Court Reporter.)
Q. It's a six page document beginning with 361974 and ending in 979. I'll represent again, it's the email and its attachment. And do you see on your screen, Ms. Gleckler, an email from you to you dated October 6, 2021?
A. Yes.
Q. Okay. So you emailed that to yourself in October of 2021. Is that correct?
A. I don't recall, but okay.
Q. Well, based on what you see in front of you--
A. --That's what I'm saying. Yes.
Q. Okay. Do you have any reason to doubt that this is accurate?
A. No.
Q. Okay. And who is a little further down, there's an email from Jeffrey Chapman. Do you see that?
A. I do.

Page 177

Q. Who's Jeffrey Chapman?
A. He was Dean's friend that did a little bit of branding for us.
Q. All right. And so he's creating pages for the webpage here. Is that correct? Is that what he's talking about?
MR. ARGIONIS: Read the email.
THE WITNESS: I'm going to.
MR. ARGIONIS: Yeah, take. Take your time. Let them know if you need to scroll down, if there's something to scroll down to.
MR. SHOWEL: Just the attachment.
MR. ARGIONIS: Okay. (Pause.)
THE WITNESS: Okay.
BY MR. SHOWEL:
Q. All right. I'm going to scroll down to the first page of the attachment. It says front page website, and it's got that same language, the Merri Gleckler and Dean Dussias owner's language, correct?
A. Yeah.
Q. Okay. And this, in fact, this same document went through several edits, right?
A. Yes.
Q. Okay. And at no point did you ever edit out

Page 178

the owner's line, correct?
A. Incorrect.
Q. When did you edit out the owner's line?
A. It started without the owners. It started with CEO Merri Gleckler and became, based on Dean's request, for me to add the owners.
Q. Okay. So I will say for the record that I read that in your counterclaims, and I looked very hard for that document that says CEO, and I couldn't find it. Do you have any reason or do you know of any reason why it wouldn't have been produced in this case?
A. No, I don't know.
MR. ARGIONIS: And she relied upon us. We'll certainly check to see if that exists or if it was produced.
BY MR. SHOWEL:
Q. Okay. And this never was edited before. Well, let me ask, did this go on the webpage, this copy?
A. I don't remember the exact copy that went on the webpage.
Q. But the Merri Gleckler and Dean Dussias owners copy went on the webpage, right?
A. I believe, I believe so.
MR. ARGIONIS: Again, it's not a memory contest.

Page 179

So if you know it went on there, you know, if you don't, you don't. But, yeah, you don't need to guess.
(Pause.)
THE WITNESS: Are you waiting for me?
BY MR. SHOWEL:
Q. No, I don't have any question pending. I'm just going slow. And I thank you for bearing with me. There's a lot of documents to get through. And like I said, I'm not that bright and not that organized, so it's. It's a struggle. All right. Looking at what will be marked as Exhibit 38.
(Whereupon Exhibit No. 38 was marked for identification by the Court Reporter.)
Q. Which is a six page document beginning with 529412 and ending in 417.
MR. HICKMAN: Matt, can I stop you for a second?
MR. SHOWEL: Yep.
MR. HICKMAN: I just went on my Relativity and just looked at our production and I found the version that you're looking for. It just says Merri Gleckler, CEO.
MR. SHOWEL: Okay.
MR. HICKMAN: It's TMG 00529609.
MR. SHOWEL: Zero zero five two nine six zero nine.

Page 180

MR. HICKMAN: Yep.
BY MR. SHOWEL:
Q. Okay. All right. So this, Ms. Gleckler, do you see an email on your screen to Arum Malhotra?
A. Yes.
Q. All right. And it dated September 23, 2020?
A. Yes.
Q. All right. And this is a true and correct copy of a. Well, let me ask you a different way. Any reason to doubt that you sent this email to Arum on or about this date?
A. No.
Q. Looking at what will be marked as Exhibit 39.
(Whereupon Exhibit No. 39 was marked for identification by the Court Reporter.)
Q. Which is a document Bates stamp, TMG 76419. It's two pages. Ends on 420. And there's an email here at the top from Jack Mueller to John Bartlett, Collin Phillips and Tracy Gibbs. Right?
A. I see that.
Q. Dated 3/19/2020?
A. Okay.
Q. And if you look at the attachment, it's got a

Page 181

PNG extension. Do you see that?
A. I do.
Q. And if you scroll down to the attachment, it is what appears to me to be a, like a photo or a screenshot of a webpage. And it's got this Merri and Dean owner's language on there. Do you see that?
A. I do.
Q. Okay. Does this refresh your memory in any way as to whether this copy made it onto the webpage?
A. I don't know.
Q. Might this have been a, an image of a, like a test page that never went live?
A. I don't know what it is.
Q. Okay.
A. (Indiscernible - simultaneous speech.)
Q. Taking a look at what will be marked as Exhibit 40.
(Whereupon Exhibit No. 40 was marked for identification by the Court Reporter.)
Q. And do you recognize this document, Ms. Gleckler?
A. I don't see anything.
MR. ARGIONIS: Yeah. Could you give us the Bates

and scroll a bit?
BY MR. SHOWEL:
Q. Yeah. It's a three page document beginning with TMG 476958 and ending with... So these pages are not Bates numbered because they were produced in native. But these are, I will represent the attachments to the email. So these should be, you know, 959 and 960 or. No, I guess it would be one Bates number. Right? So it would be 959 because it's one.
MR. ARGIONIS: Yeah. I don't know. I don't know, Corey. Do, I don't know if you would know either. But.
MR. HICKMAN: I think (Indiscernible - simultaneous speech.) it's just one Bates number. I think.
MR. SHOWEL: Yeah.
MR. HICKMAN: I think.
MR. SHOWEL: Yes, I think that's correct.
MR. ARGIONIS: So it's kind of. It's an embedded image in the email?
MR. SHOWEL: No, it's an Excel spreadsheet. That was attached to the email.
MR. ARGIONIS: Okay.
BY MR. SHOWEL:
Q. So, Ms. Gleckler, on your screen, do you see an email from Dean to you dated July 4, 2020?



A. I do.
Q. All right. And you see the. The subject is David Lazar draft.
A. Yes.
Q. Okay. And the attachment is David Lazar hyphen Kashwere dot xlxs? Xlsx? Do you see that?
A. Yes.
Q. All right. And I'm going to blow this up a little bit so we can see the attachment. Do you recall receiving a copy of this cap table from Dean around this time?
A. I do.
Q. Okay. And there's a pre-money value section here, right?
A. Yeah.
Q. That indicates that you are a 70 percent owner and Dean is a 30 percent owner. Correct?
MR. ARGIONIS: Objection to form. To the extent you're trying to say that, that some kind of legally binding document, legal conclusion, if you're asking her what's on the document, I think that's a fair question. Go ahead. You could answer.
THE WITNESS: Yeah. This was a document Dean created, in hindsight, very cleverly, but it has no. It



was... David Lazar never asked to buy into Kashwere. Dean proposed this, that he buy into Kashwere.
BY MR. SHOWEL:
Q. Okay. You said very cleverly. Is it your testimony that Dean created this to create the illusion that he was an owner?
A. Dean was not an owner and a member of Kashwere at that time.
Q. Right. And I understand that that's your position. My question is slightly different. I'm asking you, is it your understanding that Dean created this because he was trying to create the illusion that he was an owner?
A. I believe the discussions. Well, yes. And I believe the discussions were that that was the anticipated agreement that we would possibly have. So if David joined, that he would also become a member and he was proposing. It was a Dean proposal.
Q. All right, let's take a look at what we've marked as Exhibit 41.
(Whereupon Exhibit No. 41 was marked for identification by the Court Reporter.)
Q. Exhibit 41 is a document Bates stamp, TMG



473681. It's a two page document. Second page is not Bates stamped because it's the native attachments. Ms. Gleckler, do you see on your screen an email from Dean to you and David Lazar?
A. Yes.
Q. Dated 7/23/2020?
A. Yes.
Q. Okay. For the record, I'll note that that's 19 days after the first version of the cap table we saw. And you see there's an attachment here that says David Lazar Two dash Kashwere dot xlsx. Do you see that?
A. I do.
Q. And if we scroll down over those 19 days, nothing has changed on the pre-money cap table. Right?
MR. ARGIONIS: I guess to the extent you're saying this, the whole cap table, she hasn't reviewed the whole thing. But if you're just saying the--
THE WITNESS: --paperwork--
MR. ARGIONIS: --The 70 and 30. That's the first time indicated on there. I think that's an easy thing for her to compare to, but I don't want her saying, I don't want her trying to bind her to the whole thing because she didn't.
BY MR. SHOWEL:

Page 186

Q. You're right, Jim. It was a bad. It was a bad question. Let me. Let me withdraw it and ask a different question. In this version of the cap table that was sent to David Lazar with you copied, you still see the pre-money ownership interests are represented as MerriG, 70 percent, and Dean Dussias, 30 percent, correct?
A. That's what the paperwork says, yes.
Q. Okay, so over those 19 days, you never said to Dean, well, Dean, hold on a second. You're not a member here. Let's, let's not send this out to David. Correct?
MR. ARGIONIS: I'll object to the form of that question. Calls for speculation. Mischaracterizes prior testimony. But go ahead. You can answer.
THE WITNESS: This was not. This was a proposal.
MR. SHOWEL: Okay. Did you ever clarify with David Lazar that Dean is not... Was not at this time, in fact an owner?
MR. ARGIONIS: Objection form. She just testified, it's a proposal, and therefore, I don't think... It's a bad question, but if you understand it, go ahead and answer.
BY MR. SHOWEL:

Page 187

Q. Seems like a pretty simple (Indiscernible - simultaneous speech.)
A. It was a proposal. There would be no reason. It was a proposal.
Q. Okay, so the short answer to my question is that, no, you never told David Lazar that this cap table is not accurate. Dean is not, in fact, a member?
MR. ARGIONIS: Objection to form mischaracterizes her testimony. But go ahead and asked and answered.
THE WITNESS: It was a proposal.
BY MR. SHOWEL:
Q. Okay, and in what way does that answer the question that I just asked?
A. This isn't an agreement. It's a proposal, and there are many different versions. There would be no reason to go. This was a proposal for David Lazar. Should he be interested, even though there was no, he never said he was interested. But Dean created this to see if he was interested.
Q. Okay. You said there's many different versions. Is there any version that doesn't reflect Dean's 30 percent ownership in the company?
MR. ARGIONIS: Objection to form. Are you asking if there's any other proposals by Dean that were less

Page 188

than 30 percent?
MR. SHOWEL: Well, I'm asking her about the comment that she just made about versions.
MR. ARGIONIS: Okay, I'll object to form. If you understand a question, you can answer.
THE WITNESS: I don't understand what he's trying to say, so, no.
BY MR. SHOWEL:
Q. Well, it's pretty simple. I mean, you said there's a bunch of different versions of this document, right?
A. You asked me if he has a are there any versions of or any versions of a non-70/30 proposal? I can't recall, so I don't. If that's what you're asking. Not sure exactly what you're asking.
Q. Yeah, that's pretty close. All right, let's take a look at Exhibit 42.
(Whereupon Exhibit No. 42 was marked for identification by the Court Reporter.)
Q. Forty two is Bates stamped 470606. It's a 21 page document. It's the one page email, and the attachment. The attachment runs through 626. Ms. Gleckler, do you see on your screen an email to Dean at

Page 189

Kashwere and Merri at Kashwere from TSA Mail? I'm sorry. TS Mail?
A. Yes.
Q. Dated approximately July 30, 2020?
MR. ARGIONIS: And not approximately. It's dated July 30, 2020, right?
BY MR. SHOWEL:
Q. It is. That's correct. I told you, I'm not that bright and mealy mouthed and every other thing, so thank you for the correction. It is dated July 30, 2020. Do you see that?
A. I do.
Q. All right. Who is Howard Simon & Associates?
A. They used to manage our payroll.
Q. Do they no longer manage your payroll?
A. They no longer manage our payroll.
Q. And when did that relationship break up?
A. I don't recall.
Q. In the last six months?
A. I don't recall.
Q. So you can't say for certainty whether it was two years ago or six months ago?
MR. ARGIONIS: Objection to form. Asked and answered. Go ahead.

Page 190

THE WITNESS: I don't recall.
BY MR. SHOWEL:
Q. Okay. Who decided to terminate that relationship, you or Howard Simon?
A. We did. I did.
Q. Okay. Why?
A. The Supporting Strategies dealt with another payroll company that they were much more familiar with, and they worked closer to how they work. It was just easier for them. So it was recommended that we change. We outsource our accounting.
Q. You outsource. And Supporting Strategies is your current bookkeeper?
A. Yes.
Q. And that's the bookkeeper that was hired by Dean Dussias, correct?
A. Yes.
Q. So if we scroll down to the page that's Bates numbered 470621, which is page 16 of this PDF, we see that Dean Dussias is receiving a draw here. Do you see that?
A. Yes.
Q. Okay. Do you have any reason to doubt that you received this report in your email?

Page 191

A. This report? I can't confirm that.
Q. Well, this is your email, correct?
A. Yes.
Q. Okay. And it was your email on July 30, 2020, correct?
A. Yes.
Q. Okay.
MR. ARGIONIS: Can you. Can you scroll up at least for my benefit?
MR. SHOWEL: It's as high up as I can go.
MR. ARGIONIS: Oh, we're not. Wait, it's still showing--
THE WITNESS: --blank.
MR. ARGIONIS: No, mine's showing the page.
MR. SHOWEL: I think you must have a lag, Jim, because...
MR. ARGIONIS: Yeah, there we go. No, it's up there. It did say. Now it says my Internet was unstable. Got it. It was my computer. Sorry. Go ahead.
BY MR. SHOWEL:
Q. Yeah, no worries. So this was your, your email address on July 30, 2020, was this Merri at Kashwere.com?

Page 192

A. Correct. Right.
Q. Okay. So do you have any reason to doubt that you received this email?
A. No.
MR. ARGIONIS: And when you're, when you're done with this exhibit, Matt, let's take a quick bathroom break for me. But whenever you're done with it, it's fine.
MR. SHOWEL: I'm done with it. We can go off right now if you'd like.
MR. ARGIONIS: Yeah, let's just take a, whatever, three minute, five minute break. Whatever, three minute break to 2:55 your time.
MR. SHOWEL: You got it. That's fine by me.
MR. ARGIONIS: Thanks.
THE REPORTER: We are off the record at 2:52 p.m. okay.
(Whereupon a short recess was taken.)
THE REPORTER: So with that we are back on the record at 2:58 p.m.
BY MR. SHOWEL:
Q. Good job everybody on a nice short break. All right. Taking a look at what will be marked as Exhibit

Page 193

43.
(Whereupon Exhibit No. 43 was marked for identification by the Court Reporter.)
Q. Sorry, bear with me. It's. Was looking for those. I gotta go find it. All right. Exhibit 43 is a one page document that is Bates stamped 590668. Ms. Gleckler, do you have an email on your screen to Ray Conway from you?
A. Yes.
Q. Okay. And who is Cheryl Borland?
A. She was my previous attorney.
Q. Okay. And you state to Ray. Ray, I reiterated what we discussed with Cheryl, that Dean and I need to have our operating agreement finalized prior to TMG filing our return. Do you see that?
A. I do.
Q. Okay. What was the significance of having the operating agreement finalized prior to filing a tax return?
A. Well, we needed to, we need an updated operating agreement if we were going to include Dean as a member and we didn't have that.
Q. Okay. And as you sit here, do you know why

you wanted to have that done before filing a tax return?

MR. ARGIONIS: If, if you remember. Because it says like--

THE WITNESS: --For this particular email. No, I don't.

MR. ARGIONIS: I just want to remind you if it's not, I don't think he's trying to be tricky or anything. But if you, if you remember the reason, then give it to us. But if you don't remember or you know it was based on. Yeah, don't speculate. Right. That's all.

THE WITNESS: I don't remember this email at all.

BY MR. SHOWEL:

Q. Okay. Any reason to think that you did not send this email to Ray and Cheryl?

A. I just don't remember the email.

Q. Okay. But I'm asking sort of what is a silly legal foundational question. I'm just asking you if you have any reason to doubt that you did in fact send this email.

A. No, I see that it's, it was from me.

Q. Okay. Take a look at what will be marked as Exhibit 44.

(Whereupon Exhibit No. 44 was marked for identification by the Court Reporter.)



Q. Five page document, Bates stamped TMG 162671, runs consecutively to 675. At the top, there's an email from you to Lisa Jadis, J-A-D-I-S. Do you see that?

A. I do.

Q. Dated April 3, 2021, correct?

A. Yes.

Q. Who's Lisa Jah-dis? (Phonetic.)

A. Jay-dis, (Phonetic.) my sister and an employee of Kashwere.

Q. Is she currently an employee of Kashwere?

A. Yes.

[redacted]

Q. And a little further down, we've got an email from you to your Gmail account also dated April 3, 2021, correct?

A. Yes.

Q. And it appears as though you're making notes in response to this email from Dean Dussias. If you need to take a minute and read your notes, you sure can. It's a pretty long email and the notes are fairly long.

MR. ARGIONIS: Yeah. Take your time. If you can ask your questions about it, other than if it came from



her email address, then yeah, she should take some time to read it. And she'll let you know when the scroll.

THE WITNESS: (Pause.) Can you scroll, please? Oh, too much. Thank you. (Pause.) Can you scroll, please? (Pause.) Please scroll. (Pause.) Is that it, the end of email?

BY MR. SHOWEL:

Q. Yeah, until we get to Dean's email. But my question is a little simpler. I'm just asking you, these are notes that you wrote to yourself in response to Dean's email. Is that correct?

A. I believe it's incorrect.

Q. Okay.

A. I think that was sent. Yeah, it's incorrect.

Q. Okay. What is it then?

MR. ARGIONIS: And I would take a look down, is Dean's email attached and what's the date of it?

MR. SHOWEL: Oh, yeah. I mean, it's all for. It's all part of one thread. So on April 2, 2021, Dean sent Merri an email that goes on at some length. And again, I'm just trying to understand the nature of what Merri sent to herself.

MR. ARGIONIS: Yeah. Why don't you take a peek at what this is?



THE WITNESS: I'm going to read his email. (Pause.) Can you please scroll? (Pause.) Can I just ask, is there, how far down does this go? Because I feel like I'm reading it backwards. I don't, where. What is the stemming from?

MR. SHOWEL: It looks like Dean's. I mean, I can tell you what it looks to me. It looks to me like Dean sent you a long email on April 2.

MR. ARGIONIS: Of 2021. Keep in mind.

MR. SHOWEL: Correct.

THE WITNESS: April, yeah.

MR. ARGIONIS: Yeah, yeah. Yes. (Indiscernible - simultaneous speech.)

MR. SHOWEL: Look, if your-- if your answer to this whole thing is I don't remember, that's fine. I'm just...

MR. ARGIONIS: Yeah.

MR. SHOWEL: And then--

MR. ARGIONIS: Right. It's not like we said, it's not a memory context.

MR. ARGIONIS: Look at it closely. If you remember the context, you remember what you were doing. Answer, but don't try to guess and give us something that might be inaccurate. I don't think that helps anybody.

Page 198

THE WITNESS: What is the question? I guess. What is the question? What do you want to...
BY MR. SHOWEL:
Q. I'm asking about the email that you sent to yourself. And I'm simply asking. I thought it was a pretty straightforward question. I apologize if that's not correct. Are these just notes that you made to yourself in response to Dean's email?
A. I can't remember what, what that was specifically.
Q. Got it. That's all. I.
A. Sorry, I did. I didn't know that's what you wanted to know.
MR. ARGIONIS: No, but regardless, take the time to read it because if there's more.
THE WITNESS: Well, can I. I. Yeah, even. It's not, it's.
MR. ARGIONIS: No, you're, you're fine.
THE WITNESS: I think I should be reading from the bottom up. It doesn't make sense.
MR. ARGIONIS: Okay. For the next one, we'll do that. We'll start with the chronological order and go upward for you.
MR. SHOWEL: All right, so take a look at what will

Page 199

be marked as Exhibit 45.
(Whereupon Exhibit No. 45 was marked for identification by the Court Reporter.)
MR. SHOWEL: It's a three page document, HS 826, ending with 828. I'll just represent for the record that it's an email with its attachment.
MR. ARGIONIS: And Merri, for your benefit, these were documents. If they're Bates labeled HS, they came from the subpoena you issued to Howard Simon. Right, Matt?
BY MR. SHOWEL:
Q. That is correct. And Ms. Gleckler, you should have an email to you and Ray Conway from Michelle Thompson on your screen. Do you see that?
A. I do.
Q. Dated September 29, 2021. Is that correct?
A. Yes.
Q. And a little further down in the thread, there's an email from Michelle Thompson to you on February 16, 2021. Do you see that?
A. I do.
Q. And do you have any reason to doubt that you received that email?

Page 200

A. I don't remember this email, but I don't. So I don't know if I received it or I didn't receive it or see it.
Q. All right. Was this your email address?
A. That's my email. Yes.
Q. As of February 16, 2021?
A. Yes.
Q. Okay. And, and any reason to doubt that you received this email at the very top on September 29, 2021?
A. There would be no reason to think I didn't receive it. It is my email.
MR. ARGIONIS: And just to clarify. It's her name on there. I think we'd have to hover over it, but, you know, to make sure it's not going to work on a PDF. But her name is on that email. But it doesn't specifically have the email address on that particular one you're looking at.
BY MR. SHOWEL:
Q. That is true.
A. Right.
Q. So as of this date, as of February 16, 2021. You were advised that by Michelle Thompson that Dean Dussias was being paid a draw, correct?

Page 201

A. That's what that email says, yes.
Q. Take a look at what will be marked as Exhibit 46.
(Whereupon Exhibit No. 46 was marked for identification by the Court Reporter.)
Q. It is a 24 page document beginning with TMG 416384. It's an email with the attachment. The attachment runs through 6407. Ms. Gleckler, on your screen, you should see an email from Dean to Ray Conway with you CC'd on there. Do you have that?
A. I do.
Q. Dated September. I'm sorry, jeez. Dated February 16, 2021, correct?
A. Yes.
Q. And it appears that Dean is attaching a Kashwere limited liability company agreement in Word format, correct?
A. That's what it shows, yes.
Q. And a little further down, there's an email of the previous day, February 15, 2021, in which Dean says, Merri and I spoke today and would like you to review the attached agreement. You see that?
A. I do.

Page 202

Q. All right, let's take a look at what will be marked as Exhibit 47.

(Whereupon Exhibit No. 47 was marked for identification by the Court Reporter.)

Q. Exhibit 47 is a four page document, begins with 410243, runs to 410246. It's another email with a one page attachment. Ms. Gleckler, you should have on your screen an email from Ray Conway to you and Dean Dussias. Do you see that?
A. Yes.
Q. Dated February 19, 2021. You see that?
A. Yes.
Q. And Mr. Conway is attaching a PDF document called Kashwere op agreement review notes, correct?
A. Yes.
Q. And if we scroll down to the last page of this document, there is, what I will represent is the attachments, which is Bates stamped 410246. And do you see these numbered paragraphs here?
A. I do.
Q. Okay. Do you recall receiving this from Ray Conway?
A. I don't.

Page 203

MR. ARGIONIS: And this attached to, if you could scroll up, Matt?
MR. SHOWEL: Yes.
MR. ARGIONIS: February 19, 2021. Email, right?
MR. SHOWEL: Yeah. What did I say?
MR. ARGIONIS: Okay. No, I'm just wanting to clarify because I couldn't see it.
BY MR. SHOWEL:
Q. All right, let's look at this. First numbered paragraph says, could we do same day as pet (Phonetic.) Cedric's payout? And it goes on from there. Do you see that?
A. I see that.
Q. And it says, Dean could be allocated a one cent capital interest at that time with no profits interest until his buy-in on July 1, 2020. Do you see that?
A. I do.
Q. Okay, so you guys were drafting an agreement that assumed that, or stated I should. I don't want to say assumed. That's going to be a loaded word. I could see Jim just itching to object all over that one, but. All right, so you guys--
MR. ARGIONIS: --We'll note your objection for the

Page 204

record.
MR. SHOWEL: Yeah. You guys were negotiating an agreement that stated that Dean bought-in on July 1, 2020, correct?
MR. ARGIONIS: I'll object. And I'll object to the format. It doesn't seem to be in the right tense there with the 2021. But again, if you remember this document in the context, you could testify.
THE WITNESS: I don't remember the document.
BY MR. SHOWEL:
Q. Well, let's go back and look at the previous exhibit. Let's go back and look at 46, taking a look at what was previously marked Exhibit 46, which again begins with Bates number 41634-- 384 and if we scroll down and look at the attachment, it says this limited liability company agreement is made and entered into this 23rd day of February, 2021. Correct?
A. That's what that says.
Q. Okay. And effective as of July 1, 2020. Correct?
A. That's what that says.
Q. Okay.
MR. ARGIONIS: And scroll down. That's an unsigned version, right?

Page 205

THE WITNESS: Wait.
MR. ARGIONIS: Yeah.
MR. SHOWEL: Oh, yes. It's a draft agreement that I, was never signed to my knowledge.
MR. ARGIONIS: Okay. Just show it to her that it's a...
THE WITNESS: Dean had created this.
MR. ARGIONIS: Okay, well, there's no. Let him ask you a question about it. I just want you to, when you're looking at a document, just take a look at what it is. But I guess, Matt, I don't know if it came up on your computer, but it's an unsigned version of something that we produced, a TMG document. But go ahead. Sorry.
MR. SHOWEL: Yeah, correct. My question is real simple. You guys were asking Ray to comment on a document in February 2021 that said that Dean had bought-in on July 1, 2020. Correct?
MR. ARGIONIS: I'll object to the form of the question as to you guys asking Ray, but you can answer.
THE WITNESS: This agreement wasn't a we. This is agreement created by Dean and sent to Ray, and this was Dean's document.
MR. SHOWEL: Okay. Did you read it when it got sent to Ray?

MR. ARGIONIS: And again, if you remember.
THE WITNESS: I was going to say, I don't recall.
MR. ARGIONIS: Yeah. Without scrolling through the whole document and looking at which draft this is, because I don't know which draft it is either. I would just caution you. If you remember, you remember. If you don't, you don't.
THE WITNESS: I don't remember this document.
BY MR. SHOWEL:
[redacted]
Q. Bear with me one second.
MR. ARGIONIS: And, Matt, I'm not going to hold you necessarily because you do have time, but do you have an estimate of when so that we can determine whether we do a dinner or anything? Or anything like that, or how long you're going to take?
MR. SHOWEL: We are not doing dinner. I will get



you out of here before dinner. I promise.
MR. ARGIONIS: And. And then, yeah, we'll probably take a break in a little bit. But why don't you go ahead with that understanding, then we won't have to arrange for dinner. We'll keep going. We'll just take some bathroom breaks as needed.
MR. SHOWEL: Oh, it's 2:25 where you are, right?
MR. ARGIONIS: It is. No, we're earlier than you. It's 1:25. We just got started earlier than you guys, obviously. We're two hours, up earlier.
MR. SHOWEL: Okay, take a look at what will be marked as Exhibit 48. Oh, I'm not sharing my screen, am I?
(Whereupon Exhibit No. 48 was marked for identification by the Court Reporter.)
MR. ARGIONIS: No.
THE WITNESS: No.
BY MR. SHOWEL:
Q. All right. Exhibit 48 is a two page document that begins with TMG 464589 and ends on the next page. And Ms. Gleckler, you should have an email on your screen from you to JCB London House. Do you see that?
A. I do.



Q. Who is that person?
A. He's a distributor. Or was a distributor.
Q. All right, is this a true and correct copy of an email that you sent on or about February 27, 2021, to Mr. London House?
A. I don't remember this email per se, but it shows that I sent it.
Q. Okay. No reason to doubt that you sent it?
A. Right.
Q. And at this time, were you working on the new website efforts?
A. I don't remember.
Q. Let's take a look at what will be marked as Exhibit 49.
(Whereupon Exhibit No. 49 was marked for identification by the Court Reporter.)
Q. There's a two page document, begins with. Whoops. Oh, man. It begins with TMG 180792. And it's got the attachment which goes on to page, it's got a little Bates stamp in the corner, but it's got to be 793. I can blow it up for you if you'd like to see. It's gonna be really hard.
A. Too big.



Q. Yeah, well, I'm just trying to show the Bates number. There's the 793 Bates number in the bottom.
MR. ARGIONIS: Okay. It's lagging a bit, but okay.
BY MR. SHOWEL:
Q. All right, so on your screen, Ms. Gleckler, you should have an email from you to Sprinkles. You see that?
A. Yes.
Q. Sprinkles looks like maybe it's your personal Gmail account?
A. Yes.
Q. Okay. Dated 3/27/21, correct?
A. That's what it says.
Q. All right. And in this email, you state, here is what Dean created. 2/22/20. Correct?
A. That's what it says.
Q. All right. Now I'm going to scroll down and look at the attachment. Well, let's. If you look at the attachment, it's got IMG 5943 dot jpg. Correct?
A. That's what it says.
MR. ARGIONIS: And before, before you scroll, give an opportunity to review this so that you.
THE WITNESS: Can see the whole thing.
MR. ARGIONIS: You can't see the thing. Take a

look at the. It's not that long before I scroll so that you can hopefully get context.

MR. SHOWEL: Yeah. Just so you know, there's going to be no substantive questions on this email, just foundation. But...

MR. ARGIONIS: Let her take a look at it, though, so that she knows what the document is. And, Matt, for your reference, we're certainly not going to say that there's, that, this isn't something that was produced from our records if it's Bates labeled with TMG on it. But we can proceed. Go ahead. Wait, she didn't get to read it. I'm sorry. The go ahead was to Merri. She didn't finish reading it.

THE WITNESS: Yeah, I don't. Okay.

BY MR. SHOWEL:

Q. All right. So I'm going to have to mess with this attachment to get it to be legible. Okay. To the best of your recollection, or if you recall, this is a term sheet that Dean sent to you or gave to you or handed to you on or about February 22 of 2020?

A. I don't know when I was given it. It's dated February 22, 2020, and it was written by Dean.

Q. Got it. Take a look at what we marked as Exhibit 50, which is Bates stamp TMG 391187.



(Whereupon Exhibit No. 50 was marked for identification by the Court Reporter.)

Q. It's a two page document consecutively Bates numbered. Ms. Gleckler, you should have on your screen an email from Rachel Melgar to you. Do you see that?

A. I do.

Q. Who is Rachel Melgar?

A. She was our payroll contact at H. Simon.

Q. All right. And a little further down, on May 17, 2021, there's an email from you to Rachel Melgar, correct?

A. Yes.

[redacted]



[redacted]

Q. Well, Dean changed his status in July of 2020, correct?

A. I don't know exactly when he changed it, but it was without my knowledge.

Q. Well, you received regular payroll reports from H. Simon, correct?

A. Is your question, do I receive payroll reports from H. Simon? I'm not understanding what your question



is.

Q. Yeah. Every two weeks, you received a payroll report from Howard Simon, correct?

A. I do many things with Kashwere. I don't scrutinize the payroll reports. So possibly, yes, but I rely on the people in place to take care of the business at hand.

Q. Okay. And we looked at an email a few minutes ago, in three months prior to this, in February, in which Michelle Thompson told you that Dean was being paid on a draw. Correct? Do you recall that?

A. Now, I can't remember what that Dean-- What that email was all about.

Q. Well, let's go back to 44... Whoa, wrong one. Oh, I'm sorry, 45, which again is Bates stamped. Howard Simon, H2-- 826 HS 826. And Michelle Thompson says, I noticed that Dean Dussias received a draw. Do you recall us discussing that?

MR. ARGIONIS: Yeah. And could you scroll up? I. Was there a response to. Oh, no, it goes to the other email. Okay.

THE WITNESS: I think I answered that. The email was sent to me. I don't know if I saw or acknowledged the email. If it was acknowledged, it would have been

anticipation that Dean was going to be my partner, but he never. And a member of TMG, and he never was. So that's my answer.

MR. SHOWEL: Okay. So it was okay that he was being paid a draw, then that was fine?

MR. ARGIONIS: Objection. Mischaracterizes her testimony. Go ahead. You could answer.

THE WITNESS: It was with the anticipation of him becoming a member of TMG.

BY MR. SHOWEL:

Q. Take a look at what we marked as Exhibit 51.

(Whereupon Exhibit No. 51 was marked for identification by the Court Reporter.)

Q. And I apologize. I went out of order. I told you I'm disorganized and not that bright. But a few minutes ago, we looked at a couple of exhibits. They were 46 and 47, in which we looked at an operating agreement dated February of 2021 that said it was going to be effective as of July 2020. And you stated that that was Dean's draft agreement. You had nothing to do with it. Do you recall that?

A. I said it was Dean's agreement.

Q. Right. Okay. Do you recall that line of



questioning?

A. I do.

Q. Okay. And then we looked at some commentary from, we looked at one page of notes from Ray Conway. Do you recall that?

A. Yes.

Q. Okay. And...

A. I'm sorry. I recall you showing me his notes. I don't recall the notes.

Q. Sure. Why don't we just go back and take a look at it. Let's see. So right now we're looking at Exhibit 47, which is TMG 410243, which we discussed previously. It's Bates stamp 410243. And it's an email from Ray Conway to you and Dean. Right. Do you see that?

A. Yeah. Yes.

Q. And you see that he says, Ray Conway says, I have us tentative for tomorrow, but not a specific time. Do you see that?

A. Yes.

Q. All right. Now let's go look at what we just marked as Exhibit 51, which is TMG 44374. And it's an email from you to Dean and Ray, correct?

A. Yes.



Q. All right. And you see earlier in the thread, the email we just talked about in which Ray says, I have us tentative for tomorrow, but not at a specific time. Right?

A. Yes.

Q. Okay. And you respond, thank you, Ray. I would like to discuss, Dean is a member, not a manager. Do you see that?

A. Yes.

Q. Okay. So it's your position that your statement here was not actually correct. Dean. Dean was not a member at this time?

MR. ARGIONIS: Objection to form. Go ahead.

THE WITNESS: Dean. In Dean's paperwork. And he, I was telling Ray that although Dean called himself a member and a manager, he was not going to be a manager. He was never going to be a manager. So I was telling Ray he would, he was only going to be if we had an agreement, a member and never a manager.

MR. SHOWEL: So let's take a look at what we marked as Exhibit 51.

MR. ARGIONIS: I thought this was 51, right?

BY MR. SHOWEL:

Q. Oh, it was. You're correct. So we'll go on



to what will be March as Exhibit 52.

(Whereupon Exhibit No. 52 was marked for identification by the Court Reporter.)

[redacted]

[redacted]

MR. SHOWEL: Okay. You recall a little while ago we discussed Exhibit 33, which is the TMG operating agreement. I can show it to you.

MR. ARGIONIS: Yeah, why don't you pull it up?

BY MR. SHOWEL:

Q. Do you recall discussing this document?

A. Yes.

Q. Bates stamped 590558?

A. Yes.

Q. Did you ever execute an Exhibit C or take any other corporate action on behalf of TMG to admit yourself as a member individually? Or did you just go ahead and do it on your own?



A. I rely on my, my legal partners to do all that for me. I'm not sure what was done or needed to be done. I did whatever was needed.

Q. Okay, so you don't recall whether or not you ever executed any document admitting yourself individually as a member of TMG Kreations?

A. I don't recall what was done. No.

Q. And you don't recall ever having any conversations like that with your attorneys?

A. No.

Q. Okay. And if you had documents in which you did that, they would have been produced in this case, correct?

MR. ARGIONIS: Well, I'll object to that to the extent that they were asked and responsive. And if we missed something, we'll certainly go back and do it. But as I sit here today, I don't know what, and I guarantee you Merri won't know what was specifically asked without going through it. But if there was some kind of formal writing that added that member on that tax return, we'll certainly, Corey and I will search the database to see if it was produced and if it exists, we'll certainly produce it. But if you recall, it's certainly fair game. If you don't, then.



THE WITNESS: I don't know.

BY THE WITNESS:

Q. All right, let's, while we've got Exhibit 33 up, let's scroll down to paragraph 4.1. And paragraph 4.1 states that the business of the company shall be managed by the members. Do you see that?

A. I do.

Q. Let's take a look at what will be marked as Exhibit 53.

(Whereupon Exhibit No. 53 was marked for identification by the Court Reporter.)

Q. And these are documents that I pulled off the State of Arizona's Secretary of State's website. They're publicly available.

MR. ARGIONIS: This is what, Exhibit 53?

MR. SHOWEL: Yeah.

MR. ARGIONIS: Okay.

BY MR. SHOWEL:

Q. And this document here says that TMG is not member-managed like the operating agreement says. It says that it's manager-managed. Do you see that?

A. I do.

Q. Okay. Did you ever amend the TMG operating



agreement, the 2009 operating agreement to change the structure from being manager-- member-managed to manager -managed?

A. I don't know what was changed at that time.

Q. Well, how do you not know?

A. I relied on my lawyers to help keep the company updated.

Q. Is this your signature?

A. It is, but I would have been working with my legal. I may have signed it, but they would have guided me into what was needed.

Q. Okay, so you don't know whether or not there's a. As you sit here today, you don't know whether or not there's an agreement out there or a document out there that amended the 2009 operating agreement to make TMG a manager-managed LLC?

A. I don't know.

Q. And you see here, it identifies both Merri Gleckler and MerriG LLC as managers. Do you see that?

A. I do.

Q. Okay. It's correct that both MerriG LLC and Merri Gleckler individually are members of TMG, correct?

A. Correct.

Q. And it's also true that they are both managers

of TMG, correct?
A. Yes.
Q. Do you recall ever executing any amendment to the 2009 operating agreement to identify both Merri Gleckler individually and MerriG as managers of TMG Kreations?
A. I don't recall what was done after Cedric was gone.
Q. And is this your signature here?
A. Yes.
Q. Take a look at Exhibit 54.
(Whereupon Exhibit No. 54 was marked for identification by the Court Reporter.)
Q. Exhibit 54 is a 66 page document, Bates stamped JPM 2206. In the lower right of the first page, it continues to JPM 2271. These are documents that were produced by JP Morgan in response to a subpoena. And on the first page, Ms. Gleckler, you should see something that says user data.
A. Yes.
Q. Do you see that?
A. Yes.
[redacted]



[redacted]



[redacted]

[redacted]



[redacted]

[redacted]

[redacted]

[redacted]



MR. SHOWEL: Why don't we take a break right now? How's that sound?

MR. ARGIONIS: Yeah, why don't we take a short break? It's 4:08 your guys' time. How long do you want, man?

MR. SHOWEL: How about ten minutes?

MR. ARGIONIS: Sounds good. Or let's say 4:20. Just put it on-- here off the.

THE REPORTER: We are off the record at 4:08 p.m.

(Whereupon a short recess was taken.)

THE REPORTER: We are back on the record at 4:24 p.m. Please proceed.

BY MR. SHOWEL:

Q. Ms. Gleckler, at the beginning of the deposition, we talked a lot about your counterclaims against Dean and the website and Bergen and issues like that. Do you recall that?

A. I do.

Q. Okay. Is it your contention that Dean wasn't trying to do a good job?

A. I don't know what Dean's contention was.

Q. Okay. So as you sit here, you don't know whether or not Dean was actually trying his best to do a



good job?

A. I don't know if it was he wasn't trying or he couldn't. He wasn't capable of. He portrayed, he told me he was, and that didn't happen. So I'm not. I can't say for sure why it didn't happen, why he couldn't execute certain things.

Q. Okay. Do you believe that Dean was malicious toward TMG in the way he executed his various mandates?

MR. ARGIONIS: And. And let me object to the record. Are you, cause there's different allegations here. Are you talking about the website stuff and the business related stuff or the allegations in the counterclaim that he did do some things behind Merri's back that were, I won't characterize them, but there's a distinction there between those things that I think you should clarify as to what you're talking about.

BY MR. SHOWEL:

Q. Okay, so for example, for example, the website. Is it your contention that Dean wanted the website to fail?

A. I don't know what the issue was. I don't know. I don't know why certain things were ignored. Does that mean he wanted it to fail or he didn't, you know, it could be a number of things. Why would you



ignore something? I can't answer that. I don't know.

Q. And what is it that you're saying that he ignored?

A. The example I gave was, you know, he was told, you know, you're going to ruin the spiders. Nobody did anything about that, didn't concern him. When the issues were brought to his attention, he blamed it on market. I don't know what the issue was. What I do know is that the website that he spearheaded and was supposed to be responsible for was a disaster and what was committed to was more than I agreed upon, and it was done behind my back. So I don't know the reasons for that sitting here today.

Q. And when you say it was done behind your back, you mean the, what, what is referred to in your pleadings as the handshake agreement with Anatta?

A. The gentleman's agreement that (Indiscernible - simultaneous speech.) Anatta told me. Yeah.

Q. Okay.

A. Quote unquote.

Q. And where does that quote come from?

A. Anatta.

Q. Is it your contention that Anatta was not a, sort of a reasonable selection to do this work?

A. I don't know what the issue was. I also don't know. Part of the issue were invoices that were due Anatta, with the gentleman's agreement that I was not made aware of, that was for more time than I was aware of. So why did it take so long? I don't know. You know, there were a lot of issues with that website that I was unaware of.
Q. And you mentioned the spiders a few seconds ago.
A. That's layman's way of, yes.
Q. Okay. And I. In the documents, I can tell you that I've seen the term crawlers used. I don't know if that's the same as spiders, but at any rate, let's stick with spiders. Do you have any idea? So when you say he got information about the spiders, you mean he got information from Collin, right?
A. It was from Collin. It was also based on the performance of the website or not-performing website at that time. So, yes.
Q. Okay.
A. It wasn't something Collin made up.
Q. Okay. But do you know whether or not Dean took that information and sought out a second opinion, for example, from Anatta or from anyone else?



A. I don't know that. But I know there was nothing changed at that time. And then it did get changed. So I know it was possible to fix.
Q. Okay, what time frame are you talking about that. This was pointed out to Dean?
A. While Dean was still with Kashwere.
Q. Okay. But you're not able to say--.
A. --Building the website. During. During. While Anatta was working with us and the website. Exactly when, I can't answer that.
MR. ARGIONIS: So from the time that they brought on until sometime before Dean is the best estimate.
THE WITNESS: Yeah.
MR. ARGIONIS: Okay.
BY MR. SHOWEL:
Q. Similar line of questioning for Bergen. Is it your suggestion that the problems with Bergen happened because Dean didn't try to do a good job?
A. I can't. I don't know if Dean tried to do a good job. I know that clearly Dean was incapable of defining what is needed for Bergen to do a good job. There was no details. The situation that we dealt with was not specific enough.
Q. And do you know. Let's go back to Anatta for



a second. Sorry to flip around here, but, you know, do as you sit here, do you know, do other. Well, let me. Let me step back a second. Accurate for me to say that Kashwere is a, I don't know. How would you describe the business?
A. In what, regarding what?
Q. Well, you know, what type of seller is your primary line of business, direct to consumer or what? How would you categorize the business? And here, let me just let you know where I'm going with this. I'm curious as to whether you know whether or not other similarly situated businesses use Anatta for website development.
A. I have no idea who. What companies use Anatta for their websites.
Q. Okay. And similar question for Bergen. Do you know whether or not companies that are similar to yours use Bergen for their logistics needs?
A. Not logistics. 3PL.
Q. 3PL?
A. 3PL.
Q. Sorry about that.
A. It's Okay. I will tell you. The owner of the company had said that a company our size and our needs



should not have been put in a Bergen type of facility.
Q. Okay. And when did the. Do you know the name of the individual that said that to you?
A. His name was Ron.
Q. Ron. And did he say that to you via email or via telephone?
A. No. During a call. Phone call.
THE REPORTER: Is that Ron? R-O-N?
THE WITNESS: Yes.
THE REPORTER: Thank you.
THE WITNESS: You're welcome.
BY MR. SHOWEL:
Q. What, your counterclaim mentions reputational harm a number of times. How do you know what reputational harm has Kashwere suffered?
A. Our consumer base. We had seen so many issues with our consumers. Again, shipping delays, incorrect shipping, double shipping, wrong products. So that would affect not only direct to consumer, but wholesalers. And when somebody is purchasing their Christmas gifts and puts their emphasis into your products to meet their needs and you don't meet them, they're not coming back.
Q. Okay. And that last example that you gave

with Christmas gifts and you're not reaching, satisfying the customer's needs. Are you referring to a specific instance?

A. There are many instances, both wholesale, retail.

Q. And do you have those instances identified in any way, shape or form? Like, do you have a list of them?

A. A list where I could just hand over a list? No.

Q. And at one point in this deposition, you mentioned consumer confidence. Is that similar in your mind, to the reputational harm?

A. Yes. Yes.

Q. I mean, is there a distinction? And I'm not. I'm just trying to understand if they're the same thing or if there's a separate injury for consumer confidence that you're aware of.

A. Let me just think about the different harms. Signing documents behind my back, telling employees not to, or anybody else, for all I know, telling employees not to share information with me, belittling me with employees and outsiders, that's not. You know, it's a poor reflection on not only myself but the company.



Q. And is that something for which you're seeking damages?

A. Well, we lost customers, definitely. You know, I personally had to call some customers to try to keep them. We don't really know who didn't come back, who relied on us. Boxes were falling apart. Bergen was shipping boxes that were, you know, weren't either packed correctly. They were shipping four pieces in a box that would hold ten pieces and overcharging and, you know, when the UPCs, when the integration never happened, we weren't shipping. There's a multitude of things. Everything seemed to be a domino effect of something else. When you're--

Q. --Go ahead.

A. I'm just going to say, when you're a luxury brand, details matter. Customer service really matters.

Q. Did in the history of the. Well, let me, let me ask this a different way. Was, was Lazar paid as a 1099?

A. Yes.

[redacted]



[redacted]

BY MR. SHOWEL:

Q. Your counterclaims raise some problems with the conversion to NetSuite. Does that sound familiar to you?

A. Yes.

Q. Okay. And as you sit here, are you able to say what problems with NetSuite that you believe Dean caused and that you're seeking damages for?

A. Some of them. Maybe not all of them. Yes.

Q. Okay. What are they?

A. The mapping in NetSuite was a disaster. Nothing it. Nothing connected. If it connected, it was connected improperly. Nobody, to start with, nobody was trained on NetSuite. So there was an exorbitant amount of money having to, Dean. There was one, I guess, path, let's call it, of training that Dean gave to himself. And literally we were shoved into this new platform that nobody knew how to use. So we had to purchase training



libraries. We had to get outside NetSuite people to help us reconfigure the way it was reconfigured because it didn't work. So to try to manage the business on a daily, day to day basis where nothing's working, it was a nightmare.

Q. And why was the switch to NetSuite made in the first place?

A. Dean had recommended we do it. Everything was always to scale. That's what he said, to scale. Everest was a system we used for many years. Inventory was duplicated and Dean was made aware of it when we moved over and did nothing about it. I mean, there were numerous problems with NetSuite.

Q. Okay.

A. On top of us not being familiar how to work it, use it.

Q. What is Loop Returns?

MR. ARGIONIS: You were breaking up there. What did you say?

BY MR. SHOWEL:

Q. What is Loop L-O-O-P Returns?

A. It's something that helps with returns.

Q. Okay. And your counterclaims raise an issue with Loop Returns. Can you tell me what problem you

Page 242

believe that Dean caused with Loop Returns?
A. Dean signed an agreement with Loop Returns before the website was even created or finished. And we paid for a year and it sat there for no reason.
Q. There's something in your counterclaims about Zonos, and Zonos is Z-O-N-O-S, and Avalara, which is A-V-A-L-A-R-A. Do you recall that?
A. Yes.
Q. Okay, let's start with Zonos. What is Zonos?
A. Zonos deals with international shipping where somebody internationally comes on and it's given the ability to ship and quote international shipping. And we had a couple of customers that were repeat customers and they got very annoyed because they tried to order a couple of times and everything. It wasn't connected. So although I was told Zonos was connected and we were up and running, we continued to find connectors or things that related to the website that was never done, even though. Or connected even though I was told it was.
Q. Okay. And did that lead to damages? To...
A. It led to, I don't know, long term damages. It led to, it's taking a company that prides itself on customer service and all of that with great experiences

Page 243

to horrible experiences across the board. So, yes, it created, it created problems for us. It just was added on to the many problems. So everything was a problem.
Q. And what's Avalara?
A. Avalara manages all the tax returns and Shopify when you're. It deals with Nexus. And that was another thing that Dean had put that every single person that was in our system had given us their resale certificates. So then we had to go through everybody because everybody was noted, as you know, that they gave their resale certificate and they didn't. So now we had to go and treat everybody as if they didn't and go out and get, and pay Avalara to help us create that paperwork or get that documentation. And now we have, an actually a Nexus specialist, so that we can manage this the correct way.
THE REPORTER: Is Nexus N-E-X-U-S?
THE WITNESS: N-E-X-U-S, yes.
THE REPORTER: Thank you.
BY MR. SHOWEL:
Q. A Nexus specialist is that a tax thing?
A. Yes.
Q. So you mean tax, but--
A. It's through the Shopify that is connected to

Page 244

Nex-- to NetSuite. It's all connected.
Q. The reporter is really getting a workout here between Zonos, Avalara, Shopify. Hang in there, Lindsay. All right. There's something in your counterclaims about delays in processing Amazon sales. Do you recall that?
A. I recall there was a point where we needed to update our Amazon efforts and I could not get into Amazon. The people that were helping us manage could not get into Amazon because Dean had put Amazon, the account and passwords into his own name, something I asked him not to do, but I could not. I had to prove, and it took months, months to prove that I was the owner of Kashwere. So my name was nowhere to be found. They didn't even know who I was.
Q. And so as I understand, as I understand your counterclaims, Dean came on, he started implementing a number of changes, including NetSuite, including Anatta, I don't know if we've ever spelled that for the reporter Anatta is A-N-A-T-T-A, and including Bergen. And to hear your telling of the story, it caused, you know, there was chaos ensued. It caused a lot of problems for TMG. My question is that through all this you were the manager of TMG. Correct?

Page 245

MR. ARGIONIS: And object to form of the question you could answer if you understand it.
THE WITNESS: What do you want to know? I'm a manager and I'm an owner. What are you asking me?
BY MR. SHOWEL:
Q. Well, let's start. I mean, you were the manager throughout this entire process, correct? That you're describing was so chaotic and injurious to TMG. Correct?
A. I was the manager. I was the owner of the company. Yes.
Q. And the manager too. Right? I mean, it's not a trick question.
A. Where you're a manager in the context that you're asking me. You're asking me as if a manager of a restaurant and I'm involved with the every single facet of the everyday. I relied on employees or other people, depending on the task, to spearhead certain tasks. So how are you asking me if I'm a manager?
Q. I'm merely asking you if you were at the top of the organizational chart for the company during this time period.
A. Yes.
Q. Okay. So do you view yourself as having any

Page 246

sort of supervisory role over these various facets? That these various problems that occurred with the company?

A. I'm one person, and there's only x amount of time in a day. Although I work seven days a week, I put people in place that either know more than I do or can help divvy up the day to day responsibility.

Q. Okay, so. So it's your opinion that you have no ultimate supervisory authority over these issues that you've raised with Mr.-- about Mr. Dussias's performance?

A. I don't understand that question.

Q. Did you have any duty to supervise Dean?

A. If I had to babysit Dean, I wouldn't need Dean. I would do it myself if that was possible.

Q. And in your opinion, you have no culpability of any kind for the implementation of all these systems and everything that went wrong, is that correct?

MR. ARGIONIS: I'll object to the question form of the question, but go ahead.

THE WITNESS: Again. I rely on people to spearhead, to be the best in their position. If I'm relying on them or I can't be, a lot of things I didn't know about. So I had to be made aware. If somebody

Page 247

brought something my attention, that was a major issue. Of course I would look into it. If I don't know it, I can't look into it. So at least even, yeah. Leave it at that.

BY MR. SHOWEL:

Q. How many employees does Kashwere currently have? W-2 employees?

A. I want to double confirm. (Pause.) Seven.

Q. Okay. So I don't have anything further at this time. With that said, I have, you know, learned now that Seed and Chief have apparently created work product relevant to the performance of the website. I've just received the documents that I received a few hours ago, the documents from counsel. So I am. I think it's unlikely that I will want to recall you. And I know your counsel will object, but what I'm telling you is I think that there is a non-zero chance that I might need to recall you. And so for that reason, I am not going to say that we're all done but I'm going to say I'm all done at this time.

MR. ARGIONIS: And you know me so well, Matt. Yes, I will object, but we'll certainly meet and confer in good faith and try to figure it out, I think she said. But we'll check on the Seed stuff. I think she said

Page 248

there was no paper that was created by them. CDA, I believe you should have. And we could certainly check on that. But take a look at what you think you don't have. And we could also talk about what was turned over today. I don't think you asked for it prior to today because you didn't have a doc request tied to your notice of deposition. So we just had to prepare her for that. And those documents were just pulled together. But we could talk about that and see. If you do want something, let us know. Let's talk about it. We'll meet and confer in good faith. If there is something to supplement, we'll supplement, then take a look at it. I'm not agreeing some more time, but I'm saying I'm not excluding the possibility. So that's all. We'll reserve all our rights on that. And we have no questions for Merri today.

THE REPORTER: Mr. Showel, would you like a copy of the transcript?

MR. SHOWEL: Yeah, I'd like an e-tran for regular delivery, if I could.

THE REPORTER: Sounds good. How about you, Mr. Argionis?

MR. ARGIONIS: Yeah, we'll take it to. How long is your regular delivery?

Page 249

THE REPORTER: I think it's a ten day turnaround right now.

MR. ARGIONIS: Okay, we'll get in touch with you if we need it earlier. But Matt, can you. Because the court reporter, you didn't give her the exhibits as you were marking them. I do want those.

MR. SHOWEL: I will circulate them and I got to get them through the reporter as well.

MR. ARGIONIS: Yeah, so maybe when you get them to her, just copy Corey and me on it. So we have those because you didn't give us copies today.

MR. HICKMAN: Yeah, sorry, Matt. One thing is I'm working on getting those ones I sent you, bates labels. I should have those to you by tomorrow. So if you want to wait to send them to the court reporter. So you have the Bates labeled versions.

MR. SHOWEL: I think we ought to give them to the reporter as I used them today, just for. I mean, isn't that kind of what we ought to do? Not change them before we...

MR. HICKMAN: I mean, they'll be exactly the same other than the other Bates label on, just so we can follow, identify them easier in later proceedings. But I mean, if you want. It doesn't really matter to me,

honestly.
MR. ARGIONIS: Whatever you want to do, Matt. I think Bates labels just keep track of them. But if you want to use the versions we sent you, you know, we're going to. We're going to just basically put them on there. We'll then do a letter saying, we'll match them up to your things and just saying Exhibit 37, 38, et cetera, now have Bates number so and so because they weren't Bates labeled, what you turned over to court reporter, however you want to do it. We just need a record for later on, on what we turned over and what the Bates is. It's just easier that way.
MR. SHOWEL: Okay.
THE REPORTER: So this might be a good time to verify that all of the exhibits today are going to be marked as confidential. Is that correct?
MR. SHOWEL: Yes. That's fine. Yeah, I don't have any problem with it.
THE REPORTER: Does that also include Exhibit Number 1, which is the Amended Notice of Rule 30(b)(6)?
MR. SHOWEL: That probably should not be confidential. Right?
MR. ARGIONIS: Right.
THE REPORTER: (Indiscernible - simultaneous



speech.)
MR. ARGIONIS: Corey, what do you think about that? I don't want to sit here and sort it out now, but I guess.
MR. HICKMAN: Yeah, we could say yes for now and we can go through them and figure out what should remain confidential and what shouldn't.
THE REPORTER: Works for me.
MR. ARGIONIS: Okay.
MR. SHOWEL: Fine by me.
MR. ARGIONIS: All right.
THE REPORTER: Is that it?
MR. ARGIONIS: Thank you all.
THE REPORTER: Is that everything now?
MR. SHOWEL: Yeah. Ms. Gleckler, thanks so much for being here.
THE WITNESS: Thank you.
MR. SHOWEL: I'm sure not how you ever want to spend any time, but thanks for being a very patient with me.
THE WITNESS: Thank you. Appreciate it.
MR. SHOWEL: I'm sorry for the weather incident that you guys have had over the further--
THE WITNESS: See what's left.



MR. SHOWEL: Further making your life difficult.
THE WITNESS: Yeah. Thank you.
MR. SHOWEL: Lindsay, can you stay on for a second?
THE REPORTER: For sure. We are off the record at 4:58 p.m.



DIGITALLY SIGNED CERTIFICATE

THOMPSON REPORTERS hereby certify that the attached pages represent an accurate transcript of the electronic sound recording of the remote videoconference proceedings in the Circuit Court for Cook County in the matter of:

CASE NO.: 1:21-cv-05709

DUSSIAS, v. GLECKLER, et al.

By:


LINDSAY WELBERS, CER #1487

Thompson Court Reporters

**Exhibits**

**Exhibit 1** 3:9 11:23,24 59:6,7 250:19,20
**Exhibit 2** 3:10 47:1,2
**Exhibit 3** 3:11 47:19, 20,21
**Exhibit 4** 3:12 50:23 51:15
**Exhibit 5** 3:13 52:19, 20
**Exhibit 6** 3:15 54:18, 19
**Exhibit 7** 3:17 55:6,7, 8
**Exhibit 8** 3:18 78:10, 11,18
**Exhibit 9** 3:19 80:23, 24 81:13,15
**Exhibit 10** 3:20 83:2, 3,4 84:12,13
**Exhibit 11** 3:21 86:9, 10
**Exhibit 12** 3:22 88:10, 11,12
**Exhibit 13** 3:23 90:8,9
**Exhibit 14** 3:24 91:7, 8,9
**Exhibit 15** 4:1 93:13, 14,15
**Exhibit 16** 4:2 96:9, 10,13
**Exhibit 17** 4:3 99:11, 12,15
**Exhibit 18** 4:4 104:9, 10,13
**Exhibit 19** 4:5 113:9, 10,11 114:23 115:2
**Exhibit 20** 4:6 116:2, 3,8
**Exhibit 21** 4:7 119:13, 14
**Exhibit 22** 4:8 124:12, 13,14
**Exhibit 23** 4:9 128:6, 7,8
**Exhibit 24** 4:10 132:18,19
**Exhibit 25** 4:11 134:13,14
**Exhibit 26** 4:12 136:20,21
**Exhibit 27** 4:13 142:15,16
**Exhibit 28** 4:14 148:8, 9
**Exhibit 29** 4:15 152:10,11,16,17
**Exhibit 30** 4:16 157:4, 5
**Exhibit 31** 4:17 158:23 159:1,12,13, 14
**Exhibit 32** 4:18 159:16,19,22 160:2
**Exhibit 33** 4:19 163:11,12 170:23,24 218:13 220:3
**Exhibit 34** 4:20 166:4, 5,8
**Exhibit 35** 4:21 169:9, 10
**Exhibit 36** 4:22 174:5, 6
**Exhibit 37** 4:23 176:4, 5 250:7
**Exhibit 38** 4:24 179:11,12
**Exhibit 39** 5:1 180:13, 14
**Exhibit 40** 5:2 181:17, 18
**Exhibit 41** 5:3 184:20, 21,24
**Exhibit 42** 5:4 188:17, 18
**Exhibit 43** 5:5 192:24 193:1,2,6
**Exhibit 44** 5:6 194:22, 23
**Exhibit 45** 5:7 199:1,2
**Exhibit 46** 5:8 201:2, 3,4 204:13
**Exhibit 47** 5:9 202:2, 3,6 215:12
**Exhibit 48** 5:10 207:12,14,20
**Exhibit 49** 5:11 208:14,15
**Exhibit 50** 5:12 210:24 211:1
**Exhibit 51** 5:13 214:11,12 215:22 216:21
**Exhibit 52** 5:14 217:1, 2
**Exhibit 53** 5:15 220:9, 10,16
**Exhibit 54** 5:16 222:11,12,15
**Exhibit 55** 5:17 225:6, 7
**Exhibit 56** 5:18 226:14,15,16

**$**

**$1** 63:1
**$392** 17:21 18:2
**$50,000** 43:8
**$63,000** 16:11 17:3,16

**-**

**--and** 152:12 173:9
**--as** 53:12
**--blank** 191:13
**--building** 235:8
**--for** 194:4
**--go** 239:14
**--I** 100:16 138:11 151:4,22 229:9
**--i'm** 90:21
**--just** 88:8
**--let** 102:23
**--no** 227:23
**--open** 24:18
**--paperwork--** 185:18
**--pop** 157:13
**--prior** 140:1
**--reputation** 60:15
**--so** 168:16
**--that's** 172:8 176:18
**--the** 185:19
**--they** 56:5
**--they're** 71:16 229:2
**--wait** 146:19
**--we** 167:10
**--we'll** 203:24
**--what** 83:17
**--why** 99:5
**--yeah** 123:14 157:14
**--you** 18:1 140:2
**-managed** 221:3

**0**

**00529609** 179:23
**0056099** 83:22
**037** 152:23

**1**

**1** 11:23,24 19:13,24 20:3 26:4,10,11 33:19 34:10,13 48:18 49:1 59:7 120:13 147:12 160:10 161:19,20 162:4 165:24 203:16 204:3,19 205:17 206:15 250:20
**1/16/2020** 158:4
**10** 83:3,4 84:13 147:20
**100** 16:3,4 98:20
**1099** 29:19 35:16 99:22,24 195:13 211:16 212:2,10 239:19,21
**10:04** 46:12
**10:59** 84:6
**11** 16:12 86:9,10 91:15 163:22
**11,300** 14:20
**11:02** 84:9
**11:43** 170:3
**11:47** 114:18
**11:59** 114:22
**12** 88:11,12
**12,500** 14:19,20,21
**13** 90:8,9
**14** 91:8,9 111:10
**15** 93:14,15 101:17,20 102:7,8,9,13 115:12 128:15 139:4,6 141:19 201:21
**16** 85:21 96:9,10,13 157:10 190:19 199:21 200:6,22 201:14
**162671** 195:2
**167071** 137:5
**167246** 142:20
**167248** 142:24
**17** 99:11,12,15 104:18 166:14 211:11
**18** 104:9,10,13
**180586** 148:13
**180620** 148:14
**180792** 208:19
**19** 82:1 113:10,11 114:23 115:2 174:13 175:8,12 185:9,13 186:9 202:12 203:4
**191553** 157:9
**1:09** 156:21
**1:25** 207:9
**1:55** 156:14

**2**

**2** 47:1,2 196:19 197:8
**2.0** 100:20,22 101:3
**2/22/20** 209:15
**20** 39:9 116:2,3,8 123:17 137:22 175:8
**20--** 212:3
**2005** 131:20
**2009** 149:21 150:12,16 154:16,20 155:3,12, 19 156:2 170:22 221:1,15 222:4
**2017** 19:13,24 26:4 33:19 34:10
**2019** 8:5 19:22 20:3 44:6 79:19 80:6 137:8 141:6 158:9,15 161:19,20 162:4 165:24 166:14 229:8, 17
**202** 217:5
**2020** 82:1 86:16 90:1, 17,21,22,24 91:15 94:1 96:16 101:7 104:18 111:10 112:13 169:24 170:2 172:10

Case: 1:21-cv-05709 Document #: 91-2 Filed: 01/31/25 Page 229 of 571 PageID #:999



174:13 175:10,12 180:6 182:24 189:4,6, 11 191:4,23 203:16 204:4,19 205:17 206:15,16 210:20,22 211:15,23 212:3,17 214:20
**2021** 14:10 16:12 18:1 26:10,11,12 34:13 44:7,8,11 49:1 115:6 117:5 120:13,18,24 124:23 128:15 176:12,15 195:6,16 196:19 197:9 199:17, 21 200:6,10,22 201:14,21 202:12 203:4 204:7,17 205:16 208:4 211:11, 16 214:19 217:7 218:2
**2022** 45:11,16
**2023** 27:3,4 37:11 45:13 58:20
**2024** 6:15 19:14,23 26:4 34:20,24 112:13
**208,000** 14:18
**21** 119:13,14 188:21
**213638** 134:18
**213643** 134:18
**2180** 226:21 227:11
**2181** 227:11
**22** 45:23 55:19 124:13, 14 210:20,22 217:14
**2206** 222:16
**2271** 222:17
**2272** 225:11
**2280** 225:11
**23** 94:1 128:7,8 158:9 180:6
**23rd** 204:17
**24** 33:20 86:16 132:18, 19 169:24 170:2 172:10,23 201:7
**244709** 132:22
**25** 134:13,14
**26** 96:16 101:7 136:20, 21
**27** 142:15,16 208:4
**28** 115:6 148:8,9
**29** 152:11,16,17 199:17 200:9
**2:00** 156:15
**2:03** 157:1
**2:25** 207:7
**2:52** 192:16
**2:55** 192:13
**2:58** 192:21

**3**

**3** 47:20,21 117:5 158:15 195:6,16
**3/19/2020** 180:22
**3/27/21** 209:12
**3/3/21** 117:5
**30** 137:23 157:4,5 183:17 185:19 186:6 187:22 188:1 189:4,6, 10 191:4,23
**30(b)(6)** 12:3 13:17 14:1 250:20
**31** 14:10 158:23 159:1, 12,14
**32** 159:16,19,22 160:2
**33** 163:11,12 170:24 218:13 220:3
**331717** 124:17
**338992** 128:12
**34** 166:4,5,8
**35** 148:13 169:9,10
**36** 174:5,6
**361974** 176:8
**364** 169:20
**37** 176:4,5 250:7
**378** 91:13
**38** 179:11,12 250:7
**384** 204:14
**39** 180:13,14
**390** 17:18
**391187** 210:24
**392--** 17:24
**3PL** 56:13,17 58:1,14 61:16 236:19,20,21

**4**

**4** 50:23 51:15 137:7 141:6 182:24
**4.1** 220:4,5
**4/15/2021** 14:19
**4/20/2021** 14:19
**4/30/2021** 14:20
**4/6/2021** 14:18
**40** 90:13 181:17,18
**405153** 116:9
**405163** 116:9
**41** 184:20,21,24
**410243** 202:7 215:12, 13
**410246** 202:7,19
**415035** 115:3
**41634--** 204:14
**416384** 201:8
**417** 179:16
**418557** 104:14
**42** 188:17,18
**420** 180:18
**43** 193:1,2,6
**436066** 99:16
**44** 194:22,23 213:14
**44374** 215:22
**45** 114:13 156:13 199:1,2 213:15
**46** 201:3,4 204:12,13 214:18
**464589** 207:21
**47** 202:2,3,6 206:10 214:18 215:12
**470606** 188:21
**470621** 190:19
**473681** 185:1
**476590** 90:13
**476629** 90:14
**476958** 182:4
**48** 207:12,14,20
**482923** 96:13
**487956** 93:19
**489874** 86:14
**49** 208:14,15
**498516** 174:10
**4:08** 231:4,9
**4:20** 231:7
**4:24** 231:12
**4:58** 252:5
**4A** 26:2 29:24
**4D** 149:8

**5**

**5** 52:19,20 137:22
**5/15/2021** 14:21
**50** 44:7 127:7 210:24 211:1
**50,000** 44:2
**500** 122:1
**51** 156:18 214:11,12 215:22 216:21,22
**512682** 78:22 79:3
**519** 174:10
**52** 217:1,2
**529412** 179:16
**53** 220:9,10,16
**533753** 81:4
**54** 222:11,12,15
**549377** 91:12
**55** 225:6,7
**554725** 160:2
**556099** 83:8 84:13
**556100** 84:15
**558** 104:14
**56** 226:15,16
**564950** 158:24
**589613** 119:18
**589622** 119:18
**590269** 217:6
**590470** 217:6
**590558** 163:22 218:19
**590568** 163:23
**590668** 193:7
**5943** 209:19
**595035** 152:22
**595290** 166:8
**595362** 169:20
**595598** 88:15
**599** 88:16

**6**

**6** 54:18,19 80:5 89:24 90:17,22 176:11
**626** 188:23
**63,000** 16:23,24 17:7
**6407** 201:9
**66** 222:15
**675** 195:3
**68** 99:17

**7**

**7** 6:15 55:7,8
**7/23/2020** 185:6
**70** 183:16 185:19 186:6
**710** 132:23
**719** 124:19
**76** 226:19
**76419** 180:17
**793** 208:22 209:2

**8**

**8** 78:10,11,18 124:23
**81** 226:21
**826** 199:5 213:16
**828** 199:6
**8:59** 6:3

**9**

**9** 80:23,24 81:13,15 90:21,24
**92** 166:10
**957** 93:20
**959** 182:7,9
**960** 182:7
**979** 176:9
**9:00** 6:16
**9:30** 98:10
**9:53** 46:8

**A**

**A-** 242:6
**A-N-A-T-T-A** 244:20
**A-Z-I-Z-U-L** 116:14
**a.m.** 6:3,16 46:8,12 84:6,10 98:10 114:18, 22 170:3

**abilities** 158:16
**ability** 65:13 86:3 168:18 242:12
**able** 19:15 20:18 21:20 31:24 34:5 45:3 70:7,16,20,22 84:4 123:5 130:14 235:7 240:12
**about** 7:7 11:15 14:8 15:2 16:1 21:9 28:12 29:21 34:15 36:7 37:16 38:19,21,23 39:1,7 45:3,13 56:13, 14 58:1 59:6 62:6 68:24 69:1,17 72:21 73:24 75:9 80:10,17, 19 83:17,18 85:23 95:10 96:6 101:16 105:17 111:24 114:22 127:5,19 129:9 130:2 135:20,22,23 149:24 150:4 155:11,12 156:13 159:18 164:21 165:13,24 170:2,4 177:6 180:11 188:2,3 195:24 198:4 205:9 208:4 210:20 213:13 216:2 231:6,16 232:11,16 233:6 234:15 235:4 236:22 238:19 241:12 242:5 244:5 246:10,24 248:4,9,10,21 251:2
**above** 77:18 89:22
**absolutely** 162:1,2,12
**access** 20:6 34:17 82:17 133:18 134:7
**according** 118:13 140:18 161:3 224:11
**account** 61:22 195:16 209:10 224:8 229:5 244:11
**accountant** 37:23 135:1
**accounting** 37:18 190:11
**accounts** 226:1
**accumulate** 32:11
**accumulated** 13:12 67:5,6 69:5 71:13
**accurate** 8:21 115:24 118:3 127:7 130:12 176:20 187:7 236:3
**accurately** 21:21 23:24
**acknowledged** 213:23, 24
**acknowledging** 223:20
**across** 243:1
**ACS** 49:8 51:2
**action** 218:22
**actions** 61:4 165:13
**actual** 11:5 19:18 23:18 34:23 65:17
**actually** 12:24 17:17 18:16 21:15 56:3 75:2 87:8 128:18,21 131:22 216:11 224:18 230:1,19 231:24 243:15
**add** 63:10 172:6 178:6
**added** 219:20 243:2
**adding** 39:21
**addition** 40:20 76:1 78:7
**additional** 67:18
**address** 110:22 131:12 135:15 191:23 196:1 200:4,17 223:4,7 229:21
**addresses** 229:23
**Adkins** 57:24
**admit** 162:9 164:24 218:22
**admitting** 219:5
**advertising** 46:16
**advised** 200:23 212:10
**Advisors** 120:6,8
**affect** 237:19
**affiliated** 35:19
**affirm** 7:6
**after** 7:11 15:14 28:12 32:18 77:20 114:12, 13 123:4 126:1 139:3, 6 141:19 149:13 150:18 172:23 185:9 222:7
**afterwards** 14:9 130:19 131:9
**again** 19:11 29:23 31:8,15 39:11 40:15 41:21 52:11 58:21 63:14 68:24 69:12 73:4,23 74:15 79:11 88:4 99:21 101:14 111:23 112:22 117:9 151:2 159:7 161:1 169:18 175:4 176:9 178:24 196:20 204:7, 13 206:1 213:15 225:11 226:3 227:6 237:17 239:24 246:21
**again--** 139:24
**against** 231:17
**agencies** 86:19
**ago** 8:4 25:3 34:15 35:8 36:5 50:16 58:1 66:3 68:6 70:13 100:7 147:16 155:11 164:3 189:22 213:9 214:17 218:12 228:17 234:9 247:14
**agree** 6:7 27:8 128:20 171:23
**agree--** 147:1
**agreed** 40:3 233:11
**agreeing** 248:13
**agreement** 7:15 64:21 136:13 140:16,18,19, 20,24 141:16,22 142:3,5,6 144:17 146:22 147:2,5,8,24 148:16,23 149:1,11, 20,22 150:9,12,14,16 151:12,18 154:4,8,17, 19,20 155:3,12,13,20 156:3,7 161:3,5,6,14, 15,16,24 162:6,8,9,16 163:2,16 164:10,16, 21,23,24 165:6,8,16, 23 167:1,4,10,16,20 169:7 170:19,23,24 171:1,2,4,13,20,22 172:2 173:6 184:16 187:14 193:15,19,22 201:17,23 202:15 203:19 204:3,16 205:3,20,21 212:5,6, 15 214:19,21,23 216:19 218:14 220:21 221:1,14,15 222:4 233:16,17 234:3 242:2
**agreements** 62:5 168:22 169:3 172:11, 13
**ahead** 24:11 50:9,10 53:24 72:9 76:7 89:21 90:4 92:10 98:19 101:12 104:3,22 107:1 117:8 118:1 119:5 129:12,13,22 130:7 136:16 146:11 152:2 155:5,6 160:23 162:23 167:6,13,22 169:5 171:6 172:17 173:13,21 183:22 186:15,22 187:9 189:24 191:20 205:13 207:4 210:11,12 214:7 216:13 218:24 239:14 246:20
**all** 6:2,3,5 7:4 11:22 12:15 13:6,18,22 14:9 16:4,10 17:14 19:20 21:14 24:3 25:6 29:20 31:14,15 33:1,10,12, 18,24 34:9 35:3,7 41:15,21 42:19 43:6 45:15 46:14,15,19,24 49:5 51:22 52:6 53:14 54:17 55:16,23 56:9, 11,23 58:12 59:5,13 60:17 61:8 64:14 65:6,11,17 66:16 71:11,22,24 72:2 75:14 76:20 78:2,9,21 80:16,22 81:16 82:7 84:22 85:3 87:3,12,20 88:9,17,19,20 89:11 90:19 91:16 92:4 95:20,23 96:3 98:15 100:19 104:20 105:9 106:21 111:14 115:1 116:7,22,24 118:18 120:8 121:24 123:23 125:1,23 127:10 128:18,21,23 130:17 131:9,24 132:7 133:19,21 138:8,10, 12,15 141:12,23 142:14 146:1 147:17 148:4,14 156:9,20 157:3,20 158:13 159:7 161:12 163:9 164:2,13 166:3 170:2, 20 171:14 173:7,17, 18 177:4,16 179:10 180:3,6,8 183:2,8 184:19 188:16 189:13 192:23 193:6 194:10, 11 196:18,19 198:11, 24 200:4 202:1 203:9, 22,23 206:10 207:20 208:3 209:5,14,17 210:16 211:10,14,19, 20 212:3 213:13 215:21 216:1 217:6 219:1 220:3 225:3 229:21 230:7 238:21 240:15 242:24 243:5 244:1,4,23 246:17 247:19,20 248:14,15 250:15 251:11,13
**allegations** 232:10,12
**allocated** 203:14
**allow** 73:2
**allowed** 28:22 123:7
**almost** 17:19
**alpha** 64:9
**already** 14:6 23:9 152:1 155:22 171:4
**alright** 113:14
**also** 6:24 7:1,2 25:19 93:1 97:21 98:2 123:1 154:5 184:17 195:16 221:24 234:1,17 248:4 250:19
**although** 108:7 216:15 230:15 242:16 246:5
**always** 112:2,19 154:12 227:19 241:9
**am** 96:24 103:12 107:15 148:18 164:11 170:10 172:12 207:12 247:14,18
**Amateur** 57:17
**Amazon** 61:22,23 135:17 244:5,8,9,10
**ambiguous** 41:12 168:22
**amend** 149:10 220:24
**amended** 12:3 149:20 151:17 221:15 250:20
**amending** 150:1
**amendment** 152:7 222:3
**amount** 17:6,8,13 18:4 22:14,22 39:21,22,24

40:4,5,7,11,17,23 41:2,4,6 54:8 63:12 68:9 240:20 246:4

**amounts** 18:6 40:18

**an** 8:12 12:3 17:8 23:7 24:11,12 27:11 28:9, 21 29:17,18 30:8 35:11,13 37:23 40:4 41:12,13,15 64:20 65:14 69:23 72:12 74:16 75:10 77:22 79:8 81:5,23 82:3,8, 23 83:9,19 84:16 85:20 86:15 90:16 91:14 93:18,20 95:19 96:15 97:14,17 98:3 99:18,22 104:15 105:4 111:9,14 113:14 115:3,8 116:8, 9 119:19 122:8 123:1 124:1,20 125:20 128:12 131:3,15 132:24 133:2,13 134:18 136:12,13,14 137:6,7 140:17 142:9 143:14 144:5,17,23 145:2,8,16,20 147:1 152:7 155:4 157:9 158:3,6,14 159:4,8 160:4,11 161:23 162:5,6,8,10 164:9, 21,22 165:7,22 167:5, 10 171:4,19,22 173:6 174:11,12 176:11,23 180:4,18 181:11 182:17,19,24 184:6,7, 13 185:3,10,20 186:19 187:14 188:24 193:8,21 195:3,9,11, 15 196:20 199:7,14, 20 201:8,10,20 202:9 203:19 204:2,23 205:12 206:20 207:22 208:4 209:6,22 211:6, 11,19,20,22 212:4 213:8 214:18 215:13, 22 216:18 218:21 221:14 224:7 240:20 241:23 242:2 243:15 245:4 248:19

**Analytics** 23:10

**Anatta** 38:3,7 41:10, 15,20 76:22 77:1 79:15,16 80:3,18 85:24 87:1,3,6 89:6 91:19 92:8,13,21 93:2 95:21 96:1,4 98:13 100:23 105:10,15,16, 17,23 106:7,8,12,18 107:6,7 108:2 109:6,9 116:16 117:5 124:8, 10 129:1,5,7,9 130:2, 5 131:23 132:14 233:16,18,22,23 234:3,24 235:9,24 236:12,14 244:18,20

**and** 6:5,9,12,15,19,22, 24 7:2,8,12 8:1,4,11, 16,21 9:2,5,11 10:9, 17,23 11:21 12:6,9,12 13:1,6,14,17,20,21 14:6,8,10,17 15:1,2,4, 6,8,15 16:6,12,24 18:3,7,16,17,19 19:1, 6,9,16,20,22,24 20:17,19,22 21:2,19, 20,22 22:6,17,20 23:1,7,18 24:6,10,17, 23 25:2,10,19,24 26:2,19 27:2,7,10,15, 17 28:1,7,19,22 29:9, 12,14,20,21,22 30:5, 20,24 31:4,6,10,19, 20,21,24 32:10,11,12, 17,18,19,22,23 33:5, 6,7,8,9,20 34:3,5,6,9, 14,16,20,23 35:5,7, 11,17,19 36:7,14,16 37:4,21,23 38:1,6,17, 19 39:8,11,21 40:4,5, 6,13 41:4,7,9,11,12 42:6,9 43:8,13,16,19 44:3,13,20 45:2,8,13, 17,23 46:19,24 47:5, 9,24 48:5,13 49:10, 12,24 50:8 51:5,6,8,9, 17 52:9,11,12,13,17, 23 53:24 54:3,5,7,22, 24 55:1,5,14,16,17,22 56:13,20 57:11,17,18, 20,23 58:8,10,11,14 59:15,18 60:6 61:8,9, 10,14,19,20 62:19,21 63:3,18,19,22 64:2,7, 17,23,24 65:6,16 66:6,15 67:5,9,11,12 68:5,7,13,17 69:1,2,7, 24 70:14,21,24 71:2, 8,13 72:5,8,9,12,15, 16,17,20,23 73:2,6,9, 10,14 74:3,15,20 75:7,16 76:1,12,23 77:11,21,22,24 78:6 79:6,8,9,13,19 80:1,3, 7 81:3 82:3,11,15,20, 23 83:7,10,11,13,23, 24 84:3,14,15,18 85:19,23 86:1,4,13, 18,21,24 87:5,8,15 88:1,6 89:2,3,6,12,14, 18,19,24 90:12,16,19, 24 91:4,13,17,21,24 92:4,7 93:1,4,7,9,18, 21,23,24 94:1,4,7,16 95:2,10,14,17,20,24 96:3,16,18 97:1,7,10, 14,20 98:9 99:16,17, 19,21,24 100:2,9 101:1,3,23 102:5,11, 14,16 103:2,17,18,21 104:14,15,16,18,20, 24 105:6 106:11,17, 21,24 107:5,7,12 108:5,10,24 109:8,17 110:4,7,15,20 111:9, 13,14,20 112:2,6,9, 16,19,22 113:19,20 114:5,6,14 115:4,8,9, 12 116:9,10,12,14,18, 24 117:19 118:5,12, 15,20 119:2,5,17,18, 22 120:4,13 121:9,12, 22 122:1,7,9,17,19, 20,21,22,24 123:1,3 124:3 125:1,12,22 126:3,5,14,19 127:4, 6,15 128:12,17,20,24 129:12,19,21 130:6, 14,18 131:9,13,22,23, 24 132:3,7,11,14,23 133:2,7,18,21 134:6, 12,18,23 135:2,17 136:1,4,6,9,15 137:4, 6,10,13,16,22 139:3, 8,16 140:3,10,18,19 141:20 142:6,8,9,21, 24 143:8,11,13 144:1, 3,4,5,16 145:4,11,13, 19,23,24 146:12,21 147:9,19 148:4,12,14 149:1,8,10,12 150:13, 15,18,22 151:13,17, 20 152:22,23 153:3, 11,16,19,21,23 154:4, 6,8,9,15,20 155:1,4,8, 9 156:18 157:9 158:6, 11,13,18 159:7 160:7, 10,13,15,17,20,23 161:3,17 162:1,8,10, 19,22 163:17,22 164:2,15,22,24 165:9, 10,12 166:13,19,24 167:4,19,23 168:3,11, 21 169:5,16,23 170:2, 10,12,18 171:16,19, 20,23 172:3,7,9,18,20 173:20 174:1,10,15, 18,21,22 175:4,7,16, 18,19,23 176:9,10,22 177:4,18,19,21,24 178:5,8,9,13,17,21 179:7,8,9,16,19,20 180:6,8,18,20,24 181:3,5,21 182:1,4,7 183:2,5,8,13,17 184:7,9,14,17 185:4, 10,13,19 186:2,6,21, 22 187:9,12,14 188:22 189:1,5,9,17, 23 190:9,12,15 191:4 192:5 193:11,13,14, 23,24 194:14 195:9, 15,19,21,22 196:2,16, 17,20 197:18,23 198:5,22 199:8,13,14, 19,23 200:8,13 201:16,20,22 202:9, 14,17,19 203:1,11,14 204:5,11,12,14,15,16, 19,23 205:21 206:1,4, 10,14,19 207:2,21,22 208:3,10,19 209:14, 17,21 210:7,22 211:10,14,15 212:5 213:8,16,19 214:2,15, 16,18,20 215:3,7,10, 13,14,17,22,23 216:1, 6,14,16,19 217:6,11, 15,16,18 218:1,24 219:8,11,15,16,17,21, 22 220:4,13,20 221:18,19,21,24 222:5,9,18,24 223:3, 7,9,11,14,18 224:6,8, 14,18,20 225:11,15 226:3,21,23 227:4,6, 11,12,13 228:10,17 229:2,4,15,17,19,21 230:8,17,18 231:17 232:4,9,11 233:2,9, 10,11,14,21 234:8,11, 23 235:2,9,24 236:9, 16,24 237:2,5,20,21, 22,24 238:1,6,11,15, 23 239:1,9 240:12,14, 23 241:6,11,12,23 242:3,4,6,11,12,14, 15,16,17,21,24 243:4, 5,6,11,12,13,14 244:8,11,13,16,20 245:1,4,8,12,16 246:4,16,18 247:11, 15,18,21,22,23 248:2, 4,8,9,11,15 249:7,10 250:7,8,11 251:3,5,6, 7

**And--** 22:3

**annoyed** 242:14

**another** 11:15 23:15 64:2 91:13 97:7 114:13 127:21 159:16 190:7 202:7 243:7

**answer** 8:18,19 21:11 24:11 27:11 29:22 41:13,14 46:3 54:1 62:6,22 63:1,6 68:12 72:9,24 73:18,20 74:7 76:11 80:7 83:11,14 87:19 88:2 99:8 101:13 102:17 106:4, 15 110:17 113:1 142:6,9 146:6 151:14 156:5 158:19 160:24 163:1,3,5 168:23,24 173:21 183:22 186:15,23 187:5,12 188:5 197:14,22 205:19 214:3,7 226:2 233:1 235:10 245:2

**answered** 88:1 94:13 106:24 110:15 118:20 129:13,21 130:6 151:20 152:1 162:22 173:21 187:9 189:24 213:22

**answering** 240:4

**Anthony** 42:10

**anticipated** 184:16

**anticipation** 154:12 161:16 167:24 214:1, 8

**any** 7:21 8:15,19 9:14, 23 10:2 14:4,9 16:7 20:14 25:10 26:20,21 28:1 32:15 36:16,23 40:20 41:19 42:23,24 43:2,7,19 44:20 59:18 60:1 63:12 68:14,22 74:20 75:8,16 76:15 87:24 92:12,20 103:4 106:6,17 107:18 108:1,15 109:5,8,11, 14,20 110:4 111:2,4, 7,17,23 122:18 124:7 127:10,23 128:2,4 130:4,11,15 135:12, 13 146:3 151:11 155:9,24 159:7 161:22 164:24 166:21 168:2,7,10,22 169:7 172:3,24 176:19 178:10 179:6 180:9 181:8 187:21,24 188:12,13 190:23 192:2 194:13,18 199:23 200:8 212:1 218:21 219:5,8 222:3 224:15 225:18 229:23 234:13,14 238:7 245:24 246:13,17 250:18 251:19

**anybody** 9:8 12:16 141:12 145:6 197:24 229:4,14 238:21

**anymore** 26:21 38:7 103:10

**anyone** 11:8 228:23 229:11,12 234:24

**anything** 15:7 16:19 23:17 27:19 41:22 62:7 75:22 76:11 88:18 107:10 115:15, 19 117:22 128:3 136:24 138:1 139:17 142:7 148:4 161:12 165:3 173:15 181:23 194:7 206:22 233:6 247:9

**anything--** 140:1

**anytime** 99:1

**anyway** 51:22 76:9

**anyways** 70:16

**apart** 127:15 239:6

**apologize** 6:13 10:20 14:22 103:2 198:6 214:15

**app** 107:16

**apparently** 28:21 247:11

**appear** 122:7

**appeared** 101:23

**appears** 81:19 90:5,19 91:1 119:23 120:5 121:13 122:9 125:1 181:4 195:19 201:16

**apple** 64:10

**Appreciate** 251:21

**approached** 106:11

**approved** 63:18

**approximately** 7:23 16:3 19:6 45:8 189:4, 5 206:15

**April** 26:4 85:21 86:16 195:6,16 196:19 197:8,11 229:17

**are** 6:2,4 9:2 10:8 13:22 14:13,17,23 16:1 22:6,7 32:7,16 40:15,18 42:9 44:3 45:8 46:8 47:9 48:8 49:10,20,24 50:11 51:10,14 52:6 53:7,17 54:24 56:3,15 58:11 60:14,16,18,20,21 61:13 63:24 64:18 65:12 67:2,3,12,19 69:24 71:12,23 73:6 77:1,8,17 81:12 83:17,18 84:6,9 86:24 87:1 90:1,24 93:4 103:5 104:21 105:8 111:14 112:2,19 114:5,18,21 120:9 122:12 128:4 136:4, 12 137:10 138:5,6 146:17 156:20,24 160:13 162:5 164:8 165:18 171:9 179:4 182:4,6 183:16 186:5 187:15,23 188:12 192:16,20 195:22 196:10 198:7 206:24 207:7 217:19 220:13 221:22,24 222:17 226:11,21 229:16 230:22 231:9,12 232:10,11 235:4 236:17 238:2,4 240:12,16 245:4,19 250:15 252:4

**area** 24:12 28:8

**areas** 116:19

**aren't** 147:19

**Argionis** 6:23 9:5,19, 22,24 10:6,22 11:4,8, 13 12:24 13:11 15:1, 21 17:20 21:7 23:7 24:9 27:7 31:2,19 32:18 33:4,14 37:13 39:11,16 41:11 45:2, 17 46:7 47:5 48:14, 17,20,23 49:1,4,12,17 50:8 51:14,17 52:11 53:19 54:5,11 59:8 67:5,9 68:20 69:22 70:4,14,19,20 72:8,15 74:15 75:6,24 76:7,10 78:14,17,20,24 79:2,5 80:5,13 81:7,12,16,20 83:11,17 84:20,23 85:5 86:1 87:18 88:1, 19 89:14 90:3 92:9,14 98:19 101:10 102:23 104:3,22 105:11 106:24 108:19 110:15 112:24 113:19 114:2, 4,9,11,17 117:8,24 118:20 121:22 122:17 123:12,15,19 125:3,7, 11,15 126:21 129:10, 21 130:6 131:3,4 133:13 135:8 136:15 137:1 139:10,12 140:4,6,23 141:2,5,15 142:8 143:22 144:19 145:1,22 146:8,10,15, 19,23 147:7 148:17, 19 149:15,17,23 150:6 151:2,14,20 152:1,12 153:7 154:22 155:21 156:4, 11,13,17 157:13,16, 18,21,24 158:16 160:22 162:21 163:5, 17 167:6,11,21 168:20 169:4,17,21 171:6 172:15,18 173:9,20 175:4,10,12 177:7,9,13 178:13,24 181:24 182:10,17,21 183:18 185:15,19 186:13,20 187:8,23 188:4 189:5,23 191:8, 11,14,17 192:5,11,15 194:2,6 195:23 196:16,23 197:9,12, 17,19,21 198:14,18, 21 199:8 200:13 203:1,4,6,24 204:5,23 205:2,5,8,18 206:1,3, 19 207:2,8,17 209:3, 21,24 210:6 213:19 214:6 216:13,22 217:20 218:7,10,15 219:14 220:16,18 223:11,17 224:6,14, 24 225:2 227:4,9,12, 16,21 228:2,6,13 229:8,19 230:3,8,15, 21 231:3,7 232:9 235:11,14 239:24 241:18 245:1 246:19 247:21 248:22,23 249:3,9 250:2,23 251:2,9,11,13

**arguably** 117:19

**argue** 150:15

**argument** 125:19,20

**Arizona** 9:3 36:15

**Arizona's** 220:14

**arm's** 9:15

**around** 61:21 65:1 143:1 183:10 236:1

**arrange** 56:9 207:5

**arrive** 101:20

**art** 94:10,11,14

**article** 89:3

**Arum** 180:4,10

**as** 7:11,12 11:23 12:9 13:16,20,21 15:4,5,21 17:15 21:8,9 22:20 23:4,18 25:3,4 27:8 29:10 30:1,7,22 33:1, 13 44:13,14 47:1,6,19 50:21 51:14,18 52:19 54:17 55:6 62:19 63:4,10 67:15,20,24 68:2,5 71:2,3,14 73:8, 9 78:4,10,17 80:23 81:13,14,15 82:20 83:2,19 86:9 88:10 89:19 90:7 91:7 93:7, 13 94:4 96:8 97:4 98:22 99:10 100:3,10 101:6,11 102:5 103:23 104:8 105:18 108:4 110:16 113:9 115:2 116:2,8 117:4, 5,24 119:2,13,23 120:24 121:4,24 122:3,15,16 124:12 128:6,17 130:14 132:12,18 134:13 136:19 149:6,21 152:10 153:20 154:5 155:13 157:4 158:18, 22 159:11,16 160:15 161:1 162:22 163:11 164:24 166:4 169:9 170:23 171:13 172:9 176:3 179:11 180:13 181:9,16 184:20 186:5 191:10 192:24 193:22,24 194:21 195:19 199:1 200:6, 22 201:2 202:2 203:10 204:19 205:19 206:12 207:6,12 208:13 210:23 211:16 212:3 214:11,20 215:22 216:21 217:1 218:23 219:6,17 220:8 221:13,19 222:5 224:8,9 225:6 226:14,22 227:18,21 228:1,10 231:23 232:16 233:16 234:13 236:2,11 239:18,21 240:2,3,5,12 243:10, 12 244:16 245:15,24 249:5,8,18 250:16

**ask** 6:5 8:18 13:1 16:5 17:11,12 19:11 20:14, 23 21:4 31:16 32:5 39:12 44:17,24 57:8 74:19 76:24 83:23 102:19 127:14 151:23 154:14,18 155:8,16 164:16 178:18 180:9 186:2 195:24 197:3 205:8 239:18

**asked** 13:1 18:24 20:16 21:1,17 29:21 43:21,24 46:22 69:6 75:6 87:15 88:1 96:6

100:14 106:24 110:15 118:20 127:5 129:12, 21 130:6 135:5 136:4 151:20 153:11 154:16,21 156:7 162:22 168:4,6 171:21 173:20 184:1 187:9,13 188:12 189:23 219:15,19 227:24 244:12 248:5

**asking** 20:11 22:18 24:6 25:14 38:20 50:3,11 57:13 66:2, 20,22 73:24 74:10 80:16 81:17 82:7 94:20 97:1 98:1 101:11 110:16 121:5 135:20 138:15 140:6 143:18 145:4,5 149:23 155:9,22 156:6 163:7 164:11 165:12,13,18 171:10, 21 172:3,4 183:20 184:11 187:23 188:2, 14,15 194:16,17 196:9 198:4,5 205:15, 19 212:2 217:20 223:12 224:10 240:3 245:4,15,19,20

**aspects** 107:20 131:9

**assert** 53:21

**assigned** 223:13

**associated** 223:4,9 224:12

**Associates** 189:13

**assume** 44:5 117:18 129:19 153:20

**assumed** 134:11 203:20,21

**assuming** 89:23

**assumption** 153:18

**at** 6:3,5 8:15 9:14 10:1,23 14:5 16:2,7 18:5,7 19:9 20:7 21:14 23:4,14 25:6 27:1,4 30:15 33:18 41:15,21 42:8,18 44:20 46:8,11 47:19 50:21 52:23 55:16 56:23 58:10 59:13 60:24 62:2 63:22 65:9 67:21 69:1 70:12,24 71:9 72:11,22 73:6,22 74:18 75:12 76:19 78:9 79:19,22 80:3,22 82:17 83:2,21 84:3,6, 9,21 85:23 86:2,8,22, 24 87:21 88:8,9,10,17 89:24 90:7 91:7,19 93:13 96:8 98:10 99:10 100:12 101:20 103:4 104:2,8,20 106:6 110:7 112:14 113:9,20 114:14,18, 22 115:12 116:1,7,22, 23 117:9,13,16 118:1, 2,12 119:13 120:24 123:4,11 124:12 125:3,23 126:20 127:1 128:6 132:11, 18 133:18 134:13 135:9 136:19 138:12 139:16 142:15 143:13,22 144:22 145:7 146:1,23 147:7, 20,23 148:7,15 151:10 152:10,12 153:17 156:21 157:1, 3 159:11 160:3,8 161:22 165:18 166:3, 10 169:9,20 170:2,4, 23 171:4 172:11,13 174:5,18,21 175:4,24 176:3 177:24 179:10, 20 180:13,19,24 181:16 184:8,19 186:18 188:17,24 189:1 191:8,23 192:16,21,24 194:11, 21 195:3 196:20,23 197:21 198:24 200:9, 18 201:2 202:1 203:9, 15 204:11,12,15 205:10 206:4 207:11 208:10,13 209:18 210:1,6,23 211:9,18, 20 213:7,8 214:11,17, 18 215:3,4,11,21 216:3,12,20 218:2 220:8 221:4 222:11 223:5,23 224:5,13 225:5,18 226:3,14 229:19 230:18 231:9, 12,15 234:13,18 235:2 238:11 245:20 247:3,4,9,20 248:3,12 252:4

**attached** 135:2 182:20 196:17 201:23 203:1

**attaches** 174:15

**attaching** 201:16 202:14

**attachment** 123:1 135:9 137:6 138:13 142:21 174:11,18 176:10 177:12,17 180:24 181:3 183:5,9 185:10 188:23 199:7 201:8,9 202:8 204:15 208:20 209:18,19 210:17

**attachments** 90:15 182:6 185:2 202:19

**attend** 111:4,7

**attention** 130:19 131:10,16 132:14 233:7 247:1

**attorney** 8:17 9:5 155:4 193:12

**attorney's** 15:20 54:8

**attorney-** 67:12 74:20

**attorney-client** 53:21, 22 54:9 72:18,21 73:3 74:16 75:4,8,11

**attorneys** 8:17 27:16 69:6 72:17 76:12 146:4 158:17 219:9

**audio** 53:3 70:18 94:12 130:24 132:6 139:23 140:4

**audits** 117:2

**August** 6:15

**authority** 246:9

**automatically** 228:24

**available** 21:10,18 91:21 220:15

**Avalara** 135:17 242:6 243:4,5,13 244:3

**average** 111:14

**avoid** 39:12

**aware** 8:20 9:1 23:12 72:3 120:21 147:11 162:8,12,13 165:7 173:22 234:4 238:18 241:11 246:24

**away** 64:22 157:14

**awful** 77:14

**AZ** 58:14

**Azizul** 116:14

**B**

**babysit** 246:14

**back** 8:14 15:24 20:19 23:22 29:20 34:9,12 44:5,20 45:21 46:3,11 62:23 63:6,22 69:1 70:2 71:8 72:20 73:12,18 74:2,7 79:14 84:9 101:24 104:24 107:11,13,19,21 114:21 122:21,24 123:1 125:8 131:21 132:1 139:16 141:2 147:2,14,15,18 148:5 152:3 156:19,24 165:9 171:19,20 172:4 192:20 204:11, 12 206:10 212:4 213:14 215:10 219:16 231:12 232:14 233:12,14 235:24 236:3 237:23 238:20 239:5

**back-end** 77:18

**backend** 106:21

**background** 69:3 89:20

**backseat** 105:5

**backside** 61:15

**backwards** 197:4

**bad** 6:13 90:24 106:21 120:17 159:15 186:1, 2,22

**ballpark** 14:24

**Bank** 44:21 225:19 229:17

**banking** 224:1

**Bartlett** 29:8,9,12,17 95:5 180:19

**Bartlett's** 29:14

**base** 237:16

**based** 34:14 40:15 42:13 43:23 58:22 72:13 93:3,9 101:12, 16 102:10 103:14 105:7 106:21 108:11, 14,23 117:18 123:2 125:18 137:15 138:8, 18 163:2 176:17 178:5 194:9 234:17

**baseline** 70:17

**basically** 250:5

**basis** 19:13 33:19 40:2 241:4

**bates** 23:9 31:20 32:19,21,22 33:9 69:7 70:1,10,23 78:22 81:4,8,10 83:8,12,16 84:13 86:14 88:15 90:12,14 91:12 93:18 96:13 104:13 123:16 124:17,18 128:11 137:4 142:19,22 148:13 152:21 157:8 158:18,24 160:2 166:8,9 169:18 174:10 180:17 181:24 182:5,8,13 184:24 185:2 188:21 190:18 193:7 195:2 199:9 202:19 204:14 208:21 209:1,2 210:10,24 211:4 213:15 215:13 217:5 218:19 222:15 225:10 226:19,20 227:6,11 249:13,16, 22 250:3,8,9,12

**bathroom** 192:6 207:6

**be** 6:6 7:7 8:10 10:8, 17 11:9,22 14:5 15:7, 8,19 16:5,6 19:11 23:23 31:16,24 33:3, 12 46:24 47:19 49:13 50:21 51:21 52:13,18 53:21 57:3,5 61:5,13 63:18,23 67:21 70:16, 20,22 71:7 72:12,13, 18 73:5,6 75:4 76:3 77:4,21 78:9 80:22 81:19 84:4 86:9 87:14 90:7 91:21 92:5 93:13 94:22 99:10 101:23 102:14 104:8 105:4 106:5 107:14 113:14, 18 115:2 116:1,7,17 118:12,18 119:19,23 120:5 122:8,9 123:5 124:4 126:14 128:6 132:9 135:13 136:19 139:3,5,12 141:18,19 144:2,14 148:7

152:15 153:16,19,20 154:8,10 155:3,24 157:3 158:22 159:11, 16,19 161:13 162:5, 10 163:10 165:11 166:3 167:24 168:13 171:24 174:21 175:13 176:3 179:11 180:13 181:4,16 182:7,8,9 187:3,15,17 192:24 194:7,21 197:24 198:19 199:1 200:11 201:2 202:1 203:14, 21 204:6 207:11 208:13,21,23 210:4, 17 212:2 214:1,20 216:16,17,18 217:1 219:2 220:5,8 224:19 225:5 226:14 227:18 228:11 232:24 233:10 239:12 244:14 246:22,23,24 249:21 250:14,15,21

**bear** 46:14 116:6 193:5 206:18

**bearing** 179:7

**became** 28:10,14 178:5

**because** 10:8 11:4 17:18 19:10 20:7 26:13 27:9 32:5,10 39:23 40:7 53:20 61:17 64:22 65:3,22 67:20 74:18 75:3 79:23 99:6 101:22 103:13 105:6 106:4 110:8,13 112:23 113:21 117:15 122:7, 8 134:6,11 140:17 148:3 162:14 168:3, 10,22 171:4 172:6,23 175:17 182:5,9 184:12 185:2,23 191:16 194:2 197:3 198:15 203:7 206:5, 20 212:4 223:17 230:22 235:18 241:2 242:14 243:10 244:10 248:6 249:4,11 250:8

**because--** 151:3

**become** 162:20 164:15 165:23 171:24 184:17 211:22

**become--** 165:10

**becoming** 161:17 164:7,12 214:9

**been** 7:12 14:7 41:10 59:6 60:24 66:10 67:4,12 68:18 69:7,17 70:7 79:20 87:16 95:2 99:2 104:23 112:9,13 113:21 121:23 127:11 129:12 139:20 178:11 181:11 213:24 217:12 218:1,2 219:12 221:9 237:1

**before** 6:3 7:19 12:7 32:5 45:17,23 74:18 83:11 117:1 135:11 149:5 162:19 164:7, 12 172:23 178:17 194:1 207:1 209:21 210:1 235:12 242:3 249:20

**begin** 114:22

**beginning** 6:17 125:8 134:17 146:13 176:8 179:15 182:3 201:7 231:15

**begins** 6:10 84:13 99:16 109:1 132:22 163:21 174:9 202:6 204:14 207:21 208:18,19

**behalf** 6:21,23 7:1 17:1 28:24 29:4 168:14,19 169:3 218:22

**behavior** 133:4

**behind** 143:17 147:15, 18 148:5 232:13 233:12,14 238:20

**being** 24:12 62:8 111:24 117:22 143:5 150:9 154:13 200:24 213:10 214:5 221:2 241:15 251:16,19

**belief** 136:12

**believe** 13:6 27:5 32:3 34:17 38:6 41:22 42:19 53:20 60:23 61:2 64:1 65:22 67:19 68:1 69:9,12,19 71:7, 23 77:2,24 95:22 114:22 115:21 116:23 124:3 127:13,16 134:9 139:13 144:6 145:16 170:17 178:23 184:14,15 196:12 232:7 240:13 242:1 248:2

**believed** 135:6

**belittling** 238:22

**benefit** 51:8 191:9 199:8

**Bergen** 36:7,8,10 37:3,7 59:1 115:9 126:4 231:17 235:16, 17,21 236:16,18 237:1 239:6 244:20

**Bergen--** 36:19

**best** 31:9 41:23 50:9 65:12 68:17 97:20 158:16 171:22 210:18 231:24 235:12 246:22

**better** 70:6 115:13 117:1,6 122:20

**between** 89:12 150:12 154:20 232:15 244:3

**big** 23:23 102:11 103:15 132:16 208:24

**bigger** 227:1

**bill** 43:19

**bills** 53:17,18 54:3 64:23

**bind** 185:22

**binding** 155:4 183:20

**bit** 8:17 25:13 85:10 91:17 114:4,6,10 136:18 176:1 177:2 182:1 183:9 207:3 209:3

**blamed** 233:7

**blankets** 33:20

**blanks** 123:4

**blow** 183:8 208:22

**board** 243:1

**Boiling** 230:14

**bookkeeper** 37:19 135:1 190:13,15

**books** 149:10 150:22 151:13

**Borland** 193:11

**both** 68:6 91:4 103:18 171:23 217:18

221:18,21,24 222:4 238:4

**bottom** 126:3 166:13 174:21 198:20 209:2

**bought** 75:1

**bought-in** 204:3 205:17

**box** 61:8 239:9

**boxes** 239:6,7

**boy** 64:19

**brand** 132:12 239:16

**branding** 85:18 177:3

**brands** 109:6

**break** 8:15 113:15,16, 20,22 114:6,12,14 156:10 189:17 192:7, 12,13,23 207:3 231:1, 4

**breaking** 61:20 241:18

**breaks** 207:6

**Breit** 160:4,7,10

**bright** 103:3 179:9 189:9 214:16

**bring** 55:24 75:2

**Bringing** 63:19

**broke** 40:8,10

**brought** 29:11 75:7 77:10 130:18 131:10, 16 132:13 233:7 235:11 247:1

**buck** 106:2

**build** 87:10

**built** 41:18 97:8 107:17

**bunch** 188:10

**burning** 156:19

**busiest** 61:9

**business** 146:21 147:8 153:17 173:24 213:6 220:5 232:12 236:5,8, 9 241:3

**businesses** 236:12

**but** 6:3 7:8 8:13 9:24 12:24 13:15,21,23 14:7 15:7,12 16:7 18:4 20:4,8,11,23 21:10 22:18 23:21 24:11 28:13,24 29:4 31:9 32:4,9,15,21 33:8,15 39:6 40:3 41:13,21 49:1,13 50:9 53:1,6,22,24 63:12 65:13,14 66:3,14 67:10,14,19,24 68:22, 23 69:3,12 70:16,22 71:1,21 72:2,19,21 73:3,7 74:11 78:7 79:1,3 84:1,18 85:2 87:21 88:4 89:17,20 93:7 96:6 97:24 98:15 100:4,12 101:12,15 102:7,13 103:4,15 105:22 107:18 113:21 118:1 119:23 122:1, 20 123:6 126:15 129:6,8 130:10,22 131:1,5,17 132:15 133:15 134:9 136:16 138:8,10,18,21 140:10,11 141:22 142:22 147:5,11,14, 21,23 152:2,13 153:21,22 154:6 155:5 156:14 160:23 161:8 162:7,11,17,22 164:18 167:12 168:6 170:22 173:11,12 175:6,22,23 176:16 178:21 179:2 182:6, 11 183:24 185:17,21 186:15,22 187:9,18 192:7 194:8,9,16 196:8 197:23 198:14 200:1,14,15,16 203:22 204:7 205:11, 12,13,19 206:20 207:3 208:6,21 209:3 210:5,11 212:19 213:5 214:1,16 215:18 216:3 219:17, 19,23 221:9,10 223:19 225:24 227:18,21 228:1,14 229:23 230:20 232:14 234:13,22 235:1,7 236:1 237:19 238:24 239:23 240:2 244:12 246:20 247:16,19,22, 24 248:3,9,13 249:4, 23 250:3 251:3,19

**but--** 243:23

**buy** 149:2 184:1,2

**buy-in** 203:16
**by** 7:17 11:17 12:1 13:5 14:3,9 15:23 16:7,11 17:8,18,22 18:1 19:15,19 21:12, 24 22:17 23:13 24:16 25:19 26:9 27:14 30:4,5 33:17 37:15 39:4,18 41:10,16,20 42:20 45:5 46:13,16 47:3,8,22 48:11,16,22 49:6,8,19 50:14,24 51:2,12,20 52:9,16,21 53:10 54:6,12,20 55:9,12 59:9 61:4,11 62:17 63:1,7 64:13 66:1 67:23 68:2 69:10 71:4 73:19 74:8 75:13 76:14 77:2 78:2,12 79:7,23 80:14 81:1,21 83:5 84:11 85:8 86:7, 11 88:5,13,22 90:6,10 91:10 92:17 93:16 94:21 95:1 96:11 98:23 99:13 101:19 103:1 104:7,11 105:2, 13 107:4 109:2 110:19 113:5,12 114:24 116:4 117:11 118:4,21 119:15 122:5 123:22 124:15 125:17 126:24 128:9, 22 129:15,24 130:9 131:14 132:17,20 133:17 134:15 135:10 136:17,22 137:3 139:15 140:11,12 141:17 142:13,17 143:15,20 144:11 145:3 146:2,4 147:10 148:10,21 150:7 151:5 152:5,18,20 153:9 155:7,23 157:2, 6 158:2,21 159:2,23 160:1 161:7 163:8,13, 20 165:9 166:6 167:8, 14 168:5 169:8,11,22 171:11 173:4 174:4,7 175:15 176:6 177:15 178:16 179:5,13 180:2,15 181:19 182:2,22 184:3,22 185:24 186:24 187:11,24 188:8,19 189:7 190:2,15 191:21 192:14,22 193:3 194:12,24 196:7 198:3 199:3,12 200:19,23 201:5 202:4 203:8 204:10 205:21 206:9 207:15, 19 208:16 209:4 210:15,22 211:2 214:10,13 216:23 217:3,22 218:16 220:2,6,11,19 222:13, 18 223:22 225:4,8 226:17,20 228:7,16 229:10 231:14 232:17 235:15 237:12 240:7 241:20 243:20 245:5 247:5 248:1 249:14 251:10

**C**

**calculate** 17:6
**calculated** 17:13,16
**calculation** 68:1,5,9
**calculations** 66:11 68:18 69:18
**calendar** 27:4
**call** 30:12 79:15 92:2,5 95:24 96:4 97:11 99:1 106:19 107:2,7,9 108:4 161:8 174:16 237:7 239:4 240:22
**call--** 58:24
**called** 7:11 28:18 31:3 46:16 47:24 51:23 102:12 121:7 132:10 169:14 174:15 202:15 216:15
**calling** 49:12 64:8 154:22 155:1 160:23 168:21
**calls** 41:12 98:10,13, 18,21 99:6,8 112:24 117:24 136:16 145:23 155:4 162:24 169:5 186:14
**came** 18:18 19:4 45:24 50:20 64:24 65:17 70:13 87:8 89:16 101:24 106:6,15 142:6 195:24 199:9 205:11 244:17
**can** 8:15 13:19 14:1,8, 24 15:6,22 16:17 21:11 23:18 25:15 28:4 29:23 30:8 31:10 33:7,12 38:14 42:2 45:15,20,22 57:3 58:8 60:8 61:1 62:22 63:23 71:3,8,18 73:12,20,23 74:1 76:3 77:4,13 78:6 80:9 81:7 83:14 85:13 88:2 101:13 110:17 111:13 113:1, 16 123:6 131:15 140:15 141:22 142:2 143:1 145:24 146:9, 14 153:11 156:5 160:24 162:19 163:5 166:21 168:2,23 169:2 171:23,24 173:21 175:2 179:17 183:9 186:15 188:5 191:8,10 192:9 195:21,23 196:3,4 197:2,6 198:16 205:19 206:21 208:22 209:23 210:2,11 218:14 224:19,20 227:1 229:4 234:11 241:24 243:15 246:6 249:4,22 251:6 252:3
**can't** 8:20 11:4 39:13 40:6 57:5 65:6,9 68:11 79:2 81:17 85:6 87:22 99:8 102:12,17 106:4 142:6 145:13 146:1,6 148:3 162:11 175:21 188:14 189:21 191:1 198:9 209:24 213:12 225:20 226:2 227:19 229:14,15 232:4 233:1 235:10, 19 246:23 247:3
**can--** 151:21
**cancel** 149:9 150:21
**canceled** 152:8
**cancellation** 149:12 151:18
**cap** 183:10 185:9,14, 16 186:3 187:6
**capability** 42:2 107:8
**capable** 232:3
**capital** 203:15
**caps** 141:12
**card** 115:10
**care** 55:23 56:1,2 170:20 171:3,14,17 172:2 173:7,17,18 213:6
**Cares** 174:16
**case** 14:6 41:1 60:9 62:11 67:4 68:19 73:1 121:10,18 178:11 219:12
**Cat** 64:10
**catch** 108:20
**categories** 30:13 31:14 73:10
**categorize** 236:9
**category** 73:8
**Catherine** 134:19
**Cathleen** 47:14 134:23,24 135:12
**Cathy** 160:4,7,10
**cause** 232:10
**caused** 62:12 69:19 71:7 77:2 78:2 135:6 240:14 242:1 244:21, 22
**caution** 206:6
**CC'D** 201:11
**CDA** 64:3,8,17 77:19 248:1
**Cedric** 8:1 11:21 80:2 82:13,20,23 141:20 144:4 147:9,16,18 148:6 149:2 150:6,13 154:21 156:7 163:2 222:7 239:21,22 240:6
**Cedric's** 82:17 141:20 150:19 151:19 152:7 170:4 203:11 206:12, 14
**cell** 134:9,10
**cent** 203:15
**CEO** 178:5,9 179:21
**certain** 40:4 67:7 224:13 232:6,22 245:18
**certainly** 13:15,19 73:7 122:1 123:7 178:14 210:8 219:16, 21,23,24 247:22 248:2
**certainty** 189:21
**certificate** 243:11
**certificates** 243:9
**cetera** 33:20 250:8
**chain** 64:24 81:13 83:14 84:3,4
**challenge** 6:7
**challenges** 135:16
**challenging** 6:4
**chance** 32:19 125:3 247:17
**change** 40:17,20 131:23 134:1 190:10 221:1 249:19
**changed** 136:24 144:6 148:1,4 185:14 212:13,17,19 221:4 235:2,3
**changes** 223:18 244:18
**changing** 39:22
**chaos** 244:22
**chaotic** 245:8
**Chapman** 176:23 177:1
**characterize** 232:14
**Charlie** 64:9
**chart** 245:21
**chase** 44:21 144:21 223:24 224:5,12 225:19,20 226:1,20 228:18 229:5,12,17
**Chase's** 223:24
**chat** 85:4
**check** 122:21,24 123:2 178:14 247:24 248:2
**Cheryl** 193:11,14 194:14
**Chief** 120:5,8 121:2,7, 12 127:18 247:11
**choice** 63:19,21
**choose** 87:9
**Christmas** 237:21 238:1
**chronological** 198:22
**circulate** 249:7

**cite** 131:15
**cities** 229:22,24 230:22
**claim** 70:11
**claimed** 144:20
**claiming** 144:14 145:2,4
**clarify** 13:21 133:21 186:17 200:13 203:7 232:16
**classified** 30:7
**clean** 63:15 64:15 148:4
**cleanest** 117:20
**clear** 10:13 32:13 49:13 75:10 94:23 223:19
**clearing** 153:7,10
**clearly** 6:5 82:10,11 101:15 235:20
**clears** 153:5
**cleverly** 183:24 184:4
**click** 111:13
**clicks** 111:14
**client** 10:15 67:13 74:21 98:10,13
**climb** 111:15
**close** 18:4 157:12 188:16
**closely** 197:21
**closer** 190:9
**clumped** 28:8
**collaborate** 144:4
**collected** 89:15
**Collin** 18:21,22,24 20:4,7,16,19,23 21:1,5,9 25:20 35:4,8,13 42:13,14,16 55:3 79:11,15,20 95:10 97:20,23 98:2 100:9,14,16,22 101:1,15 103:17 104:16 106:6 109:14 110:7,8,11 111:10 112:6 113:7 116:10,18 118:2,6,13,15 127:5,11,13 131:22 132:24 133:3 136:1 180:19 234:16,17,21
**Collin's** 35:11 100:11 101:7,12 110:13
**colors** 116:19
**column** 226:23,24 228:8 229:19
**com** 110:22
**combine** 227:9
**combined** 226:22 227:4,7
**combo** 103:18
**come** 20:5 34:3 45:18 50:19 68:10 134:12 233:21 239:5
**comes** 106:2 122:11 242:11
**coming** 77:14 237:23
**comment** 27:15 110:11 188:2 205:15 206:11
**commentary** 215:3
**committed** 233:11
**communicate** 121:2
**communicated** 121:4
**communicating** 77:15
**communication** 9:14
**comp** 15:8
**companies** 64:5 73:10 87:24 127:17 236:14,17
**company** 29:11,12,15,17 48:1 55:21 57:7 58:4,6,16,18 59:3 61:5,7 62:20 63:4 64:1,2,7 65:18 77:19,20 78:4 87:4,15 90:2 95:2,7 106:20,21 120:23 121:7 125:22 126:20 127:1 144:1,2,23 145:8 149:3 151:19 165:10,11 187:22 190:8 201:17 204:16 212:8 220:5 221:7 236:24 238:24 242:23 245:11,21 246:3
**company's** 164:23
**compare** 185:21
**comparisons** 19:22
**compilation** 119:24
**compile** 18:13
**compiled** 16:7 66:12 138:6
**complain** 136:3
**complaint** 62:10
**completed** 65:13
**completely** 28:3,4
**components** 41:19
**computer** 9:12 52:15 77:18,23 191:19 205:12
**concern** 116:19 233:6
**conclusion** 136:16 154:23 155:2,5,10 160:23 162:24 168:21 169:5 183:20
**conduct** 68:3
**conducted** 127:10
**confer** 14:8 15:6 247:22 248:11
**conference** 9:2
**conferred** 12:20 18:15
**confers** 123:3
**confidence** 61:11 238:12,17
**confidential** 15:4,5,9,19 31:21 32:24 33:10,12 47:6 51:19,21 250:16,22 251:7
**confidentially** 15:14
**confidently** 108:21
**confirm** 94:17 141:23 191:1 224:21 247:8
**confirmed** 16:23
**confirming** 133:4
**confusing** 25:13
**connected** 240:18,19 242:15,16,19 243:24 244:1
**connectors** 242:17
**consecutive** 142:23
**consecutively** 84:14 99:16 124:19 152:22 166:9 195:3 211:4
**consider** 13:14 91:4 153:16
**consisted** 107:6
**consistently** 103:18
**construction** 105:6
**consult** 68:13 71:6
**consultant** 120:9
**consultants** 63:19 64:17
**consulted** 72:6 98:7
**consumer** 60:10 61:10 236:8 237:16,19 238:12,17
**consumers** 237:17
**consummated** 212:5
**contact** 106:14 153:15 211:9
**contained** 44:21 68:6
**contains** 53:14
**contention** 231:20,22 232:19 233:23
**contest** 178:24
**context** 86:2 130:13 133:14 135:9 142:9 143:23 146:12 171:7 173:12 197:20,22 204:8 210:2 245:14
**contingent** 165:5,16
**continue** 28:14,23 114:9,10
**continued** 61:20 242:17
**continues** 222:17
**continuing** 114:6
**contract** 27:1,22 28:11,19,21,23 29:2,4,5,6 39:20 40:1 41:3,5 105:9,15,16 120:5,22 122:9
**contractor** 35:11 36:24 95:11 211:19,20,22
**contracts** 168:18
**conversation** 69:17 108:11 128:5 137:13 173:23 212:9
**conversations** 42:1 92:24 93:1 129:4,8 130:2,5,20 137:11 138:6,18 140:8 172:13 174:1 219:9
**conversion** 18:7 23:1,2,4 25:3 34:16 44:11 240:9
**conversions** 23:6
**convert** 25:3
**converted** 212:2
**Conway** 12:23 16:8 17:9,12 37:23 38:1 44:17 52:9 193:9 199:14 201:10 202:9,14,23 215:4,14,17 217:11
**Conway's** 206:11
**copied** 186:4
**copies** 33:2 249:11
**copy** 74:19 83:20 146:21 158:14 159:8 175:21,23 178:18,19,22 180:9 181:9 183:10 208:3 248:17 249:10
**Corey** 7:1 13:14 15:12 33:4,7 45:18,24 46:20 67:12 69:2 70:24 71:1 76:12 89:19 122:20 182:11 219:21 249:10 251:2
**Corey's** 70:2
**corner** 78:23 208:21
**corporate** 12:10 30:9 218:22
**correct** 9:3,6 15:11 16:8 17:4 19:2 21:6,16,17 22:15,23 24:4,8,24 25:4 26:5,17,22,23 27:23,24 28:2,20 29:3 30:13 35:9 37:19,23 38:1,4,8 40:24 41:20 43:4,5,20 45:6 47:11 49:11,22 51:6,11,16 52:9 54:5,10 58:12,13 59:19,20 65:15,23 68:7,15 72:7 73:16 74:5 79:14,16 80:4 82:4,13,15,18,21,24 86:19,22 87:6,10 90:2,24 92:2,8 93:2 95:8,12,13,15,21 96:1,2,5 97:2,5,8,12,15,18,22 98:4,16 100:10,23 101:9 104:2,18 105:19 106:3,23 111:10 115:6,16,19 116:10,12 117:2,17 118:10,

13 127:2,3 129:17 130:16 134:3 136:2,7, 10 144:18 145:9,21 147:12 149:3,22 150:2,10,13 151:1,19 153:12 154:17 158:9, 13 159:8,20 160:20 161:10 165:6,17 166:17,18 167:5 169:24 170:20 175:9 176:15 177:5,19 178:1 180:8 182:16 183:17 186:7,12 189:8 190:16 191:2,5 192:1 195:6,17 196:11 197:10 198:7 199:13,17 200:24 201:14,18 202:15 204:4,17,20 205:14, 17 208:3 209:12,15, 19 211:12 212:18,22 213:3,11 215:23 216:11,24 217:12,16, 17,19,23 218:3,6 219:13 221:21,22,23 222:1 223:7 224:11 226:4 228:4,20,22 229:18 243:16 244:24 245:7,9 246:18 250:16

**correction** 189:10

**correctly** 20:2 170:10 239:8

**correlation** 62:18 63:2

**cost** 66:10

**costs** 64:18 66:12 67:18,20 68:1 72:12

**could** 10:23 13:1,21 23:22 28:15 32:21 33:15 39:23 41:14 53:23,24 63:11 67:14, 21 70:6 71:5,19 72:5 73:15,22 74:3,11 75:6 80:7 83:11 87:19 99:2 104:23 105:4,18,24 108:10,14,23 114:10 122:1 134:2 135:9,13 139:20 140:2 144:6 151:14 154:6,23 158:19 162:23 163:17 169:18 175:7,13 181:24 183:22 203:1, 10,14,21 204:8 206:11 213:19 214:7 224:22 229:20 230:17 232:24 238:9 244:8,9, 12 245:2 248:2,4,9,20 251:5

**couldn't** 61:7,16 62:6, 7 65:4 77:6,16 155:24 178:9 203:7 228:18 232:3,5

**counsel** 6:18 7:15 13:9 54:6,7 152:4 170:7 247:14,16

**counterclaim** 38:6 232:13 237:13

**counterclaims** 62:11 178:8 231:16 240:8 241:23 242:5 244:5, 17

**country** 38:15

**couple** 35:7 102:13 125:12 214:17 242:13,15

**course** 13:23 23:20 24:2 31:9 32:8 65:17 247:2

**court** 6:8,17 11:5 12:2 45:20 46:2 47:4,23 51:1 52:22 54:21 55:10 63:5 73:13,17 74:1,6 78:13 81:2 83:6,24 86:12 88:14 90:11 91:11 93:17 96:12 99:14 104:12 113:13 116:5 119:16 124:16 128:10 132:21 134:16 136:23 142:18 148:11 152:19 157:7 159:3,24 163:14 166:7 169:12 174:8 176:7 179:14 180:16 181:20 184:23 188:20 193:4 195:1 199:4 201:6 202:5 207:16 208:17 211:3 214:14 217:4 220:12 222:14 225:9 226:18 249:5, 15 250:9

**cover** 32:9

**crane** 65:2,5

**crawled** 111:21

**crawlers** 234:12

**create** 41:8 50:6,9 52:12,14 64:20 68:13 127:23 141:22 164:14,22 171:19 175:17 184:5,12 225:1 227:24 243:13

**created** 41:10 50:1 52:9 68:18 76:22 87:4 109:9 121:12,15 138:19 165:9 183:24 184:5,11 187:18 205:7,21 209:15 229:2 242:3 243:2 247:11 248:1

**creates** 44:13

**creating** 78:5 79:13, 16,17 107:20 177:4

**creative** 42:4,10

**credential** 225:18

**credentials** 229:12,13

**criteria** 93:10

**CTR** 109:23 110:2

**culpability** 246:16

**curious** 236:11

**current** 36:12 38:10 41:18 93:5 159:15 190:13

**currently** 9:2 36:24 195:11 217:19 247:6

**custom** 41:8

**customer** 25:8 31:4,6, 13 239:16 242:24

**customer's** 238:2

**customers** 239:3,4 242:13

**cut** 53:3 61:8 79:3 94:12 108:17 130:22 140:4 142:23 144:21 148:4

**D**

**D-I-L-E-E-P-A-N** 91:19

**D-U-S-S-I-A-S** 10:16

**daily** 77:15 241:4

**damage** 71:19

**damages** 59:15 60:9, 10,11,12,13,16,18,19 61:6 62:13 69:18 70:8,11 71:7,11,23 72:1,12 73:8 239:2 240:14 242:21,22

**dash** 185:11

**data** 23:1,10 24:24 28:1,17 34:18,20 60:2 222:20 225:13

**database** 219:22

**date** 6:15 20:17 34:22 36:2 37:8 40:14 70:12 101:6 126:21 141:3,5 146:13 161:18 162:3 167:1,16 169:24 172:19,21,22 175:7, 11 180:11 196:17 200:22

**dated** 82:1 86:16 91:15 94:1 96:16 104:18 111:10 112:12 115:6 124:23 128:15 137:7 158:4,9,23 176:11 180:6,22 182:24 185:6 189:4,5, 10 195:6,16 199:17 201:13 202:12 209:12 210:21 214:19

**dates** 169:16 173:2 175:5

**David** 35:19,22,24 42:21 99:19,21 104:15 106:11 109:11,17 110:16 111:1 115:4,18 116:12 124:20 125:2 126:10 128:12 136:9 183:3,5 184:1,17 185:4,10 186:4,11,18 187:6,16

**David's** 110:10

**day** 104:24 201:21 203:10 204:17 206:12 217:20 228:11 241:4 246:5,7 249:1

**days** 70:13 101:17,20 102:7,8,9,13 137:20 149:13 150:18 185:9, 13 186:9 246:5

**deal** 102:11 132:16

**dealing** 110:14 121:16

**deals** 242:10 243:6

**dealt** 190:7 235:22

**Dean** 6:21 10:15,23 28:19,22 29:11,19 60:23 61:4 62:12,18 63:3 65:23 68:2 69:19 71:7 77:2 79:9 85:20 86:16 87:8,14 89:12 90:17 91:1,15,17 92:24 93:21 98:6 99:18 104:15 106:20 107:7 115:4,9,21,23 116:12 118:9,22,24 120:21,23 126:19 127:1 128:17 130:15, 17 131:8,23 135:6,16, 22,23 137:7 138:8,19, 24 140:11,15 142:2 153:2,11,16 154:14, 16,18,21 155:16 156:1,7 160:11,15,17 161:9,16,18,22 162:5, 7,11,13,14,18,19 164:6,9,11,15,24 165:4,7,10,11,13,15, 20 166:14 167:5,23 168:1 170:3 171:18, 21,24 172:3 173:23 174:12,22 175:23 177:19 178:21 181:6 182:24 183:10,17,23 184:2,5,7,11,18 185:3 186:6,10,18 187:7,18, 24 188:24 190:16,20 193:14,22 195:20 196:19 197:7 200:23 201:10,16,21 202:9 203:14 204:3 205:7, 16,21 209:15 210:19, 22 211:18 212:6,10, 13,17 213:10,17 214:1 215:14,23 216:7,11,14,15 231:17,20,24 232:7, 19 234:22 235:5,6,12, 18,19,20 240:13,21, 22 241:8,11 242:1,2 243:7 244:10,17 246:13,14,15

**Dean's** 79:18 89:22 132:14 133:19 134:3 138:1,4,7 173:5 175:18 177:2 178:5 187:22 196:8,11,17 197:6 198:8 205:22 211:15 212:12,16 214:21,23 216:14 231:22

**Dean--** 168:1 213:12

**December** 104:18 111:10 166:14
**decide** 41:23
**decided** 190:3
**decision** 28:7 42:4,7, 21 54:5 93:8,9 98:7 103:9,14 107:3
**decisions** 127:15
**deep** 101:23
**defendants** 6:24 7:2
**defining** 235:21
**definitely** 176:2 239:3
**degree** 100:12
**delayed** 61:9
**delays** 237:17 244:5
**deliver** 65:4 108:10
**delivery** 248:20,24
**delta** 64:9
**denying** 154:13
**department** 14:20 100:4
**depending** 40:18 245:18
**deponent** 7:11
**deposition** 6:11 7:19, 20,21 8:6 11:1,6,9 12:4 14:5 15:5 21:9 27:17 31:1 33:12 46:21 47:1 48:9 59:5 72:14 74:23 75:2,12 76:8,13 137:17 149:6 231:16 238:11 248:7
**depositions** 11:15
**describe** 98:9 236:4
**described** 29:10 96:22 119:2
**describing** 42:6 245:8
**Design** 38:3 89:6 116:16
**designate** 15:4,20
**designating** 15:17
**designation** 15:7
**designations** 15:16
**designed** 38:7,10
**designer** 38:3 41:24 93:5
**designers** 91:2
**desire** 108:8
**Despite** 98:1
**detail** 24:15,19 122:3
**detailed** 28:9
**details** 106:22 107:10 147:4 212:15 235:22 239:16
**determination** 103:5
**determine** 206:21
**determined** 52:13 93:10
**determining** 63:21
**developer** 57:14,15
**development** 236:13
**devices** 9:14
**diagnostic** 77:23
**diagnostics** 63:20 120:10
**did** 6:13 8:6 16:19,22 17:6,11,12 18:13,14 20:5,14,19,23 21:4,15 23:8 25:22,24 26:24 28:1 30:24 31:9 34:3, 6 35:24 36:19 37:3,6 38:18,19,21,23 39:1,8 41:9,23 42:16,23 43:13,14,16 44:17,20, 24 45:18,24 47:13 50:2,6,7,12,18,19 55:1 56:18,20,22 57:2,7,11,18 59:21 60:1,5 61:4,8 62:11, 15,24 63:20,21 68:16 69:3 72:11,16 74:13, 18 75:19 76:15,19 77:7,22 78:17 87:12, 21,22 88:4 89:11 90:22 91:4 93:7 98:12 100:2,17 102:16 106:9,16,17 108:8,15, 19 109:5,8,11,14 111:4 115:15,17,18 117:4 120:1,11,12 121:2,6,8,12,17 123:20 124:7,9,10,11 125:22 126:21 127:23 129:18 130:15 131:3, 11 132:5 136:8 137:13,16 143:20 144:12 145:16 148:2 151:1,11 154:14,18 155:16 156:1 162:10, 20 164:7,16 165:24 167:10 175:18 177:2, 24 178:3,18 186:17 189:17 190:5 191:18 194:13,18 198:12 203:5 205:23 211:22 212:9,11 218:21,23 219:3,12 220:24 227:4 232:13 233:5 234:5 235:2 237:2,5 239:17 241:12,19 242:21 246:13
**didn't** 26:19 29:22 31:22 32:5 41:22 42:18 52:14 53:20 61:5,13 62:1,5,7,8 64:22,23 65:3 68:13 69:24 74:12 75:2,22 88:2 100:5 105:20,23 108:1,7,17 122:3 130:5 131:5,12 134:7, 11,12 138:1,3 144:18 146:5 161:8 164:17 165:3 168:8 185:23 193:23 198:12 200:2, 11 210:11,13 224:17 225:1 232:4,5,23 233:6 235:18 239:5 241:3 243:11,12 244:15 246:23 248:6 249:5,11
**die** 102:16
**died** 102:15,20 103:5, 6
**difference** 66:19
**different** 13:18 20:11 24:7,13 25:10 39:21 40:19 57:12 60:7,11, 12,18 61:1,24 63:14 64:14 66:24 76:24 91:2 92:15 98:1,24 102:20 105:23 127:14 130:10 145:20 155:9 163:9 172:4 180:9 184:10 186:3 187:15, 20 188:10 226:1 229:22,24 232:10 238:19 239:18
**difficult** 252:1
**difficulties** 135:24
**digital** 86:19 120:5,8
**digits** 226:6,11
**Dileepan** 91:18
**diligence** 92:8 106:17 107:5 108:2,15 109:5, 8,12,15
**dinner** 206:22,24 207:1,5
**direct** 7:16 62:18 63:2, 12 236:8 237:19
**directing** 110:7,10
**direction** 28:7
**directly** 62:19 63:3
**director** 42:10 94:10, 11,14
**disaster** 61:19 233:10 240:17
**disclosing** 75:7
**disconnected** 132:11
**discoverable** 32:17
**discovery** 72:18,23,24 74:22 95:24
**discuss** 97:11 133:8 216:7
**discussed** 21:2 97:12 108:8,14,24 128:24 129:7,11 130:3 138:8, 19 140:11 176:2 193:14 215:12 218:13
**discusses** 100:20
**discussing** 114:23 133:11 213:18 217:12 218:17
**discussion** 126:1,4
**discussions** 69:5 76:12 108:5 171:18 184:14, 15
**disorganized** 214:16
**distinction** 232:15 238:15
**distribution** 16:11 26:9 30:4,5 51:3,12 147:21
**distributor** 30:19,22 208:2
**distributors** 26:2,4,8 29:22 30:3,9,12,13 31:4
**dive** 101:23 212:15
**divvy** 246:7
**do** 7:6 8:6,11,15 9:14, 17,23 10:2 12:3 14:7, 10,16,23 15:18 16:13, 15,19,22 17:15,17 18:8,10 19:7,12 20:14 21:22 22:8 24:19,23 25:8,10,13 26:7 30:1, 2,3,5,16,20 33:21,24 34:9,12,23 35:5 36:16,23 37:2,3,21 38:7 40:1 43:8,10,11, 16 45:17,23 46:15,21 48:1,5 50:7,12 51:3, 22 52:1,24 53:1 54:15 55:1,12,18,20,22 56:6,8,20,24 58:2,3, 14,23,24 59:5,10,15, 21 61:4,5 62:13 63:19 66:5,6,12,22 70:1,6,7, 11 71:2,21 75:4,15, 16,18,19,22 78:6,21 79:8 81:5,22,24 83:9, 15,18 84:15 85:3,10, 21 86:15 87:15 88:16, 23 89:4 90:16 91:14, 19,20,22,23 92:5 93:20 94:1,9 96:15, 19,20,22 98:10,11 99:17 100:2,4,21 101:3,5,20 102:8 103:19,23,24 104:17 106:17 108:1,9,15 109:5,8,11,14,20,24 110:5,6,10,22,24 111:1,6,10,12,15,16, 17,21,22 112:3,5,8 113:6,17,23,24 114:2, 11 115:4,10,11,13,14, 15,18,20,21 116:15 117:20,21,22 118:16 119:5,7,20 120:2,6,7, 9 121:20,21 122:6 123:7,8 124:1,2,4,6, 20,22,24 125:1,7,18, 22 126:5,7,9,15,16 127:7,9,10,17 128:13, 14,18,19,20 129:1,3 130:4,11 131:19 132:23 133:4,6 134:19 135:3,4,11,17, 18 137:6,13 139:6,7, 13,17 140:16,17 141:23,24 143:2,4,9, 10 144:17 146:3,5 147:21,23 148:22,24 149:13 150:19,22 152:23,24 155:13,15 157:9 158:3,7 159:5

160:4,11,12,15,16,18 161:21 162:13 163:10,16,23 164:1, 17 166:10,12,14,16, 22,23 167:2,3 169:13, 17 171:14,15 174:12, 14,16,17,19,20,22,23 175:16,19 176:10,19, 23,24 178:10 180:3 181:1,2,6,7,21 182:11,23 183:1,6,9, 12 185:3,11,12 188:24 189:11,12,15 190:20,23 192:2 193:8,16,17,24 195:4, 5 198:2,21 199:15,16, 21,22,23 201:11,12, 24 202:10,19,21,22 203:10,11,16,18 206:11,14,20,21 207:23,24 211:6,7,16, 17 212:23 213:4,11, 17 214:21,22,24 215:2,5,14,19 216:8 217:6,8,10 218:17,24 219:1,16 220:6,7,22, 23 221:5,19,20 222:3, 22 223:1,2,5,6,10,21 225:13,14,15,17,22, 23 226:24 227:1,9 228:8,23 229:11 231:4,18,19,21,24 232:7,13 233:8,24 234:14,22 235:18,19, 21,24 236:1,2,16 237:2,14 238:6,7 241:8 242:7 244:6,12 245:3,24 246:6,15 248:9 249:6,19 250:2, 6,10 251:2

**doc** 248:6

**doc--** 10:4

**document** 12:6 31:22 32:3 46:15,19 47:24 49:7 51:2,23 52:3,17 53:7 54:14 55:11,17 58:11 66:13,16,17,18 69:7 71:21 72:3,6 73:15,21 74:4,17 75:1,3,7,9,11 78:22 81:14 83:8 86:14 88:15,17 90:12 91:12 96:13,14 99:15 104:13 115:3 119:17, 23 120:4 122:7,11,12, 15,16 123:9,10,11,16, 24 124:17 128:11 132:22 134:17 137:4, 16,19 138:2,13,16 139:1 142:19,20 143:23 148:14 151:8 152:6,21 154:21,24 155:2,17 157:8 160:3 164:12,15,17 166:9, 11,22 169:14,19 174:9,15 175:1 176:8 177:21 178:9 179:15 180:17 181:21 182:3 183:20,21,23 184:24 185:1 188:10,22 193:7 195:2 199:5 201:7 202:6,14,18 204:7,9 205:10,13,16, 22 206:4,8 207:20 208:18 210:7 211:4 217:5,15 218:17 219:5 220:20 221:14 222:15 223:15 224:18 225:10,12 226:19,21 227:13 228:13

**document's** 81:4

**document--** 164:13

**documentation** 243:14

**documented** 171:23 172:19

**documents** 10:3,6 14:8 23:8 32:15 60:1 68:7,23 69:4,15 70:10,23 74:19 76:15, 19 138:4,7 168:12,13 172:21 179:8 199:9 219:11 220:13 222:17 223:13 227:18 234:11 238:20 240:1 247:13, 14 248:8

**does** 20:12 23:19,20 34:20 36:10 40:17 54:22 55:14,20 73:9 81:8 91:1 95:14 112:23 125:23 135:19,21 141:12 144:8 156:17 157:14 166:24 167:15 172:5 181:8 187:12 197:3 228:11 232:23 233:21 240:9 247:6 250:19

**doesn't** 20:9 41:19 73:5 118:2 122:7 154:11 161:12 187:21 198:20 200:16 204:6 224:23 230:1,2 249:24

**dog** 64:10

**doing** 9:11 15:1 38:19, 21 138:17 154:5 171:22 176:1 197:22 206:24

**dollar** 18:6 22:14,22 62:15

**dollars** 18:3 62:13

**domino** 239:12

**don't** 16:17 18:4 19:10,17 20:1,6,8,10, 13,21,22 22:10,17,19 23:2,5 24:3,7,13 26:14,19,20 27:5,6,8, 11,18,21 29:16,18 30:11 33:14 34:17 36:2 37:8,12 39:5,13 40:7,11,13,22 41:6,21 43:2 46:4 48:7 52:12 58:21 59:18,23,24 60:17 64:6 66:1 67:10,17,19 68:11,21 69:14 70:21 71:24 76:8 79:1,6,17,21,23 80:16 82:6 83:20 84:2 86:3,4,6 87:13,23 88:3,4,18,21 89:10 95:3,22 97:23 98:5,6, 8,20 99:3,5,7 100:11 101:14 102:24 104:4 105:12,14,16 107:16, 17,18 109:7,10,13,16 110:3,12,18 111:3,5,8 113:3 115:23,24 117:13 118:17,19 120:16 121:11,19,23 122:18 123:5,14,21 125:24 126:13,18 127:13 128:1,2,4,22, 23 129:6,14,23 130:1, 3,8,13 131:19 132:15 133:9,14 134:10 135:7,13,14 136:24 137:15 138:11,17,19, 21,23,24 139:4,20 140:3,8,9,22 141:5 142:5,8,10 143:15,22 144:6,9 146:1,7 147:4,14,17 151:4,16, 22 152:9 154:24 162:7 163:6 166:2,19, 20 167:12 168:7,24 172:22,23 173:2,8,10, 14,16 175:6,22 176:16 178:12,19 179:1,2,6 181:10,13, 23 182:10,11 185:21, 22 186:21 188:6,14 189:18,20 190:1 194:5,7,9,10,11,15 196:23 197:4,15,23, 24 200:1,2 202:24 203:20 204:9 205:11 206:2,5,7,8,17 207:3 208:6,12 210:14,21 211:24 212:11,19 213:4,23 215:9,10 218:11,15 219:4,7,8, 17,24 220:1 221:4,12, 13,17 222:7 223:17 224:2,3,8,15,19 225:20 226:2 227:5 230:6,11,12,14,15,20, 22 231:1,3,22,23 232:2,21,22 233:1,8, 12 234:1,5,12 235:1, 19 236:4 237:22 239:5,22 240:4,6 242:22 244:19 246:12 247:2,9 248:3,5 250:17 251:3

**done** 70:12 72:1 73:5 108:14,23 113:4 134:2 147:18 161:13 166:17 174:3 192:5,7, 9 194:1 206:15 219:2, 3,7 222:7 233:12,14 242:18 247:19,20

**Doosias** 6:12

**dot** 110:22 183:6 185:11 209:19

**double** 237:18 247:8

**doubt** 159:8 176:19 180:10 190:23 192:2 194:18 199:23 200:8 208:8

**down** 8:10 16:10 23:17,22,24 35:3 43:6 75:14 82:12 85:10,19 89:2 91:17 96:22 100:19 103:8,17 110:20 111:9 115:8 120:4 125:13 133:2 135:8 141:2 142:22 146:9,15,20 149:8 158:6 163:17 166:19, 24 176:22 177:10,11, 16 181:3 185:13 190:18 195:15 196:16 197:3 199:19 201:20 202:17 204:15,23 209:17 211:10 217:6 220:4 223:3

**download** 85:6,7

**downloaded** 89:18

**downloading** 85:5

**draft** 172:10,12 174:24 175:2,14 183:3 205:3 206:4,5 214:21

**drafted** 153:19

**drafting** 203:19

**drafts** 172:20

**draw** 190:20 200:24 213:11,17 214:5

**drawn** 119:24 122:10

**drive** 110:5

**drove** 24:21

**due** 92:7 234:2

**duly** 7:12

**dumpster** 64:24

**dumpsters** 64:22

**duplicate** 123:2

**duplicated** 241:11

**during** 14:5 23:19 27:17 61:9 235:8 237:7 245:21

**Dussias** 6:21 10:12,16, 18 11:10 29:6 60:23 61:2 62:12 64:21,23 65:23 69:19 77:2 78:2,3 79:9 85:20 89:13 99:18 133:3 136:13 156:1,2 174:12 177:19 178:21 186:6 190:16,20 195:20 200:24 202:10 213:17

**Dussias'** 28:7 68:2 153:2

**Dussias's** 246:10

**duty** 246:13

E

**E-** 159:4
**e-tran** 248:19
**each** 8:12,13 22:24 24:24 25:1 30:21 59:14 66:9
**earlier** 207:8,9,10 216:1 249:4
**easier** 190:10 249:23 250:12
**easily** 134:2
**easy** 185:20
**edit** 177:24 178:3
**edited** 178:17
**edits** 177:22
**effect** 239:12
**effective** 204:19 214:20
**effort** 8:12 28:1
**efforts** 100:18 130:18 174:2 208:11 244:8
**eight** 43:7,20 55:15
**either** 122:4 131:11 182:11 206:5 223:17 230:12 239:7 246:6
**electronic** 33:2
**eleven** 75:15 76:16 116:8
**eliminate** 143:8 144:17
**else** 9:8 10:24 32:12 46:6 48:11 50:7,12 61:21 78:7 147:3 172:5 228:23 229:4 234:24 238:21 239:13
**email** 32:21 45:18,19, 24 46:20 79:9 81:5,23 82:3,6,8,17 83:9 84:16 85:20 86:2,15, 18 90:15,16,19 91:14, 18 93:3,18,21 94:1,4 96:15,18,21 97:2,12, 23,24 98:2 99:18 104:15 105:4 110:8 111:9 112:12 115:3,9 116:8,10 118:18 119:19 121:3 122:8 124:1,20 125:2,9,11, 15 126:22 128:12,22 129:16 132:24 133:2 134:3,12,18 137:6,7 139:16 141:6 142:21 143:2 145:7,12 146:1, 5,8,12 157:9 158:3,7, 14,23 159:4,8 160:4 161:9,19 170:4 174:11,12 175:8 176:9,11,23 177:7 180:4,10,18 182:7,18, 20,24 185:3 188:22, 24 190:24 191:2,4,23 192:3 193:8 194:4,11, 14,15,19 195:3,15,20, 22 196:1,6,8,11,17,20 197:1,8 198:4,8 199:7,14,20,24 200:1, 4,5,9,12,16,17 201:1, 8,10,20 202:7,9 203:4 207:22 208:4,6 209:6, 14 210:4 211:6,11 212:4 213:8,13,21,22, 24 215:13,23 216:2 223:4,7 226:3 237:5
**emailed** 33:3 82:13 176:14
**emailing** 91:1
**emails** 121:6,9 122:9 133:15,19,22
**embedded** 182:17
**emphasis** 237:21
**employ** 136:14
**employee** 29:17,18 35:13,22 95:19 195:9, 11,13
**employees** 238:20,21, 23 245:17 247:6,7
**employment** 136:13
**end** 27:1,4 63:22 107:11,13,19,21 131:21 147:20 169:20 196:6 228:2,3
**ended** 77:22 148:5
**ending** 134:18 166:10 176:9 179:16 182:4 199:6
**endless** 62:3
**ends** 124:19 142:21,24 163:22 174:10 180:18 207:21
**enough** 73:2 86:8 105:20 123:23 147:20 235:23
**ensued** 244:22
**enter** 168:18 169:2
**entered** 10:12 28:19 204:16
**entering** 120:22
**entire** 77:5,7,21,22 245:7
**entirety** 131:13
**entities** 53:14 73:10
**entity** 53:23
**equity** 137:22,23
**error** 126:14,17
**errors** 77:14,24
**estimate** 206:21 235:12
**et** 33:20 250:7
**Euler** 159:4
**evaluate** 106:18,20 107:24 108:2 115:15, 19
**evaluated** 106:23
**even** 6:8 39:5 62:6,7,8 109:24 116:15,16 122:4 127:7 138:11 144:9 145:19 187:17 198:16 230:22 242:3, 19 244:15 247:3
**even--** 28:23
**event** 92:1
**events** 65:1
**ever** 7:18 35:22 39:19 41:1 57:6 100:14 124:10 145:15,16 151:11 154:14 155:16 156:1 164:11 165:19 177:24 186:17 212:9 218:21 219:5,8 220:24 222:3 229:6, 11,14 244:19 251:18
**ever--** 165:20
**Everest** 26:16,21 27:22 28:2 34:16 241:10
**every** 24:20 61:20 65:1,9 87:21 98:21 122:2 189:9 213:2 243:7 245:16
**everybody** 7:4 11:11 23:19 46:5 192:23 243:9,10,12
**everyday** 245:17
**everyone** 10:14 118:5, 16
**everything** 15:13,17 51:18 77:3 78:7 140:17 143:17 153:19 161:15 239:12 241:8 242:15 243:3 246:18 251:14
**everything's** 15:19 51:21
**evidently** 106:4
**exact** 18:4 32:9 37:8 39:13,22 40:11 41:6 178:19
**exactly** 27:6 38:20 40:8 55:22 58:21 66:1 67:10,15 68:21 69:13 71:19 83:21 88:3 100:16 101:14 125:24 129:6 139:2 163:6 173:2,14 175:21 188:15 211:24 212:19 218:11 235:10 249:21
**EXAMINATION** 7:16
**examined** 7:12
**example** 22:10 30:8 34:24 35:1 40:23 44:17 66:13 131:15 144:16 229:15 232:18 233:4 234:24 237:24
**Excel** 66:20 67:3 68:7 182:19 226:22 227:10 228:5
**exchange** 89:12 121:6 125:2
**exchanged** 172:10,12
**excited** 111:20,24
**excluding** 248:14
**Excuse** 71:10 73:14
**execute** 42:2,3 151:11 218:21 232:6
**executed** 219:5 232:8
**executing** 222:3
**exhibit** 11:23,24 47:1, 2,19,21 50:22,23 51:15 52:19,20 54:18, 19 55:6,8 59:6 78:10, 11,18 80:23,24 81:13, 15 83:2,4,19 84:12 86:9,10 88:10,12 90:7,8,9 91:7,9 93:13, 15 96:9,10,13 99:11, 12,15 101:12 104:9, 10,13 113:9,11 114:23 115:2 116:2,3, 8 119:13,14 124:12, 14 128:6,8 132:18,19 134:13,14 136:20,21 142:15,16 148:8,9 149:11,19,21 151:17 152:7,10,14,16,17 157:4,5 158:23 159:1, 12,13,16,17,18,19,22 160:2 162:10,17 163:11,12 164:3 166:4,5,8 169:9,10 170:23 174:5,6 176:4, 5 179:11,12 180:13, 14 181:17,18 184:20, 21,24 188:17,18 192:6,24 193:2,6 194:22,23 199:1,2 201:2,4 202:2,3,6 204:12,13 207:12,14, 20 208:14,15 210:24 211:1 214:11,12 215:12,22 216:21 217:1,2 218:13,21 220:3,9,10,16 222:11, 12,15 225:6,7 226:14, 16 227:24 250:7,19
**exhibiting** 150:1
**exhibits** 33:2 214:17 227:24 249:5 250:15
**existed** 62:8
**existing** 28:21
**exists** 174:24 178:14 219:22
**exorbitant** 240:20
**expectations** 101:2,8
**expected** 227:17
**expeditiously** 71:2
**expenditure** 65:9
**expenditures** 62:17 63:2,8,10,11 65:12, 17,22,24 66:5
**expense** 46:16
**experience** 112:16,18
**experienced** 78:1

**experiences** 135:23,24 136:4 242:24 243:1
**expert** 24:12 41:13
**expertise** 105:8 110:13
**experts** 73:6
**explain** 28:5 29:23
**exports** 55:24
**expressed** 22:7
**extension** 138:12 181:1
**extent** 24:9 41:9 52:12 53:22 74:16 86:1 92:23 101:10 118:8 127:11 136:15 160:22 162:24 168:20 169:4 183:18 185:15 219:15
**extract** 83:24
**eyes** 15:20

**F**

**F-O-U-F-A-S** 143:5
**face** 10:23 159:10
**Facebook** 133:8,11 134:2
**facet** 245:16
**facets** 246:1
**facility** 237:1
**fact** 28:12 34:17 80:3 98:2 149:20 151:1 154:7 167:20 177:21 186:19 187:7 194:18
**factory** 153:15
**factual** 155:10
**fail** 232:20,23
**failed** 78:8 131:13
**failure** 124:4
**fair** 86:8 123:23 183:21 219:24
**fairly** 112:9 195:22
**faith** 247:23 248:11
**fake** 230:18
**fall** 52:13
**falling** 239:6
**familiar** 87:1 137:18 190:8 240:9 241:15
**far** 30:1 34:12 44:13 68:10 72:3 125:18 147:2 197:3 228:8
**fast** 80:13
**featured** 131:20
**February** 199:21 200:6,22 201:14,21 202:12 203:4 204:17 205:16 208:4 210:20, 22 213:9 214:19
**federal** 11:6
**fee** 64:19
**feel** 41:14 197:4
**feeling** 105:17
**fees** 53:19 54:8
**few** 8:9 25:2 34:15 58:1 66:3 67:1 68:6 69:17 95:11 103:3 130:23 137:20 155:10 164:2 213:8 214:16 234:8 247:13
**Fifty** 156:18
**fighting** 84:2
**figure** 22:19 33:4 57:7 60:23 122:10 247:23 251:6
**figured** 15:17
**file** 124:10
**filed** 62:11
**filing** 193:16,19 194:1
**filling** 123:4
**final** 90:14 93:8,9 141:19 149:13 150:19
**finalized** 193:15,19
**financial** 60:10,16,18, 19 61:6,14 64:18
**financials** 15:2,8 71:16,17
**financing** 148:19
**find** 102:18 136:5 151:24 178:9 193:6 242:17
**findings** 136:5
**fine** 10:13 37:14 46:7 83:24 113:21,24 114:8 152:14 156:12 175:5 192:8,14 197:15 198:18 214:5 250:17 251:10
**finger** 126:5
**finish** 71:10 102:23 131:5 132:7 210:13
**finished** 167:12 242:3
**first** 7:12 12:15 57:6, 20 66:16 77:20 81:10 83:16 88:23 89:11 90:13 91:13 93:19 101:17 102:8,13 119:19 124:19 125:1, 11 141:2 164:13 174:24 175:13,20 177:17 185:9,19 203:9 217:7 222:16, 19 241:7
**fit** 43:19
**five** 46:5,23 113:17,18 139:10 179:24 192:12 195:2
**fix** 77:11 79:6 235:3
**fixed** 40:22 41:2,4 63:23
**flip** 227:5 236:1
**flying** 116:19
**folks** 95:20,23 118:18 120:22
**follow** 13:1 29:22 249:23
**following** 25:7 31:3
**follows** 7:13
**for** 7:6 10:6,10,13,20, 22 12:1 14:1,24 15:3, 14 16:7 17:1,4,14 18:24 19:1,7 20:15 21:9 22:10,24 23:23 24:24 25:12,17 26:3 29:23 31:1,3,5,14,16 32:6 33:11,12,20 34:1,6,23 36:18,21 37:3 38:14 40:19,23 41:8,12,19,24 42:8, 23,24 43:11,14,19 44:17 45:16,23 46:5 47:3,22 48:8 49:10, 14,21 50:7,13,24 51:8,10,19,22,24 52:6,18,21 53:6 54:20 55:1,3,9,20,22 56:3,9, 20,21 57:2,8,12,18,19 59:14,18,22 60:9 61:1 62:2,19,23 63:4,14 65:2,4,5 66:9,12 67:1, 6 69:6 70:10 72:14 74:19,22 75:8,12 76:4,13 77:13 78:12, 15 80:9,13 81:1,3 83:5,7 85:5 86:2,3,11, 13 87:4,9,15,16 88:13 90:10,14 91:10,13,21 93:16,23 95:11,14 96:11 99:13 100:2 101:2 104:11 105:23 108:7 110:16 112:9, 14,23,24 113:12,20 114:6,15 116:4,19 117:1,13,24 119:11, 15 120:10 121:13,22 124:4,15 127:17,23 128:9 131:19 132:15, 20 134:15,22 135:20 136:16,22 137:5,17 141:13 142:12,17 143:23 144:16 145:6, 23 146:4 148:10,12 152:18 154:23 155:1, 5,9 156:11 157:6 159:2,23 160:23 161:13 163:13,17,21 164:15 166:6 168:21 169:5,11 170:12 174:3,7,10 176:1,6 177:3,4 178:6,7,9 179:4,7,13,17,21 180:15 181:19 184:22 185:8,21 186:14 187:16 188:19 189:10,21 190:10 191:9 192:7 193:3,5 194:24 196:18 198:21,23 199:3,6,8 201:5 202:4 203:24 207:5,15 208:16,22 210:7 211:2,15 214:13 215:18 216:3 217:3,8 219:2 220:11 222:13 223:11,24 225:8,18,20 226:17, 21 229:15,16,20 230:21 232:5,18 233:10,12 234:4,24 235:16,21,24 236:3, 12,15,16,18 238:17, 21 239:1 240:14 241:10 242:4 243:2 244:19,22 245:21 246:17 247:18 248:5, 7,16,19 249:18 250:11 251:5,8,16,19, 22 252:3,4
**forget** 131:17
**forgot** 11:15
**form** 87:18 90:3 92:9, 14 98:19 101:10 104:3,22 117:8 129:10 144:19 145:1, 22 149:23 151:14 154:22 155:21 156:4 160:22 162:21 167:6 169:4 171:6 173:20 183:18 186:13,20 187:8,23 188:4 189:23 205:18 216:13 238:7 245:1 246:19
**formal** 219:20
**format** 31:9 32:9 50:18 66:22 89:20 122:23,24 201:18 204:6
**formats** 66:24
**former** 141:20 149:2
**forth** 104:24 165:9 171:19,20
**Forty** 188:21
**forward** 110:21
**Foufas** 143:2,5,6
**found** 62:5 179:20 244:14
**foundation** 210:5 224:15
**foundational** 194:17
**four** 25:7,12,17 29:21 30:15 31:16 50:22 51:10,14 112:14 174:9 202:6 226:6,11 239:8
**frame** 235:4
**Fran** 170:4,6,7,8
**Fran's** 172:1
**frankly** 14:6 16:6 31:17 227:17
**fraudulent** 133:3
**free** 41:14
**friend** 143:7 177:2
**from** 13:12 14:10 16:11,12 18:8,14,16, 18 19:1,13,22 20:5 22:1,2,3,4,11,23 26:3 27:16 28:9 33:8,19,21 34:3,16,24 35:5 42:3

43:8 45:4 46:20 47:16 50:1,2,12 51:6,24 52:14 59:2,15 65:17 66:7 67:14 68:14 75:16 79:9 81:5,23 83:9 84:14,16,17 85:1,20 86:16,21 87:9 89:3 90:17,19 91:2,14 93:21 96:15 98:9,18 99:3,16,18 103:8 104:15 110:4 111:9 113:7 115:4,9 116:10 122:11 124:1,8,20 125:12 128:3,12 132:13,24 134:19 135:16 136:1,6,9 137:7 142:6 143:2 148:1 151:13 152:22 154:10 157:9 158:3,7 159:4 160:4,14 161:3 166:14 171:7 173:13 174:12,16 176:11,23 180:19 182:24 183:10 185:3 189:1 193:9 194:20 195:4,16,20, 24 197:5 198:19 199:10,14,20 201:10 202:9,22 203:11 207:23 209:6 210:10 211:6,11 212:22,24 213:3 215:4,14,23 221:2 230:3,16,19 233:21 234:16,17,24 235:11 247:14

**front** 10:3 12:4,12,20 16:15,17 18:10 19:10, 21 21:23 22:7,11,20, 21 26:3 31:7 33:15 34:1 46:15 59:6 68:11 81:5,22 83:8,9,20 93:20 115:1 123:23 163:10 169:20 174:19 176:17 177:17 224:9

**frustrated** 125:20

**fucked** 128:17

**full** 45:11 81:7,9 83:12 133:18

**fully** 162:8

**fulsome** 23:10

**functional** 78:6

**fundraising** 160:9

**further** 85:19 89:2 96:22 103:17 109:24 110:20 111:9 115:8 120:4 127:4 133:2,7 158:6 166:19,24 176:22 195:15 199:19 201:20 211:10 223:3 247:9 252:1

**further--** 251:23

**furthest** 226:23

**G**

**G-R-E-I-S-I-N-G** 170:13,16

**gain** 101:1,15

**gains** 103:22

**game** 31:23 144:6 219:24

**Gary** 57:21,24

**Gary's** 57:23

**gather** 10:9 73:2 122:4

**gathered** 55:1

**gathering** 31:10

**gave** 83:15 210:19 228:5 229:14 233:4 237:24 240:22 243:10

**general** 51:24

**generated** 223:18

**gentleman's** 233:17 234:3

**get** 6:3 13:13 14:1 15:14 18:14 20:23 21:1,5,14,16,17 23:14 25:22,24 28:15 29:20 30:24 31:21 32:19,23 33:5 34:5,6 40:19 46:11 47:13 59:1 60:24 62:15,24 78:20 103:3 108:7,14,23 113:7 124:7 132:1 136:18 157:14 167:11 173:13 174:3 179:8 196:8 206:24 210:2, 11,17 224:23 235:2 241:1 243:13,14 244:8,10 249:3,7,9

**gets** 107:17 147:21

**getting** 23:24 39:9 44:14 140:1 147:11, 13 224:21 244:2 249:13

**Gibb** 95:17

**Gibbs** 42:19 95:17,18 136:7 180:20

**gifts** 30:9 237:21 238:1

**give** 7:7 8:20 20:16 27:11 30:8 39:23 81:7,9 83:12,24 125:3,15 133:13 142:9 146:12 156:17, 18 169:18 181:24 194:8 197:23 209:21 228:23 230:18 249:5, 11,17

**given** 7:19 13:23 23:16 47:14,15 72:13 105:21 140:11 154:18 162:1 210:21 229:3 242:11 243:8

**giving** 164:17 172:1 229:12

**Glec--** 6:11

**Gleckler** 6:12 7:5,10, 18 12:4 14:11,22 15:24 16:12 23:16 33:22 51:24 52:4,18, 23,24 53:2,6,8 54:13 59:11 69:11 71:6 75:15,17 79:8 81:5,22 83:9 84:15,17 85:1 86:15 88:17 90:16 91:14 93:20 94:2,9 96:15,23 99:17 104:14 115:2 122:6 123:9 132:23 157:9 160:4 163:24 166:10 168:17 169:13,23 174:12 176:11 177:19 178:5,21 179:21 180:3 181:22 182:23 185:3 188:24 193:8 199:13 201:9 202:8 207:22 209:5 211:5 217:16,19 221:19,22 222:5,19 223:10 224:13 225:12 231:15 251:15

**glitched** 70:18 132:6 139:24

**Gmail** 195:16 209:10

**go** 13:22 16:10 19:4 20:19,23 21:5,15 24:11,14,19,20 25:24 30:24 33:8 34:5,6,12, 20 35:3 38:19,21 43:6 44:20 45:11 46:4 50:9,10 53:24 68:24 71:8 72:9,19,20 76:2, 7 80:9 81:8 84:5 89:20 90:4 92:10 98:19 101:12 104:3, 22 106:24 114:4 117:8 118:1 122:21, 24 123:1 129:12,13, 21 130:7 136:16 139:16 141:6 142:24 144:6 146:11 148:20 152:2,3,13 155:5,6 156:19 157:14,20,22 160:23 162:23 167:6, 13,22 169:5 171:6 172:17 173:13,21 178:18 183:22 186:15,22 187:9,16 189:24 191:10,17,19 192:9 193:6 197:3 198:22 204:11,12 205:13 206:10 207:3 210:11,12 212:4 213:14 214:7 215:10, 21 216:13,24 217:14 218:23 219:16 235:24 243:9,12 246:20 251:6

**goals** 110:22

**goes** 14:10 16:12 18:7 33:21 34:22 35:5 43:8 44:5 59:15 61:19 62:9 75:16 84:14 86:21 88:16 89:3 91:13 93:19 94:21 98:9 99:16 103:21,23 107:16 109:23 110:4 112:2 116:9 117:19 119:18 132:23 142:2 148:14 160:13 196:20 203:11 208:20 213:20 227:19

**going** 8:10,13,16,18 10:8 11:22 15:17,19 16:5 19:11 23:14,15 31:16,19 32:4 33:1,9 34:9 37:13 40:7,10 46:14,24 51:21 52:11, 18 54:17 69:2 70:5 71:2 72:18,23 73:6 74:20 76:2 78:16,20 81:9 83:15,18,22,23 97:11 100:4 102:11 105:24 106:8,13 110:20,21 113:21 114:15 118:13 123:5 131:4 144:9 147:2 152:22 160:13 162:5, 22 163:1 167:24 171:19,20 172:24 177:8,16 179:7 183:8 193:22 197:1 200:15 203:21 206:2,19,23 207:5 209:17 210:3,8, 16 214:1,19 216:16, 17,18 219:19 233:5 236:10 239:15 247:19 250:5,15

**gone** 127:15 130:24 222:8

**gonna** 208:23

**good** 7:18 11:10,12 17:18 104:2 106:20 107:12 109:4,18 192:23 231:7,21 232:1 235:18,20,21 247:23 248:11,21 250:14

**Google** 23:9 131:21 132:11

**got** 9:19,22 11:20 31:5,15,23 32:13 34:8 40:22 47:16 48:13,17, 18 49:1 50:21 51:6,13 59:8 64:14,15,16,17 71:15 72:2 73:21 80:20 89:2 94:12 110:13 112:16 115:23 120:4 122:8 140:3 148:1 173:6 175:21 177:18 180:24 181:5 191:19 192:14 195:15 198:11 205:23 207:9 208:20,21 209:19 210:23 220:3 225:5 226:11,24 227:18 228:2 234:15,16 242:14 249:7

**gotta** 156:18 193:6

**grant** 97:24

**great** 15:24 82:11 92:4 113:18 242:24

**greet** 95:24

**Griesing** 170:8,11
**ground** 8:9
**Group** 57:17
**guarantee** 219:18
**guess** 24:9 26:20 27:9, 19 32:22 33:6 50:8 70:1 78:16 86:4 119:22 120:15 122:10 123:8 127:14 136:19 142:8 154:24 172:23 179:2 182:8 185:15 197:23 198:1 205:11 229:7,22 240:21 251:4
**guessing** 27:9 39:12 142:11 175:6
**guesstimate** 17:18
**guesstimated** 17:8
**guidance** 79:18
**guide** 169:7
**guided** 221:10
**guideline** 23:15
**guilty** 23:19
**gun** 167:13
**guys** 8:6 11:10 24:3 26:20 30:20 41:19 58:11,18 62:12 80:3 87:5,9 89:11 97:2,10 104:20 113:20,23,24 121:2,13 124:7 127:24 156:9 203:19 204:2 205:15,19 207:9 251:23
**guys'** 156:14 231:4
**guys--** 203:23

**H**

**H-O-Q-U-E** 116:15
**H2--** 213:16
**had** 10:9 11:14 20:5,7 23:10 28:9,22 29:11, 19 32:10 39:6,20 41:10 42:1,2 44:18,24 47:14,15 48:19 55:3 56:17,21,24 59:1 61:5,13,17,23,24 62:2 63:11,17,18 64:19 65:2,3,5 69:6 72:11, 13 73:15 74:21 76:12, 21,22 77:5 78:3 80:3 82:13,17 93:1 96:3 97:14,17,21 98:3 105:17 107:2 108:24 109:6,9 122:22,23 123:3 128:2 129:4,8 130:1 131:18,19,22 133:18 134:6 136:13 138:8,19 140:17 143:14 144:23 145:2, 8,16,19 149:1 154:8 161:18,22,24 162:2,8, 14,15 164:9,18 165:22 172:10,13 205:7,16 212:6,13,15 214:21 216:18 219:11 224:5 225:24 227:17 236:24 237:16 239:4 240:24 241:1,8 242:13 243:7,8,9,11 244:10,12 246:14,24 248:7 251:23
**hand** 7:6 78:23 119:24 122:10 213:7 226:23 238:9
**hand--** 167:9
**handed** 210:20
**handle** 33:15 58:12
**handshake** 167:1,4, 16,20 233:16
**handwritten** 13:18 49:13
**Hang** 244:3
**happen** 8:13 24:21,22 61:20 108:19 148:2 162:11 232:4,5
**happened** 24:22 44:11 62:1,4 147:15 235:17 239:11
**happenings** 60:6
**hard** 8:11 123:13 142:22 178:8 208:23
**harm** 59:14 237:14,15 238:13
**harmed** 60:24 61:2,3
**harms** 60:8 238:19
**has** 10:12 23:17,21 31:6,14 33:6,7 43:7 53:7 61:2 66:15 69:19 71:7 72:24 73:4 89:15 95:2 112:18 113:4 144:20 171:4 172:3 183:24 185:14 188:12 228:10 229:21 237:15
**hasn't** 137:1 185:16
**hate** 10:11 130:24
**Haute** 230:12,13
**have** 7:14,18 9:14,17, 23 10:2,6,7,23 11:14 12:20,21 13:6 14:6,17 15:3,21 16:15,17 18:10,17 19:7,10,12, 15,17,21 20:1,3,6,8, 10 21:22,24 22:7,8, 10,14,19,20,21 23:1, 16 24:11,22,23 25:10, 16 26:3,7,9,14,19,21 27:18 29:23 30:1,3,4 31:22 33:14,24 34:6, 9,17,21,23 36:13 39:15 41:13 42:24 43:2,11,14 44:10 45:9,19 50:7,12 51:22 54:14 55:1,11 59:5,18 60:17 63:20 65:14,16, 19,21 66:10,12,23 67:4,12,13,24 68:11, 18,24 69:7,24 71:13, 21,24 72:1,5,20 73:5, 6,15,22 74:4,17 75:4, 7,12 77:7 78:21 79:20 83:19,20 86:2,3 87:16 88:23 90:16 93:20 98:3,6 99:2 100:14 103:17 104:23 105:18,24 107:24 108:5 109:20 111:17 116:6 121:20,23 122:19,21,24 123:1, 24 127:10,11,15 130:4,5,11 132:15 134:2,7,11 136:12 137:20 139:20 140:2 143:23 144:18 146:3, 10 147:4 152:3 154:6 161:2 166:20 167:1, 10,16 168:7,12,18 169:1 170:18,20 171:12,14,23 172:1 173:17,18 175:18 176:19 178:10,11 179:6 181:11 184:16 190:23 191:15 192:2 193:8,15,23 194:1,18 199:14,23 200:14,17 201:11 202:8 206:20 207:4,22 209:6 210:16 211:5,15 212:2,9 213:24 215:18 216:2 219:12 221:9,10 223:19 224:2,5,8,15 225:24 226:22 227:5 230:17 234:14 236:14 237:1 238:6,7 243:14 246:8, 13,16 247:7,9,10,11 248:2,4,6,15 249:10, 14,15 250:8,17 251:23
**haven't** 70:7,12 78:19 229:3
**having** 7:11 69:17 125:19 135:24 136:3 173:24 193:18 219:8 229:11 240:21 245:24
**he** 11:2 13:1 17:12,19 18:4 19:1 20:7,17 29:18 35:17,19 44:18 45:18,24 48:19 78:7 79:13,17,18,23 85:23 86:21 91:21,24 95:6, 14 98:2 99:22 100:2, 3,6,12,17,19 103:21 104:4,5 106:9 109:20, 21,23 110:4,20 111:13,17,18,20,23 112:2,18,19,22,23 113:2,4 115:12,21 116:16,21 117:14,15, 18,19,22,23 118:1 119:1,2 125:20,24 126:12 128:22,23 131:5,10,11,13,16,17, 18,22,23 132:14 133:4 143:19 144:5 145:1,2,19 147:13,21 153:7,18,21,22,23 154:1,4 161:1,4 162:1,2,15,22 164:6, 9,11,18 165:15,22 166:17 167:24 168:2, 3,10,11 172:3,5,6 177:2 184:2,6,12,13, 17,18 187:17,18,19 188:12 211:16,20,22 212:10,19 214:2,4 215:17 216:14,16,17, 18 232:2,3,4,5,8,13, 23 233:2,4,7,9 234:15 237:5 241:9 244:17
**He'll** 78:14
**he's** 10:19 29:13 35:15,17 48:17 49:1 80:10,17,19 84:20 88:19 95:7,11 97:24 101:17 110:7 112:16 116:16 118:16 123:12,15,19 137:1 143:7 145:4 153:15 158:12 177:4,5 188:6 194:7 208:2 223:20 240:3
**he--** 172:6
**head** 95:3
**header** 85:1
**heading** 12:12 53:5 84:22
**hear** 8:16 27:16 107:18 131:5 244:21
**heard** 20:2 51:18 108:21
**held** 31:8 32:7
**help** 18:11 20:18 23:23 77:10 107:3 154:9 172:14,24 221:6 241:2 243:13 246:7
**helped** 100:3 122:4 162:14
**helping** 79:18 85:17 100:6,9 175:24 244:9
**helps** 160:8 197:24 241:22
**her** 9:19,22 10:10 14:1 21:8 31:7 32:16 54:6, 7,8 72:16,19 74:17 75:1,2,11 76:1 79:5 80:13 101:11 125:3, 12,15 131:4,5 133:13 135:5,20,23 144:20 145:23 146:23 149:24 158:16,17 170:14 175:7 183:20 185:21, 22 187:9 188:2 196:1 200:13,16 205:5 210:6 214:6 223:12 248:7 249:5,10
**here** 6:10 12:9 17:15 19:10 29:21 32:13 33:2 55:5 57:14 67:24 70:3 74:17 75:12 82:20 84:19 85:20 87:1 89:3,19 98:9

100:19 109:17 119:19 120:1 122:18 126:3, 12 128:24 130:12,14 133:12 137:10 138:5 140:15,20 143:8 144:13 147:19 150:10 152:23 156:19 166:13 167:16 177:5 180:18 183:14 185:10 186:11 190:20 193:24 202:20 207:1 209:14 216:11 217:14 219:17 220:20 221:13,18 222:9 224:15 226:3,23 231:8,23 232:11 233:13 236:1,2,9 240:2,5,12 244:2 251:3,16

**here's** 72:1 115:9 154:3

**hereby** 151:12

**herein** 7:11

**hers** 79:3

**herself** 196:22

**Hickman** 7:1 70:3,9 150:3 179:17,19,23 180:1 182:12,15 249:12,21 251:5

**high** 191:10

**Highland** 230:9

**highlight** 102:5 120:1 122:10

**highlighted** 85:11,14 98:22

**highlights** 53:1 119:24

**him** 10:24 12:21 17:14 21:15,17 27:8 29:11, 19 37:14 76:3 80:6 86:3 95:10 98:7 102:23,24 128:18,21 131:12 154:12,19 155:22 161:8 164:17 165:5 166:1 172:1,4, 21 205:8 212:2,10 214:8 233:6 244:12

**himself** 216:15 240:6, 22

**hindsight** 183:24

**hire** 106:8,13

**hired** 29:19 63:21,24 79:23 80:3 127:17 154:9 164:19,22 173:23 190:15

**hiring** 87:5 106:7,12 107:6

**Hiroshi** 158:7,11,14

**his** 10:23 18:21 20:5 21:11 28:7,23 42:13, 18 65:4,5 76:11 80:7 101:8 102:23 115:23 127:7 131:10,16 133:3,21 134:9,10,12 143:19 145:21 153:7 165:5,15 197:1 203:16 212:7,12,13, 17 215:8 231:24 232:8 233:7 237:4 244:11

**history** 239:17

**hmm** 23:21

**hold** 28:10,13,14 48:14 85:5 157:18,21 186:10 206:19 239:9

**holiday** 61:11

**honest** 8:21

**honestly** 250:1

**hope** 211:14

**hopefully** 210:2

**Hoque** 116:15

**horrible** 243:1

**hospitality** 30:9,10

**hour** 114:14

**hours** 207:10 247:14

**House** 207:23 208:5

**hover** 200:14

**how** 7:23 8:4 13:20 14:23 15:17 16:1 17:6,12,15 18:13 19:6 31:5 32:13 33:4 34:12 36:7 37:16 38:19,21, 23 39:1,15 41:23 43:16 44:3 45:8,13 47:13 60:23 62:15,24 66:6,19 79:19 94:16 95:2 100:22 101:2,20 102:8,18 103:5 106:20 107:17 108:7 111:20 113:4 123:6, 16 145:13 157:14 162:13 165:24 166:21 168:2,24 173:8 175:16 190:9 197:3 206:22 212:7 221:5 223:18 225:22,23 227:19 231:4,6 236:4, 9 237:14 239:22 240:6,24 241:15 245:19 247:6 248:21, 23 251:18

**How's** 231:2

**Howard** 189:13 190:4 199:10 213:3,15

**however** 250:10

**HS** 199:5,9 213:16

**huge** 118:5,15

**hundred** 18:3 40:6

**hyphen** 183:6

**hypothetically** 75:1

## I

**I'D** 13:9 15:3,8 33:2 39:12 68:24 72:15,20, 21 92:4 122:24 248:19

**I'LL** 21:7,13 24:9 30:12 41:11 49:12 50:8 51:8 68:20 72:8, 9 73:2 75:24 76:10 78:15 79:15 81:3 83:7 86:1,13 89:14 90:14 93:23 102:19 114:11 134:22 136:15 137:5 142:20 145:5 146:3 148:12 154:22 155:21 156:4 157:20 162:24 163:21 173:11 174:10 176:9 185:8 186:13 188:4 199:6 204:5 205:18 219:14 223:11 246:19

**I'M** 8:18 9:1,21 10:4 11:22 12:21 13:3 15:11 16:5 17:21 19:9,11 20:11 21:14 22:18,19 23:19 24:6 25:13,16 27:7 30:1 31:15 33:1,23 35:12 37:1 38:20,24 39:9 40:6,9 42:11,15,17 43:22 46:14 48:7,10, 11 49:15 51:17 52:11 53:3,5 57:7,8,9,10 60:22 64:4 65:8 66:19,20,22 67:17 69:2,11,12,15 70:3,18 72:19 73:23 74:9 75:10 76:5 78:15 80:16 81:9,14,16 82:7 83:15 89:14,16,19,22 90:21,22 94:11,13,19 96:24 97:1 98:1,22 99:1 103:2 104:5 105:3 107:19 108:17 110:21 111:20 114:8 116:15 119:12 121:4 122:10,18 123:11 130:21 132:4 134:23 137:18 138:15,22 139:23 140:3 142:14 143:18 145:4,5 147:16 148:19 150:15 151:9 153:10 154:13 155:9 156:19 157:11 161:19 163:1 165:2, 12,13 169:17 170:3, 14 173:24 176:18 177:8,16 179:6,9 183:8 184:10 188:2 189:1,8 192:9 194:16, 17 196:9,21 197:1,4, 15 198:4,5 201:13 203:6 206:19 207:12 209:1,17 210:12,16 212:24 213:15 214:16 215:8 217:14 219:2 222:24 223:16,20 224:11,14 227:23 230:5 232:4 236:10 238:15,16 239:15 240:1 245:3,4,16,19, 20 246:4,22 247:16, 19,20 248:13 249:12 251:18,22

**I'VE** 57:6 85:11,13 117:20 135:2 137:18 234:12 247:13

**I--** 138:10 223:15

**ID** 222:24 224:4,9,12, 17 225:15 226:7,8

**idea** 175:17 234:14 236:14

**identification** 12:1 47:3,22 50:24 52:21 54:20 55:9 78:12 81:1 83:5 86:11 88:13 90:10 91:10 93:16 96:11 99:13 104:11 113:12 116:4 119:15 124:15 128:9 132:20 134:15 136:22 142:17 148:10 152:18 157:6 159:2,23 163:13 166:6 169:11 174:7 176:6 179:13 180:15 181:19 184:22 188:19 193:3 194:24 199:3 201:5 202:4 207:15 208:16 211:2 214:13 217:3 220:11 222:13 225:8 226:17

**identified** 13:17 38:17 84:12 238:6

**identifies** 217:15 221:18

**identify** 14:13 28:8 60:8 61:1 63:19 67:1 69:24 70:16,22 77:13 83:21 123:6 222:4 249:23

**identifying** 67:20 70:10 224:7

**IDS** 224:5 226:1

**if** 6:8,13 8:11,14 15:6, 11 20:2 21:10 23:15, 22 24:11,14 25:16 27:8,9,10,11,18 29:18 30:15 37:13 39:11,12 41:13 44:17,21,24 46:5 50:9,11 53:19 57:12 63:20 64:6 67:9,10,18 68:23 69:1 71:3,5 72:5,15,22 73:14 74:3,24 75:6,9 79:17 80:7,8,15,16 81:17 82:7,11 83:13, 18,21 84:1,3 85:9,19 86:1,4 87:14 91:17 98:6,20,21 99:2,7 101:15 103:21 105:11,17,23 108:19 113:20 115:24 120:4 122:24 123:2,6,7 126:14 128:4 129:11 131:5 132:12 133:24 134:1,10 136:24 138:12 139:16,17 140:9,23 142:3,8,9,24 143:23 145:14 151:2, 15 152:13 154:4 155:2,5 156:5,6 161:4 162:23 164:11 165:11 167:12,18 168:11,23 171:6,7 172:3,18,21,

22,24 173:5,12,24 175:4,5,6,22 177:10 178:14 179:1 180:24 181:3 182:11 183:20 184:17 185:13,17 186:22 187:19,24 188:4,12,14 190:18 192:10 193:22 194:2, 6,8,9,17 195:20,23,24 197:14,21 198:6,15 199:9 200:2 202:17 203:1 204:7,14 205:11 206:1,6 208:22 209:18 210:10,18 213:23,24 216:18 218:7,10 219:11,15,19,22,23, 24 223:14,18 224:15 226:23 228:13 229:8, 14 230:16,22 232:2 234:13 235:19 238:16,17 239:24 240:2,18 243:12 244:19 245:2,15,19, 20 246:14,15,22,24 247:2 248:9,11,20 249:3,14,24 250:3

**ignore** 233:1

**ignored** 131:11,16,23 132:15 232:22 233:3

**Illinois** 14:19 17:2,4 18:1

**illusion** 184:5,12

**image** 181:11 182:18

**IMG** 209:19

**impacting** 8:23

**implementation** 246:17

**implementing** 244:17

**implication** 173:11

**important** 93:10

**imports** 55:23 56:1,3

**impressions** 111:14

**improperly** 240:19

**improve** 109:24

**in** 6:6,9,11,19 8:1,6,14 9:2,3,5,8 10:3,24 12:4,12,20 13:17,23 14:6,11 15:9,18,19 16:15,17 17:3 18:1,10 19:10,17,21 20:3,8 21:4,23 22:7,8,11,20, 21 23:9,22 24:12 25:11 26:3,12 27:22 28:2,23,24 29:1,24 30:11 31:1,7,8,9 32:7, 9 33:15 34:1 36:24 37:11 38:6 39:9 40:1, 11,20 41:17,20 42:7, 21 43:2,18 44:11,14 45:19 46:15,20 48:5,9 49:4 53:6,15 55:24 56:22,24 58:20 59:6 60:9,22 61:2,6,22 62:11,13 63:12,19 65:3 66:13,14,23 67:2,3,4 68:6,11,14, 19 69:7 70:4,15 71:8, 16,17 72:3,6 73:1,15 74:4 76:1,13,16 77:10 78:7,22 79:13,15,19 80:3 81:4,5,22 83:9, 20 84:19,24 85:4 86:14 88:16 89:6,16 90:1 91:18 92:1,7,8, 12,13,20 93:20 95:21 96:7,14,21 97:2,12 98:3,7,12,18 100:4,11 101:2,6,8,11 104:24 105:6 107:6 108:2 109:5,8 110:14,21 115:1 116:24 117:6, 15 120:18 121:9,15, 18 122:2,23,24 123:4, 23 124:18 127:12 129:20 130:17 131:8, 13,20,21 132:16 133:3,24 136:5 137:16,20 139:8,13 140:18 143:14,15 144:23 145:8,17,20 148:5,13 149:3,5,20 151:1,19 153:19 154:9,10,11 156:19 160:2 161:2,8,13,15 162:3,9,10 163:7,10 164:19 165:5,8,15 167:11,19 169:7 171:18 172:20 173:10,22,24 174:2 176:9,14,17 177:21 178:8,11 179:16 181:8 182:5,18 183:24 186:3,19 187:7,12,22 189:19 190:24 194:18 195:20 196:10 197:9 198:8 199:19 201:17,21 204:6,8 205:16 206:15 207:3 208:21 209:2,14 211:23 212:10,17 213:6,9 214:18 216:1,2,14 217:15 218:5 219:11, 12 222:16,18 224:8, 10,13 225:22,23,24 226:20 227:18 229:1, 3,17 230:16,22 232:8, 12 233:15 234:11 236:6 237:1 238:6,11, 12 239:8,17 240:3,17 241:6 242:5 243:8 244:3,4,5 245:14 246:5,6,16,22 247:22 248:11 249:3,23

**In-person** 8:8

**inaccurate** 173:1 197:24

**inappropriate** 127:6

**incapable** 235:20

**incident** 251:22

**include** 53:20 193:22 250:19

**included** 54:4 70:9

**including** 21:18 64:17 116:12 224:16 244:18,20

**incorrect** 92:11 167:7 178:2 196:12,14 237:17

**incorrectly** 61:7,10

**increases** 137:23

**incurred** 65:22 68:2

**independent** 35:11 211:19,20,22

**indicate** 104:1

**indicated** 185:20

**indicates** 183:16 223:3

**indiscernible** 6:11 17:24 22:4 36:19 38:21 42:11 48:21 49:14 53:2 56:15 64:19 65:6,20 67:16 70:15 94:8 108:16 130:19,21 131:2,24 132:2 138:22 139:21 140:23 146:11,24 151:8 165:1 172:15 181:15 182:12 187:1 197:12 227:20 233:17 250:24

**individual** 24:23 30:12 237:3

**individually** 218:23 219:6 221:22 222:5

**individuals** 13:13,24 53:14

**information** 10:9 12:21 15:3 18:17 19:1,4,12,20 20:1,3,9, 10,12,16,24 21:1,19, 22 22:21 26:14 28:6, 10,15 30:21 31:1,5,8, 11 32:1 43:23 44:4, 14,18,22 45:1,2,3 50:2,12,16 54:9,24 60:2 67:6 72:19 73:3 76:20 99:7 113:6 115:23 131:21,24 132:3,7,9 171:9 172:5 234:15,16,23 238:22

**informed** 162:16

**infringe** 76:11

**initially** 28:6 40:12 101:16,22

**initiatives** 78:3

**injuries** 60:9

**injurious** 245:8

**injury** 59:14 238:17

**input** 96:4 97:15,17,21 161:3

**inquiring** 39:6

**instance** 238:3

**instances** 238:4,6

**Instead** 136:3

**instruct** 76:10

**instructed** 165:4

**instructions** 13:24

**instructs** 8:18

**insurance** 166:17,20 168:2,12,13

**integrated** 61:18

**integration** 239:10

**interest** 141:15 143:14,15,16,19,20 144:13,17,20,23 145:2,8,14,16,20,21 148:15,22 149:3,10, 13 150:1,22 151:19 152:8 203:15,16

**interested** 187:17,18, 19

**interesting** 89:3

**interests** 143:9 186:5

**interject** 12:24 23:7 69:22 72:9,15,21 122:18 172:18

**international** 55:18 242:10,12

**internationally** 242:11

**Internet** 18:6 19:12,18 20:20 21:5,16 24:3,7, 10 41:13 191:18

**interpreted** 31:5

**interpreting** 31:10

**interrupt** 10:11 14:22 130:22,24

**interrupting** 10:21

**interruption** 16:1

**into** 24:14,19,20 26:13 28:8,13,15,20 29:11 40:8 42:5 50:18 61:16 72:19 76:2 107:17 122:2 127:11 135:16 136:18 162:9 168:18 169:2 184:1,2 204:16 212:13,15 221:11 223:24 224:7 226:22 227:13,24 229:5 237:21 240:23 244:8, 10,11 247:2,3

**introduce** 6:18

**introduced** 161:1

**inventory** 77:15,16 78:1 241:10

**investigation** 20:15 127:11 128:3

**invited** 111:7

**invoices** 62:7 234:2

**involve** 36:23

**involved** 42:21 73:11 79:13,15 90:1 95:20 96:7 122:2 127:12 173:19 245:16

**involvement** 29:14 100:11

**IP** 229:21,23 230:18

**IRS** 14:18
**is** 6:8,15,16 8:19 9:3,5,6,8 10:13,15 11:2,5 12:6,16,19 13:22 15:13 16:8,11 17:4 18:19,21 19:2,20,21 20:17 21:15 22:14,20,22,23 23:14,16 24:1,7,10 25:1,4,7 26:4,17,22 27:18,22 28:2,20 29:2,9,12 30:13,18 31:12 32:7,16 34:14,16 35:4,9,13,17,19,24 36:8,12,14 37:16,19,23 38:3,8,11,14 39:16 41:20 42:10 43:3 44:7,8,10,11 46:19,24 47:10,24 48:11,14,16 49:24 50:2 51:2,5,9,10,19 52:18 53:13,18,23 54:3,4,7,8,9,24 57:6,17,20 58:4,12,16 60:9,23,24 65:15,23 66:16,17,18,22 67:17,18 68:6,7,9,22 70:1 71:19,24 74:24 75:9,21 78:16 79:5 80:15,16 81:7,10,16 82:3,4,7,18,21,23 83:8,21 84:3,15 85:23 86:13,18,19 87:5 88:9,15 89:9,17,20 90:2,12,14,15 91:1,12 93:18,24 94:1,7,9,14,15,20 95:5,10,14,17 96:13,18 97:4,5,7 98:2 99:15,21 100:22,23 101:2,8 102:11 104:13 105:22 106:16 107:5,15,20 109:23 110:2,8,13 111:9,21 112:12 113:2 115:1,3 116:14 117:19 118:10 119:17,22 120:3,8,19 122:7,11 123:16,19 124:1,17 126:19 127:18,21 128:18,21 130:10,15,16 131:17 133:4 134:17,23 135:7 137:4 138:15 139:19 140:7,9,16 142:1,3,19,22 143:5 144:8,18 145:6,11,21 146:19 147:1,2 148:5,12 149:1,3 150:6,10 151:8,12 152:8 153:1,3,6 154:5 155:10 157:16 158:11,13,23 159:8,16 160:2,7,11,17 161:4,9,19 164:3,18 165:6,8,14,16 166:8 168:3,15,17 169:24 170:8,12,14,15,23,24 171:1,16 172:6 173:6 174:9,24 175:1,8 176:15,20,22 177:5 179:15 180:8,17 181:4,13 183:2,5,17 184:4,10,11,24 185:1 186:18 187:5,7,21 188:21 189:8,10,13 190:12,19,20 191:2 193:6,7,11 194:16 195:11,13 196:5,9,11,15,16,24 197:3,5,15 198:1,2 199:13,17 200:12,16,20 201:7,16 202:6,14,18,19 204:16 205:11,14,20 206:4,5 207:8,20 208:1,3 209:15 210:7,18,24 211:8,14,16,18 212:1,23 213:1,15 215:12,22 216:7 217:5,11 218:1,6,13 220:16,20 221:8,9 222:9,15 223:4,7,9,23 224:10,12,14 225:10 226:3,6,19 227:5,11,13 228:5 229:6,20 230:4,5,11,13 231:20 232:19 233:2,9,15,23 235:12,16,21 236:4,7 237:8,20 238:12,15 239:1 241:17,21 242:6,9 243:17,21,24 244:2,20,23 246:18 247:17 248:11,23 249:12 250:12,16,20 251:12,14
**is--** 152:11
**isn't** 23:18 31:8 187:14 210:9 249:18
**isolating** 62:17 63:1
**issue** 131:3 232:21 233:8 234:1,2 241:23 247:1
**issued** 17:3 69:23 72:24 199:10
**issues** 76:21,23 77:8,17 162:14 164:20 231:17 233:7 234:6 237:16 246:9
**it** 8:14 10:1,11 11:20 14:7,10,24 15:18,20 16:6,12 17:1,8,17 18:7,18 19:3,4,19 20:2,7 22:20,21 23:19,22 27:17 28:7,8,13,18,21,22,24 29:7,10 30:16 31:15,22 33:15,21 34:20,22 35:5 36:3 37:9,11 38:14 39:21,22,23 40:8,22 41:1 42:3,4,5,13 43:8 44:5,21 47:16 48:13,16 49:4 50:13,18,19,20,21 51:13 53:5,7,13 55:1,3,17 56:14,17 58:21,23,24 59:8,10,15 60:23 61:19,20,24 62:3 63:18,21 64:6,24 65:5 66:16,17 69:3 70:6,9,12,21 71:5 72:11,22 73:22 74:17 75:3,10,12,16 77:11,16,22 78:6,14,15,16,19,20 79:2,3,6,15 80:8,20 81:7,8,11,14 82:5 83:20,21 84:17 85:3,4,6,7,10 86:3 87:14,16 88:9 89:2,6,16,17 90:5,19,21 91:1,13 92:1,3 93:7 95:6 98:9 99:2 100:12 101:15,16,22,23 102:3,14,16,20 103:3,15,16 104:23 105:7 106:2,5,22 107:5,10,17 108:7,20,24 109:19 110:13 112:21 116:7,20,23 117:3,10 118:3,12,18 119:4,9,23 120:13,15,20 121:13 122:3,7,11,19,21,24 123:6,19 125:1,4,20 126:1,8,14,15 129:10 130:15,18 131:23 132:1,9,10,12 133:9,14 134:6,9,10,12 135:13,21 137:1,20,23 138:17,18,23 139:4,19,20 140:2,10 141:8 142:1,2,6,7,9,21,24 143:1 144:3,9 145:6,14 146:1,6,13 147:3,5,23 148:1,3,4,5 149:9 154:6,8,11,12,15 155:4,8,13 156:5 157:13,15,16,19,20 158:18 161:2 162:12,13,24 163:21,22 165:14 167:17,18 168:15,17,23 169:4,16 170:12,13,15 171:23 172:6,22 173:1,13 174:3,15,18,21 175:1,18,19,20,21,22,23 176:1 177:17 178:4,9,11,14 179:1,21 180:6 181:3,9,13 182:8 183:24 184:4,11,18 186:1,2,22 187:3,4,10 189:8,10,21 190:9,10 191:4,18,19 192:7,9,14 193:6 194:2,8,9,20 195:19,24 196:2,5,15,17 197:4,6,7,21 198:5,11,15,20 200:2,3,12,14,16 201:7,16,19 203:7,11,14 204:6,15 205:5,9,11,23 206:5 207:8 208:6,7,8,19,22 209:13,16,20 210:6,10,12,13,17,21,22,23 211:18 212:13,19,20 213:20,24 214:4,8,19,22,23 215:11 216:24 217:6,7,15 218:14,15,24 219:16,19,22,23 220:21 221:9,10,18 222:17 223:3,21,23 224:21,23 225:5,15 226:11,21 227:1,19,21,24 228:2,10,14 229:14,15 230:1,4,17,18 231:8,20 232:2,5,19,23,24 233:2,7,11,14,23 234:5,17,21 235:2,3,16 240:18,22 241:2,3,4,8,11,12,16 242:4,15,19,22,23 243:1,2,6 244:13,21,22 245:2 246:15 247:2,3,23 248:5,10,12,23 249:4,10,24 250:10,18 251:3,12,21
**It'll** 152:15
**it's** 8:11,13 9:24 11:6 15:15 18:16 21:13 27:17 31:17,23 32:9,13 41:17 48:21 53:5 65:6,11 66:5,10,11,19 70:21 73:21 74:9 76:9 79:3,5,8 81:17,19 84:1,14,18 85:5,6 86:14 88:16 89:23 90:13 93:19 94:19,20,24 96:14 101:7,15 102:12 103:8 104:18 105:6 112:12,13 114:6 115:2,3 116:8,9 119:11 120:4 122:1,8 123:2,16,20 124:18,23 125:12 128:11 132:22 134:18,23 137:5,6 138:13 142:20,21,22,23 144:7 146:24 148:3,13,15 150:14,16 152:16,21 155:1 157:8,16 158:18 159:4 160:3,23 161:12 162:4 163:15,18,22 165:4 166:8 167:19 168:21 169:5,19 170:12,22 171:1 172:7,9,19 174:11 176:8,9 177:18 178:24 179:10,23 180:18,24 181:5 182:3,9,13,17,19 185:1,2 186:21 187:14 188:9,21,22 189:5 191:10,11,17 192:7 193:5 194:6,20 195:22 196:12,14,18 197:19 198:16,17 199:5,7 200:13,15 201:8 202:7 205:3,5,12 207:7,9 208:19,20,21,23 209:3,9,19 210:1,10,21 211:4 215:13,22 216:10 218:2 219:23 220:22 221:21,24 224:23 226:8,24 227:10 228:4,13 229:8 231:4 236:23 238:23 240:4 241:22 242:11,23 243:24 244:1 245:12

246:8 247:15 249:1 250:12
**itching** 203:22
**item** 46:20
**itemization** 65:14 72:12
**itemized** 65:6,11,12
**its** 27:1 90:15 131:13 174:11 176:10 199:7
**itself** 242:23

J

**J-A-D-I-S** 195:4
**J-U-N-G-R-E-I-S** 134:23
**Jack** 91:21 94:7,9,17, 20,21 95:2 180:19
**Jacqueline** 94:20
**Jadis** 195:4
**Jah-dis** 195:8
**January** 19:13,24 20:3 26:4 33:19 34:10,24 55:19 110:21 115:6 157:10 161:19 169:24 170:2 172:10,23 211:23
**Japanese** 158:12
**Jay-dis** 195:9
**JCB** 207:23
**jeez** 201:13
**Jeffrey** 176:23 177:1
**Jim** 6:23 9:5 15:11 76:6 186:1 191:15 203:22
**Jim's** 27:15
**job** 6:13 192:23 231:21 232:1 235:18, 20,21
**John** 29:8,9,12,14,17 95:5 180:19
**join** 92:2
**joined** 184:17
**JP** 222:18 223:13 224:8,21 227:6 228:3, 4
**jpg** 209:19
**JPM** 222:16,17 225:11 226:21
**Jude** 160:8
**July** 137:7 141:6 182:24 189:4,6,10 191:4,23 203:16 204:3,19 205:17 212:17 214:20
**jump** 75:14
**jumping** 167:13
**June** 90:17,21,22,24 91:15 94:1 96:16
**Jungreis** 134:19,22
**just** 8:9,12,14,15 10:12,17,19 11:10 12:15 14:16 19:21 22:18 23:11 25:11,16 27:7,12 28:13,14 29:9 32:13 34:24 37:13 39:9 42:3 43:18 46:19 47:5 48:17 49:13 50:15 51:8 53:2,8 57:7,9,10 58:24 60:22 62:3 63:9 64:24 65:5, 24 70:5,12,13 71:10 72:1 74:2,9,18 76:6, 10 77:19 78:7,24 79:5 80:9,11 81:3,7,10 83:7,21 84:2,20,22 85:4 87:16 88:9 90:15 93:23 94:17,22 96:24 99:1 100:7 101:21 102:2,10,11,14,16,20 103:5,8 105:22 116:6 126:15 127:19 131:3, 4,16 132:5 134:22 140:7 142:14 144:21 146:3 147:5,17 150:15 152:12 153:7, 10 154:23 156:14 157:11,18,21 162:18 164:20 167:11 170:23 177:12 179:7,19,21 182:13 185:17 186:20 187:13 188:3 190:9 192:11 194:6,15,17 196:9,21 197:2,16 198:7 199:6 200:13 203:6,22 205:5,9,10 206:6 207:5,9 209:1 210:3,4 215:10,21 216:2 218:23 223:11, 14,19,20 224:14,22 227:13 231:8 236:10 238:9,16,19 239:15 240:3 243:2 247:13 248:7,8 249:10,18,22 250:3,5,7,10,12

K

**K-** 147:11
**K-1** 147:13,21
**K-1's** 218:5
**KA** 96:18
**Kashwere** 11:19 42:8 46:16 47:24 54:14 95:14,19 99:23 100:2, 20,22 101:3 117:5 124:3 139:8 144:8 174:15 183:6 184:1,2, 7 185:11 189:1 195:10,11 201:17 202:15 212:8 213:4 235:6 236:4 237:15 244:14 247:6
**Kashwere's** 115:13 226:7
**Kashwere.com** 133:22 191:24 226:4
**Kashwere.com.** 223:5
**keep** 8:14 20:9,22 23:15,22 30:20,21 39:21 49:4 67:20 103:21 197:9 207:5 221:6 239:5 240:3 250:3
**keeps** 39:22 131:21 170:19 171:13 173:17
**kept** 13:23 64:8 77:14 99:6 134:12
**keyword** 71:24
**kickoff** 96:18
**kind** 14:9 121:16 135:12 151:11 154:23 182:17 183:19 219:20 246:17 249:19
**kindly** 6:5
**knew** 105:8 161:13,14 162:2 164:9,18 240:24
**know** 8:16 14:23 17:15,17 18:4 19:9 20:13 22:17 24:14 27:12,21 30:2 32:11, 17 36:7 37:14 39:2 40:13 41:21 44:14 53:19,22 55:24 57:10 60:11 61:12 62:2,6,8, 21 63:15,20 64:20 65:2,13 66:1,9 67:10, 14,18,19 68:21 71:18, 19 75:21 79:17,23 80:6,16,17 83:12 84:2,3 86:6 87:23 89:10,18 92:1 94:9 98:5,6,20 99:3,5,7 100:11,16 101:14,16 102:8,10 104:4 105:5, 20 106:7,12,20 107:11,16,17,18 108:7,13,22 109:11, 13,14,16 110:3,12,18 111:3,5,8 112:22 113:3,19,21 114:13 115:18,23,24 117:13 118:17,19 120:16 121:11,19,24 122:6,8, 20 123:3,7 126:13 128:22,23 132:14 133:9 134:10 135:7, 13,14 136:24 138:21 139:4,17 140:22 142:5,10 143:15 144:9 146:7 147:3,5, 18 151:2,4,6 153:21 161:15 162:13 167:1, 12,15 168:24 171:21 172:1,3,5 173:8 175:13,16,19,22 177:10 178:10,12 179:1 181:10,13 182:7,10,11 193:24 194:9 196:2 198:12, 13 200:2,15 205:11 206:5 210:3,21 211:24 212:19 213:23 218:11 219:17,18 220:1 221:4,5,12,13, 17 223:17 224:15,20 227:19 228:13 229:7 230:11,13,14,15,20, 22 231:22,23 232:2, 21,22,24 233:1,4,5,8, 9,12 234:1,2,5,6,12, 22 235:1,3,19,20,24 236:1,2,4,7,10,11,17 237:2,14 238:21,23 239:4,5,7,10,22 240:4,6 242:22 243:10 244:15,19,21 245:3 246:6,24 247:2, 10,16,21 248:10 250:4
**know--** 17:17
**knowledge** 13:24 68:17 97:20 205:4 212:14,20
**knows** 89:19 210:7 223:14
**Krasnodar** 230:24
**Kreations** 6:13 12:10 51:23 163:15 217:8 219:6 222:6

L

**L-O-O-P** 241:21
**label** 23:9 31:20 32:19,23 33:9 70:1 169:18 227:6 249:22
**labeled** 32:22 69:7 123:16 158:18 199:9 210:10 249:16 250:9
**labels** 249:13 250:3
**lag** 191:15
**lagging** 209:3
**laid** 73:4
**language** 177:18,19 181:6
**laptop** 9:11
**large** 121:24
**larger** 103:18,22
**last** 21:13 37:9 57:23 69:17 73:12 108:18, 21 137:20 161:19 189:19 202:17 226:6, 11 237:24
**later** 15:6 32:23 70:12 136:19 249:23 250:11
**launch** 117:20
**launching** 102:10
**Laurel** 147:8
**lawsuit** 124:10
**lawyers** 151:7,10 161:4,14 164:19,22 165:9 169:7 173:24 221:6
**layman's** 234:10
**Lazar** 35:19,22 36:1 42:21 99:19,21 104:15 106:11

109:11,17 110:16 115:4,18 116:12 124:20 125:2,19,22 126:4 127:4 128:12, 17 136:10 183:3,5 184:1 185:4,11 186:4, 18 187:6,16 239:18
**lead** 242:21
**leadership** 95:24
**learn** 38:23 39:1 67:20
**learned** 28:11 131:9 132:13 168:1 247:10
**least** 10:23 83:21 112:14 115:12 135:9 191:8 218:2 247:3
**leave** 125:22 247:3
**led** 127:16 242:22,23
**ledger** 52:1
**left** 125:24 172:8 226:23 228:8 251:24
**legal** 53:17,18,19 54:3 64:19 136:16 154:9, 23 155:2,3,5,10 160:23 162:24 164:14 166:21 168:7,10,21 169:5 183:20 194:17 219:1 221:10
**legally** 183:19
**legible** 210:17
**length** 9:15 196:20
**lent** 144:1,2
**Leslie** 83:10 84:16,17, 18 85:2,13,16
**less** 187:24
**let** 8:16 12:24 14:22 23:7 26:20 27:12 31:2 37:14 44:3 53:18 69:22 71:10 72:8 74:15 76:24 79:14 80:6,11 84:2 102:18, 19 113:19 122:17 125:12 127:14 131:4 133:21 139:4,5,17 146:23 150:8 154:15 155:8 167:11 172:18 173:9 177:9 178:18 180:9 186:2 196:2 205:8 210:6 212:4 232:9 236:2,3,9,10 238:19 239:17 248:10
**let's** 8:12,13 12:15
16:10 18:5 25:6 26:2 29:20 33:4,5,18 35:3 43:6 45:11 46:11 55:16 59:13 64:21 75:14 78:9 80:22 83:2 84:5 86:8,24 91:7 96:8 99:10 104:8 106:13 113:9 114:11 116:1 120:17 123:23 124:12 141:18 142:15,23 144:21 148:7 149:19 156:13, 14 157:18 163:9 166:3 174:5 184:19 186:11 188:16 192:6, 11 202:1 203:9 204:11,12 208:13 209:18 213:14 215:11,21 216:20 220:3,4,8 225:5 231:7 234:13 235:24 240:22 242:9 245:6 248:10
**letter** 123:10 135:2,5, 12,13,14,20 136:1,6,9 250:6
**letting** 85:6
**levels** 18:6 19:13,18 20:20 21:5,16 24:4,8, 10
**Levito** 83:10 84:16 85:2,13,16
**liability** 201:17 204:16
**libraries** 241:1
**license** 26:21,24
**licensee** 158:12
**lie** 118:2
**life** 252:1
**light** 119:5
**like** 8:24 10:12 13:9 15:3,6,8 23:18,20 27:19 31:24 32:3 33:2 38:14 40:22 50:19,20 66:21 71:1,15 82:5,8 89:12 92:1,5 108:9 120:14,18 122:20,21 128:3 132:10 135:15 179:8 181:4,11 187:1 192:10 197:4,6,7,19 201:22 206:22 208:22 209:9 216:7 219:9 220:21 228:14 230:5 231:17 238:7 248:17, 19
**like--** 194:3
**likely** 32:8
**Likewise** 228:21
**limitation** 34:15 44:13
**limited** 201:17 204:15
**Lindsay** 6:16 10:22 42:17 47:5 51:17 94:19 108:19 109:4 113:19 114:5 132:4 244:4 252:3
**line** 51:3 86:18 89:3 101:2,8 122:18 178:1, 3 214:24 235:16 236:8
**lines** 125:13
**Lisa** 195:4,8
**list** 30:11,12 31:21 45:9 61:18 62:9 65:5 71:22 238:7,9
**listed** 31:13 53:15 60:17
**Listen** 173:23
**listener** 104:24 105:3
**listening** 11:1,9
**literally** 240:23
**litigation** 148:6
**little** 25:13 85:10,19 89:2 91:17 96:21 98:24 103:17 110:20 111:9 114:4,10 115:8 127:4 133:2,7 136:18 158:6 166:19,24 176:1,22 177:2 183:9 195:15 196:9 199:19 201:20 207:3 208:21 211:10 218:12 223:3 227:1
**live** 181:12
**lived** 59:23
**living** 112:23
**LLC** 12:10 51:23 163:15 217:8,16,18 218:5 221:16,19,21
**loaded** 203:21
**located** 36:14
**location** 58:24 229:21
**locations** 62:2 230:7
**log** 156:18 223:24 225:22,23 229:4
**logging** 230:16
**login** 225:18 229:12, 13
**logins** 225:20 229:17
**logistics** 36:7,8,10,12, 17,24 37:3 55:18,21 56:10,11 58:12 61:6 236:18,19
**London** 207:23 208:5
**long** 8:4 15:21 27:21 79:19 90:13 93:19 94:16 95:2,3 112:10 147:16 195:22 197:8 206:23 210:1 231:4 234:5 242:22 248:23
**longer** 95:7,9 114:5 126:19 127:1 189:15, 16
**look** 18:5 23:4 25:6 30:15 33:18 44:20 55:16 59:13 63:22 69:1 71:8,19 76:19 78:9 80:22 83:2 84:3 86:2,8,21,24 87:21 88:10 89:11 90:7 91:7 93:13 96:8 99:10 104:8 107:14 108:9 113:9 115:12 116:1,7 119:13 122:1 123:4 124:12 125:3 128:6 132:18 134:13 136:19 138:12 139:16 142:15 143:22 146:23 148:7 152:10 157:3 159:11 166:3 169:9 174:5 175:4 176:3 180:24 181:16 184:19 188:17 192:24 194:21 196:16 197:14,21 198:24 201:2 202:1 203:9 204:11,12,15 205:10 207:11 208:13 209:18 210:1,6,23 214:11 215:11,21 216:20 220:8 222:11 225:5 226:14,23 247:2,3 248:3,12
**looked** 28:13 43:19 73:22 76:20 170:23 178:8 179:20 212:13 213:8 214:17,18 215:3,4
**looking** 10:1 16:2 42:18 47:19 50:21 58:10 74:18 75:12 88:8,9 108:6 123:11 132:11 147:7 179:10, 21 180:13 193:5 200:18 205:10 206:4 215:11
**looks** 10:11 14:5 82:5, 7 109:17 119:19 120:14,17 122:20,21 197:6,7 209:9 228:11, 14
**Loop** 241:17,21,24 242:1,2
**loss** 19:9
**losses** 63:11
**lost** 61:10,17,23 116:7 131:24 132:6,10 239:3
**lot** 60:7 77:17 112:16, 18 123:3 131:21 147:14,18 148:4 154:1 179:8 231:16 234:6 244:22 246:23
**lower** 78:22 81:4 86:14 88:16 96:14 124:18 148:13 160:3 222:16
**lump** 22:7,22
**lunch** 113:21,23,24 114:12,14 152:13 156:11
**luxury** 239:15
**lying** 109:21 111:18, 23 115:21

**M**

**M-I-P-A** 141:10
**mad** 23:14
**madam** 45:20 62:22 73:13 74:1
**made** 14:9 53:8 54:6 93:8 103:9,13 120:21 160:21 181:9 188:3 198:7 204:16 234:4, 21 241:6,11 246:24
**Magento** 80:11,21 119:5,8 131:19
**magistrate** 69:23 70:5,6 71:1 73:4

**Mail** 189:1,2
**maintain** 20:12
**major** 100:4 247:1
**make** 8:12 10:13 15:15 28:1 72:20 78:16 107:3 138:3 147:20 198:20 200:15 221:15 223:18 227:1 228:11
**making** 32:2 98:7 103:5 142:14 195:19 252:1
**Malhotra** 180:4
**malicious** 232:7
**Mallory** 55:17,20 58:11
**man** 208:19 231:5
**manage** 18:18,20 36:21 56:5,7,9 189:14,15,16 241:3 243:15 244:9
**managed** 220:6
**manager** 216:7,16,17, 19 221:2 244:24 245:4,7,10,12,14,15, 19
**manager--** 221:2
**manager-managed** 220:22 221:16
**managers** 221:19,24 222:5
**manages** 243:5
**managing** 36:24
**mandates** 232:8
**many** 7:23 14:23 16:1 19:6 42:1,5 44:3 45:8 57:12 60:11,18 61:4, 14,24 64:22 66:24 113:4 123:16 140:7, 14 171:18 172:4 187:15,20 213:4 224:5 225:24 226:1 237:16 238:4 241:10 243:3 247:6
**mapping** 240:17
**March** 14:10 16:12 19:14 26:10,11 33:20 34:13,20 44:5 48:18 49:1 117:5 139:4,6 141:19 174:13 175:8, 12 206:15 217:1 229:17
**mark** 31:20 33:1 47:6 54:17 55:6 78:17 83:22 166:20 169:9
**marked** 11:23 12:1 32:23 46:24 47:3,19, 22 50:21,24 52:18,21 54:20 55:9 78:10,12, 19 80:23 81:1 83:2,5 86:9,11 88:10,13 90:7,10 91:7,10 93:13,16 96:8,11 99:10,13 104:8,11 113:9,12 115:2 116:2, 4,8 119:13,15 124:12, 15 128:6,9 132:18,20 134:13,15 136:19,22 142:17 148:7,10 152:10,18 157:4,6 158:22 159:2,11,16, 23 163:10,13 166:4,6 169:11 174:7 176:3,6 179:11,13 180:13,15 181:16,19 184:20,22 188:19 192:24 193:3 194:21,24 199:1,3 201:2,5 202:2,4 204:13 207:12,15 208:13,16 210:23 211:2 214:11,13 215:22 216:20 217:3 220:8,11 222:13 225:6,8 226:14,17 250:16
**market** 233:8
**marketing** 46:22 57:19 85:18 176:1
**marking** 51:14,18 81:12,14 83:19 249:6
**match** 250:6
**Matt** 10:23 13:2 15:2 27:7 31:20 45:17 51:14 69:22 73:4 121:22 123:17 139:10 167:13 169:17 171:10 179:17 192:6 199:11 203:2 205:11 206:19 210:7 224:6 229:20 247:21 249:4,12 250:2
**matter** 6:12 8:1 154:11 239:16 249:24
**matters** 239:16
**Matthew** 6:22 42:18
**may** 7:15 24:22 89:24 116:16 127:11 139:20 211:10 221:10
**maybe** 70:6 105:4 114:12 175:22 209:9 240:15 249:9
**me** 7:6 8:16 10:15 11:10 12:20,24 13:10 14:17,22,24 15:11 16:6,18 19:10,11 20:16,18 21:1,17 23:7,15 26:20 29:23 30:8 31:2,17 32:2 33:3,15 38:14,20 39:3,6 42:8 44:3 45:15,22 46:14 47:14, 15 50:11,13 53:18 55:3 62:8,23 64:19 66:1 67:1,12 68:11 69:2,22 71:10 73:14, 24 74:15 76:13,24 77:13 79:14 80:11 81:15 83:20 84:2 91:21 102:8,19 103:3 105:21 107:3 114:1 116:6 119:23 121:5 122:15,17 125:1 127:14 131:15 133:21 136:3 139:5,17 140:11 142:4,12 143:18 144:5 146:5 150:8 154:9,15 155:8 156:6 161:12,14 162:14 163:7 164:19, 22 165:10,18 169:7 170:18,19 171:9,12, 14 172:14,18 173:9, 17,24 174:2 178:6,18 179:4,7 180:9 181:4 186:2 188:12 192:7, 14 193:5 194:20 197:7 206:18 212:4 213:23 215:8 219:2 221:11 223:21 224:9 232:4,9 233:18 236:2, 3,9 238:19,22 239:17, 18 241:24 245:4,15, 19 247:21 249:10,24 251:8,10,20
**me--** 17:11
**mealy** 103:2 189:9
**mean** 22:17 30:5,6 33:11 42:16 59:10 60:22 69:16 71:8 79:22 87:14 88:8 100:15 106:2 107:13, 19 108:17 112:12 135:11 143:15,20 144:12,21 188:9 196:18 197:6 212:1 225:23 228:14 232:23 233:15 234:15 238:15 241:12 243:23 245:6, 12 249:18,21,24
**mean--** 11:7
**means** 146:15
**meant** 128:22 154:6
**medical** 8:19
**meet** 14:8 15:6 95:24 108:5 123:3 237:22 247:22 248:11
**meeting** 76:1
**meetings** 110:22 111:2,4,5,7
**Melgar** 211:6,8,11
**member** 144:8,14 145:10,14 149:21 153:23 161:23 162:20 164:7,12 165:11,23 167:24 168:3,8,11 171:24 173:5 184:7, 17 186:10 187:7 193:23 212:6 214:2,9 216:7,12,16,19 218:6, 23 219:6,20
**member-managed** 220:21 221:2
**members** 217:15,19 220:6 221:22
**membership** 141:15 148:15,22 149:9,12, 24 150:21 151:12 165:5,15
**Membership--** 141:14
**memorize** 32:1
**memory** 8:23 27:17 31:23 102:12 125:23 129:11 178:24 181:8 197:20
**mention** 160:15
**mentioned** 35:7 101:21 152:13 162:18 164:2,3 234:8 238:12
**mentions** 237:13
**Mercenary** 35:17 79:9 85:20 99:18
**Mercenary's** 79:11
**merchandise** 77:16
**merely** 97:1 245:20
**merger** 144:17
**Merri** 6:11 7:10 51:24 52:18,23 53:2,6,8 70:20 84:17 85:1 89:15,16,17 113:20 114:7 122:2,22 140:16 142:2 160:4, 10 174:22 177:18 178:5,21 179:21 181:5 189:1 191:23 196:20,21 199:8 201:22 210:12 217:16,18 219:18 221:18,22 222:4 223:5,10 224:12,16 226:3 248:16
**Merri's** 41:12 70:14 73:7 123:5 232:13
**Merrig** 17:1,4 53:7 186:6 217:16,18 218:5 221:19,21 222:5
**Merrig12** 225:15 228:21
**mess** 126:5,11 210:16
**message** 88:24 89:12 166:11,14 169:14 170:3 173:11
**messages** 89:18
**messy** 148:1
**Michelle** 159:4 199:14,20 200:23 213:10,16
**middle** 82:12
**might** 44:10 75:4 107:14 181:11 197:23 247:18 250:14
**million** 62:13,15 63:1 137:23
**mind** 23:22 31:18 101:12 131:1 132:16 197:9 238:13 240:3
**minds** 8:14
**mine** 76:9
**mine's** 191:14

**minute** 113:22 114:6 130:23 192:12 195:21 228:17
**minutes** 25:2 34:15 35:8 46:5 68:6 69:17 113:17,18 114:13,16 155:11 156:13,18 213:8 214:17 231:6
**MIPA** 140:21 141:9, 13 149:6 155:11,18, 19
**Mischaracterize** 144:19 145:23
**mischaracterizes** 75:24 167:21 186:14 187:8 214:6
**mischaracterizing** 21:8
**miserably** 131:13
**mislead** 116:21
**misremembered** 44:10
**missed** 139:17 219:16
**missing** 61:11
**Miyakawa** 158:7
**mm-** 23:20
**mm-hmm** 23:14,15 119:12
**mm-mm** 153:6
**modifiers** 103:22
**moment** 45:22 65:10
**Monday** 111:10 112:12
**Mondays** 98:10
**money** 28:9 124:7 144:1,2 240:21
**monitor** 24:15
**month** 19:15 22:8,11, 14,22,24 27:21 228:11
**month--** 21:24
**monthly** 19:13 21:24 25:7 26:3 30:3,4 31:3 33:19 40:2,3,23 41:2, 4
**months** 189:19,22 213:9 244:13
**more** 6:4 12:17,22 23:10 36:5 43:8 57:3, 5 67:15,18,20,22 77:4 79:22 101:2 107:10 125:13 126:8 141:4 146:19,20 147:23 156:1 171:7 190:8 198:15 233:11 234:4 246:6 248:13
**Morgan** 222:18 223:13 224:8,21 227:6 228:5
**Morgan's** 228:3
**morning** 7:18 11:11, 12
**most** 36:21 114:14 116:19 159:13
**mouth** 42:18
**mouthed** 103:2 189:9
**move** 42:18 62:1 65:3 157:12,18
**moved** 26:13 28:6 61:16 63:16 77:20 241:12
**Mr** 6:21,23 7:1,4,17 9:19,21,22,23,24 10:2,6,12,15,18,19,22 11:3,4,7,8,10,13,17 12:24 13:5,11 14:3 15:1,11,21,23 17:12, 20,22 21:7,12 23:7,13 24:9,16 27:7,14 29:6 31:2,15,19 32:15,18 33:1,4,11,14,17 37:13,15 39:11,15,16, 18 41:11,16 42:20 45:2,5,17,20 46:4,7, 13 47:5,8 48:14,17, 20,23 49:1,4,6,12,17, 19 50:8,14 51:14,16, 17,20 52:11,16 53:10, 19 54:5,7,11,12 59:8, 9 63:7 64:13,21,23 67:5,9,23 68:20 69:6, 10,22 70:3,4,9,14,18, 20 71:4 72:8,15 73:19 74:8,15,24 75:6,13,24 76:7,8,10,14 78:2,3, 14,15,17,19,20,21,24 79:2,4,5,7 80:5,13,14 81:7,9,12,14,16,19, 20,21 83:11,15,17 84:5,11,20,23 85:3,5, 8 86:1,7 87:18,23 88:1,5,19,22 89:14,24 90:3,6 92:9,12,14,17 95:1 98:19,23 101:10, 19 102:23 103:1 104:3,7,22 105:2,11, 13 106:24 107:4 108:19 109:2 110:15, 19 112:24 113:5,16, 19,23 114:2,4,9,11, 15,17,24 117:8,11,24 118:4,20,21 121:22 122:5,17 123:12,15, 18,19,22 125:3,5,7, 11,15,17,19,22 126:4, 21,24 127:4 129:10, 15,21,24 130:6,9 131:3,4,14 132:17 133:3,13,17 135:8,10 136:13,15,17 137:1,3 139:10,12,15 140:4,6, 12,23 141:2,4,5,8,10, 12,15,17 142:8,13 143:22 144:11,19,21 145:1,3,22 146:2,8, 10,15,17,19,21,23 147:7,10 148:17,18, 19,21 149:15,16,17, 19,23 150:2,3,4,6,7 151:2,5,14,17,20,23 152:1,5,12,15,20 153:5,7,9 154:22 155:7,21,24 156:2,4, 9,11,13,16,17 157:2, 13,16,18,21,24 158:2, 16,21 159:15,20 160:1,22 161:7 162:21 163:3,5,8,17, 20 167:6,8,11,14,21 168:5,20 169:1,4,8, 17,19,21,22 171:6,11 172:15,17,18 173:4,9, 16,20 174:4 175:4,9, 10,12,15 177:7,9,12, 13,15 178:13,16,24 179:5,17,18,19,22,23, 24 180:1,2 181:24 182:2,10,12,14,15,16, 17,19,21,22 183:18 184:3 185:15,19,24 186:13,17,20,24 187:8,11,23 188:2,4,8 189:5,7,23 190:2 191:8,10,11,14,15,17, 21 192:5,9,11,14,15, 22 194:2,6,12 195:23 196:7,16,18,23 197:6, 9,10,12,14,17,18,19, 21 198:3,14,18,21,24 199:5,8,12 200:13,19 202:14 203:1,3,4,5,6, 8,24 204:2,5,10,23 205:2,3,5,8,14,18,23 206:1,3,9,19,24 207:2,7,8,11,17,19 208:5 209:3,4,21,24 210:3,6,15 213:19 214:4,6,10 216:13,20, 22,23 217:20,22 218:7,9,10,12,15,16 219:14 220:16,17,18, 19 223:11,17,22 224:6,11,14,22,24 225:1,2,4 227:4,8,9, 10,12,15,16,17,21,23 228:2,4,6,7,13,16 229:8,10,19 230:3,7, 8,11,13,15,21 231:1, 3,6,7,14 232:9,17 235:11,14,15 237:12 239:24 240:7 241:18, 20 243:20 245:1,5 246:10,19 247:5,21 248:17,19,21,23 249:3,7,9,12,17,21 250:2,13,17,21,23 251:2,5,9,10,11,13, 15,18,22 252:1,3
**Mr.--** 246:10
**Ms** 6:11 7:5,18 12:4 14:11,22 15:24 23:16 33:21 52:3,24 54:13 59:11 69:11 71:6 75:15,17 79:8 81:4,22 83:9 84:15 86:15 88:17 90:16 91:14 93:20 94:2,9 96:14, 21,23 99:17 104:14 115:2 122:6 123:9 132:23 157:9 163:23 166:10 168:17 169:13,23 174:11 176:10 180:3 181:21 182:23 185:2 188:23 193:7 199:13 201:9 202:8 207:22 209:5 211:5 222:19 225:11 231:15 251:15
**much** 39:15 56:12 128:17 156:17 190:8 196:4 251:15
**Mueller** 94:7,9,18 180:19
**multiple** 40:15 77:8, 12 81:17 130:19
**multitude** 60:12 239:11
**must** 126:5 191:15
**my** 6:16 10:15 13:21 39:10 42:4 56:24 61:22 65:13,16,20 66:5,10 68:22 70:2 73:12 77:18 79:23 80:15 90:24 95:3 98:24 101:2 102:2 103:3 105:6,22 119:22 120:3,17 130:10,18 132:16 139:14 140:19 147:15,18 148:5,18 151:7,10 152:3 153:4, 10,11,23 154:3,13 155:10 156:19 159:15 161:4,14,17 162:15 164:14 165:1,9 166:22 169:6,7 171:22 175:17 179:19 184:10 187:5 191:9, 18,19 193:12 195:9 196:8 200:5,12 205:4, 14 207:12 212:14,20 214:1,3 219:1 221:6,9 224:19 225:2,20 229:20 233:12 238:20 244:14,23 247:1
**my--** 93:7
**myself** 29:6 34:8 51:18 93:7 107:16 154:10 238:24 246:15

**N**

**N-E-T-S-U-I-T-E** 51:9
**N-E-X-U-S** 243:17,18
**name** 6:16 18:21 28:23 29:1,2,5 38:11 57:20,23 58:4,6 61:23 64:1,2,4 87:1 170:14 175:18 200:13,16 223:9 237:2,4 244:11, 14
**named** 82:4,8 134:19
**names** 42:9 45:15,23 87:12

**native** 182:5 185:2 226:20
**nature** 11:1 67:11 108:3 196:21
**near** 9:20,22
**necessarily** 13:23 31:8 73:5 206:20
**need** 20:20 80:7,8 86:2 109:23 125:7 135:8 151:23 156:2 161:2, 13 162:19 171:7,17 172:1 175:4 177:10 179:2 193:15,21 195:21 211:15 224:9 246:14 247:18 249:4 250:10
**needed** 13:13 21:19 41:24 77:16 78:6 106:22 107:11 162:10 164:7,12 165:8 193:21 207:6 219:2,3 221:11 235:21 244:7
**needs** 15:7 77:21 83:13 131:5 236:18, 24 237:22 238:2
**negotiating** 204:2
**neither** 107:23
**Netsuite** 25:23 26:14, 16 34:4,16 43:17,18 44:11,15 45:4 47:10 50:1,2,12,19,20 51:6, 9 127:6 135:17 240:9, 13,17,20 241:1,6,13 244:1,18
**never** 28:15 31:17 101:24 106:6,11,15 107:10 145:10,14,19 147:2,6 149:20 151:1, 17 152:6 154:7,16 161:2,18,22 162:17, 18 164:6 178:17 181:12 184:1 186:9 187:6,18 205:4 212:5 214:2 216:17,19 239:10 242:18
**new** 26:13 57:14,15 65:4 67:20 79:13 102:10 111:21 112:3, 17,20 113:3 117:16 118:10 132:11,12 208:10 240:23
**Nex--** 244:1
**next** 84:15 125:15 198:21 207:21
**Nexus** 243:6,15,17,21
**nice** 192:23
**Nicole** 81:6,23 82:4,8, 12,15
**Nigeria** 230:3
**nightmare** 59:23 241:5
**nine** 45:14 59:14 60:3 68:15 72:7 73:16,24 74:5 179:24 225:10
**Nirav** 123:10 124:1
**no** 8:22 9:1,10 10:4, 22,24 11:24 13:3 17:14,17 19:19 21:17 22:13 23:1,18 25:21 26:6 29:13 31:24 34:11 35:14,21,23 36:4,11 37:10 39:19, 22 40:6 42:22 43:1 44:19,23 45:7 47:2, 12,21 48:20 50:23 52:20 54:19 55:8 57:10 58:5,19 59:4 70:3 74:11 78:11 80:24 81:9 83:4,15 85:2 86:10 88:12 90:9 91:9 93:15 95:7,9,22 96:10 98:17 99:12 103:11 104:10 106:5, 10,15 108:4,12 109:22 112:1 113:11 116:3,23 119:14 124:14 125:24 126:2, 19 127:1 128:8 131:4 132:19 134:4,14 136:21 137:1 138:4 142:14,16 145:18 148:9,19 152:17 153:6 155:18,19 156:8 157:5,17,21 159:1,10,22 163:5,12 166:5 167:20 168:18 169:1,10 173:3,19 174:6 176:5,21 177:24 178:12 179:6, 12 180:12,14 181:18 182:8,19 183:24 184:21 187:3,6,15,17 188:7,18 189:15,16 191:14,17,22 192:4 193:2 194:4,20,23 198:14,18 199:2 200:11 201:4 202:3 203:6,15 205:8 207:8, 14,17,18 208:8,15 210:4 211:1,21 212:5, 15 213:20 214:12 217:2 219:7,10 220:10 222:12 224:19 225:7 226:16 228:24 235:22 236:14 237:7 238:10 239:23 242:4 246:9,16 248:1,15
**No--** 8:23
**nobody** 233:5 240:19, 24
**nods** 23:20
**non-** 107:15
**non-70/30** 188:13
**non-employee** 100:1
**non-experts** 230:21
**non-party** 11:8
**non-technical** 108:2
**non-zero** 247:17
**nonetheless** 20:23
**noon** 170:4
**nor** 107:24
**normal** 23:19 87:16
**not** 6:7,8,9 8:12,18 9:1 10:1 13:11,15,18,22 17:15,20 19:24 20:5 21:4,17 24:12 27:10, 17,18 28:1,3,4,7 29:6, 13 30:24 31:23 32:9, 21 36:16 37:1 38:7,20 40:7 41:12,15 49:13 51:17 53:8 54:4 57:8, 19 61:11 62:10 63:12 65:13,24 66:10,14,19 68:16,18 69:2,13 70:2,14 71:11 72:11, 19 74:9,13,20 75:10 76:2,5,10 78:16 80:3, 17 81:9 83:15,18 85:5,6 87:16,23 89:14,16,19 91:1 92:12 97:24 98:2,15, 22 99:8 100:17 103:3, 10 105:6,14,24 106:5, 8,12,13,16 107:12 108:13,23 111:1,6,19 115:16,17,19,20 116:15 118:24 121:4 124:9,11 127:6,7 128:18,21 130:12,14 131:23 134:5 135:23 138:6 139:13,14 140:3 143:18 144:8 145:4 147:13,16 148:17 150:15 153:23 154:13 155:4,9,19 156:19 157:16 159:10 161:4,23 162:5,11 163:1 164:9,16,17 165:12 167:10 168:3, 6,8,10,11 169:2 172:12,24 173:5 175:1,13,18 178:24 179:9 182:5 184:7 185:1 186:10,11,16, 18 187:7 188:15 189:5,8 191:11 194:7, 13 197:19,20 198:7, 17 200:15 206:19,24 207:12 210:1,8 211:20 212:6,11,24 214:16 215:18 216:3, 7,11,12,16 219:2,4 220:20 221:5,12,13 226:8 228:3,13 229:9, 23 230:7,21 231:24 232:4 233:23 234:3, 22 235:7,23 236:11, 17,19 237:1,19,23 238:1,15,20,22,23,24 239:23 240:15 241:15 244:8,10,12 245:12 247:19 248:13 249:19 250:21 251:18
**not-performing** 234:18
**notary** 6:9
**note** 51:9 57:6 69:2 81:3 83:7 86:13 93:23 134:22 142:14 148:12 163:21 185:8 203:24
**noted** 52:17 243:10
**notes** 9:23 10:2 12:20 13:7,9,12,18 14:4,17 16:15,17 18:10,13 19:1,7,10 21:23 22:6, 19 25:10,11,17,22,24 26:3 29:24 31:16 34:1,3,9 42:23,24 43:2,11,13 46:21 47:9,13 48:8 49:10,13 51:10 52:6,12,13,23 59:18 65:16,19,21,24 66:3,23 67:2,9,11 68:14 71:6,22 137:10 138:3,5,6 195:19,21, 22 196:10 198:7 202:15 215:4,8,9
**nother** 144:7
**nothing** 7:8 8:23,24 21:15 56:24 61:17,18 84:18,19,24 85:2 132:4 140:19 171:3 185:14 214:21 230:3 235:2 240:18 241:12
**nothing's** 241:4
**notice** 12:3 13:17 46:21 48:5 59:5 248:7 250:20
**noticed** 213:17
**noticing** 6:17
**November** 120:13,18, 24 160:10 161:20 162:4 165:24
**now** 10:7 13:15 15:3 39:23 45:19 47:19 48:20,21 51:19 58:10 61:1 65:7 70:3 73:5 80:18 85:6,9 95:11 102:17 112:10,13 113:24 114:16 142:23 154:11 167:19 191:18 192:10 209:17 213:12 215:11,21 223:23 227:13 231:1 243:11, 14 247:11 249:2 250:8 251:3,5,14
**nowhere** 244:14
**number** 16:10 18:5 22:8,11 25:6,11,12,17 29:21,24 30:15 31:16 33:18 35:3 42:23 43:3,6,20 46:22,23 47:1,20 48:12,16 49:11,22 50:22 51:10 52:7,19 54:18,23 55:7,15 59:7,13 60:3 62:16 63:1 68:15 72:7 73:16,24 74:5 75:14 76:16 78:10,24 80:23 81:8 83:3,16 84:13 86:9 87:9 88:11 89:22 90:14 124:13 139:10 152:23 153:1,3,4 163:22 174:10 182:8,

13 204:14 209:2 226:7,8,9,19 227:11 232:24 237:14 244:18 250:8,20

**numbered** 166:9 182:5 190:19 202:20 203:9 211:5

**numbers** 226:20

**numerous** 165:9 172:13 225:24 241:13

**O**

**oath** 6:7

**object** 8:17 21:7 24:9 31:2 41:11 49:12 50:8 52:11 68:20,21 74:15 75:9,24 86:1 89:14 136:15 145:22 149:23 154:22 155:21 156:4 162:21,24 167:6 173:9,12 186:13 188:4 203:22 204:5 205:18 219:14 223:11 232:9 245:1 246:19 247:16,22

**objection** 23:8 39:16 74:24 87:18 88:1 90:3 92:9,14 98:19 101:10 104:3,22 106:24 110:15 112:24 117:8, 24 118:20 129:10,21 130:6 131:3 144:19 145:1,22 151:14,20 160:22 167:21 168:20 169:4 171:6 173:20 183:18 186:20 187:8, 23 189:23 203:24 214:6 216:13 224:19 225:2

**observing** 10:17,19

**obtain** 45:4

**obviously** 31:23 32:10 207:10

**occurred** 98:21 246:2

**October** 101:7 124:23 126:3 128:15 176:11, 15

**of** 6:7,11,12,13,19,21, 23 7:1,2,14 8:14,20 9:1 10:3 11:1,19,21 12:3,4,10,12,20 13:19,22 14:9,20 15:5 16:4,15,17 17:1,6 18:10 19:4,6,9,10,21 20:15,22 21:23 22:7, 11,20,21,23 23:12,19, 20,22 24:2,19 25:17 26:3 27:1,4,16 28:24 29:4,17 30:8,13,20,21 31:7,14,21 32:9 33:11,15,24 34:1 35:8,13 36:16,23 40:4,16,17,18,19,20 41:3,7 42:2,9,13 43:19 44:5,14,20 45:15,23 46:16 47:10 48:9 50:19,20 51:8 54:8 55:17,23 56:1,2 57:3,6,20 58:4,6,10 59:1,6 60:7,12,18 61:10 62:1,11,20 63:4 64:5 65:1,12,16,21,23 66:5,16 67:1,11 68:1, 2,9,11,17 69:18 70:2, 4 71:11,22 72:3,12 73:8,9,10,11 74:18,20 76:2,20 77:13,17,18, 20 78:4 81:5,22 82:12,23 83:9,13,20 86:16,18 87:9,12,18, 21,24 89:11 90:3 91:4 92:9,13,14,21,23 93:5,20 95:3,19,20, 21,23 96:3,18 97:4,20 99:6,7 100:12,17,18 101:6 102:13 103:15, 16,18 104:20,23,24 106:14,17,22 107:6, 18,20 108:1,4,6 109:5,9,11,12,14,15 111:2,4 112:16,18,23 114:13 115:1 116:16, 19 117:4,5,13 119:5, 24 120:5,18,24 121:4, 16 123:3,23,24 125:1, 8,19 126:21 127:4,18 128:18 130:13,18 131:9,15,18,21,24 132:7 133:14,19,21 135:5,12 136:3,12 137:10 138:5,23 139:19 140:7,8,9,14 141:5 143:7,17 144:5, 8,14,17,18 145:10,15 146:13,21 147:4,14, 17 148:4 149:10,12 150:22 151:11,13,19 153:15,23 154:1,12, 23 155:9,21 156:4 158:14,16 159:8 161:16,19 162:12,13, 15,16,21 163:10 164:13,20 165:11,14, 23 167:9,24 168:3,14, 19 169:2,3 170:14,20 171:4,14,17,24 172:2, 9,24 173:7,10,17,18 174:18,19,21,24 175:8,21 176:15,17 177:2,17 178:10 179:8 180:9 181:5,11 182:17 183:10,19 184:7 185:9 186:3,13 188:10,13 190:19 193:18 194:16 195:10,11 196:6,17, 19,21 197:9 200:6,22 201:20 202:17 204:17,19 205:12,18 206:15,21 207:1 208:3 210:18,20 211:19,23 212:3,11, 12,15,17 213:6 214:2, 8,9,15,17,19,20,24 215:4 217:14,18,19 218:22 219:6,20 220:5,14 221:22 222:1,5,16 223:8 224:9,15 226:6,11 227:10 229:17,23 230:22 231:15 232:3, 24 233:24 234:2,4,5, 6,7,10,18 235:16,20 236:7,8,23 237:1,3,14 238:7,18 239:11,12, 17 240:15,21,22 241:11,15 242:13,15, 24 244:14,18,21,22, 24 245:1,10,15,17,21 246:1,4,17,19,23 247:2,12 248:7,17 249:19 250:3,15,20

**of--** 24:17

**off** 14:16 16:4 41:3,4 45:19 46:1,4,8 47:10 61:8 77:15,20 79:3 83:13 84:5,6 94:12 95:3 108:17 114:15, 18 142:23 156:18,20 157:15 172:8 192:9, 16 220:13 230:17 231:8,9 252:4

**oh** 7:4 10:4 12:24 13:3 42:17 64:19 69:22 78:17,20 125:7 140:5 141:1 142:12 150:4 153:7 158:20 191:11 196:4,18 205:3 207:7, 12 208:19 213:15,20 216:24 217:14 228:2 230:5

**oh--** 173:8

**okay** 7:5 8:1,4,6,9,23 9:2,8,11,19,23 10:2, 11 11:18 12:6,19,22 13:3,9 14:4,7,13,16 16:4,15,19,24 17:3,6, 10,12,15 18:5,10,13, 19,24 19:6,9,17,20,24 20:9,14,19 21:4,22 22:3,6,10,17 23:3 24:1,6,23 25:2,10,19 26:7,11,19 27:13,20 28:4,16 30:5,8,11,18, 20,24 33:4 34:3,14 40:5 41:1,17 43:11 44:1,17 46:5 47:13 48:3,23 49:3,10 50:6, 18 51:9 53:11,13,17, 24 54:3,7,13 55:14, 20,22 56:2,6,8,18,22 57:2,20 58:4,16 59:2, 18,21 60:5,8,14,20 62:15,21 63:8,13 65:11,14,19,21 66:6, 8,12 67:1,4,24 68:9, 13 69:21 71:21 72:2,5 73:12,20 74:14 75:19, 22 76:7,15,19,23 77:4,9,12 79:1,4,8,11, 13 80:10,11 81:12,16, 20,22 82:3,6,11,15, 17,23 84:12 85:9,12, 16,19 86:8,18,24 87:5,8,23 88:23 89:6, 9,11,24 91:4,24 92:7, 18 93:1,4,9 94:7,14, 16,24 95:7,20,23 96:3,8,24 97:4,10,14 98:12,17,24 99:21,24 100:6,22 101:6,20,23 102:1,7,14 103:12 104:1,20 105:14,22 106:11 107:23 109:3, 8,20 110:7,10 111:1, 6,17 112:6,16,19,22 113:19 114:5,11,15, 17 115:8,15,18 116:1, 21 117:4,12,15,22 118:8,12 120:11,21 121:9,18 122:6 124:3, 23 125:1,6,13,14 127:18,23 128:20 129:4,8,16,19 131:15 133:7,11,16,18,24 135:2,5,15,19 136:18 138:10,15,21,24 139:12,16,22 140:4, 13 141:1 142:1 143:13 144:12,16 146:3,11,13 147:19 148:22 149:1,17,19 151:1,11,17,23 152:6 153:3,16 154:14 155:16 156:13,16 157:22 158:1,3,6,11, 22 159:11 160:20 161:8,22 162:3,17 163:9 164:6,15 165:21 167:4,9,11,15, 19 168:6 169:1,21 170:6,18,22 171:3,12, 16 172:9,14 173:5,16 174:21,24 175:19 176:14,16,19,22 177:13,14,21,24 178:7,17 179:22 180:3,23 181:8,14 182:21 183:5,13 184:4 185:8 186:9,17 187:5,12,20 188:4 190:3,6,23 191:4,7 192:2,17 193:11,13, 18,24 194:13,16,21 196:13,15 198:21 200:8 202:22 203:6, 19 204:19,22 205:5,8, 23 206:14 207:11 208:8 209:3,12 210:14,17 211:14,18, 22 212:1,9 213:8,21 214:4,24 215:3,7 216:6,10 217:18 218:5,12 219:4,11 220:18,24 221:12,21 222:24 223:3,17,23 224:14 227:16,21 228:6,10,15,17 229:3, 11 230:7 231:20,23 232:7,18 233:19

234:11,20,22 235:4,7, 14 236:16,23 237:2, 24 240:4,12,16 241:14,23 242:9,21 245:24 246:8 247:9 249:3 250:13 251:9

**old** 80:17,19 85:24 117:6 119:11 121:16 154:24

**on** 6:2,21,23 7:1,15 9:11 12:17 14:4,10, 18,23 15:16 16:2,12, 16,19 17:1,14,19 18:7,11 19:12,13 21:22 22:6,19 23:1,10 24:15,19 28:24 29:2,4 31:11 32:13,16 33:19, 21 34:14 35:5 40:2,3, 15,18 41:9,13,15 42:13 43:8,23 45:8 46:11 48:14,15 49:7, 21 50:1 51:22 52:3 54:4,13 55:11 57:14 58:11,22 59:8,10,15 60:2 61:14,19 62:2,9 63:16,20 64:16 65:5,6 67:7 68:14 70:2 71:6 72:6,13 73:16 74:4 75:10,15,16,20,23 76:17 77:19,23 78:21 79:3 80:5 83:8,23 84:2,9,14,16 85:5,9, 21 86:15,21 88:16,20, 23 89:3 90:13,16,17 91:12,13,14 92:5 93:3,9,19 94:4 95:23 96:4 97:11,15,18,21, 23,24 98:2,3,9,10 99:2,16,17 101:12,16 102:10 103:14,21,23 104:14,21 105:4,7 106:19,21 107:2,10, 11,14 108:5,11,13,14, 22,23 109:23 110:4,5 111:14 112:2 114:4, 21 116:9 117:18,19, 20 118:18,22,24 119:18 120:11 122:18 123:2 124:19 125:18 128:18,21 131:12,20 134:1,17,18 137:6,15 138:8,12,18 139:10 142:2,21,24 148:18, 23 149:10,21 150:22 152:22 154:24 155:2 156:24 157:10,18,21 158:3,14 159:10 160:10,13 163:2,22, 23 164:14 165:5,16 166:10,14,21 168:7, 10,13,18 169:3,6,13, 20,23 170:2 172:6 173:1 174:10,13 175:6,18 176:10,17 178:5,18,19,22 179:1, 19 180:4,10,18 181:6 182:23 183:21 185:3, 14,20 186:10 188:24 191:4,23 192:20,23 193:8 194:10 196:19, 20 197:8 199:15,20 200:9,14,15,16,17 201:9,11 202:8 203:11,16 204:3 205:11,15,17 207:21, 22 208:4,10,20 209:5 210:4,10,20 211:5,10 213:6,11 216:24 217:7,14 218:7,22,24 219:1,20 221:6 222:18 223:13,15,19 225:12 226:23 228:2, 8 230:3 231:12 233:7 234:17 235:12 238:24 239:6 240:20 241:3, 15 242:11,23 243:3 244:17 245:17,18 246:21,23 247:24 248:3,15 249:10,13, 22 250:5,11 252:3

**on--** 231:8

**once** 7:24 28:11 140:16 142:3 154:16 159:7 164:6

**one** 6:5 10:24 11:16,18 14:11 15:1 22:8,22 27:16 28:8 33:23 39:23 45:22 46:14 47:6 48:9,19 52:7 53:15 55:5 62:22 64:1 81:8,16,17 82:5 83:22,23 84:1 86:15 87:21 96:14 97:4 103:15 107:7,9,14 115:2 116:6 121:4 122:15 126:8 127:18 128:11 132:16 138:23 140:7,14 147:7 153:15 157:8,11,18 158:23 160:3 168:13 182:8,9,13 188:22 193:7 196:19 198:21 200:17 202:8 203:14, 22 206:18 213:14 215:4 223:8,24 226:22 227:10,13,19, 21,24 229:16 238:11 240:21 246:4 249:12

**ones** 72:2 122:23 249:13

**online** 224:1,8

**only** 15:20 20:6 21:2, 20 22:14 26:11 41:3 44:5 52:23 71:11 72:8 83:23 101:17 107:9 118:22,24 127:6 156:6 167:1,15 216:18 218:5 237:19 238:24 246:4

**onto** 181:9

**op** 202:15

**open** 24:13 48:18,19 85:3

**openly** 140:15 142:2,3

**operating** 64:20 140:18,19 149:11,20, 22 150:9,12,14,16 151:18 154:4,8,16,19, 20 155:3,12,13,19 156:2,7 161:3,5,14,24 162:6,8,9,16 163:2,15 164:10,16,21,23,24 165:6,7,16,23 170:19, 23,24 171:1,2,4,13,20 172:2,10,12 173:6 193:15,19,22 212:6 214:18 218:13 220:21,24 221:1,15 222:4

**operations** 30:10

**opine** 223:12

**opinion** 234:23 246:8, 16

**opportunity** 96:4 97:14,17,21 98:3 133:13 209:22

**opposed** 27:9 228:1

**Oprah** 131:20

**option** 97:7

**options** 28:13 87:9 96:22 97:2,4,10,15, 18,22 98:3

**or** 7:6 8:7,20 9:3 10:2 13:15 14:4,24 15:11 16:15 17:8 18:13 20:14 23:18,20 26:21 27:19 28:14 29:6,18 30:10 34:6 36:23 38:17 41:9 42:24 43:7,13,21 50:6,12,18 51:24 52:17 53:6,14, 21 55:1 56:3 57:6 59:14 60:1,2,8 61:2,4, 5,11 64:2,6,23 66:13, 15,17,18,21 68:13 70:23 71:21 72:13 74:22 78:3 80:17,18 81:8,17 85:24 87:23 98:6 99:6 102:8 104:24 105:8,14,20 106:6,21 107:10 108:9,13,23 110:11 111:1,6 114:4,14 115:16,19 116:15 122:11 123:1 128:3,4, 23 131:11 132:9 135:9,24 136:12 138:19,24 139:20 142:11 144:8 146:15 161:5,19 164:9 169:2 171:7 172:6,23 173:12 175:5,8 178:10,14 180:10 181:4 182:7 188:13 189:22 190:4 194:7,9 195:13 200:2 203:20 206:15,22 208:2,4 210:18,19,20 212:6,7 213:23 218:21,23 219:2,4 221:12,13,14 223:18,23 224:22 226:6 229:12,16 231:7,24 232:2,12,23 234:18,22,24 236:8, 11,17 237:5 238:7,17, 21 242:3,17,19 243:14 245:17 246:6, 23

**oral** 136:13,14

**order** 15:4,9,13,18 33:13,15 47:7 49:4 69:23 70:2,13 76:16 198:22 214:15 242:14

**ordered** 70:7

**ordinary** 13:23 31:9 32:8

**organization** 12:16

**organizational** 245:21

**organized** 179:9

**original** 11:19 39:20 40:1,7,21 41:3,5 80:11 119:10 147:24

**originally** 138:19

**other** 8:12,13 9:14 10:2 11:4,18 15:19 17:3 19:17 21:4 22:8 28:13 30:11 41:17 43:2,18 53:2,7,8 60:22 64:18 71:8 74:19 99:8 101:6 105:7 106:19 107:2 108:1 109:5,9 117:15, 23 121:15 132:15 133:24 162:3 187:24 189:9 195:24 212:1 213:20 218:22 229:1, 3,16 236:2,11 245:17 249:22

**others** 83:10 93:21 96:16 116:10 155:23

**otherwise** 8:20 50:10 129:12

**ought** 249:17,19

**our** 8:14 17:14 18:16 20:4,8 26:13 28:22 31:12 32:22 36:13,21 37:4,18 42:10 55:23 56:1,9 57:11 61:8,9 64:24 70:11 71:16 72:23 76:21 94:10 119:10 123:4 126:5, 14 128:24 131:19,24 132:11 135:1 137:10 138:5 153:15 158:12 162:9,15 168:1 170:7 179:20 189:14,16 190:11 193:15,16 210:10 211:9 236:24 237:16,17 243:8 244:8 248:15

**out** 13:20 19:4 22:19 23:11 33:4 44:14 50:19,20 52:14 53:3 57:7 59:1 60:23 62:1, 5 63:16 65:3 66:7 70:13 73:4,10 89:16 99:6 100:6,9 101:22

102:18 103:4 106:8, 13 118:5,15 119:18 122:3,11 130:22 132:16 140:4 149:2 151:24 156:19 157:13 177:24 178:3 186:11 207:1 214:15 221:14 234:23 235:5 243:12 247:23 251:3,6

**outlined** 10:7

**outside** 28:9,16,22 29:10 63:22,24 64:17 99:22 127:17 241:1

**outsiders** 238:23

**outsource** 190:11,12

**outvote** 144:5

**over** 8:12,13 9:24 13:15 26:20 28:6,12 32:4,5,8,18,20 33:7 44:2,4,7 54:14 62:13 69:4 70:4,24 86:22 102:11,24 108:18 112:3,17,20 113:3 131:1,6 150:8 185:13 186:9 200:14 203:22 238:9 241:12 246:1,9 248:4 250:9,11 251:23

**overall** 101:1 109:17 116:18

**overcharging** 239:9

**overextended** 63:17

**overpaid** 17:18 18:1

**overpaid--** 17:23

**own** 28:23 36:13,21 37:4 50:1 65:16,20 106:17 126:5 144:8 218:24 244:11

**owner** 11:19 61:23 65:4 82:23 116:17 144:5 160:11,18 161:9,11 162:5 167:5 183:16,17 184:6,7,13 186:19 236:23 244:13 245:4,10

**owner's** 177:19 178:1, 3 181:6

**owners** 160:14 174:22 178:4,6,21

**ownership** 133:8,10 186:5 187:22

**P**

**p.m.** 156:21 157:1 192:16,21 231:9,13 252:5

**pack** 37:4 57:11

**packed** 239:8

**page** 48:17,18 55:17 58:10 81:10,16,17 82:12 83:8,22,24 84:1,15 86:15 88:20, 23 90:13 91:13 93:19 96:14 99:15 104:13 115:3 116:8 119:17, 19 122:15 123:24 124:19 128:11 132:22 133:11 134:2,17 142:20 148:13 152:21 157:8 158:23 160:3 163:22 166:9 169:19 174:9,19 176:8 177:17 179:15 181:12 182:3 185:1 188:22 190:18,19 191:14 193:7 195:2 199:5 201:7 202:6,8,17 207:20,21 208:18,20 211:4 215:4 217:5,7, 14 222:15,16,19 225:10 226:19

**page--** 83:16

**pages** 19:6 81:17,19 84:14 88:16 90:13 93:19 122:1 123:16 124:18 137:5 163:22 177:4 180:18 182:4

**paid** 39:15 40:13 41:1 43:8 66:7,9,11 115:3 200:24 211:16 213:11 214:5 239:18,21,22 240:6 242:4

**paper** 139:19 140:8,9 248:1

**paperwork** 60:7 153:19 156:8 166:21 168:2,8,10 186:8 216:14 243:14

**paragraph** 203:10 220:4

**paragraphs** 202:20

**parent** 47:24

**Park** 230:9

**part** 11:21 36:22 42:13 100:12,17 103:15,16 104:23 108:4,18,21 116:16 120:5 129:20 149:24 173:18 196:19 234:2

**partial** 160:17 161:9, 11

**partially** 124:4

**participants** 6:5

**participate** 98:12

**participated** 42:7

**participating** 92:7,12, 20 98:18 107:6

**participation** 92:23

**particular** 23:11 31:6, 12 39:17 80:5 164:17 194:4 200:17

**particularly** 113:4

**parties** 6:7 7:14 77:10

**partner** 79:24 80:1 82:20 141:20 147:15 149:2 153:11,17,23 154:2,4,5,6,13 161:2, 4,8,11,17 164:21 165:1 214:1

**partners** 153:21 162:15 164:15 169:6, 7 219:1

**Partnership** 217:7

**party** 6:17 28:16 35:15 36:16,23 126:8

**pass** 134:1

**passes** 116:18

**password** 134:1 229:4

**passwords** 244:11

**Past** 60:6

**path** 240:21

**patient** 251:19

**Pause** 108:22 125:5, 13,16 133:15 142:11 143:24 146:14,16 177:13 179:3 196:3,4, 5 197:2 247:8

**pay** 28:9 39:20 40:1,2, 3,22 62:2 64:23 65:2, 3,5 212:7 243:13

**paying** 53:17,18,23 54:3 63:14 65:2

**payment** 17:1,4 141:19 149:13 150:19

**payments** 14:9,14,17, 23 16:1,5 40:15,17 51:23 52:17 53:6,8,14 65:18 71:12,18,23

**payout** 203:11 206:12, 14

**payroll** 189:14,15,16 190:8 211:9 212:21, 23 213:2,5

**PDF** 190:19 200:15 202:14

**PDFS** 227:10

**peek** 196:23

**pending** 179:6

**people** 10:9 11:4 39:7 42:8,9 63:22,24 105:7 107:2 108:12 136:3 154:1 213:6 223:18 241:1 244:9 245:17 246:6,21

**per** 22:8,11,14,22 46:17 51:24 52:18 53:6 135:3 153:23 208:6

**percent** 98:21 115:12 127:7 137:22,23 147:20 183:16,17 186:6 187:22 188:1

**perform** 101:3

**performance** 234:18 246:11 247:12

**performing** 101:8 117:16

**period** 39:17 117:13 245:22

**person** 8:7 12:22 18:15,19 29:5,9 57:18,20 85:17 93:4 99:22,24 107:14,16 108:13,22 118:22,24 160:8 175:24 208:1 227:23 243:7 246:4

**personal** 69:18 165:13 209:9

**personally** 165:15 239:4

**pet** 203:10

**phases** 39:21 40:8,11

**Phillips** 18:22,24 25:20 35:4,8 42:14,16 79:11 95:10 97:21 100:9 104:16 106:6 109:14 116:10 132:24 136:2 180:20

**Phoenix** 9:3

**phone** 9:18,19,22 106:19 107:7,9 108:4 134:9,10 152:23 153:1,3,4 156:19 174:16 230:16 237:7

**phonetic** 6:12 195:8,9 203:10 229:22

**photo** 181:4

**physically** 6:8

**pick** 37:4 57:11

**picked** 57:12 127:15

**piece** 139:19 140:8,9

**pieces** 239:8,9

**pipes** 61:19

**place** 15:10 41:20 106:5 117:1,6 119:3,4 137:14 213:6 241:7 246:6

**plain** 145:6

**Plainly** 144:22

**plaintiff** 72:24

**platform** 66:20 119:9, 11 224:1 240:23

**pleadings** 233:16

**please** 6:18 7:5 10:21 25:15 30:14 53:4 64:5 70:19 71:10 73:20 82:6 97:16 131:7 132:7 145:24 146:14 156:3 157:11 196:3,5 197:2 227:2 231:13

**plug** 224:7,9

**plural** 160:14

**PNG** 181:1

**pocket** 73:11

**podium** 160:14

**point** 8:15 71:1 73:7 79:19,22 80:4 85:23 89:24 100:13 103:9 104:2,20 106:7,14 113:20 118:12 126:20 127:2 133:18 143:13 145:7 153:17 165:18

171:5 177:24 223:24 224:13 238:11 244:7
**pointed** 235:5
**pointing** 126:5
**poor** 238:24
**populated** 228:24
**populates** 229:2
**portion** 15:5
**portrayed** 232:3
**position** 54:8 111:14 142:1 184:10 211:18 216:10 246:22
**positive** 101:1,15 103:22
**possibility** 248:14
**possible** 235:3 246:15
**possibly** 71:11 184:16 213:5
**pre-money** 183:13 185:14 186:5
**preface** 158:19
**preferred** 129:1,9 130:2
**preparation** 31:1 68:14 72:14 75:8 76:13 137:17
**preparations** 74:21
**prepare** 14:1 16:19 20:15 21:9 42:23 43:13 59:21 60:2 75:19,22 76:17 248:7
**prepared** 13:7 14:13 19:1 42:24 43:15 48:8 65:15 76:3 217:8
**preparing** 43:14 72:6 73:15 74:4
**present** 6:8 217:20
**presented** 97:1 120:15 162:17,18
**president** 62:19 63:4 78:4
**presumably** 96:3
**presumptively** 32:17
**pretty** 10:9 18:4 21:13 56:12 73:21 80:15 102:7 104:2 109:4 187:1 188:9,16 195:22 198:6
**previous** 46:3 63:6
73:18 74:7 76:21,24 79:24 80:1 119:9 147:15 152:4 162:15 163:2 164:21 170:7 193:12 201:21 204:11 218:5
**previously** 84:12 204:13 215:13
**prides** 242:23
**primary** 236:8
**print** 49:14
**printed** 13:20 52:14
**printout** 31:7 50:6 51:5
**printouts** 13:12,19 32:12 49:15,17,20
**prior** 11:15 26:14,16 28:8 44:15 63:21 87:5 91:18 106:7,12 119:9 161:18,23 162:3 165:24 186:15 193:15,19 212:12 213:9 218:8 248:5
**privilege** 53:21,22 67:13 72:22 73:3 74:16,21 75:4,8,11
**privileged** 54:9 72:18
**privy** 99:8
**probably** 8:16 27:16 67:13 101:17 117:10 118:3 122:20,21,22, 23 207:2 250:21
**problem** 75:16 241:24 243:3 250:18
**problems** 77:1,12 78:1 135:6 235:17 240:8, 13 241:13 243:2,3 244:22 246:2
**procedure** 15:12
**proceed** 7:15 10:21 131:7 210:11 231:13
**proceeding** 11:5
**proceedings** 6:4 249:23
**process** 109:1 245:7
**processing** 244:5
**produce** 20:18 23:8 69:3 75:3 219:23
**produced** 14:5,7 19:11 31:17 67:4,7,
13,21 68:18,21,22 69:9,12 70:4,11,24 72:16,22 81:15 89:18 119:22 121:9,18,23 122:15,16,19 123:6 146:4 158:18 163:19 172:20 178:11,15 182:5 205:13 210:9 219:12,22 222:18 223:13 226:20,21 227:12,21
**product** 48:11,16,22 49:8 55:24 56:21 63:16 64:16 65:4 121:12 127:23 129:1, 9 130:2 247:12
**production** 23:9 31:22 32:7 69:8 89:17 121:24 122:3 123:5 179:20
**products** 37:5 56:3 57:2,4,12 61:9 237:18,22
**profits** 147:20 203:15
**prohibited** 98:18
**promise** 207:1
**pronouncing** 6:14 170:10
**pronouns** 94:18
**proposal** 139:14 140:10 184:18 186:16,21 187:3,4,10, 14,16 188:13
**proposals** 91:2,5 187:24
**proposed** 138:9 184:2
**proposing** 144:16 145:20 184:18
**proposition** 20:15
**protect** 154:10 161:14 164:19,22 165:10 173:24 174:2
**protective** 15:4,9,13, 18 33:13,15 47:7
**prove** 61:23 244:12,13
**proved** 144:7
**provide** 40:10 96:4 97:15,17,21
**provided** 25:19 33:13
**provider** 35:15 36:12, 17 105:18
**providers** 43:7
**PTHREEMEDIA** 89:7,9
**publicly** 220:15
**pull** 50:2 71:18 78:14, 15 218:15
**pulled** 13:21 43:23 44:5 47:10 48:10 50:11,16 66:1 220:13 248:8
**pulling** 137:1
**purchase** 55:12 141:15 148:15,23 149:12 240:24
**purchases** 18:6
**purchasing** 237:20
**purely** 155:10
**purposes** 33:11
**pursuant** 15:9 47:6 69:5
**put** 19:3 41:20 50:18 55:3 123:20 136:4 158:17 171:22 227:13,24 231:8 237:1 243:7 244:10 246:5 250:5
**puts** 237:21
**putting** 63:16 64:16 123:8

**Q**

**Q-U-E-T-I-C-O** 58:9
**qualified** 12:17,21,22
**quantification** 73:5
**quantify** 73:7
**quarter** 46:16
**question** 8:19 20:11 21:11,13,18,19 37:1 44:4 45:21 48:7 50:10 57:8 59:24 62:24 66:20 71:3 73:2,12,20 74:2,9 76:11 77:1 80:8,15 83:14 87:19 90:3 92:10,14,15 97:16 98:1 102:19,20, 23 105:22 106:16 110:11 119:22 120:3 127:5 130:10 139:5 145:6 155:1,6,8,10, 21,24 156:5 162:21,
23 163:4,7 166:20 167:12 168:4,6,16 179:6 183:21 184:10 186:2,3,14,22 187:5, 13 188:5 194:17 196:9 198:1,2,6 205:9,14,19 212:23, 24 229:6 236:16 244:23 245:1,13 246:12,19,20
**question's** 53:24 98:24
**questioned** 168:2
**questioning** 72:13 114:13 215:1 235:16
**questions** 13:2 72:17 83:23 103:4 195:24 210:4 240:4 248:16
**Quetico** 58:7,8,16,18 59:3
**quick** 152:15 192:6
**quite** 8:17 22:17 29:22 118:13 147:16
**quote** 112:17 118:9 233:20,21 242:12
**quotes** 40:19,21

**R**

**R-O-N** 237:8
**Rachel** 211:6,8,11
**raise** 7:6 240:8 241:23
**raised** 246:10
**ran** 135:16
**random** 34:24 122:8
**range** 20:17 81:10 83:12
**range--** 169:16
**ranges** 70:1,10,23
**rate** 16:7 103:4 115:9 234:13
**rates** 18:7 23:1 24:13, 18 25:3 115:12
**rather** 15:16 16:4
**Ray** 12:23 16:7 17:8 32:12 44:17 52:9 193:8,13 194:14 199:14 201:10 202:9, 22 205:15,19,21,24 215:4,14,17,23 216:2,

6,15,18 217:11
**reaching** 238:1
**read** 14:16 21:18 38:6 45:15,20,22 46:3 62:22 63:6 73:12,18 74:1,2,7 80:6 125:18 133:14 142:22 143:22 146:8,10,12 177:7 178:8 195:21 196:2 197:1 198:15 205:23 210:12
**reading** 16:4 96:24 104:5 139:13 146:17 149:15 197:4 198:19 210:13
**reads** 145:6
**ready** 31:11 70:14 73:8 156:11
**real** 205:14
**realize** 25:12
**realized** 212:14
**really** 27:10 32:5 57:5 133:4 171:3 208:23 239:5,16 244:2 249:24
**reason** 8:19 20:6 85:6 105:23 109:20 111:17,23 130:4,11 159:7 174:3 176:19 178:10 180:10 187:3, 16 190:23 192:2 194:8,13,18 199:23 200:8,11 208:8 212:1 242:4 247:18
**reasonable** 233:24
**reasonably** 114:12
**reasons** 233:12
**recall** 27:6,8 29:16,18 36:2 37:8 40:11 58:21,23 62:13 64:6 65:7,9 66:4 73:9 79:21 82:6 87:13 88:2,3,4 89:10 92:5 95:3 98:8 102:8 105:11,14,16 107:9 109:7,10 111:1,6 123:8,21 125:2,19,23, 24 126:18 128:1,2 129:6,14,23 130:1,3, 8,13 135:11 137:13, 15 138:18,20,23,24 139:19,20 140:3,8,9 142:8,9 146:1 147:4, 14 151:15,16,22 152:9 155:14 162:7, 11 164:17 166:2 175:21 176:16 183:9 188:14 189:18,20 190:1 202:22 206:2, 14,17 210:18 213:11, 18 214:22,24 215:5,8, 9 218:7,10,12,17 219:4,7,8,23 222:3,7 225:20 229:11,14 231:18 242:7 244:6,7 247:15,18
**receive** 200:2,12 212:23
**received** 46:20 190:24 192:3 199:24 200:2,9 212:21 213:2,17 247:13
**receiving** 183:10 190:20 202:22
**recent** 159:13
**recently** 36:3 69:23 229:6
**recess** 46:9 84:7 114:19 156:22 192:18 231:10
**recognize** 88:17 152:23 181:21
**recollection** 13:16 32:2 102:2 135:19 210:18
**recommendation** 105:21
**recommended** 39:3 190:10 241:8
**recompensed** 124:4
**reconfigure** 241:2
**reconfigured** 241:2
**record** 6:3 7:15 10:13 15:16 32:14 46:5,8,11 49:14 81:3 83:7 84:5, 6,9 86:13 90:15 114:18,22 121:22 137:5 146:4 148:12 156:21,24 163:18,21 174:11 178:7 185:8 192:16,21 199:6 204:1 211:15 223:12 225:1 231:9,12 232:10 250:11 252:4
**records** 20:5 149:10 150:22 151:13 210:10
**recurring** 110:22
**redacted** 53:20
**redone** 77:21
**refer** 82:20 155:13
**reference** 140:20 210:8 212:7 229:20
**references** 30:16 55:17 89:6 147:3 225:15
**referencing** 10:8 103:13
**referred** 25:11 63:9 100:22 141:8 149:5 150:9 233:15
**referring** 24:14 67:10 69:13,15,16 74:16 101:17 102:3 107:21 118:16 122:12 126:12,17 129:20 135:7,14 144:15 164:4,8 238:2
**refers** 139:8 140:21 143:11
**reflect** 149:11 151:18 164:23 187:21 240:2
**reflection** 238:24
**refresh** 13:16 32:2 125:23 135:19 181:8
**refreshes** 129:11
**refusing** 163:3
**regard** 107:8 131:22 143:18
**Regard--** 37:1
**regarding** 13:1 15:7 21:23 43:3 113:3 170:19 171:13 236:6
**regardless** 198:14
**regular** 212:21 248:19,24
**reimbursed** 144:3
**Reingold** 8:2 80:2 82:13 149:9,12,24 150:21
**Reingold's** 149:2 151:12
**reiterate** 47:5
**reiterated** 193:14
**relate** 46:21 48:5 54:22 55:14 68:23
**related** 76:16 232:12 242:18
**relating** 75:16
**relationship** 35:4 37:6 58:20 189:17 190:4
**relative** 26:7 70:8 74:21
**Relativity** 179:19
**relevant** 247:12
**relied** 77:19 105:7 108:13,22 131:12 178:13 221:6 239:6 245:17
**relies** 14:4
**reload--** 108:12
**rely** 17:14 41:9,15 169:6 213:6 219:1 246:21
**relying** 22:18 32:16 49:21 58:11 76:3 164:14 246:23
**remain** 251:6
**remember** 27:11,18 37:12,14 39:5,13 40:6,8 41:6 86:4 101:22 102:13 105:12 128:4 138:17 141:12 147:17 172:19,21,22 173:2 175:5 178:19 194:2,8,9,11,15 197:15,21,22 198:9 200:1 204:7,9 206:1, 6,8 208:6,12 213:12 224:2,3,22 226:2 228:18 240:1
**remembers** 224:16
**remind** 194:6
**remote** 6:4,10
**remotely** 6:6,20 7:3
**remove** 149:21
**removed** 15:7 64:24
**renegotiated** 28:22
**renting** 59:2
**repeat** 25:15 30:14 53:4 70:19 97:16 140:6 145:5 242:13
**repeating** 51:18
**rephrase** 139:5 154:15
**replatform** 97:4,7
**report** 23:10 53:1 88:24 166:11 169:14 190:24 191:1 213:3
**reporter** 6:2,8 7:5,14 8:10 10:11,17,20 11:12 12:2 23:14,17, 21,24 42:14,16 45:20, 22 46:2,8,11 47:4,23 49:15,18 51:1,8 52:22 53:3,9 54:21 55:10 62:22,24 63:5 64:4,9, 11 70:18 73:13,14,17 74:1,3,6 78:13 81:2 83:6 84:1,6,9 86:12 88:14 90:11 91:11 93:17,23 94:17,22 96:12 99:14 104:12 108:21 113:13,14,18 114:8,18,21 116:5 119:16 124:16 128:10 131:2,7 132:2,6,21 134:16,22 136:23 139:23 140:2 141:8, 11 142:18 148:11 152:16,19 153:6 156:20,24 157:7 159:3,13,18,21,24 163:14 166:7 169:12 170:12 174:8 176:7 179:14 180:16 181:20 184:23 188:20 192:16,20 193:4 195:1 199:4 201:6 202:5 207:16 208:17 211:3 214:14 217:4 220:12 222:14 225:9 226:18 231:9,12 237:8,10 243:17,19 244:2,19 248:17,21 249:1,5,8,15,18 250:10,14,19,24 251:8,12,14 252:4
**Reporters** 6:17
**reports** 121:15 128:2, 4 212:21,23 213:5
**represent** 6:19 90:14 137:5 142:20 146:3 174:10 176:9 182:6 199:6 202:18
**representative** 12:10
**represented** 186:5

**republic** 6:9
**reputational** 237:13, 15 238:13
**request** 31:22 32:3 72:23 135:3 178:6 248:6
**requested** 16:11 20:17 21:2,20 53:12
**requesting** 135:12
**requests** 70:15,22
**required** 71:1
**resale** 243:8,11
**resellers** 30:10
**reserve** 32:22 248:15
**resides** 6:10
**respect** 130:16
**respond** 23:23 216:6
**responded** 82:15 92:4
**responding** 72:17 74:22 82:5
**response** 160:17 195:20 196:10 198:8 213:20 222:18
**responsibilities** 78:4
**responsibility** 246:7
**responsible** 62:19 63:4 130:17 131:8 233:10
**responsive** 219:15
**rest** 140:3
**restaurant** 245:16
**result** 68:2
**resuscitated** 61:5
**retail** 30:10 238:5
**retailers** 31:4
**retain** 26:19 28:1 39:8
**retained** 38:17 73:6 120:13,18
**retroactively** 212:3
**return** 193:16,20 194:1 217:8 218:2 219:21
**returned** 144:3
**returns** 218:8 241:17, 21,22,24 242:1,2 243:5
**retyped** 140:10
**Revenue** 14:20
**review** 24:20,21 60:1, 5 76:15 80:8 83:13 87:12,15,17 137:16 201:22 202:15 209:22
**reviewed** 19:3 55:4 60:6 76:20 87:24 125:11 137:20 175:22,23 185:16
**ridiculous** 62:3
**right** 6:2,3 7:4,6 10:7 11:9,22 12:15 13:4,6 16:10 18:18 24:3 25:6 29:20 31:15 32:15,22 33:18,24 35:3,7 39:23 43:6 44:9,11 45:15 46:14,15,19,24 47:9 48:20,21 49:5,8 50:16 51:22 52:6 54:4,17 55:16 59:5,10,13 62:10 64:14 65:7 66:4 67:8 68:3 69:19 71:6, 8,9,13,14 73:22 74:9 75:5,14 78:9,21,22 80:22 81:4 85:3,9 86:14 87:3 88:16 90:19 91:16 92:4,16 93:6 94:5 96:6,14,22 98:18 100:19 102:17 104:21 105:9,10,24 107:13 109:18 110:8 112:7,10,14,17,20,22, 23 113:24 114:16 115:1 116:7,19,24 118:5,23 119:3,11 120:8,17,19,24 121:1, 13 123:23 124:18,23 126:11,20,23 127:1, 10,18 129:20 130:10 133:8,12,19,22 137:11,24 138:12,13 139:1 140:21 141:20 142:15 143:16 144:24 148:13 149:6 150:4, 16 154:2,11 156:9,20 157:3,20 158:13 159:7 160:3,21 161:9 163:10 164:2 166:3 167:16 168:7,8,9 170:2,4,24 171:5 177:4,16,22 178:22 179:10 180:3,6,8,20 182:8 183:2,8,14 184:9,19 185:14 186:1 188:11,16 189:6,13 192:1,9,24 193:6 194:10 197:19 198:24 199:10 200:4, 21 202:1 203:4,9,23 204:6,24 206:10,12 207:7,20 208:3,9 209:5,14,17 210:16 211:10 214:24 215:11,14,21 216:1,4, 22 217:15,21 220:3 222:16 224:22,24 231:1 234:16 244:4 245:12 249:2 250:22, 23 251:11
**right--** 146:18
**rights** 248:15
**robes** 33:20 34:24
**role** 246:1
**Ron** 237:4,5,8
**room** 9:3,5,8 10:12,24 43:3
**rough** 68:1,5
**ruin** 233:5
**ruined** 61:8 131:18
**Rule** 12:3 250:20
**rules** 8:9 144:5
**running** 242:17
**runs** 188:23 195:3 201:9 202:7 217:6
**Russ** 143:11,18 144:1, 4,8,14,18,23 145:8, 10,14,16 147:9,11,21, 24 149:21 150:3
**Russ'** 143:8 144:5,12
**Russel** 143:14

**S**

**S-C-O-V-E-** 93:24
**S-E-E-D** 64:7
**S-H-O-W-E-L** 6:22
**S-W-E-D-E-N** 38:16
**said** 13:6 15:6 31:24 32:3 49:16 62:12 65:11 71:1 76:6 77:12 81:11 83:22 88:2 94:10 102:9 105:3,24 106:7 108:4 109:21 111:18 118:8 126:10 140:2 141:8 144:20 145:1,13 150:3 152:13,16 153:6 156:14 161:9 162:4,7, 11,19 164:6 167:15 168:7 179:9 184:4 186:9 187:18,20 188:9 197:19 205:16 214:19,23 224:17 236:24 237:3 241:9 247:10,23,24
**salary** 14:19,20,21 15:8
**sale** 24:24 25:1
**sales** 19:15,19,21,22 20:21 21:3,21,23,24 22:5,11,16,18,23 23:4,5 24:5,15,19,20, 21 25:4,7 26:3,9 30:3, 4,21 31:3 33:19 34:23 48:11,16,22 49:8 51:2,12 54:14 57:19 61:11,24 100:4 102:5, 12,22 103:7,8,14,15, 18,19 137:23 244:5
**same** 25:3 33:12 34:14 51:17 58:16 74:2 126:4 177:18,21 203:10 206:11 217:11 234:13 238:16 249:21
**Saracino** 42:10
**sat** 242:4
**satisfied** 108:10
**satisfying** 238:1
**savvy** 107:16
**saw** 45:18 89:16 185:9 213:23
**say** 20:19 21:15 27:17 28:4 37:13 40:7 45:2 51:19 56:2 64:21 67:17 72:1 73:23 86:21 87:22 88:6 90:22 91:24 102:3,20 103:4,21 106:12 107:8,13,15,18,21 109:23 110:4 112:2 122:7 124:3 131:4 132:5 134:10 137:10 138:5 139:4,17 142:2 144:5 154:3 156:1,14 160:13 161:4 165:3, 20 168:8 170:18 178:7 183:19 188:7 189:21 191:18 203:5, 21 206:2 210:8 224:7 227:4 229:9,15 231:7 232:5 233:14 234:15 236:3 237:5 239:15, 23 240:4,13 241:19 247:19,20 251:5
**say--** 102:21 235:7
**saying** 99:1 123:12,15, 19 150:16 168:22 170:3 172:1,12 176:18 185:15,17,21 224:11,14 227:14,23 233:2 248:13 250:6,7
**says** 23:20 49:7 51:2 53:5 54:14 55:12 84:17 85:10 88:24 89:3 90:21 91:17,24 96:21 101:1,15 103:17 109:17,19 110:20 111:20 112:19,21 115:9,12 116:20 117:3 118:15 119:4 126:4 129:10 133:3,9 135:2 139:4 149:24 150:18 151:12 152:6,7 166:11,17 167:17,18 169:16 171:12 174:18,21 177:17 178:9 179:21 185:10 186:8 191:18 194:3 201:1,21 203:10,14 204:15,18, 21 206:13 209:13,16, 20 213:16 215:17 216:2 217:7 220:20, 21,22 222:20 224:23 225:13 226:24
**scale** 241:9
**Schaefer** 144:23
**schedule** 110:21
**scheduled** 111:2
**scope** 40:4,16,18,19 41:7 42:2
**Scottsdale** 9:3 36:15 56:13,23 57:1 58:2
**Scovel** 93:21,24 96:15, 21
**scrap** 63:21 77:5,7 103:14
**scrapped** 61:13 63:18
**scrapping** 63:17 64:16 77:22

**scratch** 132:13 139:19 140:9
**screen** 49:7 51:23 52:3 54:13 55:11 59:8,11 75:15 78:21 79:5 84:16 85:9 86:16 88:23 90:16 91:14 99:18 104:15 137:7 148:18,23 157:15 158:3 163:23 166:10 169:13,23 176:10 180:4 182:23 185:3 188:24 193:8 199:15 201:10 202:9 207:12, 23 209:5 211:5 225:12
**screenshot** 181:5
**screw** 126:8
**screwed** 127:13
**screwing** 127:12
**scroll** 80:7,13 82:11 85:10,19 86:3 91:17 120:4 125:8 126:21 135:8 141:2 145:24 146:9,12,14,20 149:8 163:17 175:7 177:10, 11,16 181:3 182:1 185:13 190:18 191:8 196:2,3,4,5 197:2 202:17 203:2 204:14, 23 209:17,21 210:1 213:19 220:4
**scrolling** 206:3
**scrutinize** 213:5
**scumbag** 133:4
**se** 153:24 208:6
**search** 219:21
**searches** 32:11
**second** 27:15 33:23 46:15 50:15 55:16 62:22 64:7 77:19 79:14 80:9 82:5 100:7 116:6 134:7,8,11 157:11,18 179:17 185:1 186:10 206:18 234:23 236:1,3 252:3
**seconds** 58:1 66:3 130:24 164:2 234:8
**Secretary** 220:14
**section** 149:8 183:13
**Security** 226:9
**see** 12:3,12 14:11 16:13 18:8 25:8 30:16 33:21 35:5 42:18 43:9 44:21 45:24 46:15 48:1 49:7 51:3 52:1, 24 53:1 54:15 55:12, 18 57:14 58:2,14 59:10,15 64:6 75:15, 17 79:1,2,3,8 80:7,10, 11 81:5,18,22 82:12 83:9 84:16,17,22 85:1,10,13,20,21 86:15 88:18 89:4,8,22 91:14,19,22 92:3,6 94:1,4 96:15,19,23 97:23 98:10 99:17 100:19 101:3 103:19, 22,23 104:14 109:24 110:5,23 111:11,13, 15,20,21 112:4 114:5 115:4,10,13 116:9,15 117:20 119:5,20 120:1,6,17 122:3 123:2 124:1,5,20,24 125:12 126:6,9,15 127:8 128:12,13,18 129:1 132:23 133:5,9 134:18,19 135:3,9,17 137:6 139:6,17 140:16 141:5,18,23 142:23 143:3,9 145:7 147:22 148:14,22 149:14 150:19,22 157:9 158:3,7 159:5 160:5,11,15,18 161:20 163:10,16,18, 23 166:10,13,14,22 167:2 169:13,23 171:14 173:10,14 174:12,16,19,22 175:2 176:10,17,23 178:14 180:4,21 181:1,6,23 182:23 183:2,6,9 185:3,10,11 186:5 187:19 188:24 189:11 190:19,20 193:16 194:20 195:4 199:15,21 200:3 201:10,23 202:10,12, 20 203:7,11,13,16,22 206:11 207:23 208:22 209:6,23,24 211:6,16 215:11,14,17,19 216:1,8 217:7,8 219:22 220:6,22 221:18,19 222:19,22, 24 223:1,5,10,16,21 225:12,13,16 226:24 228:8 248:9 251:24
**Seed** 64:1,6,17 127:21, 23 247:11,24
**Seeds** 64:2,7
**seeing** 148:19
**seeking** 60:9 239:1 240:14
**seeks** 59:15
**seem** 116:6 204:6
**seemed** 102:14 239:12
**seems** 32:2 102:7 118:12 187:1
**seen** 12:6 57:6 89:15 117:20 137:18 152:6 234:12 237:16
**sees** 141:2 146:13
**selected** 93:4
**selecting** 90:1 92:8 128:24 129:11
**selection** 92:13,21 95:21 96:6 233:24
**sell** 30:7
**seller** 236:7
**send** 13:9 33:7 91:24 135:12 170:3,18 171:12 186:11 194:14,18 249:15
**sending** 67:12 134:12
**sense** 198:20 228:11
**sent** 16:6 45:18,24 62:8 82:3,8 85:4 87:14 91:18 119:20 122:22 129:16 133:2 158:14 159:9 175:19, 23 180:10 186:4 196:14,19,22 197:8 198:4 205:21,24 208:4,7,8 210:19 213:23 249:13 250:4
**sentence** 130:13 132:8
**SEO** 35:17 79:9,11 85:20 95:14 99:18
**separate** 25:17 33:24 227:18 228:4,5 238:17
**separately** 227:12
**September** 79:19 80:5 82:1 158:9,14 180:6 199:17 200:9 201:13
**service** 28:10 35:15 37:18 43:7 105:18 239:16 242:24
**set** 25:17 33:24 39:20, 24 62:11 71:22
**setting** 135:16
**settings** 230:17
**seven** 35:4 42:24 43:3 149:13 150:18 246:5 247:8
**several** 118:9 129:1,8 130:1,5 177:22
**Shafer** 143:11,14
**shakeups** 112:3,19
**shall** 220:5
**shape** 238:7
**share** 238:22
**shares** 139:3,5,8,12 141:18
**sharing** 11:22 207:12
**she** 10:9 13:12,13,19, 21 14:1,4,5 21:8 31:6, 14 33:6,7 45:3 70:16, 22,24 72:16 73:9 74:21,24 75:2,6,9 79:2 83:13,14 84:3,4 85:17 88:1,2 94:14, 15,20 96:22,24 97:1 122:3,4 125:11 131:5 135:2,6,9,15 141:2 145:1,5 146:13,15 152:1 160:13 170:19 171:12,13,16 173:17, 22,23 174:2 178:13 185:16,23 186:20 188:3 193:12 195:11, 13 196:1 210:7,11,12 211:9 223:14 224:7, 16,17,19,20,22,23 225:1 247:23,24
**she'd** 31:24
**she'll** 33:6 196:2
**she's** 9:19,22,24 10:8 13:15 15:1 31:11 32:1 59:8 69:1 72:20 74:16 94:10,11 95:19 129:12 133:14 135:1, 24 140:6 155:4 160:8 195:14
**she/her** 94:18
**sheet** 14:23 16:2 68:24 154:18 162:1 210:19
**ship** 56:6 57:2 61:7,16 242:12
**shipment** 56:5
**shipments** 36:21 56:7 61:9
**shipped** 56:21 61:7,10
**shipping** 56:3 61:6,11, 17 237:17,18 239:7,8, 11 242:10,12
**shipping--** 56:4
**Shopify** 18:16 19:2,4 20:6,9,12 22:2,3 97:8 119:9 127:6 135:17 243:6,24 244:3
**short** 27:21 46:9 64:2, 7 84:7 88:24 113:15 114:19 156:22 166:11 169:14 187:5 192:18, 23 231:3,10
**shortly** 126:1
**should** 14:5,6 16:6 23:16 45:19 54:13 55:11 83:19 84:4 101:3 106:5 110:5 121:23 123:24 124:3 132:9 160:14 168:13 182:7 187:17 196:1 198:19 199:13 201:10 202:8 203:20 207:22 209:6 211:5 222:19 225:12 232:16 237:1 248:2 249:14 250:21 251:6
**shouldn't** 11:8 106:8 107:15 134:10 251:7
**shout** 118:5,15
**shoved** 240:23
**show** 10:23 159:18 175:7 205:5 209:1 218:14
**Showel** 6:21,22 7:4,17 9:21,23 10:2,15,19 11:3,7,17 13:5 14:3 15:11,23 17:22 21:12 23:13 24:16 27:14 31:15 32:15 33:1,11, 17 37:15 39:15,18

41:16 42:20 45:5,20 46:4,13 47:8 49:6,19 50:14 51:16,20 52:16 53:10 54:7,12 59:9 63:7 64:13 67:23 69:6,10 71:4 73:19 74:8,24 75:13 76:8,14 78:15,19,21 79:4,7 80:14 81:9,14,19,21 83:15 84:5,11 85:3,8 86:7 87:23 88:5,22 89:24 90:6 92:12,17 95:1 98:23 101:19 103:1 104:7 105:2,13 107:4 109:2 110:19 113:5,16,23 114:15, 24 117:11 118:4,21 122:5 123:18,22 125:5,17 126:24 129:15,24 130:9 131:14 132:17 133:17 135:10 136:17 137:3 139:15 140:12 141:4, 8,10,12,17 142:13 144:11,21 145:3 146:2,17,21 147:10 148:18,21 149:16,19 150:2,4,7 151:5,17,23 152:5,15,20 153:5,9 155:7,24 156:9,16 157:2 158:2,21 159:15,20 160:1 161:7 163:3,8,20 167:8,14 168:5 169:1, 8,19,22 171:11 172:17 173:4,16 174:4 175:9,15 177:12,15 178:16 179:5,18,22,24 180:2 182:2,14,16,19,22 184:3 185:24 186:17, 24 187:11 188:2,8 189:7 190:2 191:10, 15,21 192:9,14,22 194:12 196:7,18 197:6,10,14,18 198:3, 24 199:5,12 200:19 203:3,5,8 204:2,10 205:3,14,23 206:9,24 207:7,11,19 209:4 210:3,15 214:4,10 216:20,23 217:22 218:9,12,16 220:17, 19 223:22 224:11,22 225:1,4 227:8,10,15, 17,23 228:4,7,16 229:10 230:7,11,13 231:1,6,14 232:17 235:15 237:12 240:7 241:20 243:20 245:5 247:5 248:17,19 249:7,17 250:13,17, 21 251:10,15,18,22 252:1,3

**showing** 88:19 158:22 191:14 215:8 223:21 224:20 229:8

**showing--** 191:12

**shows** 201:19 208:7 224:18

**Sic** 75:1 95:17

**SID** 229:22

**side** 61:14 141:22

**sign** 154:14,16,19,21, 24 155:2,16,22 156:2, 7 161:23 162:2,6,19, 22 164:7,9,12,18 165:22 166:20,21 168:2

**signature** 166:22 221:8 222:9

**signed** 29:5,7 62:10 105:9,15,16 120:19, 20 140:16,19 142:3 147:3,6 155:23 156:8 168:1 205:4 221:10 242:2

**significance** 193:18

**significantly** 116:24 117:6

**signing** 161:16 165:5, 16 168:11,13 238:20

**signs** 154:4 161:5

**silly** 194:16

**similar** 136:1,6,9 235:16 236:16,17 238:12

**similarly** 236:12

**Simon** 189:13 190:4 199:10 211:9 212:22, 24 213:3,16

**simple** 8:9 80:15 187:1 188:9 205:15

**simpler** 196:9

**simply** 16:5 198:5

**simultaneous** 17:24 22:5 36:20 38:22 42:11 48:22 56:15 65:7,20 67:16 108:16 130:21 131:2 132:2 138:22 140:24 146:11 151:9 172:15 181:15 182:12 187:2 197:13 227:20 233:18 250:24

**since** 15:2,18 76:8 86:3 218:1,2

**single** 65:9 119:23 122:16 243:7 245:16

**sister** 195:9

**sit** 11:4 17:15 67:24 89:19 130:14 193:24 219:17 221:13 231:23 236:2 240:2,5,12 251:3

**site** 77:14,24 116:18 117:1

**sitting** 233:13

**situated** 236:12

**situation** 66:10 75:21 154:11 235:22

**six** 33:18 48:12,16 49:11,22 134:17 176:8 179:15,24 189:19,22

**size** 236:24

**skipped** 55:5,6

**slash** 110:21 135:1

**slightly** 98:1 105:22 130:10 184:10

**slow** 179:7

**small** 103:22

**so** 6:2,10,22 8:4,9,12 12:20,21 14:1,4,9 15:11,16,19,24 16:1,4 17:3,15,19 18:18,24 19:4,10,12,17,20 20:2 21:4,22 22:8,10,19,20 23:11,22 24:3 26:2 27:5,7,10,18,21 28:11 29:2,20,22 30:11,15 31:11,13,15,22 32:1, 12,13 33:2 34:23 39:22 40:1,11,20,22 41:17 43:2,18 44:10 45:19 46:4,11,14,15, 24 47:1,9,16 49:1,7 51:17 52:17 54:3 55:6,16 56:8 57:7,11 58:18 59:2,21 60:8,12 61:1,14,24 64:14,21 65:3,4,19,21 67:13,21 68:10 69:13 70:11,14 71:5 72:3,5 73:14 74:3,24 75:22 76:9,10 77:5,24 80:10 83:12, 21 84:12,15 85:9 87:8,20,21,23 89:22, 24 90:5 92:7,12,20 95:20,22,23 97:14 98:6 99:7,8 100:6 101:6 102:2,11 103:3, 4,8 104:1,20 106:5,15 107:16,23 108:7 109:5 112:13 114:15, 21 115:1 117:4,15,18 118:2,8,12 120:3 121:2,15 122:6,10,14 123:5 125:11,18,20 126:11,14 128:20 129:11 130:1 131:12 132:1,6,13 133:24 135:5,8 138:3,5,12, 17,24 139:5,9,21 140:15 141:2,18 142:6 143:18 144:9, 16 145:5,19 146:1,13 147:2,4,16 148:1,2 150:8 151:11 152:12, 16 154:10,11,24 156:14,19 161:6,15 162:3,11 163:18 164:16,21 165:1 166:21 167:15 168:3 169:1 170:17 171:3, 21,24 172:4,14 173:3, 5,11,16,23,24 174:2 176:1,14 177:4 178:7, 23 179:1,9 180:3 182:4,7,8,17,23 183:9 184:16 186:9 187:5 188:7,14 189:9,21 190:10,18 191:22 192:2,20 196:19 198:24 200:1,22 203:19,23 206:21 209:5,22 210:1,3,7,16 211:15 212:14 213:5 214:2,4 215:11 216:10,17,20,24 217:14 218:2 219:4 221:12 223:19 224:3 225:22 226:11 228:2, 8 229:1,3,4 230:7 231:23 232:4,18 233:12 234:5,14,19 235:3,11 237:16,18 240:3,20,24 241:3 242:16 243:1,3,9,11, 15,23 244:14,16 245:8,18,24 246:8,24 247:3,9,14,18,21 248:7,14 249:9,10,14, 15,22 250:8,14 251:15

**So--** 53:11

**social** 226:9,12

**sold** 57:18

**sole** 42:3

**solely** 103:14

**solicited** 136:1,6,9

**some** 10:6 13:7,22 19:1 32:9 55:23 57:19 67:2 70:24 73:7 77:13 85:6 93:10 96:22 97:2 99:6,7 100:4,12 105:23 110:21 113:20 119:24 120:10 121:12,15,16 122:1, 23 135:16 154:23 183:19 196:1,20 207:6 215:3 219:19 230:8,22 232:13 239:4 240:8,15 248:13

**somebody** 18:17 34:6 39:6 43:14 50:7,12 55:1 82:4 134:19 147:3 154:3 162:9 237:20 242:11 246:24

**somebody's** 146:18

**somehow** 155:3

**someone** 52:13 87:10

**something** 17:18 18:3 24:7 29:21 48:11 49:24 61:21 66:21 67:14 72:10,16,22 83:13,19 89:17 122:19,22 131:15 155:22 162:2 163:18 177:11 197:23 205:12 210:9 219:16 222:19 227:5 233:1 234:21 239:1,13 241:22 242:5 244:4,11 247:1

248:10,11
**sometime** 114:12 235:12
**Sometimes** 98:14,15 230:16
**somewhere** 65:14,21 66:13 68:1 71:14,21 72:3 151:8
**sorry** 7:4 9:21 10:4 16:1 17:21 30:1 33:23 35:12 38:24 40:9 42:12,15,17 43:22 48:7,10,11 49:15 53:3,5 64:4 65:8 69:11,22 70:18 73:23 88:2 90:21,22 94:11, 13,19 95:17 105:3 108:17 119:12 130:22 132:4 134:23 138:22 139:23 141:3 142:14 145:22 150:4 151:9 153:10 158:19 159:13 161:19 165:2 169:17 170:14 189:2 191:19 193:5 198:12 201:13 205:13 210:12 213:15 215:8 223:1 236:1,22 249:12 251:22
**sort** 19:9 24:17,19 36:16,23 109:12,15 112:23 119:24 125:19 155:9 194:16 233:24 246:1 251:3
**sought** 234:23
**sound** 231:2 240:9
**Sounds** 231:7 248:21
**space** 59:2
**spas** 31:4
**speak** 6:5 63:11 146:1 147:5
**speaking** 23:20 170:4
**speaks** 173:15
**spearhead** 100:17 105:7 131:12 245:18 246:22
**spearheaded** 118:9 233:9
**spearheading** 62:19 63:3 119:1 130:17 131:8
**specialist** 243:15,21
**specific** 10:9 13:16 32:10 57:3,5 68:24 70:15,22,23 71:12,22 73:4 77:4 102:7 142:7 155:18 164:13 172:21,22 215:18 216:3 226:1 235:23 238:2
**specifically** 63:12 76:16 122:13 126:13 156:8 198:10 200:16 219:18 224:17 225:21
**specifications** 108:1
**specificity** 130:15
**specifics** 73:9 76:2 132:15 147:14,17
**speculate** 101:11 194:10
**speculating** 86:5 142:10
**speculation** 41:12 110:16 112:24 117:24 145:23 186:14
**speech** 17:24 22:5 36:20 38:22 42:11 48:22 56:16 65:7,20 67:16 108:16 131:3 132:3 138:22 140:24 146:11 151:9 172:16 181:15 182:13 187:2 197:13 227:20 233:18 251:1
**speed** 77:14,24
**spell** 38:14 58:8 64:4
**spelled** 91:19 116:14 244:19
**spelling** 170:14
**spend** 46:22 251:19
**spiders** 131:18 132:10 233:5 234:8,13,14,15
**spoke** 108:18 201:22
**spot** 17:19
**spreadsheet** 54:4 66:13,15,17,18 182:19
**spreadsheet--** 71:15
**spreadsheets** 226:22 228:5
**Springs** 230:14
**Sprinkles** 209:6,9
**Square** 30:16,18,22
**St** 160:8
**stacking** 103:21
**staff** 56:22
**stamp** 78:22 91:12 115:3 142:22 158:24 180:17 184:24 208:21 210:24 215:13
**stamped** 81:4,10 83:8 86:14 88:15 90:12 93:18 96:13 104:14 124:17,19 128:11 137:4 142:19 148:13 152:22 157:8 160:2 166:8 185:2 188:21 193:7 195:2 202:19 213:15 217:5 218:19 222:16 225:11
**stands** 132:16 141:13
**start** 12:15 26:2,20 44:4 45:11 131:6 149:19 150:8 198:22 240:19 242:9 245:6
**started** 6:4 101:22 178:4 207:9 244:17
**started--** 102:22
**starting** 26:9,11,12 44:7 119:2,4 131:1 132:12
**starts** 20:2,3 116:9 119:17
**state** 6:9,18 17:2 117:19 128:24 130:15 137:22 138:1 139:3 147:19 166:19,24 193:13 209:14 211:14 220:14
**State's** 220:14
**stated** 7:14 203:20 204:3 214:20
**statement** 128:20 140:15 148:20 160:20,21 216:11
**statements** 44:21
**states** 59:14 111:13 116:18 149:9 160:10 220:5 230:23
**status** 212:8,12,14,17
**stay** 252:3
**Steadfast** 28:18
**stemming** 197:5
**step** 79:14 122:18 134:6,7,8,11 236:3
**stick** 234:14
**still** 29:12 35:8,19 36:10 37:21 38:1 58:11,18 90:1 94:14 95:11 100:15 112:6 121:20 146:17 147:21 161:12 186:4 191:11 235:6
**stipulate** 6:19,24 7:2
**stipulated** 6:22
**stop** 35:24 56:18 126:5 179:17
**stopped** 28:12
**stops** 106:2
**store** 28:14
**stored** 28:2
**stores** 100:4
**storing** 28:17
**story** 27:21 244:21
**straightforward** 21:14 73:21 156:1 198:6
**strain** 84:1
**Strategies** 37:16,17,21 44:24 47:14,17 190:7, 12
**strong** 105:17
**structure** 221:2
**struggle** 27:19 179:10
**stuff** 13:14 32:1,7 41:13 56:6 73:11 89:15 107:18 175:7 230:16 232:11,12 247:24
**subject** 69:6 86:18 96:18 183:2
**subpoena** 199:10 222:18
**subscription** 26:21
**substantive** 210:4
**such** 30:22
**suffered** 237:15
**suggestion** 235:17
**sum** 22:7,22
**summarize** 70:5
**summary** 55:12
**super** 111:20,24
**superb** 119:2
**supervise** 246:13
**supervisory** 246:1,9
**supplement** 69:24 248:12
**support** 32:16 70:11 95:6
**Supporting** 37:16,17, 21 44:24 47:14,16 190:7,12
**suppose** 33:8 53:24
**supposed** 144:2 148:2 233:10
**sure** 14:18 27:7 33:11 38:20 48:8 60:1 69:2, 13 70:20 72:19,20 74:1 75:10 76:5 89:14,16,20 98:22 113:16 121:5 125:5 140:3 143:18 152:15 163:21 175:3 188:15 195:21 200:15 215:10 219:2 227:3 229:16 232:5 240:1 251:18 252:4
**suspect** 130:11 146:5
**swapping** 112:3,17,20 113:3
**swear** 7:6
**swearing** 6:19
**swearing-in** 7:2
**Sweden** 38:11,12,13, 17,23 39:1,8,15 41:18,23 57:16 93:6 106:23
**Sweden's** 41:7
**switch** 241:6
**sworn** 6:6 7:12
**system** 18:18 20:4,8 26:14,16 52:15 241:10 243:8
**systems** 61:18 246:17

**T**

**table** 183:10 185:9,14, 16 186:3 187:6
**take** 8:15 15:16 18:5

25:6 55:23,24 56:2 59:13 76:8 78:9 80:6, 22 83:2 86:8,21 88:10 90:7 91:7 93:13 96:8 99:10 104:8 113:9,15, 16 114:12,14 116:1 119:13 124:12 125:3 128:6 132:18 134:13 136:19 137:14 142:15 143:22 146:8,23 147:13 148:7 156:9, 13 159:11 166:3 170:20 171:3,14,17 172:2 173:6,17,18 174:5 177:9 184:19 188:17 192:6,11 194:21 195:21,23 196:1,16,23 198:14, 24 201:2 202:1 205:10 206:23 207:3, 5,11 208:13 209:24 210:6,23 213:6 214:11 215:10 216:20 218:21 220:8 222:11 225:5 226:14 229:15 231:1,3 234:5 248:3, 12,23

**taken** 46:10 64:22 84:8 114:20 156:23 192:19 231:11

**takes** 103:3 126:8

**taking** 8:10 23:17,21 54:7 114:5 116:7 152:10 157:3 169:9 176:3 181:16 192:24 204:12 242:23

**Talisay** 230:10,11

**talk** 8:11,13 102:24 148:3 248:4,9,10

**talked** 21:8 34:15 58:1 95:10 127:19 216:2 231:16

**talking** 15:2 32:12 45:3 59:6 68:24 69:1 72:21 75:9 80:10,17, 19 83:17,18 84:20,21 85:23 155:11,12 177:6 218:7 224:20 232:11,16 235:4

**Tam** 166:24 167:15

**tap** 157:21

**task** 245:18

**tasks** 245:18

**tax** 37:23 38:1 193:19 194:1 217:11 218:8 219:21 226:7,8 243:5, 21,23

**taxes** 17:2,4,14 18:1

**team** 42:4,6 93:7 95:24 164:14

**tech** 107:16

**technical** 77:17 106:22 107:19,24 110:13 117:1 131:17

**telephone** 237:6

**tell** 10:24 14:17 21:15 23:18 27:8 63:22 76:3 102:12 145:13 153:11 166:1 171:9 172:21 197:7 234:11 236:23 241:24

**telling** 170:19 171:13, 16 173:17 216:15,17 223:14,16 238:20,21 244:21 247:16

**temporary** 58:24

**ten** 45:12,16,23 113:17,22 114:5,15 119:17 122:15 123:18 164:20 231:6 239:9 249:1

**tense** 204:6

**tentative** 215:18 216:3

**term** 131:17 154:18 162:1 210:19 234:12 242:22

**terminate** 26:24 37:6 145:21 190:3

**terminated** 27:22 29:15 58:20,22,23 151:13

**terms** 31:7 44:14 70:4 107:6 109:5,8

**Terra** 230:12

**Terre** 230:13

**test** 27:17 181:12

**testified** 7:12 25:2 50:15 100:7 186:20 228:17

**testify** 12:17 16:16,17 18:11 31:11 60:2 67:15 68:14 70:14 72:6 73:8,15 74:4 75:19,23 76:17 204:8

**testimony** 7:7 8:11,21 11:6 15:5 21:8 23:24 32:16 49:21 68:6 71:14 76:1 107:5 144:20 145:23 162:4 165:4,14 167:19,22 170:22 172:9 184:5 186:15 187:9 214:7

**text** 89:12,18,23 91:18 173:11

**texts** 171:8

**than** 12:17 15:16 16:4 25:11 36:5 43:8 79:22 106:19 115:13 117:1, 6,23 126:8 188:1 195:24 207:8,9 233:11 234:4 246:6 249:22

**thank** 10:20 11:13 49:18 53:9 64:11 81:20 85:10 94:22 131:7 141:11 143:1 157:23 159:21 160:13,14 179:7 189:10 196:4 216:6 237:10 243:19 251:13,17,21 252:2

**thanks** 10:22 11:10 51:19 192:15 251:15, 19

**that** 6:2,14 7:7 8:1,4,6, 11,15,20,24 9:1,3,6 10:7,13,22,24 11:1, 19,21 12:6,9,19,21 13:12,13,17,19,22 14:1,4,11,17,23 15:2, 3,6,12,13,21,22 16:1, 2,5,7,8,13 17:4,9,13, 16 18:8,17,18,19,20 19:2,11,20 20:1,4,5,6, 7,8,9,10,12,15,21,22, 23,24 21:2,10,19 22:6,15,19,20,21,22, 23,24 23:8,9,10,12, 16,17,21,23 24:1,6, 10,23 25:3,4,8,11,12, 15 26:5,15,17,22,24 27:2,12,19,22 28:2, 10,15,16,19,20,21,23 29:3,9 30:6,8,13,14, 16,24 31:11,13,16 32:3,7,8,15,19 33:9, 16,21 34:14,15,17,21 35:5,8,9 36:14 37:19 38:3,6,7,8,14,19,21 39:22 40:19 41:1,10, 18,19,20,23 42:5,6,8, 21 43:3,7,9,15,16,19 44:4,5,8,11,15 45:3,9, 17,23 46:19,22 47:9, 10,15 48:1,8,14 49:7, 20,24 50:3,7,15,16,20 51:2,3,5,9,11 52:1,12, 24 53:4,13,23,24 54:1,4,5,8,9,14,15 55:11,12,18 56:17 57:18,20 58:2,4,8,12, 14,16,18,20,22 59:6, 16 60:23 61:4,7,8 62:1,5,12,13,15,17, 18,22,24 63:2,3,8,10, 11,17,18,24 64:22 65:1,2,15,17,22,23 66:4,15,21 67:11,14, 15,22 68:1,5,7,9,10, 11,12,13,14,18,21,23 69:3,4,15,16,18,23 70:1,7,10,11,12,19, 21,23,24 71:2,3,7,11, 19,23 72:1,2,6,15,19, 20,22,24 73:3,4,6,7, 15,20,23 74:2,4,11, 18,19,20,21 75:2,3,4, 7,9,10,15,17,20,23 76:2,4,11,21,22 77:2, 6,17,19,21 78:1,5,6 79:1 80:6 81:3 82:3,4, 8,12,18,21,23 83:7, 15,18,22,23,24 84:1 85:11,13,21 86:13,19 87:1,4,20 88:20,24 89:3,4,8,17,18,20 90:2,15 91:1,19,22 92:1,5,6 93:4,9,10,23 94:17,20 95:14 96:4, 7,18,19,23 97:1,10 98:2,10 99:1,3,5,8,9, 15 100:14,23 101:1,4, 7,16,17,20 102:5,17, 18,19 103:3,6,9,13, 19,23 104:1,5 106:4, 5,19 107:3,5,11,12, 15,18,20,23 108:2,10, 11,12,13,14,18,22,23 109:6,9,12,15,20,21, 24 110:5,22,23 111:11,15,17,18,21, 23 112:4 113:4,6 114:2,8,13,21 115:3, 4,10,13,16,19,21,22 116:15,22,23 117:4,9, 13,14,15,16,20,22,23 118:1,2,8,9,10 119:6, 17,19,20 120:6,9,11, 21,24 122:2,7,19,22, 23,24 123:7,20 124:1, 5,21 125:8 126:6,9, 12,15 127:5,8,15,17, 18 128:3,13,18,20,21, 22 129:2,4,11 130:4, 11,13,16,20 131:10, 16,19,21 132:7,12,13, 15,16 133:3,5 134:2, 7,11,20,22 135:3,6, 11,12,17,19 136:12, 15,18 137:6 138:6,7, 8,18 139:6,8,14,18 140:16 141:23 142:1, 19,20 143:3,9,11,13 144:2,6,7,18,20,23 145:6,7,11,16,21 146:5,6,23 147:5,11, 13,19,22,23 148:12, 14 149:1,3,14,24 150:5,18,19,23 151:1, 10,12,24 152:1,6,7 153:1,6,18,20 154:6, 7,11,13,15,21,23 155:2,3,14,16,22 156:7,8,9,17,20,24 157:12,14 158:7,14, 17 159:5,8,13 160:5, 8,11,15,18,20,21 161:20 162:4,8,10,14, 17,18 163:1,7,16,18, 21,23 164:6,9,11,13, 23 165:4,5,6,7,14,15, 17 166:1,11,15,22 167:1,2,4,9,15,19,24 168:1,4,13,16,17,23, 24 169:17 170:8,10, 22,23 171:14,16,22, 24 172:9,11,13,19 173:10,12,15,22 174:3,9,11,16,19,22, 24 175:7,16,24 176:14,15,19,23 177:2,5,18 178:7,8,9, 14,19 179:9,20 180:10,21 181:1,6,12 182:19 183:6,16,19 184:2,5,6,8,9,11,12, 15,16,17 185:8,10,11

186:4,13,18 187:6,12, 13,21,24 188:3 189:9, 11,17 190:3,8,10,15, 20,21,23 191:1 192:2, 20 193:7,14,16,23 194:1,13,18,20 195:4 196:5,10,11,14,20 197:23,24 198:4,7,9, 22 199:7,13,15,17,21, 23,24 200:8,16,17,20, 23 201:1,11,16,23 202:10,12 203:12,13, 15,17,20,22 204:3,18, 21 205:3,5,13,16 206:11,13,15,21,22 207:4,21,23 208:1,4, 7,8 209:7,22 210:1,7, 8,9,19 211:6,15,16,18 212:10,13 213:10,11, 12,13,17,18,22 214:1, 4,5,16,19,20,21,22,24 215:5,15,17,19 216:8, 10,15 217:9 219:1,9, 12,14,15,20 220:5,6, 13,20,22 221:4,15,19, 21,24 222:17,20,22 223:1,4,5,7,9,10,12, 15,19 224:6,9,11,16, 17,18,20,23 225:10, 12,13,16,18 226:2,22, 24 227:17,23 228:11, 17 229:15,21 230:5,6, 15,16 231:2,18,20 232:4,7,13,14,15,19, 23 233:1,2,6,9,13,17, 21,23 234:2,3,4,6,12, 19,23 235:1,2,5,10, 11,17,20,22 236:3,17, 22,24 237:3,5,8,18,24 238:12,18 239:1,7,9 240:1,2,3,9,13,14,22, 23 241:22 242:1,7,13, 18,21,23,24 243:6,7, 8,10,13,14,15,21,24 244:6,9,13,19,23 245:7,14 246:2,6,8,9, 12,15,18 247:1,4,10, 11,13,15,17,18,19 248:1,3,8,9,15 249:19 250:12,15,16,19,21 251:2,12,14,23

**that's** 8:10 11:8 12:22 14:7 15:9,17,18,24 19:15,16 21:5,17,21 23:8,11,15 24:14,15 26:13 27:10 28:12 31:5,6 32:4,13 33:14 37:14 42:19 44:13 46:5,7 49:2 52:3 57:12 59:10 69:2 71:22 72:18,20 77:21 78:24 84:22 88:8,19, 20 92:15 93:18 97:11 104:4,5 106:4 108:24 109:19 112:21 113:24 115:24 116:20,23 117:3,10,14 118:6 119:4 120:15,19,20 122:19,22 123:11 126:10 133:9 137:4 138:7 144:8,15 146:24 148:2 150:9, 12 152:7,14 154:9 155:18 156:12 164:22 167:17,18 168:3,4,6, 16 172:23 173:11 174:2 175:5 182:16 183:21 184:9 185:8, 19,20 186:8 188:14, 16 189:8 190:15,18 192:14 194:10 197:15 198:6,11,12 200:5 201:1,19 203:21 204:18,21,23 206:13 209:13,16,20 214:3 218:1 223:12,15,16, 18 224:7,18 225:2 230:21 234:10,13 238:23 241:9 248:14 250:17

**that--** 90:20 99:4

**the** 6:2,3,6,7,8,9,10, 11,15,19,23 7:2,3,5,7, 8,9,11,14,15 8:1,14, 19 9:5,8 10:4,6,11,12, 13,17,20,24 11:1,12, 14,18,19 12:2,12,15, 16,22 13:3,12,16,23, 24 14:1,8,18 15:4,9, 12,14,16,18 16:2,11, 23,24 17:6,21 18:4,6, 15,18,19 19:3,12,20 20:2,6,16,17 21:13, 18,19,20,21 22:1,4,6, 10,11,21,23 23:5,9, 14,16,19,21,22,24 24:9,10,12 25:3,7,11 26:7,14,16 27:1,4,13, 21,22 28:6,11,12,16, 17 29:2,4,5,9,10,11, 12,15,17 31:3,5,9,10, 16 32:7,8,9,13,15 33:8,12,13 34:3,9,14, 16,17,20 35:17 36:2, 21 37:1,6,8,9 38:7,10, 14 39:13,20 40:1,5,7, 10,11,16,17,18,20 41:1,3,5,6,9,15,18,23 42:6,8,9,14,15,16,17 43:3,19,23 44:4,7,10, 13 45:8,15,18,20,22, 23,24 46:2,3,4,8,11, 20,22 47:4,6,23 48:5, 9,16,18,19,21,24 49:1,3,14,15,18 50:8, 9,11,16 51:1,8 52:3, 12,22,23 53:1,3,5,6,9, 14,22 54:7,8,21 55:6, 10,16,24 56:5,7 57:6, 14,17,20 58:4,6,10,16 59:5,8,23 60:8,16,17, 20,21 61:1,4,12,13, 14,18,19,22,23 62:3, 8,18,20,24 63:2,4,5,6, 15,20,22,23,24 64:2, 4,6,7,9,10,11,12,15, 23 65:4,5,12,17 66:3, 10,18,19 67:8,17,21 68:9,17,20 69:7,9,15, 17,18,19,23 70:2,5,6, 10,12,16,18,21,23 71:1,7,11,18,19,22,24 72:1,2,8,11,13,14,24 73:4,8,9,10,14,17,18 74:2,3,6,7,15,18,19 75:9,21 76:2,5,8,20, 23 77:1,5,7,8,15,16, 19,20,21,23,24 78:1, 4,13,22,24 79:1,5,13, 15,16,17,18 80:9,11, 17,18,19,21 81:2,3,4, 7,8,9,10,12,16 82:12 83:6,7,8,12,13,16,22, 24 84:3,5,6,9,15,20, 21,22,24 85:1,23,24 86:1,2,6,12,13,14,18, 22 87:4,10,18,20 88:3,14,16,21 89:15, 16,20,22 90:3,5,11, 13,14,15 91:11,13 92:1,2,5,9,11,13,14, 16,20,23 93:4,5,8,10, 17,19,23 94:17,19,22, 24 95:2,3,7,21 96:3,6, 12,14,18 97:16,20 98:1,15,20,21 99:6,7, 14 100:3,6,9,11,17, 18,23 101:7,10,14,17, 20 102:3,5,8,12,13 103:4,5,6,8,9,14 104:1,4,12,23,24 105:1,5,9,12,15,16, 18,21 106:2,14,15,21 107:2,10,11,13,14,19, 20,21,24 108:5,8,9, 12,18,21,22 109:1 110:18,22 111:13,20 113:2,6,13,14,18 114:3,8,10,18,21 115:9 116:5,17,18 117:1,5,6,9,10,16,19 118:2,8,9,18,22,23,24 119:1,9,11,16,18 120:9,11,23 121:4,16, 22,24 122:3,14,23 123:10,11,14,20,21, 24 124:16,18,19 125:6,8,10,11,14,15, 22 126:3,4,5,11,19, 21,23 127:1,12,13,15, 16 128:5,10 129:14, 23 130:8,13,16,18 131:2,7,8,9,17,18 132:2,4,6,9,10,21 133:4,9,11,14,16 134:1,7,8,16,22 135:2,9,23,24 136:12, 15,23 137:5,10,20 138:5,12,13,23 139:5, 11,13,16,23 140:1,2, 3,5,7,14,21 141:1,3,5, 6,7,8,9,11,14 142:8, 12,18,21,23,24 143:23 144:1,2,5,9, 21,23 145:5,8,14,24 146:4,8,9,10,12,13, 14,18,21,24 147:1,4, 7,8,14,17,24 148:11, 12,13,14,15,19 149:1, 3,6,9,10,11,12,13,18, 19,21 150:9,12,14,16, 21,22 151:4,13,16,18, 19,22 152:3,12,16,19 153:6,18 154:4,7,10, 12,16,19,20 155:3,8, 11,12,13,19,21,24 156:4,6,7,12,20,24 157:7,14,15,17,20,23 158:1,16,17,18,20,23 159:3,13,18,21,24 160:2,3,14,22 161:1, 2,3,5,12,13,16,18 162:16,21,23,24 163:1,2,3,6,14,15,18, 21 164:13,16,23 165:10 166:7,13 167:7,13,23,24 168:6, 13,20,24 169:4,6,12, 18,20,23 170:12,14, 19,22,24 171:8,9,13 172:1,2,19,20,21,22 173:2,6,9,10,11,12, 14,22,24 174:8,11,18, 21,24 175:2,5,11,13, 23,24 176:7,9 177:4, 7,8,12,14,16,17,18 178:1,3,4,6,7,18,19, 20,21,22 179:4,14,20 180:16,19,24 181:3,9, 20,24 182:6,18,20 183:2,5,9,18,21,23 184:5,12,14,15,23 185:2,8,9,14,15,16, 18,19,22 186:3,5,8, 13,16 187:5,10,12,22 188:2,6,20,22,23 189:10,19 190:1,7,15, 18 191:13,14 192:16, 20 193:4,18 194:4,8, 11,15 195:1,3,22 196:2,3,6,17,21 197:1,5,11,22 198:1, 2,4,14,16,19,21,22 199:4,6,10,19 200:9, 17 201:6,8,21,22 202:5,17,18 203:24 204:5,6,7,8,9,11,15 205:1,7,18,20 206:2, 3,8 207:16,18,21 208:10,17,20,21 209:1,2,18,19,23,24 210:1,7,12,14,17 211:3 212:8,11,15 213:5,6,20,22,24 214:8,14 215:9 216:1, 2,14 217:4,6,7,11 218:2,5,11,13 219:14, 21 220:1,2,5,6,12,13, 21,24 221:1,6,15 222:4,14,16,19 223:4, 9,12,13,15,16,20 224:8,12,15 225:1,9, 15 226:6,11,18,19,20, 23 227:6,10,23 228:8, 14 229:6,9,16,19,21,

23 230:1,5,7,10,12, 14,18,20,23,24 231:8, 9,12,15,17 232:8,9, 11,12,18,19,21 233:4, 5,6,8,9,12,15,16,17 234:1,2,3,8,11,12,13, 15,17,18 235:8,9,11, 12,13,17,22 236:4,9, 23 237:2,3,8,9,10,11 238:2,13,16,19,24 239:10,17 240:6,9,17 241:2,3,6 242:3,11,18 243:1,3,5,16,17,18, 19,24 244:2,9,10,13, 19,21,23 245:1,3,6, 10,12,14,16,17,18,20, 21 246:2,7,17,19,20, 21,22 247:12,13,14, 24 248:14,17,18,21 249:1,4,5,8,15,16,17, 21,22 250:4,11,14,15, 19,20,24 251:8,12,14, 17,21,22,23,24 252:2, 4

**the--** 60:14 185:17

**their** 7:14 38:11 40:18 41:4,7 63:1 64:1 72:12 87:20 88:9 105:8 107:8 128:3 136:4,5 160:9 167:21 174:2 227:11 236:15, 18 237:20,21,22 243:8,11 246:22

**them** 13:15,20,22 18:14 27:11 31:20,21 32:4,18,19,20,21,23 33:1,5,9 34:6,8 40:1, 2,3,13,22 41:1 42:1,3 43:15 45:19 49:12 52:14 56:18 60:17 64:8 66:6,7 67:1 71:9, 11 77:13 87:15,17,21 96:3 105:18,24 106:13 107:9 108:5, 11,24 112:9,13 120:13,18 121:20 127:18 131:12,18 136:4 142:9 153:15 167:11 174:1 177:10 190:10 223:8,14,16 224:21 227:13,18 232:14 237:22 238:8 239:5 240:15 246:23 248:1 249:6,7,8,9,15, 17,18,19,23 250:3,5,6 251:6

**theme** 77:21 97:8

**themselves** 6:18

**then** 14:8 15:15,22 27:12 32:22 33:7,8 39:21 50:18 72:9 80:7 84:18 97:7 101:23 102:14 108:5 113:19 114:14 127:18 131:5 132:7 137:23 140:3 141:22 142:2,9,10 144:4 173:5 194:8 196:1,15 206:10 207:2,4 214:5 215:3 217:16 219:24 229:21 235:2 243:9 248:12 250:6

**then--** 197:18 229:8

**there** 8:19 9:8 12:16 13:1 14:10 16:12 18:8 23:11 31:13 32:7 33:8,21 35:5 39:16 40:15 42:5 43:8 53:7 59:15 60:18 61:13,21, 22,24 62:5 64:8,18,21 67:18,19,21 71:12 72:22 75:16 77:8,12 84:14,18,24 85:2 86:21 89:4 98:17 99:1,7,17 108:7 110:4 112:2,19 128:4 130:22,23 131:20 133:24 141:6 142:1, 22 146:19 147:19,23 148:3,17,20 151:8 152:22 157:22 167:20 173:18,19 179:1 181:6 185:20 187:3, 15,17,21 188:12 191:17,18 197:3 200:11,14 201:11 202:18 203:11 204:6 212:1,5,14 213:20 219:19 221:14 224:10 229:20,22,24 230:4,8 232:15 234:6 235:1, 22 238:4,15 240:20, 21 241:12,18 242:4 244:3,7,22 247:17 248:1,11 250:6

**there's** 8:10 10:24 31:24 39:22 53:19 60:10 67:9,11 72:15 77:17 84:18,19,24 85:2 89:2 115:8 119:19 123:13 124:20 128:12 132:23 143:2, 17 146:21 158:6 160:4 166:13 171:3 176:23 177:10 179:8 180:18 183:13 185:10 187:20,24 188:10 195:3 198:15 199:20 201:20 205:8 208:18 209:2 210:3,9 211:11 217:16 221:12,14 224:19 229:20 230:3, 8 232:10,14 238:17 239:11 240:1 242:5 244:4 246:4

**therefore** 186:21

**these** 13:22 19:11 32:6 45:18 46:21 47:9,13 48:5,8 49:10,20,24 51:10 52:6,12 54:24 66:12,23 86:24 87:12, 14,24 95:20,23 97:10, 15,18,21 98:3,12,18 103:22 111:2,4 120:22 138:3,6 182:4, 6,7 196:10 198:7 199:8 202:20 220:13 222:17 226:11 227:24 229:16 246:1,2,9,17

**they** 6:18 13:20 14:6 24:21,22 32:4 33:12 34:12 39:3 40:10,20 41:9,21,22 42:2 44:24 52:14 55:22,23,24 56:2,3,6,7,9,15,20,21, 22,24 57:2,7,11 61:16 62:8 64:24 67:4 69:9, 12 77:20,22 96:7 106:15,16 108:10,13, 23 120:9 121:15,17, 22,23 128:2 131:11 134:11 136:4 154:23 174:1 182:5 189:14, 15,16 190:8,9 199:9 214:17 219:12,15 221:10,24 223:13 227:12,17,21 229:4 235:11 239:8 240:16 242:14 243:10,11,12 244:14 250:8

**they'll** 249:21

**they're** 13:11,12,18 30:7 32:21 33:10 37:19 40:20 49:13,14, 15,17 55:21 65:24 71:17 106:8,12 172:20 199:9 220:15 228:24 237:23 238:16

**they--** 56:8

**thing** 15:1 21:20 51:17 72:8 112:23 122:14 146:24 155:4 185:17, 20,22 189:9 197:15 209:23,24 238:16 243:7,21 249:12

**things** 11:1 23:20 24:13 42:5 61:14 62:1,18 63:3 67:7,11 122:4 131:10 147:14 154:5 213:4 232:6,13, 15,22,24 239:12 242:18 246:23 250:7

**think** 25:2 31:17 35:7 39:9 55:5 70:21 72:11,16 75:6 82:7 84:20 87:16,21 88:4, 6,7,19 91:6 100:7 109:20 110:10 111:17,19,23 116:21 117:22 118:16 121:23 122:18 123:4,5,12,15, 19 125:12 129:12 130:4,15,22,23 133:14 135:8 139:9, 23 140:4 141:3 145:6 146:15 152:1 153:7 155:1 165:12 172:19 173:10,16 182:12,13, 15,16 183:21 185:20 186:21 191:15 194:7, 13 196:14 197:24 198:19 200:11,14 213:22 223:14 224:19 232:15 238:19 239:23 247:15,17,23,24 248:3,5 249:1,17 250:3 251:2

**thinking** 104:5 118:1 224:6

**third** 35:15 36:16,23 58:10 77:10

**Thirty** 159:15

**this** 9:11 11:5,9,14 12:6,17 13:13 14:5,6 15:3,4,5 16:16,19 18:11,24 19:7 20:15, 17 21:9,20 23:10 24:12 27:17 28:10 31:1,8,9,23 32:1,9,11 33:11 34:1 42:7 43:11,19 44:18,21 45:1,2 46:19,24 47:6, 16,24 48:11,17,19 49:24 50:2,6,10,11, 18,19 51:5,9,14 52:9, 17,18,23 53:13 54:4, 17,22,24 55:6,14,17 57:5,6 58:1,11 59:3, 18,22 60:9 61:5 62:11 65:10 67:4 68:19 72:11 73:1 74:22 75:12 76:13,17 79:19, 22 80:4,5 81:3,14 82:3,6,7,8,18 83:7 84:2 85:23 86:13,18 87:5 88:17 89:11,15, 24 90:12,15,19 93:3, 18 94:1,4 96:21 97:2, 11,12,23,24 98:2,7 101:6,12 104:1,2,20, 21 110:5,7,8,10,11 112:12,23 113:2,14 117:19 118:12,18 119:2,17,22 120:1,3, 19,22 121:6,9,18 122:6,11,14,15 123:8, 12,15 124:4 125:2,8, 19,23 126:1,8,19,20, 21 127:2,6 128:18,21 129:16 131:13 133:18 135:7 137:4,13,15,16, 17,18 138:1,15 139:1, 13,14 140:7,9,10,15, 20 142:5 143:13,21 144:10,22 145:7,8,12 146:1,4,5,17 147:1,2, 4,5,16,17 148:3,12 149:1,5,24 150:6,18 152:14,23 153:3,17 154:10,24 155:6 156:2 157:21 158:13, 17 159:8,15,16 161:4, 9,13,15,19,23 162:3, 19 163:9 164:3,7,12, 17,19 165:11 170:20 171:5,14 172:2 173:7, 13,18 174:9,21,24 175:1,8,13,17,18 176:20 177:21

178:11,17,18 180:3,8, 10,11 181:5,8,9,11,21 183:8,10,23 184:2,5, 12 185:16 186:3,11, 16,18 187:6,14,16,18 188:10 190:19,24 191:1,2,22,23 192:3,6 194:4,11,14,18 195:20 196:24 197:3, 14 200:1,4,9,22 202:17,22 203:1,9 204:7,15,17 205:7,20, 21 206:4,8 208:3,6,10 209:14,22 210:4,9,17, 18 212:4 213:9 216:12,22 217:14 218:1,17 219:12 220:16,20 221:8 222:9 224:18,20 226:3,6,19,20,21,24 227:4,5 233:24 235:5 236:10 238:11 239:18 240:23 243:16 244:23 245:7,21 247:10,20 250:14

**Thompson** 6:16 199:15,20 200:23 213:10,16

**those** 13:9,14 14:13,17 16:5 18:13 22:6,7 25:19,22,24 31:6,11, 12,14 33:7 34:5 42:9 43:13 45:24 53:20,21 62:21 63:8 64:5 67:12 68:17 69:7 71:13 72:12 73:9 91:4 97:4 121:9,18 129:4 138:4 185:13 186:9 193:6 229:23 230:22 232:15 238:6 248:8 249:6,10, 13,14

**though** 9:24 65:11 99:1 122:4 145:19 187:17 195:19 210:6 242:19

**thought** 15:12 48:10, 19 94:13 110:16 144:22 145:8,11,13, 19 168:12 198:5 216:22 230:6

**thoughts** 110:4

**thousand** 17:19,20

**thread** 116:8 196:19 199:19 216:1

**three** 18:3,5 25:12 54:23 78:3 99:15 123:24 124:18 142:20 145:20 152:21 166:9 169:19 182:3 192:12 199:5 213:9

**throat** 153:5,8,10

**through** 11:5 13:20,22 15:22 19:4,14,23,24 26:4 30:21 31:13 32:11 33:5,6,19 34:20,22 45:18,24 59:23 60:11 72:23 80:6 81:8 111:13 134:2,12 143:23 144:6 146:8 152:13 164:20 177:22 179:8 188:23 201:9 206:3 219:19 225:11 227:5 243:9,24 244:23 249:8 251:6

**throughout** 245:7

**throw** 230:17

**throws** 33:20

**tied** 248:6

**Tim** 143:2,5

**time** 6:6,15 15:16 20:8 23:17,21 27:16 39:17 44:15 61:9,17,20 62:2,3 63:15 65:1,3 67:21 69:24 72:11 82:18 92:1 95:4 98:15,17 103:23 112:10 113:14 116:23 117:10,13,14,16 118:1,2 120:24 144:22 147:16,23 151:10 152:12 156:14,15,17 161:22 172:11,13 175:24 177:9 183:11 184:8 185:20 186:18 192:13 195:23 196:1 198:14 203:15 206:20 208:10 215:18 216:3,12 221:4 224:13 225:18 231:4 234:4,19 235:2, 4,11 245:22 246:5 247:10,20 248:13 250:14 251:19

**timeframe** 37:8 39:14 164:8

**timelines** 60:6

**times** 7:23 30:16,18,22 95:11 113:4 118:9 129:1 130:19 165:9 172:4 211:19,21 237:14 242:15

**titled** 148:15

**TMG** 6:12 12:10,16 13:2 14:9 16:11 17:3 28:1,24 29:2,4,6 35:9, 13,20,22,24 36:10 41:24 43:7 51:23,24 52:18 53:6,18 54:3 55:20,22 56:20 59:14 60:9,24 61:2,3 62:11, 12 68:2 69:19 71:7,23 78:22 82:23 83:8,22 84:13 85:18 88:15 90:12 91:12 95:11 99:16 106:2 119:18 124:7,10,17 143:14, 15 144:14,17 145:10, 15,17,20 149:9,10,20 150:14,21,22 151:1, 11,13 153:23 155:13 157:8 158:18 162:9, 16 163:15 165:5,15, 23 168:1,3,11,14,19 169:3,19 170:24 171:1,4,24 179:23 180:17 182:4 184:24 193:16 195:2 201:7 205:13 207:21 208:19 210:10,24 211:19 212:7 214:2,9 215:12, 22 217:8,15,19 218:13,22 219:6 220:20,24 221:15,22 222:1,5 232:8 244:23, 24 245:8

**TMG's** 18:7 29:1 35:4 36:12

**to** 6:5,7,19 7:2,7 8:10, 11,12,13,14,15,16,18 10:8,11,13 11:1,9,14, 15,22 12:17,21 13:9, 13,15,16,20,24 14:1, 13,16,18 15:3,7,8,9, 15,18,19,24 16:5,6, 10,16,19 17:4 18:10, 17,20 19:11,16,22 20:6,15,16,18,19,23 21:1,5,8,9,14,15,17, 20 22:19 23:7,14,23 24:9,14 25:7,11,19 26:4,7,15,16,21 27:9, 16,18 28:1,7,9,10,13, 14,22 29:20,23 30:2, 3,7 31:3,11,16,17,19, 20,21,22,24 32:1,2,4, 11,12,16,19,20,21,22, 23 33:1,2,3,4,7,9 34:5,10,16,17,22,24 35:3 37:2,8,13 39:3,7, 9,12,21 40:7,10,11, 13,20 41:8,9,14 42:3 43:6,18 44:5,15,21 45:3,15,19,22 46:1, 14,21,24 47:5,6 48:6 49:4,12 50:8,9 51:21, 24 52:11,12,13,17,18 53:8,14,22 54:17,22 55:14,24 56:24 57:7, 8,9,10 58:12 59:1,21 60:2,23,24 61:5,13, 20,23,24 62:2,6,8,15, 24 63:9,10,11,15,18, 19,20,21,22 64:20 65:2,3,5,12,13 67:10, 12,15,17,22 68:10,14, 17,20,21,23,24 69:2, 3,4,5,6,13,15,16,24 70:1,5,7,8,14,16,20, 22,24 71:2,6,7,23 72:1,5,6,12,13,16,17, 18,19,20,24 73:2,5,6, 7,8,9,14,15 74:3,4,15, 16,17,20,21,22 75:1, 2,3,9,12,14,19,22 76:1,2,3,10,16,17 77:5,7,10,17,21 78:6, 7,16,20 79:6,9 80:7,8, 10 81:6,9,15,19,23 82:3,8,12,15,17,20 83:10,13,14,15,18,22, 23 84:3,5,6,16 85:2,3, 4,20 86:1,2,3,4,16,21 87:5,9,10,15,16,18 88:16 89:14 90:3,17 91:13,15,18 92:2,5,9 93:10,20,21 94:17,22 96:4,15 97:11,14,17, 20,21 98:3,9,19 99:2, 8,17,18 100:4,12,16, 22 101:10,11,18,23 102:3,8,14 103:3,9, 14,21 104:3,15,22,24 105:5,7,20,21 106:2, 6,7,8,12,13,15,17,20 107:2,8,19,21,24 108:2,4,6,7,9,17,19 109:20,23 110:4,5,8, 11,16,21 111:7,17,20, 23 112:2,3,17,20 113:3,14,17,20,23,24 114:2,4,6,9,22,23 115:4,15,19 116:6,9, 10,21 117:8,19 118:1, 5,8,12,13,15,16 119:9,18,19,20,23 120:3,5,9 122:2,8,9, 10,12,15,21,22,24 123:1,2,5,6,7,10 124:1,20 125:1,3,7,8 126:8,12,17,21 127:11,16,17 128:13 129:10,20 130:4,11, 14,16,18,22,24 131:4, 5,10,12,16,22,23 132:14,23,24 133:3, 13,19 134:1,7,12 135:5,7,8,14,15 136:3,4,15 137:7,22, 23 139:8 140:1,6,11, 17,19,20,21 141:8,19, 23 142:2,4,7,22,24 143:2,8,11,19,23 144:2,4,14,15,17,19, 21 145:1,7,21,22 146:1,4,12 147:5,20, 21,23 148:2,3,14 149:2,5,8,11,21,23 150:9,15 151:14,18, 23 152:3,7,13,22 153:16 154:3,8,9,14, 16,19,21,22 155:13, 16,21,22 156:1,2,4,7, 9 157:10,11 158:4,7, 14,16 159:4,7,18 160:4,13,22 161:2,3, 12,13,23 162:2,3,4,5, 7,9,10,18,19,21,22,23 163:1,3 164:4,7,8,9, 12,14,15,18,19,22,24 165:10,11,22,23,24 166:20 167:1,6,16,24 168:18,20,24 169:4,7, 17,18 170:3,4,20 171:3,6,14,17,19,22, 23 172:2,5,24 173:6, 9,12,13,15,17,18,20, 24 174:1,3,12 175:4, 17,19 176:11,14,19 177:8,10,11,16 178:6,

14 179:2,8 180:4,10, 19 181:3,4,9 182:6, 20,24 183:8,18,19 184:1,5,12 185:4,15, 21,22 186:4,9,11,13 187:5,8,16,18,23 188:4,7,24 189:14,23 190:3,9,18,23 192:2, 13 193:8,13,15,16,19, 21,22 194:1,6,7,8,13, 14,18 195:3,4,16,20, 21 196:2,8,10,11,21, 22 197:1,7,14,23 198:2,4,7,8,13,14 199:10,14,20,23 200:8,11,13,14,15 201:10,22 202:7,9,17 203:1,6,20,21,22 204:5,6 205:4,5,9,15, 18,19,21,24 206:2,10, 19,23 207:4,23 208:4, 8,20,21,22 209:1,6, 17,22 210:4,8,11,12, 16,17,19,20 211:6,11, 15 212:2,4,6,12,15 213:6,9,14,20,23 214:1,20,21 215:14, 23 216:7,13,16,17,18 217:1,6 218:14,22 219:1,2,14,22 220:4 221:1,2,6,15 222:3,4, 17,18 223:12,24 224:9,11,21 226:1 227:5,24 228:1,5,11, 23 229:14,17 231:21, 24 232:9,16,20,23 233:5,7,10,11,15,24 235:3,5,7,18,19,21,24 236:1,3,8,11,17 237:3,5,19,22 238:2, 13,16,21,22 239:4,12, 15 240:4,9,12,19,21, 22,24 241:1,3,4,6,9, 15 242:12,14,17,18, 21,22,23 243:1,3,9, 12,13,24 244:1,7,12, 13,14,20 245:1,3,8,18 246:7,13,14,19,21,22, 24 247:8,12,15,18,19, 23 248:5,6,7,11,23 249:7,9,14,15,17,19, 24 250:2,4,5,7,9,10, 14,15 251:3,18

**to--** 123:13

**today** 8:11,19 10:17, 19 11:15 12:9 15:20 16:6 19:12 31:1 32:3 33:3 39:23 67:24 76:17 130:14 201:22 219:17 221:13 233:13 240:2,5 248:5,16 249:11,18 250:15

**Today's** 6:15

**together** 19:3 31:23 55:3 66:1 104:21 123:9,20 153:20 154:6 158:17 167:23 171:22 248:8

**told** 39:6 77:20 105:8 115:22 131:19,23 154:1 161:18,22 164:6,11 165:15 187:6 189:8 213:10 214:15 232:3 233:4, 18 242:16,19

**tomorrow** 91:21 215:18 216:3 249:14

**too** 23:8,12 68:22 69:23 72:21 80:13 89:19 146:13,23 152:2 156:17 162:24 196:4 208:24 245:12

**took** 61:4 101:23 105:5 106:5 123:4 234:23 244:13

**top** 52:23 84:20,21 95:3 142:24 148:15 160:3 174:18 180:19 195:3 200:9 229:19 241:15 245:20

**topic** 12:16,17 14:11 16:10,16,20 18:5,11 19:7 23:11 25:6,11, 12,17 29:20,23 30:15 31:3,16 33:18,21 34:1 35:3 42:23 43:3,6,11, 20 46:23 48:5 49:10, 21 51:10 52:6 53:15 54:22 55:14,15 59:13, 19,22 60:3 68:14 72:6 73:16 74:4 75:14,20, 23 76:4,16,17

**topics** 10:7,8 12:12 13:16 14:2 31:10,12, 21 32:10 48:9 70:15, 21

**tops** 61:8

**totality** 66:14

**touch** 249:3

**touchscreen** 157:16

**tough** 23:17,21

**toward** 232:8

**towards** 126:3 166:13

**track** 19:16,19 20:21, 22 21:2,21 22:16,18 23:2,4,5 24:3,5,7,13 30:20,21 66:6,7 250:3

**tracked** 25:1 66:19

**tracking** 65:16 66:5

**Tracy** 42:18 95:17,18 136:6 180:20

**traffic** 18:6 19:13,18 20:20 21:5,16 24:4,8, 10 132:10

**trained** 240:20

**training** 240:22,24

**transcript** 15:15 248:18

**transferred** 139:3,6, 12 141:19

**treat** 243:12

**treated** 15:13

**trend** 109:17

**trial** 11:5

**trick** 57:8 74:9 245:13

**tricky** 194:7

**tried** 100:16 144:4 235:19 242:14

**true** 158:13 160:20 180:8 200:20 208:3 218:1,2 221:24

**trust** 113:6

**trusted** 105:20,21 108:12

**truth** 7:8

**truthful** 117:23

**try** 8:14 23:23 77:10 79:6 163:9 171:22 173:13 197:23 235:18 239:4 241:3 247:23

**trying** 21:14,15 22:19 27:9 39:9 49:4 57:7,8, 9,10 60:22,24 64:20 67:17 72:24 116:21 122:10 150:15 157:11 171:19 183:19 184:12 185:22 188:6 194:7 196:21 209:1 231:21, 24 232:2 238:16

**TS** 189:2

**TSA** 189:1

**turn** 13:14 32:4,18,20 143:1

**turnaround** 249:1

**turned** 9:24 32:5,8 61:21 65:1 69:4 70:24 248:4 250:9,11

**turns** 103:3

**two** 11:15 15:14 16:10 19:8 33:13 51:22 62:2 63:14 64:5,14 70:13 81:19 84:14 88:16 91:2 93:19 97:18,22 102:13 104:13 122:8 132:22 134:6 137:5 159:15 179:24 180:18 185:1,11 188:21 189:22 207:10,20 208:18 211:4 213:2 217:15 226:22 227:10,18 228:1,4,5

**type** 48:12,22 49:8 57:11 73:8,11 108:6 236:7 237:1

**typed** 138:15 139:1,20 140:2

**types** 13:19 25:8 31:4, 6,13 57:3 60:11,12, 18,20,21

**tyty1010--** 222:24

**tyty1019** 223:1,23 224:3,12 228:18

U

**U-L-E-R** 159:5

**UCC** 148:19

**ultimate** 246:9

**Um** 8:5

**unaffordable** 28:11,14

**unaware** 212:11,12 234:7

**undefined** 24:10

**under** 15:3,12 28:7 33:13 79:18

**underlying** 68:22

**underperforming** 127:16

**understand** 12:9 20:22 21:10 22:21 24:6 25:13 48:7 50:9, 15 57:9,10 59:24 68:5 69:16 71:14 74:11 75:21 76:5 117:4 142:3 150:8 155:1,5 156:5 162:23 163:6 168:23 171:7 173:12 184:9 186:22 188:5,6 196:21 228:10 230:6 238:16 244:16 245:2 246:12

**understand--** 172:14

**understanding** 13:21 15:22 31:12 33:9 37:1 41:18 49:20 53:13 66:19 68:22 70:2 77:18 101:7 107:19, 23 127:7 158:17 168:17 169:2 184:11 207:4 212:24

**understood** 143:13 145:5 165:13

**unfixable** 77:11

**United** 230:23

**unless** 8:17 15:20 32:19,20 89:19 224:16

**unlikely** 247:15

**unquote** 112:17 118:9 233:20

**unsigned** 204:23 205:12

**unstable** 191:19

**until** 15:14 141:22 161:23 162:5 196:8 203:16 235:12

**up** 13:2 15:15 40:8 48:11 63:15 64:15 71:20 77:14,22 78:14, 15 79:6 80:9 85:3 87:8 106:6 114:6 126:5,8,12 127:4,12, 13 128:17 132:14 133:7 135:16 137:2, 22 138:15 139:1 141:3,4 145:24 146:14 148:5 164:24

175:7 183:8 189:17 191:8,10,17 198:20 203:2 205:11 207:10 208:22 213:19 218:15 220:4 234:21 241:18 242:17 246:7 250:7
**UPC** 61:17
**upcoming** 97:11
**UPCS** 63:16 64:16 239:10
**update** 11:14 161:5 164:14,16 174:1 212:7 244:8
**update--** 165:22
**updated** 29:5 64:20 140:18 154:8 164:9 165:7,22 171:19,23 193:21 211:15 212:5 221:7
**updates** 164:24
**updating** 172:2
**uphill** 111:15
**upon** 40:3 76:3,12 178:13 233:11
**upward** 198:23
**urgency** 173:6,10,19
**us** 10:24 18:17 20:7 27:12 40:11 41:8 51:19 56:21 57:12,18, 19 62:4 63:22 67:6 69:4 70:7,24 71:1 72:16 74:22 76:1 77:10,21 81:7 83:12 84:2 85:7 87:4 113:19 119:23 120:10 122:4, 22 127:17 156:17,18 159:18 169:18 172:24 174:3 175:24 176:1 177:3 178:13 181:24 194:9 197:23 213:18 215:18 216:3 224:15 228:5 230:21 235:9 239:6 241:2,15 243:2, 8,13 244:9 248:10 249:11
**use** 26:21 34:24 36:10 37:21 38:1,7 41:9,22 58:18 77:6 145:14 173:10 236:12,14,18 240:24 241:16 250:4
**used** 41:21 66:3 120:9 154:5 189:14 224:17 234:12 241:10 249:18
**useful** 27:10
**user** 222:20,24 224:4, 5,9,12,17 225:13,15 226:1
**username** 223:4,9,24 228:19 229:4
**usernames** 228:23
**uses** 94:18
**using** 13:15 32:1 66:20
**usually** 229:9
**utilize** 36:16 41:19

V

**V-A-L-A-R-A** 242:7
**V-I-C-T-O-R-I-Y-A** 93:24
**vague** 24:10 39:16 41:11 168:21 169:5
**validity** 6:7
**value** 159:10 183:13
**various** 13:13 39:7 62:17 232:8 246:1,2
**vendor** 55:6,12
**vendors** 43:7,19 44:3 45:8
**verbal** 168:18,22 169:3
**verbally** 23:23
**verification** 134:6
**verify** 250:15
**version** 167:9 179:20 185:9 186:3 187:21 204:24 205:12
**versions** 187:15,21 188:3,10,13 249:16 250:4
**very** 84:21 107:15 142:22 148:1,4 162:15,16 178:8 183:24 184:4 200:9 242:14 251:19
**veto** 105:20
**vetoed** 105:18
**via** 8:7 46:20 121:2 162:10 237:5,6
**Victoriya** 93:21,24 96:15
**view** 25:3 79:5 245:24

W

**W-2** 195:13,14 247:7
**wait** 48:14 80:13 125:7 149:15,23 157:11 167:11 191:11 205:1 210:11 249:15
**waiting** 142:12 179:4
**waive** 74:20 161:12
**waived** 154:7
**walk** 13:19 33:5,6
**Wang** 153:11,14
**want** 8:15 10:12 14:16 30:2 31:20 32:20 33:5 63:10 71:5 72:19 74:17 75:3,11 79:6 80:10 85:3 86:4 94:17 105:23 108:8 113:17, 20,23,24 114:2,4,9 142:10 149:8 152:13 156:9 172:5 173:13 175:6 185:21,22 194:6 198:2 203:20 205:9 231:5 245:3 247:8,15 248:9 249:6, 14,24 250:2,4,10 251:3,18
**wanted** 42:3 72:5 73:14 74:3 94:22 99:2 108:6 134:1 173:23 174:1,2 194:1 198:13 232:19,23
**wanting** 203:6
**wants** 84:3
**warehouse** 36:13,14 56:22,24 59:2 62:1 63:14,16 64:15
**warehouses** 63:15 64:15
**was** 7:12 8:1,4 11:14, 18,19,24 16:7,23,24 17:1,8,9,16,17,19 18:4 20:7,17 21:2,10, 18,19,20,21 23:9 25:12,13 26:16 27:2 28:2,6,7,8,12,16,18, 19,21,22,24 29:4,6, 14,17,18 35:22 36:3 37:9,11,13 38:3 39:6 40:5 41:1,4,7,23 42:4, 13,17,21 43:23 46:9 47:2,21 50:23 52:9,20 54:5,19 55:8 56:17 57:18 58:21,24 61:17, 18,19,21,23,24 62:3, 17,18 63:2,3,23 64:1, 2,6,7,8,24 66:7,9,11 67:19,21 68:21 70:5 71:3 72:22 73:3 75:10 77:11,12,14,15,19 78:5,11 79:13,15,17, 18,23 80:24 81:11,14 82:5,23 83:4 84:7 85:17 86:10 87:20 88:9,12 90:9 91:9 92:23 93:9,15 94:13 95:6 96:10 98:17 99:1,6,8,12,22 100:3, 6,9,12,17 101:11,15, 17 102:14 104:2,5,6, 10,23,24 105:4,5,8 106:19 107:10,11,12 108:2,4,8,14,18,22,24 109:21 111:18,23 113:11 114:19 115:16,19,21 116:3, 21,23 117:6,9,10,16, 22 118:1,3,24 119:1, 9,14,22 120:15,20,21 121:24 122:14,16 123:1,6 124:14 125:20 126:1,11,12, 14,19 127:1,6,7 128:5,8,23 129:7 130:3,12,17,18,23,24 131:4,8,11,16,18,20, 22,23 132:9,10,11,12, 13,14,16,19 133:3,24 134:8,9,10,14 136:21 138:1,7,8,18,23 139:14 140:10,19 142:16 144:3,5,7,14, 15 145:1,10,14 146:4 147:2,5,11,13,16,18, 23 148:1,2,5,9 152:17 153:7,10,18,23 154:1, 12,18 155:22 156:22 157:5 159:1,13,22 160:20 161:1,15,16 162:1,7,8,11,12,13, 15,22 163:12 164:14 165:5,7,8,11,15 166:5 167:4,5,9,20,24 168:10,11 169:10 170:7 171:21,24 172:3,4,22 173:18,22 174:6 175:8,11,17,22, 23,24 176:1,5 177:2 178:14,17 179:12 180:14 181:18 182:20 183:23 184:1,6,7,12, 13,15,18,21 186:1,4, 16,18 187:3,4,10,16, 17,18,19 188:18 189:21 190:9,10,15 191:4,18,19,22,23 192:18 193:2,5,12,18 194:9,20,23 196:14 198:5,9 199:2 200:4, 24 201:4 202:3 204:13 205:4,21 206:2,14 207:14 208:2,15 210:9,12,21, 22 211:1,9,18,20 212:5,6,10,11,12,15, 20 213:10,13,20,23, 24 214:1,2,4,5,8,12, 19,21,23 216:11,12, 15,16,17,18,22,24 217:2 219:2,3,7,18, 19,22 220:10 221:4, 11 222:7,12 223:23 224:3 225:7,18 226:16,20,21 228:2, 18 231:10,22,24 232:2,4,7,21 233:4,8, 9,10,11,14,23 234:1, 3,4,7,17 235:1,3,5,6, 9,20,22,23 237:4 239:6,18,21,22 240:17,18,19,20,21 241:2,4,6,8,10,11 242:3,16,18,19,20 243:2,3,6,8,10 244:7, 13,14,15,22 245:8,10 246:15 247:1 248:1,4
**wasn't** 28:9,23,24 29:2 39:23 42:3 45:3 61:22 63:18 71:5 77:15 106:14 118:22 120:23 122:2 125:20 130:20 144:2 148:3 153:21,22 205:20 231:20 232:2,3 234:21 242:15
**wavering** 161:2
**way** 14:7 31:24 33:16 34:9 77:16,17 79:5

89:15,16 92:13,20 101:2 106:5 123:20 127:15 148:14 155:9 163:9 180:9 181:9 187:12 217:6 224:20 229:16 232:8 234:10 238:7 239:18 241:2 243:16 250:12

**ways** 61:1 121:4 143:8 145:21

**we** 6:2,3,4,24 7:2 8:11 10:6 13:14 14:8 15:6, 21,22 17:18 18:17 19:3,4,16,19 20:1,6,8, 10,21 21:2,20,21 22:16,18 23:2,4,5,8 24:5,12,13,14,15,20, 21 25:11 26:13,14 28:9,12,15 30:7,15 31:5,9,10,22 32:8,10, 13,19,20,21,22 33:15 34:15 36:13,21 37:4 39:20,21 40:3,8,10,19 42:1,2 46:4,8 53:20 56:17 58:1 59:1 60:11 61:6,8,12,16,20,23,24 62:1,2 63:11,16,20,21 64:7,19,22 65:1,2,3,4 67:6,13,20,24 68:22 69:3,24 70:4,7,10,11, 12 71:3 72:17,23 73:6 76:21 77:5,10,16,19, 20,22 78:6,17 83:2,12 84:6,9 85:6,17 86:3,4 88:10 89:15,17,18 91:7,17 93:7 96:8 103:13,17,21 106:7 108:5,6,8 109:23 110:5 113:9,16 114:10,18,21,22 117:1 119:13 120:9 121:4,8 122:1,19,23 123:3 124:9,11,12 126:4 127:17,19 128:24 129:10,19 131:19,20,24 132:12, 18 134:13 139:16,17 141:5,22 142:10,24 144:6 146:9 147:4 152:12,13 153:20 155:11 156:14,20,24 157:22 160:13,14 161:5 162:8 163:18 165:8 166:20 167:1, 15 168:7 169:9 170:23 171:18,20,23 172:1,3,8,12,13 173:18 183:9 184:16 185:9,13 190:5,10,11, 18,19 191:17 192:9, 16,20 193:14,21,22, 23 196:8 197:19 202:17 203:10 204:14 205:13,20 206:10,11, 21,24 207:4,9 210:11, 23 212:6 213:8 214:11,17,18 215:3,4, 10,12,21 216:2,18,20 217:14 218:13 219:15 231:1,3,9,12,16 235:22 237:16 239:3, 5,11 240:23,24 241:1, 8,10,11 242:3,13,16, 17 243:9,11,14,15 244:7 248:2,4,7,9,15 249:4,10,17,19,20,22 250:4,10,11 251:5 252:4

**we'd** 122:21 200:14

**we'll** 14:7 32:18 33:8 47:6 53:21 55:6 83:24 91:24 103:22 114:14 136:18 178:13 198:21,22 207:2,5 216:24 219:16,21,23 247:22,24 248:10,12, 14,23 249:3 250:6

**we're** 15:2,17 19:15 31:19 32:4 33:9 51:18 54:17 58:10 69:2 71:2 74:20 105:24 114:15 116:24 122:23 142:12 152:12 154:11 191:11 207:8,10 210:8 215:11 223:19 247:19 250:4,5

**we've** 59:6 60:24 64:14,15,16,17 69:16 84:12 95:10 113:21 149:5 152:10 184:19 195:15 217:11 220:3 244:19

**weather** 251:22

**web** 54:14 57:14,15 86:19 91:2 106:15,20, 21

**webpage** 177:5 178:18,20,22 181:5,9

**website** 18:7 22:1,4,5, 11,23 38:3,7,10 41:8, 10,18 61:12,13 63:17, 20,23 64:16 76:21 77:1,5,6,7,8,23 78:2,5 79:14,15,16,17,18 80:10,11,18,19,21 85:24 87:4,10 90:1 93:5,11 100:3,6,10, 12,17,18,23 101:8,16 102:4,11 103:5,6,8,14 104:1,21 105:1,5 107:17,20 108:1,6,9 111:21 112:3,17,20 113:3 117:5,7,16,20 118:10,23 119:1,10, 11 120:11 121:16 124:4 127:12,13,16 130:16,18 131:9,18, 19 132:11,12 174:19 175:24 177:18 208:11 220:14 231:17 232:11,19,20 233:9 234:6,18 235:8,9 236:12 242:3,18 247:12

**website's** 103:10

**websites** 39:7 87:20 88:8,9 109:9 110:14 112:18 113:2 131:22 236:15

**week** 24:20 98:21 246:5

**weekend** 86:22

**weekly** 98:9,12,21

**weeks** 15:14 33:13 51:22 102:14 213:2

**weigh** 98:3

**Welbers** 6:16

**welcome** 64:12 237:11

**well** 13:11 18:15 20:20 26:20 31:2,17,19 33:1,5 36:19,21 37:3 38:23 44:3 53:17 62:21 63:10 66:16 67:5 68:20 69:15 75:24 76:7,24 79:2,14 80:15 86:24 87:14 94:4 100:3,10,14 102:6,18 107:15 113:6,23 114:3 117:16 118:13,22 120:15 127:14 129:16 133:13 135:11 136:18 139:4 140:20 142:1, 21 143:16,20 147:13 151:6 154:1,14 155:8 160:15 161:18 162:15 165:7 172:19 174:22 176:17 178:18 180:9 184:14 186:10 188:2, 9 191:2 193:21 198:16 204:11 205:8 209:1,18 211:14 212:17,21 213:14 219:14 221:5 229:22 230:15 236:2,7 239:3, 17,24 245:6 247:21 249:8

**went** 42:5 43:18 51:5 54:24 60:11 65:5 103:8 122:3 164:20 165:8 172:3 177:22 178:19,22 179:1,19 181:12 214:15 246:18

**were** 11:21 13:20,23 21:20 25:19 32:10 34:5 39:3 40:10 41:19 42:5 59:2 61:6,20,22, 24 62:5,7,21 63:8 64:21,22 65:1 68:2 69:9,12 72:17,23 76:23 77:2 78:2 85:17 87:20 92:7,12,20 93:10 95:20,23 97:10, 11 98:17 99:7 103:15 105:3 108:6,10 111:6 114:22 117:1 120:21 121:9,18 123:3 126:17 129:4 131:10, 11,20 132:10,12 138:4,18 139:10 144:16 145:20 147:11 155:11,12 164:3 167:23 171:18,20 172:20 182:5 184:15 187:24 190:8 193:22 197:22 199:9 200:23 203:19 204:2 205:15 208:10 214:18 219:15 222:17 227:12 232:14,22 233:7 234:2,6 239:6,7,8 240:23 241:12,18 242:13,16 244:9,23 245:6,20 248:8 249:6

**were--** 130:20

**weren't** 32:5 61:18 96:7 239:7,11 250:9

**what** 9:17 11:18 14:17 16:22,23,24 17:17 19:12,15,16 20:17 21:8,10,14,21,22 22:17,20 24:14,15,17, 19,21 25:13 26:7 29:23 30:1,2,5,12,18 31:6 33:6,14 36:18,19 37:2,3 38:20 40:5,10, 13 41:4,7,9,21,24 42:2,9 43:23 44:13 45:10 47:19 48:14 49:21 50:3,21 52:13 55:20,22 56:13,14,20 57:2,3,7,11,12,17 59:10,21 60:5,14,16, 20,21,24 62:3,21 63:8,17,22 64:18 66:1,7,9,10,11,16,17, 18,20,22 67:10,15,17 68:9,21 69:1,6,13 70:4,5,6 71:6 72:20 73:9 74:18 75:19,21 76:3,5,19,23 77:1 78:6,9,16,17 80:10, 12,22 83:2,17,21 84:3 86:8 88:10 89:20 90:7 91:7 92:23 93:13 94:20 96:8,24 99:3,10 100:2,12 101:11,14, 16 104:4,5,8 105:7 106:5 107:11,12,16, 20 108:6,8,14,17,23 109:19 110:2,5,16 111:5 112:21 113:9, 16 115:1 116:1,7,20, 23 117:3,10,13,18 118:1,6 119:4,13,19 120:3,4 121:5 122:6, 9,11 123:1 124:12 125:18 126:10,11,17 127:11 128:6,22,23 129:7 130:3,11,15 131:17 132:4,18 133:9 134:8,13 135:7, 13,14 136:4,19 138:7, 8 139:19 140:9 141:12 142:3,5 143:15,18,20 144:12, 15 145:4,5,11,13 148:1,2,7 149:5 150:9 152:10 153:1,22 154:12 157:3 158:22

159:11 162:7,11,22 163:6,10 164:3,8 165:12,18 166:3 167:9,17,18 169:9 170:12,14,18 171:9, 12,16 172:5 173:6 175:7,11 176:3,17,18 177:5 179:10 180:13 181:4,13,16 184:19 186:8 187:12 188:6, 14,15 192:24 193:14, 18 194:16,21 196:15, 21,24 197:5,7,22 198:1,2,9,12,24 201:1,2,19 202:1,18 203:5 204:13,18,21 205:10 206:13 207:11 208:13 209:13,15,16, 20 210:7,23 212:24 213:12 214:11 215:21 216:20 217:1 218:1 219:2,7,17,18 220:8, 16 221:4,11 222:7 223:13,16,18 224:7, 10,14,18,23 225:5,23 226:14 227:9,13 228:4 229:6 230:5 231:22 232:16,21 233:2,8,10,15 234:1 235:4,21 236:6,7,8,14 237:13,14 239:22 240:13,16 241:9,17, 18,21,24 242:9 245:3, 4 247:16 248:3,4 249:19 250:9,11 251:2,6,7

**what's** 11:22 15:18 30:6 57:23 58:6 99:24 119:8 183:21 196:17 223:15 229:19 243:4 251:24

**whatever** 14:16 21:1, 18 67:6,21 81:10 114:11 123:19 131:11 142:23 192:11,12 219:3 224:9 230:17 250:2

**wheelhouse** 105:6

**when** 24:21 26:13,24 27:2,6 28:4,12 29:14 35:24 37:6 39:8 45:2 56:2 58:21 63:16 72:17,23 80:6 92:1 98:17,21 102:3,16,20 103:4 106:2 107:13, 18,21 109:21 111:18 112:3,20 115:21 116:22 117:23 118:15 120:15,19,20 125:22, 24 129:19 130:23,24 131:10 132:13 137:13 138:5 143:20 144:12, 22 145:7,11 147:24 155:11 160:21 165:10 168:1 172:20 173:16 175:19 178:3 189:17 192:5 196:2 205:9,23 206:21 210:21 212:13,14,19 233:6, 14 234:14 235:10 237:2,20 239:10,13, 15 241:11 243:6 249:9

**whenever** 117:9 192:7

**where** 6:10 11:2 18:14 25:22 34:3 36:14 61:16 71:11,19 85:10 100:19 103:9 109:1, 23 115:23 122:11 142:5 144:9 172:6,8 197:4 207:7 230:11, 13,17,19 233:21 236:10 238:9 241:4 242:10 244:7 245:14

**whereupon** 11:24 46:2,9 47:2,21 50:23 52:20 54:19 55:8 63:5 73:17 74:6 78:11 80:24 83:4 84:7 86:10 88:12 90:9 91:9 93:15 96:10 99:12 104:10 113:11 114:19 116:3 119:14 124:14 128:8 132:19 134:14 136:21 142:16 148:9 152:17 156:22 157:5 159:1, 22 163:12 166:5 169:10 174:6 176:5 179:12 180:14 181:18 184:21 188:18 192:18 193:2 194:23 199:2 201:4 202:3 207:14 208:15 211:1 214:12 217:2 220:10 222:12 225:7 226:16 231:10

**wherewithal** 107:24

**whether** 13:14 80:17 87:23 105:14 108:13, 23 109:11,14 111:1,6 115:15,18,19 128:2 130:1 138:21,24 164:8 169:2 172:22 181:9 189:21 206:21 219:4 221:12,13 224:3 228:18 229:16 231:24 234:22 236:11,17

**which** 16:11 24:7 25:7 27:22 28:11 31:12 34:15 35:4 46:20 48:5 51:2 53:23 54:22 55:3,14 59:14 60:9,24 61:2 67:19 75:10 76:2 84:13 88:15 91:12 122:12 123:16,24 124:17 134:17 142:19 148:5 152:11 158:23 164:18 165:8 179:15 180:17 190:19 201:21 202:19 204:13 206:4, 5 208:20 210:24 212:10 213:10,15 214:18 215:12,22 216:2 217:5 218:13 219:11 224:17 225:10 239:1 242:6 250:20

**while** 15:1 61:1 218:12 220:3 235:6,9

**who** 12:19 13:20 18:15,19 28:16 29:5,7 30:7 36:7,12 37:16 38:10,17 39:5 56:15 63:24 89:9 94:7,9 95:5,17 99:21 105:16 116:14 118:16 120:8 125:12 134:23 138:15 139:4 142:6 143:5 151:6,23 158:11 160:7 175:19,21 176:22 189:13 190:3 193:11 208:1 211:8 236:14 239:5,6 244:15

**who's** 12:22 42:6 57:14 80:1 85:16 87:3 134:24 153:14 170:6 177:1 195:8

**Whoa** 213:14

**whoever** 32:12

**whole** 7:8 81:12 83:13 84:1,4 86:2 106:14 122:14,15 123:12,15 143:17 144:7 185:16, 22 197:15 206:4 209:23

**wholesale** 238:4

**wholesalers** 237:20

**whom** 6:18 39:4

**Whoops** 208:19

**whose** 153:3

**why** 8:20 11:3 19:24 24:22 26:11 32:4 46:4 58:23 76:8 77:7,22 84:2 88:6 102:9,12 103:12 110:10 117:14 134:5 143:22 148:2,5 154:9 164:18,22 165:8 168:4,16 174:2 178:10 190:6 193:24 196:23 207:3 215:10 218:15 231:1,3 232:5, 22,24 234:5 241:6

**will** 6:6,17 7:7 13:14 27:7 47:19 50:21 70:11 78:9 80:22 86:9 90:7 91:21 93:13 97:24 102:5 104:8 107:14 115:2 116:1,7 136:19 139:3,5,12 141:18,19 148:7 149:9 150:21 157:3 158:22 159:11,16,19 163:10 166:3 176:3 178:7 179:11 180:13 181:16 182:6 192:24 194:21 198:24 201:2 202:1,18 206:24 207:11 208:13 217:1 219:21 220:8 225:5 226:14 236:23 247:15,16,22 249:7

**Williams** 81:6,23 82:4,9,13

**wing** 126:15

**Winnetka** 230:8

**with** 6:2,9,16,17 8:1 9:6,8 10:13,15,24 11:19 12:15,21 13:24 16:16 18:15,17,20 20:7 21:9,10 26:2,9, 11 29:12,14 33:8 35:4,8,19,24 37:6 42:1,4,8 43:3 44:7 45:11 46:5,14 49:20 56:17,18,24 60:17 62:18 63:2 64:21 69:3,5 74:17,19,22 75:7 76:1,11,12,21,23 77:1,8 78:1 79:18,20 84:13 85:17,18 87:1,8 89:20 90:15 92:24 93:1 95:2,7,24 97:2,7 98:13 99:16 100:3,6,9 101:2,8 105:9,24 106:3,14,19 107:7,8,9 108:11,24 109:6 110:14 112:6,9,13,16, 18 113:2,22 114:1,8, 21 116:6,18 119:18, 24 120:5,22,23 121:2, 6,16 124:10 125:2,19 126:4,19 127:1 128:20 129:1,5,7,8 130:2,5,15,16 131:21 132:22 136:13 137:18 140:16,17 142:2 143:5,18 144:4,9 147:8,15,18,24 148:6, 7 149:19 153:18 154:12 156:20,24 158:16,18,23 160:8 161:16 162:14,15 163:2,22 164:20 167:23 168:23 171:18,19 173:23 174:1,9,11 175:23,24 176:8 178:5 179:7,15 182:4 186:4,17 190:7, 8 192:6,7,9,20 193:5, 14 198:22 199:6,7 201:7,8,11 202:7 203:15 204:7,14 206:18 207:4,21 208:18,19 210:10,16 212:9 213:4 214:8,22 219:9 221:9 223:4,9 224:12 227:6 228:21 233:16 234:3,6,14 235:6,9,17,22 236:10 237:17 238:1,22 240:8,13,19 241:13, 22,24 242:1,2,9,10,24 243:6 245:16 246:2, 10 247:10 249:3 250:18 251:19

**with--** 100:15

**withdraw** 21:13 44:4 102:19 154:15 155:8 186:2

**within** 12:16 13:2 20:17 37:9 52:13 70:21 99:22 149:13 150:18 212:8

**without** 75:7 105:11 166:22 178:4 206:3 212:14,20 219:19 224:20

**witness** 6:6,9,10,20 7:3,9,11 10:4 11:14 13:3 17:21 24:12 27:13 32:16 39:13 41:15 42:15,17 48:16, 19,21,24 49:3 50:11 53:5 64:6,10,12 67:8, 17 69:9 72:11 76:5 79:1 80:9 84:22,24 85:1 86:6 87:20 88:3, 21 89:22 90:5 92:11, 16 94:19,24 98:20 101:14 104:4,23 105:12 107:2 110:18 113:2 114:3,10 117:9 118:2 123:14,21 125:6,10,14 126:23 129:14,23 130:8 131:8 132:4,9 133:16 139:11,13 140:1,5,7 141:1,7,14 142:12 144:1 145:24 146:9, 14,18 147:1,8 149:18 151:4,16,22 152:3 156:6,12 157:14,17, 20,23 158:1,20 161:1 163:1,6 167:7,23 168:24 169:6 171:9 173:2,14,22 175:11, 13 177:8,14 179:4 183:23 185:18 186:16 187:10 188:6 190:1 191:13 194:4,11 196:3 197:1,11 198:1, 16,19 204:9 205:1,7, 20 206:2,8 207:18 209:23 210:14 213:22 214:8 216:14 218:11 220:1,2 223:16,20 228:14 229:9 230:1,5, 10,12,14,20,24 235:13 237:9,11 240:6 243:18 245:3 246:21 251:17,21,24 252:2

**woman** 82:8 94:19

**won't** 126:15 157:20 207:4 219:18 232:14

**wondering** 25:16

**word** 50:8 52:12 66:3, 13,15,16,18,21 67:2 68:7 138:13,16 145:14 173:10 201:17 203:21

**words** 15:19 17:3 19:17 21:4 22:8 23:18 30:11 41:17 43:2,18 60:22 71:8 101:6 117:15 121:15 133:24 162:3 229:3

**words--** 229:1

**work** 15:22 18:19 40:4,16,19 41:7 42:2, 8 61:13 78:7 95:14 100:15 106:8,13 112:6 121:12 127:23 140:15 142:2 190:9 200:15 233:24 241:3, 15 246:5 247:11

**worked** 20:7 56:17 109:6 190:9

**working** 35:24 56:18 78:5 79:20 83:12 85:17 103:10 104:2, 21 112:9,13 118:22, 24 130:20 153:20 167:23 208:10 221:9 235:9 241:4 249:13

**workout** 244:2

**works** 18:17 35:8 113:2 251:8

**world** 143:17 144:7 212:16

**worries** 191:22

**would** 7:5 23:23 53:4, 21 64:4 66:10 67:11 68:23 70:19 74:19 75:8 76:11 87:14,16, 21 88:3,6 91:6 92:1 98:2,6 99:10 102:18 104:1 107:8 108:5,13, 22 111:19 112:22 113:14,18 118:18 122:19,20 128:6 131:1 135:15 139:9 151:6,23 152:3 153:19,20 161:4,14 164:23 165:10,20 168:12 169:6 182:8,9, 11 184:16,17 187:3, 15 196:16 200:11 201:22 206:5 212:2,7 213:24 216:7,18 219:12 221:9,10 224:7,19 227:18 229:9 232:24 236:4,9 237:19 239:9,23 240:2 246:15 247:2 248:17

**wouldn't** 67:13 70:16, 20,22 74:17 75:3,11 106:20 107:11 154:3, 10 178:11 246:14

**write** 135:5 143:8 146:5

**writes** 127:4,5 128:17 135:15

**writing** 136:5 140:18 153:20 154:9 161:2, 13 162:10 165:8 219:20

**written** 15:15 117:9 165:6,16 210:22

**wrong** 15:11 27:10 63:23 103:12 130:16 213:14 237:18 246:18

**wrote** 96:24 104:4 116:22 117:14,15,18, 23 118:6 123:10 126:14 129:19 130:11 139:14 142:6 143:16, 21 144:12,22 145:7, 11 173:17 175:18,20 196:10

**X**

**xlsx** 183:6 185:11

**xlxs** 183:6

**Y**

**yeah** 9:19 15:21 17:9 25:16 27:15 30:15 31:19 32:18 33:14 46:4 48:15,17 49:2,3, 4,17 51:21 55:19 57:5 59:12 60:1,22 64:10 65:13 66:22 67:3 69:20 70:5,9 71:5 78:15,17 84:23 92:19 97:17 103:2 104:6,19 105:12 113:16 114:3, 8,11 120:17,18 121:6 123:8 125:7,10,12,15, 16,21 130:7 133:21 138:11 139:11 141:5, 10 146:15,18 147:1 150:4,8,15 152:15 153:21 156:11,12 157:24 158:8 163:1, 17 167:18 169:19 170:5 173:14 177:9, 20 179:2 181:24 182:3,10,14 183:15, 23 188:16 191:17,22 192:11 194:10 195:23 196:1,8,14,18,23 197:11,12,17 198:16 203:5 204:2 205:2,14 206:3 207:2 209:1 210:3,14 213:2,19 215:16 218:10,15 220:17 223:20 227:8, 15 228:14 229:2 230:1,5,6,23 231:3 233:18 235:13 247:3 248:19,23 249:9,12 250:17 251:5,15 252:2

**year** 19:22 21:24 27:4 34:22 36:5 37:9 45:10,11 46:17 54:14, 15 61:10 79:22 147:20 228:11 242:4

**years** 28:8 39:10 112:14 119:5 131:20 164:20 189:22 241:10

**Yep** 46:7 48:24 56:12 141:7 149:16 152:21 179:18 180:1 218:9 225:2

**yes** 6:21 7:9,20,21,22 8:3 9:4,7,13,16 10:4, 5,6,15,19 12:5,8,11, 14,18 13:3,8 14:12,15 16:9,14,21 17:5 18:3, 9,12,23 19:5,23 20:4, 11 22:9,16,24 23:18 25:1,5,9,18 26:1,18 29:11 30:17,23 33:2, 23 34:2,19 35:2,6,10, 18 36:6,9 37:20,22,24 38:2,5,9 42:9,17 43:12 44:12,16 46:18 47:18 48:2,4 49:9,23 50:4,5,17 51:4,7,12, 16 52:2,5,8,10 53:16 54:2,11,16 55:13 56:12,19 57:22 58:15, 17 59:17 60:4 62:14 66:14 68:4,8 71:10, 16,20 72:4 74:11 76:18 79:10,12 82:2, 10,11,14,16,19,22 83:1 85:12,15,22 86:17,20,23 87:2,7,11 89:1,5,23 90:18,23 91:3,6,16 92:4,22 93:3,8,12,22 94:3,6 95:16 96:17 97:3,6,9, 13,19 99:20 100:8,24 102:5,11 103:20 106:1 107:22 110:1,9 112:11,15 113:8 115:1,5,7 116:11,13, 16 118:7,11,14 119:12,21 120:20 121:14 127:20,22 128:16 133:1,10,16, 20,23 134:21 136:11, 14 137:9,12,21 138:14 140:17 141:7, 18,21 143:12 145:4 146:10 149:4,7,18 150:11,17,20,24 153:13 154:18 155:24 158:5,10,20 159:6 160:6,17,19 161:11 164:5 165:12,20 169:15 170:1,9,17,21 171:1 176:13,18 177:23 180:5,7 182:16 183:4,7 184:14 185:5,7 186:8 189:3 190:14,17,22 191:3,6 193:10 195:7, 12,18 197:12 199:18 200:5,7 201:1,15,19 202:11,13,16 203:3 205:3 209:8,11 211:13 213:5 215:6, 16,20,24 216:5,9 217:13,24 218:4,18, 20 222:2,10,21,23 223:8,21 226:5,10,13 227:15 228:9 234:10, 19 237:9 238:14 239:20 240:11,15 242:8 243:1,18,22

245:11,23 247:21 250:17 251:5

**yet** 70:1,7,12 75:10 78:19 137:1 141:5 148:17 168:11

**yet--** 70:2

**YMD** 226:24 228:8,10

**you** 7:5,6,15,18 8:6, 14,15,18,20 9:2,6,9, 14,17,23 10:2,3,7,20, 23 11:13 12:3,4,9,12, 13,17 13:1,6,15,17, 19,22 14:10,13,16,17, 23,24 15:6,14,15,20, 24 16:7,13,15,16,19, 22 17:6,11,12,15,23 18:8,10,11,13,14,19, 24 19:1,7,9,12,17,20, 21 20:2,3,14,19,22,23 21:4,5,10,11,15,22,23 22:6,7,8,10,12,14,17, 18,20,21,22 23:1,16, 18,22 24:3,6,7,11,19, 23 25:2,3,8,10,13,14, 15,16,19,22,24 26:2, 3,7,19,20 27:8,10,11, 18,21 28:4 29:9,21,23 30:2,3,5,8,11,12,15, 16,20,24 31:13,21,24 32:5,11,17,19,20,21, 23 33:5,6,7,21,24 34:1,5,6,7,9,17,21,23 35:5,7 36:7,16,23 37:3,6,13,21 38:1,7, 14,19,23 39:1,8,12, 15,23 40:1,2,13,22 41:1,13,19,23 42:16, 23,24 43:2,3,9,11,13, 14,16,18,21 44:5,14, 17,20,24 45:2,9,15, 17,19,20,22,23 46:1, 15,16,22 47:9,10,13, 16 48:1,8,10,13 49:7, 15,18,24 50:6,7,9,11, 15,16,18 51:3,5,14, 18,22 52:1,24 53:4,9, 12,17,19,22,23,24 54:13,15,24 55:1,2, 11,12,18,24 56:2,3,18 57:2,3,8 58:2,8,11,14, 18,23 59:2,5,6,10,15, 18,21 60:1,5,8,11,23 61:1,2,12 62:2,6,10, 11,12,13,15,21,22,24 63:8,15,24 64:4,11,20 65:2,11,13,14,19,21, 22 66:3,4,6,12,22 67:5,6,11,14,24 68:1, 13 69:4,16,18 70:6,19 71:5,6,8,13,21,23 72:5,8,16,22 73:2,12, 14,15,20,22,23 74:1, 2,3,12,18,19 75:3,6, 15,16,19,22 76:3,5, 10,12,15,19,24 77:2, 4,7,12,13,24 78:1,15, 16,21 79:8,9,20 80:3, 6,7,8,9,13,15,16,17 81:5,7,9,12,20,22,23 82:3,7,8,11,12,15,17, 20 83:9,10,11,16,17, 18,22 84:15,16 85:3, 4,9,10,11,13,21 86:2, 3,4,15,16 87:1,5,9,12, 15,16,19,23,24 88:2, 6,17,19,23 89:4,11,12 90:1,16,17,24 91:1,4, 14,15,18,19,22,24 92:1,4,5,7,12,20 93:1, 4,10,20 94:1,4,9,22 96:6,15,16,19,22 97:1,10,14,17,24 98:6,10,12,17 99:2,5, 17,18 100:7,14,15,19 101:3,12,20,21 102:3, 7,8,9,10,12,18,19,20 103:4,5,9,19,23 104:14,15,20 105:3,5, 9,11,14,17,23,24 106:3,6,7,11,12,17,23 107:13,18,19,21,24 108:1,10,15,17,19 109:5,8,11,14,20,24 110:5,10,17,23 111:1, 4,6,11,13,15,17,21 112:3,6 113:1,6,17, 20,21,23,24 114:2,4, 5,6,9,13 115:1,4,10, 13,15,18,21,22 116:9, 10,15,21,22 117:4,20, 22 118:16 119:5,20 120:1,3,4,6,11,13,18, 21 121:2,6,13,20,24 122:2,6,8,12 123:2,4, 6,7,8,20,24 124:1,3,5, 7,20 125:2,7,18,23 126:6,9,14,15,17,21 127:8,10,14,15,16,24 128:2,12,13,18,20,24 129:1,4,8,16,19 130:1,4,11,14,15,22 131:1,3,7,15 132:5,6, 14,15,23,24 133:2,4, 7,18 134:1,2,18,19 135:3,5,8,11,12,17,20 136:1,6,9,12,13 137:6,7,10,13,16,20, 22 138:3,5,6,12,21,24 139:3,6,10,17 140:6, 16,23 141:6,8,11,23 142:3,8,9,10 143:1,2, 3,8,9,13,15,16,20,22, 23 144:12,16,20,22 145:7,8,11,13,16,19, 20,24 146:3,5,10,14, 17 147:3,11,19,21 148:14,20,22 149:1, 14 150:3,8,13,19,22 151:2,14,15,17,20,23 152:13,16,23 153:6, 11,16,21 154:1,3,14, 15,20,21 155:2,5,12, 13,16 156:1,2,5,9 157:9,10,23 158:3,4, 7,14,19,22 159:4,5,8, 21 160:5,11,14,15,18, 21,24 161:8,9,15,18, 20,22,23,24 162:4,5, 13,17,18,19,20,23 163:5,10,16,17,23 164:2,3,6,7,8,11 165:4,12,13,14,18,22, 24 166:10,13,14,19, 21,22,24 167:2,12,15 168:6,7,8,18,23 169:1,2,13,18,23 170:3,18 171:7,9,12, 14,16,21 172:1,3,5, 10,18,21,22 173:8,12, 13,16,21 174:12,16, 19,22 175:4,5,6,7,16, 19,20 176:10,11,14, 17,19,23 177:10,24 178:3,10 179:1,2,4,7, 17 180:4,9,10,24 181:1,3,6,21,24 182:7,11,23,24 183:2, 6,9,16,22 184:4,11 185:3,4,10,11 186:4, 9,15,17,22 187:6,20, 23 188:4,5,9,12,24 189:8,10,11,21 190:4, 12,20,23,24 191:8,15 192:2,3,14 193:8,9, 13,16,24 194:1,2,6,8, 9,13,17,18 195:4,16, 20,21,23 196:2,3,4,9, 10,23 197:2,7,8,21,22 198:2,4,7,12,23 199:10,13,14,15,20, 21,23 200:8,14,23 201:10,11,22,23 202:8,9,10,12,19,22 203:1,11,16,19,23 204:2,7,8 205:9,15, 19,23 206:1,6,7,14, 19,20 207:1,3,7,8,9, 22,23 208:4,8,10,22 209:6,14,18,21,22,24 210:2,3,18,19,20 211:5,6,11,14,16 212:1,7,9,10,21 213:2,10,11,17,19 214:7,16,20,21,22,24 215:5,8,14,17,19,23 216:1,6,8 217:7,8 218:7,10,12,14,15,17, 21,23 219:4,8,11,18, 23,24 220:6,22,24 221:5,12,13,18,19 222:3,19,22,24 223:1, 5,10,19 224:3,9 225:12,13,16,22,23 226:23,24 227:1,4,6, 9,13,19 228:8,12,13, 17,23 229:3,7,8,11, 15,20 230:17 231:4, 18,23 232:7,10,11,15, 23,24 233:4,5,14,15 234:5,8,12,14,15,22 235:4,24 236:1,2,4,7, 9,10,11,17,23 237:2, 3,5,10,14,22,24 238:2,6,7,11,23 239:3,7,9,24 240:1,2, 4,5,10,12,13 241:18, 19,24 242:7 243:10, 19,23 244:6,21,23 245:2,3,4,6,19,20,24 246:8,13,16 247:10, 15,17,18,21 248:2,3, 5,6,9,17,21 249:3,4,5, 9,11,13,14,15,24 250:2,3,4,9,10 251:2, 13,17,18,21,23 252:2, 3

**you'd** 192:10 208:22

**you'll** 10:17 27:15

**you're** 7:7 8:16,20 9:11 12:9 13:3 16:2 21:7 22:18 23:11 24:14 27:9,10 32:2 38:20 39:11 42:6 45:3 49:21 50:3 57:13 64:12 66:1,20 67:10, 15 68:23 69:13,16 72:2 73:23 76:2,3 78:20 83:12,18,19,21, 23 84:2,21 94:4,20 101:11 102:3 103:13 107:20 120:17 121:5 123:7 129:19 130:14, 23 133:11 135:14 143:18 144:9 147:7 148:17 149:15,23 150:4 153:11 154:5, 22 155:22 156:6 159:18 161:23 163:3, 7 167:12 168:8,20,22 172:24 175:6 179:21 183:19,20 185:15,17 186:1,10 188:14,15 192:5,7 195:19 198:18 200:17 205:10 206:23 216:24 217:20 218:7 223:12,14 224:6,10 227:14 230:16,18,19 232:16 233:2,5 235:7 237:11 238:1,18 239:1,15 240:3,14 243:6 245:8, 14,15

**you're--** 239:13

**you've** 12:6 13:7 40:13 48:18 65:15 68:10,18 71:15 72:2 73:21 112:9,13 118:8 125:18 152:6 173:5 246:10

**you--** 88:7 176:17 227:22

**your** 7:6,19 8:10,16, 17,23 9:5,11 10:8 13:16,17 14:7 18:1 19:10 21:23 23:22,24 26:3 27:16 29:22,24 30:21 31:2,10,21 32:2,10 36:24 38:6 41:17 44:20 48:7 49:7,10,21 50:1 51:10,22 52:3,6 53:3, 13,17,18 54:3,13

55:11 56:2,11,22 58:12 59:11,24 68:6, 17 69:5,18 70:15,18 71:3,6,14,17 74:24 75:15 76:12 78:21 80:1 82:20 83:23 84:16 85:4,9 86:15 87:15 88:23 90:16 91:14 92:23 94:11,14 97:20 99:17 104:15 106:15,17 107:5 108:11 125:23 126:11 129:11 130:24 132:3, 6,7 135:3,19 137:7 139:23 140:4 141:20 142:1 146:4 148:23 149:2 153:16 154:1 155:1 156:14,15 158:3 160:17 162:4 163:23 165:4,14 166:10 167:9,12,19 168:17 169:13,23 170:22 172:9 173:11 176:10 177:9 178:8 180:4 181:8 182:23 184:4,9,11 185:3 188:24 189:15 190:13,24 191:2,4,22 192:13 193:8 195:16, 21,23,24 197:14 199:8,15 200:4 201:9 202:9 203:24 205:12 207:22 209:5,9 210:8, 18 211:5,18 212:23, 24 216:10 218:24 219:9 221:8 222:9 223:7,24 224:4 225:12,18 226:3,6,12 228:2,13,18,23 229:4, 5,11,12,16 231:4,16, 20 232:19 233:14,15, 23 235:17 236:7 237:13,21 238:12 240:8 241:23 242:5 244:4,16,21 246:8,16 247:16 248:6,24 250:7 252:1

**your--** 197:14

**yours** 236:18

**yours--** 168:15 172:7

**yourself** 25:24 34:6 43:13 47:10 50:16 51:5 55:1 59:21 60:2 76:17 119:20 129:20 140:6 146:12 165:14 176:14 196:10 198:5, 8 218:23 219:5 245:24

### Z

**Z-O-N-O-S** 242:6

**zero** 179:24

**Zonos** 242:6,9,10,16 244:3

**Zoom** 8:7 107:14

# EXHIBIT F

| | |
|---|---|
| **From:** | Merri Gleckler |
| **Sent:** | Monday, May 4, 2020 4:35 PM CDT |
| **To:** | Dean H Dussias |
| **Subject:** | Fwd: TERM SHEET for Dean Membership Acquisition.DOCX |
| **Attachments:** | TERM SHEET for Dean Membership Acquisition.DOCX |

Here you go...For us to review and discuss.

I think we should get on a call with Cheryl so that we can highlight all in detail .
As you said, the hope is that our operating agreement is for the sole purpose of "conflct" which neither of us wants or expects.

Let me know your thoughts?

M

---------- Forwarded message ---------
From: Cheryl Borland <CBorland@griesinglaw.com>
Date: Mon, May 4, 2020 at 11:32 AM
Subject: TERM SHEET for Dean Membership Acquisition.DOCX
To: Merri Gleckler <merri.gleckler@gmail.com>

Merri

Attached is the Term Sheet that outline's Dean's proposed new ownership in TMG Kreations, LLC. Please forward this email along with the document to Dean for his review and comment.

Dean and Merri

Outlined is the Term Sheet that will outline your proposed ownership in TMG as well as the duties and policies/procedures for the operation of TMG on a go-forward basis. I am a corporate and transactional attorney and have been in practice for 25 years. I specialize in starting, growing, and strategic planning with my clients. My experience covers the full life cycle of a business. I know that you have known Merri for a number of years and were with her as she was dealing with the litigation regarding the buyout of her former co-owner. Some of the provisions included in the Term Sheet as well as the eventual Operating Agreement, once we come to agreement on the Term Sheet, are designed to prevent a similar situation from happening with you or with any other additional member, if any, in the future. I use these terms and provisions on a regular basis, especially when a new member is coming into an existing and operating business. My goal is that everyone knows what to expect in nearly every situation that a business would face and to provide a process for handling it at the time. If the scenarios never materializes, then that is usually

best for everyone concerned. But if they do, to avoid expensive and protracted litigation, we would look to the Operating Agreement to see how the Parties agreed to resolve them.

In addition, I want you to know that these terms and provisions should not be viewed as any doubt of Merri's desire to have your continued involvement in TMG and moving into ownership.

Finally, please note that Griesing Law represents Merri and TMG. You have a right to engage an attorney to work with you and explain the legal principles laid out in the Term Sheet, Employment Agreement and Operating Agreement. If you choose not to engage a separate attorney, the documents will all be clear of my representation and in the event of a conflict with you, we will continue to represent only Merri and TMG.

I'm happy to set up a call with you and Merri this week to discuss the attached Term Sheet and answer any questions that you may have.

Best

Cheryl

# EXHIBIT G

**From:** Dean H Dussias
**Sent:** Sunday, February 23, 2020 11:30 AM CST
**To:** Merri Gleckler
**Subject:** Kashwere for MG and DHD
**Attachments:** MG DHD Agreement Feb 2020.docx

please see attached. have a great trip!

will miss you later today, nice day here...

Best,

Dean

**Dean H Dussias**
dean@dussias.org
**(847) 612-1010**

February 22, 2020

TMG Kreations, LLC (d/b/a Kashwere, referred to as "Kashwere")

Summary of principles/terms between Merri Gleckler (MG) and Dean Dussias (DHD)

- New Operating Agreement to be created for Kashwere that reflects the trust, commitment and partnership between MG and DHD. Strong fiduciary obligations, commitment to open and complete sharing of information, including any/all potential purchases and issuance of equity and debt of Kashwere or any of its subsidiaries or related entities. Both partners to have obligation(s) at all times to act in the best interest of Kashwere – no self-dealing, competing interests, etc. - and to maximize the long-term value of its equity. Partners' equity units to be treated the same in all situations – distributions, financings, sale etc.

- MG equity at 70%; DHD equity at 30%, with the following exceptions – (a) if revenue of Kashwere less than $5MM, then DHD profit distributions to reduce to 20% - at the current time, profit distributions, if any, to be made at the 20% level, with any true-up if necessary to be paid no later than January 31st of 2021 and (b) if Kashwere's equity is sold for less than $5MM, then DHD to receive 20% of the equity value from the total consideration paid to Kashwere. Rationale for 30% start: (1) tax considerations so there is no future receipt/award of equity and (2) if any future equity event DHD starting at an assumed 30%, not 20%.

- In the event MG would like to sell some or all of her equity, then DHD to be informed of the intention at the earliest opportunity and in the event there is a competing offer from a third party, to have the right of first refusal over ninety days to agree a binding term sheet and proceed on a reasonable basis to close/funding of the equity purchase. DHD to have the obligation to inform MG of any/all potential offers for equity purchase or investment at the earliest opportunity and for DHD and MG to have joint participation in all equity purchase or investment discussions. DHD to have standard rights for tag along should MG look to sell a controlling/complete interest (in the event DHD is not the purchaser) and MG to have drag along rights in the event she is selling her complete interest and DHD is not the buyer, the drag-along on the same terms/conditions for both partners' equity.

- MG and DHD to collaborate on an annual budget; MG to have final, reasonable approval of the budget. MG to draw $25,000/month; DHD to draw $20,000/month ($300,000/year and $240,000/year respectively); partners may defer draws to meet budget considerations. MG to have a car allowance not to exceed $_____ and DHD to have a car allowance not to exceed ______. MG and DHD to not exceed $_____/month each in incidental expenses. Profit available for distribution – 70/30% to MG and DHD, respectively; no other distributions/accruals/benefits to be paid to or accrue to the benefit of MG or DHD. Amounts subject to change only by agreement of both partners. MG to decide amount and timing of distributions consistent with budget and value creation; LLC agreement to contemplate tax distributions as a minimum.

- All other Operating Agreement content to be drafted by MG and Griesing Law for comment by DHD. Will trust terms to be reciprocal, protective of minority unit holder rights, enabling for MG to make business decisions in context of building value in Kashwere.

# EXHIBIT H

| | |
|---|---|
| **From:** | Merri Gleckler |
| **Sent:** | Monday, May 4, 2020 4:35 PM CDT |
| **To:** | Dean H Dussias |
| **Subject:** | Fwd: TERM SHEET for Dean Membership Acquisition.DOCX |
| **Attachments:** | TERM SHEET for Dean Membership Acquisition.DOCX |

Here you go...For us to review and discuss.

I think we should get on a call with Cheryl so that we can highlight all in detail .
As you said, the hope is that our operating agreement is for the sole purpose of "conflct" which neither of us wants or expects.

Let me know your thoughts?

M

---------- Forwarded message ---------
From: Cheryl Borland <CBorland@griesinglaw.com>
Date: Mon, May 4, 2020 at 11:32 AM
Subject: TERM SHEET for Dean Membership Acquisition.DOCX
To: Merri Gleckler <merri.gleckler@gmail.com>

Merri

Attached is the Term Sheet that outline's Dean's proposed new ownership in TMG Kreations, LLC. Please forward this email along with the document to Dean for his review and comment.

Dean and Merri

Outlined is the Term Sheet that will outline your proposed ownership in TMG as well as the duties and policies/procedures for the operation of TMG on a go-forward basis. I am a corporate and transactional attorney and have been in practice for 25 years. I specialize in starting, growing, and strategic planning with my clients. My experience covers the full life cycle of a business. I know that you have known Merri for a number of years and were with her as she was dealing with the litigation regarding the buyout of her former co-owner. Some of the provisions included in the Term Sheet as well as the eventual Operating Agreement, once we come to agreement on the Term Sheet, are designed to prevent a similar situation from happening with you or with any other additional member, if any, in the future. I use these terms and provisions on a regular basis, especially when a new member is coming into an existing and operating business. My goal is that everyone knows what to expect in nearly every situation that a business would face and to provide a process for handling it at the time. If the scenarios never materializes, then that is usually

best for everyone concerned. But if they do, to avoid expensive and protracted litigation, we would look to the Operating Agreement to see how the Parties agreed to resolve them.

In addition, I want you to know that these terms and provisions should not be viewed as any doubt of Merri's desire to have your continued involvement in TMG and moving into ownership.

Finally, please note that Griesing Law represents Merri and TMG. You have a right to engage an attorney to work with you and explain the legal principles laid out in the Term Sheet, Employment Agreement and Operating Agreement. If you choose not to engage a separate attorney, the documents will all be clear of my representation and in the event of a conflict with you, we will continue to represent only Merri and TMG.

I'm happy to set up a call with you and Merri this week to discuss the attached Term Sheet and answer any questions that you may have.

Best

Cheryl

**TERM SHEET**
**TMG KREATIONS, LLC**
**REVISED AND RESTATED OPERATING AGREEMENT**

*TMG Kreations, LLC, is a Delaware limited liability company, with its principal place of business at ____ ________________________________________ ("TMG"). The Sole Member of TMG is Merri Glecker ("Merri"). This Term Sheet will outline the proposed structure of TMG by the additional of Dean Dussias ("Dean") and the material terms of the agreements governing the relationship among TMG, Merri, and Dean. The Term Sheet is non-binding except as expressly set forth below. It is not a complete description of the terms of any proposed transaction, is for discussion purposes only and does not create, and is not intended to create, a binding or enforceable contract between the parties or any duty on any person to negotiate toward a binding contract. Each party reserves the right to terminate discussion with respect to the acquisition of membership in TMG and the revised Operating Agreement at any time and for any reason. This summary may not be relied upon by any person as the basis for a contract by estoppel or otherwise.*

| Concept/Issue | Proposal |
|---|---|
| Business Purpose | TMG was formed in 2010 when Merri and a former business associate acquired the business. TMG will continue to operate for the purposes of the design, production, sales, marketing, and distribution of textile products. Expansion of products and markets is part of the TMG's strategic plan. |
| Overall Structure | • Merri is the sole Member of TMG and is the Managing Member<br>• Merri will remain as the sole Managing Member<br>• TMG, as a limited liability company, is taxed as a partnership<br>• Dean will be entitled to acquire a twenty-percent (20%) Membership Interest in TMG in return for services rendered as well as completion of a 3 year vesting period. He may be given an additional ten percent (10%) Membership Interest in the Company in the event that TMG has greater than $5M in sales by December 31, 2020. In the event that the sales metric is not met, Dean shall not be entitled to the additional ten percent (10%). The vesting period may be accelerated in the event of a sale or change of control.<br>• TMG will apply to become a WBE, to be certified by WBENC. |
| Contributions/Due Diligence | • Dean will contribute services for his Membership Interests in the Company. The Membership Interests will vest over a 3-year period. Until Dean's Membership Interests are fully vested, he shall be entitled to participate in votes. He will still |

| Concept/Issue | Proposal |
|---|---|
| | be involved in providing Merri all necessary information that she needs to make decisions for TMG as the sole Managing Member.<br>• Merri has already established her contribution for her Membership Units.<br>• Merri will continue in her role as CEO of the Company.<br>• Dean will be the President of the Company. |
| Board Composition | Merri shall be the Sole Managing Member and shall be responsible for the management, control and decision-making of the Company. Once Dean is fully vested, then the Board of Managers shall expand to two Members - Merri and Dean. The Managing Members shall vote based on their pro-rata share of Membership Interests. |
| Employment Arrangements | • Dean will enter into an employment agreement as part of his admission into the Company and in exchange for his Membership Interest. The terms of the employment will be discussed as well as the roles/responsibilities he plays with the Company.<br>• Dean's employment agreement will include a "work for hire" agreement with TMG and TMG shall be entitled to any Confidential, Proprietary, and Intellectual Property that is developed by Dean while he is an employee or Member of the Company (including, but not limited to the following, best practices, policies, procedures, marketing plans, vendor supply plans, etc.)<br>• Dean's Title will be President. His job responsibilities shall include consulting with Merri on an on-going basis about the operation of the business that he currently handles and any additional responsibilities he will be asked to perform in the future.<br>• Dean's Employment Agreement shall set out the term of the agreement, salary and benefits, restrictive covenants (confidentiality, non-compete, non-solicitation, non-disparagement).<br>• Merri' Title will be CEO |

| Concept/Issue | Proposal |
|---|---|
| Other Agreements | • Agreements may be negotiated and entered into for purposes of this revised Operating Agreement for the Company with either of the Members, or third parties, as necessary to operate the Business, as determined by mutual agreement of the Members. |
| Intellectual Property | • The rights and interest of TMG in the Intellectual Property Rights owned by TMG or Merri shall remain as assets of the Company.<br>• The rights and interest in the licenses and supply agreements used in the operation of the Company will remain as the exclusive rights of the Company<br>• TMG shall be entitled to retain all right, title and interest in and to any and all ideas, concepts, know-how, development tools, methodologies, processes, procedures, technologies, algorithms or any other proprietary information, and all derivatives thereof, while members of the Company, unless specifically agreed otherwise. |
| Transactions requiring Member Consents | The following actions would require a majority vote of the Members: provided, however, that no action shall be taken that would violate any WBE program requirement:<br>• Financing/refinancing/borrowing in excess of threshold amounts to be agreed to for a single transaction or a series of related transaction in any six-month period, other than trade payables in the ordinary course of business;<br>• Purchasing, selling, encumbering, mortgaging, or leasing any real estate property or any interest therein;<br>• Change in control transactions (e.g., sale of assets, sale of membership units, merger, etc.);<br>• Entering into joint ventures, partnerships, or similar strategic relationships;<br>• Filing any voluntary bankruptcy petition on behalf of TMG or confessing a judgment against TMG; |

| Concept/Issue | Proposal |
|---|---|
| | • Increase/decreased in size of Board of Managers (currently on one member on Board of Managers);<br>• Amendments to organizational documents;<br>• Transactions with affiliates, insiders or family members; and<br>• Any other material transaction identified in the Amended and Restated Operating Agreement as requiring Board of Manager approval and majority votes of the Members. |
| Operating Agreement Terms | • *Capital Call:* Merri shall be entitled to make a capital call of the Members if the Company needs additional capital for operating, expenses, or expansion. If Members do not contribute pro-rata, then their ownership interest will be adjusted accordingly.<br>• *Profit Distributions:* Once Dean's Interest fully vests, then the profit and loss distribution shall be pro-rata after the Managing Member makes any provisions for taxes, reserves for operating or expansion needs, etc. Until fully vested, Dean shall only receive his salary but Merri may, at her discretion, award a bonus based on a 20% profit distribution. Until Dean's Interest fully vests, Merri shall be entitled to 100% of any losses.<br>• *Voting Rights:* The Members shall vote in accordance to their Membership Units. Dean will have no voting rights until his Membership Units fully vest.<br>• *Control:* The Company shall be Manager Managed. Merri shall be the sole Managing Member. When Dean's Interest is fully vested, then the Board of Managers shall consist of Merri and Dean (votes shall be by percentage of ownership).<br>• *Withdrawal/Termination/Disability:* In the event a Member wishes, to withdraw, he/she may only withdraw with consent of other Member. In the event of Termination (Voluntary or Involuntary) or Death/Disability, the Member Interests shall be reacquired by the Company or the other Member. If the event of termination – there may be a discount penalty if termination for cause.<br>• *Expenses.* Members shall be entitled to reimbursement of expenses and requests for reimbursement (along with documentation) shall be provided to Merri for approval.<br>• *Major expenditures for the Company:* Members must obtain consent of Merri before incurring major expenditures for the Company.<br>• *Transfer Restrictions*: No transfers (other than estate-planning transfers and transfers to affiliates) would be permitted without the approval of the other Member. |

| Concept/Issue | Proposal |
|---|---|
| | • *Right of First Refusal*: If any Member wishes to sell its membership interest in TMG, the other Member would have a right of first refusal at the same price as the selling Member has been offered by a third-party purchaser.<br>• *Admission of New Members*: If Managing Member wishes to raise additional capital by adding additional members, subject to rights of the other Members.<br>• *Drag-along rights:* If either Member determines to sell its membership units to a third-party, the selling Member could "drag-along" the other Member.<br>• *Tag-along rights:* If either Member proposes to sell its membership units to a third-party, the other Member could "tag-along."<br>• *Repurchase upon Death/Disability/Termination*. Valuation and purchase shall be set out in the Operating Agreement.<br>• *Restrictions on Parties*: Potential restrictions on the ability of either Member to compete with the Business<br>• *Membership Meetings*: Members shall attend the weekly/monthly/quarterly meetings, as scheduled, via any mutually agreed upon electronic means of communication.<br>• *Duty of Good Faith*. The Members have a duty of good faith to each other and to the Company as Members and Managing Members.<br>• *Business Opportunity/Duty of Loyalty*. If either party discovers a business opportunity for the provision of services substantially similar to the scope of services of the Company, that party shall identify and refer such business opportunity to the other party. Such business opportunity must be presented to the other party if it falls within the parameters of the Company before being allowed to pursue it on its own. Merri is entitled to maintain other business interests (MIA KAYA) and Dean shall have no claim to any ownership in Merri's other business interests as a member of TMG. |
| Collaborative Marketing and Sales | • The Members will use good faith, commercially reasonable efforts (a) to jointly develop, print and distribute marketing materials and (b) coordinate (i) appearances at appropriate trade shows and conventions and (ii) regular sales meetings with prospective customers of either party.<br>• The Managing Member, with assistance from the Dean, shall prepare an annual budget and operating/strategic plan. |

| Concept/Issue | Proposal |
| --- | --- |
| Conditions and Approval | • The restructure and admission of Dean as a Member in the Company shall be conditioned on both parties being satisfied with the negotiation of the Amended and Restated Operating Agreement and the terms and conditions contained therein.<br>• Dean's acquisition of Membership Units and his roles/responsibilities with TMG are based on his independent judgment and not on any representations or statements by Merri. |
| Dissolution | The Company may be dissolved on the consent of the Managing Member and the Members. |
| Non-Solicitation/Non-Compete | The Operating Agreement as well as the Dean's Employment Agreement shall include restrictive covenants for non-solicitation, confidential/proprietary information, and non-compete. |
| Costs | • The parties will pay their own costs and expenses relating to the preparation of the proposed Amended and Restated Operating Agreement and any other documents relating to the provision of services thereunder, including, without limitation, legal and accounting fees and taxes associated with the transactions, whether or not the strategic alliance agreement is executed.<br>• Dean should consider hiring separate counsel. Griesing represents Merri and TMG. The Operating Agreement and the ancillary agreements shall be fair and equitable but will be drafted for the purposes of protecting Merri – especially after the protracted litigation she went through with Cedric.<br>• Once the Amended and Restated Operating Agreement is executed, all overhead costs, including legal and accounting fees and taxes, as well as marketing costs and expenses shall be paid by TMG. |
| Governing Law | • The Amended and Restated Operating Agreement and all definitive transaction documents, the rights and obligations of the parties, and any claims or disputes relating thereto will be governed by and construed in accordance with the laws of the State of Delaware, without regard to or application of its conflict of laws principles.<br>• All disputes arising from or relating to the above will be subject to the exclusive jurisdiction of and be litigated in the Chancery Courts of Delaware. |
| Exclusivity | • Either party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG and the |

| Concept/Issue | Proposal |
| --- | --- |
| | ancillary and associated agreements by notice in writing at any time prior to the execution of definitive agreements between them.<br><br>• In the event that Dean decides to terminate discussions with TMG for acquisition of Membership Interests or decides to terminate his employment with TMG, Dean will be bound by the NDA and be bound by general terms of confidentiality and proprietary information he learned while affiliated with TMG.<br><br>• Any information that Dean has acquired up until this point shall be considered to be confidential and proprietary and shall be bound to keep it confidential. |
| Binding Effect | The provisions in the above sections entitled Costs, Governing Law, and WBE Exclusivity shall be binding on both parties in consideration of their discussions regarding the Company, the Amended and Restated Operating Agreement and any related agreements described therein. |
| Indemnification | The Strategic Alliance agreement will provide for appropriate indemnification provisions for items such as intellectual property infringement and material breach of any representation, warranty or obligation of either party. |

Each party has caused the foregoing to be signed by its duly authorized representative below, effective as of _____________, 2020.

**TMG Kreations, LLC**

**By:**___________________________________
**Name:** ___________________________________
**Title: President**

**Dean Dussias**

___________________________________________

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEAN H. DUSSIAS | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:21-cv-05709 |
| | ) | |
| v. | ) | Hon. Judge Martha M. Pacold |
| | ) | |
| MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE | ) | Magistrate Judge Beth W. Jantz |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S ANSWERS TO**
**DEFENDANT, TMG KREATIONS, LLC'S FIRST SET OF INTERROGATORIES**

Plaintiff, Dean H. Dussias ("Plaintiff"), by his attorneys Golan Christie Taglia LLP, pursuant to Fed. R. Civ. P. 33, hereby answers Defendant/Counter-Plaintiff, TMG Kreations, LLC's First Interrogatories to Plaintiff as follows:

**PRELIMINARY STATEMENT AND OBJECTIONS**

1. Plaintiff has not completed his investigation or discovery into the subject matter of this action or the underlying facts and evidence. Accordingly, all responses and objections to Defendants' interrogatories are based only upon such information and documents that are presently available and in the possession of Plaintiff. All responses and objections are provided without prejudice to presenting further information, documents, evidence, or analyses not yet identified, obtained, or completed.

2. Plaintiff objects to these interrogatories to the extent they seek materials protected by any privilege, doctrine, or immunity, including the attorney-client privilege, the work product privilege, and any other applicable privilege recognized by common law, statutes, or rules of evidence. The fact that Plaintiff may not specifically object to an individual interrogatory on

privilege or protection grounds shall not be deemed a waiver of any applicable privilege or protection. To the extent that Plaintiff inadvertently produces any privileged materials, such inadvertent disclosures shall not be a waiver of protection. Plaintiff expressly reserves the right to object to the use of any privileged materials in this or any other litigation.

3. Plaintiff objects to these interrogatories insofar as they attempt to impose obligations in addition to those set forth in the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, or any other applicable procedural rule.

4. Plaintiff reserves all objections to the admissibility, authenticity, and relevance of any documents or information produced in response to these interrogatories until the trial of this action. Identification or production of any document or information does not constitute an admission by Plaintiff that such document or information is relevant or material to this proceeding. Plaintiff also reserves the right to object to further inquiry with respect to any subject matter.

5. Plaintiff objects to these interrogatories to the extent they seek disclosure of documents or information not within the possession, custody, or control of Plaintiff. By stating that it will produce documents or information responsive to a particular request, Plaintiff does not represent that any such documents or information exists or ever existed or that Plaintiff has responsive documents or information in his possession, custody, or control. Rather, Plaintiff only that to the extent it has possession, custody, or control of responsive documents or information not protected by any applicable privilege, Plaintiff will produce such documents or information.

6. Plaintiff objects to these interrogatories to the extent they assume the existence of facts that do not exist or the occurrence of events that did not occur. Any response of Plaintiff to

any individual interrogatory is not intended to be, and shall not be construed as, an admission that any factual predicate stated in the request is accurate.

7. Plaintiff reserves the right to supplement or amend these objections and the right to seek appropriate orders and relief under the Federal Rules or the rules of the court.

The foregoing General Objections are incorporated by reference in each of the specific responses below as if fully set forth therein.

**ANSWERS**

1. Identify all Person(s) preparing, assisting in the preparation of or providing information for your answers to these Interrogatories, including any Person who supplied documents used in the preparation of the answers. Please include the information or documents supplied by any such Person.

**ANSWER:** Plaintiff objects to this interrogatory as overbroad and seeking information protected by the attorney-client privilege or work product doctrine. Subject to the foregoing objections, Plaintiff supplied the information used in preparing these answers which were prepared with the assistance of his attorneys.

2. State the basis, including all supporting facts, Documents, and Communications, for your contention and belief that you are a member of TMG, as alleged in the Complaint.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Subject to and without waiving or otherwise limiting the foregoing objection, and pursuant to Fed. R. Civ. P. 33(d), Plaintiff is producing documents from which part of the answer to this interrogatory may be derived or ascertained, and the burden of deriving the answer is substantially the same for Defendant as for Plaintiff. *See, e.g.*, documents Bates stamped DHD000001 - DHD000996.

3. Identify all Person(s) with knowledge regarding your contention and belief that you are a member of TMG, as alleged in the Complaint.

**ANSWER:** Plaintiff objects to this interrogatory as vague as to the meaning of "knowledge," overbroad, and unduly burdensome. Subject to the foregoing objections, Plaintiff believes that the following individuals may have knowledge of facts relevant to the parties' allegations, claims, defenses, or damages:

a. Merri Gleckler,

b. Robert Gleckler,

c. David Lazar,

d. A corporate representative from Howard Simon & Associates, and

e. Raymond Conway.

Plaintiff believes that these individuals have knowledge of various topics relevant to both parties' allegations in this case, including whether Plaintiff reasonably performed all of his obligations to Defendants and Defendants' representations and agreement that Plaintiff was a member and owner of TMG.

4. Identify all agreements between you, Gleckler, and/or TMG that were signed by you, as well as by Gleckler and/or TMG, including but not limited to any term sheets, contracts, agreements, letters of intent, or operating agreements.

**ANSWER:** Plaintiff objects to this interrogatory as seeking information equally or more readily available to Defendants. Subject to the foregoing objections, Plaintiff is not aware of any signed agreements fitting the description of this interrogatory.

5. Identify all persons or entities, including attorneys, consultants, tax professionals, financial advisors, and accountants, with which you discussed that you would potentially be acquiring a membership interest in TMG.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff further objects to this interrogatory to the extent it calls for disclosure of attorney-client communications. Subject to the foregoing

objections, Plaintiff identifies Merri Gleckler, Robert Gleckler, David Lazar, and Raymond Conway as individual with whom he had discussed that he was a member and owner of TMG.

6. Identify all Communications you had relating to, referring to, or in response to the Term Sheet.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine. Plaintiff further objects to this interrogatory on grounds that it seeks information vis-à-vis written communications that is in the sole possession, custody, and control of Defendant, TMG. Plaintiff further objects to this interrogatory on the basis that it is vague as to the meaning of "relating to, referring to, or in response to" as those qualifiers could apply to every conversation Plaintiff ever had through any medium relating to TMG.

7. Identify, including but not limited to the date and author(s), any amendments made to the Operating Agreement, and whether you contend those amendments were oral or written.

**ANSWER:** Plaintiff objects to this request on the basis that it calls for a legal conclusion. Plaintiff further objects on the basis that this information is within Defendants' possession. Subject to the foregoing objections, during the period after Reingold's membership terminated and Plaintiff's began, Gleckler was effectively the sole member of TMG and could unilaterally change, waive, or reject provisions of the Operating Agreement.

8. Identify the author(s) of the Counter Term Sheet, including the author of any revisions or edits thereto.

**ANSWER:** Plaintiff objects to this interrogatory to the extent it calls for information protected by the attorney-client privilege or work product doctrine. Subject to the foregoing objections, Plaintiff drafted the "Counter Term Sheet."

9. Identify all drafts of any amended TMG operating agreements that were exchanged between you and Gleckler and/or TMG, and for each, please identify the author.

**ANSWER:** Plaintiff objects to this request in that it calls for information within Defendants' possession. Subject to the foregoing objections, Plaintiff is not aware of any written drafts of amendments to the Operating Agreement.

10. Identify all TMG accounts that you had access to while you were TMG's President, including but not limited to bank accounts, credit card accounts, website accounts, social media accounts, vendor accounts.

**ANSWER:** Plaintiff objects to this interrogatory on the basis that it is vague as to the meaning of "accounts" and seeks information already within Defendants' possession. Subject to the foregoing objections, Plaintiff states that he believes that he had access to all accounts for software services used by TMG through the dean@kashwere.com email address.

11. Did you ever execute the Term Sheet, Counter Term Sheet, or any term sheet relating to TMG? If you did not, why not?

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff further objects to this interrogatory to the extent it calls for information protected by the attorney-client privilege or work product doctrine. Subject to the foregoing objections, Plaintiff did not sign any term sheet.

12. Identify each expert witness you may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705, including (a) the expert's name; (b) the expert's business address and telephone number; (c) a complete statement of all opinions the witness will express and the basis and reasons for them; (d) the data or other information considered by the witness in forming his opinions; (e) any exhibits that will be used to summarize or support his opinions; (f) the witness's qualifications, including a list of all publications authored in the previous 10 years; (g) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or deposition; and (h) a statement of the compensation to be paid for the study and testimony in this case.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is premature. Subject to and without waiving or otherwise limiting the foregoing objection, Plaintiff will disclose any lay

witness, independent expert witness, and/or controlled expert witness as required by the Federal Rules of Civil Procedure, Federal Rules of Evidence, local rules, and disclosure schedules set by the Court.

13. Identify all Documents you intend to introduce as exhibits or use as demonstrative evidence at trial.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is premature. Subject to and without waiving or otherwise limiting the foregoing objection, Plaintiff will identify any all Documents he intends to introduce as exhibits or use as demonstrative evidence at trial as required by the Federal Rules of Civil Procedure, Federal Rules of Evidence, local rules, and disclosure schedules set by the Court.

Dated: February 27, 2023

Respectfully submitted,

**DEAN DUSSIAS**

By: *_/s/ Matthew M. Showel_*
One of his Attorneys

Matthew M. Showel
Brittany N. Bermudez
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 696-1361
mmshowel@gct.law
bnbermudez@gct.law

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing Plaintiff's Answers to Defendant, TMG Kreations, LLC's First Set of Interrogatories was served on the following via email on February 27, 2023.

James G. Argionis (jargionis@cozen.com)
Corey T. Hickman (chickman@cozen.com)
Cozen O'Connor
123 North Wacker Drive, Suite 1800
Chicago, IL 60606

*/s/ Matthew M. Showel*

# EXHIBIT J

CONFIDENTIAL

| | |
|---|---|
| **From:** | Dean H Dussias |
| **Sent:** | Thursday, May 7, 2020 4:50 PM CDT |
| **To:** | Merri Gleckler |
| **Subject:** | Re: TERM SHEET for Dean Membership Acquisition.DOCX |

Confirmed, message received with attachment - will send you back a redline after I have reviewed it, etc.

**Dean H Dussias**
dean@dussias.org
**(847) 612-1010**

On Thu, May 7, 2020 at 4:38 PM Merri Gleckler <merri.gleckler@gmail.com> wrote:

Dean,
I'm sorry I am not sure if I sent this email in it's entirety.....Please see below and ensure that the copy sent to you is the same as it was updated prior to being sent to you. ( I hate working with GMAIL for this reason).

----------------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------

Dean and Merri

Outlined is the Term Sheet that will outline your proposed ownership in TMG as well as the duties and policies/procedures for the operation of TMG on a go-forward basis. I am a corporate and transactional attorney and have been in practice for 25 years. I specialize in starting, growing, and strategic planning with my clients. My experience covers the full life cycle of a business. I know that you have known Merri for a number of years and were with her as she was dealing with the litigation regarding the buyout of her former co-owner. Some of the provisions included in the Term Sheet as well as the eventual Operating Agreement, once we come to agreement on the Term Sheet, are designed to prevent a similar situation from happening with you or with any other additional member, if any, in the future. I use these terms and provisions on a regular basis, especially when a new member is coming into an existing and operating business. My goal is that everyone knows what to expect in nearly every situation that a business would face and to provide a process for handling it at the time. If the scenarios never materializes, then that is usually best for everyone concerned. But if they do, to avoid expensive and protracted litigation, we would look to the Operating Agreement to see how the Parties agreed to resolve them.

EXHIBIT
PENGAD 800-631-6989
Dussias 7
8-22-24 K

In addition, I want you to know that these terms and provisions should not be viewed as any doubt of Merri's desire to have your continued involvement in TMG and moving into ownership.

Finally, please note that Griesing Law represents Merri and TMG. You have a right to engage an attorney to work with you and explain the legal principles laid out in the Term Sheet, Employment Agreement and Operating Agreement. If you choose not to engage a separate attorney, the documents will all be clear of my representation and in the event of a conflict with you, we will continue to represent only Merri and TMG.

I'm happy to set up a call with you and Merri this week to discuss the attached Term Sheet and answer any questions that you may have.

Best

Cheryl

# EXHIBIT K

**To:** Merri Gleckler[merri.gleckler@gmail.com]
**From:** Dean H Dussias[dean@dussias.org]
**Sent:** Sun 6/7/2020 7:29:36 PM (UTC)
**Subject:** Agreements...
Merri Dean TMG Kreations, LLC Term Sheet June 2020.docx
Employment Agreement - TMG - Dussias.docx

Please see attached; call you in an hour. :-)

**Dean H Dussias**
dean@dussias.org
**(847) 612-1010**

EXHIBIT
PENGAD 800-631-6989
Dussias 10
8-27-24

# EXHIBIT L

**To:** Merri Gleckler[merri.gleckler@gmail.com]
**From:** Dean H Dussias[dean@dussias.org]
**Sent:** Sun 6/7/2020 7:29:36 PM (UTC)
**Subject:** Agreements...
Merri Dean TMG Kreations, LLC Term Sheet June 2020.docx
Employment Agreement - TMG - Dussias.docx

Please see attached; call you in an hour. :-)

**Dean H Dussias**
dean@dussias.org
**(847) 612-1010**

EXHIBIT
PENGAD 800-631-6989
Dussias 10
8-27-24

**TERM SHEET**
**TMG KREATIONS, LLC**
**REVISED AND RESTATED OPERATING AGREEMENT**

*TMG Kreations, LLC, is a Delaware limited liability company, with its principal place of business at 350 Wainwright Drive, Northbrook, IL 60062 ("TMG" or "Company"). Currently, the Sole Member of TMG is Merri Gleckler ("Merri"). This Term Sheet will outline the proposed structure of TMG by the addition of Dean Dussias ("Dean") and the material terms of the agreements governing the relationship among TMG, Merri, and Dean.*

*The Term Sheet is non-binding except as expressly set forth below. It is not a complete description of the terms of any proposed transaction, is for discussion purposes only and does not create, and is not intended to create, a binding or enforceable contract between the parties or any duty on any person to negotiate toward a binding contract. Each party reserves the right to terminate discussion with respect to the acquisition of membership in TMG and the revised Operating Agreement at any time and for any reason. This summary may not be relied upon by any person as the basis for a contract by estoppel or otherwise.*

| **Concept/Issue** | **Proposal** |
|---|---|
| Business Purpose | TMG, doing business as Kashwere, is a consumer products company that owns a lifestyle brand; markets and sells robes, throws, blankets, children's blankets and apparel (both adult and child), with distribution to commercial accounts (mainly hospitality, corporate marketing and distributors) and directly to the consumer. TMG is currently expanding its brand presence, improving its direct-to-consumer activity, and adding to its product line. |
| Overall Structure | • Merri is the sole Member of TMG and is the Managing Member<br>• Merri will not remain as the sole Managing Member; Dean, upon completion of this transaction as a minority owner will become a Member and be a Manager of the Company.<br>• TMG, as a limited liability company, will be taxed as a partnership (pending confirmation from Conway Tax)<br>• Dean will acquire a 30% membership interest in TMG; rights to the economic benefits of his membership interest shall be treated in all respects the same as Merri's membership units to be modified only by Value and Distribution Specifics as described in the Additional Terms and Exhibits below.<br>• TMG will apply to become a WBE, to be certified by WBENC. |

| | |
|---|---|
| | • Merri will continue in her role as CEO of the Company; Dean will continue in his role as President of the Company. |
| Contributions/Due Diligence | Dean will contribute and have as his initial tax basis $20,000. Merri's only representation and warranty to Dean shall be she has no knowledge of any lawsuit or liability that has not previously been disclosed to Dean and that since August of 2019 she has not engaged in any self-dealing or other activity that has diverted an opportunity from the Company that would have benefitted the Company. |
| Board Composition | Once this transaction is concluded, then the Board of Managers shall expand to two Members - Merri and Dean. The Managing Members shall vote based on their pro-rata share of Membership Interests, with the only super-majority exceptions described below. |
| Employment Arrangements | • Dean will enter into an employment agreement as part of his admission into the Company and will describe the terms of his activity on behalf of the Company.<br>• Merri' Title will be CEO and her employment with the company shall be substantially similar to Dean's, with exceptions, as described in her agreement.<br>• Merri and Dean's employment agreements will define fully their compensation outside of their profit and membership interests, including any and all perquisites. The economic terms are set out in the Additional Terms and Exhibits. |
| Other Agreements | • Agreements may be negotiated and entered into for purposes of this revised Operating Agreement for the Company with either of the Members, or third parties, as necessary to operate the Business, as determined by mutual agreement of the Members.<br>• Other Agreements will require approval by Merri and Dean only in the event a contemplated Agreement would impact the value and voting rights of Merri's Membership Interests unequally from Dean's (accounting for the different pro rata holdings). |
| Intellectual Property | • The rights and interest of TMG in the Intellectual Property Rights owned by TMG or Merri shall remain as assets of the |

| | |
|---|---|
| | • Company.<br>• The rights and interest in the licenses and supply agreements used in the operation of the Company will remain as the exclusive rights of the Company<br>• TMG shall be entitled to retain all right, title and interest in and to any and all ideas, concepts, know-how, development tools, methodologies, processes, procedures, technologies, algorithms or any other proprietary information, and all derivatives thereof, while members of the Company, unless specifically agreed otherwise. |
| Transactions requiring Member Consents | The following actions would require a majority vote of the Members: provided, however, that no action shall be taken that would violate any WBE program requirement:<br>• Financing/refinancing/borrowing in excess of threshold amounts to be agreed to for a single transaction or a series of related transaction in any six-month period, other than trade payables in the ordinary course of business;<br>• Purchasing, selling, encumbering, mortgaging, or leasing any real estate property or any interest therein;<br>• Change in control transactions (e.g., sale of assets, sale of membership units, merger, etc.);<br>• Entering into joint ventures, partnerships, or similar strategic relationships;<br>• Filing any voluntary bankruptcy petition on behalf of TMG or confessing a judgment against TMG;<br>• Increase/decreased in size of Board of Managers (above two Managers post-this-transaction on Board of Managers);<br>• Amendments to organizational documents, subject to super-majority;<br>• Transactions with affiliates, insiders or family members; and<br>• Any other material transaction identified in the Amended and Restated Operating Agreement as requiring Board of Manager approval and majority votes of the Members. |
| Operating Agreement Terms | • *Capital Call:* Merri shall be entitled to make a capital call of the Members if the Company needs additional capital for operating, expenses, or expansion. If Members do not contribute pro-rata, then their ownership interest will be adjusted accordingly at all times using a reasonable, arms- |

| | |
|---|---|
| | • length valuation for the Company.<br>• *Profit Distributions:* Pro rata according to the Members percentage interests and as limited and described in the Additional Terms and Exhibits section below.<br>• *Voting Rights:* The Members shall vote in accordance to their Membership Units. Only defined exceptions listed below will require a super-majority of Membership Units.<br>• *Control:* Merri as majority Member has voting and operational control of the Company to decide budgets, operating activities and disposition/sale of the Company only limited by (a) fiduciary obligations to Dean of good faith and loyalty and (b) same pro rata outcome for the economic benefit of their ownership interests.<br>• *Withdrawal/Termination/Disability:* In the event a Member wishes, to withdraw, he/she may only withdraw with consent of other Member. In the event of Termination (Voluntary or Involuntary) or Death/Disability, the Member Interests shall be reacquired by the Company or the other Member. In the event of termination – there may be a discount penalty if termination for cause – all other purchases of Member Interests shall be at fair market value.<br>• *Expenses.* Members shall be entitled to reimbursement of expenses and requests for reimbursement (along with documentation) shall be provided to Merri for approval.<br>• *Major expenditures for the Company:* Members must obtain consent of Merri before incurring major expenditures for the Company; agreement on budget shall constitute such approval.<br>• *Transfer Restrictions*: No transfers (other than estate-planning transfers and transfers to affiliates) would be permitted without the approval of the other Member.<br>• *Right of First Refusal*: If any Member wishes to sell its membership interest in TMG, the other Member would have a right of first refusal at the same price as the selling Member has been offered by a third-party purchaser. The purchasing Member shall have ninety-days from the time of receiving the third-party, committed terms to complete their purchase. A selling Member has the obligation to inform the other Member of the start of any bona fide purchase discussions within three business days of their start.<br>• *Admission of New Members*: If Managing Member wishes to raise additional capital by adding additional members, the Managing Member may do so, subject to rights of the other Members. In no case may the Managing Member raise capital and have her membership interests treated differently or have new (replaced) membership interests to the detriment of the minority Member (Dean).<br>• *Drag-along rights:* If either Member determines to sell its membership units in their entirety to a third-party, the selling Member could "drag-along" the other Member. |

| | |
|---|---|
| | • *Tag-along rights:* If either Member proposes to sell its membership units to a third-party, the other Member could "tag-along."<br>• *Repurchase upon Death/Disability/Termination.* Valuation and purchase shall be set out in the Operating Agreement.<br>• *Restrictions on Parties:* Restrictions on the ability of either Member to compete with the Business included in Employment Agreements<br>• *Membership Meetings:* Members shall attend the semi-annual meetings, as scheduled, via any mutually agreed upon electronic means of communication.<br>• *Duty of Good Faith, Loyalty and Fair Dealing.* The Members have a duty of good faith to each other and to the Company as Members and Managing Members. *Fiduciary obligations of good faith, loyalty and fair dealing.*<br>• *Business Opportunity/Duty of Loyalty.* If either party discovers a business opportunity for the provision of products or services substantially similar to the potential scope of services of the Company, that party shall identify and refer such business opportunity to the Company. Merri is entitled to maintain other business interests (MIA KAYA) and Dean shall have no claim to any ownership in Merri's other business interests as a member of TMG; Merri's business interests subject to her Employment Agreement. Dean is entitled to maintain other business interests unrelated to the Company and subject to his Employment Agreement |
| Collaborative Marketing and Sales | • Please remove. |
| Conditions and Approval | • The restructure and admission of Dean as a Member in the Company shall be conditioned on both parties being satisfied with a revised Amended and Restated Operating Agreement and the terms and conditions contained therein.<br>• Dean's acquisition of Membership Units and his roles/responsibilities with TMG are based on his independent judgment and not on any representations or statements by Merri. |
| Dissolution | The Company may be dissolved on the consent of the Managing Member and the Members. Such dissolution shall not bias the value of Merri's membership interests to the detriment of Dean's. |
| Non-Solicitation/Non-Compete | The Operating Agreement as well as the Employment Agreements shall include restrictive covenants for non-solicitation, confidential/proprietary information, and non-compete. |
| Costs | • The parties will pay their own costs and expenses relating to the |

| | |
|---|---|
| | • preparation of the proposed Amended and Restated Operating Agreement and any other documents relating to the provision of services thereunder, including, without limitation, legal and accounting fees and taxes associated with the transactions.<br><br>• Dean should consider hiring separate counsel. Griesing represents Merri and TMG. The Operating Agreement and the ancillary agreements shall be fair and equitable but will be drafted for the purposes of protecting Merri. |
| Governing Law | • The Amended and Restated Operating Agreement and all definitive transaction documents, the rights and obligations of the parties, and any claims or disputes relating thereto will be governed by and construed in accordance with the laws of the State of Delaware, without regard to or application of its conflict of laws principles.<br><br>• All disputes arising from or relating to the above will be subject to the exclusive jurisdiction of and be litigated in the Chancery Courts of Delaware. Employment Agreement subject to Illinois law and jurisdiction of Illinois. |
| Exclusivity | • Either party may terminate the discussions regarding the potential admission of Dean as a new Member of TMG and the ancillary and associated agreements by notice in writing at any time prior to the execution of definitive agreements between them. |
| Binding Effect | The provisions in the above sections entitled Costs, Governing Law, and WBE Exclusivity shall be binding on both parties in consideration of their discussions regarding the Company, the Amended and Restated Operating Agreement and any related agreements described therein. |
| Indemnification | Operating Agreement to have market standard indemnification section. |

Each party has caused the foregoing to be signed by its duly authorized representative below, effective as of ____________, 2020.

**TMG Kreations, LLC**

**By:**______________________________
**Name:**
______________________________
**Title: President**

**Dean Dussias**

______________________________

## Additional Terms and Exhibits

The following are additional terms to provide further specificity to the Term Sheet and to include a draft Employment Agreement to be used for Merri and Deans' service provision to TMG.

**Overall Structure – Value and Distribution Specifics:**

In any year, Dean's profit allocation may be reduced from 30% to 20% if and only if TMG's annual revenue is less than USD $5,000,000. Similarly, if there is a sale and/or acquisition of Kashwere and the valuation of TMG's membership units is less than USD $5,000,000 then Dean's membership interest shall only be 20% and not 30%.

Any true-up for distribution's previously made, will occur no later than March 15th of the following year.

Dean's profit allocation percentage shall be estimated used on a six-month basis (20% or 30%), then every distribution as decided by Merri must be pro rata (70/30% or 80/20% as the case may be) between the Members.

For all other purposes, Dean's ownership interest will be treated at 30%, including but not limited to capital calls and voting.

**Merri and Dean Manager (CEO and President) Compensation:**

- Merri's draw shall be $25,000/month; Dean's $20,000 month. Since March 16, 2020, as of this writing Merri has only drawn $18,000/month and Dean $8,000/month (as W-2 earnings). Prior to any profit calculation, Merri shall receive an additional $7,000/month and Dean an additional $12,000/month.

- Merri shall continue with her car allowance as is and in all future years will receive a substantially similar car allowance; Dean shall have an allowance not to exceed $1,200/month and in all future years a substantially similar allowance. If either Member shall desire to use a portion of the allowance for different expenses, they may do so and inform the other Member.

- Merri and Dean shall have an incidental allowance of up to $750/month.

- Merri in her reasonable judgment may decide to reduce her and Dean's distributions to not less than $10,000/month on an as needed basis when in the best interests of the Company; reductions lower than $10,000/month for each Member must have Dean's agreement unless the reasonably expected cash flow of the company requires such reduction to maintain uninterrupted operations of the Company. Such reductions must be to the same compensation level; true-up cash payments to be made prior to subsequent profit calculations as described in the first bullet point of this section.

- There shall be no other compensation or allowances of any kind other than the one's specified above and it is the intention of both Members that their economic benefit from the Company is only from the compensation and allowances described here and their ownership interests treated on a pro rata basis (80/20% or 70/30% as described above). These terms can only be changed by agreement of Merri and Dean.

**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT (this "Agreement") is dated as of June 30, 2020, with effect from July 1, 2020 (the "Effective Date"), by and between TMG KREATIONS, LLC, a Delaware limited liability company (the "Company"), and Dean H Dussias ("Executive").

RECITALS:

A. In completion of Executive becoming a Member of the Company and in continuation of his employment activity with the Company

B. The Company is engaged in the business of, among other things, providing robes, throws and blankets, children's blankets and apparel and adult apparel throughout the world (the "Business").

C. Executive has been and will continue to be actively involved in the Business acting in the role of President of the Company. Executive has been and will be exposed to certain of the Company's confidential and proprietary information during the course of Executive's employment with the Company. Executive's involvement or participation in a business which is competitive with the Company, disruption of the Company's business relationships, or misappropriation or unauthorized use of the Company's confidential and proprietary information would have a material adverse impact on the Company and its business operations.

D. The Company desires to retain the services of Executive and Executive desires to be retained by the Company on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the covenants, representations and warranties contained herein, the parties hereto agree as follows:

1. Employment. The Company hereby agrees to engage Executive to render employment services to the Company, and Executive hereby accepts such engagement and agrees to provide employment services to the Company, upon the terms and conditions set forth in this Agreement.

2. Employment Period. Subject to the provisions of Section 7 below, the initial term of Executive's employment pursuant to this Agreement shall commence on the Effective Date and continue until the third (3rd) anniversary of the Effective Date (the "Initial Employment Period") and thereafter shall automatically renew for successive one-year periods (each an "Annual Renewal Period"), unless either party elects not to so renew and provides notice thereof at least ninety (90) days prior to the end of the Initial Employment Period or the then current Annual Renewal Period (a "Non-Renewal"), subject to earlier termination at any time in accordance with Section 7 below. The period of continuing employment of Executive by the Company is hereunder referred to herein as the "Employment Period."

3. Duties and Responsibilities. Executive shall serve as President of the Company and shall have such normal and customary duties and responsibilities commensurate with his position, subject to the general supervision of the Company's Board of Managers (the "Board") or such other person or persons as the Board may designate from time to time. Executive shall devote Executive's best efforts and all of Executive's business time and attention to the business and affairs of the Company and shall diligently, faithfully and competently perform Executive's duties and responsibilities hereunder; provided, however, that the foregoing shall not preclude Executive from engaging in business opportunities and charitable and community affairs and managing Executive's personal investments to the extent they do not unreasonably

interfere with Executive's duties and obligations hereunder (or otherwise violate Executive's obligations to the Company).

4. Compensation and Related Matters.

(a) Base Salary. The Company will pay Executive an annual base salary ("Base Salary") of $240,000, prorated for partial periods, payable in substantially equal monthly or more frequent installments in accordance with the Company's normal and customary payroll practices.

(b) Expense Reimbursement. The Company shall reimburse Executive for all reasonable business expenses properly incurred by Executive in the ordinary course of performing Executive's duties and responsibilities hereunder, subject to the Company's normal and customary practices and policies as are in effect from time to time with respect to travel, entertainment and other business expenses (including the Company's reasonable requirements with respect to prior approval, reporting and documentation of such expenses). Executive shall not incur expenses greater than $5,000 without prior approval from a Board member (or designee of the Board).

(c) Benefits. The Company will provide or offer for Executive's participation such benefits as are generally provided or offered by the Company to its employees, including, without limitation, health/major medical insurance, sick days, 401K, and other fringe benefits (collectively, "Benefits"), if and to the extent that Executive is eligible to participate in accordance with the terms of the applicable Benefits plan or program generally. Regarding health care, the Company shall pay for such benefits should Executive choose to participate. Further, Executive acknowledges and agrees that the costs of health care insurance are subject to change and the plan established by the Company shall be subject to prevailing market terms and conditions and cost considerations and subject to such changes and modifications as the Company, in its discretion, may determine to be reasonable and appropriate. Executive shall be entitled to four (4) weeks of paid vacation during each full year of service, together with paid holidays, all in accordance with the Company's normal and customary practices and policies as are in effect from time to time. Vacation time shall not carry over from year-to-year (past April 15th of a subsequent year) and (other than if required by law upon separation from employment) will not be paid to Executive in the event it is not used.

(d) Annual Bonus. There is no annual bonus and one is not considered at this time.

(e) Withholding. All salary, bonus and other compensation described in this Agreement shall be subject to withholding for federal, state or local taxes, amounts withheld under applicable benefit policies or programs, and any other amounts that may be required to be withheld by law, judicial order or otherwise.

5. Inventions/Copyrights.

(a) Transfer of Ownership of Inventions. Executive agrees that Inventions shall be deemed "work made for hire" and shall be the property of the Company. Executive shall promptly disclose to the Company all such Inventions and hereby irrevocably assigns to Company all such Inventions and all such worldwide right, title and interest. Executive hereby waives and agrees not to assert any moral rights or similar rights under the laws of any jurisdiction with respect to any Inventions. Executive further agrees to execute or cause to be executed any and all assignment documents or other documents that may be necessary to perfect the ownership rights of the Company in such Inventions or to secure the Company's statutory protection (including, without limitation, patent, trademark, trade secret or copyright protection) throughout the world for any and all such Inventions. For purposes hereof, "Invention" means all work product, including, without limitation, any and all creative works, discoveries, ideas, inventions, designs,

devices, models, prototypes, processes, works, know-how, documentation, files, information, manuals, materials, input materials and output materials, software programs or packages (together with any related documentation, source code or codes, object codes, upgrades, revisions, modifications and any related materials) and other information and materials, and the media upon which they are located (including cards, tapes, discs and other storage facilities), which are conceived, created, developed, reduced to practice, fixed in a tangible medium of expression or otherwise made by Executive solely or jointly with others in connection with or arising from Executive's employment hereunder (whether or not during regular business hours).

(b) Executive and Company acknowledge and agree, the foregoing to the contrary notwithstanding, that this Section does not waive or transfer Executive's rights to any Inventions for which no equipment, supplies, facility or trade secret or other Confidential Information (as defined herein) was used and which was developed entirely on Executive's own time, unless the Invention relates to the Business or to the Company's research or development or the results of any work that Executive performed for the Company during the term of Executive's employment relationship with the Company. Employee further acknowledges and understands that the assignment of ownership rights in Inventions pursuant to this section are intended to comply with the requirements of the Illinois Employee Patent Act 765 (ILCS 1060/1 et seq.), and that the above-stated conditions should be interpreted in a manner consistent with said Act.

6. Non-Solicitation, Non-Competition and Confidentiality. Executive acknowledges that Executive will be employed by the Company directly or indirectly in one or more aspects of the research, development, engineering, manufacturing, design, promotion and/or sales relating to the Company's existing or proposed products and services (including, without limitation, interacting with members of the Company, its customers and suppliers, assisting with the preparation and review of the Company's financial reports, and participating in the creation of products used in the Business). Executive further acknowledges that Executive will be exposed to certain confidential and proprietary information of the Company and its Affiliates during the course of Executive's employment with the Company. Executive's involvement or participation in a business which is competitive with the Company or any of its Affiliates, disruption of the Company's or any of its Affiliates' business relationships, or misappropriation or unauthorized use of the Company's or any of its Affiliates' confidential and proprietary information would have a material adverse impact on the Company and its Affiliates and their business operations. Accordingly, as a condition to the Company's execution of the Purchase Agreement and consummation of the transactions contemplated thereby and employment of Executive hereunder, Executive hereby agrees as follows:

(a) Certain Definitions. For purposes hereof:

"Affiliate" means, with respect to the Company, (i) the Company's present and former parent companies, subsidiaries, successors, affiliated and related companies, and (ii) a person or entity, directly or indirectly through one or more intermediaries, that is in control of, or controlled by, or under common control with, the Company;

"Competitive Business" means any person or entity engaged in a business that is competitive with the Business as it is or was conducted by the Company at any time during the Restricted Period (including such business as the Company may develop from time to time);

"Current Customer" means all accounts and customers (consumers) that purchased any product from the Company (or its predecessor) or any Affiliate during the thirty-six (36) months preceding the date of the termination of Executive's employment;

"Prospective Customer" means any account that Executive has solicited, identified or had contact with on behalf of the Company or any Affiliate during the twelve (12) months preceding the date of the termination of Executive's employment; and

"Restricted Period" means the period of Executive's employment with the Company and two (2) years thereafter.

(b) Non-Interference with Business Relationships. Executive hereby agrees that during the Restricted Period, Executive will not directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venturer, investor, employer, director, manager, officer, employee, consultant, contractor, agent, or in any other manner or capacity whatsoever:

(i) solicit, induce, advise, request, influence, or take any other action with regard to any sales representative, supplier, customer (both Current Customers and Prospective Customers), lessor, or any other person or entity that has a business relationship with the Company or any Affiliate (or has or had a business relationship with the Company's or any Affiliate's predecessors) which is intended to or has the effect of causing such person or entity to discontinue, reduce the extent of, discourage the development of or otherwise adversely affect such relationship with the Company or any of the Affiliates;

(ii) canvass, solicit, promote or sell any products or services that compete with any of the products or services of the Company or any of the Affiliates to any then Current Customer or Prospective Customer of the Company or any of the Affiliates; or

(iii) (A) recruit, solicit, or otherwise induce or influence any employee, consultant, sales representative, agent, or other personnel of the Company or any of the Affiliates to discontinue or otherwise terminate such relationship with the Company or any of the Affiliates or (B) retain, engage, employ, seek to retain, engage, or employ, or cause any Competitive Business (as defined herein) to retain, engage, employ, or seek to retain, engage, or employ as an employee, consultant, sales representative, or agent, any person who is then (or was at any time during the preceding twelve (12) months) an employee, consultant, sales representative, agent, or other personnel of the Company or any of the Affiliates (or their predecessors).

(c) Non-Competition. Executive hereby agrees that during the Restricted Period, Executive will not directly or indirectly, either individually or as a principal, shareholder, member, partner, joint venturer, investor, employer, director, manager, officer, employee, consultant, agent, or in any other manner or capacity whatsoever, engage in, assist, directly or indirectly, or have any active or economic interest in a Competitive Business; provided, however, that Executive shall not be prohibited from owning less than two percent (2%) of the outstanding securities of a corporation which is publicly traded on a securities exchange or over-the-counter.

(d) No Disclosure of Confidential Information. Executive hereby agrees that Executive will not, directly or indirectly, disclose to anyone, or use or otherwise exploit for Executive's own benefit or for the benefit of anyone other than the Company, any Confidential Information of the Company or any Affiliate. For purposes hereof, "Confidential Information" means any and all confidential or proprietary information regarding the Company or its Business or any Affiliate or its business, including, without limitation, any and all trade secrets, employer records (including personnel records), customer lists, prospect lists, price lists, customer order or purchasing patterns and activities, product costing information, stocking requirements, purchase orders, invoices, customer records, product information and applications, customer uses and preferences, passwords, access codes, products, patents, trademarks, copyrights, processes, techniques, formulas, designs, scientific information, training information and materials,

computer programs, computer network and security information, databases, software, services, research, development, inventions, and information regarding manufacturing, financials, purchasing, accounting, marketing, production, customers, suppliers, lessors, employees, and prospective customers, suppliers, lessors, and employees, and other information, whenever conceived, originated, discovered or developed, concerning any aspect of the Company or its Business or any Affiliate or its business, whether or not in written or tangible form; provided, however, that (i) the term "Confidential Information" shall not include information which is or becomes generally available to the public on a non-confidential basis, including from a third party provided that such third party is not in breach of an obligation of confidentiality with respect to such information and Executive is aware of such breach; and (ii) Executive shall not be in violation of this subsection in the event that Executive is legally compelled to disclose any of the Confidential Information, provided that in any such event Executive will provide the Company with reasonably prompt written notice prior to any such disclosure so that the Company (or an Affiliate) may obtain a protective order or other confidential treatment for the Confidential Information, and in the event that a protective order or other remedy is not obtained by the Company, Executive will furnish only that portion of the Confidential Information which Executive is advised by opinion of legal counsel is legally required to be furnished.

(e) Remedies. Executive understands that the Company will not have an adequate remedy at law for the material breach or threatened breach by Executive of any one or more of the covenants set forth in this Section 6 and agrees that in the event of any such material breach or threatened breach, the Company shall be entitled, in addition to any other remedies which may be available to it, to injunctive relief (without bond) to enjoin Executive from the breach or threatened breach of such covenants. Further, if Executive violates any of the restrictions contained in this Section 6, the Restricted Period shall be extended by a period equal to the length of time from the commencement of any such violation until such time as such violation shall be cured by Executive to the satisfaction of the Company. If any of the covenants set forth herein is not enforceable, in whole or in part, the remaining covenants set forth herein shall be enforceable notwithstanding the invalidity of any other covenant to the extent the remaining terms and provisions hereof reasonably continue the intent of this Agreement. Any covenant not enforceable in part shall be enforced to the extent valid and enforceable. If, in any judicial proceeding, a court of competent jurisdiction shall refuse to enforce any of the separate covenants herein or shall find that the term or scope of one or more of the separate covenants is unreasonably broad, then in that event the invalid or unreasonably broad provision shall be deleted or modified by said court to the minimum extent necessary to permit enforcement thereof, and the substitute provision shall be incorporated herein. The parties acknowledge and agree that the Affiliates shall be third-party beneficiaries of the Company's rights and Executive's obligations under this Section 6.

(f) Notice to Future Employers. During the period that any of the restrictive covenants or confidentiality restrictions contained herein are in effect, Executive agrees to notify the Company in writing of any subsequent occupation whether as owner, employee, officer, director, agent, consultant, independent contractor, or the like, and Executive's duties and responsibilities in that position. Further, Executive agrees that during said period, Executive will inform each new employer, prior to accepting employment, of the existence of this Agreement and the terms of the restrictive covenants and confidentiality restrictions contained herein. Executive acknowledges that during said period the Company shall have the right to contact, independently, any potential or actual future employer of Executive to notify it of Executive's obligations under this Agreement and provide such employer with a copy of this Agreement. The Company shall also be entitled, at its election, to notify any such actual or potential employer of the Company's understanding of the requirements of this Agreement and what steps, if any, the Company intends to take to ensure compliance with or enforcement of this Agreement. Failure of the Company to avail itself of the benefits of this subsection shall not in any way affect its right to obtain enforcement of any provision of this Agreement.

(g) No Conflicting Obligations or Use.

(i) Executive represents and warrants to the Company that his execution of this Agreement and the performance of the terms and conditions contained herein does not constitute a breach of any agreement to which Executive is a party (including, without limitation, any such agreement with a previous employer). In addition, Executive agrees not to use in connection with his employment hereunder, or to disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or other person or entity. The foregoing restriction shall not apply with respect to information and material that is generally publicly available without restraint and thus is not confidential or proprietary.

(ii) In the event Executive shall be permanently enjoined by a court of competent jurisdiction from being employed by the Company based on his prior employment relationship, or in the event the Company shall be enjoined from employing Employer, then Executive's employment shall terminate on the effective date of such injunction and the Company shall pay to Executive his then current Base Salary, Benefits accrued, and any expenses for which Executive is entitled to be reimbursed, up to and including the effective date of such termination. Executive shall not be entitled to any other salary, bonus, benefits or other compensation as a result of termination pursuant to this section.

(iii) Executive understands that the Company is relying upon the representation, warranties, and agreements set forth in Section 6(g)(i) in agreeing to employ Executive, and Executive will indemnify and defend the Company from any loss, cost, damage or expense (including reasonable attorneys' fees), that may arise directly or indirectly from Executive's breach of the representations, warranties, or agreements set forth herein.

7. Termination.

(a) Certain Definitions. For purposes hereof:

"Cause" means the occurrence of any one of the following on the part of Executive: (i) conviction of or a plea of *nolo contendre* to a felony, act of moral turpitude or other behavior which impacts Executive's performance of his duties and responsibilities to the Company or affects the Company in a negative manner; (ii) attempted or actual theft, fraud or embezzlement of money; (iii) gross negligence or willful misconduct in respect of Executive's performance of his duties and responsibilities to the Company, which such conduct (if susceptible to cure) continues or is repeated following thirty (30) days' written notice from the Company to Executive thereof; (iv) breach of Executive's fiduciary duties to the Company; (v) violation of any express direction from the Board, relating to the Executive's duties and responsibilities commensurate with his position, which such violation (if susceptible to cure) continues or is repeated following thirty (30) days' written notice from the Company to Executive thereof; (vi) breach of any obligation of confidentiality or restrictive covenant under the employment agreement or otherwise; (vii) refusal or failure to comply with the Company's reasonable written policies, procedures and directives, with such conduct (if susceptible to cure) continues or is repeated following (30) days' written notice from the Company to Executive thereof; (viii) drunkenness or intoxication while engaged in the Business that adversely affects Executive's performance of Company activities; (ix) breach of any other material term, covenant, representation or warranty contained in this Agreement, which such breach (if susceptible to cure) remains uncured or is repeated following thirty (30) days' written notice from the Company to Executive thereof. All such written notices must reference this Section 7(a) when communicating non-compliance to Executive.

"Disability" means the inability of Executive to substantially perform Executive's duties and responsibilities to the Company by reason of a physical or mental disability or infirmity (i) for a continuous period of ninety (90) days or for at least 120 days in any consecutive twelve (12) month period or (ii) at

such earlier time as Executive submits or the Company receives satisfactory medical evidence that Executive has a physical or mental disability or infirmity which will likely prevent Executive from returning to the performance of Executive's work duties for ninety (90) days or longer. In the event of any dispute regarding the determination of Executive's Disability, such determination shall be made by a physician selected by the Company and reasonably acceptable to Executive, at the Company's sole expense; provided, however, that Executive's Disability shall be conclusively presumed if such determination is made by an insurer providing disability insurance coverage to Executive or the Company in respect of Executive.

"Good Reason" means that:

(i) without Executive's prior consent and in the absence of Cause one or more of the following events occurs:

(A) There is a substantial diminution, not of a temporary nature or justified by Executive's misconduct, in Executive's responsibilities that is materially inconsistent with those normally associated with an executive's position (excluding for this purpose an isolated, insubstantial or inadvertent action by Company which is remedied by Company promptly after Company's receipt of written notice thereof from Executive); provided, however, that Executive acknowledges that Company may add new senior management positions and persons acting in such positions may take on activities or roles performed by Executive, which shall not constitute a substantial diminution of the Executive's responsibilities; or

(B) The Company's breach of any other material term, covenant, representation or warranty contained in this Agreement, which such breach (if susceptible to cure) remains uncured or is repeated following thirty (30) days' written notice from Executive to the Company thereof.

(b) Termination by the Company for Cause. The Company shall have the right to terminate Executive's employment hereunder for Cause, effective immediately without further notice. Notwithstanding anything to the contrary contained herein, if Executive's employment is terminated other than pursuant to this Section, after which the Company determines that Executive's acts or omissions would have constituted grounds to terminate Executive for Cause, then Executive shall be deemed to have been terminated for Cause, as the case may be, pursuant to this Section. In the event of such termination, then the Company shall pay to Executive his then current Base Salary and Benefits and vacation accrued and unpaid, and any expenses for which Executive is entitled to be reimbursed, up to and including the effective date of such termination. Executive shall not be entitled to any other salary, bonus, benefits or other compensation as a result of termination pursuant to this Section.

(c) Termination as a Result of Executive's Disability or Death. The Company or Executive (or Executive's legal representative) shall have the right to terminate Executive's employment hereunder in the event of Executive's Disability or death, effective immediately. In the event of such termination, then the Company shall pay to Executive (or Executive's legal representative) Executive's then current Base Salary and Benefits and vacation accrued and unpaid, and any expenses for which Executive is entitled to be reimbursed, up to and including the effective date of such termination. In addition, the Company shall pay to Executive (or Executive's legal representative) a pro-rated amount of Executive's Annual Bonus, as adjusted to reflect Executive's performance as of the effective date of such termination. Executive shall not be entitled to any other salary, bonus, benefits or other compensation as a result of termination pursuant to this Section.

(d) Termination by the Company Without Cause, Non-renewal or by Executive with Good Reason. The Company may terminate Executive's employment hereunder at will, for any reason (or for no reason) whatsoever, effective immediately upon notice from the Company to Executive thereof. In

the event of such termination or a Non-renewal by the Company (i.e., other than by reason of death, Disability or for Cause) or by Executive for Good Reason, then the Company shall pay to Executive his then current Base Salary and Benefits and vacation accrued and unpaid, and any expenses for which Executive is entitled to be reimbursed, up to and including the effective date of such termination. In addition, the Company shall pay to Executive a pro-rated amount of Executive's Annual Bonus, as adjusted to reflect Executive's performance as of the effective date of such termination. Executive shall not be entitled to any other salary, bonus, benefits or other compensation as a result of termination pursuant to this Section.

(e) Voluntary Termination by Executive. Executive may voluntarily terminate Executive's employment hereunder at any time upon not less than ninety (90) days' written notice to the Company; provided, however, that any time during said 90-day period, the Company may request Executive to vacate Executive's office and cease to perform employment services for or on behalf of the Company except those assigned by the Board which are to be conducted from Executive's home. If Executive so terminates Executive's employment, then the Company shall pay to Executive his then current Base Salary, Benefits and vacation accrued and unpaid, and any expenses for which Executive is entitled to be reimbursed, up to and including the effective date of such ninety-day (90) termination period. Executive shall not be entitled to any other salary, bonus, benefits or other compensation as a result of termination pursuant to this Section.

(f) Severance Pay. If Executive's employment is terminated pursuant to Section 7(d) above, subject to the terms and conditions in this Agreement and the Release Agreement (as defined below), and provided that Executive executes (and does not revoke, if applicable) a release and waiver agreement by which Executive releases the Company from claims relating to or arising from Executive's employment with or separation from the Company (the "Release Agreement") in form and substance substantially similar to Exhibit B hereto and at a time acceptable to the Company, and further provided that Executive has been and remains in compliance with Executive's obligations as set forth in this Agreement and the Release Agreement, the Company shall pay to Executive Executive's then-current Base Salary for a twelve (12) month period following the effective date of such termination. Such payments shall be payable in equal installments in accordance with the Company's payroll policy ("Severance Pay").

8. Company Property. Executive agrees that Executive will not take or retain any Confidential Information, whether in written, computerized, machine readable, model, sample, or other medium or form capable of physical delivery, upon or after termination for any reason of Executive's employment with the Company, without the prior written consent of the Company. Executive also agrees that upon the termination for any reason of Executive's employment with the Company or at any other time that the Company may request, Executive shall deliver promptly and return to the Company all such documents and materials, along with any other Confidential Information and all other property of the Company and property relating to the Company's employees customers and business in Executive's possession or control, but excluding, for the avoidance of doubt, personal photos, documents, files and other items of Executive's personal property.

9. Assignment. The parties acknowledge and agree that the covenants, terms and provisions contained in this Agreement constitute a personal employment contract and the rights and obligations of the parties hereunder cannot be transferred, sold, assigned, pledged or hypothecated, excepting that the Company may assign this Agreement in connection with a sale of the business, merger, consolidation, share exchange, sale of substantially all of the Company's assets, or other reorganization, whether or not the Company is the continuing entity, provided that the assignee is the successor to the business and all or substantially all of the assets of the Company.

10. Severability. If any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect (a) any other provision or part of a provision of this Agreement nor (b) this Agreement's validity, legality and enforceability in any other jurisdiction, but this Agreement shall be reformed and construed to the extent the remaining provisions hereof reasonably continue the intent of this Agreement in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

11. Governing Law. This Agreement shall be covered by, construed, applied and enforced in accordance with the internal laws of the State of Illinois, without regard to conflicts of law provisions. EACH PARTY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY SUIT OR ACTION ARISING OUT OF THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THE OTHER PARTY RELIED ON THIS WAIVER OF RIGHT TO JURY TRIAL AS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.

12. Attorneys' Fees. The prevailing party in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing parties all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the prevailing parties in connection with any such litigation.

13. Continuing Obligation. The covenants, obligations, duties and liabilities of Executive pursuant to Sections 5 and 6 hereof are continuing, absolute and unconditional and shall remain in full force and effect as provided herein.

14. Waiver. The waiver by the Company or Executive of any breach of any term or condition of this Agreement shall not be deemed to constitute the waiver of any other breach of the same or any other term or condition hereof.

15. Notices. Any notice, request, consent or communication under this Agreement shall be effective only if it is in writing and shall be deemed to have been given when personally delivered, on the next business day when sent by overnight courier or three (3) days after being deposited in the United States mail, certified or registered, postage prepaid, return receipt requested and addressed to the party at its or Executive's last known address. The address of any party may be changed by notice in writing to the other party duly served in accordance with this Section.

16. Miscellaneous. This Agreement may be executed in two or more counterparts (including via facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings (whether oral or written) between the parties with respect to such subject matter.

[EXECUTION PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have made and entered into this Employment Agreement the date first hereinabove set forth.

THE COMPANY:

TMG KREATIONS, LLC

By:______________________________
Name:____________________________
Its: ______________________________

EXECUTIVE:

______________________________
Dean H. Dussias

EXHIBIT A

At the time of this writing, Executive was to have received pay at the rate of $240,000/year beginning on March 15, 2020; Merri Gleckler was to have received pay at the rate of $300,000/year beginning on March 15, 2020.

All profit calculations for 2020 shall be made first taking into account a catch-up payment from March 15th, 2020 to the date of such proft calculation and distribution to make Executive and Merri Gleckler whole for such payments.

In addition, Executive shall have a car allowance of $1,200/month and an incidental allowance of $750/month. The $750/month may be postponed and accrued by the decision of the CEO; catch-up of the incidental allowance will be calculated in the determination of profit and the 70/30% (or as applicable, 80/20%) division of profits.

EXHIBIT B

(Form of Release Agreement)

1. Release. (a) Executive, individually and on behalf of Executive's heirs, agents, assigns and representatives, intending to make a full, complete, and general release, unconditionally and irrevocably releases and forever discharges the following persons and entities (collectively, the "Released Parties"): (i) the Company, (ii) the Company's present and former officers, directors, shareholders, employees, agents, representatives, and assigns, (iii) the Company's present and former parent companies, subsidiaries, successors, affiliated and related entities (collectively, the "Company Affiliates"), and (iv) all of the Company Affiliates' respective present and former officers, directors, shareholders, members, managers, employees, agents, representatives, and assigns, from any liability for any and all claims, counterclaims, controversies, actions, causes of action, demands, debts, damages, costs, attorneys' fees, or liabilities of any nature whatsoever in law or in equity ("Claims"), whether now known or hereafter discovered, that have arisen, or may arise, out of events that have occurred from the beginning of time until the expiration of the revocation period described in Section 1(c) below, including, but not limited to, claims relating to or arising from Executive' employment with the Company and the Company Affiliates, and any contracts that Executive may have entered into with the Company and the Company Affiliates; except that this release (this "Release") shall not be effective to release the Company from any Claims relating to or arising from the Company's obligations under this Release and/or to pay Severance Pay to Executive under Section 7(f) of Executive's Employment Agreement.

(b) The release provided by Executive in Section 1(a) above is intended to apply to all charges, claims, or lawsuits arising out of Executive's employment with the Company and the Company Affiliates, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Family and Medical Leave Act (to the extent permitted by law), the Consolidated Omnibus Budget Reconciliation Act ("COBRA") (to the extent permitted by law), the wage, labor and civil rights laws of the State of Oregon, and all other federal, state, and local constitutions, statutes, ordinances, and regulations, and including, but not limited to, claims for wrongful or retaliatory discharge, retaliation, breach of contract, breach of covenant of good faith and fair dealing, interference with contract or economic advantage, defamation, negligence, and any other contract or tort claims, that could be filed with any court or governmental administrative body or tribunal having jurisdiction over such matters, and that this Release resolves and subsumes any and all claims based upon any conduct by the Released Parties. Executive represents and warrants that as of the date of Executive's execution of this Release, Executive knows of no right to which Executive is entitled under the Family and Medical Leave Act. **With regard to this release, Executive acknowledges that Executive has been given a period of twenty-one (21) days in which to consider such release and consult an attorney, and understands that Executive's may revoke this release upon written notice to the Company, within seven (7) days from Executive's execution of this Release, this release becoming fully enforceable upon the eighth (8th) calendar day thereafter.** Executive covenants and agrees that with regard to the Claims released pursuant to this Release, Executive will never sue, institute, prosecute, cause to prosecute, assist in prosecuting, or permit to be prosecuted any proceeding in any court or any administrative or arbitration forum, or otherwise allege or assert any claim (including by way of counterclaim, defense, or set off to any legal action against it) against any of the Released Parties, or bring any Claim against them or allege any liability of them for, any Claim of any nature whatsoever which is released or covered by this Release.

(c) Notwithstanding any other provision of this Release, Executive, and Executive's beneficiaries and dependents, as applicable, shall retain entitlement to: (i) any and all benefits to which they

are entitled under the terms of any plan maintained or contributed to by the Company which is qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended; (ii) any continuation of health insurance coverage at Executive's, Executive's beneficiaries', or Executive's dependents' expense, to the extent required by the relevant provisions of COBRA; and (iii) Severance Pay under Section 7(f) of Executive's Employment Agreement. Executive represents and warrants that Executive's and Executive's beneficiaries and dependents timely received from the Company (or its plan administrator) proper notice of their rights under COBRA and that Executive knows of no obligation under COBRA with which the Company has not complied.

(d) Executive represents and warrants that Executive has neither made nor caused to be made any assignment or transfer of any right, claim, demand, or cause of action covered by the above release and that Executive is the sole and absolute legal and equitable owner thereof.

(e) Executive represents that Executive has carefully read the above release and fully understands its terms and import, and voluntarily consents thereto. Recognizing that Executive may hereinafter discover material facts in addition to, or different from, those Executive now knows, or believes, to be true with respect to the subject matter of this Release, Executive nonetheless affirms Executive's intention to fully, finally, and forever settle and release any and all claims, counterclaims, disputes, and/or differences identified in this release, known or unknown, suspected or unsuspected.

2. Confidentiality. Executive and the Company agree that the terms of this Release are confidential, and Executive and the Company agree not to make any statement or pronouncement regarding the existence or terms of this Release (other than to their respective attorneys and accountants or as required by law).

3. Remedies. Executive acknowledges that the Company would be greatly injured by, and have no adequate remedy at law for, breach of Executive's obligations under this Release. Accordingly, Executive agrees that whenever such breach occurs or is threatened, the Company and the Company Affiliates may, in addition to all other remedies available to them, enjoin Executive (together with all persons acting with Executive) from such breach or threatened breach. The prevailing party in any litigation in connection with this Release shall be entitled to recover from the non-prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the prevailing party in connection with such litigation.

4. No Future Employment. Executive agrees that Executive will not seek employment with the Company or any of the Company Affiliates at any time in the future and that neither the Company nor any of the Company Affiliates has any obligations to employ or offer employment to Executive.

5. Independent Advice. Executive represents that in making Executive's decision to provide this Release, Executive has had the opportunity to obtain the advice of independent counsel and that Executive has not relied upon any express or implied representations of the Company's agents or representatives concerning any matter related hereto. Executive acknowledges that Executive either: (a) has fully obtained whatever information and advice Executive desires regarding the effect hereof; or (b) is willing to go forward with this Release without that information or advice and to assume whatever risks that decision may entail. Executive also acknowledges that Executive has had the opportunity to take up to twenty-one (21) days after receiving this Release to review it before signing below. Executive represents that Executive has been afforded an opportunity to review all documents and to ask all questions related to the Company as Executive deems necessary to make an informed decision regarding entering into this Release.

6. No Admission. This Release is not an admission by the Company regarding the applicability of any federal, state, or local statute, ordinance, or regulation, or that any action the

Company, the Affiliates, or any of the other Released Parties, took with respect to Executive was wrongful, unlawful or in violation of any federal, state, or local statute, ordinance, or regulation.

7. Successors and Assigns. This Release shall be binding upon you and the Company, and each of Executive's and the Company's respective agents, representatives, assigns, heirs, predecessors, and successors, including any receiver or trustee in bankruptcy.

8. Construction. This Release has been subject to negotiations and discussions between Executive and the Company. It has been, and shall be construed to have been, drafted by all parties to it, so that any rule construing ambiguities against the drafter shall have no force and effect.

9. Severability. In the event that one or more of the provisions contained in this Release shall for any reason be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Release to the extent the remaining provisions reasonably carry out the intent of this Release.

10. Entire Agreement. This Release embodies the entire understanding between Executive and the Released Parties with regard to the subject matter of this Release and supersedes the terms of all prior agreements between Executive and the Released Parties. No change to this Release may be effected without the written consent and authorization of the Company.

11. Governing Law. This Release shall be covered by, construed, applied and enforced in accordance with the internal laws of the State of Illinois, without regard to conflicts of law provisions.

12. Consideration. Executive acknowledges and agrees that this Release waives rights and claims in exchange for valuable consideration, i.e., Severance Pay under Section 7(f) of Executive's Employment Agreement, to which Executive is not otherwise entitled. In the event that the Company determines that Executive's acts or omissions would have constituted grounds to terminate Executive for Super Cause, then this Release shall be null and void.

EXHIBIT C

In the event of Executive's termination from the Company for any reason, Company shall purchase Executive's membership interest (equity) for the then-current fair market value ("FMV"), such market value to be determined by ____________.

Payment for such equity, shall become senior secured debt of the Company and shall be paid to Executive:

(a) In the event of Executive's termination for any reason other than Section 7 (e), payable one-third (1/3) of the FMV at the time of termination and then in payments of one-sixth (1/6) of FMV semi-annually for the next two-years (four payments of one-sixth the total owed). Such payments will accrue with interest of not more than three percent interest per year. Company may pay off any or all of the amount without penalty at any time.

(b) In the event of Executive's termination according to Section 7 (e) and beginning at the time of termination, payable in amounts equal to one-sixth (1/6) of the FMV semi-annually for the next two-and-one-half-years (six payments of one-sixth the total owed). Such payments will accrue with interest of not more than three percent interest per year. Company may pay off any or all of the amount without penalty at any time.

For a period of two years following Executive's termination, in the event, the Company or any of its Members sells equity for a price more than 5% greater than the pro rata FMV paid to Executive, then Executive's equity shall be revalued in its entirety to the new, higher FMV.

# EXHIBIT M

Export to Excel | Export to Pdf | dean

| Emp Id | First Name | Last Name | Table | Field | Old Value | New Value | Action | Date (Local Time) | User |
|---|---|---|---|---|---|---|---|---|---|
| 100027 | Dean | Dussias | EmployeeFile | ViewableByEmployee | False | True | Change | 01/24/2022 07:27:21 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | False | True | Change | 01/24/2022 07:27:21 PM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 189904 | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | FileId | New Record | 603160 | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | False | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 122850 | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | FileId | New Record | 603159 | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | False | Add | 01/24/2022 07:27:18 PM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EPayEntry | autoPay | True | False | Change | 03/11/2021 08:33:21 AM | deandussias |
| 100027 | Dean | Dussias | EmployeeFile | ViewableByEmployee | False | True | Change | 01/25/2021 08:50:25 AM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | False | True | Change | 01/25/2021 08:50:24 AM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 189904 | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | FileId | New Record | 427134 | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100027 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | False | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 122850 | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | FileId | New Record | 427133 | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | False | Add | 01/25/2021 08:50:19 AM | AccountAnnualFormP |
| 100027 | Dean | Dussias | Employee | cellPhone | 8476121010 | (847) 612-1010 | Change | 07/07/2020 09:01:07 AM | deandussias |
| 100027 | Dean | Dussias | UserPin | RegistrationEmailSentDate | | 7/7/2020 3:55:13 PM | Change | 07/07/2020 08:55:13 AM | rmelgar |
| 100014 | Dean | Dussias | Employee | officer | False | True | Change | 07/05/2020 06:33:56 PM | dussias |
| 100014 | Dean | Dussias | Employee | owner | False | True | Change | 07/05/2020 06:32:11 PM | dussias |
| 100014 | Dean | Dussias | Employee | ownerPercent | | 30 | Change | 07/05/2020 06:32:11 PM | dussias |
| 100014 | Dean | Dussias | ERate | salary | 4000.00 | 4000 | Change | 07/05/2020 06:30:33 PM | dussias |
| 100014 | Dean | Dussias | ERate | endDate | 12/31/2100 12:00:00 AM | 6/30/2020 12:00:00 AM | Change | 07/05/2020 06:30:33 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | co | New Record | 50995 | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | id | New Record | 100014 | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | startDate | New Record | 7/1/2020 12:00:00 AM | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | endDate | New Record | 12/31/2100 12:00:00 AM | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | det | New Record | E | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | detCode | New Record | Draw | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | amount | New Record | 7500 | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | guidfield | New Record | 58642cc9-05d1-40bf-9f8e-69f91b65536a | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EAutoPay | sequence | New Record | 0 | Add | 07/05/2020 06:30:14 PM | dussias |
| 100014 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 122850 | Add | 01/22/2020 12:24:48 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | FileId | New Record | 309211 | Add | 01/22/2020 12:24:48 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | False | Add | 01/22/2020 12:24:48 PM | AccountAnnualFormP |
| 100014 | Dean | Dussias | EmployeePayRat | PayRateReviewId | New Record | 0 | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | EmployeePayRat | EmployeeKeyId | New Record | 122850 | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | EmployeePayRat | PayRateGuid | New Record | 18281dc9-eff1-4b3c-958d-c7eea909a3cd | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | endDate | 12/31/2100 12:00:00 AM | 12/31/2019 12:00:00 AM | Change | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | co | New Record | 50995 | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | id | New Record | 100014 | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | rateCode | New Record | Base | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | salary | New Record | 4000 | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | ratePer | New Record | Hour | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | startDate | New Record | 1/1/2020 12:00:00 AM | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | endDate | New Record | 12/31/2100 12:00:00 AM | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | ERate | guidfield | New Record | 18281dc9-eff1-4b3c-958d-c7eea909a3cd | Add | 01/12/2020 07:31:57 AM | dussias |
| 100014 | Dean | Dussias | Employee | middleName | Hippolcrates | Hippocrates | Change | 09/28/2019 07:08:26 PM | mglecker |
| 100014 | Dean | Dussias | Employee | sex | | | Change | 09/28/2019 07:08:26 PM | mglecker |
| 100014 | Dean | Dussias | Employee | emailAddress | dean@kashwere.com | dean@dussias.org | Change | 09/28/2019 07:02:36 PM | dussias |
| 100014 | Dean | Dussias | Employee | title | | President | Change | 09/28/2019 04:35:36 PM | mglecker |
| 100014 | Dean | Dussias | Employee | cc1 | | 100 | Change | 09/28/2019 04:27:29 PM | mglecker |
| 100014 | Dean | Dussias | Employee | i9Verified | False | True | Change | 09/28/2019 04:27:29 PM | mglecker |
| 100014 | Dean | Dussias | Employee | citizenship | | USA | Change | 09/28/2019 04:27:29 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | co | New Record | 50995 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | empId | New Record | 100014 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | sequence | New Record | 0 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | transit | New Record | 071000013 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | account | New Record | 679833033 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | checking | New Record | True | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | amountCode | New Record | % | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | amount | New Record | 100 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | excludeSpecial | New Record | False | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | nameOnAccount | New Record | Dean Dussias | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | startDate | New Record | 10/1/2019 12:00:00 AM | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | endDate | New Record | 12/31/2100 12:00:00 AM | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | DirectDeposit | guidfield | New Record | b73df61c-8340-45a9-bb78-d3d9d0343fba | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeFile | EmployeeKeyId | New Record | 122850 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeFile | FileId | New Record | 266650 | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeFile | ViewableByEmployee | New Record | True | Add | 09/28/2019 04:25:27 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeProfileE | EmployeeKeyId | New Record | 122850 | Add | 09/28/2019 04:23:05 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeProfileE | IsSupervisor | New Record | False | Add | 09/28/2019 04:23:05 PM | mglecker |
| 100014 | Dean | Dussias | UserPin | UserId | | 39709 | Change | 09/28/2019 04:23:04 PM | mglecker |
| 100014 | Dean | Dussias | EmployeeKey | UserId | | 39709 | Change | 09/28/2019 04:23:04 PM | mglecker |
| 100014 | Dean | Dussias | ERate | co | New Record | 50995 | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | id | New Record | 100014 | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | rateCode | New Record | Base | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | salary | New Record | 6000 | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | startDate | New Record | 9/28/2019 12:00:00 AM | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | endDate | New Record | 12/31/2100 12:00:00 AM | Add | 09/28/2019 04:23:02 PM | mglecker |
| 100014 | Dean | Dussias | ERate | guidfield | New Record | b4ec6176-ef75-4e8d-ae584c4cd1e2536b | Add | 09/28/2019 04:23:02 PM | mglecker |

1 | 100 items per page | 1 - 82 of 82 items

EXHIBIT Dussias 20 8-22-24 (PENGAD 800-631-6989)

# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEAN H. DUSSIAS<br><br>Plaintiff,<br><br>v.<br><br>MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:21-cv-05709<br><br>Hon. Judge Martha M. Pacold<br><br>Magistrate Judge Beth W. Jantz |

**PLAINTIFF'S ANSWERS AND OBJECTIONS TO**
**<u>DEFENDANT MERRI GLECKLER'S FIRST SET OF INTERROGATORIES</u>**

Plaintiff, Dean H. Dussias ("Plaintiff"), by his attorneys Golan Christie Taglia LLP, pursuant to Fed. R. Civ. P. 33, hereby answers Defendant/Counter-Plaintiff Merri Glecker's First Set of Interrogatories to Plaintiff as follows:

**<u>PRELIMINARY STATEMENT AND OBJECTIONS</u>**

1. Plaintiff has not completed his investigation or discovery into the subject matter of this action or the underlying facts and evidence. Accordingly, all responses and objections to Defendants' interrogatories are based only upon such information and documents that are presently available and in the possession of Plaintiff. All responses and objections are provided without prejudice to presenting further information, documents, evidence, or analyses not yet identified, obtained, or completed.

2. Plaintiff objects to these interrogatories to the extent they seek materials protected by any privilege, doctrine, or immunity, including the attorney-client privilege, the work product privilege, and any other applicable privilege recognized by common law, statutes, or rules of evidence. The fact that Plaintiff may not specifically object to an individual discovery request on

privilege or protection grounds shall not be deemed a waiver of any applicable privilege or protection. To the extent that Plaintiff inadvertently produces any privileged materials, such inadvertent disclosures shall not be a waiver of protection. Plaintiff expressly reserves the right to object to the use of any privileged materials in this or any other litigation.

3. Plaintiff objects to these interrogatories insofar as they attempt to impose obligations in addition to those set forth in the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, or any other applicable procedural rule.

4. Plaintiff reserves all objections to the admissibility, authenticity, and relevance of any documents or information produced in response to these interrogatories until the trial of this action. Identification or production of any document or information does not constitute an admission by Plaintiff that such document or information is relevant or material to this proceeding. Plaintiff also reserves the right to object to further inquiry with respect to any subject matter.

5. Plaintiff objects to these interrogatories to the extent they seek disclosure of documents or information not within the possession, custody, or control of Plaintiff. By stating that it will produce documents or information responsive to a particular request, Plaintiff does not represent that any such documents or information exists or ever existed or that Plaintiff has responsive documents or information in his possession, custody, or control. Rather, Plaintiff only that to the extent it has possession, custody, or control of responsive documents or information not protected by any applicable privilege, Plaintiff will produce such documents or information.

6. Plaintiff objects to these interrogatories to the extent they assume the existence of facts that do not exist or the occurrence of events that did not occur. Any response of Plaintiff to

any individual interrogatory is not intended to be, and shall not be construed as, an admission that any factual predicate stated in the request is accurate.

7. Plaintiff reserves the right to supplement or amend these objections and the right to seek appropriate orders and relief under the Federal Rules or the rules of the court.

The foregoing General Objections are incorporated by reference in each of the specific responses below as if fully set forth therein.

## ANSWERS

1. Identify all person(s) preparing, assisting in the preparation of or providing information for your answers to these Interrogatories, including any person who supplied documents used in the preparation of the answers. Please include the information or documents supplied by any such Person.

**ANSWER:** Plaintiff objects to this interrogatory as overbroad and seeking information protected by the attorney-client privilege or work product doctrine. Subject to the foregoing objections, Plaintiff supplied the information used in preparing these answers which were prepared with the assistance of his attorneys.

2. Identify all Person(s) from whom you have obtained any statements regarding any issue or matter relating to the allegations of the Complaint and/or Counterclaim, and provide the date that such statement was taken, the name of the Person who took the statement, and who currently has possession of each such statement.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is vague and ambiguous as to the term "statements", and subject to multiple interpretations. Subject to and without waiving or limiting the foregoing objection, and assuming "statements" means written statements, Plaintiff has not obtained any written statements regarding any issue or matter relating to the allegations of the Complaint and/or Counterclaim from any individual.

3. Identify each Person who claims to or is believed to have knowledge regarding the facts and/or damages alleged in the Complaint. As to each such Person, state his/her area of knowledge.

**ANSWER:** Plaintiff objects to this interrogatory as vague as to the meaning of "knowledge," overbroad, and unduly burdensome. Subject to the foregoing objections, Plaintiff believes that the following individuals may have knowledge of facts relevant to the parties' allegations, claims, defenses, or damages:

a. Merri Gleckler,

b. Robert Gleckler,

c. David Lazar,

d. Rachel Stewart,

e. Representatives from Howard Simon & Associates,

f. Raymond Conway,

g. Jesse Safian, and other NetSuite representatives

h. Tracy Gibbs,

i. Toby Hemmerling and other Anatta representatives.

Plaintiff believes that these individuals have knowledge of various topics relevant to both parties' allegations in this case, including whether Plaintiff reasonably performed all of his obligations to Defendants and Defendants' representations and agreement that Plaintiff was a member and owner of TMG.

4. Identify, including by date and subject matter, all Communications you had with Cedric Reingold referring or relating to Gleckler and/or TMG, from January 1, 2009 to the present.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad, calls for irrelevant information, and calls for a narrative better suited for deposition.

5. Identify all Communications, including oral Communications, between you and any other person or entity relating to, or evidencing the allegations in the Complaint and/or the Counterclaim.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine. Plaintiff further objects to this interrogatory on grounds that it seeks information vis-à-vis written communications that is in the sole possession, custody, and control of Defendant, TMG.

6. Identify all Communications, including oral communications, between you and any other person or entity, relating to your potential acquisition of a membership interest in TMG, including but not limited to Communications relating to the Operating Agreement, Term Sheet, and/or Counter Term Sheet.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine. Plaintiff further objects to this interrogatory on grounds that it seeks information vis-à-vis written communications that is in the sole possession, custody, and control of Defendant, TMG.

7. Identify all Communications, including oral communications between you and any vendor or service provider of TMG (including but not limited to Anatta, NetSuite, Bergen Logistics, NovaModule, Supporting Strategies, Zonos), from January 1, 2020 to the present.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it calls for a narrative better suited for deposition. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine. Plaintiff further objects to this interrogatory on grounds that it seeks information vis-à-vis written communications that is in the sole possession, custody, and control of Defendant, TMG.

8. Identify all Communications, including oral communications, exchanged

between you and any other person or entity regarding this lawsuit.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine.

9. Identify all Communications or Documents exchanged between you and any other person or entity after January 1, 2009, which mention, reference, describe, or relate to Gleckler or TMG in any way.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it calls for a narrative better suited for deposition and is overly broad in scope and time. Plaintiff also objects to this interrogatory on grounds that it seeks information that is directly encompassed and protected by the attorney-client privilege and/or work product doctrine. Plaintiff further objects to this interrogatory on grounds that it seeks information vis-à-vis written communications that is in the sole possession, custody, and control of Defendant, TMG.

10. Describe in detail and amount all damages you allege you sustained as a result of each cause of action asserted in the Complaint, itemizing the amount claimed for each element of damages and explaining how it was calculated and identify all Documents, Communications, or Person(s) supporting those alleged damages.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it premature, as Plaintiff filed the Complaint to recover the fair and reasonable value of his ownership interest in Defendant, TMG. Subject to and without waiving or otherwise limiting the foregoing objection, Plaintiff has not yet computed his claims for damages, as such computations will be based upon documents produced in discovery by Defendants and the subject of expert discovery.

11. State the basis, including all supporting facts, Documents, and Communications, and Person(s) with knowledge, for your contention in paragraph 52 of the Complaint that the money you paid was a "capital contribution."

**ANSWER:** Plaintiff objects to this interrogatory as compound and overbroad. Subject to the foregoing objections, Plaintiff and Merri Gleckler had several conversations in the weeks leading up to and during June 2022 in which they agreed that Dussias would make a capital contribution in connection with his membership in TMG; Gleckler agreed that a capital contribution would be beneficial for TMG; she was told by Plaintiff that the contribution would be made and was further notified of the capital contribution through JPM Chase's online banking platform and via TMG's accounting software, Everest; furthermore she never commented upon, let alone objected to the capital contribution and has kept the money for the full use and benefit of TMG.

12. Did you give any advance notice to Gleckler, or inform her in advance in any way, that you would be paying as a capital contribution to TMG the money you reference in paragraph 52 of the Complaint? If you did give notice, identify how, when, and by what means you notified Gleckler that you would be making the payment referenced in paragraph 52 of the Complaint.

**ANSWER:** Plaintiff objects to this interrogatory as compound and overbroad. Subject to the foregoing objections, Plaintiff and Merri Gleckler had several conversations in the weeks leading up to and during June 2022 in which they agreed that Dussias would make a capital contribution in connection with his membership in TMG; Gleckler agreed to the capital contribution; and knew that Plaintiff intended to make it.

13. Identify all individuals who prepared, drafted, and/or submitted the Annual Report filed with the Illinois Secretary of State that is referenced in paragraph 55 of the Complaint.

**ANSWER:** Plaintiff prepared and submitted the Annual Report.

14. Did you give any advance notice to Gleckler, or inform her in advance in any way, that you would prepare and file the Annual Report referenced in paragraph 55 of the Complaint? If you did give notice, identify how, when, and by what means you notified Gleckler about that Annual Report referenced in paragraph 55 of the Complaint.

**ANSWER:** Plaintiff objects to this interrogatory as compound and overbroad. Subject to the foregoing objections, Plaintiff and Gleckler spoke several times a day via phone, text, and email and during those communications Plaintiff advised Gleckler that the annual report needed to be filed and that he would file it.

15. Did you request that any bank issue a debit card for any TMG bank account. including but not limited to from a Chase bank account? If you did make such a request, identify how, when and by what means you notified Gleckler about that request or about the debit card.

**ANSWER:** Plaintiff did not request that any bank issue a debit card for any TMG account.

16. Did you ever tell anyone that your wife had a membership or ownership interest in TMG? If so, identify when, where, who you told, and the substance of the conversation.

**ANSWER:** Plaintiff did not tell anyone that his wife had a membership or ownership interest in TMG.

17. Did you ever tell anyone that you had a membership or ownership interest in TMG? If so, identify when, where, who you told, and the substance of the conversation.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is overbroad and calls for a narrative better suited for deposition. Subject to and without waiving or otherwise limiting the foregoing objection, Plaintiff had conversations in which he discussed his ownership interest or membership in TMG.

18. Did you ever inform any individuals performing work for or providing services to TMG that they should not copy Gleckler on certain e-mails that they were sending to you? If so, identify all such Person(s) and the date(s) on which you so informed that Person(s).

**ANSWER:** Plaintiff does not recall ever informing any individuals performing work for or providing services to TMG that they should not copy or inform Gleckler on any communication they were sharing with Plaintiff unless Gleckler specifically requested to be left out of the discussion.

19. In or about 2021, were you involved in changing your status at TMG from a W-2 employee to a 1099-NEC (non-employee compensation)? If so, please describe your

involvement and identify how, when and by what means you notified Gleckler about that change.

**ANSWER:** Plaintiff objects to this interrogatory on grounds that it is compound, overbroad, and calls for a narrative better suited for deposition. Plaintiff further objects to this interrogatory on the grounds that it is vague as to the meaning of "involved." Subject to the foregoing objections, in 2020, Plaintiff's status did change with the cooperation of Howard Simon & Associates ("Simon") and the full knowledge of Gleckler.

20. Did you change any TMG business account and/or TMG social media account into your name without also adding Gleckler's name? If so, identify how, when and by what means you notified Gleckler about that change.

**ANSWER:** Plaintiff objects to this interrogatory as compound, vague as to the meaning of "change… into your name without also adding Gleckler's name," and vague as to the accounts referenced. Subject to the foregoing objections, Plaintiff created certain accounts using a TMG email address (dean@kashwere.com) in order to create value as an owner and facilitate certain processes to the improve the operation of TMG with Gleckler's knowledge and consent and, on information and belief, Gleckler had her own login credentials or administrative access to all of these same accounts.

Dated: February 27, 2023

Respectfully submitted,

**DEAN DUSSIAS**

By: *__/s/ David J. Ben-Dov__*
One of his Attorneys

Matthew M. Showel
Brittany N. Bermudez
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 696-1361
mmshowle@gct.law
bnbermudez@gct.law

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing Plaintiff's Answers and Objections to Defendant Merri Gleckler's First Set of Interrogatories was served on the following via email on February 27, 2023.

James G. Argionis (jargionis@cozen.com)
Corey T. Hickman (chickman@cozen.com)
Cozen O'Connor
123 North Wacker Drive, Suite 1800
Chicago, IL 60606

*/s/ Matthew M. Showel*

# EXHIBIT O

**To:** Merri Glecker[merri@kashwere.com]
**From:** dean@kashwere.com[dean@kashwere.com]
**Sent:** Fri 1/1/2021 9:40:53 PM (UTC)
**Subject:** signature page LLC Agreement
TMG LLC Signature page DHD.pdf

Please see attached; counter-sign; PDF and send back.

As discussed, whatever we may need to add as Exhibit C we can do during 2021 in time to support the stability, increase in value and growth of the business.

Thank you!

2021 will be a great year for us all!

Best,

Dean

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

EXHIBIT
PENGAD 800-631-6989
Dussias 11
8-22-24

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first written above.

**COMPANY:**

TMG Kreations, LLC d/b/a Kashwere

By: Merri G LLC, its majority Member

Merri G LLC

**MANAGER:**

Merri G LLC

By:

Merri Gleckler

Dean H Dussias

Dean H. Dussias

Dean H Dussias

**MEMBER:**

Merri G, LLC

By:

its Owner

**MEMBER:**

Dean H Dussias

By: Dean H. Dussias

An Individual

# EXHIBIT P

**To:** Dean H Dussias[dean@dussias.org]
**From:** Merri Gleckler[merri.gleckler@gmail.com]
**Sent:** Sat 2/6/2021 4:48:20 AM (UTC)
**Subject:** Fwd: AMENDED AND RESTATED TMG KREATIONS AMENDED OPERATING AGREEMENT February 2021.DOCX
AMENDED AND RESTATED TMG KREATIONS AMENDED OPERATING AGREEMENT February 2021.DOCX

Hi Dean,

Finally , attached is our Operating Agreement created by Fran's law firm highlighting the details of our agreement.

Of course Cheryl will be happy to review any part of this should you need or want that.

I don't think anything was left out... :)

Merri

EXHIBIT
PENGAD 800-631-6989
Dussias 12
8-22-24

# EXHIBIT Q

**To:** Dean H Dussias[dean@dussias.org]
**From:** Merri Gleckler[merri.gleckler@gmail.com]
**Sent:** Sat 2/6/2021 4:48:20 AM (UTC)
**Subject:** Fwd: AMENDED AND RESTATED TMG KREATIONS AMENDED OPERATING AGREEMENT February 2021.DOCX
AMENDED AND RESTATED TMG KREATIONS AMENDED OPERATING AGREEMENT February 2021.DOCX

Hi Dean,

Finally , attached is our Operating Agreement created by Fran's law firm highlighting the details of our agreement.

Of course Cheryl will be happy to review any part of this should you need or want that.

I don't think anything was left out... :)

Merri

EXHIBIT
PENGAD 800-631-6989
Dussias 12
8-22-24

**AMENDED AND**
**RESTATED**
**LIMITED LIABILITY COMPANY OPERATING**
**AGREEMENT OF**
**TMG KREATIONS, LLC**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "***Agreement***") is made and entered into as of January __, 2021 by and among TMG Kreations, LLC, an Arizona limited liability company (the "***Company***"), and each of the Persons listed on Exhibit A attached hereto (such Persons and their respective successors in interest being hereinafter referred to individually as a "***Member***" and collectively as the "***Members***").

**RECITALS**

WHEREAS, a Certificate of Organization of the Company was originally filed with the State of Delaware on _______________, 2011, to organize the Company as a Delaware limited liability company.

WHEREAS, Merri Gleckler, through MerriG, LLC, purchased the Units owned by the other former Member, Cedric Reingold pursuant to a Member Interest Purchase Agreement dated September 18, 2019 and the acquisition was completed by March 16, 2020. Subsequent to the buyout, Merri Gleckler was the sole Member of the Company.

WHEREAS, Merri Gleckler is converting the Company from a Delaware limited liability company into an Arizona limited liability company.

WHEREAS, Merri Gleckler is interested in transferring thirty percent (30%) of the Company to Dean H. Dussias as set forth in the terms of this Amended and Restated Operating Agreement;

WHEREAS, the parties desire to amend and restate the Operating Agreement and enter into this Agreement to set forth the respective rights, obligations and interests of the Members. This Agreement, as it may be amended from time to time in accordance with the terms herein, shall be binding on any person who at the time is a Member, regardless of whether or not such Person has executed this Agreement or any amendment hereto.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE I – DEFINITIONS; CONSTRUCTION**

1.1. Definitions. When used in this Agreement the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Section 1.1 shall have the meanings set forth elsewhere in this Agreement, including Exhibit B attached hereto and made a part hereof):

"***Act***" means the Arizona Limited Liability Company Law and any successor statute, as the same may be amended from time to time.

"***Affiliate***" of any Person means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such Person. The term "***control,***" "***is controlled by,***" or "***is under the common control***", means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity. In the case of a partnership, the term "***Affiliate***" shall also include any limited or general partner of such partnership.

"***Agreement***" means this Amended and Restated Limited Liability Company Operating Agreement, including the Exhibits hereto, as the same may be amended, modified, supplemented, or restated from time to time.

"***Bankruptcy***" (and grammatical variations thereof) means, with respect to any Person:
(a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time (the "***Bankruptcy Code***"); (c) the making by such Person of a general assignment for the benefit of creditors; (d) the voluntary filing of a petition in accordance with the Bankruptcy Code; (e) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of such Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within one hundred twenty (120) days; (f) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in sub-clauses (a) through (f) of this clause or (g) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the Bankruptcy Code, as determined by the Bankruptcy Court.

"***Bona Fide Offer***" means an arm's length written offer by an unrelated third party that is not an Affiliate of a Member to purchase part or all of a Member's Units on the terms specified therein.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks, generally are authorized or required to be closed.

"***Capital Account***" means with respect to any Member the capital account that the

Company establishes and maintains for such Member pursuant to Section 3.4 and Exhibit B herein.

"***Capital Contribution***" means the aggregate amount of cash and the Gross Asset Value (as defined in Exhibit B) of any property (other than money) contributed by each Member to the Company as provided in Section 3.1, offset by the amount of debt and other liabilities of such Member which the Company has assumed, or taken such property subject to, in connection with such contribution. In the case of a Member that acquires Units by an assignment or Transfer in accordance with the terms of this Agreement, "***Capital Contribution***" means the Capital Contribution of that Member's predecessor proportionate to the acquired Unit(s).

"***Cause***" shall mean a Manager's: (i) direct or indirect material breach or violation of this Agreement, (ii) material breach of a Company policy that causes monetary or reputational damage to the Company; (iii) violation of a pertinent law or regulation that causes monetary or reputational damage to the Company; (iv) failure to follow any lawful, reasonable directive issued by the Manager (as hereinafter defined), (v) material misconduct or gross negligence that causes monetary or reputational damage to the Company; (vi) conviction of, or plea of nolo contendere to, any felony or to any crime or offense causing harm to the Company (whether or not for personal gain) or which otherwise impairs its goodwill; (vii) act of theft, fraud, embezzlement, extortion, blackmail, moral turpitude or similar conduct; or (viii) fraudulent or willful and material misrepresentations or concealments on any written reports submitted to the Company.

"***Certificate***" means the Certificate of Organization of the Company originally filed with the Commonwealth of Pennsylvania, as the same may be amended and/or restated from time to time.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section (§) of the Code refers not only to such specific section but also to any corresponding provision of any Federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"***Company Tax Proceeding***" means any examination of the Company's tax affairs by tax authorities and any administrative or judicial proceeding involving the Company's tax affairs, including the filing of any amended return or administrative adjustment request.

"***Liens***" shall mean any and all liens, encumbrances, security interests, mortgages, pledges, claims, options or restrictions of any kind whatsoever.

"***Majority Interest***" means that number of Units that, in the aggregate, exceed fifty percent (50%) of the aggregate of all Units.

"***Manager***" means the Person who is initially appointed or subsequently elected to be the Manager of the Company (the "***Manager***") in accordance with the terms of this Agreement. This

Initial Manager shall be Merri Gleckler.

"***Member***" means each Person who is a record holder or record owner of Units and (a) is identified as a Member on Exhibit A, has been admitted to the Company as a Member in accordance with this Agreement or is an assignee or transferee who has become a Member in accordance with Article VII, and (b) has not withdrawn, been removed or if other than an individual, dissolved.

"***Percentage Interest***" means, for each Member, the Member's ownership interest in the Company, calculated as a fraction, and expressed as a percentage, having as its numerator the Units owned by the Member at such time, and having as its denominator the aggregate issued and outstanding Units at such time. The Percentage Interests of the Members shall be adjusted upon the admission of a new Member, the withdrawal of a Member or any other event that alters the number of Units owned by any Member, or all of the Members in the aggregate.

"***Permanent Disability***" means an illness, incapacity or a mental or physical condition that renders a Member unable or incompetent to carry out the essential functions of such Member's position, if any, with the Company, with reasonable accommodation, for a period of at least one hundred eighty (180) consecutive days because of an illness, incapacity or a mental or physical condition.

"***Person***" means any natural person, individual, general partnership, limited partnership, limited liability company, limited liability partnership, corporation, trust, estate, real estate investment trust, association or other legal entity or organization.

"***Prime Rate***" means a varying rate per annum that is equal to the interest rate published by The Wall Street Journal from time to time as the prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate.

"***Profits***" and "***Losses***" has the meaning set forth in Exhibit B.

"***Sale Transaction***" means a (i) sale of all, substantially all or part of the assets or Units and other Equity Securities (as hereinafter defined) of the Company to an unrelated Person or entity in one transaction or a series of similar transactions or (ii) a merger or consolidation of the Company with or into any unrelated Person, unless after the consummation of such transaction the Members hold a majority of the outstanding capital securities of the surviving entity.

"***Transfer***" means any and all types of transfers, including, but not limited to, any sale, assignment, conveyance, hypothecation, distribution, gift, or other disposition, or the pledge, mortgage, or grant of a security interest or Lien in, or other encumbrance, whether voluntary or by operation of law, directly or indirectly, of all or any portion of a Member's Units, other than in connection with a Sale Transaction.

"***Triggering Event***" means the occurrence of any of the events listed below:

(a) Bankruptcy. A Member becoming Bankrupt;

(b) Dissolution. In the case of a Member that is a business entity, the dissolution and commencement of winding up of such Member;

(c) Criminal or Fraudulent Activities. Upon a finding that the Member : (i) is convicted of, submits a plea of nolo contendere to, submits a guilty plea to or confesses to (A) to an act of fraud, misappropriation or embezzlement, or (B) to a felony or other crime involving moral turpitude; (ii) committed an act, or multiple acts, of willful misconduct; (iii) willfully violated any provision of this Agreement; or (iv) committed an act of theft, misappropriation, embezzlement or fraud with respect to the assets or properties of the Company, other than de minimis takings of common office supplies and similar items;

(d) Impermissible Voluntary Lien. A Member proposes to pledge or otherwise grant a Lien on any Units owned by such Member;

(e) Impermissible Transfer. A Member purports to Transfer any Units held by such Member in violation of this Agreement;

(f) Death or Permanent Disability. A Member dies or becomes Permanently Disabled; or

(g) Impermissible Involuntary Lien. The Units owned by a Member are attached, levied upon or executed against in connection with the enforcement of any Lien or otherwise be transferred by operation of law.

"***Units***" means the units representing a Member's entire interest in the Company, including the Member's right to share in Profits and Losses, income, gains, losses, deductions, credits or similar items of, and to receive distributions (liquidating or otherwise) and allocations from, the Company pursuant to this Agreement, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, and the right to receive information concerning the business and affairs of the Company, as assigned to a Member under the terms of this Agreement as set forth on Exhibit A, as amended from time to time.

1.2. Rules of Construction. The following rules of construction shall apply to this Agreement:

1.2.1 The titles of the Articles and Sections herein have been inserted as a matter of convenience and reference only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

1.2.2 All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders and the singular shall include the plural and vice versa, as the context may require.

1.2.3 The term "including" shall in all cases be interpreted as "including, but not limited to."

1.2.4 Each provision of this Agreement shall be considered severable from the rest, and if any provision of this Agreement or its application to any Person or circumstances shall be held invalid or contrary to any existing or future law or unenforceable to any extent, the remainder of this Agreement and the application of any other provision to any Person or circumstances shall not be affected thereby and shall be interpreted and enforced to the greatest extent permitted by law so as to give effect to the original intent of the parties hereto.

1.2.5 Unless the context clearly requires otherwise, words such as "hereof," "herein," "hereunder" and similar terms shall refer to this entire Agreement (including exhibits hereto) and not to a particular Section or provision, references to particular Sections shall refer to the Sections of this Agreement, and this Agreement shall not be construed against the drafter of this Agreement.

**ARTICLE II – ORGANIZATIONAL MATTERS**

2.1. Formation. Pursuant to the Act, the Members have initially formed a Delaware limited liability company under the laws of the State of Delaware through the filing of the Certificate with the State of Delaware. In February ___, 2021, Merri Gleckler, through MerriG, LLC, converted the Company to an Arizona Limited Liability Company by filing the requisite paperwork with the Secretary of State for the State of Delaware as well filing Articles of Organization with the Secretary of State of the State of Arizona. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2. Name and Qualification. The name of the Company shall be "TMG Kreations, LLC". The business and affairs of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager may deem appropriate or advisable. Any authorized officer shall file any fictitious name certificates and similar filings and any amendments thereto, that the Manager deems appropriate or advisable. In addition to the Certificate, an authorized officer shall prepare and file in each jurisdiction where such filing is appropriate such additional documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company in each jurisdiction in which the Company shall conduct business.

2.3. Term. The existence of the Company commenced on the date of the filing of the Certificate with the State of Arizona, and shall continue until the Company is dissolved in accordance with the provisions of this Agreement and the Certificate is cancelled in accordance with the Act.

2.4. Registered Office; Principal Place of Business; Other Offices. The Company's registered office shall be ________________________________________. The principal place of business of the Company shall be at ________________________________________, or at such other place as the Manager may designate from time to time, which need not be in the State

of Arizona. The Company may have such other offices as the Manager may designate from time to time.

2.5. Title to Property. All real and personal property owned by the Company, including, but not limited to, all real and personal property (tangible and intangible) which may be contributed by the Members to the Company from time to time, shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in such Member's individual name or right. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

2.6. No State Law Partnership. The Members intend that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes. The Members intend that the Company not be a partnership or joint venture for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.7. Purpose and Powers. The character and purpose for which the Company is formed, in general, is to engage in any lawful act or business activity for which limited liability companies may be formed under the Act and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.

**ARTICLE III – CAPITAL CONTRIBUTIONS**

3.1. Capital Contributions.

3.1.1 Each of the Members has contributed as of the date hereof such Member's Capital Contribution to the Company.

3.1.2 Initial Services Contributions. In addition to the Initial Cash Contributions set forth herein, Dean has also contributed personal services utilized in the operation of the Company as part of their contribution to the Company in return for their respective Membership Interests.

3.1.3 Vesting Schedule. Dean's Membership Interest shall not fully vest for a period of three years from the effective date of this Agreement. In the event that Dean resigns or is terminated prior to the Membership Interests being fully vested, Dean shall surrender his Membership Interests in the Company without payment of any compensation or consideration. However, in the event that Company is sold or there is some other change of control, Dean's Membership Interests shall immediately vest immediately prior to the sale and he shall be entitled to share pro rata in the increase of valuation of the Company from the date of this Agreement until the Closing. Notwithstanding the foregoing, Dean will be entitled to attend and participate in Member Meetings but will not be entitled to vote until his Membership Interest is fully vested.

3.1.4 Capital Call. The Manager, in the event that she deems that the Company needs

additional capital, shall have the authority to issue a capital call to the Members. The Members shall be entitled, but not required, to make additional Capital Contributions in amounts that are proportionate to their respective number of Units. If any Member declines to make its proportionate additional Capital Contributions, the Units shall be adjusted as reasonably determined by the Manager to reflect the additional Capital Contributions made by other Members.

3.1.5 The Manager shall not be required to require a Member to restore any negative balance in such Member's Capital Account, whether upon the liquidation of the Company or otherwise.

3.2. Return of Contributions. A Member is not entitled to the return of any part of the Member's Capital Contribution, or to be paid interest in respect of the Member's Capital Account or Capital Contribution. An un-repaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.3. Advances by Members. To the extent the Manager determines that the Company requires additional funds in connection with its business, the Company shall first endeavor to secure third party financing for such funds on commercially reasonable terms prior to obtaining a loan from any of the Members. If the third party lender requires a Member guarantee in connection with such third party financing, each Member shall fully cooperate with the Company and shall execute a personal guarantee. If such third party financing is not available or if the Manager determines that exigent circumstances require an immediate need for funds, then the Company may seek such funds through a loan from the Members. If the Company elects to seek such funds through a loan from the Members, then each Member shall have the option but not the obligation to lend the Company an amount equal to such Member's pro rata share (based on such Member's Membership Interest) of the amount of funds that the Company is seeking to borrow from the Members. Each such loan shall: (a) be made on terms and conditions that are the same for all Members that elect to participate in that loan; (b) be evidenced by one or more written promissory notes and such other documents as are acceptable to the Company and to each Member who elects to participate in that loan; and (c) have equal priority with all outstanding loans to the Company from the Members. To facilitate this process, the Manager shall send written notice to each Member setting forth the amount of the loan requested by the Company, how the loan proceeds will be used by the Company, and a reasonable period of time during which the Members can consider the Company's request. If a Member fails to loan the funds that the Member is entitled to loan to the Company, then each of the participating Members may loan an additional amount equal to such participating Member's pro rata share of the non-participating Member's share of the loan or any other proportion of the non-participating Member's share of the loan as all of the participating Members may agree.

3.4. Capital Accounts. The Company shall maintain an individual Capital Account for each Member in accordance with the provisions of Section B.2 of Exhibit B.

3.5. No Withdrawal. No Member shall have the right to withdraw such Member's

Capital Contributions or to demand and receive property of the Company or any distribution in return for such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by the Act.

## ARTICLE IV – ISSUANCE OF UNITS; MEMBERS

4.1. Authorization and Issuance of Units.

4.1.1 Authorized Units. The aggregate equity in the Company shall be divided into such number and class of Units, or other form of equity, including, but not limited to, common or preferred Units, rights, profit units, options, warrants exercisable for, or convertible into, Units, or other securities or instruments of any type or class whatsoever, (collectively, the "***Equity Securities***"), including fractional interests, as may be issued and outstanding from time to time by the Manager in its sole discretion, upon the affirmative vote of the Manager. Any such Equity Securities may be issued for cash, property, services, satisfaction of existing obligations or such other type, form, and amount of consideration (including notes, other evidences of indebtedness or obligations of the Person acquiring the interest, instrument or security, as the case may be) as the Manager may determine to be appropriate in her sole discretion. Any such issuance may be made by the Company by setting forth either in an amendment or an addendum to this Agreement, the relative rights, obligations, duties, and preferences of each new class or series of Units created and reflecting all necessary adjustments. A copy of this Agreement as so amended, or the addendum as so adopted, as the case may be, shall be provided to each Member upon written request therefor. All filings necessary to be made under the Act or applicable law in connection with the creation of such interests shall be made by an authorized officer.

4.1.2 Issuance. As of the date hereof, each Member owns the number of Units set forth next to his, her or its name on Exhibit A. The name, residence, business or mailing address and Percentage Interest of each Member are also set forth on Exhibit A.

4.2. Issuance of Additional Units. The Manager may, from time to time, cause the Company to issue additional Units to new or existing Members in exchange for such Capital Contributions as the Manager may determine. A Person shall be admitted as a new Member at such time as such Person makes the Capital Contribution required by the Manager, executes and delivers a counterpart copy of this Agreement and satisfies such other conditions as may be required by the Manager. In connection with the issuance of such additional Units, the Manager shall cause Exhibit A to be amended to reflect the issuance of such additional Units, the admission of any additional Members and the adjustment of the Percentage Interests of all the Members. Persons who are subsequently admitted as Members shall execute this Agreement either by counterpart or amendment. When any Person is admitted as a Member or ceases to be a Member, the Manager shall prepare a revised version of Exhibit A and distribute it to all the Members.

4.3. Record Holders of Units. The Company shall be entitled to treat the Person in whose name any Units of the Company stand on the books of the Company as the absolute owner thereof. The Company shall not be bound to recognize any equitable or other claim to, or interest

in, such Units on the part of any other Person, whether or not the Company has express or other notice of any such claim.

4.4. Evidence of Units. The evidence of the amount of Units held by a Member or Assignee shall be reflected in the books and records of the Company, including but not limited to the Schedule A to this Agreement. The Company shall not issue certificates of ownership.

4.5. Conflicts of Interest, Related Party Transactions and Other Activities. Any Member and any Affiliate of any such Member, and any of their respective directors, officers, members, partners, stockholders, employees, or controlling persons may engage in or possess an interest in any business or activity, without any accountability to the Company or any other Member, and without obligation to offer such business opportunity to the Company or any other Member. No such Person shall be liable to the Company or any other Member for breach of any fiduciary or other duty, as a Member or otherwise, by reason of the fact that such Person acquires or pursues such opportunity or directs such opportunity to another person, except for any Member that agrees otherwise pursuant to a separate agreement with the Company or any other direct or indirect subsidiaries or Affiliates of the Company; *provided, however*, that nothing in this Section 4.5 or in such separate agreement shall be construed to relieve or excuse any Person from his, her or its obligations under Section 4.14 or any employment agreement, non-use, non-disclosure, non-compete, non-solicitation, covenant-not-to-compete or similar covenant in this Agreement or any other agreement between such Person and the Company.

4.6. Limited Liability. The Members, as such, shall not be personally liable for any debt, obligation or liability of the Company, whether such debt, obligation or liability arises in contract, tort or otherwise.

4.7. Powers of Members. Except as provided herein, a Member in his, her or its capacity as such shall not have the authority or power to act for or on behalf of the Company or otherwise bind the Company in any way.

4.8. No Right of Partition. A Member shall not have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular assets of the Company and notwithstanding any provisions of applicable law to the contrary, each Member (and its successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his, her or its Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

4.9. No Appraisal Rights. No Member shall be entitled to any appraisal rights with respect to such Member's Units, whether individually or as part of any class or group of Members, even in the event of a Sale Transaction or other transaction involving the Company, the Units or the Equity Securities of the Company unless such rights are expressly granted by the Members holding at least a majority of the issued and outstanding Units.

4.10. No Dissenter's Rights. No Member shall be entitled to exercise any dissenter rights with respect to such Member's Units or Equity Securities, whether individually or as part of

any class or group of Members, in the event of a Sale Transaction or other transaction involving the Company, the assets of the Company, the Units or the Company's Equity Securities unless such rights are expressly granted by the Members holding at least sixty six and two thirds percent (66.67%) of the issued and outstanding Units.

4.11. Voluntary Withdrawal. No Member shall have the right or power to voluntarily withdraw from the Company without the express written consent of the Manager. Any withdrawal in violation of this Agreement shall entitle the Company to damages which may be offset against the amounts otherwise payable as a distribution to such Member purporting to withdraw from the Company.

4.12. Member Assurances. Each Member agrees to execute such further documents, instruments and agreements as the Manager deems necessary to further effect and carry out the intentions and provisions of this Agreement.

4.13. Agreements with Members. The Company may, upon approval by the Manager in its sole discretion, enter into employment agreements, consulting agreements or other appropriate agreements with some or all of the Members providing for the provision of personal services to the Company; *provided, however*, the agreements shall be on terms and conditions no less favorable than the Company could have obtained from any third party providing such goods or services.

4.14. Voting; Action by Members. With respect to all matters to be decided or voted on by the Members pursuant to the terms of this Agreement or the Act, each Member shall have one vote for each Unit held by such Member. All decisions of the Members must be approved by Members holding at least majority of the issued and outstanding Units, unless a greater percentage is required by this Agreement or the Act.

4.15. Meetings of Members.

4.15.1 General. An annual meeting of the Members for the transaction of such business as may properly come before the Members shall be held on such date and at such time as the Manager shall fix and set forth in the notice of such annual meeting. Special meetings of the Members for any proper purpose or purposes may be called at any time by the Manager or Members holding at least a majority of the issued and outstanding Units. Only business within the purpose or purposes described in the notice of the special meeting may be conducted at a special meeting. A meeting of the Members shall not be organized for the transaction of business unless a quorum is present. The presence, whether in person or by proxy, of Members holding at majority of the issued and outstanding Units shall constitute a quorum for the purposes of consideration and action on the matter. The Members present at a duly organized meeting can continue to do business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum. All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Arizona as shall be specified or fixed in the notice thereof.

4.15.2 Notices. Notice of a meeting of Members shall be given to the Members:

(i) Personally at least two (2) Business Days prior to the Meeting;

(ii) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of each Member appearing on the books of the Company (notice pursuant to this paragraph shall be deemed to have been given when deposited in the United States mail five (5) Business Days prior to the meeting date or with the courier service at least three (3) Business Days prior to the meeting date); or

(iii) By facsimile transmission, e-mail or other electronic communication to the facsimile number or address for e-mail or other electronic communications supplied by a Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given when sent.

4.15.3 Waiver of Notice. A waiver of notice of a meeting signed by the Member entitled to the notice, whether before or after the meeting, shall be deemed equivalent to the giving of the notice. Attendance of a Member at a meeting constitutes a waiver of notice, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

4.16. Action by Consent or Remote Participation.

4.16.1 Action by Consent. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting, without prior notice, and without a vote, upon the consent of Members who would have been entitled to cast the minimum number of votes that would be necessary to authorize the action at a meeting at which all Members entitled to vote thereon were present and voting unless a greater percentage is required under this Agreement or by applicable law. The consents shall be in writing or in electronic form and shall be filed with the Manager. Prompt notice of the taking of an action by less than unanimous consent of the Members, if such consent is permitted by this Agreement, shall be given to each Member entitled to vote thereon who has not consented thereto.

4.16.2 Remote Participation. The presence or participation, including voting and taking other action, at a meeting of Members, by conference telephone or other electronic means, including, without limitation, the Internet, Zoom, Microsoft Teams, Skype, or any other type of video conference, shall constitute the presence of, or vote or action by, the Member.

## ARTICLE V– MANAGEMENT OF THE COMPANY

5.1. Management. Except for any actions requiring or authorizing Member action described herein, all matters pertaining to the management of the Company, including the day-to-day management of the Company, shall be vested in the Manager. The Manager shall direct, manage, oversee, and control the business and operations of the Company. The Manager may appoint such officers as she deems appropriate. The officers shall perform such duties as the Manager shall determine. Except as otherwise set forth herein, other than the Manager, no other Person is permitted or authorized to take part in, or interfere in any manner with, the

management, conduct or control of the business and affairs of the Company, and no other Person shall have any right or authority to act for or bind the Company, unless such Person is an officer of the Company elected by the Manager or otherwise authorized pursuant to a written employment agreement approved by the Manager. The Initial Manager shall be Merri Gleckler, who shall serve as the Manager until her death, resignation, retirement or the sale of her Membership Interest.

5.2. Resignation of Manager, Death of Manager and Election of New Manager. Any Manager appointed pursuant to this Agreement may resign at any time upon written notice given to the Members. Any vacancies created by the resignation, removal or death of a Manager shall be filled by the majority vote of the Members.

5.3. Officers; Delegation and Duties. The Company may have such officers as shall be necessary or desirable to conduct its business. The Manager may appoint a Member, Manager or other Person to serve as an officer of the Company. The Manager may assign titles to the officers it appoints. As of the date hereof, Merri Gleckler shall be appointed to the office of the Chief Executive Officer and Founder and (ii) Dean Dassias shall be appointed to the office of President. Each officer shall devote a sufficient amount of time to enable her or him to satisfactorily fulfill her or his duties and responsibilities to the Company. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Manager. In the event that an officer appointed by the Manager fails to perform his or her duties and responsibilities, the Manager shall be entitled to remove that person from his or her role as an officer of the Company. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Manager.

5.4. Reimbursement. The Company shall reimburse the Manager for all reasonable and documented out-of-pocket expenses, fees, costs and disbursements incurred by the Manager in connection with her service of the Manager.

5.5. Limitation of Liability. A Manager shall not be personally liable, as such, for monetary damages (other than under criminal statutes and under federal, state and local laws imposing liability on a Manager for the payment of taxes) for any action taken, or any failure to take any action, unless the Manager's conduct constitutes self-dealing or willful misconduct. No amendment or repeal of this Section 5.5 shall apply to or have any effect on the liability or alleged liability of any Person who is or was a Manager for or with respect to any acts or omissions of the Manager occurring prior to the effective date of such amendment or repeal. If the Act is amended to permit a Pennsylvania limited liability company to provide greater protection from personal liability for its Manager than the express terms of this Section 5.5, this Section 5.5 shall be construed to provide for such greater protection.

## ARTICLE VI – DISTRIBUTIONS AND ALLOCATIONS

6.1. Distributions.

6.1.1 General Rule. Prior to the liquidation and winding up of the Company, if the Manager determines, in her sole discretion, that the Company has cash in excess of the reasonable needs of the Company's business, after providing for reasonable reserves for working capital, debt service and future expenditures, the Manager in her sole discretion, may authorize the Company to make distributions to the Members. All distributions made to the Members prior to the liquidation and winding up of the Company shall be made to the Members in accordance with their respective Percentage Interests.

6.2. Return of Distributions. Except for distributions made in violation of the Act or this Agreement, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

6.3. Limitations on Distribution. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of his, her or its Units in the Company (i) if the distribution would violate the Act or other applicable law, or (ii) if such distributions are prohibited by any contract to which the Company is a party or by which the Company is bound, unless such distributions are required by law. The Members acknowledge that all payments to any Member in exchange for services performed or to be performed shall be deemed a "guaranteed payment" as such term is defined under Section 707(c) of the Code.

6.4. Allocations of Profits and Losses. Profits and Losses and, to the extent required, individual items of income, gain, loss or deduction, shall be allocated in accordance with Exhibit B.

6.5. Tax Withholding and Payments Attributable to Members.

6.5.1 All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state or local tax law with respect to an amount actually distributed to a Member under this Agreement shall be treated as amounts actually distributed to such Member for all purposes under this Agreement of the same type as the distribution giving rise to the withholding obligation.

6.5.2 In the event that applicable tax law requires the Company (or any third party acting on behalf of or with respect to the Company) to pay or withhold any amount on behalf of or with respect to a Member (other than any amount required to be withheld from actual distributions in accordance with Section 6.5.1), including any amount allocable to a Member under Section 10.12(d)(iii)(d) that the Company is obligated to pay in accordance with Code Section 6225 (as amended by the BBA), then such amount (the "***Tax Advance***") shall be paid by the applicable Member to the Company within 30 days after written notice from the Company, plus interest accruing after the expiration of such 30-day period at a rate equal to eight percent (8%) per annum on the amount that such Member fails to pay to the Company on a timely basis. In addition to any other rights of the Company to enforce its entitlement to

receive payment of such Tax Advance, the Company shall offset the unpaid balance of such Tax Advance against distributions to which the applicable Member otherwise would be entitled under this Agreement, and the amount so offset shall be deemed for all purposes of this Agreement to be a distribution to such Member followed by a payment of such Tax Advance to the Company, in whole or in part, as the case may be. Any Tax Advance paid (or deemed to be paid) by a Member to the Company under this Section 6.5.2 shall not be treated as a Capital Contribution for purposes of this Agreement. A Member's obligations under this Section 6.5.2 shall survive the transfer of its Units, the termination of this Agreement and the dissolution of the Company.

## ARTICLE VII – TRANSFER OF INTERESTS

7.1. Restrictions on Transfer of Units. Unless approved by the Manager, no Member shall sell, transfer or otherwise dispose of any Equity Securities held by such Member other than in compliance with this Article VII. Any Transfer or attempted Transfer by a Member in contravention of this Agreement shall be null and void and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, (i) the purported transferee shall have no right to any Profits, Losses or distributions of the Company or any other rights of a Member; and (ii) both the purported transferor and the purported transferee, jointly and severally, shall indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages (including, without limitation, tax liabilities, loss of tax benefits and reasonable attorney's fees and costs) arising directly or indirectly as a result of the attempted Transfer or efforts to enforce this Agreement.

7.2. Permitted Transfers. A Member shall be permitted to Transfer any or all of such Member's Units free of the requirements under this Section to any or all of (i) am existing Member of the Company, (ii) one or more of the Persons that is a Member immediately prior to such Transfer, (ii) a trust which has as its sole beneficiaries Persons described in the preceding clauses (a Member's living trust), and (iii) the Company (each an "Approved Transferee" and collectively the "Approved Transferees"); provided that such Transfer otherwise complies with the terms of this Article 7 and that concurrently with or prior to any such Transfer, the Company, at its option, shall have received an opinion of counsel acceptable to the Company that such Transfer complies with all applicable federal and state securities laws.

7.3. Right of First Refusal. If at any time any Member obtains an unsolicited Bona Fide Offer for the purchase of all or any portion of such Member's Units, such Member (for purposes of this Section 7.3, the "***Selling Member***") shall give written notice thereof (the "***Selling Member's Notice***") to the Company, stating: (i) the identity of the proposed transferee and a description of the Units proposed to be transferred (the "***Offered Units***"); (ii) the value of the consideration to be received by the Selling Member therefor; and (iii) the other terms and conditions of such transaction, and the Selling Member will offer to sell the Offered Units to the Company and the Other Members (as hereinafter defined) in accordance with the terms of this Section 7.3 at the price and on the same terms and conditions as in the Selling Member's Notice.

7.3.1 Upon receipt of the Selling Member's Notice, the Company shall have thirty (30) days to determine whether the Company shall purchase all or a portion of the Offered

Units. The offer to purchase the Offered Units shall be deemed rejected unless, within thirty (30) days after the receipt of the Selling Member's Notice, the Company gives the Selling Member a written notice of acceptance of the offer to sell all or a portion of the Offered Units.

7.3.2 If the Manager determines that the Company shall purchase none or less than all of the Offered Units, the Company shall provide written notice to the other Members (the "***Other Members***") of its receipt of such Selling Member's Notice, including a copy thereof, and setting forth the portion of the Offered Units which shall be available for purchase by the Other Members. The Other Members who desire to purchase some or all of the available Offered Units shall provide a notice in writing to the Selling Member within thirty (30) days after the expiration of the period set forth in Section 7.3.1. If more than one Other Member desires to purchase all or a portion of the Offered Units, then such Other Members will have the right to purchase the Offered Units (or the portion thereof offered to the Other Members) in proportion to their respective Percentage Interests, or in such other proportion as they may mutually agree. The closing of a purchase and sale of Units pursuant this Section 7.3 shall take place at the principal office of the Company within sixty (60) days after such option shall have been duly exercised.

7.3.3 The Selling Member may sell, transfer or otherwise dispose of the Offered Units that are not so purchased by the Company or the Other Members to the proposed transferee on the terms and conditions specified in the Selling Member's Notice for thirty (30) days following the expiration of the time periods during which the Company and the Other Members were entitled to accept the offer to purchase the Offered Units. If the Offered Units shall not be so sold or otherwise disposed of by the Selling Member during such thirty (30) day period, the Offered Units will again be subject to the restrictions of this Agreement. Any modification of the terms of an Offer as set forth in or attached to the Offer Notice shall constitute a new offer which shall again be subject to all of the requirements and procedures of this Section 7.3.

7.3.4 Rights of Transferees Pending the Exercise or Expiration of Option. If any Units shall be transferred in a transaction or by reason of an event which gives rise to an option exercisable by the Company to purchase such Units, the transferee thereof shall not be entitled to vote such Units or otherwise to exercise any of the rights of a registered holder thereof until the time shall have expired (i) for the exercise of such option or (ii) if such option shall be exercised, for the completion of settlement of such purchase.

7.4 Purchase on Death, Permanent Disability or Termination.

7.4.1 Upon the death of any Member (the "Deceased Member"), the Deceased Member shall be treated as if such Member received an Offer under Section 6.3(a) with a deemed Offer Price equal to the Agreed Value (as defined in Section 6.4(d) below), and the Company or the remaining members ("Remaining Members") shall be obligated to purchase such Offer Interest with the purchase price paid in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. Upon the permanent disability of any Member (the "Disabled Member"), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Disabled Member's Membership Interest at a purchase price equal to the Agreed Value, payable in thirty-

six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. A Member will be considered disabled for purposes of this Agreement if such Member is unable to perform the duties and responsibilities required of such Member by the Company or the Manager by reason of mental or physical illness, incapacity or impairment for a continuous period of not less than six months (and, if requested by the Company, such Member shall provide a written opinion of a licensed physician regarding his condition). Upon the termination of employment of any Member ("Terminated Member") employed by the Company (other than a termination due to death or disability as provided above), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Terminated Member's Membership Interest at a purchase price equal to the Agreed Value. In the event the termination was involuntary and for cause (as "cause" is defined in such Terminated Member's employment agreement), the purchase price shall be reduced by twenty-five percent (25%). If the Company or Remaining Members exercise the option to acquire the Terminated Member's Offer Interest, payments shall be made in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum.

7.4.2 Insurance. The Company, at its option, may obtain and become the owner of life insurance policies on the lives of the Members. The Company shall name itself as the beneficiary of the policies. The policies and any proceeds received thereunder shall be held by the Company in trust for purposes of this Operating Agreement. The Company shall have the right to take out additional insurance on the life of any Member, whenever it may be reasonable necessary to carry out its obligations under this Operating Agreement. If the Company shall receive any proceeds of any life insurance policy on the life of a Member, such proceeds shall be used by the Company to pay the purchase price to the Deceased Member's estate. Any excess insurance proceeds following the payment for the Deceased Member's Membership Interests and debts of the Member shall be retained by the Company.

7.4.3 Preemptive Rights. Each Member shall have the right to purchase its proportionate share of any additional Capital Interests to be issued by the Company such that upon any such issuance of additional Capital Interests, each Member, if it so elects to purchase, will retain the same proportionate Capital Interest in the Company.

7.4.4 Valuation; Determination of Purchase Price. The Members shall meet each year (the "Valuation Meeting") in Scottsdale, Arizona or at such location as set forth in the Notice of Meeting between the dates of __________ 1st through 30th (as they may mutually agree) to review and determine the fair market value of the Company (the "Agreed Value"). Prior to such meeting, the Members shall have compiled sufficient financial statements and other necessary information to enable a reasonable judgment on the Agreed Value. There shall be no minority, "lack-of-control" or other related discounting of any such Membership Interest. The Members shall thereafter debate any differences of opinion and establish a final agreement on the Agreed Value of each such Membership Interest. The Agreed Value shall be set forth and each Member shall sign and date a "Certificate of Value" in the form attached hereto and incorporated herein by reference as Exhibit "C". Upon complete execution by each Member of the Certificate of Value it shall be binding and conclusive in establishing the Agreed Value for purposes of this Agreement. In the event that the Agreed Value was not established for any reason (including because the Members could not agree on a value) for a period of two years at the time of a triggering event, the Member and the Company shall

each select an independent appraiser to determine the value of a Member's Interest at the time of the triggering event. In the event the two appraisers cannot agree on a price, they shall appoint a third appraiser who shall determine the value of the Company at the time of the triggering event and said decision shall be binding upon the parties and shall constitute the Agreed Value. In the event of a change of control for Dean's Membership Interests, the valuation for his Membership Interests shall be based on the difference of the Initial Value of the Company and the Valuation of the Company at the time of the triggering event multiplied by his Membership Interests (such that Dean shall only be entitled to an increased value of the Company and his Membership Interests).

7.5. Drag Along Right.

7.5.1 Notwithstanding any other provision of this Agreement to the contrary, the Members holding at least sixty six and two thirds percent (66.67%) of the issued and outstanding Units (the "***Majority Holders***") shall have the right (the "***Drag Along Right***"), exercisable by notice (the "***Drag Along Notice***") to the other Members ("***Minority Members***"), to require the Minority Members to sell all (but not less than all, unless the Majority Holders are selling less than all of the Majority Holder's Units, in which case the Minority Members will be obligated to sell only the same proportion of their Units as the Majority Holders are selling) of the Units owned by the Minority Members to the purchaser (who shall be bona fide and named in the Drag Along Notice, together with the terms and conditions of the Sale Transaction, which shall be arm's length), such Sale Transaction to take place contemporaneously with, and on the same terms and conditions of, the sale of the Units by the Majority Holders.

7.5.2 If the Manager and the Majority Holders approve any Sale Transaction, pursuant to this Section 7.5, each Minority Member will be obligated to (i) vote for and raise no objections to the Sale Transaction, (ii) sell, exchange, redeem, agree to cancel or otherwise dispose of such securities or options, warrants or other rights on the terms and conditions approved by the Majority Holders if such transaction includes the sale, exchange, redemption, cancellation or other disposition of securities convertible into or exchangeable for Units, or options, warrants or other rights to purchase such Units, and (iii) take all other necessary or desirable actions, including, without limitation, providing access to documents and records of the Company, entering into an agreement reflecting the terms of such sale, surrendering certificated Units, if applicable, giving customary and reasonable representations and warranties as to title and authority of such Minority Member, joining on a pro-rata basis the indemnification obligations in accordance with the consideration received in such transaction and executing and delivering any certificates or other documents, reasonably requested by the Majority Holder to consummate such transaction. Any Drag Along Notice may be rescinded by the Majority Holder at any time prior to the closing of such transaction by delivering written notice thereof to all of the Minority Members.

7.6. Commercially Reasonable Efforts to Relieve Selling Member of Obligation for Company Debt. If the Company or any other Member shall purchase the Units of any Member pursuant to this Agreement, such purchaser(s) shall use their commercially reasonable efforts to cause to be terminated, on or before the date for settlement of such purchase, any contingent obligation of such Member (by guaranty, suretyship or otherwise) for indebtedness and other

obligations of the Company.

7.7. Failure to Offer or Transfer Units. If any Person whose Units are subject to purchase hereunder does not assign and transfer such Units to the purchaser after receipt or tender of the purchase price, such tender and receipt will result in an immediate transfer of such Units to the purchaser, subject to the applicable requirements of Section 7.7.

7.8. Conditions to Transfer. In addition to the other requirements of this Agreement, no Member shall be entitled to transfer all or any part of such Member's Units unless all of the following conditions have been met: (a) the Company shall (at its option) have received an attorney's written opinion, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed transfer, and stating that the proposed transfer will not violate of any of the registration provisions of the Securities Act of 1933, as amended, or any applicable state securities laws; (b) the Company shall have received from the transferee a written consent to be bound by all of the terms and conditions of this Agreement and the transferee executes such documents and instruments as the Manager may reasonably request as necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement; (c) the transfer will not result in the loss of any license, regulatory approval, certification as a WBE, or an exemption that has been obtained by the Company, or result in a default under or breach or termination of any contract to which the Company is a party, and in each case that is materially useful in the conduct of its business as then being conducted or proposed to be conducted; (d) the Company is reimbursed for all reasonable legal, filing, publication, accounting and all other expenses the Company incurs in connection with the admission of the transferee as a Member; (e) the Company shall have received a certificate signed by the selling Member certifying that the Units are being transferred free and clear of all Liens, and all other documents that counsel for the Company or the purchasing Member, as applicable, shall reasonably deem necessary or advisable in order to accomplish a complete transfer of the Units free and clear of Liens; and (f) a written release by the selling Member of all claims against the Company and the other Members in a form satisfactory to counsel for the other Members and the Company.

7.9. WBE Certification. Any and all provisions of this Agreement are subject to the WBE Requirements and any conflicts between the terms hereof and the Certification Requirements shall be resolved in favor of compliance with the Certification Requirements. Each of the Members shall take all action to assist the Company in compliance with the Certification Requirements, shall take no action which shall result in the Company's failure to comply therewith, and, absent any agreement to the contrary, the rights of the Members shall in all cases be subject to change as necessitate by the Certification Requirements.

7.10. Allocation With Respect to Transferor's Interest. Upon a Transfer of all or any part of a Member's Units in accordance with this Article VII, each item of Company income (or loss) and deduction allocable to such Units (aside from gains or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business) may be prorated (as to the transferred Units) between the transferor and transferee on the basis of the number of days in the taxable year of the Company preceding (and including) and succeeding, respectively, the

date as of which the instrument evidencing the Transfer is executed. Gain or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business shall be allocated to the Persons who were Members at the time such gain or loss was recognized by the Company. Notwithstanding anything to the contrary, however, the allocations under this Section 7.10 may be varied for any transfer by agreement of the transferor and transferee, *provided* that such agreed upon allocation is permissible under Federal income tax law.

7.11. Effect of Transfers and Admission of Transferee.

7.11.1 A Transfer by a Member or other Person shall not itself entitle the transferee to become a Member or exercise any rights of a Member unless approved by the Manager.

7.11.2 A Transfer shall not otherwise eliminate the transferring Member's entitlement to any rights associated with the transferring Member's Units and shall not cause the transferring Member to be released from any liability to the Company solely as a result of the Transfer.

7.11.3 Notwithstanding the admission of a transferee as a Member, the transferor shall not be released from any obligations to the Company existing as of the date of the Transfer, but such admission shall cause a transferor that is a Member (A) to cease to be a Member with respect to the Units transferred when the transferee becomes a Member and (B) to be released from any obligations arising after the date of such Transfer solely with respect to the Units transferred.

7.11.4 When the transferee of a Unit becomes a Member in accordance with this Agreement, the transferee shall be entitled to all rights of the transferring Member under this Agreement with respect to the Units Transferred.

7.12. Effective Date. Any Transfer and any related admission of a Person (other than an existing Member) as a Member in compliance with this Article VII shall be deemed effective on such date that the transferee or successor in interest complies with the requirements of this Agreement.

7.13. Restrictions Continue After Transfer. After the effective date of any transfer of all or a portion of a Member's Units in accordance with this Agreement, the Units so transferred shall continue to be subject to the terms, provisions and conditions of this Agreement and any further transfers shall be required to comply with all of the terms, provisions and conditions of this Agreement. Any transferee of a Member's Units shall take such Units subject to the restrictions on transfer imposed by this Agreement.

## ARTICLE VIII – REPRESENTATIONS, WARRANTIES, AND COVENANTS

Each Member hereby represents, warrants, and covenants that:

8.1 Due Organization; Authorization of Operating Agreement. If the Member is a corporation or other business entity, such Member is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, has the power and authority

to execute and deliver this Operating Agreement and to perform its obligations hereunder, and the execution, delivery, and performance of this Operating Agreement have been duly authorized by all necessary action. This Operating Agreement constitutes the legal, valid, and binding obligation of such Member.

8.2 No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Operating Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of: (a) any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member; or (b) any of the terms, conditions, or provisions of the organizational or governance documents of such Member if it is a corporation or other business entity or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of his, her, or its material properties or assets is subject.

8.3 Securities. Such Member is acquiring his, her, or its Membership Interest only for his, her, or its own account and not on behalf of any other Person, and only for the purpose of holding for investment and not with a view to any further distribution thereof. No other Person is participating with, or providing or otherwise arranging funds, or credit for such Member in respect to the acquisition of his, her, or its Membership Interests. Except as contemplated by ARTICLE VII of this Agreement, such Member has no agreement, arrangement, or understanding for transfer of any part of his, her, or its Membership Interest to any other Person. Subject to and in addition to all of the restrictions on transfer contained in this Operating Agreement, such Member shall not offer for sale or sell any part of his, her, or its Membership Interest except upon acceptance by the Company of an opinion of counsel for the purchaser in such form as is satisfactory to counsel for the Company that registration under federal and state securities laws is not required. Such Member (a) either has such knowledge and experience in financial and business matters, or has the advice or representation of a person or entity having such knowledge and experience, to be able to evaluate the merits and risks of his, her, or its investment in the Company or has been given or had access to sufficient information regarding the Company to evaluate the investment in his, her, or its Membership Interest being acquired, and (b) is able to bear the economic risk of the investment in his, her, or its Membership Interest and to hold the same for purposes of investment. Such Member is aware that no market exists for the resale of his, her, or its Membership Interest.

8.4 Confidentiality. Each Member and Manager acknowledges that the nonpublic data and records maintained by the Company and its Affiliates pertaining to its or their business, including, without limitation, intellectual property, technical information, trade secrets, product formulae, data and know-how, business and marketing plans and reports, design materials, documentation and information respecting customers and prospective customers, vendors, partners and employees, product specifications, data, know-how, techniques, methods, processes, designs, sketches, photographs, graphs, drawings, inventions and ideas, past, current and planned research and development, customer lists, names or addresses, current and anticipated customer requirements, price lists, market studies, business plans and any other



 

information and financial information and data, (such nonpublic information is hereinafter referred to as "***Confidential Information***") are valuable and unique assets of the Company. Each Member and Manager agrees that he, she or it will not, without the written consent of the Manager, disclose to any person, firm or corporation, or use for any purpose whatsoever, except in connection with and furtherance of the business of the Company, any Confidential Information, *provided* that no provision of this Agreement shall be construed as precluding the disclosure of Confidential Information if such disclosure is required by law or a court order. If disclosure of Confidential Information is required by law or court order, the affected Member or Manager shall give written notice to the Manager prior to making such disclosure so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the affected Member or Manager is, in the opinion of its counsel, compelled to disclose any Confidential Information under pain of liability for contempt or other censure or penalty, such affected Member or Manager may disclose only that portion of such Confidential Information as is legally required without liability hereunder; *provided* that the affected Member or Manager agrees to exercise his, her or its reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. Upon a withdrawal, removal or resignation, as applicable, such Member or Manager shall forthwith deliver to the Company immediately all Confidential Information and other property of the Company in his, her or its possession and will not make or retain copies of any thereof, except as may be required by applicable law or court order.

8.5 Non-Disclosure of Confidential Information.

(a) During the time that each party is a Member of the Company and for two (2) years after a Member ceases to be affiliated with the Company in any manner, each Member acknowledges that he will be afforded access to Confidential Information (as defined below); that public disclosure of such Confidential Information would have an adverse effect on the Company and its business; and that the provisions of this Section are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b) Each Member agrees that while he, she, or it is a Member of the Company and for a period of two (2) years following the termination of the Member's affiliation with the Company, shall not communicate or divulge or use for the Member's benefit or any other persons, firm, corporation, or other entity any Confidential Information, and the Member shall hold in confidence the Confidential Information and shall not disclose it to any other person except with the specific prior written consent of the Company and the other Members.

(c) Any trade secrets of the Company shall be entitled to all of the protections and benefits under Arizona Statutes and any other applicable law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret of purpose of this Agreement. The Members hereby waive any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

(d) All price lists, customer lists, contact information, records, notebooks, plans, models, components, software, databases, marketing information, business plans, devices, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") shall be deemed proprietary to the Company. Upon the termination of a Member's Membership Interest in the Company, the Member shall return to the Company all of the Proprietary Items in his possession or subject to his control, and the Member shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(e) "Confidential Information" shall also mean any and all: (1) trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute; (2) information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented); and (3) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing.

8.6 Duty of Loyalty. Members shall devote their energies into the operation of this Company. Nevertheless, a Member may have other business interests and may engage in or invest in other activities in addition to those relating to the Company provided such business interests do not directly or indirectly compete with the Company and provided that such interests do not prevent or interfere with a Member's obligation to the Company. Each Member shall offer the Company and the other Members the opportunity to take advantage of a business opportunity she or he identifies that would be within the synergies of the Company. If the Company wishes not to explore a business opportunity presented by a Member, then and only then would a Member be entitled to take advantage of such opportunity. This provision does not preclude Merri from continuing her involvement in her other companies nor does it entitle Dean from any profits or proceeds from the operation of these businesses.

## ARTICLE IX – INDEMNIFICATION

9.1 Indemnification. The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person bad no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that

the Person had reasonable cause to believe that the Person's conduct was unlawful.

9.2 To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members. "Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civic, criminal, administrative, or investigative.

9.3 Standard of Care. Each Member, Manager, and officer (if any) shall perform such Person's duties in good faith, in a manner such Person reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Member, Manager, or officer who so performs the duties as a Member, Manager, or officer shall not have any liability by reason of being or having been a Member, Manager, or officer of the Company. In performing such Person's duties, the Member, Manager, or officer shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Members, Manager, officers, or employees whom such Member, Manager, or officer reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including lawyers or accountants, as to matters which such Member, Manager, or officer reasonably believes are within such Person's professional or expert competence. No Member, Manager, or officer shall be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved in a court of competent jurisdiction that such Person's action or failure to act (i) was not in good faith, (ii) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (iii) resulted in an improper personal benefit to such Person or any related party as determined by application of Code § 267(b) at the expense of the Company, (iv) constituted fraud or deceit, or (v) was a knowing violation of law.

9.3.1 Remedies. Each Party hereby acknowledges that with respect to disclosed Confidential Information, the Company would be irreparably harmed by a breach hereof by the Members or his or her Representatives and it may be difficult to estimate damages resulting from such a breach and, consequently, the Company shall be entitled to injunctive or such other equitable relief as may be appropriate to prevent a breach or threatened or continuing breach of this Agreement, and to secure the enforcement of this Agreement, without foregoing any legal relief to which the Company may otherwise be entitled to recover. In addition, the Company will be entitled to damages and expenses (including legal fees) to enforce the terms of this Agreement.

9.4 Expenses. Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

9.5 Nonexclusivity of Indemnification. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall not be deemed exclusive of any other rights to which an Indemnitee seeking indemnification or advancement of expenses may be entitled under any other provision of this Agreement, the Act, any statute or any insurance or other agreement with the Company, both as to actions in the Indemnitee's official capacity and as to actions in another capacity while holding that office. The Company may create and fund a fund of any nature, which may, but need not be, under the control of a trustee, or otherwise secure or insure in any manner (including by entering into agreements with its Indemnitees, employees and agents) its obligation to indemnify or advance expenses, whether arising under or pursuant to this Article IX or otherwise.

9.6 Modification. The duties of the Company to indemnify and to advance expenses to an Indemnitee provided in this Article IX shall be in the nature of a contract between the Company and each such Indemnitee, and no amendment or repeal of any provision of this Article IX, the Act or any other applicable law, including, without limitation, the Act, and no amendment or termination of any trust or other fund created pursuant to Section 9.4, shall alter, to the detriment of such Indemnitee, the right of such Person to the advance of expenses or indemnification related to a claim based on an act or failure to act which took place prior to such amendment, repeal or termination unless such actions are prohibited by applicable law. Notwithstanding anything to the contrary herein, if any change or amendment to the Act or any other applicable law allows for broader indemnification rights than as are provided in this Article IX, this Article IX shall be deemed to be automatically modified without any further action by the Members or the Manager to provide such broader indemnification rights to any Indemnitee. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be an Indemnitee, employee or agent of the Company and shall inure to the benefit of the executors, administrators, heirs, successors and assigns of that Person.

## ARTICLE X – BOOKS AND RECORDS; ACCOUNTING; EXPENSES; INSURANCE; TAX MATTERS

10.1. Books and Records. At all times during the continuance of the Company, the Company shall maintain, either at its principal place of business or at its accountant's principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's business. Such books of account, together with (i) a certified copy of this Agreement, all amendments thereto and of the Certificate, (ii) a current list of the full name and last known business or residence address each Member together with the contribution and share of the Profits and Losses of each Member, and (iii) copies of the Company's Federal, state and local tax or information returns and reports, if any, shall at all times be maintained at the principal place of business of the Company.

10.2. Delivery of Books and Records to Members and Inspection.

10.2.1 Subject to such standards as may be established by the Members, upon the

reasonable request of any Member for purposes reasonably related to the interest of that Person as a Member, the Manager shall make available to the requesting Member the information required to be maintained pursuant to Section 10.1.

10.2.2 Subject to such standards as may be established by the Manager, any request, inspection, or copying of information by a Member under this Section 10.2 may be made at such Member's expense by a Member or such Member's agent or attorney.

10.3. Establishment of Reserves. The Manager shall have the right to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company for any Fiscal Year as the Manager may deem necessary or appropriate for that purpose.

10.4. Financial Statements. The Manager shall provide any Member with such financial statements of the Company as such Member may from time to time reasonably request; *provided* that the Company shall only be required to deliver any financial statements which it regularly maintains and it shall not be required to prepare any financial statement solely at the request of a Member. The financial statements of the Company shall be unaudited, unless the Manager determines otherwise.

10.5. Tax Returns. The Manager shall cause to be prepared and filed with the appropriate authorities all necessary Federal and state income tax and information returns for the Company. The Manager shall send or cause to be sent to each Member within a timely fashion after the end of each taxable year, or as soon as practicable thereafter, such information, including Schedules K-1, and corresponding forms for state and local tax purposes, as is necessary, to complete such Member's Federal and state income tax or information returns, and a copy of the Company's Federal, state, and local income tax or information returns for that year. Each Member shall furnish to the Company all pertinent information in his, her or its possession relating to Company operations that is necessary to enable the Company's tax returns to be prepared and filed.

10.6. Member Tax Reporting. Each Member shall report for federal, state and local income tax purposes consistently with the relevant Schedules K-1 and corresponding state or local tax information provided to such Member by the Company.

10.7. Other Filings. The Manager shall cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules and regulations.

10.8. Bank Accounts. The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person. All withdrawals therefrom shall be made upon checks signed by any Person authorized to do so by the Manager. The Company shall open and maintain from time to time such bank accounts as deemed advisable by the Manager, *provided* that the appropriate resolutions for the authorization of such accounts,

supplied by the bank with which such accounts are opened, are inserted into the books of the Company.

10.9. Accounting Decisions and Reliance Upon Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. For both financial and tax reporting purposes, the books and records of the Company shall be kept on the method of accounting as elected by the Manager, in consultation with the Company's tax advisors, applied in a consistent manner and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

10.10. Payment of Expenses. The Company shall pay with the funds of the Company all fees, costs, disbursements and expenses incident to, and necessary for, the formation and organization of the Company.

10.11. Insurance. The Company shall obtain insurance coverage of the type and amount that the officers of the Company may deem necessary, appropriate or desirable to protect the business interests of the Company.

10.12. Certain Tax Matters.

(a) Designation of Representatives for Purposes of Company Tax Partner.

(b) Merri Gleckler shall serve as the Company's "tax matters partner" ( "***Tax Matters Member***") under Code Section 6231(a)(7) for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code for any Company.

(c) Merri Gleckler shall serve as the Company's "partnership representative" ("***Partnership Representative***") under Code Section 6223(a) (as amended by the BBA), for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code (as amended by the BBA). Each Member agrees to take such action as may reasonably be required to ensure that such Partnership Representative is properly designated on a timely basis in accordance with applicable rules and regulations.

10.13 Handling of Tax Controversies Generally.

(a) The Tax Matters Member, Partnership Representative or such other Person, as the case may be, as such Person is determined in accordance with Section 10.12(a), is authorized and directed to represent the Company, at the Company's expense, in connection with any Company Tax Proceeding and to retain tax professionals and expend Company funds for professional services and costs associated with such matters. Such representative shall provide the Members with periodic information or reports regarding the conduct of any Company Tax Proceeding within a reasonable period of time after the occurrence of any material developments. The limitation on liability and indemnification provisions of Article IX shall apply to such representative to the same extent that such provisions apply to any Member.

10.13 Tax Elections. To the extent permitted by applicable tax law, the Manager shall have the authority to cause the Company to make any tax elections on behalf of the Company as he deems necessary or appropriate, including, but not limited to:

10.13.1 adopting the calendar year as the Company's Fiscal Year;

10.13.2 adopting such method of accounting as the Manager may determine to be required or appropriate for the Company and to keep the Company's books and records consistent with such method; and

10.13.3 making any other election the Company's tax advisors may deem appropriate.

Neither the Company nor the Manager shall make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

10.14 Code §754 Adjustments. The Manager, in conjunction with the Company's tax advisors, may make a Code Section 754 election, to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required to be taken into account in determining Capital Accounts under Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(2) or Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) as the result of a distribution to a Member in complete liquidation of his, her or its Units. The amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be taken into account as part of Profits or Losses of the Company in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(2) applies, or specially allocated to the Member to whom such distribution was made in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) applies.

**ARTICLE XI – DISSOLUTION AND WINDING UP**

11.1. Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs shall be wound up only upon the first to occur of the following (each a "***Dissolution Event***"):

(i) the consent of the Members holding at least a majority of the issued and outstanding Units; or

(ii) the entry of an order of judicial dissolution of the Company pursuant to the Act.

11.2 The death, dissolution, retirement, resignation, expulsion or bankruptcy of a Member or the occurrence of any other event that terminates the continued membership of a Member shall not cause a dissolution of the Company. The Members agree that they will take such actions as may be required to continue the Company in the event of the Bankruptcy or other dissociation of a Member, unless the remaining Members affirmatively elect to dissolve the Company in accordance with this Section 11.

11.3 The dissolution of the Company shall be effective on the day of the Dissolution Event, but the Company and this Agreement shall not terminate until the assets of the Company have been liquidated and/or distributed as provided herein.

11.4. Winding Up. Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company, shall either cause its assets to be sold to any Person or distributed to a Member, and if sold, as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 11.3 and Section 11.4. The Manager shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. All actions and decisions required to be taken or made by such Person(s) under this Agreement shall be taken or made only with the consent of all such Person(s).

11.5 Liquidation of Assets. The Manager shall liquidate the assets of the Company as promptly as possible, but in an orderly and business-like manner, and shall have the right to offer the business and the assets of the Company for sale, in whole or in part. Any offer for sale of the business or the assets of the Company pursuant to this Section 11.3 shall be on such terms and conditions as the Manager deems appropriate in order to maximize the proceeds of such sale. Any Member(s) shall be entitled to participate in the bidding for the business and the assets (or any part thereof). The proceeds of the liquidation of the Company's assets shall be distributed in the following priority:

11.5.1 first, to pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company to its creditors (including, without limitation, all expenses incurred in liquidation and any advances described in Section 3.3) or otherwise make adequate provision for or establish reserves for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the Manager may reasonably determine); and

11.5.2 after all of the payments required by Section 11.3.1 have been made, any remaining assets of the Company shall be distributed to the holders of Units in accordance with their respective Percentage Interests.

11.6. Distributions. All distributions in kind to the Members under this Article XI shall be made subject to the liability of such Member for costs, expenses, and liabilities relating to the

assets distributed in kind theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to such Member pursuant to this Section 11.4. In the event that an asset is distributed in kind, for purposes of maintaining Capital Accounts, the asset will be deemed to have been sold by the Company at its fair market value as determined in good faith by the Manager and any gain or loss, which would have been recognized on such deemed sale, shall be allocated to the Member as provided in this Agreement and such Member's Capital Accounts shall reflect such allocation. The distribution of cash and/or property to a Member in accordance with the provisions of Sections 11.3 and 11.4 is intended to constitute a complete return to the Member of his, her or its Capital Contributions and a complete distribution to such Member of his, her or its interest in all the Company's property. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds. No Member shall have the right to demand to receive property in kind in connection with any distribution by the Company.

11.7. Limitations on Payments Made in Dissolution. Each Member shall be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance. Notwithstanding that the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company may be insufficient to return the Capital Contributions or share of Profits reflected in such Member's positive Capital Account balance, a Member shall have no recourse against the Company or any other Member.

11.8. Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

11.9. Final Accounting. As promptly as possible after dissolution and again after final liquidation, the Manager shall cause a proper accounting to be made by Company's accountants, of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

11.10. Certificate of Dissolution. Upon completion of the winding up of the affairs of the Company, the Manager shall cause to be filed in the office of, and on a form prescribed by, the Department of State of the Commonwealth of Pennsylvania, a certificate of dissolution as provided in the Act.

11.11. Termination. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.3 and the certificate of cancellation is filed in accordance with Section 11.8.

11.12. No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a dissolution of the Company.

## ARTICLE XII – DISPUTE RESOLUTION

12.1 Mediation. If and to the extent the Members are unable to reach agreement on any bona fide matter requiring their unanimous consent, the Members shall in good faith attempt to resolve their disagreement by negotiation. If the dispute is not resolved within thirty (30) days or such shorter time as may be necessary to meet business obligations, the controversy shall be submitted to mediation. If agreement cannot be reached through mediation, then for controversy shall be settled by arbitration as set forth below.

12.2 Arbitration. All parties hereto agree that upon the written demand of any party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Operating Agreement or any course of dealing, course of conduct, statement or actions of any party in connection with this Operating Agreement, including, without limitation, contract disputes and tort claims, shall be resolved by binding arbitration pursuant to the Commercial Rules of the American Arbitration Association ("AAA"). Any arbitration proceeding held pursuant to this arbitration provision shall be conducted before one arbitrator in Scottsdale, Arizona. This arbitration provision shall not limit the right of any party during any dispute, claim, or controversy to seek, use, and employ ancillary, or preliminary rights and/or remedies, judicial or otherwise, and any such action shall not be deemed an election of remedies. Such remedies include, without limitation, obtaining injunctive relief or a temporary restraining order. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.

## ARTICLE XIII – MISCELLANEOUS

13.1. Complete Agreement. This Agreement and the Certificate constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition, or warranty not contained in this Agreement or the Certificate shall be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Certificate conflicts with any provision of this Agreement, the terms of the Certificate shall control.

13.2. Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns.

13.3. Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective heirs, legal representatives, successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.4. Additional Documents and Acts. Each Member agrees to execute and deliver, from time to time, such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.5. Notices.

13.5.1 To Members. Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(i) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Member appearing on the books of the Company. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when deposited in the United States mail or with a courier service for delivery to that Member.

(ii) By facsimile transmission, e-mail or other electronic communication to the Member's facsimile number or address for e-mail or other electronic communications supplied by the Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when sent.

13.5.2 To the Company. Any notice to the Company must be given to the address set forth in Section 2.4 hereof, or such other address as the Manager may designate from time to time on behalf of the Company.

13.6. Amendments. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if approved in writing by the holders of a majority of the issued and outstanding Units. The Manager may amend Exhibit A hereto at any time and from time to time to reflect the admission or withdrawal of any Member, or the change in any Member's Capital Contributions, or any changes in the Member's addresses, all as contemplated by this Agreement.

13.7. Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.8. Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

13.9. Attorneys' Fees. Except as otherwise provided herein, in any action, suit or proceeding brought to enforce the provisions of this Agreement, the parties shall bear their own costs and expenses (including attorneys' fees), except that the party determined by the applicable court of competent jurisdiction to be the prevailing party in such action, suit or proceeding shall be entitled to recover its cost and expenses (including attorneys' fees).

13.10. Investment Representation. Each Member hereby represents to, and agrees with, the other Members and the Company that such Member is acquiring the Units for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.

13.11. Governing Law. This Agreement shall be governed and construed and the legal relationship of the parties determined in accordance with the laws of the State of Arizona applicable to contracts executed and to be performed solely in Arizona.

* * * * *

**IN WITNESS WHEREOF**, the Members have executed this Amended and Restated Limited Liability Company Operating Agreement, effective as of the date first written above.

**COMPANY**

**TMG KREATIONS, LLC**

By: ______________________________
Name: Merri Gleckler
Title: Manager

**MEMBERS**

______________________________
MerriG, LLC
By: Merri Gleckler, Managing Member

______________________________
Dean H. Dussias

**EXHIBIT A**

**SCHEDULE OF MEMBERS, PERCENTAGE INTERESTS AND UNITS**

**Dated as of February __, 2021**

| Member | Percentage Interest | Units |
|---|---|---|
| MerriG, LLC, c/o<br>Merri Gleckler<br>Merri.Gleckler@gmail. | 70% | |
| | | |
| Dean H. Dussias<br>Dean@dussias.org | 30% | |
| TOTALS | 100% | |

**EXHIBIT B**

**CAPITAL ACCOUNTS AND ALLOCATIONS**

B.1. Definitions. In addition to the terms defined in other provisions of this Agreement, including without limitation Section 1.1, the following terms shall have the meanings set forth below:

"Adjusted Capital Account Deficit" shall mean with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) increasing the Capital Account by any amounts that the Member is obligated to restore or is deemed to be obligated to restore pursuant to Treas. Reg. §§ 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) reducing the Capital Account by the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Treas. Reg. §§ 1.704-2(b)(2) and 1.704-2(d).

"Depreciation" shall mean for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager, and if the Company uses the "remedial allocation method" under Treas. Reg. § 1.704-3(d) with respect to any asset, Depreciation for that asset shall be computed in accordance with Treas. Reg. § 1.704-3(d)(2).

"Excess Nonrecourse Liabilities" has the same meaning as set forth in Treas. Reg. § 1.752-3(a)(3).

"Gross Asset Value" with respect to any asset shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

(1) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Manager.

(2) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager as of the following

times:

(i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money, other property or services;

(ii) the distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an interest in the Company;

(iii) the liquidation of the Company for Federal income tax purposes within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g);

except that the adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company. In the case of the adjustment to Gross Asset Values as of the date hereof (and in the event of any other adjustment to Gross Asset Values pursuant to this subsection (2)), the current Fiscal Year shall end as of the time of such adjustment, and a new Fiscal Year shall be deemed to begin immediately after such adjustment.

(3) The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(4) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m) and Section B.2, except that Gross Asset Values shall not be adjusted pursuant to this paragraph (4) to the extent the Manager determines that an adjustment pursuant to paragraph (2) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (4).

(5) If the Gross Asset Value of an asset has been determined pursuant to paragraphs (1), (2), or (4), that Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to that asset for purposes of computing Profits and Losses.

"Member Nonrecourse Debt" has the same meaning as "partner nonrecourse debt" set forth in Treas. Reg. §§ 1.704-2(b)(4) and 1.704-2(i).

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as "partner nonrecourse debt minimum gain" set forth in Treas. Reg. § 1.704-2(i) and shall be determined in accordance with the principles of that Section.

"Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse

deductions" set forth in Treas. Reg. §§ 1.704-2(i)(1) and 1.704-2(i)(2).

"Nonrecourse Deductions" are deductions having the meaning set forth in Treas. Reg. §§ 1.704-2(b)(1) and 1.704-2(c).

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2) Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code Section 705(a)(2)(B) expenditures pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraphs (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6) Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

B.2. Preparation and Maintenance of Capital Accounts.

(a) The Capital Account for each Member shall:

(1) be increased by (i) the amount of money contributed by that Member to the Company, (ii) the Gross Asset Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code § 752), and (iii) allocations to that Member of Profits and any other Company income and gain (or items thereof), including

income and gain exempt from tax and income and gain described in Treas. Reg. § 1.704- 1(b)(2)(iv)(g), and

(2) be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Gross Asset Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Code § 752), and (iii) allocations of Losses and any other Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(b) The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas. Reg. §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of Depreciation and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1.704-1(b)(2)(iv)(g). On the transfer or all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(1).

B.3. Allocation of Profits and Losses. Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company for a Fiscal Year shall be allocated among the persons who were Members during such Fiscal Year in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal to:

(a) the amount of the hypothetical distribution (if any) that such Member would receive if, on the last day of the Fiscal Year, (1) the Company were dissolved, its affairs wound up and its assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto for such Fiscal Year, (2) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (3) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 11.3.2 hereof, over

(b) the sum of (1) the amount, if any, without duplication, that such Member would be obligated to contribute to the capital of the Company, (2) such Member's share of Company Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(g), and (3) such Member's share of Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5), all computed as of the hypothetical sale described in Section B.3(a) of this Annex B.

B.4. Losses Limitation. Losses allocated pursuant to Section B.3 of this Annex B shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Company year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an

allocation of Losses pursuant to Section B.3 of this Annex B, the limitation set forth in this Section B.4 shall be applied on a Member by Member basis, and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each member under Section 1.704-(b)(2)(ii)(d).

B.5. Special Allocations. The following special allocations shall be made in the following order:

(1) Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B, if there is a net decrease in Company Minimum Gain during any Company taxable year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. §§ 1.704-2(f). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. This Section B.5(1) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

(2) Member Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B except Section B.5(1), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. § 1.704-2(i)(4). This Section B.5(2) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(3) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) that would create an Adjusted Capital Account Deficit for such Member, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section B.5(3) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Annex B have been tentatively made as if this Section B.5(3) were not in the Agreement.

(4) Gross Income Allocation. In the event any Member has a deficit Capital Account balance at the end of any Company taxable year that exceeds the amount described in clause (i) of the definition of Adjusted Capital Account Deficit for such Member, each such Member shall be specially allocated items of Company income and gain to eliminate such excess as quickly as possible, provided that an allocation pursuant to this Section B.5(4) shall be made if and only to the extent that such an excess would exist after all other allocations provided for in this Annex B have been tentatively made as if Section B.5(3) and this Section B.5(4) were not in the Agreement.

(5) Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period shall be allocated among the Members in proportion to their Common Units.

(6) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i).

(7) Excess Nonrecourse Liabilities. The Excess Nonrecourse Liabilities of the Company shall be allocated among the Members in accordance with their respective Percentage Interests.

B.6. Curative Allocations. The allocations set forth in Section B.4 and in Section B.5 (the "Regulatory Allocations") are intended to comply with certain requirements of Treas. Reg. § 1.704-1(b). Notwithstanding any other provisions of this Agreement (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits, Losses, and items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory Allocations relating to (i) Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain, and (ii) Member Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Member Nonrecourse Debt Minimum Gain.

B.7. Tax Allocations: Code Section 704(c).

(a) In accordance with Code § 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value.

(b) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code § 704(c) and the Treasury Regulations thereunder(c) Any elections or other decisions relating to allocations pursuant to this Section B.7 shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section B.7 are solely for purposes of Federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

B.8. Miscellaneous Allocation Provisions.

(a) For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code § 706 and the Treasury Regulations promulgated thereunder.

(b) Except as otherwise provided in this Agreement, all items of Company income gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, including, for this purpose, items allocated pursuant to Section B.7, for the year.

(c) Notwithstanding anything in this Annex B or this Agreement to the contrary, the Manager shall have the authority to modify any allocation provisions of this Annex B to the extent necessary to comply with Federal income tax requirements.

B.9 Election of Liquidation Value Safe Harbor. Each Member, by executing this Agreement, hereby agrees to the following:

(a) The Company is authorized to elect the safe harbor, in accordance with proposed Regulations Section 1.83-3(l) and the proposed revenue procedure thereunder (once such regulations and revenue procedure become effective), under which the fair market value of each interest in the Company that is transferred in connection with the performance of services shall be treated as being equal to the liquidation value of that interest (the "***Safe Harbor Election***");

(b) The Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Election with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election remains effective, including the requirement that all relevant Federal income tax items be reported consistently with the Safe Harbor Election;

(c) The effective date of the Safe Harbor Election shall be the earliest permitted such date under the applicable regulations and revenue procedure, once those become effective, and the Safe Harbor Election shall continue to apply until such time (if ever) as all Members affected by the Safe Harbor Election shall agree to terminate it and the Company shall affirmatively terminate it under applicable procedures;

(d) The Manager shall file, with the Company's Federal income tax return for the taxable year in which the Safe Harbor Election becomes effective, a document, executed by the Manager, stating that the Company is electing, on behalf of the Company and the Members, to have the Safe Harbor Election apply irrevocably with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election is in effect; and

(e) The Company shall comply with applicable recordkeeping requirements for the Safe Harbor Election, and the Company and the Members shall take all other actions, if any, required to comply with the requirements of such Safe Harbor Election as ultimately promulgated, to the extent practicable.

**EXHIBIT C**

Certificate of Value

**EXHIBIT D**

**AMOUNT OF KEY-PERSON LIFE INSURANCE**

Merri Gleckler - $___________
Dean Dussias - $___________

# EXHIBIT R

**To:** Ray Conway[ray@conwaytax.com]
**Cc:** Kashwere[MERRI@kashwere.com]
**From:** Dean Dussias[dean@kashwere.com]
**Sent:** Tue 2/16/2021 12:51:44 AM (UTC)
**Subject:** Re: Kashwere Operating Agreement, draft
Kashwere Limited Liability Company Agreement.docx

I'm sorry, I did think I had attached the document; apologies…

Please confirm receipt of attachment.

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

---

**From:** Ray Conway <ray@conwaytax.com>
**Date:** Monday, February 15, 2021 at 6:39 PM
**To:** Dean Dussias <dean@kashwere.com>
**Cc:** Kashwere <MERRI@kashwere.com>
**Subject:** Re: Kashwere Operating Agreement, draft

Friday will work, but I'm not available from 10 - 11 AM CST. Please let me know what time works for the two of you outside of that time slot.

Please send the attachment referenced in your email.

Ray Conway, CPA
Conway Tax CPA's
11313 Distinctive Drive
Orland Park, IL 60467

Office: 815-463-9150, ext. 2
Cell: 815-685-5804
Fax: 815-462-4366

On Mon, Feb 15, 2021 at 5:07 PM Dean Dussias <dean@kashwere.com> wrote:
Hi Ray,

Merri and I spoke today and would like you to review the attached agreement and suggest changes (preferably in redline) to ensure we have the most favorable tax treatment for the Members (Merri G and me) and for TMG Kreations, LLC ("Kashwere").

As you will see, we will be re-establishing Kashwere in Arizona – if you have any thoughts on timing, etc. please include those as well.

When you are ready to discuss, let's do a joint call and you can walk us through on Zoom, etc.

If we could review with you on Thursday or Friday, would be appreciated.

Thank you,

Dean & Merri

EXHIBIT
Dussias 14
8-22-24

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

# EXHIBIT S

**To:** Ray Conway[ray@conwaytax.com]
**Cc:** Kashwere[MERRI@kashwere.com]
**From:** Dean Dussias[dean@kashwere.com]
**Sent:** Tue 2/16/2021 12:51:44 AM (UTC)
**Subject:** Re: Kashwere Operating Agreement, draft
Kashwere Limited Liability Company Agreement.docx

I'm sorry, I did think I had attached the document; apologies…

Please confirm receipt of attachment.

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

---

**From:** Ray Conway <ray@conwaytax.com>
**Date:** Monday, February 15, 2021 at 6:39 PM
**To:** Dean Dussias <dean@kashwere.com>
**Cc:** Kashwere <MERRI@kashwere.com>
**Subject:** Re: Kashwere Operating Agreement, draft

Friday will work, but I'm not available from 10 - 11 AM CST. Please let me know what time works for the two of you outside of that time slot.

Please send the attachment referenced in your email.

Ray Conway, CPA
Conway Tax CPA's
11313 Distinctive Drive
Orland Park, IL 60467

Office: 815-463-9150, ext. 2
Cell: 815-685-5804
Fax: 815-462-4366

On Mon, Feb 15, 2021 at 5:07 PM Dean Dussias <dean@kashwere.com> wrote:

Hi Ray,

Merri and I spoke today and would like you to review the attached agreement and suggest changes (preferably in redline) to ensure we have the most favorable tax treatment for the Members (Merri G and me) and for TMG Kreations, LLC ("Kashwere").

As you will see, we will be re-establishing Kashwere in Arizona – if you have any thoughts on timing, etc. please include those as well.

When you are ready to discuss, let's do a joint call and you can walk us through on Zoom, etc.

If we could review with you on Thursday or Friday, would be appreciated.

Thank you,

Dean & Merri

EXHIBIT
PENGAD 800-631-6989
Dussias 14
8-22-21

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**TMG KREATIONS, LLC d/b/a KASHWERE (the "Company")**

THIS LIMITED LIABILITY COMPANY AGREEMENT ("Agreement") is made and entered into this 23rd day of February, 2021, and effective as of July 1, 2020, by and between the Company, a Delaware limited liability company and each Person executing this Agreement (or a joinder hereto) as a Member or Manager, who is subsequently admitted to the Company as an additional or substitute Member or appointed or elected to serve as a successor Manager as provided herein, or who otherwise becomes bound by this Agreement as provided herein (each a "Party," and collectively, the "Parties").

RECITALS:

WHEREAS, the Company has been organized as a limited liability company under and pursuant to the laws of the State of Delaware on December 15, 2009 for the purposes hereinafter stated; and

WHEREAS, the Parties hereto desire to set forth in this Agreement their respective rights and obligations with respect to the Company and to replace all prior Operating Agreements.

WHEREAS, the Parties would like to convert the Company from a Delaware limited liability company into an Arizona limited liability company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

ARTICLE I
Definitions

Capitalized terms used in this Agreement have the meanings set forth in Schedule I hereto. Capitalized terms used in this Agreement and not otherwise defined in Schedule I hereto shall have the meanings ascribed to them elsewhere in this Agreement.

ARTICLE II
Formation of Company

The Company was formed in December 2019 and this Agreement shall replace in its entirety all prior company and operating agreements without exception and the Company shall be operated in accordance with the terms and conditions of this Agreement. To the extent that the rights and obligations of a Member or Manager with respect to the Company, or the administration, dissolution, liquidation and termination of the Company are not set forth in this Agreement, they shall be governed by the LLC Act. To the extent this Agreement contains a provision contrary to an LLC Act provision that may be waived or overridden by a limited liability company agreement, that LLC Act provision shall be overridden by such contrary provision in this Agreement whether or not specific reference is made to the overridden provision of the LLC Act.

ARTICLE III
Name, Offices, Registered Agents, Company Records and Organization Matters

3.1 Name . The name of the Company will be the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may, in its discretion, select in accordance with the LLC Act. The Company shall have the

exclusive ownership of and right to use the Company name (and any name under which the Company shall elect to conduct its affairs) as long as the Company continues.

3.2 Principal Office of the Company. The principal office of the Company will be located at such place within or outside of the State of Delaware (and subsequently outside the State of Arizona) as the Manager may from time to time designate. The Company may have subsidiary offices in such other place or places as the Manager may from time to time designate. Currently, the principal office is located in Illinois.

3.3 Registered Office and Registered Agent. The Manager will select and designate each registered agent and registered office for the Company. The Manager may from time to time in accordance with the LLC Act change any registered agent and/or registered office of the Company.

3.4 Records to be Maintained: Inspection Rights. The Company will keep at its principal office the information and records to fulfill the obligations of the LLC Act, which shall be subject to inspection and/or copying at the request and at the expense of any Member or Legal Representative for reasonable business purposes during ordinary business hours, subject to the restrictions set forth in Section 8.5(c) below and such other standards and limitations as the Manager may reasonably determine from time to time.

3.5 Title to Property. All real and personal property owned by the Company, including, but not limited to, all real and personal property (tangible and intangible) which may be contributed by the Members to the Company from time to time, shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in such Member's individual name or right. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

3.6 No State Law Partnership. The Members intend that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes. The Members intend that the Company not be a partnership or joint venture for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

## ARTICLE IV
## Purpose of the Company

The purpose of the Company shall be to engage in any one or more enterprises, ventures, undertakings, businesses and activities in which limited liability companies are permitted to engage, and the Company may exercise any and all powers that may be legally exercised, under the LLC Act. Consistent with the foregoing, the Company may: (i) exercise all other powers necessary to or reasonably connected with its business that may be legally exercised by limited liability companies under the LLC Act; and (ii) engage in any one or more enterprises, ventures, undertakings, businesses and activities as are necessary, customary, convenient or incidental to any of the foregoing.

## ARTICLE V
## Contributions to Capital; Interests

5.1 Capital Contributions. The Member's Capital Contribution in respect of its Interests shall be set forth on Exhibit A hereto. The Member shall not be required to make additional Capital Contributions to the Company. Without limiting the foregoing, the Member shall have no obligation to restore or otherwise make any Capital Contribution to the Company in respect of a Capital Account deficit upon liquidation and termination of the Company.

5.2 Interests. The Member, in receipt of its Capital Contributions, shall receive or has received the Interests set forth on Exhibit A hereto. The Manager, in its discretion, may cause the Interests of the Company to be represented by certificates in form and substance satisfactory to the Manager, including the use of Units as defined below in Schedule I. The Manager, in its discretion, may cause the Company to issue additional Interests for equity capital, in connection with an acquisition, joint venture or strategic alliance, for or in receipt of services rendered to or on behalf of the Company, or otherwise. Such Interests may be issued as a single class or in one or more classes, and with such rights, powers, obligations, restrictions and limitations as the Manager shall determine in its discretion. Upon the issuance of additional Interests pursuant to this Section, the Manager shall be authorized to adjust the Percentage Interests of the Members (or class of Members, as the case may be) to reflect any dilution resulting from such issuance.

ARTICLE VI
Allocations of Profits and Losses; Distributions

6.1 Books of Account

(a) At all times during the continuance of the Company, the Manager shall cause proper and true books of account wherein there shall be entered particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's business, and all of such other transactions, matters and things relating to the business of the Company as are usually entered in books of account kept by persons engaged in a business of like kind and character.

(b) Promptly after the close of each fiscal year, the Company shall cause to be prepared such income tax and other returns required under applicable law and regulation, if any, including any and all statements necessary to advise all Members promptly about their investment in the Company for federal income tax reporting purposes. The Manager shall be responsible for the prompt filing and delivery of all such returns and statements. The initial "tax matters partner" and "partnership representative" (under Code Section 6223(a) (as amended by the BBA) for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code (as amended by the BBA) shall be Merri Gleckler.

6.2 Net Profit and Loss and Tax Allocations .

(a) Until such time as two or more Persons hold Interests in the Company for federal income tax purposes, it is the intention of the Member that the Company be disregarded for federal and all relevant state tax purposes and that the activities of the Company shall be deemed to be activities of the Member for such purposes. At all times that two or more Persons hold Interests in the Company for federal income tax purposes (i) it is the Company's intention, and the Company shall make all available elections to be treated, and the Company will be treated, as a "partnership" for federal and all relevant state tax purposes; and (ii) in such case, Net Profits and Net Losses shall be allocated for each applicable accounting period, among the Members, pro rata in accordance with their Percentage Interests.

(b) Company income, gain, loss, deduction, credit and other tax items shall be allocated to the Members in the same manner as corresponding Net Profits and Net Losses are allocated pursuant to Subsection (a) above. Notwithstanding the foregoing, to the extent the Company is treated as a "partnership" for federal and state tax purposes, the tax allocations hereunder are intended to allocate Company tax items in accordance with the Members' economic interests in the Company while complying with the requirements of Code Section 704(b) and the applicable Treasury Regulations. Accordingly, the Manager may allocate tax items in a manner other than set forth above, in the Manager's discretion, if the Manager determines that doing so will achieve more equitable allocations or allocations more consistent with Section 704 of the Code and the applicable Treasury Regulations.

6.3 Distributions . Cash from Operations and Other Available Assets may be distributed in such amounts and at such times as the Manager shall determine in its discretion, to the Members, pro rata in accordance with their Percentage Interests. The foregoing to the contrary notwithstanding, upon the occurrence of a Dissolution Event in respect of the Company, the Company's liquidating proceeds shall be distributed in accordance with Section 11.5 below.

ARTICLE VIII
Management of the Company

7.1 Management of the Company . The business and affairs of the Company shall be managed exclusively by or under the direction of one or more individuals (each, a "Manager"). Each Manager shall be appointed by the Member. The initial Manager(s) of the Company shall be Merri G, LLC, a Delaware limited liability company and Dean H Dussias, an individual. The Member may, in its discretion, remove and replace, for any reason (or no reason), with or without cause, any Manager appointed by the Member. Each Manager shall serve until his or her successor is appointed or until his or her earlier resignation, Disability, death or removal. In the event of a vacancy, a successor Manager may be appointed by the Member. A Person's ceasing to serve as a Manager shall not affect such Person's rights as a Member, if any.

7.2 Authority of Manager . Subject to such limitations as may be imposed by this Agreement, non-waivable provisions of the LLC Act or other applicable law, the Manager is authorized to carry out and implement any and all of the purposes of the Company and shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the business of the Company.

7.3 Action by Manager . At any time, there are two or more Managers, (a) each Manager shall have a vote proportional to their membership interest; and (b) the approval, consent or vote of a majority of the Managers shall govern with respect to any matter requiring the approval, consent or vote of the Managers, except as otherwise expressly provided herein. Exceptions to the majority vote are listed in Exhibit B.

7.4 Officers. The Manager, in its discretion, may from time to time designate officers of the Company, with titles including but not limited to "chairman," "chief executive officer," "president," "secretary," "chief financial officer," "chief operating officer," "chief information officer" and "vice president". Any number of offices may be held by the same individual or the Manager, in its discretion, may choose not to fill any office for any period as it may deem advisable. Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or disability or until such officer shall resign or shall have been removed in the manner hereinafter provided. Any officer may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. The Manager may remove any officer for any reason (or no reason) at any time, with or without cause. Designation of an officer shall not of itself create any contractual employment rights. As of the date hereof, Merri Gleckler shall be appointed to the office of the Chief Executive Officer and Founder and (ii) Dean Dussias shall be appointed to the office of President. Each officer shall devote a sufficient amount of time to enable her or him to satisfactorily fulfill her or his duties and responsibilities to the Company. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business, the assignment of such title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Manager.

7.5 Compensation and Reimbursement of Managers . Any Manager may, in the discretion of the Member, receive reasonable compensation for such Manager's services to the Company. The Company shall reimburse each Manager for any costs that may be properly expended by such Manager on behalf of the Company.

7.6 Duties and Obligations; Standard of Conduct .

(a) The Manager shall devote to the Company such time as may be reasonably necessary for the performance of such Manager's duties and responsibilities hereunder. Each Manager may otherwise engage in business ventures of any nature and description, independently or with others, including, but not limited to, business of the character described in Article IV above, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

(b) The Manager, in managing the business and affairs of the Company, will discharge his or her duties: (i) in a manner he or she believes in good faith to be in the best interests of the Company; (ii) in a manner he or she believes in good faith to represent the care an ordinarily prudent person in a like position would exercise under similar circumstances; (iii) in good faith reliance on the provisions of this Agreement; (iv) without engaging in or willful misconduct or a knowing violation of applicable law; and (v) without engaging in any transaction for which he or she receives a personal benefit in violation or breach of any provision of this Agreement. Except for the implied contractual covenant of good faith and fair dealing under applicable Arizona law, no Manager has any other duty to the Company, any Member or any other Person.

(c) The provisions of this Agreement (including, without limitation, this Section) replace, eliminate and otherwise supplant those duties (including fiduciary duties) that a Manager might otherwise have under applicable law.

7.7 Liability of Managers . To the fullest extent permitted by applicable law, a Manager (which for purposes of this Section shall include his or its shareholders, members, partners or other principal owners, directors, managers, officers, employees, agents and their respective Affiliates) shall not be liable to the Company or any Member for (a) any action taken, or failure to act, as Manager, or on behalf of the Manager, with respect to the Company, unless such action taken (or failure to act) was taken in bad faith and not in a manner reasonably believed to be in the best interests of the Company or was the result of the Manager's or such other Person's willful misconduct, (b) any action or inaction arising from reliance in good faith upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected by any of them with reasonable care or (c) the action or inaction of any agent, contractor or consultant selected and monitored by any of them with reasonable care.

7.8 Indemnification . (a) The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the Person is or was a Manager (which for purposes of this Section shall include the Manager's shareholders, members, partners, directors, managers, officers, employees, agents and affiliates), officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with the action, suit or proceeding, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful.

(b) The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action or suit, by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was a Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of the action or suit, if the Person acted in good faith and in a manner

the Person reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made in respect of any claim, issue or matter as to which the Person shall have been adjudged to be liable for willful misconduct in the performance of the Person's duty to the Company, unless, and only to the extent that, the court in which the action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for those expenses as the court shall deem proper.

(c) The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under the Company's Certificate of Formation, or any agreement, vote of Members, or otherwise, both as to action in the Person's official capacity and as to action in another capacity while holding office, and shall continue as to a Person who has ceased to hold a position subject to indemnification under this Section and shall inure to the benefit of the heirs, executors and administrators of such Person.

7.9 No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Operating Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of: (a) any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member; or (b) any of the terms, conditions, or provisions of the organizational or governance documents of such Member if it is a corporation or other business entity or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of his, her, or its material properties or assets is subject.

7.10 Securities. Such Member owns his, her, or its Membership Interest only for his, her, or its own account and not on behalf of any other Person, and only for the purpose of holding for investment and not with a view to any further distribution thereof. No other Person is participating with, or providing or otherwise arranging funds, or credit for such Member in respect to the acquisition of his, her, or its Membership Interests. Such Member has no agreement, arrangement, or understanding for transfer of any part of his, her, or its Membership Interest to any other Person. Subject to and in addition to all of the restrictions on transfer contained in this Operating Agreement, such Member shall not offer for sale or sell any part of his, her, or its Membership Interest except upon acceptance by the Company of an opinion of counsel for the purchaser in such form as is satisfactory to counsel for the Company that registration under federal and state securities laws is not required. Such Member (a) either has such knowledge and experience in financial and business matters, or has the advice or representation of a person or entity having such knowledge and experience, to be able to evaluate the merits and risks of his, her, or its investment in the Company or has been given or had access to sufficient information regarding the Company to evaluate the investment in his, her, or its Membership Interest being acquired, and (b) is able to bear the economic risk of the investment in his, her, or its Membership Interest and to hold the same for purposes of investment. Such Member is aware that no market exists for the resale of his, her, or its Membership Interest.

7.11 Confidentiality. Each Member and Manager acknowledges that the nonpublic data and records maintained by the Company and its Affiliates pertaining to its or their business, including, without limitation, intellectual property, technical information, trade secrets, product formulae, data and know-how, business and marketing plans and reports, design materials, documentation and information respecting customers and prospective customers, vendors, partners and employees, product specifications, data, know-how, techniques, methods, processes, designs, sketches, photographs, graphs, drawings, inventions and ideas, past, current and planned research and development, customer lists, names or addresses, current and anticipated customer requirements, price lists, market studies, business plans and any other information and financial information and data, (such nonpublic information is hereinafter referred to as "Confidential

Information") are valuable and unique assets of the Company. Each Member and Manager agrees that he, she or it will not, without the written consent of the Manager, disclose to any person, firm or corporation, or use for any purpose whatsoever, except in connection with and furtherance of the business of the Company, any Confidential Information, provided that no provision of this Agreement shall be construed as precluding the disclosure of Confidential Information if such disclosure is required by law or a court order. If disclosure of Confidential Information is required by law or court order, the affected Member or Manager shall give written notice to the Manager prior to making such disclosure so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the affected Member or Manager is, in the opinion of its counsel, compelled to disclose any Confidential Information under pain of liability for contempt or other censure or penalty, such affected Member or Manager may disclose only that portion of such Confidential Information as is legally required without liability hereunder; provided that the affected Member or Manager agrees to exercise his, her or its reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. Upon a withdrawal, removal or resignation, as applicable, such Member or Manager shall forthwith deliver to the Company immediately all Confidential Information and other property of the Company in his, her or its possession and will not make or retain copies of any thereof, except as may be required by applicable law or court order.

Non-Disclosure of Confidential Information.

(a) During the time that each party is a Member of the Company and for two (2) years after a Member ceases to be affiliated with the Company in any manner, each Member acknowledges that he will be afforded access to Confidential Information (as defined below); that public disclosure of such Confidential Information would have an adverse effect on the Company and its business; and that the provisions of this Section are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b) Each Member agrees that while he, she, or it is a Member of the Company and for a period of two (2) years following the termination of the Member's affiliation with the Company, shall not communicate or divulge or use for the Member's benefit or any other persons, firm, corporation, or other entity any Confidential Information, and the Member shall hold in confidence the Confidential Information and shall not disclose it to any other person except with the specific prior written consent of the Company and the other Members.

(c) Any trade secrets of the Company shall be entitled to all of the protections and benefits under Arizona Statutes and any other applicable law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret of purpose of this Agreement. The Members hereby waive any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

(d) All price lists, customer lists, contact information, records, notebooks, plans, models, components, software, databases, marketing information, business plans, devices, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") shall be deemed proprietary to the Company. Upon the termination of a Member's Membership Interest in the Company, the Member shall return to the Company all of the Proprietary Items in his possession or subject to his control, and the Member shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(e) "Confidential Information" shall also mean any and all: (1) trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute; (2) information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented); and (3) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing.

(f) Duty of Loyalty. Members shall devote their energies into the operation of this Company. Nevertheless, a Member may have other business interests and may engage in or invest in other activities in addition to those relating to the Company provided such business interests do not directly or indirectly compete with the Company and provided that such interests do not prevent or interfere with a Member's obligation to the Company. Each Member shall offer the Company and the other Members the opportunity to take advantage of a business opportunity she or he identifies that would be within the scope of the Company's operating activity. If the Company wishes not to explore a business opportunity presented by a Member, then and only then would a Member be entitled to take advantage of such opportunity. This provision does not preclude Merri Gleckler from continuing her involvement in her other companies nor does it entitle any other Member at any time to any profits or proceeds from the operation of these companies.

## ARTICLE IX
## Certain Rights and Obligations of Member

8.1 No Management by the Member . The Member, in its capacity as such, shall take no part in the control or management of the affairs of the Company, nor have any authority to act for or on behalf of the Company or to sign for or bind the Company.

8.2 Limited Liability of the Member . Except as expressly provided in this Agreement, by non-waivable provisions of the LLC Act or by other applicable law, the Member of the Company shall not be personally liable for any debts, liabilities or obligations of the Company, whether arising in tort, contract or otherwise, solely by reason of being a Member of the Company.

8.3 Action by the Member . At any time, there are two or more Members, then (a) each Member shall be entitled to a number of votes equal to his or its Percentage Interest; and (b) the approval, consent or vote of a Majority Interest of the Members shall govern with respect to matters permitting or requiring the approval, consent or vote of the Members hereunder; exceptions to such majority vote are listed in Exhibit B.

8.4 Confidentiality . The Member shall not to, directly or indirectly, disclose to anyone, or use or otherwise exploit for such Member's own benefit or for the benefit of anyone other than the Company, any Confidential Information of the Company; provided, however, that the Member may make any such disclosure required by law or court order, provided that such Member shall promptly notify the Company and reasonably cooperate with the Company to obtain a protective order or other remedy, and if such remedy is not obtained by the Company, such Member will furnish only that portion of the Confidential Information which is required to be furnished pursuant to such law or court order. The

Member understands that the Company will not have an adequate remedy at law for the material breach or threatened breach of any one or more of the covenants set forth in this Section and agrees that in the event of any such material breach or threatened breach, the Company shall be entitled, in addition to any other remedies which may be available to it, to injunctive relief (without bond) to enjoin the breaching party from the breach or threatened breach of such covenants.

8.5 Conflicts of Interest, Related Party Transactions and Other Activities. Any Member and any Affiliate of any such Member, and any of their respective directors, officers, members, partners, stockholders, employees, or controlling persons may engage in or possess an interest in any business or activity, without any accountability to the Company or any other Member, and without obligation to offer such business opportunity to the Company or any other Member. No such Person shall be liable to the Company or any other Member for breach of any fiduciary or other duty, as a Member or otherwise, by reason of the fact that such Person acquires or pursues such opportunity or directs such opportunity to another person, except for any Member that agrees otherwise pursuant to a separate agreement with the Company or any other direct or indirect subsidiaries or Affiliates of the Company; provided, however, that nothing in this Section 8.5 or in such separate agreement shall be construed to relieve or excuse any Person from his, her or its obligations under Section 8.6 or any employment agreement, non-use, non-disclosure, non- compete, non-solicitation, covenant-not-to-compete or similar covenant in this Agreement or any other agreement between such Person and the Company.

8.6 Voting; Action by Members. With respect to all matters to be decided or voted on by the Members pursuant to the terms of this Agreement or the Act, each Member shall have one vote for each Unit held by such Member. All decisions of the Members must be approved by Members holding at least majority of the issued and outstanding Units, unless a greater percentage is required by this Agreement or the Act.

8.7 Member Assurances. Each Member agrees to execute such further documents, instruments and agreements as the Manager deems necessary to further effect and carry out the intentions and provisions of this Agreement.

## ARTICLE IX
## Transfers of Membership Interests and Investment Representation

9.1 General Prohibition on Transfers . The Member shall not Transfer its Interest, in whole or in part, directly or indirectly, without the prior written consent of the Manager, in its sole and absolute discretion, subject to Exhibit B. Upon the Insolvency, legal incompetency, death, dissolution or liquidation of the Member, or the occurrence of an Involuntary Transfer or other Transfer with respect to the Member's Interest, the assignee, transferee, successor or Legal Representative of such Member shall not (unless admitted as a Member pursuant to Section 10.1 below) be entitled to become or exercise any rights of a Member, but shall, at most and subject to the terms and conditions of this Agreement, to the extent of the Membership Interest acquired, be entitled only to the predecessor Member's economic rights, if any, in the capital, profits, losses and distributions of the Company and all duties, liabilities and obligations in connection therewith. Any Person who acquires, in any manner whatsoever, any Membership Interest held by a Manager shall not be a Manager by reason thereof.

9.2 General Transfer Provisions . In the case of a Transfer of the Member's Interest permitted pursuant to this Agreement, such Transfer shall not be given effect unless and until (a) the Transfer is made in writing, in form and substance acceptable to the Manager in its discretion, signed by the Member

and accepted in writing by the transferee, and a duplicate original of such document is delivered to the Company, (b) the transferee executes and delivers to the Company a written agreement, in form and substance acceptable to the Manager in its discretion, pursuant to which said transferee agrees to be bound by and confirms the terms and conditions of this Agreement and (c) if necessary or appropriate, an amendment to this Agreement, in form and substance acceptable to the Manager in its discretion, is executed and delivered to the Company. The foregoing to the contrary notwithstanding: (i) the Company shall be entitled to treat any such prospective transferee as the absolute owner of the Interest in all respects and shall incur no liability for distributions made in good faith to such transferee prior to such time as the documents specified in the preceding Subsections (a) through (c) have been delivered to and accepted by the Company; and (ii) the transferee shall be subject to and bound by all terms, conditions and obligations of this Agreement to which such Member was subject or bound, without regard to whether such transferee has executed a counterpart hereof or any other document contemplated hereby. The costs (including reasonable attorneys' fees) incurred by the Company in processing the Transfer of a Member's Interest shall be borne by the transferee, and shall be payable prior to and as a condition of such Transfer.

9.3 Investment Representation. Each Member hereby represents to, and agrees with, the other Members and the Company that such Member owns its Units for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.

## ARTICLE X
## Admission or Withdrawal of a Member

10.1 Admission of a Member. The Manager, in its discretion, may admit one or more additional or substitute Members. Such Members shall be entitled to all of the rights and privileges, and subject to the obligations and restrictions, applicable to other Members holding the same class of Interest hereunder, and in all other respects their admission shall be subject to all of the terms and provisions hereof.

10.2 Withdrawal of a Member. A Member may withdraw at any time; provided, however, that a Member who dissociates or withdraws shall not be relieved of its Capital Commitment, nor shall such Member be entitled to receive any distribution from the Company in respect of its Interest, except by way of distributions pursuant to Section 6.2 above or upon the winding up of the Company pursuant to Section 11.5 below. For the avoidance of doubt, upon the dissociation or withdrawal of a Member, the Company shall not have any obligation to purchase, redeem or liquidate such Member's Interest. Any withdrawal in violation of this Agreement shall entitle the Company to damages which may be offset against the amounts otherwise payable as a distribution to such Member purporting to withdraw from the Company. This Section expressly overrides any and all contrary provisions of the LLC Act.

## ARTICLE XI
## Dissolution; Winding Up

11.1 Term of Existence of the Company. The term of existence of the Company commenced or will commence upon the filing of its Certificate of Formation with the Office of the Secretary of State and shall continue until the Company winds up its affairs, liquidates and is dissolved pursuant to this Article XI.

11.2 Winding Up and Liquidation. The Company shall commence winding up, liquidate and dissolve upon the occurrence of any one or more of the following (a "Dissolution Event"):

(a) The sale or other disposition of all or substantially all of the Company's non-cash assets; provided, however, that if such sale or other disposition involves the receipt of a deferred payment obligation, whether or not secured, or payment in whole or in part in kind, then at the election of the Manager, in its discretion, the term of the Company shall not end and it shall continue until the earlier of the time that (i) the deferred payment obligation shall have been paid in full, (ii) the in-kind consideration received by the Company shall have been sold or otherwise converted to cash or (iii) the Manager, in its discretion, elects to terminate the Company and distribute the deferred payment obligation or in-kind consideration to the Members;

(b) If the Manager, in its discretion, shall elect to wind up and dissolve the Company;

(c) The entry of a judicial decree, as provided in the LLC Act; or

(d) The administrative dissolution of the Company under the LLC Act, unless the Company is reinstated promptly following receipt by the Manager of notice of such administrative dissolution.

11.3 Waiver of Rights; Dissociation of a Member . Each Member irrevocably waives, on behalf of itself and its successors and assigns, any and all rights to terminate, liquidate or dissolve, or to petition a court for the partition, termination, liquidation or dissolution of the Company, except as provided in this Agreement. The occurrence of a Dissociation Event with respect to a Member shall not result in the dissolution of the Company, but the Dissociating Member (a) shall immediately cease to be a Member of the Company and shall be deemed to be an Assignee, and (b) at the election of the Manager in its discretion, automatically be deemed to have resigned from any position as an employee, agent or independent contractor of the Company, or as a trustee of any employee benefit plan of the Company.

11.4 Liquidation Procedures . Upon the occurrence of a Dissolution Event, the affairs and business of the Company shall be wound up and the Company shall be liquidated and dissolved. In connection therewith, a proper accounting shall be made of the Net Profit or Net Loss of the Company from the date of the last previous accounting to the date of termination.

11.5 Distribution on Winding Up . The proceeds of liquidation of the Company shall be applied in the following order:

(a) first, to the payment of the liabilities and obligations of the Company, other than those owed to a Member;

(b) then, to the payment of the liabilities and obligations of the Company to the Member, other than distributions pursuant to Section 6.3 above; and

(c) thereafter, in accordance with Section 6.3.

11.6 Filing of Certificate of Cancellation . If the Company is liquidated and the winding up of the Company has been completed, the Manager shall promptly file the Articles of Dissolution, as required by the LLC Act.

## ARTICLE XII
## Amendments

The Company's Certificate of Formation or this Agreement may be amended in any respect with the written consent of not less than 75% of the equity interests of the Members and only if such amendment(s) do not have an adverse impact on the equity interests of the existing Member(s).

ARTICLE XIII
General Provisions

13.1 Notices . All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given and received (a) when personally delivered, sent by facsimile with a confirmation of transmission, or sent by email with confirmation of transmission, (b) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery or (c) three (3) business days following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, to the following addresses:

(a) If to the Company: The address of the Company's principal office on record with the Office of the Secretary of State.
Attn: Manager

With a copy to: Fran Griesing – fgriesing@griesinglaw.com

(b) If to the Member: The latest address for the Member in the books and records of the Company and to merri.gleckler@gmail.com and dean@dussias.org.

or to such other address as any party hereto may request by notice given to the other parties hereto in accordance with this Section.

13.2 Successors . This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Members and their legal representatives, heirs, successors and assigns, and any other Person who shall have acquired any of the Interest of any Member in accordance with this Agreement.

13.3 Governing Law; Jurisdiction and Venue . This Agreement shall be construed in conformity with the laws of the jurisdiction under which the Company is presently organized, without regard to conflict of law provisions (currently Delaware, subsequently Arizona) and when the Company is formed in Arizona, this Agreement shall be governed and construed, and the legal relationship of the parties determined in accordance with the laws of the State of Arizona applicable to contracts executed and to be performed solely in Arizona. The Company and each Member agree that any dispute among or between them concerning the Company or this Agreement shall first be (a) subject to mediation in Arizona to the extent the Members are unable to reach agreement on any bona fide matter requiring their unanimous consent, the Members shall in good faith attempt to resolve their disagreement by negotiation. If the dispute is not resolved within thirty (30) days or such shorter time as may be necessary to meet business obligations, the controversy shall be submitted to mediation. If agreement cannot be reached through mediation, then the controversy shall be settled by arbitration as set forth as follows: by Arbitration: All parties hereto agree that upon the written demand of any party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Operating Agreement or any course of dealing, course of conduct, statement or actions of any party in connection with this Operating Agreement, including, without limitation, contract disputes and tort

claims, shall be resolved by binding arbitration pursuant to the Commercial Rules of the American Arbitration Association ("AAA"). Any arbitration proceeding held pursuant to this arbitration provision shall be conducted before one arbitrator in Scottsdale, Arizona. This arbitration provision shall not limit the right of any party during any dispute, claim, or controversy to seek, use, and employ ancillary, or preliminary rights and/or remedies, judicial or otherwise, and any such action shall not be deemed an election of remedies. Such remedies include, without limitation, obtaining injunctive relief or a temporary restraining order. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Except as otherwise provided herein, in any action, suit or proceeding brought to enforce the provisions of this Agreement, the parties shall bear their own costs and expenses (including attorneys' fees), except that the party determined by the applicable court of competent jurisdiction to be the prevailing party in such action, suit or proceeding shall be entitled to recover its cost and expenses (including attorneys' fees).

13.4 Counterparts . This Agreement may be executed via facsimile and in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.5 Pronouns and Headings . As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

13.6 Rights of Creditors or Third Parties Under the Agreement . This Agreement is entered into among the Managers and Members for the exclusive benefit of the Company and its Managers and Members and is expressly not intended for the benefit of any other Person, including any Assignee or any creditor of the Company, its Managers or Members. Except and only to the extent provided by applicable law, no such Assignee, creditor or other third party shall have any rights under this Agreement or any agreement between the Company and any Manager or Member with respect to any Capital Contributions, Interest, or otherwise.

13.7 Entire Understanding . This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

13.8 Severability . If any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect (a) any other provision or part of a provision of this Agreement nor (b) this Agreement's validity, legality and enforceability in any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

13.9 Further Assurances . Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.10 Insurance. The Company, at its option, may obtain and become the owner of life insurance policies on the lives of the Members. The Company shall name itself as the beneficiary of the policies. The policies and any proceeds received thereunder shall be held by the Company in trust for purposes of this Operating Agreement. The Company shall have the right to take out additional insurance on the life of any Member, whenever it may be reasonably necessary to carry out its obligations under this Operating Agreement. If the Company shall receive any proceeds of any life insurance policy on the life of a Member,

such proceeds shall be used by the Company to pay the purchase price to the Deceased Member's estate. Any excess insurance proceeds following the payment for the Deceased Member's Membership Interests and debts of the Member shall be retained by the Company.

13.11 WBE Certification. Any and all provisions of this Agreement are subject to the WBE Requirements and any conflicts between the terms hereof and the Certification Requirements shall be resolved in favor of compliance with the Certification Requirements. Each of the Members shall take all action(s) to assist the Company in compliance with the Certification Requirements, shall take no action which shall result in the Company's failure to comply therewith, and, absent any agreement to the contrary, the rights of the Members shall in all cases be subject to change as necessitate by the Certification Requirements.

[EXECUTION PAGE(S) FOLLOWS]

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first written above.

**COMPANY:**

TMG Kreations, LLC d/b/a Kashwere

By: Merri G LLC, its majority Member

______________________________
Merri G LLC

**MANAGER:**

Merri G LLC

By:

______________________________
Merri Gleckler

Dean H Dussias

______________________________
Dean H Dussias

**MEMBER:**

Merri G, LLC

By:

______________________________
its Owner

**MEMBER:**

Dean H Dussias

By:

______________________________
An Individual

SCHEDULE I
Definitions

"Affiliate" of a Person means (i) a director, manager, partner, member, officer, executor or trustee of a Person and (ii) any Person directly or indirectly controlling, controlled by, or under common control with that Person, provided, however, that no Party to this Agreement will be considered an affiliate of any other Party solely by reason of its participation in the Company. For purposes of the foregoing, "control," "controlling" and "controlled" mean having the right to elect a majority of the board of directors or other comparable body responsible for management and direction of a Person by virtue of ownership, by contract or otherwise.

"Assignee" means an assignee, successor or transferee who acquires an Interest, or any separate rights thereunder, as a result of a Transfer pursuant to the terms of this Agreement or otherwise, but who is not admitted as a Member, or a Member who has withdrawn, dissociated or been expelled from the Company. An Assignee shall not (unless admitted as a Member pursuant to Section 10.1 of the Agreement) be entitled to become or exercise any rights of a Member, but shall, at most and subject to the terms and conditions of this Agreement, to the extent of the Interest acquired, be entitled only to the predecessor Member's share of Net Profits and Net Losses, allocations of income, gain, loss, deduction, credit or similar items, and distributions, if any, and all duties, liabilities and obligations in connection therewith.

"Cash from Operations" means all cash available to the Company from operations in the ordinary course of business, after payment of expenses, debts, liabilities and obligations of the Company and reasonable reserves.

"Capital Contribution" means money and the fair market value of other property (net of liabilities assumed by the Company or to which such property is subject) contributed to, or services rendered to or on behalf of, the Company in receipt or respect of an Interest in the Company.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provisions of succeeding law.

"Company" means the limited liability company governed by this Agreement.

"Confidential Information" means any and all confidential or proprietary information regarding the Company or its business, including, without limitation, all products, patents, trademarks, copyrights, processes, techniques, scientific information, computer programs, databases, software, services, research, development, inventions, manufacturing, financial, purchasing, accounting, marketing, customers and prospective customers, and other information, whenever acquired, conceived, originated, discovered or developed, concerning any aspect of the Company or its business, whether or not in written or tangible form. The foregoing to the contrary notwithstanding, "Confidential Information" shall not include (i) information which is or becomes generally available to the public on a non-confidential basis, including from a third party, provided that to the best of the Member's knowledge such third party is not in breach of an obligation of confidentiality with respect to the information; (ii) information that the Member can substantiate that he or it possessed prior to the receipt of any Confidential Information from the Company; (iii) information that the Member can substantiate he or it developed independently and without the disclosure or use of any Confidential Information in violation of this Agreement; or (iv) information that the Company authorizes may be disclosed.

"Disabled" or "Disability" means, with respect to a natural Person, his or her incompetence or inability by reason of any mental or physical impairment for a period of 120 business days during any twelve (12) month period, regardless of such Person's presence or absence at his or her place of employment, to carry out and perform the duties, obligations and responsibilities ordinarily required of such Person by the Company.

In the event of any dispute regarding the determination of Disability, such determination shall be made by a physician selected by the Manager, at the Company's sole expense, in consultation with such Person's primary treating physician; provided, however, that a Person shall be conclusively presumed to be Disabled if such determination is made by an insurer providing long-term disability insurance coverage in respect of such Person.

"Dissociating Member" means any Member with respect to whom a Dissociation Event has occurred.

"Dissociation Event" means (i) a Member's withdrawal pursuant to Section 10.2, (ii) a Member's Insolvency, or (iii) a Transfer in violation of this Agreement or an Involuntary Transfer with respect to a Member's Interest, in whole or in part.

"Dissolution Event" means any of the events set forth in Section 11.2.

"Entity" means a corporation, limited liability company, partnership (general or limited), trust, estate, unincorporated organization, association or other entity.

"Insolvent" or "Insolvency" means, with respect to any Person, that such Person has made an assignment for the benefit of creditors; filed a voluntary petition in bankruptcy; been adjudged a bankrupt or insolvent, or had entered against such Person an order of relief in any bankruptcy or insolvency proceeding; filed a petition or an answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; filed an answer or other plea admitting or failing to contest the material allegations of a petition filed against him in any proceeding of such nature; sought, consented to, or acquiesced in the appointment of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his, her or its properties; sixty (60) days have elapsed after the commencement of any proceeding against such Person seeking reorganization, arrangement, or similar relief under any statute, law, or regulation and such proceeding has not been dismissed; or sixty (60) days have elapsed since the appointment without his, her or its consent or acquiescence of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his, her or its properties and such appointment has not been vacated or stayed or the appointment is not vacated within sixty (60) days after the expiration of such stay.

"Interest" means all of a Member's interest in the Company pursuant to this Agreement and within the meaning of the Act, including, without limitation, such Member's interest in the Company's capital, profits, losses, income, deductions, credits and other tax items and distributions and voting rights, as applicable.

"Involuntary Transfer" means any non-volitional Transfer of an Interest whatsoever, including, without limitation, a Transfer: (i) by reason of Insolvency; (ii) pursuant to a divorce or separation decree, property settlement, or any form of judicially approved marital arrangement; (iii) pursuant to the foreclosure of any lien or other security interest; (iv) pursuant to judicial sale; or (v) otherwise by operation of law (other than a Transfer to a Permitted Transferee by reason of death or legal incompetency).

"Legal Representative" means, (i) with respect to a Disabled Member, an agent of a disabled Member acting pursuant to a valid power of attorney, or if none, the legally appointed guardian of a Disabled Member, and (ii) with respect to a deceased Member, the executor, trustee or other Person with the authority to Transfer such deceased Member's Units.

"LLC Act" means the Arizona Limited Liability Company Act, as amended from time to time.

"Majority Interest" means, with respect to the relevant group of Members, as the context requires, those Members holding Interests representing more than fifty percent (50%) of the aggregate Units or Percentage Interests, as the case may be, entitled to approve, consent to or vote on a matter.

"Manager" means each Person appointed or elected to serve as a Manager of the Company as provided herein.

"Member" means each Person executing this Agreement (or a joinder hereto or subscription agreement) as a Member, each Person who is subsequently issued an Interest and admitted as an additional Member as provided herein, each permitted successor or assign of a Member who is admitted as a substitute Member as provided herein, and, when appropriate to effect the binding nature of this Agreement for the benefit of another Party, any other successor or assign of a Member.

"Net Profit" and "Net Loss" mean the net book income or net book loss, as the case may be, of the Company (including all items of income or loss, such as Code Section 705(a)(2)(B) expenditures and items of nontaxable income, that adjust Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)) determined in accordance with the principles for computing "book" income and "book" loss under Treasury Regulations Section 1.704-1(b)(2)(iv); provided, however, that Regulatory Allocations shall be excluded from the computation of Net Profit and Net Loss.

"Other Available Assets" means cash or other property generated by the Company outside the ordinary course of business and available for distribution as determined by the Manager in its discretion.

"Percentage Interest" means, at any time, a Member's Interest as a fraction of all of the Interests of the relevant group of Members, as the context requires, expressed as a percentage.

"Person" means any natural person or Entity.

"Secretary of State" means the office of the Secretary of State in the jurisdiction of the Company's formation or where the Certificate of Formation of the Company is filed.

"Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment, gift, or other transfer, be it voluntary or involuntary, to any person, inter vivos, testamentary, by operation of laws of devise and descent or other laws, and, when used as a verb, to sell, hypothecate, pledge, assign, gift, or otherwise transfer to any person, be it voluntarily or involuntarily, inter vivos, testamentary, by operation of the laws of devise or descent or any other laws.

"Treasury Regulations" means the tax regulations, including temporary regulations, promulgated under the Code.

"Units" means the units representing a Member's entire interest in the Company, including the Member's right to share in Net Profits and Net Losses, income, gains, losses, deductions, credits or similar items of, and to receive distributions (liquidating or otherwise) and allocations from, the Company pursuant to this Agreement, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, and the right to receive information concerning the business and affairs of the Company, as assigned to a Member under the terms of this Agreement, as amended from time to time.

EXHIBIT A

Table of Members and Interests

| NAME/ADDRESS OF MEMBER | | INTEREST |
|---|---|---|
| Merri G LLC (merri.gleckler@gmail.com | | 70% |
| Dean H Dussias (dean@dussias.org) | | 30% |

**Exhibit B**

This Exhibit B describes the economic agreement and Member provisions between the two Members – Merri G LLC ("MGL") and Dean H Dussias ("DHD"):

**Economic Agreement:**

- Profits, allocated by pro rata ownership, shall be distributed $20,000/month to MGL and $15,000 to DHD; majority member vote may decrease, but not increase the amounts, so long as the percentage decrease is the same for both. Increases require agreement from both MGL and DHD. Distributions above these amounts may be made by majority Member vote, shall be made first to provide a catch-up for MGL equal to pro rata ownership and subsequently shall then resume according to pro rata ownership (70/30% as of the effective date of this Agreement). Distributions above the monthly amounts must be reasonably believed not to be detrimental to the Company's economic value and the ownership interests of MGL and DHD.

- MGL shall have an additional monthly distribution of not more than $1,500/month and DHD has have an additional monthly distribution of not more than $1,200/month which may be used for automobile, technology, office, or other reasonable expenses.

- No other distributions and/or compensation is provided for MGL and DHD without joint, written agreement.

**Member provisions:**

**Transfer Restrictions:** No transfers (other than estate-planning transfers and transfers to affiliates) permitted without the approval of the other Member and no admission of new Members without permission of the other.

**Right of First Refusal:** If any Member wishes to sell a membership interest in the Company, the other Member has a right of first refusal at the same price as the selling Member has been offered by a third-party purchaser. The purchasing Member shall have ninety-days from the time of receiving the third-party, committed terms to complete their purchase. A selling Member has the obligation to inform the other Member of the start of any bona fide purchase discussions within three business days of their start.

**Admission of New Members:** If the Company wishes to raise additional capital by adding additional members, the Managers may do so with majority Member permission. In no case may the Company raise capital and have the majority Member membership interests treated differently or have new (replaced) membership interests to the detriment of the minority Member.

**Drag-along rights:** If the majority Member decides to sell its membership interest in their entirety to a third-party, the selling Member may "drag-along" the other Member only if the market capitalization is at minimum $7MM (minority Member interests worth $2.1MM or more).

**Tag-along rights:** If either Member proposes to sell a portion or all of its membership interest to a third-party, the other Member may participate pro rata in such sale.

**Preemptive Rights:** Each Member shall have the right to purchase its proportionate share of any additional Capital Interests to be issued by the Company such that upon any such issuance of additional Capital Interests, each Member, if it so elects to purchase, will retain the same proportionate Capital Interest in the Company.

# EXHIBIT T

**To:** Kashwere[MERRI@KASHWERE.COM]
**From:** Dean Dussias[dean@kashwere.com]
**Sent:** Mon 2/22/2021 2:02:18 PM (UTC)
**Subject:** Kashwere Operating Agreement (draft)
Kashwere Limited Liability Company Agreement.docx

Hi Merri,

Have incorporated feedback from Friday; let's go over when you have a moment.

Hope your weekend was good…

Best,
Dean

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

EXHIBIT
PENGAD 800-631-6989
Dussias 15
8.22.24 [illegible]

# EXHIBIT U

**To:** Kashwere[MERRI@KASHWERE.COM]
**From:** Dean Dussias[dean@kashwere.com]
**Sent:** Mon 2/22/2021 2:02:18 PM (UTC)
**Subject:** Kashwere Operating Agreement (draft)
Kashwere Limited Liability Company Agreement.docx

Hi Merri,

Have incorporated feedback from Friday; let's go over when you have a moment.

Hope your weekend was good…

Best,
Dean

Dean Dussias
President
Kashwere
dean@kashwere.com
01 (847) 612-1010

EXHIBIT
PENGAD 800-631-6989
Dussias 15
8.22.24 [illegible]

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**TMG KREATIONS, LLC d/b/a KASHWERE (the "Company")**

THIS LIMITED LIABILITY COMPANY AGREEMENT ("Agreement") is made and entered into this ___ day of February, 2021, and effective as of March 13, 2020, by and between the Company, a Delaware limited liability company and each Person executing this Agreement (or a joinder hereto) as a Member or Manager, who is subsequently admitted to the Company as an additional or substitute Member or appointed or elected to serve as a successor Manager as provided herein, or who otherwise becomes bound by this Agreement as provided herein (each a "Party," and collectively, the "Parties").

RECITALS:

WHEREAS, the Company has been organized as a limited liability company under and pursuant to the laws of the State of Delaware on December 15, 2009 for the purposes hereinafter stated; and

WHEREAS, the Parties hereto desire to set forth in this Agreement their respective rights and obligations with respect to the Company and to replace all prior Operating Agreements.

WHEREAS, the Parties would like to convert the Company from a Delaware limited liability company into an Arizona limited liability company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

ARTICLE I
Definitions

Capitalized terms used in this Agreement have the meanings set forth in Schedule I hereto. Capitalized terms used in this Agreement and not otherwise defined in Schedule I hereto shall have the meanings ascribed to them elsewhere in this Agreement.

ARTICLE II
Formation of Company

The Company was formed in December 2009 and this Agreement shall replace in its entirety all prior company and operating agreements without exception and the Company shall be operated in accordance with the terms and conditions of this Agreement. To the extent that the rights and obligations of a Member or Manager with respect to the Company, or the administration, dissolution, liquidation and termination of the Company are not set forth in this Agreement, they shall be governed by the LLC Act. To the extent this Agreement contains a provision contrary to an LLC Act provision that may be waived or overridden by a limited liability company agreement, that LLC Act provision shall be overridden by such contrary provision in this Agreement whether or not specific reference is made to the overridden provision of the LLC Act.

ARTICLE III
Name, Offices, Registered Agents, Company Records and Organization Matters

3.1 Name . The name of the Company will be the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may, in its discretion, select in accordance with the LLC Act. The Company shall have the

exclusive ownership of and right to use the Company name (and any name under which the Company shall elect to conduct its affairs) as long as the Company continues.

3.2 Principal Office of the Company . The principal office of the Company will be located at such place within or outside of the State of Delaware (and subsequently outside the State of Arizona) as the Manager may from time to time designate. The Company may have subsidiary offices in such other place or places as the Manager may from time to time designate. Currently, the principal office is located in Illinois.

3.3 Registered Office and Registered Agent . The Manager will select and designate each registered agent and registered office for the Company. The Manager may from time to time in accordance with the LLC Act change any registered agent and/or registered office of the Company.

3.4 Records to be Maintained: Inspection Rights . The Company will keep at its principal office the information and records to fulfill the obligations of the LLC Act, which shall be subject to inspection and/or copying at the request and at the expense of any Member or Legal Representative for reasonable business purposes during ordinary business hours, in accordance with the standards and limitations as the Manager may reasonably determine from time to time.

3.5 Title to Property. All real and personal property owned by the Company, including, but not limited to, all real and personal property (tangible and intangible) which may be contributed by the Members to the Company from time to time, shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in such Member's individual name or right. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

3.6 No State Law Partnership. The Members intend that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes. The Members intend that the Company not be a partnership or joint venture for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

## ARTICLE IV
## Purpose of the Company

The purpose of the Company shall be to engage in any one or more enterprises, ventures, undertakings, businesses and activities in which limited liability companies are permitted to engage, and the Company may exercise any and all powers that may be legally exercised, under the LLC Act. Consistent with the foregoing, the Company may: (i) exercise all other powers necessary to or reasonably connected with its business that may be legally exercised by limited liability companies under the LLC Act; and (ii) engage in any one or more enterprises, ventures, undertakings, businesses and activities as are necessary, customary, convenient or incidental to any of the foregoing.

## ARTICLE V
## Contributions to Capital; Interests

5.1 Capital Contributions . The Member(s) shall not be required to make additional Capital Contributions to the Company. Without limiting the foregoing, the Member shall have no obligation to restore or otherwise make any Capital Contribution to the Company in respect of a Capital Account deficit upon liquidation and termination of the Company.

5.2 Interests. The Members have the Percentage Interests set forth on Exhibit A hereto. The Manager, in its discretion, may cause the Interests of the Company to be represented by certificates in form and substance satisfactory to the Manager, including the use of Units as defined below in Schedule I. The Manager, in its discretion, may cause the Company to issue additional Interests for equity capital, subject to Exhibit B, in connection with an acquisition, joint venture or strategic alliance, for or in receipt of services rendered to or on behalf of the Company, or otherwise. Such Interests may be issued as a single class or in one or more classes, and with such rights, powers, obligations, restrictions and limitations as the Manager shall determine in its discretion. Upon the issuance of additional Interests pursuant to this Section, the Manager shall be authorized subject to Exhibit B to adjust the Percentage Interests of the Members (or class of Members, as the case may be) to reflect any dilution resulting from such issuance.

## ARTICLE VI
## Allocations of Profits and Losses; Distributions

6.1 Books of Account

(a) At all times during the continuance of the Company, the Manager shall cause proper and true books of account wherein there shall be entered particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's business, and all of such other transactions, matters and things relating to the business of the Company as are usually entered in books of account kept by persons engaged in a business of like kind and character.

(b) Promptly after the close of each fiscal year, the Company shall cause to be prepared such income tax and other returns required under applicable law and regulation, if any, including any and all statements necessary to advise all Members promptly about their investment in the Company for federal income tax reporting purposes. The Manager shall be responsible for the prompt filing and delivery of all such returns and statements. The initial "tax matters partner" and "partnership representative" (under Code Section 6223(a) (as amended by the BBA) for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code (as amended by the BBA) shall be Merri Gleckler.

6.2 Net Profit and Loss and Tax Allocations

(a) Until such time as two or more Persons hold Interests in the Company for federal income tax purposes, it is the intention of the Member that the Company be disregarded for federal and all relevant state tax purposes and that the activities of the Company shall be deemed to be activities of the Member for such purposes. At all times that two or more Persons hold Interests in the Company for federal income tax purposes (i) it is the Company's intention, and the Company shall make all available elections to be treated, and the Company will be treated, as a "partnership" for federal and all relevant state tax purposes; and (ii) in such case, Net Profits and Net Losses shall be allocated for each applicable accounting period, among the Members, pro rata in accordance with their Percentage Interests.

(b) Company income, gain, loss, deduction, credit and other tax items shall be allocated to the Members in the same manner as corresponding Net Profits and Net Losses are allocated pursuant to Subsection (a) above. Notwithstanding the foregoing, to the extent the Company is treated as a "partnership" for federal and state tax purposes, the tax allocations hereunder are intended to allocate Company tax items in accordance with the Members' economic interests in the Company while complying with the requirements of Code Section 704(b) and the applicable Treasury Regulations. Accordingly, the Manager may allocate tax items in a manner other than set forth above, in the Manager's discretion, if the Manager determines that

doing so will achieve more equitable allocations or allocations more consistent with Section 704 of the Code and the applicable Treasury Regulations.

6.3 Distributions . Cash from Operations and Other Available Assets may be distributed in such amounts and at such times as the Manager shall determine in its discretion, to the Members, pro rata in accordance with their Percentage Interests. The foregoing to the contrary notwithstanding, upon the occurrence of a Dissolution Event in respect of the Company, the Company's liquidating proceeds shall be distributed in accordance with Section 11.5 below.

## ARTICLE VIII
## Management of the Company

7.1 Management of the Company . The business and affairs of the Company shall be managed exclusively by or under the direction of one or more individuals (each, a "Manager"). Each Manager shall be appointed by a majority vote by the Members. The initial Manager(s) of the Company shall be Merri G, LLC, a Delaware limited liability company. The Members may, in their discretion, remove and replace, for any reason (or no reason), with or without cause, any Manager appointed by the Members. Each Manager shall serve until his or her successor is appointed or until his or her earlier resignation, Disability, death or removal. In the event of a vacancy, a successor Manager may be appointed by the Members. A Person's ceasing to serve as a Manager shall not affect such Person's rights as a Member, if any.

7.2 Authority of Manager . Subject to such limitations as may be imposed by this Agreement, non-waivable provisions of the LLC Act or other applicable law, the Manager is authorized to carry out and implement any and all of the purposes of the Company and shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the business of the Company.

7.3 Action by Manager . At any time, there are two or more Managers, (a) each Manager shall have a vote proportional to their membership interest; and (b) the approval, consent or vote of a majority of the Managers shall govern with respect to any matter requiring the approval, consent or vote of the Managers, except as otherwise expressly provided herein. Exceptions to the majority vote are listed in Exhibit B.

7.4 Officers. The Manager, in its discretion, may from time to time designate officers of the Company, with titles including but not limited to "chairman," "chief executive officer," "president," "secretary," "chief financial officer," "chief operating officer," "chief information officer" and "vice president". Any number of offices may be held by the same individual or the Manager, in its discretion, may choose not to fill any office for any period as it may deem advisable. Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or disability or until such officer shall resign or shall have been removed in the manner hereinafter provided. Any officer may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. The Manager may remove any officer for any reason (or no reason) at any time, with or without cause. Designation of an officer shall not of itself create any contractual employment rights. As of the date hereof, Merri Gleckler shall be appointed to the office of the Chief Executive Officer and Founder and (ii) Dean Dussias shall be appointed to the office of President and Chief Financial Officer. Each officer shall devote a sufficient amount of time to enable her or him to satisfactorily fulfill her or his duties and responsibilities to the Company. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business, the assignment of such title shall

constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Manager.

7.5 Compensation and Reimbursement of Managers . Any Manager may, in the discretion of the Member, receive reasonable compensation for such Manager's services to the Company. The Company shall reimburse each Manager for any costs that may be properly expended by such Manager on behalf of the Company.

7.6 Duties and Obligations; Standard of Conduct .

(a) The Manager shall devote to the Company such time as may be reasonably necessary for the performance of such Manager's duties and responsibilities hereunder. Each Manager may otherwise engage in business ventures of any nature and description, independently or with others, including, but not limited to, business of the character described in Article IV above, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

(b) The Manager, in managing the business and affairs of the Company, will discharge his or her duties: (i) in a manner he or she believes in good faith to be in the best interests of the Company; (ii) in a manner he or she believes in good faith to represent the care an ordinarily prudent person in a like position would exercise under similar circumstances; (iii) in good faith reliance on the provisions of this Agreement; (iv) without engaging in or willful misconduct or a knowing violation of applicable law; and (v) without engaging in any transaction for which he or she receives a personal benefit in violation or breach of any provision of this Agreement. Except for the implied contractual covenant of good faith and fair dealing under applicable Arizona law, no Manager has any other duty to the Company, any Member or any other Person.

(c) The provisions of this Agreement (including, without limitation, this Section) replace, eliminate and otherwise supplant those duties (including fiduciary duties) that a Manager might otherwise have under applicable law.

7.7 Liability of Managers . To the fullest extent permitted by applicable law, a Manager (which for purposes of this Section shall include his or its shareholders, members, partners or other principal owners, directors, managers, officers, employees, agents and their respective Affiliates) shall not be liable to the Company or any Member for (a) any action taken, or failure to act, as Manager, or on behalf of the Manager, with respect to the Company, unless such action taken (or failure to act) was taken in bad faith and not in a manner reasonably believed to be in the best interests of the Company or was the result of the Manager's or such other Person's willful misconduct, (b) any action or inaction arising from reliance in good faith upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected by any of them with reasonable care or (c) the action or inaction of any agent, contractor or consultant selected and monitored by any of them with reasonable care.

7.8 Indemnification . (a) The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the Person is or was a Manager (which for purposes of this Section shall include the Manager's shareholders, members, partners, directors, managers, officers, employees, agents and affiliates), officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with the action, suit or proceeding, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests

of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful.

(b) The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action or suit, by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was a Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of the action or suit, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made in respect of any claim, issue or matter as to which the Person shall have been adjudged to be liable for willful misconduct in the performance of the Person's duty to the Company, unless, and only to the extent that, the court in which the action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for those expenses as the court shall deem proper.

(c) The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under the Company's Certificate of Formation, or any agreement, vote of Members, or otherwise, both as to action in the Person's official capacity and as to action in another capacity while holding office, and shall continue as to a Person who has ceased to hold a position subject to indemnification under this Section and shall inure to the benefit of the heirs, executors and administrators of such Person.

7.9 No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Operating Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of: (a) any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member; or (b) any of the terms, conditions, or provisions of the organizational or governance documents of such Member if it is a corporation or other business entity or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of his, her, or its material properties or assets is subject.

7.10 Securities. Such Member owns his, her, or its Membership Interest only for his, her, or its own account and not on behalf of any other Person, and only for the purpose of holding for investment and not with a view to any further distribution thereof. No other Person is participating with, or providing or otherwise arranging funds, or credit for such Member in respect to the acquisition of his, her, or its Membership Interests. Such Member has no agreement, arrangement, or understanding for transfer of any part of his, her, or its Membership Interest to any other Person. Subject to and in addition to all of the restrictions on transfer contained in this Operating Agreement, such Member shall not offer for sale or sell any part of his, her, or its Membership Interest except upon acceptance by the Company of an opinion of counsel for the purchaser in such form as is satisfactory to counsel for the Company that registration under federal and state securities laws is not required. Such Member (a) either has such knowledge and experience in financial and business matters, or has the advice or representation of a person or entity having such knowledge and experience, to be able to evaluate the merits and risks of his, her, or its investment in the Company or has been given or had access to sufficient information regarding the Company to evaluate the investment in his, her, or its Membership Interest being acquired, and (b) is able to bear the economic risk of the investment in his, her, or its Membership Interest and to hold the same for purposes of investment. Such Member is aware that no market exists for the resale of his, her, or its Membership Interest.

7.11 Confidentiality. Each Member and Manager acknowledges that the nonpublic data and records maintained by the Company and its Affiliates pertaining to its or their business, including, without limitation, intellectual property, technical information, trade secrets, product formulae, data and know-how, business and marketing plans and reports, design materials, documentation and information respecting customers and prospective customers, vendors, partners and employees, product specifications, data, know-how, techniques, methods, processes, designs, sketches, photographs, graphs, drawings, inventions and ideas, past, current and planned research and development, customer lists, names or addresses, current and anticipated customer requirements, price lists, market studies, business plans and any other information and financial information and data, (such nonpublic information is hereinafter referred to as "Confidential Information") are valuable and unique assets of the Company. Each Member and Manager agrees that he, she or it will not, without the written consent of the Manager, disclose to any person, firm or corporation, or use for any purpose whatsoever, except in connection with and furtherance of the business of the Company, any Confidential Information, provided that no provision of this Agreement shall be construed as precluding the disclosure of Confidential Information if such disclosure is required by law or a court order. If disclosure of Confidential Information is required by law or court order, the affected Member or Manager shall give written notice to the Manager prior to making such disclosure so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the affected Member or Manager is, in the opinion of its counsel, compelled to disclose any Confidential Information under pain of liability for contempt or other censure or penalty, such affected Member or Manager may disclose only that portion of such Confidential Information as is legally required without liability hereunder; provided that the affected Member or Manager agrees to exercise his, her or its reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. Upon a withdrawal, removal or resignation, as applicable, such Member or Manager shall forthwith deliver to the Company immediately all Confidential Information and other property of the Company in his, her or its possession and will not make or retain copies of any thereof, except as may be required by applicable law or court order.

Non-Disclosure of Confidential Information.

(a) During the time that each party is a Member of the Company and for two (2) years after a Member ceases to be affiliated with the Company in any manner, each Member acknowledges that he will be afforded access to Confidential Information (as defined below); that public disclosure of such Confidential Information would have an adverse effect on the Company and its business; and that the provisions of this Section are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b) Each Member agrees that while he, she, or it is a Member of the Company and for a period of two (2) years following the termination of the Member's affiliation with the Company, shall not communicate or divulge or use for the Member's benefit or any other persons, firm, corporation, or other entity any Confidential Information, and the Member shall hold in confidence the Confidential Information and shall not disclose it to any other person except with the specific prior written consent of the Company and the other Members.

(c) Any trade secrets of the Company shall be entitled to all of the protections and benefits under Arizona Statutes and any other applicable law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret of purpose of this Agreement. The Members hereby waive any requirement that the Company submit

proof of the economic value of any trade secret or post a bond or other security.

(d) All price lists, customer lists, contact information, records, notebooks, plans, models, components, software, databases, marketing information, business plans, devices, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") shall be deemed proprietary to the Company. Upon the termination of a Member's Membership Interest in the Company, the Member shall return to the Company all of the Proprietary Items in his possession or subject to his control, and the Member shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(e) "Confidential Information" shall also mean any and all: (1) trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute; (2) information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented); and (3) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing.

(f) Duty of Loyalty. Members shall devote their energies into the operation of this Company. Nevertheless, a Member may have other business interests and may engage in or invest in other activities in addition to those relating to the Company provided such business interests do not directly or indirectly compete with the Company and provided that such interests do not prevent or interfere with a Member's obligation to the Company. Each Member shall offer the Company and the other Members the opportunity to take advantage of a business opportunity she or he identifies that would be within the scope of the Company's operating activity. If the Company wishes not to explore a business opportunity presented by a Member, then and only then would a Member be entitled to take advantage of such opportunity. This provision does not preclude Merri Gleckler from continuing her involvement in her other companies nor does it entitle any other Member at any time to any profits or proceeds from the operation of these companies.

## ARTICLE IX
## Certain Rights and Obligations of Member

8.1 No Management by the Member . The Member, in its capacity as such, shall take no part in the control or management of the affairs of the Company, nor have any authority to act for or on behalf of the Company or to sign for or bind the Company.

8.2 Limited Liability of the Member . Except as expressly provided in this Agreement, by non-waivable provisions of the LLC Act or by other applicable law, the Member of the Company shall not be personally liable for any debts, liabilities or obligations of the Company, whether arising in tort, contract or otherwise, solely by reason of being a Member of the Company.

8.3 Action by the Member . At any time, there are two or more Members, then (a) each Member shall be entitled to a number of votes equal to his or its Percentage Interest; and (b) the approval, consent or vote of a Majority Interest of the Members shall govern with respect to matters permitting or

requiring the approval, consent or vote of the Members hereunder; exceptions to such majority vote are listed in Exhibit B.

8.4 Confidentiality . The Member shall not to, directly or indirectly, disclose to anyone, or use or otherwise exploit for such Member's own benefit or for the benefit of anyone other than the Company, any Confidential Information of the Company; provided, however, that the Member may make any such disclosure required by law or court order, provided that such Member shall promptly notify the Company and reasonably cooperate with the Company to obtain a protective order or other remedy, and if such remedy is not obtained by the Company, such Member will furnish only that portion of the Confidential Information which is required to be furnished pursuant to such law or court order. The Member understands that the Company will not have an adequate remedy at law for the material breach or threatened breach of any one or more of the covenants set forth in this Section and agrees that in the event of any such material breach or threatened breach, the Company shall be entitled, in addition to any other remedies which may be available to it, to injunctive relief (without bond) to enjoin the breaching party from the breach or threatened breach of such covenants.

8.5 Conflicts of Interest, Related Party Transactions and Other Activities. Any Member and any Affiliate of any such Member, and any of their respective directors, officers, members, partners, stockholders, employees, or controlling persons may engage in or possess an interest in any business or activity, without any accountability to the Company or any other Member, and without obligation to offer such business opportunity to the Company or any other Member. No such Person shall be liable to the Company or any other Member for breach of any fiduciary or other duty, as a Member or otherwise, by reason of the fact that such Person acquires or pursues such opportunity or directs such opportunity to another person, except for any Member that agrees otherwise pursuant to a separate agreement with the Company or any other direct or indirect subsidiaries or Affiliates of the Company; provided, however, that nothing in this Section 8.5 or in such separate agreement shall be construed to relieve or excuse any Person from his, her or its obligations under Section 8.6 or any employment agreement, non-use, non-disclosure, non- compete, non-solicitation, covenant-not-to-compete or similar covenant in this Agreement or any other agreement between such Person and the Company.

8.6 Voting; Action by Members. With respect to all matters to be decided or voted on by the Members pursuant to the terms of this Agreement or the Act, each Member shall have one vote for each Unit held by such Member. All decisions of the Members must be approved by Members holding at least majority of the issued and outstanding Units, unless a greater percentage is required by this Agreement or the Act.

8.7 Member Assurances. Each Member agrees to execute such further documents, instruments and agreements as the Manager deems necessary to further effect and carry out the intentions and provisions of this Agreement.

## ARTICLE IX
## Transfers of Membership Interests and Investment Representation

9.1 General Prohibition on Transfers . The Member shall not Transfer its Interest, in whole or in part, directly or indirectly, without the prior written consent of the Manager, in its sole and absolute discretion, subject to Exhibit B. Upon the Insolvency, legal incompetency, death, dissolution or liquidation of the Member, or the occurrence of an Involuntary Transfer or other Transfer with respect to the Member's Interest, the assignee, transferee, successor or Legal Representative of such Member shall not (unless admitted as a

Member pursuant to Section 10.1 below) be entitled to become or exercise any rights of a Member, but shall, at most and subject to the terms and conditions of this Agreement, to the extent of the Membership Interest acquired, be entitled only to the predecessor Member's economic rights, if any, in the capital, profits, losses and distributions of the Company and all duties, liabilities and obligations in connection therewith. Any Person who acquires, in any manner whatsoever, any Membership Interest held by a Manager shall not be a Manager by reason thereof.

9.2 General Transfer Provisions . In the case of a Transfer of the Member's Interest permitted pursuant to this Agreement, such Transfer shall not be given effect unless and until (a) the Transfer is made in writing, in form and substance acceptable to the Manager in its discretion, signed by the Member and accepted in writing by the transferee, and a duplicate original of such document is delivered to the Company, (b) the transferee executes and delivers to the Company a written agreement, in form and substance acceptable to the Manager in its discretion, pursuant to which said transferee agrees to be bound by and confirms the terms and conditions of this Agreement and (c) if necessary or appropriate, an amendment to this Agreement, in form and substance acceptable to the Manager in its discretion, is executed and delivered to the Company. The foregoing to the contrary notwithstanding: (i) the Company shall be entitled to treat any such prospective transferee as the absolute owner of the Interest in all respects and shall incur no liability for distributions made in good faith to such transferee prior to such time as the documents specified in the preceding Subsections (a) through (c) have been delivered to and accepted by the Company; and (ii) the transferee shall be subject to and bound by all terms, conditions and obligations of this Agreement to which such Member was subject or bound, without regard to whether such transferee has executed a counterpart hereof or any other document contemplated hereby. The costs (including reasonable attorneys' fees) incurred by the Company in processing the Transfer of a Member's Interest shall be borne by the transferee, and shall be payable prior to and as a condition of such Transfer.

9.3 Investment Representation. Each Member hereby represents to, and agrees with, the other Members and the Company that such Member owns its Units for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.

## ARTICLE X
## Admission or Withdrawal of a Member

10.1 Admission of a Member. The Manager, in its discretion, may admit one or more additional or substitute Members. Such Members shall be entitled to all of the rights and privileges, and subject to the obligations and restrictions, applicable to other Members holding the same class of Interest hereunder, and in all other respects their admission shall be subject to all of the terms and provisions hereof.

10.2 Withdrawal of a Member. A Member may withdraw at any time; provided, however, that a Member who dissociates or withdraws shall not be relieved of its Capital Commitment, nor shall such Member be entitled to receive any distribution from the Company in respect of its Interest, except by way of distributions pursuant to Section 6.2 above or upon the winding up of the Company pursuant to Section 11.5 below. For the avoidance of doubt, upon the dissociation or withdrawal of a Member, the Company shall not have any obligation to purchase, redeem or liquidate such Member's Interest. Any withdrawal in violation of this Agreement shall entitle the Company to damages which may be offset against the amounts otherwise payable as a distribution to such Member purporting to withdraw from the Company. This Section expressly overrides any and all contrary provisions of the LLC Act.

## ARTICLE XI

Dissolution; Winding Up

11.1 Term of Existence of the Company . The term of existence of the Company commenced or will commence upon the filing of its Certificate of Formation with the Office of the Secretary of State and shall continue until the Company winds up its affairs, liquidates and is dissolved pursuant to this Article XI.

11.2 Winding Up and Liquidation . The Company shall commence winding up, liquidate and dissolve upon the occurrence of any one or more of the following (a "Dissolution Event"):

(a) The sale or other disposition of all or substantially all of the Company's non-cash assets; provided, however, that if such sale or other disposition involves the receipt of a deferred payment obligation, whether or not secured, or payment in whole or in part in kind, then at the election of the Manager, in its discretion, the term of the Company shall not end and it shall continue until the earlier of the time that (i) the deferred payment obligation shall have been paid in full, (ii) the in-kind consideration received by the Company shall have been sold or otherwise converted to cash or (iii) the Manager, in its discretion, elects to terminate the Company and distribute the deferred payment obligation or in-kind consideration to the Members;

(b) If the Manager, in its discretion, shall elect to wind up and dissolve the Company;

(c) The entry of a judicial decree, as provided in the LLC Act; or

(d) The administrative dissolution of the Company under the LLC Act, unless the Company is reinstated promptly following receipt by the Manager of notice of such administrative dissolution.

11.3 Waiver of Rights; Dissociation of a Member . Each Member irrevocably waives, on behalf of itself and its successors and assigns, any and all rights to terminate, liquidate or dissolve, or to petition a court for the partition, termination, liquidation or dissolution of the Company, except as provided in this Agreement. The occurrence of a Dissociation Event with respect to a Member shall not result in the dissolution of the Company, but the Dissociating Member (a) shall immediately cease to be a Member of the Company and shall be deemed to be an Assignee, and (b) at the election of the Manager in its discretion, automatically be deemed to have resigned from any position as an employee, agent or independent contractor of the Company, or as a trustee of any employee benefit plan of the Company.

11.4 Liquidation Procedures . Upon the occurrence of a Dissolution Event, the affairs and business of the Company shall be wound up and the Company shall be liquidated and dissolved. In connection therewith, a proper accounting shall be made of the Net Profit or Net Loss of the Company from the date of the last previous accounting to the date of termination.

11.5 Distribution on Winding Up . The proceeds of liquidation of the Company shall be applied in the following order:

(a) first, to the payment of the liabilities and obligations of the Company, other than those owed to a Member;

(b) then, to the payment of the liabilities and obligations of the Company to the Member, other than distributions pursuant to Section 6.3 above; and

(c) thereafter, in accordance with Section 6.3.

11.6 Filing of Certificate of Cancellation. If the Company is liquidated and the winding up of the Company has been completed, the Manager shall promptly file the Articles of Dissolution, as required by the LLC Act.

ARTICLE XII

Amendments

The Company's Certificate of Formation or this Agreement may be amended in any respect with the written consent of not less than 80% of the Interests of the Members.

ARTICLE XIII

General Provisions

13.1 Notices . All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given and received (a) when personally delivered, sent by facsimile with a confirmation of transmission, or sent by email with confirmation of transmission, (b) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery or (c) three (3) business days following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, to the following addresses:

| | | |
|---|---|---|
| (a) | If to the Company: | The address of the Company's principal office on record with the Office of the Secretary of State. Attn: Manager |
| | With a copy to: | Fran Griesing – fgriesing@griesinglaw.com |
| (b) | If to the Member: | The latest address for the Member in the books and records of the Company and to merri.gleckler@gmail.com and dean@dussias.org. |

or to such other address as any party hereto may request by notice given to the other parties hereto in accordance with this Section.

13.2 Successors . This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Members and their legal representatives, heirs, successors and assigns, and any other Person who shall have acquired any of the Interest of any Member in accordance with this Agreement.

13.3 Governing Law; Jurisdiction and Venue . This Agreement shall be construed in conformity with the laws of the jurisdiction under which the Company is presently organized, without regard to conflict of law provisions (currently Delaware, subsequently Arizona) and when the Company is formed in Arizona, this Agreement shall be governed and construed, and the legal relationship of the parties determined in accordance with the laws of the State of Arizona applicable to contracts executed and to be performed solely in Arizona. The Company and each Member agree that any dispute among or between them concerning the Company or this Agreement shall first be (a) subject to mediation in Arizona to the extent the Members are unable to reach agreement on any bona fide matter requiring their unanimous consent, the Members shall in good faith attempt to resolve their disagreement by negotiation. If the dispute is not resolved within thirty (30) days or such shorter time as may be necessary to meet business obligations, the controversy shall be submitted to mediation. If agreement cannot be reached through mediation, then the controversy shall be settled by arbitration as set forth as follows: by Arbitration: All parties hereto agree that upon the written demand of any party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims and controversies between them, whether individual, joint, or class in nature,

arising from this Operating Agreement or any course of dealing, course of conduct, statement or actions of any party in connection with this Operating Agreement, including, without limitation, contract disputes and tort claims, shall be resolved by binding arbitration pursuant to the Commercial Rules of the American Arbitration Association ("AAA"). Any arbitration proceeding held pursuant to this arbitration provision shall be conducted before one arbitrator in Scottsdale, Arizona. This arbitration provision shall not limit the right of any party during any dispute, claim, or controversy to seek, use, and employ ancillary, or preliminary rights and/or remedies, judicial or otherwise, and any such action shall not be deemed an election of remedies. Such remedies include, without limitation, obtaining injunctive relief or a temporary restraining order. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Except as otherwise provided herein, in any action, suit or proceeding brought to enforce the provisions of this Agreement, the parties shall bear their own costs and expenses (including attorneys' fees), except that the party determined by the applicable court of competent jurisdiction to be the prevailing party in such action, suit or proceeding shall be entitled to recover its cost and expenses (including attorneys' fees).

13.4 Counterparts . This Agreement may be executed via facsimile and in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.5 Pronouns and Headings . As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

13.6 Rights of Creditors or Third Parties Under the Agreement . This Agreement is entered into among the Managers and Members for the exclusive benefit of the Company and its Managers and Members and is expressly not intended for the benefit of any other Person, including any Assignee or any creditor of the Company, its Managers or Members. Except and only to the extent provided by applicable law, no such Assignee, creditor or other third party shall have any rights under this Agreement or any agreement between the Company and any Manager or Member with respect to any Capital Contributions, Interest, or otherwise.

13.7 Entire Understanding . This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

13.8 Severability . If any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect (a) any other provision or part of a provision of this Agreement nor (b) this Agreement's validity, legality and enforceability in any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

13.9 Further Assurances . Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.10 Insurance. The Company, at its option, may obtain and become the owner of life insurance policies on the lives of the Members. The Company shall name itself as the beneficiary of the policies. The policies and any proceeds received thereunder shall be held by the Company in trust for purposes of this Operating Agreement. The Company shall have the right to take out additional insurance on the life of any

Member, whenever it may be reasonably necessary to carry out its obligations under this Operating Agreement. If the Company shall receive any proceeds of any life insurance policy on the life of a Member, such proceeds shall be used by the Company to pay the purchase price to the Deceased Member's estate. Any excess insurance proceeds following the payment for the Deceased Member's Membership Interests and debts of the Member shall be retained by the Company.

13.11 WBE Certification. Any and all provisions of this Agreement are subject to the WBE Requirements and any conflicts between the terms hereof and the Certification Requirements shall be resolved in favor of compliance with the Certification Requirements. Each of the Members shall take all action(s) to assist the Company in compliance with the Certification Requirements, shall take no action which shall result in the Company's failure to comply therewith, and, absent any agreement to the contrary, the rights of the Members shall in all cases be subject to change as necessitate by the Certification Requirements.

[EXECUTION PAGE(S) FOLLOWS]

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the date first written above.

**COMPANY**:

TMG Kreations, LLC d/b/a Kashwere

By: Merri G LLC, its majority Member

____________________________________

Merri G LLC

**MANAGER**:

Merri G LLC

By:

________________________

Merri Gleckler

**MEMBER**:

Merri G, LLC

By:

____________________________________

its Owner

**MEMBER**:

Dean H Dussias

By:

____________________________________

An Individual

# SCHEDULE I
## Definitions

"Affiliate" of a Person means (i) a director, manager, partner, member, officer, executor or trustee of a Person and (ii) any Person directly or indirectly controlling, controlled by, or under common control with that Person, provided, however, that no Party to this Agreement will be considered an affiliate of any other Party solely by reason of its participation in the Company. For purposes of the foregoing, "control," "controlling" and "controlled" mean having the right to elect a majority of the board of directors or other comparable body responsible for management and direction of a Person by virtue of ownership, by contract or otherwise.

"Assignee" means an assignee, successor or transferee who acquires an Interest, or any separate rights thereunder, as a result of a Transfer pursuant to the terms of this Agreement or otherwise, but who is not admitted as a Member, or a Member who has withdrawn, dissociated or been expelled from the Company. An Assignee shall not (unless admitted as a Member pursuant to Section 10.1 of the Agreement) be entitled to become or exercise any rights of a Member, but shall, at most and subject to the terms and conditions of this Agreement, to the extent of the Interest acquired, be entitled only to the predecessor Member's share of Net Profits and Net Losses, allocations of income, gain, loss, deduction, credit or similar items, and distributions, if any, and all duties, liabilities and obligations in connection therewith.

"Cash from Operations" means all cash available to the Company from operations in the ordinary course of business, after payment of expenses, debts, liabilities and obligations of the Company and reasonable reserves.

"Capital Contribution" means money and the fair market value of other property (net of liabilities assumed by the Company or to which such property is subject) contributed to, or services rendered to or on behalf of, the Company in receipt or respect of an Interest in the Company.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provisions of succeeding law.

"Company" means the limited liability company governed by this Agreement.

"Confidential Information" means any and all confidential or proprietary information regarding the Company or its business, including, without limitation, all products, patents, trademarks, copyrights, processes, techniques, scientific information, computer programs, databases, software, services, research, development, inventions, manufacturing, financial, purchasing, accounting, marketing, customers and prospective customers, and other information, whenever acquired, conceived, originated, discovered or developed, concerning any aspect of the Company or its business, whether or not in written or tangible form. The foregoing to the contrary notwithstanding, "Confidential Information" shall not include (i) information which is or becomes generally available to the public on a non-confidential basis, including from a third party, provided that to the best of the Member's knowledge such third party is not in breach of an obligation of confidentiality with respect to the information; (ii) information that the Member can substantiate that he or it possessed prior to the receipt of any Confidential Information from the Company; (iii) information that the Member can substantiate he or it developed independently and without the disclosure or use of any Confidential Information in violation of this Agreement; or (iv) information that the Company authorizes may be disclosed.

"Disabled" or "Disability" means, with respect to a natural Person, his or her incompetence or inability by reason of any mental or physical impairment for a period of 120 business days during any twelve (12) month period, regardless of such Person's presence or absence at his or her place of employment, to carry out and perform the duties, obligations and responsibilities ordinarily required of such Person by the Company.

In the event of any dispute regarding the determination of Disability, such determination shall be made by a physician selected by the Manager, at the Company's sole expense, in consultation with such Person's primary treating physician; provided, however, that a Person shall be conclusively presumed to be Disabled if such determination is made by an insurer providing long-term disability insurance coverage in respect of such Person.

"Dissociating Member" means any Member with respect to whom a Dissociation Event has occurred.

"Dissociation Event" means (i) a Member's withdrawal pursuant to Section 10.2, (ii) a Member's Insolvency, or (iii) a Transfer in violation of this Agreement or an Involuntary Transfer with respect to a Member's Interest, in whole or in part.

"Dissolution Event" means any of the events set forth in Section 11.2.

"Entity" means a corporation, limited liability company, partnership (general or limited), trust, estate, unincorporated organization, association or other entity.

"Insolvent" or "Insolvency" means, with respect to any Person, that such Person has made an assignment for the benefit of creditors; filed a voluntary petition in bankruptcy; been adjudged a bankrupt or insolvent, or had entered against such Person an order of relief in any bankruptcy or insolvency proceeding; filed a petition or an answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; filed an answer or other plea admitting or failing to contest the material allegations of a petition filed against him in any proceeding of such nature; sought, consented to, or acquiesced in the appointment of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his, her or its properties; sixty (60) days have elapsed after the commencement of any proceeding against such Person seeking reorganization, arrangement, or similar relief under any statute, law, or regulation and such proceeding has not been dismissed; or sixty (60) days have elapsed since the appointment without his, her or its consent or acquiescence of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his, her or its properties and such appointment has not been vacated or stayed or the appointment is not vacated within sixty (60) days after the expiration of such stay.

"Interest" means all of a Member's interest in the Company pursuant to this Agreement and within the meaning of the Act, including, without limitation, such Member's interest in the Company's capital, profits, losses, income, deductions, credits and other tax items and distributions and voting rights, as applicable.

"Involuntary Transfer" means any non-volitional Transfer of an Interest whatsoever, including, without limitation, a Transfer: (i) by reason of Insolvency; (ii) pursuant to a divorce or separation decree, property settlement, or any form of judicially approved marital arrangement; (iii) pursuant to the foreclosure of any lien or other security interest; (iv) pursuant to judicial sale; or (v) otherwise by operation of law (other than a Transfer to a Permitted Transferee by reason of death or legal incompetency).

"Legal Representative" means, (i) with respect to a Disabled Member, an agent of a disabled Member acting pursuant to a valid power of attorney, or if none, the legally appointed guardian of a Disabled Member, and (ii) with respect to a deceased Member, the executor, trustee or other Person with the authority to Transfer such deceased Member's Units.

"LLC Act" means the Arizona Limited Liability Company Act, as amended from time to time.

"Majority Interest" means, with respect to the relevant group of Members, as the context requires, those Members holding Interests representing more than fifty percent (50%) of the aggregate Units or Percentage Interests, as the case may be, entitled to approve, consent to or vote on a matter.

"Manager" means each Person appointed or elected to serve as a Manager of the Company as provided herein.

"Member" means each Person executing this Agreement (or a joinder hereto or subscription agreement) as a Member, each Person who is subsequently issued an Interest and admitted as an additional Member as provided herein, each permitted successor or assign of a Member who is admitted as a substitute Member as provided herein, and, when appropriate to effect the binding nature of this Agreement for the benefit of another Party, any other successor or assign of a Member.

"Net Profit" and "Net Loss" mean the net book income or net book loss, as the case may be, of the Company (including all items of income or loss, such as Code Section 705(a)(2)(B) expenditures and items of nontaxable income, that adjust Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)) determined in accordance with the principles for computing "book" income and "book" loss under Treasury Regulations Section 1.704-1(b)(2)(iv); provided, however, that regulatory allocations made to comply with Treasury Regulations Section 1.704-1(b), to the extent possible, shall be excluded from the computation of Net Profit and Net Loss.

"Other Available Assets" means cash or other property generated by the Company outside the ordinary course of business and available for distribution as determined by the Manager in its discretion.

"Percentage Interest" means, at any time, a Member's Interest as a fraction of all of the Interests of the relevant group of Members, as the context requires, expressed as a percentage.

"Person" means any natural person or Entity.

"Secretary of State" means the office of the Secretary of State in the jurisdiction of the Company's formation or where the Certificate of Formation of the Company is filed.

"Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment, gift, or other transfer, be it voluntary or involuntary, to any person, inter vivos, testamentary, by operation of laws of devise and descent or other laws, and, when used as a verb, to sell, hypothecate, pledge, assign, gift, or otherwise transfer to any person, be it voluntarily or involuntarily, inter vivos, testamentary, by operation of the laws of devise or descent or any other laws.

"Treasury Regulations" means the tax regulations, including temporary regulations, promulgated under the Code.

"Units" means the units representing a Member's entire interest in the Company, including the Member's right to share in Net Profits and Net Losses, income, gains, losses, deductions, credits or similar items of, and to receive distributions (liquidating or otherwise) and allocations from, the Company pursuant to this Agreement, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, and the right to receive information concerning the business and affairs of the Company, as assigned to a Member under the terms of this Agreement, as amended from time to time.

EXHIBIT A

Table of Members and Interests

| NAME/ADDRESS OF MEMBER | | INTEREST |
|---|---|---|
| Merri G LLC (merri.gleckler@gmail.com | | 70% |
| Dean H Dussias (dean@dussias.org) | | 30% |

# Exhibit B

This Exhibit B describes the economic agreement and Member provisions between the two Members – Merri G LLC ("MGL") and Dean H Dussias ("DHD"):

**Economic Agreement:**

- Profits, allocated by pro rata ownership, shall be distributed $25,000/month to MGL and $15,000 to DHD; majority member vote may decrease, but not increase the amounts, so long as the percentage decrease is the same for both. Increases require agreement from both MGL and DHD. Distributions above these amounts may be made by majority Member vote, shall be made first to provide a catch-up for MGL equal to pro rata ownership and subsequently shall then resume according to pro rata ownership (70/30% as of the effective date of this Agreement). Distributions above the monthly amounts must be reasonably believed not to be detrimental to the Company's economic value and the ownership interests of MGL and DHD.

- MGL shall have an additional monthly payment of not more than $1,500/month and DHD has have an additional monthly payment of not more than $1,200/month which may be used for automobile, technology, office, or other reasonable expenses.

- No other distributions and/or compensation is provided for MGL and DHD without joint, written agreement.

- DHD's Percentage Interest as of March 13, 2020 was .0001% and until the period beginning July 1, 2020 had no profit interest; as of July 1, 2020, DHD's Percentage Interest increased to 30% and pro rata participation in profits began on that date.

- The tax basis increase attributable to the Company buyout of a previous Member (such buyout completed on March 13, 2020, according to the Membership Interest Purchase Agreement to which Merri Gleckler, Merri G LLC and the Company were all parties) is specifically allocated to Merri G LLC and all subsequent related amortization deductions and basis decreases are also specifically allocated to Merri G LLC.

**Member provisions:**

**Transfer Restrictions:** No transfers (other than estate-planning transfers and transfers to affiliates) permitted without the approval of the other Member and no admission of new Members without permission of the other.

**Right of First Refusal:** If any Member wishes to sell an Interest in the Company, the other Member has a right of first refusal at the same price as the selling Member has been offered by a third-party purchaser. The purchasing Member shall have ninety-days from the time of receiving the third-party, committed terms to complete their purchase. A selling Member has the obligation to inform the other Member of the start of any bona fide purchase discussions within three business days of their start.

**Admission of New Members:** If the Company wishes to raise additional capital by selling an additional Interest and adding a new Member(s), the Manager may do so with majority Member permission. In no case may the Company raise capital and have the majority Member Interests treated differently or have new (replaced) Interests to the detriment of the minority Member, without minority Member agreement, such agreement not unreasonably withheld.

**Drag-along rights:** If the majority Member decides to sell its Interest in their entirety to a third-party, the selling Member may "drag-along" the other Member only if the market capitalization of the Company is at minimum $7MM (minority Member interests worth $2.1MM or more).

**Tag-along rights:** If either Member proposes to sell a portion or all of its Interest to a third-party, the other Member may participate pro rata in such sale.

**Preemptive Rights:** Each Member shall have the right to purchase its proportionate share of any additional Interests to be issued by the Company such that upon any such issuance of additional Interests, each Member, if it so elects to purchase, will retain the same proportionate Percentage Interest in the Company.

# EXHIBIT V

CONFIDENTIAL



3/24/21 8:49:24 AM CDT

Good morning 😊 - let's plan on speaking at 1:30pm PDT (your time zone, 3:30pm for me) - looking to have a productive, great day - will send email when container all taken care of...

3/24/21 9:30:38 AM CDT

👍

3/24/21 4:04:51 PM CDT

Call when off

3/24/21 4:54:59 PM CDT

On a call, will phone when done.

3/24/21 4:55:12 PM CDT

Ok

3/24/21 6:25:02 PM CDT

Called you back

3/24/21 6:25:41 PM CDT

On phone call u back?

3/24/21 6:25:53 PM CDT

Yes

3/25/21 3:52:59 PM CDT

Hi - Laura Balson from gct law will contact Cheryl Borland at Fran's firm...just an fyi.

3/25/21 3:55:58 PM CDT

Ok did she give you a quote?

3/25/21 3:56:41 PM CDT

No

EXHIBIT
PENGAD 800-631-6989
Dussias 16
8-27-24 r

CONFIDENTIAL



3/25/21 3:59:33 PM CDT

We need that . This is not open ended.

I'm gifting 30% of Kashwére to you . You just want to ensure you feel comfortable that I or anyone else cannot take that away from you . There is nothing else she needs to discuss .

3/25/21 4:12:28 PM CDT

While yes, it's important for me to know that the 30% is real, neither you nor TMG gifted it to me - I paid for the 30%. It's also the sole way in which I derive compensation from Kashwere and create value. I was sent a document over 40 pages, appropriate for an Operating Agreement - it requires review and then some revision and I think for both of us important its done well and sets the right foundation for a successful partnership.

3/25/21 4:16:17 PM CDT

I don't think texting is smart... you put money in an account without my knowledge claiming that you told me so you bought in?

I value you, which is why I gifted you the partnership opportunity ! Now you want to tell me how you want the opportunity ?

I'm blown away !

3/26/21 2:47:42 PM CDT

Hi Merri - please use your Administrator role for now - if you would like another role to have the privilege just let me know - I could give you the same Sales and Operations role Rachel has? (you can give you any role you want, by the way...)

3/26/21 2:56:02 PM CDT

Any role I'm in I should have admin access.

3/28/21 6:16:45 PM CDT

Emailed u 2x for book keeper info ... no response so I figured I'd text so u see it . Who did hire , company and agreement .

# EXHIBIT W

**From:** Dean H Dussias
**Sent:** Monday, April 12, 2021 2:47 PM CDT
**To:** Laura A. Balson
**CC:** Darrin S. Baim; Kelly E. Hall
**Subject:** Re: FW: Kashwere & David Lazar

[redacted]

On Mon, Apr 12, 2021 at 2:06 PM Laura A. Balson <labalson@gct.law> wrote:

[redacted]

**From:** Dean H Dussias <dean@dussias.org>
**Sent:** Monday, April 12, 2021 1:12 PM
**To:** Laura A. Balson <labalson@GCT.law>
**Cc:** Darrin S. Baim <dsbaim@GCT.law>; Kelly E. Hall <KEHall@GCT.law>
**Subject:** Re: FW: Kashwere & David Lazar

[redacted]

[redacted]

On Mon, Apr 12, 2021 at 11:05 AM Laura A. Balson <labalson@gct.law> wrote:

[redacted]

**From:** Cheryl Borland <CBorland@griesinglaw.com>
**Sent:** Monday, April 12, 2021 11:02 AM
**To:** Darrin S. Baim <dsbaim@GCT.law>
**Cc:** Kelly E. Hall <KEHall@GCT.law>; Laura A. Balson <labalson@GCT.law>
**Subject:** RE: Kashwere & David Lazar

Darrin

Thank you for letting me know that Kelly was out of the office today. We received the revised Operating Agreement and I reviewed it with my client on Friday. I will have our revisions and notes back to you shortly.

Best

Cheryl

GRIESING LAW LLC

**Cheryl L. Borland, Esq.**

**Of Counsel**

cborland@griesinglaw.com

11 Garfield Place

Cincinnati, OH 45202

M.: 859.468.2374• P.: 513.381.0045 • F.: 215.814.9049

https://link.edgepilot.com/s/36bd03d7/BfNCW4QJ-0SLzYFwcY1WoQ?u=http://www.griesinglaw.com/

Click here to read my bio.

Follow WBENC NAMWOLF WOMEN OWNED LAW

This email and any attachments may contain information that is confidential, privileged or otherwise protected. If you received this message in error or are not the intended recipient or authorized by the intended recipient to read it, please destroy the message and any copies and please do not retain, distribute or share this message or any of the information contained herein. Please also reply and inform the sender that you received this message in error. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

Email Acceptance Disclosure: Under the Electronic Signatures in Global and National Commerce Act (the "Electronic Signatures Act" a/k/a "E-Sign"), the Uniform Electronic Transactions Act ("UETA") and the Pennsylvania Uniform Electronic Transactions Act ("PUETA"), our receipt of this email and its contents does not constitute confirmation of our electronic signature and/or acceptance of any contract terms or language that may or may not be contained herein including in any attachments sent with this electronic communication. Further, any signature block contained in this email should not be misconstrued as an electronic signature that contractually obligates us or our clients to any contract terms that may or may not be contained herein, including in any attachments. The binding of any contract terms or provisions herein must be willfully acknowledged and accepted by us in order for our firm or our clients to be legally bound.

****Please note while our physical offices are temporarily closed, we remain fully available to you and will respond in normal course. Where possible, please refrain from sending mail, deliveries or faxes to our offices and we ask instead that you send via email. Thank you and please stay safe. ****

**From:** Darrin S. Baim <dsbaim@GCT.law>
**Sent:** Monday, April 12, 2021 11:42 AM
**To:** Cheryl Borland <CBorland@griesinglaw.com>
**Cc:** Kelly E. Hall <KEHall@GCT.law>; Laura A. Balson <labalson@GCT.law>
**Subject:** RE: Kashwere & David Lazar

WARNING: This email originated outside of the Firm. DO NOT CLICK links or attachments unless you recognize the sender and *are expecting* the email.

Hi Cheryl,

Just a quick follow up to confirm that you received our proposed revisions to the Operating Agreement and to let you know that Kelly is out of the office this week (so please be sure to copy

Laura and me on all emails). If you have any questions, please let me know. We look forward to wrapping this up this week. Thanks!

**Darrin S. Baim** | Partner

**GOLAN** | **CHRISTIE** | **TAGLIA LLP**

70 W Madison, Ste 1500, Chicago, IL 60602

☎ (312) 696-1350 🖷 (312) 263-0939

✉ dsbaim@gct.law

@: https://link.edgepilot.com/s/71eae680/vRy8RWjUoUa8MSwOXPiOpA?u=http://www.gct.law/

CONFIDENTIALITY NOTICE: INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE.

This message is sent by or on behalf of a lawyer at the law firm of Golan Christie Taglia LLP (https://link.edgepilot.com/s/71eae680/vRy8RWjUoUa8MSwOXPiOpA?u=http://www.gct.law/) and is intended only for the use of the individual or entity to which it is addressed. This message may contain information which is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to others. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone (call us collect at (312) 263-2300) and immediately delete this message and all its attachments.

---

**From:** Kelly E. Hall <KEHall@GCT.law>
**Sent:** 04/08/2021 10:08 AM
**To:** Laura A. Balson <labalson@GCT.law>; Cheryl Borland <CBorland@griesinglaw.com>
**Cc:** Darrin S. Baim <dsbaim@GCT.law>
**Subject:** RE: Kashwere & David Lazar

Hi Cheryl,

Attached please find a revised draft of the Amended and Restated Operating Agreement for TMG Kreations LLC. I have also attached a redline showing all of our changes for your reference.

Note, I have cc'd our corporate practice chair, Darrin Baim, on this email. He will be working with Laura and me as we move toward finalizing the Operating Agreement.

Once you have had a chance to review the attached, please let us know your availability for a call to discuss any questions or comments you may have.

Sincerely,

**Kelly E. Hall**

**GOLAN** | **CHRISTIE** | **TAGLIA**

312-696-1698

---

**From:** Laura A. Balson <labalson@GCT.law>
**Sent:** Tuesday, April 06, 2021 4:10 PM
**To:** Cheryl Borland <CBorland@griesinglaw.com>
**Cc:** Kelly E. Hall <KEHall@GCT.law>
**Subject:** RE: Kashwere & David Lazar

Hi Cheryl,

Just as a brief update, we should have our redline ready to send you by tomorrow, and it is our hope that the document will be pretty close to final. I know that everyone is anxious to get this resolved, so I just wanted you to have an update on where things stand from our end.

Please feel free to reach out if you have questions or concerns in the interim.

Thanks!

**Laura A. Balson** | Partner

**GOLAN** | **CHRISTIE** | **TAGLIA LLP**

70 W Madison, Ste 1500, Chicago, IL 60602

CONFIDENTIAL


Tel: (312) 696-1351 Fax: (312) 263-0939

Email: labalson@gct.law

Web: https://link.edgepilot.com/s/71eae680/vRy8RWjUoUa8MSwOXPiOpA?u=http://www.gct.law/

---

**From:** Laura A. Balson
**Sent:** Friday, April 02, 2021 4:43 PM
**To:** 'Cheryl Borland' <CBorland@griesinglaw.com>
**Cc:** Kelly E. Hall <KEHall@GCT.law>
**Subject:** FW: Kashwere & David Lazar

Hi Cheryl,

We will be sending you a redline of the Operating Agreement early next week and then will be happy to schedule a call to discuss any points of disagreement. I believe Merri and Dean may currently be working through some tensions around the day to day operations of the business, but my hope is that those stem from the current disagreements over the terms of the Operating Agreement, so once we have that finalized and signed, the minor issues will be easy to resolve.

While we are absolutely committed to finding common ground in the Agreement, my client firmly believes (and does not see any reason to change) that he already owns 30% of the company, and he has since July 1, 2020. There are many other examples of documentation that evidence the terms of the oral agreement that he reached with Merri on this, but as just one, attached is spreadsheet reflecting a proposal that Merri and Dean, together, presented to David Lazar on July 23, 2020, reflecting changes that could be made to the company ownership if David were to be added as a third partner in the business.

I look forward to speaking with you in more detail next week. Enjoy your weekend.

**Laura A. Balson** | Partner

**GOLAN** | **CHRISTIE** | **TAGLIA LLP**

70 W Madison, Ste 1500, Chicago, IL 60602

Tel: (312) 696-1351 Fax: (312) 263-0939

Email: labalson@gct.law

Web: https://link.edgepilot.com/s/71eae680/vRy8RWjUoUa8MSwOXPiOpA?u=http://www.gct.law/

---------- Forwarded message ---------
From: **Dean Dussias** <dean@kashwere.com>
Date: Thu, Jul 23, 2020 at 4:41 PM
Subject: Kashwere & David Lazar
To: Merri Gleckler <merri@kashwere.com>, David Lazar <david@lazar-family.com>

Attached…

Dean Dussias

President

Kashwere

dean@kashwere.com

01 (847) 612-1010

# EXHIBIT X

**To:** Merri Glecker[merri@kashwere.com]
**From:** Merri Gleckler[merri.gleckler@gmail.com]
**Sent:** Mon 10/18/2021 3:37:52 AM (UTC)
**Subject:** Fwd: TMG Kreations LLC - Amended and Restated Operating Agreement Redline 4.8.21.pdf
TMG Kreations LLC - Amended and Restated Operating Agreement Redline 4.8.21.pdf
ATT00002.bin

Sent from my iPhone

Begin forwarded message:

> **From:** Merri Gleckler <merri.gleckler@gmail.com>
> **Date:** April 8, 2021 at 11:11:53 AM MST
> **To:** Sprinkles <merri.gleckler@gmail.com>
> **Subject: TMG Kreations LLC - Amended and Restated Operating Agreement Redline 4.8.21.pdf**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF TMG KREATIONS, LLC**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "***Agreement***") is made ~~and entered into~~effective as of ~~January __, 2021~~July 1, 2020 (the "***Effective Date***") by and among TMG Kreations, LLC, an Arizona limited liability company (the "***Company***"), and each of the Persons listed on Exhibit A attached hereto (such Persons and their respective successors in interest being hereinafter referred to individually as a "***Member***" and collectively as the "***Members***").

**RECITALS**

WHEREAS, a Certificate of Organization of the Company was originally filed with the State of Delaware on __________________December 15, ~~2011,~~2009 to organize the Company as a Delaware limited liability company~~.~~;

~~WHEREAS, Merri Gleckler, through MerriG, LLC, purchased the Units owned by the other former Member, Cedric Reingold pursuant to a Member Interest Purchase Agreement dated September 18, 2019 and the acquisition was completed by March 16, 2020. Subsequent to the buyout, Merri Gleckler was the sole Member of the Company.~~

~~WHEREAS, Merri Gleckler is converting~~

WHEREAS, concurrently with the execution of this Agreement, the Manager has converted the Company from a Delaware limited liability company ~~into~~to an Arizona limited liability company~~.~~ by filing a Statement of Conversion and Articles of Organization (the "***Articles***") with the Arizona Corporation Commission;

WHEREAS, ~~Merri Gleckler is interested in transferring thirty percent (30%) of the Company to Dean H. Dussias as set forth in the terms of this Amended and Restated~~prior to the Effective Date, the Company and its then current Members conducted the business of the Company pursuant to that certain Operating Agreement of the Company dated __________________, 20_______ (the "***Prior Agreement***"); and

WHEREAS, the parties desire to amend and restate the ~~Operating~~Prior Agreement and enter into this Agreement to, among other things, formally admit Dean Dussias as a Member of the Company and set forth the respective rights, obligations and interests of the Members. This Agreement, as it may be amended from time to time in accordance with the terms

herein, shall be binding on any person who at the time is a Member, regardless of whether or not such Person has executed this Agreement or any amendment hereto.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I – DEFINITIONS; CONSTRUCTION

1.1. Definitions. When used in this Agreement the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Section 1.1 shall have the meanings set forth elsewhere in this Agreement, including Exhibit B attached hereto and made a part hereof):

"***Act***" means the Arizona Limited Liability Company ~~Law~~Act and any successor statute, as the same may be amended from time to time.

"***Affiliate***" of any Person means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such Person. The term "***control,***" "***is controlled by,***" or "***is under the common control***", means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity. In the case of a partnership, the term "***Affiliate***" shall also include any limited or general partner of such partnership.

"***Agreement***" means this Amended and Restated Limited Liability Company Operating Agreement, including the Exhibits hereto, as the same may be amended, modified, supplemented, or restated from time to time.

"***Articles***" means the Articles of Organization of the Company originally filed with the State of Arizona, as the same may be amended and/or restated from time to time.

"***Bankruptcy***" (and grammatical variations thereof) means, with respect to any Person: ~~(a)~~ (a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time (the "***Bankruptcy Code***"); (c) the making by such Person of a general assignment for the benefit of creditors; (d) the voluntary filing of a petition in accordance with the Bankruptcy Code; (e) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of

the assets of such Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within one hundred twenty (120) days; (f) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in sub-clauses (a) through (f) of this clause or (g) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the Bankruptcy Code, as determined by the Bankruptcy Court.

"***Bona Fide Offer***" means an arm's length written offer by an unrelated third party that is not an Affiliate of a Member to purchase part or all of a Member's Units on the terms specified therein.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks, generally are authorized or required to be closed.

"***Capital Account***" means with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to Section 3.4 and Exhibit B herein.

"***Capital Contribution***" ~~means the aggregate amount of cash and the Gross Asset Value (as defined in Exhibit B) of any property (other than money) contributed by each Member to the Company as provided in Section 3.1, offset by the amount of debt and other liabilities of such Member which the Company has assumed, or taken such property subject to, in connection with such contribution. In the case of a Member that acquires Units by an assignment or Transfer in accordance with the terms of this Agreement, "*Capital Contribution*" means the Capital Contribution of that Member's predecessor proportionate to the acquired Unit(s)~~shall mean any contribution to the capital of the Company, which shall be made in cash, property, or services, by the Member whenever made.

"***Cause***" shall mean ~~a Manager's: (i) direct or indirect~~occurrence of any of the following events: (a) a Member's material breach ~~or violation~~ of this Agreement~~,~~; (~~ii~~b) ~~material breach of a Company policy that causes monetary or reputational damage to the Company; (iii) violation of a pertinent law or regulation that causes monetary or reputational damage to~~a Member's conviction of a felony or any other crime involving moral turpitude or dishonesty which, in the good faith opinion of the Company, would impair Member's ability to perform his duties or adversely impact the Company's reputation; (~~iv~~c) Member's failure or refusal to ~~follow any lawful, reasonable directive issued by the Manager (as hereinafter defined), (v) material misconduct or gross negligence that causes monetary or reputational damage~~comply with Company's policies, standards or regulations or to perform the ~~Company~~responsibilities of his position after ten (10) days' written notice and opportunity to cure; (d) a Member's

unauthorized d isclosure o f C ompany t rade s ecrets a nd/or o ther c onfidential b usiness information; (vie) conviction of, or plea of nolo contendere to, any felony or to any crime or offense causing harm to the Company (whether or not for personal gain) or which otherwise impairs its goodwill;a Member's breach of his legal duty of loyalty to the Company; or (viif) a Member's act of theft, fraud, theft or embezzlement, extortion, blackmail, moral turpitude or similar conduct; or (viii) fraudulent or willful and material misrepresentations or concealments on any written reports submitted to or the misappropriation of Company.

"*Certificate*" means the Certificate of Organization of the Company originally filed with the Commonwealth of Pennsylvania, as the same may be amended and/or restated from time to time assets.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section (§) of the Code refers not only to such specific section but also to any corresponding provision of any Federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"***Company Tax Proceeding***" means any examination of the Company's tax affairs by tax authorities and any administrative or judicial proceeding involving the Company's tax affairs, including the filing of any amended return or administrative adjustment request.

"***Cut Off Date"*** shall have the meaning set forth in Section 7.4.4

"***Equity Securities***" has the meaning set forth in Section 4.1.1

"***Fair Market Value***" shall mean the fair market value of the Company determined by the Company (as directed by a majority of the Members (excluding the Selling Member)) and Selling Member.

"***Liens***" shall mean any and all liens, encumbrances, security interests, mortgages, pledges, claims, options or restrictions of any kind whatsoever.

"***Majority Interest***" means that number of Units that, in the aggregate, exceed fifty percent (50%) of the aggregate of all Units.

"***Manager***" means the Person who is initially appointed or subsequently elected to be the Manager of the Company (the "*Manager*") in accordance with the terms of this Agreement. This Initial Manager shall be Merri Gleckler.

"***Member***" means each Person who is a record holder or record owner of Units and (a) is identified as a Member on Exhibit A, has been admitted to the Company as a Member in

accordance with this Agreement or is an assignee or transferee who has become a Member in accordance with Article VII, and (b) has not withdrawn, been removed or if other than an individual, dissolved.

"***Mutually Agreeable Valuation Firm***" shall have the meaning set forth in Section 7.4.4

"***Outside Party Offer***" shall have the meaning set forth in Section 7.5.3

"***Percentage Interest***" means, for each Member, the Member's ownership interest in the Company, calculated as a fraction, and expressed as a percentage, having as its numerator the Units owned by the Member at such time, and having as its denominator the aggregate issued and outstanding Units at such time. The Percentage Interests of the Members shall be adjusted upon the admission of a new Member, the withdrawal of a Member or any other event that alters the number of Units owned by any Member, or all of the Members in the aggregate.

"***Permanent Disability***" means an illness, incapacity or a mental or physical condition that renders a Member unable or incompetent to carry out the essential functions of such Member's position, if any, with the Company, with reasonable accommodation, for a period of at least one hundred eighty (180) consecutive days because of an illness, incapacity or a mental or physical condition.

"***Person***" means any natural person, individual, general partnership, limited partnership, limited liability company, limited liability partnership, corporation, trust, estate, real estate investment trust, association or other legal entity or organization.

"***Prime Rate***" means a varying rate per annum that is equal to the interest rate published by The Wall Street Journal from time to time as the prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate.

"***Profits***" and "***Losses***" has the meaning set forth in Exhibit B.

"***Recent Determination***" shall have the meaning set forth in Section 7.4.4

"***Sale Transaction***" means a (i) sale of all, substantially all or part of the assets or Units and other Equity Securities (as hereinafter defined) of the Company to an unrelated Person or entity in one transaction or a series of similar transactions or (ii) a merger or consolidation of the Company with or into any unrelated Person, unless after the consummation of such transaction the Members hold a majority of the outstanding capital securities of the surviving entity.

"***Selection Period***" shall have the meaning set forth in Section 7.4.4

"***Tag-Along Exercise Notice***" shall have the meaning set forth in Section 7.5.4

"***Tag-Along Members***" shall have the meaning set forth in Section 7.5.3

"***Tag-Along Notice***" shall have the meaning set forth in Section 7.5.3

"***Tag-Along Offeree***" shall have the meaning set forth in Section 7.5.3

"***Tag-Along Right***" shall have the meaning set forth in Section 7.5.4

"***Tax Distribution***" shall have the meaning set forth in Section 6.5.2.

"***Transfer***" means any and all types of transfers, including, but not limited to, any sale, assignment, conveyance, hypothecation, distribution, gift, or other disposition, or the pledge, mortgage, or grant of a security interest or Lien in, or other encumbrance, whether voluntary or by operation of law, directly or indirectly, of all or any portion of a Member's Units, other than in connection with a Sale Transaction.

"***Triggering Event***" means the occurrence of any of the events listed below:

(a) Bankruptcy. A Member becoming Bankrupt;

(b) Dissolution. In the case of a Member that is a business entity, the dissolution and commencement of winding up of such Member;

(c) Criminal or Fraudulent Activities. Upon a finding that the Member : (i) is convicted of, submits a plea of nolo contendere to, submits a guilty plea to or confesses to (A) to an act of fraud, misappropriation or embezzlement, or (B) to a felony or other crime involving moral turpitude; (ii) committed an act, or multiple acts, of willful misconduct; (iii) willfully violated any provision of this Agreement; or (iv) committed an act of theft, misappropriation, embezzlement or fraud with respect to the assets or properties of the Company, other than de minimis takings of common office supplies and similar items;

(d) Impermissible Voluntary Lien. A Member proposes to pledge or otherwise grant a Lien on any Units owned by such Member;

(e) Impermissible Transfer. A Member purports to Transfer any Units held by such Member in violation of this Agreement;

(f) Death or Permanent Disability. A Member dies or becomes Permanently Disabled; or

(g) Impermissible Involuntary Lien. The Units owned by a Member are attached, levied upon or executed against in connection with the enforcement of any Lien or otherwise be transferred by operation of law.

"***Units***" means the units representing a Member's entire interest in the Company, including the Member's right to share in Profits and Losses, income, gains, losses, deductions, credits or similar items of, and to receive distributions (liquidating or otherwise) and allocations from, the Company pursuant to this Agreement, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, and the right to receive information concerning the business and affairs of the Company, as assigned to a Member under the terms of this Agreement as set forth on Exhibit A, as amended from time to time.

"***Valuation Firm***" shall have the meaning set forth in Section 7.4.4

1.2. Rules of Construction. The following rules of construction shall apply to this Agreement:

1.2.1 The titles of the Articles and Sections herein have been inserted as a matter of convenience and reference only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

1.2.2 All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders and the singular shall include the plural and vice versa, as the context may require.

1.2.3 The term "including" shall in all cases be interp

limited to."

1.2.4 Each provision of this Agreement shall be considered severable from the rest, and if any provision of this Agreement or its application to any Person or circumstances shall be held invalid or contrary to any existing or future law or unenforceable to any extent, the remainder of this Agreement and the application of any other provision to any Person or circumstances shall not be affected thereby and shall be interpreted and enforced to the greatest extent permitted by law so as to give effect to the original intent of the parties hereto.

1.2.5 Unless the context clearly requires otherwise, words such as "hereof," "herein," "hereunder" and similar terms shall refer to this entire Agreement (including exhibits hereto) and not to a particular Section or provision, references to particular Sections shall refer to the Sections of this Agreement, and this Agreement shall not be construed against the drafter of this Agreement.

**ARTICLE II – ORGANIZATIONAL MATTERS**

2.1. Formation. Pursuant to the Delaware Limited Liability Company Act, the ~~Members have~~Company was initially formed as a Delaware limited liability company under the laws of the State of Delaware through the filing of ~~the~~a Certificate of Organization with the State of Delaware. ~~In February ___, 2021, MerriGleckler, through MerriG, LLC, converted~~Concurrently with the execution of this Agreement and pursuant to the Act, the Company will convert to an Arizona Limited Liability Company by filing the requisite paperwork with the Secretary of State for the State of Delaware as well filing a Statement of Conversion and the Articles ~~of Organization~~ with the ~~Secretary of State of the State of~~ Arizona Corporation Commission. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2. Name and Qualification. The name of the Company shall be "TMG Kreations, LLC". The business and affairs of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager may deem appropriate or advisable. Any authorized officer shall file any fictitious name certificates and similar filings and any amendments thereto, that the Manager deems appropriate or advisable. In addition to the ~~Certificate~~Articles, an authorized officer shall prepare and file in each jurisdiction where such filing is appropriate such additional documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company in each jurisdiction in which the Company shall conduct business.

2.3. Term. The existence of the Company commenced on the date of the filing of the ~~Certificate~~Articles with the State of Arizona, and shall continue until the Company is dissolved in accordance with the provisions of this Agreement and the ~~Certificate is~~Articles are cancelled in accordance with the Act.

2.4. Registered Office; Principal Place of Business; Other Offices[1]. The Company's registered office shall be ________________________________________. The principal place of business of the Company shall be at ________________________________________, or at such other place as the Manager may designate from time to time, which need not be in the State of Arizona. The Company may have such other offices as the Manager may designate from time to time.

2.5. Title to Property. All real and personal property owned by the Company, including, but not limited to, all real and personal property (tangible and intangible) which may be contributed by the Members to the Company from time to time, shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in such Member's individual name or right. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

2.6. No State Law Partnership. The Members intend that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes. The Members intend that the Company not be a partnership or joint venture for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.7. Purpose and Powers. The character and purpose for which the Company is formed, in general, is to engage in any lawful act or business activity for which limited liability companies may be formed under the Act and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.

**ARTICLE III – CAPITAL CONTRIBUTIONS**

3.1. Capital Contributions.

3.1.1 Each of the Members has contributed as of the date hereof such Member's Capital Contribution to the Company as provided in Exhibit A.

3.1.2 Initial Services Contributions. In addition to the ~~Initial Cash Contributions set forth herein~~cash contributed by Dean Dussias as provided in Exhibit A, Dean Dussias has also contributed personal services utilized in the operation of the Company as part of their contribution to the Company in return for their respective Membership Interests.

~~3.1.3 Vesting Schedule. Dean's Membership Interest shall not fully vest for~~

[1] **NOTE:** Please confirm the Company's Registered Office and Principal Place of Business.

a period of three years from the effective date of this Agreement. In the event that Dean resigns or is terminated prior to the Membership Interests being fully vested, Dean shall surrender his Membership Interests in the Company without payment of any compensation or consideration. However, in the event that Company is sold or there is some other change of control, Dean's Membership Interests shall immediately vest immediately prior to the sale and he shall be entitled to share pro rata in the increase of valuation of the Company from the date of this Agreement until the Closing. Notwithstanding the foregoing, Dean will be entitled to attend and participate in Member Meetings but will not be entitled to vote until his Membership Interest is fully vested.

3.1.3 3.1.4 Capital Call. The Manager, inIn the event that she deemsall of the Members deem that the Company needs additional capital, the Manager shall have the authority to issue a capital call to the Members. The Members shall be entitled, but not required, to make additional Capital Contributions in amounts that are proportionate to their respective number of Units. If any Member declines to make its proportionate additional Capital Contributions, the Units shall be adjusted as reasonably determined by the Manager to reflect the additional Capital Contributions made by other Members.

3.1.4 3.1.5 The Manager shall not be required to require a Member to restore any negative balance in such Member's Capital Account, whether upon the liquidation of the Company or otherwise.

3.2. Return of Contributions. A Member is not entitled to the return of any part of the Member's Capital Contribution, or to be paid interest in respect of the Member's Capital Account or Capital Contribution. An un-repaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.3. Advances by Members. To the extent the Manager determines that the Company requires additional funds in connection with its business, the Company shall first endeavor to secure third party financing for such funds on commercially reasonable terms prior to obtaining a loan from any of the Members. If the third party lender requires a Member guarantee in connection with such third party financing, each Member shall fully cooperate with the Company and shall execute a personal guarantee. If such third party financing is not available or if the Manager reasonably determines that exigent circumstances require an immediate need for funds, then the Company may seek such funds through a loan from the Members. If the Company elects to seek such funds through a loan from the Members, then each Member shall have the option but not the obligation to lend the Company an amount equal to such Member's pro rata share (based on such Member's Membership Interest) of the amount of funds that the Company is seeking to borrow from the Members. Each such loan shall: (a) be made on terms and conditions that are the same for all Members that elect to participate in that loan provided however that the interest rate for

any such loan shall not exceed the Prime Rate; (b) be evidenced by one or more written promissory notes and such other documents as are acceptable to the Company and to each Member who elects to participate in that loan; and (c) have equal priority with all outstanding loans to the Company from the Members. To facilitate this process, the Manager shall send written notice to each Member setting forth the amount of the loan requested by the Company, how the loan proceeds will be used by the Company, and a reasonable period of time during which the Members can consider the Company's request. If a Member fails to loan the funds that the Member is entitled to loan to the Company, then each of the participating Members may loan an additional amount equal to such participating Member's pro rata share of the non-participating Member's share of the loan or any other proportion of the non-participating Member's share of the loan as all of the participating Members may agree.

3.4. Capital Accounts. The Company shall maintain an individual Capital Account for each Member in accordance with the provisions of Section B.2 of Exhibit B.

3.5. No Withdrawal. No Member shall have the right to withdraw such Member's Capital Contributions or to demand and receive property of the Company or any distribution in return for such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by the Act.

**ARTICLE IV – ISSUANCE OF UNITS; MEMBERS**

4.1. Authorization and Issuance of Units.

4.1.1 Authorized Units. The aggregate equity in the Company shall be divided into such number and class of Units, or other form of equity, including, but not limited to, common or preferred Units, rights, profit units, options, warrants exercisable for, or convertible into, Units, or other securities or instruments of any type or class whatsoever, (collectively, the "***Equity Securities***"), including fractional interests, as may be issued and outstanding from time to time by the Manager in its sole discretion, upon the affirmative vote of the Manager. Any such Equity Securities may be issued for cash, property, services, satisfaction of existing obligations or such other type, form, and amount of consideration (including notes, other evidences of indebtedness or obligations of the Person acquiring the interest, instrument or security, as the case may be) as all of the ~~Manager~~Members may determine to be appropriate ~~in her sole discretion~~. Any such issuance may be made by the Company by setting forth either in an amendment or an addendum to this Agreement duly executed in accordance with the requirements under Section 13.6 herein, the relative rights, obligations, duties, and preferences of each new class or series of Units created and reflecting all necessary adjustments. A copy of this Agreement as so amended, or the addendum as so adopted, as the case may be, shall be provided to each Member upon written request therefor. All filings necessary to be made under the Act or applicable law in connection with the creation of such

interests shall be made by an authorized officer.

4.1.2 Issuance. As of the date hereof, each Member owns the number of Units set forth next to his, her or its name on Exhibit A. The name, residence, business or mailing address and Percentage Interest of each Member are also set forth on Exhibit A.

4.2. Issuance of Additional Units. ~~The~~Subject to Section 7.4.3, the Manager may, from time to time, cause the Company to issue additional Units to new or existing Members in exchange for such Capital Contributions as the Manager may determine. A Person shall be admitted as a new Member at such time as such Person makes the Capital Contribution required by the Manager, executes and delivers a counterpart copy of this Agreement and satisfies such other conditions as may be required by the Manager. In connection with the issuance of such additional Units, the Manager shall cause Exhibit A to be amended to reflect the issuance of such additional Units, the admission of any additional Members and the adjustment of the Percentage Interests of all the Members. Persons who are subsequently admitted as Members shall execute this Agreement either by counterpart or amendment. When any Person is admitted as a Member or ceases to be a Member, the Manager shall prepare a revised version of Exhibit A and distribute it to all the Members.

4.3. Record Holders of Units. The Company shall be entitled to treat the Person in whose name any Units of the Company stand on the books of the Company as the absolute owner thereof. The Company shall not be bound to recognize any equitable or other claim to, or interest in, such Units on the part of any other Person, whether or not the Company has express or other notice of any such claim.

4.4. Evidence of Units. The evidence of the amount of Units held by a Member or Assignee shall be reflected in the books and records of the Company, including but not limited to the Schedule A to this Agreement. The Company shall not issue certificates of ownership.

4.5. Conflicts of Interest, Related Party Transactions and Other Activities. ~~Any~~Subject to Section 8.6 herein, any Member and any Affiliate of any such Member, and any of their respective directors, officers, members, partners, stockholders, employees, or controlling persons may engage in or possess an interest in any business or activity, without any accountability to the Company or any other Member, and without obligation to offer such business opportunity to the Company or any other Member. No such Person shall be liable to the Company or any other Member for breach of any fiduciary or other duty, as a Member or otherwise, by reason of the fact that such Person acquires or pursues such opportunity or directs such opportunity to another person, except for any Member that agrees otherwise pursuant to a separate agreement with the Company or any other direct or indirect subsidiaries or Affiliates of the Company; *provided, however*, that nothing in this Section 4.5 or in such separate agreement shall be construed to relieve or excuse any Person from his, her or its obligations under Section 4.14 or any employment agreement, non-use, non-disclosure, non- compete, non-solicitation, covenant-not-to-compete or similar covenant in this

Agreement or any other agreement between such Person and the Company.

4.6. Limited Liability. The Members, as such, shall not be personally liable for any debt, obligation or liability of the Company, whether such debt, obligation or liability arises in contract, tort or otherwise.

4.7. Powers of Members. Except as provided herein, a Member in his, her or its capacity as such shall not have the authority or power to act for or on behalf of the Company or otherwise bind the Company in any way.

4.8. No Right of Partition. A Member shall not have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular assets of the Company and notwithstanding any provisions of applicable law to the contrary, each Member (and its successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his, her or its Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

4.9. No Appraisal Rights. No Member shall be entitled to any appraisal rights with respect to such Member's Units, whether individually or as part of any class or group of Members, even in the event of a Sale Transaction or other transaction involving the Company, the Units or the Equity Securities of the Company unless such rights are expressly granted by the Members holding at least a majority of the issued and outstanding Units.

4.10. No Dissenter's Rights. No Member shall be entitled to exercise any dissenter rights with respect to such Member's Units or Equity Securities, whether individually or as part of any class or group of Members, in the event of a Sale Transaction or other transaction involving the Company, the assets of the Company, the Units or the Company's Equity Securities unless such rights are expressly granted by the Members holding at least sixty six and two thirds percent (66.67%) of the issued and outstanding Units.[2]

4.11. Voluntary Withdrawal. No Member shall have the right or power to voluntarily withdraw from the Company without the express written consent of the Manager. Any withdrawal in violation of this Agreement shall entitle the Company to damages which may be offset against the amounts otherwise payable as a distribution to such Member purporting to withdraw from the Company.

4.12. Member Assurances. Each Member agrees to execute such further documents, instruments and agreements as the Manager deems necessary to further effect and carry out the intentions and provisions of this Agreement.

[2] **NOTE**: We would like to discuss the intended purpose for this Section 4.10. We are not agreeable to the language as drafted.

4.13. Agreements with Members or Affiliates. The Company may, upon approval by the Manager in its sole discretion, enter into employment agreements, consulting agreements or other appropriate agreements with some or all of the Members or any Affiliate's providing for the provision of personal services to the Company; *provided, however*, the agreements shall be on terms and conditions no less favorable than the Company could have obtained from any third party providing such goods or services.

4.14. Voting; Action by Members. With respect to all matters to be decided or voted on by the Members pursuant to the terms of this Agreement or the Act, each Member shall have one vote for each Unit held by such Member. All decisions of the Members must be approved by Members holding at least majority of the issued and outstanding Units, unless a greater percentage is required by this Agreement or the Act.

4.15. Meetings of Members.

4.15.1 General. An annual meeting of the Members for the transaction of such business as may properly come before the Members shall be held on such date and at such time as the Manager shall fix and set forth in the notice of such annual meeting. Special meetings of the Members for any proper purpose or purposes may be called at any time by the Manager or Members holding at least a majority of the issued and outstanding Units. Only business within the purpose or purposes described in the notice of the special meeting may be conducted at a special meeting. A meeting of the Members shall not be organized for the transaction of business unless a quorum is present. The presence, whether in person or by proxy, of Members holding at majority of the issued and outstanding Units shall constitute a quorum for the purposes of consideration and action on the matter. The Members present at a duly organized meeting can continue to do business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum. All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Arizona as shall be specified or fixed in the notice thereof.

4.15.2 Notices. Notice of a meeting of Members shall be given to the Members:

(i) Personally at least two (2) Business Days prior to the Meeting;

(ii) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of each Member appearing on the books of the Company (notice pursuant to this paragraph shall be deemed to have been given when deposited in the United States mail five (5) Business Days prior to the meeting date or with the courier service at least three (3) Business Days prior to the meeting date); or

(iii) By facsimile transmission, e-mail or other electronic communication at least two (2) Business Days prior to the Meeting to the facsimile number or address for

e-mail or other electronic communications supplied by a Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given when sent.

4.15.3 Waiver of Notice. A waiver of notice of a meeting signed by the Member entitled to the notice, whether before or after the meeting, shall be deemed equivalent to the giving of the notice. Attendance of a Member at a meeting constitutes a waiver of notice, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

4.16. Action by Consent or Remote Participation.

4.16.1 Action by Consent. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting, without prior notice, and without a vote, upon the consent of ~~Members who would have been entitled to cast the minimum number of votes that would be necessary to authorize the action at a meeting at which all Members entitled to vote thereon were present and voting unless a greater percentage is required under this Agreement or by applicable law~~all of the Members. The consents shall be in writing or in electronic form and shall be filed with the Manager. ~~Prompt notice of the taking of an action by less than unanimous consent of the Members, if such consent is permitted by this Agreement, shall be given to each Member entitled to vote thereon who has not consented thereto.~~

4.16.2 Remote Participation. The presence or participation, including voting and taking other action, at a meeting of Members, by conference telephone or other electronic means, including, without limitation, the Internet, Zoom, Microsoft Teams, Skype, or any other type of video conference, shall constitute the presence of, or vote or action by, the Member.

4.17. No Other Compensation. Notwithstanding anything contained in this Agreement to the contrary, no Member shall be entitled to receive any remuneration other than such Member's pro-rata distribution of Net Profits pursuant to Article 6 below without the consent of all of the Members including, without limitation, compensation to any Member in connection with such Member serving as the Manager or an officer of the Company.

**ARTICLE V– MANAGEMENT OF THE COMPANY**

5.1. Management. Except for any actions requiring or authorizing Member action described herein, all matters pertaining to the management of the Company, including the day-to- day management of the Company, shall be vested in the Manager. The Manager shall direct, manage, oversee, and control the business and operations of the Company. The Manager may appoint such officers as she deems appropriate. The officers

shall perform such duties as the Manager shall determine. Except as otherwise set forth herein, other than the Manager, no other Person is permitted or authorized to take part in, or interfere in any manner with, the management, conduct or control of the business and affairs of the Company, and no other Person shall have any right or authority to act for or bind the Company, unless such Person is an officer of the Company elected by the Manager or otherwise authorized pursuant to a written employment agreement approved by the Manager. The Initial Manager shall be Merri Gleckler, who shall serve as the Manager until her death, resignation, retirement or the sale of her Membership Interest.

5.2. Resignation of Manager, Death of Manager and Election of New Manager. Any Manager appointed pursuant to this Agreement may resign at any time upon written notice given to the Members. Any vacancies created by the resignation, removal or death of a Manager shall be filled by the majority vote of the Members.

5.3. Officers; Delegation and Duties. The Company may have such officers as shall be necessary or desirable to conduct its business. The Manager may appoint a Member, Manager or other Person to serve as an officer of the Company. The Manager may assign titles to the officers it appoints. As of the date hereof, Merri Gleckler shall be appointed to the office of the Chief Executive Officer and Founder and (ii) Dean ~~Dassias~~Dussias shall be appointed to the office of President. Each officer shall devote a sufficient amount of time to enable her or him to satisfactorily fulfill her or his duties and responsibilities to the Company. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Manager. In the event that an officer appointed by the Manager fails to perform his or her duties and responsibilities, the Manager shall be entitled to remove that person from his or her role as an officer of the Company. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Manager.

5.4. Reimbursement. The Company shall reimburse the Manager for all reasonable and documented out-of-pocket expenses, fees, costs and disbursements incurred by the Manager in connection with her service of the Manager.

5.5. Limitation of Liability. A Manager shall not be personally liable, as such, for monetary damages (other than under criminal statutes and under federal, state and local laws imposing liability on a Manager for the payment of taxes) for any action taken, or any failure to take any action, unless the Manager's conduct constitutes self-dealing or willful misconduct. No amendment or repeal of this Section 5.5 shall apply to or have any effect on the liability or alleged liability of any Person who is or was a Manager for or with respect to any acts or omissions of the Manager occurring prior to the effective date of such amendment or repeal. If the Act is amended to permit ~~a Pennsylvania~~an Arizona limited liability

company to provide greater protection from personal liability for its Manager than the express terms of this Section 5.5, this Section 5.5 shall be construed to provide for such greater protection.

## ARTICLE VI – DISTRIBUTIONS AND ALLOCATIONS

6.1. Distributions.

6.1.1 General Rule. Prior to the liquidation and winding up of the Company, if the Manager determines, in her sole discretion, that the Company has cash in excess of the reasonable needs of the Company's business, after providing for reasonable reserves for working capital, debt service and future expenditures, the Manager in her sole discretion, may authorize the Company to make distributions to the Members. All distributions made to the Members prior to the liquidation and winding up of the Company shall be made to the Members in accordance with their respective Percentage Interests. Notwithstanding the foregoing and subject to Section 6.3 below, upon the written consent of all of the Members, the Members shall be entitled to receive monthly draws against future Net Profits of the Company.

6.2. Return of Distributions. Except for distributions made in violation of the Act or this Agreement, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

6.3. Limitations on Distribution. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of his, her or its Units in the Company (i) if the distribution would violate the Act or other applicable law, or (ii) if such distributions are prohibited by any contract to which the Company is a party or by which the Company is bound, unless such distributions are required by law. ~~The Members acknowledge that all payments to any Member in exchange for services performed or to be performed shall be deemed a "guaranteed payment" as such term is defined under Section 707(c) of the Code~~.

6.4. Allocations of Profits and Losses. Profits and Losses and, to the extent required, individual items of income, gain, loss or deduction, shall be allocated in accordance with Exhibit B.

6.5. Tax Withholding and ~~Payments Attributable to Members~~Tax Distribution.

6.5.1 All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state or local tax law with respect to an amount actually distributed to a Member under this Agreement shall be treated as amounts actually

distributed to such Member for all purposes under this Agreement of the same type as the distribution giving rise to the withholding obligation.

6.5.2 ~~In the event that applicable tax law requires the Company (or any third party acting on behalf of or with respect to the Company) to pay or withhold any amount on behalf of or with respect to a Member (other than any amount required to be withheld from actual distributions in accordance with Section 6.5.1), including any amount allocable to a Member under Section 10.12(d)(iii)(d) that the Company is obligated to pay in accordance with Code Section 6225 (as amended by the BBA), then such amount (the "***Tax Advance***") shall be paid by the applicable Member to the Company within 30 days after written notice from the Company, plus interest accruing after the expiration of such 30-day period at a rate equal to eight percent (8%) per annum on the amount that such Member fails to pay to the Company on a timely basis. In addition to any other rights of the Company to enforce its entitlement to receive payment of such Tax Advance, the Company shall offset the unpaid balance of such Tax Advance against distributions to which the applicable Member otherwise would be entitled under this Agreement, and the amount so offset shall be deemed for all purposes of this Agreement to be a distribution to such Member followed by a payment of such Tax Advance to the Company, in whole or in part, as the case may be. Any Tax Advance paid (or deemed to be paid) by a Member to the Company under this Section 6.5.2 shall not be treated as a Capital Contribution for purposes of this Agreement. A Member's obligations under this Section 6.5.2 shall survive the transfer of its Units, the termination of this Agreement and the dissolution of the Company.~~Except as provided in Section 6.3 (Limitation on Distributions) above, with respect to Net Profits of the Company, the Manager shall cause the Company to distribute distributable cash to the Members in an amount sufficient to enable the Members to pay applicable federal, state, and local income taxes attributable to their respective allocable shares of Net Profits of the Company (the "***Tax Distribution***"). For purposes of making the aforesaid Tax Distribution, the Manager shall assume all Members have an aggregate federal, state, and local income tax rate equal to the maximum aggregate income tax rate for such year attributable to an individual. Tax Distributions with respect to Net Profits shall be made to the Members within ten (10) days prior to the United States federal estimated tax payment dates.

**ARTICLE VII – TRANSFER OF INTERESTS**

7.1. Restrictions on Transfer of Units. Unless approved by the Manager, no Member shall sell, transfer or otherwise dispose of any Equity Securities held by such Member other than in compliance with this Article VII. Any Transfer or attempted Transfer by a Member in contravention of this Agreement shall be null and void and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, (i) the purported transferee shall have no right to any Profits, Losses or distributions of the Company or any other rights of a Member; and (ii) both the purported transferor and the purported transferee, jointly and severally, shall indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages

(including, without limitation, tax liabilities, loss of tax benefits and reasonable attorney's fees and costs) arising directly or indirectly as a result of the attempted Transfer or efforts to enforce this Agreement.

7.2. Permitted Transfers. A Member shall be permitted to Transfer any or all of such Member's Units free of the requirements under this Section to any or all of (i) ~~a~~an existing Member of the Company, (ii) one or more of the Persons that is a Member immediately prior to such Transfer, (ii) a trust which has as its sole beneficiaries Persons described in the preceding clauses (a Member's living trust), and (iii) the Company (each an "Approved Transferee" and collectively the "Approved Transferees"); provided that such Transfer otherwise complies with the terms of this Article 7 and that concurrently with or prior to any such Transfer, the Company, at its option, shall have received an opinion of counsel acceptable to the Company that such Transfer complies with all applicable federal and state securities laws.

7.3. Right of First Refusal. Any Member who engages in discussions with an outside third party regarding the potential sale of such Member's Membership Interest shall notify the other Member of such discussions within three (3) Business Days of the initiation of such discussion. If at any time any Member obtains an unsolicited Bona Fide Offer for the purchase of all or any portion of such Member's Units, such Member (for purposes of this Section 7.3, the "***Selling Member***") shall give written notice thereof (the "***Selling Member's Notice***") to the Company, stating: (i) the identity of the proposed transferee and a description of the Units proposed to be transferred (the "***Offered Units***"); (ii) the value of the consideration to be received by the Selling Member therefor; and (iii) the other terms and conditions of such transaction, and the Selling Member will offer to sell the Offered Units to the Company and the Other Members (as hereinafter defined) in accordance with the terms of this Section 7.3 at the price and on the same terms and conditions as in the Selling Member's Notice.

7.3.1 Upon receipt of the Selling Member's Notice, the Company shall have thirty (30) days to determine whether the Company shall purchase all or a portion of the Offered Units. The offer to purchase the Offered Units shall be deemed rejected unless, within thirty (30) days after the receipt of the Selling Member's Notice, the Company gives the Selling Member a written notice of acceptance of the offer to sell all or a portion of the Offered Units.

7.3.2 If the ~~Manager~~non-selling Member determines that the Company shall purchase none or less than all of the Offered Units, the Company shall provide written notice to the other Members (the "***Other Members***") of its receipt of such Selling Member's Notice, including a copy thereof, and setting forth the portion of the Offered Units which shall be available for purchase by the Other Members. The Other Members who desire to purchase some or all of the available Offered Units shall provide a notice in writing to the Selling Member within thirty (30) days after the expiration of the period set forth in Section 7.3.1. If

more than one Other Member desires to purchase all or a portion of the Offered Units, then such Other Members will have the right to purchase the Offered Units (or the portion thereof offered to the Other Members) in proportion to their respective Percentage Interests, or in such other proportion as they may mutually agree. The closing of a purchase and sale of Units pursuant this Section 7.3 shall take place at the principal office of the Company within sixty (60) days after such option shall have been duly exercised.

7.3.3 The Selling Member may sell, transfer or otherwise dispose of the Offered Units that are not so purchased by the Company or the Other Members to the proposed transferee on the terms and conditions specified in the Selling Member's Notice for thirty (30) days following the expiration of the time periods during which the Company and the Other Members were entitled to accept the offer to purchase the Offered Units. If the Offered Units shall not be so sold or otherwise disposed of by the Selling Member during such thirty (30) day period, the Offered Units will again be subject to the restrictions of this Agreement. Any modification of the terms of an Offer as set forth in or attached to the Offer Notice shall constitute a new offer which shall again be subject to all of the requirements and procedures of this Section 7.3.

7.3.4 Rights of Transferees Pending the Exercise or Expiration of Option. If any Units shall be transferred in a transaction or by reason of an event which gives rise to an option exercisable by the Company to purchase such Units, the transferee thereof shall not be entitled to vote such Units or otherwise to exercise any of the rights of a registered holder thereof until the time shall have expired (i) for the exercise of such option or (ii) if such option shall be exercised, for the completion of settlement of such purchase.

7.4 Purchase on Death, Permanent Disability or Termination.

7.4.1 Upon the death of any Member (the "Deceased Member"), the Deceased Member shall be treated as if such Member received an Offer under Section 6.3(a) with a deemed Offer Price equal to the ~~Agreed~~Fair Market Value (as defined in Section 6.4(d) below), and the Company or the remaining members ("Remaining Members") shall be obligated to purchase such Offer Interest with the purchase price paid in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. Upon the permanent disability of any Member (the "Disabled Member"), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Disabled Member's Membership Interest at a purchase price equal to the ~~Agreed~~Fair Market Value, payable in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. A Member will be considered disabled for purposes of this Agreement if such Member is unable to perform the duties and responsibilities required of such Member by the Company or the Manager by reason of mental or physical illness, incapacity or impairment for a continuous period of not less than six months (and, if requested by the Company, such Member shall provide a written opinion of a licensed physician regarding his condition). Upon the termination of

~~employment~~engagement of any Member ("Terminated Member") ~~employed~~engaged by the Company (other than a termination due to death or disability as provided above), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Terminated Member's Membership Interest at a purchase price equal to the ~~Agreed~~Fair Market Value. In the event the termination was involuntary and for ~~cause (as "cause" is defined in such Terminated Member's employment agreement)~~Cause, the purchase price shall be reduced by twenty-five percent (25%). If the Company or Remaining Members exercise the option to acquire the Terminated Member's Offer Interest, payments shall be made in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. The Company shall use commercially reasonable efforts to ensure any payments due under this Section 7.4.1 are granted priority of payment over any amounts owed by the Company to any third party. Notwithstanding anything contained in this Agreement to the contrary, in the event all or substantially all of the Company's Membership Interests or assets are sold to a third party purchaser within twelve (12) months of a redemption or purchase of Dean Dussias's Membership Interest pursuant to this Section 7.4.1, the Company shall be contractually obligated to pay to Dean Dussias the difference between the amount Dean Dussias would have received as a result of the sale to such third party purchaser and the purchase price paid to Dean Dussias in connection with redemption or sale by the Company and/or Remaining Members, as applicable, hereunder.

7.4.2 Insurance. The Company, at its option, may obtain and become the owner of life insurance policies on the lives of the Members. The Company shall name itself as the beneficiary of the policies. The policies and any proceeds received thereunder shall be held by the Company in trust for purposes of this Operating Agreement. The Company shall have the right to take out additional insurance on the life of any Member, whenever it may be reasonable necessary to carry out its obligations under this Operating Agreement. If the Company shall receive any proceeds of any life insurance policy on the life of a Member, such proceeds shall be used by the Company to pay the purchase price to the Deceased Member's estate. Any excess insurance proceeds following the payment for the Deceased Member's Membership Interests and debts of the Member shall be retained by the Company.

7.4.3 Preemptive Rights. Each Member shall have the right to purchase its proportionate share of any additional ~~Capital Interests~~Units to be issued by the Company such that upon any such issuance of additional ~~Capital Interests~~Units, each Member, if it so elects to purchase, will retain the same proportionate ~~Capital~~Membership Interest in the Company.

7.4.4 Valuation; Determination of Purchase Price. ~~The Members shall meet each year (the "Valuation Meeting") in Scottsdale, Arizona or at such location as set forth in the Notice of Meeting between the dates of ____________ 1st through 30th (as they may mutually agree) to review and determine the fair market value of the Company (the "Agreed Value"). Prior to such meeting, the Members shall have compiled sufficient financial statements and other necessary information to enable a reasonable judgment on the Agreed Value. There shall be no minority, "lack-of-control" or other related discounting~~

of any such Membership Interest. The Members shall thereafter debate any differences of opinion and establish a final agreement on the Agreed Value of each such Membership Interest. The Agreed Value shall be set forth and each Member shall sign and date a "Certificate of Value" in the form attached hereto and incorporated herein by reference as Exhibit "C". Upon complete execution by each Member of the Certificate of Value it shall be binding and conclusive in establishing the Agreed Value for purposes of this Agreement. In the event that the Agreed Value was not established for any reason (including because the Members could not agree on a value) for a period of two years at the time of a triggering event, the Member and the Company shall each select an independent appraiser to determine the value of a Member's Interest at the time of the triggering event. In the event the two appraisers cannot agree on a price, they shall appoint a third appraiser who shall determine the value of the Company at the time of the triggering event and said decision shall be binding upon the parties and shall constitute the Agreed Value. In the event of a change of control for Dean's Membership Interests, the valuation for his Membership Interests shall be based on the difference of the Initial Value of the Company and the Valuation of the Company at the time of the triggering event multiplied by his Membership Interests (such that Dean shall only be entitled to an increased value of the Company and his Membership Interests). For purposes of this Section 7.4.4 only, the Deceased Member, Disabled Member or Terminated Member, as applicable, shall herein be referred to as the "Selling Member". If the Company and the Selling Member are unable to agree upon the fair market value of the Company within thirty (30) days after the exercise of the right to purchase such Member's shares under Section 7.4.1 above (the "***Cut Off Date***"), such determination shall be made by a qualified business valuation firm, which shall be a Certified Public Accounting firm or a Person qualified to value closely held businesses with operations and assets similar to those of the Company (the "***Valuation Firm***"), mutually agreeable to the Company (as directed by the Manager) and to the Selling Member (the "***Mutually Agreeable Valuation Firm***") with (i) such Mutually Agreeable Valuation Firm being selected within fifteen (15) days after the expiration of the Cut Off Date and (ii) such determination of fair market value being made within sixty (60) days after such Mutually Agreeable Valuation Firm is selected. If the Company and Selling Member cannot agree upon a Mutually Agreeable Valuation Firm within fifteen (15) days after the Cut Off Date ("***Selection Period***"), the Company (as directed by the Manager shall select a single Valuation Firm and the Selling Member shall select a single Valuation Firm. The two (2) Valuation Firms shall select a third (3rd) Valuation Firm that shall be the Mutually Agreeable Valuation Firm. If either the Company or the Selling Member fails or refuses to select a Valuation Firm within seven (7) days after the expiration of the Selection Period, then the Valuation Firm chosen by the other party shall be deemed the Mutually Agreeable Valuation Firm. The determination by the Mutually Agreeable Valuation Firm as to the Fair Market Value shall be conclusive and binding on the parties. The cost and expense of any valuation of the Company by a Mutually Agreeable Valuation Firm shall be paid equally by the Company and Selling Member. Each Member and the Company hereby agrees to promptly provide the other and the Mutually Agreeable Valuation Firm with all documentation reasonably requested in order to make such determination. Notwithstanding anything to the contrary in this Agreement, if the Fair Market Value is to be determined as provided above and a determination of Fair Market Value has been made for any reason as provided above within six (6) months of the date the Company is to be valued as of (the "***Recent Determination***"), then the Fair Market Value set forth in such Recent Determination shall be deemed to be the Fair

Market Value.

7.5. Drag Along and Tag Along Right.

7.5.1 Notwithstanding any other provision of this Agreement to the contrarySubject to Section 7.3 above, the Members holding at least sixty six and two thirds percent (66.67%) of the issued and outstanding Units (the "***Majority Holders***") and selling all (but not less than all) of such Majority Holders' Units, shall have the right (the "***Drag Along Right***"), exercisable by notice (the "***Drag Along Notice***") to the other Members ("***Minority Members***"), to require the Minority Members to sell all (but not less than all, unless the Majority Holders are selling less than all of the Majority Holder's Units, in which case the Minority Members will be obligated to sell only the same proportion of their Units as the Majority Holders are selling) of the Units owned by the Minority Members to the purchaser (who shall be bona fide and named in the Drag Along Notice, together with the terms and conditions of the Sale Transaction, which shall be arm's length), such Sale Transaction to take place contemporaneously with, and on the same terms and conditions of, the sale of the Units by the Majority Holders *provided, however,* that the Majority Holders shall be entitled to exercise the Drag Along Right under this Section 7.5.1 only in the event that the total remuneration payable to Dean Dussias in connection with any such Sale Transaction is at least Two Million One Hundred Thousand Dollars ($2,100,00.00).

7.5.2 If the Manager and the Majority Holders approve any Sale Transaction, pursuant to this Section 7.57.5.1, each Minority Member will be obligated to (i) vote for and raise no objections to the Sale Transaction, (ii) sell, exchange, redeem, agree to cancel or otherwise dispose of such securities or options, warrants or other rights on the terms and conditions approved by the Majority Holders if such transaction includes the sale, exchange, redemption, cancellation or other disposition of securities convertible into or exchangeable for Units, or options, warrants or other rights to purchase such Units, and (iii) take all other necessary or desirable actions, including, without limitation, providing access to documents and records of the Company, entering into an agreement reflecting the terms of such sale, surrendering certificated Units, if applicable, giving customary and reasonable representations and warranties as to title and authority of such Minority Member, joining on a pro-rata basis the indemnification obligations in accordance with the consideration received in such transaction and executing and delivering any certificates or other documents, reasonably requested by the Majority Holder to consummate such transaction. Any Drag Along. Notice may be rescinded by the Majority Holder at any time prior to the closing of such transaction by delivering written notice thereof to all of the Minority Members.

7.5.3 If, at any time, the Majority Holders (the "***Tag-Along Offeree***") receive an offer to purchase all or any portion of the Tag-Along Offeree's Units (an "***Outside Party Offer***") from a third Person (other than a permitted transferee) (an "Outside Party") that the Tag-Along Offeree desires to accept, the Tag-Along Offeree shall, after complying with the provisions of Section 7.3 (Right of First Refusal), promptly provide written notice (a "***Tag-Along***

***Notice***") of such Outside Party Offer to the other Members (the "***Tag-Along Members***"). The Tag-Along Notice shall (i) set forth the Tag-Along Offeree's desire to sell the Tag-Along Offeree's Units on the terms in the Outside Party Offer, the name of the Outside Party, the Units proposed to be Transferred, the proposed amount and form of consideration, and all other terms and conditions of the proposed Transfer, and (ii) be accompanied by a copy of such Outside Party Offer, if the same is in writing.

7.5.4 The Tag-Along Members shall have the right (the "***Tag-Along Right***"), but not the obligation, to cause the Tag-Along Offeree to require the Outside Party to purchase, on the same terms offered to the Tag-Along Offeree in the Outside Party Offer, from each Tag-Along Member who elects to participate, all or the same proportion of such participating Tag-Along Member's Units. Each Tag-Along Member who desires to exercise his, her, or its Tag-Along Right shall provide written notice (the "***Tag-Along Exercise Notice***") to the Tag-Along Offeree within thirty (30) days of his, her, or its receipt of a Tag-Along Notice, informing the Tag-Along Offeree of such Tag-Along Member's election to exercise the Tag-Along Right. The failure of any Tag-Along Member to send a Tag-Along Exercise Notice within such thirty (30) day period shall be deemed to be a waiver of such Tag-Along Member's right to purchase the Units pursuant to the Tag-Along Right. In the event (i) the Outside Party agrees to purchase all of the electing Tag-Along Members' Units at the same purchase price and on the same terms and conditions set forth in the Outside Party Offer, or (ii) no Tag-Along Members elect to exercise their Tag-Along Right, the Tag-Along Offeree may Transfer his Units to the Outside Party, provided, however, that the Tag-Along Offeree and Outside Party fully comply with all of the other requirements set forth in this Agreement In the event, the Outside Party does not agree to purchase all of the electing Tag-Along Members' Units, then the Tag-Along Offeree shall be prohibited from making such transfer.

7.6. Commercially Reasonable Efforts to Relieve Selling Member of Obligation for Company Debt. If the Company or any other Member shall purchase the Units of any Member pursuant to this Agreement, such purchaser(s) shall use their commercially reasonable efforts to cause to be terminated, on or before the date for settlement of such purchase, any contingent obligation of such Member (by guaranty, suretyship or otherwise) for indebtedness and other obligations of the Company.

7.7. Failure to Offer or Transfer Units. If any Person whose Units are subject to purchase hereunder does not assign and transfer such Units to the purchaser after receipt or tender of the purchase price, such tender and receipt will result in an immediate transfer of such Units to the purchaser, subject to the applicable requirements of Section ~~7.7~~7.8.

7.8. Conditions to Transfer. In addition to the other requirements of this Agreement, no Member shall be entitled to transfer all or any part of such Member's Units unless all of the following conditions have been met: (a) the Company shall (at its option) have received an attorney's written opinion, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed transfer, and stating that the proposed transfer will not violate of any of the registration provisions of the Securities Act

of 1933, as amended, or any applicable state securities laws; (b) the Company shall have received from the transferee a written consent to be bound by all of the terms and conditions of this Agreement and the transferee executes such documents and instruments as the Manager may reasonably request as necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement; (c) the transfer will not result in the loss of any license, regulatory approval, certification as a WBE, or an exemption that has been obtained by the Company, or result in a default under or breach or termination of any contract to which the Company is a party, and in each case that is materially useful in the conduct of its business as then being conducted or proposed to be conducted; (d) the Company is reimbursed for all reasonable legal, filing, publication, accounting and all other expenses the Company incurs in connection with the admission of the transferee as a Member; (e) the Company shall have received a certificate signed by the ~~selling~~Selling Member certifying that the Units are being transferred free and clear of all Liens, and all other documents that counsel for the Company or the purchasing Member, as applicable, shall reasonably deem necessary or advisable in order to accomplish a complete transfer of the Units free and clear of Liens; and (f) a written release by the selling Member of all claims against the Company and the other Members in a form satisfactory to counsel for the other Members and the Company.

7.9. WBE Certification. Any and all provisions of this Agreement are subject to the WBE Requirements and any conflicts between the terms hereof and the Certification Requirements shall be resolved in favor of compliance with the Certification Requirements. Each of the Members shall take all action to assist the Company in compliance with the Certification Requirements, shall take no action which shall result in the Company's failure to comply therewith, and, absent any agreement to the contrary, the rights of the Members shall in all cases be subject to change as necessitate by the Certification Requirements.

7.10. Allocation With Respect to Transferor's Interest. Upon a Transfer of all or any part of a Member's Units in accordance with this Article VII, each item of Company income (or loss) and deduction allocable to such Units (aside from gains or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business) may be prorated (as to the transferred Units) between the transferor and transferee on the basis of the number of days in the taxable year of the Company preceding (and including) and succeeding, respectively, the date as of which the instrument evidencing the Transfer is executed. Gain or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business shall be allocated to the Persons who were Members at the time such gain or loss was recognized by the Company. Notwithstanding anything to the contrary, however, the allocations under this Section 7.10 may be varied for any transfer by agreement of the transferor and transferee, *provided* that such agreed upon allocation is permissible under Federal income tax law.

7.11. Effect of Transfers and Admission of Transferee.

7.11.1 A Transfer by a Member or other Person shall not itself entitle the transferee to become a Member or exercise any rights of a Member unless approved by the Manager.

7.11.2 A Transfer shall not otherwise eliminate the transferring Member's entitlement to any rights associated with the transferring Member's Units and shall not cause the transferring Member to be released from any liability to the Company solely as a result of the Transfer.

7.11.3 Notwithstanding the admission of a transferee as a Member, the transferor shall not be released from any obligations to the Company existing as of the date of the Transfer, but such admission shall cause a transferor that is a Member (A) to cease to be a Member with respect to the Units transferred when the transferee becomes a Member and (B) to be released from any obligations arising after the date of such Transfer solely with respect to the Units transferred.

7.11.4 When the transferee of a Unit becomes a Member in accordance with this Agreement, the transferee shall be entitled to all rights of the transferring Member under this Agreement with respect to the Units Transferred.

7.12. Effective Date. Any Transfer and any related admission of a Person (other than an existing Member) as a Member in compliance with this Article VII shall be deemed effective on such date that the transferee or successor in interest complies with the requirements of this Agreement.

7.13. Restrictions Continue After Transfer. After the effective date of any transfer of all or a portion of a Member's Units in accordance with this Agreement, the Units so transferred shall continue to be subject to the terms, provisions and conditions of this Agreement and any further transfers shall be required to comply with all of the terms, provisions and conditions of this Agreement. Any transferee of a Member's Units shall take such Units subject to the restrictions on transfer imposed by this Agreement.

**ARTICLE VIII – REPRESENTATIONS, WARRANTIES, AND COVENANTS**

Each Member hereby represents, warrants, and covenants that:

8.1 Due Organization; Authorization of Operating Agreement. If the Member is a corporation or other business entity, such Member is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, has the power and authority to execute and deliver this Operating Agreement and to perform its obligations hereunder, and the execution, delivery, and performance of this Operating Agreement have been duly authorized by all necessary action. This Operating Agreement constitutes the legal, valid, and binding obligation of such Member.

8.2 No Conflict with Restrictions; No Default. Neither the execution, delivery,

and performance of this Operating Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of: (a) any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member; or (b) any of the terms, conditions, or provisions of the organizational or governance documents of such Member if it is a corporation or other business entity or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of his, her, or its material properties or assets is subject.

8.3 Securities. Such Member is acquiring his, her, or its Membership Interest only for his, her, or its own account and not on behalf of any other Person, and only for the purpose of holding for investment and not with a view to any further distribution thereof. No other Person is participating with, or providing or otherwise arranging funds, or credit for such Member in respect to the acquisition of his, her, or its Membership Interests. Except as contemplated by ARTICLE VII of this Agreement, such Member has no agreement, arrangement, or understanding for transfer of any part of his, her, or its Membership Interest to any other Person. Subject to and in addition to all of the restrictions on transfer contained in this Operating Agreement, such Member shall not offer for sale or sell any part of his, her, or its Membership Interest except upon acceptance by the Company of an opinion of counsel for the purchaser in such form as is satisfactory to counsel for the Company that registration under federal and state securities laws is not required. Such Member (a) either has such knowledge and experience in financial and business matters, or has the advice or representation of a person or entity having such knowledge and experience, to be able to evaluate the merits and risks of his, her, or its investment in the Company or has been given or had access to sufficient information regarding the Company to evaluate the investment in his, her, or its Membership Interest being acquired, and (b) is able to bear the economic risk of the investment in his, her, or its Membership Interest and to hold the same for purposes of investment. Such Member is aware that no market exists for the resale of his, her, or its Membership Interest.

8.4 Confidentiality. Each Member and Manager acknowledges that the nonpublic data and records maintained by the Company and its Affiliates pertaining to its or their business, including, without limitation, intellectual property, technical information, trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute, information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented), notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing , product formulae, data and know-how, business and marketing plans and reports, design materials, documentation and information respecting customers and prospective customers, vendors, partners and employees, product specifications, data, know-how, techniques, methods, processes, designs, sketches, photographs, graphs, drawings, inventions and ideas, past,

current and planned research and development, customer lists, names or addresses, current and anticipated customer requirements, price lists, market studies, business plans and any other information and financial information and data, (such nonpublic information is hereinafter referred to as "***Confidential Information***") are valuable and unique assets of the Company. Each Member and Manager agrees that he, she or it will not, without the written consent of the Manager, disclose to any person, firm or corporation, or use for any purpose whatsoever, except in connection with and furtherance of the business of the Company, any Confidential Information, *provided* that no provision of this Agreement shall be construed as precluding the disclosure of Confidential Information if such disclosure is required by law or a court order. If disclosure of Confidential Information is required by law or court order, the affected Member or Manager shall give written notice to the Manager prior to making such disclosure so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the affected Member or Manager is, in the opinion of its counsel, compelled to disclose any Confidential Information under pain of liability for contempt or other censure or penalty, such affected Member or Manager may disclose only that portion of such Confidential Information as is legally required without liability hereunder; *provided* that the affected Member or Manager agrees to exercise his, her or its reasonable efforts to obtain assurance that confidential treatment will be ~~accorded~~afforded to such Confidential Information. Upon a withdrawal, removal or resignation, as applicable, such Member or Manager shall forthwith deliver to the Company immediately all Confidential Information and other property of the Company in his, her or its possession and will not make or retain copies of any thereof, except as may be required by applicable law or court order.

8.5 Non-Disclosure of Confidential Information.

(a) During the time that each party is a Member of the Company and for two (2) years after a Member ceases to be affiliated with the Company in any manner, each Member acknowledges that he will be afforded access to Confidential Information (as defined below); that public disclosure of such Confidential Information would have an adverse effect on the Company and its business; and that the provisions of this Section are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b) Each Member agrees that while he, she, or it is a Member of the Company and for a period of two (2) years following the termination of the Member's affiliation with the Company, shall not communicate or divulge or use for the Member's benefit or any other persons, firm, corporation, or other entity any Confidential Information, and the Member shall hold in confidence the Confidential Information and shall not disclose it to any other person except with the specific prior written consent of the Company and the other Members.

(c) Any trade secrets of the Company shall be entitled to all of the protections and benefits under Arizona Statutes and any other applicable law. If any information that the Company deems to be a trade secret is found by a court of

competent jurisdiction not to be a trade secret of purpose of this Agreement. The Members hereby waive any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

(d) All price lists, customer lists, contact information, records, notebooks, plans, models, components, software, databases, marketing information, business plans, devices, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") shall be deemed proprietary to the Company. Upon the termination of a Member's Membership Interest in the Company, the Member shall return to the Company all of the Proprietary Items in his possession or subject to his control, and the Member shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

~~(e) "Confidential Information" shall also mean any and all: (1) trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute; (2) information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented); and (3) notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing.~~

8.6 Duty of Loyalty. Members shall devote their energies into the operation of this Company. Nevertheless, a Member may have other business interests and may engage in or invest in other activities in addition to those relating to the Company provided such business interests do not directly or indirectly compete with the Company and provided that such interests do not prevent or interfere with a Member's obligation to the Company. Each Member shall offer the Company and the other Members the opportunity to take advantage of a business opportunity she or he identifies that would be within the synergies of the Company. If the Company wishes not to explore a business opportunity presented by a Member, then and only then would a Member be entitled to take advantage of such opportunity. This provision does not preclude Merri from continuing her involvement in her other companies nor does it entitle Dean from any profits or proceeds from the operation of these businesses.

**ARTICLE IX – INDEMNIFICATION**

9.1 Indemnification. The Company shall ~~have the power to~~ indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the

best interests of the Company, and, in the case of a criminal proceeding, such Person bad no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

9.2 To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company ~~only if authorized in the specific case unanimously by all of the Members~~unless a court of competent jurisdiction has determined that such Person entitled to indemnification hereunder has violated the requisite standard of care. "Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civic, criminal, administrative, or investigative.

9.3 Standard of Care. Each Member, Manager, and officer (if any) shall perform such Person's duties in good faith, in a manner such Person reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Member, Manager, or officer who so performs the duties as a Member, Manager, or officer shall not have any liability by reason of being or having been a Member, Manager, or officer of the Company. In performing such Person's duties, the Member, Manager, or officer shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Members, Manager, officers, or employees whom such Member, Manager, or officer reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including lawyers or accountants, as to matters which such Member, Manager, or officer reasonably believes are within such Person's professional or expert competence. No Member, Manager, or officer shall be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved in a court of competent jurisdiction that such Person's action or failure to act (i) was not in good faith, (ii) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (iii) resulted in an improper personal benefit to such Person or any related party as determined by application of Code § 267(b) at the expense of the Company, (iv) constituted fraud or deceit, or (v) was a knowing violation of law.

9.3.1 Remedies. Each Party hereby acknowledges that with respect to disclosed Confidential Information, the Company would be irreparably harmed by a breach hereof by the Members or his or her Representatives and it may be difficult to estimate damages resulting from such a breach and, consequently, the Company shall be entitled to injunctive or such other equitable relief as may be appropriate to prevent a breach or threatened or continuing breach of this Agreement, and to secure the enforcement of this Agreement, without foregoing any legal relief to which the Company may otherwise be entitled to recover. In addition, the Company will be

entitled to damages and expenses (including legal fees) to enforce the terms of this Agreement.

9.4 Expenses. Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

9.5 Nonexclusivity of Indemnification. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall not be deemed exclusive of any other rights to which an Indemnitee seeking indemnification or advancement of expenses may be entitled under any other provision of this Agreement, the Act, any statute or any insurance or other agreement with the Company, both as to actions in the Indemnitee's official capacity and as to actions in another capacity while holding that office. The Company may create and fund a fund of any nature, which may, but need not be, under the control of a trustee, or otherwise secure or insure in any manner (including by entering into agreements with its Indemnitees, employees and agents) its obligation to indemnify or advance expenses, whether arising under or pursuant to this Article IX or otherwise.

9.6 Modification. The duties of the Company to indemnify and to advance expenses to an Indemnitee provided in this Article IX shall be in the nature of a contract between the Company and each such Indemnitee, and no amendment or repeal of any provision of this Article IX, the Act or any other applicable law, including, without limitation, the Act, and no amendment or termination of any trust or other fund created pursuant to Section 9.4, shall alter, to the detriment of such Indemnitee, the right of such Person to the advance of expenses or indemnification related to a claim based on an act or failure to act which took place prior to such amendment, repeal or termination unless such actions are prohibited by applicable law. Notwithstanding anything to the contrary herein, if any change or amendment to the Act or any other applicable law allows for broader indemnification rights than as are provided in this Article IX, this Article IX shall be deemed to be automatically modified without any further action by the Members or the Manager to provide such broader indemnification rights to any Indemnitee. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be an Indemnitee, employee or agent of the Company and shall inure to the benefit of the executors, administrators, heirs, successors and assigns of that Person.

## ARTICLE X – BOOKS AND RECORDS; ACCOUNTING; EXPENSES; INSURANCE; TAX MATTERS

10.1. Books and Records. At all times during the continuance of the Company, the Company shall maintain, either at its principal place of business or at its accountant's principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's business.

Such books of account, together with (i) a certified copy of this Agreement, all amendments thereto and of the ~~Certificate~~Articles, (ii) a current list of the full name and last known business or residence address each Member together with the contribution and share of the Profits and Losses of each Member, and (iii) copies of the Company's Federal, state and local tax or information returns and reports, if any, shall at all times be maintained at the principal place of business of the Company.

10.2. Delivery of Books and Records to Members and Inspection.

10.2.1 ~~Subject to such standards as may be established by the Members, upon~~Upon the reasonable request of any Member for purposes reasonably related to the interest of that Person as a Member, the Manager shall make available to the requesting Member the information required to be maintained pursuant to Section 10.1.

10.2.2 ~~Subject to such standards as may be established by the Manager, any~~Any request, inspection, or copying of information by a Member under this Section 10.2 may be made at such Member's expense by a Member or such Member's agent or attorney.

10.3. Establishment of Reserves. The Manager shall have the right to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company for any Fiscal Year as the Manager may deem necessary or appropriate for that purpose.

10.4. Financial Statements. The Manager shall provide any Member with such financial statements of the Company as such Member may from time to time reasonably request; *provided* that the Company shall only be required to deliver any financial statements which it regularly maintains and it shall not be required to prepare any financial statement solely at the request of a Member. The financial statements of the Company shall be unaudited, unless the Manager determines otherwise.

10.5. Tax Returns. The Manager shall cause to be prepared and filed with the appropriate authorities all necessary Federal and state income tax and information returns for the Company. The Manager shall send or cause to be sent to each Member within a timely fashion after the end of each taxable year, or as soon as practicable thereafter, such information, including Schedules K-1, and corresponding forms for state and local tax purposes, as is necessary, to complete such Member's Federal and state income tax or information returns, and a copy of the Company's Federal, state, and local income tax or information returns for that year. Each Member shall furnish to the Company all pertinent information in his, her or its possession relating to Company operations that is necessary to enable the Company's tax returns to be prepared and filed.

10.6. Member Tax Reporting. Each Member shall report for federal, state and local

income tax purposes consistently with the relevant Schedules K-1 and corresponding state or local tax information provided to such Member by the Company.

10.7. Other Filings. The Manager shall cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules and regulations.

10.8. Bank Accounts. The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person. All withdrawals therefrom shall be made upon checks signed by any Person authorized to do so by the Manager. The Company shall open and maintain from time to time such bank accounts as deemed advisable by the Manager, *provided* that the appropriate resolutions for the authorization of such accounts, supplied by the bank with which such accounts are opened, are inserted into the books of the Company.

10.9. Accounting Decisions and Reliance Upon Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. For both financial and tax reporting purposes, the books and records of the Company shall be kept on the method of accounting as elected by the Manager, in consultation with the Company's tax advisors, applied in a consistent manner and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

10.10. Payment of Expenses. The Company shall pay with the funds of the Company all fees, costs, disbursements and expenses incident to, and necessary for, the formation and organization of the Company.

10.11. Insurance. The Company shall obtain insurance coverage of the type and amount that the officers of the Company may deem necessary, appropriate or desirable to protect the business interests of the Company.

10.12. Certain Tax Matters.

(a) Designation of Representatives for Purposes of Company Tax Partner.

(b) Merri Gleckler shall serve as the Company's "tax matters partner" ("***Tax Matters Member***") under Code Section 6231(a)(7) for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code for any Company.

(c) Merri Gleckler shall serve as the Company's "partnership representative" ("***Partnership Representative***") under Code Section 6223(a) (as

amended by the BBA), for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code (as amended by the BBA). Each Member agrees to take such action as may reasonably be required to ensure that such Partnership Representative is properly designated on a timely basis in accordance with applicable rules and regulations.

10.13 Handling of Tax Controversies Generally.

(a) The Tax Matters Member, Partnership Representative or such other Person, as the case may be, as such Person is determined in accordance with Section 10.12(a), is authorized and directed to represent the Company, at the Company's expense, in connection with any Company Tax Proceeding and to retain tax professionals and expend Company funds for professional services and costs associated with such matters. Such representative shall provide the Members with periodic information or reports regarding the conduct of any Company Tax Proceeding within a reasonable period of time after the occurrence of any material developments. The limitation on liability and indemnification provisions of Article IX shall apply to such representative to the same extent that such provisions apply to any Member.

10.13 Tax Elections. To the extent permitted by applicable tax law, the Manager shall have the authority to cause the Company to make any tax elections on behalf of the Company as he deems necessary or appropriate, including, but not limited to:

10.13.1 adopting the calendar year as the Company's Fiscal Year;

10.13.2 adopting such method of accounting as the Manager may determine to be required or appropriate for the Company and to keep the Company's books and records consistent with such method; and

10.13.3 making any other election the Company's tax advisors may deem appropriate.

Neither the Company nor the Manager shall make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

10.14 Code §754 Adjustments. The Manager, in conjunction with the Company's tax advisors, may make a Code Section 754 election, to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required to be taken into account in determining Capital Accounts under Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(2) or Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) as the result of a distribution to a Member in complete liquidation of his, her or its Units. The amount of such

adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be taken into account as part of Profits or Losses of the Company in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(2) applies, or specially allocated to the Member to whom such distribution was made in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) applies.

**ARTICLE XI – DISSOLUTION AND WINDING UP**

11.1. Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs shall be wound up only upon the first to occur of the following (each a "***Dissolution Event***"):

(i) the consent of all of the Members ~~holding at least a majority of the issued and outstanding Units;~~ or

(ii) the entry of an order of judicial dissolution of the Company pursuant to the Act.

11.2 The death, dissolution, retirement, resignation, expulsion or bankruptcy of a Member or the occurrence of any other event that terminates the continued membership of a Member shall not cause a dissolution of the Company. The Members agree that they will take such actions as may be required to continue the Company in the event of the Bankruptcy or other dissociation of a Member, unless the remaining Members affirmatively elect to dissolve the Company in accordance with this Section 11.

11.3 The dissolution of the Company shall be effective on the day of the Dissolution Event, but the Company and this Agreement shall not terminate until the assets of the Company have been liquidated and/or distributed as provided herein.

11.4. Winding Up. Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company, shall either cause its assets to be sold to any Person or distributed to a Member, and if sold, as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 11.3 and Section 11.4. The Manager shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. All actions and decisions required to be taken or made by such Person(s) under this Agreement shall be taken or made only with the consent of all such Person(s).

11.5 Liquidation of Assets. The Manager shall liquidate the assets of the Company as promptly as possible, but in an orderly and business-like manner, and shall have the right to offer the business and the assets of the Company for sale, in whole or in part. Any offer for sale of the business or the assets of the Company pursuant to this Section 11.3 shall be on such terms and conditions as the Manager deems appropriate in order to maximize the proceeds of such sale. Any Member(s) shall be entitled to participate in the bidding for the business and the assets (or any part thereof). The proceeds of the liquidation of the Company's assets shall be distributed in the following priority:

11.5.1 first, to pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company to its creditors (including, without limitation, all expenses incurred in liquidation and any advances described in Section 3.3) or otherwise make adequate provision for or establish reserves for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the Manager may reasonably determine); and

11.5.2 after all of the payments required by Section 11.3.1 have been made, any remaining assets of the Company shall be distributed to the holders of Units in accordance

with their respective Percentage Interests.

11.6. Distributions. All distributions in kind to the Members under this Article XI shall be made subject to the liability of such Member for costs, expenses, and liabilities relating to the assets distributed in kind theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to such Member pursuant to this Section 11.4. In the event that an asset is distributed in kind, for purposes of maintaining Capital Accounts, the asset will be deemed to have been sold by the Company at its fair market value as determined in good faith by the Manager and any gain or loss, which would have been recognized on such deemed sale, shall be allocated to the Member as provided in this Agreement and such Member's Capital Accounts shall reflect such allocation. The distribution of cash and/or property to a Member in accordance with the provisions of Sections 11.3 and 11.4 is intended to constitute a complete return to the Member of his, her or its Capital Contributions and a complete distribution to such Member of his, her or its interest in all the Company's property. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds. No Member shall have the right to demand to receive property in kind in connection with any distribution by the Company.

11.7. Limitations on Payments Made in Dissolution. Each Member shall be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance. Notwithstanding that the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company may be insufficient to return the Capital Contributions or share of Profits reflected in such Member's positive Capital Account balance, a Member shall have no recourse against the Company or any other Member.

11.8. Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

11.9. Final Accounting. As promptly as possible after dissolution and again after final liquidation, the Manager shall cause a proper accounting to be made by Company's accountants, of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

11.10. Certificate of Dissolution. Upon completion of the winding up of the affairs of the Company, the Manager shall cause to be filed in the office of, and on a form

prescribed by, the Department of State of the Commonwealth of PennsylvaniaArizona Corporation Commission, a certificate of dissolution as provided in the Act.

11.11. Termination. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.3 and the certificate of cancellationdissolution is filed in accordance with Section 11.811.10.

11.12. No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a dissolution of the Company.

**ARTICLE XII – DISPUTE RESOLUTION**

12.1 Mediation. If and to the extent the Members are unable to reach agreement on any bona fide matter requiring their unanimous consent, the Members shall ingood faith attempt to resolve their disagreement by negotiation. If the dispute is not resolved within thirty (30) days or such shorter time as may be necessary to meet business obligations, the controversy shall be submitted to mediation. If agreement cannot be reached through mediation, then for controversy shall be settled by arbitration as set forth below.

12.2 Arbitration. All parties hereto agree that upon the written demand of any party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Operating Agreement or any course of dealing, course of conduct, statement or actions of any party in connection with this Operating Agreement, including, without limitation, contract disputes and tort claims, shall be resolved by binding arbitration pursuant to the Commercial Rules of the American Arbitration Association ("AAA"). Any arbitration proceeding held pursuant to this arbitration provision shall be conducted before one arbitrator in Scottsdale, Arizona. This arbitration provision shall not limit the right of any party during any dispute, claim, or controversy to seek, use, and employ ancillary, or preliminary rights and/or remedies, judicial or otherwise, and any such action shall not be deemed an election of remedies. Such remedies include, without limitation, obtaining injunctive relief or a temporary restraining order. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.

**ARTICLE XIII – MISCELLANEOUS**

13.1. Complete Agreement. This Agreement and the CertificateArticles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition, or warranty not contained in this Agreement or the CertificateArticles shall be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the CertificateArticles conflicts with any provision of this Agreement, the terms of the CertificateArticles shall control.

13.2. Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns.

13.3. Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective heirs, legal representatives, successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.4. Additional Documents and Acts. Each Member agrees to execute and deliver, from time to time, such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.5. Notices.

13.5.1 To Members. Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(i) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Member appearing on the books of the Company. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when deposited in the United States mail or with a courier service for delivery to that Member.

(ii) By facsimile transmission, e-mail or other electronic communication to the Member's facsimile number or address for e-mail or other electronic communications supplied by the Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when sent.

13.5.2 To the Company. Any notice to the Company must be given to the address set forth in Section 2.4 hereof, or such other address as the Manager may designate from time to time on behalf of the Company.

13.6. Amendments. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if approved in writing by ~~the holders~~all of ~~a majority of~~ the ~~issued and outstanding Units~~Members. The Manager may amend Exhibit A hereto at any time and from time to time to reflect the admission or withdrawal of any Member, or the

change in any Member's Capital Contributions, or any changes in the Member's addresses, all as contemplated by this Agreement.

13.7. Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.8. Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

13.9. Attorneys' Fees. Except as otherwise provided herein, in any action, suit or proceeding brought to enforce the provisions of this Agreement, the parties shall bear their own costs and expenses (including attorneys' fees), except that the party determined by the applicable court of competent jurisdiction to be the prevailing party in such action, suit or proceeding shall be entitled to recover its cost and expenses (including attorneys' fees).

~~13.10. Investment Representation. Each Member hereby represents to, and agrees with, the other Members and the Company that such Member is acquiring the Units for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.~~

13.10. ~~13.11.~~ Governing Law. This Agreement shall be governed and construed and the legal relationship of the parties determined in accordance with the laws of the State of Arizona applicable to contracts executed and to be performed solely in Arizona.

* * * * *

**IN WITNESS WHEREOF**, the Members have executed this Amended and Restated Limited Liability Company Operating Agreement, effective as of the date first written above.

**COMPANY**

**TMG KREATIONS, LLC**

By: _
Name: Merri Gleckler
Title: Manager

**MEMBERS**

______________________________________
MerriG, LLC
By: Merri Gleckler, Managing Member

______________________________________
Dean H. Dussias

## EXHIBIT A

### SCHEDULE OF MEMBERS, PERCENTAGE INTERESTS AND UNITS

**Dated as of ~~February~~ __July 1, ~~2021~~2020**

| Member | Capital Contribution [3] | Percentage Interest | Units |
|---|---|---|---|
| MerriG, LLC, c/o<br>Merri Gleckler<br>Merri.Gleckler@gmail.com<br>~~Merri.Gleckler@gmail.com~~ | ________ | 70% | 70 |
| | | | |
| Dean H. Dussias<br>Dean@dussias.org | $20,000 *plus* services and other consideration | 30% | 30 |
| TOTALS | | 100% | 100 |

[3] **NOTE:** Please confirm MerriG LLC's capital contribution.

# EXHIBIT B

## CAPITAL ACCOUNTS AND ALLOCATIONS

B.1. Definitions. In addition to the terms defined in other provisions of this Agreement, including without limitation Section 1.1, the following terms shall have the meanings set forth below:

"Adjusted Capital Account Deficit" shall mean with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) increasing the Capital Account by any amounts that the Member is obligated to restore or is deemed to be obligated to restore pursuant to Treas. Reg. §§ 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) reducing the Capital Account by the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Treas. Reg. §§ 1.704-2(b)(2) and 1.704-2(d).

"Depreciation" shall mean for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager, and if the Company uses the "remedial allocation method" under Treas. Reg. § 1.704-3(d) with respect to any asset, Depreciation for that asset shall be computed in accordance with Treas. Reg. § 1.704-3(d)(2).

"Excess Nonrecourse Liabilities" has the same meaning as set forth in Treas.
Reg. § 1.752-3(a)(3).

"Gross Asset Value" with respect to any asset shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

(1) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Manager.

(2) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager as of the following times:

(i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money, other property or services;

(ii) the distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an interest in the Company;

(iii) the liquidation of the Company for Federal income tax purposes within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g);

except that the adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company. In the case of the adjustment to Gross Asset Values as of the date hereof (and in the event of any other adjustment to Gross Asset Values pursuant to this subsection (2)), the current Fiscal Year shall end as of the time of such adjustment, and a new Fiscal Year shall be deemed to begin immediately after such adjustment.

(3) The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(4) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m) and Section B.2, except that Gross Asset Values shall not be adjusted pursuant to this paragraph (4) to the extent the Manager determines that an adjustment pursuant to paragraph (2) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (4).

(5) If the Gross Asset Value of an asset has been determined pursuant to paragraphs (1), (2), or (4), that Gross Asset Value shall thereafter be adjusted by the

Depreciation taken into account with respect to that asset for purposes of computing Profits and Losses.

"Member Nonrecourse Debt" has the same meaning as "partner nonrecourse debt" set forth in Treas. Reg. §§ 1.704-2(b)(4) and 1.704-2(i).

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as "partner nonrecourse debt minimum gain" set forth in Treas. Reg. § 1.704-2(i) and shall be determined in accordance with the principles of that Section.

"Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse deductions" set forth in Treas. Reg. §§ 1.704-2(i)(1) and 1.704-2(i)(2).

"Nonrecourse Deductions" are deductions having the meaning set forth in Treas. Reg. §§ 1.704-2(b)(1) and 1.704-2(c).

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2) Any e xpenditures of the Company d escribed in Code Section 705(a)(2)(B) or that are treated as Code Section 705(a)(2)(B) expenditures pursuant to Treas. Reg.
§ 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraphs (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6) Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

B.2. Preparation and Maintenance of Capital Accounts.

(a) The Capital Account for each Member shall:

(1) be increased by (i) the amount of money contributed by that Member to the Company, (ii) the Gross Asset Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code § 752), and (iii) allocations to that Member of Profits and any other Company income and gain (or items thereof), including

income and gain exempt from tax and income and gain described in Treas. Reg. § 1.704- 1(b)(2)(iv)(g), and

(2) be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Gross Asset Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Code § 752), and (iii) allocations of Losses and any other Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(b) The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas. Reg. §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of Depreciation and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1.704-1(b)(2)(iv)(g). On the transfer or all or part of a Membership Interest, the Capital Account of the transferor t hat is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(1).

B.3. Allocation of Profits and Losses. Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company for a Fiscal Year shall be allocated among the persons who were Members during such Fiscal Year in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal to:

(a) the amount of the hypothetical distribution (if any) that such Member would receive if, on the last day of the Fiscal Year, (1) the Company were dissolved, its affairs wound up and its assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto f or such Fiscal Y ear, (2) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (3) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 11.3.2 hereof, over

(b) the sum of (1) the amount, if any, without duplication, that such Member would be obligated to contribute to the capital of the Company, (2) such Member's share of Company Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(g), and (3) such Member's share of Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5), all computed as of the hypothetical sale described in Section B.3(a) of this Annex B.

B.4. Losses Limitation. Losses allocated pursuant to Section B.3 of this Annex B shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Company year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section B.3 of this Annex B, the limitation set forth in this Section B.4 shall be applied on a Member by Member basis, and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each member under Section 1.704-(b)(2)(ii)(d).

B.5. Special Allocations. The following special allocations shall be made in the following order:

(1) Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B, if there is a net decrease in Company Minimum Gain during any Company taxable year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. §§ 1.704-2(f). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. This Section B.5(1) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

(2) Member Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B except Section B.5(1), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. § 1.704-2(i)(4). This Section B.5(2) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(3) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) that would

create an Adjusted Capital Account Deficit for such Member, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section B.5(3) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Annex B have been tentatively made as if this Section B.5(3) were not in the Agreement.

(4) Gross Income Allocation. In the event any Member has a deficit Capital Account balance at the end of any Company taxable year that exceeds the amount described in clause (i) of the definition of Adjusted Capital Account Deficit for such Member, each such Member shall be specially allocated items of Company income and gain to eliminate such excess as quickly as possible, provided that an allocation pursuant to this Section B.5(4) shall be made if and only to the extent that such an excess would exist after all other allocations provided for in this Annex B have been tentatively made as if Section B.5(3) and this Section B.5(4) were not in the Agreement.

(5) Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period shall be allocated among the Members in proportion to their Common Units.

(6) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i).

(7) Excess Nonrecourse Liabilities. The Excess Nonrecourse Liabilities of the Company shall be allocated among the Members in accordance with their respective Percentage Interests.

B.6. Curative Allocations. The allocations set forth in Section B.4 and in Section B.5 (the "Regulatory Allocations") are intended to comply with certain requirements of Treas. Reg. § 1.704-1(b). Notwithstanding any other provisions of this Agreement (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits, Losses, and items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory

Allocations relating to (i) Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain, and (ii) Member Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Member Nonrecourse Debt Minimum Gain.

B.7. Tax Allocations: Code Section 704(c).

(a) In accordance with Code § 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value.

(b) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code § 704(c) and the Treasury Regulations thereunder(c) Any elections or other decisions relating to allocations pursuant to this Section B.7 shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section B.7 are solely for purposes of Federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

B.8. Miscellaneous Allocation Provisions.

(a) For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code § 706 and the Treasury Regulations promulgated thereunder.

(b) Except as otherwise provided in this Agreement, all items of Company income gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, including, for this purpose, items allocated pursuant to Section B.7, for the year.

(c) Notwithstanding anything in this Annex B or this Agreement to the contrary, the Manager shall have the authority to modify any allocation provisions of this Annex B to the extent necessary to comply with Federal income tax requirements.

B.9 Election of Liquidation Value Safe Harbor. Each Member, by executing this Agreement, hereby agrees to the following:

(a) The Company is authorized to elect the safe harbor, in accordance with proposed Regulations Section 1.83-3(l) and the proposed revenue procedure thereunder (once such regulations and revenue procedure become effective), under which the fair market value of each interest in the Company that is transferred in connection with the performance of services shall be treated as being equal to the liquidation value of that interest (the "***Safe Harbor Election***");

(b) The Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Election with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election remains effective, including the requirement that all relevant Federal income tax items be reported consistently with the Safe Harbor Election;

(c) The effective date of the Safe Harbor Election shall be the earliest permitted such date under the applicable regulations and revenue procedure, once those become effective, and the Safe Harbor Election shall continue to apply until such time (if ever) as all Members affected by the Safe Harbor Election shall agree to terminate it and the Company shall affirmatively terminate it under applicable procedures;

(d) The Manager shall file, with the Company's Federal income tax return for the taxable year in which the Safe Harbor Election becomes effective, a document, executed by the Manager, stating that the Company is electing, on behalf of the Company and the Members, to have the Safe Harbor Election apply irrevocably with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election is in effect; and

(e) The Company shall comply with applicable recordkeeping requirements for the Safe Harbor Election, and the Company and the Members shall take all other actions, if any, required to comply with the requirements of such Safe Harbor Election as ultimately promulgated, to the extent practicable.

**EXHIBIT C**

Certificate of Value

# EXHIBIT D

## AMOUNT OF KEY-PERSON LIFE INSURANCE

Merri Gleckler - $_____________
Dean Dussias - $_____________

Document comparison by Workshare 10.0 on Thursday, April 08, 2021 9:52:50 AM

| **Input:** | |
|---|---|
| Document 1 ID | file://\\GCTDB\ClientWIdox\CLIENT\6639\6639.000\DOCUMENT\~VER\1\00466864.DOCX |
| Description | 00466864 |
| Document 2 ID | file://\\GCTDB\ClientWIdox\CLIENT\6639\6639.000\DOCUMENT\00466864.DOCX |
| Description | 00466864 |
| Rendering set | Standard |

| **Legend:** | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| **Statistics:** | |
|---|---|
| | Count |
| Insertions | 163 |
| Deletions | 105 |
| Moved from | 8 |
| Moved to | 8 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 284 |

# EXHIBIT Y

CLB/GRIEISING 4-12-21

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF TMG KREATIONS, LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "***Agreement***") is made effective as of July 1, 2020 (the "***Effective Date***") by and among TMG Kreations, LLC, an Arizona limited liability company (the "***Company***"), and each of the Persons listed on Exhibit A attached hereto (such Persons and their respective successors in interest being hereinafter referred to individually as a "***Member***" and collectively as the "***Members***").

## RECITALS

WHEREAS, a Certificate of Organization of the Company was originally filed with the State of Delaware on December 15, 2009 to organize the Company as a Delaware limited liability company;

WHEREAS, concurrently with the execution of this Agreement, the Manager has converted the Company from a Delaware limited liability company to an Arizona limited liability company by filing a Statement of Conversion and Articles of Organization (the "***Articles***") with the Arizona Corporation Commission;

WHEREAS, prior to the Effective Date, the Company and its then current Members conducted the business of the Company pursuant to that certain Operating Agreement of the Company dated _______________, 20______ (the "***Prior Agreement***"); and

WHEREAS, the parties desire to amend and restate the Prior Agreement and enter into this Agreement to, among other things, formally admit Dean Dussias as a Member of the Company and set forth the respective rights, obligations and interests of the Members. This Agreement, as it may be amended from time to time in accordance with the terms herein, shall be binding on any person who at the time is a Member, regardless of whether or not such Person has executed this Agreement or any amendment hereto.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I – DEFINITIONS; CONSTRUCTION

1.1. Definitions. When used in this Agreement the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Section 1.1

shall have the meanings set forth elsewhere in this Agreement, including Exhibit B attached hereto and made a part hereof):

"***Act***" means the Arizona Limited Liability Company Act and any successor statute, as the same may be amended from time to time.

"***Affiliate***" of any Person means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such Person. The term "***control,***" ***"is controlled by,"*** or ***"is under the common control"***, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity. In the case of a partnership, the term "***Affiliate***" shall also include any limited or general partner of such partnership.

"***Agreed Value***" shall mean the agreed upon fair value of the Units of the Company determined by the Company (as directed by the Manager) at the Annual Meeting of the Company as set forth in Section 7.4.1.

"***Agreement***" means this Amended and Restated Limited Liability Company Operating Agreement, including the Exhibits hereto, as the same may be amended, modified, supplemented, or restated from time to time.

"***Articles***" means the Articles of Organization of the Company originally filed with the State of Arizona, as the same may be amended and/or restated from time to time.

"***Bankruptcy***" (and grammatical variations thereof) means, with respect to any Person: (a) the filing of an application by such Person for, or such Person's consent to, the appointment of a trustee, receiver, or custodian of its assets; (b) the entry of an order for relief with respect to such Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time (the "***Bankruptcy Code***"); (c) the making by such Person of a general assignment for the benefit of creditors; (d) the voluntary filing of a petition in accordance with the Bankruptcy Code; (e) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of such Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within one hundred twenty (120) days; (f) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in sub-clauses (a) through (f) of this clause or (g) the failure by such Person generally to pay such Person's debts as the debts become due within the meaning of Section 303(h)(1) of the Bankruptcy Code, as determined by the Bankruptcy Court.

"***Bona Fide Offer***" means an arm's length written offer by an unrelated third party that is not an Affiliate of a Member to purchase part or all of a Member's Units on the terms specified therein.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks, generally are authorized or required to be closed.

"***Capital Account***" means with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to Section 3.4 and Exhibit B herein.

"***Capital Contribution***" means the aggregate amount of cash and the Gross Asset Value (as defined in Exhibit B) of any property (other than money) contributed by each Member to the Company as provided in Section 3.1, offset by the amount of debt and other liabilities of such Member which the Company has assumed, or taken such property subject to, in connection with such contribution. In the case of a Member that acquires Units by an assignment or Transfer in accordance with the terms of this Agreement, "***Capital Contribution***" means the Capital Contribution of that Member's predecessor proportionate to the acquired Unit(s).

"***Capital Contribution***" shall mean the contribution to the capital of the Company, which shall be made in cash, property, or services, by the Member whenever made and acknowledged by the Manager and the Company. Capital Contribution shall also consist of a Member's contribution to the Company prior to its conversion into the Arizona limited liability company.

"***Cause***" shall mean direct or indirect occurrence of any of the following events: (a) a Member's material breach or threatened breach of this Agreement; (b) a Member's material breach of a Company policy that causes monetary or reputational damage to the Company; (c) a Member's violation of a pertinent law or regulation that causes monetary or reputation damage to the Company; (d) a Member's conviction of a felony or a plea of nolo contender for any other crime involving moral turpitude or dishonesty; (e) Member's failure or refusal to comply with a directive by the Manager, with the Company's policies, standards or regulations, or to perform the responsibilities of his position after ten (10) days' written notice and opportunity to cure; (f) a Member's material misconduct or gross negligence that causes monetary of reputational damage to the Company; (g) a Member's unauthorized disclosure of Company trade secrets and/or other confidential business information; (h) a Member's breach of his legal duty of loyalty to the Company; (i) a Member's fraudulent or willful and material misrepresentation or concealments of any written reports submitted to the Company or the Manager; or (f) a Member's act of fraud, theft, extortion, blackmail, moral turpitude or similar conduct, or embezzlement or the misappropriation of Company assets.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section (§) of the Code refers not only to such specific section but also to any corresponding provision of any Federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"***Company Tax Proceeding***" means any examination of the Company's tax affairs by tax authorities and any administrative or judicial proceeding involving the Company's tax affairs, including the filing of any amended return or administrative adjustment request.

"***Cut Off Date***" shall have the meaning set forth in Section 7.4.4

"***Equity Securities***" has the meaning set forth in Section 4.1.1

"***Fair Market Value***" shall mean the fair market value of the Company determined by the Company as determined in Section 7.4.4.

"***Liens***" shall mean any and all liens, encumbrances, security interests, mortgages, pledges, claims, options or restrictions of any kind whatsoever.

"***Majority Interest***" means that number of Units that, in the aggregate, exceed fifty percent (50%) of the aggregate of all Units.

"***Manager***" means the Person who is initially appointed or subsequently elected to be the Manager of the Company in accordance with the terms of this Agreement. This Initial Manager shall be Merri Gleckler.

"***Member***" means each Person who is a record holder or record owner of Units and (a) is identified as a Member on Exhibit A, has been admitted to the Company as a Member in accordance with this Agreement or is an assignee or transferee who has become a Member in accordance with Article VII, and (b) has not withdrawn, been removed or if other than an individual, dissolved.

"***Mutually Agreeable Valuation Firm***" shall have the meaning set forth in Section 7.4.4

"***Outside Party Offer***" shall have the meaning set forth in Section 7.5.3

"***Percentage Interest***" means, for each Member, the Member's ownership interest in the Company, calculated as a fraction, and expressed as a percentage, having as its numerator the Units owned by the Member at such time, and having as its denominator the aggregate issued and outstanding Units at such time. The Percentage Interests of the Members shall be adjusted upon the admission of a new Member, the withdrawal of a Member or any other event that alters the number of Units owned by any Member, or all of the Members in the aggregate.

"***Permanent Disability***" means an illness, incapacity or a mental or physical condition that renders a Member unable or incompetent to carry out the essential functions of such Member's position, if any, with the Company, with reasonable accommodation, for a period of at least one hundred eighty (180) consecutive days because of an illness, incapacity or a mental or physical condition.

"***Person***" means any natural person, individual, general partnership, limited partnership, limited liability company, limited liability partnership, corporation, trust, estate, real estate investment trust, association or other legal entity or organization.

"***Prime Rate***" means a varying rate per annum that is equal to the interest rate published by The Wall Street Journal from time to time as the prime commercial or similar reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate.

"***Profits***" and "***Losses***" has the meaning set forth in Exhibit B.

"***Recent Determination***" shall have the meaning set forth in Section 7.4.4

"***Sale Transaction***" means a (i) sale of all, substantially all or part of the assets or Units and other Equity Securities (as hereinafter defined) of the Company to an unrelated Person or entity in one transaction or a series of similar transactions or (ii) a merger or consolidation of the Company with or into any unrelated Person, unless after the consummation of such transaction the Members hold a majority of the outstanding capital securities of the surviving entity.

"***Selection Period***" shall have the meaning set forth in Section 7.4.4

"***Tax Distribution***" shall have the meaning set forth in Section 6.5.2.

"***Transfer***" means any and all types of transfers, including, but not limited to, any sale, assignment, conveyance, hypothecation, distribution, gift, or other disposition, or the pledge, mortgage, or grant of a security interest or Lien in, or other encumbrance, whether voluntary or by operation of law, directly or indirectly, of all or any portion of a Member's Units, other than in connection with a Sale Transaction.

"***Triggering Event***" means the occurrence of any of the events listed below:

(a) Bankruptcy. A Member becoming Bankrupt;

(b) Dissolution. In the case of a Member that is a business entity, the dissolution and commencement of winding up of such Member;

(c) Criminal or Fraudulent Activities. Upon a finding that the Member : (i) is convicted of, submits a plea of nolo contendere to, submits a guilty plea to or confesses to (A) to an act of fraud, misappropriation or embezzlement, or (B) to a felony or other crime involving moral turpitude; (ii) committed an act, or multiple acts, of willful misconduct; (iii) willfully violated any provision of this Agreement; or (iv) committed an act of theft, misappropriation, embezzlement or fraud with respect to the assets or properties of the Company, other than de minimis takings of common office supplies and similar items;

(d) Impermissible Voluntary Lien. A Member proposes to pledge or otherwise grant a Lien on any Units owned by such Member;

(e) Impermissible Transfer. A Member purports to Transfer any Units held by such Member in violation of this Agreement;

(f) Death or Permanent Disability. A Member dies or becomes Permanently Disabled; or

(g) Impermissible Involuntary Lien. The Units owned by a Member are attached, levied upon or executed against in connection with the enforcement of any Lien or otherwise be transferred by operation of law.

"***Units***" means the units representing a Member's entire interest in the Company, including the Member's right to share in Profits and Losses, income, gains, losses, deductions, credits or similar items of, and to receive distributions (liquidating or otherwise) and allocations from, the Company pursuant to this Agreement, the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, and the right to receive information concerning the business and affairs of the Company, as assigned to a Member under the terms of this Agreement as set forth on Exhibit A, as amended from time to time.

"***Valuation Firm***" shall have the meaning set forth in Section 7.4.4

1.2. Rules of Construction. The following rules of construction shall apply to this Agreement:

1.2.1 The titles of the Articles and Sections herein have been inserted as a matter of convenience and reference only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

1.2.2 All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders and the singular shall include the plural and vice versa, as the context may require.

1.2.3 The term "including" shall in all cases be interpreted as "including, limited to."

1.2.4 Each provision of this Agreement shall be considered severable from the rest, and if any provision of this Agreement or its application to any Person or circumstances shall be held invalid or contrary to any existing or future law or unenforceable to any extent, the remainder of this Agreement and the application of any other provision to any Person or circumstances shall not be affected thereby and shall be interpreted and enforced to the greatest extent permitted by law so as to give effect to the original intent of the parties hereto.

1.2.5 Unless the context clearly requires otherwise, words such as "hereof," "herein," "hereunder" and similar terms shall refer to this entire Agreement (including exhibits hereto) and not to a particular Section or provision, references to particular Sections shall refer to the Sections of this Agreement, and this Agreement shall not be construed against the drafter of this Agreement.

**ARTICLE II – ORGANIZATIONAL MATTERS**

2.1. Formation. Pursuant to the Delaware Limited Liability Company Act, the Company was initially formed as a Delaware limited liability company under the laws of the State of Delaware through the filing of a Certificate of Organization with the State of Delaware. Concurrently with the execution of this Agreement and pursuant to the Act, the Company will convert to an Arizona Limited Liability Company by filing the requisite paperwork with the Secretary of State for the State of Delaware as well filing a Statement of Conversion and the Articles with the Arizona Corporation Commission. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2. Name and Qualification. The name of the Company shall be "TMG Kreations, LLC". The business and affairs of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager may deem appropriate or advisable. Any authorized officer shall file any fictitious name certificates and similar filings and any amendments thereto, that the Manager deems appropriate or advisable. In addition to the Articles, an authorized officer shall prepare and file in each jurisdiction where such filing is appropriate such additional documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company in each jurisdiction in which the Company shall conduct business.

2.3. Term. The existence of the Company commenced on the date of the filing of the Articles with the State of Arizona, and shall continue until the Company is dissolved in accordance with the provisions of this Agreement and the Articles are cancelled in accordance with the Act.

2.4. Registered Office; Principal Place of Business; Other Offices[1]. The Company's registered office shall be ________________________________________. The principal

[1] **NOTE:** Please confirm the Company's Registered Office and Principal Place of Business.

place of business of the Company shall be at ________________________________, or at such other place as the Manager may designate from time to time, which need not be in the State of Arizona. The Company may have such other offices as the Manager may designate from time to time.

2.5. Title to Property. All real and personal property owned by the Company, including, but not limited to, all real and personal property (tangible and intangible) which may be contributed by the Members to the Company from time to time, shall be owned by the Company as an entity, and no Member shall have any ownership interest in such property in such Member's individual name or right. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

2.6. No State Law Partnership. The Members intend that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes. The Members intend that the Company not be a partnership or joint venture for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.7. Purpose and Powers. The character and purpose for which the Company is formed, in general, is to engage in any lawful act or business activity for which limited liability companies may be formed under the Act and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.

**ARTICLE III – CAPITAL CONTRIBUTIONS**

3.1. Capital Contributions.

3.1.1 Each of the Members has contributed as of the date hereof such Member's Capital Contribution to the Company as provided in Exhibit A.

3.1.2 Initial Services Contributions. Dean Dussias has contributed personal services utilized in the operation of the Company as part of their contribution to the Company in return for their respective Membership Interests. [NTD: All of the Membership Units in the Company were owned by MerriG, LLC – the $20,000 to the Company for a capital contribution cannot be made to the Company.]

3.1.3 Vesting Schedule. Dean's Membership Interest shall not fully vest for a period of three years from the effective date of this Agreement. In the event that Dean resigns or is terminated prior to the Membership Interests being fully vested, Dean shall surrender his Membership Interests in the Company without payment of any compensation or consideration. However, in the event that Company is sold or there is some other change of control, Dean's Membership Interests shall immediately vest immediately prior to the sale and he shall be entitled to share pro rata in the increase of valuation of the Company from the date of this Agreement until the Closing. Notwithstanding the foregoing, Dean will be entitled to attend and participate in Member Meetings but will not be entitled to vote until his Membership Interest is fully vested.

3.1.4 Capital Call. In the event that the Manager deems that the Company needs additional capital, the Manager shall have the authority to issue a capital call to the Members. The Members shall be entitled, but not required, to make additional Capital Contributions in amounts that are proportionate to their respective number of Units. If any Member declines to make its proportionate additional Capital Contributions, the Units shall be adjusted as reasonably determined by the Manager to reflect the additional Capital Contributions made by other Members.

3.1.5 The Manager shall not be required to require a Member to restore any negative balance in such Member's Capital Account, whether upon the liquidation of the Company or otherwise.

3.2. Return of Contributions. A Member is not entitled to the return of any part of the Member's Capital Contribution, or to be paid interest in respect of the Member's Capital Account or Capital Contribution. An un-repaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.3. Advances by Members. To the extent the Manager determines that the Company requires additional funds in connection with its business, the Company shall first endeavor to secure third party financing for such funds on commercially reasonable terms prior to obtaining a loan from any of the Members. If the third party lender requires a Member guarantee in connection with such third party financing, each Member shall fully cooperate with the Company and shall execute a personal guarantee. If such third party financing is not available or if the Manager determines that exigent circumstances require an immediate need for funds, then the Company may seek such funds through a loan from the Members. If the Company elects to seek such funds through a loan from the Members, then each Member shall have the option but not the obligation to lend the Company an amount equal to such Member's pro rata share (based on such Member's Membership Interest) of the amount of funds that the Company is seeking to borrow from the Members. Each such loan shall: (a) be made on terms and conditions that are the same for all Members that elect to participate in that loan; (b) be evidenced by one or more written promissory notes and such other documents as are acceptable to the Company and to each Member who elects to participate in that loan; and (c) have equal priority with all outstanding loans to the Company from the Members. To facilitate this process, the Manager shall send written notice to each Member setting forth the amount of the loan requested by the Company, how the loan proceeds will be used by the Company, and a reasonable period of time during which the Members can consider the Company's request. If a Member fails to loan the funds that the Member is entitled to loan to the Company, then each of the participating Members may loan an additional amount equal to such participating Member's pro rata share of the non-participating Member's share of the loan or any other proportion of the non-participating Member's share of the loan as all of the participating Members may agree.

3.4. Capital Accounts. The Company shall maintain an individual Capital Account for each Member in accordance with the provisions of Section B.2 of Exhibit B.

3.5. No Withdrawal. No Member shall have the right to withdraw such Member's Capital Contributions or to demand and receive property of the Company or any distribution in return for such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by the Act.

## ARTICLE IV – ISSUANCE OF UNITS; MEMBERS

4.1. Authorization and Issuance of Units.

4.1.1 Authorized Units. The aggregate equity in the Company shall be divided into such number and class of Units, or other form of equity, including, but not limited to, common or preferred Units, rights, profit units, options, warrants exercisable for, or convertible into, Units, or other securities or instruments of any type or class whatsoever, (collectively, the "***Equity Securities***"), including fractional interests, as may be issued and outstanding from time to time by the Manager in its sole discretion, upon the affirmative vote of the Manager. Any such Equity Securities may be issued for cash, property, services, satisfaction of existing obligations or such other type, form, and amount of consideration (including notes, other evidences of indebtedness or obligations of the Person acquiring the interest, instrument or security, as the case may be) as the Manager may determine to be appropriate in her sole discretion. Any such issuance may be made by the Company by setting forth either in an amendment or an addendum to this Agreement duly executed in accordance with the requirements under Section 13.6 herein, the relative rights, obligations, duties, and preferences of each new class or series of Units created and reflecting all necessary adjustments. A copy of this Agreement as so amended, or the addendum as so adopted, as the case may be, shall be provided to each Member upon written request therefor. All filings necessary to be made under the Act or applicable law in connection with the creation of such interests shall be made by an authorized officer.

4.1.2 Issuance. As of the date hereof, each Member owns the number of Units set forth next to his, her or its name on Exhibit A. The name, residence, business or mailing address and Percentage Interest of each Member are also set forth on Exhibit A.

4.2. Issuance of Additional Units. Subject to Section 7.4.3, the Manager may, from time to time, cause the Company to issue additional Units to new or existing Members in exchange for such Capital Contributions as the Manager may determine. A Person shall be admitted as a new Member at such time as such Person makes the Capital Contribution required by the Manager, executes and delivers a counterpart copy of this Agreement and satisfies such other conditions as may be required by the Manager. In connection with the issuance of such additional Units, the Manager shall cause Exhibit A to be amended to reflect the issuance of such additional Units, the admission of any additional Members and the adjustment of the Percentage Interests of all the Members. Persons who are subsequently admitted as Members shall execute this Agreement either by counterpart or amendment. When any Person is admitted as a Member or ceases to be a Member, the Manager shall prepare a revised version of Exhibit A and distribute it to all the Members.

4.3. Record Holders of Units. The Company shall be entitled to treat the Person in whose name any Units of the Company stand on the books of the Company as the absolute owner thereof. The Company shall not be bound to recognize any equitable or other claim to, or interest in, such Units on the part of any other Person, whether or not the Company has express or other notice of any such claim.

4.4. Evidence of Units. The evidence of the amount of Units held by a Member or Assignee shall be reflected in the books and records of the Company, including but not limited to the Schedule A to this Agreement. The Company shall not issue certificates of ownership.

4.5. Conflicts of Interest, Related Party Transactions and Other Activities. Any Member and any Affiliate of any such Member, and any of their respective directors, officers, members, partners, stockholders, employees, or controlling persons may engage in or possess an interest in any business or activity, without any accountability to the Company or any other Member, and without obligation to offer such business opportunity to the Company or any other Member. No such Person shall be liable to the Company or any other Member for breach of any fiduciary or other duty, as a Member or otherwise, by reason of the fact that such Person acquires or pursues such opportunity or directs such opportunity to another person, except for any Member that agrees otherwise pursuant to a separate agreement with the Company or any other direct or indirect subsidiaries or Affiliates of the Company; *provided, however*, that nothing in this Section 4.5 or in such separate agreement shall be construed to relieve or excuse any Person from his, her or its obligations under Section 4.14 or any employment agreement, non-use, non-disclosure, non-compete, non-solicitation, covenant-not-to-compete or similar covenant in this Agreement or any other agreement between such Person and the Company.

4.6. Limited Liability. The Members, as such, shall not be personally liable for any debt, obligation or liability of the Company, whether such debt, obligation or liability arises in contract, tort or otherwise.

4.7. Powers of Members. Except as provided herein, a Member in his, her or its capacity as such shall not have the authority or power to act for or on behalf of the Company or otherwise bind the Company in any way.

4.8. No Right of Partition. A Member shall not have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular assets of the Company and notwithstanding any provisions of applicable law to the contrary, each Member (and its successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his, her or its Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

4.9. No Appraisal Rights. No Member shall be entitled to any appraisal rights with respect to such Member's Units, whether individually or as part of any class or group of Members, even in the event of a Sale Transaction or other transaction involving the Company, the Units or the Equity Securities of the Company unless such rights are expressly granted by the Members holding at least a majority of the issued and outstanding Units.

4.10. No Dissenter's Rights. No Member shall be entitled to exercise any dissenter rights with respect to such Member's Units or Equity Securities, whether individually or as part of any class or group of Members, in the event of a Sale Transaction or other transaction involving the Company, the assets of the Company, the Units or the Company's Equity Securities unless such rights are expressly granted by the Members holding at least sixty six and two thirds percent (66.67%) of the issued and outstanding Units.[2]

4.11. Voluntary Withdrawal. No Member shall have the right or power to voluntarily withdraw from the Company without the express written consent of the Manager. Any withdrawal in violation of this Agreement shall entitle the Company to damages which may be offset against the amounts otherwise payable as a distribution to such Member purporting to withdraw from the Company.

4.12. Member Assurances. Each Member agrees to execute such further documents, instruments and agreements as the Manager deems necessary to further effect and carry out the intentions and provisions of this Agreement.

4.13. Agreements with Members or Affiliates. The Company may, upon approval by the Manager in its sole discretion, enter into employment agreements, consulting agreements or other appropriate agreements with some or all of the Members or any Affiliate's providing for the provision of personal services to the Company; *provided, however*, the agreements shall be on terms and conditions no less favorable than the Company could have obtained from any third party providing such goods or services.

4.14. Voting; Action by Members. With respect to all matters to be decided or voted on by the Members pursuant to the terms of this Agreement or the Act, each Member shall have one vote for each Unit held by such Member. All decisions of the Members must be approved by Members holding at least majority of the issued and outstanding Units, unless a greater percentage is required by this Agreement or the Act.

4.15. Meetings of Members.

4.15.1 General. An annual meeting of the Members for the transaction of such business as may properly come before the Members shall be held on such date and at such time as the Manager shall fix and set forth in the notice of such annual meeting. Special meetings of the Members for any proper purpose or purposes may be called at any time by the Manager or Members holding at least a majority of the issued and outstanding Units. Only business within the purpose or purposes described in the notice of the special meeting may be conducted at a special meeting. A meeting of the Members shall not be organized for the transaction of business unless a quorum is present. The presence, whether in person or by proxy, of Members holding at majority of the issued and outstanding Units shall constitute a quorum for the purposes of consideration and action on the matter. The Members present at a duly organized meeting can continue to do business until adjournment notwithstanding the withdrawal of enough Members to

[2] **NOTE**: We would like to discuss the intended purpose for this Section 4.10. We are not agreeable to the language as drafted.

leave less than a quorum. All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Arizona as shall be specified or fixed in the notice thereof.

4.15.2 Notices. Notice of a meeting of Members shall be given to the Members:

(i) Personally at least two (2) Business Days prior to the Meeting;

(ii) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of each Member appearing on the books of the Company (notice pursuant to this paragraph shall be deemed to have been given when deposited in the United States mail five (5) Business Days prior to the meeting date or with the courier service at least three (3) Business Days prior to the meeting date); or

(iii) By facsimile transmission, e-mail or other electronic communication at least two (2) Business Days prior to the Meeting to the facsimile number or address for e-mail or other electronic communications supplied by a Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given when sent.

4.15.3 Waiver of Notice. A waiver of notice of a meeting signed by the Member entitled to the notice, whether before or after the meeting, shall be deemed equivalent to the giving of the notice. Attendance of a Member at a meeting constitutes a waiver of notice, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

4.16. Action by Consent or Remote Participation.

4.16.1 Action by Consent. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting, without prior notice, and without a vote, upon the consent of Members who would have been entitled to cast the minimum number of votes that would be necessary to authorize the action at a meeting at which all Members entitled to vote thereon were present and voting unless a greater percentage is required under this Agreement or by applicable law. The consents shall be in writing or in electronic form and shall be filed with the Manager. Prompt notice of the taking of an action by less than unanimous consent of the Members, if such consent is permitted by this Agreement, shall be given to each Member entitled to vote thereon who has not consented thereto.

4.16.2 Remote Participation. The presence or participation, including voting and taking other action, at a meeting of Members, by conference telephone or other electronic means, including, without limitation, the Internet, Zoom, Microsoft Teams, Skype, or any other type of video conference, shall constitute the presence of, or vote or action by, the Member.

## ARTICLE V– MANAGEMENT OF THE COMPANY

5.1 Management. Except for any actions requiring or authorizing Member

action described herein, all matters pertaining to the management of the Company, including the day-to- day management of the Company, shall be vested in the Manager. The Manager shall direct, manage, oversee, and control the business and operations of the Company. The Manager may appoint such officers as she deems appropriate. The officers shall perform such duties as the Manager shall determine. Except as otherwise set forth herein, other than the Manager, no other Person is permitted or authorized to take part in, or interfere in any manner with, the management, conduct or control of the business and affairs of the Company, and no other Person shall have any right or authority to act for or bind the Company, unless such Person is an officer of the Company elected by the Manager or otherwise authorized pursuant to a written employment agreement approved by the Manager. Without limiting the generality of the foregoing, and subject to any restrictions in the Company's Articles of Organization or this Operating Agreement, the Manager may authorize the Company to:

(a) make distributions to the Members;

(b) endorse any instrument or act as an accommodation party or otherwise become a guarantor or surety for any Person;

(c) borrow or lend money or make, deliver, or accept any commercial paper;

(d) execute any mortgage, bond, or lease;

(e) purchase or sell real or personal property;

(f) incur any expense or liability;

(g) establish the Company's policies with respect to personnel, environmental, health and safety, accounting, internal audit, tax, and other management functions;

(h) hire and fire, and determine the compensation of, the Company's executive employees, officers and agents; and

(i) obtain appropriate types and amounts of insurance for the Company and its assets

(j) transfer or sell all or substantially all of the Company's assets;

(k) subject to the terms of this Operating Agreement, admit a new Member to the Company;

(l) convert the Company into, or merge or consolidate the Company with, any Company;

(m) redeem, purchase, or otherwise acquire any Membership Interest.

5.2 Manager.

The Initial Manager shall be Merri Gleckler, who shall serve as the Manager until

her death, resignation, retirement or the sale of her Membership Interest.

5.3. Resignation of Manager, Death of Manager and Election of New Manager. Any Manager appointed pursuant to this Agreement may resign at any time upon written notice given to the Members. Any vacancies created by the resignation, removal or death of a Manager shall be filled by the majority vote of the Members.

5.4. Officers; Delegation and Duties. The Company may have such officers as shall be necessary or desirable to conduct its business. The Manager may appoint a Member, Manager or other Person to serve as an officer of the Company. The Manager may assign titles to the officers it appoints. As of the date hereof, Merri Gleckler shall be appointed to the office of the Chief Executive Officer and Founder and (ii) Dean Dussias shall be appointed to the office of President. Each officer shall devote a sufficient amount of time to enable her or him to satisfactorily fulfill her or his duties and responsibilities to the Company. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Manager. In the event that an officer appointed by the Manager fails to perform his or her duties and responsibilities, the Manager shall be entitled to remove that person from his or her role as an officer of the Company. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Manager.

5.5. Reimbursement. The Company shall reimburse the Manager for all reasonable and documented out-of-pocket expenses, fees, costs and disbursements incurred by the Manager in connection with her service of the Manager.

5.6. Limitation of Liability. A Manager shall not be personally liable, as such, for monetary damages (other than under criminal statutes and under federal, state and local laws imposing liability on a Manager for the payment of taxes) for any action taken, or any failure to take any action, unless the Manager's conduct constitutes self-dealing or willful misconduct. No amendment or repeal of this Section 5.5 shall apply to or have any effect on the liability or alleged liability of any Person who is or was a Manager for or with respect to any acts or omissions of the Manager occurring prior to the effective date of such amendment or repeal. If the Act is amended to permit an Arizona limited liability company to provide greater protection from personal liability for its Manager than the express terms of this Section 5.5, this Section 5.5 shall be construed to provide for such greater protection.

## ARTICLE VI – DISTRIBUTIONS AND ALLOCATIONS

6.1. Distributions.

6.1.1 General Rule. Prior to the liquidation and winding up of the Company, if the Manager determines, in her sole discretion, that the Company has cash in excess of the reasonable needs of the Company's business, after providing for reasonable reserves for working capital, debt service and future expenditures, the Manager in her sole discretion, may authorize the

Company to make distributions to the Members. All distributions made to the Members prior to the liquidation and winding up of the Company shall be made to the Members in accordance with their respective Percentage Interests. Notwithstanding the foregoing and subject to Section 6.3 below, upon the written consent of the Manager, the Members shall be entitled to receive monthly draws against future Net Profits of the Company.

6.2. Return of Distributions. Except for distributions made in violation of the Act or this Agreement, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

6.3. Limitations on Distribution. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of his, her or its Units in the Company (i) if the distribution would violate the Act or other applicable law, (ii) if such distributions are prohibited by any contract to which the Company is a party or by which the Company is bound, unless such distributions are required by law; or (iii) the distribution would occur while the Company is insolvent or such distribution would cause the Company to become insolvent.

6.4. Allocations of Profits and Losses. Profits and Losses and, to the extent required, individual items of income, gain, loss or deduction, shall be allocated in accordance with Exhibit B.

6.5. Tax Withholding and Tax Distribution.

6.5.1 All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state or local tax law with respect to an amount actually distributed to a Member under this Agreement shall be treated as amounts actually distributed to such Member for all purposes under this Agreement of the same type as the distribution giving rise to the withholding obligation.

6.5.2 Except as provided in Section 6.3 (Limitation on Distributions) above, with respect to Net Profits of the Company, the Manager shall cause the Company to distribute distributable cash to the Members in an amount sufficient to enable the Members to pay applicable federal, state, and local income taxes attributable to their respective allocable shares of Net Profits of the Company (the "***Tax Distribution***"). For purposes of making the aforesaid Tax Distribution, the Manager shall assume all Members have an aggregate federal, state, and local income tax rate equal to the maximum aggregate income tax rate for such year attributable to an individual. Tax Distributions with respect to Net Profits shall be made to the Members within ten (10) days prior to the United States federal estimated tax payment dates. [NTD: Subject to approval from accountant.]

## ARTICLE VII – TRANSFER OF INTERESTS

7.1. Restrictions on Transfer of Units. Unless approved by the Manager, no Member

shall sell, transfer or otherwise dispose of any Equity Securities held by such Member other than in compliance with this Article VII. Any Transfer or attempted Transfer by a Member in contravention of this Agreement shall be null and void and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, (i) the purported transferee shall have no right to any Profits, Losses or distributions of the Company or any other rights of a Member; and (ii) both the purported transferor and the purported transferee, jointly and severally, shall indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages (including, without limitation, tax liabilities, loss of tax benefits and reasonable attorney's fees and costs) arising directly or indirectly as a result of the attempted Transfer or efforts to enforce this Agreement.

7.2. Permitted Transfers. A Member shall be permitted to Transfer any or all of such Member's Units free of the requirements under this Section to any or all of (i) an existing Member of the Company, (ii) one or more of the Persons that is a Member immediately prior to such Transfer, (ii) a trust which has as its sole beneficiaries Persons described in the preceding clauses (a Member's living trust), and (iii) the Company (each an "Approved Transferee" and collectively the "Approved Transferees"); provided that such Transfer otherwise complies with the terms of this Article 7 and that concurrently with or prior to any such Transfer, the Company, at its option, shall have received an opinion of counsel acceptable to the Company that such Transfer complies with all applicable federal and state securities laws.

7.3. Right of First Refusal. If at any time any Member obtains an unsolicited Bona Fide Offer for the purchase of all or any portion of such Member's Units, such Member (for purposes of this Section 7.3, the "***Selling Member***") shall give written notice thereof (the "***Selling Member's Notice***") to the Company, stating: (i) the identity of the proposed transferee and a description of the Units proposed to be transferred (the "***Offered Units***"); (ii) the value of the consideration to be received by the Selling Member therefor; and (iii) the other terms and conditions of such transaction, and the Selling Member will offer to sell the Offered Units to the Company and the Other Members (as hereinafter defined) in accordance with the terms of this Section 7.3 at the price and on the same terms and conditions as in the Selling Member's Notice.

7.3.1 Upon receipt of the Selling Member's Notice, the Company shall have thirty (30) days to determine whether the Company shall purchase all or a portion of the Offered Units. The offer to purchase the Offered Units shall be deemed rejected unless, within thirty (30) days after the receipt of the Selling Member's Notice, the Company gives the Selling Member a written notice of acceptance of the offer to sell all or a portion of the Offered Units.

7.3.2 If the Manager determines that the Company shall purchase none or less than all of the Offered Units, the Company shall provide written notice to the other Members (the "***Other Members***") of its receipt of such Selling Member's Notice, including a copy thereof, and setting forth the portion of the Offered Units which shall be available for purchase by the Other Members. The Other Members who desire to purchase some or all of the available Offered Units shall provide a notice in writing to the Selling Member within thirty (30) days after the expiration of the period set forth in Section 7.3.1. If more than one Other Member desires to purchase all or a portion of the Offered Units, then such Other Members will have the right to purchase the Offered Units (or the portion thereof offered to the Other Members) in proportion to their

respective Percentage Interests, or in such other proportion as they may mutually agree. The closing of a purchase and sale of Units pursuant this Section 7.3 shall take place at the principal office of the Company within sixty (60) days after such option shall have been duly exercised.

7.3.3 The Selling Member may sell, transfer or otherwise dispose of the Offered Units that are not so purchased by the Company or the Other Members to the proposed transferee on the terms and conditions specified in the Selling Member's Notice for thirty (30) days following the expiration of the time periods during which the Company and the Other Members were entitled to accept the offer to purchase the Offered Units. If the Offered Units shall not be so sold or otherwise disposed of by the Selling Member during such thirty (30) day period, the Offered Units will again be subject to the restrictions of this Agreement. Any modification of the terms of an Offer as set forth in or attached to the Offer Notice shall constitute a new offer which shall again be subject to all of the requirements and procedures of this Section 7.3.

7.3.4 Rights of Transferees Pending the Exercise or Expiration of Option. If any Units shall be transferred in a transaction or by reason of an event which gives rise to an option exercisable by the Company to purchase such Units, the transferee thereof shall not be entitled to vote such Units or otherwise to exercise any of the rights of a registered holder thereof until the time shall have expired (i) for the exercise of such option or (ii) if such option shall be exercised, for the completion of settlement of such purchase.

7.4 Purchase on Death, Permanent Disability or Termination.

7.4.1 Upon the death of any Member (the "Deceased Member"), the Deceased Member shall be treated as if such Member received an Offer under Section 7 .3 with a deemed Offer Price equal to the Fair Market Value (as defined in Section 7.4.4 below), and the Company or the remaining members ("Remaining Members") shall be obligated to purchase such Offer Interest with the purchase price paid in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. Upon the permanent disability of any Member (the "Disabled Member"), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Disabled Member's Membership Interest at a purchase price equal to the Fair Market Value, payable in thirty-six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum. A Member will be considered disabled for purposes of this Agreement if such Member is unable to perform the duties and responsibilities required of such Member by the Company or the Manager by reason of mental or physical illness, incapacity or impairment for a continuous period of not less than six months (and, if requested by the Company, such Member shall provide a written opinion of a licensed physician regarding his condition). Upon the termination of engagement of any Member ("Terminated Member") engaged by the Company (other than a termination due to death or disability as provided above), the Company and the Remaining Members shall have the option, but not the obligation, to purchase the Terminated Member's Membership Interest at a purchase price equal to the Fair Market Value. In the event the termination was involuntary and for Cause, the purchase price shall be reduced by twenty-five percent (25%). If the Company or Remaining Members exercise the option to acquire the Terminated Member's Offer Interest, payments shall be made in thirty-

six (36) equal monthly installments of principal bearing interest at a rate of five percent (5%) per annum.

7.4.2 Insurance. The Company, at its option, may obtain and become the owner of life insurance policies on the lives of the Members. The Company shall name itself as the beneficiary of the policies. The policies and any proceeds received thereunder shall be held by the Company in trust for purposes of this Operating Agreement. The Company shall have the right to take out additional insurance on the life of any Member, whenever it may be reasonable necessary to carry out its obligations under this Operating Agreement. If the Company shall receive any proceeds of any life insurance policy on the life of a Member, such proceeds shall be used by the Company to pay the purchase price to the Deceased Member's estate. Any excess insurance proceeds following the payment for the Deceased Member's Membership Interests and debts of the Member shall be retained by the Company.

7.4.3 Preemptive Rights. Each Member shall have the right to purchase its proportionate share of any additional Units to be issued by the Company such that upon any such issuance of additional Units, each Member, if it so elects to purchase, will retain the same proportionate Membership Interest in the Company.

7.4.4 Valuation; Determination of Purchase Price. The Members shall meet each year (the "Valuation Meeting") in Scottsdale, Arizona or at such location as set forth in the Notice of Meeting between the dates of __________ 1st through 30th (as they may mutually agree) to review and determine the fair market value of the Company (the "Agreed Value"). Prior to such meeting, the Members shall have compiled sufficient financial statements and other necessary information to enable a reasonable judgment on the Agreed Value. There shall be no minority, "lack-of-control" or other related discounting of any such Membership Interest. The Members shall thereafter debate any differences of opinion and establish a final agreement on the Agreed Value of each such Membership Interest. The Agreed Value shall be set forth and each Member shall sign and date a "Certificate of Value" in the form attached hereto and incorporated herein by reference as Exhibit "C". Upon complete execution by each Member of the Certificate of Value it shall be binding and conclusive in establishing the Agreed Value for purposes of this Agreement. For purposes of this Section 7.4.4 only, the Deceased Member, Disabled Member or Terminated Member, as applicable, shall herein be referred to as the "Selling Member".

7.4.4.1 In the event that the Agreed Value was not established for any reason (including because the Members could not agree on a value) for a period of two years prior to the triggering event, and the Company and the Selling Member are unable to agree upon the fair market value of the Company within thirty (30) days after the exercise of the right to purchase such Member's shares under Section 7.4.1 above (the "***Cut Off Date***"), such determination of the Fair Market Value under these circumstances shall be made by a qualified business valuation firm, which shall be a Certified Public Accounting firm or a Person qualified to value closely held businesses with operations and assets similar to those of the Company (the "***Valuation Firm***"), mutually agreeable to the Company (as directed by the Manager) and to the Selling Member (the "***Mutually Agreeable Valuation Firm***") with (i) such Mutually Agreeable Valuation Firm being selected within fifteen (15) days after the expiration of the Cut Off Date and (ii) such

determination of fair market value being made within sixty (60) days after such Mutually Agreeable Valuation Firm is selected. If the Company and Selling Member cannot agree upon a Mutually Agreeable Valuation Firm within fifteen (15) days after the Cut Off Date ("***Selection Period***"), the Company (as directed by the Manager shall select a single Valuation Firm and the Selling Member shall select a single Valuation Firm. The two (2) Valuation Firms shall select a third (3rd) Valuation Firm that shall be the Mutually Agreeable Valuation Firm. If either the Company or the Selling Member fails or refuses to select a Valuation Firm within seven (7) days after the expiration of the Selection Period, then the Valuation Firm chosen by the other party shall be deemed the Mutually Agreeable Valuation Firm. The determination by the Mutually Agreeable Valuation Firm as to the Fair Market Value shall be conclusive and binding on the parties. The cost and expense of any valuation of the Company by a Mutually Agreeable Valuation Firm shall be paid equally by the Company and Selling Member. Each Member and the Company hereby agrees to promptly provide the other and the Mutually Agreeable Valuation Firm with all documentation reasonably requested in order to make such determination. Notwithstanding anything to the contrary in this Agreement, if the Fair Market Value is to be determined as provided above and a determination of Fair Market Value has been made for any reason as provided above within six (6) months of the date the Company is to be valued as of (the "***Recent Determination***"), then the Fair Market Value set forth in such Recent Determination shall be deemed to be the Fair Market Value.

7.5. Commercially Reasonable Efforts to Relieve Selling Member of Obligation for Company Debt. If the Company or any other Member shall purchase the Units of any Member pursuant to this Agreement, such purchaser(s) shall use their commercially reasonable efforts to cause to be terminated, on or before the date for settlement of such purchase, any contingent obligation of such Member (by guaranty, suretyship or otherwise) for indebtedness and other obligations of the Company.

7.6. Failure to Offer or Transfer Units. If any Person whose Units are subject to purchase hereunder does not assign and transfer such Units to the purchaser after receipt or tender of the purchase price, such tender and receipt will result in an immediate transfer of such Units to the purchaser, subject to the applicable requirements of Section 7.7.

7.7. Conditions to Transfer. In addition to the other requirements of this Agreement, no Member shall be entitled to transfer all or any part of such Member's Units unless all of the following conditions have been met: (a) the Company shall (at its option) have received an attorney's written opinion, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed transfer, and stating that the proposed transfer will not violate of any of the registration provisions of the Securities Act of 1933, as amended, or any applicable state securities laws; (b) the Company shall have received from the transferee a written consent to be bound by all of the terms and conditions of this Agreement and the transferee executes such documents and instruments as the Manager may reasonably request as necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement; (c) the transfer will not result in the loss of any license, regulatory approval, certification as a WBE, or an

exemption that has been obtained by the Company, or result in a default under or breach or termination of any contract to which the Company is a party, and in each case that is materially useful in the conduct of its business as then being conducted or proposed to be conducted; (d) the Company is reimbursed for all reasonable legal, filing, publication, accounting and all other expenses the Company incurs in connection with the admission of the transferee as a Member; (e) the Company shall have received a certificate signed by the Selling Member certifying that the Units are being transferred free and clear of all Liens, and all other documents that counsel for the Company or the purchasing Member, as applicable, shall reasonably deem necessary or advisable in order to accomplish a complete transfer of the Units free and clear of Liens; and (f) a written release by the selling Member of all claims against the Company and the other Members in a form satisfactory to counsel for the other Members and the Company.

7.8. WBE Certification. Any and all provisions of this Agreement are subject to the WBE Requirements and any conflicts between the terms hereof and the Certification Requirements shall be resolved in favor of compliance with the Certification Requirements. Each of the Members shall take all action to assist the Company in compliance with the Certification Requirements, shall take no action which shall result in the Company's failure to comply therewith, and, absent any agreement to the contrary, the rights of the Members shall in all cases be subject to change as necessitate by the Certification Requirements.

7.9. Allocation With Respect to Transferor's Interest. Upon a Transfer of all or any part of a Member's Units in accordance with this Article VII, each item of Company income (or loss) and deduction allocable to such Units (aside from gains or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business) may be prorated (as to the transferred Units) between the transferor and transferee on the basis of the number of days in the taxable year of the Company preceding (and including) and succeeding, respectively, the date as of which the instrument evidencing the Transfer is executed. Gain or loss from any sale or other disposition of a Company asset that is not in the ordinary course of business shall be allocated to the Persons who were Members at the time such gain or loss was recognized by the Company. Notwithstanding anything to the contrary, however, the allocations under this Section 7.9 may be varied for any transfer by agreement of the transferor and transferee, *provided* that such agreed upon allocation is permissible under Federal income tax law.

7.10. Effect of Transfers and Admission of Transferee.

7.10.1 A Transfer by a Member or other Person shall not itself entitle the transferee to become a Member or exercise any rights of a Member unless approved by the Manager.

7.10.2 A Transfer shall not otherwise eliminate the transferring Member's entitlement to any rights associated with the transferring Member's Units and shall not cause the transferring Member to be released from any liability to the Company solely as a result of the Transfer.

7.10.3 Notwithstanding the admission of a transferee as a Member, the transferor shall not be released from any obligations to the Company existing as of the date of the Transfer, but such admission shall cause a transferor that is a Member (A) to cease to be a Member with

respect to the Units transferred when the transferee becomes a Member and (B) to be released from any obligations arising after the date of such Transfer solely with respect to the Units transferred.

7.10.4 When the transferee of a Unit becomes a Member in accordance with this Agreement, the transferee shall be entitled to all rights of the transferring Member under this Agreement with respect to the Units Transferred.

7.11. Effective Date. Any Transfer and any related admission of a Person (other than an existing Member) as a Member in compliance with this Article VII shall be deemed effective on such date that the transferee or successor in interest complies with the requirements of this Agreement.

7.12. Restrictions Continue After Transfer. After the effective date of any transfer of all or a portion of a Member's Units in accordance with this Agreement, the Units so transferred shall continue to be subject to the terms, provisions and conditions of this Agreement and any further transfers shall be required to comply with all of the terms, provisions and conditions of this Agreement. Any transferee of a Member's Units shall take such Units subject to the restrictions on transfer imposed by this Agreement.

## ARTICLE VIII – REPRESENTATIONS, WARRANTIES, AND COVENANTS

Each Member hereby represents, warrants, and covenants that:

8.1 Due Organization; Authorization of Operating Agreement. If the Member is a corporation or other business entity, such Member is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, has the power and authority to execute and deliver this Operating Agreement and to perform its obligations hereunder, and the execution, delivery, and performance of this Operating Agreement have been duly authorized by all necessary action. This Operating Agreement constitutes the legal, valid, and binding obligation of such Member.

8.2 No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Operating Agreement nor the consummation by such Member of the transactions contemplated hereby will conflict with, violate, or result in a breach of: (a) any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member; or (b) any of the terms, conditions, or provisions of the organizational or governance documents of such Member if it is a corporation or other business entity or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of his, her, or its material properties or assets is subject.

8.3 Securities. Such Member is acquiring his, her, or its Membership Interest only for his, her, or its own account and not on behalf of any other Person, and only for the purpose of holding for investment and not with a view to any further distribution thereof. No

other Person is participating with, or providing or otherwise arranging funds, or credit for such Member in respect to the acquisition of his, her, or its Membership Interests. Except as contemplated by ARTICLE VII of this Agreement, such Member has no agreement, arrangement, or understanding for transfer of any part of his, her, or its Membership Interest to any other Person. Subject to and in addition to all of the restrictions on transfer contained in this Operating Agreement, such Member shall not offer for sale or sell any part of his, her, or its Membership Interest except upon acceptance by the Company of an opinion of counsel for the purchaser in such form as is satisfactory to counsel for the Company that registration under federal and state securities laws is not required. Such Member (a) either has such knowledge and experience in financial and business matters, or has the advice or representation of a person or entity having such knowledge and experience, to be able to evaluate the merits and risks of his, her, or its investment in the Company or has been given or had access to sufficient information regarding the Company to evaluate the investment in his, her, or its Membership Interest being acquired, and (b) is able to bear the economic risk of the investment in his, her, or its Membership Interest and to hold the same for purposes of investment. Such Member is aware that no market exists for the resale of his, her, or its Membership Interest.

8.4 Confidentiality. Each Member and Manager acknowledges that the nonpublic data and records maintained by the Company and its Affiliates pertaining to its or their business, including, without limitation, intellectual property, technical information, trade secrets concerning the business and affairs of the Company, however documented, that is a trade secret within the meaning of the Arizona statute, information concerning the business and affairs of the Company (which includes the names and backgrounds of key personnel, personnel training and techniques and materials however documented), notes, analysis, compilations, studies, summaries, and other material prepared by or for the Company containing or based, in whole or in part, on any information included in the foregoing, product formulae, data and know-how, business and marketing plans and reports, design materials, documentation and information respecting customers and prospective customers, vendors, partners and employees, product specifications, data, know-how, techniques, methods, processes, designs, sketches, photographs, graphs, drawings, inventions and ideas, past, current and planned research and development, customer lists, names or addresses, current and anticipated customer requirements, price lists, market studies, business plans and any other information and financial information and data, (such nonpublic information is hereinafter referred to as "***Confidential Information***") are valuable and unique assets of the Company. Each Member and Manager agrees that he, she or it will not, without the written consent of the Manager, disclose to any person, firm or corporation, or use for any purpose whatsoever, except in connection with and furtherance of the business of the Company, any Confidential Information, *provided* that no provision of this Agreement shall be construed as precluding the disclosure of Confidential Information if such disclosure is required by law or a court order. If disclosure of Confidential Information is required by law or court order, the affected Member or Manager shall give written notice to the Manager prior to making such disclosure so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the affected Member or Manager is, in the opinion of its counsel, compelled to disclose any Confidential Information under pain of liability for contempt or other censure or penalty, such affected Member or Manager may disclose only that portion of such Confidential Information as is legally required without liability hereunder; *provided* that the

affected Member or Manager agrees to exercise his, her or its reasonable efforts to obtain assurance that confidential treatment will be afforded to such Confidential Information. Upon a withdrawal, removal or resignation, as applicable, such Member or Manager shall forthwith deliver to the Company immediately all Confidential Information and other property of the Company in his, her or its possession and will not make or retain copies of any thereof, except as may be required by applicable law or court order.

8.5 Non-Disclosure of Confidential Information.

(a) During the time that each party is a Member of the Company and for two (2) years after a Member ceases to be affiliated with the Company in any manner, each Member acknowledges that he will be afforded access to Confidential Information (as defined below); that public disclosure of such Confidential Information would have an adverse effect on the Company and its business; and that the provisions of this Section are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b) Each Member agrees that while he, she, or it is a Member of the Company and for a period of two (2) years following the termination of the Member's affiliation with the Company, shall not communicate or divulge or use for the Member's benefit or any other persons, firm, corporation, or other entity any Confidential Information, and the Member shall hold in confidence the Confidential Information and shall not disclose it to any other person except with the specific prior written consent of the Company and the other Members.

(c) Any trade secrets of the Company shall be entitled to all of the protections and benefits under Arizona Statutes and any other applicable law. If any information that the Company deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret of purpose of this Agreement. The Members hereby waive any requirement that the Company submit proof of the economic value of any trade secret or post a bond or other security.

(d) All price lists, customer lists, contact information, records, notebooks, plans, models, components, software, databases, marketing information, business plans, devices, whether embodied in a disk or in any other form (collectively, the "Proprietary Items") shall be deemed proprietary to the Company. Upon the termination of a Member's Membership Interest in the Company, the Member shall return to the Company all of the Proprietary Items in his possession or subject to his control, and the Member shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

8.6 Duty of Loyalty. Members shall devote their energies into the operation of this Company. Nevertheless, a Member may have other business interests and may engage in or invest in other activities in addition to those relating to the Company provided such business interests do not directly or indirectly compete with the Company and provided that such interests do not prevent or interfere with a Member's obligation to the Company. Each Member shall

offer the Company and the other Members the opportunity to take advantage of a business opportunity she or he identifies that would be within the synergies of the Company. If the Company wishes not to explore a business opportunity presented by a Member, then and only then would a Member be entitled to take advantage of such opportunity. This provision does not preclude Merri from continuing her involvement in her other companies nor does it entitle Dean from any profits or proceeds from the operation of these businesses.

## ARTICLE IX – INDEMNIFICATION

9.1 Indemnification. The Company shall indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person bad no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

9.2 To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company unless a court of competent jurisdiction has determined that such Person entitled to indemnification hereunder has violated the requisite standard of care. "Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civic, criminal, administrative, or investigative.

9.3 Standard of Care. Each Member, Manager, and officer (if any) shall perform such Person's duties in good faith, in a manner such Person reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Member, Manager, or officer who so performs the duties as a Member, Manager, or officer shall not have any liability by reason of being or having been a Member, Manager, or officer of the Company. In performing such Person's duties, the Member, Manager, or officer shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Members, Manager, officers, or employees whom such Member, Manager, or officer reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including lawyers or accountants, as to matters which such Member, Manager, or officer reasonably believes are within such Person's professional or expert competence. No Member, Manager, or officer shall

be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved in a court of competent jurisdiction that such Person's action or failure to act (i) was not in good faith, (ii) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (iii) resulted in an improper personal benefit to such Person or any related party as determined by application of Code § 267(b) at the expense of the Company, (iv) constituted fraud or deceit, or (v) was a knowing violation of law.

9.3.1 Remedies. Each Party hereby acknowledges that with respect to disclosed Confidential Information, the Company would be irreparably harmed by a breach hereof by the Members or his or her Representatives and it may be difficult to estimate damages resulting from such a breach and, consequently, the Company shall be entitled to injunctive or such other equitable relief as may be appropriate to prevent a breach or threatened or continuing breach of this Agreement, and to secure the enforcement of this Agreement, without foregoing any legal relief to which the Company may otherwise be entitled to recover. In addition, the Company will be entitled to damages and expenses (including legal fees) to enforce the terms of this Agreement.

9.4 Expenses. Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

9.5 Nonexclusivity of Indemnification. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall not be deemed exclusive of any other rights to which an Indemnitee seeking indemnification or advancement of expenses may be entitled under any other provision of this Agreement, the Act, any statute or any insurance or other agreement with the Company, both as to actions in the Indemnitee's official capacity and as to actions in another capacity while holding that office. The Company may create and fund a fund of any nature, which may, but need not be, under the control of a trustee, or otherwise secure or insure in any manner (including by entering into agreements with its Indemnitees, employees and agents) its obligation to indemnify or advance expenses, whether arising under or pursuant to this Article IX or otherwise.

9.6 Modification. The duties of the Company to indemnify and to advance expenses to an Indemnitee provided in this Article IX shall be in the nature of a contract between the Company and each such Indemnitee, and no amendment or repeal of any provision of this Article IX, the Act or any other applicable law, including, without limitation, the Act, and no amendment or termination of any trust or other fund created pursuant to Section 9.4, shall alter, to the detriment of such Indemnitee, the right of such Person to the advance of expenses or indemnification related to a claim based on an act or failure to act which took place prior to such amendment, repeal or termination unless such actions are prohibited by applicable law. Notwithstanding anything to the contrary herein, if any change or amendment to the Act or any other applicable law allows for broader indemnification rights than as are provided in this Article

IX, this Article IX shall be deemed to be automatically modified without any further action by the Members or the Manager to provide such broader indemnification rights to any Indemnitee. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article IX shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be an Indemnitee, employee or agent of the Company and shall inure to the benefit of the executors, administrators, heirs, successors and assigns of that Person.

**ARTICLE X – BOOKS AND RECORDS; ACCOUNTING; EXPENSES; INSURANCE; TAX MATTERS**

10.1. Books and Records. At all times during the continuance of the Company, the Company shall maintain, either at its principal place of business or at its accountant's principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's business. Such books of account, together with (i) a certified copy of this Agreement, all amendments thereto and of the Articles, (ii) a current list of the full name and last known business or residence address each Member together with the contribution and share of the Profits and Losses of each Member, and (iii) copies of the Company's Federal, state and local tax or information returns and reports, if any, shall at all times be maintained at the principal place of business of the Company.

10.2. Delivery of Books and Records to Members and Inspection.

10.2.1 Upon the reasonable request of any Member for purposes reasonably related to the interest of that Person as a Member, the Manager shall make available to the requesting Member the information required to be maintained pursuant to Section 10.1.

10.2.2 Any request, inspection, or copying of information by a Member under this Section 10.2 may be made at such Member's expense by a Member or such Member's agent or attorney.

10.3. Establishment of Reserves. The Manager shall have the right to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company for any Fiscal Year as the Manager may deem necessary or appropriate for that purpose.

10.4. Financial Statements. The Manager shall provide any Member with such financial statements of the Company as such Member may from time to time reasonably request; *provided* that the Company shall only be required to deliver any financial statements which it regularly maintains and it shall not be required to prepare any financial statement solely at the request of a Member. The financial statements of the Company shall be unaudited, unless the Manager determines otherwise.

10.5. Tax Returns. The Manager shall cause to be prepared and filed with the appropriate authorities all necessary Federal and state income tax and information returns for the Company. The Manager shall send or cause to be sent to each Member within a timely fashion

after the end of each taxable year, or as soon as practicable thereafter, such information, including Schedules K-1, and corresponding forms for state and local tax purposes, as is necessary, to complete such Member's Federal and state income tax or information returns, and a copy of the Company's Federal, state, and local income tax or information returns for that year. Each Member shall furnish to the Company all pertinent information in his, her or its possession relating to Company operations that is necessary to enable the Company's tax returns to be prepared and filed.

10.6. Member Tax Reporting. Each Member shall report for federal, state and local income tax purposes consistently with the relevant Schedules K-1 and corresponding state or local tax information provided to such Member by the Company.

10.7. Other Filings. The Manager shall cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules and regulations.

10.8. Bank Accounts. The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person. All withdrawals therefrom shall be made upon checks signed by any Person authorized to do so by the Manager. The Company shall open and maintain from time to time such bank accounts as deemed advisable by the Manager, *provided* that the appropriate resolutions for the authorization of such accounts, supplied by the bank with which such accounts are opened, are inserted into the books of the Company.

10.9. Accounting Decisions and Reliance Upon Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. For both financial and tax reporting purposes, the books and records of the Company shall be kept on the method of accounting as elected by the Manager, in consultation with the Company's tax advisors, applied in a consistent manner and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

10.10. Payment of Expenses. The Company shall pay with the funds of the Company all fees, costs, disbursements and expenses incident to, and necessary for, the formation and organization of the Company.

10.11. Insurance. The Company shall obtain insurance coverage of the type and amount that the officers of the Company may deem necessary, appropriate or desirable to protect the business interests of the Company.

10.12. Certain Tax Matters.

(a) Designation of Representatives for Purposes of Company Tax Partner.

(b) Merri Gleckler shall serve as the Company's "tax matters partner" (

"***Tax Matters Member***") under Code Section 6231(a)(7) for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code for any Company.

(c) Merri Gleckler shall serve as the Company's "partnership representative" ("***Partnership Representative***") under Code Section 6223(a) (as amended by the BBA), for purposes of any Company Tax Proceeding arising under Subchapter C of Chapter 63 of the Code (as amended by the BBA). Each Member agrees to take such action as may reasonably be required to ensure that such Partnership Representative is properly designated on a timely basis in accordance with applicable rules and regulations.

10.13 Handling of Tax Controversies Generally.

(a) The Tax Matters Member, Partnership Representative or such other Person, as the case may be, as such Person is determined in accordance with Section 10.12(a), is authorized and directed to represent the Company, at the Company's expense, in connection with any Company Tax Proceeding and to retain tax professionals and expend Company funds for professional services and costs associated with such matters. Such representative shall provide the Members with periodic information or reports regarding the conduct of any Company Tax Proceeding within a reasonable period of time after the occurrence of any material developments. The limitation on liability and indemnification provisions of Article IX shall apply to such representative to the same extent that such provisions apply to any Member.

10.13 Tax Elections. To the extent permitted by applicable tax law, the Manager shall have the authority to cause the Company to make any tax elections on behalf of the Company as he deems necessary or appropriate, including, but not limited to:

10.13.1 adopting the calendar year as the Company's Fiscal Year;

10.13.2 adopting such method of accounting as the Manager may determine to be required or appropriate for the Company and to keep the Company's books and records consistent with such method; and

10.13.3 making any other election the Company's tax advisors may deem appropriate.

Neither the Company nor the Manager shall make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

10.14 Code §754 Adjustments. The Manager, in conjunction with the Company's tax advisors, may make a Code Section 754 election, to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required to be taken into account in determining Capital Accounts under Treas. Reg. Section 1.704-

1(b)(2)(iv)(m)(2) or Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) as the result of a distribution to a Member in complete liquidation of his, her or its Units. The amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be taken into account as part of Profits or Losses of the Company in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(2) applies, or specially allocated to the Member to whom such distribution was made in the event Treas. Reg. Section 1.704-1(b)(2)(iv)(m)(4) applies.

**ARTICLE XI – DISSOLUTION AND WINDING UP**

11.1. Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs shall be wound up only upon the first to occur of the following (each a "***Dissolution Event***"):

(i) the consent of the Majority of the Members or

(ii) the entry of an order of judicial dissolution of the Company pursuant to the Act.

11.2 The death, dissolution, retirement, resignation, expulsion or bankruptcy of a Member or the occurrence of any other event that terminates the continued membership of a Member shall not cause a dissolution of the Company. The Members agree that they will take such actions as may be required to continue the Company in the event of the Bankruptcy or other dissociation of a Member, unless the remaining Members affirmatively elect to dissolve the Company in accordance with this Section 11.

11.3 The dissolution of the Company shall be effective on the day of the Dissolution Event, but the Company and this Agreement shall not terminate until the assets of the Company have been liquidated and/or distributed as provided herein.

11.4. Winding Up. Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company, shall either cause its assets to be sold to any Person or distributed to a Member, and if sold, as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 11.3 and Section 11.4. The Manager shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. All actions and decisions required to be taken or made by such Person(s) under this Agreement shall be taken or made only with the consent of all such Person(s).

11.5 Liquidation of Assets. The Manager shall liquidate the assets of the Company as promptly as possible, but in an orderly and business-like manner, and shall have the right to offer the business and the assets of the Company for sale, in whole or in part. Any offer for sale of the business or the assets of the Company pursuant to this Section 11.5 shall be on such terms and conditions as the Manager deems appropriate in order to maximize the proceeds of such sale. Any Member(s) shall be entitled to participate in the bidding for the business and the assets (or any part thereof). The proceeds of the liquidation of the Company's assets shall be distributed in the following priority:

11.5.1 first, to pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company to its creditors (including, without limitation, all expenses incurred in liquidation and any advances described in Section 3.3) or otherwise make adequate provision for or establish reserves for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the Manager may reasonably determine); and

11.5.2 after all of the payments required by Section 11.3.1 have been made, any remaining assets of the Company shall be distributed to the holders of Units in accordance with their respective Percentage Interests.

11.6. Distributions. All distributions in kind to the Members under this Article XI shall be made subject to the liability of such Member for costs, expenses, and liabilities relating to the

assets distributed in kind theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to such Member pursuant to this Section 11.6. In the event that an asset is distributed in kind, for purposes of maintaining Capital Accounts, the asset will be deemed to have been sold by the Company at its fair market value as determined in good faith by the Manager and any gain or loss, which would have been recognized on such deemed sale, shall be allocated to the Member as provided in this Agreement and such Member's Capital Accounts shall reflect such allocation. The distribution of cash and/or property to a Member in accordance with the provisions of Sections 11.3 and 11.4 is intended to constitute a complete return to the Member of his, her or its Capital Contributions and a complete distribution to such Member of his, her or its interest in all the Company's property. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds. No Member shall have the right to demand to receive property in kind in connection with any distribution by the Company.

11.7. Limitations on Payments Made in Dissolution. Each Member shall be entitled to look solely to the assets of the Company for the return of such Member's positive Capital Account balance. Notwithstanding that the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company may be insufficient to return the Capital Contributions or share of Profits reflected in such Member's positive Capital Account balance, a Member shall have no recourse against the Company or any other Member.

11.8. Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

11.9. Final Accounting. As promptly as possible after dissolution and again after final liquidation, the Manager shall cause a proper accounting to be made by Company's accountants, of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

11.10. Certificate of Dissolution. Upon completion of the winding up of the affairs of the Company, the Manager shall cause to be filed in the office of, and on a form prescribed by, the Arizona Corporation Commission, a certificate of dissolution as provided in the Act.

11.11. Termination. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.3 and the certificate of dissolution is filed in accordance with Section 11.10.

11.12. No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a dissolution of the Company.

## ARTICLE XII – DISPUTE RESOLUTION

12.1 Mediation. If and to the extent the Members are unable to reach agreement on any bona fide matter requiring their unanimous consent, the Members shall in good faith attempt to resolve their disagreement by negotiation. If the dispute is not resolved within thirty (30) days or such shorter time as may be necessary to meet business obligations, the controversy shall be submitted to mediation. If agreement cannot be reached through mediation, then for controversy shall be settled by arbitration as set forth below.

12.2 Arbitration. All parties hereto agree that upon the written demand of any party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Operating Agreement or any course of dealing, course of conduct, statement or actions of any party in connection with this Operating Agreement, including, without limitation, contract disputes and tort claims, shall be resolved by binding arbitration pursuant to the Commercial Rules of the American Arbitration Association ("AAA"). Any arbitration proceeding held pursuant to this arbitration provision shall be conducted before one arbitrator in Scottsdale, Arizona. This arbitration provision shall not limit the right of any party during any dispute, claim, or controversy to seek, use, and employ ancillary, or preliminary rights and/or remedies, judicial or otherwise, and any such action shall not be deemed an election of remedies. Such remedies include, without limitation, obtaining injunctive relief or a temporary restraining order. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.

## ARTICLE XIII – MISCELLANEOUS

13.1. Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition, or warranty not contained in this Agreement or the Articles shall be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Articles conflicts with any provision of this Agreement, the terms of the Articles shall control.

13.2. Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns.

13.3. Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective heirs, legal representatives, successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.4. Additional Documents and Acts. Each Member agrees to execute and deliver, from time to time, such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.5. Notices.

13.5.1 To Members. Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(i) By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Member appearing on the books of the Company. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when deposited in the United States mail or with a courier service for delivery to that Member.

(ii) By facsimile transmission, e-mail or other electronic communication to the Member's facsimile number or address for e-mail or other electronic communications supplied by the Member to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Member entitled thereto when sent.

13.5.2 To the Company. Any notice to the Company must be given to the address set forth in Section 2.4 hereof, or such other address as the Manager may designate from time to time on behalf of the Company.

13.6. Amendments. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if approved in writing by the Majority of the Members. The Manager may amend Exhibit A hereto at any time and from time to time to reflect the admission or withdrawal of any Member, or the change in any Member's Capital Contributions, or any changes in the Member's addresses, all as contemplated by this Agreement.

13.7. Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.8. Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

13.9. Attorneys' Fees. Except as otherwise provided herein, in any action, suit or proceeding brought to enforce the provisions of this Agreement, the parties shall bear their own costs and expenses (including attorneys' fees), except that the party determined by the applicable court of competent jurisdiction to be the prevailing party in such action, suit or proceeding shall be entitled to recover its cost and expenses (including attorneys' fees).

13.10. Investment Representation. Each Member hereby represents to, and agrees with, the other Members and the Company that such Member is acquiring the Units for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. No other Person will have any direct or indirect beneficial interest in or right to the Units.

13.11. Governing Law. This Agreement shall be governed and construed and the legal relationship of the parties determined in accordance with the laws of the State of Arizona applicable to contracts executed and to be performed solely in Arizona.

* * * * *

**IN WITNESS WHEREOF**, the Members have executed this Amended and Restated Limited Liability Company Operating Agreement, effective as of the date first written above.

**COMPANY**

**TMG KREATIONS, LLC**

By: ____________________________
Name: Merri Gleckler
Title: Manager

**MEMBERS**

_____________________________________
MerriG, LLC
By: Merri Gleckler, Managing Member

_____________________________________
Dean H. Dussias

# EXHIBIT A

## SCHEDULE OF MEMBERS, PERCENTAGE INTERESTS AND UNITS

**Dated as of July 1, 2020**

| Member | Capital Contribution[3] | Percentage Interest | Units |
|---|---|---|---|
| MerriG, LLC, c/o<br>Merri Gleckler<br>Merri.Gleckler@gmail.com | ________ | 70% | 70 |
| Dean H. Dussias<br>Dean@dussias.org | $20,000 *plus* services and other consideration | 30% | 30 |
| TOTALS | | 100% | 100 |

[3] **NOTE:** Please confirm MerriG LLC's capital contribution.

# EXHIBIT B

## CAPITAL ACCOUNTS AND ALLOCATIONS

B.1. Definitions. In addition to the terms defined in other provisions of this Agreement, including without limitation Section 1.1, the following terms shall have the meanings set forth below:

"Adjusted Capital Account Deficit" shall mean with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) increasing the Capital Account by any amounts that the Member is obligated to restore or is deemed to be obligated to restore pursuant to Treas. Reg. §§ 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) reducing the Capital Account by the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Treas. Reg. §§ 1.704-2(b)(2) and 1.704-2(d).

"Depreciation" shall mean for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager, and if the Company uses the "remedial allocation method" under Treas. Reg. § 1.704-3(d) with respect to any asset, Depreciation for that asset shall be computed in accordance with Treas. Reg. § 1.704-3(d)(2).

"Excess Nonrecourse Liabilities" has the same meaning as set forth in Treas. Reg. § 1.752-3(a)(3).

"Gross Asset Value" with respect to any asset shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

(1) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Manager.

(2) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager as of the following

times:

(i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money, other property or services;

(ii) the distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an interest in the Company;

(iii) the liquidation of the Company for Federal income tax purposes within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(g);

except that the adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company. In the case of the adjustment to Gross Asset Values as of the date hereof (and in the event of any other adjustment to Gross Asset Values pursuant to this subsection (2)), the current Fiscal Year shall end as of the time of such adjustment, and a new Fiscal Year shall be deemed to begin immediately after such adjustment.

(3) The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(4) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m) and Section B.2, except that Gross Asset Values shall not be adjusted pursuant to this paragraph (4) to the extent the Manager determines that an adjustment pursuant to paragraph (2) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (4).

(5) If the Gross Asset Value of an asset has been determined pursuant to paragraphs (1), (2), or (4), that Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to that asset for purposes of computing Profits and Losses.

"Member Nonrecourse Debt" has the same meaning as "partner nonrecourse debt" set forth in Treas. Reg. §§ 1.704-2(b)(4) and 1.704-2(i).

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as "partner nonrecourse debt minimum gain" set forth in Treas. Reg. § 1.704-2(i) and shall be determined in accordance with the principles of that Section.

"Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse

deductions" set forth in Treas. Reg. §§ 1.704-2(i)(1) and 1.704-2(i)(2).

"Nonrecourse Deductions" are deductions having the meaning set forth in Treas. Reg. §§ 1.704-2(b)(1) and 1.704-2(c).

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2) Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code Section 705(a)(2)(B) expenditures pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraphs (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6) Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

B.2. Preparation and Maintenance of Capital Accounts.

(a) The Capital Account for each Member shall:

(1) be increased by (i) the amount of money contributed by that Member to the Company, (ii) the Gross Asset Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code § 752), and (iii) allocations to that Member of Profits and any other Company income and gain (or items thereof), including

income and gain exempt from tax and income and gain described in Treas. Reg. § 1.704- 1(b)(2)(iv)(g), and

(2) be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Gross Asset Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Code § 752), and (iii) allocations of Losses and any other Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(b) The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas. Reg. §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of Depreciation and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1.704-1(b)(2)(iv)(g). On the transfer or all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(1).

B.3. Allocation of Profits and Losses. Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company for a Fiscal Year shall be allocated among the persons who were Members during such Fiscal Year in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal to:

(a) the amount of the hypothetical distribution (if any) that such Member would receive if, on the last day of the Fiscal Year, (1) the Company were dissolved, its affairs wound up and its assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto for such Fiscal Year, (2) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing such liability), and (3) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 11.3.2 hereof, over

(b) the sum of (1) the amount, if any, without duplication, that such Member would be obligated to contribute to the capital of the Company, (2) such Member's share of Company Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(g), and (3) such Member's share of Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5), all computed as of the hypothetical sale described in Section B.3(a) of this Annex B.

B.4. Losses Limitation. Losses allocated pursuant to Section B.3 of this Annex B shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Company year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an

allocation of Losses pursuant to Section B.3 of this Annex B, the limitation set forth in this Section B.4 shall be applied on a Member by Member basis, and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each member under Section 1.704-(b)(2)(ii)(d).

B.5. Special Allocations. The following special allocations shall be made in the following order:

(1) Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B, if there is a net decrease in Company Minimum Gain during any Company taxable year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. §§ 1.704-2(f). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. This Section B.5(1) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

(2) Member Minimum Gain Chargeback. Notwithstanding any other provision of this Annex B except Section B.5(1), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treas. Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treas. Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. § 1.704-2(i)(4). This Section B.5(2) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(3) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) that would create an Adjusted Capital Account Deficit for such Member, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section B.5(3) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Annex B have been tentatively made as if this Section B.5(3) were not in the Agreement.

(4) Gross Income Allocation. In the event any Member has a deficit Capital Account balance at the end of any Company taxable year that exceeds the amount described in clause (i) of the definition of Adjusted Capital Account Deficit for such Member, each such Member shall be specially allocated items of Company income and gain to eliminate such excess as quickly as possible, provided that an allocation pursuant to this Section B.5(4) shall be made if and only to the extent that such an excess would exist after all other allocations provided for in this Annex B have been tentatively made as if Section B.5(3) and this Section B.5(4) were not in the Agreement.

(5) Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period shall be allocated among the Members in proportion to their Common Units.

(6) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i).

(7) Excess Nonrecourse Liabilities. The Excess Nonrecourse Liabilities of the Company shall be allocated among the Members in accordance with their respective Percentage Interests.

B.6. Curative Allocations. The allocations set forth in Section B.4 and in Section B.5 (the "Regulatory Allocations") are intended to comply with certain requirements of Treas. Reg. § 1.704-1(b). Notwithstanding any other provisions of this Agreement (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits, Losses, and items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory Allocations relating to (i) Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain, and (ii) Member Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Member Nonrecourse Debt Minimum Gain.

B.7. Tax Allocations: Code Section 704(c).

(a) In accordance with Code § 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value.

(b) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code § 704(c) and the Treasury Regulations thereunder(c) Any elections or other decisions relating to allocations pursuant to this Section B.7 shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section B.7 are solely for purposes of Federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

B.8. Miscellaneous Allocation Provisions.

(a) For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code § 706 and the Treasury Regulations promulgated thereunder.

(b) Except as otherwise provided in this Agreement, all items of Company income gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, including, for this purpose, items allocated pursuant to Section B.7, for the year.

(c) Notwithstanding anything in this Annex B or this Agreement to the contrary, the Manager shall have the authority to modify any allocation provisions of this Annex B to the extent necessary to comply with Federal income tax requirements.

B.9 Election of Liquidation Value Safe Harbor. Each Member, by executing this Agreement, hereby agrees to the following:

(a) The Company is authorized to elect the safe harbor, in accordance with proposed Regulations Section 1.83-3(l) and the proposed revenue procedure thereunder (once such regulations and revenue procedure become effective), under which the fair market value of each interest in the Company that is transferred in connection with the performance of services shall be treated as being equal to the liquidation value of that interest (the "***Safe Harbor Election***");

(b) The Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Election with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election remains effective, including the requirement that all relevant Federal income tax items be reported consistently with the Safe Harbor Election;

(c) The effective date of the Safe Harbor Election shall be the earliest permitted such date under the applicable regulations and revenue procedure, once those become effective, and the Safe Harbor Election shall continue to apply until such time (if ever) as all Members affected by the Safe Harbor Election shall agree to terminate it and the Company shall affirmatively terminate it under applicable procedures;

(d) The Manager shall file, with the Company's Federal income tax return for the taxable year in which the Safe Harbor Election becomes effective, a document, executed by the Manager, stating that the Company is electing, on behalf of the Company and the Members, to have the Safe Harbor Election apply irrevocably with respect to all interests in the Company transferred in connection with the performance of services while the Safe Harbor Election is in effect; and

(e) The Company shall comply with applicable recordkeeping requirements for the Safe Harbor Election, and the Company and the Members shall take all other actions, if any, required to comply with the requirements of such Safe Harbor Election as ultimately promulgated, to the extent practicable.

**EXHIBIT C**

Certificate of Value

# EXHIBIT D

## AMOUNT OF KEY-PERSON LIFE INSURANCE

Merri Gleckler - $____________
Dean Dussias - $____________

# EXHIBIT Z

GRIESING LAW LLC

Cheryl Borland, Esquire
Direct Dial: 513.381.0045
Mobile 859.468.2374
cborland@griesinglaw.com

April 22, 2021

**VIA ELECTRONIC MAIL**

Laura A. Balson
Partner
GOLAN | CHRISTIE | TAGLIA LLP
70 W Madison, Ste 1500
Chicago, IL 60602
labalson@gct.law

**Re: Dean Dussias**

Dear Ms. Balson:

This letter is to inform you and your client that Merri Gleckler and TMG Kreations, LLC will not be pursuing the completion of the offer of membership into the Company by your client, Dean Dussias.

We made an offer of membership and proffered a term sheet by which he would need to be agreeable to and that required that an Operating Agreement must be signed by him before he could become a Member. This offer was never accepted in writing as your client did not sign the term sheet. The Operating Agreement that he drafted that was not in line with the Term Sheet was a rejection of the terms of the original offer and can only be construed to be a counter-offer, which were not accepted by my client. The offer was predicated on your client performed certain roles and responsibilities for the Company. That offer and the proposed operating agreement are hereby rescinded.

Since the time of the offer for membership, your client has a made a series of mismanagement decisions, entered into deceptive behaviors, breached his fiduciary duties, and failed to perform critical tasks that has placed the Company in a serious financial and logistics issue. Your client was employed as the President of the Company and was paid nearly $155,000 last year and received benefits including health insurance and a company car allowance.

Based on your client's poor performance and mismanagement of the Company, this letter is to provide you and your client notice of termination of his employment with the Company, effective as of April 30, 2021.

In the event that your client effectuates the successful transition of the Company between now and April 30, 2021, then the Company would be willing to provide your client with two

months' salary and two months payment for insurance and car allowance. The $20,000.00 that Dean deposited into the Company's bank account will also be returned. Despite your representations that this evidenced payment for Dean's interest in the Company, this payment was improperly deposited (without Merri's knowledge and consent) in the Company's operating account. The payment should not have been paid to the Company as the units were not owned by the Company but were actually held by MerriG, LLC, not by the Company or Merri Gleckler, individually. If these terms are acceptable, we will provide you with a settlement agreement for your client's signature and return. In the event that these terms are not acceptable, your client fails to effectuate the successful transition of Company operations, or fails to execute the settlement agreement in a timely basis, then your client's employment will be terminated immediately.

In order for Dean to receive the Severance Package, he must fully comply with all of his outstanding obligations to the Company, including but may not be limited to the following: (a) his obligation to return all Company documents (in hard or electronic form) and property, such as keys, identification badges, cell phone, computers, and credit cards; (b) his obligation to delete all proprietary and/or confidential information related to the Company that he may have on non-Company computers, devices, and storage drives, such as a home computer, personal laptop, personal mobile phone, tablets, external hard drives, and USB drives; (c) his confidentiality obligations under applicable law and non-disclosure agreement protecting Company trade secrets and proprietary information, and (d) Dean's obligation to repay any outstanding monetary obligation to the Company.

Thank you for your attention to this matter.

Regards,

Cheryl L. Borland

# EXHIBIT AA

Fully Redacted Pursuant to Protective Order

# EXHIBIT BB

Fully Redacted Pursuant to Protective Order

# EXHIBIT CC

Fully Redacted Pursuant to Protective Order