# EXHIBIT
# 1

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| DEAN H. DUSSIAS,<br><br>*Plaintiff*,<br><br>v.<br><br>MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE,<br><br>*Defendants*. | Case No. 1:21-cv-05709<br><br>Judge April M. Perry<br><br>Magistrate Judge Beth W. Jantz |

**DECLARATION OF DEAN H. DUSSIAS**

Dean H. Dussias hereby declares and testifies as follows:

1. I am over the age of eighteen, have personal knowledge of facts stated herein, and could competently testify to these facts if called at trial.

2. Defendant Merri Gleckler and an individual named Cedric Reingold organized Defendant, TMG Kreations, LLC d/b/a Kashwere ("TMG"), for the purpose of taking an ownership position in an existing business called Kashwere.

3. Beginning in approximately September 2019, I had signature authority and log-in access to TMG's Chase bank accounts and statements and its payroll system operated by its third-party payroll administrator, HowardSimon, Inc. ("HSimon"). I had the highest level log-in access, the ability to move funds, and for HSimon the same level of access with the ability to enter and edit all information, create new employees/payees, and cease employee or payee participation at TMG. In addition, I had highest level access to TMG's accounting software, Everest and then NetSuite, and was the person that made the majority of accounting entries, provided accounting

information to third parties, including external accountants, consultants, and tax authorities. I first encountered Kashwere and met Gleckler in 2009, prior to TMG being formed and subsequently from approximately 2013 through 2016 consulted with TMG, principally working with Gleckler and her former partner Reingold. Lastly, in the summer of 2018, Gleckler contacted me and asked me to lead the creation of an offer, presentation to, and negotiation with a potential acquirer, Michael Krieger, who did not invest in or buy TMG. From approximately August 2019 through April 21, 2021, with Gleckler, I led and/or managed nearly every facet of TMG's business, including marketing, logistics, warehousing, purchasing, overall strategy and change management, direct-to-consumer web presence and systems, accounting, finance, legal, information technology, taxes, and payroll. I supported Gleckler in her main focus - sales to distributors, retailers/resellers, hotels, resorts, and spas; management of the sales team; product management; and inventory purchasing.

**a. <u>Dussias and Gleckler Agree that Dussias Will Become a Member of TMG.</u>**

4. In the Summer of 2019, while she was suing Reingold, Gleckler and I initiated discussions about my joining TMG in partnership with her. I informed her that I would only join TMG as a member. At the time, TMG's primary business was selling throws, robes, and clothing to commercial customers, primarily distributors, retailers/resellers, hotels, resorts, and spas. TMG also had a smaller web presence selling direct-to-consumer, which we hoped to grow substantially with my involvement.

5. On July 4, 2019, Gleckler sent me [redacted] Gleckler deposition exhibit 26 (TMG_00167071-072) is a true and accurate copy of [redacted] Gleckler said that [redacted]

[redacted] at which point I would officially be identified as an owner.

6. I began working with TMG at the end of July 2019. I accepted a lower rate of compensation than I would have otherwise accepted in reliance on Gleckler's promise that I would officially become a member as soon as practicable. Earlier that year, I had been paid more than [redacted] per hour, plus bonus and revenue sharing for a consulting engagement. I knew that TMG could not afford my typical compensation. The pay was also considerably [redacted], which I was willing to accept because I was receiving a membership share.

7. On September 20, 2019, Gleckler [redacted] DHD000482 is a true and correct copy of [redacted]

8. TMG made the final payment to Reingold on or about March 13, 2020.

9. In May 2020, Gleckler forwarded me a term sheet created by an attorney. That term sheet is Defendants' Exhibit H ("Dx H").[1] In response to that document, I pointed out to Gleckler that it included certain terms that Gleckler and I had never discussed, including a vesting period and employment agreement. The term sheet indicated that the attorney was not informed about our negotiations. Gleckler agreed with me that vesting and an employment agreement were not part of our agreement and that my membership was immediate. During my deposition in this case, I attempted to convey that Gleckler and I had not discussed an employment agreement prior to receiving this term sheet. I did not intend to convey that we never discussed an employment agreement at any point.

[1] Exhibits to Defendants Statement of Material Facts will be cited as "Dx _."

10. The $20,000 capital contribution that I proposed in the June 7, 2020, term sheet that I provided to Gleckler was based on [redacted]

b. **<u>The Parties Finalize and Implement the Essential Terms of Dussias' Membership and Agree that Negotiations Are Concluded.</u>**

11. Building on our ten-year relationship and numerous prior conversations, between June 6 and 15, 2020, Gleckler and I finalized the terms of my membership and specifically agreed that the negotiations were concluded. These discussions occurred over the course of several phone calls (both to Gleckler's cell and office numbers), adding up to multiple hours.

12. The terms were finalized as follows: Gleckler and I would own 70% and 30% of TMG, respectively, as we had discussed since the previous July; we would take a draw against profits beginning July 1, 2020, in proportion to our membership interest and not receive any salary, bonus, or other compensation beyond the draw; we would share profits and losses on a *pro rata* basis; Gleckler's draw would [redacted]; my compensation would change from [redacted]; Gleckler and Dussias would distribute profits at the end of each year such that, after accounting for the draw, Gleckler would receive 70% and Dussias 30%; and I would receive owners' perquisites, including [redacted], reimbursement for [redacted], payment of a [redacted], inclusion in the [redacted], and a split of the [redacted]. Finally, I would make a $20,000 capital contribution.

13. On June 7, 2020, after one of these calls, I texted Gleckler: [redacted] – [redacted] – [redacted] – [redacted] DHD000760 is a true and correct copy of [redacted]

14. During these discussions, Gleckler suggested that my pay should increase. Gleckler initially requested that her draw [redacted] which was ultimately what was agreed to and implemented.

15. Gleckler also requested during these negotiations that I share in profits beginning on July 1, 2020, rather than August 2019 as we had originally contemplated. This was a give-up of more than [redacted] by me, based on [redacted]. I agreed to this term only on the condition that Gleckler and I would agree that the negotiations were concluded, the deal was done, and I would start receiving my draw, profit participation, and other perquisites of membership, and be entered into TMG's accounting and payroll as a member, beginning on July 1, 2020. Gleckler agreed to these terms. Had we not reached agreement at this time, I would not have continued with TMG unless I knew that the profits we were creating in 2020 and long-term value from the change I was leading would start July 1, 2020.

16. Gleckler stated that she did not want to incur additional attorney fees getting an agreement drawn up to memorialize these terms. She asked me to prepare an operating agreement because she said that TMG had no operating agreement. Specifically, as to the 2009 operating agreement between her and Reingold ("GRA"), she told me it was "gone" and not applicable to my membership in TMG. She had also stated on prior occasions that she believed the GRA was strictly between Reingold and her and she did not consider it to govern TMG.

17. We did not feel it was urgent to create an operating agreement because both parties wanted to begin the work of redesigning and reimplementing nearly all of TMG's operational infrastructure (e.g., we were just beginning to change all of the systems and consumer-facing presence of TMG, had just concluded numerous contracts, and taken on new team members), I did not expect Gleckler to renege on our membership agreement, and did not see the need for a dispute

resolution mechanism because Gleckler controlled 70% of the company and there was no possibility of a deadlock.

18. During this period, Gleckler also suggested and I accepted that we split [redacted] according to our *pro rata* membership interest. I suggested that the payment should be included with the other changes in the payroll beginning July 1 for continuity. Gleckler insisted that it be included in the June 15 payroll because [redacted] TMG 474462 and the attachment thereto reflect that payment at 474473-74. Gleckler's portion is calculated by [redacted]

19. On or about June 14, 2020, I confirmed the following with Gleckler over the phone: (i) I would make a $20,000 capital contribution prior to July 1, 2020, that we had discussed in the previous days, (ii) [redacted] would be reflected on the next day's payroll, and (iii) that the remaining changes would be implemented on July 1. I told her I would add a note to the transfer of the capital contribution so that we could clearly identify it in the Chase account.

20. Shortly after the June 14 conversation, I caused changes to be made to both my and Gleckler's accounts with TMG's payroll administrator, HSimon, effective July 1. These included: (i) increasing Gleckler's [redacted]; (ii) adding her status as [redacted]; (iii) setting her [redacted] (iv) changing my compensation from [redacted]; (v) setting my status as [redacted]; (vi) setting my [redacted] and (vii) increasing my compensation from [redacted] TMG 590493 reflects the changes to Gleckler's

account information. Additionally, a new employee number had to be created to change my compensation from [redacted] I discussed these changes with Gleckler.

21. These changes were effective as of July 1 and reflected on the July 15, 2020, payroll and in the subsequent bi-weekly payroll reports emailed directly to Gleckler and me. TMG 590541, TMG_00590523 (Dx CC), and TMG_00470606 (at 470617 and 470621) reflect these changes. TMG paid payroll taxes [redacted]

22. I also received perquisites only provided to Gleckler and me as members. These included: [redacted], reimbursement for [redacted], payment of a [redacted], inclusion in the [redacted], a split of the [redacted].

23. Between July 1, 2020, and February 2021, there was no further discussion of terms between Gleckler and me because the terms had been agreed upon. Nor did Gleckler ever ask me to sign the GRA or Exhibit C to the GRA, or suggest that my membership was contingent on signing a written document or any other future event or action. She agreed I was a member. We operated under these terms through April 21, 2021.

24. We did not revisit the issue of an operating agreement until the end of 2020. The issue arose at that point because Gleckler wanted to have an agreement in place in order to have the business certified as a Women's Business Enterprise ("WBE") by the Women's Business Enterprise National Council ("WBENC"). I sent Dx O to Gleckler in connection with that effort following a telephone conversation with her about it, as stated in the email.

**c. <u>Gleckler Consistently and Repeatedly Acknowledges Dussias' Membership.</u>**

25. Gleckler consistently and repeatedly acknowledged my membership of TMG.

26. On or about March 19, 2020, Gleckler approved that language be added to the front page of TMG's website identifying her and me as "Owners." TMG_00076419 is a true and correct image of that language.

27. At the same time, Gleckler and I caused TMG to send a marketing email to TMG's entire customer email list (tens of thousands of people) that identified Gleckler and me as "Owners" in the signature block. TMG_00529106 is a true and correct copy of that email. The email went through several edits, without Gleckler making any change to my status as an "owner." TMG numbered documents 498516, 361974, 498464, 498513, 498291, and 498332 are copies of those edits. While Gleckler initially drafted the email as coming only from her, she acknowledged that it made sense that the email identify both of us as the owners.

28. On September 22, 2019, Gleckler asked Dussias via text, "Can I tell Wang you r my partner"? Wang operates [redacted]. Gleckler further stated in that thread that she would not tell Wang that I was her partner until after she [redacted] During the fall of 2019, Dussias, Gleckler, and the [redacted] had a call to introduce me as Gleckler's new partner and co-owner.

29. On September 23, 2019, Gleckler wrote to Hiroshi Miyakawa of Flat-Be Co. Ltd.: "Cedric [Reingold] is no longer with Kashwere and I have a new partner, Dean Dussias." [redacted]

30. On July 23, 2020, I sent a capitalization table ("cap table") reviewed extensively and approved by Gleckler to a prospective investor, David Lazar, reflecting my 30% ownership interest. The cap table was an Excel spreadsheet attached to an email. A true and correct copy of the email is TMG_00473681. Gleckler deposition exhibit 41 is a pdf version of the cap table.

Gleckler and I went through multiple rounds of edits of the Excel table over nearly three weeks, all of which stated that I was a 30% owner. Accurate copies of previous versions of the table are attached to TMG_00476958 (Gleckler deposition exhibit 40) and TMG_00475856.

31. Gleckler's primary concern with the cap table was that it provide her the option to either (1) sell a portion of her own interest directly to Lazar (reducing her interest and generating liquidity for herself) or (2) cause TMG to sell an interest to Lazar (generating cash for TMG and effectively diluting both of us). The Excel spreadsheet could model both options. Lazar did not invest, but was subsequently hired as a consultant, primarily for his digital marketing and retail expertise.

32. On March 29, 2021, I wrote to Gleckler: "While we don't share equally (70/30)… I am your partner." That email is TMG_00399819. I stated further: "the start date of my 30% interest, would not be March 16th… but instead be July 1, 2020, which was a give up on my part of approximately $300,000 in profits." I stated that Gleckler's conduct was hurting my "Kashwere ownership." Gleckler never responded that I was not an owner or that my statements were inaccurate.

33. On April 2, 2021, I wrote to Gleckler: "I own 30% of Kashwere (TMG Kreations, LLC)" and "if we vote, as owners it's 10-0 or 7-3." A true and correct copy of that email is included in the thread TMG_00162671. Gleckler did not write back to deny that I was an owner.

34. In November 2020, after discussing it with Gleckler, I filed an annual report with the State of Illinois. In the document, I identified myself as a "member" and "manager."

35. At no time, prior to April 22, 2021, did Gleckler, directly or indirectly, ever question my membership of TMG. On the contrary, in her communication with me, she consistently and repeatedly confirmed and explicitly stated my status as a partner and Member of

TMG. In the many times that Gleckler referred to me as an owner, member, or partner of TMG, she never indicated that she was using those terms colloquially, conditionally, or subject to any qualification of any kind.

**d. <u>Gleckler Admits Her Agreement With Dussias.</u>**

36. On December 17, 2019, Gleckler [redacted]

37. In the same thread, Dussias wrote [redacted] is included in Gleckler deposition exhibit 34. Gleckler never disagreed with those statements.

38. On February 2, 2021, Gleckler sent TMG's accountant, Ray Conway, an email stating that "Dean and I have an *agreement* in place but not yet a *formalized ownership contract.*" That email is Gleckler deposition exhibit 43.

**e. <u>The Exchange of Operating Agreements in February 2021 Confirms the June 2020 Agreement.</u>**

39. On February 6, 2021, Gleckler sent me Dx Q. While that draft included my 30% ownership interest, it was otherwise inconsistent with the agreement with Gleckler that had governed our conduct in the previous several months. This included the vesting schedule that Gleckler and I had mutually agreed in May 2020 was not applicable to my ownership.

40. Upon my review of that draft, I pointed out to Gleckler in a telephone conversation that my ownership was effective as of July 1, 2020, and we had never agreed to any sort of delayed vesting and had explicitly rejected the concept when it appeared in the May 2020 term sheet prepared by Geckler's attorney. Gleckler acknowledged this and agreed. The attorneys were simply not doing what Gleckler and I had agreed to.

41. On February 15, 2021, I emailed Gleckler and TMG's accountant, Ray Conway, a revised operating agreement.

42. Gleckler never took issue with the fact that I was receiving a draw and never changed my compensation structure until May or June 2021, weeks after I had stopped working with TMG. To the contrary, she knew I was going to start receiving a draw July 1, 2020, because we agreed on it ahead of time and I told her I was going to make the change.

43. On February 19, 2021, Conway responded with notes on the February 15 draft. Those notes are Gleckler deposition exhibit 47. Conway's notes referenced my "buy-in on 7/1/2020." *Id.* at 410246. Gleckler never disputed that I had bought in on July 1, 2020.

44. Gleckler responded to Conway's notes as follows: "Dean is a Member not a Manager. All else I need clarification."

45. Gleckler, Conway, and I spoke to discuss his notes; my ownership was never questioned by Gleckler or Conway.

46. I sent a draft agreement incorporating Conway's comments on February 22, 2021. That draft is Defendants' exhibit U.

**f. <u>Gleckler Explicitly Told Dussias the GRA Was Terminated and Treated It as Such.</u>**

47. Gleckler never asked me to sign the GRA or Exhibit C to the GRA. When considering different operating agreement drafts, we never compared or redlined them with the GRA. After signing the MIPA, Gleckler never suggested the GRA was operative until this litigation.

48. Gleckler never discussed amending the GRA or Exhibits A and B thereto to [redacted]

49. At some point in 2013, [redacted]

**g. <u>Gleckler First Denies Dussias' Membership in Late April 2021.</u>**

50. In late April 2021, Gleckler first denied I was a member of TMG.

51. Gleckler and I had never discussed my being a 1099 independent contractor and never considered me to be one when she changed my status to 1099 in or about May 2021.

**h. <u>Dussias Contributed Substantially to the Success of TMG.</u>**

52. Between August 2019 and April 2021, Gleckler and I worked together collaboratively to strategize, plan, and implement changes that would improve TMG and set the foundation for future growth. TMG was at this time a small business (less than ten employees) with rudimentary operational infrastructure that could not be scaled if the company grew significantly, as was our intention. Gleckler, with her previous partner Reingold, had so neglected the website/direct-to-consumer channel that the Magento platform software was no longer being supported and TMG was in violation of terms of service with its shopping cart provider (PayPal), all of which created greater urgency in the summer of 2020 for TMG to change systems and get on a stable platform (Shopify) to support future growth.

53. This included replacing every part of the architecture by which a consumer makes a purchase and receives a product from Kashwere: replacing the website the consumer uses; replacing the software that communicates the purchase from the website to TMG's accounting software; replacing TMG's accounting software Everest with NetSuite; replacing the software that communicates the consumer's website purchase to a warehouse that manages inventory and ships the actual product; replacing the antiquated system by which TMG stored, recorded, and shipped inventory; implementing the transition to all of these new systems; hiring a professional bookkeeper (that TMG still uses); engaging a professional email marketing platform; and hiring professional marketing personnel.

54. The new order fulfillment architecture went live on March 3, 2021. It worked well while I was still involved with TMG. Once the new systems were up and running, Gleckler attempted to fire me as though I was an employee on April 22, 2021.

55. Gleckler and I spoke on the phone roughly twice a day every day on average between August 2019 and April 2021. Between May 4, 2019, and April 15, 2021, Gleckler and I exchanged 568 pages of text messages, produced as DHD000429-996.

**i. <u>Dussias Has Not Been Compensated for His Interest in TMG.</u>**

56. I have not received a draw or other payment from TMG since April 2021. I have not received a 30% share of profits earned by TMG in 2021 or any other year.

**j. <u>The Capital Contribution Was Reflected in Systems that Gleckler Regularly Reviewed.</u>**

57. In addition to the fact that Gleckler and I spoke repeatedly about my capital contribution before I made it, and the fact that I told her I was going to make it weeks before making it, the capital contribution was disclosed in TMG's Chase account, Chase statements, and accounting software—all of which Gleckler had access to and accessed regularly.

58. On or about June 30, 2020, I sent by ACH payment the $20,000 capital contribution to TMG's primary Chase Account ending in 3714. The deposit was received in TMG's Chase account on June 30, 2020. The deposit was reflected in [redacted] A true and correct copy of [redacted] is JPM 951. I witnessed Gleckler login to TMG's Chase accounts on several occasions and discussed her activity in the account with her multiple times per week.

59. The capital contribution was also reflected in TMG's accounting system called Everest. I witnessed Gleckler examine TMG's sales, inventory, and accounting information on Everest and know from conversations with her that she accessed it daily (including by her frequent

references to its contents). Gleckler had her own customized interface ("dashboard") in Everest that she kept open on her computer at nearly all times. Gleckler and I used Everest on a daily basis; used the Chase online account on a near-daily basis; and used the HSimon system multiple times per month in addition to receiving the payroll reporting twice monthly. Gleckler regularly reviewed the HSimon payroll system because, among other reasons, it told her the commission amounts paid to salespeople. She also regularly reviewed the Chase account, among other reasons, to see receipts from customers and payments to contractors. When we spoke about TMG, multiple times per day, we would both reference those systems as a matter of course and frequently bring up the information on our phones or via virtual meeting platforms such as Zoom.

60. In early 2020, I sent TMG's accountant, Ray Conway, a trial balance prepared from the Everest accounting records reflecting my $20,000 capital contribution for the purpose of preparing taxes. That trial balance is DHD 3749. Neither Conway nor Gleckler made any mention of change to my ownership reflected in TMG's accounting system.

61. I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 2, 2025

Dean H. Dussias

Dean H. Dussias