**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

DEAN H. DUSSIAS,

*Plaintiff,*

v.

MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE,

*Defendants*.

Case No. 1:21-cv-05709

Judge April M. Perry

Magistrate Judge Beth W. Jantz

**PLAINTIFF'S RULE 56.1(b)(3) STATEMENT OF ADDITIONAL MATERIAL FACTS**

For his Statement of Additional Material Facts pursuant to Local Rule 56.1(b)(3), Plaintiff Dean Dussias, by his attorneys Golan Christie Taglia LLP, states the following:

**a. The Gleckler-Reingold Agreement.**

1. Defendant Merri Gleckler and an individual named Cedric Reingold organized Defendant, TMG Kreations, LLC d/b/a Kashwere ("TMG"), under Delaware law in 2009 for the purpose of taking an ownership position in an existing business called Kashwere. Exhibit 1, Declaration of Dean Dussias, at ¶ 2; Dkt. 28 ¶ 11 (stating that TMG is organized under DE law).[1]

2. Reingold and Gleckler created an operating agreement in 2009 naming Gleckler and Reingold each as a manager and 50% member stating that TMG was member-managed (the

[1] For a more detailed discussion of the relationship between Kashwere and TMG, see *TMG Kreations, LLC v. Seltzer*, 771 F.3d 1006 (7th Cir. 2014).

"Gleckler-Reingold Agreement" or "GRA"). Ex. A to Defendants' Rule 56.1(a)(2) Statement of Material Facts, at pp. 8-10 (identifying members), § 4.1 (stating that it is member-managed).[2]

**b. Gleckler and Reingold Terminate Their Relationship.**

3. In 2018, Gleckler filed a lawsuit against Reingold alleging various breaches of the GRA, which was [redacted] Dx B. at p. 1.

4. In the [redacted]

5. Gleckler agreed [redacted]

**c. Dussias and Gleckler Agree that Dussias Will Become a Member of TMG.**

6. In the Summer of 2019, while she was suing Reingold, Gleckler and I initiated discussions about Dussias joining TMG as a partner. Dussias informed her that he would only join TMG as a member. Ex. 1 ¶ 4.

7. On July 4, 2019, Gleckler sent Dussias [redacted] Ex. 1 ¶ 5; Exhibit 2. The [redacted] Ex. 2 at TMG_00167072, ¶ 1. They state further that

[2] The exhibits to Defendants' Statement of Material Facts will be cited as "Dx _" and are all located at Dkt. 91-2.

[redacted] *Id.* ¶ 5-6 [redacted] Ex. 1 ¶ 5.

8. Dussias began working with TMG full time at the end of July 2019. He accepted a lower rate of compensation than he would have otherwise accepted in reliance on Gleckler's promise that he would officially become a member as soon as practicable. Ex. 1 ¶ 6. For example, earlier that year, he had been paid more than [redacted] per hour, plus bonus and revenue sharing for a consulting engagement. *Id.* Dussias knew that TMG could not afford his typical compensation. *Id.* It was also considerably lower than [redacted] which Dussias was willing to accept because he was receiving a membership share. *Id.*

9. On September 20, 2019, Gleckler [redacted] Ex. 1 ¶ 7; Exhibit 3.

10. TMG made the [redacted] Ex. 1 ¶ 8.

11. On February 23, 2020, Dussias sent Gleckler a "Summary of principles/terms between Merri Gleckler (MG) and Dean Dussias (DHD)." Dx G. The summary provided "MG equity at 70%; DHD equity at 30%... Profit available for distribution – 70/30% to MG and DHD, respectively." *Id.* p. 2.

12. In May 2020, Gleckler forwarded Dussias a term sheet created by an attorney. Dx H. Dussias pointed out to Gleckler that the term sheet included certain terms Gleckler and Dussias had never discussed, including a vesting period and employment agreement. Ex. 1 ¶ 9. The term sheet indicated to Dussias that the attorney was not informed about the parties' negotiations. *Id.*

Gleckler agreed with Dussias that vesting and an employment agreement were not part of their agreement and that Dussias' membership was immediate. *Id.*

13. On June 7, 2020, Dussias sent Gleckler a term sheet that provided that Gleckler and Dussias would own 70% and 30% interests in TMG, respectively; Dussias would contribute capital of $20,000; and both Gleckler and Dussias would have employment agreements. Dx L at p. TMG_00187354-355. $20,000 was the cost of [redacted] Ex. 1 ¶ 10.

**d. <u>The Parties Finalize and Implement the Essential Terms of Dussias' Membership and Agree that Negotiations Are Concluded.</u>**

14. Between June 6 and 15, 2020, Gleckler and Dussias finalized the terms of Dussias' membership and concluded the negotiations. Ex. 1 ¶ 11. These discussions occurred over the course of several phone calls (both to Gleckler's cell and office numbers), adding up to multiple hours. *Id.*

15. The terms were finalized as follows: Dussias and Gleckler would own 30% and 70% of TMG, respectively, as they had discussed since the previous July; they would take a draw against profits beginning July 1, 2020, in proportion to their membership interest and not receive any salary, bonus, or other compensation beyond the draw; they would share profits and losses on a *pro rata* basis; Gleckler's draw would increase from [redacted] per month to [redacted] per month; Dussias' compensation would increase from [redacted] per month to [redacted] per month; Dussias' compensation would also change from W-2 to an owner's draw; Gleckler and Dussias would distribute profits at the end of each year such that, after accounting for the draw, Gleckler would receive 70% and Dussias 30%; and Dussias would receive owners' perquisites, including full payment of [redacted] reimbursement for [redacted], payment of a [redacted], inclusion in the [redacted], and a split of the [redacted]

[redacted] Ex. 1 ¶ 12. Finally, Dussias would make a $20,000 capital contribution. *Id.*

16. On June 7, 2020, after one of these calls, Dussias texted Gleckler: [redacted] Exhibit 4.

17. Gleckler also requested during these negotiations that Dussias share in profits beginning on July 1, 2020, rather than August 2019 as the parties had originally contemplated. *Id.* ¶ 15. This was a give-up of more than [redacted] by Dussias. *Id.* Dussias agreed to this term on the condition that they would agree that the negotiations were concluded and he would start receiving his draw, profit participation, and other perquisites of membership, and be entered into TMG's accounting and payroll as a member, beginning on July 1, 2020. *Id.* Gleckler agreed to these terms. *Id.* Dussias would not have continued with TMG had they not reached a definitive agreement at this time. *Id.*

18. Gleckler stated that she did not want to incur additional attorney fees getting an agreement drawn up to memorialize these terms. *Id.* ¶ 16. She asked Dussias to prepare an operating agreement because she said that TMG had no operating agreement. *Id.* Specifically, as to the GRA, she told Dussias it was "gone" and not applicable to Dussias' membership in TMG. *Id.* She had also stated on prior occasions that she believed the GRA was strictly between Reingold and her and she did not consider it to govern TMG. *Id.*

19. Gleckler and Dussias did not feel it was urgent to create an operating agreement because both parties wanted to begin the work of updating TMG's operational infrastructure (e.g., accounting systems, website, shipping) and Dussias did not expect Gleckler to renege on the

agreement and did not see the need for a dispute resolution mechanism because Gleckler controlled 70% of the company. *Id.* ¶ 17.

20. During this period, Gleckler also suggested and Dussias accepted that they split a [redacted] according to their *pro rata* membership interest. *Id.* ¶ 18. Dussias suggested that the payment should be included with the other changes in the payroll beginning July 1 for continuity. *Id.* Gleckler insisted that it be included in the June 15 payroll [redacted] *Id.* [redacted] Exhibit 5 at TMG_00474473-74. Gleckler's portion is calculated by [redacted]. Ex. 1 ¶ 18.

21. On or about June 14, 2020, Dussias confirmed the following with Gleckler over the phone: (i) he would make a $20,000 capital contribution prior to July 1, 2020, that they had discussed in the previous days, (ii) [redacted] would be reflected on the next day's payroll, and (iii) that the remaining changes would be implemented on July 1. *Id.* ¶ 19. Dussias told her he would add a note to the transfer of the capital contribution so that they could clearly identify it in the Chase account. *Id.*

22. Shortly after the June 14 conversation, Dussias caused changes to be made to both his and Gleckler's accounts with TMG's payroll administrator, HowardSimon, Inc. ("HSimon"), effective July 1. *Id.* ¶ 20. These included: (i) increasing Gleckler's [redacted] per pay period (from [redacted]); (ii) adding her status as [redacted]; (iii) setting her [redacted]; (iv) changing his compensation from [redacted]; (v) setting his status as [redacted]; (vi) setting his [redacted] and (vii) increasing his compensation

from [redacted] (from [redacted]). *Id.*; Exhibit 6. Additionally, a new employee number had to be created to change Dussias from [redacted]. Ex. 1 ¶ 20. Dussias discussed these changes with Gleckler. *Id.*

23. These changes were effective as of July 1 and reflected on the July 15, 2020, payroll and in the subsequent bi-weekly payroll reports emailed directly to Gleckler and Dussias. *Id.* ¶ 21; Dx CC at TMG_00590527-28 (showing [redacted] from 6/30/20 to 7/15/20); Exhibit 7 at TMG_00590542-43 (same); Exhibit 8 at TMG_00470617, 470621 (same); Dx E, 190:23-192:4. TMG paid payroll taxes consistent with [redacted]. Ex. 1 ¶ 21.

24. Gleckler regularly reviewed the HSimon payroll system to confirm payments to employees. *Id.* ¶ 59.

25. Dussias also received perquisites only provided to him and Gleckler as members. *Id.* ¶ 22. These included: full payment of [redacted], reimbursement for [redacted], payment of a [redacted], inclusion in the [redacted], and a split of the [redacted]. *Id.*

26. Between July 1, 2020, and February 2021, there was no further discussion of terms between Dussias and Gleckler because the terms had been agreed upon. *Id.* ¶ 23. Nor did Gleckler ever ask Dussias to sign the GRA or Exhibit C to the GRA; or suggest that Dussias' membership was contingent on his signing a written document or any other future event or action. *Id.* He was a member. *Id.* The parties operated under these terms until April 22, 2021. *Id.*

27. The parties did not revisit the issue of an operating agreement until the end of 2020. *Id.* ¶ 24; Dx O. The issue arose at that point because Gleckler wanted to have an agreement in place in order to have the business certified as a Women's Business Enterprise ("WBE") by the

Women's Business Enterprise National Council ("WBENC"). Ex. 1 ¶ 24; Dx H at TMG_00168421 (referencing Gleckler's desire to have TMG certified as a WBE).

**e. <u>Gleckler Consistently and Repeatedly Acknowledges Dussias' Membership.</u>**

28. Gleckler consistently and repeatedly acknowledged Dussias' membership in TMG. Ex. 1 ¶ 25. On October 2, 2019, Gleckler identified Dussias as "My new partner… YAY!" Exhibit 9. In the same email thread, on November 1, Gleckler was asked: "is Dean an owner? … should we thank the owners plural and mention Dean as well?" *Id.* Gleckler responded: "Yes Dean is a partial owner." *Id.*

29. On or about March 19, 2020, Gleckler approved that language be added to the front page of TMG's website identifying her and Dussias as "Owners." Ex. 1 ¶ 26; Exhibit 10 at TMG_0076420; Dx E, 178:21-23.

30. At the same time, Gleckler and Dussias caused TMG to send a marketing email to TMG's entire customer email list (tens of thousands of people) that identified Dussias and Gleckler as "Owners" in the signature block. Ex. 1 at ¶ 27; Exhibit 11; Dx E, 178:21-23. This mail went through several edits, without Gleckler making any change to Dussias as an "owner." Exhibits 12-17. While Gleckler initially drafted the email as coming only from her, she acknowledged that it made sense that the email come from both of us as the owners. Ex. 1 at ¶ 27.

31. On February 19, 2021, Gleckler wrote to TMG's accountant, Ray Conway, "Dean is a Member not a Manager." Exhibit 18 at TMG_00444374.

32. On September 22, 2019, Gleckler asked Dussias via text, "Can I tell Wang you r my partner"? Exhibit 19 at TMG_00595036. Wang operates [redacted] Ex. 1 ¶ 28. She further stated that she would not tell Wang that Dussias was her partner until after [redacted]. Ex. 19

at TMG_00595036 (stating "Not before I signed" the MIPA). Around the same time, Gleckler, Dussias and the owners of [redacted] had a call to introduce Dussias as the new co-member of TMG. Ex. 1 ¶ 28.

33. On September 23, 2019, Gleckler wrote to Hiroshi Miyakawa of Flat-Be: "Cedric [Reingold] is no longer with Kashwere and I have a new partner, Dean Dussias." Exhibit 20. [redacted] Ex. 1 ¶ 29.

34. On September 26, 2019, Gleckler emailed HSimon: "Dean Dussias is my new partner." Exhibit 21.

35. Between September 2019 and February 27, 2021, Gleckler represented to third parties in writing that Dussias was her "partner" at least 19 times. Exhibits 22-25, Exhibit 26 at TMG_00510023, Exhibits 27-30, Exhibit 31 at TMG_00529067, Exhibit 32 at TMG_00480429, Exhibits 33-37.

36. Gleckler also repeatedly represented to Dussias in writing that he was her "partner." *E.g.* Exhibit 38 at TMG_00595039; Exhibit 39 at TMG_00595305.

37. Gleckler testified that the terms "partner" and "owner" are interchangeable in her mind. Dx E at 161:1-11.

38. "Partner" is how she referred to her previous co-owner, Reingold. Dx E at 79:23-80:2, 82:20-22, 141:18-21, 147:15-16, 149:1-4.

39. On July 23, 2020, Dussias sent a capitalization table reviewed extensively and approved by Gleckler to a prospective investor, David Lazar, reflecting Dussias' 30% membership interest. Ex. 1 ¶ 30; Exhibit 40 (showing Dussias 30% ownership prior to potential Lazar investment ["Pre-Money"]). Gleckler and Dussias went through multiple rounds of edits of the table over nearly three weeks, all of which stated that Dussias was a 30% member. Exhibit 41

(showing Dussias 30% ownership prior to potential investment ["Pre-Money"] and being diluted after investment ["Post-Money"]); Exhibit 42 [redacted]); Ex. 1 ¶ 30.

40. Gleckler's primary concern with the cap table was that she have the option to either (1) sell a portion of her own interest directly to Lazar (thus, reducing only her interest and generating liquidity for herself) or (2) cause TMG to sell an interest to Lazar (effectively diluting both her and Dussias and generating cash for TMG). Ex. 1 ¶ 31. The Excel version of the document could model both options. *Id.*

41. On March 29, 2021, Dussias wrote to Gleckler: "While we don't share equally (70/30)… I am your partner." Exhibit 43 at TMG_00399819. He stated further: "In February of 2020, when I was in Arizona with you and Robert, he asked me to trust that our partnership agreement would not be concluded as of March 16, 2020 [the approximate date of the final scheduled MIPA payment], but instead be July 1, 2020, which was a give up on my part of approximately $300,000 in profits." Dussias stated that Gleckler's conduct was hurting his "Kashwere ownership." *Id.* Gleckler never responded to tell Dussias he was not an owner or that his statements were inaccurate. Ex. 1 ¶ 32.

42. On April 2, 2021, Dussias wrote to Gleckler: "I own 30% of Kashwere (TMG Kreations, LLC)" and "if we vote, as owners it's 10-0 or 7-3." Exhibit 44 at TMG_00162675. Gleckler did not write back to deny that Dussias was an owner. Ex. 1 at ¶ 33.

43. In November 2020, after discussing it with Gleckler, Dussias filed an annual report with the State of Illinois, identifying himself as a "member" and "manager." Ex. 1 ¶ 34.

44. At no time, prior to April 22, 2021, did Gleckler, directly or indirectly, ever question Dussias' membership of TMG. Ex. 1 ¶ 35. To the contrary, she repeatedly and consistently confirmed that Dussias was a member of TMG. *Id.*

45. Nor did she provide any indication to Dussias that she was using the terms owner, member, or partner colloquially, conditionally, or subject to any qualification of any kind. *Id.*

**f. <u>Gleckler Admits Her Agreement With Dussias.</u>**

46. On December 17, 2019, Gleckler admitted that [redacted] Exhibit 45 at TMG_0595292.

47. In the same thread, Dussias wrote [redacted] *Id.* at TMG_00595292. Gleckler did not disagree with those statements. Ex. 1 at ¶ 37.

48. On February 2, 2021, Gleckler sent TMG's accountant, Ray Conway, an email stating that "Dean and I have an *agreement* in place but not yet a *formalized ownership contract.*" Exhibit 46 (emphasis in original).

**g. <u>The Exchange of Operating Agreements in February 2021 Confirms the June 2020 Agreement.</u>**

49. On February 6, 2021, Gleckler sent Dussias a draft operating agreement. Dx Q. While that draft included Dussias' 30% membership interest, it was otherwise inconsistent with the Parties' June 2020 agreement (which had governed their conduct in the previous nine months) including a vesting schedule the parties had already mutually rejected in May 2020. Ex. 1 ¶ 39.

50. Upon Dussias' review of that draft, he pointed out to Gleckler in a telephone conversation that his membership was effective as of July 1, 2020, and the parties had never agreed to any sort of delayed vesting and had explicitly rejected the concept when it appeared in the May

2020 term sheet prepared by Geckler's attorney. Ex. 1 ¶ 40. Gleckler acknowledged this and agreed. *Id.*

51. On February 15, 2021, Dussias emailed Gleckler and TMG's accountant, Ray Conway, a revised operating agreement. Dx S. The revised document reiterated the 70/30 membership split that parties had agreed upon since 2019 and stated that Dussias' membership had become effective on July 1, 2020. *Id.*

52. On February 16, 2021, while these discussions were occurring, an individual from HSimon emailed Gleckler: "I noticed that Dean Dussias received a draw from the company of [redacted]. Is he a partner? What's his ownership percentage?" Exhibit 47 at HS_000826. Gleckler did not confront Dussias about this information or change Dussias' compensation structure. Ex. 1 ¶ 42.

53. On February 19, 2021, Conway responded with notes on the February 15 draft operating agreement. Exhibit 48. Conway's notes referenced Dussias' "buy-in on 7/1/2020." *Id.* at TMG_00410246. He asked Dussias and Gleckler if they could make Dean's ownership effective "same day as Cedric [Reingold]'s payout in order to avoid becoming a sole proprietorship? Dean could be allocated a $.01 capital interest at that time, with no profits interest until his buy-in on 7/1/2020." *Id.* Gleckler did not dispute that he had bought in on July 1, 2020. Ex. 1 ¶ 43.

54. Gleckler responded to Conway's notes as follows: "Dean is a Member not a Manager. All else I need clarification." Ex. 18.

55. Gleckler, Dussias, and Conway discussed Conway's notes and no one questioned Dussias' ownership in TMG. Ex. 1 ¶ 45.

56. Dussias sent a draft incorporating Conway's comments on February 22, 2021. Ex. 1 ¶ 46; Dx U.

h. **<u>Gleckler Explicitly Told Dussias the GRA Was Terminated and Treated It as Such.</u>**

57. In addition to the fact that Gleckler specifically told Dussias that the GRA was "gone" and that TMG had no operating agreement (*supra* ¶ 18), Gleckler testified that she never intended for Dussias to sign Exhibit C to the GRA because she intended to create a new operating agreement to govern her relationship with Dussias. Dx E, 164:11-165:1, 165:22-23.

58. Gleckler never asked Dussias to sign the GRA or Exhibit C to the GRA. Ex. 1 ¶ 47; Dx E, 156:6-8, 164:11-19. When considering different operating agreement drafts, the parties never compared or redlined them with the GRA. Ex. 1 ¶ 47. After the signing MIPA, Gleckler never suggested that the GRA was operative until this litigation. *Id.*

59. Gleckler referred to the GRA as "the Operating Agreement I had with Cedric." Exhibit 49.

60. The MIPA required that [redacted] Dx E at 149:8-152:9. *See also* Dkt. 90, TMG's Memorandum of Law (claiming that the non-amended GRA is the current operating agreement for TMG).

61. Although the GRA identifies Gleckler as the member of TMG, Gleckler at some point substituted her entity MerriG, LLC as the member. Dx A, p. 9 (identifying Gleckler as member) (*see also* Dx B, [redacted]); [redacted]); Dkt. 38 (Defendants' Local Rule 3.2 Disclosure identifying MerriG, LLC as the sole member of TMG). Gleckler never amended the Exhibits A or B to the GRA to reflect the changed membership. Dx E, 221:18-222:10. Nor did

she execute Exhibit C to admit MerriG. *Id.* Gleckler has no knowledge of any other corporate action or writing by which this change in membership occurred. *Id.*

62. At some point after [redacted], Gleckler re-admitted herself as a member of TMG, individually. Dx E, 217:5-220:1. Gleckler never amended Exhibits A or B to the GRA or executed Exhibit C thereto to effectuate this change and Gleckler has no knowledge of any other corporate action to re-admit her as a member individually. *Id.*

63. At some point prior to December 18, 2023, Gleckler converted TMG from a member-managed LLC to a manager-managed LLC. Exhibit 51, § 12. Gleckler did not amend the GRA to reflect this change and has no knowledge of any other corporate action or writing by which this change occurred. Dx E, 220:20-221:17.

64. At some point in 2012, [redacted] The GRA was never [redacted]. Ex. 1 ¶ 49. [redacted] Dx E, 143:8-12.

**i. <u>Gleckler First Denies Dussias' Membership in Late April 2021.</u>**

65. In late April 2021, Gleckler denied that Dussias was a member of TMG for the first time. Ex. 1 ¶ 50.

66. On May 17, 2021, more than three months after HSimon told Gleckler that Dussias was paid a draw, Gleckler wrote HSimon: [redacted] Exhibit 53 at TMG_00391187-88. HSimon responded: [redacted]

67. Dussias and Defendants had never discussed his being a 1099 independent contractor and never considered him to be one. Ex.1 ¶ 51.

**j. <u>Dussias Contributed Substantially to the Success of TMG.</u>**

68. Between August 2019 and April 2021, Dussias worked with Gleckler to upgrade several of TMG's operational functions so the business could grow; including by leading or managing nearly every facet of TMG's business, including accounting, finance, legal, information technology, taxes, and payroll. Ex. 1 ¶ 3, 52.

69. This included replacing every part of the architecture by which a consumer makes a purchase and receives a product from Kashwere: replacing the website the consumer uses; replacing the software that communicates the purchase from the website to TMG's accounting software; replacing TMG's accounting software Everest with NetSuite; replacing the software that communicates the consumer's website purchase to a warehouse that manages inventory and ships the actual product; replacing the antiquated system by which TMG stored, recorded, and shipped inventory; implementing the transition to all of these new systems; hiring a professional bookkeeper (that TMG still uses); engaging a professional email marketing platform; and hiring professional marketing personnel. Ex. 1 ¶ 53.

70. The new order fulfillment architecture went live on March 3, 2021. *Id.* ¶ 54. It worked well while Dussias was still working at TMG. *Id.* After more than a year of work to get the new systems up and running, once Dussias got them functioning, Gleckler attempted to fire Dussias as though he was an employee on April 22, 2021. *Id.*

71. Gleckler and Dussias spoke roughly twice a day every day on average between August 2019 and April 2021. Ex. 1 ¶ 55. Between May 4, 2019, and April 15, 2021, Gleckler and Dussias exchanged 568 pages of text messages, produced as DHD000429-996. *Id.*

**k. Dussias Has Not Been Compensated for His Interest in TMG.**

72. Dussias has not received a draw or other payment from TMG since April 2021. Ex. 1 ¶ 56. He did not receive a 30% share of TMG's profits for 2021 or any other year. *Id.*

73. Between March 31, 2021, and May 15, 2024, Gleckler [redacted]. Exhibit 54; Dx E, 53:5-16. This includes [redacted] Ex. 54. Gleckler is also [redacted] Dx E, 53:17-54:6.

**l. The Capital Contribution Was Reflected in Systems That Gleckler Regularly Reviewed.**

74. In addition to the fact that Gleckler and Dussias spoke repeatedly about Dussias' capital contribution before he made it and the fact that he told her he was going to make it weeks beforehand (*supra* ¶ 14-15, 21), the capital contribution was disclosed in TMG's Chase account, Chase statements, and accounting software—all of which Gleckler had access to and accessed regularly. Ex. 1 ¶ 57.

75. On or about June 30, 2020, Dussias sent by ACH payment the $20,000 capital contribution to TMG's primary Chase Account ending in 3714. Ex. 1 ¶ 58. The deposit was received in TMG's Chase account on June 30, 2020. *Id.* It was reflected in [redacted] Exhibit 55 at JPM000953; Ex. 1 ¶ 58. Gleckler examined TMG's online Chase account on a near-daily basis. Ex. 1 ¶ 58-59.

76. Documents produced by Chase show [redacted] Exhibit 56 at p. 7 [redacted]

[redacted] Dx E, 222:11-226:13.

77. The capital contribution was also reflected in TMG's accounting system called Everest. Ex. 1 ¶ 59. Gleckler reviewed TMG's financial data in Everest on a daily basis. *Id.* Gleckler had her own customized interface ("dashboard") in Everest that she kept open on her computer at nearly all times. *Id.*

78. In early 2020, Dussias sent TMG's accountant, Ray Conway, a trial balance prepared from the Everest accounting records reflecting his $20,000 capital contribution ("Capital Account DHD"). Exhibit 57 at DHD003749, [redacted] Ex. 1 ¶ 60.

Dated: March 3, 2025

Respectfully submitted,

**DEAN H. DUSSIAS**

By: */s/ Matthew M. Showel*
One of his Attorneys

Mathew M. Showel, Esq. (ARDC No. 6300861)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
mmshowel@gct.law