**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEAN H. DUSSIAS<br><br>Plaintiff,<br><br>v.<br><br>MERRI GLECKLER and TMG KREATIONS, LLC, a Delaware limited liability company, d/b/a KASHWERE<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:21-cv-05709<br><br>Honorable April M. Perry |

**<u>DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT</u>**

James G. Argionis
Corey T. Hickman
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898
jargionis@cozen.com
chickman@cozen.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**


I. Introduction ..... 1

II. The Admission of Dussias as a New Member Required a Signed Writing ..... 1

III. Plaintiff Cites No Authority Permitting Membership by Implication ..... 3

IV. Plaintiff's Argument that the Operating Agreement is "Gone" is Meritless ..... 5

V. The Evidence Establishes There Was No Oral Agreement ..... 6

a. The Parties Never Had a Meeting of the Minds ..... 6

b. An Agreement was Conditioned on a Signed, Written Document ..... 10

VI. Judgment Should Be Granted on Plaintiff's Supplementary Claims ..... 10

VII. Plaintiff's Argument Regarding an Economic "Membership Interest" is Meritless ..... 12

VIII. Plaintiff's Request to Strike Facts Should Be Denied ..... 12

IX. Portions of Plaintiff's Declaration Should Be Stricken and Disregarded ..... 13

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AMPMS Chicago, LLC v. BEDT, LLC*,
Case No. 2022 CH 09167 (Cook County, Ill., Chancery Div.) (Dkt. 90-1) ....4

*Black Horse Capital, LP v. Xstelos Holdings, Inc.*,
CIV.A. 8642-VCP, 2014 WL 5025926 (Del. Ch. Sept. 30, 2014) ....7

*Cont'l Ins. Co. v. Rutledge & Co., Inc.*,
750 A.2d 1219 (Del. Ch. 2000)....6, 7

*Iacono v. Estate of Capano*,
CV 11841-VCL, 2020 WL 3495328 (Del. Ch. June 29, 2020) ....2

*James v. Hale*,
959 F.3d 307 (7th Cir. 2020) ....14

*KIM, Charles, v. FERDINAND CAPITAL LLC.*,
No. 0104915/2005, 2007 WL 2176410 (N.Y. Sup. Ct. July 09, 2007) ....3

M*ickman v. Am. Int'l Processing, L.L.C.*,
CIV.A. 3869-VCP, 2009 WL 891807 (Del. Ch. Apr. 1, 2009) ....3

*Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*,
17 C 8829, 2019 WL 955354 (N.D. Ill. Feb. 27, 2019)....12

*Riverside Risk Advisors LLC v. Chao*,
2019-0789-KSJM, 2022 WL 14672745 (Del. Ch. Oct. 26, 2022)....2, 4, 11

*Robinson v. Darbeau*,
CV 2019-0853-KSJM, 2021 WL 776226 (Del. Ch. Mar. 1, 2021) ....2

*Seshadri v. Kasraian*,
130 F.3d 798 (7th Cir.1997) ....13

*SMS Fin. Recovery Services, LLC v. Canelo*,
21-CV-04000, 2023 WL 2161660 (N.D. Ill. Feb. 22, 2023) ....13

## Statutes

Del. Code § 18-101(9) ....5

Del. Code § 18-301(b)(1)....1

Delaware LLC Act....4, 5

## I. Introduction

Defendants' Motion for Summary Judgment put Plaintiff on clear notice that his claims lack any good faith basis in law or fact. Unsurprisingly, Plaintiff's response doubles down, advancing absurd arguments contrary to the law and the undisputed documentary evidence. Plaintiff's arguments should not be well taken. Summary judgment should be granted.

## II. The Admission of Dussias as a New Member Required a Signed Writing

Plaintiff does not contest that TMG's Operating Agreement conditioned the admission of a new member on a signed, written document and the unanimous consent of all members. (RSOF ¶¶ 6, 7).[1] While Delaware law permits oral or implied operating agreements, it clearly provides that *where there is already a written operating agreement*, its terms must be followed to admit a new member. It is undisputed that no writing was ever agreed upon or signed. (RSOF, ¶¶ 60-61). Notwithstanding these undisputed facts, Plaintiff claims he became a member of TMG because Gleckler – who has stated all along that she anticipated Plaintiff would become a member, *but only after a final written agreement was reached and signed* in order to protect her from disputes like the one she had with her prior co-owner – called him an "owner" or a "partner" during the time they were exchanging terms sheets and draft amended operating agreements. (RSOAF ¶¶ 27-28). Plaintiff's theory lacks merit.

Plaintiff's recitation of Delaware law is simply wrong. While Delaware permits an operating agreement to be oral or implied, where a written operating agreement is already in place, a new member may be admitted only "at the time provided in and upon compliance with the limited liability company agreement . . ." 6 Del. Code § 18-301(b)(1). Indeed, Judge Lee recognized this

[1] Defendants' statement of facts is referred to herein as the "SOF." Plaintiff's response to Defendants' SOF is referred to herein as the "RSOF." Plaintiff's statement of additional facts is referred to herein as the "SOAF." Defendants' response to Plaintiff's SOAF is referred to herein as the "RSOAF."

in his ruling denying TMG's motion to dismiss, finding that a "writing" may provide for the admittance of a new member so long as the person "complies with the conditions for becoming a member," and finding that Dussias alleged "through a series of writings and agreements (which may reasonably be inferred were *in writing*)" that those conditions were met. (Dkt. 16). Plaintiff cites no law – because none exists – that simply allows the express conditions precedent to membership set forth in a written, existing operating agreement, to be completely ignored.

*Riverside Risk Advisors LLC v. Chao*, 2019-0789-KSJM, 2022 WL 14672745, at *20 (Del. Ch. Oct. 26, 2022), is on all fours with this case. There, the Court analyzed whether a party could be deemed an implied member of an LLC that was governed by *the same form operating agreement from LegalZoom as the TMG Operating Agreement*. The Court rejected the same argument raised by Plaintiff here regarding Delaware law, holding: "the fact that an LLC agreement *may* be oral or implied does not change the fact that Riverside had a written agreement. Put differently, even though LLC agreements do not have to be written, the founding Riverside Members executed a written agreement that established terms for admitting new members. That agreement governs." *Id.* at *20. The Court ultimately held that, under the same Section 7.2 as the TMG Operating Agreement, "for Chao to become a Member under the LegalZoom Agreement, written consent of all Riverside Members would have been necessary and Chao would have needed to agree in writing to be bound by the LegalZoom Agreement. Neither happened, so Chao did not become a Member under the LegalZoom Agreement." *Id.* at *21.

The cases cited by Plaintiff are wholly inapposite and misleading. In *Robinson v. Darbeau*, CV 2019-0853-KSJM, 2021 WL 776226, at *9 (Del. Ch. Mar. 1, 2021), the Court found an implied operating agreement where the company "has never had a written limited liability company agreement." *Id.* at *9. Similarly, *Iacono v. Estate of Capano*, CV 11841-VCL, 2020 WL 3495328,

at *1, 11 (Del. Ch. June 29, 2020) involved an attempt to enforce an oral agreement to create a joint venture where there was no existing joint venture agreement or operating agreement. In M*ickman v. Am. Int'l Processing, L.L.C.*, CIV.A. 3869-VCP, 2009 WL 891807, at *2 (Del. Ch. Apr. 1, 2009), the Court analyzed whether, for purposes of a records request, the plaintiff was an *initial* member of the LLC at the time the operating agreement was executed. The same is true of *KIM, Charles, v. FERDINAND CAPITAL LLC.*, No. 0104915/2005, 2007 WL 2176410 (N.Y. Sup. Ct. July 09, 2007), in which the Court analyzed whether the plaintiff was an *initial* member of an LLC. These cases had nothing to do with the admittance of a new member after formation and whether the express conditions for doing so set forth in an existing operating agreement were met.

There is simply no legitimate basis for Plaintiff to claim that an oral or "implied operating agreement" can supplant an existing, integrated operating agreement, especially where that written agreement provides that it cannot be modified except in writing. (RSOF, ¶ 8). It is ***undisputed*** that neither condition of the Operating Agreement was satisfied – Plaintiff did not sign any writing adopting the Operating Agreement, and TMG's members (Gleckler) did not give unanimous ***written*** consent to Dussias' admittance. Summary judgment is therefore appropriate on all claims.

## III. Plaintiff Cites No Authority Permitting Membership by Implication

Defendants' Motion cited ample case law holding that there is no such thing as membership in an LLC by implication or conduct. Plaintiff cites *no* authority in his response recognizing such a theory, and yet spends the majority of his brief citing to irrelevant facts regarding how Gleckler referred to him or other conduct of the parties, arguing that this establishes his membership.

As discussed above, none of the cases cited by Plaintiff found that a party could circumvent the express conditions precedent to admitting a new member in an existing, integrated operating agreement. Those cases involved scenarios where there was no operating agreement or where a

party claimed to be an initial member of an LLC. No case supports that express conditions in a written operating agreement can simply be cast aside to permit a party to become a member.[2]

Rather than address the cases cited by Defendants head on, Plaintiff instead merely argues that they are "inapplicable" because they either involved a different State's LLC statute or were at a different procedural posture. This is unsurprising, as there is no basis to distinguish these cases on the merits, nor is there any support for Plaintiff's theory. As Judge Cohen succinctly and correctly stated in analyzing the Illinois LLC Act, which is effectively the same as Delaware's: "The Act does not allow a person to become a member of a limited liability company by implication . . . Because Plaintiff did not comply with the requirements of the Operating Agreement, it is not a member." *AMPMS Chicago, LLC v. BEDT, LLC*, Case No. 2022 CH 09167 (Cook County, Ill., Chancery Div.) (Dkt. 90-1). Delaware law is in accord. *See Riverside Risk*, 2022 WL 14672745 at *21 ("Indisputably, the Frosts did not execute a written consent. Nor did Chao execute a consent agreeing to be bound by the terms of the LegalZoom Agreement. Thus, Chao was not admitted as a Member under the terms of the LegalZoom Agreement.").

Nor does Plaintiff's "waiver" argument hold any water. The section of the Delaware LLC Act Plaintiff relies on, 6 Del. Code. 18-106(e), does not even apply because it was newly added in August 2021, more than a year after Dussias claims he "became" a member. And even if it did, there is no competent evidence, whatsoever, of any waiver of the requirements of the Operating Agreement. To the contrary, Gleckler repeatedly made clear *in writing* to Dussias that a formal, signed agreement was a condition to Plaintiff's membership. The term sheets expressly stated as such. (RSOF, ¶¶ 21, 29). Drafts of a formal amended operating agreement were prepared and sent

---

[2] Dussias also incorrectly argues that the breadth of his responsibilities when he was employed by TMG establish his membership. Dussias was hired as TMG's President, and in that role, he was given many responsibilities, including access to TMG's payroll and financial systems. That the President of a company had important responsibilities and access to the company's systems is hardly evidence of ownership.

to Dussias. (RSOF, ¶¶ 41-60). Gleckler's attorneys and Gleckler herself communicated multiple times to Dussias, in writing, that a signed operating agreement was required. (RSOF, ¶¶ 19; RSOAF, ¶ 19). Plaintiff's suggestion that Gleckler demonstrated an intent to waive the conditions of the Operating Agreement, despite the parties exchanging two term sheets and five draft amended operating agreements clearly demonstrating that a writing was being negotiated, is absurd.[3]

## IV. <u>Plaintiff's Argument that the Operating Agreement is "Gone" is Meritless</u>

Plaintiff's response argues a new theory, not alleged in the Complaint, that the Operating Agreement is somehow not in effect because Gleckler purportedly told Dussias it was "gone" after her prior partner exited the company. Dussias' theory is not only meritless, but it contradicts his Complaint, in which he alleges that the Operating Agreement governs. (Dkt. 1-3, ¶¶ 35-41, 56-57). This attempt to argue outside the allegations in his Complaint is telling.

Contrary to Plaintiff's argument (which is unsupported by any case law) that a single-member LLC can simply wish away an operating agreement, the Delaware LLC Act provides that every LLC and its members are "bound by the limited liability company agreement," and that a "limited liability company agreement of a limited liability company having only 1 member shall not be unenforceable by reason of there being only 1 person who is a party to the limited liability company agreement." 6 Del. Code § 18-101(9). The Operating Agreement itself provides that it "shall not be modified or amended in any respect except by a written instrument executed by all

[3] Plaintiff also points to Gleckler's purported failure to properly amend the Operating Agreement following her former co-owner's departure, and when she added herself as a member (Gleckler signed the Operating Agreement originally on behalf of MerriG, LLC, and MerriG, LLC was a named plaintiff in the 2018 lawsuit against Cedric Reingold). These examples are not relevant because they are completely unrelated to the instant dispute, did not involve Dussias, and did not involve the admission of a person as a new member. Gleckler adding *herself* or her *own LLC* as a member is not equivalent to admitting a third party as a 30% owner in the company, and certainly does not demonstrate a clear and unequivocal intent to waive any requirements in the Operating Agreement as to Dussias. (RSOAF, ¶¶ 60-64).

of the Members." (SOF ¶ 8). Gleckler therefore was bound by the Operating Agreement and had no ability to cast aside the entire document by purportedly saying it was "gone" to a third party.

Even if this were possible, the evidence does not even remotely support a finding of oral modification. "A party asserting an oral modification must prove the intended change with 'specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.'" *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000). This is a "high evidentiary burden." *Id.* (granting summary judgment and rejecting oral modification argument supported by self-serving affidavits). Here, the evidence shows that Gleckler attempted to comply with the Operating Agreement by having a written amendment agreed upon and executed by her and Plaintiff. (RSOAF, ¶¶ 27-28). The Gleckler Term Sheet was entitled "REVISED AND RESTATED OPERATING AGREEMENT," and discussed the preparation of an "Amended and Restated Operating Agreement." (RSOF ¶ 21). Each of the draft amended operating agreements prepared by Gleckler was entitled "AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT." (RSOF ¶¶ 41, 57). The only evidence Dussias offers is the purported vague statement that the Operating Agreement was "gone." That is not clear evidence that leaves "no doubt of the intention," especially when Gleckler's drafts were entitled "amended" or "restated" operating agreement.

## V. <u>The Evidence Establishes There Was No Oral Agreement</u>

### a. *The Parties Never Had a Meeting of the Minds*

The documentary evidence in this case is undisputed and provides another basis for summary judgment. The parties exchanged multiple communications in 2019 regarding proposed terms. (RSOF, ¶ 18; RSOAF, ¶ 7). The parties exchanged term sheets in May and June 2020 that contained materially different terms, and that unambiguously conditioned any agreement on a signed, formal writing. (RSOF, ¶¶ 19-33). Neither term sheet was signed. (*Id.*). The parties then

exchanged multiple draft amended operating agreements in 2021. (RSOF, ¶¶ 39-61). Those draft amended operating agreements also contained materially different terms, with Gleckler's versions mirroring the terms in the Gleckler Term Sheet from May 2020, and Dussias' versions mirroring the terms in the Dussias Term Sheet from June 2020. (*Id.*). Plaintiff does not dispute that no version was ever agreed upon or signed. (RSOF, ¶¶ 60-61).[4] These undisputed facts should end the inquiry.

Recognizing that the undisputed documentary evidence dooms his claims, Dussias attempts to create a question of fact by submitting a broad, 61-paragraph self-serving declaration stating that, despite all of the drafts exchanged back and forth in 2020 and 2021, the parties actually reached a final oral agreement via phone calls in June 2020 – an agreement that he conveniently claims adopted all of his term sheet,[5] and not Gleckler's term sheet. (Dussias Decl., ¶¶ 11-12). Dussias' story does not preclude summary judgment in light of the documentary record. The existence of a contract under Delaware law is determined by "overt manifestations of assent – not subjective intent." *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, CIV.A. 8642-VCP, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014). Assent "is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent." *Id.* The Court should rely on "objective, contemporaneous evidence." *Id.* There is no such evidence here to support Plaintiff's after-the-fact story.

Plaintiff cannot point to a single contemporaneous document to support the existence of an agreement. Nor has he produced any phone records or documents establishing that these purported

[4] Plaintiff fails to even address Defendants' argument that, under the "mirror image" rule, each subsequent draft was a rejection and counter-offer, and none was ever accepted or signed. Summary judgment may be granted on this additional basis.

[5] To the extent Plaintiff is arguing that the purported oral agreement to become a member was something other than a "limited liability company agreement" under the Delaware LLC Act, his claim is barred by the Statute of Frauds because it could not have been performed within one year. *See* 6 Del. C. § 18-101(9).

June 2020 phone calls actually occurred. All of the contemporaneous, documentary evidence establishes that there was no meeting of the minds on the material terms. There would be no reason for the parties to retain separate counsel and exchange multiple draft amended operating agreements with materially different terms if an agreement had already been finalized. Dussias' spin aside, the documents establish, as a matter of law, that the parties were negotiating for multiple years and simply never reached an agreement before the deal fell apart.

Plaintiff argues that the material differences between the parties' draft amended operating agreements somehow support the existence of an oral agreement because Gleckler's drafts were "outliers" given they included a vesting schedule. (Response, p. 6). This argument lacks any merit. It can just as easily be said that Dussias' versions were the "outliers," and in fact, the evidence supports this. In May 2020, Gleckler's attorneys prepared and sent Dussias the Gleckler Term Sheet that contemplated a three-year vesting schedule. (RSOF, ¶¶ 19, 24). Dussias had previously acknowledged in an email that the proposed transaction documents *would be prepared by Gleckler's attorneys,* yet he never requested clarification on the vesting schedule or responded to Gleckler's attorneys regarding this provision, instead purposely keeping them out of the loop because "the lawyers aren't the decision-makers." (RSOF, ¶¶ 18, 62). Dussias argues that an oral agreement was reached in June 2020, one month *after* the Gleckler Term Sheet was sent to him. (Response, p. 10). The draft amended operating agreements prepared by Glecker and her counsel in 2021 contained *the same terms as the term sheet* her counsel prepared a month *before* Dussias claims an agreement was reached in June 2020. (RSOF, ¶¶ 42, 58). In other words, Gleckler proposed the same terms both before and after Dussias claims an agreement was reached in June 2020. These are not "outliers," but establish as a matter of law that no agreement was reached.

Dussias further contends that the conduct of the parties is proof of a meeting of the minds. Dussias is wrong. Dussias adduced no evidence of any particular statement or document specifically describing the terms of any oral agreement, instead referring to his own unilateral conduct (making a deposit into TMG's bank account without Gleckler's knowledge and admittedly changing his own status in the payroll system to a 30% owner and changing his method of compensation) and one-off statements from Gleckler that he claims prove an agreement to acquire a membership interest. (SOF, ¶¶ 37, 52). Not only does such conduct fall woefully short of establishing an enforceable contract, but Dussias' characterization of Gleckler's statements is completely misleading. For example, he cites repeatedly to Gleckler's statement in an email that "Dean is a member, not a Manager." (Response, pp. 1, 4, 6, 13). Dussias fails to disclose to the Court, however, that this email was sent in relation to a draft operating agreement prepared by Dussias in which he listed himself as a manager, and Gleckler was merely clarifying that any agreement would make Dussias a member, and not a manager. (RSOAF, ¶ 31). The drafts from Gleckler's lawyers were always consistent on the point that if a writing were ever agreed upon and executed, Gleckler would be the sole manager. (RSOF ¶¶ 24, 43). In no way can this email be perceived as some sort of admission that Dussias was already a member in TMG.

Similarly, Plaintiff also points to emails Gleckler sent referring to a "handshake agreement" or a "side agreement." (Response, pp. 1, 5, 10). These statements are also red-herrings. The "handshake agreement" comment was a text message Gleckler sent in December 2019 *before Plaintiff even claims there was an oral agreement reached*, and in which Gleckler expressed to Dussias that he cannot sign legal documents until a final, formal agreement is reached: "We don't have you on any legal paperwork, so how can you sign a document without my signature? That does not seem kosher? Does Tam know that we only have a handshake agreement to date?"

(RSOAF ¶ 46). Similarly, the "side agreement" comment was made in July 2019, also before Dussias claims an enforceable agreement was reached, and was contained in Dussias' own proposal to Gleckler that was retyped and circulated. (RSOAF, ¶ 7). Dussias admits no "side agreement" was ever created. (*Id.*). Gleckler's statement that "Dean and I have an agreement but no formal ownership contract" is more of the same. There is nothing in that statement indicating an agreement on specific terms, especially when at the same time competing drafts were being exchanged. That is Gleckler again making clear, as she did time and time again, that a signed contract was necessary before Dussias could be admitted as a new member. (RSOAF, ¶ 48).

To be sure, Gleckler has admitted from the beginning that she often referred to Dussias as an "owner" or "partner" because she fully expected the negotiations to be successful and for Dussias to ultimately become a member upon a final written agreement being reached and signed. (RSOAF, ¶ 28). But that did not occur, and merely using those words does not establish a meeting of the minds on all material terms, especially given the extensive, ongoing negotiations.

**b.** ***An Agreement was Conditioned on a Signed, Written Document***

Based on the same misleading emails, Dussias claims that Gleckler did not condition any agreement on a formal, signed written contract. Dussias' argument lacks any merit. Loose language in an email does not trump the *written, draft contractual documents* exchanged between the parties, which state – explicitly – that any agreement is *conditioned* on a final, signed contract, and/or which had signature lines for the parties to indicate their assent. (RSOF, ¶¶ 21, 29, 39-61).

## VI. Judgment Should Be Granted on Plaintiff's Supplementary Claims

Plaintiff offers no viable arguments for any of his supplementary claims. As merely a former employee of TMG, Plaintiff is not entitled to an accounting or constructive trust. Plaintiff has no ownership interest in TMG and in turn, TMG owes him no fiduciary duties that could support such a request. Plaintiff's argument regarding his claim for breach of fiduciary duty is

baffling. TMG is an LLC, yet Dussias now argues that he somehow was in a joint venture with Defendants because he was employed by TMG. Clearly, that is not the law. Dussias was merely an employee of TMG and is owed no fiduciary duty. Dussias also cannot even meet the elements of a joint venture because he had no "joint proprietary interest in" TMG and, because he was not a member, had no "right to share in profits" or a "duty to share in the losses." (Response, p. 17). Allowing Plaintiff's argument to proceed would grant any employee the ability to claim a joint venture to circumvent the law that mere employees are not owed fiduciary duties.

Plaintiff further argues that his unjust enrichment claim should stand because he "took reduced compensation to join TMG" and he "has not received his 30% interest in profits." (Response, p. 19). But absent any membership interest, Dussias was never entitled to "30% interest in profits" or anything on top of the salary he was indisputably paid.[6]

Finally, Dussias' promissory estoppel claim fails as matter of law because it "suffers the same flaw as [his] other claims—[he] has failed to prove the existence of an actionable promise that was not fulfilled." *Riverside Risk*, 2022 WL 14672745 at *33. In *Riverside*, on similar facts the Court entered judgment on a promissory estoppel claim because "any promise that Chao would receive perpetual equity in Riverside was not definite enough on material terms to satisfy the first element." *Id.* Here, Dussias cannot show any unambiguous promise given the documentary evidence showing extensive, ongoing negotiations, and his own admission that the terms of any purported agreement were not reached until June 2020, a year after he began working for TMG. Further, any purported reliance by Dussias was not reasonable given that he is a sophisticated

[6] Moreover, there is no evidence in the record of any purported higher-paying job Dussias could have had if he did not join TMG. His declaration vaguely states that he "had been paid more than $450 per hour" for a "consulting engagement" earlier in the year, but he does not disclose that engagement or state that he had additional consulting jobs lined up. (Dussias Aff., ¶ 6). Dussias' averments are also improper and inadmissible given that he did not disclose any information in discovery regarding his compensation received at any other job. (RSOAF, ¶ 6).

businessman with substantial experience in contracts who certainly understood that the purpose of those negotiations was to reach a final, signed written agreement. (RSOF, ¶¶ 22, 30, 79).

## VII. Plaintiff's Argument Regarding an Economic "Membership Interest" is Meritless

Dussias' last-ditch argument that, even if he is not deemed a member, he should be credited with an economic "Membership Interest" in TMG, also fails as a matter of law. First, Plaintiff's interpretation that there is a difference between a "voting 'Member' and an economic 'Membership Interest'" is simply wrong. The Operating Agreement defines a "Membership Interest" as a "Percentage Interest," which in turn is defined as a "percent ownership in the Company entitling the holder to an ***economic and voting interest*** in the Company." (SOF at Ex. A thereto, p. 2) (emphasis added). Thus, a "Membership Interest" is an economic and voting interest.

Further, the Operating Agreement expressly provides that "a person may acquire a Membership Interest directly from the Company upon the written consent of all Members." (RSOF ¶ 6). As discussed at length above, it is undisputed that this condition precedent did not occur. Therefore, Plaintiff could not have acquired a Membership Interest in TMG.

## VIII. Plaintiff's Request to Strike Facts Should Be Denied

There is no basis to strike any of the evidence offered by Defendants. It is well-settled that on summary judgment, "evidence need not be admissible in form, but must be admissible in content." *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 17 C 8829, 2019 WL 955354, at *10 (N.D. Ill. Feb. 27, 2019). Evidence may be stricken only if it "cannot be presented in a form that would be admissible in evidence." *Id.* (citing Fed. R. Civ. P. 56(2). Where a document can be authenticated or a foundation can be established *at trial* such that it would be admissible, it should be considered on summary judgment. *Id.* (citations omitted).

Here, all of the evidence in question pertains to documents that can be presented in admissible form at trial. If this case goes to trial, Defendants will put forth a custodian of records

who will authenticate Exhibit M (images from TMG's payroll software) and establish it is a record of a regularly conducted activity. Defendants will also call the parties' transactional attorneys at trial who can authenticate Exhibits W, X, Y (draft amended operating agreements) and Exhibit Z (termination letter to Dussias).[7] There is no basis to strike any of Defendants' exhibits and statements because they are all capable of being made admissible at trial.

## IX. <u>**Portions of Plaintiff's Declaration Should Be Stricken and Disregarded**</u>

Plaintiff's declaration cannot defeat summary judgment given that it is contradicted at every turn by the documentary evidence. *See SMS Fin. Recovery Services, LLC v. Canelo*, 21-CV-04000, 2023 WL 2161660, at *4 (N.D. Ill. Feb. 22, 2023) ("[A] nonmoving party at the summary judgment stage cannot rest upon conclusory statements in affidavits; [they] must go beyond the pleadings and support [their] contentions with proper documentary evidence.") (collecting cases and disregarding affidavit on summary judgment that is not supported by the documents of record); *see also Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir.1997) (confirming that witness testimony may be rejected on summary judgment if it is contradicted by the documentary evidence or if it is internally inconsistent or implausible, and that testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it).

Portions of Plaintiff's declaration are inadmissible and improper for two additional reasons. First, much of Plaintiff's declaration consists of his own apparent out-of-court oral conversations with Gleckler regarding the alleged negotiations, that are offered for the truth of the matter asserted. There is no hearsay exception to admit a party's own statements. And there are no specific statements of Gleckler's that have any foundation to be admitted as statements of a party opponent. For example, Dussias concludes without support that during phone conversations, "Gleckler and I

[7] Dussias' counsel responded directly to the letter contained in Exhibit Z with his own letter setting forth Dussias' flawed positions. Any claim that Exhibit Z lacks foundation is disingenuous at best.

finalized the terms of my membership . . . The terms were finalized as follows . . ." (Dussias Aff., ¶ 11). As stated in Defendants' RSOAF, paragraphs 4, 9, 11-12, 15, 19-20, 28, 31-33, and 40 of Dussias' declaration should be stricken because they contain inadmissible hearsay.

Second, recognizing that his deposition testimony undermined his position, Plaintiff now attempts to course correct by contradicting certain prior sworn testimony. A district court should "disregard a 'sham' affidavit" that "contradicts prior deposition testimony" or "other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). The purpose of the rule is to "weed out unfounded claims" by preventing a party from "conjur[ing] out of nothing" a genuine issue of fact to defeat summary judgment. *Id.*

Here, Dussias testified during his deposition that he had between 2 and 11 phone conversations with Gleckler between May 7 and June 7, 2020, during which an oral agreement was reached. (RSOF, ¶ 14). This timing, of course, makes no sense considering that Dussias sent the Dussias Term Sheet to Gleckler on the evening of June 7, 2020. (RSOF, ¶ 29). Now, in an attempt to fix this timing contradiction, Dussias changes his story yet again, claiming that the calls occurred "between June 6 and 15, 2020." (Dussias Aff., ¶ 11). He also fails to attach (and has not produced) any phone records, phone or Zoom screenshots, or any other information to corroborate that any of these calls actually occurred. Dussias should not be permitted to change his story at this juncture. As detailed in the RSOAF, paragraphs 4, 11-12, and 15 of Dussias' declaration should be stricken pursuant to the "sham affidavit" rule.

Dated: March 17, 2025

Respectfully submitted,

COZEN O'CONNOR

*<u>/s/ James G. Argionis</u>*
Attorney for Defendants

James G. Argionis
Corey T. Hickman
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898
jargionis@cozen.com
chickman@cozen.com

## CERTIFICATE OF SERVICE

I, James G. Argionis, an attorney, hereby certify that on March 17, 2025, I filed the foregoing **Reply in Further Support of Motion for Summary Judgment** electronically, via Electronic Case Filing (ECF), which shall send notice to all counsel of record.

/s/ *James G. Argionis*